# APPENDIX

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-549-502
Scope Inquiry
**Public Document**
E&C/OVII:  LA

June 30, 2020

| | |
|---|---|
| **MEMORANDUM TO:** | James Maeder<br>Deputy Assistant Secretary<br>  for Antidumping and Countervailing Duty Operations |
| **THROUGH:** | Melissa G. Skinner<br>Senior Director, Office VII<br>Antidumping and Countervailing Duty Operations |
| **FROM:** | Leo Ayala<br>International Trade Compliance Analyst, Office VII<br>Antidumping and Countervailing Duty Operations |
| **RE:** | Antidumping Duty Order on Circular Welded Carbon Steel Pipes and Tubes from Thailand:  Final Scope Ruling on Line Pipe and Dual-Stenciled Standard and Line Pipe |

**SUMMARY**

Based on the analysis below, we recommend that the Department of Commerce (Commerce) find that line pipe is not within the scope of the antidumping (AD) duty order (*Order*) on circular welded pipes and tubes (CWP) from Thailand.[1]  We also recommend that products which are dual-stenciled[2] as standard pipe and line pipe are within the scope of the *Order*.  We recommend that you approve the positions described in the "Final Scope Ruling" section of this memorandum.  Below is a list of the issues in this scope ruling for which we received comments from interested parties:

Comment 1:  Consideration of the (k)(1) sources
Comment 2:  Line pipe and dual-stenciled standard and line pipe
Comment 3:  Date of initiation

---

[1] *See Antidumping Duty Order; Circular Welded Carbon Steel Pipes and Tubes from Thailand,* 51 FR 8341 (March 11, 1986) (*Order*).

[2] Standard pipe and line pipe often require physical and mechanical characteristics that overlap.  Specifically, a pipe may be dual-stenciled, *i.e.*, certified that the product complies with two different industry specifications, such as ASTM A53 and API 5L, which are applicable for standard pipe and line pipe, respectively.



## BACKGROUND

On February 24, 2020, Commerce issued a Preliminary Scope Ruling.[3] In the Preliminary Scope Ruling, Commerce found, pursuant to 19 CFR 351.225(k)(1), that line pipe is not covered by the scope of the *Order*, but that products which are dual-stenciled as standard pipe and line pipe are within the scope of the *Order*.[4] On March 23, 2020 and March 30, 2020, Commerce received case briefs from Wheatland Tube Company (Wheatland) and Saha Thai Steel Pipe (Public) Company, Ltd. (Saha Thai), respectively.[5] On April 9, 2020, Commerce received scope rebuttal briefs from Wheatland and Saha Thai.[6]

## SCOPE OF THE *ORDER*

The products covered by the order are certain circular welded carbon steel pipes and tubes from Thailand. The subject merchandise has an outside diameter of 0.375 inches or more, but not exceeding 16 inches, of any wall thickness. These products, which are commonly referred to in the industry as "standard pipe" or "structural tubing" are hereinafter designated as "pipes and tubes." The merchandise is classifiable under the Harmonized Tariff Schedule of the United States (HTSUS) item numbers 7306.30.1000, 7306.30.5025, 7306.30.5032, 7306.30.5040, 7306.30.5055, 7306.30.5085 and 7306.30.5090. Although the HTSUS subheadings are provided for convenience and purposes of U.S. Customs and Border Protection (CBP), the written description of the merchandise subject to the order is dispositive.

## DESCRIPTION OF MERCHANDISE SUBJECT TO THIS SCOPE INQUIRY

The scope of this *Order* covers "pipes and tubes," commonly referred to as "standard pipe" and "structural tubing," limited by the dimensional requirements stated in the scope of the *Order*. The Petition describes "standard pipe" as:[7]

> {A} general-purpose commodity used in such applications as plumbing pipe, sprinkler systems and fence posts and is commonly referred to in the industry as a standard pipe. It may be supplied with an oil coating (black pipe) or may be galvanized, and is sold in

---

[3] *See* Memorandum, "Antidumping Duty Order on Circular Welded Carbon Steel Pipes and Tubes from Thailand: Preliminary Scope Ruling on Line Pipe and Dual-Stenciled Standard and Line Pipe," dated February 24, 2020 (Preliminary Scope Ruling).
[4] *Id.*
[5] *See* Wheatland's Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Case Brief," dated March 23, 2020 (Wheatland's Case Brief); *see also* Saha Thai's Letter, "Saha Thai's Scope Inquiry Case Brief Circular Welded Carbon Steel Pipe and Tubes from Thailand," dated March, 30, 2020 (Saha Thai's Case Brief).
[6] *See* Wheatland's Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Rebuttal Brief," dated April 9, 2020 (Wheatland's Rebuttal); *see also* Saha Thai's Letter, "Saha Thai's Scope Inquiry Rebuttal Brief Circular Welded Carbon Steel Pipe and Tubes from Thailand," dated April 9, 2020 (Saha Thai's Rebuttal).
[7] *See* Wheatland's Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Response to July 29, 2019 Request for Comments," dated August 26, 2019 (Wheatland's August 26 Comments) at Exhibit 3: Petitioners' Letter, "Petition for the Imposition of Antidumping Duties: Certain Welded Carbon Steel Pipe and Tube Products from Thailand," dated February 28, 1984 (Petition), at 6-7, filed on behalf of the Committee on Pipe and Tube Imports, its sub-committees and constituent members (petitioners).

plain ends, threaded, threaded and coupled, or beveled for welding form. (These products are generally produced to ASTM specifications A-120, A-53, or A-135.)[8]

Further, the International Trade Commission (ITC), in its final injury determination,[9] defined the merchandise subject to its injury investigation for pipes and tubes from Thailand:

> The imported pipe and tube products that are the subject of these investigations are circular welded carbon steel pipes and tubes over 0.375 inch but not over 16 inches in outside diameter, which are known in the industry as standard pipes and tubes. Standard pipes and tubes are intended for the low-pressure conveyance of water, steam, natural gas, air, and other liquids and gases in plumbing and heating systems, air-conditioning units, automatic sprinkler systems, and other related uses. They may also be used for light load-bearing or mechanical applications, such as for fence tubing. These steel pipes and tubes may carry fluids at elevated temperatures and pressures but may not be subjected to the application of external heat. They are most commonly produced to ASTM specifications A-120, A-53, and A-135.[10]

This scope inquiry covers "line pipe" with outside diameters of 0.375 inch or more, but not exceeding 16 inches, produced in Thailand.[11] "Line pipe," as described in the Petition, "is produced to API specifications for line pipe, API-5L or API{-}5X."[12] The ITC stated that "{l}ine pipes and tubes are used for the transportation of gas, oil, or water, generally in pipeline or utility distribution systems. They are most commonly produced to API specification 5L."[13]

Further, pipe may be dual-stenciled as both "standard pipe" and "line pipe," *i.e.*, identified to indicate compliance with two different industry specifications, as conforming to industry standards for both standard pipe and line pipe, such as ASTM A53 and API 5L.

---

[8] *See* Wheatland's August 26 Comments at Exhibit 3: Petition at 12.
[9] *See* Saha Thai's Letter, "Saha Thai's Comments on 'Line Pipe' Scope Inquiry Circular Welded Carbon Steel Pipe and Tubes from Thailand," dated August 26, 2019 (Saha Thai's August 26 Comments) at Attachment 5: "*Certain Welded Carbon Steel Pipes and Tubes from Turkey and Thailand: Determinations of the Commission In Investigation No. 701-TA-253 (Final) Under the Tariff Act of 1930, Together With the Information Obtained in the Investigation; and Determination of the Commission In Investigation No. 731-TA-252 (Final) Under the Tariff Act of 1930, Together With the Information Obtained In the Investigation*, USITC Publication 1810 (February 1986) (*ITC Final Injury Determination*).
[10] *See ITC Final Injury Determination* at I-1 to I-2.
[11] *See* Memorandum, "Antidumping Duty Order on Circular Welded Carbon Steel Pipes and Tubes from Thailand: Self Initiation of Scope Inquiry on Line Pipe and Dual-Stenciled Standard Line Pipe," dated November 22, 2019 at 4 (Scope Inquiry Initiation).
[12] *See* Petition at 12. Line pipe was included in the Petition, however, because record information demonstrated that no line pipe was produced in Thailand at that time, the petitioners withdrew their request for the imposition of antidumping duties on line pipe from Thailand. *See* Saha Thai's August 26 Comments at Attachment 14: Petitioners' Letter, "Certain Welded Carbon Steel Circular Pipe and Tube Products from Thailand and Venezuela: Partial Withdrawal of Petition," dated March 14, 1985.
[13] *See ITC Final Injury Determination* at II-1.

The following diagram from Saha Thai is helpful to conceptually illustrate the overlap between the industrial standards which result in a dual-stenciled product.[14]



**FINAL SCOPE RULING**

Legal Framework

In determining if merchandise is covered by the scope of an AD and/or countervailing duty order, Commerce will first examine the plain language of the underlying order to determine if it is dispositive of the matter.[15]  Pursuant to its regulations, Commerce may also examine other information, including the description of the merchandise contained in the petition, the descriptions of the merchandise in the initial investigation, and prior scope determinations made for the same product.[16]  If Commerce determines that these sources are sufficient to decide the matter, it will issue a final scope ruling as to whether the merchandise is covered by the *Order*.[17]

Conversely, where the descriptions of the merchandise in the sources described in 19 CFR 351.225(k)(1) are not dispositive, Commerce will consider the five additional factors set forth at 19 CFR 351.225(k)(2).[18]  These factors are:  (i) the physical characteristics of the merchandise; (ii) the expectations of the ultimate purchasers; (iii) the ultimate use of the product; (iv) the channels of trade in which the product is sold; and (v) the manner in which the product is advertised and displayed.[19]  The determination as to which analytical framework is most appropriate in any given scope proceeding is made on a case-by-case basis after consideration of all evidence before Commerce.

---

[14] *See* Saha Thai's Case Brief at 5.
[15] *See Tak Fat Trading Co. v. United States*, 396 F. 3d 1378, 1383 (Fed. Cir. 2005) ("a predicate for the interpretive process is language in the order that is subject to interpretation,") (quoting *Duferco Steel, Inc. v. United States*, 296 F. 3d 1087, 1097 (Fed. Cir. 2002)).
[16] *See* 19 CFR 351.225(k)(1).
[17] *See* 19 CFR 351.225(d).
[18] Four of the regulatory factors originate from a Court of International Trade holding - *Diversified Products Corp. v. United States*, 572 F. Supp. 883 (CIT 1983) (*Diversified Products*).
[19] *See* 19 CFR 351.225(k)(2).

4

Analysis of Comments

**Comment 1: Consideration of the 19 CFR 351.225 (k)(1) sources.**

*Wheatland's Case Brief:*

- Commerce's preliminary determination erroneously found that regular line pipe is outside the scope of the *Order*. Commerce should find that the plain language of the *Order* covers both regular line pipe and dual-stenciled pipe.[20]
- There is no requirement that Commerce look beyond the plain language of the scope, to the sources listed under 19 CFR 351.225(k)(1), such as the description of merchandise contained in the Petition, the investigation, and other proceedings conducted by Commerce and the ITC because there is no ambiguity in the scope language that needs clarification.[21]
- Additionally, the Court of Appeals for the Federal Circuit (CAFC) found that, where there is no ambiguity in the language of the scope, there is no need to examine the other factors set forth in 19 CFR 351.225(k)(1).[22]

*Saha Thai's Rebuttal:*
- Commerce is required to consider the sources under 19 CFR 351.225(k)(1) to determine whether the plain language of the scope of the *Order* is ambiguous.
- The scope language does not unambiguously establish that line pipe and dual-stenciled standard and line pipe is covered by the scope of the *Order*. Therefore, the (k)(1) sources are relevant to Commerce's analysis.[23]
- In accordance with 19 CFR 351.225(k), Commerce "will take into account" the (k)(1) sources in conducting a scope determination.[24]
- Even if Wheatland were correct that Commerce "must first determine that the plain language of the scope does not ambiguously cover the product at issue before analyzing the (k)(1) {sources}, such a requirement is met in this case."[25]
- Further, Wheatland's request that Commerce conduct a "minor alteration" circumvention inquiry clearly indicates that the scope of the *Order* is ambiguous.

---

[20] *See* Wheatland's Case Brief at 1.
[21] *Id*.
[22] *Id.* at 4 (citing *Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1381 (Fed. Cir. 2017) ("If the scope is unambiguous, it governs.") (citations omitted); *see also Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1302 (Fed. Cir. 2013) (explaining that the inquiry begins with "the language of the final order" and turns to other sources only if the scope itself "is ambiguous").
[23] *See* Saha Thai's Rebuttal at 2-6.
[24] *Id*. at 2-3 (citing *TMB 440AE, Inc. v. United States*, Ct. No. 18-00095, Slip Op. 19-109, 399 F. Supp. 3d 1314 (CIT 2019) (citing *Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1383 (Fed. Cir. 2017) noting that the court "must first assess whether the plain language of the Orders' scope, in light of the disputed {(k)(1) sources}, is unambiguous").
[25] *Id*. at 3.

**Commerce Position:** We continue to reject Wheatland's argument that Commerce need not consider the (k)(1) sources in making our scope determination because the plain language of the scope is definitive in finding that line pipe and dual-stenciled pipe are covered by the scope of the *Order*. Importantly, the Court of International Trade (CIT) has stated that "when a respondent cites (k)(1) sources as supporting a product's exclusion from the scope of an order, the court cannot consider the language of a scope order in isolation, but must consider those sources."[26] The CIT has also stated that regardless of "{w}hether the order is ambiguous or not, Commerce's regulations are unambiguous– it 'will take into account' the (k)(1) criteria in conducting a scope determination. No case has invalidated this regulatory requirement."[27]

In this scope inquiry, Saha Thai has challenged the inclusion of line pipe and dual-stenciled standard and line pipe in the scope of the *Order*, based on the information in the (k)(1) sources, which Saha Thai has placed on the record of this inquiry, such that it would be inconsistent with Commerce's statutory obligations to ignore these sources. In particular, Saha Thai placed information on the record showing that, in the original investigation, the petitioners filed an amended petition removing line pipe from the scope of the Petition.[28] The omission of "line pipe" from the scope of the investigation was memorialized in Commerce's initiation of the less-than-fair-value investigation for Thailand.[29] Additionally, Saha Thai submitted information documenting the ITC's preliminary and final injury determinations, which explicitly state that its injury investigation of steel pipe from Thailand did not include line pipe.[30] Significantly, in accordance with section 731 of the Act (Supp. V 1981), the ITC must find that an industry in the United States is "materially injured, or threatened with material injury" prior to the imposition of antidumping duties. This requirement has been affirmed by the CAFC in *Wheatland Tube*, where it stated that "{a}llowing Commerce to include downstream products {in the scope} would "frustrate the purpose of the antidumping laws because it would allow Commerce to assess antidumping duties on products intentionally omitted from the ITC's injury investigation."[31] Based on this statutory requirement, among others,[32] Commerce would be acting inconsistently with our statutory and regulatory obligations[33] if we ignored the (k)(1) sources placed on the record by Saha Thai in rendering our scope determination.

We also disagree with Wheatland that Commerce has been directed by the CAFC to ignore record evidence that speaks directly to an issue in a scope inquiry. In *Fedmet,* the CAFC held that because the plain language of the scope is "paramount," in "reviewing the plain language of a duty order, "Commerce *must* consider the descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior

---

[26] *See TMB 440AE, Inc. v. United States,* 399 F. Supp. 3d 1314, 1320 (CIT 2019).
[27] *Id.* (emphasis in original).
[28] *See* Saha Thai's August 26 Comments at 10-12; *see also* Attachment 14 (citing the Petition).
[29] *See* Saha Thai's December 20 Comments at 5; *see also* Saha Thai's August 26 Comments at 11 and Attachment 11.
[30] *See* Saha Thai's December 12 Comments at 10-11; *see also* Saha Thai's August 26 Comments at 16-17 and Attachment 8.
[31] *See Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1371 (Fed. Cir. 1998).
[32] *See*, *e.g.*, section 516A(b)(1)(B)(i) of the Act ("The court shall hold unlawful any determination, finding, or conclusion . . . unsupported by substantial evidence on the record.")
[33] *Id.*

determinations) and the Commission."[34]  In other words, under the CAFC's holding in *Fedmet*, Commerce cannot elect not to review the (k)(1) sources of information, but must always consider those sources in analyzing the plain language of the scope of an order to determine if the language is unambiguous.  Likewise, in its 2015 *Shenyang Yuanda* holding, after affirming Commerce's determination that Yuanda's merchandise was "within the plain language of the Orders," the CAFC stated:

> The regulations require Commerce, when determining the scope of an order, to engage in a two-step process.  First, Commerce must consider the scope language contained in the order itself {and then} the descriptions contained in the petition, and how the scope was defined in the investigation and in the determinations issued by Commerce and the ITC.[35]  The petition and preliminary determinations of Commerce and the ITC involved in the underlying duty investigations "may provide valuable guidance as to the interpretation of the final order."[36]

We recognize that the CAFC has, at times, suggested that the (k)(1) sources might be of less importance if the scope language does not appear to be ambiguous, and we agree with that interpretation of the statute and regulations when there is little to no (k)(1) sources on the record of a proceeding or the sources on the record do not actually address the language at issue.  But, when (k)(1) sources have been placed on the record, such as in this inquiry, which directly address the language at issue, the CAFC has never directed Commerce to ignore such evidence in making its determination.  In fact, such direction would contradict the statutory requirement that we consider the substantial evidence on the record.  Instead, in *Shenyang Yuanda*, the CAFC has affirmed Commerce's two-step process of considering such arguments – first to review the plain language of the scope, and then to examine the (k)(1) sources that were placed on the record and address the language, as a matter of course, to see if those sources add any additional context.[37]  The key, for purposes of our analysis in this scope inquiry, is that Commerce's interpretation of the scope was considered *in conjunction with* the additional regulatory sources, such as the initial investigation record, and not *instead* of those sources.[38]

Therefore, in accordance with our regulations and judicial precedent, we have considered the (k)(1) sources in making our final scope determination.

**Comment 2:  Line pipe and dual-stenciled standard and line pipe.**

*Wheatland's Case Brief:*
- There is neither an exclusion referencing "line pipe specifications" in the *Order* nor an ambiguity in the other terms used to describe the subject merchandise, such as "circular," "welded," or "diameter."[39]

---

[34] *See Fedmet Resources Corp. v. United States*, 755 F.3d 912, 918 (Fed Cir 2014).
[35] *See Duferco Steel*, 296 F.3d at 1097; *see also* 19 CFR 351.225(k)(1).
[36] *See Shenyang Yuanda Aluminum Industry Engineering Co., Ltd. v. United States*, 776 F.3d 1351, 1354 (Fed. Cir. 2015).
[37] *Id.*
[38] *Id.*
[39] *See* Wheatland's Case Brief at 5

- Commerce's preliminary scope ruling ignores the fact that the original language of the scope was never amended through the petition withdrawal process. The petitioners withdrew the Petition with respect to line pipe from Thailand because it would not be possible to show dumping by Thai producers that was specific to line pipe as opposed to dumping of circular welded carbon steel pipes and tubes.[40] "Because there was no production of line pipe in Thailand during the course of the ITC's original investigation, there are no concerns as to whether the ITC included line pipe or dual-stenciled standard and line pipe in its injury analysis."[41]

*Saha Thai's Case Brief:*
- The investigation documents demonstrate that all line pipe products are excluded from the scope of the *Order*. Since the investigation, Saha Thai asserts that Commerce has consistently considered dual-stenciled pipe to be the same as line pipe. Therefore, if all line pipe was excluded from the scope, then dual-stenciled standard and line pipe is also excluded from the *Order*.[42]
- On March 14, 1985, the petitioners modified the Petition and withdrew their request for AD duties on line pipe from Thailand.[43] In its withdrawal of line pipe from the Petition, the petitioners place no qualifications on the line pipe to be excluded from its request for AD duties, such that all line pipe is was excluded from the Petition.[44]
- Further, the petitioners identified the excluded line pipe products with numbers 610.3208 and 610.3209 of the Tariff Schedules of the United States, Annotated (TSUSA).[45] Saha Thai asserts that both dual-stenciled standard and line pipe as well as "mono-stenciled" line pipe "could only be categorized as "line pipe" under TSUSA 610.3208 and 610.3209."[46] Thus, as a result of the petitioners' exclusion of products classified under TSUSA 610.3208 and 610.3209 from the scope of the Petition, all line pipe products, including dual-stenciled standard and line products are excluded from the scope of the *Order*.
- Saha Thai asserts that the ITC has consistently considered dual-stenciled standard and line pipe as line pipe for injury purposes, especially at the time of the investigation.[47]
- The ITC noted in its preliminary ruling that the Petition regarding imports of line pipe from Thailand had been withdrawn.[48]
- Saha Thai further asserts that "the ITC determined that subject standard pipe were imported entirely under TSUSA 610.3231, 610.3234, 610.3241, 610.3242, 610.3243,

---

[40] *Id.* at 6.
[41] *See* Wheatland's Case Brief at 7.
[42] *See* Saha Thai's Case Brief at 1.
[43] *See* Saha Thai's Case Brief at 6-7.
[44] *Id.* at 7.
[45] *Id.*
[46] *Id.* at 8.
[47] *Id*. at 5.
[48] *Id.* at 10 (citing *Certain Welded Carbon Steel Pipes and Tubes from Thailand and Venezuela: Determination of the Commission In Investigation No. 701-TA-242 (Preliminary) Under the Tariff Act of 1930, Together With the Information Obtained In the Investigation; and Determinations of the Commission In Investigation Nos. 731-TA-252 and 253 (Preliminary) Under the Tariff Act of 1930, Together With the Information Obtained In the Investigations*, USITC Publication 1680 (April 1985) (*ITC Preliminary Injury Determination*) at 3; and the *ITC Final Injury Determination*).

    610.3252, 610.3254, 610.3256, 610.3258 and 610.4925; while imports under TSUSA 610.3208 and 610.3209 were of entirely of line pipe, which was <u>not</u> subject to the Thailand investigation."[49]

- In its fourth sunset review of the *Order*,[50] the ITC stated that "since these standards often require engineering characteristics that overlap with other specifications, a pipe may be dual stenciled, *i.e.*, stamped to indicate compliance with two different specifications, such as ASTM A53 and API 5L. Dual-stenciled pipe, which enters as line pipe under a different subheading of the Harmonized Tariff Schedule of the United States ("HTS") for U.S. customs purposes, is not within the scope of the orders."[51]
- Furthermore, in the fourth sunset review of the *Order*, the ITC says that "standard pipe of non-alloy steel is the primary product within the scope of these reviews. Standard pipe is intended for the low pressure conveyance of water, steam, natural gas, air, and other liquids and gases in plumbing and heating systems, air conditioning units, automatic sprinkler systems, and other related uses. Standard pipe may carry liquids at elevated temperatures but may not be subject to the application of external heat. It is made primarily to ASTM A53, A135, and A795 specifications, but can also be made to other specifications, such as British Standard (BS) 1387. Since these standards often specify required engineering characteristics that overlap, a pipe also can be dual stenciled, meaning that the pipe is stamped with monograms signifying compliance with two different specifications, such as ASTM A53 and API 5L; however, such dual-stenciled pipe is not within the scope of the subject orders."[52]
- Further, in its third sunset review of the *Order*,[53] the ITC stated that "dual-stenciled pipe, which for U.S. customs purposes enters as line pipe under a different tariff subheading, is not within the scope of the orders."[54]
- Saha Thai rejects Commerce's determination in the Preliminary Scope Ruling that these statements in the *ITC Fourth Sunset Final* and the *ITC Third Sunset Final* "{are} not definitive, given the variations in the scope language of the CWP orders covered by the {*ITC Fourth Sunset Final*}." Saha Thai asserts that the ITC's explicit exclusion of dual-stenciled products is "<u>without limitation to any particular country</u>."[55] Saha Thai rationalizes that whether the scope of a given order explicitly excludes a product is immaterial, that an order "can specifically exclude a product without containing an enumerated exclusion language in the scope."[56] "Indeed, {Commerce} itself correctly finds in the preliminary determination that the {*Order*} excludes line pipe

---

[49] *Id.* at 10 (citations omitted, emphasis in the original).
[50] *See Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey Investigation Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534, and 536 (Fourth Review)*, USITC Publication 4754 (January 2018) (*ITC Fourth Sunset Final*).
[51] Saha Thai's Case Brief at 11 (quoting *ITC Fourth Sunset Final* at 6-7).
[52] *Id.* at 12 (quoting *ITC Fourth Sunset Final* at I-16).
[53] *See Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey Investigation Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534 and 536 (Third Review)*, USITC Publication 4333 (June 2012) (*ITC Third Sunset Final*).
[54] *See* Saha Thai's Case Brief at 12-13 (quoting *ITC Third Sunset Final* at 8).
[55] *Id.* at 13 (emphasis in the original).
[56] *Id.* at 14 (referencing *Fedmet Resources Corp. v. United States*, 755 F.3d 912, 919 (Fed. Cir. 2014) (*Fedmet*)).

9

- notwithstanding that there is no enumerated exclusion language of line pipe in the scope language."[57]
- Saha Thai asserts that the "{petitioners} testified under oath that line pipe and dual-stenciled pipe were not covered by the CWP from Thailand AD Order."[58] In citing 19 CFR 351.225(k)(1), Saha Thai asserts that "there is a well-developed history of {Commerce} investigations of CWP standard pipes from different countries."
- Commerce's past scope definitions in other standard pipe AD proceedings confirm that dual-stenciled pipe is excluded from the *Order*. Moreover, the petitioners' intentions with respect to multi-stenciled pipe have changed over time.[59]
- In the earliest Petitions concerning CWP, including India, Taiwan, Thailand and Turkey, there was no explicit mention of line pipe or dual-stenciled standard and line pipe in the Petition or the resulting AD duty orders.[60]
- The scopes of the petitions for the 1991 Brazil, Korea, Mexico and Venezuela CWP investigations did not contain enumerated line pipe or dual-stenciled pipe language. In the case of the Brazil, Korea, Mexico and Venezuela CWP investigations, the petitioners stated that "{t}he scope, as defined by the petition, {Commerce} and the Commission, clearly excludes both imports of line pipe entering the United States in Harmonized Tariff System of the United States (HS) category 7306.10 and oil country tubular goods entering the United States in HS category 7306.20." Thus, at the time of the 1985 and 1991 pipe investigations, the petitioners did not seek to include multi-stenciled pipe as subject merchandise.[61]
- The petitioners did not file a petition with scope language that enumerated multi-stenciled pipe was included until the 2007 China pipe investigation and the 2015 Oman, Pakistan and United Arab Emirates investigations.[62]
- Commerce may not expand the scope to include dual-stencil standard and line pipe because the ITC did not include dual-stenciled standard and line pipe in its injury analysis. This legal prohibition has been affirmed by both the CIT and the CAFC in litigation addressing CWP AD orders.[63]

*Wheatland's Rebuttal:*
- Commerce correctly found in its Preliminary Scope Ruling that dual-stenciled is covered by the scope of the *Order*. The plain language of the *Order* covers dual-stenciled standard and line pipe.[64]
- The CAFC's decision in *Wheatland Tube* does not preclude Commerce from finding that dual-stenciled pipe is covered by the scope of the *Order*. Unlike the scope at issue in

---

[57] *Id.*

[58] *Id*. at 13 (emphasis in the original) (citing Saha Thai's August 26, 2019 Comments at Attachment 7: Saha Thai's Letter, "Saha Thai's Comments on 'Line Pipe' Scope Inquiry Circular Welded Carbon Steel Pipe and Tubes from Thailand," dated August 26, 2019 at 58-59).

[59] *See* Saha Thai's Case Brief at 14.

[60] *Id.* at 16.

[61] *See* Saha Thai's Case Brief at 16-20.

[62] *Id.*

[63] *Id.* at 19, 20, 22, 24 (citing *Wheatland Tube Co. v. United States*, 161 F. 3d 1365 (Fed. Cir. 1998); *Wheatland Tube Co. v. United States*, 973 F. Supp. 149 (CIT 1997)).

[64] *See* Wheatland's Rebuttal at 2.

- *Wheatland Tube*, the scope of the *Order* on CWP from Thailand does not contain an explicit exclusion for dual-stenciled pipe.[65]
- More importantly, the ITC's pronouncements regarding dual-stenciled line pipe being excluded from the scope of the orders were general statements regarding the orders on CWP from seven countries and not statements specific to the order on CWP from Thailand.
- These statements are generally true because the orders on CWP for countries other than Thailand have specific scope exclusions for line pipe.[66]
- Saha Thai's claim that "Wheatland testified under oath that line pipe and dual-stenciled pipe were not covered by the CWP from Thailand AD Order" is not accurate. The language quoted by Saha Thai is not testimony but a section of Wheatland's Pre- Hearing brief in the 2000 sunset review of CWP from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey. That section of the brief focused exclusively on Korean producers of line pipe. This is relevant because the order on CWP from Korea has a specific exclusion for line pipe.[67]
- The scope language of the *Order* does not expressly and unambiguously exclude line pipe. Unlike the orders governing CWP from Brazil, Korea, and Mexico, the scope of the *Order* at issue does not mention "line pipe," "dual-stenciled pipe," "triple-stenciled pipe," or pipe of "a kind used for oil or gas pipelines."[68]
- The record of the investigation of CWP from Thailand shows that dual-stenciled pipe is covered by the scope of the *Order*. The petition with respect to line pipe was later withdrawn only because there was no known production in Thailand of line pipe at that time.[69]
- In the investigation, Wheatland did not amend the scope language in the petition in any way to exclude any line pipe that might later be produced in Thailand.[70]
- The only language in the scope that appears to have changed through Wheatland's withdrawal process is the removal of the Tariff Schedules of the United States (TSUS) codes for line pipe – *i.e.*, 640.3208 and 610.3209, which appears to have been done by Commerce.[71]
- Commerce should reject Saha Thai's contention that the scope of the *Order* cannot be interpreted to cover dual-stenciled pipe because the ITC never included imports of line pipe from Thailand in its original injury investigation.[72]
- Because at the time of the investigation there was no production of line pipe in Thailand, there would be no point in attempting to show material injury to the domestic line pipe industry by reason of imports of line pipe from Thailand.[73]

---

[65] *Id*. at 10-11.
[66] *Id*. at 7 (citing Saha Thai's August 26 Comments at 20-22).
[67] *See* Wheatland's Rebuttal at 7.
[68] *Id*. at 10.
[69] *Id*. at 2.
[70] *Id*. at 3.
[71] *Id.* at 4.
[72] *Id*. at 10.
[73] *Id.*

*Saha Thai's Rebuttal*
- Wheatland itself does not deny that generally speaking "line pipe" and "standard pipe" are two different types of product. In fact, this is exactly why on January 31, 2019, Wheatland requested that Commerce conduct a "minor alteration" circumvention of Saha Thai's "line pipe" imports under section 781(c) of the Tariff Act of 1930, as amended (the Act), which is the type of proceeding to determine whether an "out-of-scope" product should otherwise be covered to prevent circumvention.[74]
- The original petition included both TSUSA 610.3208 and 610.3209 as two of the relevant HTS of subject merchandise (line pipe), but they were omitted from the final scope language. This intentional omission confirms that the scope of the *Order* does not unambiguously cover line pipe, contrary to Wheatland's contention, and instead the scope was specifically drafted to exclude line pipe.[75]
- As explained in Saha Thai's case brief, all of the other CWP AD cases confirm that Commerce has always considered "line pipe" (which by definition includes dual-stenciled pipe) to be excluded from the scope of any AD case covering "standard pipe."[76]

**Commerce's Position:** Commerce continues to find that the scope of the *Order* does not include line pipe but does include dual-stenciled standard and line pipe.

As partially documented in the *ITC Fourth Sunset Final*, there has been a decades-long history of trade remedy proceedings involving steel "pipes and tubes."[77] Moreover, as discussed in the *ITC Final Injury Determination*, "pipes and tubes" consists of a number of distinct product groups which are broadly defined by the American Iron and Steel Institute (AISI) based on end-use.[78] In addition to "standard pipe," "structural pipe and tubing" and "line pipe," these product groups include "mechanical tubing," "pressure tubing" and "oil country tubular goods" (OCTG).[79] Although there "may be few or no inherent differences among a number of steel tubular products," "{s}teel pipes and tubes are generally produced according to standards and specifications published by a number of organizations, including the American Society for Testing & Materials (ASTM); the American Society of Mechanical Engineers; and the American Petroleum Institute (API)."[80] These distinct product groups are distinguishable based on these industry standards, which are also reflected in the TSUSA which is contemporaneous with the filing of the Petition, spanning numbers 610.3205 through 610.3299.[81] Although the ITC found that these distinct product groups share many common features, the ITC injury investigation was

---

[74] *See* Saha Thai's Rebuttal at 4.
[75] *Id*. 5-6.
[76] *Id*. at 7.
[77] *See ITC Fourth Sunset Final* at I-4 to I-9.
[78] *See ITC Final Injury Determination* at I-1.
[79] *Id.* (citing *Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Determination of the Commission in Investigation No. 701-TA-168 (Final) Under the Tariff Act of 1930, Together With the Information Obtained in the Investigation*, USITC Publication 1345 (February 1983) (*ITC CWP Korea Final Injury Determination*) at A-3 to A-4);*see also ITC Fourth Sunset Final* at I-14 to I-15.
[80] *See ITC CWP Korea Final Injury Determination* at A-4.
[81] *See Tariff Schedules of the United States Annotated (1985)*, USITC Publication 1610 (1984, 3rd supp. September 1, 1985).

limited to "standard pipes and tubes."[82] Similarly, Commerce's less-than-fair-value investigation was limited to standard pipe.[83]

As discussed above, the original Petition requested the imposition of AD duties on both standard pipe and line pipe from Thailand; however, after inquiry by Commerce, the petitioners withdrew their requests for AD duties on line pipe from Thailand.  If not for the qualification that both the ITC's investigation and Commerce's investigation were limited to standard pipe, the scope's description of the physical characteristics of the merchandise (*i.e.*, the product is "welded," made from "carbon steel," with an outside diameter of 0.375 inches through 16 inches, and with any wall thickness) could apply to all of the product groups defined by AISI.

In its investigations, the majority of the commissioners found that the ITC investigations covered two separate-like products:

> We conclude, therefore, that there are two like products in these investigations--standard pipe up to and including 16 inches outside diameter and line pipe up to and including 16 inches outside diameter.  We further conclude that there are two domestic industries comprised, respectively, of the domestic producers of standard pipe and line pipe.[84]

In the *ITC Final Injury Determination*, the ITC found that, as a result of imports of standard pipe from Thailand (and only standard pipe), "an industry in the United States is materially injured, or threatened with material injury, by reason of imports from Thailand of welded carbon steel standard pipes and tubes."[85]

Commerce rejects Wheatland's argument that line pipe must be included within the scope of *Order* because the description of the merchandise was not modified as a result of the petitioners withdraw of their inclusion of line pipe in the Petition.  The historical documents establish that the investigations of both Commerce and the ITC were limited to standard pipe.[86]  The relevant

---

[82] *See ITC Final Injury Determination* at I-1.
[83] *See Certain Circular Welded Carbon Steel Pipes and Tubes From Thailand:  Initiation of Antidumping Duty Investigation*, 50 FR 12068 (March 27, 1985) ("These products {under investigation}, commonly referred to in the industry as standard pipe or structural tubing, are produced to various ASTM specifications, most notably A-152, A-53 or A-135"); *see also Antidumping:  Circular Welded Carbon Steel Pipes and Tubes From Thailand;  Final Determination of Sales at Less Than Fair Value*, 51 FR 3384 (January 27, 1986) (*Final LTFV Determination*) ("The products under investigation are certain circular welded carbon steel pipes and tubes, also known as 'standard pipe' or 'structural tubing'…").
[84] Commerce and the ITC have also found other product groups which satisfy these general physical descriptions to constitute other like products, such as OCTG.  *See ITC Final Injury Determination* at 7.
[85] *See ITC Final Injury Determination*.
[86] *See*, *e.g.*, *Final LTFV Determination*, *see also ITC Final Injury Determination*.

statutory provision[87] states that to impose AD duties, Commerce must determine that the class or kind of merchandise has been found to be sold at less than fair value, and the ITC must conclude that a domestic industry has been materially injured or threatened with material injury. Consequently, the scope of an AD order imposed as a result of the *Final LTFV Determination* and the *ITC Final Injury Determination* does not include line pipe.

Commerce further rejects Saha Thai's assertion that "all" line pipe, including dual-stenciled standard and line pipe, is not covered by the scope of the *Order*. Unlike the AD orders covering similar merchandise (*e.g.*, from Mexico or Venezuela),[88] the CWP from Thailand *Order* does not explicitly exclude dual-stenciled standard and line pipe.[89] Moreover, in contrast to the investigations which resulted in the *1992 Standard Pipe Orders*, and contrary to Saha Thai's claims, neither the *Final LTFV Determination* nor the *ITC Final Injury Determination* address dual-stenciled standard and line pipe.

Commerce finds that Saha Thai's construct that dual-stenciled standard and line pipe are not covered by the scope of the *Order* because line pipe is not covered by the scope of *Order* lacks merit. Simply because a certain product *is* certified as line pipe does not result in it being *not* certified as standard pipe.[90] Stated differently, if a certain product is certified as standard pipe, then it is standard pipe regardless of whether it is also certified as line pipe.

Commerce disagrees with Saha Thai assertion that the sources enumerated under 19 CFR 351.225(k)(1) include determinations in proceedings on similar CWP products "from different countries." The "petition, the initial investigation, and the determinations of the Secretary … and the Commission"[91] reference the instant proceeding and not other proceedings, no matter how similar. The "petition" and "initial investigation," of "the Secretary" and "the

---

[87] *See* section 731 of the Act (Supp. V 1981):

> Imposition of antidumping duties
> If—
> (1) the administering authority determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value, and
> (2) the Commission determines that—
>   (A) an industry in the United States—
>     (i) is materially injured, or
>     (ii) is threatened with material injury, or
>   (B) the establishment of an industry in the United States is materially retarded, by reason of imports of that merchandise,
> then there shall be imposed upon such merchandise an antidumping duty, in addition to any other duty imposed, in an amount equal to the amount by which the foreign market value exceeds the United States price for the merchandise.

[88] *See Notice of Antidumping Duty Orders: Certain Circular Welded Non-Alloy Steel Pipe from Brazil, the Republic of Korea (Korea), Mexico, and Venezuela and Amendment to Final Determination of Sales at Less Than Fair Value: Certain Welded Non-Alloy Steel Pipe from Korea*, 57 FR 49453 (November 2, 1992) (*1992 Standard Pipe Orders*).
[89] *See 1992 Standard Pipe Orders*, 57 FR at 4945 ("Standard pipe that is dual or triple certified/stenciled that enters the U.S. as line pipe of a kind used for oil or gas pipelines is also not included in these orders.")
[90] In reference to Saha Thai's diagram copied above, the standard pipe encompasses both the blue area as well as green area representing the dual-stenciled products.
[91] *See* 19 CFR 351.225(k)(1).

Commission," are singular, and do not reference multiple petitions or investigations of multiple proceedings. Depending upon the similarity of the circumstances in other proceedings, the petitions, investigations or determinations in such other proceedings may be informative, but are not dispositive in a separate, distinct proceeding.[92]

In any case, Saha Thai has failed to demonstrate how this assertion is directly applicable to the Thailand *Order*. The fact that some CWP orders include specific exclusion language and other CWP orders do not include similar exclusion language is a relevant fact, but the reason behind that differing language may depend on the circumstances during the investigation stage of the proceeding. Put simply, just because certain language is included in one order does not dispositively provide meaning to an order which does not include the same language. At most, such differences merely suggest that some products may have been intended to be treated differently under the different orders.

As Saha Thai has pointed out, in the *ITC Fourth Sunset Final*[93] covering seven CWP orders, including the instant *Order* on standard pipe products from Thailand, the ITC stated that "dual-stenciled pipe, which enters as line pipe under a different subheading of the Harmonized Tariff Schedule of the United States ("HTS") for U.S. customs purposes, is not within the scope of the orders"[94] and that "such dual-stenciled pipe is not within the scope of the subject orders."[95] However, in reviewing those sentences in context, it is clear that the ITC was not addressing the language of each individual order, including the scope text which differed between those orders, but instead was providing a generalized statement applicable to the majority of the orders, which contained explicit exclusions for dual-stenciled pipe. Notably, the ITC in making such statements cited to a table in the confidential and public reports from the original investigations, neither which is on this record, but were summarized in the footnote as pertaining to all of the underlying investigations.[96]

---

[92] *See* Memorandum "Antidumping Duty Order on Certain Circular Welded Non-Alloy Steel Pipe from Mexico: Final Scope Ruling on Finished Electrical Conduit Imported by LOA Incorporado," dated November 15, 2012 at 7-8; *see also* Memorandum, "Antidumping Duty Order on Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Scope Ruling on Precision Components Inc.'s Green Machined but not Heat-Treated Components," dated June 12, 2020 at 7 ("Regarding the Green Rings Memorandum and the Rough Forgings Memorandum {two scope rulings from *TRBs Over Four Inches from Japan*}, we note that although "scope rulings" are a source under 19 CFR 351.225(k)(1), these particular scope rulings are not part of the record of the TRBs from China proceeding, and instead are part of the record of *TRBs Over Four Inches from Japan*, on which these two rulings are based. Nonetheless, because *TRBs Over Four Inches from Japan* and the {Chinese} *Order* are based on the same antidumping duty petition, the scope for *TRBs Over Four Inches from Japan* is unquestionably similar and, in the portions relevant to the scope issue at hand, virtually identical, to the scope of the {Chinese} *Order*. Accordingly, we find that the Green Rings Memorandum and the Rough Forgings Memorandum are informative to the issue at hand, but we have not treated these scope rulings from a separate proceeding as dispositive on their own as to whether Precision Components' merchandise is subject to the scope of the {Chinese} *Order* under 19 CFR 351.225(k)(1)." (citations omitted)).

[93] *See Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey (Final)*, Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534, and 536 (Fourth Review), USITC Pub. 4754 (Jan. 2018) (*ITC Fourth Sunset Final* at 6).

[94] *See* Saha Thai's Case Brief at 11 (quoting *ITC Fourth Sunset Final* at 6-7).

[95] *Id.* at 12 (quoting *ITC Fourth Sunset Final* at I-16).

[96] *See ITC Fourth Sunset Final* at I-6 (citing CR at I-20, PR at I-16 which are described in footnote 1 on page 3 as Confidential Report (CR)/Public Report (PR) (tabulating original investigations)). This language appears to be

Further, as Saha Thai also notes, the ITC in its third sunset review of the *Order* and the six other CWP orders,[97] the ITC stated that "dual-stenciled pipe, which for U.S. customs purposes enters as line pipe under a different tariff subheading, is not within the scope of the orders."[98]  Again, that reference was to the "orders" in the plural, yet the scope language of those seven orders was not the same with respect to the inclusion or exclusion of dual-stenciled pipe.

Saha Thai provided a chart on this record which shows that only some of the orders contained an enumerated exclusion of dual stenciled pipe in the scope.[99]  Specifically, the orders on CWP from Brazil, Mexico, Korea, and Venezuela have exclusionary language for dual-stenciled pipe and line pipe, while the others do not.[100]

It would be illogical for the ITC to "find" that dual-stenciled pipe is not within the scope of all the orders at issue, when the scopes of some orders explicitly excluded dual-stenciled pipe and others did not.  As noted above, the *1992 Standard Pipe Orders* include the dual-stenciled exclusions because of issues raised in the specific LTFV investigations which culminated in those orders.  Despite Saha Thai's argument, therefore, the only reasonable conclusion we can derive from the various references to the ITC language is that that language was meant to summarize the status of dual-stenciled pipe under the majority of orders, but not all of the orders.

Furthermore, Saha Thai's reliance on the exclusions in other proceedings involving standard pipe, as well as the CIT's opinion in *Wheatland Tube Co.*, which is specific to the AD order on CWP from Mexico, is misplaced.[101]  These proceedings are separate from the order on CWP from Thailand, which has different scope language and its own record that differs from the records covered by the proceedings referenced by Saha Thai.  Specifically, the scope of the Mexican CWP order includes the explicit exclusions for line pipe and dual- or triple-stenciled products, which was the crux of the *Wheatland Tube Co.* litigation.[102]  However, unlike the Mexican CWP order, there is no basis to find that pipe which has been dual-stenciled as standard pipe and line pipe is outside the scope of the *Order*.

Saha Thai's claim that "Wheatland testified under oath that line pipe and dual-stenciled pipe were not covered by the CWP from Thailand AD Order" is not accurate.  The language quoted by Saha Thai is not testimony but a section of Wheatland's Pre- Hearing brief in the 2000 sunset review of CWP from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey.  That section of the brief focused on how Korean producers of line pipe would shift from production of line

---

taken from *Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey Investigation Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534 and 536 (Third Review)*, USITC Publication 4333 (June 2012) (*ITC Third Sunset Final*) without further analysis or consideration.  Furthermore, the cited clause references only the status of the majority of orders and was not intended to apply to all the orders, regardless of exclusion language.

[97] *See ITC Third Sunset Final*.
[98] *See* Saha Thai's Case Brief at 12-13 (quoting *ITC Third Sunset Final* at 8).
[99] *See* Saha Thai's Case Brief at 23.
[100] *See 1992 Standard Pipe Orders*.
[101] *See 1992 Standard Pipe Orders*, 57 FR at 49453.
[102] *Id.*

pipe to standard pipe if the order on standard pipe from Korea were revoked. This is relevant because the order on CWP from Korea has a specific exclusion for line pipe.[103]

Saha Thai is correct that the petitioners' interest in the imposition of antidumping duties with respect to dual-stenciled pipe changed between the 1991 investigations on Brazil, Korea, Mexico and Venezuela where the petitioners clarified that the scope excluded dual-stenciled pipe and the 2007 China investigation and the 2015 Oman, Pakistan and United Arab Emirates investigations where the four petitions specifically enumerated that multi-stenciled standard pipe was included in the petitioners' request for antidumping duties.

However, Commerce rejects Saha Thai's claim to extrapolate the petitioners' interest in the imposition of antidumping duties for dual-stenciled pipe to the earlier, pre-1991 investigations.[104] Any such conclusions by Saha Thai are mere speculation. There is no information on the record to substantiate Saha Thai's claim that the petitioners' intentions with respect to dual-stenciled pipe in the CWP from Thailand *Order* were the same as in the 1991 investigations on Brazil, Korea, Mexico and Venezuela. Indeed, the petitioners' original interest was to include all line pipe in its request for antidumping duties.[105] The exclusion language in the *1992 Standard Pipe Orders* was based, in part, on the petitioners' clarification in the four 1991 investigations, that Commerce specifically concluded that, notwithstanding an omission of any mention of dual-stenciled standard and line pipe in the scope of the petitions, the petitioners did not intend for the AD orders to cover dual-stenciled standard and line pipe *in those four orders*.

While the scope in the Petition similarly did not include language specific regarding dual-stenciled standard and line pipe, the petitioners made no similar statement or clarification with respect to dual-stenciled pipe in the investigation underlying the instant *Order*. As such, we find that Saha Thai's claim that that the petitioners did not intend to include dual-stenciled pipe in the scope of the instant *Order* is not supported by the record of this proceeding.

**Comment 3:  Date of Initiation**

*Saha Thai's Case Briefs*
- If Commerce concludes that the *Order* covers line pipe, the earliest date that Commerce can suspend liquidation of imports is November 22, 2019, the date of the self-initiation, because it did not properly initiate the scope inquiry by way of its July 29, 2019 letter.[106]

---

[103] Elsewhere in Wheatland's Prehearing Brief, multiple parties acknowledge that 70 to 80 percent of dual stenciled pipe imported from Korea is sold for "standard pipe applications." *See* Saha Thai's August 26 Comments at Attachment 7 (pages 58-59).

[104] *See* Saha Thai's Case Brief at 15 ("When they intended to include dual-stenciled pipe to be included they explicitly stated so. The lack of explicit inclusion language in earlier petitions means that there was no intention at all.").

[105] *See* Petition.

[106] *See* Saha Thai's Case Brief at 15 22.

*Wheatland's Case Brief*
- There is no merit to Saha Thai's argument that Commerce did not properly initiate this scope inquiry in its July 29, 2019 notice.[107]
- On July 29, 2019, Commerce issued a notification to all interested parties on its scope service list that it was initiating an inquiry and requesting comments on whether the *Order* covers line pipe and products that are dual-stenciled as both standard pipe and line pipe. This notification complied with all of the relevant requirements set form in the agency's regulations.[108]
- Saha Thai's contention that "the July 29th letter provides no reasons why the Secretary is initiating a scope inquiry" simply ignores the reasons that were provided in the letter.[109]

**Commerce's Position:** On November 22, 2019, Commerce self-initiated a scope inquiry to determine whether line pipe, as well as dual-stenciled standard and line pipe, is subject to the *Order*.[110] The Initiation Memorandum was the first document on this record which provided the following: (1) a description of the products covered by this scope inquiry;[111] (2) an explanation of our decision to initiate the scope inquiry;[112] and (3) 20 days for interested parties to submit additional comments and supporting factual information concerning this issue and 10 days for interested parties to submit rebuttal comments and supporting factual information.[113] Commerce did not initiate a formal scope inquiry in its July 29, 2019 Memorandum.[114] Instead, Commerce intended to provide parties with an opportunity to comment[115] on whether line pipe was covered by the scope of the *Order,* and "to issue a final scope ruling within 45 days of the {July 29th letter}."[116] Normally, when initiating a formally scope inquiry, Commerce issues a final scope ruling within 120 days after initiation, rather than 45 days.[117] In this case, we set a deadline of issuing a final scope ruling within 45 days, and found that the phrase "pipe and tube with an outside diameter of 0.375 inches or more but not over 16 inches" is covered by the *Order* was critical to our analysis.[118] However, after receiving scope comments from interested parties, containing (k)(1) sources, we determined that initiation of a formal scope inquiry was warranted.[119] We disagree with Wheatland that the phrase "line pipe" in the July 29th Memorandum satisfies the requirement to provide a "*description* of the product that is the subject of the scope inquiry" under 19 CFR 351.225(f)(1)(i). Accordingly, Commerce's November 22,

---

[107] *See* Wheatland's Rebuttal at 11-13.
[108] *Id*. at 11.
[109] *Id.* at 13.
[110] *See* Memorandum, "Antidumping Duty Order on Circular Welded Carbon Steel Pipes and Tubes from Thailand: Self Initiation of Scope Inquiry on Line Pipe and Dual-Stenciled Standard Line Pipe," dated November 22, 2019 (Initiation Memorandum).
[111] *See* 19 CFR 351.225(f)(1)(i).
[112] *See* 19 CFR 351.225(f)(1)(ii).
[113] *See* 19 CFR 351.225(f)(1)(iii).
[114] *See* Memorandum, "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Scope Inquiry on Line Pipe," dated July 29, 2019 (July 29th Memorandum).
[115] We set a deadline of 10 days for initial comments and factual information and 7 days for rebuttal comments and factual information. *Id.* Typically, when initiating a formal scope inquiry, Commerce provides interested parties with 20 days to provide comments and factual information and 10 days to provide rebuttal to such comments. *See* 19 CFR 351.225(f)(1(iii).
[116] *See* July 29th Memorandum at 2.
[117] *See* 19 CFR 351.225(f)(5).
[118] *See* July 29th Memorandum at 2.
[119] *See* Initiation Memorandum at 3-4.

2019 Initiation Memorandum complied with all of the regulatory requirements and is the date on which Commerce self-initiated a scope inquiry to determine whether line pipe, as well as dual-stenciled standard and line pipe, is subject to the *Order*.

**Recommendation**

For the reasons discussed above, we recommend continuing to find that line pipe is not covered by the scope of the *Order*. We further recommend continuing to find that products which are dual-stenciled as standard pipe and line pipe are within the scope of this *Order*. If the recommendations in this memorandum are accepted, we will serve a copy of this memorandum on all interested parties on the scope service list via FEDEX in lieu of first-class mail as directed by 19 CFR 351.225(f)(3). In addition, we will issue the appropriate instructions to U.S. Customs and Border Protection (CBP) stating that we found line pipe not within the scope of the *Order*. We will also issue instructions to CBP that we found products which are dual-stenciled as standard pipe and line pipe are within the scope of this *Order* and to suspend liquidation and to require a cash deposit of estimated antidumping duties, at the applicable rate, for each unliquidated entry of the product entered, or withdrawn from warehouse, for consumption on or after the date of initiation of the scope inquiry.

This scope ruling does not preclude an interested party to the proceeding from requesting a circumvention inquiry in the future concerning line pipe. If interested parties become aware of circumvention involving merchandise not considered part of the scope as a result of this scope ruling through one of the four scenarios set forth in Section 781 of the Act, please bring the alleged circumvention to our attention, and we will consider such a request for a circumvention ruling at that time.

☒                ☐
_____          _____
Agree            Disagree

6/30/2020

X _James Maeder_____

Signed by: JAMES MAEDER