# UNITED STATES OF COURT OF INTERNATIONAL TRADE

*Before:* The Honorable Stephen Alexander Vaden, Judge

| | |
|---|---|
| Saha Thai Steel Pipe Public Company, Limited )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>**United States** )<br>)<br>Defendant, )<br>)<br>and )<br>)<br>**Wheatland Tube Company** )<br>)<br>Defendant-Intervenor. )<br>) | **Court No. 20-00133** |

## PLAINTIFF SAHA THAI'S REPLY BRIEF

Daniel L. Porter
James P. Durling
James C. Beaty

**Curtis, Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, NW
Washington, DC, 20006

April 23, 2021                    *Counsel for Plaintiff Saha Thai*

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................................... 1

I.  COMMERCE'S FINAL SCOPE RULING UNLAWFULLY IGNORES THAT
    THE ORIGINAL INVESTIGATION DOCUMENTS DEMONSTRATE THAT
    THE SCOPE EXCLUDES ALL LINE PIPE INCLUDING DUAL-STENCILED
    PIPE. ........................................................................................................................ 4

    A.  Defendant's Rationale for Ignoring Original Investigation Documents
        Fails ............................................................................................................ 6

    B.  Defendant's Attempt to Address And Dismiss The Original
        Investigation Documents Also Fails .......................................................... 8

    C.  Defendant's Improperly Ignores Commerce's Past Scope Definitions In
        Standard Pipe Cases ................................................................................ 11

II. BECAUSE IT INCLUDES A PRODUCT THAT EXPLICITLY EXCLUDED
    FROM THE COMMISSION'S INJURY ANALYSIS AND DETERMINATION,
    COMMERCE'S OVERBROAD SCOPE RULING IS CONTRARY TO LAW .. 16

III. COMMERCE'S SCOPE RULING IS CONTRARY TO SETTLED LAW
     UNDER *WHEATLAND TUBE* ................................................................................ 20

CONCLUSION ............................................................................................................ 29

# TABLE OF AUTHORITIES

## Cases

*A.L. Patterson, Inc. v. United States*,
  585 Fed. Appx. 778 (Fed. Cir. 2014) ................................................................... 16, 24
*ArcelorMittal Stainless Belg. N.V. v. United States*,
  694 F.3d 82 (Fed. Cir. 2012) ........................................................................................ 15
*Duferco Steel, Inc. v. United States*,
  296 F.3d 1087 (Fed. Cir. 2002) ............................................................................ 16, 24
*Eckstrom Indus. v. United States*,
  254 F.3d 1068 (Fed. Cir. 2001) ............................................................................ 16, 24
*Fedmet Res. Corp. v. United States*,
  755 F.3d 912 (Fed. Cir. 2014) ...................................................................................... 15
*Mid Continent Nail Corp. v. United States*,
  725 F.3d 1295 (Fed. Cir. 2013) ...................................................................................... 4
*Novosteel SA v. U.S., Bethlehem Steel Corp.*,
  284 F.3d 1261 (Fed. Cir. 2002) .................................................................................... 10
*SEC v. Chenery, Corp.*,
  332 U.S. 194 (1947) ........................................................................................................ 7
*Shenyang Yuanda Aluminum Industry Engineering Co., Ltd. v. United States*,
  776 F.3d 1351 (Fed. Cir. 2015) .................................................................................... 14
*Smith Corona Corp. v. United States*,
  915 F.2d 683 (Fed. Cir. 1990) ...................................................................................... 11
*Thai I-Mei Frozen Foods Co., Ltd. v. United States*,
  31 CIT 334, 477 F. Supp. 2d 1332 (2007)..................................................................... 7
*TMB 440AE, Inc. v. United States*,
  __ CIT, __, 399 F. Supp. 3d 1314 (2019)..................................................................... 4
*Wheatland Tube Co. v. United States*,
  161 F.3d 1365 (Fed. Cir. 1998) ..........................................................................passim
*Wheatland Tube v. United States*,
  21 CIT 808, 973 F. Supp. 149 (1997)....................................................... 21, 22, 23, 24
*Wirth Ltd. v. United States*,
  22 CIT 285, 5 F. Supp. 2d 968 (1998)......................................................................... 11

## Statutes

19 U.S.C. §1673d ................................................................................................... 16, 17
19 U.S.C. §1675 ..................................................................................................... 14, 19

**Regulations**

19 C.F.R. §351.225 ........................................................................................ 12, 15

**Administrative Determinations**

*Antidumping Duty Order; Circular Welded Carbon Steel Pipes and Tubes from Thailand*,
    51 Fed. Reg. 8,341 (Mar. 11, 1986) ........................................................... 1, 6
*Certain Welded Carbon Steel Pipes And Tubes From Turkey And Thailand*, Inv. Nos.
    701-TA-253 and 731-TA-252, USITC Pub. 1810 (Feb. 1986) (Final) ......................... 18
*Final Negative Determination of Scope Inquiry on Certain Circular Welded Non-Alloy
    Steel Pipe and Tube From Brazil, the Republic of Korea, Mexico and Venezuela*,
    61 Fed. Reg. 11,608 (Mar. 21, 1996) ......................................................... 27
*Initiation of Antidumping Duty Investigations: Circular Welded Non-Alloy Steel Pipe
    From Brazil, the Republic of Korea, Mexico, Romania, Taiwan, and Venezuela*,
    56 Fed. Reg. 52,528 (Oct. 21, 1991) .......................................................... 27

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Department of Commerce's ("Commerce") final scope decision is contrary to the scope of the *Order*[1] identified in the original investigation documents and is also unlawful because it violates the Federal Circuit's mandate not to expand the scope to include products not covered by the International Trade Commission's (the "Commission") injury determination. Defendant and Defendant-Intervenor try to justify these fundamental legal flaws, but their arguments all fail.

Defendant misreads the scope language, and now asserts clarity that is just not to be found. Indeed, that is precisely why Commerce's final scope decision itself found the scope language to be ambiguous and turned to the original investigation documents for clarity not found in the language. Defendant's assertion that dual-stenciled pipe is also known as "standard pipe" goes well beyond the language of the scope and ignores the original investigation documents to the contrary.

Likewise, Defendant's argument that the original investigation documentation does not confirm that dual-stenciled pipe was excluded from the scope of the original antidumping ("AD") investigation is belied by the very documentation. There is no dispute that (a) dual-stenciled pipe entered under the same TSUSA numbers as line pipe and (b) the original petition excluded all line-pipe TSUSA numbers from the scope. Much as Defendant and Defendant-Intervenor want to do so, these two undisputed facts cannot be ignored.

---

[1] *Antidumping Duty Order; Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 51 Fed. Reg. 8,341 (Mar. 11, 1986) (the "*Order*").

And indeed these two facts explain Commerce's long history of excluding dual-stenciled pipe from the scope of all subsequent cases against standard pipe because dual-stenciled pipe was considered to be line pipe, and has never been known as standard pipe. Defendant's argument that this Court should ignore this long history is contrary to past precedent and logic.

Moreover, Defendant and Defendant-Intervenor fail to acknowledge the basic point that the Commission's injury determination prevented Commerce from expanding the scope to include dual-stenciled pipe.  Neither Defendant nor Defendant-Intervenor address the long-standing Federal Circuit precedent that Commerce has a legal obligation not to expand the scope of an order to include products that were not part of the Commission's injury analysis and determination.  Rather, Defendant and Defendant-Intervenor argue only that it was unclear which products were included in the Commission's injury determination, an argument that is just wrong.  The Commission's final injury report make crystal clear that the Commission only included in its injury analysis steel pipe that entered under those TSUSA numbers that did *not* cover the dual-stenciled pipe at issue here.

Finally, Defendant ignores the significance of the Federal Circuit's *Wheatland Tube* decision.  Contrary to Defendant's assertion, the *Wheatland Tube* decisions are directly relevant to this Court's analysis as they address the same issue—whether dual-stenciled pipe can be included in the scope of a case covering standard pipe.  Of particular importance and relevance are those conclusions in *Wheatland Tube* concerning

(1) the reliance on the activities of the petitioner during the opening stages of the investigation to discern the ambit of the scope, (2) the relevance of tariff code coverage to understanding the scope, and (3) the fundamental  importance of the limits of the Commission's injury determinations.  By focusing on narrow factual differences, Defendant ignores the continuing relevance of these basic principles limiting the legal scope of an order.

## ARGUMENT

I. **COMMERCE'S FINAL SCOPE RULING UNLAWFULLY IGNORES THAT THE ORIGINAL INVESTIGATION DOCUMENTS DEMONSTRATE THAT THE SCOPE EXCLUDES ALL LINE PIPE INCLUDING DUAL-STENCILED PIPE.**

Plaintiff's Opening Brief explained that Commerce has a specific regulation governing scope inquiries confirming that Commerce must examine the language of the order under review and the other *original investigation documents* to determine whether the inquiry merchandise is included or excluded from the scope of the order where the language of the order is itself unclear.  *See* Pl's Br. in Support of R. 56.2 Mot. for J. on the Agency R. at 14-16 (Dec. 4, 2020), ECF No. 26 (*referencing* 19 C.F.R. § 351.225(k)(1)) ("Pl's Br.").  The courts have confirmed that although Commerce starts with the language of the order, other investigation documents must also be examined if the scope language is ambiguous.  *See Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1302 (Fed. Cir. 2013) ("Commerce *must* next consider the regulatory history, as contained in the so-called '(k)(1) materials.'") (emphasis supplied); *TMB 440AE, Inc. v. United States*, __ CIT __,__, 399 F. Supp. 3d 1314, 1321 (2019) ("Commerce's regulations are unambiguous—it '*will* take into account' the (k)(1) criteria in conducting a scope determination. {} No case has invalidated this regulatory requirement.") (emphasis in original).

Plaintiff's Opening Brief then detailed how the original investigation documents from the case circular welded pipe ("CWP") from Thailand demonstrate that the *Order* excludes all line pipe, including line pipe that is dual-stenciled pipe.  Pl's Br. at 16-20.

Plaintiff's Opening Brief further explained that such a reading of the scope of the *Order*, that line pipe was always considered to include line pipe that is dual-stenciled, and excluded, was fully consistent with numerous past Commerce scope decisions. *Id.* at 20-24.

In its Response Brief, Defendant makes various rebuttal arguments, but they all fail. Chief among these arguments is Defendant's assertion that the plain language of the *Order* resolves the question now before this Court. Def. Resp. to Pl's R. 56.2 Mot. for J. Upon the Agency Record at 13 (Mar. 26, 2021), ECF No. 37 ("the language of the *Thailand Order* is not ambiguous.") (italics in original) ("Def. Br."). This assertion is not only wrong; it also directly contradicts Commerce's position below. Commerce's Final Scope Ruling explicitly rejected Petitioner's argument that Commerce need not examine investigation documents (so-called (k)(1) sources) because (in Petitioner's view) the scope language was "definitive" (that is, unambiguous). *See* Final Scope Ruling at 6-7 ("We continue to reject Wheatland's argument") (P.R. 76).

Defendant is not allowed *now* to change Commerce's stated position. Defendant's arguments cannot create clarity out of previous acknowledged ambiguity. Defendant tries to focus on the language of the scope alone and to avoid the other documents from the original investigation because those documents so severely undercut Defendant's position. Those documents, properly considered under subsection (k)(1), show the scope of the *Order* has always excluded line pipe, including line pipe that is dual-stenciled pipe. Indeed, that is why prior Commerce cases so consistently interpret the scope of following

pipe cases as excluding line pipe that is dual-stenciled, and why the decision in this case is such an extreme about-face that ignores all of the prior history about the scope of this *Order*.

A.    **Defendant's Rationale for Ignoring Original Investigation Documents Fails**

Defendant first argues that the "the language of the *Thailand Order* is not ambiguous and supports Commerce's" final scope ruling."  *See* Def. Br. at 13.  This argument can be summarily dismissed as inconsistent with the position Commerce took in the underlying scope inquiry.  *See* Final Scope Ruling at 6-7 (P.R. 76).  In addition, the ambiguity as to whether line pipe that is dual-stenciled is apparent from the plain scope language adopted in the *Order*.  The *Order* not only provides certain physical characteristics <u>but also</u> states in pertinent part that "{t}he products under investigation are certain circular welded carbon steel pipes and tubes (referred to in this notice as 'pipes and tubes'), *also known as 'standard pipe'* or 'structural tubing,'" *Order*, 51 Fed. Reg. at 8,341 (emphasis supplied).  The scope language, however, provides no indication what is meant by "also known as" standard pipe.  There is also no reference in the scope language to line pipe or line pipe that is dual-stenciled.

As a result, Commerce's conclusion in this case necessarily rests on addressing the issue not addressed at all in the *Order*—whether line pipe that is dual-stenciled can be considered standard pipe.  The plain language of the scope is completely silent on this issue.  Defendant's suggestion that the question before this Court is resolved by the plain

language of the scope is fundamentally inconsistent with Commerce's stated position on this issue in the proceeding below and the plain language of the *Order*.

By recognizing in the underling proceeding that it had to examine "(k)(1) sources" (that is original investigation documents), Commerce effectively admitted that the scope language was ambiguous as there would be no need to examine the (k)(1) sources if the scope language was truly unambiguous.  Given that Commerce's written scope determination is what is under review, Defendant cannot now deem clear, language that Commerce has already admitted is ambiguous.

Fundamentally, this Court's task is to determine whether Commerce's determination, as written, is supported by substantial evidence and in accordance with law, and not whether the Department of Justice can now belatedly identify alternate grounds for the decision.  "{A} reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." *Thai I-Mei Frozen Foods Co., Ltd. v. United States*, 31 CIT 334, 362, 477 F. Supp. 2d 1332, 1357 (2007) (*quoting SEC v. Chenery, Corp.*, 332 U.S. 194, 196 (1947).

Indeed, we note that Defendant-Intervenor effectively adopts the opposite position from Defendant stating that "Commerce's final scope ruling is supported by substantial evidence derived from the petition, the original investigation, and other determinations specified in section (k)(1)," Def-Int. Wheatland Tube Company's Resp. in Opp. To R.

56.2 Mot. at 23 (Mar. 19, 2021), ECF. No. 34 ("Def-Int. Br."), thereby acknowledging that scope language is ambiguous requiring and requires examining (k)(1) sources.

In short, Defendant's argument that, with respect to the issue dual-stenciled pipe, "the language of the *Thailand Order* is not ambiguous" and therefore it is not necessary to examine original investigation documents is flat wrong.[2] Def. Br. at 13 (italics in original). During the underlying proceeding, Commerce itself found the language was ambiguous and it had an obligation to examine the (k)(1) sources. Final Scope Ruling at 7 (P.R. 76). As a result, the language of the scope read in the context of the (k)(1) sources must serve as the evidentiary benchmark for whether Commerce's scope ruling is supported by substantial evidence.

### B.    Defendant's Attempt to Address And Dismiss The Original Investigation Documents Also Fails

Defendant's second rebuttal is that the original examination documentation does not confirm that dual-stenciled pipe was excluded from the scope of the original Ad investigation, but Defendant's efforts in this regard are lacking. In its Opening Brief, Plaintiff explained in considerable detail how the original petition and the amended petition, when examined in context, demonstrate that dual-stenciled pipe was considered

---

[2] Moreover, Defendant's attempt to argue that Plaintiff somehow never argued that the scope language was ambiguous is just silly. Plaintiff's arguments to Commerce and Plaintiff's arguments to this Court could not be more clear that (a) appropriate legal framework required Commerce to examine original investigation documentation ((k)(1) sources) when the plain language of the *Order* was ambiguous, (b) with respect to dual-stenciled pipe, Commerce was required to examine the (k)(1) sources and (c) such documentation demonstrated that dual-stenciled pipe was excluded.

to be the same as line-pipe, and as line-pipe, was definitely excluded from the scope.  Pl's

Br. at 16-20.  Rather, than actually address the evidence and context in any detail,

Defendant simply makes conclusionary statements.  Rather than truly addressing

Plaintiff's arguments about what the original petition and amended petition mean,

Defendant's primary argument is simply to state that these documents "do not explicitly

exclude dual stenciled pipe" and reiterating that "what matters is the plain language."

Def. Br. at 18.  Such argument does little to address Plaintiff's detailed argument about

the original investigation documentation and what it shows.

Specifically, Plaintiff discussed the withdrawal of the petition with respect to the

tariff headings that covered line pipe, including any line pipe that was dual-stenciled,

Pl's Br. at 16-17, and how that decision was incorporated into the Commission's injury

analysis.  Pl's Br. at 17-18.  Defendant's failure to address or contradict any of these

arguments essentially admits that Commerce's determination was not supported by

substantial evidence.  Defendant offers no rejoinder beyond sweeping assertions about

the factual record.

Likewise, Defendant's claim that past court precedent support its argument also

fail.  Specifically, Defendant's position that "the original petition and the letter fall short

of demonstrating that dual-stenciled pipe is excluded from the scope of the *Thailand*

*Order*", *see* Def. Br. at 17 (italics in original), is based on Defendant's reference to

various cases discussing the role of tariff codes in the interpretation of AD orders.  In

each case, however, the cited authority fails to address the particular issue.

For example, Defendant cites *Novosteel SA v. U.S., Bethlehem Steel Corp.* for the proposition that "absence of particular HTSUS classification number does not show exclusion of any merchandise." Def. Br. at 17. The *Novosteel* case, however, was considering a fundamentally different scope challenge. In that case, the plaintiff alleged, unsuccessfully, that the absence of certain HTSUS codes in the scope resulted in the exclusion of products entered under those tariff headings. *Novosteel SA v. U.S., Bethlehem Steel Corp.*, 284 F.3d 1261, 1268 (Fed. Cir. 2002).

That is not Plaintiff's argument here. Plaintiff is not arguing that the absence *itself* in the language of the scope of the tariff codes that cover line pipe and line pipe that is dual-stenciled is dispositive as to their coverage. Rather, Plaintiff argues that the petitioners explicit withdrawal of its petition as to the group of products that fall within those tariff codes demonstrates that no relief was sought for those products, no Commission investigation was conducted for those products, and thus those products could not be included in the scope of any order issuing from that petition. The absence of tariff codes from the scope language is not the point. The key is that the petitioners used the tariff codes as shorthand to identify those products for which it was withdrawing its request for relief, thus removing these products from the scope of the investigation. In that scenario, it is crucial to understand the coverage of the tariff codes in order to understand the scope of what was left subject to the investigation.

Defendant also cites *Smith Corona Corp. v. United States* and *Wirth Ltd. v. United States*. Def. Br. at 17. Although both cases address the legal premise addressed in

*Novosteel,* they do not contain any legal analysis that would bear on the role that tariff codes play in this case, *i.e.* demonstrating whether line pipe that is dual-stenciled was withdrawn from the petition. *Smith Corona* addresses whether "a change in tariff classification after the investigation and order does not of itself change the intended scope of the order." *Smith Corona Corp. v. United States*, 915 F.2d 683, 687 (Fed. Cir. 1990). This legal point is wholly unrelated to the issues before this Court here. Similarly, *Wirth* did not address the role of tariff classification in understanding products that had been withdrawn from a petition. *Wirth Ltd. v. United States*, 22 CIT 285, 290-292, 5 F. Supp. 2d 968, 973-74 (1998) (identifying the four issues under appeal). Accordingly, both cases are inapposite.[3]

### C.   Defendant's Improperly Ignores Commerce's Past Scope Definitions In Standard Pipe Cases

In its Opening Brief, Plaintiff noted that Commerce's regulations provide that in making a new scope determination Commerce "will take into account … scope determinations," and argued that following the requirement was particularly important in

---

[3] Likewise, the arguments of Defendant-Intervenor fail to address properly the importance of the original investigation documents. Defendant-Intervenor further argues that "{t}he only change to the language in the scope that resulted from petitioner's withdrawal process was the omission of TSUS subheadings 610.3208 and 3209 from the final scope language {and that} the removal of these subheadings was apparently made by Commerce and was not requested by petitioners." Def-Int. Br. at 15. However, this argument fails to address the fundamental point that Plaintiff is making. The importance of the withdrawal letter is not the fate of the relevant subheadings but the intent that was demonstrated by reference to those subheadings. No party disputes that line pipe and line pipe that is dual-stenciled were covered by the same tariff codes at issue. The reference to those tariff codes, therefore, demonstrates an intent to withdraw the petition with respect to all of those products.

this case because there was a well-developed history of Commerce and Commission investigations of CWP that confirmed that dual-stenciled pipe has always been considered to be line pipe.  Pl's Br. at 14-16 (*referencing* 19 C.F.R. §351.225(k)(1)).  In response, Defendant effectively argues that this Court should ignore all of the subsequent decisions by Commerce and the Commission regarding the definition of CWP.  Def. Br. at 18-19.  This argument to ignore prior Commerce decisions is contrary to Commerce's own regulation and to settled court precedent.

Commerce's regulations direct it to consider "the determinations of the Secretary (including prior scope determinations)" in addition to other (k)(1) sources.  19 C.F.R. §351.225(k)(1).  The reference to prior scope determinations is notably absent from Defendant's recitation of this rule.  Def. Br. at 19.  Instead, Defendant urges an incredibly narrow reading of the regulation that conflicts with the regulation's plain language.  *Id.* Defendant states that because petition and initial investigation are singular, the subsequent plural reference to determinations that Commerce and the Commission make is limited to the specific proceeding on the specific country.  *Id.*  This position is inconsistent with Commerce's own approach to the record in the underlying investigation and settled jurisprudence.

In the Final Scope Ruling, Commerce notes that "Commerce would be acting inconsistently with our statutory and regulatory obligations if we ignored the (k)(1) sources placed on the record by Saha Thai in rendering our scope determination."  Final Scope Ruling at 6 (internal citations omitted) (P.R. 76). Plaintiff placed documents from

subsequent injury determinations regarding the *Order* on the record.  *See Scope*

*Comments* at Attach. 7, 9 (placing elements of the record from certain sunset proceedings

on the record) (P.R. 25, 28); *see also* Pl's Br. at 8-9 (discussing the progression of the

Commission's sunset reviews).  Further, in its Final Scope Ruling, Commerce actually

considered the sources that Defendant would now have this Court ignore.  Specifically,

Commerce noted that "{a}s partially documented in the ITC Fourth Sunset Final, there

has been a decades-long history of trade remedy proceedings involving steel 'pipes and

tubes.'"  Final Scope Ruling at 12 (P.R. 76).  This Court is examining whether the

analysis that Commerce actually performed supports its determination as written and the

analysis discussed above is part of that.

Additionally, Commerce and the courts have already repeatedly considered what

line pipe means with respect to the issue of whether it includes line pipe that is dual-

stenciled and answered the question with a definitive "yes."  *Wheatland Tube Co. v.*

*United States*, 161 F.3d 1365, 1368-69 (Fed. Cir. 1998) (affirming the CIT's decision

which left Commerce's scope ruling undisturbed).  Defendant offers no support for the

contention that Commerce's regulation excludes from the (k)(1) factors "prior scope

determinations" or other determinations of Commerce or the Commission because they

were made in the context of a different order.  Indeed, this would be an absurd reading as

the Commission in particular often conducts multi-country proceedings and all scope

rulings for all of those countries must be consistent ensure that there is coherence

between the injury determination and the scope.  *Wheatland Tube*, 161 F.3d at 1368-69.

As a result, this Court's analysis of whether Commerce's scope ruling was supported by substantial evidence must include Commerce's other determinations regarding line pipe and the sunset reviews conducted by the Commission.

Commerce later states that it "disagrees with Saha Thai assertion that the sources enumerated under 19 CFR 351.225(k)(1) include determinations in proceedings on similar CWP products 'from different countries.'" Def. Br. at 14. This argument about the meaning of Commission's determinations in the sunset reviews, however, ignores two key facts. First, the evidence is on the record and, as Commerce states, it is relevant to whether the scope ruling is supported by substantial evidence. Final Scope Ruling at 7 (*citing Shenyang Yuanda Aluminum Industry Engineering Co., Ltd. v. United States*, 776 F.3d 1351, 1354 (Fed. Cir. 2015)) (P.R.76). Second, the sunset reviews are directly related to the *Order* on Thailand. Without a finding in the context of the sunset reviews that "material injury would be likely to continue or recur," 19 U.S.C. §1675(d)(2)(B), the *Order* would be revoked. It is true that other orders reviewed in these sunset reviews had different scope language. Some of those orders included an express exclusion for line pipe. Revocation would, however, apply equally to orders imposed on any country covered by the sunset review. The Commission's determination and the underlying reasoning are, therefore, a "determination{} of {} the Commission" within the meaning of Commerce's regulation. 19 C.F.R. §351.225(k)(1). As a result, there is no basis in this record, or the law, for Commerce to ignore the evidence in the sunset reviews in this case or afford it less weight.

Finally, the Federal Circuit has repeatedly found that "antidumping and countervailing duty orders 'should not be interpreted in a vacuum devoid of any consideration of the way the language of the order is used in the relevant industry.'" *Fedmet Res. Corp. v. United States*, 755 F.3d 912, 921 (Fed. Cir. 2014) (*quoting ArcelorMittal Stainless Belg. N.V. v. United States*, 694 F.3d 82, 88 (Fed. Cir. 2012)).  As Commerce states, the fourth sunset review includes a description of a "decades-long history of trade remedy proceedings involving steel 'pipes and tubes.'"  Final Scope Ruling at 12 (P.R. 76). This evidence is, therefore, directly relevant to discerning whether the group of products referred to as line pipe includes line pipe that is dual-stenciled, the key question in this case. For these reasons, this Court should reject Defendant's narrow reading of the (k)(1) documents relevant here.

**II.     BECAUSE IT INCLUDES A PRODUCT THAT EXPLICITLY EXCLUDED FROM THE COMMISSION'S INJURY ANALYSIS AND DETERMINATION, COMMERCE'S OVERBROAD SCOPE RULING IS CONTRARY TO LAW**

In its Opening Brief Plaintiff explained why, *as a matter of law*, Commerce may not expand the scope to include dual-stenciled pipe because the Commission did not include dual-stenciled pipe in its injury analysis.  *See* Pl's Br. at 26-36.  This legal prohibition has been affirmed by the courts, including cases addressing orders covering CWP.  Fundamentally, the scope of the order is limited by the injury determination that serves as the factual and legal predicate for the order. *See* 19 U.S.C. §1673d(b), (c); *see also Wheatland Tube,* 161 F.3d at 1371 (a scope ruling that diverges from the underlying injury determination would "frustrate the purpose of the antidumping laws because it would allow Commerce to assess antidumping duties on products intentionally omitted from the ITC's injury investigation"); *A.L. Patterson, Inc. v. United States*, 585 Fed. Appx. 778, 785-786 (Fed. Cir. 2014) ("there is insufficient evidence to conclude that Patterson's coil rod, a distinctly different product than steel threaded rod, was part of the Commission's material injury investigation."); *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1089 (Fed. Cir. 2002) (discussing the importance of the Commission's proceedings in imposing trade remedy orders); *Eckstrom Indus. v. United States*, 254 F.3d 1068, 1075 (Fed. Cir. 2001) ("the ITC's finding of material injury was directed to fittings classifiable under HTSUS 7307.23.00, which does not cover cast fittings."). Finally, this section of Plaintiff's Opening Brief demonstrated the undisputed fact that the Commission has repeatedly confirmed in sunset reviews of the very *Order*, covering

CWP, under review in this case that all line pipe—including dual-stenciled line pipe—was not within the scope in the underlying investigation and is excluded from the scope without qualification.  Pl's Br. at 32.

In its Response Brief Defendant argues that, in fact, Commerce's final scope ruling "is consistent" with the Commission's injury analysis and subsequent sunset reviews.  Def. Br. at 20-23.  Defendant's understanding of the key documents at issue is just wrong.

In particular, Defendant baldly and incorrectly asserts that "{t}he ITC's acknowledgement of the partial withdrawal of the petition as to line pipe does not show that the ITC omitted dual-stenciled pipe from its injury investigation covering Thailand." Def. Br. at 20.  In fact, the Commission's discussion of the precise merchandise subject to the AD investigation underlying the *Order* (a) explicitly noted the petition amendment and (b) explicitly identified "subject merchandise" as falling in tariff codes that did not cover dual-stenciled pipe.  These facts, confirm that the Commission did not consider dual-stenciled pipe as part of the subject merchandise being investigated.  Indeed, such fact is completely evident from the Commission's determination itself.

The Commission analyzes whether the subject merchandise caused the domestic industry to suffer material injury or the threat of material injury.  19 U.S.C. §1673d(b)(1).  As part of this assessment, in its injury investigation the Commission examined the volume of imports of the subject merchandise and how the quantity of imports changed over the three-year time period.  *See Certain Welded Carbon Steel Pipes And Tubes*

*From Turkey And Thailand*, Inv. Nos. 701-TA-253 and 731-TA-252, USITC Pub. 1810 at 15-16 (Feb. 1986) (Final).[4]  To ensure the most accurate analysis possible, the Commission includes all known imports of the subject merchandise.  The Commission's import volume analysis on page I-16 of the Commission's Report for the injury investigation identifies those imports that were considered in the injury determination. *Id.* at I-16.  The table on page I-16 provides the total import quantity of "subject merchandise" (that is, "standard pipe and tubes") from each country including Thailand. *Id.*  The Commission's report confirms that the source of the import quantities of "subject merchandise" are the volumes of imports that entered the United States under certain TSUSA numbers, specifically, 610.3231, 610.3232, 610.3241, 610.3242, 610.3243, 610.3244, 610.3247, 610.3252, 610.3254, 610.3256, 610.3258, and 610.4925.  *Id.*  The Commission's injury analysis and determination therefore relied on official import statistics (TSUSA numbers) for assessing the quantity and market shares of imports subject to the AD case.  *Id.*  (noting that the data was "Compiled from official statistics of the U.S. Department of Commerce").

As detailed extensively in Plaintiff's Opening Brief, none of these TSUSA numbers included any dual-stenciled line pipe. Pl's Br. at 5-7.  Rather, at that time, all dual-stenciled line pipe would have been entered under different TSUSA numbers that were not included.  *Id.* at 6 (demonstrating that dual-stenciled line pipe would enter under 610.3208 and 610.3209).  This fact not dispute.  Therefore, the Commission's final injury

---

[4] The Commission's Report was placed on the record of the administrative proceeding in Plaintiff's Scope Comments. *Scope Comments* at Attach. 5. (P.R. 23, 25).

determination itself demonstrates that dual-stenciled pipe was excluded from the underlying injury determination.

This fundamental fact is further confirmed in the approach taken by the Commission in subsequent sunset reviews where it has explicitly stated that it was not considering line pipe that is dual-stenciled.  Pl's Br. at 32-33.  Both Defendant and Defendant-Intervenor argue that this Court should ignore these reviews because the Commission was presenting generalized statements about the scopes of various orders and was not focused on the *Order* that is under review in this case.  Def. Br. at 22, Def-Int. Br. at 18.  These sunset review determinations, however, address the specific injury determination underlying the continued imposition of duties pursuant to the *Order*.  Without those determinations and the underlying factual predicate, the *Order* would terminate.  19 U.S.C. §1675(d).  These sunset reviews are (k)(1) sources that Commerce was bound to consider in making its scope ruling.

In short, Defendant's attempt to claim that there is no evidence that the Commission did not include dual-stenciled pipe in its injury analysis is wrong.  There is conclusive evidence that the Commission affirmatively excluded imports of dual-stenciled line pipe from its injury determination.  This fact is apparent from the Commission's injury reports themselves and Commerce's failure to acknowledge this fact in its scope ruling renders it unsupported by substantial evidence or otherwise contrary to law.

### III.    COMMERCE'S SCOPE RULING IS CONTRARY TO SETTLED LAW UNDER *WHEATLAND TUBE*

In the last section of its Opening Brief, Plaintiff explained how the Federal Circuit has effectively already decided the key issue present in this case.  Pl's Br. at 37-40. Plaintiff argued that in light of the *Wheatland* Tube decision "*Commerce's final scope ruling is contrary to Federal Circuit precedent*." Pl's Br. at 2 (emphasis supplied).  In its Response Brief, Defendant argues that *Wheatland Tube* should not guide this Court's decision due to differences in the scope language adopted in the orders under review in that case and differences in the legal framework applied to scope rulings when the Federal Circuit decided *Wheatland Tube*.  Def. Br. at 14-15.

Defendant's argument should be rejected because *Wheatland Tube* remains good law and sets forth important principles to guide this Court's decision.  Contrary to Defendant's assertion, the analysis of specific sets of evidence in *Wheatland Tube*—and the factual conclusions flowing from that evidence are directly relevant to this appeal. Specifically, (1) the reliance on the activities of the petitioner during the opening stages of the investigation to discern the ambit of the scope, (2) the relevance of tariff code coverage to understanding the scope, and (3) the fundamental  importance of the Commission's injury determinations in sunset reviews all apply and confirm the value of *Wheatland Tube* as a controlling precedent here.

First, in *Wheatland Tube*, the CIT's analysis of the investigation documents, what now are considered (k)(1) sources, demonstrates that the court and the parties were grappling with essentially the same question, whether line pipe that can be dual-stenciled

is properly covered by the order. *Wheatland Tube v. United States*, 21 CIT 808, 815, 973 F. Supp. 149, 156 (1997) ("petitioners acknowledged that importers could sell dual-certified pipe entered under the HTS line pipe item into either the line pipe or standard pipe market after it entered the United States."). The CIT's review of this issue focused on representations made to Commerce by the petitioners, which illustrated "petitioners' intention to exclude any pipe entered as line pipe." *Id.* at 816, 156. The primary documentation driving Commerce's conclusion in the underlying proceeding was communication by the petitioners early in the investigation that focused on which pipe should be excluded. *Id.* Consequently, *Wheatland Tube* instructs that the factual evidence underlying the opening stages of the investigation that gave rise to the *Order* is critical to understanding whether the domestic industry was seeking relief from line pipe that is dual-stenciled.

Stated differently, *Wheatland Tube* demonstrates that Defendant's core argument—that the intent of the original petitioner is largely irrelevant "because the final language of the *Thailand Order* was left to Commerce to decide," Def. Br. at 19 (italics in original)—has it exactly wrong. Where, as here, there is ambiguity in the language that Commerce adopts in the order, the historical context and documentation provided by the opening stages of the investigation are crucial to understanding the scope of the relief sought and thus the scope of the relief granted. That the scope language adopted in the order was somewhat different in *Wheatland Tube* does not change the basic principle that historical context matters for understanding the language.

Second, *Wheatland Tube* also highlighted the importance of tariff classifications. Defendant argues that the observations regarding the coverage of the relevant tariff codes is immaterial to this decision because "{s}ubheadings are included in antidumping duty orders for convenience and customs purposes; they do not define those orders' scope." Def. Br. at 17 (citations omitted).  Although the tariff codes do not define the scope, this narrow conception of the role of the tariff descriptions ignores the role they played in the both the CIT and Federal Circuit's analyses in *Wheatland Tube* precisely because of the importance of the investigation documents in determining the meaning of the scope.

In *Wheatland Tube*, the CIT focused on the definition of the tariff headings because the initial efforts to delineate the scope of the petition focused on the definition of the tariff headings.  *Wheatland Tube*, 21 CIT at 810-11, 973 F. Supp. at 152.  The Federal Circuit also focused on the role that the petitioners reliance on tariff headings played in defining the scope of the relief they were requesting.  *Wheatland Tube*, 161 F.3d at 1369 ("Wheatland also contradicts its statements during the antidumping investigations that they should cover pipe entering the United States under one of the tariff numbers pertaining to standard pipe and that pipe entering as line pipe would be outside the scope of the petitions").

The key point was not that the inclusion of the tariff headings themselves defined the scope, but that the petitioner's reliance on those tariff headings to define the scope in its communications with Commerce made the definition of those tariff headings central to understanding what was removed from the scope of the case.  The intended scope of a

petition—and the investigation that then resulted—is the fundamental building block upon which an antidumping or countervailing duty order is built.

Indeed, this is why the *Wheatland Tube* decisions confirm that removing the tariff codes that cover line pipe from the petition demonstrated that dual-stenciled pipe had also been removed from the scope.  In its opinion in *Wheatland Tube*, the CIT focused on the fact that "Commerce concluded that 'petitioners understood that HTS classification of pipe products was based upon the specificity of the category, not actual use, and that dual-certified pipe would be placed in the line pipe category and, thus, excluded from the order.'"  *Wheatland Tube*, 21 CIT at 816, 973 F. Supp. at 156.

And so, the analysis performed by the CIT and the Federal Circuit on this point in the *Wheatland Tube* case bears directly on the case here.  Commerce was working with a nearly identical situation where the petitioner withdrew the petition as to the merchandise covered by tariff headings similar to those at issue in *Wheatland Tube.*  Specifically, in the instant case the tariff codes removed in petitioners' withdrawal letter were known at the time to cover dual-stenciled pipe.  *See* Pl's Br. at 17-20 (demonstrating the inclusion of dual-stenciled pipe in the tariff heading covering line pipe that were excluded).  It would therefore be inconsistent with *Wheatland Tube* for this Court to find that the removal of tariff codes covering dual-stenciled pipe from the scope of this investigation had no effect on the coverage of those items when the Federal Circuit, and the CIT before it, found the exact opposite.

Finally, and perhaps most importantly, a core premise of the Federal Circuit's decision in *Wheatland Tube* was that reversing Commerce's negative scope ruling "would itself frustrate the purpose of the antidumping laws because it would allow Commerce to assess antidumping duties on products intentionally omitted from the ITC's injury investigation." *Wheatland Tube*, 161 F.3d at 1371. The CIT observed that "{a} fundamental requirement of both U.S. and international law is that an antidumping duty order must be supported by an ITC determination of material injury covering the merchandise in question." *Wheatland Tube*, 21 CIT at 819, 973 F. Supp. at 158. This principle has been repeatedly reinforced in subsequent decisions. *See, e.g., A.L. Patterson, Inc. v. United States*, 585 Fed. Appx. at 785-786; *Duferco Steel*, 296 F.3d at 1089; *Eckstrom Indus.*, 254 F.3d at 1075.

Defendant does not attempt to challenge these specific holdings in the *Wheatland Tube* decisions about the importance of the scope of the Commission's injury determination. Rather, Defendant appears to suggest that *Wheatland Tube* has been superseded because "the analysis in *Wheatland Tube* began with the scope proposed by the original petition {and} that approach is no longer consistent with the governing precedent from the Federal Circuit." Def. Br. at 15.

However, Defendant's argument that the *Wheatland Tube* approach has been superseded and has no precedential authority fails. There is nothing in subsequent Federal Circuit precedent that suggests any invalidation of the key *Wheatland Tube* conclusions that investigation documents should be considered when analyzing the

proper scope of an AD order and that Commerce may not adopt a scope definition that goes beyond those products included in the Commission's injury analysis.

The *Wheatland Tube* decisions, therefore, remain directly relevant and provide useful guidance for this Court in how it must look at withdrawal of merchandise from the petition and the role of the Commission's injury findings.  The *Wheatland Tube* decisions are especially relevant here given that the scope ruling under review in those proceedings considered the exact same merchandise, CWP.  Defendant's suggestion that the difference in the prevailing analytical framework at Commerce robs the *Wheatland Tube* decisions of their force in this proceeding is meritless.

Defendant also attempts to cast doubt on whether it was evident from the Commission's injury determination that dual-stenciled pipe was not covered by the Commission's analysis. Def. Br. at 20 ("The ITC's acknowledgement of the partial withdrawal of the petition as to line pipe does not show that the ITC omitted dual-stenciled pipe from its injury investigation covering Thailand.").  However, as we detail in Section II, this argument is just wrong.  It is very clear from the Commission's injury decision that imports of dual-stenciled pipe were not included in the Commission's injury analysis.

The *Wheatland Tube* decisions emphasize the importance of this fact, and demonstrate that Defendant's suggested analytic approach on this topic is wrong. Defendant effectively claims that Saha Thai must prove that the Commission did not include dual-stenciled pipe in its injury analysis.  But such burden of proof claim is

contrary to the holding in *Wheatland Tube*. *Wheatland Tube* instructs that where an ambiguity in the coverage of the scope exists, Commerce, in the context of its scope ruling, must find that the Commission actually did consider the relevant merchandise for there to be a proper legal basis for applying AD duties to those products. *Wheatland Tube*, 161 F.3d at 1371 (holding that it would "frustrate the purpose of the antidumping laws because it would allow Commerce to assess antidumping duties on products intentionally omitted from the ITC's injury investigation."). Here, the factual record shows the opposite, that the Commission omitted line pipe that is dual-stenciled from it injury analysis.

Finally, Defendant's attempt to dismiss the importance of the *Wheatland Tube* decisions because of the exclusionary language in the order at issue in those cases also fails. At the outset we note this argument presupposes that dual-stenciled pipe is included in the *Order*. The removal of the tariff headings covering line pipe and dual-stenciled pipe shows that the affirmative scope of the *Order* never covered those items and thus no exclusion was necessary for Commerce to reach the conclusion that that dual-stenciled line pipe was not within the scope of the order. Commerce may have adopted the exclusionary language in later orders on the same goods as a prudential matter, but the absence of exclusionary language does not show that line pipe that is dual-stenciled was affirmatively *included* in those products that were initially investigated under the *Order*. As Plaintiff has demonstrated throughout this proceeding, the factual record shows that they were not.

Finally, it is important to emphasize the timing of the exclusionary language of the

relevant orders in *Wheatland Tube*.  In the administrative proceeding underlying the

*Wheatland Tube* decisions, Commerce observed that

> the descriptions of the merchandise contained in the petition, the initial
> investigations, and the determinations of the Department and the ITC, plus
> the record compiled during this scope inquiry, indicate that it is correct to
> conclude that API 5L line pipe and dual-certified pipe were excluded from
> these proceedings *from their inception*.

*Final Negative Determination of Scope Inquiry on Certain Circular Welded Non-Alloy*

*Steel Pipe and Tube From Brazil, the Republic of Korea, Mexico and Venezuela*, 61 Fed.

Reg. 11,608, 11,612 (Mar. 21, 1996) (emphasis supplied).  The exclusionary language,

upon which Defendant and Defendant-Intervenor rest their distinction of this case, was

only added later in the proceeding. *Cf. Initiation of Antidumping Duty Investigations:*

*Circular Welded Non-Alloy Steel Pipe From Brazil, the Republic of Korea, Mexico,*

*Romania, Taiwan, and Venezuela*, 56 Fed. Reg. 52,528 (Oct. 21, 1991) (omitting any

exclusion regarding line pipe from the initial scope language).

In short, contrary to the suggestion that the *Wheatland Tube* decision was

premised entirely on the existence of exclusionary language for line pipe that is dual-

stenciled, it is clear that the Federal Circuit and CIT performed and relied on a far more

probing analysis in reaching their respective decisions.  The CIT in particular relied

heavily on the documents underlying Commerce's determination in upholding

Commerce's determination that line pipe that was dual-stenciled was outside of the scope

of the orders considered in *Wheatland Tube*.  This Court should perform a similarly

thorough analysis and conclude that the record in this case does not support Commerce's

divergence from those prior decisions here.

## CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests this Court hold unlawful Commerce's final scope ruling rendered in the underlying proceeding with instructions for Commerce to reissue its scope ruling consistent with this Court's decision.

Respectfully submitted,

/s/ Daniel L. Porter

Daniel L. Porter
James P. Durling
James C. Beaty

*Counsel for Plaintiff Saha Thai*

## Word Count Certificate of Compliance

This brief has been prepared utilizing Microsoft Word using a proportionally spaced typeface 13 point Times New Roman font.

In accordance with the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that this brief complies with the word limitations set forth in the Chambers Procedures. Specifically, excluding those exempted portions of the brief as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains 6,811 words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Daniel L. Porter
Daniel L. Porter

Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, NW
Washington, D.C., 20006

*Counsel for Plaintiff Saha Thai*

Dated: April 23, 2021