**UNITED STATES OF COURT OF INTERNATIONAL TRADE**

***Before:*** **The Honorable Stephen Alexander Vaden, Judge**

**Saha Thai Steel Pipe Public Company, Limited**

Plaintiff,

v.

**United States**

Defendant,

and

**Wheatland Tube Company**

Defendant-Intervenor.

**Court No. 20-00133**

**JOINT APPENDIX TO THE PARTIES' BRIEFS**

Daniel L. Porter
James P. Durling
James C. Beaty

**Curtis, Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, NW
Washington, DC, 20006

May 7, 2021

*Counsel for Plaintiff Saha Thai*

Pursuant to this Court's Order dated March 19, 2021, ECF No. 36, Plaintiff Saha Thai Steel Pipe Public Company, Limited ("Saha Thai"), on behalf of all parties in this action, hereby submits the joint appendix of administrative record documents cited in the parties' brief previously submitted to this Court. Saha Thai prepared this joint appendix based on documents identified by the parties.

**INDEX OF DOCUMENTS**

| Tab | Name | Record Number(s) |
|---|---|---|
| 1 | LETTER FROM USDOC TO INTERESTED PARTIES PERTAINING TO INTERESTED PARTIES INITIATION OF SCOPE INQUIRY (July 29, 2019) | 2 |
| 2 | RESPONSE FROM SCHAGRIN ASSOCIATES TO SEC OF COMMERCE PERTAINING TO PETITIONER SCOPE COMMENTS (Aug. 26, 2019) | 19, 20 |
| 3 | LETTER FROM CURTIS, MALLET-PREVOST, COLT & MOSLE LLP TO SEC OF COMMERCE PERTAINING TO SAHA THAI SCOPE COMMENTS (Aug. 26, 2019) | 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31 |
| 4 | LETTER FROM CURTIS, MALLET-PREVOST, COLT & MOSLE LLP TO SEC OF COMMERCE PERTAINING TO SAHA THAI REBUTTAL COMMENTS ON SCOPE INQUIRY (Sept. 3, 2019) | 34 |
| 5 | MEMO FROM USDOC TO DAS FOR OPERATIONS PERTAINING TO INTERESTED PARTIES SCOPE INQUIRY SELF INITIATION (Nov. 22, 2019) | 36 |
| 6 | MEMO FROM USDOC TO FILE PERTAINING TO INTERESTED PARTIES DOCS PLACED ON RECORD (Dec. 6, 2019) | 38, 39 |
| 7 | LETTER FROM CURTIS, MALLET-PREVOST, COLT & MOSLE LLP TO SEC OF COMMERCE PERTAINING TO SAHA THAI COMMENTS ON SCOPE INQUIRY (Dec. 20, 2019) | 52 |
| 8 | LETTER FROM CURTIS, MALLET-PREVOST, COLT & MOSLE LLP TO SEC OF COMMERCE PERTAINING TO SAHA THAI CMTS ON SCOPE INQUIRY (Dec. 30, 2019) | 53 |
| 9 | MEMO FROM USDOC TO DAS FOR OPERATIONS PERTAINING TO INTERESTED PARTIES PRELIMINARY SCOPE INQUIRY DECISION (Feb. 25, 2020) | 62 |
| 10 | BRIEF FROM SCHAGRIN ASSOCIATES TO SEC OF COMMERCE PERTAINING TO WHEATLAND TUBE CASE BRIEF (Mar. 23, 2020) | 68 |
| 11 | BRIEF FROM CURTIS, MALLET-PREVOST, COLT & MOSLE LLP TO SEC OF COMMERCE PERTAINING TO SAHA THAI CASE BRIEF - SCOPE (Mar. 30, 2020) | 71 |
| 12 | BRIEF FROM CURTIS, MALLET-PREVOST, COLT & MOSLE LLP TO SEC OF COMMERCE PERTAINING TO SAHA THAI REBUTTAL BRIEF (Apr. 9, 2020) | 72 |
| 13 | BRIEF FROM SCHAGRIN ASSOCIATES TO SEC OF COMMERCE PERTAINING TO WHEATLAND TUBE REBUTTAL BRIEF (Apr. 9, 2020) | 73 |
| 14 | MEMO FROM USDOC TO DAS FOR OPERATIONS PERTAINING TO INTERESTED PARTIES FINAL SCOPE RULING (June 30, 2020) | 76 |

**Tab 1**

LETTER FROM USDOC TO INTERESTED PARTIES PERTAINING TO INTERESTED
PARTIES INITIATION OF SCOPE INQUIRY (July 29, 2019) (P.R. 2)

Barcode:3872413-01 A-549-502 SCO - Scope Inquiry - Line Pipe

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-549-502
Anti-Circumvention Inquiry
Scope Inquiry
**Public Document**
E&C Office VII: AC

July 29, 2019

RE: *Circular Welded Carbon Steel Pipes and Tubes from Thailand*: Scope Inquiry on Line Pipe

Dear Interested Parties:

On January 31, 2019, the petitioners[1] filed a request for a circumvention ruling pursuant to 781(c) of the Tariff Act of 1930, as amended (the Act).[2] Specifically, the petitioners asked the Department of Commerce (Commerce) to determine whether Saha Thai Steel Pipe (Public) Company, Ltd. (Saha Thai) is circumventing the antidumping duty (AD) order on circular welded carbon steel pipes and tubes from Thailand,[3] by performing minor alterations on standard pipe to convert it to allegedly non-subject "line pipe." On February 19, 2019, Saha Thai rebutted the petitioners' submission claiming that Saha Thai paid AD duties on all U.S. imports of pipe, identified by the petitioners.[4]

On May 3, 2019, Commerce issued a supplemental questionnaire to the petitioners asking them to clarify and supplement their claim that the standard pipe exported by Saha Thai is being subject to minor alterations in form or appearance and exported to the United States.[5] On May 30, 2019, the petitioners responded to our request for information.[6]

On June 6, 2019, Saha Thai responded to the petitioners' May 30, 2019 submission, arguing that the petitioners have only shown that Saha Thai has produced and exported steel pipe that meets the specifications of line pipe.[7] Specifically, Saha Thai argued that "Saha Thai has not circumvented the current antidumping duty order, but rather, in fact, has simply produced and exported to the United States line pipe – non-subject merchandise that is expressly excluded from the circular welded line pipe antidumping duty order…{which} cannot be subject to {a} minor alteration anti-circumvention investigation."[8] Finally, on

---

[1] The petitioners are Wheatland Tube Company, Independence Tube Corporation, a Nucor Company, and Southland Tube, Incorporated, a Nucor Company.
[2] *See* Petitioners' Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Request for Circumvention Ruling Pursuant to Section 781(c) of the Tariff Act of 1930," dated January 31, 2019 (Circumvention Request).
[3] *See Antidumping Duty Order; Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 51 FR 8341 (March 11, 1986) (*Antidumping Duty Order*).
[4] *See* Saha Thai's Letter, "Saha Thai's Response to Petitioners' Circumvention Allegation: Circular Welded Carbon Steel Pipe and Tubes from Thailand (AR 16-17)," dated February 19, 2019.
[5] *See* Commerce's Letter, "Request for Circumvention – Circular Welded Carbon Steel Pipes and Tubes from Thailand: Request for Further Information," dated May 3, 2019.
[6] *See* Petitioners' Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Response to Request for Information for Allegation of Circumvention," dated May 30, 2019.
[7] *See* Saha Thai's Letter, "Saha Thai's Comments to Petitioner's May 30, 2019 Response to Department Request: Circular Welded Carbon Steel Pipe and Tubes from Thailand," dated June 6, 2019.
[8] *Id*. at 2.

Filed By: Alexander Cipolla, Filed Date: 8/1/19 10:26 AM, Submission Status: Approved

June 14, 2019, the petitioners argued that the scope language does not exclude "line pipe" or products that are dual-stenciled, and, therefore, any minor alterations to standard pipe to classify it as line pipe does not remove it from the scope of the *Order*.[9]

The scope language provides that "pipe and tube with an outside diameter of 0.375 inches or more but not over 16 inches" is subject to the *Order*.[10] Commerce intends to issue a final scope ruling within 45 days of the issuance of this memorandum regarding the merchandise at issue and this scope language. We are providing an opportunity for interested parties to submit comments and factual information on this matter no later than 5:00 p.m. Eastern Time, on August 8, 2019, and rebuttal comments and factual information no later than 5:00 p.m. Eastern Time, on August 15, 2019. If Commerce determines that the line pipe in question is subject merchandise, we will issue a scope ruling and not initiate an anti-circumvention inquiry. Alternatively, if Commerce determines, in accordance with 19 CFR 351.225, that the merchandise is not subject to the *Order*, we will resume our analysis of the petitioners' anti-circumvention inquiry request.

Should you have any questions on this matter, please contact Alex Cipolla at (202) 482-4956.

Sincerely,

Steven Presing
Acting Senior Director, Office VII
Antidumping and Countervailing Duty Operations

[9] *See* Petitioners' Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Response to Saha Thai's June 6, 2019 Comments," dated June 14, 2019 at 5; *see also Antidumping Duty Order*, 51 FR at 8341.
[10] *See Antidumping Duty Order*, 51 FR at 8341.

**Tab 2**

RESPONSE FROM SCHAGRIN ASSOCIATES TO SEC OF COMMERCE PERTAINING TO
PETITIONER SCOPE COMMENTS (Aug. 26, 2019) (P.R. 19-20)

Barcode:3883503-01 A-549-502 SCO - Scope Inquiry - Line Pipe

SCHAGRIN ASSOCIATES

900 SEVENTH STREET, N.W. - SUITE 500 - WASHINGTON, D.C. 20001
P: (202) 223-1700 E: LMEISNER@SCHAGRINASSOCIATES.COM F: (202) 429-2522

August 26, 2019

DOC Case No.: A-549-502
Total Pages: 169
Anti-Circumvention Inquiry
Scope Inquiry

**PUBLIC VERSION**

Petitioner's Business Proprietary Information
Deleted from Brackets on Exhibits 1-2.

The Honorable Wilbur Ross, Jr.
Secretary of Commerce
Attention: Enforcement & Compliance
Central Records Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

**Re: Circular Welded Carbon Steel Pipes and Tubes from Thailand: Response to July 29, 2019 Request for Comments**

Dear Secretary Ross:

On behalf of Wheatland Tube Company ("Petitioner"), we hereby respond to the July 29, 2019 request by the U.S. Department of Commerce ("Commerce") for comments on whether the scope of the antidumping duty order on *Circular Welded Carbon Steel Pipes and Tubes from Thailand* (the "Order") covers line pipe and products that are dual-stenciled as both standard pipe and line pipe. As discussed in greater detail below, Commerce should find that the plain language of the scope does, in fact, cover these pipe and tube products because they are circular in shape, welded, made of carbon steel, and have an outside diameter of 0.375 inches or more, but not exceeding 16 inches.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

## I. Scope of the Order

The current scope of the order on *Circular Welded Carbon Steel Pipes and Tubes from Thailand* describes the subject merchandise as:

> certain circular welded carbon steel pipes and tubes from Thailand. The subject merchandise has an outside diameter of 0.375 inches or more, but not exceeding 16 inches. These products, which are commonly referred to in the industry as "standard pipe" or "structural tubing" are hereinafter designated as "pipes and tubes." The merchandise is classifiable under the Harmonized Tariff Schedule of the United States (HTSUS) item numbers 7306.30.1000, 7306.30.5025, 7306.30.5032, 7306.30.5040, 7306.30.5055, 7306.30.5085 and 7306.30.5090. Although the HTSUS subheadings are provided for convenience and purposes of U.S. Customs and Border Protection (CBP), the written description of the merchandise subject to the order is dispositive.[1]

## II. Legal Framework

To determine whether a product is subject to an antidumping or countervailing duty order, Commerce follows an interpretive framework provided in the regulations.[2] First, relying on the description of the product contained in the scope ruling request, Commerce looks to the plain language of the underlying order.[3] If the terms of the order are dispositive — *i.e.*, not subject to interpretation – then those terms govern.[4] If those terms do not govern, Commerce

---

1 Issues and Decision Memorandum accompanying *Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 83 Fed. Reg. 51,927 (Dep't Commerce Oct. 15, 2018) (final results of antidumping duty admin. review; 2016-2017) at 2-3.

2 19 C.F.R. § 351.225(a).

3 *See* 19 C.F.R. § 351.225(d) (ruling based upon the application).

4 *Tak Fat Trading Co. v. United States*, 396 F. 3d 1378, 1383 (Fed. Cir. 2005) ("{A} predicate for the interpretive process is language in the order that is subject to interpretation."). *See also ArcelorMittal Stainless Belgium N.V. v. United States*, 694 F. 3d 82, 84 (Fed. Cir . 2012) ("If Commerce determines that the language at issue is not ambiguous, it states what it understands to be the plain meaning of the language, and the proceedings terminate. On the other hand, if Commerce finds that the scope language is ambiguous, it then looks to two sets of factors spelled out in {19 C. F.R. § 351.225(k)} to determine the intended scope of the order.").

applies the factors set forth in 19 C.F.R. § 351.225(k)(1).[5] Finally, if the factors set forth in paragraph (k)(1) do not resolve the question, Commerce applies the "*Diversified Products*" criteria[6] found in 19 C.F.R. § 351.225(k)(2).[7] Here, the terms of the order are unambiguous and dispositive of whether line pipe and dual-stenciled pipe are covered by the scope.

## III. The Scope's Plain Language Establishes that Line Pipe and Pipe that Is Dual Stenciled as Line Pipe and Standard Pipe Are Subject Merchandise

The plain language of the scope establishes that line pipe and dual-stenciled pipe imported from Thailand are subject merchandise. The scope sets forth a number of criteria based on the physical characteristics of the merchandise to determine whether it is covered by the antidumping duty order on *Circular Welded Carbon Steel Pipes and Tubes from Thailand*. In particular, the pipes and tubes: (i) must be circular in shape; (ii) welded (as opposed to seamless); (iii) composed of carbon steel (as opposed to alloy steel or stainless steel); and (iv) have an outside diameter of 0.375 inches or more but not exceeding 16 inches.[8]

---

5 The (k)(1) criteria include: "The descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission."

6 The "Diversified Products" criteria are so named as they arise out of *Diversified Products Corp. v. United States*, 6 C.I.T. 155, 162, 572 F. Supp. 883, 889 (1983).

7 The (k)(2) criteria include: "(i) The physical characteristics of the product; (ii) The expectations of the ultimate purchasers; (iii) The ultimate use of the product; (iv) The channels of trade in which the product is sold; and (v) The manner in which the product is advertised and displayed."

8 Issues and Decision Memorandum accompanying *Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 83 Fed. Reg. 51,927 (Dep't Commerce Oct. 15, 2018) (final results of antidumping duty admin. review; 2016-2017) at 2-3.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Barcode:3883503-01 A-549-502 SCO - Scope Inquiry - Line Pipe
PUBLIC VERSION

Based on the evidence available to Petitioner, the line pipe and dual-stenciled pipe imported from Thailand meet all of these criteria. In particular, in the May 30, 2019 supplemental allegation submitted in the anti-circumvention proceeding, Petitioners submitted a mill test certificate and photographs of pipe that was manufactured by Saha Thai Steel Pipe (Public) Company Ltd. and exported to the United States.[9] The pipe in question was dual-stenciled to meet both API 5L and ASTM A/53 specifications.[10] The evidence showed that the pipe was: (i) circular in shape; (ii) welded; (iii) composed of carbon steel; and (iv) had an outside diameter between 0.375 inches and 16 inches.[11]

Petitioner is unaware whether the pipe in question is being imported under the HTSUS subheadings 7306.30.1000, 7306.30.5025, 7306.30.5032, 7306.30.5040, 7306.30.5055, 7306.30.5085 and 7306.30.5090 or, alternatively, is being imported under HTSUS subheadings that are specific to line pipe. However, the Order clearly states that the HTSUS items listed in the scope are "provided for convenience and purposes of U.S. Customs and Border Protection (CBP)" and that the written description of the merchandise subject to the order is dispositive. Thus, the HTSUS subheadings under which the pipe is being imported has no bearing on whether it is covered by the scope of the Order.

---

9 Petitioners' Supplemental Allegation re: Circumvention (May 30, 2019) at Exhibits 1 and 2. Because this evidence was submitted only on the record of the anti-circumvention inquiry and not on the record of the scope inquiry, Petitioner is attaching to this submission the mill test certificate and photographs associated with the imports of line pipe manufactured by Saha Thai. *See* **Exhibits 1 and 2** hereto.

10 *Id.*

11 Issues and Decision Memorandum accompanying *Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 83 Fed. Reg. 51,927 (Dep't Commerce Oct. 15, 2018) (final results of antidumping duty admin. review; 2016-2017) at 2-3.

4

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Significantly, there are no scope exclusions that apply to line pipe and dual-stenciled pipe imported from Thailand. This is in stark contrast to the scope language of orders on circular welded pipe from other countries that specifically state that "{s}tandard pipe that is dual or triple certified/stenciled that enters the U.S. as line pipe of a kind used for oil or gas pipelines is also not included in this investigation."[12] Thus, there is nothing in the plain language of the scope of the Order that would prohibit Commerce from determining that the "line pipe" being shipped by Saha Thai should be covered by the Order.[13]

## IV. Conclusion

In sum, the plain language of the scope covers the line pipe and dual-stenciled pipe manufactured by Saha Thai because these pipe and tube products are circular in shape, welded, made of carbon steel, and have an outside diameter of 0.375 inches or more, but not exceeding 16 inches. Accordingly, Petitioner requests that Commerce determine that imports of line pipe and dual-stenciled pipe and tube that is manufactured by Saha Thai are subject to the Order.

---

12 *See, e.g.*, *Wheatland Tube Co. v. United States*, 161 F.3d 1365 (Fed. Cir. 1998).

13 Because there is no ambiguity in the language of the scope, there is no need to examine the other factors set forth in 19 C.F.R. § 351.225(k)(1) such as the initial investigation and prior scope determinations by Commerce. *See Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1381 (Fed. Cir. 2017) ("If the scope is unambiguous, it governs.") (citations omitted); *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1302 (Fed. Cir. 2013) (explaining that the inquiry begins with "the language of the final order" and turns to other sources only if the scope itself "is ambiguous"). Petitioner notes, however, that the record of the initial investigation supports inclusion of line pipe in the scope. In particular, the initial petition filed in the original investigation included all "small diameter circular welded carbon steel pipes and tubes" from Thailand and specifically included any imports of line pipe. *See* Petition (Feb. 28, 1984) at pp. 1, 12, attached as **Exhibit 3.** The petition was withdrawn as it related to line pipe only because there was no known production in Thailand of line pipe to API specifications at that time. *See* Letter re: Partial Withdrawal of Petition (Mar. 14, 2019), attached as **Exhibit 4**; *see also Certain Welded Carbon Steel Pipes and Tubes from Thailand and Venezuela*, Inv. No 701-TA-242, USITC Pub. No. 1680 (Apr. 1985) (preliminary) at 3, attached as **Exhibit 5**.

* * *

**REQUEST FOR BUSINESS PROPRIETARY TREATMENT**

Petitioner requests proprietary treatment for information designated as proprietary in this submission pursuant to Commerce's regulations codified at 19 C.F.R. §§ 351.202(d) and 351.304. Business proprietary information is enclosed in single brackets ("[ ]"). The information for which the Petitioner requests proprietary treatment is located at Exhibits 1and 2 and consists of the names of individuals or organizations that provided price, cost, and other production, freight, sales or market information, information which would tend to identify those individuals or organizations, and other information that would cause harm to the submitters' competitive position. *See* 19 C.F.R. § 351.105(c)(9)).

Respectfully submitted,

Roger B. Schagrin
Luke A. Meisner
SCHAGRIN ASSOCIATES
*Counsel to Wheatland Tube Company*

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

**Certification**

I, Kevin Kelly, currently employed by the Wheatland Tube Company, certify that I have prepared or otherwise supervised the preparation of the attached *Comments on Scope Inquiry* pursuant to the anticircumvention and scope inquiry proceedings in Circular Welded Carbon Steel Pipes and Tubes from Thailand (Case No. A-549-502).

I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that I am filing a copy of this signed certification with this submission to the U.S. Department of Commerce and that I will retain the original for a five-year period commencing with the filing of this document. The original will be available for inspection by U.S. Department of Commerce officials.

Signature: [signature]

Date: 8/26/19

**Counsel Certification**

I, Luke A. Meisner, counsel to Wheatland Tube Company, certify that I have prepared or otherwise supervised the preparation of the attached *Comments on Scope Inquiry* pursuant to the anticircumvention and scope inquiry proceedings in Circular Welded Carbon Steel Pipes and Tubes from Thailand (Case No. A-549-502).

In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. § 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: Luke A. Meisner

Date: August 26, 2019

# CERTIFICATE OF SERVICE

**Welded Carbon Steel Pipe & Tube from Thailand**
**A-549-502**
**Anti-Circumvention Inquiry**
**CIRC - Line Pipe**

I, Brittney Allen, hereby certify that copies of the attached PUBLIC DOCUMENT were served today, August 26, 2019, via hand delivery upon the following parties:

Daniel L. Porter, Esq.
**Curtis, Mallet-Prevost**
**Colt & Mosle LLP**
1717 Pennsylvania Avenue, NW
Washington, DC 20006

Alan H. Price, Esq.
**Wiley Rein LLP**
1776 K Street, NW
Washington, DC 20006

Brittney Allen, *Paralegal*
SCHAGRIN ASSOCIATES

# EXHIBIT 1

# EXHIBIT NOT SUSCEPTIBLE TO PUBLIC SUMMARIZATION

# EXHIBIT 2

# EXHIBIT NOT SUSCEPTIBLE TO PUBLIC SUMMARIZATION

# EXHIBIT 3

Barcode:3883503-01 A-549-502 SCO - Scope Inquiry - Line Pipe

63 pages
Nonconfidential

BEFORE THE
UNITED STATES DEPARTMENT OF COMMERCE
AND THE
INTERNATIONAL TRADE COMMISSION

| In the Matter of Certain Welded Carbon Steel Pipe and Tube Products from Thailand | PETITION FOR IMPOSITION OF ANTIDUMPING DUTIES |
|---|---|

PETITIONERS: MEMBERS OF COMMITTEE ON PIPE AND TUBE IMPORTS

Roger B. Schagrin, Esq.
Paul W. Jameson, Esq.
923 15th Street, N.W.
Fourth Floor
Washington, D.C. 20005
(202) 628-3810

Counsel to Petitioners

ATTENTION:

Assistant Secretary for Trade Administration
U.S. Department of Commerce
Washington, D.C. 20230

Secretary, United States International Trade Commission
701 E Street, N.W.
Washington, D.C. 20436

Dated: February 28, 1984

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | SUMMARY OF PETITION | 1 |
| II. | INFORMATION REQUIRED BY §353.36 OF THE ANTIDUMPING REGULATIONS | 6 |
| A. | The Name and Address Of The Petitioners And Any Other Person, Firm, Or Association The Petitioners Represent, 19 C.F.R. §353.36(a)(1). | 6 |
| B. | The Industry On Whose Behalf The Petition Is Filed, Including The Names Of Other Enterprises In Such Industry, 19 C.F.R. §353.36(a)(2). | 8 |
| C. | A Statement Indicating Whether The Petitioners Have Filed, Or Are Filing, For Import Relief Pursuant to Section 201 Of The Trade Act Of 1974, Or Have Initiated Proceedings Pursuant To Section 337 or 702 Of The Act, Section 232 Of The Trade Expansion Act Of 1962, Or Section 301 Of The Trade Act Of 1974 With Respect To The Merchandise Which Is The Subject Of The Proceeding, 19 C.F.R. §353.36(a)(3). | 8 |
| D. | A Detailed Description Of The Imported Merchandise, Including Its Technical Characteristics And Uses, And, Where Appropriate, Its Tariff Classification Under The Tariff Schedules Of The United States, 19 C.F.R. §353.36(a)(4). | 12 |
| E. | The Name Of The Country Or Countries From Which The Merchandise Is Being, Or Is Likely To Be Exported To The United States And, If The Merchandise Is Produced In A Country Other Than That From Which It Is Exported, The Name Of The Country In Which It Is Produced, 19 C.F.R. §353.36(a)(5). | 15 |

Page

F. The Names And Addresses Of All Known Foreign Enterprises Believed To Be Manufacturing, Producing or Exporting The Merchandise In Question, 19 C.F.R. §353.36(a)(6). 15

G. All Pertinent Facts As To The Price At Which The Foreign Merchandise Is Sold Or Offered For Sale In The United States And In The Home Market In Which Produced Or From Which Exported, Including Information Concerning Transportation And Insurance Charges, And If Appropriate, Information Regarding Sales In Third Countries Or The Cost Of Producing The Merchandise, 19 C.F.R. §353.36(a)(7). 16

H. The Volume And Value Of Imports Of The Merchandise From The Country In Question In The Most Recent Two-Year Period, And Also Other Periods If The Petitioner Believes Such Other Periods To Be More Representative, 19 C.F.R. §353.36(a)(10). 19

I. The Names And Addresses Of Enterprises Believed To Be Importing The Merchandise, 19 C.F.R. §353.36(a)(11). 20

J. The Names And Addresses Of Other Enterprises In The United States Engaged In The Production, Manufacture, Or Sale Of Like Merchandise, 19 C.F.R. §353.36(a)(12). 21

K. Information As To The Material Injury Or Threat Thereof To, Or The Material Retardation Of The Establishment Of, A United States Industry By Reason Of The Imported Merchandise Alleged To Be Sold At Less Than Fair Value, As Described In 19 C.F.R. §207.11 And §207.26, 19 C.F.R. §353.36(a)(13). 21

1. The Relevant Industry Consists of Those Domestic Producers of Standard and Line Pipe, Considered Together 21

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Barcode:3883503-01 A-549-502 SCO - Scope Inquiry - Line Pipe

Page

2. The Domestic Industry Producing Small Diameter Standard and Line Pipe Threatened With Material Injury By Reason Of Less-Than-Fair-Value Imports From Thailand. 24

3. The Regional Industry on the West Coast Producing Small Diameter Standard and Line Pipe Is Threatened With Material Injury By Reason Of Less-Than-Fair-Value Imports From Thailand. 29

III. CONCLUSION 31

-iii-

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

## EXHIBITS

1    Members of The Committee on Pipe and Tube Imports

2    Other Domestic Producers of Small Diameter Welded Circular Pipe

3    Other Producers of Thai Small Diameter Welded Circular Pipe

4    Formula for Determining Zinc Costs

5    Calculation of Constructed Value and Dumping Margins

6    Offers for Sale of Thai Pipe and Tube Products

7    Article on Thai Pipe Industry

PETITION FOR THE IMPOSITION OF ANTIDUMPING DUTIES
CERTAIN WELDED CARBON STEEL CIRCULAR PIPES AND TUBES
FROM THAILAND

This petition is filed on behalf of The Committee on Pipe and Tube Imports, a trade association composed of domestic producers of welded carbon steel pipes and tubes, its product line subcommittees and its member companies. Petitioners hereby allege that small diameter circular welded carbon steel pipes and tubes are likely to be imported at less than fair value from Thailand within the meaning of section 731 of the Tariff Act of 1930 as amended, 19 U.S.C. §1673. These less-than-fair-value imports threaten to cause material injury to the domestic industries producing the products covered by the industry, and particularly to those domestic producers located on the West Coast. This petition contains information reasonably available to petitioners in support of these allegations.

I. SUMMARY OF PETITION

This petition will demonstrate that imports of the pipe and tube products covered by this petition are being offered for sale at less than fair value (LTFV) by Thai producers and United States distributors and that these LTFV imports are threatening to cause material injury to the domestic industries producing these products. Petitioner is filing simultaneously with this petition a petition under 19 U.S.C. §1671, alleging

that the products covered by this petition are being subsidized by the government of Thailand and their offer for sale in the United States threatens to cause material injury to the domestic industries producing these products.

The domestic pipe and tube industry is continuing to be injured by reason of dumped and subsidized imports. In the past two years, the International Trade Commission (ITC) found that the domestic industry producing small diameter circular pipe suffered material injury by reason of imports of subsidized pipe from Brazil, Korea and Spain and by less-than-fair-value imports from Spain, Brazil, Korea and Taiwan.

The indicia of injury upon which the Commission based their recent final determinations of injury are still very much in evidence today. The relevant domestic industries are operating at dangerously low profit margins with some producers battling increasing net losses. Capacity utilization remains low and employment continues to decline.

The main reason for the continued poor operating conditions of the domestic industry, in spite of the successful trade cases filed against producers from a number of major exporting countries, is the lost volume and price depression caused by increased imports of unfairly traded pipe and tube products from a variety of countries. With Voluntary Restraint Agreements (VRAs) being negotiated with the major exporting

countries such as the EC countries, Spain, Brazil, Australia, Japan, and Korea, the threat of unfairly traded imports has shifted to non-traditional suppliers. Import statistics reflect an increase in imports from countries such as Saudi Arabia, Turkey and India.

Petitioners have received information that a serious threat of material injury is posed by less-than-fair-value imports from Thailand. While only small amounts of imports of the products covered by this petition have shown up in the import statistics as of December 1984, petitioners have information that 10,000 tons are already available for shipment for the first quarter of 1985.

Petitioners also have information that two Thai pipe and tube producers alone have expanded their capacity such that they could be able to export as much as 300,000 tons of pipe and tube per year into the U.S. market. At least one of these major Thai pipe and tube manufacturers is a subsidiary of a Japanese steel company. Petitioners have knowledge of at least 11 producers of pipe and tube products in Thailand. This information indicates that Thailand has the capacity to export large amounts of pipe and tube to the United States.

At least four importers are already offering Thai pipe and tube products for sale in the domestic market: Globe Traders Group, Inc. of New York, Triangle Winter Wolff (TWW) of Torrance, California, Phillips Brothers of Chicago, and Borneo

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Sumatra Trading Co., Inc. of New York. Price sheets for TWW indicate that Thai pipe and tubes are being sold for less than Korean or Japanese prices for the same products. Because there are no integrated steel producers in Thailand, it is believed that the Thai pipe producers are importing their steel coil and sheet from Japan. They also have been importing the necessary zinc for galvanized products. TWW is offering black pipe for just over $400 a ton ex docks duty paid for large purchases and is offering galvanized pipe for just under $500 per ton. This represents sales at prices below that of the Koreans during the fourth quarter of 1984. Such prices indicate less-than-fair-value sales with which domestic producers cannot compete.

Petitioner will demonstrate that a regional threat of injury exists with regard to the producers of the pipe and tube products covered in this petition located on the West Coast as well as to the entire domestic industry. LTFV imports will be particularly devastating to West Coast domestic producers who, despite efficient operations, have been continuing to lose sales to imports, primarily Japanese, Korean and Taiwanese. With at least one of Thailand's major producers of pipe and tube being a subsidiary of a Japanese company, these imports become a way for major Japanese exporters to avoid carefully negotiated VRAs. The result is that West Coast pipe and tube producers fail to get the relief which this Commission has previously determined that the domestic industry requires.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Petitioner was unable to obtain home market sales prices from Thailand for the products covered by this petition; Foreign market value was based instead on cost of production for Thai producers. These costs of production were based on prices for Japanese hot-roll coil exported to Thailand, and on estimates of zinc costs based on conversations with international zinc brokers. Conversion costs and selling, general and administrative expenses were based upon the United States industry average for non-integrated producers as determined by the International Trade Commission and adjusted for differences in labor rates. These cost of production figures clearly show that the Thais are offering to sell the pipe and tube products covered by this petition in the United States at less than fair value.

This petition provides specific information demonstrating that imports from Thailand are being offered for sale at less than fair value and threaten to cause material injury to the domestic industries producing these products. Petitioners respectfully request that the Commerce Department and the Commission, based on this information, immediately commence a full scale investigation under 19 U.S.C. §1673 and 19 C.F.R. 207.12 and 353.37 of imports of these products from Thailand.

## II. INFORMATION REQUIRED BY §353.36 OF THE ANTIDUMPING DUTY REGULATIONS

### A. The Name And Address Of The Petitioners And Any Other Person, Firm, Or Association The Petitioners Represent, 19 C.F.R. §353.36(a)(1).

This petition is filed on behalf of the members of the product line subcommittees of The Committee on Pipe and Tube Imports, a not-for-profit trade association of pipe and tube producers organized under the laws of the District of Columbia. The Committee, its subcommittees, and member companies file unfair trade cases to prevent the importation of pipe and tube products in violation of unfair trade laws. Each member of the Committee or a product line subcommittee can choose not to lend its company's name or support to any particular trade case. The Committee's members produce a wide spectrum of carbon steel pipe and tube products. For this reason, the Committee's member companies are organized in subcommittees according to the product lines which they produce. The members producing a particular product line can decide whether or not to support an unfair trade petition involving a product which they produce imported from a certain country.

The members of the subcommittee producing standard and line pipe less than 16 inches in outside diameter in support of this petition are:

Allied Tube & Conduit Corp.*
16100 S. Lathrop
Harvey, IL 60426

American Tube Co., Inc.*
P.O. Box 6633
Phoenix, AZ 85005

Bernard Epps & Co.*
3691 Bandini Blvd.
Los Angeles, CA 90023

Bull Moose Tube Co.*
12837 Flushing Meadow Dr.
St. Louis, MO 63131

Wheatland Tube Corp.
900 Haddon Avenue
Collingswood, NJ 08108

Tex-Tube Division**
Cyclops Corporation
P.O. Box 7705
Houston, TX 77007

Hughes Steel & Tube*
5333 E. Slauson St.
City of Commerce, CA 90040

LaClede Steel Co.
10 Broadway
St. Louis, MO 63102

Merchants Metals, Inc.*
P.O. Box 11646
Houston, TX 77293

Pittsburgh-International*
P.O. Box 9 - Route 24
West Fairbury, IL 61739

Sawhill Tubular Division
Cyclops Corporation
Box 11
Sharon, PA 16146

Sharon Tube Co.*
134 Mill St.
Sharon, PA 16146

Southwestern Pipe, Inc.*
P.O. Box 2002
Houston, TX 77252

* Standard pipe only

** Line pipe only

The companies listed above represent approximately 45% of domestic production of the product covered by this petition.

The products produced by each of the member companies listed above are like or similar to the respective imported articles covered by this petition. Attached as Exhibit 1 to this petition is a full membership list of The Committee on Pipe and Tube Imports.

B. The Industry On Whose Behalf The Petition Is Filed, Including The Names Of Other Enterprises In Such Industry, 19 C.F.R. §353.36(a)(2).

There are approximately 53 producers of the pipe and tube products covered by this petition. A list of those domestic producers other than petitioners is attached as Exhibit 2.

C. A Statement Indicating Whether The Petitioners Have Filed, Or Are Filing, For Import Relief Pursuant To Section 201 Of The Trade Act of 1974, Or Have Initiated Proceedings Pursuant To Section 337 Or 702 Of The Act, Section 232 Of The Trade Expansion Act Of 1962, Or Section 301 Of The Trade Act Of 1974 With Respect To The Merchandise Which Is The Subject Of The Proceeding, 19 C.F.R. §353.36(a)(3).

CPTI has filed or intervened in the following cases:

1. Countervailing Duty Petition Against South Africa:

Covered standard, structural and mechanical tubing. Filed October, 1982. Suspension agreement entered into on May 30, 1983 renouncing all subsidies. Final countervailing duty determinations of 21.6% plus 9.99 Rand per ton and 26.7% plus 9.99 Rand per ton on September 12, 1983.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

2. Countervailing Duty Petition Against Korea:

Covered small diameter circular pipe. Filed May 7, 1982. Final affirmative subsidy determination of 0 to 1.88% on December 27, 1982. The ITC determined on February 2, 1983 that the domestic industry was being materially injured by reason of subsidized imports from Korea.

3. Antidumping Petition Against Taiwan:

Covered small diameter circular pipe. Filed April 18, 1983. Final dumping margins issued on March 12, 1984, ranging from 9.7% to 42.7%. The ITC determined on April 26, 1984 that the domestic industry was being materially injured by reason of less-than-fair-value imports of circular pipes and tubes from Taiwan.

4. Antidumping Petition Against Korea:

Covered small diameter circular pipe and light- and heavy-walled rectangular tubing. Filed April 18, 1983. Final dumping margins issued on March 12, 1984 ranging from de minimus to 1.51%. Final ITC determination that the domestic industries producing small diameter circular pipe and light-walled rectangular tubing were being injured by reason of LTFV imports from Korea, and a negative determination of injury on heavy-walled rectangular tubing products issued April 25, 1984.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

5. Countervailing Duty Petition Against Mexico

Covered small diameter circular pipe. Filed November, 1983 by United States Steel Corporation. Petition withdrawn on April 24, 1984, after the Mexican government proposed a Voluntary Restraint Agreement. The CPTI filed a countervailing duty petition covering standard and line pipe and mechanical tubing on October 25, 1984. The Department has initiated an investigation and the preliminary determination is due on January 18, 1985.

6. Countervailing Duty Petition Against Spain:

Covered small diameter circular pipe and light-walled rectangular tubing. Filed July 17, 1984. Preliminary affirmative subsidy determination of 1.14% on October 10, 1984.

7. Antidumping Petition Against Spain:

Covered small diameter circular pipe and light-walled rectangular tubing. Filed July 17, 1984.

8. Antidumping Petition Against Brazil:

Covered small diameter circular pipe. Filed July 17, 1984.

9. Antidumping Petition Against Taiwan:

Covered small diameter light-walled rectangular tubing. Filed December 18, 1984. On January 28, 1985, the Commission

preliminarily determined that there was a reasonable indication that the domestic industry producing this product was suffering material injury by reason of imports of this product.

10. Antidumping Petition Against Venezuela:

Covered small diameter circular standard and line pipe. Filed December 18, 1984. On January 28, 1985, the Commission preliminarily determined that there was a reasonable indication that the domestic industry producing standard pipe was suffering material injury by reason of imports of this product, but that the domestic industry producing line pipe, because of the difficulty the industry had in providing information solely on line pipe, was not suffering material injury.

11. Section 201 Petition on Carbon and Certain Alloy Steel Products:

Filed January 24, 1984 by Bethlehem Steel Corporation and the United Steelworkers of America. The CPTI intervened as an interested party. On June 12, 1984, the ITC found that imports were not a substantial cause of serious injury to the domestic pipe and tube industry. On September 18, 1984, the President rejected the ITC's recommendations and authorized the United States Trade Representative to enter into negotiations for Voluntary Restraint Agreements with major steel producing countries in order to reduce import penetration to 18.5%,

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

excluding semifinished products. Pipe and tube products are covered under the President's plan.

Petitioners are filing concurrently with this petition a countervailing duty petition regarding the same products from Thailand, and antidumping and countervailing duty petitions regarding the same products from Venezuela.

D. A Detailed Description Of The Imported Merchandise, Including Its Technical Characteristics And Uses, And, Where Appropriate, Its Tariff Classification Under The Tariff Schedules Of The United States, 19 C.F.R. §353.36(a)(4).

The product covered by this petition is certain circular welded carbon steel circular pipes and tubes, .375 inch or more but not over 16 inches in outside diameter. The product includes "standard pipe," which is a general-purpose commodity used in such applications as plumbing pipe, sprinkler systems and fence posts and is commonly referred to in the industry as a standard pipe. It may be supplied with an oil coating (black pipe) or may be galvanized, and is sold in plain ends, threaded, threaded and coupled, or beveled for welding form. (These products are generally produced to ASTM specifications A-120, A-53, or A-135.) The product also includes "line pipe," which is produced to API specifications for line pipe, API-5L or API5X.

Prior to April 1, 1984 the small diameter circular pipes subject to this investigation were classified in TSUSA

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

categories 610.3208, 610.3209, 610.3231, 610.3232, 610.3241, 610.3244, and 610.3247. As of April 1, 1984, changes were made in the TSUSA. Small diameter pipes with a wall thickness greater than .065 inch are now classified in 610.3208, 610.3209, 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, and 610.3258. Circular pipe with a wall thickness less than .065 inch is now classified in 610.4925.

Petitioners believe that the description of the manufacturing processes for the products covered by this investigation which was formulated by the Commission's staff is a succinct, accurate description and includes it herein in its entirety.

> Welded steel pipes and tubes are made by forming flat-rolled steel into a tubular configuration and welding along the joint axis. There are various ways to weld pipes and tubes; the most popular are the ERW, the continuous weld (butt weld)(CW), the submerged-arc weld, and the spiral weld. Submerged-arc weld and spiral weld are normally used to produce pipes and tubes of relatively large diameter. The small circular pipes and tubes which are the subject of these investigations are produced either by the ERW or CW processes, whereas the rectangular pipes and tubes are produced only by the ERW process.[1] All pipes and tubes are formed and welded in a cylindrical configuration. Immediately after welding, the product may be reduced by rolling or stretch reducing or may be further formed into squares, rectangles, or other shapes by using forming rolls.

---

[1] Transcript of the public conference on Investigation Nos. 731-TA-131 and 132 (Preliminary), pp. 52 and 53.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

In the ERW process, skelp[2] is cold-formed by tapered rolls into a cylinder. The weld is formed when the joining edges are heated to approximately 2,600°F. Pressure exerted by rolls squeezes the heated edges together to form the weld. ERW mills produce both pipe in standard sizes and tubular products between 0.375 and 24 inches in outside diameter.

In recent years, the ERW process has gained increased popularity with U.S. producers of small-diameter pipe and tube products. This process requires significantly less energy per pipe produced, as only the joining edges of the product are heated, creating a weld of comparatively high integrity within the product specification; it can be used to produce such products in sizes up to 24 inches in outside diameter, compared with the 4.5-inch maximum outside diameter usually attainable in the CW process.

In the CW process, skelp is heated to approximately 2600°F and hot-formed into a cylinder. The heat in combination with the pressure of the rolls forms the weld. Continuous-weld mills generally produce the higher volume, standardized pipe products from 0.375 through 4.5 inches in outside diameter. The advantage of the CW process lies in its ability to be used to produce pipe at speeds up to 1,200 feet per minute compared with the ERW process maximum of approximately 110 feet per minute. Thus, economics associated with high-volume production may make CW pipe cheaper to produce than ERW pipe of the same grade and specification. The CW process is especially suited for the manufacture of standardized, high-volume small-diameter pipe products, such as the ASTM A-120 circular pipe included in this investigation.[3]

The pipe and tube products covered by this petition are produced by the same processes worldwide. The finished

---

[2] Skelp is a flat-rolled, intermediate product used as the raw material in the manufacture of pipe and tube. It is typically an untrimmed band of hot- or cold-rolled sheet.

[3] USITC Publication 1519, at A-5, A-6.

products are identical. Therefore, imported and domestically produced products are completely fungible. For either service centers or end-users, the source of the product is of no consequence. Price is the only important factor.

E. The Name Of The Country Or Countries From Which The Merchandise Is Being, Or Is Likely To Be Exported To The United States And, If The Merchandise Is Produced In A Country Other Than That From Which It Is Exported, The Name Of The Country In Which It Is Produced, 19 C.F.R. §353.36(a)(5).

The pipe and tube products covered by this petition are likely to be imported from Thailand. Petitioner has no evidence indicating that the merchandise in question is being produced in a country other than that from which it is being exported.

F. The Names And Addresses Of All Known Foreign Manufacturers and Exporters Exporting The Merchandise In Question, 19 C.F.R. §353.36(a)(6).

Two Thai pipe and tube producers are believed to be capable of producing pipe for export to the United States and are believed to be responsible for the shipments that have arrived at in the 4th quarter of 1984 and are expected to arrive during the first quarter of 1985.

(1) Thai Union Steel Co., Ltd.
56 Group 2, Poochaosamingprai Rd.
Phrapradaeng, Samutprakarn 10130
Tel: 394-0457, 394-1220-3
394-2941
Cable: TUSCO PRAPRADAENG
Telex: 84500 TUS TH
Attn: Mr. Anan Pojtviboonsiri
Mr. Thongchai Leerungruang

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

(2) Thai Steel Pipe Industry Co., Ltd.
36 Bangyapraek Rd.
Poochaosamingprai Rd.
Phrapradaeng, Samutprakarn 10130
Tel: 394-0811-4
Cable: STELLPIPE BANGKOK
Telex: 87619 TSP TH
Attn: Mr. Paisan Choonchongchot

Nine other Thai producers of the pipe and tube products covered by this petition are listed at Exhibit 3. Petitioners request that the Department determine if these or other Thai producers are likely to sell the products covered by this petition at less than fair value.

G. All Pertinent Facts As To The Price At Which The Foreign Merchandise Is Sold Or Offered For Sale In The United States And In The Home Market In Which Produced Or From Which Exported, Including Information Concerning Transportation And Insurance Charges, And If Appropriate, Information Regarding Sales In Third Countries Or The Cost Of Producing The Merchandise, 19 C.F.R. 353.36(a)(7).

Petitioners have been unable to obtain home market sales prices for the Thai pipe and tube products covered by this petition. Petitioners have also been unable to obtain raw material (sheet) prices for Thai pipe and tube producers. One of the two Thai producers which petitioners believe to be the source of the less-than-fair-value shipments, Thai Steel Pipe Industry Co., is a subsidiary of Sumitomo Metal Industries, Ltd. and Nomura Trading Co. Petitioners believe that these Thai exporters are importing their steel sheet and coil from Japan and possibly from Brazil or other countries.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Petitioners, therefore, obtained information on the export prices of steel sheet and coil from Japan to Thailand from the most recent Japanese export statistics available (September 1984). Using these prices and an estimation of the cost of processing raw materials into finished pipe products, based on United States non-integrated producers' cost of production adjusted for Thai wage rates, petitioner constructed the cost of production for Thai producers of the pipe and tube products covered by this petition. Petitioner assumes that until actual home market prices are received from the Thais that those producers are not selling in their home market for below cost of production. Constructed cost of production was compared to offer prices by Triangle Winter Wolff and Global Traders for selected products and for imports from Thailand reported in import statistics for November 1984.

Petitioner selected three sample products as a basis for fair value comparisons of imports of standard pipe. Each product is representative of the various products in its category. To construct the cost of production for Thai producers of these three products, petitioner utilized the export value of sheet and coil from Japan to Thailand as a base price. Having no actual information regarding freight and insurance rates on the coils shipped from Japan to Thailand, on the basis of conversations with several international shippers petitioner estimated $40.00 per ton for the freight, insurance,

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

and delivery charges involved with transporting the steel sheet and coil from Japan to the factories in Thailand.

Added to these costs was a yield factor of 8%, to account for scrap costs associated with slitting, welding, cut-offs and rejected pipe. This is based on a domestic industry average.[4] Industry estimates are that scrap from slitting, welding, cut-offs and rejected pipe averages 5.5% for sheet and an additional 2-3% for trimming the edges of coil.

For galvanized products, petitioner added the cost of zinc necessary to galvanize a ton of that particular pipe product. The cost of zinc in Thailand, according to zinc traders, is the European producers' cost plus an add-on of $45 to $60 per ton. The formula used to calculate the amount of zinc necessary per ton is an industry formula and is attached as Exhibit 4.

After determining raw material costs petitioner added 17.1% for the cost of conversion into pipe and tube products. This is based on the industry average for labor and factory costs for non-integrated United States producers of the products covered in this petition. This estimate may actually be low. While petitioner was unable to obtain energy prices for Thailand, it believes that energy prices are as expensive or more expensive than comparable U.S. prices. Petitioner also believes that the exporting companies named in this petition

---

4 See USITC Publication 1519 at A-43 to A-49.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

have undergone heavy capital infusions over the last few years in order to obtain a dramatic increase in capacity. This would make depreciation costs higher for Thai producers.

Petitioner then added 10% for selling, general and administrative expenses and 8% for profit as per the statutory criteria listed in 19 C.F.R. 353(6)(a)(2).

After constructing the cost of production as demonstrated in confidential Exhibit 5, petitioner compared these costs of production to offers for sale of pipe and tube by Triangle Winter Wolff and Global Traders and to figures representing a shipment received in Wilmington, North Carolina in November.

These comparisons show that the Thai producers of standard pipe are offering to sell large quantities of their products at 21.1% to 40.7% below cost of production. A price list from Triangle Winter Wolff and prices given by Globe Traders Group, Inc. are provided as Exhibit 6.

H. The Volume And Value Of Imports Of The Merchandise From The Country In Question In The Most Recent Two-Year Period, And Also Other Periods If The Petitioner Believes Such Other Periods To Be More Representative, Or, If The Merchandise Is Not Presently Imported Into The United States Or Is Not Imported In Significant Quantities, Information As To The Likelihood Of Its Importation, 19 C.F.R. §353.36(a)(10).

Petitioner is unaware of any imports from Thailand of the pipe and tube products covered by this petition prior to the last quarter of 1984. As of publication of November IM 145X

(Department of Commerce, Bureau of the Census) the first evidence of imports from Thailand began to show up. 38.9 tons of small circular pipe, TSUS 610.3242 came into Wilmington, Delaware at a total value of $10,909. 11.0 tons of TSUS 610.3243 entered Philadelphia in December at a total value of $3,612.

Petitioner believes that another 100 tons of the pipe and tube products covered by this petition have already arrived, but have yet to be reported in the import statistics. Petitioner also believes that Globe Traders Group, Inc. and Borneo Sumatra Trading Co., Inc. have each already imported 500 tons of the pipe and tube products covered by this petition. Due to a lag time in Customs reporting, they have not yet shown up in the monthly import statistics published by the Commerce Department.

Petitioner is aware that 10,000 tons of standard pipe are scheduled for February shipment from Thailand to Los Angeles for March delivery. Information available to the petitioner indicates that the two Thai producers named in this petition have the capacity to ship at least 300,000 tons of the pipe and tube products covered by this petition.

I. <u>The Names And Addresses Of Enterprises Believed To Be Importing The Merchandise, 19 §353.36(a)(11).</u>

Triangle Winter Wolff Co.
1000 W. Francisco St.
Torrance, CA 90502
(213) 538-9900

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Globe Traders Group, Inc.
350 Fifth Avenue
Suite 5105
Empire State Bldg.
New York, NY 10118
(212) 947-4590

Borneo Sumatra Trading Co., Inc.
14603 Mercado Ave.
La Mirada, CA 90638
(714) 521-4451

Phillips Brothers
Petitioners are presently unable to find an address but will forward it to the ITC as soon as they obtain it.

J. The Names And Addresses Of Other Enterprises In The United States Engaged In The Production, Manufacture Or Sale Of Like Merchandise, 19 C.F.R. §353.36(a)(12).

This information is contained in Exhibit 2.

K. Information As To The Material Injury Or Threat To, Or The Material Retardation Of The Establishment Of A United States Industry By Reason Of The Imported Merchandise Alleged To Be Sold At Less Than Fair Value, As Described In 19 C.F.R. §207.11 And §207.26(d), 19 C.F.R. §353.36(a)(13).

1. The Relevant Industry Consists of Those Domestic Producers of Standard and Line Pipe, Considered Together

Section 771(4)(A) of the Act defines "industry" as:

> the domestic producers as a whole of a like product, or those producers whose collective output of the like product constitutes a major proportion of the total domestic production of the product.

Section 771(4)(D) elaborates that:

> The effect of subsidized or dumped imports shall be assessed in relation to the United States production of a like product if available data permit the separate

> identification of production in terms of such criteria as the production process or the producer's profits. If the domestic production of the like product has no separate identity in terms of such criteria, then the effect of the subsidized or dumped imports shall be assessed by the examination of the production of the narrowest group of range of products, which includes a like product, for which the necessary information can be provided.

The Senate Finance Committee Report (S. Rep. No. 249, 96th Cong., 1st Sess. 83-84 (1979)) explains this provision:

> In examining the impact of imports on the domestic producers comprising the domestic industry, the ITC should examine the relevant economic factors (such as profits, productivity, employment, cash flow, capacity utilization, etc.), as they relate to the production of only the like product, if available data permits a reasonably separate consideration of the factors with respect to production of only the like product. If this is not possible because, for example, of the accounting procedures in use or practical problems in distinguishing or separating the operations of product lines, then the impact of the imports should be examined by considering the relevant economic factors as they relate to the production of the narrowest group or range of products which includes the like product and for which available data permits separate consideration.

As the Commission discovered during the recent preliminary antidumping investigation of circular welded pipe and tube from Venezuela, although there are a number of standard pipe producers who do not also produce line pipe, most of the line pipe producers also produce standard pipe. In particular, the large integrated producers produce both types of pipe and tube products. Those producers were generally able to generate information on sales and shipments for each product, but found it difficult to provide separate information on profits,

productivity, employment, cash flow, or capacity utilization. Because standard and line pipe are produced in the same mill, such an inability should not be surprising.

Given this difficulty, the statute requires the ITC to consider the producers of standard and line pipe as one industry for injury-determination purposes. It would be inconsistent with the remedial purpose of the statute to deny relief to industries that are unable to provide information on specific problems.

There is Commission precedent for combining standard and line pipe into one industry. In the investigations of Welded Carbon Steel Pipes and Tubes from Brazil, France, Italy, the Republic of Korea, and West Germany,[5] the Commissioners divided the pipe and tube industry into two industries: small diameter (less than 16" OD) standard, structural, and line welded carbon steel pipes and tubes, and large diameter (at least 16" OD) structural and line welded carbon steel pipes and tubes. Petitioners believe that the reasons for making this division hold true today.

---

5 Inv. Nos. 701-TA-165-169 (Preliminary), USITC Pub. 1262 (June 1982), at 3-5.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

2. The Domestic Industry Producing Small Diameter Standard and Line Pipe Is Threatened With Material Injury By Reason Of Less-Than-Fair-Value Imports From Thailand.

The U.S. International Trade Commission has concluded a number of times that the industry producing the products covered by this petition are suffering material injury. In early 1983, the Commission determined that the same industry on whose behalf this petition is being brought--the domestic producers of small diameter welded carbon steel pipes and tubes--is materially injured by reason of imports of those products.[6] More recently, the Commission has preliminarily determined that the domestic industry producing some of the products covered by this petition, i.e., standard pipe, is suffering material injury by reason of imports of standard pipe.[7]

Now a new threat to the industry has appeared. Thai steel pipe and tube producers, previously unknown in the U.S. market, have begun offering large quantities of pipe and tube for delivery beginning in the first quarter of 1985. Section 612 of the Trade and Tariff Act of 1984 added subparagraph (F) to section 771(7) of the Tariff Act of 1930:

---

6 See Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea, Inv. No. 701-TA-168 (Final), USITC Pub. 1345 (February 1983).

7 See Certain Welded Carbon Steel Pipes and Tubes from Brazil and Spain, Inv. Nos. 701-TA-220 and 731-TA-197 and 198 (Preliminary), USITC Pub. 1569 (August 1984); Certain Welded Carbon Steel Pipes and Tubes from Taiwan and Venezuela, Inv. Nos. 731-TA-211 and 212 (Preliminary), 50 Fed. Reg. 5326 (February 7, 1985).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

(F) Threat of Material Injury.--

(i) In General.--In determining whether an industry in the United States is threatened with material injury by reason of imports (or sales for importation) of any merchandise, the Commission shall consider, among other relevant factors--

(I) If a subsidy is involved, such information as may be presented to it by the administering authority as to the nature of the subsidy (particularly as to whether the subsidy is an export subsidy inconsistent with the Agreement),

(II) any increase in production capacity or existing unused capacity in the exporting country likely to result in a significant increase in imports of the merchandise to the United States,

(III) any rapid increase in United States market penetration and the likelihood that the penetration will increase to an injurious level,

(IV) the probability that imports of the merchandise will enter the United States at prices that will have a depressing or suppressing effect on domestic prices of the merchandise,

(V) any substantial increase in inventories of the merchandise in the United States,

(VI) the presence of underutilized capacity for producing the merchandise in the exporting country, and

(VII) any other demonstrable adverse trends that indicate the probability that the importation (or sale for importation) of the merchandise (whether or not it is actually being imported at the time) will be the cause of actual injury.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

(VIII) the potential for product-shifting if production facilties owned or controlled by the foreign manufacturers, which can be used to produce products subject to investigation(s) under section 701 or 731 or to find orders under section 706 or 736, are also used to produce the merchandise under investigation.

(ii) Basis for determination.--Any determination made by the Commission under this title that an industry in the United States is threatened with material injury shall be made on the basis of evidence that the threat of material injury is real and that actual injury is imminent. Such a determination may not be made on the basis of mere conjecture or supposition.

A number of these considerations apply here. The evidence is that the threat of injury is real and that actual injury is imminent. First, the capacity of the Thai pipe and tube manufacturers has increased significantly in the last few years. In early 1980, the capacity of the entire Thai pipe and tube industry was 19,500 tons per month, or 234,000 tons per year. See Exhibit 7. Petitioners' information is that two companies, Thai Steel Pipe Industries Co. and the Thai Union Steel Co., alone now have the capacity to produce 300,000 tons per year of steel pipe and tube products. Petitioners believe that the Thais have increased their capacity for pipe and tube production since 1981 in order to participate in export markets. The capacity of the other nine Thai producers supplementally listed is unknown. However, it is clear that Thai pipe and tube producers have the capacity to cause material injury to United States producers of standard pipe.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Sales overtures by United States importers of Thai products and the new flow of Thai imports in these product areas show their willingness to do so.

Second, a substantial increase in market penetration will certainly result from the imports flowing from the present offers for sale. Thailand exported no small diameter circular pipe to the United States prior to 1984. In November 1984 the first shipment, 38.9 tons, was recorded in the import statistics for TSUS 610.3242 as having entered the port of Wilmington, North Carolina. In December 1984, 11 tons classified under TSUS 610.3243 entered the port of Philadelphia. Petitioners believe that another 100 tons brought in by Triangle Winter Wolff and two shipments of 500 tons each brought in by Borneo Sumatra Trading Co., Inc. and Globe Traders Group, Inc. have already arrived in the United States via Los Angeles but have not yet been recorded in the import statistics. From sales overtures made by Triangle Winter Wolff and conversations with knowledgeable persons in the industry, petitioners are aware of at least 10,000 tons of the pipe and tube products covered by this petition scheduled for February shipment from Thailand for March delivery in Los Angeles. These figures point to a dramatic increase in the rate of dumped exports from Thailand into the United States market.

Third, the offered prices will have a substantially depressive effect on prices in the U.S. market. The staff report accompanying the preliminary determination in the

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

investigation of Certain Welded Carbon Steel Pipes and Tubes from Brazil and Spain,[8] chronicles the increasingly depressed domestic producers' price for ASTM A120, schedule 40, sprinkler pipe, carbon welded, black, 2.375-inch OD, 0.154-inch wall thickness, plain end pipe. In January 1982, the average price was $100.09 per hundred feet, which translates to $548 per ton. By June 1984, the price had declined to $84.90 per hundred feet, or $465 per ton. Triangle Winter Wolff is offering for January 1985 shipment that same pipe specification for $75.88 ex-dock Los Angeles, or only $415 per ton. See Exhibit 6. The Thais are obviously using extremely low prices as the means to gain market share, which will have a severe effect on market prices for pipe and tube products.

The United States market has suddenly become a very attractive market for Thai pipe and tube products. With voluntary restraint agreements (VRAs) signed by Spain and the EC countries and VRAs imminent with Japan, Korea, Mexico and Brazil and other major exporters of pipe and tube products, Thai producers see the opportunity to put excess capacity to good use by exporting to the United States. At least one major source of Thai pipe and tube exports, Thai Steel Pipe Industry Co., is a subsidiary of a major Japanese steel producer and exporter, Sumitomo Metal Industries, Ltd. With a VRA limiting

---

8 Inv. Nos. 701-TA-220 and 731-TA-197 and 198, USITC Pub. 1569, at A-28.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Japanese exports of pipe and tube to the United States, a great incentive exists to shift production to subsidiaries in countries such as Thailand which are not covered by a VRA. VRAs were meant to provide relief to the American steel industry, but they are also providing an opportunity for non-covered countries like Thailand to sell less-than-fair-value goods to the United States. Thus the American pipe and tube industry could get little or no relief from extraordinarily high import penetration levels.

3. The Regional Industry on the West Coast Producing Small Diameter Standard and Line Pipe Is Threatened With Material Injury By Reason Of Less-Than-Fair-Value Imports From Thailand.

Thai small-diameter pipe will affect the entire domestic industry. As noted, two small shipments have already entered eastern ports. As was done by the Koreans and the Taiwanese, the Thais will be able to ship pipe to any region of the United States and displace domestic sales due to their extremely low less-than-fair-value offer prices.

Alternatively, petitioners allege that the regional industry consisting of those producers in the West Coast region are threatened with material injury by reason of imports of small-diameter welded pipe and tube products from Thailand. 19 U.S.C. §1677(4)(C) reads as follows:

> Regional industries. In appropriate circumstances, the United States, for a particular product market, may be divided into two or more markets and the producers within each market may be treated as if they were a separate industry if--

(i) the producers within such market sell all or almost all of their production of the like product in question in that market, and

(ii) the demand in that market is not supplied, to any substantial degree, by producers of the product in question located elsewhere in the United States.

The Commission can therefore also find material injury based on a regional industry analysis of the western domestic producers of these products.

Information on part of the West Coast small diameter circular welded pipe industry was developed during the investigation of Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea and Taiwan.[9] In 1983, producers West of the Rockies accounted for 162,946 tons annual capacity of total U.S. capacity of 3,605,877 tons, or 4.5%. Production in the West accounted for 78,469 tons out of total U.S. production of 1,032,280 tons, or 7.6% (the difference was largely because of the extremely low capacity utilization--15.0%--of the Eastern integrated producers). The ITC staff found that producers located east of the Rocky Mountains shipped between 2.5% and 3.3% of their aggregate U.S. shipments to customers on the West Coast and that none of the West Coast producers shipped east of the Rockies. The West Coast producers can therefore be considered a regional industry.

---

9 Inv. Nos. 731-TA-131, 132, and 138 (Final), USITC Pub. 1519 (April 1984), at A-18 to A-22 and passim (covering only standard pipe under 4.5").

Until recently West Coast producers of pipe and tube products have been in competition primarily with Korean, Taiwanese and Japanese producers. With the high dumping margins issued against the Taiwanese and with VRAs imminent with Japan and Korea, West Coast importers will be looking for other cheap foreign sources to fill the gap. The Thais are an obvious source, as the 10,000 ton shipment due in Los Angeles in March indicates. It is expected that a majority of the pipe and tube imports will enter the U.S. through West Coast ports. Therefore, the ITC could make a determination of threat of material injury based upon a threat of material injury to a regional industry.

III. CONCLUSION

This petition for the imposition of antidumping duties presents all information reasonably available to petitioners in support of the allegations that imports of certain small diameter circular pipes and tubes from Thailand are likely to be sold at less than fair value and that the domestic industries producing these products are threatened with material injury by reason of imports of the merchandise within the meaning of Section 731 of the Act. Accordingly, in compliance with Section 732 of the Act, and 19 C.F.R. §353.37, the Department and the Commission are requested to commence an antidumping investigation to determine whether the statutory elements necessary for the imposition of antidumping duties on

Barcode:3883503-01 A-549-502 SCO - Scope Inquiry - Line Pipe

imports from Thailand of small diameter circular welded pipe exists.

Roger B. Schagrin, Esq.
Paul W. Jameson, Esq.
Counsel to The Committee
On Pipe and Tube Imports

32

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

EXHIBIT 1

EXHIBIT 1

MEMBERS OF THE COMMITTEE ON PIPE AND TUBE IMPORTS

Allied Tube and Conduit Corp.
16100 S. Lathrop
Harvey, IL 60426

Bernard Epps & Co.
3691 Bandini Blvd.
P.O. Box 23984
Los Angeles, CA 90023

Bull Moose Tube Co.
12837 Flushing Meadow Drive
St. Louis, MO 63131

Century Tube Corp.
P.O. Box 7612
Pinebluff, AR 71611

Hughes Steel & Tube
5401 E. Slauson St.
City of Commerce, CA 90040

LaClede Steel Company
10 Broadway
St. Louis, MO 63102

Maverick Tube Corp.
311 N. Lindbergh, Suite 130
St. Louis, MO 63141

Pittsburgh Tube Co.
2060 Pennsylvania Avenue
Monaca, PA 15061

Sawhill Tubular Division
Cyclops Corp.
P.O. Box 11
Sharon, PA 16161

Southwestern Pipe, Inc.
P.O. Box 2002
Houston, TX 77252

UNR-Leavitt
1717 W. 115th Street
Chicago, IL 60643

Western Tube & Conduit
1001 East Dominguez
Long Beach, CA 90810

American Tube Co., Inc.
P.O. Box 6633
Phoenix, AZ 85005

Bock Industries of
Elkhart, Indiana
P.O. Box B-1027
Elkhart, IN 46515

Central Steel Tube Co.
Central Steel Road-Box 551
Clinton, IA 53732

Copperweld Tubing Group
Two Robinson Plaza
Route 60, Box 60
Pittsburgh, PA 15230

Kaiser Steel Corp.
3851 Santa Fe Avenue
Los Angeles, CA 90058

Maruichi American Corp.
11529 S. Greenstone Avenue
Santa Fe Springs, CA 90670

Phoenix Steel Corp.
121 Budge Street
Phoenixville, PA 19460

Quanex Corp.
1900 W. Loop South
Suite 1500
Houston, Texas 77027

Sharon Tube Co.
134 Mill Street
Sharon, PA 16146

Tex-Tube Division
Cyclops Corp.
P.O. Box 7705
Houston, TX 77007

Welded Tube Company of
America
1855 E. 122nd Street
Chicago, IL 60633

Wheatland Tube Corp.
Wheatland, PA 16161

EXHIBIT 2

EXHIBIT 2

OTHER DOMESTIC PRODUCERS OF SMALL DIAMETER CIRCULAR STANDARD AND LINE PIPE

Armco Inc.*
703 Curtis Street
Middletown, OH 45042

Atlantic Steel Co.*
P.O. Box 82000
Tallapoosa, GA 30176

Berger Industries, Inc.*
Steel Tube Division
7416 Grand Avenue
Maspeth, NY 11378

Daily Corp.*
Box 414
Montgomeryville, PA 18936

Donovan Steel Tube Co.*
P.O. Box 5147
Point Place Station
Toledo, OH 43611

Hanna Steel Corp.*
3812 Commerce Avenue
Fairfield, AL 35064

Hoffmann Industries, Inc.*
Shillington Road
Singing Spring, PA 19608

James Steel & Tube Co.*
P.O. Box 945
Madison Heights, MI 48071

Lone Star**
2200 W. Mockingbird Lane
Dallas, TX 75235

Metal-Matic, Inc.*
620 Second Street, S.E.
Minneapolis, MN 55414

American Roll Formed Products*
Box 668
Painesville, OH 4077

Babcock & Wilcox**
Tubular Products Group
P.O. Box 401
Beaver Falls, PA 15010

California Steel & Tube Corp.*
16049 Stephens Street
City of Industry, CA 91745

Delta Tube & Fabrication*
4149 Granges Hall Road
Holly, MI 48442

Geneva**
Box 30 A
Geneva, NE 68361

Harris Tube Division*
Automation Industries, Inc.
8720 South San Pedro Street
Los Angeles, CA 90003

Jackson Tube Service, Inc.*
P.O. Box 818
Piqua, OH 45356

Lock Joint Tube Co., Inc.*
P.O. Box 239
South Bend, IN 46624

LTV Steel
P.O. Box 6778
Cleveland, OH 44101

Miami Industries, Div. of*
MSL Ind.
P.O. Box 912
Piqua, OH 45356

Mid-States Tube Corp.*
6600 52nd Street
Kenosha, WI

Pacific Tube Co.*
5710 Smithway Street
Los Angeles, CA 90040

Pixley Tube Corp.*
Highway 81 South
Marlow, OK 73533

Roth Steel Tube Co.*
1335 E. 171st Street
Cleveland, OH 44110

Stupp**
P.O. Box 3558
Baton Rouge, LA 70821

Torrance Tubing & Conduit Co.*
1739 W. 213th Street
Torrance, CA 90509

Tubular Products Co.*
P.O. Box 6418
Birmingham, AL 35217

U.S. Tube, Inc.*
P.O. Box 5487
Birmingham, AL 35207

Valmont Industries, Inc.
West Highway 275
Valley, NB 68064

Maruichi American Corp.*
11529 S. Greenstone Ave.
Santa Fe Springs, CA 90670

Western Tube & Conduit*
1001 East Dominguez
Long Beach, CA 90810

* Produces Standard Pipe Only

** Produces Line Pipe Only

Motor City Tube Corp.*
777 Advance Street
Brighton, MI 48116

Parthenon Metal Works, Inc.*
P.O. Box 307
Laverne, TN 37086

J.M. Tull Industries*
P.O. Box 725
Norcross, GA 30071

Royal Tube Corp.*
P.O. Box 726
Seymour, IN 47274

Tectron Tube Division,*
Menco Corp.
P.O. Box 360
Depere, WI 54115

U.S. Steel
600 Grant Street
Pittsburgh, PA 15230

United Tube Corp.*
10 South Ware Blvd.
Tampa, FL 33619

Wheeling-Pittsburgh Steel Corp.
Four Gateway Center
Pittsburgh, PA 15230

Century Tube Corp.*
P.O. Box 7612
Pinebluff, AR 71611

Barcode:3883503-01 A-549-502 SCO - Scope Inquiry - Line Pipe

EXHIBIT 3

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Exhibit 3

OTHER PRODUCERS OF THAI STANDARD PIPE

1. Saha Thai Steel Pipe Co., Ltd.
   78 Group 3, Poochaosamingprai Rd.
   Phrapradaeng, Samutprakarn 10180
   Tel: 394-0891, 394-1973
   394-1650-1
   Cable: SAHASTEEL PARAPRADEANG
   Telex: 72095 SCS TH
   Attn: Mr. Somchai Karuchit
   Product: Galvanized Steel Pipe

2. Thai-Asia Steel Pipe Co., Ltd.
   35 Suksawad Rd., Phrapradaeng
   Samutprakarn 10180
   Tel: 462-6875
   Cable: TASTEEL BANGKOK
   Telex: UDOMTHAI TH 82011
   Attn: Mr. Udom Pichitpongchai
   Product: Galvanized Steel Pipe

3. Siam Syndicate Co., Ltd.
   260, 4th Floor, Suriyothai Bldg.
   Phaholyothin Road,
   Bangkok
   Tel: 279-4630-1, 279-3377,
   279-3096, 278-3730-1
   Cable: SYNDICO
   Telex: 82702 ASCO TH
   Attn: Mr. Somkiet Amorn-Trakul
   Mr. Yutthaphong Krityakianrana
   Product: Galvanized Steel Pipe
   & Fittings
   Cast Iron Valves

4. Bangkok Industry Service Co., Ltd.
   149 St. Louis 3, Chan Rd.,
   Bangkok
   Tel: 211-4601-4
   Cable: BISCO
   Telex: 87996 BISEXPO TH
   Attn: Mr. Nimitr Tiewxharoean
   Product: Galvanized Steel Pipe

5.  Sathask-driam Co., Ltd.
    76 Soi Paisanee, Charoenkrung Rd.
    Bangkok
    Tel:  234-0126
    Cable:  SATHASKCO
    Telex:  87980 TH
    Attn:  Ms. Orawan Saengrangkaran
    Product:  Black Steel Pipe

6.  TCP Thai Cast Manufacturing Ltd. Part.
    31/37 Vorachak Rd., Pomprab
    Bangkok 10100
    Tel:  223-0922-3
    Cable:  SAIRON BANGKOK
    Telex:  81099 SACKIWA TH
    Attn:  Mr. Mana Karoonyanont
    Product:  Cast Iron Pipe

7.  Siam Steel Pipe Import Export Co., Ltd.
    316 Soi Miktr-Maitri
    Pracha-Uthit Rd., Bangmod
    Rajburana, Bangkok 10140
    Tel:  234-0840, 462-5573
          462-6922, 462-5705
    Cable:  SIAM STEEL BANGKOK 14
    Telex:  87655 JHC TH
            Attn:  Vichien
    Attn:  Mr. Vichien A Wong
    Product:  Galvanized Steel Pipes

8.  P.H. and P. Co., Ltd.
    715/5 Soi Wat-Dognai, Sathupradith
    Bangkok
    Tel:  284-0887, 284-1639
    Cable:  PHPSIAM
    Telex:  82164 BVT TH
            Attn:  PHPSIAM
    Attn:  Mr. Hoon wongjitwuthikrai
    Product:  Black Steel Pipe

9.  Waltzen Enterprise Co., Ltd.
    2083, 5th Floor Wenco Bldg.,
    New Petchburi Rd., Bangkapi
    Huaykwang, Bangkok 10810
    Tel:  314-2721-2, 314-5157
    Cable:  WALTZEN BANGKOK
    Telex:  82443 TRANTEX TH
            Attn:  Watzen
    Attn:  Mr. Tavich Suksupprachai
    Product:  Cast Iron Pipe and Fittings

EXHIBIT 4

FORMULA FOR 1 1/2" SK40 (ASTM-A-120)

A. Industry formula for wt/ft

10.68 (D-t)t, where
D = O.D.
t = wall thickness
10.68 = 3.1417 (pi) x 12"/ft. x .2833#/cu. in. (steel density)

B. Square ft/lineal ft

(1.900" O.D. x 3.1417 (pi) x 12"/ft x 2 sides) divided by
144 sq. in./sq. ft. =
.9949 sq. ft. surface area/lineal ft.

C. Square ft/ton

$\frac{2000\#/ton}{2.718\#/ft}$ (.9949) = 732 sq. ft.ton

D. ASTM-A-120 requires 1.8 oz./sq. ft.
1. Price of zinc to Thailand is European producer's price plus $45-65 per ton charge.

| | |
|---|---|
| Dec. 1984 zinc prices | $900 |
| Surcharge | 45 |
| Zinc$/MT | $945 |

2.

| | |
|---|---|
| Zinc price | .4288$/# |
| Zinc price | .0268$/oz. |
| Dross price | .0134$/oz. |
| Zinc | .0402$/1.5 oz. |
| Dross | .0067$/.5 oz. |
| | $.0335 to put 1 oz. zinc on pipe |

3. $.0603 to put 1.8 oz. of zinc on pipe

Barcode:3883503-01 A-549-502 SCO - Scope Inquiry - Line Pipe

ZINC COST/SHORT TON FINISHED PIPE

550g/sq. meter

| Trade | O.D. | Wall | Wt/Ft. | Sq. ft./Ton | $ Ton |
|---|---|---|---|---|---|
| 1 1/2"SK40 | 1.900 | 1.45 | 2.718 | 732 | 44.14 |
| 1 3/8 Tube | 1.315 | .069 | .918 | 1500 | 90.45 |

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Barcode:3883503-01 A-549-502 SCO - Scope Inquiry - Line Pipe

EXHIBIT 5

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

TABLE 1

COST OF PRODUCTION

| | | Product 1[1] | Product 2[2] | Product 3[3] |
|---|---|---|---|---|
| A | Coil Price[4] | 299.47 | 299.47 | 278.41 |
| B | Shipping[5] | 40.00 | 40.00 | 40.00 |
| C | Base Price[6] | 339.47 | 339.47 | 318.41 |
| D | Yield Factor 8%[7] | 27.16 | 27.16 | 25.47 |
| E | Zinc[8] | -- | 44.14 | 90.45 |
| F | Conversion Cost 17.1%[9] | 62.69 | 70.24 | 74.27 |
| G | Total Cost of Goods | 429.32 | 481.01 | 508.60 |
| H | SGA 10%[10] | 42.93 | 48.10 | 50.86 |
| I | COP | 472.25 | 529.11 | 559.46 |
| J | Profit 8%[11] | 37.78 | 42.33 | 44.76 |
| K | Constructed Value | 510.03 | 571.44 | 604.22 |
| L | Offer Price[12] | 423.62 | 517.73 | 587.02 |
| M | Freight, Insur.[13] | 40.00 | 40.00 | 40.00 |
| N | Duty 1.9% | 7.29 | 9.08 | 10.39 |
| O | Ex-Factory U.S. Purchase Price | 376.33 | 468.65 | 536.63 |
| P | Difference Between K & O | 133.70 | 102.79 | 67.59 |
| Q | Margin | 35.5% | 21.9% | 12.6% |

FOOTNOTES FOR TABLE 1

1   Product 1 is an ASTM-A-120 Schedule 40 pipe, welded,
    carbon, black, 1.9 inch O.D., 0.145 inch (3.68 mm) wall
    thickness.  It is usually purchased in widths of 44 to 48
    inches or between 1.1 to 1.3 meters.

2   Product 2 is an ASTM-A-120 Schedule 40 pipe, welded,
    carbon, galvanized, 1.9 inch O.D., 0.145 inch (3.68 mm)
    wall thickness.  It is usually purchased in widths of 44
    to 48 inches or between 1.1 to 1.3 meters.

3   Product 3 is light-walled fence tubing, welded, carbon,
    galvanized 1.315 in. O.D., .069 in. (1.75 mm) wall
    thickness.  It is usually purchased in widths of 44 to 48
    inches or between 1.1 to 1.3 meters.

4   All coil prices are based on hot-rolled coil prices
    calculated from Japanese export statistics on coil
    shipments to Thailand for period September 1984.  See
    Exhibit 5, Table III.

5   Petitioner was unable to obtain exact shipping, insurance,
    port and handling charges from Japan to Thailand.
    Conversations with international shipping agents indicate
    that $40.00 per ton is not an unreasonable rate.  This
    does not take into account inland freight charges for
    delivery to the pipe mill, but since all pipe mills are at
    or near the coast, such charges would be minimal.

6   This base price does not include any extras which the
    Thais may actually be paying in their sheet costs, making
    this a conservative figure.

7   Industry estimates are that scrap from slitting, welding,
    cut-offs and rejected pipe average 5.5% for sheet and an
    additional 2-3% for trimming the edges of coil.

8   Based on a price of 42.88 cents per pound and the
    specified application under ASTM-A-120.  See Exhibit 4.

9   Conversion cost was based on average manufacturing cost
    for U.S. non-integrated producers as established by the
    International Trade Commission. (See Certain Welded
    Carbon Steel Pipes and Tubes from the Republic of Korea
    and Taiwan, Inv. Nos. 731-TA-131, 132, and 138 (Final),
    USITC Pub. 1519, at A-29.) No current wage information
    was available to petitioner. Petitioner therefore used an
    average industrial wage taken from the United Nations'
    Statistical Yearbook 1970, adjusted for consumer price
    increases since 1970 and further adjusted to reflect
    higher wages in the Bangkok area and higher wages in the
    steel industry. Petitioner estimates the average Thai
    steelworker engaged in the production of pipe and tube
    earns approximately $1 per hour. Petitioner believes that
    this conversion factor may even be too low considering the
    interest and depreciation expenses involved with expanding
    production capacity which are believed to have been
    incurred over the last few years.

10  Petitioner has no information concerning selling, general
    and administrative expenses of Thai pipe and tube
    producers. Petitioner has therefore chosen to use the
    statutory minimum of 10% used when constructed value is
    compared with U.S. purchase price. (See, 19 C.F.R.
    §353.6(a)(2).)

11  Petitioner has chosen the statutory minimum 8% profit
    level that would be used in a constructed value analysis.

12  Based on Triangle Winter Wolff price sheets for
    October 1984.

13  Petitioner was unable to obtain shipping and insurance
    rates between Thailand and Los Angeles. Petitioner does
    know from IM 145X statistics published by Commerce
    Department, Bureau of the Census, that 38.9 tons of the
    pipe and tube products covered by this petition cost
    $43.04 per ton in ocean freight and insurance to ship from
    Thailand to Wilmington, South Carolina. Adding port fees,
    handling cost and inland freight to this would produce an
    even higher figure. Petitioner has chosen the
    conservative estimate of $40.00 per ton to represent these
    costs.

TABLE II

FAIR VALUE COMPARISON FOR GLOBE TRADERS AND NOVEMBER SHIPMENT

| | Globe Traders Product #3 | | Nov. Shipment (Product #1) |
|---|---|---|---|
| Constructed Value | 604.22[1] | Constructed Value | 510.03[2] |
| Offer Price[3] | 553.47 | Landed Value[4] | 328.33 |
| Freight[5] | 40.00 | Shipping[6] | 43.04 |
| Duty 1.9% | 9.76 | Duty | 5.32 |
| Ex-Factory Purchase | 503.71 | Ex-Factory Purchase | 279.97 |
| Difference | 100.51 | Difference | 230.06 |
| Margin | 20.0 | Margin | 82.1 |

FOOTNOTES TO TABLE II

1 Taken from product 3 constructed value analysis in Table I.

2 Taken from product 1 constructed value analysis in Table I.

3 Taken from phone quotes offered by Globe Traders in July, 1984. See Exhibit 6.

4 Taken from IM145X statistics, Commerce Department, Bureau of the Census.

5 See footnote 13, Table I.

6 Based on IM145X statistics, Commerce Department, Bureau of the Census. This figure does not include inland freight and handling charges.

TABLE III

EXPORTS OF JAPANESE SHEET TO THAILAND
FOR JAN.-SEPT. 1984

Jan.-Sept. Average Prices

| Product | MT | ST | Yen (1000) | Yen/Ton[1] | $/Ton |
|---|---|---|---|---|---|
| Hot-rolled sheet, less than 3 mm | 5,229 | 5,762 | 372,265 | 64,603 | 275.68 |
| Cold-rolled sheet, over 3 mm, n.e.s. | 8,001 | 8,817 | 666,245 | 75,564 | 322.42 |
| Cold-rolled sheet, in coils over 3 mm | 27,482 | 30,285 | 2,217,204 | 73,211 | 312.42 |
| Sheet plates 3 mm - 4.75 mm | 3,917 | 4,317 | 302,616 | 70,107 | 299.17 |
| Sheet plates 4.75 mm - 6 mm | 1,020 | 1,124 | 74,745 | 66,499 | 283.77 |

Sept. Prices

| Product | MT | ST | (1000) | Yen/Ton[1] | $/Ton |
|---|---|---|---|---|---|
| Hot-rolled sheet, less than 3 mm | 1,023 | 1,127 | 75,735 | 67,180 | 278.41 |
| Cold-rolled sheet, over 3 mm, n.e.s. | 869 | 958 | 75,180 | 78,476 | 325.22 |
| Cold-rolled sheet, in coils over 3 mm | 2,887 | 3,182 | 243,749 | 76,615 | 317.50 |
| Sheet plates 3 mm - 4.75 mm | 633 | 709 | 51,234 | 72,262 | 299.47 |
| Sheet plates 4.75 mm - 6 mm | 13 | 14 | 1,094 | 76,343 | 316.38 |

SOURCE: Japanese Import and Export Statistics, Commodity by Country

NOTE: Average value of yen from January to August 1984 was 234.3375 y/$. The average value of the yen in August 1984 was 241.3 y/$. Taken from market/par rate, International Financial Statistics, IMF, Sept. 1984.

Barcode:3883503-01 A-549-502 SCO - Scope Inquiry - Line Pipe

EXHIBIT 6

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Barcode:3883503-01 A-549-502 SCO - Scope Inquiry - Line Pipe

TRIANGLE WINTER WOLFF

1000 W. Francisco St., Torrance, California 90502
(213) 538-9800

ML #1832
10/5/84
Cancels ML 1780

## A120 PIPE/FENCE TUBING

January Shipment from the Orient

**A120 Schedule 40**

| | Galv. T&C | Galv. P.E. (Per ton) | Galv. P.E. | | Black T & C | Black P.E. Sch. 40 (Per ton) | Black P.E. Sch. 40 | Black P.E. Sch. 10 (Per ton) | Black P.E. Sch. 10 |
|---|---|---|---|---|---|---|---|---|---|
| 1/2 | 24.17 | 527 | 22.42 | | 19.91 | 439 | 18.69 | | |
| 3/4 | 31.61 | 513 | 29.02 | | 26.18 | 430 | 24.29 | | |
| 1 | 46.74 | 516 | 43.36 | | 38.26 | 434 | 35.62 | | |
| 1-1/4 | 62.75 | 519 | 58.93 | (16'/21') | 50.21 | 422 | 47.98 | 439 | 39.62 |
| 1-1/2 | 74.27 | 518 | 70.36 | (16'/18'/21') | 61.66 | 424 | 57.57 | 437 | 45.57 |
| 2 | 99.93 | 518 | 94.61 | (16'/18'/21') | 81.05 | 415 | 75.88 | 438 | 57.75 |
| 2-1/2 | 158.08 | 517 | 149.56 | (16'/18'/21') | 128.35 | 424 | 122.79 | 435 | 76.74 |
| 3 | 207.01 | 516 | 195.73 | | 167.83 | 418 | 158.29 | 434 | 93.95 |
| 4 | 298.94 | 522 | 281.49 | | 243.10 | 426 | 230.09 | 434 | 121.78 |

**H.D. Galv. Fence Tubes, P.E.**

| | (Per ton) | | | | (Per ton) | | |
|---|---|---|---|---|---|---|---|
| .059 x 1-3/8 O.D. | 631 | 24.95 | | .104 x 1-5/8 | 551 | 47.60 | (16'/21' |
| x 1-5/8 O.D. | 612 | 30.90 | (16'/21') | x 1-7/8 | 551 | 54.95 | |
| x 1-7/8 O.D. | 614 | 35.60 | (16'/21') | x 2-3/8 | 554 | 69.90 | (16'/21' |
| x 2-3/8 O.D. | 685 | 44.85 | (16'/21') | 116 x 1-7/8 | 553 | 61.10 | (16'/18' & 21') |
| .069 x 1-3/8 OD | 587 | 26.95 | (16'/21') | x 2-3/8 | 556 | 77.85 | (16'/18' & 21') |
| x 1-5/8 O.D. | 589 | 34.50 | (17'/21') | 128 x 2-7/8 | 546 | 102.50 | (16'/18' & 21') |
| x 1-7/8 O.D. | 591 | 39.85 | (16'/21') | | | | |
| x 2-3/8 O.D. | 584 | 49.60 | (16'/21') | | | | |

Prices per 100', ex-dock L. A. Harbor , Oakland, add 1/2%; Portland, add 1%

Terms: Net 30 Days

Lengths: Where not shown all are x 21 ft

Black P.E. Sch. 40 21 ft. all; 24' 1" and larger
Black P.E. Sch. 10 21 ft. all and 24 ft. all

ML:gb

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Barcode:3883503-01 A-549-502 SCO - Scope Inquiry - Line Pipe

Price Quote from Globe Traders
July 1984

Schedule 40 Fence Pipe

Available September 1984,
Hold prices until November 1984

Prices for 100 tons:

| OD | Wall Thickness | Price per 100' | Per Ton |
|---|---|---|---|
| 1.315 | .069 | $25.41 | $533 |
| 1.660 | .069 | $32.30 | |
| 1.900 | .069 | $37.35 | |
| 2.375 | .069 | $47.06 | |

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

MEMORANDUM

TO:     The File

FROM:   Roger Schagrin

DATE:   February 13, 1985

RE:     Telephone conversation with Mr. Mahoney of
        Cambridge-Lee Industries


        On February 7 I received a phone call from a Mr.
Mahoney, representing Cambridge-Lee Industries out of
Memphis.  Mr. Mahoney requested a copy of a December 29
memo sent to all CPTI members by this office concerning
1) pipe marking regulations, 2) CPTI filing of antidumping
petitions against Venezuela and Taiwan, 3) the ITC hearing
on Canada free trade, and 4) agreements reached under the
president's program.

        I told Mr. Mahoney that this information was
prepared specifically for CPTI members and could not be
shared with non-member companies by me.  Mr. Mahoney
mentioned that his experience as an importer led him to
believe that importers would find new sources of supply to
replace the tonnages reduced from countries covered by the
agreements.  He mentioned as an example that he had been
offered 12,000 tons of standard pipe from Thailand by a
broker, Phillips Brothers.  I received another phone call
and our conversation ended.

Barcode:3883503-01 A-549-502 SCO - Scope Inquiry - Line Pipe

EXHIBIT 7

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

# Pipe dreams become reality

## Thriving local industry

Although there are doubtless a few exceptions, virtually everyone in Thailand's pipe industry must be fairly happy. All sectors report either steady or rapid growth in demand and there seems no end in sight to such growth. The country is even gaining a name for itself as a manufacturer of pipes for export.

Think of pipes, and most people picture a household water pipe. But this is only one example of a large range of pipes, which can vary from large concrete units of 1.5 metres diameter and more, to small PVC or steel pipes of only ½ inch diameter. In between are spirally welded steel pipes and pressure and non-pressure asbestos cement pipes. Rather surprisingly, except in domestic applications, there is very little market overlap among the different types.

The most common type of pipe is made of steel. Nomura Trading Thailand Co Ltd, who are the sole distributors in Thailand for Thai Steel Pipe Industry Co Ltd, estimate total production capacity to be close to 19,500 tons per month. They say there are 12 major manufacturers in Thailand, seven of whom can produce galvanised and all other types of steel pipe. The remaining five are capable of producing black ungalvanised pipe only. Pipe diameter can range between ½ and 8 inches.

### Imported steel

The pipe is made from imported steel sheet. This is trimmed, formed and welded in Thailand and after sizing, the pipe may either leave the factory as black pipe or may continue through a series of finishing processes which include straightening, pipe end facing, galvanising and threading. Whichever way, the leading companies now produce to international specifications. In fact Thai Steel Pipe Industry, using high frequency induction electric resistance welding, produces pipes to Japanese, British and American standards. This is just as well because the market for steel pipes in Thailand is estimated at 9,000 tons a month or only about 45 per cent of total production capacity. Yet all factories are now thought to be working flat out, the balance of 10,500 tons being exported.

*Local demand for steel pipes is 9,000 tons a month, only 45 per cent of total capacity*

Main markets are mainland China, which is buying between 3 to 4,000 tons of Thai made steel pipe a month and could well increase its orders, the Middle East, and the more traditional markets of Hong Kong and Singapore. Indeed, so strong is demand in both the export and domestic markets, that two to three manufacturers are expanding. This will probably give the industry a further 20 per cent additional capacity by year end.

### Seven major firms

Predictably, the seven major manufacturers divide the lion's share of the market between them. They are able to produce 17,500 tons of the present total of 19,500 and it is they who are expanding. They make a very wide range of pipes. In addition to hundreds of different specifications covering such essentials as internal and external diameter, metal thickness, weight per foot or metre and the number of threads per inch, there are several distinct applications.

These can conveniently be divided into water, gas, construction and furniture, there being major developments in each area. The demand for water pipes, for instance, has never been higher because the MWWA are in the middle of a two-decades long expansion project

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved



*Reinforced concrete pipes (above) of Siam Cement Co., Ltd. are used mostly for drainage, culverts and sewers*

which will eventually require thousands of kilometres of steel water pipe. Gas pipe demand while small, is growing fast, and should soon boom, while construction applications are also booming. This is due partly to a very healthy construction sector that has as much work as it can handle, and partly to the gradual enforcement of recent laws specifying steel, or at least wooden, scaffolding in place of flimsy bamboo. Since wood is becoming increasingly scarce and expensive and can only be used once or twice anyway, steel tubing made into prefabricated scaffolding which can be used over and over again is rapidly gaining popularity.

## Water pipes

Of the four types, water pipes account for about half the volume on the domestic market and they have an approximate market value of 49.5 million baht. All the other applications require pipe of less high quality. Thus these pipes sell for around 38.25 million baht a month. Even so, total domestic market value comes to 87.75 million baht a month which is equivalent to a very healthy 1,056 million baht a year. If the exported pipes are bringing in as much, then Thailand has discovered a new, important industrial export.

In addition to the longitudinal welded pipes, for which eight inches is the maximum diameter, at least one company in Thailand makes spirally welded steel pipes. With these, the metal sheet, instead of being allowed to lie in the direction of he pipe, is set at an angle to it and then wound round it. The spiral joint is then welded, the advantage of this method being that it allows larger diameters. Sathask-Driam, the Thai manufacturer, can produce spirally welded pipes of up to 60 inches diameter.

## Spun concrete pipes

Sathask-Driam also makes centrifugally spun concrete pipes which may or may not have steel wire reinforcement. These are used for road culverts, drains and sewers and this brings the company into more or less direct competition with the Siam Cement group. For the latter produce cast reinforced concrete pipe, this particular market being the largest in terms of tonnage and number of manufacturers, and the second largest in terms of value.

Siam Cement's reinforced concrete pipes vary in diameter from 40-150 cms. They are used almost exclusively for drainage, culverts and sewers and they offer the cheapest form of piping for these applications. Even so, there is very stiff competition within the market. Siam Cement estimates that there are at least 30 to 40 recognised manufacturers plus many more small backyard enterprises. These smaller companies serve to keep

*Pipe threading at Thai Steel Pipe Industry Co., Ltd., which manufactures steel pipes to British, American and Japanese standards*

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:51 PM, Submission Status: Approved

prices way down so that, although total market demand for 1980 is estimated by Siam Cement to be about 371,000 tons, its value will be only around 223 million baht. Quite a drop from the 1,000 million baht value for steel pipes!

Siam Cement reckons that they have an 18 per cent share of the market, the other 30 to 40 makers having between 12 to 1 per cent each. The large band of unknowns manage to capture a surprisingly large 18 per cent of the trade. The reason for this is, first, low prices offered by the small firms, and the bulky nature of the pipes themselves. They are costly to transport, relatively easy to make almost anywhere, and thus the market is fragmented in terms of location. While demand is increasing at an estimated 10 per cent per year, 30 per cent of all sales are made in Bangkok. Again, the government has been the main spur to this sector because accelerated road construction has called for more culverts and drainpipes. The Highways Department is far and away the single largest purchaser of reinforced concrete pipes.

### Asbestos cement pipes

Asbestos cement pipes, also made by the Siam Cement group of companies, come in two distinct types. These are pressure and non-pressure, the former being used as drain pipes, the latter as water supply pipes. The non-pressure drain pipes vary in diameter between 80 and 150 mm and can be between one and four metres long. Total demand is around 15,000 tons a year, giving a market value of 50 million baht. Again, there is tough competition. This is in spite of the fact that Siam Cement is the only manufacturer in Thailand of asbestos cement pipes. Wily businessmen have found substitute materials which allow them to produce similar pipe for less money. Is the quality as good? Well, no, but then the Thai market is traditionally governed by price considerations.

Asbestos cement pressure pipes tend to sell more easily because they are a comparatively high technology product. Their diameter can vary from 80 to 600 mm and they come in three classes. These are class 15, 20 and 25, the numbers specifying the pressure in kgs/square centimetre that the pipe is able to withstand. Demand is about 40,000 tons a year, and total market value about 200 million baht growing at roughly 10 per cent per year.

### PVC pipes

The final type of pipe is PVC, and although this is tending to replace steel pipes in domestic applications, the process is slow. PVC pipes, while cheap and easy to deal with, do not have such a long life as steel pipes and are not as rigid. The main manufacturer in Thailand, however, is Thai Pipe Industry Co Ltd and they make rigid PVC pipes and pipe fittings and flexible garden hose. Pipe diameter can vary from ¼ to 16 inches and the factory has TISI certification ●

THAI STEEL PIPE INDUSTRY CO.,LTD.
LEADING MANUFACTURER OF GALVANIZED AND BLACK STEEL PIPE IN THAILAND
TSP
THAI STEEL PIPE INDUSTRY CO.,LTD.
บริษัท อุตสาหกรรมท่อเหล็ก จำกัด

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

# EXHIBIT 4

Barcode:3883503-01 A-549-502 SCO - Scope Inquiry - Line Pipe

ROGER B. SCHAGRIN, P.C.

FOURTH FLOOR

923 FIFTEENTH STREET, N.W.

WASHINGTON, D.C. 20005

(202) 628-3810

March 14, 1985

Secretary of Commerce
Attn: Import Administration
Central Records Unit
Room B-099
Department of Commerce
Pennsylvania Ave. at 14th St., N.W.
Washington, D.C. 20230

A-307-502
A-549-502
C-549-501
2 pages
Nonconfidential

Attention: John Brinkmann, Room 3608

Re: Certain Welded Carbon Steel Circular Pipe and Tube Products from Thailand and Venezuela: Partial Withdrawal of Petition

Dear Mr. Secretary:

Petitioners in the above designated investigations, the standard pipe subcommittee and the line pipe subcommittee of The Committee on Pipe and Tube Imports and the individual members of these subcommittees, hereby withdraw the following portions of the followings petitions:

1. A-307-502, Certain Pipe and Tube Products from Venezuela: Petitioners withdraw the petition insofar as it concerns standard pipe, TSUS numbers 610.3231, 3234, 3241, 3242, 3243, 3252, 3254, 3256, 3258, and 4925. The ITA is presently conducting an antidumping investigation of this product from Venezuela, and initiating another investigation would be duplicative.

2. A-549-502 and C-549-501. Certain Pipe and Tube Products from Thailand: Petitioners withdraw these petitions insofar as they concern line pipe, TSUS numbers 610.3208 and 3209. Petitioners have ascertained that no Thai company is presently licensed to produce pipe to API specifications, and imports of API line pipe from Thailand are therefore not likely.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

**ROGER B. SCHAGRIN, P.C.**

Petitioners wish to stress that the withdrawal of these portions of their petitions in no way alters their position that the appropriate domestic industry for injury determination purposes is the industry producing standard and line pipe.

Respectfully submitted,

Roger B. Schagrin
Paul W. Jameson

# EXHIBIT 5

Barcode:3883503-02 A-549-502 SCO - Scope Inquiry - Line Pipe

# CERTAIN WELDED CARBON STEEL PIPES AND TUBES FROM THAILAND AND VENEZUELA

**Determination of the Commission in Investigation No. 701-TA-242 (Preliminary) Under the Tariff Act of 1930, Together With the Information Obtained in the Investigation**

**Determinations of the Commission in Investigation Nos. 731-TA-252 and 253 (Preliminary) Under the Tariff Act of 1930, Together With the Information Obtained in the Investigations**

**USITC PUBLICATION 1680**

**APRIL 1985**

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

**United States International Trade Commission / Washington, D.C. 20436**

Barcode:3883503-02 A-549-502 SCO - Scope Inquiry - Line Pipe

# UNITED STATES INTERNATIONAL TRADE COMMISSION

## COMMISSIONERS

**Paula Stern, Chairwoman**
**Susan W. Liebeler, Vice Chairman**
**Alfred E. Eckes**
**Seeley G. Lodwick**
**David B. Rohr**

Bruce Cates, Office of Investigations
Dennis Rapkins, Office of Industries
John Ryan, Office of Economics
Jack Simmons, Office of the General Counsel
Chand Mehta, Office of Investigations
Robert Carpenter, Supervisory Investigator

**Address all communications to**
**Kenneth R. Mason, Secretary to the Commission**
**United States International Trade Commission**
**Washington, DC 20436**

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

C O N T E N T S

| | Page |
|---|---|
| Determinations | 1 |
| Views of Commission | 5 |
| Separate Views of Vice Chairman Liebeler | 19 |
| Information obtained in the investigations: | |
| Introduction | A-1 |
| Previous Commission investigations | A-2 |
| Nature and extent of the alleged subsidies | A-4 |
| Nature and extent of the alleged sales at LTFV | A-5 |
| The products: | |
| Description and uses | A-5 |
| Manufacturing processes | A-6 |
| U.S. tariff treatment | A-8 |
| U.S. producers | A-8 |
| U.S. importers | A-10 |
| The U.S. market: | |
| Channels of distribution | A-10 |
| U.S. consumption | A-11 |
| Consideration of alleged material injury to an industry in the United States | A-12 |
| U.S. production, capacity, and capacity utilization | A-13 |
| U.S. producers' shipments | A-14 |
| U.S. exports | A-15 |
| U.S. producers' inventories | A-16 |
| Employment and wages | A-17 |
| Financial experience of U.S. producers | A-19 |
| Standard and line pipes and tubes | A-19 |
| Standard pipes and tubes | A-19 |
| Line pipes and tubes | A-22 |
| Overall establishment operations | A-22 |
| U.S. producers' statements on the impact of imports from Thailand and Venezuela on their growth, investment, and ability to raise capital | A-24 |
| The question of the threat of material injury | A-24 |
| U.S. importers' inventories | A-24 |
| Capacity of foreign producers to generate exports: | |
| Thailand | A-24 |
| Venezuela | A-26 |
| Consideration of the causal relationship between alleged material injury or the threat thereof and the allegedly subsidized and LTFV imports: | |
| U.S. imports | A-27 |
| Standard pipes and tubes | A-28 |
| Line pipes and tubes | A-28 |
| Market penetration by the alleged subsidized and LTFV imports | A-28 |
| Standard pipes and tubes | A-32 |
| Line pipes and tubes | A-32 |
| Prices | A-32 |
| Standard pipes and tubes | A-35 |
| Line pipe | A-37 |
| Transportation costs | A-37 |
| Exchange rates | A-39 |
| Lost sales | A-40 |

CONTENTS

| | Page |
|---|---|
| Appendix A. Commission's Federal Register notice of investigation | A-43 |
| Appendix B. Calendar of witnesses who appeared at the Commission's conference | A-47 |
| Appendix C. Previous Commission investigations | A-49 |

Tables

1. Certain welded carbon steel pipes and tubes: Selected U.S. producers' shares of domestic shipments, by product lines, 1984 ---- A-9
2. Certain welded carbon steel pipes and tubes: U.S. producers' domestic shipments, imports for consumption, and apparent consumption, by types, 1982-84, January 1984, and January 1985 ---- A-12
3. Standard and line pipes and tubes: U.S. production, capacity, and and capacity utilization, 1982-84, January-February 1984, and January-February 1985 ---- A-13
4. Standard and line pipes and tubes: U.S. producers' domestic shipments, by types, 1982-84, January-February 1984, and January-February 1985 ---- A-15
5. Standard and line pipes and tubes: U.S. producers' inventories of domestically produced merchandise, by types, as of Dec. 31 of 1982-84 and Feb. 29 of 1984-85 ---- A-17
6. Average number of production and related workers producing standard and line pipes and tubes and hours worked by and wages and total compensation paid to such employees, 1982-84, January-February 1984, and January-February 1985 ---- A-18
7. Income-and-loss experience of 6 U.S. producers on their operations producing standard and line circular welded carbon steel pipes and tubes, accounting years 1982-84 ---- A-20
8. Income-and-loss experience of 2 U.S. producers on their operations producing standard pipes and tubes, accounting years 1982-84 ---- A-21
9. Income-and-loss experience of 3 U.S. producers on their operations producing line pipes and tubes, accounting year 1982-84 ---- A-22
10. Income-and-loss experience of 6 U.S. producers on the overall operations of their establishment within which welded carbon steel pipes and tubes are produced, accounting years 1982-84 ---- A-23
11. Standard pipes and tubes: Thailand's production, capacity, capacity utilization, domestic shipments, and exports, 1982-85 ---- A-25
12. Standard and line pipes and tubes: Conduven's capacity, production, export sales, and home-market sales, 1981-83, January-September 1983, and January-September 1984 ---- A-27
13. Standard and line pipes and tubes: U.S. imports for consumption, by principal sources, 1982-84, January 1984, and January 1985 ---- A-29
14. Standard pipes and tubes: U.S. imports for consumption, by principal sources, 1982-84, January 1984, and January 1985 ---- A-30
15. Line pipes and tubes: U.S. imports for consumption, by principal sources, 1982-84, January 1984, and January 1985 ---- A-31
16. Standard and line pipes and tubes: Shares of U.S. consumption supplied by Venezuela, Thailand, all other countries, and U.S. producers, 1982-84, January 1984, and January 1985 ---- A-33

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Barcode:3883503-02 A-549-502 SCO - Scope Inquiry - Line Pipe

CONTENTS

Tables--Continued

Page

17. Standard and line pipes and tubes: Shares of U.S. consumption, by specified sources, 1982-84, January 1984, and January 1985---------- A-34
18. Standard circular pipes and tubes: U.S. producers' and importer's weighted-average prices to service centers/distributors for schedule 40 standard pipe, by quarters, January 1982-February 1985---------- A-36
19. Line pipe: U.S. producers' and importers' weighted-average prices to service center/distributors, by quarters, January 1982-February 1985---------- A-38
20. Nominal and real exchange rate indexes between the U.S. dollar and the Venezuelan bolivar and the Thai baht, by quarters, January 1982-December 1984---------- A-40

Certain welded carbon steel pipes and tubes: Pending and recently terminated title VII investigations and outstanding dumping/countervailing orders and most recent dumping/subsidy margins, and import/consumption ratios, by countries, 1982-84---------- A-50

Note.--Information that would reveal the confidential operations of individual concerns may not be published and therefore has been deleted from this report. Such deletions are indicated by asterisks.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Barcode:3883503-02 A-549-502 SCO - Scope Inquiry - Line Pipe

iv

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

UNITED STATES INTERNATIONAL TRADE COMMISSION
Washington, DC

Investigations Nos. 701-TA-242 (Preliminary) and
731-TA-252 and 253 (Preliminary)

CERTAIN WELDED CARBON STEEL PIPES AND TUBES FROM
THAILAND AND VENEZUELA

## Determinations

On the basis of the record 1/ developed in the subject investigations, the Commission determines, pursuant to section 703(a) of the Tariff Act of 1930 (19 U.S.C. § 1671b(a)), that there is a reasonable indication that industries in the United States are materially injured by reason of imports of welded carbon steel standard 2/ and line pipes and tubes 3/ which are allegedly subsidized by the Government of Venezuela. The Commission also determines, pursuant to section 733(a) of the Tariff Act of 1930 (19 U.S.C. § 1673b(a)), that there is a reasonable indication that an industry in the United States is threatened with material injury by reason of imports of welded carbon steel standard pipes and tubes from Thailand 4/ and materially injured by welded carbon steel line pipes and tubes from Venezuela, which are allegedly being sold in the United States at less than fair value (LTFV).

---

1/ The "record" is defined in section 207.2(i) of the Commission's Rules of Practice and Procedure (19 CFR § 207.2(i)).

2/ Chairwoman Stern and Vice Chairman Liebeler dissenting with respect to standard pipes and tubes.

3/ The term "welded carbon steel standard pipes and tubes" covers welded carbon steel pipes and tubes of circular cross section, 0.375 inch or more but not over 16 inches in outside diameter, provided for in items 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258, and 610.4925 of the Tariff Schedules of the United States Annotated (TSUSA). The term "welded carbon steel line pipes and tubes" covers welded carbon steel pipes and tubes of circular cross section, with walls not thinner than 0.065 inch, 0.375 inch or more but not over 16 inches in outside diameter, conforming to API specifications for line pipe, provided for in TSUSA items 610.3208 and 610.3209.

4/ Chairwoman Stern determines on the basis of a cumulative analysis that there is a reasonable indication that an industry in the United States is materially injured by reason of imports of welded carbon steel standard pipes and tubes from Thailand. Vice Chairman Liebeler dissenting with respect to imports from Thailand.

Background

On February 28, 1985, petitions were filed with the U.S. International Trade Commission and the U.S. Department of Commerce by counsel for the Committee on Pipe and Tube Imports alleging that an industry in the United States is materially injured and threatened with material injury by reason of imports of certain welded carbon steel pipes and tubes which are being subsidized by the Governments of Thailand and Venezuela, and which are also being sold in the United States at LTFV. On March 12, 1985, counsel amended the petitions to state, among other things, that the petitions were filed by the Standard Pipe Subcommittee and the Line Pipe Subcommittee of the Committee on Pipe and Tube Imports, and by each of the individual manufacturers that are members of those subcommittees. Accordingly, effective February 28, 1985, the Commission instituted investigation No. 701-TA-242 (Preliminary), to determine whether there is a reasonable indication that an industry in the United States is materially injured, or is threatened with material injury, or the establishment of an industry in the United States is materially retarded by reason of imports from Venezuela of certain welded carbon steel pipes and tubes which are allegedly subsidized by the Government of Venezuela. 1/ The Commission also instituted, effective February 28, 1985, investigations Nos. 731-TA-252 and 253 (Preliminary), to determine whether there is a reasonable indication that an industry in the United States is materially injured or threatened with material injury, or the establishment of an industry in the United States is materially retarded by reason of imports of certain welded

1/ Thailand is not a "Country under the Agreement" and therefore the Commission is not required to reach a determination with respect to injury from allegedly subsidized imports. Consequently, the Commission did not institute a countervailing duty investigation with respect to the allegedly subsidized imports from Thailand.

carbon steel pipes and tubes from Thailand and Venezuela which are alleged to be sold in the United States at LTFV.

In the process of instituting these investigations, Commerce advised the petitioner that the welded carbon steel pipe and tube products covered by the petitions represented two distinct classes or kinds of products, standard pipe and line pipe. Subsequently, on March 14, 1985, the petitions involving imports from Thailand were withdrawn as they relate to line pipe because there is no known production in Thailand of line pipe to American Petroleum Institute (API) specifications. On the same date, the antidumping petition involving imports from Venezuela was withdrawn as it relates to standard pipe because the Commission, on February 1, 1985, had made an affirmative preliminary determination with respect to imports of that product from Venezuela and Commerce was in the process of conducting its antidumping investigation.

Notice of the institution of the Commission's investigations and of a public conference to be held in connection therewith was given by posting copies of the notice in the Office of the Secretary, U.S. International Trade Commission, Washington, DC, and by publishing the notice in the Federal Register of March 18, 1985 (50 FR 10866). The conference was held in Washington, DC, on March 22, 1985, and all persons who requested the opportunity to appear in person or by counsel were given the opportunity to do so. The Commission's determinations in these investigations were made in an open "Government in the Sunshine" meeting held on April 8, 1985.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Barcode:3883503-02 A-549-502 SCO - Scope Inquiry - Line Pipe

4

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

## VIEWS OF THE COMMISSION

In these three preliminary investigations, we have determined that: (1) there is a reasonable indication that industries in the United States are materially injured by reason of allegedly subsidized imports of welded carbon steel standard and line pipes and tubes from Venezuela (Inv. No. 701-TA-242); 1/ 2/ (2) there is a reasonable indication that an industry in the United States is threatened with material injury by reason of imports of welded carbon steel standard pipes and tubes from Thailand allegedly sold at less than fair value (LTFV) (Inv. No. 731-TA-252); 3/ 4/ and (3) there is a reasonable indication that an industry in the United States is materially

---

1/ Chairwoman Stern determines that there is no reasonable indication that industries in the United States are materially injured or threatened with material injury by reason of allegedly subsidized imports of welded carbon steel standard pipes and tubes from Venezuela.

2/ Vice Chairman Liebeler determines that there is no reasonable indication that industries in the United States are materially injured or threatened with material injury by reason of allegedly subsidized imports of welded carbon steel standard pipes and tubes from Venezuela. *See* separate views of Vice Chairman Liebeler.

3/ Based on a cumulative analysis, Chairwoman Stern determines that there is a reasonable indication that an industry in the United States is materially injured by reason of allegedly LTFV imports from Thailand and does not reach the question of threat of material injury.

4/ Vice Chairman Liebeler determines that there is no reasonable indication that an industry in the United States is materially injured or threatened with material injury by reason of allegedly LTFV imports from Thailand. *See* separate views of Vice Chairman Liebeler.

injured by reason of allegedly LTFV imports of welded carbon steel line pipes and tubes from Venezuela (Inv. No. 731-TA-253). 5/

Like Products and the Domestic Industries

The term "industry" is defined in section 771(4)(A) of the Tariff Act of 1930 as being "the domestic producers as a whole of the like product." 6/ The term "like product" is defined in section 771(10) as being "a product which is like, or in the absence of like, most similar in characteristics and uses with the article subject to an investigation." 7/

There are two imported products that are the subjects of the three petitions in these investigations: standard and line circular welded carbon steel pipes and tubes, 0.375 inch or more but not over 16.0 inches in outside diameter, as follows:

(1) No. 701-TA-242, countervailing duty petition regarding Venenzuela, both standard and line pipes and tubes;

(2) No. 731-TA-252, antidumping petition regarding Thailand, standard pipes and tubes only; and

(3) No. 731-TA-253, antidumping petition regarding Venezuela, line pipes and tubes only.

We have addressed the like product question regarding standard pipes and tubes (standard pipe) and line pipes and tubes (line pipe) in prior

---

5/ Material retardation of the establishment of an industry in the United States was not at issue in any of the three investigations and will not be discussed further.

6/ 19 U.S.C. § 1677(4)(A).

7/ 19 U.S.C. § 1677(10).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

investigations. [8/] In those investigations, the Commission recognized distinctions between standard pipe and line pipe. [9/] Standard pipe is manufactured to American Society of Testing and Materials (ASTM) specifications and line pipe is manufactured to American Petroleum Institute (API) specifications. [10/] Line pipe is made of higher grade steel and may have a higher carbon and manganese content than is permissible for standard pipe. Line pipe also requires additional testing. Wall thicknesses for standard and line pipes, although similar in the smaller diameters, differ in the larger diameters. [11/] Moreover, standard pipe (whether imported or domestic) is generally used for low-pressure conveyance of water, steam, air, or natural gas in plumbing, air-conditioning, automatic sprinkler and similar systems. Line pipe is generally used for the transportation of gas, oil, or

---

8/ The Commission has conducted a series of investigations regarding imports of welded carbon steel pipes and tubes in the recent past. Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea, Inv. No. 701-TA-168, USITC Pub. 1345 (1983); Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea and Taiwan, Invs. Nos. 731-TA-131 and 132 (Preliminary), USITC Pub. 1389 (1983), aff'd, Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea and Taiwan, Invs. Nos. 731-TA-131, 132, and 138 (Final), USITC Pub. 1519 (1984); Certain Welded Carbon Steel Pipes and Tubes from Brazil and Spain, Inv. Nos. 701-TA-220 (Preliminary), 731-TA-197 and 198 (Preliminary), USITC Pub 1569 (1984); Certain Welded Carbon Steel Pipes and Tubes from Taiwan and Venezuela, Inv. Nos. 731-TA-211 and 212 (Preliminary), USITC Pub. 1639 (1985).

9/ E.g., Certain Welded Carbon Steel Pipes and Tubes from Taiwan and Venezuela, supra, at 7.

10/ According to the petitions in these cases, standard pipe is generally produced to ASTM specifications A-120, A-53, or A-135, and line pipe is produced to API specifications API-5L or API-5X. E.g., petition in No. 731-TA-252 at 11.

11/ Report at A-8.

water in utility pipeline distribution systems. 12/ We conclude that domestic line pipe is like imported line pipe and not like imported standard pipe. We further conclude that domestic standard pipe is like imported standard pipe and is not like imported line pipe.

Turning to the question of pipe diameter, we believe that differentiation of either line or standard pipe by outside diameter is somewhat arbitrary. While it may be true that in some instances a country may export standard or line pipe above or below a certain diameter, this is not sufficient reason to limit the like product to only those sizes in cases such as these. According to American Iron & Steel Institute (AISI) information, there is no domestic production of standard pipe above 16 inches outside diameter. 13/ It appears that line pipe above 16 inches diameter generally has different uses from smaller line pipe and is marketed in a different fashion. Thus, the like products consist of all standard pipe and line pipe up to 16 inches outside diameter.

We conclude, therefore, that there are two like products in this investigation -- welded carbon steel line pipe and welded carbon steel standard pipe of circular cross-section up to 16 inches outside diameter. We further conclude that there are two domestic industries comprised, respectively, of the domestic producers of welded carbon steel line pipe and welded carbon steel standard pipe.

---

12/ Id. at A-6. See also Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea, supra, at A-2-4.

13/ AISI Form 10-P.

The domestic industries are composed of the producers of the like product. The domestic standard pipe and tube industry consists of 41 firms producing only standard pipe and 7 firms that produce both standard and line pipe. The domestic line pipe and tube industry consists of 4 firms that produce only line pipe and tube and the same 7 firms that produce both the standard pipe. 14/

---

14/ Petitioners have argued that if those firms that produce both line and standard pipe are unable to provide separate data for standard and line pipes, the Commission must, under 19 U.S.C. § 1677(4)(D), "view the producers of standard and line pipe a single industry." Petitioners' preconference brief at 1. The argument is misplaced.

Even though we usually evaluate the industry consisting only of the production of the like product, the "product line" provision (19 U.S.C. § 1677(4)(D)) permits us to examine a product line that includes the like product when the like product has no separate identification in terms of such criteria as production process or producer's profits. Under product line, we must evaluate the narrowest range of products, including the like product, for which information is available; we may not use data for a product line that does not include the like product. Accordingly, in the case of the line pipe industry and assuming that the statutory criteria for use of "product line" are met, we may consider information from those firms that produce only line pipe and from those firms that produce both line and standard pipe, but not information from those firms that produce only standard pipe.

In these investigations, we have considered each industry separately. However, we also have considered data for the producers of both line and standard pipe who were unable to separate their data when such consideration provides additional insight into the condition of the domestic industry.

Should any of these cases return for a final investigation, we anticipate that the domestic producers who have been unable to allocate their production and financial data between line pipe and standard pipe within the limited time available for these preliminary investigations will be able to do so, explaining the basis for the allocations, or have persuasive reasons why such allocation is not possible.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

**Condition of the Domestic Standard Pipe Industry** 15/

As noted above, the Commission has investigated the domestic standard pipe and line pipe industries in prior investigations. 16/ From the data gathered in those investigations, the domestic line and standard pipe industries demonstrated reasonable performance through 1981, but suffered serious setbacks in 1982 in terms of almost all significant economic indicators. Production, shipments, capacity utilization, employment, and wages all decreased precipitously, and financial performance deteriorated. 17/ We keep these facts in mind as we consider the data gathered during the course of this investigation. 18/

Apparent domestic consumption of standard pipe increased 40 percent during the period under investigation. 19/ Nevertheless, AISI data show

---

15/ Much of the information in these investigations regarding the condition of the domestic industries and regarding the imports are confidential and, therefore, can only be discussed in general terms.

16/ See footnote 8, supra.

17/ See Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea, supra, at 6-8.

18/ The period covered by these investigations includes calendar years 1982, 1983, and 1984, and January 1985.

19/ Report at Table 2.

that U.S. producers' shipments declined from 1982 through 1984. 20/ Production of standard pipe increased steadily, 21/ but capacity utilization, although it increased from 1982 to 1984, remained at extremely low levels.

Data on employment, wages, and hours show no significant trends in terms of the number of production and related workers and their hours worked. The number of workers declined by more than 6 percent from 1982 to 1983 and then increased by less than 3 percent from 1983 to 1984. 22/

The financial performance of the domestic standard pipe and tube industry deteriorated from 1982 to 1983 and then improved in 1984, surpassing the 1982 levels for net sales, gross profits, operating income, and cash flow from operations. 23/ However, operating income as a percentage of net sales did not reach a reasonably profitable level in 1984. Domestic prices, moreover, have shown a steady, if irregular, downward trend. 24/

The end-of-period data show, notwithstanding the improvements experienced, that the industry's performance remains weak. Moreover, it is

---

20/ Id. According to data supplied in response to our questionnaires, domestic producers' shipments increased throughout the period of investigation. Report at Table 4. The questionnaire data are not inconsistent with the AISI data because Table 4 excludes the shipments of several large producers, whose shipments decreased sharply during the the period under investigation.

21/ Report at Table 3.

22/ Report at Table 6.

23/ Report at Tables 7 and 8.

24/ Report at Table 18.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

clear that there has been very significant growth in demand in the United States market. However, the domestic industry has consistently lost market share. Accordingly, we find that there is a reasonable indication that the domestic industry is suffering from material injury.

<u>Impact of the Allegedly Subsidized Standard Pipe Imports from Venezuela</u> 25/

Imports of standard pipe from Venezuela rose significantly from 1982 to 1984, increasing approximately twelve-fold during the course of those three years. 26/ Venezuelan standard pipe and tube, as a percentage of domestic consumption has likewise increased rapidly during the period of this investigation. 27/

Pricing information is available for one standard pipe product. 28/ The data show that the prices of the Venezuelan standard pipe imports have been consistently below the prices for the domestic standard pipe. Margins of underselling, evident in every quarter for which comparisons are possible, are significant. 29/ This underselling occurred while prices for the domestic product were generally declining.

---

25/ Petitioners have urged us to cumulate the imports from Venezuela subject to these investigations with imports from Mexico, Spain, and Brazil. However, as the investigations regarding imports from those countries have been terminated by the withdrawal of the petitions, cumulation with these imports is inappropriate.

26/ Report at Table 14.

27/ Id.

28/ Report at Table 18.

29/ Id.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Accordingly, in investigation Nos. 701-TA-242, we find that there is a reasonable indication that the domestic standard pipe industry is materially injured by reason of the alleged subsidized standard pipe imports from Venezuela. 30/ 31/

Impact of the Allegedly LTFV Imports of Standard Pipe from Thailand

In the consideration of the impact of imports from Thailand, petitioners urge us to evaluate threat of material injury on both national and regional industry bases, with the regional industry consisting of States west of the Rocky Mountains (California, Oregon, Washington, Idaho, Nevada, Utah, and

---

30/ Having found that there is a reasonable indication of material injury by reason of the allegedly subsidized imports from Venezuela, we do not need to consider whether there is a threat of material injury.

31/ Chairwoman Stern finds no reasonable indication of material injury or threat of material injury by reason of allegedly subsidized Venezuelan standard pipe. As mandated by the Tariff and Trade Act of 1984 amendments to the Tariff Act of 1930, she has considered the appropriateness of a cumulative analysis of these imports with others under investigation or subject to recent antidumping duty orders. However, the most recent other countervailing duty (CVD) investigation of this product resulted in the placing of a final order against imports from Korea in February 1983. Imports from Korea since that date have not benefitted in the U.S. marketplace from injurious subsidies. Therefore, the requirement that imports be coincident in time if they are to be cumulated has not been met. Cumulation is therefore inappropriate. Chairwoman Stern does not believe that it is appropriate to aggregate subject imports across statutes. The data on standard pipe imports show very low levels of market penetration. There was only one confirmed instance of a sale lost to the imported product and that sale involved a very low quantity. Report at A-42. Moreover, there is no threat of material injury because Venezuelan capacity utilization is at high levels and there is nothing to suggest that production levels will be further elevated to generate exports to the United States.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Arizona). 32/ 33/ The information regarding the ports of entry for the pending Thai shipments does not show the requisite concentration of imports into the proposed region, thus failing to satisfy one of the three statutory criteria for a regional industry. 34/ Therefore, we decline to conduct a regional industry analysis in this case.

Imports of standard pipe and tube from Thailand first entered the United States in 1984 with a total of 50 tons, constituting less than 0.05 percent of the United States' market. 35/ Data obtained by the Commission on future shipments indicate that it is highly likely that the quantity of imports from Thailand for 1985 will increase significantly. 36/ Pricing data obtained from the importer of Thai standard pipe show that prices of the presold product that will enter in the next several months are below the current

---

32/ Amended petition at 34-38.

33/ In this investigation, we have considered both material injury and threat of material injury even though the petition does not claim that material injury is currently present.

34/ In appropriate circumstances, the United States may be divided into two or more markets and the producers within each such market may be treated as if they were a separate industry. 19 U.S.C. § 1677(4)(C). The statute establishes three criteria for a regional industry: (1) whether the producers within the regional market sell all or almost all of their production of the like product in that market; (2) whether the demand in that market is not supplied, to any substantial degree, by producers of the product located elsewhere in the United States; and (3) whether there is a concentration of the allegedly dumped or subsidized imports into the regional market. Id.; Rock Salt from Canada, Inv. No. 731-TA-239 (Preliminary), USITC Pub. No. 1658 at 5 (1985).

35/ Report at Table 14.

36/ Report at A-26.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

weighted average price charged by U.S. producers. 37/ Therefore, we find that there is a reasonable indication that an industry in the United States is threatened with material injury by reason of imports of allegedly LTFV standard pipe from Thailand. 38/ 39/

---

37/ Memorandum to the Commission from Acting Director, Office of Investigations, No. Inv-I-071 (April 5, 1985).

38/ Chairwoman Stern finds that there is a reasonable indication of material injury and does not reach the question of threat of material injury. In reaching this determination, she has cumulated the imports from Thailand with the recently investigated allegedly LTFV imports of standard pipe from Venezuela. See Certain Welded Carbon Steel Pipes and Tubes from Taiwan and Venezuela, supra. While the imports from Thailand are miniscule, the 1984 act is clear that they must be considered for cumulation. They are reasonably coincident with and present in the same markets as the Venezuelan standard pipe on which she joined the Commission in a preliminary affirmative determination in February 1985. Thus, when the subject Thai imports -- however tiny their individual significance -- are cumulated with those Venezuelan imports, an affirmative preliminary determination is appropriate.

39/ Commissioner Rohr notes that during the period of investigation there were two shipments of Thai steel into the United States, of 11 and 39 tons, respectively, into two East Coast ports. The information which the Commission has gathered suggests that it is unlikely that these two shipments "competed" with other domestic or imported steel. In this investigation, he has concluded that the information gathered establishes a reasonable indication that imports of allegedly LTFV Thai steel are a threat to a domestic industry, and he has decided to reserve the issue of cumulation.

Commissioner Rohr also notes that this investigation poses several issues of first impression for the Commission relating to imports to the United States from non-traditional suppliers of particular articles. He expects this aspect of the investigation to be fully considered by the Commission if this investigation continues.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

## Condition of the Domestic Line Pipe Industry [40/]

Apparent consumption of line pipe decreased from 1982 to 1983, rebounding in 1984 to a level more than 22 percent above the 1982 level. [41/] U.S. producers' shipments, however, according to AISI data, declined in 1983 and exceeded 1982 levels only slightly in 1984. [42/] Domestic production, for firms that produced only line pipe, increased from 1982 to 1984. [43/] Capacity utilization levels likewise increased but remained unacceptably low even at the close of this period. [44/]

The number of production and related workers, hours worked, wages paid, and total compensation decreased sharply from 1982 to 1983 and then increased in 1984 to levels surpassing those of 1982. [45/]

The financial performance of firms producing line pipe only is quite similar to the performance of the standard pipe industry, with some

---

40/ As in the case of standard pipe, we conduct our analysis of the condition of the domestic line pipe industry keeping in mind the serious economic downturn suffered by this industry in 1982.

41/ Report at Table 2.

42/ Id. Shipment data from our questionnaires show significant increases from 1982 to 1984. These data, however, overstate the trends in domestic shipments as Table 4 excludes the shipments of several large producers, whose shipments decreased very sharply during the period covered by the investigation, and also excludes data for U.S. firms that may have ceased production in 1982 or 1983.

43/ Report at Table 3.

44/ Id. This is also true when the producers of both standard and line pipe are considered along with the producers of line pipe only.

45/ Report at Table 6.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

improvement in 1984 when compared to prior years. 46/ Gross profit and operating income as a percentage of net sales remain at depressed levels. 47/ Moreover, the prices received by domestic producers for line pipe decreased irregularly from 1982 to 1984. 48/

As in the case of standard pipe, there has been improvement in some key indicators from 1982 through 1984. However, those indicators still demonstrate a reasonable indication of material injury. Moreover, when the increase in apparent consumption is considered, it is clear that the domestic industry has not enjoyed much of that growth and has steadily lost market

**Impact of Allegedly Subsidized and LTFV Line Pipe Imports from Venezuela** 49/ 50/

The volume of imports of line pipe from Venezuela has increased substantially throughout the period of this investigation, in both absolute

---

46/ Report at Tables 7 and 9. Data for line pipe in these preliminary investigations represent less than 40 percent of domestic shipments.

47/ Report at Table 9.

48/ Report at Table 19.

49/ Allegedly LTFV imports from Venezuela are at issue in Inv. No. 731-TA-253 and allegedly subsidized imports are at issue in Inv. No. 701-TA-242. The same imports are at issue in both cases.

50/ In the case of line pipe imports from Venezuela, petitioners have urged the Commission to cumulate the line pipe imports from Venezuela with imports from Brazil, Mexico, and Spain. E.g., countervailing duty petition on Venezuela at 30. As noted above, investigations regarding imports from these countries were terminated when the petitions were withdrawn and, thus, cumulation is not appropriate.

share. Accordingly, we find that there is a reasonable indication that the domestic industry is materially injured.and relative terms. The volume has increased from 2,599 tons in 1982 to 79,451 tons in 1984. 51/ As a percentage of the domestic market, Venezuelan line pipe imports constituted 0.3 percent in 1982 and 7.5 percent in 1984. 52/

The Commission obtained usable net selling price data for one of the two line pipe products specified in the questionnaires. In each of the periods for which comparisons are available, the Venezuelan line pipe product undersold domestic line pipe in each quarter for which data are available. The margins of underselling are significant. 53/ Moreover, the U.S. producers' weighted average prices show their lowest levels during those quarters in which the Venezuela product is first significantly present in the market, showing evidence of price depression. 54/

Accordingly, we determine that there is a reasonable indication that an industry in the United States is materially injured by reason of the allegedly LTFV and subsidized imports from Venezuela. 55/

---

51/ Report at Table 15.

52/ Report at Table 16.

53/ Report at Table 19.

54/ Report at Tables 16 and 19.

55/ Chairwoman Stern notes that her analysis of the effects of the allegedly LTFV imports is made separately from that of the allegedly subsidized imports. While the imports are one and the same, the alleged unfair acts are not. In any final analysis, when final LTFV and subsidy margins are available, a more detailed individual examination will be made.

Separate Views

of Vice Chairman Liebeler

Both with regard to the countervailing duty petition concerning standard pipe from Venezuela and the antidumping duty petition concerning standard pipe from Thailand, I find no reasonable indication that material injury to a domestic industry is caused or threatened by the imports in question.[1]

The majority notes that there has been a sharp increase in imported standard pipe from Venezuela over the last three years. However, by 1984 imports reached a level of only 2.2% of domestic consumption. The record does not reveal any characteristic of the domestic market for standard pipe, such as highly inelastic supply and demand curves, that suggest that a relatively small level of imports could result in any material injury or threat of material injury. In the absence of such factors, I presume that an import penetration ratio of less than 2.5% is too small to support a finding of a reasonable indication of material injury or threat thereof by reason of imports.[2]

There are two reasons for choosing a 2.5% de minimus threshold: first, because it is small and, therefore, highly unlikely to have more

---

[1]As there is an established domestic industry, "material retardation" was not raised as an issue in these investigations and will not be discussed further.

[2]See Certain Carbon Steel Products From Czechoslovakia, East Germany, Finland, Hungary, Norway, Poland, Romania, Sweden, and Venezuela, Invs. Nos. 701-TA-225-234, 731-TA-213-217, 219, 21-26, and 228-235 (P), Views of Vice Chairman Liebeler at 50-52 for a discussion of this presumption.

than an inconsequential or insubstantial adverse impact on the domestic industry; and second, because such market share is very likely to signify a competitive process and to reflect only dumping or subsidization in a "technical" sense. Each of these justifications will be discussed in turn.

Any time a foreign producer exports products to the United States, it harms the domestic industry that competes in that market. An increase in supply, _ceteris paribus_, must result in a lower price of the product than would otherwise prevail. If a downward effect on price, accompanied by a finding by the Department of Commerce of dumping or subsidy, and a finding on the part of the Commission of material injury were all that were required for an affirmative determination, there would be no need to inquire further into the question of causation.

Congress has recognized that the mere presence of less than fair value imports is not sufficient to establish causation.[3] Thus, the inquiry into causation must proceed. The Senate Finance Committee instructed the Commission to search for a causal link:

> While injury caused by unfair competition, such as less-than-fair-value imports, does not require as strong a causation link to imports as would be required in determining the existence of injury under fair trade import relief laws, the Commission must satisfy itself that, in light of all the information presented, there is a sufficient causal link between the less-than-fair-value imports and the requisite injury. The determination of the ITC with respect to causation is, under

---

[3] "[T]he ITC will consider information which indicates that harm is caused by factors other than the less-than-fair-value imports." Report on the Trade Agreements Act of 1979, Senate Finance Committee, S. Rep. No. 249, 96th Cong. 1st Sess. 75 (1979).

> current law, and will be, under section 735, complex and difficult, and is a matter for the judgment of the ITC. [4]

This "complex and difficult" judgment begins with an examination of the import penetration ratio. There must be some import penetration level which is so insubstantial that it cannot result in material injury.

When the industry demand and supply curves have low elasticities, a given import penetration will have a large impact on the domestic industry. The more inelastic the demand and supply curves, the greater will be the effect on price of a given change in imports. Two examples are provided as illustration.

If the domestic market for standard pipe were like that depicted in Figure I (below) there might be a material effect on the domestic industry. A relatively small increase in supply from S to $S^1$ may result in a precipitous fall in price.

Fig. I

[4] Id.

On the other hand, in the more general case, where supply and demand are somewhat more elastic, as in Figure II, a 2.5% import penetration ratio even if all of it were a consequence of unfair trade, cannot have a significant enough effect on price to result in material injury or threat thereof. The shift in the curve from S to $S^1$ results in an inconsequential drop in price.

Fig. II

Therefore, in the absence of a showing that the supply and demand curves in the domestic market are sufficiently inelastic, I presume that a 2.5% import penetration ratio cannot result in material injury.

A second reason for using this de minimus threshold rests on the legislative history on "technical dumping". Import penetration ratios of

2.5% or less are more likely to represent technical dumping. In enacting the unfair trade laws, Congress was not concerned with imports that were simply priced at the level necessary to enable the producer to sell his product.

> (1) Technical dumping. The concept, underlying a number of International Trade (Tariff) Commission determinations, is wholly consistent with the basic philosophy and purpose of the Antidumping Act. This Act is not a 'protectionist' statute designed to bar or restrict U.S. imports; rather, it is a statute designed to free U.S. imports from unfair price discrimination practices. As is explained below, this distinction is of importance in the context of recent suggestions that the Antidumping Act should not be applied to imports of articles in short supply.
>
> Conceptually, the Antidumping Act is not directed toward forcing foreign suppliers to sell in the U.S. market at the same prices that they sell at in their home markets. Rather, the Act is primarily concerned with the situation in which the margin of dumping contributes to underselling the U.S. product in the domestic market, resulting in injury or likelihood of injury to a domestic industry. Such injury may be manifested by such indicators as suppression or depression of prices, loss of customers, and penetration of the U.S. market. When clear indication of injury, or likelihood of injury, exists there would be reason for making an affirmative determination. The Antidumping Act is designed to discourage and prevent foreign suppliers from using unfair price discrimination practices to the detriment of a United States industry.
>
> On the other hand, the Antidumping Act does not proscribe transactions which involve selling an imported product at a price which is not lower than that needed to make the product competitive in the U.S., market, even though the price of the imported product is lower than its home market price. Such so-called 'technical dumping' is not anti-competitive, hence, not unfair; it is procompetitive in effect. The Commission has recognized the concept of technical dumping and in a number of cases has made a negative determination in the circumstances of such dumping. It is to be noted that in the usual short supply situation or inflationary period, imports--regardless of home market price--would normally be sold to the domestic market at a price no lower than the prevailing U.S. market price, thus indicating that when dumping exists in such situations, it is likely to be a case of technical dumping in which there is not likely to be injury to a domestic industry. In other words,[23]

importers as prudent businessmen dealing fairly would be interested in maximizing profits by selling at prices as high as the U.S. market would bear. But if there is a margin of dumping in a tight supply situation, it may be due to technical reasons, which would not be injurious to domestic industries. [5]

Congress was not concerned with dumping per se. Rather, Congress focused on plans by "foreign suppliers [to use] unfair price discriminative practices to the detriment of a United States industry".[6]

The pricing policy of an importer may be either pro-competitive or anti-competitive. A rational and profit maximizing importer/competitor will price its product as high as the market will bear, unless there is some possibility of gain to be derived by predatory behavior. Two possibilities exist: first, the importer is pricing his product and seeking sales as part of an effort to meet competition, in the sense that he is seeking to sell at the highest price possible in the expectation that if ever he sells at too high a price, there will be a plethora of other suppliers available to take his place. Second, the importer could attempt to price his product below the market price, and thereby drive his competitors out of the market and gain some measure of monopoly power.

---

[5] Report on the Trade Reform Act of 1974, Senate Finance Committee, S. Rep. No. 1298, 93rd Cong. 2d Sess. at 179 (1979) (emphasis added). Because of the virtually identical language and history of Countervailing and Antidumping Duty Provisions of the Tariff Act of 1930, 19 U.S.C. Sections 1671 1673 (1982) respectively, logic compels me to extend the reasoning embodied in this "technical dumping" analysis to subsidy cases.

[6] Id.

Congress recognized that importers are normally interested in maximizing their return. The Commission must use its best judgment to determine whether this profit maximization is part of a pattern of anticompetitive "unfair" price discrimination or subsidization, or alternatively, an imperfect reflection of the normal competitive process. Congress did not intend that the Commission examine the data before it in a spirit of naivete. Rather, the Commission must cull from the mass of data that information necessary to answer the question of whether any dumping or subsidization is merely "technical", or whether it is unfair price discrimination.

In a typical case the Commission is confronted with a factual melange from which it must discern an underlying story that explains the facts. The staff report contains information on: (1) the financial condition of the domestic industry; (2) the prices of the domestic and imported products; and (3) the volume and market share of the imported product.

How much reliability should we attach to the data? Volume and relative market share are the most reliable data. They are generated by third parties and easily verified. Profit data is self-generated by the parties and is frequently provided on a product-specific basis requiring subjective cost allocations. Such data is difficult to verify. Price data is also provided by the parties and is usually not verified beyond telephone confirmations.

Moreover, price data may reflect a variety of phenomena. First, the suppliers may not be selling a homogeneous product. If the products

are not identical, there is no reason to suppose that they should sell at an identical price.[7] Second, because of: (a) a lack of homogeneity of the product; (b) the fact that the contracts for sale are not concluded on a public anonymous market; and (c) possible antitrust concerns, suppliers may be unaware of the exact price at which other suppliers are concluding contracts. Third, there may be inaccuracies in the data that the Commission receives. Finally, there is at least the theoretical possibility that a supplier, although selling a product identical to his competitors, and fully aware of the market price of that product, is attempting to undersell them in order to damage their businesses. Such behavior is something akin to predatory pricing.

Determining the plausibility of each of these explanations is the implicit task of the Commission in deciding the cases before it. At

---

[7]Commission opinions have traditionally found technical dumping only when no underselling has been found or, in cases when underselling has been found, when such underselling has been deemed "commercially insignificant". In the situation where the products under investigation are identical in <u>every</u> characteristic, this analysis would be correct. Seldom, if ever, will the Commission be dealing with such a product market. Even when dealing with products such as wheat, a homogeneous product by most standards, one might find that imports were underselling (overselling) the domestic product if certain characteristics of the product not inherent to the product, i.e., certainty of delivery, risk of loss, were worse (better) than those offered by domestic producers. Thus, the price "needed to make the product competitive in the U.S. market" could be lower or higher than the price charged by domestic producers. Commission decisions that have neglected to consider the impact on prices of characteristics which are often the source of intense negotiation and expensive litigation risked under or overstating price differentials.
(Footnote continued to page 27)

first blush it might seem that the question whether the importer is simply trying to meet the competition or, alternatively is seeking to underprice the competition, could best be resolved by examining price data.[8] However, there is no plausible way to separate and distinguish the possible explanations on the basis of the price data we receive. As explained above, it is of necessity unreliable and incomplete. There is fortunately an alternative way of approaching the question.

An assertion of unfair price competition in the form of dumping or subsidization should be accompanied by a factual record which can support such a conclusion. Foreign firms and governments exporting to the United States should be presumed to be rational. Actions which they take should be presumed to be in their self-interest. Therefore, if the factual setting in which the LTFV or subsidized sales take place do not support any rational self-serving goal to be served by predatory pricing, it is reasonable to conclude that such sales must be credited to one of the three benign explanations, and injury to the industry should not be treated as being "by reason of" such imports.

In most cases, predatory pricing by a competitor would be irrational. An examination of the wheat farming industry illustrates

(Footnote continued from page 26)
Further, when dealing with heterogenous products, the problems with straightforward price comparisons are compounded inordinately for obvious reasons.

[8] In analyzing predation, price data is primarily relevant because of its relationship to marginal cost. Because of the unavailability of marginal cost data, price data alone is not meaningful.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

this point. One of the reasons that it would be irrational for a wheat producer to undersell the market and thereby drive out his competition is that he could never hope to grow large enough to ever raise his price above the market price by dint of his now greater market power. Similarly in the various markets which we examine, it is reasonable to conclude that unless a foreign firm has a fairly large market share, it cannot hope that by charging less than the market price it can drive out competitors and thereby gain the requisite market power to charge more than the competitive equilibrium price. I have chosen a conservative market share of less than 2.5 at a preliminary proceeding as inconsistent with even the most optimistic rational expectation of gaining an advantage by selling at less than the market price.

It has been suggested that the Commission does not have the power to adopt a rebuttable de minimus standard. I believe this to be incorrect. Congress chose not to determine cases itself. Instead, it delegated this power to the Commission. Congress' mandate provides very broad discretion to the Commission. Aside from guidance about weighing causes, technical dumping, and cumulation,[9] Congress has not specifically instructed the Commission on how it is to conduct its

[9]Congress' attention to the cumulation issue in its recent revision of the statute gives further support to the use of a de minimus standard. Congress' mandating cumulation in certain cases demonstrated a sensitivity to the issue of import penetration. It was precisely because Congress was aware that certain levels of imports were insufficient to satisfy the causation standard that Congress required a summation of imports across nations in certain cases.

investigations and decide the cases before it. The use of a de minimus standard is common in the law, and although it was not specifically mandated by Congress, neither was it precluded by our enabling statute or legislative history. Congress may be presumed to have left the use of such administrative tools to the discretion of the Commission.

In adopting this de minimus threshold, I am aware that Congress indicated that no absolute volume of imports should be considered dispositive of the issue of whether there has been material injury or threat by reason of imports.[10] The 2.5% threshold is not based on the absolute volume of imports, but rather on relative market share.

The import penetration ratio of line pipe from Venezuela was 2.2% in 1984 and, therefore, fails to satisfy the de minimus standard.[11]

The imports from Thailand were less than 0.05% in 1984. I am compelled to cumulate these imports with those from Venezuela, which is concurrently under investigation in an antidumping case.[12] The cumulated import penetration ratio is still less than 2.3% of domestic consumption. For the same reasons discussed above, this level of imports

---

[10] It is expected in its investigation that the Commission will continue to focus on the conditions of trade, competition, and development regarding the industry concerned. For one industry, an apparently small volume of imports may have a significant impact on the market; for another, the same import volume might not be significant. S. Rep. No. 249, 96th Cong., 1st Sess. 88 (1979).

[11] There is nothing in the record to suggest that the demand and supply for line pipe is highly inelastic. Such factors would rebut the presumption.

[12] See supra note 2.

will not support a finding of a reasonable indication of material injury or threat thereof in the standard pipe antidumping case against Thailand. Had these imports from Thailand and Venezuela not entered the American market at subsidized and less than fair market value prices, the domestic industry would not be materially better off than it is now.

## INFORMATION OBTAINED IN THE INVESTIGATIONS

### Introduction

On February 28, 1985, petitions were filed with the U.S. International Trade Commission and the U.S. Department of Commerce by counsel for the Committee on Pipe & Tube Imports 1/ alleging that an industry in the United States is materially injured and threatened with material injury by reason of imports of certain welded carbon steel pipes and tubes 2/ that are being subsidized by the Governments of Thailand and Venezuela and that are also being sold in the United States at less than fair value (LTFV). On March 12, 1985, counsel amended the petitions to state, among other things, that the petitions were filed by the Standard Pipe Subcommittee 3/ and the Line Pipe Subcommittee 4/ of the Committee on Pipe and Tube Imports, and by each of the individual manufacturers that are members of those subcommittees. Accordingly, effective February 28, 1985, the Commission instituted investigation No. 701-TA-242 (Preliminary), under section 703 of the Tariff Act of 1930 (the Act), to determine whether there is a reasonable indication that an industry in the United States is materially injured, or is threatened with material injury, or the establishment of an industry in the United States is materially retarded by reason of imports from Venezuela of certain welded carbon steel pipes and tubes that are allegedly subsidized by the Government of

---

1/ The 25 member producers of the CPTI are Allied Tube and Conduit Corp., American Tube Co., Inc., Bernard Epps & Co., Bock Industries of Elkhart, IN, Bull Moose Tube Co., Central Steel Tube Co., Century Tube Corp., Copperweld Tubing Group, Hughes Steel & Tube, Kaiser Steel Corp., LaClede Steel Co., Maruichi American Corp., Maverick Tube Corp., Merchant Metals, Inc., Phoenix Steel Corp., Pittsburgh Tube Co., Quanex Corp., Sawhill Division of Cyclops Corp., Sharon Tube Co., Southwestern Pipe, Inc., Tex-Tube division of Cyclops Corp., UNR-Leavitt, Welded Tube Co. of America, Western Tube & Conduit, and Wheatland Tube Corp.

2/ For purposes of these investigations the term certain welded carbon steel pipes and tubes refers to welded carbon steel pipes and tubes of circular cross section, over 0.375 inch but not over 16 inches in outside diameter, provided for in Tariff Schedules of the United States Annotated (TSUSA) items 610.3208, 610.3209, 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258, and 610.4925 (TSUSA items 610.3208, 610.3209, 610.3231, 610.3232, 610.3241, 610.3244, and 610.3247 prior to Apr. 1, 1984).

3/ The 10 members of the Standard Pipe Subcommittee that are in support of these petitions are Allied Tube & Conduit Corp., American Tube Co., Bull Moose Tube Co., LaClede Steel Co., Merchant Metals, Inc., Pittsburgh Tube Co., Sawhill Division of Cyclops Corp., Sharon Tube Co., Southwestern Pipe, Inc., and Wheatland Tube Corp. The two members of the Standard Pipe Subcommittee that are not in support of these petitions are Maruichi American Corp. and Western Tube & Conduit.

4/ The four members of the Line Pipe Subcommittee that are in support of these petitions are LaClede Steel Co., Sawhill Division of Cyclops Corp., Tex-Tube Division of Cyclops Corp., and Wheatland Tube Corp.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Venezuela. 1/ The Commission also instituted, effective February 28, 1985, investigations Nos. 731-TA-252 and 253 (Preliminary), under section 733(a) of the act, to determine whether there is a reasonable indication that an industry in the United States is materially injured or threatened with material injury, or the establishment of an industry in the United States is materially retarded by reason of imports of certain welded carbon steel pipes and tubes from Thailand and Venezuela that are allegedly sold in the United States at LTFV.

In the process of instituting these investigations, Commerce advised the petitioner that the welded carbon steel pipe and tube products covered by the petitions represented two distinct classes or kinds of products, standard pipe and line pipe. Subsequently, on March 14, 1985, the petitions involving imports from Thailand were withdrawn as they relate to line pipe, because there is no known production in Thailand of line pipe to American Petroleum Institute (API) specifications. On the same date, the antidumping petition involving imports from Venezuela was withdrawn as it relates to standard pipe, because the Commission, on February 1, 1985, had made an affirmative preliminary determination with respect to imports of that product from Venezuela, and Commerce was in the process of conducting its antidumping investigation.

The statute directs the Commission to make its determinations within 45 days after receipt of petitions for preliminary countervailing duty and antidumping investigations, or in these cases by April 15, 1985. Notice of the institution of the Commission's investigations and of a conference to be held in connection therewith was given by posting copies of the notice in the Office of the Secretary, U.S. International Trade Commission, Washington, DC, and by publishing the notice in the Federal Register of March 18, 1985 (50 F.R. 10866). 2/ The Commission held a public conference in Washington, DC, on March 22, 1985, at which time all interested parties were allowed to present information and data for consideration by the Commission. 3/ The Commission's determinations in these investigations were made in an open "Government in the Sunshine" meeting held on April 8, 1985.

## Previous Commission Investigations

Several previous Commission investigations have dealt with some or all of the pipes and tubes currently under investigation. 4/ Most recently, on February 1, 1985, the Commission notified the Department of Commerce of its preliminary determination in investigation No. 731-TA-211 that there is a reasonable indication that an industry in the United States is materially injured by reason of imports from Taiwan of light-walled rectangular welded

---

1/ Thailand is not a "Country under the Agreement," and therefore, the Commission is not required to reach a determination with respect to injury from allegedly subsidized imports. Consequently, the Commission did not institute a countervailing duty investigation with respect to the allegedly subsidized imports from Thailand.

2/ A copy of the Commission's Federal Register notice is presented in app. A.

3/ A list of witnesses who appeared at the public conference is presented in app. B.

4/ See table, app. C.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

carbon steel pipes and tubes which are alleged to be sold in the United States at LTFV. At the same time, the Commission also determined in investigation No. 731-TA 212 that there is a reasonable indication that an industry in the United States is materially injured by reason of imports from Venezuela of standard welded carbon steel pipes and tubes 1/ and that there is no reasonable indication that an industry is materially injured or threatened with material injury by reason of imports from Venezuela of welded carbon steel line pipes and tubes that are alleged to be sold in the United States at LTFV. 2/

On August 22, 1984, the Commission made a preliminary determination in investigation No. 701-TA-220 (Preliminary) that there was a reasonable indication that an industry in the United States was materially injured by reason of allegedly subsidized imports of small circular and light-walled rectangular pipes and tubes from Spain. 3/ In addition, in investigations Nos. 731-TA-197 and 198 (Preliminary), the Commission found that there was a reasonable indication that an industry in the United States was materially injured by reason of imports from Spain of small circular and light-walled rectangular pipes and tubes allegedly sold at LTFV, and by reason of imports from Brazil of small circular pipes and tubes allegedly sold at LTFV. 4/ However, the pipes and tubes in the present investigation involving Venezuela cover a wider range of circular pipes and tubes than was included in the investigations involving Spain and Brazil.

On June 12, 1984, the Commission found in investigation No. TA-201-51 on carbon and certain alloy steel products that, under section 201 of the Trade Act of 1974, the domestic steel pipe and tube industry was experiencing serious injury. However, the Commission determined that imports of certain steel pipes and tubes were not being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or threat thereof, to the domestic industry producing articles like or directly competitive with the imported articles. 5/ The steel pipes and tubes that were the subject of the section 201 investigation included the welded carbon steel pipes and tubes that are the subject of the instant investigations, as well as other pipes and tubes that are not the subject of these investigations.

---

1/ Chairwoman Stern determined that there is a reasonable indication that an industry in the United States is materially injured or threatened with material injury by reason of the subject imports.

2/ Commissioners Eckes and Lodwick dissented. Certain Welded Carbon Steel Pipes and Tubes From Taiwan and Venezuela: Determination of the Commission in investigations Nos. 731-TA-211 and 212 (Preliminary). . ., USITC Publication 1639, February 1985.

3/ The final Commission investigation on these products was instituted on October 17, 1984, and terminated on February 4, 1985, subsequent to the withdrawal of the petition.

4/ Certain Welded Carbon Steel Pipes and Tubes from Brazil and Spain: Determinations of the Commission in Investigations Nos. 701-TA-220 and 731-TA-197 and 198 (Preliminary). . ., USITC Publication 1569, August 1984. The final Commission investigations on these products were instituted on Jan. 29, 1985, and terminated on Feb. 4, 1985 (Spain) and Mar. 20, 1985 (Brazil), subsequent to the withdrawal of the petitions.

5/ Carbon and Certain Alloy Steel Products: Report to the President on Investigation No. TA-201-51. . ., USITC Publication 1553, July 1984.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

On April 17, 1984, the Commission determined in investigations Nos. 731-TA-131 and 132 (Final) that an industry in the United States was materially injured by reason of imports from the Republic of Korea (Korea) and Taiwan of small circular pipes and tubes that had been found by Commerce to be sold in the United States at LTFV. In addition, on the same date, the Commission determined in investigation No. 731-TA-138 (Final) that an industry in the United States was materially injured by reason of LTFV imports of light-walled rectangular pipes and tubes from Korea. 1/ The present investigations cover other circular pipes and tubes, as well as those covered in these previous investigations.

On February 8, 1983, the Commission determined that an industry in the United States was materially injured by reason of imports of certain welded carbon steel pipes and tubes that were found by Commerce to be subsidized by the Government of Korea. That investigation covered certain circular pipes and tubes (including APl line pipe) up to 16 inches in outside diameter, which includes most of the circular pipes and tubes in the current investigations. 2/

Nature and Extent of the Alleged Subsidies

The petition alleges that CA Conduven (Conduven), the principal producer and exporter in Venezuela of welded carbon steel pipes and tubes, has benefited directly and indirectly from a number of domestic and export subsidies through a program that provides discounts ranging from 15 to 40 percent of the regular domestic price if the steel they purchase from SIDOR, the State-owned, allegedly heavily subsidized, integrated producer, is processed into products for export. 3/

The petition further alleges that there are at least three sources of below-market-rate loans available to Conduven and that, by special agreement with the Government, Conduven is allowed to convert its dollar export earnings at a free market exchange rate (currently 14 bolivars per dollar), which provides an incentive to export. 4/ According to the petition, the official exchange rate is 4.3 bolivars per dollar. 5/ Also, according to the petition, preferential export financing is available from the Fondo De Financiamiento de las Exportacinoes (Finexpo) to Conduven through the Banco Industrial de Venezuela. The loans are for a period of up to 1 year at the preferential rate

---

1/ Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea and Taiwan: Determinations of the Commission in Investigations Nos. 731-TA-131, 132, and 138 (Final). . ., USITC Publication 1519, April 1984.

2/ Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Determination of the Commission in Investigation No. 701-TA-168 (Final) . . . ., USITC Publication 1345, February 1983.

3/ A number of domestic subsidies are alleged to have been received by SIDOR, including preferential Government credit, Government equity infusions, import duty reductions, tax incentives, input subsidies, and regional incentives.

4/ Petition for countervailing duties in the matter of certain welded carbon steel pipe and tube products from Venezuela, p. 20.

5/ Ibid, p. 21.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

of 5 percent plus bank charges, with a commercial bank required to match the Finexpo financing.

## Nature and Extent of the Alleged Sales at LTFV

For Thailand, petitioners were unable to obtain home market sales prices for the pipes and tubes covered by the petition. Petitioners believe that the Thai exporters are importing steel sheet and coil from Japan and possibly from Brazil or other countries. Petitioners obtained information on export prices of steel sheet and coil from Japan and, on the basis of U.S. non integrated producers' cost of production adjusted for wage rates in Thailand, estimated the cost of processing raw materials into finished pipe products. Petitioner selected three products as a basis for fair-value comparisons of imports of standard pipes, which, according to the petition, show that the standard pipes from Thailand are offered in the United States at prices 21.1 to 40.7 percent below the cost of production. 1/

In order to determine the U.S. purchase price of the pipe and tube products from Venezuela, petitioners used import statistics as reported by the U.S. Department of Commerce for October 1984. The alleged dumping margins as determined by the petitioners are based on an average home market price to account for the range of sizes. As a result, the actual home-market prices may vary from product to product. 2/ The petition alleges that comparisons of U.S. prices to Venezuelan home-market prices show dumping margins of 65.5 percent for API line pipe up to 4-1/2 inches in outside diameter and 77.2 percent for line pipe up to 16 inches in diameter. 3/

## The Products

### Description and uses

For the most part, the terms "pipes," "tubes," and "tubular products" can be used interchangeably. In some industry publications, however, a distinction is made between pipes and tubes. According to these publications, pipes are produced in large quantities in a few standard sizes, whereas tubes are made to customers' specifications regarding dimension, finish, chemical composition, and mechanical properties. Pipes are normally used as conduits for liquids or gases, whereas tubes are generally used for load-bearing or mechanical purposes. Nevertheless, there is apparently no clear line of demarcation in many cases between pipes and tubes.

Steel pipes and tubes can be divided into two general categories according to the method of manufacture -welded or seamless. Each category can be further subdivided by grades of steel: carbon, heat-resisting, stainless, or other alloy. This method of distinguishing between steel pipe and tube

---

1/ Antidumping petition in the matter of certain welded carbon steel pipe and tube products from Thailand, p. 19.

2/ Antidumping petition in the matter of certain welded carbon steel pipe and tube products from Venezuela, p. 15.

3/ Ibid, p. 16.

product lines is one of several methods used by the industry. Pipes and tubes typically come in circular, square, or rectangular cross section.

The American Iron & Steel Institute (AISI) distinguishes among the various types of pipes and tubes according to six end uses: standard pipe, line pipe, structural pipe and tubing, mechanical tubing, pressure tubing, and oil country tubular goods. 1/

Steel pipes and tubes are generally produced according to standards and specifications published by a number of organizations, including the American Society for Testing & Materials (ASTM), the American Society of Mechanical Engineers, and the API. Comparable organizations in Japan, West Germany, the United Kingdom, the U.S.S.R., and other countries have also developed standard specifications for steel pipes and tubes.

The imported pipe and tube products that are the subject of these investigations are the following circular welded carbon steel pipes and tubes over 0.375 inch but not over 16 inches in outside diameter, which are known in the industry as standard and line pipes and tubes:

(1) Standard pipes and tubes are intended for the low-pressure conveyance of water, steam, natural gas, air, and other liquids and gases in plumbing and heating systems, air-conditioning units, automatic sprinkler systems, and other related uses. They may also be used for light load-bearing or mechanical applications, such as for fence tubing. These steel pipes and tubes may carry fluids at elevated temperatures and pressures but may not be subjected to the application of external heat. They are most commonly produced to ASTM specifications A-120, A-53, and A-135.

(2) Line pipes and tubes are used for the transportation of gas, oil, or water, generally in pipeline or utility distribution systems. They are most commonly produced to API specification 5L.

## Manufacturing processes

Welded steel pipes and tubes are made by forming flat-rolled steel into a tubular configuration and welding it along the joint axis. There are various ways to weld pipes and tubes: the most popular are the electric resistance weld (ERW), the continuous weld (butt weld) (CW), the submerged-arc weld, and the spiral weld. Submerged-arc weld and spiral weld are normally used to produce pipes and tubes of relatively large diameter. The circular pipes and tubes now under investigation are generally produced either by the ERW or CW

---

1/ For a full description of these items, see Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Determination of the Commission in Investigation No. 701-TA-168 (Final) . . ., USITC Publication 1345, February 1983.

processes. 1/ All pipes and tubes are formed and welded in a cylindrical configuration. Immediately after welding, the product may be reduced in diameter by rolling or stretch reducing or may be further formed into squares, rectangles, or other shapes by using forming rolls.

In the ERW process, skelp 2/ is cold-formed by tapered rolls into a cylinder. The weld is formed when the joining edges are heated to approximately 2,600° F. Pressure exerted by rolls squeezes the heated edges together to form the weld. ERW mills produce both pipe in standard sizes and tubular products between 0.375 and 24 inches in outside diameter.

In the CW process, skelp is heated to approximately 2,600° F and hot-formed into a cylinder. The heat, in combination with the pressure of the rolls, forms the weld. Continuous-weld mills generally produce the higher volume, standardized pipe products from 0.375 through 4.5 inches in outside diameter.

The advantage of the CW process lies in its ability to produce pipe at speeds up to 1,200 feet per minute compared with the ERW process maximum of approximately 110 feet per minute. Thus, economies associated with high-volume production may make CW pipe cheaper to produce than ERW pipe of the same grade and specification. 3/ The CW process is especially suited for the manufacture of standardized, high-volume, small-diameter pipe products, such as the ASTM A-120 circular pipe now under investigation.

Standard and line pipe can be produced on the same equipment. The principal differences between the two are that line pipe is made from a higher grade steel and requires additional testing. 4/ Line pipe may have a higher content of carbon and manganese than is permissible for standard pipe, whereas standard pipe may have a higher content of phosphorus and sulfur than is permissible for line pipe. Requirements concerning chemical and mechanical properties for API line pipe and ASTM standard pipe differ for the various specifications and grades of each. There are at least 10 grades of API 5L line pipe compared with 2 grades of ASTM A-53 and A-135 standard pipe and 1 grade of ASTM A-120 standard pipe. Of the circular pipe and tube products covered by the investigation on Venezuela, API 5L line pipe must undergo the greatest amount of testing, followed by ASTM A-53, A-135, and A-120 standard pipe. With respect to pipe sizes, wall thicknesses for standard and line

---

1/ Transcript of the public conference in investigations Nos. 731-TA-131 and 132 (Preliminary), pp. 52 and 53.

2/ Skelp is a flat-rolled, intermediate product used as the raw material in the manufacture of pipes and tubes. It is typically an untrimmed band of hot- or cold-rolled sheet.

3/ On the other hand, the ERW process has gained increased popularity with U.S. producers of small-diameter pipe and tube products in recent years because it requires significantly less energy per pipe produced, as only the joining edges of the product are heated, creating a weld of comparatively high integrity within the product specification. Also, it can be used to produce pipes in sizes up to 24 inches in outside diameter compared with the 4.5-inch maximum outside diameter usually attainable with the CW process.

4/ Transcript of the public conference, investigations Nos. 731-TA-211 and 212 (Preliminary), p. 17.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

pipe are similar in the smaller diameters but are more divergent in the larger diameters. 1/

U.S. tariff treatment

Imports of the circular pipes and tubes covered by these investigations are classified under TSUSA items 610.3208, 610.3209, 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258, and 610.4925, which cover welded pipes and tubes (and blanks therefor 2/) of iron (except cast iron) or of nonalloy (carbon) steel, of circular cross section, having an outside diameter over 0.375 inch but not more than 16 inches. During the Tokyo round of the Multilateral Trade Negotiations (MTN), the most-favored-nation (MFN) rate of duty for TSUS item 610.32 was changed from 0.3 cent per pound to 1.9 percent ad valorem, effective January 1, 1982. 3/ This MFN rate of duty is the final rate negotiated in the Tokyo round, with no further changes or reductions scheduled.

The duty rates under item 610.49 are currently set at 8.8 percent ad valorem (col. 1), 8 percent ad valorem (least developed developing countries, (LDDC)) and 25 percent ad valorem (col. 2). These articles are eligible for duty-free entry under the Caribbean Basin Initiative (CBI) but not under the Generalized System of Preferences (GSP). The 1986 column 1 duty rate will be 8.4 percent ad valorem.

U.S. Producers

Welded carbon steel pipe and tube producers may be divided into two types: large, fully integrated producers, which make raw steel and produce a variety of steel products, and smaller, nonintegrated or partially integrated producers, which concentrate on fewer product lines. The integrated producers, which include LTV Steel Corp., United States Steel Corp., and Armco, Inc., 4/ concentrate production in the high-volume, standardized pipe products. The nonintegrated producers manufacture the low-volume, more specialized tubular products as well as the high-volume products.

In 1984, according to the petitions, there were 53 producers of the products covered by these investigations. Forty-one of the firms produced

---

1/ Ibid., p. 31.

2/ Blanks are semifinished pipe or tube hollows that are purchased by producers and further processed.

3/ The col. 2 rate of duty is 5.5 percent ad valorem. There is no LDDC rate or duty-free entry under the GSP. These articles are eligible for duty-free entry under the CBI.

4/ Another integrated producer, Bethlehem, permanently closed its pipe and tube operations, which were located at Sparrows Point, MD, effective Apr. 30, 1983. A nonintegrated producer, Merchants Metals, Inc., ceased producing the small circular, and light-walled rectangular pipes and tubes in January-March 1984. LTV Steel recently announced that it was closing indefinitely two pipe mills at Aliquippa, PA, and in early 1985, Central Steel Tube of Iowa went into bankruptcy.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

only standard pipes and tubes, seven firms made both standard and line, and four made only line pipe. 1/ Production is concentrated in the East, where the integrated producers are located. U.S producers of the pipes and tubes that are the subject of these investigations are shown in table 1.

Table 1.--Certain welded carbon steel pipes and tubes: Selected U.S. producers' shares of domestic shipments, by product lines, 1984

(In percent)

| Producers | Standard pipes and tubes | Line pipes and tubes | Standard and line |
|---|---|---|---|
| CPTI member firms: | | | |
| Allied Tube and Conduit | *** | *** | *** |
| Wheatland Tube Corp | *** | *** | *** |
| Sawhill Tubular Division | *** | *** | *** |
| Sharon Tube Co | *** | *** | *** |
| Maruichi American Corp 1/ | *** | *** | *** |
| Western Tube | *** | *** | *** |
| Bull Moose Tube Corp | *** | *** | *** |
| Tex-Tube Division | *** | *** | *** |
| LaClede Steel Co | *** | *** | *** |
| Subtotal | *** | *** | *** |
| Non CPTI firms: | | | |
| LTV | *** | *** | *** |
| Lone Star | *** | *** | *** |
| U.S. Steel | *** | *** | *** |
| Subtotal | *** | *** | *** |
| Nonrespondents | 7.6 | 59.5 | 2/ |
| Total 3/ | 100.0 | 100.0 | 100.0 |

1/ * * *.

2/ Total shipments reported in questionnaire responses exceed AISI shipments by 6.2 percent.

3/ Total domestic shipments are based on AISI data which are understated, especially with respect to standard pipes and tubes, because not all producers report to AISI.

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission and from AISI data.

Note.--Because of rounding, figures may not add to the totals shown.

1/ Transcript of the conference, p. 38. The four firms that produce only line pipes are LaClede, Wheatland, Sawhill, and Tex-Tube; transcript of the conference, p. 44.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

U.S. Importers

The U.S. Customs Service's net import file showed 11 importers of pipes and tubes from Venezuela between October 1982 and September 1984. Connectors, Inc., of Melville, NY, the U.S. importer for the Venezuelan producer Conduven, 1/ was the major importer during 1984, accounting for * * * percent of imports. The only other sizable importer was * * *, which took a * * * percent share of total imports during January-September 1984. No importers of pipe and tubes from Thailand appeared on the net import file; therefore, questionnaires were sent to the three firms listed as importers in the petition. 2/

The U.S. Market

Channels of distribution

In the U.S. market, sales of the pipes and tubes that are the subject of these investigations are made directly to end users or to steel service centers/distributors, which, in turn, sell to end users. The bulk of shipments are sold typically to service centers/distributors; 3/ however, line pipe over 4 inches in outside diameter is often sold directly to end users. Service centers/distributors are middlemen that buy large quantities of pipes and tubes, usually from both domestic producers and importers, warehouse the product, and sell smaller quantities to end users. The service centers/distributors may also have some simple finishing equipment, such as equipment to cut pipe to lengths or to thread and couple it. According to AISI data for 1984, service centers/distributors accounted for 69 percent of domestic shipments of standard pipe and 28 percent of shipments of line pipe. 4/ Major markets in which shipments were made directly to end users in 1984 were the oil and gas and electrical equipment industries for standard pipe and the oil and gas industry for line pipe.

In the public conference on investigations Nos. 731-TA-211 and 212 (Preliminary), an industry representative testified that during the last 10 years, imported pipe has been sold through a distribution system distinct from that used for the sale of domestic pipe. Foreign pipe is sold by a separate group of distributors that maintain multilocation stocking depots and carry pipe imported from various foreign sources. This imported pipe is then sold to wholesale plumbing and heating jobbers and pipe valves and fittings jobbers, the same customers (end users) to which the domestic product is sold. 5/

---

1/ Post conference brief of CA Conduven in investigations Nos. 731-TA-211 and 212 (Preliminary), p. 1.

2/ Antidumping petition in the matter of Certain Welded Carbon Steel Pipes and Tubes from Thailand, pp. 20-21.

3/ Transcript of the public conference in investigations Nos. 731-TA-131 and 132 (Preliminary), pp. 79 and 86.

4/ Such AISI data are not available on the basis of size.

5/ Transcript of the public conference in investigations Nos. 731-TA-211 and 212 (Preliminary), pp. 17-18.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

U.S. consumption

In the aggregate, U.S. consumption of standard and line pipes and tubes increased annually, from 2.4 million tons 1/ in 1982 to 3.2 million tons in 1984, or by a total of 33.3 percent. Consumption continued to rise in January 1985, reaching 259,000 tons, representing an increase of 14.6 percent from consumption of 226,000 tons in January 1984.

U.S. consumption of standard pipes and tubes increased annually, from 1.5 million tons in 1982 to 2.1 million tons in 1984, or by a total of 40.0 percent. Consumption at 180,000 tons in January 1985 was up 19.2 percent from that in January 1984. Consumption of line pipes and tubes fluctuated during the period, dropping from 863,000 tons in 1982 to 772,000 tons in 1983, or by 10.5 percent, and then increasing to 1.1 million tons in 1984, or by 36.4 percent from the level of consumption in 1983, and by 22.0 percent above consumption in 1982. In January 1985, consumption of line pipes and tubes amounted to 78,000 tons, representing an increase of 4.0 percent from consumption in January 1984 (table 2).

1/ Unless otherwise noted, the term "ton" refers to a short ton (2,000 pounds).

Table 2.--Certain welded carbon steel pipes and tubes: U.S. producers' domestic shipments, imports for consumption, and apparent consumption, by types, 1982-84, January 1984, and January 1985

| Type and period | U.S. producers' shipments 1/ | Imports | Apparent consumption | Ratio to consumption of-- Producers' shipments | Imports |
|---|---|---|---|---|---|
| | --------------Tons-------------- | | | ------Percent------ | |
| Standard: | | | | | |
| 1982 | 650,780 | 843,919 | 1,494,699 | 43.5 | 56.5 |
| 1983 | 625,749 | 1,181,652 | 1,807,401 | 34.6 | 65.4 |
| 1984 | 565,132 | 1,544,141 | 2,109,273 | 26.8 | 73.2 |
| January-- | | | | | |
| 1984 | 50,226 | 101,030 | 151,256 | 33.5 | 66.8 |
| 1985 | 50,567 | 130,497 | 180,064 | 27.5 | 72.5 |
| Line: | | | | | |
| 1982 | 528,690 | 334,362 | 863,052 | 61.3 | 38.7 |
| 1983 | 494,765 | 277,077 | 771,842 | 64.1 | 35.9 |
| 1984 | 534,177 | 519,308 | 1,053,485 | 50.7 | 49.3 |
| January-- | | | | | |
| 1984 | 37,831 | 36,939 | 74,770 | 50.6 | 49.4 |
| 1985 | 33,708 | 43,845 | 77,553 | 43.5 | 56.5 |
| Total: | | | | | |
| 1982 | 1,179,470 | 1,178,281 | 2,357,751 | 50.0 | 50.0 |
| 1983 | 1,120,509 | 1,458,729 | 2,579,238 | 43.4 | 56.6 |
| 1984 | 1,099,309 | 2,063,449 | 3,162,758 | 34.8 | 65.2 |
| January-- | | | | | |
| 1984 | 88,057 | 137,969 | 226,026 | 39.0 | 61.0 |
| 1985 | 84,276 | 174,342 | 258,618 | 32.6 | 67.4 |

1/ Data on U.S. producers' shipments may be understated, especially with respect to standard pipes and tubes, because not all producers report to AISI.

Source: U.S. producers' shipments, compiled from AISI data; imports, compiled from official statistics of the U.S. Department of Commerce.

## Consideration of Alleged Material Injury to an Industry in the United States

The petition alleges, with respect to standard pipes and tubes from Thailand, that the domestic industry as a whole is materially injured, or threatened with material injury, and that the western region 1/ of the United States, in particular, is materially injured or threatened with material injury as provided in section 771(4)(C) of the Tariff Act of 1930. To the extent that data are available, separate tabulations concerning producers in the western region are provided throughout this section. Producers in the western region do not manufacture line pipe.

1/ The petitioner defines the western region as consisting of the States of California, Oregon, Washington, Idaho, Nevada, Utah, and Arizona.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

U.S. production, capacity, and capacity utilization

U.S. production of standard and line pipes and tubes by responding firms increased overall between 1982 and 1984 and continued to increase in January-February 1985. U.S. production increased from 985,000 tons in 1982 to 1.0 million tons in 1983, or by 4.3 percent. In 1984, production totaled 1.2 million tons, representing an increase of 20.0 percent from production in 1983. Production during January-February 1985, at * * * tons, was up * * * percent from the * * * tons produced in January-February 1984 (table 3).

Firms that produced standard pipes and tubes reported an annual increase in production from 371,000 tons in 1982 to 484,000 tons in 1984, or 30.5 percent. Production of standard pipes and tubes during January-February 1985 also increased, by 3.8 percent from production in the corresponding months of 1984.

Table 3.--Standard and line pipes and tubes: U.S. production, capacity, and capacity utilization, 1982-84, January-February 1984, and January-February 1985

| Item | 1982 | 1983 | 1984 | January-February-- | |
|---|---|---|---|---|---|
| | | | | 1984 | 1985 |
| Standard: | | | | | |
| Production----------tons-- | 371,138 | 433,819 | 483,827 | 78,631 | 82,254 |
| Capacity-----------do---- | 1,057,312 | 1,110,302 | 1,157,478 | 173,003 | 191,204 |
| Capacity utilization percent-- | 35.1 | 39.1 | 41.8 | 45.5 | 43.0 |
| Line: | | | | | |
| Production----------tons-- | 92,113 | 102,701 | 186,165 | 28,687 | 27,833 |
| Capacity-----------do---- | 547,200 | 601,462 | 604,974 | 92,792 | 90,794 |
| Capacity utilization percent-- | 16.8 | 17.1 | 30.8 | 30.9 | 30.7 |
| Standard and line: 1/ | | | | | |
| Production----------tons-- | 520,782 | 489,194 | 506,386 | *** | *** |
| Capacity-----------do---- | 1,127,200 | 1,009,200 | 1,009,200 | *** | *** |
| Capacity utilization percent-- | 46.2 | 48.5 | 50.2 | 2/ 57.8 | 2/ 76.4 |
| Total: | | | | | |
| Production----------tons-- | 984,033 | 1,025,714 | 1,176,378 | *** | *** |
| Capacity-----------do---- | 2,731,712 | 2,720,964 | 2,771,652 | *** | *** |
| Capacity utilization percent-- | 36.0 | 37.7 | 42.4 | 42.8 | 2/ 44.2 |

1/ Represents data from 3 firms that could not separate either capacity or production by product.

Source: Compiled from data submitted in response to questionnaies of the U.S. International Trade Commission.

Barcode:3883503-02 A-549-502 SCO - Scope Inquiry - Line Pipe

U.S. production of line pipes and tubes increased annually from 92,000 tons in 1982 to 186,000 tons in 1984, more than twice the production in 1982. Production in January-February 1985 was down slightly (3.0 percent) from production in January-February 1984.

The overall capacity of the responding firms for the production of standard and line pipes and tubes increased irregularly from 2.7 million tons in 1982 to 2.8 million tons in 1984, or by 3.7 percent. Capacity utilization increased annually from 36.0 percent in 1982 to 42.4 percent in 1984. For standard pipes and tubes, U.S. capacity increased annually from 1.1 million tons in 1982 to 1.2 million tons in 1984, or overall by 9.1 percent. Utilization of capacity by standard pipe and tube producers increased annually from 35.1 percent in 1982 to 41.8 percent in 1984. U.S. capacity as reported by firms that produce line pipes and tubes increased from 547,000 tons in 1982 to 605,000 tons to 1984, or by 10.6 percent. Capacity utilization by those firms increased annually from 16.8 percent in 1982 to 30.8 percent in 1984.

The following tabulation shows production, capacity, and capacity utilization with respect to standard pipes and tubes by producers in the western region that responded to the Commission questionnaire.

| Period | Production | Capacity | Capacity utilization |
|---|---|---|---|
| | Tons | | Percent |
| 1982 | *** | *** | *** |
| 1983 | *** | *** | *** |
| 1984 | *** | *** | *** |
| Jan.-Feb.-- | | | |
| 1984 | *** | *** | *** |
| 1985 | *** | *** | *** |

U.S. producers' shipments

Domestic shipments of standard and line pipes and tubes by U.S. producers that provided separate data in their questionnaire responses increased annually between 1982 and 1984, and that trend continued in January-February 1985. Shipments increased from 539,000 tons in 1982 to 588,000 tons in 1983, or by 9.1 percent, and then to 727,000 tons in 1984, or by 23.6 percent from shipments in 1983. In January-February, shipments were up 3.5 percent from shipments in January-February 1984 (table 4).

Domestic shipments of standard pipes and tubes rose annually from 415,000 tons in 1982 to 509,000 tons in 1984, or by 22.7 percent. In January-February 1985, producers' shipments of standard pipes were up slightly from shipments in January-February 1984. Shipments of responding firms of line pipes and tubes dropped from 124,000 tons in 1982 to 114,000 tons in 1983, or by 8.1 percent.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Table 4.--Standard and line pipes and tubes: U.S. producers' domestic shipments, by types, 1/ 1982-84, January-February 1984, and January-February 1985

| Item | 1982 | 1983 | 1984 | January-February-- | |
|---|---|---|---|---|---|
| | | | | 1984 | 1985 |
| | Quantity (tons) | | | | |
| Standard | 414,782 | 474,590 | 509,176 | 84,211 | 87,882 |
| Line | 123,842 | 113,684 | 216,492 | 26,962 | 30,316 |
| Total | 538,624 | 588,274 | 725,668 | 114,173 | 118,218 |
| | Value (1,000 dollars) | | | | |
| Standard | 261,626 | 276,664 | 311,462 | 52,598 | 54,391 |
| Line | 65,881 | 54,407 | 109,503 | 13,407 | 14,809 |
| Total | 327,507 | 331,071 | 420,965 | 66,005 | 69,200 |
| | Unit value | | | | |
| Standard | $631 | $583 | $612 | $625 | $619 |
| Line | 532 | 479 | 506 | 497 | 488 |
| Average | 608 | 563 | 580 | 594 | 585 |

1/ Excludes shipments by * * *, which did not provide the value of shipments, and * * *, which did not provide data by type of product. Shipments by those 2 firms declined annually from * * * tons in 1982 to * * * tons in 1983 and to * * * tons in 1984.

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission.

They increased in 1984 to 216,000 tons, 89.5 percent above the level of shipments in 1983 and 15.1 percent above the level of shipments in 1982. Shipments in January-February 1985 were up 11.1 percent from shipments in January-February 1984.

Three U.S. producers, * * *, were the only firms that reported shipments both east and west of the Rocky Mountains during 1982-84. * * *. Those shipments, as a share of each firm's total shipments, are shown in the following tabulation:

* * * * * * *

U.S. exports

Three firms, * * *, * * *, and * * *, were the only U.S. producers that reported exports during the period covered by the Commission questionnaire.

Exports of standard pipes and tubes by those firms increased annually from * * * tons in 1982 to * * * tons in 1984, or overall by 27.0 percent. Exports of line pipes and tubes, which were all shipped by * * *, declined from * * * tons in 1982 to * * * tons in 1984, or by * * * percent. Exports represented less than 5 percent of the firms' total shipments during the period. Exports as reported to the Commission are shown in the following tabulation:

* * * * * * *

U.S. producers' inventories 1/

U.S. producers' yearend inventories of standard and line pipes and tubes declined from 103,000 tons in 1982 to 90,000 tons in 1983, or by 12.6 percent and then increased to 109,000 tons in 1984, or by 21.1 percent from the 1983 inventory level, and by 6.9 percent compared with the level in 1982. As a share of shipments, producers' yearend inventories declined annually from 19.0 percent in 1982 to 15.0 percent in 1984 (table 5).

Yearend inventories of standard pipes and tubes declined irregularly from 82,000 tons in 1982 to 74,000 tons in 1984, or by 10.8 percent. As a share of shipments, producers' inventories of standard pipes and tubes declined annually from 19.7 percent in 1982 to 14.5 percent in 1984. Inventories of line pipes and tubes increased irregularly from 21,000 tons in 1982 to 35,000 tons in 1984, which was 66.7 percent above the inventory level in 1982. As a share of shipments, producers' yearend inventories of line pipes and tubes declined irregularly from 17.0 percent in 1982 to 16.4 percent in 1984.

1/ Seven producers provided inventory data for standard pipes and tubes, and four producers provided inventory data for line pipes.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Barcode:3883503-02 A-549-502 SCO - Scope Inquiry - Line Pipe

Table 5.--Standard and line pipes and tubes: U.S. producers' inventories of domestically produced merchandise, by types, as of Dec. 31 of 1982-84, and Feb. 28 of 1984-85

| Type | As of Dec. 31-- | | | As of Feb. 28-- | |
|---|---|---|---|---|---|
| | 1982 | 1983 | 1984 | 1984 | 1985 |
| | Quantity (tons) | | | | |
| Standard | 81,539 | 72,576 | 73,597 | 62,977 | 66,994 |
| Line | 21,051 | 17,392 | 35,403 | 19,103 | 27,873 |
| Total | 102,590 | 89,968 | 109,000 | 82,080 | 94,867 |
| | Ratio of inventories to shipments (percent) | | | | |
| Standard | 19.7 | 15.3 | 14.5 | 74.8 | 76.2 |
| Line | 17.0 | 15.3 | 16.4 | 80.4 | 91.9 |
| Average | 19.0 | 15.3 | 15.0 | 73.8 | 80.3 |

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission.

Employment and wages

Data were obtained from six producers that could provide separate employment data for standard and line pipes and tubes. 1/ The number of production workers employed at the reporting establishments declined from 1,946 in 1982 to 1,683 in 1983, or by 13.5 percent and then increased in 1984 to 2,002, up 2.9 percent from employment in 1982. Employment continued to rise in January-February 1985, by 4.4 percent from employment in January-February 1984 (table 6).

1/ One firm, * * *, reports that its employees are used interchangably in the production of standard and line pipe and separate data are not available. * * * employed * * * production workers in 1982, * * * in 1983, and * * * in 1984.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Table 6.--Average number of production and related workers employed in establishments producing standard and line pipes and tubes and hours worked by and wages and total compensation paid to such employees, 1982-84, January-February 1984, and January-February 1985

| Item | 1982 | 1983 | 1984 | January-February-- | |
|---|---|---|---|---|---|
| | | | | 1984 | 1985 |
| Production and related workers: | | | | | |
| Standard | 1,377 | 1,288 | 1,324 | 1,380 | 1,404 |
| Line | 569 | 395 | 678 | 582 | 644 |
| Total | 1,946 | 1,683 | 2,002 | 1,962 | 2,048 |
| Hours worked: | | | | | |
| Standard------1,000 hours | 2,630 | 2,638 | 2,663 | 438 | 478 |
| Line------do | 1,157 | 837 | 1,466 | 211 | 268 |
| Total------do | 3,787 | 3,475 | 4,129 | 649 | 746 |
| Wages paid: | | | | | |
| Standard----1,000 dollars | 29,606 | 30,522 | 35,327 | 5,757 | 6,144 |
| Line------do | 12,564 | 9,682 | 20,358 | 2,918 | 3,558 |
| Total------do | 42,170 | 40,204 | 55,685 | 8,675 | 9,699 |
| Total compensation paid: | | | | | |
| Standard----1,000 dollars | 43,317 | 45,276 | 47,025 | 7,836 | 8,276 |
| Line------do | 20,988 | 16,518 | 27,606 | 4,147 | 4,969 |
| Total------do | 64,305 | 61,794 | 74,631 | 11,983 | 13,240 |

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission.

Total hours worked by production and related workers declined from 3.8 million in 1982 to 3.5 million in 1983 and then increased to 4.1 million in 1984. Annual hours worked by production workers increased from 1,946 in 1982 to 2,065 in 1983 and then declined slightly in 1984 to 2,062 hours.

Total wages paid to production workers declined from $42.2 million in 1982 to $40.2 million in 1983 and then increased in 1984 to $55.7 million. Average hourly wages paid to production workers increased during the period--from $11.14 per hour in 1982 to $13.49 per hour in 1984, an increase of 21.1 percent.

Total compensation paid by U.S. producers declined from $64.3 million in 1982 to $61.8 million in 1983 and then increased in 1984 to $74.6 million. Average hourly total compensation paid to production workers increased annually from $16.98 in 1982 to $18.07 in 1984, or by 6.4 percent. Workers at all but two of the firms (* * * and * * *) are represented by unions.

The following tabulation shows employment, hours worked, wages paid, and total compensation with respect to firms located in the western region that responded to the Commission questionnaire.

| Period | Numbers of workers | Hours worked | Wages paid | Total compensation |
|---|---|---|---|---|
| | | 1,000 hours | ------1,000 dollars----- | |
| 1982 | *** | *** | *** | *** |
| 1983 | *** | *** | *** | *** |
| 1984 | *** | *** | *** | *** |
| Jan.-Feb.-- | | | | |
| 1984 | *** | *** | *** | *** |
| 1985 | *** | *** | *** | *** |

Financial experience of U.S. producers

Usable income-and-loss data on an establishment basis and for standard and/or line welded carbon steel pipes and tubes were received from only 6 of the 35 U.S. firms to which the Commission sent questionnaires.

Standard and line pipes and tubes.--Six producers provided usable income-and-loss data relative to their standard and line welded carbon steel pipes and tube operations. These producers accounted for 55.6 percent of total shipments of these products in 1984, as reported by the AISI. These data are presented in table 7. Net sales declined by 3.8 percent, from $287.2 million in 1982 to $276.4 million in 1983, and then increased by 28.2 percent to $354.3 million in 1984.

Operating income rose to $18.4 million, or 5.2 percent of net sales, in 1984, compared with an operating loss of $646,000, or 0.2 percent of net sales, in 1983 and an operating income of $4.9 million, or 1.7 percent of net sales, in 1982. Only one of the six firms reported operating losses in 1982 and 1984, whereas two sustained such losses in 1983. Cash flow from operations dropped by 72.7 percent, from $7.2 million in 1982 to $2.0 million in 1983. In 1984 such cash flow jumped to $21.3 million.

Standard pipes and tubes.--Two firms, accounting for * * * percent of total shipments of standard welded carbon steel pipes and tubes, as reported by the American Iron & Steel Institute, furnished usable income-and-loss data. These data are presented in table 8. Net sales increased from * * * in 1982 to * * * in 1984, or by * * * percent. However, operating income declined from * * * in 1982 to * * * in 1983, or by * * * percent, and then rose to * * * in 1984. The two firms reported operating income margins of * * *, * * *, and * * * percent, respectively, in 1982, 1983, and 1984. * * *. Cash flow from operations declined from * * * in 1982 to * * * in 1983 and then increased to * * * in 1984. None of the Western region producers were able to provide usable income-and-loss data.

Table 7.--Income-and-loss experience of 6 U.S. producers 1/ on their operations producing standard and line circular welded carbon steel pipes and tubes, accounting years 1982-84

| Item | 1982 | 1983 | 1984 |
|---|---|---|---|
| Net sales----1,000 dollars-- | 287,238 | 276,442 | 354,295 |
| Cost of goods sold----do---- | 257,453 | 250,105 | 305,513 |
| Gross profit----do---- | 29,785 | 26,337 | 48,782 |
| General, selling, and administrative expenses----do---- | 24,868 | 26,983 | 30,336 |
| Operating income or (loss)----do---- | 4,917 | (646) | 18,446 |
| Depreciation and amortization 2/----do---- | 2,242 | 2,602 | 2,899 |
| Cash flow from operations 2/----do---- | 7,159 | 1,956 | 21,345 |
| Ratio to net sales: | | | |
| Gross profit----percent-- | 10.4 | 9.5 | 13.8 |
| Operating income or (loss)----do---- | 1.7 | (.2) | 5.2 |
| Cost of goods sold----do---- | 89.6 | 90.5 | 86.2 |
| General, selling, and administrative expenses----do---- | 8.7 | 9.8 | 8.6 |
| Number of firms reporting operating losses---- | 1 | 2 | 1 |

1/ Accounting for 55.6 percent of total shipments of standard and line circular welded carbon steel pipes and tubes in 1984, as reported by the AISI.

2/ 2 firms that accounted for * * * percent of reported 1984 net sales did not provide the Commission with data on depreciation and amortization. Hence, cash flow from operations is understated, and deficit is overstated.

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission, except as noted.

Table 8.--Income-and-loss experience of 2 U.S. producers 1/ on their operations producing standard pipes and tubes, accounting years 1982-84

| Item | 1982 | 1983 | 1984 |
|---|---|---|---|
| Net sales----1,000 dollars | *** | *** | *** |
| Cost of goods sold----do | *** | *** | *** |
| Gross profit----do | *** | *** | *** |
| General, selling, and administrative expenses----do | *** | *** | *** |
| Operating income----do | *** | *** | *** |
| Depreciation and amortization 2/----do | *** | *** | *** |
| Cash flow from operations 2/----do | *** | *** | *** |
| Ratio to net sales of-- | | | |
| Gross profit----percent | *** | *** | *** |
| Operating income----do | *** | *** | *** |
| Cost of goods sold----do | *** | *** | *** |
| General, selling, and administrative expenses----do | *** | *** | *** |
| Number of firms reporting operating losses---- | *** | *** | *** |

1/ Accounting for * * * percent of total shipments of standard welded carbon steel pipes and tubes in 1984, as reported by the AISI.

2/ 1 firm, * * *, which accounted for * * * percent of reported 1984 net sales, did not provide the Commission with data on depreciation and amortization. Hence, cash flow from operations is understated, and deficit is overstated.

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Line pipes and tubes.--Three producers, which furnished income-and-loss data, accounted for * * * percent of the total shipments of welded carbon steel line pipes and tubes in 1984, as reported by the American Iron & Steel Institute. These data are presented in table 9. Net sales increased by * * * percent, from * * * in 1982 to * * * in 1984, after declining to * * * in 1983. In the aggregate, three firms reported operating losses of * * *, or * * * percent of net sales, in 1982 and * * *, or * * * percent of net sales, in 1983. In 1984, three firms earned an aggregate operating income of * * *, equivalent to * * * percent of net sales. One firm reported operating losses in 1982 and 1984, whereas two firms sustained such losses in 1983. The responding firms reported a positive cash flow of * * * in 1984 compared with a negative cash flow of * * * in 1983 and * * * in 1982.

Overall establishment operations.--Six producers furnished usable income-and-loss data on their overall establishment operations within which welded carbon steel pipes and tubes are produced. Net sales of standard and line pipes and tubes accounted for 8.8 to 11.5 percent of total establishment

Table 9.--Income-and-loss experience of 3 U.S. producers 1/ on their operations producing line pipes and tubes, accounting years 1982-84

| Item | 1982 | 1983 | 1984 |
|---|---|---|---|
| Net sales----1,000 dollars | *** | *** | *** |
| Cost of goods sold----do | *** | *** | *** |
| Gross profit or (loss)----do | *** | *** | *** |
| General, selling, and administrative expenses----do | *** | *** | *** |
| Operating income or (loss)----do | *** | *** | *** |
| Depreciation and amortization 2/----do | *** | *** | *** |
| Cash flow or (deficit) from operations 2/----do | *** | *** | *** |
| Ratio to net sales of-- | | | |
| Gross profit or (loss)----percent | *** | *** | *** |
| Operating income or (loss)----do | *** | *** | *** |
| Cost of goods sold----do | *** | *** | *** |
| General, selling, and administrative expenses----do | *** | *** | *** |
| Number of firms reporting operating losses---- | *** | *** | *** |

1/ Accounting for * * * percent of total shipments of line circular welded carbon steel line pipes and tubes in 1984, as reported by the AISI.

2/ 2 firms that accounted for * * * percent of reported 1984 net sales, did not provide the Commission with data on depreciation and amortization. Hence, cash flow from operations is understated, and deficit is overstated.

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

sales during 1982-84. Net sales of total establishment operations declined from $3.3 billion in 1982 to $2.7 billion in 1983, or by of 18.4 percent (table 10). Such sales increased to $3.1 billion in 1984. Six firms reported reported an aggregate operating loss of $345.2 million, or 13.0 percent of net sales, in 1983 compared with an operating income of $188.0 million, or 5.8 percent of net sales, in 1982 and $88.7 million, or 2.9 percent of net sales, in 1984.

Table 10.--Income-and-loss experience of 6 U.S. producers on the overall operations of their establishments within which welded carbon steel pipes and tubes are produced, accounting years 1982-84

| Item | 1982 | 1983 | 1984 |
|---|---|---|---|
| Net sales--------1,000 dollars-- | 3,265,323 | 2,663,414 | 3,080,414 |
| Cost of goods sold--------do---- | 2,944,166 | 2,857,671 | 2,871,687 |
| Gross profit or (loss)--------do---- | 321,157 | (194,257) | 208,727 |
| General, selling, and administrative expenses--------do---- | 133,190 | 150,929 | 120,031 |
| Operating income or (loss)--------do---- | 187,967 | (345,186) | 88,696 |
| Depreciation and amortization 1/------do---- | 29,441 | 31,425 | 32,707 |
| Cash flow from operations 1/--------do---- | 217,408 | 313,761 | 121,403 |
| Ratio to net sales of-- | | | |
| Gross profit or (loss)--------percent---- | 9.8 | (7.3) | 6.8 |
| Operating income or (loss)--------do---- | 5.8 | (13.0) | 2.9 |
| Cost of goods sold--------do---- | 90.2 | 107.3 | 93.2 |
| General, selling, and administrative expenses--------do---- | 4.1 | 5.7 | 3.9 |
| Standard and line pipes and tubes' net sales--------do---- | 8.8 | 10.4 | 11.5 |
| Number of firms reporting operating losses-- | 2 | 3 | 1 |

1/ 1 firm, * * *, which accounted for * * * percent of reported 1984 net sales, did not provide the Commission with data on depreciation and amortization. Hence, cash flow from operations is understated, and deficit is overstated.

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission.

Two producers, * * * and * * *, which accounted for * * * percent of domestic shipments of standard and line pipes and tubes in 1984, provided financial data on their total pipe and tube operations. Hence, their data were not included in any of the income-and-loss data in tables 7 through 10. Their data are presented in the following tabulation:

* * * * * * *

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

* * * * * * *.

U.S. producers' statements on the impact of imports from Thailand and Venezuela on their growth, investment, and ability to raise capital.--The Commission requested U.S. producers to describe and explain the actual and potential negative effects, if any, of imports from Brazil, Thailand, and Venezuela of the subject welded carbon steel pipes and tubes on their firms' growth, investment, and ability to raise capital. Excerpts and/or summaries of the responses from U.S. producers are presented below.

* * * * * * *

The Question of the Threat of Material Injury

In its examination of the question of a reasonable indication of the threat of material injury to an industry in the United States, the Commission may take into consideration such factors as the rate of increase of the allegedly subsidized and LTFV imports, the rate of increase of U.S. market penetration by such imports, the quantities of such imports held in inventory in the United States, and the capacity of producers in Thailand and Venezuela to generate exports (including the availability of export markets other than the United States).

U.S. importers' inventories

Questionnaires were received from two importers, Connectors, Inc., which accounted for virtually all of the standard and line pipes and tubes imported from Venezuela in 1984, and * * *, which accounted for all of the imports of standard pipes and tubes from Thailand in 1984. Both importers had no inventories during 1982-84.

Capacity of foreign producers to generate exports

Thailand.--Petitioners allege threat of material injury with respect to imports of standard pipes and tubes from Thailand, stating that producers in Thailand have recently begun offering large quantities of pipe and tube for delivery to the U.S. market beginning in January-March 1985. 1/ Petitioners further allege that the capacity of producers in Thailand has increased significantly in the last few years, stating that, in 1982, the capacity of the entire industry was 234,000 tons, but now two companies alone have the capacity to produce 300,000 tons per year. Petitioners also allege that this increased capacity is to allow producers in Thailand to increase exports. 2/

1/ Antidumping petition in the matter of certain welded carbon steel pipe and tube products from Thailand, p. 24.
2/ Ibid, p. 26.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Thailand's 1/ production of standard pipe and tube increased annually from 272,000 tons in 1982 to 323,000 tons in 1984, or by a total of 18.8 percent. Production in 1985 is projected at 20 tons less than production in 1984. Capacity in Thailand increased by 3.9 percent during 1982-84, with no increase in capacity projected for 1985. Producers in Thailand increased their capacity utilization annually from 82.2 percent in 1982 to 93.9 percent in 1984. Capacity utilization is projected to remain at 93.9 percent in 1985. Shipments to the domestic market accounted for more than one-half of Thailand's output during 1982-84, during which exports increased annually from 45.5 percent of production (1982) to 48.4 percent (1984). Exports to the United States accounted for 0.7 percent of the total exports from Thailand in 1984 (table 11).

Table 11.--Standard pipes and tubes: Thailand's 1/ production, capacity, capacity utilization, domestic shipments, and exports, 1982-85

| Item | 1982 | 1983 | 1984 | 1985 2/ |
|---|---|---|---|---|
| Production 3/------------tons--: | 272,196 | 308,291 | 322,994 | 322,974 |
| Capacity-----------------do----: | 331,131 | 331,131 | 343,918 | 343,918 |
| Capacity utilization--percent--: | 82.2 | 93.1 | 93.9 | 93.9 |
| Domestic shipments-------tons--: | 148,216 | 162,952 | 167,692 | 4/ |
| Exports to-- | | | | |
| United States----------do----: | 0 | 0 | 1,023 | 5/ 31,378 |
| All other markets------do----: | 123,980 | 145,339 | 155,302 | 4/ |
| Subtotal-------------do----: | 123,980 | 145,339 | 156,325 | 4/ |
| Total shipments--------do----: | 272,196 | 308,291 | 324,017 | 4/ |
| Ratio to total shipments: | | | | |
| Domestic shipments--percent--: | 54.5 | 52.9 | 51.8 | 4/ |
| Total exports----------do----: | 45.5 | 47.1 | 48.4 | 4/ |
| Ratio of exports to the United States to total exports percent--: | 0 | 0 | 0.7 | 4/ |

1/ Data are for the following 5 producers: First Steel Industry Co., Saha Thai Steel Pipe Co., Siam Steel Co., Thai Steel Pipe Industry Co., and Thai Union Steel Co.

2/ Projected except as noted.

3/ Manfacturers report that they produce to meet orders and do not maintain inventories excepts to accumulate quantities for bulk shipment.

4/ Not available.

5/ Data are for current orders where payment has been arranged. No allowances were made for cancellations.

Source: Post-conference brief on behalf of the 5 Thailand producers.

---

1/ The data in this section are for five producers that according to the post conference brief on behalf of First Steel Industry Co., Saha Thai Steel Pipe Co., Siam Steel Pipe Co., Thai Steel Pipe Industry Co., and Thai Union Steel Co. are the only manufacturers in Thailand with sufficient capacity and adaptability to manufacture products to U.S. specifications in suffcient quantities to make export profitable, pp. 11-12.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

According to the petitioners, producers in the west coast region of the United States are threatened with material injury from imports of the standard pipes and tubes from Thailand. 1/ According to the petitioners, because of the high dumping margins issued against imports from Taiwan and the imminent voluntary restraint agreements with Japan and the Republic of Korea (Korea), purchasers on the west coast will be looking for other foreign sources to supply their requirements and Thailand is an obvious source. Producers' shipments, imports, and apparent consumption of standard pipes and tubes in the west coast region are shown in the follow tabulation:

* * * * * * *

Petitioners further allege that a 10,000-ton shipment is due in Los Angeles in March, and petitioners expect that a majority of the pipe and tube imports from Thailand will enter the United States through west coast ports. 2/ The Commission's staff has verified that * * *, an importer on the west coast, placed an order on * * *, with a producer in Thailand for * * * metric tons (* * * short tons) of standard pipe. * * * expects the shipment, which left Thailand on * * *, and is all destined for customers on the west coast, to arrive in * * *. Counsel for the five Thailand producers provided in the post conference brief 3/ commitments for future shipments where payment has been arranged for each of the five firms. The shipments may be overstated, as no allowance was made for cancellations. These exports from Thailand are reportedly all destined for east coast ports, as shown in the following tabulation:

| Firm | Quantity (Tons) | Expected arrival date | Port |
|---|---|---|---|
| Thai Union----------- | *** | * * * | * * * |
| Thai Steel----------- | *** | * * * | * * * |
| | | | * * * |
| Saha----------------- | *** | * * * | * * * |
| First---------------- | *** | * * * | * * * |
| | | | * * * |
| Siam----------------- | *** | * * * | * * * |
| Total----------- | 31,378 | | |

Venezuela.--Counsel for Venezuelan producers was requested to provide updated information on that country's industry, but the data have not yet been received. The data presented below are the same as reported to the Commission in investigations Nos. 731-TA-211 and 212 (Preliminary).

According to counsel for the Venezuelan producer CA Conduven, this company was the sole exporter of the standard and line pipes and tubes under

---

1/ Petition, p. 29. According to counsel for the petitioners, the firms threatened with material injury are those producers that are located in California, Oregon, Washington, Idaho, Nevada, Utah, and Arizona.

2/ Ibid, p. 31.

3/ Post conference brief on behalf of 5 Thai producers, exhibit G.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Barcode:3883503-02 A-549-502 SCO - Scope Inquiry - Line Pipe

investigation. 1/ Conduven's capacity for producing these products rose by * * * percent, from * * * tons in 1981 to * * * tons in 1983, but production declined by * * * percent, from * * * tons in 1982 to * * * tons in 1983, before increasing to * * * tons during January-September 1984 (table 12).

Table 12.--Standard and line pipes and tubes: Conduven's capacity, production, export sales, and home-market sales, 1981-83, January-September 1983, and January-September 1984

| Item | 1981 | 1982 | 1983 | January-September | |
|---|---|---|---|---|---|
| | | | | 1983 | 1984 |
| Capacity--------------short tons--: | *** | *** | *** | *** | *** |
| Production------------------do-----: | *** | *** | *** | *** | *** |
| Capacity utilization----percent--: | *** | *** | *** | *** | *** |
| Domestic shipments---short tons--: | *** | *** | *** | *** | *** |
| Exports to-- | | | | | |
| United States------------do-----: | *** | *** | *** | *** | *** |
| South America------------do-----: | *** | *** | *** | *** | *** |
| Total------------------------: | *** | *** | *** | *** | *** |

Source: Compiled from data provided by counsel for CA Conduven.

Conduven's capacity utilization rate declined from * * * percent in 1982 to * * * percent in 1983 before rising to * * * percent during January-September 1984. Domestic shipments rose from * * * tons in 1981 to * * * tons in 1982 before dropping to * * * tons in 1983 and * * * tons during January-September 1984. Exports to the United States declined by * * * percent, from * * * tons in 1981 to * * * tons in 1983, and then reached * * * tons during January-September 1984. Exports to South America decreased after 1982 from * * * tons to * * * tons in January-September 1984.

## Consideration of the Causal Relationship Between Alleged Material Injury or the Threat Thereof and the Allegedly Subsidized and LTFV Imports

### U.S. imports

Aggregate U.S. imports of standard and line pipes and tubes increased annually from 1982 to 1984 and continued upward in January 1985. U.S. imports increased from 1.2 million tons in 1982 to 2.1 million tons in 1984, or by 75.0 percent. In January 1985, imports, at 174,000 tons, were up 26.1 percent from imports in January 1984. U.S. imports of the allegedly subsidized and

1/ Counsel for Conduven reports that Union Industrial Venezolana SA, named by the petitioners as a Venezuelan producer and exporter of the products under investigation, does not export pipes and tubes to the United States (transcript of conference on investigations Nos. 731-TA-211 and 212 (Preliminary), p. 41).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Barcode:3883503-02 A-549-502 SCO - Scope Inquiry - Line Pipe

LTFV imports from Venezuela more than tripled between 1982 and 1983, from 6,389 tons in 1982 to 24,435 tons in 1983. Imports from Venezuela reached 124,821 tons in 1984, more than five times the level of imports from that source in 1983. As a share of total imports, those from Venezuela increased annually from 0.5 percent in 1982 to 5.3 percent in 1983, 6.0 percent in 1984, and 9.1 percent in January 1985. Shipments of the allegedly subsidized and LTFV imports from Thailand, which entered the United States only in 1984 and January 1985, accounted for less than 0.05 percent of total imports in both those periods (table 13).

Standard pipes and tubes.--U.S. imports of standard pipes and tubes increased annually from 844,000 tons in 1982 to 1.5 million tons in 1984, or by 82.9 percent. They continued to increase in January 1985, reaching 130,000 tons, representing an increase of 28.7 percent from imports in January 1984. Imports from Venezuela increased substantially during 1982-84 and continued to surge in January 1985. Imports from that source more than tripled, from 3,790 tons in 1982 to 12,911 tons in 1983, and then more than tripled again, reaching 45,370 tons in 1984. As a share of total imports of standard pipes and tubes, those from Venezuela rose annually from 0.4 percent in 1982 to 1.1 percent in 1983, 2.9 percent in 1984, and to 3.6 percent in January 1985. Imports of standard pipes and tubes from Thailand amounted to 50 tons in 1984 and to 44 tons in January 1985. Imports from that source accounted for less than 0.05 percent of total imports in 1984 and January 1985 (table 14).

Line pipes and tubes.--U.S. imports of line pipes and tubes increased irregularly from 334,000 tons in 1982 to 519,000 tons in 1984, or by 55.4 percent. Imports totaled 44,000 tons in January 1985, up 18.5 percent from imports of 37,000 tons in January 1984. Imports from Venezuela increased substantially from 1982 to 1984 and continued to rise in January 1985. Such imports increased from 2,599 tons in 1982 to 11,524 tons in 1983 and to 79,451 tons in 1984. Imports from Venezuela in January 1985 amounted to 11,134 tons compared with imports of 1,531 tons in January 1984. As a share of total imports, those from Venezuela amounted to 0.8 percent in 1982, 4.2 percent in 1983, 15.3 percent in 1984, and 25.4 percent in January 1985. There were no imports of line pipes and tubes from Thailand during the period (table 15).

Petitioners request that the Commission cumulate the subject imports from Venezuela with imports of those products from Brazil, Mexico, and Spain that have recently been the subject of investigations. 1/ Imports of standard and line pipes and tubes from those sources, and from Korea and Taiwan whose exports of standard pipes and tubes not over 4.5 inches in outside diameter are currently subject to antidumping duties, are shown in tables 13, 14, and 15.

Market penetration by the allegedly subsidized and LTFV imports

The share of the U.S. market for standard and line pipes and tubes supplied by imports from Venezuela increased annually from 0.3 percent in 1982 to 3.9 percent in 1984 and to 6.1 percent in January 1985. Imports from

1/ Antidumping petition in the matter of Certain Welded Carbon Steel Pipes and Tubes from Venezuela, p. 24; transcript of conference, p. 36. These investigations were terminated effective Mar. 30, 1985, Apr. 2, 1985, and Feb. 4, 1985, respectively, following withdrawal of the petitions.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Table 13.--Standard and line pipes and tubes: U.S. imports for consumption, by principal sources, 1982-84, January 1984, and January 1985

| Source | 1982 | 1983 | 1984 | January 1984 | January 1985 |
|---|---|---|---|---|---|
| | Quantity (tons) | | | | |
| Venezuela | 6,389 | 24,435 | 124,821 | 1,889 | 15,814 |
| Thailand | 0 | 0 | 50 | 0 | 44 |
| Brazil | 37,757 | 79,180 | 212,603 | 14,903 | 21,817 |
| Mexico | 35,371 | 140,598 | 169,773 | 18,415 | 7,807 |
| Spain | 6,819 | 20,405 | 83,712 | 6,283 | 7,293 |
| Republic of Korea | 441,713 | 673,512 | 636,728 | 46,845 | 42,574 |
| Japan | 293,125 | 142,803 | 252,763 | 18,088 | 28,645 |
| All other | 357,107 | 377,796 | 582,999 | 31,546 | 50,348 |
| Total | 1,178,281 | 1,458,729 | 2,063,449 | 137,969 | 174,342 |
| | Value (1,000 dollars) | | | | |
| Venezuela | 2,876 | 6,873 | 34,808 | 489 | 5,398 |
| Thailand | - | - | 15 | - | 14 |
| Brazil | 17,551 | 23,765 | 69,775 | 4,289 | 7,573 |
| Mexico | 14,582 | 45,838 | 58,508 | 6,044 | 2,869 |
| Spain | 2,505 | 5,599 | 25,591 | 1,813 | 2,495 |
| Republic of Korea | 192,450 | 216,067 | 232,758 | 15,877 | 17,202 |
| Japan | 152,595 | 56,577 | 103,841 | 6,625 | 12,326 |
| All other | 168,591 | 135,145 | 223,173 | 12,496 | 19,138 |
| Total | 551,150 | 489,864 | 748,469 | 47,633 | 66,936 |
| | Unit value | | | | |
| Venezuela | $450 | $281 | $279 | $259 | $341 |
| Thailand | - | - | 300 | - | 318 |
| Brazil | 465 | 300 | 328 | 288 | 347 |
| Mexico | 412 | 326 | 345 | 328 | 367 |
| Spain | 367 | 274 | 306 | 289 | 342 |
| Republic of Korea | 436 | 321 | 366 | 339 | 404 |
| Japan | 521 | 396 | 411 | 366 | 430 |
| All other | 472 | 358 | 383 | 396 | 380 |
| Average | 468 | 336 | 363 | 345 | 384 |

Source: Compiled from official statistics of the U.S. Department of Commerce.

Table 14.--Standard pipes and tubes: U.S. imports for consumption, by principal sources, 1982-84, January 1984, and January 1985

| Source | 1982 | 1983 | 1984 | January 1984 | January 1985 |
|---|---|---|---|---|---|
| | Quantity (tons) | | | | |
| Venezuela | 3,790 | 12,911 | 45,370 | 358 | 4,680 |
| Thailand | 0 | 0 | 1/ 50 | 0 | 2/ 44 |
| Brazil | 20,265 | 52,174 | 186,958 | 13,690 | 12,390 |
| Mexico | 22,180 | 97,095 | 96,776 | 8,843 | 5,276 |
| Spain | 4,039 | 19,495 | 82,116 | 6,283 | 7,293 |
| Republic of Korea | 356,084 | 575,008 | 499,036 | 34,933 | 34,136 |
| Japan | 135,904 | 69,212 | 123,688 | 8,186 | 20,786 |
| All other | 301,657 | 355,757 | 510,147 | 28,737 | 45,892 |
| Total | 843,919 | 1,181,652 | 1,544,141 | 101,030 | 130,497 |
| | Value (1,000 dollars) | | | | |
| Venezuela | 1,862 | 3,390 | 12,579 | 90 | 1,469 |
| Thailand | - | - | 1/ 15 | - | 2/ 14 |
| Brazil | 9,654 | 15,291 | 61,109 | 3,884 | 4,392 |
| Mexico | 8,895 | 31,730 | 34,193 | 2,908 | 2,038 |
| Spain | 1,401 | 5,425 | 25,143 | 1,813 | 2,498 |
| Republic of Korea | 153,224 | 185,574 | 187,839 | 12,041 | 13,914 |
| Japan | 74,976 | 30,407 | 56,655 | 3,375 | 9,357 |
| All other | 141,923 | 127,352 | 197,330 | 11,453 | 17,169 |
| Total | 391,935 | 399,169 | 574,863 | 35,564 | 50,851 |
| | Unit value | | | | |
| Venezuela | $491 | $263 | $277 | $253 | $314 |
| Thailand | - | - | 1/ 291 | - | 2/ 317 |
| Brazil | 476 | 293 | 327 | 284 | 354 |
| Mexico | 401 | 327 | 353 | 329 | 386 |
| Spain | 347 | 278 | 306 | 289 | 343 |
| Republic of Korea | 430 | 323 | 376 | 345 | 408 |
| Japan | 552 | 439 | 458 | 412 | 450 |
| All other | 470 | 358 | 387 | 399 | 374 |
| Average | 464 | 338 | 372 | 352 | 390 |

1/ Includes 39 tons, valued at $11,000, with an average unit value of $280 per ton, which entered the United States through the port of Wilmington, NC, and 11 tons, valued at $4,000, with an average unit value of $328 per ton which entered through the port of Philadelphia, PA.

2/ All imports from Thailand in January 1985 entered the United States through the port of Bridgeport, CT.

Source: Compiled from official statistics of the U.S. Department of Commerce.

Table 15.--Line pipes and tubes: U.S. imports for consumption, by principal sources, 1982-84, January 1984, and January 1985

| Source | 1982 | 1983 | 1984 | January 1984 | January 1985 |
|---|---|---|---|---|---|
| | Quantity (tons) | | | | |
| Venezuela | 2,599 | 11,524 | 79,451 | 1,531 | 11,134 |
| Brazil | 17,492 | 27,006 | 25,645 | 1,213 | 9,427 |
| Mexico | 13,191 | 43,503 | 72,997 | 9,572 | 2,531 |
| Spain | 2,780 | 910 | 1,596 | 0 | 0 |
| Republic of Korea | 85,629 | 98,504 | 137,692 | 11,912 | 8,438 |
| Japan | 157,221 | 73,591 | 129,075 | 9,902 | 7,859 |
| All other | 55,450 | 22,039 | 72,852 | 2,809 | 4,456 |
| Total | 334,362 | 277,077 | 519,308 | 36,939 | 43,845 |
| | Value (1,000 dollars) | | | | |
| Venezuela | 1,014 | 3,483 | 22,229 | 399 | 3,929 |
| Brazil | 7,897 | 8,474 | 8,666 | 405 | 3,181 |
| Mexico | 5,687 | 14,108 | 24,315 | 3,136 | 831 |
| Spain | 1,104 | 174 | 448 | - | - |
| Republic of Korea | 39,226 | 30,493 | 44,919 | 3,836 | 3,106 |
| Japan | 77,619 | 26,170 | 47,186 | 3,250 | 2,969 |
| All other | 26,668 | 7,793 | 25,843 | 1,043 | 2,069 |
| Total | 159,215 | 90,695 | 173,606 | 12,069 | 16,085 |
| | Unit value | | | | |
| Venezuela | $390 | $302 | $280 | $261 | $353 |
| Brazil | 451 | 314 | 338 | 334 | 337 |
| Mexico | 431 | 324 | 333 | 328 | 328 |
| Spain | 397 | 191 | 281 | - | - |
| Republic of Korea | 458 | 310 | 326 | 322 | 368 |
| Japan | 494 | 356 | 366 | 328 | 378 |
| All other | 481 | 354 | 355 | 371 | 464 |
| Average | 476 | 327 | 334 | 327 | 367 |

Source: Compiled from official statistics of the U.S. Department of Commerce.

Thailand, which entered the United States only in 1984 and January 1985, accounted for less than 0.05 percent of U.S. consumption in those period (table 16).

Standard pipes and tubes.--Market penetration by standard pipes and tubes imported from Venezuela increased without interruption during the period covered by these investigations. The share of the market supplied by Venezuela increased from 0.3 percent in 1982 to 2.2 percent in 1984. In January 1985, market penetration by Venezuela reached 2.6 percent compared with an 0.2 percent penetration in January 1984. Penetration by imports from Thailand, which consisted entirely of standard pipes and tubes, was less than 0.05 percent in 1984 and in January 1985.

Lines pipes and tubes.--Line pipes and tubes imported from Venezuela increased their share of the U.S. market much more rapidly than did the imports of standard pipes and tubes. Imported line pipes and tubes from Venezuela increased their U.S. market share from 0.3 percent in 1982 to 1.5 percent in 1983 and to 7.5 percent in 1984. In January 1985, market penetration by the imports from Venezuela amounted to 14.4 percent compared with market penetration of 2.2 percent in January 1984. There were no imports of line pipes or tubes from Thailand during the period covered by these investigations.

Petitioners request that the Commission cumulate the subject imports from Venezuela with imports of those products from Brazil, Mexico, and Spain that have recently been the subject of investigations. Import penetration of standard and line pipes and tubes from those sources, and from Korea and Taiwan, whose exports of standard pipes and tubes not over 4.5 inches are currently subject to antidumping duties, is shown in table 17.

## Prices

The pipes and tubes included in these investigations are generally priced on the basis of per 100 feet. Several U.S. producers publish confidential price lists. List prices are often discounted to meet competitive offers. The U.S.-produced pipes and tubes are predominantly sold on an f.o.b. mill or warehouse basis. The imported product under investigation is normally sold on an ex-dock, duty-paid, or f.o.b. warehouse basis. Formal bidding is not the usual means of price competition for pipes and tubes up to 16 inches in diameter, unlike the market for pipes and tubes with diameter over 16 inches.

The Commission requested U.S. producers and importers to provide price data on their largest sale of each of four product specifications to both a service center/distributor and end-user customer. The four product specifications are as follows:

Product 1.--ASTM A-120 schedule 40 standard pipe, carbon welded, black, plain end, 1.315-inch outside diameter (1-inch nominal), 0.133-inch wall thickness.

Barcode:3883503-02 A-549-502 SCO - Scope Inquiry - Line Pipe

Table 16.--Standard and line pipes and tubes: Shares of U.S. consumption supplied by Venezuela, Thailand, all other countries, and U.S. producers, 1/ 1982-84, January 1984, and January 1985

| Item | 1982 | 1983 | 1984 | January 1984 | January 1985 |
|---|---|---|---|---|---|
| Standard pipes and tubes: | | | | | |
| U.S. consumption---tons-- | 1,494,699 | 1,807,401 | 2,109,273 | 151,256 | 180,064 |
| Share of U.S. consumption supplied by-- | | | | | |
| Venezuela--------percent-- | 0.3 | 0.7 | 2.2 | 0.2 | 2.6 |
| Thailand-----------do---- | - | - | 2/ | - | 2/ |
| All other-----------do---- | 56.2 | 64.7 | 71.0 | 66.6 | 69.9 |
| Subtotal----------do---- | 56.5 | 65.4 | 73.2 | 66.8 | 72.5 |
| U.S. producers------do---- | 43.5 | 34.6 | 26.8 | 33.5 | 27.5 |
| Total-------------do---- | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Line pipes and tubes: | | | | | |
| U.S. consumption---tons-- | 863,052 | 771,842 | 1,053,485 | 70,770 | 77,553 |
| Share of U.S. consumption supplied by-- | | | | | |
| Venezuela--------percent-- | 0.3 | 1.5 | 7.5 | 2.2 | 14.4 |
| Thailand-----------do---- | - | - | - | - | - |
| All other-----------do---- | 38.4 | 34.4 | 41.8 | 47.2 | 42.1 |
| Subtotal----------do---- | 38.7 | 35.9 | 49.3 | 49.4 | 56.5 |
| U.S. producers------do---- | 61.3 | 64.1 | 50.7 | 50.6 | 43.5 |
| Total-------------do---- | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Total, standard and line pipes and tubes: | | | | | |
| U.S. consumption---tons-- | 2,357,751 | 2,579,238 | 3,162,758 | 226,026 | 258,618 |
| Share of U.S. consumption supplied by-- | | | | | |
| Venezuela--------percent-- | 0.3 | 0.9 | 3.9 | 0.8 | 6.1 |
| Thailand-----------do---- | - | - | 2/ | - | 2/ |
| All other-----------do---- | 49.7 | 55.7 | 61.3 | 60.2 | 61.3 |
| Subtotal----------do---- | 50.0 | 56.6 | 65.2 | 61.0 | 67.4 |
| U.S. producers------do---- | 50.0 | 43.4 | 34.8 | 39.0 | 32.6 |
| Total-------------do---- | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

1/ Shares supplied by imports may be overstated, and shares supplied by U.S. producers may be understated, especially with respect to standard and tubes, because U.S. producers' shares are based on the AISI's shipments data, and not all producers report to the AISI.

2/ Less than 0.05 percent.

Source: Compiled from AISI data and from official statistics of the U.S. Department of Commerce.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Table 17.--Standard and line pipes and tubes: Shares of U.S. consumption, by specified sources, 1982-84, January 1984, and January 1985

(In percent)

| Item and source | 1982 | 1983 | 1984 | January 1984 | January 1985 |
|---|---|---|---|---|---|
| Standard pipes and tubes: | | | | | |
| Venezuela | 0.3 | 0.7 | 2.2 | 0.2 | 2.6 |
| Thailand | - | - | 1/ | - | 1/ |
| Brazil | 1.4 | 2.9 | 8.9 | 9.1 | 6.9 |
| Mexico | 1.5 | 5.4 | 4.6 | 5.8 | 2.9 |
| Spain | .3 | 1.1 | 3.9 | 4.2 | 4.1 |
| Republic of Korea | 23.8 | 31.8 | 23.7 | 23.1 | 19.0 |
| Taiwan | 6.4 | 7.8 | 1.5 | 0 | 2.0 |
| All other | 22.8 | 15.7 | 28.4 | 23.7 | 35.0 |
| Total imports | 56.5 | 65.4 | 73.2 | 66.8 | 72.5 |
| Line pipes and tubes: | | | | | |
| Venezuela | .3 | 1.5 | 7.5 | 2.2 | 14.4 |
| Thailand | - | - | - | - | - |
| Brazil | 2.0 | 3.5 | 2.4 | 1.7 | 12.2 |
| Mexico | 1.5 | 5.6 | 6.9 | 13.5 | 3.3 |
| Spain | .3 | .1 | .2 | - | - |
| Republic of Korea | 9.9 | 12.7 | 13.1 | 14.0 | 10.1 |
| Taiwan | .6 | .1 | .4 | - | 1.0 |
| All other | 25.3 | 12.4 | 18.8 | 18.0 | 10.0 |
| Total | 38.7 | 35.9 | 49.3 | 49.4 | 56.5 |
| Total, standard and line pipes and tubes: | | | | | |
| Venezuela | .3 | .9 | 3.9 | .8 | 6.0 |
| Thailand | - | - | 1/ | - | 1/ |
| Brazil | 1.6 | 3.1 | 6.7 | 6.7 | 8.3 |
| Mexico | 1.5 | 5.5 | 5.4 | 8.3 | 3.0 |
| Spain | .3 | .8 | 2.6 | 2.8 | 2.8 |
| Republic of Korea | 18.7 | 26.2 | 20.1 | 20.7 | 16.5 |
| Taiwan | 4.3 | 5.5 | .7 | .5 | 1.7 |
| All other | 23.3 | 14.6 | 25.8 | 21.5 | 28.9 |
| Total | 50.0 | 56.6 | 65.2 | 61.0 | 67.4 |

1/ Less than 0.05 percent.

Source: Compiled from AISI data and from official statistics of the U.S. Department of Commerce.

Note.--Because of rounding, figures may not add to the totals shown.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Product 2.--ASTM A-53 standard pipe, carbon welded, black, plain end, 6-5/8-inch outside diameter (6-inch nominal), 0.280-inch wall thickness.

Product 3.--API 5L line pipe, carbon welded, black, plain end, 4-1/2-inch diameter, 0.188-inch wall thickness.

Product 4.--API 5L line pipe, carbon welded, black, plain end, 8-5/8-inch diameter, 0.188-inch wall thickness.

Standard pipes and tubes.--Seven U.S. producers reported some selling price data on product 1, one of the two standard pipe products for which information was requested. 1/ In 1984, the seven U.S. producers accounted for approximately 95 percent of total U.S. shipments of standard pipes and tubes, as reported by the AISI. The major importer of this product from Venezuela provided price data. This importer accounted for approximately * * * percent of the tonnage of imports under investigation from Venezuela in 1984, according to the U.S. Customs Service's net import file. 2/ One major importer of Thai-produced pipe and tube reported requested price data. 3/

The weighted-average net selling prices reported by U.S. producers and the converted Venezuelan import prices for 1-inch nominal diameter standard pipe are shown in table 18. U.S. producers' quarterly selling prices per 100 hundred feet of domestically produced, 1-inch nominal diameter, schedule 40 standard pipe (product 1) decreased irregularly from $44.24 in January-March 1982 to $32.92 in July-September 1983, or by 26 percent. The price then fluctuated from October-December 1983 to January-February 1985, yielding a 19-percent overall decrease from January-March 1982 to January-February 1985.

The selling price of Venezuelan-produced product 1 increased from * * * in July-September 1983 (the first period for which imported prices were reported) to * * * in October-December 1984, or by * * * percent, but then decreased to * * * in January-February 1985, yielding an overall increase of * * * percent over the period July-September 1983 to January-February 1985. The imported standard pipe undersold the competing domestically produced pipe in each quarter in which prices could be compared. Margins of underselling ranged from * * * percent (* * *) in October-December 1984 to * * * percent (* * *) in January-March 1984 and averaged * * * percent.

* * *, the importer contracting for the all of the scheduled shipment of 11,023 tons of Thai-produced standard pipe, reported ex-dock, duty-paid prices for the estimated * * * percent of the imported product it has presold. The reported price per hundred feet of product 1 scheduled for delivery in

---

1/ Only one U.S. producer reported price data for product 2.

2/ No other importers of pipe and tube from Venezuela responded to the questionnaire. The responding importer provided price data on the basis of metric tons in lieu of the requested prices per 100 feet. The Commission's staff converted the metric ton prices to a per-hundred-feet basis using conversion factors reported by U.S. producers (the importer did not report the requested conversion factor).

3/ A second importer of Thai-produced pipe and tube submitted some aggregate average price data which were not comparable to U.S. producers' prices.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

late-April 1985 was * * *. Although no U.S. producers' price data are available for April 1985, * * * price is * * * percent (* * *) below the U.S. weighted-average price in January-February 1985. 1/

Line pipe.--Three U.S. producers and the responding importer of Venezuelan-produced pipe reported usable net selling price data for one of the two line pipe product specifications. 2/ The three producers accounted for 33 percent of total U.S. shipments of line pipe in 1984. The metric ton prices provided by the major importer of this product from Venezuela were converted to a per-hundred-feet basis. The average net selling prices reported by the U.S. producer and the converted Venezuelan import prices for 4.5-inch diameter, API 5L line pipe are shown in table 19.

U.S. producers' quarterly selling price per hundred feet of domestically produced, 4.5-inch diameter, API 5L line pipe (product 3) fluctuated in a downward trend from $272.75 in January-March 1982 to $198.83 in October-December 1983, or by 27 percent. Reversing this trend, the price then increased to $219.59 in July-September 1984, or by 10 percent over that in October-December 1983 to July-September 1984. The price then decreased by 4 percent, to $211.08, in January-February 1985, yielding a 23-percent overall decline from January-March 1982 to January-February 1985.

The quarterly selling price per 100 hundred feet of imported Venezuelan-produced line pipe increased irregularly from * * * in April-June 1983 (the first period for which imported prices were reported) to * * * in July-September 1984, or by * * * percent. In comparison, the reported price of domestically produced product 3 increased by approximately * * * percent over that in the same period. The imported line pipe undersold the competing U.S. product in each quarter for which comparable prices were available. Margins of underselling ranged from * * * percent (* * *) in October-December 1983 to approximately * * * percent (* * *) in January-March 1984 and averaged * * * percent.

## Transportation costs

Domestic producers of welded carbon steel pipes and tubes are concentrated along the eastern seaboard, the west coast, and in the Midwest. The pipes and tubes under investigation from Venezuela enter the United States mainly through the Ports of Houston, TX, and New Orleans, LA. However, many other major U.S. ports are also utilized to a lesser extent for this purpose. A shipment of * * * tons of ASTM A-120 standard pipe produced in Thailand is scheduled to be delivered to the Port of Los Angeles, CA, in * * *.

The paucity of response from U.S. producers and importers to a section of the questionnaire concerning inland transportation costs precludes drawing any conclusions from information received during the current investigation.

---

1/ Weighted-average f.o.b. prices were from U.S. producers located east of the Rocky Mountains, whereas * * *'s price is ex-dock, duty paid, port of Los Angeles, CA.

2/ No line pipe is imported from Thailand.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Barcode:3883503-02 A-549-502 SCO Scope Inquiry - Line Pipe

Table 18.--Standard circular pipes and tubes: U.S. producers' and importer's weighted-average prices to service centers/distributors for schedule 40 standard pipe, 1/ by quarters, January 1982-February 1985

(Per 100 feet)

| Period | U.S. product price | Venezuelan product: Price | Venezuelan product: Margin of underselling: Amount | Venezuelan product: Margin of underselling: Percent |
|---|---|---|---|---|
| | Per 100 feet | | | |
| 1982: | | | | |
| January-March | $44.24 | *** | *** | *** |
| April-June | 45.46 | *** | *** | *** |
| July-September | 44.68 | *** | *** | *** |
| October-December | 38.09 | *** | *** | *** |
| 1983: | | | | |
| January-March | 37.76 | *** | *** | *** |
| April-June | 35.88 | *** | *** | *** |
| July-September | 32.92 | *** | *** | *** |
| October-December | 34.33 | *** | *** | *** |
| 1984: | | | | |
| January-March | 36.33 | *** | *** | *** |
| April-June | 35.34 | *** | *** | *** |
| July-September | 36.41 | *** | *** | *** |
| October-December | 36.72 | *** | *** | *** |
| 1985 (January-February) | 35.80 | *** | *** | *** |

1/ ASTM-A120, schedule 40 standard pipe, carbon welded, black, plain end, 1.315-inch outside diameter, 0.133-inch wall thickness.
2/ Not available.

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Barcode:3883503-02 A-549-502 SCO - Scope Inquiry - Line Pipe

Table 19.--Line pipe: U.S. producers' and importer's weighted-average prices to service centers/distributors, 1/ by quarters, January 1982-February 1985

(Per 100 feet)

| Period | U.S. product price | Venezuelan product | | |
|---|---|---|---|---|
| | | Price | Margin of underselling | |
| | | | Amount | Percent |
| 1982: | | | | |
| January-March | $272.75 | *** | *** | *** |
| April-June | 231.23 | *** | *** | *** |
| July-September | 211.04 | *** | *** | *** |
| October-December | 229.84 | *** | *** | *** |
| 1983: | | | | |
| January-March | 222.86 | *** | *** | *** |
| April-June | 202.26 | *** | *** | *** |
| July-September | 206.67 | *** | *** | *** |
| October-December | 198.83 | *** | *** | *** |
| 1984: | | | | |
| January-March | 216.97 | *** | *** | *** |
| April-June | 215.74 | *** | *** | *** |
| July-September | 219.59 | *** | *** | *** |
| October-December | 215.84 | *** | *** | *** |
| 1985: (January-February) | 211.08 | *** | *** | *** |

1/ API 5L line pipe, carbon welded, black, plain end, 4.5-inch diameter, 0.188-inch wall thickness.
2/ Not available.

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

However, some information can be assembled from recent investigations concerning welded carbon steel pipes and tubes. 1/

The Venezuelan imports enjoy a distinct advantage in the Houston/New Orleans market owing to the substantial inland transportation costs required to deliver the competing U.S.-produced pipe and tube from most U.S. mills. * * *, one of the largest U.S. producers of pipe and tube, * * * estimated transportation costs to be 13 percent of the delivered price of its pipe and tube to the Houston/New Orleans market. 2/ * * *, a major producer of the line and standard pipe and tube covered by this investigation, estimated transportation costs to the Houston/New Orleans market area to be 10 percent of the delivered price of pipe and tube produced at its * * *, (13 percent from * * *). On the other hand, * * * stated that the Chicago area (* * *) was significantly insulated from import competition owing to prohibitive inland transportation costs confronting importers.

In the Los Angeles/San Francisco market area, Thai-produced standard pipes and tubes enjoy a certain inland freight advantage over most U.S. mills. * * *, the importer contracting for the scheduled shipment of * * * tons of standard pipe, reported that the Thai product will be sold primarily in southern California. The importer stated that transport costs preclude sales of the Thai product east of the Rocky Mountains. 3/

Purchasers of standard pipe located on the west coast reported that inland transport costs from mills such as * * * or * * * made delivered prices from those producers prohibitive. * * * estimated transportation costs to the Los Angeles/San Francisco market area to be 15 percent of the delivered price of pipes and tubes produced at its mill in * * * (20 percent from its mill in * * *). * * * estimated transportation costs to the Los Angeles/San Francisco market area to be 19 percent of the delivered price of pipes and tubes produced at its mills in * * * and * * *. However, several U.S. producers of standard pipes and tubes are located on the west coast. * * * estimated transportation costs to be 2 percent of the delivered price of their pipe sold in the Los Angeles/San Francisco area.

## Exchange rates

Indexes of the nominal and real exchange rates of the Venezuelan bolivar and the Thai baht relative to the U.S. dollar are shown in table 20. Exchange rate indexes in table 20 are based on rates expressed in U.S. dollars per foreign currency unit. The real exchange rate is determined by adjusting the nominal exchange rate for differences in the rate of inflation in Venezuela and Thailand relative to the inflation rate in the United States.

---

1/ Investigations Nos. 731-TA-131, 132, and 138 and 701-TA-220.

2/ Examining the Houston/New Orleans market in 1983, * * * shipped * * * tons by truck, with freight charges estimated to be 14 percent (* * * per ton) of the delivered price, and * * * tons by rail, with freight charges estimated to be 10 percent (* * * per ton) of the delivered price.

3/ Telephone inquiry on Mar. 26, 1985, * * *.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Table 20.--Nominal and real exchange rate indexes between the U.S. dollar and the Venezuelan bolivar and the Thai baht, by quarters, January 1982-December 1984

(January-March 1982=100.0)

| Period | Venezuelan Bolivar | | Thai Baht | |
|---|---|---|---|---|
| | Nominal | Real | Nominal | Real |
| 1982: | | | | |
| January-March | 100.0 | 100.0 | 100.0 | 100.0 |
| April-June | 100.0 | 101.6 | 100.0 | 100.2 |
| July-September | 100.0 | 102.3 | 100.0 | 98.7 |
| October-December | 100.0 | 101.7 | 100.0 | 99.1 |
| 1983: | | | | |
| January-March | 100.0 | 108.3 | 100.0 | 99.6 |
| April-June | 99.9 | 106.8 | 100.0 | 100.3 |
| July-September | 99.8 | 109.0 | 100.0 | 101.1 |
| October-December | 99.8 | 110.4 | 100.0 | 100.8 |
| 1984: | | | | |
| January-March | 77.1 | 87.8 | 100.0 | 96.9 |
| April-June | 57.2 | 68.1 | 100.0 | 95.2 |
| July-September | 57.2 | 1/ | 100.0 | 94.9 |
| October-December | 57.2 | 1/ | 90.0 | 1/ |

1/ Not available.

Source: International Monetary Fund, International Financial Statistics.

In nominal terms, the Venezuelan bolivar held essentially constant from January-March 1982 to October-December 1983. The nominal value of the bolivar vis-a-vis that of the U.S. dollar then depreciated by 43 percent from October-December 1983 to October-December 1984. In real terms the bolivar appreciated by 10 percent from January-March 1982 to October-December 1983. The real U.S. dollar/bolivar exchange rate then depreciated by 38 percent from October-December 1983 to April-June 1984.

The Thai baht maintained a constant nominal exchange rate vis-a-vis that of the U.S. dollar from January-March 1982 to July-September 1984. The baht then depreciated by 10 percent in nominal terms from July-September 1984 to October-December 1984. After adjusting for inflation, the baht depreciated by 5 percent from January-March 1982 to July-September 1984.

## Lost sales

The Commission received lost sales allegations from only one domestic producer. Petitioner indicated at the public conference that lost sales information is very difficult to obtain, because their customers do not inform them when they buy pipe from foreign producers, and, in fact, often do not know the origin of the pipe, except that it may be imported.

One U.S. pipe and tube producer reported seven specific instances, involving two firms, in which it had allegedly lost sales to imports from Venezuela. The allegations amounted to * * * short tons of fence tube during June-September 1984. The same producer reported four specific instances in which it had allegedly lost sales to imports from Thailand to be delivered in January-March 1985. The allegations concerning Thailand amounted to * * * short tons. The Commission investigated all 11 allegations.

In the seven allegations concerning imports from Venezuela, the purchasers stated they have never purchased pipe or tube produced in Venezuela. Of the four firms to which sales were allegedly lost to competition from Thailand, one reported it had purchased approximately * * * tons of Thai-produced pipe to be delivered in April 1985. This buyer cited the Thai pipe's lower price as his primary reason for purchasing the imported product. The remaining three firms reported they had not purchased pipe imported from Thailand. Details of the allegations are discussed below.

* * * was cited in four allegations totaling * * * tons of Venezuelan fence tube during June-September 1984. * * *, purchasing manager for the firm, denied the allegations, stating that his firm has never purchased Venezuelan pipe or tube.

* * * was cited in three allegations totaling * * * tons of Venezuelan fence tube during June-September 1984. * * * denied the allegations, stating that his firm has never purchased Venezuelan pipe or tube.

* * * was cited in an allegation involving * * * tons of Thai standard pipe for January-March 1985 arrival. * * * purchasing agent for the firm, confirmed having purchased approximately * * * tons of Thai standard pipe at the alleged price of * * * per ton, * * * percent below the delivered price offered by the U.S. producer. * * * indicated that the product he requires, * * *. He noted that the U.S.-produced product is not price competitive because of prohibitively high transportation costs.

* * * was cited in an allegation involving * * * tons of Thai standard pipe for arrival in January-March 1985. * * *, denied the allegation, stating that his firm has never purchased or ordered pipe or tube produced in Thailand.

* * * was cited in an allegation involving * * * tons of Thai standard pipe for arrival in January-March 1985. * * *, purchaser for the firm, denied the allegation, stating that her firm has never purchased or ordered pipe or tube produced in Thailand.

* * * was cited in an allegation involving * * * tons of Thai standard pipe for arrival in January-March 1985. * * *, purchaser for the firm, denied the allegation, stating that her firm has never purchased or ordered pipe or tube produced in Thailand.

The following lost sales information concerning the pipes and tubes currently under investigation was collected in a recent investigation 1/ involving Venezuela:

---

1/ Investigation No. 731-TA-212 (Preliminary), Certain Welded Carbon Steel Pipes and Tubes from Venezuela.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

One U.S. pipe and tube producer reported 15 specific instances in which it had allegedly lost sales to imports from Venezuela. The allegations amounted to * * * short tons of fence tube and covered the period June-September 1984. In 14 of the 15 allegations concerning imports from Venezuela, which amounted to * * * short tons, the purchasers stated that they had not purchased the Venezuelan product. In one allegation involving * * * short tons of Venezuelan fence tube, the buyer stated that he had purchased approximately * * * tons of the Venezuelan product. This buyer cited the Venezuelan tube's lower price as his primary reason for purchasing the imported product. Details of the allegations are discussed below.

* * * was cited in four allegations totaling * * * tons of Venezuelan fence tube during June-September 1984. * * *, a purchaser for the firm, reported having purchased approximately * * * tons of Venezuelan fence tube during September 1984. He cited the Venezuelan product's lower price as his principal reason for buying the imported product. * * * denied the remaining allegations, stating that the above referenced purchase was "a one-shot deal."

* * * was cited in three allegations totaling * * * short tons of Venezuelan fence tube during July-September 1984. * * *, a purchaser for the firm, denied the allegation. * * * stated that his firm had purchased approximately * * * tons of Venezuelan pipe about 1 year ago, reporting availability as his primary reason for purchasing the imported product.

* * * was cited in three allegations totaling * * * short tons of Venezuelan fence tube during July-September 1984. * * *, purchaser for the firm, denied the allegation. * * * stated that his firm had purchased Venezuelan pipe approximately 5 years ago but has purchased none since then.

* * * was cited in three allegations totaling * * * tons of Venezuelan fence tube during June-September 1984. * * *, a purchaser for the firm, denied the allegation, stating that his firm has never purchased Venezuelan pipe or tube.

* * * was cited in two allegations totaling * * * tons of Venezuelan fence tube during August and September 1984. * * *, a purchaser for the firm, denied the allegation, stating that his firm has never purchased Venezuelan pipe or tube.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Barcode:3883503-02 A-549-502 SCO - Scope Inquiry - Line Pipe

A-43

**APPENDIX A**

**COMMISSION'S FEDERAL REGISTER NOTICE OF INVESTIGATION**

A-43

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Barcode:3883503-02 A-549-502 SCO - Scope Inquiry - Line Pipe

## INTERNATIONAL TRADE COMMISSION

**[Investigations Nos. 701-TA-242 (Preliminary); 731-TA-252 and 253 (Preliminary)]**

### Certain Welded Carbon Steel Pipes and Tubes From Thailand and Venezuela

**AGENCY:** United States International Trade Commission.

**ACTION:** Institution of preliminary countervailing duty and antidumping investigations and scheduling of a conference to be held in connection with the investigations.

**SUMMARY:** The Commission hereby gives notice of the institution of preliminary countervailing duty investigation No. 701-TA-242 (Preliminary) under section 703(a) of the Tariff Act of 1930 (19 U.S.C. 1671b(a)) to determine whether there is a reasonable indication that an industry in the United States is materially injured, or is threatened with material injury, or the establishment of an industry in the United States is materially retarded, by reason of imports from Venezuela of certain welded carbon steel pipes and tubes [1] which are alleged to be subsidized by the Government of Venezuela. As provided in section 703(a), the Commission must complete preliminary countervailing duty investigations in 45 days, or in this case by April 15, 1985.

The Commission also gives notice of the institution of preliminary antidumping investigations Nos. 731-TA-252 and 253 (Preliminary) under section 733(a) of the Tariff Act of 1930 (19 U.S.C. 1673b(a)) to determine whether there is a reasonable indication that an industry in the United States is materially injured, or is threatened with material injury, or the establishment of an industry in the United States is materially retarded, by reason of imports from Thailand and Venezuela of certain welded carbon steel pipes and tubes,[1] which are alleged to be sold in the United States at less than fair value. As provided in section 733(a), the Commission must complete preliminary antidumping investigations in 45 days, or in these cases by April 15, 1985.

For further information concerning the conduct of these investigations and rules of general application, consult the Commission's Rules of Practice and Procedure, part 207, subparts A and B (19 CFR part 207), and part 201, subparts A through E (19 CFR part 201).

**EFFECTIVE DATE:** February 28, 1985.

**FOR FURTHER INFORMATION CONTACT:** Bruce Cates (202-523-0369), Office of Investigations, U.S. International

[1] For purposes of these investigations, the term "certain welded carbon steel pipes and tubes" covers welded carbon steel pipes and tubes of circular cross section 0.375 inch or more but not over 16inches in outside diameter, provided for in items 610.3208, 610.3209, 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258, and 610.4925 of the Tariff Schedules of the United States Annotated (TSUSA). Prior to Apr. 1, 1984, these pipes and tubes were provided for in TSUSA items 610.3208, 610.3209, 610.3231, 610.3232, 610.3241, 610.3244, and 610.3247

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

A-44

Barcode:3883503-02 A-549-502 SCO - Scope Inquiry - Line Pipe

Trade Commission, 701 E Street NW., Washington, DC 20436.

**SUPPLEMENTARY INFORMATION:**

**Background**

These investigations are being instituted in response to petitions filed on February 28, 1985, and amended on March 12, 1985, by counsel for the standard pipe subcommittee and the line pipe subcommittee of the Committee on Pipe and Tube Imports, and for each of the individual manufacturers of standard pipe and line pipe that are members of those subcommittees.

**Participation in the Investigations**

Persons wishing to participate in these investigations as parties must file an entry of appearance with the Secretary to the Commission, as provided in § 201.11 of the Commission's rules (19 CFR 201.11), not later than seven (7) days after publication of this notice in the **Federal Register**. Any entry of appearance filed after this date will be referred to the Chairwoman, who will determine whether to accept the late entry for good cause shown by the person desiring to file the entry.

**Service List**

Pursuant to § 201.11(d) of the Commission's rules (19 CFR 201.11(d)), the Secretary will prepare a service list containing the names and addresses of all persons, or their representatives, who are parties to these investigations upon the expiration of the period for filing entries of appearance. In accordance with § 201.16(c) of the rules (19 CFR 201.16(c)), each document filed by a party to the investigations must be served on all other parties to the investigations (as identified by the service list), and a certificate of service must accompany the document. The Secretary will not accept a document for filing without a certificate of service.

**Conference**

The Director of Operations of the Commission has scheduled a conference in connection with these investigations for 9:30 a.m. on March 22, 1985, at the U.S. International Trade Commission Building, 701 E Street NW., Washington, DC. Parties wishing to participate in the conference should contact Bruce Cates (202–523–0369) not later than March 21, 1985, to arrange for their appearance. Parties in support of the imposition of antidumping and/or countervailing duties in these investigations and parties in opposition to the imposition of such duties will each be collectively allocated one hour within which to make an oral presentation at the conference.

**Written Submissions**

Any person may submit to the Commission on or before March 26, 1985, a written statement of information pertinent to the subject of the investigations, as provided in § 207.15 of the Commission's rules (19 CFR 207.15). A signed original and fourteen (14) copies of each submission must be filed with the Secretary to the Commission in accordance with § 201.8 of the rules (19 CFR 201.8). All written submissions except for confidential business data will be available for public inspection during regular business hours (8:45 a.m. to 5:15 p.m.) in the Office of the Secretary to the Commission.

Any business information for which confidential treatment is desired must be submitted separately. The envelope and all pages of such submissions must be clearly labeled "Confidential Business Information." Confidential submissions and requests for confidential treatment must conform with the requirements of § 201.6 of the Commission's rules (19 CFR 201.6, as amended by 49 FR 32569, Aug. 15, 1984).

**Authority:** These investigations are being conducted under authority of the Tariff Act of 1930, title VII. This notice is published pursuant to § 207.12 of the Commission's rules (19 CFR 207.12).

Issued: March 13, 1985

By order of the Commission.

**Kenneth R. Mason,**

*Secretary.*

[FR Doc. 85–6314 Filed 3–15–85; 8:45 am]

BILLING CODE 7020-02-M

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Barcode:3883503-02 A-549-502 SCO - Scope Inquiry - Line Pipe

A-46

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

# APPENDIX B

## CALENDAR OF WITNESSES WHO APPEARED AT THE COMMISSION'S CONFERENCE

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

CALENDAR OF PUBLIC CONFERENCE

Investigations Nos. 701-TA-242 (Preliminary)
and 731-TA-252 and 253 (Preliminary)

CERTAIN WELDED CARBON STEEL PIPES AND TUBES
FROM THAILAND AND VENEZUELA

Those listed below appeared as witnesses at the United States International Trade Commission conference in connection with the subject investigations which began at 9:30 a.m., March 22, 1985, in the Hearing Room of the USITC Building, 701 E Street, N.W., Washington, DC.

In support of the imposition of countervailing duties and antidumping duties

Roger B. Schagrin, P.C.--Counsel
Washington, DC
on behalf of

The Committee on Pipe and
Tube Imports and Individual
Members of the Standard
and Line Pipe Subcommittees

Roger B. Schagrin)
Paul W. Jameson )--of Counsel

In opposition to the imposition of countervailing duties and antidumping duties

Barnett & Alagia--Counsel
Washington, DC

on behalf of

Thai Steel Pipe Industry Co., Ltd.
Thai Union Steel Co. Ltd.
Saha Thai Steel Pipe Co., Ltd.
Siam Steel Pipe Import Export Co., Ltd.
First Steel Industry Co.

P. Lance Graef--ICF Inc.

Keith L. Baker )
Richard A. Gladstone)--of Counsel

Mudge, Rose, Guthrie, Alexander and Ferdon--Counsel
Washington, DC

on behalf of

Venezuelan Steel Producers
and Exporters

David Palmeter--of Counsel

Barcode:3883503-02 A-549-502 SCO - Scope Inquiry - Line Pipe

A-49

## APPENDIX C

## PREVIOUS COMMISSION INVESTIGATIONS

A-49

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Certain welded carbon steel pipes and tubes: Pending and recently terminated title VII investigations and outstanding dumping/countervailing orders, most recent dumping/subsidy margins, and import/consumption ratios, by countries, 1982-84

| Item | Weighted-average margin | Date of bond or order 1/ | Ratio of imports to apparent consumption | | |
|---|---|---|---|---|---|
| | | | 1982 | 1983 | 1984 |
| Standard pipes and tubes not over 16 inches in outside diameter: | | | | | |
| Pending anti-dumping investigations: | | | | | |
| Thailand | 2/ | 2/ | - | - | 3/ |
| Venezuela | 2/ | 2/ | 0.3 | .7 | 2.2 |
| Pending countervailing duty investigation: | | | | | |
| Venezuela | 2/ | 2/ | .3 | .7 | 2.2 |
| Outstanding countervailing order: | | | | | |
| Korea | 1.88 | Feb. 15, 1983 | 23.8 | 31.8 | 23.7 |
| Recently terminated countervailing duty investigation: | | | | | |
| Mexico 4/ | .67-23.65 | Jan. 31, 1985 | 1.5 | 5.4 | 4.6 |
| Line pipes and tubes not over 16 inches in outside diameter: | | | | | |
| Pending anti-dumping investigation: | | | | | |
| Venezuela | 2/ | 2/ | .3 | 1.5 | 7.5 |
| Pending countervailing duty investigation: | | | | | |
| Venezuela | 2/ | 2/ | .3 | 1.5 | 7.5 |
| Outstanding countervailing order: | | | | | |
| Korea | 1.88 | Feb. 15, 1983 | 9.9 | 12.8 | 13.1 |

Continued. See footnotes at end of table.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

Certain welded carbon steel pipes and tubes: Pending and recently terminated title VII investigations and outstanding dumping/countervailing orders, most recent dumping/subsidy margins, and import/consumption ratios, by countries, 1982-84--Continued

| Item | Weighted-average margin | Date of bond or order 1/ | Ratio of imports to apparent consumption | | |
|---|---|---|---|---|---|
| | | | 1982 | 1983 | 1984 |
| Line pipes...cont.: | | | | | |
| Recently terminated countervailing duty investigation: | | | | | |
| Mexico 4/ | 0.67-23.65 | Jan. 31, 1985 | 1.5 | 5.6 | 6.9 |
| Standard pipes and tubes not over 4.5 inches in outside diameter: | | | | | |
| Recently terminated antidumping investigations: | | | | | |
| Brazil 5/ | 3.23 | Dec. 31, 1984 | 1.0 | 2.5 | 9.0 |
| Spain 6/ | 40.75 | Dec. 31, 1984 | .3 | .9 | 5.1 |
| Recently terminated countervailing duty investigation: | | | | | |
| Spain 6/ | 1.14 | Oct. 10, 1984 | .3 | .9 | 5.1 |
| Outstanding antidumping orders: | | | | | |
| Korea | .9 | May 7, 1984 | 7/ 18.5 | 7/ 22.9 | 7/ 24.8 |
| Taiwan | 9.7 | May 7, 1984 | 5.9 | 6.9 | 8/ .3 |

1/ Date posting of bond required or date order issued.

2/ This is one of the instant investigations. To date, there is no determination of sales at less than fair value by Commerce nor requirement for the posting of bond.

3/ Less than 0.05 percent.

4/ Terminated effective Apr. 2, 1985, following withdrawal of petition.

5/ Terminated effective Mar. 20, 1985, following withdrawal of petition.

6/ Terminated effective Feb. 4, 1985, following withdrawal of petition.

7/ Imports at less than fair value from this source constituted approximately * * *, * * *, and * * * percent of consumption of all standard pipes and tubes in 1982, 1983, and 1984, respectively.

8/ Imports at less than fair value from this source constituted approximately 0.1 percent of consumption of all standard pipes and tubes in 1984.

Source: Compiled from data contained in various reports of the U.S. International Trade Commission and from the U.S. Department of Commerce.

Barcode:3883503-02 A-549-502 SCO - Scope Inquiry - Line Pipe

A-52

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/26/19 2:31 PM, Submission Status: Approved

**Tab 3**

LETTER FROM CURTIS, MALLET-PREVOST, COLT & MOSLE LLP TO SEC OF
COMMERCE PERTAINING TO SAHA THAI COMMENTS ON SCOPE INQUIRY
(Dec. 20, 2019) (P.R. 21-31)

Barcode:3883995-01 A-549-502 SCO - Scope Inquiry - Line Pipe

CURTIS

**Curtis, Mallet-Prevost, Colt & Mosle LLP**

Almaty
Beijing
Buenos Aires
Dubai
Frankfurt
Geneva
Houston
London
Mexico City
Milan
Muscat
New York
Nur-Sultan
Paris
Rome

1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

**Telephone +1 202 452 7373**
**Facsimile +1 202 452 7333**
www.curtis.com

**Daniel L. Porter**
Tel: +1 202 452 7340
Fax: +1 202 452 7333
E-Mail: dporter@curtis.com

August 26, 2019

**PUBLIC DOCUMENT**

Case No.: A-549-502

No. Pages: 612

Status: Anti-Circumvention Inquiry
Scope Inquiry

This proceeding is conducted by Enforcement & Compliance, AD/CVD Operations/ VII

This submission contains no business proprietary information.

The Honorable Wilbur Ross
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/Dockets Unit, Room 18022
14th Street & Constitution Avenue, N.W.
Washington, D.C. 20230

Attn: Toni Page & Alexander Cipolla

Re: *Saha Thai's Comments on "Line Pipe" Scope Inquiry*
Circular Welded Carbon Steel Pipe and Tubes from Thailand

Dear Secretary Ross:

On behalf of Saha Thai Steel Pipe Public Co., Ltd. ("Saha Thai"), we hereby submit Saha Thai's comments on the Department's "Line Pipe" Scope Inquiry pursuant to the Department's invitation in its July 29, 2019 letter entitled "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Scope Inquiry on Line Pipe." This submission is timely made pursuant to the

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Barcode:3883995-01 A-549-502 SCO - Scope Inquiry - Line Pipe

CURTIS

**Curtis, Mallet-Prevost, Colt & Mosle LLP**

August 26, 2019
Page 2

Department's memorandum to the file dated August 22, 2019. This submission contains no business proprietary information.

If you have any questions, please contact the undersigned.

Respectfully submitted,

/s/ Daniel L. Porter

Daniel L. Porter
Tung Nguyen
Gina Colarusso

**Curtis, Mallet-Prevost, Colt & Mosle LLP**

*Counsel for Saha Thai*

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

**Circular Welded Carbon Steel Pipes and Tubes from Thailand**

**A-549-502**
**Scope Inquiry**
**SCO – Line Pipe**

## CERTIFICATE OF ACCURACY AND COMPLETENESS

I, Daniel L. Porter, of Curtis, Mallet-Prevost, Colt & Mosle LLP, counsel to Saha Thai Steel Pipe Public Co., Ltd. ("Saha Thai"), certify that I have read the attached : ***Saha Thai's Comments on "Line Pipe" Scope Inquiry***, ***dated August 26, 2019***, pursuant to the Scope Inquiry of Circular Welded Carbon Steel Pipes and Tubes from Thailand, A-549-502. In my capacity as an adviser, counsel, preparer or reviewer of this submission, I hereby certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that I am filing a copy of this signed certification with this submission to the U.S. Department of Commerce and that I will retain the original for a five-year period commencing with the filing of this document. The original will be available for inspection by U.S. Department of Commerce officials.

Daniel L. Porter
Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, NW
Washington, DC 20006

Dated: August 26, 2019

**Circular Welded Carbon Steel Pipes and Tubes from Thailand**

**A-549-502**
**Scope Inquiry**
**SCO – Line Pipe**

**PUBLIC**
**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing submission has been served this day, by hand delivery, upon the following persons:

| | |
|---|---|
| Roger B. Schagrin, Esq.<br>On behalf of Wheatland Tube<br>**SCHAGRIN ASSOCIATES**<br>900 7th Street, NW<br>Suite 500<br>Washington, DC 20001 | Robert George Gosselink, Esq.<br>On behalf of Thai Premium Pipe Company Ltd.<br>**TRADE PACIFIC PLLC**<br>660 Pennsylvania Avenue, SE<br>Suite 401<br>Washington, DC 20002 |
| Alan H. Price, Esq.<br>On behalf of Independence Tube Corporation, et al.<br>**WILEY REIN LLP**<br>1776 K Street, N.W.<br>Washington, DC 20006 | |

Daniel L. Porter
Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, NW
Washington, DC 20006

Dated: August 26, 2019

**PUBLIC DOCUMENT**

Case No.: A-549-502

No. Pages: 612

Status: Anti-Circumvention Inquiry
Scope Inquiry

This proceeding is conducted by Enforcement & Compliance, AD/CVD Operations/ VII

This submission does not contain any business proprietary information.

# SAHA THAI STEEL'S COMMENTS ON SCOPE INQUIRY

*Circular Welded Steel Pipes and Tubes from Thailand*

Daniel L. Porter
Tung Nguyen
Gina Colarusso

**Curtis, Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, N.W.
Washington, D.C., 20006
(202) 452-7327

August 26, 2019

Barcode:3883995-01 A-549-502 SCO - Scope Inquiry - Line Pipe

**TABLE OF CONTENTS**

**Page #**

INTRODUCTION AND SUMMARY OF COMMENTS ........ 1

COMMENTS ........ 4

A. The Department's Initiation of This Scope Inquiry Is Unlawful ........ 4

B. The Original Investigation Documents Demonstrate Unequivocally That Line Pipe (Including Dual-Stenciled Pipe) Was Excluded From the Scope of The AD Order on Circular Welded Steel Pipes And Tubes From Thailand ........ 10

C. Additional Context Provided By The Department's Past Scope Definitions In Standard Pipe AD Cases Further Support A Finding That Line Pipe Is Excluded From CWP AD Cases ........ 22

D. Because Line Pipe (Including Dual-Stenciled Pipe) Is Excluded From the Scope of the Underlying AD Order, The Department Also Needs to Put Petitioner's Allegation of Circumvention To Rest ........ 24

CONCLUSION ........ 27

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Barcode:3883995-01 A-549-502 SCO - Scope Inquiry - Line Pipe
PUBLIC DOCUMENT

## INTRODUCTION AND SUMMARY OF COMMENTS

On behalf of Saha Thai Steel Pipe Public Co., Ltd. ("Saha Thai"), we respectfully submit comments on the scope language "matter" identified in the Department's letter to interested parties dated July 29, 2019.[1] These comments are timely filed in accordance with the Department's memorandum dated August 22, 2019.[2] As detailed further below, Saha Thai makes four primary comments.

**Saha Thai Comment #1**: All indications are that the Department has intended to initiate a "scope inquiry" to decide whether the scope language set forth in the antidumping duty (AD) order on circular welded carbon steel pipes and tubes from Thailand includes "line pipe" or "products that are dual stenciled." However, such Department initiation of a scope inquiry is unlawful and void *ab initio* because the Department has not complied with its own regulations for the initiation of a scope inquiry. Accordingly, Saha Thai requests that the Department terminate the current scope inquiry immediately.

**Saha Thai Comment #2**: The Department's regulations governing the conduct of scope inquiries, Section 351.225 of the Department's AD-CVD regulations make clear that the Department will first examine original investigation documents to determine whether the inquiry merchandise is included or excluded from the scope of the AD

[1] Letter to Interested Parties f rom Steven Presing, *Circular Welded Carbon Steel Pipes and Tubes from Thailand*: Scope Inquiry on Line Pipe, dated July 29, 2019.

[2] Memorandum to the File from Alex Cipolla, *Ex Parte Telephone Calls: Extension of NFI Deadline*, dated Aug. 22, 2019.

- 1 -
Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

order.[3] On this legal requirement – the need to examine original investigation documents – there can be little doubt. Indeed, just days ago, in a decision involving imported pipe products, the Court of International Trade reiterated this important legal requirement for Commerce Department scope inquiries.[4]

In the instant case, the original investigation documents demonstrate unequivocally that line pipe and dual-stenciled pipe were never intended to be included in the scope of the AD order covering CWP from Thailand. The Commerce Department's own *Initiation Notice* could not be more clear that the petition was explicitly amended to exclude line pipe from the scope of the CWP from Thailand AD case. The Commerce Department's own *Final Determination* could not be more clear in failing to include line pipe HTS codes in the final scope language adopted for the CWP from Thailand AD case. And the International Trade Commission's preliminary and final determinations specifically address the distinct differences between standard pipe and line pipe and explicitly state that the underlying investigation of CWP from Thailand *does not include* line pipe. Finally, during the sunset case of the CWP from Thailand AD Order, the petitioner admitted that both dual-stenciled pipe and line pipe were excluded from the CWP AD Order.

**<u>Saha Thai Comment #3:</u>** Additional context provided by the Department's past scope definitions in standard pipe AD cases further support a finding that line pipe is

[3] 19 C.F.R. § 351.225(k)(1).

[4] *TMB 440AE, Inc. v. United States*, Slip Op. 19-109 (Ct. Int'l Trade, Aug. 13, 2019).

excluded from CWP AD cases. Indeed, in every single past AD case involving circular welded steel pipe (i.e., standard pipe), line pipe has been excluded from the scope.

**Saha Thai Comment #4**: Given that the original AD investigation documents make clear that "line pipe" and "products that are dual-stenciled" are outside the scope of the CWP AD order, the Department must terminate its minor-alterations anti-circumvention investigation. The applicable governing law leaves no doubt that the Commerce Department may not proceed with a minor-alternations anti-circumvention investigation when it is clear that the inquiry merchandise was excluded from the original AD order.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Barcode:3883995-01 A-549-502 SCO - Scope Inquiry - Line Pipe
PUBLIC DOCUMENT

## COMMENTS

### A. The Department's Initiation of This Scope Inquiry Is Unlawful

All indications are that the Department has intended to initiate a "scope inquiry" to decide whether the scope language set forth in the antidumping duty (AD) order on circular welded carbon steel pipes and tubes from Thailand includes "line pipe" or "products that are dual stenciled." The Department's July 29th letter references the phrase "Scope Inquiry" under the case investigation number. Moreover, in its electronic docket system (ACCESS), the Department itself identified its July 29th letter as a "scope inquiry."[5] However, the Department's initiation of this scope inquiry is unlawful; indeed it is void *ab initio* because the Department completely failed to adhere to its own regulations that govern the initiation and conduct of scope inquiries.

The Department has a specific regulation devoted to scope inquiries, namely, Section 351.225 of the Commerce Department's AD-CVD regulations.[6] Indeed, Section 351.225 explicitly states that "this section contains rules regarding scope rulings, requests for scope rulings, procedures for scope inquiries, and standards used in determining whether a product is within the scope of an order or suspended investigation."[7] However, as detailed below, the Department has failed to comply with its own procedures set forth in Section 351.225 for scope inquiry initiations.

---

[5] *See* **Attachment 1** (providing screen shot of ACCESS).

[6] 19 C.F.R. § 351.225.

[7] 19 C.F.R. § 351.225 (emphasis added).

- 4 -
Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

**The Department failed to issue a proper notice of initiation**: Section 351.225(f) requires that the Department issue a "notice of initiation" informing parties of the Department's decision to undertake a scope inquiry.[8] The Department did not comply with this requirement.

The letter to "Interested Parties," dated July 29, 2019, does not even include the word "initiation."[9] Rather, that July 29th letter only refers to a purported argument about scope supposedly proffered by Petitioners in their letter dated June 14, 2019. However, that Petitioners' letter clearly was submitted to the Department filed as part of the Department's separate anti-circumvention inquiry. Moreover, Petitioners' June 14th letter does not contain a formal request for a scope inquiry initiation, nor does it even include a claim that "line pipe" is covered by the existing scope for purposes other than "minor alterations" anti-circumvention. In fact, the very first sentence of Petitioners' June 14th letter reads:

> On behalf of Wheatland Tube Company, Independence Tube Corporation, a Nucor Company, and Southland Tube, Incorporated, a Nucor Company (collectively "Petitioners"), we hereby respond to the June 6, 2019 comments of Saha Thai Steel Pipe (Public) Company Ltd. ("Saha Thai") in the above-referenced *anti-circumvention inquiry*.[10]

---

[8] 19 C.F.R. § 351.225(f).

[9] Letter from Steven Presing, Acting Senior Director, Office VII to Interested Parties, *Circular Welded Carbon Steel Pipes and Tubes from Thailand: Scope Inquiry on Line Pipe*, dated July 29, 2019 (DOC July 29th letter").

[10] Letter from Wheatland Tube Company, Independence Tube Corporation, a Nucor Company, and Southland Tube, Incorporated, a Nucor Company (collectively "Petitioners"), *Circular Welded Carbon Steel Pipes and Tubes from Thailand: Response to Saha Thai's June 6, 2019 Comments*, dated June 14, 2019 at 1. ("Petitioners' June 14th letter")

Thus, there has been no request by an interested party for a scope inquiry, and therefore the Department's July 29th letter cannot constitute a proper Department scope inquiry initiation "by application" in accordance with Section 351.225(c).

Nor can the July 29th letter constitute a "self-initiation" of a scope inquiry by the Department. Nowhere in the Department's July 29, 2019 letter is there any statement that a formal scope inquiry has been self-initiated by the Department. It is hard to see how a Department document that does not contain any form of the word "initiate" or "initiation" can meet the requirements of "notice of initiation of a scope inquiry."

**The Department failed to comply with explicit initiation notice content requirements**:

Section 351.225(f) of the Department's regulations states clearly that any "notice of initiation of scope inquiry" "will include" the following:

(i) A description of the product that is the subject of the scope inquiry; and

(ii) An explanation of the reasons for the Secretary's decision to initiate a scope inquiry;

(iii) A schedule for submission of comments that normally will allow interested parties 20 days in which to provide comments on, and supporting factual information relating to, the inquiry, and 10 days in which to provide any rebuttal to such comments.

The July 29th letter fails to comply with at least two of the three requirements.

First, there is no proper description of the product that is the subject of the scope inquiry. The product is referred to only as "line pipe." There is no real description of that merchandise in the letter. Specifically, the Department has provided no technical

PUBLIC DOCUMENT

description of this term, nor has it provided any guidance as to what distinguishes "line pipe" from the "circular welded carbon steel pipes and tubes" that are within the scope of the order.

Having conducted numerous "line pipe" antidumping and countervailing duty investigations and reviews, the Department is well aware that "line pipe" must be described beyond the addition of the word "line" in front of the word "pipe." Indeed, in its requirements for initiation by application, the Department regulations set forth the following requirements for product descriptions:

> A detailed description of the product, including its technical characteristics and uses, and its current U.S. Tariff Classification number;[11]

In the case of a self-initiation, the Department should be held to the same standard as outside parties. The Department's July 29th letter did not include any discussion of the technical characteristics and uses of line pipe, nor did it include information on the current U.S. Tariff Classification for this type of pipe.

Second, the July 29th letter provides no reasons why the Secretary is initiating a scope inquiry. This is especially troubling as Saha Thai has filed extensive legal and factual information in the formally opened circumvention inquiry showing that "line pipe" cannot be subject to an affirmative circumvention finding. The information on the record regarding the applicability of the circumvention statute is relevant. As the Department is aware, the rules for scope expansions, under the law, are even stricter than for circumvention findings. Moreover, as the Department is also well aware, having

[11] 19 C.F.R. § 351.225(c)(i).

conducted multiple investigations involving "standard pipe" and "line pipe," these products have been considered as separate like products by the U.S. International Trade Commission in case after case.  Thus, there is a strong *prima facie* case that a scope inquiry in this instance is not warranted.  Notwithstanding this overwhelming *prima facie* evidence that "line pipe" falls well outside the scope of the order, the Department has provided no rationale whatsoever for initiating a scope inquiry and subjecting Saha Thai and other parties to a totally unnecessary investigation.

The Department therefore has failed to comply with the specific requirements for a scope inquiry initiation.

The Department cannot simply ignore its own rules for scope inquiries.  Indeed, the Court of International Trade just recently addressed the necessity of the Department complying with its regulations during a scope inquiry proceeding.  In an August 2019 decision, *TMB 440AE, Inc. v. United States*, Slip Op. 19-109 (Ct. Int'l Trade, August 13, 2019), the Court remanded a scope determination to the Department when it found that the Department had failed to comply with its own regulations and consider "(k)(1)" sources when assessing whether certain pipe was within the scope of antidumping duty and countervailing duty orders.  Specifically, the Court ruled that in determining whether a product is included within the scope of an order, the Department must follow its 19 C.F.R. § 351.225(k)(1) requirement to consider "{t}he descriptions of the merchandise

contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission."[12]

**The Department's initiation was not approved by the required government official**:

Finally, even if the Department believes that the July 29th letter can serve as a formal "notice of initiation of a scope inquiry," the initiation is void because the action was not approved by the proper authority. Pursuant to 19 C.F.R.§ 351.225(b), only the Secretary of the U.S. Department of Commerce (the "Secretary") has the legal authority to self-initiate a scope inquiry. However, the July 29, 2019 letter was signed by the Acting Senior Director of E&C Office VII. Under Department Organization Order 40-01, Section 6, the only individual with the authority to act as the "Secretary" is the Assistant Secretary for Enforcement and Compliance.[13] Saha Thai has found no document that allows the Assistant Secretary to delegate his authority to act as "Secretary" to an "Acting Senior Director."

In short, the Department's "initiation" of a scope inquiry is unlawful, indeed it is void *ab initio* because the Department completely failed to adhere to its own regulations that govern the initiation and conduct of scope inquiries.

---

[12] *TMB 440AE, Inc. v. United States*, Slip Op. 19-109 (Ct. Int'l Trade, August 13, 2019) (emphasis added). For the Department's convenience, we provide a copy of the Court's decision in **Attachment 10**.

[13] Available at http://www.osec.doc.gov/opog/dmp/doos/doo40_1.html (Accessed 31 July 2019). The DOO, in relevant part states:

> SECTION 6. ASSISTANT SECRETARY FOR ENFORCEMENT AND COMPLIANCE.
>
> The Assistant Secretary for Enforcement and Compliance (E&C) directs the activities of E&C, and:
>
> . . . . . . Exercises the functions of the "Secretary" and "administering authority" under U.S. Antidumping Duty (AD) and Countervailing Duty (CVD) laws within the meaning of Section 303 and Title VII of the Tariff Act of 1930, as amended; . . . . .

### B. The Original Investigation Documents Demonstrate Unequivocally That Line Pipe (Including Dual-Stenciled Pipe) Was Excluded From the Scope of The AD Order on Circular Welded Steel Pipes And Tubes From Thailand

The Department's regulations governing the conduct of scope inquiries, Section 351.225 of the Department's AD-CVD regulations make clear that the Department will first examine original investigation documents to determine whether the inquiry merchandise is included or excluded from the scope of the AD order.[14] On this legal requirement – the need to examine original investigation documents -- there can be little doubt. Indeed, just days ago, in a decision involving imported pipe products, the Court of International Trade reiterated this important legal requirement for Commerce Department scope inquiries.[15]

In the instant case, the original investigation documents demonstrate unequivocally that line pipe and dual-stenciled pipe were never intended to be included in the scope of the AD order covering CWP from Thailand. Indeed, although the original petition for an AD investigation of circular welded steel pipes and tubes from Thailand (filed over 34 years ago, in 1985) included both circular welded pipe ("standard pipe") and line pipe, pursuant to the Department's request for clarification, the petitioners filed an amended petition ***removing* line pipe from the scope of the petition**. Copies of the

[14] 19 C.F.R. § 351.225(k)(1).

[15] *TMB 440AE, Inc. v. United States*, Slip Op. 19-109 (Ct. Int'l Trade, Aug. 13, 2019). This court case concerned a Commerce Department scope ruling in which Commerce did not analyze original investigation documents to decide whether the actual scope language of the AD order was or was not ambiguous. The Court ruled that Commerce's refusal to examine original investigation documents was unlawful because it was contrary to the Commerce Department's own regulations. *See TMB 440AE* at 12 ("Commerce's failure to consider the "descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary . . . and the Commission," as required by 19 C.F.R. § 351.225(k)(1), in its Final Scope Ruling was not in accordance with law.")

original petition, the amended petition, as well as a letter from the petitioners regarding its partial withdrawal of the petition are provided in Attachments 11, 13, and 14. These documents, as well as the subsequent determinations from the Commerce Department and the International Trade Commission, demonstrate that "line pipe" was explicitly excluded during the original investigation phase by the petitioners. Below we walk through the various original investigation documents.

**The Original Petition and Amended Petition Filed by Petitioner**:

The petition, as originally filed in February of 1985, originally requested an investigation on both standard pipe and line pipe imports from Thailand.[16] Prior to its initiation, however, the Department requested petitioners' counsel to provide certain additional information, documentation, and clarification to support its allegations. Included in the Department's request was "documentation which demonstrates that line pipe is manufactured in Thailand" and "documentation which supports the allegation that line pipe from Thailand is being sold at less than fair value."[17] By amendment dated March 12, 1985, counsel for petitioners clarified that the petition was being filed on behalf of the Standard Pipe Subcommittee and the Line Pipe Subcommittee of the CPTI

[16] *See* Petition for the Imposition of Antidumping Duties on Certain Welded Carbon Steel Pipes and Tube Products from Thailand, filed by Roger B. Schagrin on behalf of Members of Committee on Pipe and Tube Imports, dated Feb. 28, 1985 (provided in **Attachment 11**); *see id.* at 12 ("The product covered by this petition is certain circular welded carbons teel circular pipes and tubes . . . includes "standard pipe" . . . the product also includes "line pipe").

[17] Commerce Department Memorandum to the file, *AD & CVD investigations of pipes and tubes from Thailand & Venezuela*, dated March 7, 1985 (provided in **Attachment 12**).

and by individual manufacturers of standard pipe and line pipe.[18] On March 14, 1985, petitioners filed a letter in which petitioners **amended the scope of the petition against Thailand by taking out line pipe**, stating:

> Petitioners in the above designated investigations . . . hereby withdraw the following portions of the followings petitions . . . A-549-502 and C-549-501. Certain Pipe and Tube Products from Thailand: Petitioners withdraw these petitions insofar as they concern line pipe, TSUS numbers 610.3208 and 3209. Petitioners have ascertained that no Thai company is presently licensed to produce pipe to API specifications, and imports of API line pipe from Thailand are therefore not likely.[19]

**The Department's Initiation Notice**:

In the Department's Notice of Initiation of the original AD Investigation it explains that the petition was originally filed against both standard pipe and line pipe from Thailand and that it was later modified to cover only standard pipe and to exclude "line pipe:" [20]

> The petition, as originally filed, covered both standard pipe, which is defined in the "Scope of Investigation" section of this notice, and line pipe. By amendment dated March 12, 1985, counsel for petitioners clarified that the petition was being filed on behalf of the standard pipe subcommittee and the line pipe subcommittee of the {Committee on Pipe and Tube Imports (CPTI)} and by individual manufacturers of standard pipe and line

[18] *See* Amended Petition for the Imposition of Antidumping Duties on Certain Welded Carbon Steel Pipes and Tube Products from Thailand, filed by Roger B. Schagrin and Paul W. Jameson on behalf of Individual Producer Members of the Subcommittees on Standard and Line Pipe of the Committee on Pipes and Tube Imports, dated March 12, 1985 (provided in **Attachment 13**).

[19] *See* Letter to the Secretary of Commerce from Roger Schagrin and Paul Jameson on behalf of Petitioners, *Certain Welded Carbon Steel Circular Pipe and Tube Products from Thailand and Venezuela: Partial Withdrawal of Petition*, dated March 14, 1985 (provided in **Attachment 14**).

[20] *Certain Circular Welded Carbon Steel Pipes and Tubes From Thailand; Initiation of Antidumping Duty Investigation*, 59 Fed. Reg. 12,068 (Mar. 27, 1985) (provided in **Attachment 2)**.

Barcode:3883995-01 A-549-502 SCO - Scope Inquiry - Line Pipe

PUBLIC DOCUMENT

> pipe. By amendment dated March 14, 1985, **petitioners withdrew the portion of the petition dealing with line pipe**.[21]

Indeed, the Department's Initiation Notice goes on to explain that although the petition was initially filed on behalf of the (full) Committee on Pipe and Tube Imports (CPTI), which included both its Subcommittee on Standard Pipe and Subcommittee on Line Pipe, after the March amendment to the petition, the Department concluded that only the Subcommittee on Standard Pipe (as well as certain individual manufacturers of standard pipe) had standing to file the petition:

> Based on the petition, as amended, we determine that the Subcommittee on Standard Pipe and the following individual manufacturers of standard pipe, who have indicated that they are filing the petition, Bull Moose Tube Company, Western Tube and Conduit Corporation, Maruichi American Corporation, Southwestern Pipe, Inc., Laclede Steel Company, Pittsburgh Tube Company, Allied Tube and Conduit, Century Tube Corporation and Sharon Tube Company, have standing to file with respect to standard pipe. We have determined from the amended petition filed March 12 that the Subcommittee on Line Pipe does not have standing with respect to standard pipe because a majority of its membership does not produce standard pipe.[22]

In short, the Commerce Department's own *Initiation Notice* makes it crystal clear that the original petition was explicitly amended to exclude line pipe from the scope of the CWP from Thailand AD investigation. Saha Thai believes that there can be no clearer evidence that the petition as initiated specifically excluded line pipe. This fact alone should be sufficient to put this scope "inquiry" to rest.

**The Department's Final Determination**

---

[21] *Id.* (emphasis added).

[22] *Id.*

- 13 -

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Further support for the conclusion that line pipe was excluded from the scope of the CWP from Thailand AD investigation can be found in the Department's Final Determination, and specifically the final scope definition included in the Final Determination. The final scope language that the Department adopted in its Final Determination provided as follows:

> Circular welded carbon steel pipes and tubes, with an outside diameter of .375 inch or more but not over 16 inches, of any wall thickness, currently classifiable in the Tariff Schedules of the United States, Annotated (TSUSA), under items 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258 and 610.4925. These products, commonly referred to in the industry as standard pipe or structural tubing, are produced to various ASTM specifications, most notably A-152, A- 53 or A-135. :[23]

The applicable tariff schedule items for "standard pipe" are important here because they demonstrate unequivocally that "line pipe" (including "dual stenciled" pipe) was specifically excluded from the Thailand investigation and subsequent AD order. Indeed, "line pipe" items and "standard pipe" items were mutually exclusive under the applicable tariff schedule. At the time of the petition/original AD investigation, "line pipe" would enter under specific Tariff Schedules of the United States, Annotated (TSUSA) items 610.3208 and 610.3209[24] while "standard pipe" would enter under items 610.3231,

[23] *Id.* at 12068-69; *see also Certain Circular Welded Carbon Steel Pipes and Tubes From Thailand; Preliminary Determination of Sales at Less Than Fair Value*, 50 Fed. Reg. 40,427 (Oct. 3, 1985) (provided in **Attachment 3**); and *Antidumping: Circular Welded Carbon Steel Pipes and Tubes From Thailand; Final Determination of Sales at Less Than Fair Value*, 51 Fed. Reg. 8384 (Jan. 27, 1986) (provided in **Attachment 4**).

[24] *Certain Welded Carbon Steel Pipes And Tubes From Turkey And Thailand (Final)*, Inv. Nos. 701-TA-253 and 731-TA-252, USITC Pub. 1810 at a-1 (Feb. 1986) (provided at **Attachment 5**).

610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258 and 610.4925. TSUSA (1985 version) provides:[25]

| TSUSA Item | Description |
|---|---|
| 61032 | Pipes and tubes and blanks therefor, all the fore-going of iron (except cast iron) or steel: Welded, jointed, or seamed, with walls not thinner than 0.065 inch, and of circular cross section, 0.375 inch or more in outside diameter |
| **61032.08-013** | **Conforming to A.P.I. specifications for line pipe** (Std. 5L, 5LS, or 5LX) |
| 61032.16-19 | Conforming to A.P. I. specifications for oil well tubing |
| 61032.21 | Cold drawn pipes and tubes |
| **61032.31-64** | **Other** |
| **610.4925** | **Pipes and tubes and blanks therefor, all the foregoing of iron (except cast iron) or steel, Other, Other, Not suitable for use in the manufacture of ball or roller bearings, Other than alloy iron or steel, Other, Welded, jointed, or seamed pipes and tubes, Of circular cross section** |

Applying TSUSA (1985 version), a circular welded steel pipe or tube that conformed to API specifications for line pipe (5L, 5 LS or 5 LX) of no more than 16 inches in outside diameter must enter the U.S. under either items 610.3208 or 610.3209. Therefore, it is crystal clear that dual-stenciled products (i.e., pipes that would meet both ASTM specifications for standard pipe and API specifications for line pipe) and other products that only conformed to API specifications for line pipe (single-stenciled) could only be categorized as "line pipe" under TSUSA 610.3208 and 610.3209. [26]

[25] Provided at **Attachment 6**.

[26] Petitioner Wheatland Tube itself in a subsequent sunset review of the AD order on circular welded steel pipes and tubes from Thailand acknowledged that "dual stenciled" pipe is considered as "line pipe" instead of "standard pipe:" "It is likely that Korea, and other countries if no longer subject to the restraints imposed by the Standard Pipe antidumping order, will switch their production from line pipe (whether dual stenciled or not) to standard pipe." *Certain Welded Non-Alloy Steel Pipes And Tubes From Brazil, India, South Korea, Mexico, Taiwan, Thailand, Turkey And Venezuela (Review)*, Prehearing Brief of Wheatland Tube et al (Feb. 29, 2000) at 58-59 (emphasis added), narrative provided at **Attachment 7**.

In sum, a proper understanding of the Department's own Initiation Notice and Final determination demonstrate unequivocally that: (1) "line pipe" was intentionally excluded from the AD order on circular welded steel pipes and tubes from Thailand; and (2) "dual-stenciled" pipe was considered as "line pipe" and therefore also excluded from the AD order on circular welded steel pipes and tubes from Thailand.

**The ITC Injury Determinations**:

The International Trade Commission's preliminary and final determinations made during the original investigation specifically address the distinct differences between standard pipe and line pipe and explicitly state that the underlying investigation of steel pipe from Thailand *does not include* line pipe. For instance, during the original investigation, the ITC explained in its preliminary determination that after the original petition was filed, and during the process of instituting the investigation, "Commerce advised the petitioner that the welded carbon steel pipe and tube products covered by the petitions represented two distinct classes or kinds of products, standard pipe and line pipe."[27] The Commission explained that the petition was subsequently amended to remove from the scope imports of line pipe from Thailand:[28]

> In the process of instituting these investigations, Commerce advised the petitioner that the welded carbon steel pipe and tube products covered by the petitions represented two distinct classes or kinds of products, standard pipe and line pipe. Subsequently, on March 14, 1985, the petitions involving imports from Thailand were withdrawn as they relate to line pipe

[27] *Certain Welded Carbon Steel Pipes and Tubes from Thailand and Venezuela*, Inv. No. 701-TA-242, 731-TA-252-53 (Prelim), USITC Pub. 1680 at 3 (Apr. 1985) (provided at **Attachment 8**).

[28] *Id.*

> because there is no known production in Thailand of line pipe to American Petroleum Institute (API) specifications.[29]

We note that in its preliminary determination, the Commission was also simultaneously considering whether there was a reasonable indication that the domestic industry was materially injured by reason of allegedly less than fair value imports of welded carbon steel line pipes and tubes from Venezuela.[30] For clarity, the Commission explicitly stated that the only imported product at issue in the AD petition regarding imports from Thailand was standard pipes and tubes; whereas the CVD petition regarding imports from Venezuela included both standard pipe and line pipe and the AD petition regarding imports from Venezuela dealt only with line pipe.[31]

Moreover, in its preliminary determination, the Commission explained at length that it has repeatedly addressed the distinctions between standard pipe and line pipe.[32]

> We have addressed the like product question regarding standard pipes and tubes (standard pipe) and line pipes and tubes (line pipe) in prior investigations. In those investigations, the Commission recognized distinctions between standard pipe and line pipe. Standard pipe is manufactured to American Society of Testing and Materials (ASTM) specifications and line pipe is manufactured to American Petroleum Institute (API) specifications. Line pipe is made of higher grade steel and may have a higher carbon and manganese content than is permissible for standard pipe. Line pipe also requires additional testing. Wall thicknesses for standard and line pipes, although similar in the smaller diameters, differ in the larger diameters. Moreover, standard pipe (whether imported or domestic) is generally used for low-pressure conveyance of water, steam, air, or natural gas in plumbing, air-conditioning, automatic sprinkler and

---

[29] *Id*. at 3.

[30] *Id*. at 6.

[31] *Id*. at 5-6 (emphasis included in the original).

[32] *Id*. at 6-8.

> similar systems. Line pipe is generally used for the transportation of gas, oil, or water in utility pipeline distribution systems.[33]

The Commission thus concluded, that "domestic line pipe is like imported line pipe and not like imported standard pipe. We further conclude that domestic standard pipe is like imported standard pipe and is not like imported line pipe."[34]

In the final determination of injury concerning imports from Thailand, the ITC repeated its determination regarding the two distinct products: standard pipe and line pipe:[35]

> Line pipes and tubes were included within the scope of the original petition. In the process of instituting its investigation, Commerce advised the petitioner that the welded carbon steel pipes and tubes covered by the petition represented two distinct classes or kinds of products---standard pipe and line pipe. Subsequently, on Mar. 14, 1985, the petition involving imports from Thailand was withdrawn as it relates to line pipe, because there is no known production in Thailand of line pipe to API specifications.

As a result, for purposes of defining the U.S. industry for its injury analysis, the ITC determined that "domestically produced standard pipe is like imported standard pipe" and that "there are two domestic industries comprised, respectively, of the domestic

[33] *Certain Welded Carbon Steel Pipes and Tubes from Thailand and Venezuela*, USITC Pub. 1680 at 7-8 (internal references omitted). *See id*. at 8, n. 8 ("The Commission has conducted a series of investigations regarding imports of welded carbon steel pipes and tubes in the recent past. *Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea*, Inv. No. 701-TA-168, USITC Pub. 1345 (1983); *Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea and Taiwan*, Invs. Nos. 731-TA-131 and 132 (Preliminary), USITC Pub. 1389 (1983), *aff'd*, *Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea and Taiwan*, Invs. Nos. 731-TA-131, 132, and 138 (Final), USITC Pub. 1519 (1984); *Certain Welded Carbon Steel Pipes and Tubes from Brazil and Spain*, Inv. Nos. 701-TA-220 (Preliminary), 731-TA-197 and 198 (Preliminary), USITC Pub 1569 (1984); *Certain Welded Carbon Steel Pipes and Tubes from Taiwan and Venezuela*, Inv. Nos. 731-TA-211 and 212 (Preliminary), USITC Pub. 1639 (1985)).

[34] *Id*. at 8 (emphasis added).

[35] *Certain Welded Carbon Steel Pipes and Tubes from Turkey and Thailand*, Inv. Nos. 701-TA-253, 731-TA-252 (Final), USITC Pub. 1810 at a-2, n. 6 (Feb. 1986) (see Attachment 5).

PUBLIC DOCUMENT

producers of standard pipe and line pipe."[36] In turn, the ITC determined imported standard pipe to be imports under TSUSA 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258 and 610.4925;[37] while imported line pipe was determined to be imported under TSUSA 610.3208 and 610.3209.[38] Clearly, imports of "line pipe" (including dual-stenciled pipe) under TSUSA 610.3208 and 610.3209 were not considered for purposes of injury by Thai imports of standard pipe. Therefore, there could be no doubt that in the original AD investigation, the ITC determined injury by subject imports from Thailand solely based on the ITC defined domestic "standard pipe" industry and "standard pipe" imports.[39]

**ITC Sunset Review 2018**

In the most recent sunset review of this AD order on circular welded steel pipes and tubes from Thailand, the ITC again made clear that line pipe and "dual-stenciled pipe, which enters as line pipe under a different subheading of the Harmonized Tariff Schedule of the United States ("HTS") for U.S. customs purposes, is not within the scope

[36] *Id.* at 6-7.

[37] *Id.* at Tables I-10 and I-11 (pages I-17, I-18)

[38] *Id.* at Tables II-9, II-10 (pages II-12, II-13).

[39] Because line pipe (including dual-stenciled pipe) was not included in the ITC's injury analysis in the original AD investigation, the Department is barred from including line pipe in the scope of the AD order through a scope proceeding. *See Wheatland Tube Co. v. United States*, 973 F. Supp. 149, 158 (Ct. Int'l Trade 1997) ("A fundamental requirement of both U.S. and international law is that an antidumping duty order must be supported by an ITC determination of material injury covering the merchandise in question. *See* 19 U.S.C. § 1673 (1994). The ITC, in defining like product for purposes of its injury investigations, followed the scope language adopted by Commerce . . . The injury determination of the ITC, thus, covered only products within the original scope of the Commerce investigation . . . It would follow that any expansion of the scope by Commerce would extend the antidumping duty order beyond the limits of the ITC injury determination and would therefore violate both U.S. and international law"); *see also Duferco Steel, Inc. v. United States*, 296 F. 3d 1087, 1089 (Fed. Cir. 2002) ("scope orders may be interpreted as including subject merchandise only if they contain language that specifically includes the subject merchandise or may be reasonably interpreted to include it.").

<u>of the orders</u>."[40] When discussing the product under review and providing the exact Commerce scope language for each of the CWP Orders under review, the Commission explained:

> Steel pipes and tubes are generally produced in various grades of carbon, alloy, or stainless steel. Tubular products frequently are distinguished by the following six end uses as defined by the American Iron and Steel Institute ("AISI").
>
> *Standard pipe* is ordinarily used for low-pressure conveyance of air, steam, gas, water, oil, or other fluids for mechanical applications. It is used primarily in machinery, buildings, sprinkler systems, irrigation systems, and water wells rather than in pipe lines or utility distribution systems. It may carry fluids at elevated temperatures which are not subject to external heat applications. It is usually produced in standard diameters and wall thicknesses to ASTM specifications.
>
> *Line pipe* is used for transportation of gas, oil, or water generally in a pipeline or utility distribution system. It is produced to API-5L and American Water Works Association ("AWWA") specifications.
>
> { . . . }
>
> Standard pipe of non-alloy steel is the primary product within the scope of these reviews (see figure I-1). Standard pipe is intended for the low-pressure conveyance of water, steam, natural gas, air, and other liquids and gases in plumbing and heating systems, air conditioning units, automatic sprinkler systems, and other related uses. Standard pipe may carry liquids at elevated temperatures but may not be subject to the application of external heat. It is made primarily to ASTM A53, A135, and A795 specifications, but can also be made to other specifications, such as British Standard ("BS") 1387. Since these standards often specify required engineering characteristics that overlap, a pipe also can be dual stenciled, meaning that the pipe is stamped with monograms signifying compliance with two different specifications, such as ASTM A53 and API 5L; <u>**however, such dual-stenciled pipe is not within the scope of the subject orders.**</u>[41]

---

[40] *Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey (Final)*, Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534, and 536 (Fourth Review), USITC Pub.4754 (Jan. 2018) at 6-7 (emphasis added) (provided in **Attachment 9**).

[41] *Id*. at I-14-16 (emphasis added).

The Commissions explanation in the most recent sunset review (i.e., the fourth review) is unsurprising as it is consistent with the previous sunset review regarding the AD Order on CWP from Thailand. For instance, in the third review, when providing a description of the scope of the Orders under review, the Commission stated "dual-stenciled pipe, which for U.S. customs purposes enters as line pipe under a different tariff subheading, is not within the scope of the orders."[42] As provided in the fourth review, the Commission explained:

> Standard pipe of non-alloy steel is the primary product within the scope of these investigations (see figure I-1). Standard pipe is intended for the low-pressure conveyance of water, steam, natural gas, air, and other liquids and gases in plumbing and heating systems, air conditioning units, automatic sprinkler systems, and other related uses . . . Since these standards often specify required engineering characteristics that overlap, a pipe also can be dual stenciled, meaning that the pipe is stamped with monograms signifying compliance with two different specifications, such as ASTM A53 and API 5L; however, **such dual-stenciled pipe is not within the scope of the subject orders**.[43]

Indeed, Petitioner Wheatland Tube itself in a sunset review of the AD order on circular welded steel pipes and tubes from Thailand and other countries acknowledged

[42] *Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey*, Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534 and 536 (Third Review), USITC Pub. 4333 at 8 (June 2012).

[43] *Id*. at I-25.

that "dual stenciled" pipe is considered as "line pipe" instead of "standard pipe":[44] The Commission explicitly quoted Petitioner as follows:

> It is likely that Korea, and other countries {e,g. Thailand} if no longer subject to the restraints imposed by the Standard Pipe antidumping order, will switch their production from {non-subject} line pipe (whether dual stenciled or not) to standard pipe.

This Petitioner admission cannot be ignored. In a legal proceeding the explicitly addressed CWP from Thailand, Petitioner testified under oath that line pipe and dual-stenciled pipe were not covered by the CWP from Thailand AD Order.

### C. Additional Context Provided By The Department's Past Scope Definitions In Standard Pipe AD Cases Further Support A Finding That Line Pipe Is Excluded From CWP AD Cases

The Department's own regulations provide that, in making scope determinations, the Department "will take into account . .. . prior scope determinations."[45] Such requirement is particularly important for the Department's instant scope inquiry because there have been so many past AD cases covering circular welded pipe in which the Department rendered a decision that confirmed that line pipe was not covered by an AD case targeted circular welded pipe.

In every single past AD case involving circular welded steel pipe (i.e., standard pipe), line pipe has been excluded from the scope. Following the CWP from Thailand

[44] *Certain Welded Non-Alloy Steel Pipes And Tubes From Brazil, India, South Korea, Mexico, Taiwan, Thailand, Turkey And Venezuela (Review)*, Prehearing Brief of Wheatland Tube et al (Feb. 29, 2000) at 58-59 (emphasis added), provided at **Attachment 7**.

[45] 19 C.F.R. § 351.225(k)(1).

AD order, there have been 9 separate Department AD investigations covering "circular welded pipe." Such AD cases included the following:

| *Country and Case Number* | *Year of AD Order* | *Relevant Scope Language* |
|---|---|---|
| United Arab Emirates (A-520-807) | 2016 | "The merchandise covered by these orders is welded carbon-quality steel pipes and tube, of circular cross-section. . . generally known as standard pipe . . . **the scope of these orders does not include . . . line pipe**" |
| Pakistan (A-535-903) | 2016 | |
| Oman (A-523-812) | 2016 | |
| China (A-570-910) | 2008 | "The merchandise subject to this proceeding is certain welded carbon quality steel pipes and tubes, of circular cross-section. . . generally known as standard pipe **the scope of this investigation does not include . . . line pipe**" |
| Brazil (A-351-809) | 1992 | "The products covered by these orders are circular welded non-alloy steel pipes and tubes, of circular cross-section generally known as standard pipes and tubes . . . All carbon steel pipes and tubes within the physical description outlined above are included within the scope of these orders, **except line pipe** . . . Standard pipe that is **dual or triple certified/stenciled** that enters the U.S. as line pipe of a kind used for oil or gas pipelines is **also not included** in these orders . . . " |
| Mexico (A-201-805) | 1992 | |
| Korea (A-580-809) | 1992 | |
| Venezuela (A-307-805) | 1992 | |
| Taiwan (A-583-814) | 1992 | "The products covered by these orders are (1) circular welded non-alloy steel pipes and tubes, of circular cross-section generally known as standard pipes and tubes . . . All carbon steel pipes and tubes within the physical description outlined above are included within the scope of these orders, **except line pipe** . . . standard pipe that is **dual or triple certified/stenciled** that enters the U.S. as line pipe of a kind used for oil or gas pipelines **is also not included** in this investigation." |

All of these multiple AD cases confirm that the Department has always considered "line pipe" (which by definition includes dual-stenciled pipe) to be excluded from the scope of any AD case covering circular welded pipe. In sum, the use of a scope inquiry

to add line pipe into an antidumping order that specifically was limited to standard pipe would violate years of precedent and AD/CVD proceedings regarding different categories of tubular products.

**D. Because Line Pipe (Including Dual-Stenciled Pipe) Is Excluded From the Scope of the Underlying AD Order, The Department Also Needs to Put Petitioner's Allegation of Circumvention To Rest**

In its letter of July 29, 2019, the Department states that, if it determines that "line pipe" does not fall within the scope of the existing order, it will continue its anti-circumvention inquiry. The analysis herein should also lay to rest any resumption of such an inquiry. Moreover, as Saha Thai has submitted in its June 6, 2019 letter in the anti-circumvention segment, the Department does not have the legal authority to initiate a minor alteration anti-circumvention investigation with respect to a product that was unambiguously excluded from the scope of an AD order.

The Department has long recognized the Federal Circuit's decision in *Wheatland Tube Co. v. United States*,[46] as the guiding authority on the general issue of initiating anti-circumvention inquiries.[47] Importantly, *Wheatland* involved the AD orders that covered imports of circular welded non-alloy steel pipe, known as *standard pipe*, and is

---

[46] 161 F.3d 1365, 1371 (Fed. Cir. 1998) ("*Wheatland*").

[47] *See e.g.* Memorandum to James Maeder from Amanda Brings, *Re: Certain Hardwood Plywood Products from the People's Republic of China: Minor Alterations Anti-Circumvention Inquiry Request*, dated Apr. 2, 2018 at 13-14; *Petroleum Wax Candles from China*, 71 Fed. Reg. 32,033 at fn. 7 (June 2, 2006).

used for low pressure applications, such as plumbing.[48] The scope of the orders at issue in *Wheatland Tube* were very similar to the scope of the underlying order at issue here and also excluded *line pipe* – a high quality type of standard pipe that is often used of oil or gas pipelines.[49] After the orders were issued, Wheatland and other domestic producers filed petitions with the Department claiming that line pipe from certain subject countries were imported for standard pipe applications, thereby circumventing the orders.[50] The Department of Commerce declined to initiate an anti-circumvention inquiry. Rather, the Department ultimately concluded that the orders expressly excluded line and dual-certified pipe that enters the United States as line pipe regardless of actual use; and such conclusion was appealed by Petitioner Wheatland.[51] Holding that the Department was correct in not initiating a "minor alteration" inquiry under 19 U.S.C. § 1677j(c), the Federal Circuit ruled that "section 1677j(c) {the minor alteration circumvention provision} does not apply to products unequivocally excluded from the order in the first place."[52]

Moreover, a minor alterations inquiry under section 1677j(c) is applicable only if the articles in question have been altered in form or appearances in some minor respects. As explained by the Court of International Trade (and confirmed by the Federal Circuit):

[48] *Wheatland*, 161 F. 3d at 1367-68; *see Wheatland Tube Co. v. United States*, 973 F. Supp. 149, 151-153 (Ct. Int'l Trade 1997) (quoting the relevant scope from *Circular Welded Non-Alloy Steel Pipe from Brazil, the Republic of Korea, Mexico, Romania, Taiwan, and Venezuela*, 56 Fed. Reg. 52,528 (Dep't Comm. 1991) (initiation of antidumping duty investigations)).

[49] *Id*. 161 F. 3d at 1367-68.

[50] *Id*.

[51] *Id*.

[52] *Wheatland*, 161 F. 3d at 1371.

> It is undisputed that API 5L and dual-certified API 5L/ASTM A53 pipe are not created by altering the subject merchandise in form or appearance. Standard pipe, such as ASTM A53 pipe, is made to lower specifications than API line pipe and cannot be transformed into line pipe through a minor alteration. Line pipe is a distinct product, produced using different raw materials, manufacture to different chemical, dimensional, and weight specifications, and designed for different uses from standard pipe.[53]

Accordingly, the Federal Circuit ruled that the Department was correct in refusing to initiate the minor alteration circumvention investigation.

The present factual situation is exactly the same as the facts in *Wheatland*. All Petitioner has shown – and Saha Thai does not dispute – is that Saha Thai has made a product that meets line pipe specifications. As evidenced by the plain language of the scope (which refers only to standard pipe and does not mention line pipe or dual-stenciled pipe) and by the original investigation documents, line pipe is explicitly excluded from the scope of the investigations. Thus, Saha Thai submits that the Department should adopt the same conclusion is it did in the CWP proceeding underlying *Wheatland* and reject Petitioner's request for initiation of a "minor alterations" anti-circumvention inquiry. The Department has previously found unlawful Petitioner's attempt to expand the scope of a CWP AD Order to include line pipe and it should reach this same conclusion once again.

[53] *Id.* (emphasis added)

## CONCLUSION

For all of the foregoing reasons, Saha Thai asks the Department to terminate this scope inquiry, as it has not been lawfully initiated.  Alternatively, the Department should find that "line pipe" and "products that are dual-stenciled" are not included in the scope of the CWP from Thailand AD Order.  Finally, the Department should also terminate its anti-circumvention inquiry, as there is no question that any claims of circumvention fall well short of the legal standard for an affirmative finding.

Respectfully submitted,

/s/ Daniel L. Porter

Daniel L. Porter
Tung Nguyen
Gina Colarusso

*Counsel for Saha Thai*

**Attachment 1**

Screen Shot of ACCESS (Department itself identified its July 29th letter as a "scope inquiry)

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Barcode:3883995-02 A-549-502 SCO - Scope Inquiry - Line Pipe

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 08/01/19 | A-549-502 | SCO-Line Pipe | Letter | Initiation of Scope Inquiry | USDOC | Interested Parties | Public Doc | 3872413-01 | |
| 08/01/19 | A-549-502 | SCO-Line Pipe | Entry_of... | Entry of Appearance | Trade Pacific PLLC | Thai Premium Pipe Co... | Public Doc | 3872376-01 | |
| 07/31/19 | A-549-502 | SCO-MB Metals Aug 20... | Customs_... | CBP Scope Instructions | USDOC | MB Metals | Public Doc | 3871951-01 | |
| 07/29/19 | A-549-502 | CIRC-Line Pipe | Letter | Scope Inquiry | USDOC | Interested Parties | Public Doc | 3870720-01 | |

**Attachment 2**

*Certain Circular Welded Carbon Steel Pipes and Tubes From Thailand; Initiation of Antidumping Duty Investigation*, 59 Fed. Reg. 12,068 (Mar. 27, 1985)

Barcode:3883993-02 A-549-502 SCO - Scope Inquiry Line Pipe

initiating with respect to this allegation. We will promptly reconsider this question on the basis of any additional information provided during this investigation.

### Notification of ITC

Section 702(d) of the Act requires us to notify the ITC of this action, and to provide it with the information we used to arrive at this determination. We will notify the ITC and make available to it all nonprivileged nonconfidential information in our files. We will also allow the ITC access to all privileged and confidential information in our files, provided it confirms in writing that it will not disclose such information, either publicly or under an administrative protective order, without the written consent of the Deputy Assistant Secretary for Import Administration.

### Preliminary Determination by ITC

The ITC will determine by April 15, 1985, whether there is a reasonable indication that imports of oil country tubular goods from Venezuela are causing material injury, or threaten material injury, to a United States industry. If its determination is negative, this investigation will terminate; otherwise, it will proceed according to the statutory procedures.

March 20, 1985.

**Alan F. Holmer,**

*Deputy Assistant Secretary for Import Administration.*

[FR Doc. 85-7277 Filed 3-26-85; 8:45 am]

**BILLING CODE 3510-DS-M**

---

**[A-307-502]**

## Certain Circular Welded Carbon Steel Line Pipe From Venezuela; Initiation of Antidumping Duty Investigation

**AGENCY:** International Trade Administration, Import Administration, Department of Commerce.

**ACTION:** Notice.

**SUMMARY:** On the basis of a petition filed in proper form with the United States Department of Commerce, we are initiating an antidumping duty investigation to determine whether certain welded carbon steel line pipe from Venezuela is being, or is likely to be, sold in the United states at less than fair value. We are notifying the United States International Trade Commission (ITC) of this action so that it may determine whether imports of this product are causing material injury, or threaten material injury, to a United States industry. If this investigation proceeds normally, the ITC will make its preliminary determination on or before April 15, 1985, and we will make ours on or before August 7, 1985.

**EFFECTIVE DATE:** March 27, 1985.

**FOR FURTHER INFORMATION CONTRACT:** Ray Busen, Office of Investigations, Import Administration, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue, NW., Washington, D.C. 20230; telephone; (202) 377-2830.

**SUPPLEMENTARY INFORMATION:**

### The Petition

On February 28, 1985, we received a petition filed on behalf of the Committee on Pipe and Tube Imports (CPTI), its subcommittees on standard and line pipe, and the companies which are members of those subcommittees with respect to certain welded carbon steel pipes and tubes. In compliance with the filing requirements of § 353.36 of the Commerce Regulations (19 CFR 353.36), the petition alleged that imports of certain welded carbon steel pipes and tubes from Venezuela are being, or are likely to be, sold in the United States at less than fair value within the meaning of section 731 of the Tariff Act of 1930, as amended (the Act), and that these imports are causing material injury, or threaten material injury, to a United States industry.

The petition, as originally filed, covered both line pipe, which is defined in the "Scope of Investigation" section of this notice, and standard pipe. By amendment dated March 12, 1985, counsel for petitioners clarified that the petition was being filed on behalf of the standard pipe subcommittee and the line pipe subcommittee of the CPTI and by individual manufacturers of standard pipe and line pipe. By amendment dated March 14, 1985, petitioners withdrew the portion of the petition dealing with standard pipe since the Department is currently conducting an antidumping investigation of this product. ("Certain Circular Welded Pipes and Tubes of Carbon Steel from Venezuela: Initiated of Antidumping Duty Investigations" (50 FR 1614)).

In the aforementioned and ongoing investigation, the Department initiated investigations with respect to both standard and line pipe. On February 1, 1985, the ITC advised the Department that it had determined that there is no reasonable indication that an industry in the United States is materially injured, or is threatened with material injury, or that the establishment of an industry in the United States is materially retarded, by reason of imports of welded carbon steel line pipe from Venezuela. consequently, the investigation with respect to line pipe was terminated. However, the ITC further advised the Department that there is a reasonable indication that an industry in the United States is materially injured by reason of imports of standard welded carbon steel pipes and tubes from Venezuela. After the February 28, 1985 petition and the March 12, 1985 amended petition were filed, we consulted with the ITC, which advised us that it will consider the information on injury in the petition with respect to line pipe.

Based on the petition, as amended, we determine that the subcommittee on line pipe and the following individual manufacturers of line pipe, who have indicated that they are filing the petition, Tex-Tube Division of Cyclop Corps., Sawhill Tubulars Division of Cyclop Corp. and Laclede Steel Company, have standing. We have determined from the amended petition filed March 12 that the subcommittee on standard pipe does not have standing with respect to line pipe because a majority of its membership does not produce line pipe.

In their sales at less than fair value allegation, the petitioners based the United States prices on statistics reported by the Bureau of Census, Department of Commerce, for the month of October, 1984 (IM 145X). The petitioners based foreign market value on home market price list prices of the two named foreign manufacturers. The price lists were in effect on October 1, 1984.

By comparing the values calculated by the foregoing methods the petitioners alleged dumping margins as follows:

API line pipe up to 4½ inches in outside diameter—65.5%.

API line pipe up to 16 inches in outside diameter—77.2%.

### Initiation of Investigation

Under section 732(c) of the Act, we must determine, within 20 days after a petition is filed, whether it sets forth the allegations necessary for the initiation of an antidumping duty investigation and whether it contains information reasonably available to the petitioner supporting the allegations.

We examined the petition, as amended, on certain circular welded carbon steel line pipe from Venezuela and have found that it meets the requirements of section 732(b) of the Act. Therefore, in accordance with section 732 of the Act, we are initiating an antidumping duty investigation to determine whether certain circular welded carbon steel line pipe from Venezuela is being, or is likely or be, sold in the United States at less than fair value. If our investigation proceeds

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Case 1:20-cv-00133-SAV Document 40 Filed 05/07/21 Page 215 of 1077
PUBLIC DOCUMENT

normally we will make our preliminary determination by August 7, 1985.

**Scope of Investigation**

The products covered under this investigation are: Circular welded carbon steel line pipe with an outside diameter of .375 inch or more but not over 16 inches, and with a wall thickness of not less than .065 inch, currently classifiable in the *Tariff Schedules of the United States, Annotated* (TSUSA), under items 610.3208 and 610.3209. These products are produced to various API specifications for line pipe, most notably API-5L or API-5LX.

**Notification of ITC**

Section 732(d) of the Act requires us to notify the ITC of this action and to provide it with the information we used to arrive at this determination. We will notify the ITC and make available to it all nonprivileged and nonconfidential information. We will also allow the ITC access to all privileged and confidential information in our files, provided it confirms in writing that it will not disclose such information either publicly or under an administrative protective order without the consent of the Deputy Assistant Secretary for Import Administration.

**Preliminary Determination by ITC**

The ITC will determine by April 15, 1985, whether there is a reasonable indication that imports of certain circular welded carbon steel line pipe from Venezuela are causing material injury, or threaten material injury, to a United States industry. If its determination is negative the investigation will terminate; otherwise, it will proceed according to the statutory procedures.

**Alan F. Holmer,**
*Deputy Assistant Secretary for Import Administration.*
March 20, 1985.
[FR Doc. 85-7270 Filed 3-26-85; 8:45 am]
BILLING CODE 3510-DS-M

---

[A-549-502]

## Certain Circular Welded Carbon Steel Pipes and Tubes From Thailand; Initiation of Antidumping Duty Investigation

**AGENCY:** International Trade Administration, Import Administration, Department of Commerce.

**ACTION:** Notice.

**SUMMARY:** On the basis of a petition filed in proper form with the United States Department of Commerce, we are initiating an antidumping duty investigation to determine whether certain circular welded carbon steel pipes and tubes from Thailand are being, or are likely to be, sold in the United States at less than fair value. We are notifying the United States International Trade Commission (ITC) of this action so that it may determine whether imports of these products are causing material injury or threaten material injury to a United States industry. If this investigation proceeds normally, the ITC will make its preliminary determination on or before April 15, 1985, and we will make ours on or before August 7, 1985.

**EFFECTIVE DATE:** March 27, 1985.

**FOR FURTHER INFORMATION CONTACT:** Jay Kenkel, Office of Investigations, Import Administration, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue, NW., Washington, D.C. 20230; telephone: (202) 377-3464.

**SUPPLEMENTARY INFORMATION:**

**The Petition**

On February 28, 1985, we received a petition filed on behalf of the Committee on Pipe and Tube Imports (CPTI), its subcommittees on standard and line pipe, and the companies which are members of those subcommittees with respect to certain welded carbon steel pipes and tubes. In compliance with the filing requirements of § 353.36 of the Commerce Regulations (19 CFR 353.36), the petition alleged that imports of certain welded carbon steel pipes and tubes from Thailand are being, or are likely to be, sold in the United States at less than fair value within the meaning of section 731 of the Tariff Act of 1930, as amended (the Act), and that these imports threaten material injury to a United States industry.

The petition, as originally filed, covered both standard pipe, which is defined in the "Scope of Investigation" section of this notice, and line pipe. By amendment dated March 12, 1985, counsel for petitioners clarified that the petition was being filed on behalf of the standard pipe subcommittee and the line pipe subcommittee of the CPTI and by individual manufacturers of standard pipe and line pipe. By amendment dated March 14, 1985, petitioners withdrew the portion of the petition dealing with line pipe.

Based on the petition, as amended, we determine that the subcommittee on standard pipe and the following individual manufacturers of standard pipe, who have indicated that they are filing the petition, Bull Moose Tube Company, Western Tube and Conduit Corporation, Maruichi American Corporation, Southwestern Pipe, Inc., Laclede Steel Company, Pittsburgh Tube Company, Allied Tube and Conduit, Century Tube Corporation and Sharon Tube Company, have standing to file with respect to standard pipe. We have determined from the amended petition filed March 12 that the subcommittee on line pipe does not have standing with respect to standard pipe because a majority of its membership does not produce standard pipe.

In their sales at less than fair value allegation, since petitioners were unable to secure home market or third country prices for the merchandise subject to this investigation, constructed value based on the cost of hot-rolled coil was used to obtain foreign market value. Coil prices were calculated from Japanese export statistics on coil shipments to Thailand for the period of September 1984. Adjustments were made to the coil price for freight, insurance and delivery charges from Japan to Thailand. The foreign market value was obtained by applying U.S. industry cost of manufacturing data, adjusted for Thailand wage rates, and converting to constructed value according to section 773(e) of the Act. For galvanized products, estimates of zinc costs were obtained by petitioners from zinc traders in Thailand.

By comparing the values calculated by the foregoing methods, the petitioner alleged dumping margins of 16.3 to 58.8 percent.

**Initiation of Investigation**

Under section 732(c) of the Act, we must determine, within 20 days after a petition is filed, whether it sets forth the allegations necessary for the initiation of an antidumping duty investigation and whether it contains information reasonably available to the petitioner supporting the allegations.

We have examined the petition, as amended, on certain circular welded carbon steel pipes and tubes and have found that it meets the requirements of section 732(b) of the Act. Therefore, in accordance with section 732 of the Act, we are initiating an antidumping duty investigation to determine whether certain circular welded carbon steel pipes and tubes from Thailand are being, or are likely to be, sold in the United States at less than fair value. If our investigation proceeds normally we will make our preliminary determination by August 7, 1985.

**Scope of Investigation**

The products under investigation are: Circular welded carbon steel pipes and

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

tubes, with an outside diameter of .375 inch or more but not over 16 inches, of any wall thickness, currently classifiable in the Tariff Schedules of the United States, Annotated (TSUSA), under items 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258 and 610.4925. These products, commonly referred to in the industry as standard pipe or structural tubing, are produced to various ASTM specifications, most notably A-152, A-53 or A-135.

### Notification of ITC

Section 732(d) of the Act requires us to notify the ITC of this action and to provide it with the information we used to arrive at this determination. We will notify the ITC and make available to it all nonprivileged and nonconfidential information. We will also allow the ITC access to all privileged and confidential information in our files, provided it confirms that it will not disclose such information either publicly or under an administrative protective order without the consent of the Deputy Assistant Secretary for Import Administration.

### Preliminary Determination by ITC

The ITC will determine by April 15, 1985, whether there is a reasonable indication that imports of certain circular welded carbon steel pipes and tubes from Thailand are causing material injury or threatening material injury to a United States industry. If its determination is negative the investigation will terminate; otherwise, it will proceed according to the statutory procedures.

**Alan F. Holmer,**

*Deputy Assistant Secretary for Import Administration.*

March 20, 1985.

[FR Doc. 85-7271 Filed 3-26-85; 8:45 am]

**BILLING CODE 3510-DS-M**

---

**[A-580-502]**

## Oil Country Tubular Goods From Austria; Initiation of Antidumping Duty Investigation

**AGENCY:** International Trade Administration, Import Administration, Department of Commerce.

**ACTION:** Notice.

---

**SUMMARY:** On the basis of a petition filed in proper form with the United States Department of Commerce, we are initiating an antidumping duty investigation to determine whether oil country tubular goods from Austria are being, or are likely to be, sold in the United States at less than fair value. We are notifying the United States International Trade Commission (ITC) of this action so that it may determine whether imports of this product are causing material injury, or threaten material injury, to a United States industry. If this investigation proceeds normally, the ITC will make its preliminary determination on or before April 15, 1985, and we will make ours on or before August 7, 1985.

**EFFECTIVE DATE:** March 27, 1985.

**FOR FURTHER INFORMATION CONTACT:** Ken Stanhagen, Office of Investigations, Import Administration, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue, NW., Washington, D.C. 20230; telephone: (202) 377-1777.

**SUPPLEMENTARY INFORMATION:**

### The Petition

On February 28, 1985, we received a petition in proper form filed by the United States Steel Corporation. In compliance with the filing requirements of § 353.36 of the Commerce Regulations (19 CFR 353.36), the petition alleged that imports of the subject merchandise from Austria are being, or are likely to be, sold in the United States at less than fair value within the meaning of section 731 of the Tariff Act of 1930, as amended (the Act), and that these imports are causing material injury, or threaten material injury, to a United States industry.

On March 5, 1985, counsel for Lone Star Steel Company requested co-petitioner status. We note that U.S. Steel has agreed to allow Lone Star Steel Company to be added as co-petitioner.

The petitioner based the United States price on average values, f.a.s. foreign port, for January to October 1984, derived from Bureau of Census statistics.

The petitioner based foreign market value on constructed value, derived from Voest-Alpine's cost of producing basic steel products, adjusted for the difference in production costs for basic steel products and oil country tubular goods.

The petition alleged sales at less than cost of production relative to third country sales only, as it avers there are insufficient sales in the home market for comparisons. The petition does contain some information that sales to at least one third country may be at less than cost of production. If, during the course of the investigation, we determine that there is not a viable home market, we will commence a cost of production investigation relative to third country sales.

Based on the comparison of values calculated by the foregoing methods, the petitioner arrived at a weighted-average dumping margin of 33.5 percent.

### Initiation of Investigation

Under section 732(c) of the Act, we must determine, within 20 days after a petition is filed, whether it sets forth the allegations necessary for the initiation of an antidumping duty investigation and whether it contains information reasonably available to the petitioner supporting the allegations.

We examined the petition on oil country tubular goods from Austria and have found that it meets the requirements of section 732(b) of the Act. Therefore, in accordance with section 732 of the Act, we are initiating an antidumping duty investigation to determine whether oil country tubular goods from Austria are being, or are likely to be, sold in the United States at less than fair value. If our investigation proceeds normally, we will make our preliminary determination by August 7, 1985.

### Scope of Investigation

The merchandise covered by this investigation is oil country tubular goods. The term oil country tubular goods hollow steel products of circular cross section intended for use in the drilling of oil or gas. It includes oil well casing, tubing and drill pipe of carbon or alloy steel, whether welded or seamless, to either American Petroleum Institute (API) or non-API specification (such as proprietary), as currently provided for in the Tariff Schedules of the United States Annotated (TSUSA) items 610.3216, 610.3219, 610.3233, 610.3242, 610.3243, 610.3249, 610.3252, 610.3254, 610.3256, 610.3258, 610.3262, 610.3264, 610.3721, 610.3722, 610.3751, 610.3925, 610.3935, 610.4025, 610.4035, 610.4225, 610.4235, 610.4325, 610.4335, 610.4942, 610.4944, 610.4946, 610.4954, 610.4955, 610.4956, 610.4957, 610.4966, 610.4967, 610.4968, 610.4969, 610.4970, 610.5221, 610.5222, 610.5226, 610.5234, 610.5240, 610.5242, 610.5243, 610.5244. This investigation includes oil country tubular goods that are finished and unfinished.

### Notification of ITC

Section 732(d) of the Act requires us to notify the ITC of this action and to provide it with the information we used to arrive at this determination. We will notify the ITC and make available to it all nonprivileged and nonconfidential information. We will also allow the ITC access to all privileged and confidential information in our files, provided it confirms that it will not disclose such information either publicly or under an administrative protective order without

# Attachment 3

*Certain Circular Welded Carbon Steel Pipes and Tubes From Thailand; Preliminary Determination of Sales at Less Than Fair Value*, 50 Fed. Reg. 40,427 (Oct. 3, 1985)

Case 1:20-cv-00133-SAV Document 40 Filed 05/07/21 Page 218 of 1077
PUBLIC DOCUMENT

Barcode:3883995-02 A-549-502 SCO - Scope Inquiry - Line Pipe

Title: 1986 Farm and Ranch Identification Survey Pretest
Form Number: Agency—86-A4, 86-A5, 86-A6, 86-A4L1, 86-A6L3; OMB—N/A
Type of Request: New collection
Burden: 3,600 respondents; 300 reporting hours
Needs and Uses: These report forms are for test purposes in preparation for the 1987 Farm and Ranch Identification Survey. The 1987 survey will be used to screen nonagricultural related persons and duplicates from the final census of agriculture mailing list.
Affected Public: Farms
Frequency: One time
Respondent's Obligation: Mandatory
OMB Desk Officer: Timothy Sprehe, 395-4814

Agency: Bureau of the Census
Title: 1986 Pre-enumeration Survey of Los Angeles, California
Form Number: Agency—DP-1350L, DP-1353L; OMB—N/A
Type of Request: New collection
Burden: 4,800 respondents; 1,240 reporting hours
Needs and Uses: This survey is needed to test an alternate method of Census evaluation in case the Post Enumeration Survey proves to be too operationally difficult. Results will be used to test whether a Pre-enumeration survey is a viable means of evaluating a census.
Affected Public: Individuals or households
Frequency: One time
Respondent's Obligation: Mandatory
OMB Desk Officer: Timothy Sprehe, 395-4814

Agency: Bureau of the Census
Title: Survey of Income and Program Participation—Wave 8
Form Number: Agency—SIPP-4800, SIPP-4803; OMB—0607-0425
Type of Request: Revision of a currently approved collection
Burden: 32,700 respondents; 16380 reporting hours
Needs and Uses: This survey is needed to provide the executive and legislative branches with improved statistics on income distribution and data not previously available on eligibility for and participation in government programs. Changes in status and participation will be measured over time. The data will support policy and program planning
Affected Public: Individuals or households
Frequency: One time
Respondent's Obligation: Voluntary
OMB Desk Officer: Timothy Sprehe, 395-4814

Agency: Bureau of the Census
Title: Questionnaire for Building Permit Official
Form Number: Agency—SOC-003; OMB—0670-0125
Type of Request: Revision of a currently approved collection
Burden: 835 respondents; 209 reporting hours
Needs and Uses: This questionnaire will be used to collect information from local building permit officials that is needed to correctly list and sample permits for the Survey of Construction.
Affected Public: State or local governments
Frequency: Other
Respondent's Obligation: Voluntary
OMB Desk Officer: Timothy Sprehe, 395-4814

Agency: Bureau of the Census
Title: Quarterly Summary of Federal, State, and Local Tax Revenue
Form Number: Agency—F-71, F-72, F-73; OMB—0607-0112
Type of Request: Extension of a currently approved collection
Burden: 5,254 respondents; 5,254 reporting hours
Needs and Uses: The collected information is used to publish benchmark statistics on public sector taxes; to provide data to the Bureau of Economic Analysis for GNP calculations and other economic indicators; and to provide data for economic research and comparative studies of governmental finances.
Affected Public: State or local governments
Frequency: Quarterly
Respondent's Obligation: Voluntary
OMB Desk Officer: Timothy Sprehe, 395-4814

Agency: Bureau of the Census
Title: Survey of Income and Program Participation 1986 Panel Wave 2 Pretest
Form Number: Agency—SIPP-62000(X), SIPP-62051(X); OMB—0607-0425
Type of Request: New collection
Burden: 350 respondents; 175 reporting hours
Needs and Uses: This survey is used to pretest the Wave 2 topical module questions. These questions will be added to the SIPP 1986 Panel Wave 2 Questionnaire.
Affected Public: Individuals or households
Frequency: One time
Respondent's Obligation: Voluntary
OMB Desk Officer: Timothy Sprehe, 395-4814

Agency: Bureau of the Census
Title: Survey of Income and Program Participation 1986 Core Waves 1-8
Form Number: Agency—SIPP-6100-6500, SIPP-6001, SIPP-6105
Type of Request: Revision of a currently approved collection
Burden: 22,400 respondents; 22,400 reporting hours
Needs and Uses: This survey is used to provide statistics not previously available, for the Executive and Legislative Branches, such as multiple recipiency of benefits of major government programs, to support policy analyses, and monthly program participation.
Affected Public: Individuals or households
Frequency: Twice a year
Respondent's Obligation: Voluntary
OMB Desk Officer: Timothy Sprehe, 395-4814

Copies of the above information collection proposals can be obtained by calling or writing DOC Clearance Office, Edward Michals (202) 377-4217, Department of Commerce, Room 6622, 14th and Constitution Avenue, NW., Washington D.C. 20230.

Written comments and recommendations for the proposed information collections should be sent to Timothy Sprehe, OMB Desk Officer, Room 3235, New Executive Office Building, Washington, D.C. 20503.

Dated: September 26, 1985.

**Edward Michals,**

*Departmental Clearance Officer.*

[FR Doc. 85-23656 Filed 10-2-85; 8:45 am]

BILLING CODE 3510-07-M

## International Trade Administration

[A-549-502]

## Certain Circular Welded Carbon Steel Pipes and Tubes From Thailand; Preliminary Determination of Sales at Less Than Fair Value

**AGENCY:** International Trade Administration, Import Administration, Department of Commerce.

**ACTION:** Notice.

**SUMMARY:** We have preliminarily determined that certain circular welded carbon steel pipes and tubes from Thailand are being, or are likely to be, sold in the United States at less than fair value, and have notified the U.S. International Trade Commission (ITC) of our determination. We have also directed the U.S. Customs Service to suspend the liquidation of all entries of certain circular welded carbon steel pipes and tubes from Thailand that are entered, or withdrawn from warehouse, for consumption, on or after the date of publication of this notice, and to require a cash deposit or bond for each entry in an amount equal to the estimated dumping margin as described in the

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Case 1:20-cv-00133-SAV Document 40 Filed 05/07/21 Page 219 of 1077
PUBLIC DOCUMENT
Barcode:3883995-02 A-549-502 SCO - Scope Inquiry - Line Pipe

"Suspension of Liquidation" section of this notice.

If this investigation proceeds normally, we will make a final determination by December 10, 1985.

**EFFECTIVE DATE:** October 3, 1985.

**FOR FURTHER INFORMATION CONTACT:** John J. Kenkel, Office of Investigations, Import Administration, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue, NW., Washington, D.C. 20230; telephone (202) 377-[illegible].

**SUPPLEMENTARY INFORMATION:**

## Preliminary Determination

We have preliminarily determined that certain circular welded carbon steel pipes and tubes from Thailand are being, or are likely to be, sold in the United States at less than fair value, as provided in section 733 of the Tariff Act of 1930, as amended (19 U.S.C. 1673b) (the Act). The weighted-average margin is listed in the "Suspension of Liquidation" section of this notice.

## Case History

On February 28, 1985, we received a petition filed in proper form from the Standard Pipe Subcommittee of the Committee on Pipe and Tube Imports, on behalf of the U.S. industry producing certain circular welded carbon steel pipes and tubes. In compliance with the filing requirements of § 353.36 of the Commerce Regulations (19 CFR 353.36), the petition alleges that imports of the subject merchandise from Thailand are being, or are likely to be, sold in the United States at less than fair value within the meaning of section 731 of the Act (19 U.S.C. 1673), and that these imports are materially injuring, or threatening material injury to, a U.S. industry.

After reviewing the petition, we determined that it contained sufficient grounds upon which to initiate an antidumping investigation. We initiated the investigation on March 20, 1985 (50 FR [illegible]), and notified the ITC of our action.

On April 15, 1985, the ITC found that there is a reasonable indication that imports of certain circular welded carbon steel pipes and tubes from Thailand are threatening material injury to a U.S. industry (U.S. ITC Pub. No. [illegible], April 1985).

On July 18, 1985, the petitioners requested that we postpone the preliminary determination until September 20, 1985. They also alleged that critical circumstances exist. We postponed the preliminary determination on July 18, 1985 (50 FR [illegible]).

We investigated Saha Thai Steel Pipe Company, Ltd., and Thai Steel Pipe Industry Company, Ltd., the manufacturers who account for all Thai exports of the merchandise to the United States. We examined 100 percent of the sales made by these companies during the period of investigation.

## Scope of Investigation

The products under investigation are certain circular welded carbon steel pipes and tubes, also known as "standard pipe" or "structural tubing," as currently provided in items 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258 and 610.4925 of the *Tariff Schedules of the United States Annotated*.

## Fair Value Comparisons

To determine whether sales of the subject merchandise in the United States were made at less than fair value, we compared the United States price with the foreign market value.

## United States Price

As provided in section 772(b) of the Act, we used the purchase price of the subject merchandise to represent the United States price because the merchandise was sold prior to the date of importation to unrelated purchasers in the United States. We calculated the purchase price based on the FOB or C. + I. packed price. We made deductions, where appropriate, for foreign inland freight, inland and marine insurance, handling and brokerage charges. We increased the United States price by the amount of import duties imposed by Thailand which have been rebated by reason of the exportation of the merchandise pursuant to section 772(d)(1)(B) of the Act (19 U.S.C. 1677a(d)(1)(B)).

## Foreign Market Value

In accordance with section 773(a) of the Act, we calculated foreign market value based on home market sales, packed or unpacked, to unrelated purchasers. From these prices we deducted, where appropriate, inland freight and discounts. In accordance with *Color Television Receivers from Korea*, 49 FR 50420 (December 28, 1984) we also deducted from home market prices a business or sales tax which is levied on all domestic sales of pipe and tube at a 5.5 percent rate. We made adjustments, where appropriate, for differences in credit in accordance with § 353.15 of our Regulations (19 CFR 353.15). We also deducted, where appropriate, the home market packing cost and added the packing cost incurred on sales to the United States. Pursuant to § 353.56 of the Regulations, we made currency conversions at the rates certified by the Federal Reserve Bank.

We made comparisons of "such or similar" merchandise based on grade, dimension, and end finish selected by Commerce Department industry experts. Differences in merchandise were not considered in the price to price analysis because they were insignificant for purposes of the preliminary determination. We will reconsider them in the final determination.

The petitioners alleged that sales in the home market were at prices below the cost of producing the merchandise. We examined production costs which included all appropriate costs for materials, fabrication and general expenses. We found sufficient sales for both Saha Thai Steel Pipe Company and Thai Steel Pipe Industry Company above the cost of production to allow us to use their home market prices, in accordance with section 773(a)(1)(A) of the Act, to determine foreign market value.

## Preliminary Negative Determination of Critical Circumstances

The petitioners alleged that imports of pipe and tube from Thailand present "critical circumstances." Under section 733(e) of the Act, critical circumstances exist if we have a reasonable basis to believe or suspect that (1) there is a history of dumping in the United States or elsewhere of the class or kind of the merchandise which is the subject of the investigation, or the person by whom, or for whose account, the merchandise was imported knew or should have known that the exporter was selling the merchandise which is the subject of the investigation at less than its fair value; and (2) there have been massive imports of the class or kind of merchandise that is the subject of the investigation over a relatively short period.

In determining whether there is a history of dumping of the product under investigation, we ascertain whether there have been any prior investigations of this product in any other country. While Australia investigated this product, it made a negative final determination in February, 1985. The Department has not investigated this

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Barcode:3883995-02 A-549-502 SCO - Scope Inquiry - Line Pipe

product before. Therefore, we find that there is no history of dumping.

The second criterion is whether the importer knew, or should have known, that the exporter was dumping the merchandise. We normally consider margins of 25 percent or more to constitute knowledge of dumping. Since the margins in this case do not meet or exceed this level, we find that knowledge of dumping cannot be imputed to the importers.

We therefore did not need to consider whether there are massive imports over a relatively short period.

For the reasons described above, we preliminary determine that "critical circumstances" do not exist with respect to pipe and tube from Thailand.

## Verification

As provided in section 776(a) of the Act, we will verify all information used in reaching our final determination.

## Suspension of Liquidation

In accordance with section 733(d) of the Act, we are directing the United States Customs Service to suspend liquidation of all entries of certain circular welded carbon steel pipes and tubes from Thailand that are entered, or withdrawn from warehouse, for consumption, on or after the date of publication of this notice in the Federal Register. The United States Customs Service shall require a cash deposit or the posting of a bond equal to the estimated weighted-average amounts by which the foreign market value of the merchandise subject to this investigation exceeds the United States price as shown in the table below. This suspension of liquidation will remain in effect until further notice.

Article VI.5 of the General Agreement on Tariffs and Trade provides that "[n]o product . . . shall be subject to both antidumping and countervailing duties to compensate for the same situation of dumping or export subsidization." This provision is implemented by section 772(d)(1)(D) of the Act, which prohibits assessing dumping duties on the portion of the margin attributable to export subsidies. In the final countervailing duty determination on certain circular welded carbon steel pipes and tubes from Thailand, we found export subsidies (50 FR 32751). Since dumping duties cannot be assessed on the portion of the margin attributable to export subsidies, there is no reason to require a cash deposit or bond for that amount. Thus, the amount of the export subsidies, 1.79 percent *ad valorem*, will be subtracted for deposit or bonding purposes from the dumping margin.

| Manufacturers/producers/exporters | Weighted-average margin percentage |
|---|---|
| Saha Thai Steel Pipe Co. | [illegible] |
| Thai Steel Pipe Industry Co. | [illegible] |
| All Others | [illegible] |

## ITC Notification

In accordance with section 733(f) of the Act, we will notify the ITC of our determination. In addition, we are making available to the ITC all nonprivileged and nonconfidential information relating to this investigation. We will allow the ITC access to all privileged and confidential information in our files, provided the ITC confirms that it will not disclose such information, either publicly or under an administrative protective order, without the written consent of the Deputy Assistant Secretary for Import Administration. The ITC will determine whether these imports materially injure, or threaten material injury to, a U.S. industry before the later of 120 days after we make our preliminary affirmative determination or 45 days after we make our final affirmative determination.

## Public Comment

In accordance with §353.47 of our regulations (19 CFR 353.47), if requested, we will hold a public hearing to afford interested parties an opportunity to comment on this preliminary determination at 10:00 a.m. on November 7, 1985, at the United States Department of Commerce, Room 1851, 14th Street and Constitution Avenue, NW., Washington, D.C. 20230. Individuals who wish to participate in the hearing must submit a request to the Deputy Assistant Secretary for Import Administration, Room B-099, within 10 days of the publication of this notice. Requests should contain: (1) party's name, address, and telephone number; (2) the number of participants; (3) the reason for attending; and (4) a list of the issues to be discussed.

In addition, prehearing briefs in at least 10 copies must be submitted to the Deputy Assistant Secretary by November 4, 1985. Oral presentations will be limited to issues raised on the briefs. All written views should be filed in accordance with 19 CFR 353.46, within 30 days of this notice's publication, at the above address and in at least 10 copies.

Gilbert B. Kaplan,

*Acting Deputy Assistant Secretary for Import Administration.*

September 26, 1985.

[FR Doc. 85-23624 Filed 10-2-85; 8:45 am]

BILLING CODE 3510-DS-M

## Petitions by Producing Firms for Determinations of Eligibility To Apply for Trade Adjustment Assistance; Caribbean Die Casting Corp. et al.

Petitions have been accepted for filing on the dates indicated from the following firms: (1) Caribbean Die Casting Corporation, Calle 11, Number 86, Bayamon, Puerto Rico 00619, producer of window hardware (August 21, 1985); (2) Herkimer Wood Products Company, Inc., P.O. Box 125, Herkimer, New York 13350, producer of wood pallets, crates and boxes (August 23, 1985); (3) The Zeller Corporation, P.O. Box 276, Defiance, Ohio 43512, producer of automotive parts (August 23, 1985); (4) Greenview Manufacturing Company, 2357 North Greenview Avenue, Chicago, Illinois 60614, producer of window and floor cleaning squeegees (August 27, 1985); (5) The May Apparel Group, Inc., P.O. Box 190, Mebane, North Carolina 27302, producer of girls' dresses, tops, slacks and shorts (August 28, 1985); (6) Scherer, Inc., 3777 NW. 46th Street, Miami, Florida 33166, producer of apparel belts, aprons, doll clothes and handbags (August 23, 1985); (7) Olympic Mills Corporation, P.O. Box 1869, Guaynabo, Puerto Rico 00657, producer of men's and boys' T-shirts, shorts, and pajamas; and women's dresses (August 29, 1985); (8) Leader Dyeing & Finishing Company, Inc., 94 Madison Avenue, Paterson, New Jersey 07509, producer of fabric (August 29, 1985); (9) Marjon Dyeing and Finishing Company, Inc., P.O. Box 242, East Rutherford, New Jersey 07073, producer of fabric (August 30, 1985); (10) Shapes of Clay, Inc., 25717 120th Avenue East, Graham, Washington 98338, producer of giftware (August 30, 1985); (11) North Side Lumber Company, P.O. Box 431, Philomath, Oregon 97370, producer of softwood lumber (September 3, 1985); (12) Troytown Shirt Corporation, P.O. Box 139, Cohoes, New York 12047, producer of women's blouses and men's shirts (September 6, 1985); (13) Contextual Design, Inc., P.O. Box 12103, Raleigh, North Carolina 27605, producer of wood chairs and tables (September 6, 1985); (14) [illegible], Inc., P.O. Box 31, McMillin, Washington 98352, producer of trout eggs and live trout (September 6, 1985); (15) [illegible] Doll and Novelty Company, Inc., 4012 2nd Avenue, Brooklyn, New York 11232, producer of dolls (September 6, 1985); (16) Columbian Rope Company, P.O. Box 270, Guntown, Mississippi 38849, producer of cordage (September 9, 1985); (17) United Gasket Corporation, 1633 South 55th Avenue, Cicero, Illinois 60650, producer of gaskets and gasket

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved



Barcode:3883995-02 A-549-502 SCO - Scope Inquiry - Line Pipe

materials (September 9, 1985); (18) Kruzngi Products, Inc., P.O. Box 1277, South Bend, Indiana 46624, producer of cases, bags and covers for equipment and instruments (September 10, 1985); (19) Circuit Systems, Inc., 1130 Fullerton Avenue, Addison, Illinois 60101, producer of printed circuit boards (September 10, 1985); (20) Platt Bros. & Company, 2670 South Main Street, Waterbury, Connecticut 06721, producer of zinc wire, rod, strip and eyelets (September 10, 1985); (21) Carbide Engineering Specialists, Inc., 1529 North Seymour Road, Flushing, Michigan 48433, producer of machine tool components (September 11, 1985); (22) Chapnik & Company, 230 West 38th Street, New York, New York 10018, producer of women's suits (September 11, 1985); (23) Noel Industries, Inc., 350 Fifth Avenue, New York, New York 10118, producer of men's and children's jeans and tops (September 11, 1985); (24) F & G Manufacturing, Inc., 69 Anderson Avenue, Moonachie, New Jersey 07074, producer of copying machine parts (September 11, 1985); (25) Jacki 'N Hides Corporation, 413 South 12th Street, Omaha, Nebraska 68102, producer of office and commercial furniture (September 11, 1985); (26) Omaha Steel Castings Company, 4601 Farnam Street, Omaha, Nebraska 68132, producer of steel castings (September 13, 1985); (27) Paramount Coat Company, Inc., 143 Albany Street, Cambridge, Massachusetts 02139, producer of women's blazers (September 12, 1985); (28) L.E. Jones Company, 1200 34th Avenue, Menominee, Michigan 49858, producer of gasoline and diesel engine components (September 13, 1985); (29) Warwick Dyeing Corporation, P.O. Box 267, West Warwick, Rhode Island 02893, producer of fabric (September 13, 1985); (30) Susquehanna Broadcasting Company, 140 East Market Street, York, Pennsylvania 17401, producer of earthenware (September 16, 1985); (31) Bayview Manufacturing, Inc., P.O. Box 101, North Dartmouth, Massachusetts 02747, producer of women's slacks and skirts (September 16, 1985); (32) Serotta Cycle Corporation, Route 1 Box 42, Greenfield, New York 12833, producer of bicycle frames (September 16, 1985); (33) Electromech, Inc., 520 Elm Street, Kearny, New Jersey 07032, producer of electrical transformers and linear power supplies (September 16, 1985); (34) Rosso, Inc., 15 Park Road, Tinton Falls, New Jersey 07724, producer of stampers, stamping sets, inks & pads (September 16, 1985); (35) Leon Clothing Manufacturing, Inc., 680 Summit Street, Boston, Massachusetts 02118, producer of men's coats (September 17, 1985); (36) Amendola General Woodwork Company, Inc., 529 Sherman Avenue, Hamden, Connecticut 06514, producer of wood furniture parts (September 18, 1985); and (37) H.M. Quackenbush, Inc., 220 Prospect Street, Herkimer, New York 13350, producer of nutcrackers, nutpicks and other plated metal articles (September 23, 1985).

The petitions were submitted pursuant to section 251 of the Trade Act of 1974 (Pub. L. 93-618). Consequently, the United States Department of Commerce has initiated separate investigations to determine whether increased imports into the United States of articles like or directly competitive with those produced by each firm contributed importantly to total or partial separation of the firm's workers, or threat thereof, and to a decrease in sales or production of each petitioning firm.

Any party having a substantial interest in the proceedings may request a public hearing on the matter. A request for a hearing must be received by the Certification Division, Office of Trade Adjustment Assistance, Room 4015A, International Trade Administration, U.S. Department of Commerce, Washington, D.C. 20230, no later than the close of business of the tenth calendar day following the publication of this notice.

The Catalog of Federal Domestic Assistance official program number and title of the program under which these petitions are submitted is 11.309, Trade Adjustment Assistance. Insofar as this notice involves petitions for the determination of eligibility under the Trade Act of 1974, the requirements of Office of Management and Budget Circular No. A-95 regarding review by clearinghouses do not apply.

**Jack W. Osburn, Jr.,**

*Director, Certification Division, Office of Trade Adjustment Assistance.*

[FR Doc. 85-23654 Filed 10-2-85; 8:45 am]

BILLING CODE 3510-DR-M

## Minority Business Development Agency

### Solicitation of Applications; Minority Business Development Center; Illinois

**AGENCY:** Minority Business Development Agency, Commerce.

**ACTION:** Notice.

**SUMMARY:** The Minority Business Development Agency (MBDA) announces that it is soliciting competitive applications under its Minority Business Development Center (MBDC) Program to operate a MBDC for a 3 year period, subject to available funds. The cost of performance for the first twelve (12) months is estimated at $523,529 for the project performance of April 1, 1986, to March 31, 1987. The MBDC will operate in the Chicago, Illinois Metropolitan Statistical Area (MSA). The first year cost for the MBDC will consist of $445,000 in Federal funds and a minimum of $78,529 in non-Federal funds which can be a combination of cash, in-kind contribution and fees for services. The award number will be 05-10-86022-01.

The funding instrument for the MBDC will be a cooperative agreement and competition is open to individuals, nonprofit and for-profit organizations, local and state governments, American Indian tribes and educational institutions.

The MBDC will provide management and technical assistance to eligible clients for the establishment and operation of businesses. The MBDC program is designed to assist those minority businesses that have the highest potential for success. In order to accomplish this, MBDA supports MBDC programs that can: coordinate and broker public and private sector resources on behalf of minority individuals and firms; offer them a full range of management and technical assistance; and serve as a conduit of information and assistance regarding minority business.

Applications will be judged on the experience and capability of the firm and its staff in addressing the needs of minority business individuals and organizations; the resources available to the firm in providing management and technical assistance; the firm's proposed approach to performing the work requirements included in the application; and the firm's estimated cost for providing such assistance. It is advisable that applicants have an existing office in the geographic region for which they are applying.

The MBDC will operate for a 3 year period with periodic reviews culminating in annual evaluations to determine if funding for the project should continue. Continued funding will be at the discretion of MBDA based on such factors as a MBDC's satisfactory performance, the availability of funds and Agency priorities.

*Closing Date:* The closing date for applications is November 8, 1985. Applications must be postmarked on or before November 8, 1985.

**ADDRESS:** Chicago Regional Office, Minority Business Development Agency, 55 East Monroe Street, Suite 1440, Chicago, Illinois 60603, 312/353-0182.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Barcode:3883995-02 A-549-502 SCO - Scope Inquiry - Line Pipe

# Attachment 4

*Antidumping: Circular Welded Carbon Steel Pipes and Tubes From Thailand; Final Determination of Sales at Less Than Fair Value*, 51 Fed. Reg. 8384 (Jan. 27, 1986)

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Barcode:3883995-02 A-549-502 SCO - Scope Inquiry - Line Pipe

[A-549-502]

## Antidumping: Circular Welded Carbon Steel Pipes and Tubes From Thailand; Final Determination of Sales at Less Than Fair Value

**AGENCY:** International Trade Administration, Import Administration, Commerce.

**ACTION:** Notice.

**SUMMARY:** We have determined that certain circular welded carbon steel pipes and tubes from Thailand are being, or are likely to be, sold in the United States at less than fair value, and have notified the U.S. International Trade Commission (ITC) of our determination. We have also directed the U.S. Customs Service to continue to suspend the liquidation of all entries of certain circular welded carbon steel pipes and tubes from Thailand that are entered, or withdrawn from warehouse, for consumption, on or after October 3, 1985, and to require a cash deposit or bond for each entry in an amount equal to 15.69 percent *ad valorem* for Saha Thai Steel Pipe Company and 15.60 percent for Thai Steel Pipe Industry Company.

**EFFECTIVE DATE:** January 27, 1986.

**FOR FURTHER INFORMATION CONTACT:** John J. Kenkel or Charles Wilson, Office of Investigations, Import Administration, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue, NW., Washington, D.C. 20230; telephone: (202) 377-5404 or (202) 377-5288.

**SUPPLEMENTARY INFORMATION:**

### Final Determination

We have determined that certain circular welded carbon steel pipes and tubes from Thailand are being, or are likely to be, sold in the United States at less than fair value, as provided in section 735 of the Tariff Act of 1930, as amended (19 U.S.C. 1673d) (the Act). The weighted-average margins are listed in the "Suspension of Liquidation" section of this notice.

### Case History

On February 28, 1985, we received a petition filed in proper form from the Standard Pipe Subcommittee of the Committee on Pipe and Tube Imports, and its member companies, on behalf of the U.S. industry producing certain circular welded carbon steel pipes and tubes. In compliance with the filing requirements of § 353.36 of the Commerce Regulations (19 CFR 353.36), the petition alleges that imports of the subject merchandise from Thailand are being, or are likely to be, sold in the United States at less than fair value within the meaning of section 731 of the Act (19 U.S.C. 1673), and that these imports are materially injuring, or threatening material injury to, a U.S. industry.

After reviewing the petition, we determined that it contained sufficient grounds upon which to initiate an antidumping investigation. We initiated the investigation on March 20, 1985 (50 FR 12068), and notified the ITC of our action.

On April 15, 1985, the ITC found that there is a reasonable indication that imports of certain circular welded carbon steel pipes and tubes from Thailand are materially injuring, or threatening material injury to, a U.S. industry (U.S. ITC Pub. No. 1680, April 1985).

On July 11, 1985, the petitioners alleged that the respondents' home market sales prices were below cost of production.

On July 16, 1985, the petitioners requested that we postpone the preliminary determination until September 26, 1985. They also alleged that critical circumstances exist. We postponed the preliminary determination on July 18, 1985 (50 FR 30493).

On July 25, 1985, we initiated a cost of production investigation.

We investigated Saha Thai Steel Pipe Company, Ltd., (Saha Thai) and Thai Steel Pipe Industry Company, Ltd., (Thai Steel) the manufacturers who account for all Thai exports of the merchandise to the United States. We examined 100 percent of the sales made by these companies during the period of investigation.

On September 26, 1985, we made an affirmative preliminary determination (50 FR 40427).

We verified the respondents' questionnaire resposes on October 10-24, 1985.

We conducted a public hearing on December 5, 1985.

On December 6, 1985, we postponed our final determination until not later than January 16, 1986.

### Scope of Investigation

The products under investigation are: certain circular welded carbon steel pipes and tubes, also known as "standard pipe" or "structural tubing," which includes pipe and tube with an outside diameter of 0.375 inch or more but not over 16 inches, or any wall thickness, as currently provided in items 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258 and 610.4925 of the *Tariff Schedules of the United States Annotated.*

### Fair Value Comparisons

To determine whether sales of the subject merchandise in the United States were made at less than fair value we compared the United States price with the foreign market value.

### United States Price

As provided in section 772(b) of the Act, we used the purchase price of the subject merchandise to represent the United States price because the merchandise was sold prior to the date of importation to unrelated purchasers in the United States. We calculated the purchase price based on the FOB or C + I packed price. We made deductions, where appropriate, for foreign inland freight, inland and marine insurance, handling and brokerage charges. We increased the United States price by the amount of import duties imposed by Thailand which had been rebated by reason of the exportation of the merchandise pursuant to section 772(d)(1)(B) of the Act (19 U.S.C. 1677a(d)(1)(B)).

### Foreign Market Value

The petitioners alleged that sales in the home market were at prices below the cost of producing the merchandise. We attempted to examine production costs including all appropriate costs for materials, fabrication and general expenses. However, as explained in the verification section of this notice, below, we were unable to verify portions of the respondents' cost of production information. Therefore, for those portions which could not be verified, we calculated the cost of production by using the best information available, which was estimates derived from the respondents' and petitioners' information.

In accordance with section 773(a)(1)(A) of the Act, when there were sufficient sales of such or similar merchandise at or above the cost of production for a particular product group, we calculated foriegn market value for Thai Steel based on home market sales, packed, to unrelated purchasers. When there were insufficient sales of such or similar merchandise at or above the cost of production for a particular product group, we used constructed value as the basis for comparison.

When foreign market value was based on home market price, we made comparisons of "such or similar" merchandise groups based on grade, dimension, and end finish selected by

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Barcode:3883995-02 A-549-502 SC010 Scope Inquiry - Line Pipe

Commerce Department industry experts. Where foreign market value was based on constructed value, we used timely information submitted by Thai Steel when we were able to verify it and, otherwise, best information available for materials, fabrication, general expenses, profit, and packing costs. When appropriate for constructed value, adjustments were made under § 353.15 of the Commerce Regulations for differences in circumstances of sale between the two markets. These adjustments were for differences in credit costs. Since the amount for general expenses was greater than 10 percent of the cost of materials and fabrication, we did not need to adjust it to the statutory minimum of 10 percent. Since the amount for profit was less than eight percent of the cost of materials, fabrication and general expenses, in accordance with statutory requirements, we added eight percent of the sum of the cost of materials, fabrication and general expenses for profit.

In the case of Thai Steel, we found sufficient sales in one product group at or above the cost of production to allow us to use its delivered home market prices to determine foreign market value. From these delivered prices we deducted inland freight costs. We made adjustments for differences in credit costs in accordance with § 353.15 of our Regulations (19 CFR 353.15). Since there were no home market packing costs, we added the packing costs incurred on sales to the United States.

In accordance with current Departmental policy, we also deducted from foreign market value for both respondents a business or sales tax which is levied on domestic sales of pipe and tube at a 5.5 percent rate. Although section 772(d)(1)(C) of the Act calls for adding these taxes to the United States price, this would result in distorting the tax absent an *ad valorem* margin. We are unable to establish what the appropriate tax basis would be for the exported merchandise since it is not subject to the tax. In the absence of knowing what the tax addition to U.S. price should be, we cannot calculate the differential. Therefore, as best information, we are making the adjustment by deducting these taxes from the price of the home market merchandise. Deducting from the home market price is the only tax neutral adjustment for both the *ad valorem* and absolute margin.

In the case of Saha Thai, we found sufficient sales at or above the cost of production for some product groupings, but not for others. For those sales at or above the cost of production, we used delivered home market prices to determine the foreign market value. From these delivered prices we deducted inland freight costs and trade discounts. We made adjustments for differences in credit costs. We also subtracted home market packing costs and added U.S. packing charges.

For product groupings for which there were insufficient sales at or above the cost of production, we calculated the constructed value by using information submitted by Saha Thai when it was timely and we were able to verify it, and, otherwise, best information available for cost of materials, fabrication, general expenses, profit, and packing costs. Since the amount for general expenses was less than ten percent of the cost of materials and fabrication, we adjusted it to the statutory minimum of ten percent. Since the amount for profit was less than eight percent of the cost of materials, fabrication and general expenses, in accordance with statutory requirements, we added eight percent of the sum of the costs of materials, fabrication and general expenses for profit. Where appropriate for constructed value, adjustments were made under § 353.15 of the Commerce Regulations for differences in credit costs in the two markets.

**Negative Determination of Critical Circumstances**

The petitioners alleged that imports of pipe and tube from Thailand present "critical circumstances." Under section 735(a)(3) of the Act, critical circumstances exist if we determine that: (1) There is a history of dumping in the United States or elsewhere of the class or kind of merchandise which is the subject of the investigation; or the person by whom, or for whose account, the merchandise was imported knew or should have known that the exporter was selling the merchandise which is the subject of the investigation at less than its fair value; and (2) there have been massive imports of the class or kind of merchandise that is the subject of the investigation over a relatively short period.

In determining whether there is a history of dumping of the products under investigation, we ascertain whether there have been any prior investigations of these products in any other country. When Australia investigated these products, it made a negative final determination in February 1985. Neither the Department nor Treasury has investigated these products before. Therefore, we find that there is no history of dumping.

The second criterion is whether the importers knew, or should have known, that the exporter was dumping the merchandise. We normally consider margins of 25 percent or more to constitute constructive knowledge of dumping. Since the margins in this case do not meet or exceed this level, we find tht knowledge of dumping cannot be imputed to the importers.

Because we do not have either a history of dumping or knowledge on the part of the importers that the merchandise was being dumped, we, therefore, do not have to consider whether there are massive imports over a relatively short period.

Thus, for the reasons described above, we determine that "critical circumstances" do not exist with respect to pipes and tubes from Thailand.

**Verification**

In accordance with section 776(a) of the Act, the Department attempted to verify the cost-of-production data of Thai Steel and Saha Thai. However, respondents submitted numerous revisions to the cost-of-production data shortly before the start of and during the on-site verification. In addition, there was a lack of sufficient supporting documentation for certain portions of the respondents' cost-of-production information. Therefore, we determined that portions of the cost of production data submitted by the respondents could not be verified.

**Petitioners' Comments**

*Comment 1.* The petitioners allege that critical circumtances exist and that the Department should impute knowledge of dumping to the importers based on prices of pipe imports from countries other than Thailand, price of coil imports and margins lower than 25 percent.

*DOC Position.* We have found that critical circumstances do not exist. Petitioners' position ignores the many financial complexities and adjustments that are essential in calculating whether merchandise is sold at less than fair value. Only after thorough investigation and verification can such a determination be made under section 773 of the Act. Short-hand formulas for imputing knowledge of dumping such as those suggested by petitioners run the risk of arbitrarily penalizing importers who believe in good faith that their imports are not being dumped.

*Comment 2.* Petitioners state that the Department should use the best information available since the Department could not examine underlying documentation to test the

A-10

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Barcode:3883995-02 A-549-502 SCO - Scope Inquiry - Line Pipe

accuracy of the summary documents at verification for one company, and the information and methodology changes significantly at the other company.

*DOC Position.* We agree. The Department used the best information available for those costs presented in the respondents' submission which could not be verified.

*Comment 3.* Petitioners state that the Department should use coil costs of Thai Steel only for the last three quarters of Thai Steel's 1984–1985 fiscal year instead of the full year.

*DOC Position.* We agree. The Department used best information to adjust the material costs to reflect the costs of the higher priced coils which were used by the company for the nine months ended March 31, 1985.

*Comment 4.* Petitioners contend that certain costs for Thai Steel are incorrect, specifically, the scrap rate, production rates and zinc yield.

*DOC Position.* In determining the steel scrap rate, zinc yield loss and transformation costs to be used for calculating the cost of production, the Department analyzed the respondent's data, which was considered by the Department not to be verified, to determine the reasonableness of the data compared to available U.S. industry data. The Department accepted the company's steel scrap rate but we adjusted the transformation costs and zinc yield loss.

*Comment 5.* Petitioners contend that the Department may not have included in the cost of production and may not have verified certain items, such as flux, acid for pickling and energy costs.

*DOC Position.* These costs were included as part of the fabrication costs, and adjusted accordingly. See Comment 4.

*Comment 6.* The Department should consider the business tax as a cost of manufacturing rather than as a general expense.

*DOC Position.* We disagree. The business tax was considered a part of the general expenses because it is paid on sales.

*Comment 7.* The amount of the business tax paid should be calculated by applying 5.5 percent to the price of pipe after deducting the amount of the tax.

*DOC Position.* We disagree. The business tax is already included in the home market price of the pipe. Therefore, we subtracted the verified amount from the home market price.

*Comment 8.* Since the foreign market value, pursuant to section 773(a)(1), is the price in the home market at the time of sale of the merchandise within the United States, the Department should consider only the home market price in the same month as sales to the U.S. Since the only sale to the U.S. occurred in February, 1985, then the Department need look at only February, 1985, home market sales.

*DOC Position.* We disagree. It is our practice to use foreign market value for the entire period of investigation, unless we are investigating imports from a hyper-inflationary economy or rapidly changing prices. Therefore, we have used all home market sales during the period of investigation.

*Comment 9.* The petitioners contend that the Department should compare U.S. sales of ASTM–120 pipe to both British Standard medium and heavy pipe sold in the home market because the specification of ASTM 1–120, in terms of wall thickness, is between both British specifications for some sizes and is thicker than the heavy specification for other sizes.

*DOC Position.* Our Departmental steel industry experts agree. When ASTM–120 pipe wall thickness is closer to British Standard medium, we used that for comparison purposes. Likewise, where the ASTM–120 is closer to British Standard heavy, we used it.

*Comment 10.* Saha Thai's duty drawback claims cannot be correct, particularly in light of what it pays for coil.

*DOC Position.* We disagree. We verified the amount that Saha Thai collects for duty drawback and have used that amount.

*Comment 11.* Petitioners contend that certain costs of Saha Thai do not seem plausible, specifically scrap loss, factory overhead and finishing galvanizing costs.

*DOC Position.* The Department did not consider the cost of manufacturing presented in the response received by the Department prior to its verification to be verified. Therefore, we adjusted such costs.

*Comment 12.* Petitioners contend that the business tax should not be included in Saha Thai's production costs if it is paid on sales.

*DOC Position.* In comparing cost of production to home market sales, we included the business tax in each. We did not include the business tax in constructed value or in the home market sales price, nor in the U.S. sales price when making our fair value comparisons.

*Comment 13.* Petitioners contend that not all interest expense should be allocated to SG&A expenses. Specifically, interest expenses arising from supplier credits should properly be considered a part of raw material costs.

*DOC Position.* The Department considers the financing expense of assets, long-term or short-term, to be fungible and, therefore, a general expense of operating the company.

**Respondents' Comments**

*Comment 1.* Respondents contend that the Department should not use best information available because they gave the verification team revised data at the outset of the verification and the data were fully verified. Any changes made to the data were insignificant.

*DOC Position.* The purpose of verification is to assess the accuracy of the response to the Department's questionnaire which is required, in most instances, prior to the preliminary determination. When required, respondents have an obligation to provide the Department with an accurate and complete response prior to the preliminary determination so that the Department has accurate and complete information on which to base its preliminary determination. That obligation is not met where a respondent reconstructs its response after the preliminary determination and presents it to our analysts or accountants shortly before the start of the verification or at the verification site. Indeed, this may render meaningless our preliminary determination. In addition, a thorough on-site verification can be conducted only where the Department has the opportunity: (1) To fully analyze information included in the response, (2) to assess comments submitted by other parties to the proceeding, and (3) to develop questions to pursue at the on-site verification. In cases where initial or supplemental responses to questionnaires are due after the preliminary determination date, they must be submitted in a timely manner to allow for analysis, comments and the development of questions prior to arrival at the verification site. Thus, while correction of minor errors is acceptable during verification, as a general matter we will not accept portions of responses (or entire responses) when they are changed in major respects shortly before the start of the verification or at the verification site because there is insufficient time for analysis and verification.

In this case both respondents prior to and in the course of the verification made significant changes in the cost submissions because the respondents were unable to provide support for their responses and because of the discovery of errors and inconsistencies.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Barcode:3883995-02 A-549-502 SCO - Scope Inquiry - Line Pipe

*Comment 2.* Respondents contend that the Department, if it uses constructed value, should adjust for circumstances of sale.

*DOC Position.* We agree. See our section, *supra*, on "Foreign Market Value."

*Comment 3.* Respondents contend that with respect to the outstanding countervailing duty order, the Department should adjust the U.S. price to reflect the amount of the countervailing duty attributable to an export subsidy, instead of adjusting the deposit rate.

*DOC Position.* We disagree. The statutory prohibition of section 772(d)(1)(D) is on double assessment for the same situation of dumping or export subsidization. Nevertheless, the Departmental practice has been to deduct the amount of the export subsidy from the dumping deposit or bonding requirement when there is a final countervailing duty order in effect on the imported merchandise. It is reasonable not to collect a double deposit when there cannot be double assessment. There has not yet been any assessment of countervailing duties on the shipments referred to by respondents. If there is ultimately such an assessment attributable to export subsidies, assessment of dumping duties for that amount will not be made. In the meantime, we will continue to deduct the amount attributable to the export subsidy from the dumping deposit.

*Comment 4.* Respondents contend that the Department erred in not correcting a clerical error in the preliminary determination concerning the use of British Standard heavy pipe, when only medium pipe should have been used.

*DOC Position.* We disagree. The Department's steel industry experts have decided that it is proper to include British Standard heavy pipe for certain product groups in making our comparisons.

*Comment 5.* Respondents contend that the Department should adjust the business tax by adding it to the U.S. purchase price instead of adjusting the foreign market value.

*DOC Position.* We disagree. See "Foreign Market Value," *supra*.

**Suspension of Liquidation**

In accordance with section 733(d) of the Act, we are directing the United States Customs Service to continue to suspend liquidation of all entries of certain circular welded carbon steel pipes and tubes from Thailand that are entered, or withdrawn from warehouse, for consumption, on or after October 3, 1985. The United States Customs Service shall require a cash deposit or the posting of a bond equal to the estimated weighted-average amounts by which the foreign market value of the merchandise subject to this investigation exceeds the United States price as shown in the table below. This suspension of liquidation will remain in effect until further notice.

Article VI.5 of the General Agreement on Tariffs and Trade provides that "[n]o product . . . shall be subject to both antidumping and countervailing duties to compensate for the same situation of dumping or export subsidization." This provision is implemented by section 772(d)(1)(D) of the Act, which prohibits assessing dumping duties on the portion of the margin attributable to export subsidies. In the final countervailing duty determination on certain circular welded carbon steel pipes and tubes from Thailand, we found export subsidies (50 FR 32751). Since dumping duties cannot be assessed on the portion of the margin attributable to export subsidies, there is no reason to require a cash deposit or bond for that amount. Thus, the amont of the export subsidies will be subtracted for deposit or bonding purposes from the dumping margins.

| Manufacturer/Producer/Exporter | Weighted-average margin percentage |
|---|---|
| Saha Thai Steel Pipe Co | 15.69 |
| Thai Steel Pipe Industry Co | 15.60 |
| All others | 15.67 |

**ITC Notification**

In accordance with section 735(c)(1) of the Act, we will notify the ITC of our determination. In addition, we are making available to the ITC all nonprivileged and nonconfidential information relating to this investigation. We will allow the ITC access to all privileged and confidential information in our files, provided the ITC confirms that it will not disclose such information, either publicly or under an administrative protective order, without the written consent of the Deputy Assistant Secretary for Import Administration. The ITC will determine whether these imports materially injure, or threaten material injury to, a U.S. industry within 45 days after we make our final affirmative determination.

This determination is published pursuant to section 735(d) of the Act (19 U.S.C. 1673d(d)).

**Paul Freedenberg,**

*Assistant Secretary for Trade Administration.*

January 16, 1986.

[FR Doc. 86-1702 Filed 1-24-86; 8:45 am]

BILLING CODE 3510-DS-M

A-12

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

# Attachment 5

*Certain Welded Carbon Steel Pipes And Tubes From Turkey And Thailand (Final)*, Inv. Nos. 701-TA-253 and 731-TA-252, USITC Pub. 1810 (Feb. 1986)

PUBLIC DOCUMENT

Barcode:3883995-03 A-549-502 SCO - Scope Inquiry - Line Pipe

# CERTAIN WELDED CARBON STEEL PIPES AND TUBES FROM TURKEY AND THAILAND

Determinations of the Commission in Investigation No. 701-TA-253 (Final) Under the Tariff Act of 1930, Together With the Information Obtained in the Investigation

Determination of the Commission in Investigation No. 731-TA-252 (Final) Under the Tariff Act of 1930, Together With the Information Obtained in the Investigation

USITC PUBLICATION 1810

FEBRUARY 1986

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

United States International Trade Commission / Washington, DC 20436

PUBLIC DOCUMENT
Barcode:3883995-03 A-549-502 SCO - Scope Inquiry - Line Pipe

# UNITED STATES INTERNATIONAL TRADE COMMISSION

## COMMISSIONERS

**Paula Stern, Chairwoman**
**Susan W. Liebeler, Vice Chairman**
**Alfred E. Eckes**
**Seeley G. Lodwick**
**David B. Rohr**
**Anne E. Brunsdale**

Staff Assigned:

Bonnie Noreen, Office of Investigations
Jerald Tepper, Office of Investigations
Vincent DeSapio, Office of Industries
Paul Gibson, Office of Economics
Marci Stras, Office of the General Counsel
Robert Carpenter, Supervisory Investigator

**Address all communications to**
**Kenneth R. Mason, Secretary to the Commission**
**United States International Trade Commission**
**Washington, DC 20436**

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

CONTENTS

Page

Determination of the Commission 1
Views of Chairwoman Paula Stern, Commissioner Alfred E. Eckes, Commissioner Seeley G. Lodwick and Commissioner David B. Rohr 5
Views of Chairwoman Paula Stern on causation 11
Views of Commissioner Eckes on causation in the investigations of standard pipes and tubes 19
Views of Commissioners Seeley G. Lodwick, and David B. Rohr concerning threat of material injury by reason of imports of standard welded carbon steel pipes and tubes from Turkey and Thailand 23
Views of Chairwoman Stern, Commissioner Eckes, Commissioner Lodwick, and Commissioner Rohr concerning line pipes and tubes from Turkey 31
Views of Commissioner Eckes, Commissioner Lodwick, and Commissioner Rohr 33
Views of Vice Chairman Liebeler and Commissioner Brunsdale 35
Additional views of Commissioner Brunsdale 49
Information obtained in the investigations:
- Introduction a-1
- Background a-2
- Discussion of report format a-4
- Nature and extent of subsidies and sales at LTFV a-4
- Foreign producers:
  - Turkey a-5
  - Thailand a-7
- The President's program on voluntary restraints of exports to the United States a-8
- The European Community pipe and tube agreement a-9
- Financial experience of U.S. producers of subject products:
  - Overall operations of establishments within which subject products are produced a-9
  - Investment in productive facilities and capital expenditures a-10
  - Capital and investment a-12
- Exchange rates a-12

Part I. Standard pipes and tubes:
- Introduction I-1
- The products:
  - Description and uses I-1
  - Manufacturing processes I-2
  - U.S. tariff treatment I-3
- U.S. producers I-5
- U.S. importers I-5
- The U.S. market:
  - Channels of distribution I-5
  - Apparent U.S. consumption I-7
- Consideration of alleged material injury to an industry in the United States:
  - U.S. production, capacity, and capacity utilization I-7
  - U.S. producers' domestic shipments I-8
  - U.S. exports I-8
  - U.S. producers' inventories I-9
  - Employment and wages I-9
  - Financial experience of U.S. producers I-11
    - Operations on standard pipes and tubes I-11
    - Capital expenditures and research and development expenses I-13
    - Investment in productive facilities I-13

CONTENTS

| | Page |
|---|---|
| Part I. Standard pipes and tubes—Continued | |
| The question of the threat of material injury: | |
| Consideration factors | I-14 |
| U.S. importers' inventories | I-14 |
| Consideration of the causal relationship between alleged material injury or the threat thereof and subsidized and/or LTFV imports: | |
| U.S. imports | I-15 |
| Market penetration by the subject imports | I-17 |
| Market penetration by the subsidized imports | I-17 |
| Market penetration by the LTFV imports | I-17 |
| Prices | I-18 |
| Prices of domestic products | I-19 |
| Prices of imports from Thailand and price comparisons | I-21 |
| Prices of imports from Turkey and price comparisons | I-22 |
| Transportation costs | I-24 |
| Other purchase decision factors | I-24 |
| Lost sales | I-24 |
| Purchasers' responses to general allegations of lost sales | I-25 |
| Part II. Line pipes and tubes: | |
| Introduction | II-1 |
| The products: | |
| Description and uses | II-1 |
| U.S. tariff treatment | II-1 |
| U.S. producers | II-2 |
| U.S. importers | II-4 |
| The U.S. market: | |
| Channels of distribution | II-4 |
| Apparent U.S. consumption | II-5 |
| Consideration of alleged material injury to an industry in the United States: | |
| U.S. production, capacity, and capacity utilization | II-6 |
| U.S. producers' domestic shipments | II-6 |
| U.S. exports | II-6 |
| U.S. producers' inventories | II-7 |
| Employment and wages | II-8 |
| Financial experience of U.S. producers | II-8 |
| Operations on line pipes and tubes | II-8 |
| Capital expenditures and research and development expenses | II-11 |
| The question of the threat of material injury: | |
| Consideration factors | II-11 |
| U.S. importers' inventories | II-11 |
| Consideration of the causal relationship between alleged material injury or the threat thereof and subsidized imports: | |
| U.S. imports | II-11 |
| Market penetration by the subsidized imports | II-13 |
| Prices | II-14 |
| Prices of domestic products | II-14 |
| Prices of imports from Turkey and price comparisons | II-16 |
| Transportation costs | II-16 |
| Other purchase decision factors | II-16 |
| Lost sales | II-17 |

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Barcode:3883995-03 A-549-502 SCO - Scope Inquiry - Line Pipe

CONTENTS

Page

Appendix A. Commerce's final subsidy and LTFV determinations — A-1
Appendix B. Notices of the investigations by the Commission — B-1
Appendix C. List of witnesses appearing at the hearing — C-1
Appendix D. Notices of termination by the Commission — D-1
Appendix E. Voluntary restraint agreement export ceilings and import data — E-1
Appendix F. Previous Commission investigations — F-1

Tables

1. Standard and line pipes and tubes: Turkey's capacity, production, and export sales, by firms, 1982-84, January-September 1984, and January-September 1985 — a-6
2. Standard pipes and tubes: Thail production, capacity, capacity utilization, domestic shipments, and exports, 1982-84, January-September 1984, and January-September 1985 — a-8
3. Income-and-loss experience of U.S. producers on the overall operations of their establishments within which standard and line pipes and tubes are produced, accounting years 1982-84 and interim periods ended Sept. 30, 1984 and Sept. 30, 1985 — a-11
4. Income-and-loss experience of U.S. producers on the overall operations of their establishments within which standard and line pipes and tubes are produced, by nonintegrated producers and specified integrated producers, accounting years 1982-84 and interim periods ended Sept. 30, 1984 and Sept. 30, 1985 — a-12
5. Nominal-exchange-rate equivalents of the Turkish lira and the Thai baht in U.S. dollars, real-exchange-rate equivalents, and producer price indicators in the United States, Turkey, and Thailand, indexed by quarters, January 1983-September 1985 — a-13
I-1. Standard pipes and tubes: Pending and recently terminated title VII investigations and outstanding dumping/countervailing duty orders since January 1984, most recent dumping/subsidy margins, and import-to-consumption ratios, by sources, 1982-84, January-September 1984, and January-September 1985 — I-4
I-2. Standard pipes and tubes: Selected U.S. producers' shares of domestic shipments and plant locations, by firms, 1984 — I-6
I-3. Standard pipes and tubes: U.S. producers' domestic shipments, imports for consumption, and apparent consumption, 1982-84, January-September 1984, and January-September 1985 — I-7
I-4. Standard pipes and tubes: U.S. production, capacity, and capacity utilization, 1982-84, January-September 1984, and January-September 1985 — I-8
I-5. Standard pipes and tubes: U.S. domestic shipments, 1982-84, January-September 1984, and January-September 1985 — I-8
I-6. Average number of production and related workers producing standard pipes and tubes, hours paid, wages and total compensation paid to such employees, and labor productivity, hourly compensation, and unit labor production costs, 1982-84, January-September 1984, and January-September 1985 — I-10

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

CONTENTS

Page

I-7. Income-and-loss experience of U.S. producers on their operations producing standard pipes and tubes, accounting years 1982-84 and interim periods ended Sept. 30, 1984, and Sept. 30, 1985 — I-12

I-8. Income-and-loss experience of U.S. producers on their operations producing standard pipes and tubes, by nonintegrated producers and specified integrated producers, accounting years 1982-84, and interim periods ended Sept. 30, 1984, and Sept. 30, 1985 — I-13

I-9. Standard pipes and tubes: U.S. imports for consumption, by sources, 1982-84, January-November 1984, and January-November 1985 — I-16

I-10. Standard pipes and tubes: U.S. imports for consumption, by sources, January-November 1985 — I-17

I-11. Standard pipes and tubes: Shares of U.S. consumption supplied by imports from Turkey, Thailand, and all other countries, 1982-84, January-September 1984, and January-September 1985 — I-18

I-12. Standard pipes and tubes: U.S. producers' weighted-average net selling prices to service centers/distributors and end users of specified products, January 1983-September 1985 — I-20

I-13. Standard pipes and tubes: Weighted-average prices to service centers/distributors and end users of specified products, U.S. produced and imported products from Thailand, by specified quarters, January-September 1985 — I-21

I-14. Standard pipes and tubes: Weighted-average prices to service centers/distributors and end users of specified products, U.S. produced and imported products from Turkey, by specified quarters, October 1984-September 1985 — I-23

II-1. Line pipes and tubes: Pending and recently terminated title VII investigations and outstanding countervailing duty order since January 1984, most recent dumping/subsidy margins, and import-to-consumption ratios, by sources, 1982-84, January-September 1984, and January-September 1985 — II-3

II-2. Line pipes and tubes: Selected U.S. producers' shares of domestic shipments and plant locations, by firms, 1984 — II-4

II-3. Line pipes and tubes: U.S. producers' domestic shipments, imports for consumption, and apparent consumption, 1982-84, January-September 1984, and January-September 1985 — II-5

II-4. Line pipes and tubes: U.S. production, capacity, and capacity utilization, 1982-84, January-September 1984, and January-September 1985 — II-6

II-5. Line pipes and tubes: U.S. producers' domestic shipments, 1982-84, January-September 1984, and January-September 1985 — II-7

II-6. Average number of production and related workers producing line pipes and tubes, hours paid, wages and total compensation paid to such employees, and labor productivity, hourly compensation, and unit labor production costs, 1982-84, January-September 1984, and January-September 1985 — II-9

II-7. Income-and-loss experience of U.S. producers on their operations producing line pipes and tubes, accounting years 1982-84, and interim periods ended Sept. 30, 1984, and Sept. 30, 1985 — II-10

II-8. Income-and-loss experience of U.S. producers on their operations producing line pipes and tubes, by nonintegrated producers and specified integrated producers, accounting years 1982-84, and interim periods ended Sept. 30, 1984, and Sept. 30, 1985 — II-10

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

CONTENTS

Page

II-9. Line pipes and tubes: U.S. imports for consumption, by sources, 1982-84, January-November 1984, and January-November 1985 — II-12

II-10. Line pipes and tubes: U.S. imports for consumption, by sources, by month and cumulative, January-November 1985 — II-13

II-11. Line pipes and tubes: U.S. producers' weighted-average net selling prices to service centers/distributors and end users of specified products, January 1983-September 1985 — II-15

E-1. Steel pipes and tubes: Ceilings negotiated under voluntary restraint agreements for exports shipped to the United states from certain countries, by products and sources, initial period and 1986 — E-2

E-1. Steel pipes and tubes: U.S. imports for consumption, by selected sources that have signed voluntary agreements restraining their exports shipped to the United States, January-November 1984, January-November 1985, and October 1984-November 1985 — E-4

F-1. Standard and line pipes and tubes: Title VII investigations by the U.S. International Trade Commission, 1982-85 — F-6

Note.—Information which would disclose confidential operations of individual concerns may not be published and therefore has been deleted from this report. Deletions are indicated by asterisks.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

PUBLIC DOCUMENT
Barcode:3883995-03 A-549-502 SCO - Scope Inquiry - Line Pipe

vi

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Barcode:3883995-03 A-549-502 SCO - Scope Inquiry - Line Pipe

UNITED STATES INTERNATIONAL TRADE COMMISSION
Washington, DC

Investigations Nos. 701-TA-253 (Final) and 731-TA-252 (Final)

CERTAIN WELDED CARBON STEEL PIPES AND TUBES FROM TURKEY AND THAILAND

Determinations

On the basis of the record 1/ developed in the subject investigations, the Commission determines, 2/ pursuant to section 705(b) of the Tariff Act of 1930 (19 U.S.C. § 1671d(b)), that an industry in the United States is materially injured, or threatened with material injury, by reason of imports from Turkey of welded carbon steel standard pipes and tubes, 3/ which have been found by the Department of Commerce to be subsidized by the Government of Turkey. Chairwoman Paula Stern and Commissioner Alfred E. Eckes determine that an industry in the United States is materially injured by reason of the subject imports. Commissioner Seeley G. Lodwick and Commissioner David B. Rohr determine that a domestic industry is threatened with material injury by reason of the subject imports. Commissioner Lodwick and Commissioner Rohr further determine, pursuant to section 705(b)(4)(B) of the Act (19 U.S.C. § 1671d(b)(4)(B)), that they would not have found material injury but for any suspension of liquidation of entries of the subject merchandise.

The Commission also determines, 4/ pursuant to section 705(b) of the Tariff Act of 1930 (19 U.S.C. § 1671d(b)), that an industry in the United States is threatened with material injury by reason of imports from Turkey of

1/ The record is defined in sec. 207.2(i) of the Commission's Rules of Practice and Procedure (19 CFR § 207.2(i)).

2/ Vice Chairman Liebeler and Commissioner Brunsdale make negative determinations.

3/ For purposes of this investigation, the term "welded carbon steel standard pipes and tubes" covers welded carbon steel pipes and tubes of circular cross section, 0.375 inch or more but not over 16 inches in outside diameter, provided for in items 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258, and 610.4925 of the Tariff Schedules of the United States Annotated (TSUSA).

4/ Chairwoman Stern, Vice Chairman Liebeler, and Commissioner Brunsdale make negative determinations.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

welded carbon steel line pipes and tubes, 1/ which have been found by the Department of Commerce to be subsidized by the Government of Turkey. Commissioners Eckes, Lodwick, and Rohr further determine, pursuant to section 705(b)(4)(B) of the Act (19 U.S.C. § 1671d(b)(4)(B)), that they would not have found material injury but for any suspension of liquidation of entries of the subject merchandise.

Finally, the Commission determines, 2/ pursuant to section 735(b) of the Tariff Act of 1930 (19 U.S.C. § 1673d(b)), that an industry in the United States is materially injured, or threatened with material injury, by reason of imports from Thailand of welded carbon steel standard pipes and tubes, 3/ which have been found by the Department of Commerce to be sold in the United States at less than fair value (LTFV). Chairwoman Paula Stern and Commissioner Alfred E. Eckes determine that an industry in the United States is materially injured by reason of the subject imports. Commissioner Seeley G. Lodwick and Commissioner David B. Rohr determine that a domestic industry is threatened with material injury by reason of the subject imports. Commissioner Lodwick and Commissioner Rohr further determine, pursuant to section 735(b)(4)(B) of the Act (19 U.S.C. § 1673d(b)(4)(B)), that they would not have found material injury but for any suspension of liquidation of entries of the subject merchandise.

---

1/ For purposes of this investigation, the term "welded carbon steel line pipes and tubes" covers welded carbon steel pipes and tubes of circular cross section, with walls not thinner than 0.065 inch, 0.375 inch or more but not over 16 inches in outside diameter, conforming to American Petroleum Institute (API) specifications for line pipe, provided for in TSUSA items 610.3208 and 610.3209.

2/ Vice Chairman Liebeler and Commissioner Brunsdale make negative determinations.

3/ For purposes of this investigation, the term "welded carbon steel standard pipes and tubes" covers welded carbon steel pipes and tubes of circular cross section, 0.375 inch or more but not over 16 inches in outside diameter, provided for in items 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258, and 610.4925 of the Tariff Schedules of the United States Annotated (TSUSA).

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Background

The Commission instituted the investigation on Thailand effective October 1, 1985, following a preliminary determination by the Department of Commerce that imports of certain welded carbon steel pipes and tubes from Thailand were being sold at LTFV within the meaning of section 731 of the Act (19 U.S.C. § 1673). Effective October 25, 1985, the Commission instituted the investigation on Turkey following a preliminary determination by the Department of Commerce that imports of certain welded carbon steel pipes and tubes from Turkey were being subsidized within the meaning of section 701 of the Act (19 U.S.C. § 1671). Notices of the institution of the Commission's investigations and of a public hearing to be held in connection therewith were given by posting copies of the notices in the Office of the Secretary, U.S. International Trade Commission, Washington, DC, and by publishing the notices in the Federal Register on October 28, 1985 (50 F.R. 43614) and November 14, 1985 (50 F.R. 47125). The hearing was held in Washington, DC, on January 7, 1986, and all persons who requested the opportunity were permitted to appear in person or by counsel.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

PUBLIC DOCUMENT
Barcode:3883995-03 A-549-502 SCO - Scope Inquiry - Line Pipe

4

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

VIEWS OF CHAIRWOMAN PAULA STERN, COMMISSIONER ALFRED E. ECKES, COMMISSIONER SEELEY G. LODWICK, AND COMMISSIONER DAVID B. ROHR

Chairwoman Stern and Commissioner Eckes determine that an industry in the United States is materially injured by reason of subsidized imports of welded carbon steel standard pipes and tubes from Turkey. 1/ Chairwoman Stern and Commissioner Eckes also determine that an industry in the United States is materially injured by reason of less than fair value (LTFV) imports of welded carbon steel standard pipes and tubes from Thailand. Commissioner Lodwick and Commissioner Rohr determine that a domestic industry in the United States is threatened with material injury by reason of the subsidized imports of welded carbon steel standard pipes and tubes from Turkey. 2/ Commissioner Lodwick and Commissioner Rohr also determine that a domestic industry in the United States is threatened with material injury by reason of LTFV imports of carbon steel standard pipes and tubes from Thailand. Commissioner Lodwick and Commissioner Rohr would not have found that the domestic industry was materially injured but for the suspension of liquidation of entries of welded carbon steel standard pipes and tubes from Turkey and Thailand.

Finally, we determine that an industry in the United States is threatened with material injury by reason of subsidized imports of welded carbon steel line pipes and tubes from Turkey. 3/ We would not have found that the

---

1/ See the Views of Chairwoman Stern and the Views of Commissioner Eckes, infra.

2/ See the Views of Commissioner Lodwick and Commissioner Rohr, infra.

3/ Chairwoman Stern dissents from the determination with respect to subsidized line pipes and tubes from Turkey. See her Views which follow.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

domestic industry was materially injured but for the suspension of liquidation of entries of welded carbon steel line pipes and tubes. 4/ 5/

Like products and domestic industries 6/

Two imported products are the subjects of these final investigations: (1) circular welded carbon steel standard pipes and tubes, 0.375 inch or more but not over 16.0 inches in outside diameter (standard pipe), and (2) circular welded carbon steel line pipes and tubes, 0.375 inch or more but not over 16.0 inches in outside diameter (line pipe). 7/

In the preliminary investigations, we determined that domestically produced line pipe is like imported line pipe and that domestically produced standard pipe is like imported standard pipe. 8/ None of the parties to these

4/ Material retardation of the establishment of an industry in the United States is not an issue in any of these investigations and will not be discussed further.

5/ 19 U.S.C. § 1671d(b)(4)(B).

6/ The term "industry" is defined in § 771(4)(A) of the Tariff Act of 1930 as "[t]he domestic producers as a whole of the like product, or those producers whose collective output of the like product constitutes a major proportion of the total domestic production of that product." 19 U.S.C. § 1677(4)(A). The term "like product," in turn, is defined in § 771(10) as "[a] product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation . . . ." 19 U.S.C. § 1677(10).

7/ We have considered circular standard pipe and line pipe as separate like products in previous investigations: Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea and Taiwan, Invs. Nos. 731-TA-131-132 (Preliminary), USITC Pub. 1389 (1983), aff'd, Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea and Taiwan, Invs. Nos. 731-TA-131, 132, and 138 (Final), USITC Pub. 1519 (1984); Certain Welded Carbon Steel Pipes and Tubes from Brazil and Spain, Invs. Nos. 701-TA-220 and 731-TA-197-198 (Preliminary), USITC Pub. 1569 (1984); Certain Welded Carbon Steel Pipes and Tubes from Taiwan and Venezuela, Invs. Nos. 731-TA-211-212 (Preliminary), USITC Pub. 1639 (1985); and Certain Welded Carbon Steel Pipes and Tubes from Brazil, France, Italy, the Republic of Korea, and West Germany, Invs. Nos. 701-TA-165-169 (Preliminary), USITC Pub. 1262 (1982).

8/ Certain Welded Carbon Steel Pipes and Tubes from Thailand and Venezuela, Invs. Nos. 701-TA-242 and 731-TA-252-253 (Preliminary), USITC Pub. 1680 (Apr. 1985); Certain Welded Carbon Steel Pipes and Tubes from India, Taiwan, Turkey, and Yugoslavia, Invs. Nos. 701-TA-251-253 and 731-TA-271-274 (Preliminary), USITC Pub. 1742 (Aug. 1985).

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

investigations has argued that those determinations should be changed and no facts have been presented that persuade us to change them.

We conclude, therefore, that there are two like products in these investigations--standard pipe up to and including 16 inches outside diameter and line pipe up to and including 16 inches outside diameter. We further conclude that there are two domestic industries comprised, respectively, of the domestic producers of standard pipe and line pipe.

Standard Pipe

Condition of the domestic standard pipe industry

In making a determination as to the condition of the domestic industry, the Commission considers, among other factors, consumption, production, capacity, domestic shipments, inventories, employment, and financial data. 9/

As noted above, we have investigated the domestic standard pipe industry in prior investigations. 10/ Our data in those investigations showed that the domestic standard pipe industry demonstrated reasonable performance through 1981 but suffered serious setbacks in 1982 in terms of almost all significant economic indicators. Production, shipments, capacity utilization, employment, and financial indicators all decreased precipitously. 11/ Therefore, the data for the first year of our current investigation, 1982, reflect very low performance levels. 12/

---

9/ 19 U.S.C. § 1677(7)(C)(iii).
10/ See footnote 7, supra.
11/ See Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea, supra, at 6-8.
12/ See Certain Welded Carbon Steel Pipes and Tubes from India, Taiwan, Turkey, and Yugoslavia, supra, at 9.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

In the current investigations, the data show that, despite modest improvements, the domestic standard pipe industry continued to experience difficulties throughout the period under investigation. 13/

Apparent U.S. consumption of standard pipe increased annually from 1.7 million tons in 1982 to 2.4 million tons in 1984, or by 45.2 percent. Apparent consumption of standard pipe decreased by 2.0 percent during January-September 1985 compared with consumption in January-September 1984. 14/

Domestic production and shipments also increased. However, the rates of increase were substantially below that for consumption. 15/  Standard pipe production increased 12 percent from 1982 to 1984 and 2 percent during January-September 1985 as compared with interim 1984. Capacity remained constant during the period of investigation. Capacity utilization, although increasing throughout the period, remained below 55 percent. 16/

Domestic shipments of standard pipe have generally followed the same pattern as production. Shipments increased by 7 percent from 1982 to 1984. 17/  During January-September 1985, shipments were 3 percent higher than during the corresponding period of 1984. The ratio of inventories to domestic shipments improved slightly throughout the period of investigation. 18/

Despite these improvements in shipments, domestic producers' share of the U.S. market declined from 49 percent in 1982 to 36 percent in 1984. The share

---

13/ We note that during the period of investigation several firms, for example, Bethlehem Steel Corp., LTV Steel Corp., and Merchants Metal, Inc., have closed standard pipe mills.
14/ See Report of the Commission (Report) at I-7, Table I-3.
15/ Id. at I-7.
16/ Id. at I-8, Table I-4.
17/ Id. at I-7, Table I-3.
18/ Id. at I-8-I-9.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

of the U.S. market during January-September 1985 increased to 38 percent but remained below the levels of 1982 and 1983. 19/

Both the number of production and related workers employed and hours worked declined throughout the period of investigation. At the same time, hourly compensation remained relatively stable and unit labor costs generally decreased. 20/

The financial experience of the U.S. producers substantiates the view that the domestic industry remains in poor condition. Although net sales increased by 12 percent from 1982 to 1984 and were 4 percent higher in the interim period ending September 1985 than in the corresponding period of 1984, the domestic industry reported operating losses during the entire period under investigation. 21/ We note that there is a substantial difference in the financial performance of the various domestic producers, and in general the nonintegrated producers outperformed the integrated firms. We have taken this into account but note that we are required by statute to assess the condition of the industry as a whole.

Accordingly, we find that the domestic standard pipe industry is still experiencing difficulties. 22/ 23/

---

19/ Id. at I-7, Table I-3.
20/ Id. at I-10, Table I-6.
21/ Id at I-11.
22/ Commissioner Eckes finds that the domestic standard pipe industry is experiencing material injury.
23/ Commissioners Lodwick and Rohr conclude that this industry is vulnerable to a threat of material injury.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

PUBLIC DOCUMENT
Barcode:3883995-03 A-549-502 SCO - Scope Inquiry - Line Pipe

10
Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

## VIEWS OF CHAIRWOMAN PAULA STERN ON CAUSATION

Cumulation of standard pipe imports

Petitioners urged the Commission to examine the cumulative impact of imports of standard pipe from Turkey and Thailand with each other and with imports of standard pipe from the People's Republic of China (China), India, the Philippines, Singapore, Venezuela, and Yugoslavia.

Section 612(a)(2)(A) of the Trade and Tariff Act of 1984 amends title VII of the Tariff Act of 1930 by the enactment of a new subsection pertaining to cumulation:

> (iv) CUMULATION.--For the purposes of clauses (i) and (ii), the Commission shall cumulatively assess the volume and effect of imports from two or more countries of like products subject to investigation if such products compete with each other and with the like products of the domestic industry in the United States market. 1/

The subject imports must satisfy three requirements before cumulation is warranted. They must (1) compete with other imports and with the domestic

1/ 19 U.S.C. § 1677(7)(C)(iv).

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

like product, (2) be marketed within a reasonably coincident time period, and (3) be subject to investigation. 2/ 3/

In these standard pipe investigations, I have found that all standard pipes and tubes are fungible, that the imports enter the same geographic areas, and that they have the same marketing patterns and distribution. 4/

Petitioners have urged the Commission to cumulate the impact of imports subject to countervailing duty investigations or orders with imports subject to antidumping investigations or orders. As I have previously stated, I do not believe that it is appropriate to cumulate imports across countervailing duty and antidumping investigations, and have declined to do so. 5/ Consequently, I have only considered as eligible for cumulative analysis

---

2/ Id. See Certain Steel Wire Nails from the People's Republic of China, Poland, and Yugoslavia, Invs. Nos. 731-TA-266-268 (Preliminary), USITC Pub. 1730 at 8 (July 1985).

3/ In determining whether the imported products compete with each other and with the like product in the U.S. market and whether the marketing of imports is reasonably coincident, I have considered the following factors:

1. The degree of fungibility between imports from different countries and between imports and the domestic like product, including consideration of specific customer requirements and other quality-related questions;
2. The presence of sales or offers to sell in the same geographic markets of imports from different countries and the domestic like product;
3. The existence of common or similar channels of distribution of imports from different countries and the domestic like product; and,
4. Whether the imports are simultaneously present in the market.

E.g., Certain Steel Wire Nails, supra, at 8; Oil Country Tubular Goods from Australia, Romania, and Venezuela, Invs. Nos. 701-TA-240-241 and 731-TA-249-251 (Preliminary), USITC Pub. 1679 at 8 (1985). This list is not exclusive and no single factor is determinative.

4/ Report at I-18.

5/ See Certain Carbon Steel Products from Austria and Sweden, Invs. Nos. 701-TA-225, 227-228, 230-231 and 731-TA-219 (Final), USITC Pub. 1759 at 11 (1985).

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

imports subject to the same type of investigation or final order as those at issue in each investigation. 6/ 7/

I have cumulated the impact of imports from countries that are not entitled to an injury test under section 303 of the Tariff Act of 1930 (Thailand and Yugoslavia) with the impact of imports of countries (Turkey) that have signed the Subsidies Code. I believe that there are several reasons that provide strong support for my position: (1) all of the imports at issue are allegedly subsidized; (2) inconsistent injury findings can result if the Commission does not cumulate; (3) exempting imports subject to investigation under section 303(a)(1) from the cumulation provision of section 771(7) would require the Commission to interpret "subject to investigation" as subject to investigation before the Commission. 8/

Petitioners urged the Commission to cumulate the impact of imports of standard pipe from Turkey with outstanding countervailing duty orders for Thailand and Yugoslavia. 9/ It is my view, based on the plain wording of the statute, that imports subject to recently issued final orders satisfy all the

---

6/ The impact of imports from India, Turkey, Yugoslavia, China, the Philippines, and Singapore (all current antidumping cases) were cumulated with the impact of imports from Thailand in the instant antidumping case; the impact of imports from Thailand and Yugoslavia (both subject to recent countervailing duty orders) were cumulated with the impact of imports from Turkey in the instant countervailing duty case.

7/ I take administrative note of the Court of International Trade's ruling in Bingham and Taylor v. United States, Slip Op. 86-14 (Feb. 14, 1986). Because that ruling was issued subsequent to the Commission's vote in the instant case, it has no bearing on the reasoning underlying my determination in this investigation.

8/ That interpretation would be inconsistent with the usage of the term "investigation" throughout title VII. Investigation refers to both the investigation before the Department of Commerce (Commerce) and before the Commission--it is a single bifurcated investigation.

9/ There are outstanding countervailing duty orders against Thailand (Aug. 14, 1985) and Yugoslavia (Oct. 16, 1985).

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

statutory requirements for cumulation, provided that one does not cumulate the impact of imports on which duties have been collected. (Those imports are, of course, fairly traded once the appropriate duty has been paid.) Therefore, I have cumulated the impact of subsidized imports from Turkey, Thailand, and Yugoslavia.

Petitioners have also urged the Commission to cumulate the impact of imports of standard pipe from Turkey with Venezuela and again with Yugoslavia, for additional reasons. Venezuela and Yugoslavia have entered voluntary restraint agreements (VRAs) with the United States. However, only the investigation regarding imports from Venezuela has been terminated as a result of a withdrawal of the petition. 10/ The termination of an antidumping investigation on Venezuelan standard pipe occurred subsequent to the preliminary affirmative determinations by the Commission and Commerce but prior to any final determination as to whether the imports were unfairly traded. The termination of the countervailing duty investigation occurred subsequent to a preliminary affirmative determination by the Commission but prior to a preliminary subsidy determination by Commerce. The statute does not allow cumulation in such circumstances. Because these imports have not been determined to be unfairly traded and because there is no pending investigation involving them, it is not appropriate to include them in any cumulative analysis. 11/

The petition against imports from Yugoslavia subject to the VRA has not been withdrawn. Since these imports remain subject to investigation, I have

---

10/ Certain Welded Carbon Steel Line Pipes and Tubes from Venezuela, 50 F.R. 43,615 (Oct. 28, 1985); Id., 50 F.R. 46,801 (Nov. 13, 1985).
11/ See Certain Carbon Steel Products from Austria and Sweden, supra, at 5.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

included them in my cumulative analysis. 12/ Thus, I have cumulated the impact of subsidized imports from Turkey with that of subsidized imports from Thailand and Yugoslavia recently subject to outstanding countervailing duty orders.

Finally, I have cumulated the impact of LTFV imports of standard pipe from Thailand with the impact of LTFV imports from China, the Philippines, India, Turkey, Yugoslavia, and Singapore. 13/ As explained above, it is my view that recently issued final orders satisfy all the statutory requirements for cumulation. This view is also applicable to imports subject to Commission and/or Commerce preliminary determinations.

Material injury by reason of LTFV standard pipe imports from Thailand

In making a determination of material injury by reason of unfair imports, section 771(7)(B) of the Tariff Act of 1930 directs the Commission to consider, among other factors, the volume of imports of the merchandise under investigation, the effect of such imports on domestic prices, and the impact of such imports on the relevant domestic industry. 14/

The total ratio of LTFV imports of standard pipe from Thailand, Turkey, India, Yugoslavia, China, the Philippines, and Singapore to apparent U.S. consumption was 0.8 percent in 1984 and 3.8 percent in January-September 1985 as compared with 0.6 percent in the corresponding period of 1984. 15/

---

12/ I note that I would have found material injury if the imports from Yugoslavia were not included in my cumulative analysis.
13/ The outstanding antidumping order for Taiwan was issued on May 7, 1984, and is thus, too remote in time to be cumulated.
14/ 19 U.S.C. § 1677(7)(B).
15/ Report at I-4, Table I-1.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

The pricing data collected in these investigations reveal that the prices from Thailand were lower than those of domestic products. 16/ The margins of underselling of Thai standard pipe ranged from 11 percent to 34 percent. Prices of domestic products increased in 1984 over the 1983 levels, but subsequently fell in 1985, ending the period of investigation about 5 percent below prices in January-March 1983. 17/

An important factor was the size of the average weighted margin. The weighted average dumping margin for Thai standard pipe was 15.67 percent *ad valorem*. Thus, the dumping constitutes a major reason why Thai imports have been able to penetrate the U.S. market.

In light of all the above factors, I determine that the domestic industry has been materially injured by LTFV imports of standard pipe from Thailand. 18/

Material injury by reason of subsidized standard pipe imports from Turkey

I have also cumulated the impact of imports under countervailing duty investigations or orders from Turkey, Thailand, and Yugoslavia. These imports were 0.7 percent in 1984 and 2.6 percent in January-September 1985 as compared with 0.5 percent in the corresponding period of 1984. 19/

The pricing data collected in these investigations reveal that the prices of imports from Turkey were lower than those of domestic products. 20/ The margins of underselling for Turkish standard pipe ranged from 10 percent to 36 percent. As noted above, prices for domestic products fell in 1985.

---

16/ *Id*. at I-21-I-22.
17/ *Id*. at I-19-I-21.
18/ The Commission received very few allegations of lost sales and none of lost revenues. The purchasers who were contacted stated, in general, that although price was a factor when they purchased imported products, non-price factors also played a significant role.
19/ Report at I-4, Table I-1.
20/ *Id*. at I-22-I-23.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

An important factor in my affirmative material injury determination on standard pipe from Turkey was the size of the average weighted margin and net subsidy. The bond margin for Turkish standard pipe was 17.80 percent ad valorem and accounts in large part for the ability of the Turkish standard product to enter the U.S. market.

In light of the import penetration levels, apparent underselling of Turkish standard pipe, and other factors, I determine that the domestic industry has been injured by subsidized imports of standard pipe from Turkey. 21/

No material injury or threat by reason of subsidized line pipe imports from Turkey

I determine that an industry in the United States is not being materially injured, or threatened with material injury, or materially retarded, by reason of imports of line pipes and tubes from Turkey that are being subsidized.

I join with the Commission majority in the discussion of the condition of the line pipe domestic industry and conclude that it continues to experience difficulties. However, the extremely tiny presence of the Turkish product in this market (0.7 percent during January-September 1985), taken with other factors, precludes any possibility that these imports are causing or threaten to cause material injury.

The record has established that Turkish producers have the capability to some extent to switch production from standard to line pipe. I find that this factor is insufficient to justify a finding of threat where there is certainly no present injury by reason of the subject imports. The record establishes that, in the past few years, the Turkish producers have not switched their

---

21/ The Commission received no allegations of lost sales and revenues.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

production from standard to line pipes. Also, despite the already sizeable unused line capacity that could have been used in the past to produce line pipe, the Turkish producers have chosen not to do so. Because of this unused capacity, the Turkish producers have no need to switch production from standard to line pipes and tubes in response to the Commission's affirmative determination on standard pipes and tubes. Thus, I do not regard product-shifting as an important factor in this investigation.

The information in the record of this investigation is too weak and speculative with regard to the additional threat factors to justify a finding that there is a real and imminent threat of material injury.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

VIEWS OF COMMISSIONER ECKES ON CAUSATION IN THE INVESTIGATIONS OF STANDARD PIPES AND TUBES

Cumulation

In determining whether there is a causal link between material injury to the domestic standard pipe and tube industry and unfairly traded imports from Thailand and Turkey, the Commission must follow the statutory directive on cumulation. The Trade and Tariff Act of 1984 states that "...the Commission shall cumulatively assess the volume and effect of imports from two or more countries of like products subject to investigation if such products compete with each other and with the like products of the domestic industry in the United States market."

In these investigations, there is no question that imported standard pipes from various sources compete with each other and with the domestic like product in the U.S. market. Standard pipes are fungible. Imported and domestic pipes are marketed nationwide and have similar channels of distribution.

Determining the appropriate imports to cumulate in the current investigations, however, does pose several questions. The petitioners maintained that the Commission should cumulate imports of standard pipe from Thailand and Turkey with each other and with imports from the Peoples' Republic of China (China), India, the Philippines, Singapore, Venezuela, and Yugoslavia. To follow this course entails: (1) cumulating imports from countries entitled to an injury test with those not entitled to a test (Thailand and Yugoslavia); (2) cumulating

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

imports from countries subject to recent final orders (Thailand and Yugoslavia--countervailing duty orders) which were marketed within a reasonably coincident time period with the subject imports; (3) cumulating imports from countries that have entered into voluntary restraint agreements with the United States (Venezuela and Yugoslavia); and (4) cumulating imports subject to countervailing duty investigations or orders with those subject to antidumping investigations.

For my determinations in both standard pipe investigations, I cumulated standard pipe imports from all of the countries urged by the petitioners with the exception of Venezuela.1/ In my view, cumulation in this way satisfies the congressional mandate to include all imports "subject to investigation." This approach also complies with the directive of Judge Carman of the Court of International Trade in Bingham & Taylor v. United States, Slip Op. 86-14 (Feb. 14, 1986) to cumulate imports subject to antidumping investigations with those subject to countervailing duty investigations. Since this directive was issued prior to the statutory deadline for delivering the Commission determinations in the current cases to the Department of Commerce, I do not believe it should be ignored. In these particular countervailing duty (Turkey) and antidumping (Thailand) investigations, cumulating across

---

1/ After Venezuela entered into a VRA, investigations of Venezuelan imports were terminated following withdrawal of the petition. The petition was not withdrawn for Yugoslavia. Therefore imports from Yugoslavia are still subject to investigation.

statutes is not determinative. I would have found material injury in both investigations without cross cumulation.

Material injury by reason of unfair imports from Turkey and Thailand

The cumulated volume of standard pipe imports from Turkey, Thailand, India, China, the Philippines, Singapore, and Yugoslavia increased sharply from 18,217 tons in 1984 to 115,490 tons in 1985. Prior to 1984, most of these countries did not participate in the U.S. market at all (Turkey and India exported around 500 tons each in 1983).

These new entrants captured a rapidly increasing share of the U.S. market. The cumulated ratio of imports to apparent U.S. consumption was only 0.8 percent in 1984, but it increased to 3.8 percent in January-September 1985 as compared to 0.6 percent in the comparable 1984 period.

The increases in import volume were particularly large for Turkey and Thailand. The volume of standard pipe from Turkey increased from 2,578 tons in 1984 to 36,277 tons in 1985. Thailand import volume jumped from 50 tons in 1984 to 33,678 tons in 1985. The combined Turkey-Thailand market share rose from 0.1 percent in interim 1984 to 2 percent in interim 1985.

Prices for domestic standard pipe generally rose in 1984 as compared to 1983. However, prices fell in 1985 to levels in the third quarter of the year (for most of the product types sampled) which were even lower than for the comparable quarter of 1983.

The President's program of voluntary restraints acted to limit imports of standard pipe from many traditional foreign suppliers in 1985.  Thus, conditions for the recovery of the domestic industry were more favorable in 1985, and yet the industry lowered its prices and continued to operate at a loss.

Pressure in the marketplace from the unfairly traded imports of new entrants undoubtedly acted to depress domestic prices during 1985.  In light of the underselling of Turkish and Thai imports and the rapid increase in market share claimed by those imports, I determine that the domestic standard pipe industry is materially injured by reason of subsidized imports from Turkey and less than fair value imports from Thailand.

Barcode:3883995-03 A-549-502 SCO - Scope Inquiry - Line Pipe

VIEWS OF
COMMISSIONERS SEELEY G. LODWICK AND DAVID B ROHR
CONCERNING
THREAT OF MATERIAL INJURY BY REASON OF IMPORTS OF STANDARD WELDED CARBON STEEL PIPES AND TUBES FROM TURKEY AND THAILAND

We have determined that the domestic industry producing standard welded carbon steel pipe and tube (standard pipe and tube) is threatened with material injury by reason of subsidized imports of standard pipe and tube from Turkey and dumped imports of standard pipe and tube from Thailand. In making these determinations, we have considered the current condition of the domestic industry, as characterized in the views of the majority, which is very vulnerable to injury, and the factors listed in Section 771(7)(F) of the Tariff Act of 1930, which Congress has directed the Commission to consider in assessing threats of material injury. 1/

---

1/ As added to the Tariff Act of 1930 by Section 612(a)(2)(B) of the Trade and Tariff Act of 1984, this provision states, in relevant part:

> In determining whether an industry in the United States is threatened with material injury by reason of imports (or sales for importation) of any merchandise, the Commission shall consider, among other relevant economic factors --
>
> (I) If a subsidy is involved, such information as may be presented to it by the administering authority as to the nature of the subsidy (particularly as to whether the subsidy is an export subsidy inconsistent with the Agreement),
>
> (II) any increase in production capacity or existing unused capacity in the exporting country likely to result in a significant increase in imports of the merchandise to the United States,
>
> (III) any rapid increase in United States market penetration and the likelihood that the penetration will increase to an injurious level,
>
> (IV) the probability that imports of the merchandise will enter the United States at prices that will have a depressing or suppressing effect on domestic prices of the merchandise,

(Con't on next page)

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Our investigation of standard pipe and tube from Turkey involves imports which have benefitted from subsidies provided by the Turkish government. The information provided to the Commission by the Department of Commerce indicates that all of these subsidies are export subsidies. The information presented to the Commission by Commerce, however, does not indicate whether the export subsidies in question are "inconsistent with the Agreement."2/ In any event, such subsidies do provide an incentive for Turkish producers to export the subject merchandise to the United States. The Thai investigation involves sales at LTFV rather than subsidized imports.

(Con't from previous page)

(V) any substantial increase in inventories of the merchandise in the United States,
(VI) the presence of underutilized capacity for producing the merchandise in the exporting country,
(VII) any other demonstrable adverse trends that indicate the probability that the importation (or sale for importation) of the merchandise (whether or not it is actually being imported at the time) will be the cause of actual injury, and
(VIII) the potential for product shifting if production facilities owned or controlled by the foreign manufacturers, which can be used to produce products subject to investigation(s) under section 701 or 731 or to find orders under section 706 or 736, are also used to produce the merchandise under investigation.

2/ This phrase is used in Section 771(7)(F)(i)(I) to refer to those export subsidies which are inconsistent with the provisions of the Agreement on the Interpretation and Application of Articles VI, XVI, and XXIII of the General Agreement on Tariffs and Trade (the "Subsidies Code"). This Agreement contains numerous provisions and illustrations of export subsidies and the conditions under which they may be legal or illegal. Under the statute, the Commission must rely on the Department of Commerce to determine that a particular subsidy fits in this category. Commissioner Rohr adds that it would be useful to the Commission for Commerce to present such information to it in the future.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Turkish capacity increased significantly in 1985, and substantially all of this increase was immediately put into production.  Possible effects on capacity from a recently purchased pipe and tube mill are too speculative and are not imminent.  With respect to Thailand there was a slight increase in capacity in 1984.  In neither case was there an increase in existing unused capacity.

Market penetration of Turkish imports of the product under investigation increased from one tenth of one percent in 1984 to 1.3 percent during the first nine months of 1985.  In actual volume terms, imports increased from 500 tons in 1983 to 2,600 tons in 1984.  During January-September 1985, imports totalled 24,800 tons.  An additional 11,500 tons were imported in the fourth quarter, bringing total 1985 import volumes to 36,300 tons.  This rate of increase is very significant, even though the absolute volume of imports is still small.  Imports from Thailand grew from virtually nothing to 13,500 tons, a 0.7 percent market share in the first nine months of 1985.  An additional 20,200 tons were imported in the fourth quarter, bringing the full year figure for 1985 to 33,700 tons.  There seems a substantial likelihood that these penetrations will increase to an injurious level.

While the pricing data in these two investigations is very limited due to the short time period and limited numbers of individual transactions, it appears likely that imports from both Turkey and Thailand will enter the United States at prices that will have a depressing or suppressing effect on domestic prices.  In both investigations, the data reflect consistent

underselling of the domestic prices. This is supported by information received from purchasers during lost sales confirmation calls. It is also supported by official import data that indicates that the unit value of imports from Turkey and Thailand is both substantially below the unit value of most other imports and, as calculated by the Commission, the unit value of domestic production. Further, imports from Turkey and Thailand undersold the domestic product at a time when domestic prices were declining.

Information regarding importers inventories was too limited to permit a firm basis for any conclusions in either investigation.

Both Turkish and Thai capacity utilization increased over the period of investigation. Turkish producers have significant amounts of underutilized capacity available for increasing production. Thai producers appear to be operating at close to capacity, based on the limited information received.

We have also examined several other factors relevant to these investigations, which are appropriately considered as "other demonstrable adverse trends." First, the market share of the domestic producers slipped steadily over the period of investigation from 49 to 36 percent, with a slight increase in interim 1985 to 38 percent. This erosion of the market share of domestic producers to importers is significant. It is particularly relevant to these investigations because the importers who are responsible for this erosion frequently import their products from a variety of sources, including, as

this investigation reveals, lately, from Thailand and Turkey. 3/

It is particularly important in light of the "drying up" of many sources of supply due to voluntary restraint agreements. Importers (including those entities who sell imports, whether or not "importers of record") have a considerable incentive to seek unrestrained sources of supply who are willing to undercut domestic prices, such as Turkey and Thailand. Indeed, information received during this investigation substantiates that both Turkey and Thailand are in the U.S. market largely due to the activities of U.S. importers. Under the statute, the threat of such imports is the same whether they are "pushed" into the U.S. market by foreign producers or "pulled" into the market by U.S. sellers of imports.

For both Thailand and Turkey, exports to the United States have rapidly become a substantial portion of their total exports. Such exports are, in turn, a substantial portion

---

3/ Commissioner Rohr notes that it has been argued that we should assess threat of material injury on a cumulative basis as we do in assessing the effect of cumulative imports on a presently injured industry. As discussed herein, the presence in the market of other imports is a factor relevant to the "vulnerability" of the domestic industry to the threat posed by imports. It is appropriate to consider the presence of other unfairly traded imports in assessing the level at which increases in imports from a particular country might begin to be injurious. This is not, however, cumulation in its statutory form. The actual threat, that is the capability of foreign producers to supply the U.S. market at injurious levels and their intention to do so, cannot properly be analyzed on a cumulative basis. For example, the incentive to supply product sold at LTFV is different than the incentive to supply subsidized goods, and the incentive to supply goods benefitting from an export subsidy is different from that to supply goods benefitting from domestic subsidies. He has therefore analyzed the question of threat of material injury without resort to the cumulation provisions of the statute.

of their total production.  In interim 1985, the U.S. accounted
for over 39 percent of each of these countries exports.  In
addition, imports from Turkey steadily increased throughout
1985, and significant quantities of import orders were
cancelled during the pendency of the investigation.  For
Thailand, the majority of its exports entered the United States
in the fourth quarter of 1985, and the Commission received
information of substantial outstanding orders for additional
significant tonnages of Thai product.  Continued and expanding
presence in the U.S. market is therefore important to both
countries.

The final factor which the statute requires us to consider
is the potential for product shifting.  Several different pipe
and tube products can be produced in a single pipe and tube
mill.  Changes between standard, line, light-walled
rectangular, and other types and sizes of pipe and tube can be
accomplished relatively economically.  There is, therefore,
potential for significant product shifting.

Producers in Turkey and Thailand clearly have a strong
incentive to direct additional product at the U.S. market.
Similarly, U.S. importers have an incentive to import as much
of this unfairly traded product as possible.  While the
capability of Turkey and Thailand to produce such additional
tonnages is not unlimited, the domestic industry is vulnerable
to a level of imports which would be within each of their
capabilities.  Based upon our evaluation of all of these
factors, we conclude that there is a real and immanent threat
of material injury by reason of imports of standard pipe and

tube from Thailand and Turkey.

Commissioner Rohr also states that under sections 705(b)(4)(B) and 735(b)(4)(B) of the Tariff Act of 1930, he has also determined that he would not have found material injury but for the suspension of liquidation of entries of the merchandise that went into effect as a result of the Department of Commerce preliminary affirmative findings in these two investigations. 4/ This provision requires the Commission to look at the condition of the industry and the effect of imports during the period between the date of the Department of Commerce preliminaries and the date of this decision to determine if the suspension of liquidation had the effect of preventing the threat of injury which now exists from maturing into actual injury.

He notes that the Department of Commerce made its affirmative preliminary determinations in the Turkish investigation in October 1985 and in the Thai investigation in September 1985. He also notes that the domestic industry supplied the Commission with information of the condition of the domestic industry only up to September 1985. Most of the Commission information on the effect of imports is similarly limited.

Very limited information is thus available to the Commission covering the period relevant to the "but for"

---

4/ Under section 706(b)(2) and 736(b)(2), this finding, if it is the determination of the Commission, has the effect of subjecting only those imports entered after the date of this determination to the appropriate countervailing duty or antidumping order.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

PUBLIC DOCUMENT
30
Barcode:3883995-03 A-549-502 SCO - Scope Inquiry - Line Pipe

determination. We do possess certain monthly import figures for the fourth quarter of 1985 and anecdotal information about recent shipments of the product under investigation from both countries. This information does not persuade him that the threat which he has determined to exist would have become actual injury in the period since the suspension of liquidation but for that suspension.

30
Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Barcode:3883995-03 A-549-502 SCO - Scope Inquiry - Line Pipe

VIEWS OF CHAIRWOMAN STERN, COMMISSIONER ECKES, COMMISSIONER LODWICK, AND COMMISSIONER ROHR CONCERNING LINE PIPES AND TUBES FROM TURKEY

Line Pipe

Condition of the domestic line pipe industry

In assessing the condition of the domestic industry in this investigation, the Commission considered, among other factors, line pipe consumption and the production, shipments, capacity utilization, employment, and financial data of the line pipe producers. 1/

Apparent U.S. consumption of line pipe decreased from 863,000 tons in 1982 to 772,000 tons in 1983, or by 11 percent, and then rose by 36 percent to 1.1 million tons in 1984. U.S. consumption in January-September 1985, at 694,000 tons, was 18 percent below the level of consumption in January-September 1984. 2/

Total production of line pipe increased irregularly from 316,000 tons in 1982 to 418,000 tons in 1984. During January-September 1985, production was 9 percent less than for the corresponding period of 1984. 3/

While capacity of the domestic industry remained stable, capacity utilization increased from 26 percent in 1982 to 37 percent in 1984, and fell to 34 percent in January-September 1985 as compared with 38 percent during the corresponding period of 1984. 4/ In terms of both value and quantity, domestic shipments of line pipe increased irregularly from 1982 to 1984 and then decreased in January-September 1985 as compared with the corresponding

---

1/ See 19 U.S.C. § 1677(7)(C)(iii).
2/ Report at II-5.
3/ Id. at II-6.
4/ Id.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

period in 1984. 5/  Inventories of U.S. producers increased from 47,000 tons in 1982 to 54,000 tons in 1984 and have remained at that level. 6/

The domestic producers' share of the U.S. market declined from 61 percent in 1982 to 51 percent in 1984.  The share of the U.S. market during January-September 1985 increased to 55 percent but remained below the levels of 1982 and 1983. 7/

The number of employees involved in production and related work decreased in 1983, increased in 1984, and decreased in January-September 1985. 8/  The total number of hours worked by production and related workers producing line pipe followed the same trend. 9/

In general, the financial data from the domestic producers indicate that the industry is experiencing difficulties.  Net sales of line pipe declined from 1982 to 1983, then increased in 1984 and then decreased in the interim period of 1985 as compared with the interim period of 1984.  Producers experienced operating losses throughout the period which, although decreasing, remain significant.  As with standard pipe producers, there is a substantial difference in the financial performance of the various domestic producers, and in general the nonintegrated producers outperformed the integrated firms.  As we stated above, we have taken this into account but note that we are required by statute to assess the condition of the industry as a whole.  The ratios of operating loss to net sales ranged from a low of 29 percent in 1983 to 10.5 percent in 1985. 10/  Thus, even though performance has shown some improvement, the industry has remained very unprofitable.

---

5/ Id. at II-7, Table II-5.
6/ Id. at II-7.
7/ Id. at II-5, Table II-3.
8/ Id. at II-9, Table II-6.
9/ Id.
10/ Id. at II-10, Table II-7.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

VIEWS OF COMMISSIONER ECKES, COMMISSIONER LODWICK, AND COMMISSIONER ROHR

Threat of material injury by reason of imports of line pipes from Turkey

Section 771(7)(F) of the Tariff Act of 1930 directs the Commission to consider a number of factors in assessing the threat of material injury. 11/ 12/ 13/

Although there were essentially no imports of line pipe from Turkey until mid-1985, 14/ such imports in January-September 1985 amounted to 4,987 tons

---

11/ "Material injury" is defined as "[h]arm which is not inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A).

12/ These factors include:

(1) If a subsidy is involved, such information as may be presented to it by the administering authority (particularly as to whether the subsidy is an export subsidy inconsistent with the Agreement),
(2) any increase in production capacity or existing unused capacity in the exporting country likely to result in a significant increase in imports of the merchandise to the United States,
(3) any rapid increase in United States market penetration and the likelihood that the penetration will increase to an injurious level,
(4) the probability that imports of the merchandise will enter the United States at prices that will have a depressing or suppressing effect on domestic prices of the merchandise,
(5) any substantial increase in inventories of the merchandise in the United States,
(6) the presence of underutilized capacity for producing the merchandise in the exporting country,
(7) any other demonstrable adverse trends that indicate the probability that the importation . . . of the merchandise . . . will be the cause of actual injury,
(8) the potential for product-shifting.

19 U.S.C. § 1677(7)(F)(i)(I)-(VIII). We note at the outset that in concluding that imports of line pipe constitute a threat of material injury, we find that the threat is real and actual injury is imminent. Our finding is not based upon mere conjecture or supposition that material injury might occur at some remote future date. See 19 U.S.C. § 1677(7)(F)(ii).

13/ Commissioners Lodwick and Rohr note that their comments with regard to the effect of Turkish subsidies and "other demonstrable adverse trends" in their Additional Views concerning Turkish standard pipe are equally applicable to Turkish line pipe.

14/ Report at II-13, Table II-10.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

and they captured 0.7 percent of the U.S. market. Through November, imports increased to 7,111 tons, and much of this is still in inventories in the United States.

Turkey's capacity to produce line pipe is substantial and could expand to meet changes in demand. From past performance we know that to a considerable extent Turkish producers have the capability to switch production between standard and line pipe. 15/ 16/

Because most of the imports from Turkey entered after the first half of 1985, very little pricing data are available. However, there is evidence of underselling in July-September 1985. 17/ It is probable that imports of line pipe from Turkey will have a depressing or suppressing effect on domestic prices of the merchandise. The unit import value reported for line pipe from Turkey is lower than the average import value of imports from all sources and lower than any other major sources, except Brazil. 18/

Investigation data indicate that the line pipe industry is experiencing difficulties. Although the volume of imports from Turkey is not high, Turkey's substantial unused capacity, the capability of Turkish producers to switch from standard to line pipe, and the considerable inventories held by importers indicate that the domestic industry producing line pipe is threatened with material injury by reason of subsidized imports of line pipe from Turkey. 19/

---

15/ Id. at a-5-a-7.

16/ Turkish producers have demonstrated the capability to produce significant quantities of line pipe in 1984 after producing minimal amounts in 1982-83. With the duty on standard pipe, there is a real threat of product-shifting.

17/ Report at II-16.

18/ Id. at II-12, Table II-9.

19/ Commissioner Rohr notes that his Additional Views with respect to his finding that the domestic standard pipe industry would not have been materially injured but for the suspension of liquidation of entries of that merchandise are also applicable to the line pipe industry and suspension of liquidation of entries of imported line pipe from Turkey.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Barcode:3883995-03 A-549-502 SCO - Scope Inquiry - Line Pipe

VIEWS OF VICE CHAIRMAN LIEBELER

AND COMMISSIONER BRUNSDALE

Based on the record in these investigations, we determine that an industry in the United States is not materially injured, or threatened with material injury, or materially retarded, by reason of (1) subsidized imports of welded carbon and steel standard and line pipes and tubes from Turkey, and (2) less than fair value (dumped) imports of welded carbon steel standard pipes and tubes from Thailand. 1/

In order for a domestic industry to prevail in a final investigation the Commission must determine that the dumped or subsidized imports cause or threaten to cause material injury to the domestic industry producing the like product. This analysis is usually recognized to be a two-step procedure. First, the Commission must

1/ Material retardation of the establishment of an industry in the United States is not an issue in these investigations and will not be discussed.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

determine whether the domestic industry producing the like product is injured or is threatened with material injury. Second, the Commission must determine whether any injury or threat thereof is by reason of the dumped or subsidized imports. Only if the Commission answers both questions in the affirmative will it make an affirmative determination in the investigation.

## I. The Like Product and the Domestic Industry

For purposes of determining whether dumped or subsidized imports are a cause of material injury to a U.S. industry we follow the approach of the majority and find two like products and two domestic industries. 2/

## II. Condition of the Industries

The Commission has investigated these products on several occasions since 1982. Despite this experience

2/ Commissioner Brunsdale nevertheless has serious reservations about this finding. See her Additional Views, infra. Vice Chairman Liebeler believes these Additional Views raise serious questions that deserve careful consideration.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

PUBLIC DOCUMENT
Barcode:3883995-03 A-549-502 SCO - Scope Inquiry - Line Pipe
37

we find that the overall performance of the domestic producers of standard and line pipes in recent years is difficult to assess. 3/

One might get the impression that we are dealing with a chronically depressed industry. In an economic sense, this is a contradiction in terms. Industries that are depressed normally experience a period of decline and eventual adjustment. However, the experience of the domestic steel industry is hardly normal, for it has been the beneficiary of a variety of U.S. actions to restrict imports, 4/ most recently the voluntary restraint agreements (VRAs) with all major foreign suppliers. 5/ Thus it is likely that contractions that would have otherwise occurred were curbed or postponed. As a consequence important facets

---

3/ Staff Report, Appendix F.

4/ See, for example, Gary N. Horlich and Christopher W. Savage, "Steel Trade Wars, 1968-84," WorldLaw July/August 1984, at 5-11.

5/ Staff Report at pp. A-8 and A-9.

37

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

of the industries' recent record are distorted. 6/

An important indicator of the state of an industry's health is aggregate profits for all firms. However, there appear to be significant deficiencies with the reported data. For both standard and line pipes there is an important difference between the results reported by the smaller nonintegrated firms and those reported by the larger integrated firms -- the former report positive incomes, the latter are apparently doing poorly. Overall, for both groups combined, the nonconfidential information presented in the Staff Report (on pp. I-12 and II-10) paints a picture of an industry suffering losses. However, these data have a flaw so serious that if properly corrected it could mean that producers of standard and line pipes were actually earning positive profits.

6/ From the viewpoint of domestic firms, the recently negotiated VRAs should be expected to postpone decisions to scale back domestic pipe and tube operations since the VRAs offer the promise of greater demand for domestic steel in the near future. Under these conditions domestic firms may very naturally hold on to an unusually large quantity of existing machinery and equipment and plan to reactivate such assets when demand increases. Thus the low capacity utilization figures reported are not useful in assessing whether the industry is suffering material injury.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Our concern with the profit data involves certain producers reporting negative gross profits for both products for each year from 1982 to 1984 and also for the first nine months of 1985.

Generally speaking, sustained negative gross profits are not rational for a firm. Continued production is not rational when revenues are less than variable costs. Sustained negative gross profits on a product line should not occur if a firm is properly allocating costs.

* * * * * * *

We conclude that the aggregate reported profit data for domestic producers of standard and line pipe is subject to a potentially serious bias. The industries' reported profits do not appear to be a reliable and accurate measure of the returns earned on the companies' standard and line pipe operations. We strongly suspect that the profit situation for domestic producers as a whole is severely understated.

Cumulation

Petitioners urge that imports of standard pipes and tubes from Thailand and Turkey should be cumulated with each other and with imports of standard pipes and tubes from India, Yugoslavia, Singapore, the Philippines, China and Venezuela. They also argue that imports of line pipes and tubes from Turkey should be cumulated with imports of line pipes and tubes from Taiwan and Venezuela.

We do not agree that all these possible combinations should be cumulated. The subject imports must satisfy three requirements before cumulation is warranted. They must compete with other imports and with the domestic like product and be subject to investigation. 7/ The plain meaning of the statute is one of several reasons why one should not cumulate imports from countries subject to a section 701 countervailing duty investigation with imports from countries subject to a section 731 antidumping investigation. 8/

7/ 19 U.S.C. 1677(7)(C)(iv).

8/ Certain Carbon Steel Products from Austria, Czechoslovakia, East Germany, Hungary, Norway, Poland, Romania, Sweden, and Venezuela, Nos. 701-TA-225-234 (Preliminary), 731-TA-213-217, 219, 221-226, and 228-235 (Preliminary), USITC Pub. No. 1642 (February 1985) (Views of Vice Chairman Liebeler) at 48. [Certain Carbon Steel Products]

The recent decision on cross-cumulation in Binghman and Taylor v. United States, CIT No. 85-07-00909 (decided February 14, 1986) is not binding on us here inasmuch as that decision is still subject to appeal.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Nor should one cumulate imports subject to final orders, even if recently issued. Certain Carbon Steel Products, supra at 50. Among other reasons, the plain meaning of the statute requires that the imports be "under investigation." In addition, cumulation with imports subject to a final negative determination by Commerce is inappropriate because such imports are fairly traded. Moreover, cumulation with imports from a country that has signed a voluntary restraint agreement (VRA) is inappropriate. Our best information is that in the future that country's subject imports will be fairly traded. 9/

Consequently, as regards respondent Thailand, we would cumulate imports of standard pipes and tubes from

---

9/ Yugoslavia's situation deserves further comment. The U.S. has negotiated a VRA with Yugoslavia. However, petitioners have not withdrawn their petition and in a technical sense the investigation involving Yugoslavia continues. Counsel for petitioners has admitted that it has not withdrawn the petition in order to require cumulation. We should not cumulate in this situation when the processes of government are being misused. To countenance such conduct now could set a bad precedent for the future. In any event, the USTR has informed us that the Yugoslavian VRA is in force and that it is not contingent on the withdrawal of the petition. We note that it would not alter our decision even if we had cumulated.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Barcode:3883995-03 A-549-502 SCO - Scope Inquiry - Line Pipe

Thailand with those from Turkey, China, India, Philippines, and Singapore. This results in an import penetration ratio of 3.25 percent. As to respondent Turkey, because there are no relevant subsidy investigations pending against other countries, it is not appropriate to cumulate any of the imports suggested by Petitioner. Therefore, the import penetration ratio of Turkish standard pipes and tubes is 1.3 percent and Turkish line pipes and tubes is 0.7 percent. 10/

III. Material Injury by Reason of Imports or Threat Thereof

A. Lost Sales and Underselling

Frequently in Title VII proceedings the Commission examines allegations of lost sales and underselling. In this case staff examined four allegations of standard

10/ We note that here too even if we were to accept petitioners' cumulation arguments in their entirety the total import penetration would still be in a very low range and our decision would not change.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

pipe sales lost to Thailand by domestic producers. Two of the allegations were denied and one purchaser refused to talk specifically about the other two allegations except to indicate that domestic sources do not offer the specific product the purchaser wants. The Commission received no allegation of lost sales involving standard pipe from Turkey. A single allegation concerning Turkish line pipe could not be corroborated directly, since the facts concerning the lost-sales allegation were in dispute.

In addition, the staff report indicates that prices of standard pipe and tube from Thailand and Turkey typically "undersold" U.S. products. Evidence of Turkish line pipe "underselling" was de minimis.

1. Lost sales

We note first that lost sales are not mentioned in Title VII. Moreover, the presence or absence of specific lost sales is rarely determinative or persuasive on the question of a causal link between dumped or subsidized imports and material injury to the domestic industry. Confirmed lost sales account for only a small portion of total imports or excess domestic

capacity. Aggregate trade, production, and capacity data are far more probative. 11/

2. Underselling

We believe that evidence of underselling is ordinarily not probative on the issue of causation. And we do not find the data on underselling gathered by the Commission in this case to be useful. In brief, when there are price differences we expect that they are usually explained by differences in the items compared. Rarely will the characteristics of the imported product exactly match those of the domestic product. Even when products appear to be identical (e.g., a bushel of wheat) a correct price comparison would have to take into account factors other than the exchange of ownership of the product. Inventory costs, reliability of the producing firm, timely delivery, transportation costs, and other service elements all go into the buyer's decision on what price it will pay. Merely

11/ See Memorandum from Director, Office of Economics, EC-J-010 (January 7, 1986), at 1-5. In addition, the Commission's sampling method is biased, e.g., we do not ask how many foreign sales are lost to domestic producers' sales.

comparing transaction prices and making a seat-of-the-pants judgment that the products are "homogeneous" is not a useful exercise. 12/

In this investigation, for example, there is some evidence that while the physical characteristics of the products are very similar, they are not identical (i.e., homogeneous). Moreover, delivery or other service related factors may not be the same. For example, one U.S. purchaser noted that * * *. Another stated that domestic producers * * *. One purchaser tended to buy * * *. Hence, prices received by different suppliers are expected to vary and, moreover, price differences among firms are expected to persist over time. Thus, the observed price differences among firms are not helpful in analyzing causation in this investigation. 13/

---

12/ Vice Chairman Liebeler notes that predatory behavior is an alternative explanation for price differences. See footnote 15.

13/ See Memorandum from Director, Office of Economics, EC-J-010 (January 7, 1986), at 8-22.

Vice Chairman Liebeler's views are more fully set forth in Certain Table Wine from the Federal Republic of Germany, France, and Italy, Invs. No. 701-TA-258-60 and 731-TA-283-85 (Preliminary), USITC Pub. 1771 at 34-36 (1985) (Additional Views of Vice Chairman Liebeler).*

3. Causation Analysis

Our negative determinations in these investigations are based on the following factors. As to material injury, the data in this proceeding with regard to the condition of the domestic industries are strongly suspect. The great majority of firms in the industry are healthy. Moreover, the market share of respondents and the cumulated countries is very low. 14/ Even in the case of standard pipes and tubes, which had the largest cumulative import penetration (3.25 percent for the first nine months of 1985), the performance of domestic producers during this period is not consistent with a finding of material injury. Virtually all the indicators for domestic firms show improvement. Shipments, production, net sales, wage rates, capital expenditures, and R & D spending were all up. In particular, note that comparing interim 1984 and

14/ Vice Chairman Liebeler notes that it is highly unlikely that even a single firm possessing a market share in this range could exert any significant effect on price or sales in the U.S. market in the absence of evidence that both the demand and the supply of the product are highly inelastic.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

interim 1985 capital expenditures rose sharply from $2.4 million to $*** million; firms would not embark on substantial capital investment programs if the subject imports caused material injury. Also note that total compensation to production and related workers rose from $18.92 per hour to $19.83 per hour.

4. Threat Analysis

As to threat of material injury, we considered whether capacity utilization in the cumulated countries is such that the domestic industry might eventually be harmed by large increases in import volume. The low base of penetration achieved by those countries makes it improbable that there could be any real threat of material injury or imminent actual injury. Moreover, since decisions to invest necessarily are based on estimates of future demand and supply conditions we find no support for the argument that there is a threat of

PUBLIC DOCUMENT
48
Barcode:3883995-03 A-549-502 SCO - Scope Inquiry - Line Pipe

material injury that clouds future prospects. 15/

15/ Vice Chairman Liebeler finds five factors to be particularly helpful on the issue of causation. An affirmative vote is more likely when the following conditions are present: (1) a large and increasing market share; (2) a high margin of dumping or subsidization; (3) homogeneous products; (4) declining domestic prices; and (5) barriers to entry. See Certain Red Raspberries from Canada, Inv. No. 731-TA-196 (Final), USITC Pub. 1680 at 11-19 (1985). In this case, she finds that the low market share of respondents and the cumulated countries is such that material injury or the threat of material injury cannot occur in light of the evidence regarding the other factors. This other evidence includes a moderate level of dumping and subsidization; relatively high homogeneity for most products' uses; mixed pricing patterns; and relatively high barriers to entry in the form of voluntary restraint agreements (although the diversity of countries producing the relevant products suggests that, absent VRAs, entry is easy).

48

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

ADDITIONAL VIEWS OF COMMISSIONER BRUNSDALE

These investigations cover two products like or most similar to the imported products involved, standard pipes and tubes and line pipes and tubes made of carbon steel. There is some evidence which suggests to me, however, that there is only one domestic industry that produces both like products. I base these concerns on the fact that there are significant links between the two products in terms of production characteristics. These supply-side links are so strong that I seriously question the utility of constructing separate industries for each product line.

The term "like product" is defined in section 771(10) of the Tariff Act of 1930 as "a product which is like, or in the absence of like, most similar in characteristics and uses with the article subject to an investigation. [emphases added] 1/ The term "industry," in turn, is defined in section 771(4)(A) as "the domestic producers as a whole of the like product." 2/ In other words, domestic products that are close substitutes in demand with the imported product are the "like product."

Having established the "like product," the domestic producers of that product are the focus of my inquiry into

1/ 19 U.S.C. sec. 1677(10).
2/ 19 U.S.C. sec. 1677(4)(A).

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

the scope of the relevant domestic industry. "Domestic industry" is not defined solely in terms of demand-side substitutes, because the statute directs us to focus on producers of the like product. In my view, this includes consideration of the interrelationship among different domestic products in production or supply. Domestic facilities utilized to produce the like product often, as they do here, possess the capacity to produce a number of products including the "like product" subject to investigation.

In particular, when there is a high degree of commonality of inputs in the production of several goods (one of which is the "like product") proper allocation of the costs to separate goods may be impossible. This occurs, for example, when two goods are (or can be) produced using the same equipment so that useful information for such important variables as production capacity and profits cannot be obtained for each good. In such cases the two goods are very close substitutes in supply and the appropriate definition of the domestic industry should properly encompass facilities producing goods in addition to the "like product."

More generally, it would seem that when the domestic supply-side substitutability 3/ between two products is

3/ For example, when there are common production facilities, machines, workers, etc., and no meaningful cost allocations can be made among different goods.

Barcode:3883995-03 A-549-502 SCO - Scope Inquiry - Line Pipe

very strong -- when the domestic industry as a matter of ordinary business practice can easily switch from producing one product to a second -- then the appropriate definition of the domestic industry should include both products. 4/ To do otherwise, i.e., to define the domestic industry in terms of each like product separately (finding two industries), can lead to incorrect conclusions about material injury and causation.

To illustrate how one can reach erroneous conclusions when these production interrelationships (or supply-side substitutions) are ignored, consider the following hypothetical. Suppose initially that there are no imports and that domestic firms produce 95 Gadgets and 5 Widgets using the same equipment and labor in the same facilities. Some firms may specialize in Gadgets, some in Widgets, while others make both products. But given high supply-side substitution, firms can easily switch between the two products. 5/

4/ Compare with the statement by Professor F. M. Scherer: "Substitution on the production side must also be considered [in the ideal definition of a market or an industry]. Groups of firms producing completely noncompeting products may nevertheless be potential competitors if they employ essentially similar skills and machinery, and if there are no barriers preventing each group from entering the other's product lines should the profit lure beckon." Industrial Market Structure and Economic Performance, 1970, at 53.

5/ Widgets and Gadgets could also be close substitutes on the demand side but this is not necessary for the present analysis and in the following discussion it is assumed that Widgets and Gadgets are not substitutes in demand.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Now let dumped imports enter the U.S. and capture half of the domestic Widget market. Suppose foreign and domestic firms each sell 3 units for a total of 6 units (consumption is higher because the market price of Widgets declines). The domestic industry responds by shifting resources from Widgets to Gadgets, which increases sales of Gadgets to 97 units (because the price of Gadgets has also declined), and by filing an antidumping petition alleging unfair competition by certain foreign producers of Widgets. This raises the issue of how the Commission should proceed to determine whether there has been material injury by reason of the dumped imports of Widgets.

Note that if this production interrelationship (supply-side substitution) is ignored, the domestic industry is defined in terms of Widgets. Then, import penetration of Widgets has increased from zero to 50 percent; profits of domestic firms that specialize in Widgets could plummet; capacity utilization of these same firms could also fall off sharply. But, if production/supply-side flexibility is considered, the domestic industry is defined properly, i.e. the combination of Widgets and Gadgets. Then, import

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

penetration has increased slightly from zero to about 3 percent (i.e., 3/103); profit results over all firms would probably be little affected; and capacity utilization for the industry as a whole would change very modestly.

The probability that the Commission would reach different decisions in this hypothetical under these two differing approaches to industry definition suggests that one should consider supply-side flexibility in Title VII cases. Finally, note that this observation is not affected by evidence which indicates that any individual firm may have suffered injury as a result of the dumped imports, i.e., a firm specializing in Widgets. For the statute plainly states that the relevant concern of the Commission is injury to the domestic industry, not merely injury to particular firms. 6/

These points are directly relevant to the two cases under consideration here. For example, as indicated in the Staff Report (p. II-1), standard and line pipes and tubes can be produced on the same equipment and using nearly identical manufacturing processes. Moreover, the Staff Report (p. a-12) also indicates that * * * domestic firms specialize in standard pipes and tubes, * * * firms specialize in line pipes and tubes, and * * * firms produce both types of products. The report also notes,

6/ 19 U.S.C. sec. 1671(2)(A) and 19 U.S.C. sec. 1673(2)(A).

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

however, (p. II-1) that line pipes require additional testing. Unfortunately, we do not possess sufficient information to assess how severe a barrier this poses to the standard pipe producer that contemplates switching to line pipe production. It is not likely, however, that this barrier would be high. After all, some major producers, which account for over half of the reported production capacity of both standard and line pipes, already produce both types of pipes. Thus the supply-side flexibility between standard and line pipes appears to be very strong.

Evidence of strong supply-side flexibility between the two products is also bolstered by Petitioners' arguments in a previous antidumping case involving these same products. The arguments call into question the reported data in the present investigations that purport to distinguish information for the two products. In Certain Welded Carbon Steel Pipes and Tubes from Thailand and Venezeula, Petitioners maintained that firms that produce both line and standard pipe could not provide separate data for the two products and "view[ed] the producers of standard and line pipe as a single industry." 7/ Since that time these firms have apparently devised a procedure to allocate such variables as capacity and profits to the two products. However, it is worth

7/ Inv. Nos. 701-TA-242 (Preliminary) and 731-TA-252 (Preliminary), USITC Pub. 1680 (April 1985) at 9 note 14.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

inquiring what meaning the Commission can give to these new data. Since, as has been discussed above, the same machinery can be used to make both standard and line pipes, the new data are suspect. In particular, they are of questionable value in assessing the performance of the firms that produce both products.

Having discussed certain deficiencies of a two-product, two-industry analysis, I nevertheless concur with my colleagues in this case--and note that my determination would have been the same either way. I am persuaded, however, that the issues discussed here merit further consideration and study in the context of future cases coming before the Commission.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

PUBLIC DOCUMENT
Barcode:3883995-03 A-549-502 SCO - Scope Inquiry - Line Pipe

56
Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

INFORMATION OBTAINED IN THE INVESTIGATIONS

Introduction

As a result of preliminary determinations by the U.S. Department of Commerce that producers or exporters of certain welded carbon steel pipes and tubes in Turkey are receiving subsidies from their Government and that imports of certain welded carbon steel pipes and tubes from Thailand are being sold in the United States at less than fair value (LTFV), 1/ the U.S. International Trade Commission instituted investigations under sections 705(b) and 735(b) of the Tariff Act of 1930 (19 U.S.C. § 1671d(b) and § 1673d(b)) to determine whether an industry in the United States is materially injured or threatened with material injury, or whether the establishment of an industry in the United States is materially retarded, by reason of the following subsidized and/or LTFV imports:

Standard 2/ and line 3/ pipes and tubes from Turkey (countervailing duty investigation No. 701-TA-253 (Final)) and
Standard pipes and tubes from Thailand (antidumping investigation No. 731-TA-252 (Final)).

Notice of the institution of the Commission's final antidumping investigation concerning subject imports from Thailand was given by posting copies of the notice in the Office of the Secretary, U.S. International Trade Commission, Washington, DC, and by publishing the notice in the Federal Register on October 28, 1985. 4/ Notice of the institution of the Commission's final countervailing duty investigation concerning subject imports from Turkey and of a public hearing to be held in connection with both the countervailing duty investigation and the antidumping investigation was

1/ On Oct. 3, 1985, Commerce published notice in the Federal Register of its preliminary determination of sales in the United States at LTFV for imports of subject products from Thailand (50 F.R. 40427); on Oct. 28, 1985, Commerce published notice of its preliminary affirmative determination of subsidies for subject imports from Turkey (50 F.R. 43597). Commerce subsequently made affirmative final determinations in the investigations, publishing notice in the Federal Register on Jan. 10, 1986 (Turkey) and Jan. 27, 1986 (Thailand). Copies of those final determinations are presented in app. A.

2/ For purposes of subject investigations, the term "standard pipes and tubes" refers to welded carbon steel pipes and tubes of circular cross section, over 0.375 inch but not over 16 inches in outside diameter, provided for in items 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258, and 610.4925 of the Tariff Schedules of the United States Annotated (TSUSA) (items 610.3231, 610.3232, 610.3241, 610.3244, and 610.3247 prior to Apr. 1, 1984).

3/ For purposes of subject investigations, the term "line pipes and tubes" refers to welded carbon steel pipes and tubes of circular cross section, with walls not thinner than 0.065 inch, 0.375 inch or more but not over 16 inches in outside diameter, conforming to American Petroleum Institute (API) specifications for line pipe, provided for in TSUSA items 610.3208 and 610.3209.

4/ A copy of the Commission's notice of investigation, as published in the Federal Register on Oct. 28, 1985, is presented in app. B.

given in the same manner. 1/ The hearing was held in the Commission's hearing room on January 7, 1986. 2/

## Background

These investigations result from petitions filed with the Commission and the Department of Commerce by counsel for the Committee on Pipe and Tube Imports (CPTI) 3/ on February 28, 1985, and by counsel for the individual members of the subcommittees on standard and line pipe 4/ on July 16, 1985. The February 28, 1985, petition 5/ alleges that an industry in the United States is materially injured and threatened with material injury by reason of standard pipes and tubes from Thailand which are sold in the United States at LTFV. 6/ Accordingly, the Commission instituted investigation No. 731-TA-252

---

1/ The Commission published notice of its countervailing duty investigation in the Federal Register on Nov. 14, 1985. The Commission also published a notice in the Federal Register on Nov. 14, 1985, revising the scheduling of the hearing for the antidumping investigation to be held concurrent with the subject countervailing duty investigation. Copies of the Commission's notices, as published in the Federal Register, are presented in app. B.

2/ A list of witnesses appearing at the hearing is presented in app. C.

3/ The 25 member producers of the Committee on Pipe and Tube Imports as of Feb. 28, 1985, were Allied Tube and Conduit Corp.; American Tube Co., Inc.; Bernard Epps & Co.; Bock Industries of Elkhart, Indiana; Bull Moose Tube Co.; Central Steel Tube Co.; Century Tube Corp.; Copperweld Tubing Group; Hughes Steel and Tube; Kaiser Steel Corp.; LaClede Steel Co.; Maruichi American Corp.; Maverick Tube Corp.; Merchant Metals, Inc.; Phoenix Steel Corp.; Pittsburgh Tube Co.; Quanex Corp.; Sawhill Division of Cyclops Corp.; Sharon Tube Co.; Southwestern Pipe, Inc.; Tex-Tube Division of Cyclops Corp.; UNR-Leavitt; Welded Tube Co. of America; Western Tube and Conduit; and Wheatland Tube Corp.

4/ The Committee on Pipe and Tube Imports is divided into subcommittees, including one for standard pipes and tubes and one for line pipes and tubes. The 12 members of the standard pipe subcommittee as of Feb. 28, 1985, were Allied Tube & Conduit Corp.; American Tube Co.; Bull Moose Tube Co.; Century Tube Corp.; LaClede Steel Co.; Maruichi American Corp.; Pittsburgh-International Division of Pittsburgh Tube Co.; Sawhill Division of Cyclops Corp.; Sharon Tube Co.; Southwestern Pipe, Inc.; Western Tube & Conduit; and Wheatland Tube Corp. The four members of the line pipe subcommittee as of Feb. 28, 1985, were LaClede Steel Co., Sawhill Division of Cyclops Corp., Tex-Tube Division of Cyclops Corp., and Wheatland Tube Corp.

5/ On Mar. 12, 1985, counsel for the Committee on Pipe and Tube Imports amended the petition to state, among other things, that the petition was filed by the standard pipe subcommittee of the Committee on Pipe and Tube Imports, and by each of the individual manufacturers that are members of that subcommittee.

6/ Line pipes and tubes were included within the scope of the original petition. In the process of instituting its investigation, Commerce advised the petitioner that the welded carbon steel pipes and tubes covered by the petition represented two distinct classes or kinds of products---standard pipe and line pipe. Subsequently, on Mar. 14, 1985, the petition involving imports from Thailand was withdrawn as it relates to line pipe, because there is no known production in Thailand of line pipe to API specifications.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

(Preliminary). 1/ On the basis of information developed during the course of that investigation, the Commission determined that there was a reasonable indication that an industry in the United States was threatened with material injury 2/ by reason of imports of the subject merchandise from Thailand (50 F.R. 16167, Apr. 24, 1985).

The July 16, 1985, petitions allege that industries in the United States are materially injured and/or threatened with material injury by reason of imports of standard and line pipes and tubes from Turkey that are being subsidized by their respective Governments. Accordingly, the Commission instituted investigation No. 701-TA-253 (Final). 3/ On the basis of information developed during the course of those investigations, the Commission determined that there was a reasonable indication that industries in the United States were materially injured 4/ by reason of imports of the subject merchandise (50 F.R. 37068, Sept. 11, 1985).

---

1/ In addition, petitioners filed a countervailing duty petition on subject imports from Thailand, a countervailing duty petition on standard and line pipes from Venezuela, and an antidumping petition (as modified) on standard pipes and tubes from Venezuela. Thailand is not a "Country under the Agreement," and therefore the Commission is not required to reach a determination with respect to injury from allegedly subsidized imports. Consequently, the Commission did not institute a countervailing duty investigation with respect to the allegedly subsidized imports from Thailand. The Commission instituted countervailing duty investigation No. 701-TA-242 (Preliminary) and antidumping investigation No. 731-TA-253 (Preliminary) concerning standard and/or line pipes and tubes from Venezuela and made affirmative preliminary determinations (50 F.R. 16167, Apr. 24, 1985). The petitions concerning imports of these products from Venezuela were subsequently withdrawn. Copies of the Commission's notices of termination, as published in the Federal Register on Oct. 28, 1985, and Dec. 12, 1985, are presented in app. D.

2/ Chairwoman Stern determined on the basis of a cumulative analysis that there was a reasonable indication that an industry in the United States was materially injured by reason of imports of standard pipes and tubes from Thailand. Vice Chairman Liebeler dissented.

3/ In addition, petitioners also filed countervailing duty petitions on imports of standard pipes and tubes from India and Yugoslavia and line pipes and tubes from Taiwan and Yugoslavia, and antidumping petitions on imports of standard pipes and tubes from India and Yugoslavia, line pipes and tubes from Taiwan, and standard and line pipes and tubes from Turkey. Inasmuch as Yugoslavia is not a "Country under the Agreement," no countervailing duty investigation with respect to imports from Yugoslavia was instituted. Countervailing duty investigations Nos. 701-TA-251 and 252 (Preliminary) were instituted concerning subject imports from India and Taiwan, respectively; antidumping investigations Nos. 731-TA-271, 272, 273, and 274 (Preliminary) were instituted concerning subject imports from India, Taiwan, Turkey, and Yugoslavia, respectively. The Commission made a negative preliminary determination with respect to imports of line pipes from Yugoslavia and affirmative preliminary determinations with respect to all other cases (50 F.R. 37068, Sept. 11, 1985). Commerce made affirmative preliminary determinations in each of these cases, but made final negative determinations with respect to the countervailing duty investigations concerning subject products from India (50 F.R. 53367, Dec. 31, 1985) and Taiwan (50 F.R. 53363, Dec. 31, 1985).

4/ Chairwoman Stern determined that the domestic industries were materially injured or threatened with material injury.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Discussion of Report Format

This report is organized in two major parts on the basis of product groups. Part I deals with standard pipes and tubes and part II deals with line pipes and tubes. Discussions of Commerce's final subsidy and LTFV determinations, the foreign producers of these products in Turkey and Thailand, the President's program for voluntary reductions of steel exports to the United States, financial information of the overall establishments within which subject products are produced, and exchange rates of the Turkish and Thai currencies, are presented in this introductory portion of the report.

Nature and Extent of Subsidies and Sales at LTFV

Commerce made final determinations that standard pipes and tubes from Thailand are being sold in the United States at LTFV and that certain benefits which constitute subsidies are being provided to Turkish manufacturers, producers, or exporters of standard and line pipes and tubes by the Government of Turkey. In addition, Commerce made negative final determinations of critical circumstances with respect to imports of subject pipes and tubes from Turkey and Thailand. Details of Commerce's final subsidy and LTFV determinations are contained in the Federal Register notices presented in appendix A.

Commerce determined that, during the period September 1984-February 1985, the LTFV margins were 15.69 percent for Saha Thai Steel Pipe Co., Ltd.; 15.60 percent for Thai Steel Pipe Industry Co., Ltd.; and 15.67 percent for all other companies.

Although Commerce estimated the net subsidy on subject Turkish exports to be 18.81 percent ad valorem, it set the bond or cash deposit rate at 17.80 percent after taking into account several programwide changes that occurred after its review period (calendar year 1984). The programs found to confer subsidies, and the amount of each, are presented in the following tabulation:

| Program | Subsidy (percent ad valorem) |
|---|---|
| Export tax rebate and supplemental tax rebate | 14.68 1/ |
| Preferential export financing | 3.74 2/ |
| Deduction from taxable income for export revenues | .39 |
| Resource Utilization Support Fund | - 3/ |
| All programs | 18.81 4/ |

1/ 14.01 percent for bonding purposes.
2/ Excluded from the bonding rate since all loans were repaid prior to Commerce's preliminary determination and the preferential export financing program was abolished, effective Jan. 1, 1985.
3/ Payments to exporters from the Resource Utilization Support Fund were nonexistent during the review period since the fund was not effectively established until Jan. 1, 1985. However, Commerce included an estimated subsidy of 3.40 percent for bonding purposes.
4/ 17.80 percent for bonding purposes.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

PUBLIC DOCUMENT

Barcode:3883995-03 A-549-502 SCO - Scope Inquiry - Line Pipe

Export tax rebates were the single largest subsidy found to exist in this investigation. Commerce reported that the rates of export tax rebates were reduced during the review period from 20 percent of the f.o.b. value of the exported goods to 16 percent and again to 11 percent. Counsel for the Government of Turkey report that the export tax rebate rate will be further reduced, to 8 percent, by November 1, 1986. 1/

## Foreign Producers

### Turkey

There are four principal producers of standard and line pipes and tubes in Turkey. Borusan Holding AS, * * *, is strongly export oriented, selling predominantly to the Middle East. Mannesmann-Sumerbank Boru Endustrisi 2/ * * *, * * * Erkboru Profil Sanayi ve Ticaret AS, and Umran Spiral Welded Pipe, Inc. 3/ Umran is not known to have exported the subject products to the United States and is believed to produce primarily large diameter pipes; however, the purchase of a pipemill from Bethlehem Steel Corp. will give the firm a sizeable capacity to produce subject products. 4/ Erkboru began to produce ASTM-grade pipes when it opened a new mill in January 1985. A fifth Turkish producer, Yucel Boru ve Profil Endustrisi, exported about * * * tons 5/ of standard pipes and tubes to the United States in 1984 and none in 1985.

Counsel for Borusan, Mannesmann, and Erkboru provided the Commission with the firms' capacity, production, and exports of the subject products during January 1982-September 1985 (table 1). The combined annual capacity of Borusan and Mannesmann for both standard and line pipes and tubes is * * * tons. The capacity of Erkboru to produce standard pipes and tubes was * * * tons in 1985 and is projected to be * * * tons in 1986; however, * * *.

The producers in Turkey are able to shift between the production of standard pipes and tubes and line pipes and tubes. Borusan reported capacity to produce standard and line pipes and tubes to be * * * tons--of which * * *

---

1/ Submission by respondent dated Jan. 22, 1986.

2/ This company is 57.14 percent owned by the Mannesmann Group of West Germany and 42.86 percent owned by interests in Turkey. The Mannesmann Group produces steel, through joint ventures or subsidiaries, in West Germany, Turkey, Brazil, and the Netherlands (Coudert Brothers' submission of Jan. 16, 1986, pp. 2 and 3.

3/ Metal Bulletin Monthly, July 1983, p. 99.

4/ This plant, previously operating at Sparrows Point, MD, allegedly had the capacity to produce 200,000 tons of pipes and tubes annually. In an affidavit submitted with the postconference statement of counsel on behalf of the Government of Turkey, the marketing manager of Umran provided information on that acquisition. The pipe and tube facility at Sparrows Point was purchased near the end of 1983 and is currently being dismantled and in the process of being shipped to Turkey. Approximately one-half of the plant has been shipped to Turkey. All parts are expected to be on their way to Turkey by early 1986, but the earliest the plant in Turkey is expected to be even partly operational is early in 1988. The targeted export market for the pipes that will eventually be produced by this mill is the Soviet Union.

5/ Unless otherwise noted, the term "ton" refers to a short ton (2,000 pounds).

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Table 1.--Standard and line pipes and tubes: Turkey's capacity, production, and export sales, by firms, 1982-84, January-September 1984, and January-September 1985

| Item | 1982 | 1983 | 1984 | January-September-- | |
|---|---|---|---|---|---|
| | | | | 1984 | 1985 1/ |
| Capacity: 2/ | | | | | |
| Borusan------------short tons--: | *** | *** | *** | *** | *** |
| Erkboru------------------do----: | 3/ | 3/ | 3/ | 3/ | *** |
| Mannesmann-Sumerbank-----do----: | *** | *** | *** | *** | *** |
| Total------------------do----: | *** | *** | *** | *** | *** |
| Production: | | | | | |
| Standard pipes and tubes: | | | | | |
| Borusan----------------do----: | *** | *** | *** | *** | *** |
| Erkboru----------------do----: | 3/ | 3/ | 3/ | 3/ | *** |
| Mannesmann-Sumerbank---do----: | *** | *** | *** | *** | *** |
| Total----------------do----: | *** | *** | *** | *** | *** |
| Line pipes and tubes: | | | | | |
| Borusan----------------do----: | *** | *** | *** | *** | *** |
| Mannesmann-Sumerbank---do----: | *** | *** | *** | *** | *** |
| Total----------------do----: | *** | *** | *** | *** | *** |
| Capacity utilization: 2/ | | | | | |
| Borusan---------------percent--: | *** | *** | *** | *** | *** |
| Erkboru------------------do----: | 3/ | 3/ | 3/ | 3/ | *** |
| Mannesmann-Sumerbank-----do----: | *** | *** | *** | *** | *** |
| Average----------------do----: | *** | *** | *** | *** | *** |
| Exports of standard pipes to-- | | | | | |
| The United States by: | | | | | |
| Borusan----------short tons--: | *** | *** | *** | *** | *** |
| Erkboru----------------do----: | 3/ | 3/ | 3/ | 3/ | *** |
| Mannesmann-Sumerbank---do----: | *** | *** | *** | *** | *** |
| Total----------------do----: | *** | *** | *** | *** | *** |
| All other countries by: | | | | | |
| Borusan----------------do----: | *** | *** | *** | *** | *** |
| Erkboru----------------do----: | 3/ | 3/ | 3/ | 3/ | *** |
| Mannesmann-Sumerbank---do----: | *** | *** | *** | *** | *** |
| Total----------------do----: | *** | *** | *** | *** | *** |
| Total by: | | | | | |
| Borusan----------------do----: | *** | *** | *** | *** | *** |
| Erkboru----------------do----: | 3/ | 3/ | 3/ | 3/ | *** |
| Mannesmann-Sumerbank---do----: | *** | *** | *** | *** | *** |
| Total----------------do----: | *** | *** | *** | *** | *** |
| Exports of line pipes to-- | | | | | |
| The United States by: | | | | | |
| Borusan----------short tons--: | *** | *** | *** | *** | *** |
| Mannesmann-Sumerbank---do----: | *** | *** | *** | *** | *** |
| Total----------------do----: | *** | *** | *** | *** | *** |
| All other countries by: | | | | | |
| Borusan----------------do----: | *** | *** | *** | *** | *** |
| Mannesmann-Sumerbank---do----: | *** | *** | *** | *** | *** |
| Total----------------do----: | *** | *** | *** | *** | *** |
| Total by: | | | | | |
| Borusan----------------do----: | *** | *** | *** | *** | *** |
| Mannesmann-Sumerbank---do----: | *** | *** | *** | *** | *** |
| Total----------------do----: | *** | *** | *** | *** | *** |

1/ January-December 1985 for Erkboru.
2/ Both standard and line pipes and tubes.
3/ Not applicable; Erkboru did not begin production of ASTM-grade pipes until 1985.

Source: Compiled from data provided by counsel for subject firms and the U.S. Embassy in Turkey.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Barcode:3883995-03 A-549-502 SCO - Scope Inquiry - Line Pipe

to * * * tons could be used to produce either standard or line pipes and tubes and the remaining * * * tons can be used only to produce standard pipes and tubes. Mannesmann reported that, although its entire capacity of * * * tons could be used to produce either standard or line pipes and tubes and any unused capacity could be considered available to produce either standard or line pipes and tubes, its ability to shift from production of standard pipes and tubes to production of line pipes and tubes (or vice versa) is only * * * tons per month.

Production of standard pipes and tubes by Borusan, Mannesmann, and Erkboru * * * from * * * tons in 1982 to * * * tons in 1983, * * * to * * * tons in 1984, and then * * * to * * * tons during January-September 1985, compared with * * * tons during January-September 1984. Reported production of line pipes and tubes * * * from * * * tons in 1982 to * * * tons in 1984, and then * * * to * * * tons during January-September 1985, compared with * * * tons during January-September 1984. The capacity utilization rate * * * from * * * percent in 1982 to * * * percent in 1984 and * * * percent during January-September 1985. At the January-September 1985 rate of utilization, * * *, these three Turkish producers would have approximately * * * tons of unutilized capacity.

The firms reported exporting * * * tons of standard pipes and tubes to the United States in 1982. These exports * * * in 1983 to * * * tons, then * * * to * * * tons in 1984. During January-September 1985, exports to the United States from these firms rose to * * * tons.

These firms reported no exports of line pipes and tubes to the United States in 1982 and 1983. Exports of line pipe to the United States in 1984 were by * * *, which reported shipping * * * tons. * * * reported shipping * * * tons of line pipe to the United States during January-September 1985.

Thailand

Petitioners alleged threat of material injury with respect to imports of standard pipes and tubes from Thailand, stating that producers in Thailand began offering large quantities of pipe and tube for delivery to the U.S. market during January-March 1985. 1/ Petitioners further alleged that the capacity of producers in Thailand has been increased significantly in the last few years for the purpose of increasing exports. 2/

Thailand's 3/ production of standard pipe and tube increased annually from 272,196 tons in 1982 to 322,994 tons in 1984, or by 18.7 percent (table 2). Production during January-September 1985 totaled 194,254 tons,

1/ Antidumping petition in the matter of certain welded carbon steel pipe and tube products from Thailand, p. 24.

2/ Ibid., p. 26.

3/ The data in this section are for 5 producers, which according to the postconference brief on behalf of First Steel Industry Co., Saha Thai Steel Pipe Co., Siam Steel Pipe Co., Thai Steel Pipe Industry Co., and Thai Union Steel Co., are the only manufacturers in Thailand with sufficient capacity and adaptability to manufacture products to U.S. specifications in sufficient quantities to make export profitable, pp. 11 and 12.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Table 2.—Standard pipes and tubes: Thai 1/ production, capacity, capacity utilization, domestic shipments, and exports, 1982-84, January-September 1984, and January-September 1985

| Item | 1982 | 1983 | 1984 | Jan.-Sept.— | |
|---|---|---|---|---|---|
| | | | | 1984 | 1985 |
| Production 2/——tons— | 272,196 | 308,291 | 322,994 | 173,203 | 194,254 |
| Capacity——do— | 331,131 | 331,131 | 343,918 | 244,845 | 244,845 |
| Capacity utilization—percent— | 82.2 | 93.1 | 93.9 | 70.7 | 79.3 |
| Domestic shipments——tons— | 148,216 | 162,952 | 167,692 | 110,329 | 96,381 |
| Exports to— | | | | | |
| United States——do— | 0 | 0 | 1,023 | *** | 38,339 |
| All other markets——do— | 123,980 | 145,339 | 155,302 | *** | 59,534 |
| Subtotal——do— | 123,980 | 145,339 | 156,325 | 62,874 | 97,873 |
| Total shipments——do— | 272,196 | 308,291 | 324,017 | 173,203 | 194,254 |
| Ratio to total shipments of— | | | | | |
| Domestic shipments—percent— | 54.5 | 52.9 | 51.8 | 63.7 | 49.6 |
| Total exports——do— | 45.5 | 47.1 | 48.2 | 36.3 | 50.4 |
| Ratio of exports to the United States to total exports percent— | 0 | 0 | 0.7 | *** | 39.2 |

1/ Data are for the following 5 producers: First Steel Industry Co., Saha Thai Steel Pipe Co., Siam Steel Pipe Co., Thai Steel Pipe Industry Co., and Thai Union Steel Co.

2/ Manufacturers report that they produce to meet orders and do not maintain inventories excepts to accumulate quantities for bulk shipment.

Source: Submissions by counsel on behalf of the 5 Thai producers.

compared with 173,203 during January-September 1984. Reported capacity in Thailand increased by 3.9 percent during 1982-84. Producers in Thailand increased their capacity utilization annually from 82.2 percent in 1982 to 93.9 percent in 1984. Capacity utilization was 79.3 percent during January-September 1985 compared with 70.7 percent during January-September 1984. Shipments to the domestic market accounted for about one-half of Thailand's output during the January 1982-September 1985 period. Total exports as a share of total shipments increased only slightly—from 45.5 percent in 1982 to 48.2 percent in 1984 and to 50.4 percent during January-September 1985. Exports to the United States, which were zero in 1982 and 1983, accounted for 0.7 percent of the total exports from Thailand in 1984 and 39.2 percent of total exports from Thailand during January-September 1985.

## The President's Program on Voluntary Restraints of Exports to the United States

In September 1984, the President outlined a nine-point program designed to assist the U.S. steel industry in a number of areas, including trade. Under this program, the U.S. Government would negotiate surge-control arrangements (and self-initiate unfair petitions, if necessary) with

understandings, or suspension agreements, with countries "whose exports to the United States have increased significantly in recent years due to an unfair surge in imports." Unfair surges were described in the President's decision as dumping, subsidization, or diversion from other importing countries that have restricted access to their markets. Subsequent to arrangements being negotiated with Brazil, Mexico, Spain, and Venezuela, unfair trade petitions concerning standard and line pipes and tubes from these countries were withdrawn by the petitioners prior to the completion of the investigations. In addition, the antidumping and/or countervailing duty orders concerning imports of subject products from Korea were revoked after the Korean Government signed an arrangement. Recently, an agreement was negotiated with the Government of Yugoslavia. Petitioners in the instant cases have decided not to withdraw their petition in the antidumping investigation involving Yugoslavia (investigation No. 731-TA-274 (Final)). Counsel for the petitioners stated in a telephone conversation with the staff that inasmuch as the Commission must consider cumulation of imports from subject countries with imports subject to other ongoing investigations in making its injury determinations, it would not be in the best interests of his clients to withdraw the petition against Yugoslavia.

Petitioners and respondents contend that one reason countries that did not export to the United States previously, e.g., Turkey, are able to do so now is because of a void in the marketplace previously filled by imports from countries that have signed voluntary restraint agreements (VRA's) with the United States to limit their exports to the United States. 1/ Petitioners also point out that the impetus for increased imports from new entrants such as Turkey comes from U.S. importers which are turning to these suppliers in an attempt to retain their share of the market. 2/ Information on the export levels allowable under the VRA's and imports from the subject countries is presented in appendix E.

## The European Community Pipe and Tube Agreement

On January 11, 1985, the Office of the United States Trade Representative announced an agreement with the European Community (EC) on imports of steel pipes and tubes. The agreement, effective from January 1, 1985, through December 31, 1986, will reduce the EC share of the U.S. pipe and tube market from the 14.6 percent share held during January-October 1984 to 7.6 percent in 1985 and 1986. This agreement followed an embargo on pipe and tube imports from the EC from November 29, 1984, through December 31, 1984.

## Financial Experience of U.S. Producers of the Subject Products

### Overall operations of establishments within which the subject products are produced

* * * U.S. producers supplied usable income-and-loss data on overall operations for those establishments within which standard and/or line pipes and tubes are produced. * * * of these firms produce standard pipes and tubes and * * * produce line pipes and tubes; * * * firms produce both standard and line pipes and tubes.

---

1/ See petitioners' prehearing brief, pp. 2-6, and transcript of public hearing, pp. 64 and 70.

2/ Transcript, pp. 167 and 168. See also transcript pp. 143 and 158-160. * * *.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Aggregate net sales of the * * * reporting firms declined 30.2 percent from $1.7 billion in 1982 to $1.2 billion in 1983, then rose by 28.9 percent to $1.5 billion in 1984 (table 3). Net sales were $1.2 billion and $1.1 billion in the interim periods of 1984 and 1985, respectively. An operating income of $196.1 million in 1982, or 11.6 percent of sales, was followed by operating losses of $150.8 million, or 12.8 percent of sales, in 1983 and $30.5 million, or 2.0 percent of sales, in 1984. Operating losses of $26.1 million, or 2.2 percent of sales, and $48.3 million, or 4.2 percent of sales, were sustained in the interim periods of 1984 and 1985, respectively.

The integrated firms, i.e., those firms producing raw steel in the blast furnace and then producing the intermediate skelp and sheets from which the pipes and tubes are produced, generally experienced operating losses during the periods covered by this report, as shown in table 4. The nonintegrated firms reported aggregate operating incomes of $*** in 1982, $*** in 1983, $*** in 1984, $*** in the interim period of 1984, and $*** in the interim period of 1985. The operating income margins for the nonintegrated establishments increased from * * * percent in 1982 to * * * percent in 1983 and * * * percent in 1984; the margin was * * * percent in interim 1984, compared with * * * percent in interim 1985.

* * * reported financial information on establishments within which the firm produced standard pipes and tubes * * *. As shown in the following tabulation, * * *:

* * * * * * *

Investment in productive facilities and capital expenditures

The aggregate investment by * * * U.S. producers of standard and/or line pipes and tubes in productive facilities for all products of their establishments, valued at cost, increased from $120.3 million at yearend 1982 to $136.4 million at yearend 1984 and rose further to $159.8 million as of September 30, 1985. The book value of such assets followed a similar trend from yearend 1982 to September 30, 1985. Capital expenditures for * * * U.S. producers increased from $6.5 million in 1982 to $8.3 million in 1983, then fell to $7.9 million in 1984. Capital expenditures increased sharply from $6.7 million during the interim period in 1984 to $22.2 million in the corresponding period of 1985. Reported investment in productive facilities and capital expenditures are shown in the following tabulation (in thousands of dollars):

| Period | Investment in productive facilities 1/ | | Capital |
|---|---|---|---|
| | Original cost | Book value | expenditures |
| 1982 | 120,288 | 52,814 | 6,466 |
| 1983 | 128,703 | 53,971 | 8,263 |
| 1984 | 136,395 | 53,830 | 7,909 |
| Jan.-Sept-- | | | |
| 1984 | 136,257 | 54,872 | 6,697 |
| 1985 | 159,823 | 70,319 | 22,216 |

1/ As of yearend 1982, 1983, and 1984; Sept. 30, 1984; and Sept. 30, 1985.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Table 3.--Income-and-loss experience of * * * U.S. producers 1/ on the overall operations 2/ of their establishments within which standard and line pipes and tubes are produced, accounting years 1982-84 and interim periods ended Sept. 30, 1984, and Sept. 30, 1985

| Item | 1982 | 1983 | 1984 | Interim period ended Sept. 30-- | |
|---|---|---|---|---|---|
| | | | | 1984 | 1985 |
| Net sales------1,000 dollars-- | 1,684,443 | 1,174,501 | 1,515,134 | 1,167,655 | 1,137,845 |
| Cost of goods sold------do---- | 1,391,192 | 1,223,488 | 1,439,147 | 1,102,598 | 1,085,529 |
| Gross profit or (loss)--do---- | 293,251 | (48,987) | 75,987 | 65,057 | 52,316 |
| General, selling, and administrative expenses--------------do---- | 97,181 | 101,812 | 106,492 | 91,188 | 100,612 |
| Operating income or (loss)----------------do---- | 196,070 | (150,799) | (30,505) | (26,131) | (48,296) |
| Depreciation and amortization expense--------do---- | 41,973 | 42,664 | 48,685 | 36,840 | 37,536 |
| As a share of net sales: | | | | | |
| Cost of goods sold percent-- | 82.6 | 104.2 | 95.0 | 94.4 | 95.4 |
| Gross profit or (loss)--------------do---- | 17.4 | (4.2) | 5.0 | 5.6 | 4.6 |
| General, selling, and administrative expenses------------do---- | 5.8 | 8.7 | 7.0 | 7.8 | 8.8 |
| Operating income or (loss)--------------do---- | 11.6 | (12.8) | (2.0) | (2.2) | (4.2) |
| Number of firms reporting operating losses------------ | 3 | 4 | 3 | 3 | 4 |

1/ These firms are * * *.
2/ * * *.

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Table 4.—Income-and-loss experience of U.S. producers on the overall operations of their establishments within which standard and line pipes and tubes are produced, by nonintegrated producers and specified integrated producers, accounting years 1982-84 and interim periods ended Sept. 30, 1984, and Sept. 30, 1985

| Item | 1982 | 1983 | 1984 | Interim period ended Sept. 30— | |
|---|---|---|---|---|---|
| | | | | 1984 | 1985 |
| * | * | * | * | * | * |

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission.

Capital and investment

Pursuant to section 771(7)(c)(iii)(III) of the act, U.S. producers were asked to describe any actual or potential negative effects of imports of the subject products from Turkey and Thailand on their firms' growth, investment, and ability to raise capital. Four firms issued statements: * * * commented on the effect of imports of standard pipes and tubes from Thailand on selling prices in the west (statement included in section on prices in part I); * * * and * * * addressed the effect of imports of pipes and tubes in general, from all sources; and * * * (statement not included) described the effect of imports of a product not subject to these investigations. Below are the replies of * * *:

* * * * * * *

Exchange Rates

Indexes of the nominal and real exchange rates of the Turkish lira and Thai baht relative to the U.S. dollar are shown in table 5. The exchange rate indexes are based on rates expressed in U.S. dollars per foreign currency unit. The real exchange rate is determined by adjusting the nominal exchange rate for differences in the rates of inflation in Turkey and Thailand relative to the inflation rate in the United States. 1/

1/ The percentage change in the international purchasing power of each currency from the reference period January-March 1983 provides an indication of the maximum amount that a foreign producer or its agent can reduce its dollar prices of foreign products in the U.S. market without reducing its profits, assuming it has no dollar-denominated costs or contracts. A foreign producer, however, may choose to increase its profits by not reducing its dollar prices or by reducing its dollar prices by less than the depreciation would allow. Within specific industries, such as the carbon steel pipe and tube industry, the proportion of foreign producers' costs attributable to imports of raw materials and energy from the United States or from countries whose currencies are linked to the dollar would vary by specific product and producer.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Table 5.—Nominal-exchange-rate equivalents 1/ of the Turkish lira and the Thai baht in U.S. dollars, real-exchange-rate equivalents, and producer price indicators in the United States, Turkey, and Thailand, 2/ indexed by quarters, January 1983-September 1985

(January-March 1983=100)

| Period | U.S. Producer Price Index | Turkey | | | Thailand | | |
|---|---|---|---|---|---|---|---|
| | | Producer Price Index | Exchange rate indexes 3/ | | Producer Price Index | Exchange rate indexes 4/ | |
| | | | Nominal | Real 5/ | | Nominal | Real 5/ |
| 1983: | | | | | | | |
| Jan.-Mar | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Apr.-June | 100.3 | 107.0 | 91.5 | 97.7 | 100.7 | 100.0 | 100.5 |
| July-Sept | 101.3 | 114.7 | 82.6 | 93.6 | 102.6 | 100.0 | 101.3 |
| Oct.-Dec | 101.8 | 126.1 | 74.5 | 92.3 | 102.7 | 100.0 | 100.9 |
| 1984: | | | | | | | |
| Jan.-Mar | 102.9 | 144.1 | 62.6 | 87.8 | 99.5 | 100.0 | 96.7 |
| Apr.-June | 103.6 | 165.6 | 55.8 | 89.2 | 98.5 | 100.0 | 95.1 |
| July-Sept | 103.3 | 177.2 | 50.1 | 86.0 | 98.1 | 100.0 | 95.0 |
| Oct.-Dec | 103.0 | 191.9 | 46.1 | 85.8 | 97.5 | 90.0 | 85.1 |
| 1985: | | | | | | | |
| Jan.-Mar | 102.9 | 215.0 | 41.3 | 86.2 | 97.2 | 82.8 | 78.2 |
| Apr.-June | 103.0 | 232.5 | 37.4 | 84.5 | 98.1 | 83.8 | 79.9 |
| July-Sept | 102.2 | 6/ | 36.0 | 6/ | 6/ | 85.4 | 6/ |

1/ Exchange rates expressed in U.S. dollars per unit of foreign currency.
2/ Producer price indicators—intended to measure final product prices—are based on average quarterly indexes presented in line 63 of International Financial Statistics.
3/ U.S. dollars per lira.
4/ U.S. dollars per baht.
5/ The real value of a currency is the nominal value adjusted for the difference between inflation rates as measured by the Producer Price Index in the United States and the respective foreign country.
6/ Not available.

Source: International Monetary Fund, International Financial Statistics, December 1985.

In nominal terms, the value of the Turkish lira depreciated steadily relative to the U.S. dollar, falling by 64 percentage points from January-March 1983 to July-September 1985. In real terms, the value of the lira vis-a-vis that of the U.S. dollar also declined steadily, but only by some 16 percentage points between January-March 1983 and April-June 1985.

The Thai baht maintained a constant nominal exchange rate vis-a-vis the U.S. dollar from January-March 1983 to July-September 1984. Between July-September 1984 and July-September 1985, however, the baht depreciated by about 15 percentage points in nominal terms relative to the dollar. Between January-March 1983 and April-June 1985, the real value of the baht depreciated by 20 percentage points relative to the dollar.

# STANDARD PIPES AND TUBES

## Introduction

This part of the report presents information relating specifically to countervailing duty investigation No. 701-TA-253 (Final) concerning imports of standard pipes and tubes from Turkey and antidumping investigation No. 731-TA-252 (Final) regarding such imports from Thailand.

## The Products

### Description and uses

For the most part, the terms "pipes," "tubes," and "tubular products" can be used interchangeably. In some industry publications, however, a distinction is made between pipes and tubes. According to these publications, pipes are produced in large quantities in a few standard sizes, whereas tubes are made to customers' specifications regarding dimension, finish, chemical composition, and mechanical properties. Pipes are normally used as conduits for liquids or gases, whereas tubes are generally used for load-bearing or mechanical purposes. Nevertheless, there is apparently no clear line of demarcation in many cases between pipes and tubes.

Steel pipes and tubes can be divided into two general categories according to the method of manufacture---welded or seamless. Each category can be further subdivided by grades of steel: carbon, heat-resisting, stainless, or other alloy. This method of distinguishing between steel pipe and tube product lines is one of several methods used by the industry. Pipes and tubes typically come in circular, square, or rectangular cross section.

The American Iron & Steel Institute (AISI) distinguishes among the various types of pipes and tubes according to six end uses: standard pipe, line pipe, structural pipe and tubing, mechanical tubing, pressure tubing, and oil country tubular goods. 1/

Steel pipes and tubes are generally produced according to standards and specifications published by a number of organizations, including the American Society for Testing & Materials (ASTM), the American Society of Mechanical Engineers, and the American Petroleum Institute (API). Comparable organizations in Japan, West Germany, the United Kingdom, the U.S.S.R., and other countries have also developed standard specifications for steel pipes and tubes.

The imported pipe and tube products that are the subject of these investigations are circular welded carbon steel pipes and tubes over 0.375 inch but not over 16 inches in outside diameter, which are known in the industry as standard pipes and tubes. Standard pipes and tubes are intended for the low-pressure conveyance of water, steam, natural gas, air, and other liquids and gases in plumbing and heating systems, air-conditioning units,

---

1/ For a full description of these items, see Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Determination of the Commission in Investigation No. 701-TA-168 (Final) . . ., USITC Publication 1345, February 1983.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

automatic sprinkler systems, and other related uses. They may also be used for light load-bearing or mechanical applications, such as for fence tubing. These steel pipes and tubes may carry fluids at elevated temperatures and pressures but may not be subjected to the application of external heat. They are most commonly produced to ASTM specifications A-120, A-53, and A-135.

## Manufacturing processes

Standard pipes and tubes are made by forming flat-rolled steel into a tubular configuration and welding it along the joint axis. There are various ways to weld pipes and tubes; the most popular are the electric resistance weld (ERW), the continuous weld (butt weld) (CW), the submerged-arc weld, and the spiral weld. The submerged-arc weld and spiral weld are normally used to produce pipes and tubes of relatively large diameter. The standard pipes and tubes in these investigations are generally welded by either the ERW or CW process. Immediately after welding, the product may be reduced in diameter by rolling or stretch reducing or may be further formed into squares, rectangles, or other shapes by using forming rolls.

In the ERW process, skelp 1/ is cold-formed by tapered rolls into a cylinder. The weld is formed when the joining edges are heated to approximately 2,600°F. Pressure exerted by rolls squeezes the heated edges together to form the weld. ERW mills produce both pipe in standard sizes and tubular products between 0.375 and 24 inches in outside diameter.

In the CW process, skelp is heated to approximately 2,600° F and hot-formed into a cylinder. The heat, in combination with the pressure of the rolls, forms the weld. Continuous-weld mills generally produce the higher volume, standardized pipe products from 0.375 through 4.5 inches in outside diameter.

The advantage of the CW process lies in its ability to produce pipe at speeds up to 1,200 feet per minute compared with the ERW process maximum of approximately 110 feet per minute. Thus, economies associated with high-volume production may make CW pipe cheaper to produce than ERW pipe of the same grade and specification. 2/ The CW process is especially suited for the manufacture of standardized, high-volume, small-diameter pipe products, such as ASTM A-120.

Requirements concerning chemical and mechanical properties for ASTM standard pipes differ for various specifications and grades. There are two grades of ASTM A-53 and A-135 standard pipes and one grade of ASTM A-120 standard pipe. Standard pipes are inspected and tested at various stages in the production process to ensure strict conformity to ASTM specifications.

---

1/ Skelp is a flat-rolled, intermediate product used as the raw material in the manufacture of pipes and tubes. It is typically an untrimmed band of hot- or cold-rolled sheet.

2/ On the other hand, the ERW process has gained increased popularity with U.S. producers of small-diameter pipe and tube products in recent years because it requires significantly less energy per pipe produced, since only the joining edges of the product are heated, creating a weld of comparatively high integrity within the product specification. Also, it can be used to produce pipes in sizes up to 24 inches in outside diameter, compared with the 4.5-inch maximum outside diameter usually attainable in the CW process.

U.S. tariff treatment

Imports of the circular pipes and tubes covered by these investigations are classified and reported for tariff and statistical purposes under TSUSA items 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258, and 610.4925, 1/ which cover welded pipes and tubes (and blanks therefor 2/) of iron (except cast iron) or of nonalloy (carbon) steel, of circular cross section, having an outside diameter over 0.375 inch but not more than 16 inches.

The current column 1 rate of duty 3/ for standard pipes and tubes classified under Tariff Schedules of the United States (TSUS) item 610.32 is 1.9 percent ad valorem. This rate of duty was modified as a result of the Tokyo Round of Multilateral Trade Negotiations (MTN) from the 0.3-cent-per-pound rate in effect prior to January 1, 1982; there are no further duty modifications scheduled. The current column 1 rate of duty for standard pipes and tubes classified under TSUS item 610.49 is 8.4 percent ad valorem and is scheduled to be reduced to 8.0 percent in 1987 as a result of the Tokyo Round of the MTN. Imports from Turkey and Thailand are dutiable under the column 1 rates.

In addition to these import duties, final determinations of subsidies and dumping have been made with respect to imports from Turkey and Thailand, respectively, and preliminary determinations of dumping have been made with respect to imports from India, Turkey, and Yugoslavia. Antidumping duties are currently in effect with respect to imports of standard pipes and tubes from Taiwan. Countervailing duties are currently in effect with respect to imports from Thailand and Yugoslavia. Until recently, countervailing duty and dumping orders were in effect with respect to imports from the Republic of Korea (Korea). 4/

---

1/ Prior to Apr. 1, 1984, subject products were classified under TSUSA items 610.3231, 610.3232, 610.3241, 610.3244, and 610.3247.

2/ Blanks are semifinished pipe or tube hollows that are purchased by producers and further processed.

3/ The rates of duty in column 1 are most-favored-nation (MFN) rates and are applicable to imported products from all countries except those Communist countries and areas enumerated in general headnote 3(d) of the TSUS. However, imports of standard pipes and tubes are eligible for duty-free entry, if the products of designated beneficiary countries under the Caribbean Basin Economic Recovery Act or the United States-Israel Free Trade Agreement. The current column 2 rates of duty, applicable to imports from the Communist countries enumerated in general headnote 3(d), are 5.5 percent ad valorem for imports under TSUS item 610.32 and 25 percent ad valorem for imports under TSUS item 610.49.

4/ Net subsidy and dumping margins from current investigations, outstanding dumping/countervailing duty orders issued since January 1984, and terminated (other than negative) title VII cases since January 1984 are presented in table I-1. On Oct. 29, 1985, subsequent to Korea agreeing to a voluntary restraint arrangement, Commerce published a notice, effective Oct. 1, 1984, in the Federal Register revoking the countervailing duty order with respect to imports exported from Korea after the effective date.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Table I-1.--Standard pipes and tubes: Pending and recently terminated title VII investigations and outstanding dumping/countervailing duty orders since January 1984, most recent dumping/subsidy margins, and import-to-consumption ratios, by sources, 1982-84, January-September 1984, and January-September 1985

| Item | Weighted-average margin | Date of bond or order 1/ | Ratio of imports to apparent U.S. consumption | | | | |
|---|---|---|---|---|---|---|---|
| | | | 1982 | 1983 | 1984 | Jan.-Sept.-- 1984 | Jan.-Sept.-- 1985 |
| Antidumping investigations/orders: | | | | | | | |
| Pending antidumping investigations: | | | | | | | |
| Thailand (instant investigation) | 2/ 15.67 | Jan. 27, 1986 | - | - | 3/ | - | 0.7 |
| India | 4/ 5/ | Dec. 31, 1985 | 3/ | 3/ | 0.1 | 0.1 | .8 |
| Turkey | 5/ 12.78 | Jan. 3, 1986 | - | 3/ | .1 | .1 | 1.3 |
| Yugoslavia | 5/ 31.24 | Dec. 31, 1985 | 0.2 | - | .6 | .4 | .6 |
| The People's Republic of China | 6/ | 6/ | - | - | - | - | 3/ |
| The Philippines | 6/ | 6/ | - | - | - | - | .2 |
| Singapore | 6/ | 6/ | - | - | 3/ | - | .2 |
| Outstanding antidumping order: | | | | | | | |
| Taiwan | 9.7 | May 7, 1984 | 7/ 5.2 | 7/ 6.3 | 7/ .2 | 7/ .2 | 7/ .5 |
| Recently revoked antidumping order: | | | | | | | |
| Korea 8/ | 0.9 | May 7, 1984 | 9/ 15.5 | 9/ 21.6 | 9/ 14.9 | 9/ 15.4 | 9/ 19.5 |
| Recently terminated antidumping investigations: | | | | | | | |
| Brazil 10/ | 3.23 | Dec. 31, 1984 | 7/ .7 | 7/ 1.7 | 7/ 6.4 | 7/ 5.9 | 7/ 1.6 |
| Spain 11/ | 40.75 | Dec. 31, 1984 | 7/ .2 | 7/ .6 | 7/ 3.0 | 7/ 3.1 | 7/ .8 |
| Venezuela 12/ | 26.19 | June 3, 1985 | .2 | .6 | 1.9 | 1.8 | 1.2 |
| Countervailing duty investigations/orders: | | | | | | | |
| Pending countervailing duty investigation: | | | | | | | |
| Turkey (instant investigation) | 13/ 17.80 | Jan. 10, 1986 | - | 3/ | .1 | .1 | 1.3 |
| Outstanding countervailing duty orders: | | | | | | | |
| Thailand | 1.79 | Aug. 14, 1985 | - | - | 3/ | - | .7 |
| Yugoslavia | 74.50 | Oct. 16, 1985 | .2 | - | .6 | .4 | .6 |
| Recently terminated countervailing duty investigations: | | | | | | | |
| Mexico 14/ | 15/ | Jan. 31, 1985 | 1.3 | 4.7 | 4.0 | 4.4 | 1.8 |
| Spain 11/ | 1.14 | Oct. 10, 1984 | 7/ .2 | 7/ .6 | 7/ 3.0 | 7/ 3.1 | 7/ .8 |
| Venezuela 16/ | | | .2 | .6 | 1.9 | 1.8 | 1.2 |

1/ Date posting of bond required or date order issued.
2/ Commerce determined different final margins for dumping for the following companies: Saha Thai (15.69 percent ad valorem), Thai Steel (15.60) percent, and all other companies (15.67 percent).
3/ Less than 0.05 percent.
4/ Commerce determined different preliminary margins of dumping for the following companies: Tisco (50.37 percent ad valorem), Zenith (5.01 percent), Gujarat (0.62 percent), and all other companies (27.29 percent).
5/ This is Commerce's preliminary determination. Commerce's final determination in this case is due by Mar. 10, 1986.
6/ The Commission has issued a preliminary affirmative determination. To date, there is no determination of sales at less than fair value by Commerce nor a requirement for the posting of bond.
7/ Ratios of imports to apparent U.S. consumption are computed using imports of standard pipes and tubes not over 4.5 inches in outside diameter (O.D.) (the product covered in the particular investigation) and consumption of standard pipes and tubes not over 16 inches in O.D. (the product covered in the instant investigations on imports from Turkey and Thailand). Standard pipes and tubes not over 4.5 inches in O.D. is a subset of those not over 16 inches in O.D.
8/ Order revoked effective Oct. 1, 1984, the effective date of the import restraint agreement reached with Korea.
9/ Ratios of imports to apparent U.S. consumption are computed using imports of standard pipes and tubes not over 4.5 inches in outside diameter (O.D.) (the product covered in the particular investigation) and consumption of standard pipes and tubes not over 16 inches in O.D. (the product covered in the instant investigations on imports from Turkey and Thailand). Standard pipes and tubes not over 4.5 inches in O.D. is a subset of those not over 16 inches in O.D. The ratios of imports to apparent consumption are overstated to the extent that import data include exports by Union Steel Manufacturing Co., Ltd., and Dougjin Steel Co., Ltd., which were excluded from Commerce's affirmative determination.
10/ Terminated by the Commission, effective Mar. 20, 1985, following withdrawal of petition, prior to a final determination by Commerce.
11/ Terminated by the Commission, effective Feb. 4, 1985, following withdrawal of petition, prior to a final determination by Commerce.
12/ Terminated by Commerce prior to making its final determination, effective Oct. 23, 1985, following withdrawal of petition.
13/ In its final determination, Commerce found the actual net subsidy to be 18.81 percent but the bonding or cash deposit rate was adjusted to 17.80 percent to take into account several programwide changes occurring after the review period.
14/ Terminated by Commerce, effective Apr. 2, 1985, following withdrawal of petition.
15/ 0.67 to 23.65 percent.
16/ Terminated by Commerce prior to making its preliminary determination, effective Nov. 13, 1985, following withdrawal of petition.

Source: Margins and date of bond or order obtained from U.S. Department of Commerce; ratio of imports to apparent consumption, compiled from official statistics of the U.S. Department of Commerce and data submitted in response to questionnaires of the U.S. International Trade Commission.

Note.--Data in this table are effective as of Jan. 27, 1986.

U.S. Producers

Standard pipe and tube producers may be divided into two types: large, fully integrated producers, which make raw steel and produce a variety of steel products, and smaller, nonintegrated or partially integrated producers, which concentrate on fewer product lines. The integrated producers, which include LTV Steel Corp. (LTV) and United States Steel Corp. (U.S. Steel), 1/ concentrate production in the high-volume standardized pipe products. The nonintegrated producers manufacture the low-volume, more specialized tubular products as well as the high-volume products.

In 1984, there were about 30 U.S. producers of standard pipes and tubes. Production is concentrated in the East, where the integrated producers are located. Selected U.S producers of standard pipes and tubes and, for those responding to the Commission's questionnaire, their shares of 1984 domestic shipments are shown in Table I-2.

U.S. Importers

The U.S. Customs Service's net import file listed about nine importers of standard pipes and tubes from Turkey during January 1982-September 1985 and eight importers of the product from Thailand. Questionnaires of the instant final investigations with usable data have been received from * * * importers of standard pipes and tubes--* * * reported imports from Thailand, and * * * reported imports from Turkey. The firms reporting to the Commission accounted for * * * percent of imports of standard pipes and tubes from Thailand during January-September 1985 and * * * percent of imports from Turkey in the same period.

The U.S. Market

Channels of distribution

According to AISI data, 69 percent of standard pipes and tubes shipped by U.S. manufacturers in 1984 and during January-June 1985 were sold to service centers/distributors. Service centers/distributors are middlemen that buy large quantities of pipes and tubes, usually from both domestic producers and importers, warehouse the product, and sell smaller quantities to end users. The service centers/distributors may also have some simple finishing equipment to cut pipe to lengths or to thread and couple it. Most direct shipments to end users were made to the oil and gas and electrical equipment industries in 1984.

---

1/ Another integrated producer, Bethlehem, permanently closed its standard and line pipe and tube operations, which were located at Sparrows Point, MD, effective Apr. 30, 1983. Umran, a Turkish producer, bought Bethlehem's plant and is in the process of setting it up in Turkey. A nonintegrated producer, Merchants Metals, Inc., ceased producing the small standard and light-walled rectangular pipes and tubes during January-March 1984. In December 1984, LTV Steel announced the closing of its two standard and line pipe mills at Aliquippa, PA, and in October 1985, it announced the indefinite closing of its continuous weld standard and line pipe mill at Youngstown, OH, where it still operates an electric-resistance weld mill for producing standard and line pipes and tubes. In early 1985, Central Steel Tube of Iowa filed for bankruptcy.

Table I-2.--Standard pipes and tubes: Selected U.S. producers' shares of domestic shipments and plant locations, by firms, 1984

| Firm | Share of 1984 domestic shipments 1/ | Plant locations |
|---|---|---|
| | Percent | |
| CPTI member firms: | | |
| Allied Tube & Conduit | *** | Harvey, IL. |
| American Tube Co | *** | Phoenix, AZ. |
| Bernard Epps Co | *** | Los Angeles, CA. |
| Bull Moose Tube Corp | *** | Gerald, MO. |
| | | Chicago Heights, IL. |
| | | Trenton, GA. |
| Century Tube Co | *** | Pine Bluff, AR. |
| Cyclops Corp., Sawhill Tubular Division | *** | Sharon, PA. |
| LaClede Steel Co | *** | Alton, IL. |
| Maruichi American Corp | *** | Santa Fe Springs, CA. |
| Pittsburgh Tube Corp | *** | Fairbury, IL. |
| Sharon Tube Co | *** | Sharon, PA. |
| Western Tube & Conduit Corp | *** | Long Beach, CA. |
| Wheatland Tube & Conduit | *** | Wheatland, PA. |
| Non-CPTI firms: | | |
| Harris Tube | *** | Los Angeles, CA. |
| J.M. Tull Industries, Inc | *** | Gardena, CA. |
| | | Norcross, GA |
| Jackson Tube Service, Inc | *** | Piqua, OH. |
| James Steel & Tube Co | *** | Madison Heights, MI. |
| LTV Steel Corp | *** | Youngstown, OH. |
| | | Aliquippa, PA. 2/ |
| | | Counce, TN. |
| Lock Joint Tube Co., Inc | *** | South Bend, IN. |
| Mid-States Tube Corp | *** | Kenosha, WI. |
| United States Steel Corp | *** | Fairless Hills, PA. |
| | | Lorain, OH. |
| | | Geneva, UT. |
| | | McKeesport, PA. |
| United Tube Corp | *** | Medina, OH. |

1/ Total domestic shipments are based on questionnaire responses for which usable data were provided in the instant investigations.
2/ Plant closed in December 1984.

Source: Share of domestic shipments compiled from data submitted in response to questionnaires of the U.S. International Trade Commission.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Apparent U.S. consumption

Apparent U.S. consumption of standard pipes and tubes increased annually from 1.7 million tons in 1982 to 2.4 million tons in 1984, or by 45.2 percent (table I-3). Consumption of standard pipes decreased by 2.0 percent during January-September 1985 compared with consumption during January-September 1984.

Table I-3.--Standard pipes and tubes: U.S. producers' domestic shipments, imports for consumption, and apparent consumption, 1982-84, January-September 1984, and January-September 1985

| Period | U.S. producers' domestic shipments | Imports | Apparent consumption | Ratio to consumption of-- Producers' shipments | Ratio to consumption of-- Imports |
|---|---|---|---|---|---|
| | 1,000 tons | | | Percent | |
| 1982 | 824 | 844 | 1,668 | 49.4 | 50.6 |
| 1983 | 882 | 1,182 | 2,064 | 42.7 | 57.3 |
| 1984 | 878 | 1,544 | 2,422 | 36.3 | 63.7 |
| January-September-- | | | | | |
| 1984 | 685 | 1,207 | 1,892 | 36.2 | 63.8 |
| 1985 | 708 | 1,146 | 1,854 | 38.2 | 61.8 |

Source: U.S. producers' shipments, compiled from questionnaires of the U.S. International Trade Commission; imports, compiled from official statistics of the U.S. Department of Commerce.

Consideration of Alleged Material Injury to an Industry in the United States 1/

U.S. production, capacity, and capacity utilization

U.S. production of standard pipes and tubes increased from 811,000 tons in 1982 to 908,000 tons in 1984, an increase of 12 percent (table I-4). Another increase in production of 2 percent was reported during January-September 1985, compared with that in the corresponding period of 1984.

The capacity of reporting U.S. producers to produce standard pipes and tubes remained essentially constant at about 1.7 million tons per year during 1982-84 although dipping 2 percent in 1983 and rebounding in 1984; capacity during January-September 1985 represented an increase of 2 percent over capacity during January-September 1984. Utilization of capacity by standard pipe and tube producers increased from 44.5 percent in 1982 to 52.9 percent in 1984; capacity utilization during January-September 1985 increased 0.1 percentage point over the level during January-September 1984.

1/ Data in this section of the report were compiled from questionnaires of the instant investigations * * *.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Table I-4.—Standard pipes and tubes: U.S. production, capacity, and capacity utilization, 1982-84, January-September 1984, and January-September 1985

| Item | 1982 | 1983 | 1984 | January-September— | |
|---|---|---|---|---|---|
| | | | | 1984 | 1985 |
| Production———1,000 tons—: | 811 | 891 | 908 | 704 | 717 |
| Capacity———————do———: | 1,709 | 1,683 | 1,718 | 1,290 | 1,313 |
| Capacity utilization 1/ percent—: | 44.5 | 51.8 | 52.9 | 54.5 | 54.6 |

1/ Capacity utilization rates were calculated from unrounded figures using data from firms that provided both usable production and capacity information.

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission.

U.S. producers' domestic shipments

Domestic shipments of standard pipes and tubes by firms responding to the Commission's questionnaire rose from 824,000 tons in 1982 to 878,000 tons in 1984, or by 6.6 percent (table I-5). During January-September 1985, producers' shipments of standard pipes increased by 3.4 percent from shipments during January-September 1984.

Table I-5.—Standard pipes and tubes: U.S. domestic shipments, 1982-84, January-September 1984, and January-September 1985

| Item | 1982 | 1983 | 1984 | Jan.-Sept.— | |
|---|---|---|---|---|---|
| | | | | 1984 | 1985 |
| Quantity————1,000 tons—: | 824 | 882 | 878 | 685 | 708 |
| Value————1,000 dollars—: | *** | *** | 532,209 | 419,978 | 413,011 |
| Unit value 1/———per ton—: | $614 | $566 | $606 | $613 | $583 |

1/ Unit values were calculated from unrounded figures using data from firms which provided both usable quantity and value of shipments information.

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission.

U.S. exports

* * * firms reported exports during the period covered by the Commission's questionnaire. Exports of standard pipes and tubes by those firms increased from * * * tons in 1982 to * * * tons in 1983, or by 21.6 percent, then declined by 6.2 percent to * * * tons in 1984. Exports of these pipes and tubes increased by 9.9 percent during January-September 1985

compared with exports in the corresponding period of 1984, as shown in the following tabulation:

| Period | Quantity (tons) | Value (1,000 dollars) | Unit value 1/ (per ton) |
|---|---|---|---|
| 1982 | *** | *** | $*** |
| 1983 | *** | *** | *** |
| 1984 | *** | *** | *** |
| Jan.-Sept-- | | | |
| 1984 | *** | *** | *** |
| 1985 | *** | *** | *** |

1/ Unit values were calculated using data from firms which provided both quantity and value of shipments information.

U.S. producers' inventories

Yearend inventories of standard pipes and tubes, as reported in responses to the Commission's questionnaire, dropped from 152,000 tons in 1982 to 131,000 tons in 1983, or by 14 percent, and then remained essentially constant as of yearend 1984; as of September 30, 1985, reported inventories amounted to 113,000 tons. As a share of producers' annualized shipments, producers' inventories of standard pipes and tubes ranged between 14 and 18 percent during the period under investigation, as shown in the following tabulation:

| | Inventories (1,000 tons) | Ratio of inventories to shipments 1/ (percent) |
|---|---|---|
| As of Dec. 31-- | | |
| 1982 | 152 | 17.9 |
| 1983 | 131 | 14.4 |
| 1984 | 130 | 14.3 |
| As of Sept. 30-- | | |
| 1984 | 124 | 17.6 |
| 1985 | 113 | 15.4 |

1/ Includes intracompany and intercompany transfers, domestic shipments, and export shipments of firms responding to the Commission's questionnaire. The ratios of inventories to shipments for the inventories held as of Sept. 30 are computed from annualized shipments.

Employment and wages

Employment data for standard pipes and tubes were provided by * * * producers. The number of production workers employed in the production of standard pipes and tubes decreased from 3,097 in 1982 to 2,860 in 1984; there were 2,897 such workers employed during January-September 1985, compared with 2,972 during January-September 1984 (table I-6). Hours worked by production and related workers producing standard pipe decreased from 5.7 million in 1982 to 5.3 million in 1984, or by 6.7 percent, and decreased by 0.8 percent during

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Table I-6.--Average number of production and related workers producing standard pipes and tubes, hours paid, 1/ wages and total compensation 2/ paid to such employees, and labor productivity, hourly compensation, and unit labor production costs 3/ 1982-84, January-September 1984, and January-September 1985.

| Item | 1982 | 1983 | 1984 | Jan.-Sept.-- 1984 | Jan.-Sept.-- 1985 |
|---|---|---|---|---|---|
| Production and related workers: | | | | | |
| Number | 3,097 | 3,055 | 2,860 | 2,972 | 2,897 |
| Percentage change | 4/ | -1.4 | -6.4 | 4/ | -2.5 |
| Hours worked by production and related workers: | | | | | |
| Number----1,000 hours | 5,721 | 5,436 | 5,339 | 4,182 | 4,147 |
| Percentage change | 4/ | -5.0 | -1.8 | 4/ | -0.8 |
| Wages paid to production and related workers: | | | | | |
| Value----1,000 dollars | 76,010 | 68,468 | 71,537 | 56,822 | 58,322 |
| Percentage change | 4/ | -9.9 | +4.5 | 4/ | +2.6 |
| Total compensation paid to production and related workers: | | | | | |
| Value----1,000 dollars | 109,838 | 101,312 | 99,325 | 79,114 | 82,230 |
| Percentage change | 4/ | -7.8 | -2.0 | 4/ | +3.9 |
| Labor productivity: | | | | | |
| Quantity----tons per hour | 0.140 | 0.162 | 0.168 | 0.166 | 0.171 |
| Percentage change | 4/ | +15.7 | +3.7 | 4/ | +3.0 |
| Hourly compensation: 5/ | | | | | |
| Value | $13.29 | $12.60 | $13.40 | $13.59 | $14.06 |
| Percentage change | 4/ | -5.2 | +6.3 | 4/ | +3.5 |
| Unit labor costs: 6/ | | | | | |
| Value----per ton | $137 | $115 | $111 | $114 | $116 |
| Percentage change | 4/ | -16.1 | -3.5 | 4/ | +1.8 |

1/ Includes hours worked plus hours of paid leave time.

2/ Includes wages and contributions to Social Security and other employee benefits.

3/ Data are understated and percentage changes understated or overstated to the extent that not all producers responded to the Commission's questionnaires.

4/ Data for the previous year or comparable period of the previous year are not available.

5/ Based on wages paid excluding fringe benefits.

6/ Based on total compensation paid.

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission.

January-September 1985 compared with hours worked during January-September 1984. Although wages paid decreased by 9.9 percent in 1983, they increased by 4.5 percent in 1984 and 2.6 percent during January-September 1985, compared

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

with wages during January-September 1984. Total compensation decreased in 1983 and 1984 and increased during January-September 1985, compared with January-September 1984. Labor productivity increased by 16 percent in 1983, 4 percent in 1984, and 3 percent during January-June 1985 compared with productivity during January-June 1984. Unit labor costs fell from $137 per ton in 1982 to $115 in 1983 and remained in the $111-to-$116-per-ton range in 1984 and during January-September 1985. Workers at * * * of the * * * reporting firms, which accounted for 89 percent of reported 1984 production by firms also providing employment data, are represented by unions.

Financial experience of U.S. producers

Usable income-and-loss data on operations producing standard pipes and tubes were provided by * * * U.S. firms. During 1982-84, sales of standard pipes and tubes ranged from 26 to 37 percent of overall establishment sales, as reported in the introductory section of this report.

Operations on standard pipes and tubes.--* * * producers, which accounted for * * * percent of domestic shipments of standard pipes and tubes in 1984, as reported in the Commission's questionnaires, furnished usable income-and-loss data (table I-7). Net sales rose 12.3 percent from $431.2 million in 1982 to $484.2 million in 1984. Net sales in the interim periods ended September 30, 1984, and September 30, 1985, were $386.9 million and $402.1 million, respectively, representing an increase of 3.9 percent. Operating losses were reported in all periods; these losses increased slightly from $19.0 million in 1982 to $20.3 million in 1983, then dropped to $3.8 million in 1984. An operating loss of $5.1 million was reported for the interim period in 1984 compared with an operating loss of $91,000 in the interim period in 1985. 1/ The operating losses, which were 4.4 percent and 4.6 percent of net sales in 1982 and 1983, respectively, declined to 0.8 percent in 1984. The operating loss margins experienced in the interim periods were of 1.3 percent in 1984 compared with 0.02 percent in 1985. Three of the firms reported operating losses for the years 1982 and 1983, one firm sustained an operating loss in 1984, and four firms reported such losses during the interim period of 1985 compared with one firm in the interim period of 1984.

The integrated firms generally experienced operating losses during the periods covered by this report, as shown in table I-8. The nonintegrated firms reported aggregate operating incomes of $*** in 1982, $*** in 1983, $*** in 1984, $*** in the interim period of 1984, and $*** in the interim period of 1985. The operating income margins for the nonintegrated standard pipe

---

1/ The financial information presented, as calculated from responses to Commission questionnaires in the final investigations, differs from that presented in the preliminary reports (USITC Publication No. 1742, Certain Welded Carbon Steel Pipes and Tubes From India, Taiwan, Turkey, and Yugoslavia, August 1985; and USITC Publication No. 1680, Certain Welded Carbon Steel Pipes and Tubes From Thailand and Venezuela, April 1985), as pointed out by counsel for Borusan and Thailand at the hearing and in posthearing briefs. The discrepancy is attributable to more complete financial information, on a product line basis, received in the final investigations. In earlier investigations * * *.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Table I-7.--Income-and-loss experience of * * * U.S. producers 1/ on their operations producing standard pipes and tubes, accounting years 1982-84 and interim periods ended Sept. 30, 1984, and Sept. 30, 1985

| Item | 1982 | 1983 | 1984 | Interim period ended Sept. 30-- 1984 | Interim period ended Sept. 30-- 1985 |
|---|---|---|---|---|---|
| Net sales----1,000 dollars | 431,209 | 436,243 | 484,187 | 386,854 | 402,077 |
| Cost of goods sold----do | 412,598 | 414,640 | 446,312 | 356,605 | 364,834 |
| Gross profit----do | 18,611 | 21,603 | 37,875 | 30,249 | 37,243 |
| General, selling, and administrative expenses----do | 37,656 | 41,874 | 41,673 | 35,341 | 37,334 |
| Operating income or (loss)----do | (19,045) | (20,271) | (3,798) | (5,092) | (91) |
| Depreciation and amortization expense 2/----do | 8,428 | 8,750 | 10,345 | 8,037 | 8,574 |
| As a share of net sales: | | | | | |
| Cost of goods sold percent | 95.7 | 95.0 | 92.2 | 92.2 | 90.7 |
| Gross profit----do | 4.3 | 5.0 | 7.8 | 7.8 | 9.3 |
| General, selling, and administrative expenses----do | 8.7 | 9.6 | 8.6 | 9.1 | 9.3 |
| Operating income or (loss)----do | (4.4) | (4.6) | (0.8) | (1.3) | 3/ |
| Number of firms reporting operating losses | 3 | 3 | 1 | 1 | 4 |

1/ These firms are * * *.
2/ The Commission recieved no data on depreciation and amortization from 1 firm which accounted for * * * percent of reported 1984 net sales.
3/ An operating loss of 0.02 percent of sales.

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission.

producers increased from * * * percent in 1982 to * * * percent in 1983 and then declined to * * * percent in 1984 and * * * percent in the interim periods of 1984 and 1985.

* * * 1/ reported financial information on production of standard pipes and tubes * * *. As shown in the following tabulation, * * *:

* * * * * * *

1/ * * *.

Table I-8.--Income-and-loss experience of * * * U.S. producers on their operations producing standard pipes and tubes, by nonintegrated producers and specified integrated producers, accounting years 1982-84 and interim periods ended Sept. 30, 1984, and Sept. 30, 1985

| Item | 1982 | 1983 | 1984 | Interim period ended Sept. 30-- | |
|---|---|---|---|---|---|
| | | | | 1984 | 1985 |

* * * * * * *

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission.

Capital expenditures and research and development expenses.--* * * U.S. producers supplied information on their capital expenditures for land, buildings, and machinery and equipment used in the production of standard pipes and tubes, and two furnished data on their research and development expenses. Capital expenditures for standard pipes and tubes increased from $3.0 million in 1982 to $4.3 million in 1983, then fell to $2.4 million in 1984. Capital expenditures rose * * * percent from $2.4 million during the interim period in 1984 to $*** million in the corresponding period of 1985. Research and development expenses for standard pipes and tubes were $***, $***, and $*** in 1982, 1983, and 1984, respectively, and $*** during the interim period of 1984 and $*** in the corresponding period of 1985.

Capital expenditures and research and development expenses for standard pipes and tubes are shown in the following tabulation (in thousands of dollars):

| Period | Capital expenditures | Research and development expenses |
|---|---|---|
| 1982 | 2,959 | *** |
| 1983 | 4,316 | *** |
| 1984 | 2,419 | *** |
| Jan.-Sept.-- | | |
| 1984 | 2,373 | *** |
| 1985 | *** | *** |

Investment in productive facilities.--* * * U.S. producers supplied data for 1982-85 concerning their investment in productive facilities employed in the production of standard pipes and tubes. Their investment in such facilities, valued at cost, rose from $56.4 million as of the end of 1982 to

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

$64.9 million as of the end of 1984 and $69.8 million as of September 30, 1985, compared with $65.3 million as of September 30, 1984. The book value of such assets was $25.1 million as of yearend 1984 and $25.0 million as of September 30, 1985, as shown in the following tabulation (in thousands of dollars):

| Period | Original cost | Book value |
|---|---|---|
| 1982 | 56,425 | 18,479 |
| 1983 | 61,963 | 25,831 |
| 1984 | 64,931 | 25,059 |
| Jan.-Sept.— | | |
| 1984 | 65,340 | 25,470 |
| 1985 | 69,802 | 25,005 |

## The Question of the Threat of Material Injury

### Consideration factors

In its examination of the question of the threat of material injury to an industry in the United States, the Commission considers among other relevant factors, the nature of any subsidies, any increase in production capacity or existing unused capacity in the exporting country likely to result in an increase in imports of the subject merchandise to the United States, any rapid increase in U.S. market penetration and the likelihood that the penetration will increase to an injurious level, the probability that the price of the subject imported product will have a depressing or suppressing effect on the domestic price of the merchandise, any substantial increase in inventories of the merchandise in the United States, any other demonstrable trends that indicate that the importation (or sale for importation) of the merchandise will be the cause of actual injury, and the potential for product shifting.

Information on the market penetration of the subject products is presented in the section of the report entitled "Consideration of the Causal Relationship Between Alleged Material Injury or the Threat Thereof and Subsidized and/or LTFV Imports." Available information on the depressing or suppressing effect of the imported product on domestic prices is presented in the pricing section of this report. Available information on subsidies, foreign producers' capacity, production, and exports, and the potential for product shifting was presented in the introductory part of the report.

### U.S. importers' inventories

Questionnaires of the instant final investigations with usable inventory data have been received from * * * importers of standard pipes and tubes. * * * were the only importers able to provide inventory data on imports from Thailand, * * * reported * * * tons of product from Thailand in inventory as of September 30, 1985, and * * * reported * * * tons as of December 31, 1984, and * * * tons as of September 30, 1985. * * *, which reported * * * tons of inventories of product from Turkey as of September 30, 1985, * * *.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Consideration of the Causal Relationship Between Alleged Material Injury or the Threat Thereof and Subsidized and/or LTFV Imports

U.S. imports

Total U.S. imports of standard pipes and tubes increased at an annual rate of 35 percent from 0.8 million tons in 1982 to 1.5 million tons in 1984 (table I-9). Such imports during January-November 1985, at 1.3 million tons, were 7 percent below the level of imports during January-November 1984. Imports from Turkey and Thailand, together, increased throughout the period covered by this report from none in 1982 to 505 tons in 1983, 2,628 tons in 1984, and 63,811 tons in January-November 1985 (compared with 1,600 tons during January-November 1984). There were no imports from Turkey in 1982; such imports increased from 505 tons in 1983 to 2,578 tons in 1984 and 34,073 tons during January-November 1985. There were no imports from Thailand in 1982 and 1983, 50 tons in 1984, and 29,738 tons during January-November 1985.

As a share of total imports of standard pipes and tubes, those from Turkey and Thailand, together, rose from less than 0.1 percent in 1983 to 0.2 percent in 1984 and to 4.7 percent during January-November 1985. Imports from Turkey increased their share of the import market from 0.2 percent in 1984 to 2.5 percent during January-November 1985 and Thailand's share increased from less than 0.1 percent to 2.2 percent during the same period.

Imports of standard pipes and tubes from all sources were relatively constant from month to month during 1985, whereas imports from Turkey and Thailand varied widely, as shown in table I-10.

Petitioners state that they believe that there are sizeable quantities of Thai pipe due to arrive in the United States in the next few months and that "significant tonnages" of standard pipes are due to arrive in Los Angeles on the ship Kini on February 4, 1986. 1/ The petitioners did not provide any specific information to the Commission regarding outstanding orders of Turkish product.

The following tabulation shows outstanding purchase orders of Thai standard pipes and tubes provided by importers 2/ to the Commission's staff:

| Firm | Quantity (tons) | Arrival date |
|---|---|---|

* * * * * * *

Although the staff knows of no outstanding orders of Turkish standard pipes and tubes, * * *.

In addition, * * *.

1/ Petitioners' supplemental submission dated Jan. 21, 1986.
2/ Counsel for the Thai producers submitted a letter to the Commission on Feb. 4, 1986, which stated that a shipment of * * * tons of standard pipes and tubes left Thailand in December and another shipment of * * * tons "just has left, or will soon leave, Thailand." This * * *.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Barcode:3883995-03 A-549-502 SCO - Scope Inquiry - Line Pipe

Table I-9.—Standard pipes and tubes: U.S. imports for consumption, 1/ by sources, 1982-84, January-November 1984, and January-November 1985

| Source | 1982 | 1983 | 1984 | January-November— 1984 | January-November— 1985 |
|---|---|---|---|---|---|
| | Quantity (tons) | | | | |
| Turkey | 0 | 505 | 2,578 | 1,561 | 34,073 |
| Thailand | 0 | 0 | 50 | 39 | 29,738 |
| Republic of Korea | 356,084 | 575,008 | 499,036 | 472,322 | 527,964 |
| Canada | 74,336 | 88,660 | 165,057 | 151,483 | 129,004 |
| Brazil | 20,265 | 52,174 | 186,958 | 177,354 | 46,806 |
| Japan | 135,904 | 69,212 | 123,688 | 113,410 | 164,897 |
| Mexico | 22,180 | 97,095 | 96,776 | 93,988 | 37,539 |
| Spain | 4,039 | 19,495 | 82,116 | 76,211 | 14,584 |
| South Africa | 36,575 | 27,827 | 50,726 | 44,451 | 36,763 |
| All other | 194,537 | 251,676 | 337,156 | 308,077 | 323,021 |
| Total | 843,919 | 1,181,652 | 1,544,141 | 1,438,896 | 1,344,389 |
| | Value (1,000 dollars) | | | | |
| Turkey | — | 200 | 821 | 454 | 11,579 |
| Thailand | — | — | 15 | 11 | 10,605 |
| Republic of Korea | 153,224 | 185,574 | 187,839 | 176,060 | 199,817 |
| Canada | 40,150 | 43,279 | 77,125 | 71,068 | 57,577 |
| Brazil | 9,654 | 15,291 | 61,109 | 57,722 | 15,783 |
| Japan | 74,976 | 30,407 | 56,655 | 51,245 | 76,131 |
| Mexico | 8,895 | 31,730 | 34,193 | 33,180 | 13,984 |
| Spain | 1,401 | 5,425 | 25,143 | 23,256 | 4,902 |
| South Africa | 14,807 | 8,714 | 17,299 | 15,269 | 11,848 |
| All other | 88,828 | 78,549 | 114,664 | 104,385 | 114,969 |
| Total | 391,935 | 399,169 | 574,863 | 532,650 | 517,195 |
| | Unit value | | | | |
| Turkey | — | $396 | $318 | $291 | $340 |
| Thailand | — | — | 291 | 280 | 357 |
| Republic of Korea | $430 | 323 | 376 | 373 | 378 |
| Canada | 540 | 488 | 467 | 469 | 446 |
| Brazil | 476 | 293 | 327 | 325 | 337 |
| Japan | 552 | 439 | 458 | 452 | 462 |
| Mexico | 401 | 327 | 353 | 353 | 373 |
| Spain | 347 | 278 | 306 | 305 | 336 |
| South Africa | 405 | 313 | 341 | 344 | 322 |
| All other | 457 | 312 | 340 | 339 | 356 |
| Average | 464 | 338 | 372 | 370 | 385 |

1/ Includes imports under TSUSA items 610.3231, 610.3232, 610.3234, 610.3241, 610.3242, 610.3243, 610.3244, 610.3247, 610.3252, 610.3254, 610.3256, 610.3258, and 610.4925.

Source: Compiled from official statistics of the U.S. Department of Commerce.

Note: Because of rounding, figures may not add to the totals shown.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Table I-10.--Standard pipes and tubes: U.S. imports for consumption, 1/ by sources, January-November 1985

(In tons)

| Period | Turkey | Thailand | All sources |
|---|---|---|---|
| January 1985 | 3,127 | 44 | 130,497 |
| February 1985 | 718 | 649 | 112,231 |
| March 1985 | 2,700 | 495 | 139,007 |
| April 1985 | 513 | 43 | 121,057 |
| May 1985 | 362 | 67 | 109,989 |
| June 1985 | 2,732 | 11,091 | 132,495 |
| July 1985 | 1,615 | 52 | 119,459 |
| August 1985 | 5,437 | 392 | 153,332 |
| September 1985 | 7,587 | 642 | 128,321 |
| October 1985 | 8,797 | 11,638 | 98,439 |
| November 1985 | 484 | 4,625 | 99,561 |
| January-November 1985 | 34,072 | 29,738 | 1,344,388 |

1/ Includes imports under TSUSA items 610.3231, 610.3232, 610.3234, 610.3241, 610.3242, 610.3243, 610.3244, 610.3247, 610.3252, 610.3254, 610.3256, 610.3258, and 610.4925.

Source: Compiled from official statistics of the U.S. Department of Commerce.

Note.--Because of rounding, figures may not add to the totals shown.

Market penetration by the subject imports

Market penetration data are not available for January-November 1985. The share of the U.S. market for standard pipes and tubes supplied by imports from Turkey, Thailand, and all countries is shown in table I-11. 1/

Market penetration by the subsidized imports.--Imports from Turkey had a negligible share of the U.S. market in 1983, a 0.1 percent share in 1984, and a 1.3 percent share during January-September 1985.

Market penetration by the LTFV imports.--Imports from Thailand had a negligible share of the U.S. market in 1984 and a 0.7 percent share during January-September 1985.

The major U.S. customs districts through which imports of standard pipes and tubes from Turkey and Thailand entered the United States in 1984 and

1/ Petitioners request that the Commission cumulate imports of standard pipes and tubes from subject countries with imports of similar products from other countries subject to investigation. Market penetration by standard pipes and tubes from countries currently or recently (since January 1984) subject to investigation by the Commission or the Department of Commerce is presented in table I-1.

Table I-11.—Standard pipes and tubes: Shares of U.S. consumption supplied by imports from Turkey, Thailand, and all other countries, 1982-84, January-September 1984, and January-September 1985

(In percent)

| Source | 1982 | 1983 | 1984 | Jan.-Sept— 1/ | |
|---|---|---|---|---|---|
| | | | | 1984 | 1985 |
| Turkey | - | 2/ | 0.1 | 0.1 | 1.3 |
| Thailand | - | - | 2/ | - | .7 |
| All other | 50.6 | 57.2 | 63.6 | 63.7 | 59.8 |
| Total | 50.6 | 57.3 | 63.7 | 63.8 | 61.8 |

1/ Consumption data are not available for January-November periods. Imports of standard pipes and tubes in January-September 1984 totaled 1,435 tons from Turkey and 1,206,515 tons from all countries; such imports in January-September 1985 totaled 24,792 tons from Turkey, 13,474 tons from Thailand, and 1,146,389 tons from all countries.
2/ Less than 0.05 percent.

Source: Based on data in tables I-2 and I-9 of this report, except where noted.

Note.—Because of rounding, figures may not add to the totals shown.

January-November 1985, as compiled from offical statistics of the U.S. Department of Commerce, are presented in the following tabulation (in tons):

| Source and customs district | 1984 | Jan.-Nov. 1985 |
|---|---|---|
| Turkey: | | |
| Houston, TX | 775 | 10,687 |
| New Orleans, LA | 553 | 8,270 |
| Tampa, FL | - | 7,379 |
| Bridgeport, CT | 1,017 | 6,102 |
| All other | 234 | 1,636 |
| Total | 2,578 | 34,073 |
| Thailand: | | |
| Los Angeles, CA | - | 12,191 |
| Bridgeport, CT | - | 6,152 |
| New Orleans, LA | - | 5,755 |
| Savannah, GA | - | 3,457 |
| All other | 50 | 2,183 |
| Total | 50 | 29,738 |

Prices

The standard pipes and tubes included in these investigations are generally priced on a per-hundred-foot basis. While several U.S. producers publish confidential pricelists, list prices are often discounted to meet

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

competitive offers. The U.S.-produced pipes and tubes are predominantly sold on an f.o.b. mill basis. The imported products under investigation are normally sold on an ex-dock, duty-paid, or f.o.b. warehouse basis. Formal bidding is not the usual means of price competition for standard pipes and tubes up to 16 inches in diameter.

The Commission requested U.S. producers and importers to provide price data on their largest sale of each of five product specifications to both a service center/distributor and an end-user customer. These products were reported to be specifications currently imported from one or more of the countries subject to these investigations. The five standard pipe product specifications are as follows:

PRODUCT 1: ASTM A-120 schedule 40 standard pipe, carbon welded, black, plain end, 1.315-inch O.D. (1-inch nominal), 0.133-inch wall thickness.

PRODUCT 2: ASTM A-120 schedule 40 standard pipe, carbon welded, black, plain end, 1.050-inch O.D. (3/4-inch nominal), 0.113-inch wall thickness.

PRODUCT 3: ASTM A-120 schedule 40 standard pipe, carbon welded, galvanized, plain end, 1.660-inch O.D. (1 1/4-inch nominal), 0.140-inch wall thickness.

PRODUCT 4: ASTM A-120 schedule 40 standard pipe, carbon welded, galvanized, plain end, 2.375-inch O.D. (2-inch nominal), 0.154-inch wall thickness.

PRODUCT 5: Fence tubing, galvanized, plain end, 1 3/8-inch O.D., 0.069-inch wall thickness.

<u>Prices of domestic products</u>.--* * * U.S. producers provided selling price data for sales to service centers/distributors and end users of the five standard pipe and tube specifications (products 1 through 5). These data are presented in table I-12.

In sales to service centers/distributors, all five products showed increased prices in 1984 over the 1983 levels, but prices of products 1, 3, and 4 subsequently slid in 1985, ending the period of investigation about 5 percent below prices during January-March 1983. The reported selling prices for product 1 decreased from the January-March 1983 level of $*** to $*** during July-September 1985. Prices for product 3 declined from $*** to $*** over the same period. Overall, prices for product 4 also fell off from January-March 1983 to July-September 1985, slipping from $*** to $***.

In sales to service centers/distributors, product 2 experienced a slight boost in mid-1984, but ended the period under investigation virtually unchanged from its beginning level of $***. Product 5 (fence tubing) posted a steady price gain throughout most of the period under investigation, dropping only slightly during July-September 1985. Prices for product 5 rose by 14 percent, from $*** during January-March 1983 to $*** in July-September 1985.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Table I-12.--Standard pipes and tubes: 1/ U.S. producers' weighted-average net selling prices to service centers/distributors and end users of specified products, January 1983-September 1985

(Per 100 feet)

| Period | Product 1 | Product 2 | Product 3 | Product 4 | Product 5 |
|---|---|---|---|---|---|
| | Sold to service centers/distributors | | | | |
| 1983: | | | | | |
| Jan.-Mar. | $*** | $*** | $*** | $*** | $*** |
| Apr.-June | *** | *** | *** | *** | *** |
| July-Sept | *** | *** | *** | *** | *** |
| Oct.-Dec | *** | *** | *** | *** | *** |
| 1984: | | | | | |
| Jan.-Mar | *** | *** | *** | *** | *** |
| Apr.-June | *** | *** | *** | *** | *** |
| July-Sept | *** | *** | *** | *** | *** |
| Oct.-Dec | *** | *** | *** | *** | *** |
| 1985: | | | | | |
| Jan.-Mar | *** | *** | *** | *** | *** |
| Apr.-June | *** | *** | *** | *** | *** |
| July-Sept | *** | *** | *** | *** | *** |
| | Sold to end users | | | | |
| 1983: | | | | | |
| Jan.-Mar | $*** | $*** | $*** | $*** | $*** |
| Apr.-June | *** | *** | *** | *** | *** |
| July-Sept | *** | *** | *** | *** | *** |
| Oct.-Dec | *** | *** | *** | *** | *** |
| 1984: | | | | | |
| Jan.-Mar | *** | *** | *** | *** | *** |
| Apr.-June | *** | *** | *** | *** | *** |
| July-Sept | *** | *** | *** | *** | *** |
| Oct.-Dec | *** | *** | *** | *** | *** |
| 1985: | | | | | |
| Jan.-Mar | *** | *** | *** | *** | *** |
| Apr.-June | *** | *** | *** | *** | *** |
| July-Sept | *** | *** | *** | *** | *** |

1/ See product list for specifications.

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission.

Weighted-average prices to end users followed a pattern similar to distributor prices. Selling prices to end users for products 1 through 4 generally rose from January-March 1983 to peak in 1984 at levels that ranged from 12 to 32 percent above the January-March 1983 prices and then experienced declines. July-September 1985 prices for products 1 through 4 were 6 to 7 percent below those of January-March 1983. Unlike other standard pipe products, prices of product 5 underwent a relatively slow but consistent rise in price during the period of investigation. The price of product 5 to end

users rose by some 15 percent, from $*** during January-March 1983 to $*** during July-September 1985.

Prices of imports from Thailand and price comparisons.--* * * importers of standard pipe and tube from Thailand provided some price data for the product specifications. * * * indicated that their price quotations are made either on an ex-dock or f.o.b. warehouse basis. Most importers of the Thai product indicated that they do not use pricelists in setting their transaction prices.

The selling prices to service centers/distributors and to end users for standard pipe and tube products 1 through 5 from Thailand and comparisons with respective domestic prices are shown in table I-13. Because these products have been imported from Thailand only since early 1985, data on each product are scant and do not clearly establish trends.

Table I-13.--Standard pipes and tubes: 1/ Weighted-average prices to service centers/distributors and end users of specified products, U.S.-produced and imported products from Thailand, by specified quarters, January-September 1985

| Item | U.S. product price | Thai product | | |
|---|---|---|---|---|
| | | Price | Margin of underselling | |
| | | | Amount | Percent |
| Sales to service centers/ distributors of-- | Per 100 feet | Per 100 feet | Per 100 feet | |
| Product 1: | | | | |
| April-June 1985 | $*** | $*** | $*** | 11.98 |
| July-September 1985 | *** | *** | (***) | (2.76) |
| Product 2: | | | | |
| April-June 1985 | *** | *** | *** | 32.49 |
| July-September 1985 | *** | *** | *** | 12.73 |
| Product 3: | | | | |
| January-March 1985 | *** | *** | *** | 34.39 |
| April-June 1985 | *** | *** | *** | 30.22 |
| July-September 1985 | *** | *** | *** | 10.67 |
| Product 4: | | | | |
| January-March 1985 | *** | *** | *** | 33.13 |
| April-June 1985 | *** | *** | *** | 14.01 |
| July-September 1985 | *** | *** | *** | 25.52 |
| Product 5: | | | | |
| April-June 1985 | *** | *** | *** | 16.92 |
| July-September 1985 | *** | *** | *** | 14.01 |
| Sales to end users of-- | | | | |
| Product 1: | | | | |
| April-June 1985 | *** | *** | (***) | (1.59) |
| Product 3: | | | | |
| April-June 1985 | *** | *** | *** | 11.67 |

1/ See product list for specifications.

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

The price of product 1 from Thailand sold to service centers/ distributors was $*** during April-June 1985 and undersold the domestic product by 12 percent; during July-September 1985, the price of the imported product was $***, overselling the domestic product by 3 percent. There was a single price comparison available for sales of product 1 to end users; during April-June 1985, the product imported from Thailand sold for $***, or 2 percent over the price of the domestic product.

Product 2 from Thailand sold to service centers/distributors for $*** during April-June 1985 and $*** during July-September 1985, underselling the domestic product by 32 percent and 13 percent, respectively. No sales of product 2 to end users were reported to the Commission.

In 1985, the selling price of Thai product 3 was $*** during January-March, $*** during April-June, and $*** during July-September. At these prices, the margins of underselling were 34 percent, 30 percent, and 11 percent, respectively. There was a single price comparison available for product 3 sold to end users; during April-June 1985, Thai product 3 sold for $***, 12 percent below the domestic price.

In 1985, Thai-produced product 4 sold to service centers/distributors for $*** during January-March, $*** during April-June, and $*** during July-September and undersold the domestic product by 33 percent, 14 percent, and 26 percent, respectively. There were no prices of product 4 sold to end users submitted to the Commission.

Product 5 from Thailand sold to service centers/distributors for $*** during April-June 1985 and $*** during July-September 1985. In these periods, the margins of underselling were 17 percent and 14 percent, respectively. 1/

Prices of imports from Turkey and price comparisons.--* * * importers of standard pipe and tube from Turkey provided price data for the product specifications 1 through 4. * * * typically quote their prices on an ex-dock basis, and do not use pricelists in establishing transaction prices.

Price data for sales of products 1 through 4 to service centers/distributors and end users of both Turkish and domestic origin are compared in table I-14. Sales prices to service centers/distributors of product 1 were $*** during October-December 1984, $*** during January-March 1985, $*** during April-June 1985, and $*** during July-September 1985. The margins of underselling over this period ranged from a low of 15 percent during January-March 1985 to a high of 32 percent during October-December 1984. Turkish product 1 sold to end users during July-September 1985 for $***, underselling the U.S. product by 10 percent.

Turkish imports of product 2 sold to service centers/distributors for $*** during January-March 1985 and $*** during July-September 1985. The margins of underselling in these sales were 36 and 30 percent, respectively.

In 1985, imports of product 3 from Turkey sold to service centers/distributors for $*** during January-March, $*** during April-June, and $*** during July-September and undersold the domestic product by 18, 23, and 20 percent, respectively.

1/ * * *.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Table I-14.--Standard pipes and tubes: 1/ Weighted-average prices to service centers/distributors and end users of specified products, U.S.-produced and imported products from Turkey, by specified quarters, October 1984-September 1985

| Item | U.S. product price | Turkish product | | |
|---|---|---|---|---|
| | | Price | Margin of underselling | |
| | | | Amount | Percent |
| Sales to service centers/ distributors of-- | Per 100 feet | Per 100 feet | Per 100 feet | |
| Product 1: | | | | |
| October-December 1984 | $*** | $*** | $*** | 31.89 |
| January-March 1985 | *** | *** | *** | 14.83 |
| April-June 1985 | *** | *** | *** | 17.27 |
| July-September 1985 | *** | *** | *** | 16.73 |
| Product 2: | | | | |
| January-March 1985 | *** | *** | *** | 36.19 |
| July-September 1985 | *** | *** | *** | 30.24 |
| Product 3: | | | | |
| January-March 1985 | *** | *** | *** | 17.85 |
| April-June 1985 | *** | *** | *** | 22.81 |
| July-September 1985 | *** | *** | *** | 20.26 |
| Product 4: | | | | |
| October-December 1984 | *** | *** | *** | 24.65 |
| January-March 1985 | *** | *** | *** | 15.48 |
| April-June 1985 | *** | *** | *** | 27.08 |
| July-September 1985 | *** | *** | *** | 21.52 |
| Sales to end users of-- | | | | |
| Product 1: | | | | |
| July-September 1985 | *** | *** | *** | 9.91 |
| Product 4: | | | | |
| July-September 1985 | *** | *** | *** | 12.48 |

1/ See product list for specifications.

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission.

Product 4 from Turkey was sold to service centers/distributors between October-December 1984 and July-September 1985. Product 4 sold for $*** during October-December 1984, $*** during January-March 1985, $*** during April-June, and $*** during July-September 1985. Margins of underselling ranged from a low of 15 percent during January-March 1985 to a high of 27 percent during April-June 1985. Imports of product 4 from Turkey sold to end users during July-September 1985 for $***; at this price, the margin of underselling was 12 percent.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Transportation costs

* * * U.S. producers of standard pipe and tube responded with data detailing their firms' transportation costs. Of these producers, * * * listed their market area as nationwide; * * * as Midwestern; * * * as the Western United States; and * * * as the Eastern United States.

The Commission requested U.S. producers to estimate the percentage of shipments in which their firms absorb some transportation costs to effect a sale. * * * producers responded with such data. * * * indicated they absorb some transportation costs in * * * percent of their shipments, * * * in * * * percent, * * * in * * * percent, and * * * in * * * percent or less of their shipments.

Other purchase decision factors

The Commission also asked U.S. producers to state their standard minimum quantity requirements for a sale, as well as the average leadtime between a customer's order and shipment date. * * * producers listed * * * tons as their minimum quantity requirement, * * * listed * * *, and * * * cited * * * feet as its minimum quantity requirement. Referring to leadtime between receipt of a customer's order and shipment date, * * * producers cited their firms' average leadtime as * * * days or less, * * * indicated * * * to * * * days, and * * * said * * * days.

During January-November 1985, the largest single port of entry for standard pipes and tubes from Thailand was the Port of Los Angeles, followed by gulf and east coast ports. Imports of standard pipes from Turkey enter largely through gulf and east coast ports. * * * importers of standard pipe from Thailand, * * *, provided data regarding transportation costs. * * * importers listed their market area as nationwide, * * * cited the Western States, and * * * listed the east coast as its geographic market area. * * * reported a leadtime between receipt of a customer's order and shipment as * * * days ex-warehouse if the product is in inventory. The other * * * indicated leadtimes of between * * * and * * * months for their sales. * * * importers noted that they do not absorb transportation costs in order to effect sales. * * * of standard pipe and tube indicated absorbing shipping costs to effect sales in * * * to * * * percent of shipments.

Lost sales

One producer provided the Commission with four allegations of sales lost to imports from Thailand; these allegations, purported by * * *, consisted of two customers purchasing a reported * * * tons of galvanized plain end ASTM A-120 standard pipe.

No lost sales allegations concerning imports of standard pipe from Turkey were received. Three domestic producers submitted general statements. These producers report that the nature of the marketplace does not permit specific examples of lost sales. * * *.

* * * of the allegations made by * * * totaled * * * tons of Thai pipe allegedly purchased by * * *. * * *, indicated that his firm buys both domestic and foreign pipe. In addition to price, he cited * * * as "definitely the most important factors" in deciding whether to purchase pipe, be it of domestic or foreign origin. He also pointed out that he purchases foreign pipe because the pipe he wants * * * is available from imports, but

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

not from domestic sources, without having to pay * * *, something * * * indicated reluctance to do. In reference to the specific allegation, * * * was unwilling to speak about his firm's specific purchases. Earlier in the conversation, however, * * * did note that * * *.

Two of the lost sales allegations made by * * * totaled * * * tons of pipe of Thai origin allegedly purchased by * * *. * * * indicated that his firm * * *.

Purchasers' responses to general allegations of lost sales

One producer submitted a list of six of his customers and indicated that these purchasers buy imported pipe when prices are low. The Commission contacted five of these firms, and the following is a synopsis of their remarks. One purchaser on the list * * * was cited in * * * lost sales allegations and is discussed above.

* * * indicated that his firm * * *. * * * stated that the main two factors * * * in making a decision whether to purchase imported or domestic pipe were price and delivery terms. * * *.

* * * estimated that his firm purchases approximately * * * of its pipe and tube from abroad and * * * from domestic producers. Imports account for * * *. He pointed out that in addition to price, knowledge of importers is an important consideration in his purchasing decisions. He indicated reluctance to buy products from new foreign mills by noting that he recently declined an opportunity to purchase pipe of Thai origin because he could not get it in * * *-foot lengths. * * * noted that during the past year, domestic producers have * * *.

* * * said that his firm generally purchases about * * * to * * * percent of its pipes and tubes from foreign sources. He identified * * * as his firm's major import sources, and pointed out that his firm purchased * * * of about * * * or * * * tons of Thai-produced pipe last year. * * * pointed to "Buy American" stipulations of contractors or end users as being the major factor in deciding whether to purchase foreign or domestic pipes and tubes. In addition, he cited * * * as a product typically purchased from domestic producers due to * * *.

* * * identified quality as the biggest factor in his firm's purchasing decisions. His firm * * *. The foreign tube purchased by his firm is used as * * *. He stated that domestic producers * * *. * * * estimated that between * * * and * * * of the pipe his firm uses comes from * * *.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

PUBLIC DOCUMENT
Barcode:3883995-03 A-549-502 SCO - Scope Inquiry - Line Pipe

I-26
Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Barcode:3883995-03 A-549-502 SCO - Scope Inquiry - Line Pipe

# LINE PIPES AND TUBES

## Introduction

This part of the report presents information relating specifically to line pipes and tubes, which is the subject of countervailing duty investigation No. 701-TA-253 (Final) concerning subject imports from Turkey.

## The Products

### Description and uses

The imported pipe and tube products that are the subject of this investigation are circular welded carbon steel pipes and tubes over 0.375 inch but not over 16 inches in outside diameter, which are known in the industry as line pipes and tubes. Line pipes and tubes are used for the transportation of gas, oil, or water, generally in pipeline or utility distribution systems. They are most commonly produced to API specification 5L.

Part I of this report contains a lengthy general discussion of the description and uses of pipes and tubes and the method of manufacturing standard pipes and tubes. Standard and line pipe can be produced on the same equipment. The manufacturing processes for the two products are nearly identical; the principal differences between the two are that line pipe is made from a higher grade steel and requires additional testing to ensure that it meets API specifications. 1/ Line pipe may have a higher content of carbon and manganese than is permissible for standard pipe, whereas standard pipe may have a higher content of phosphorus and sulfur than is permissible for line pipe. Requirements concerning chemical and mechanical properties for API line pipe differ for the various specifications and grades. There are at least 10 grades of API 5L line pipe. API 5L line pipe is inspected and tested at various stages in the production process to ensure strict conformity to API specifications.

### U.S. tariff treatment

Imports of the line pipes and tubes covered by this investigation are classified and reported for tariff and statistical purposes under TSUSA items 610.3208 and 610.3209, which cover welded pipes and tubes (and blanks therefor 2/) of iron (except cast iron) or of nonalloy (carbon) steel, of circular cross section, having a wall thickness of not thinner than 0.065 inch and an outside diameter over 0.375 inch but not more than 16 inches.

1/ Transcript of the public conference, investigations Nos. 731-TA-211 and 212 (Preliminary), p. 17.

2/ Blanks are semifinished pipe or tube hollows that are purchased by producers and further processed.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

The current column 1 rate of duty 1/ for line pipes and tubes, which is 1.9 percent ad valorem, was modified as a result of the Tokyo Round of the MTN from the 0.3-cent-per-pound rate in effect prior to January 1, 1982; there are no further duty modifications scheduled.  The current column 2 rate of duty, applicable to imports from the Communist countries enumerated in general headnote 3(d), is 5.5 percent ad valorem.

Imports of line pipes and tubes, if the product of designated beneficiary countries, are eligible for duty-free entry under the Caribbean Basin Economic Recovery Act (CBERA). 2/  Effective September 1, 1985, imports of such articles from Israel are free of duty under the United States-Israel Free Trade Area Agreement.

In addition to these import duties, a final determination of subsidies has been made in the current investigation, countervailing duties are in effect with respect to imports from Yugoslavia and were until recently in effect with respect to imports from Korea. 3/  Subsequent to the U.S. Government reaching VRA's with the Governments of Mexico and Venezuela, investigations on line pipes from those countries were terminated upon withdrawal of the petitions.

## U.S. Producers

Line pipe and tube producers may be divided into two types:  large, fully integrated producers that make raw steel and produce a variety of steel products, and smaller, nonintegrated or partially integrated producers.  The integrated producers include LTV Steel Corp. and United States Steel Corp. 4/

---

1/ The rates of duty in column 1 are most-favored-nation (MFN) rates and are applicable to imported products from all countries except those Communist countries and areas enumerated in general headnote 3(d) of the TSUS.  The People's Republic of China, Hungary, Romania, and Yugoslavia are the only Communist countries eligible for MFN treatment.  However, MFN rates would not apply if preferential treatment is sought and granted to products of developing countries under the Caribbean Basin Economic Recovery Act, or to products of Israel, as provided under the special rates of duty column.

2/ See the U.S. tariff treatment section of part I of this report for an explanation of the CBERA.

3/ Net subsidy and dumping margins from current investigations, outstanding dumping/countervailing duty orders, and recently terminated (other than negative) title VII cases are presented in table II-1.  On Oct. 29, 1985, subsequent to Korea agreeing to a voluntary restraint arrangement, Commerce published a notice, effective Oct. 1, 1984, in the Federal Register, revoking the countervailing duty order with respect to imports exported from Korea after the effective date.

4/ Another integrated producer, Bethlehem, permanently closed its standard and line pipe and tube operations, which were located at Sparrows Point, MD, effective Apr. 30, 1983.  Umran, a Turkish producer, bought Bethlehem's plant and is in the process of setting it up in Turkey.  In December 1984, LTV Steel announced the closing of its two standard and line pipe mills at Aliquippa, PA, and in October 1985, it announced the indefinite closing of its continuous weld standard and line pipe mill at Youngstown, OH, where it still operates an electric-resistance weld mill for producing standard and line pipes and tubes.

Table II-1.—Line pipes and tubes: Pending and recently terminated title VII investigations and outstanding countervailing duty order since 1984, most recent dumping/subsidy margins, and import-to-consumption ratios, by sources, 1982-84, January-September 1984, and January-September 1985

| Item | Weighted-average margin | Date of bond or order 1/ | Ratio of imports to apparent U.S. consumption | | | | |
|---|---|---|---|---|---|---|---|
| | | | 1982 | 1983 | 1984 | Jan.-Sept— 1984 | Jan.-Sept— 1985 |
| Countervailing duty investigations/ orders: | | | | | | | |
| Pending countervailing duty investigation: | | | | | | | |
| Turkey (instant investigation) | 2/ 17.80 | Jan. 10, 1986 | – | – | – | – | .7 |
| Outstanding countervailing duty order: | | | | | | | |
| Yugoslavia | 74.50 | Dec. 31, 1985 | .1 | – | – | – | – |
| Recently terminated countervailing duty investigations: | | | | | | | |
| Mexico 3/ | 0.67-23.65 | Jan. 31, 1985 | 1.5 | 5.6 | 6.9 | 7.9 | 3.3 |
| Venezuela 4/ | 76.00 | Nov. 13, 1985 | .3 | 1.5 | 7.5 | 7.8 | 6.3 |
| Antidumping investigations/orders: 5/ | | | | | | | |
| Pending antidumping investigations: | | | | | | | |
| Taiwan | 6/ 27.98 | Dec. 30, 1985 | 0.6 | 0.1 | 0.4 | 0.3 | 1.5 |
| Turkey | 6/ 32.55 | Jan. 3, 1986 | – | – | – | – | .7 |
| Recently terminated antidumping investigation: | | | | | | | |
| Venezuela 7/ | 55.7 | Aug. 13, 1985 | .3 | 1.5 | 7.5 | 7.8 | 6.3 |

1/ Date posting of bond required or date order issued.

2/ In its final determination, Commerce found the actual net subsidy to be 18.81 percent, but the bonding or cash deposit rate was adjusted to 17.80 percent to take into account several programwide changes occurring after the review period.

3/ Terminated by Commerce, effective Apr. 2, 1985, following withdrawal of petition.

4/ Terminated by Commerce, effective Nov. 27, 1985, following withdrawal of petition. The Commission did not institute a final investigation.

5/ There are no outstanding or recently revoked antidumping orders.

6/ This is Commerce's preliminary determination. Commerce's final determination in this case is due by Mar. 10, 1986.

7/ Terminated by the Commission, effective Dec. 4, 1985, following withdrawal of petition prior to a final determination by Commerce.

Source: Margins and date of bond or order, obtained from U.S. Department of Commerce; ratio of imports to apparent consumption, compiled from official statistics of the U.S. Department of Commerce and data published by the American Iron & Steel Institute.

Note.—Data in this table are effective as of Jan. 27, 1986.

In 1984, there were about 10 U.S. producers of line pipes and tubes. Production is concentrated in the Eastern United States and the Great Lakes and Gulf Coast regions. Selected U.S. producers of line pipes and tubes and, for those responding to the Commission's questionnaire, their shares of 1984 domestic shipments are shown in table II-2.

Table II-2.—Line pipes and tubes: Selected U.S. producers' shares of domestic shipments and plant locations, by firms, 1984

| Firm | Share of 1984 domestic shipments 1/ | Plant location |
|---|---|---|
| | Percent | |
| CPTI member firms: | | |
| Cyclops Corp.: | | |
| Sawhill Tubular Division | *** | Sharon, PA. |
| Tex-Tube Division | *** | Houston, TX. |
| LaClede Steel Co | *** | Alton, IL. |
| Wheatland Tube & Conduit | *** | Wheatland, PA. |
| Non-CPTI firms: | | |
| LTV Steel Corp | *** | Youngstown, OH. |
| | | Aliquippa, PA. 2/ |
| | | Counce, TN. |
| Lone Star Steel Co., Inc | *** | Lone Star, TX. |
| Stupp Corp | *** | Baton Rouge, LA. |
| United States Steel Corp | *** | Fairless, PA. |
| | | Lorain, OH. |
| | | Geneva, UT. |
| | | McKeesport, PA. |

1/ Total domestic shipments are based on questionnaire responses for which usable data were provided in the instant investigation.
2/ Plant closed in December 1984.

Source: Share of domestic shipments compiled from data submitted in response to questionnaires of the U.S. International Trade Commission.

## U.S. Importers

The U.S. Customs Service's net import file showed about four importers of line pipes and tubes from Turkey during the period under investigation. Questionnaires with usable data have been received from * * * importers of line pipes and tubes from Turkey—* * *.

## The U.S. Market

### Channels of distribution

According to AISI data for 1984, 28 percent of all domestic shipments of carbon steel line pipes and tubes of all sizes were sold to service centers/distributors. 1/ Almost 57 percent of domestic shipments were made

1/ Data include outside diameters of over 16 inches; such AISI data are not available on the basis of size.

Barcode:3883995-04 A-549-502 SCO - Scope Inquiry - Line Pipe

directly to the oil and gas industry. During January-September 1985, 36 percent of shipments were made to service centers/distributors and 42 percent were made to the oil and gas industry.

Apparent U.S. consumption

Apparent U.S. consumption 1/ of line pipes and tubes decreased from 863,000 tons in 1982 to 772,000 tons in 1983, or by 11 percent, and then rose by 36 percent to 1.1 million tons in 1984 (table II-3). U.S. consumption during January-September 1985, at 694,000 tons, was 18 percent below the level of consumption during January-September 1984.

Table II-3.--Line pipes and tubes: U.S. producers' domestic shipments, imports for consumption, and apparent consumption, 1982-84, January-September 1984, and January-September 1985

| Period | U.S. producers' domestic shipments 1/ | Imports | Apparent consumption | Ratio to consumption of-- | |
|---|---|---|---|---|---|
| | | | | Producers' shipments | Imports |
| | 1,000 tons | | | Percent | |
| 1982 | 529 | 334 | 863 | 61.3 | 38.7 |
| 1983 | 495 | 277 | 772 | 64.1 | 35.9 |
| 1984 | 534 | 519 | 1,053 | 50.7 | 49.3 |
| January-September-- | | | | | |
| 1984 | 425 | 418 | 843 | 50.4 | 49.6 |
| 1985 | 381 | 313 | 694 | 54.9 | 45.1 |

1/ Estimated from AISI statistics on net domestic shipments of carbon and alloy line pipes and tubes of outside diameter (OD) less than 16 inches minus net domestic shipments of seamless carbon and alloy line pipes and tubes of all sizes; although this method of estimation results in overstatement by an amount equal to the net shipments of nonseamless alloy line pipes and tubes of OD less than 16 inches and understatement by an amount equal to the net domestic shipments of seamless pipe over 16 inches, these amounts are believed to be nil or negligible. Data on U.S. producers' shipments may be understated, however, in that some producers may not report to the AISI.

Source: U.S. producers' shipments, estimated by the staff of the U.S. International Trade Commission; imports, compiled from official statistics of the U.S. Department of Commerce.

1/ Apparent U.S. consumption of line pipes and tubes is computed to be U.S. domestic shipments plus imports. The Commission staff estimated U.S. shipments from AISI statistics as noted in table II-3.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Consideration of Alleged Material Injury
to an Industry in the United States 1/

U.S. production, capacity, and capacity utilization

U.S. production of line pipes and tubes decreased from 316,000 tons in 1982 to 271,000 tons in 1983, or by 14 percent, then rose by 54 percent to 418,000 tons in 1984 (table II-4). Production during January-September 1985, however, was 9 percent less than production during January-September 1984.

Table II-4.—Line pipes and tubes: U.S. production, capacity, and capacity utilization, 1982-84, January-September 1984, and January-September 1985

| Item | 1982 | 1983 | 1984 | January-September— | |
|---|---|---|---|---|---|
| | | | | 1984 | 1985 |
| Production——1,000 tons— | 316 | 271 | 418 | 318 | 288 |
| Capacity——do— | 1,203 | 1,119 | 1,123 | 843 | 836 |
| Capacity utilization percent— | 26.3 | 24.2 | 37.2 | 37.7 | 34.4 |

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission.

The U.S. capacity of reporting firms to produce line pipes and tubes decreased from 1.2 million tons in 1982 to 1.1 million tons in 1983 and then rose slightly in 1984; capacity during January-September 1985 was down 1 percent from the level during January-September 1984. Capacity utilization by reporting firms dropped from 26 percent in 1982 to 24 percent in 1983, then increased to 37 percent in 1984. Capacity utilization for line pipe producers was 34 percent during January-September 1985, compared with 38 percent during January-September 1984.

U.S. producers' domestic shipments

Domestic shipments of line pipes and tubes by responding firms dropped from 344,000 tons in 1982 to 284,000 tons in 1983, or by 17 percent (table II-5). They increased in 1984 to 394,000 tons, 39 percent above the level of shipments in 1983, and 15 percent above the level of shipments in 1982. Shipments during January-September 1985 declined by 6 percent from shipments during January-September 1984.

U.S. exports

Exports of line pipes and tubes, which were all shipped by * * *, declined from * * * tons in 1982 to * * * tons in 1983 and then increased to * * * tons in 1984. Exports represented less than * * * percent of the firm's

1/ Data in this section of the report were compiled from questionnaires of the instant final investigation.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Table II-5.--Line pipes and tubes: U.S. producers' domestic shipments, 1982-84, January-September 1984, and January-September 1985

| Item | 1982 | 1983 | 1984 | January-September | |
|---|---|---|---|---|---|
| | | | | 1984 | 1985 |
| Quantity------------1,000 tons--- | 344 | 284 | 394 | 302 | 285 |
| Value---------million dollars--- | 202 | 138 | 212 | 154 | 130 |
| Unit value-----------per ton--- | $587 | $486 | $538 | $510 | $456 |

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission.

total shipments during the period. Exports as reported to the Commission are shown in the following tabulation:

| Period | Quantity (tons) | Value (1,000 dollars) | Unit value (per ton) |
|---|---|---|---|
| 1982---------- | *** | *** | $*** |
| 1983---------- | *** | *** | *** |
| 1984---------- | *** | *** | *** |
| Jan.-Sept.-- | | | |
| 1984--------- | *** | *** | *** |
| 1985--------- | *** | *** | *** |

U.S. producers' inventories

Yearend inventories of line pipes and tubes, as provided by * * * firms, decreased from 47,000 tons in 1982 to 34,000 tons in 1983 and then rose to 54,000 tons in 1984 and remained at that level as of September 30, 1985. As a share of producers' annualized shipments, producers' end-of-period inventories of line pipes and tubes ranged from 11 to 14 percent during the period under investigation, as shown in the following tabulation:

| Period | Inventories (1,000 tons) | Ratio of inventories to shipments 1/ (percent) |
|---|---|---|
| As of Dec. 31-- | | |
| 1982---------------- | 47 | 13.7 |
| 1983---------------- | 34 | 12.0 |
| 1984---------------- | 54 | 13.6 |
| As of Sept. 30-- | | |
| 1984---------------- | 46 | 11.3 |
| 1985---------------- | 54 | 14.0 |

1/ Includes intracompany and intercompany transfers, domestic shipments, and export shipments of firms responding to the Commission's questionnaire. The ratios of inventories to shipments for the inventories held as of Sept. 30 are computed from annualized shipments.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Employment and wages

Employment data for line pipes and tubes were provided by all * * * producers reporting production data. The number of production workers employed in the production of line pipes and tubes decreased from 1,888 in 1982 to 1,402 in 1983, increased to 1,904 in 1984, and decreased again, to 1,704, during January-September 1985 (table II-6). Hours worked by production and related workers producing line pipes and tubes decreased from 2.9 million in 1982 to 2.2 million in 1983, increased to 3.2 million in 1984, and then decreased by 13 percent during January-September 1985 compared with January-September 1984.

Wages and total compensation paid by U.S. producers to workers producing line pipes and tubes declined from 1982 to 1983, increased from 1983 to 1984, and then fell during January-September 1985 compared with levels in the corresponding period of 1984. Labor productivity increased by 13 percent in 1983 and 7 percent in 1984, and further increased by 4 percent during January-September 1985 compared with productivity during January-September 1984. Conversely, unit labor costs fell by 12 percent in 1983 and another *** percent in 1984 and then further decreased by 1 percent during January-September 1985 compared with unit labor costs during January-September 1984. Workers at all of the reporting firms are represented by unions.

Financial experience of U.S. producers

Usable income-and-loss data on operations producing line pipes and tubes were provided by * * * U.S. firms. During 1982-84, sales of line pipes and tubes ranged from 11 to 14 percent of overall establishment sales, as reported in the introductory section of this report.

Operations on line pipes and tubes.—* * * producers that accounted for * * * percent of domestic shipments of line pipes and tubes in 1984, as reported in the Commission's questionnaires, furnished usable income-and-loss data (table II-7). 1/ Net sales fell 32 percent from $196.9 million in 1982 to $133.4 million in 1983 and then rose by 56 percent to $207.7 million in 1984. Net sales in the interim periods ended September 30, 1984, and September 30, 1985, were $150.2 million and $126.9 million, respectively, representing a decline of 16 percent. Operating losses were reported in every period; these losses rose slightly from $38.0 million in 1982 to $38.5 million in 1983, then dropped to $31.0 million in 1984. The operating losses reported for the interim periods dropped from $27.7 million in 1984 to $13.4 million in 1985. The operating loss margins, which increased from 19.3 percent in 1982 to 28.9 percent in 1983, declined to 14.9 percent in 1984. Operating loss margins in the interim periods slipped from 18.5 percent in 1984 to 10.5 percent in 1985. Two of the * * * firms reported operating losses for 1982, three firms sustained operating losses in 1983, two firms did so in both periods of 1984, and three firms reported losses during the interim period of 1985.

The integrated firms generally experienced operating losses during the periods covered by this report. The nonintegrated firms reported aggregate

1/ See part I of this report for a discussion of why income-and-loss information presented here differs from that presented in other Commission investigations.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Table II-6.--Average number of production and related workers producing line pipes and tubes, hours paid, 1/ wages and total compensation 2/ paid to such employees, and labor productivity, hourly compensation, and unit labor production costs, 3/ 1982-84, January-September 1984, and January-September 1985.

| Item | 1982 | 1983 | 1984 | January-September-- | |
|---|---|---|---|---|---|
| | | | | 1984 | 1985 |
| Production and related workers: | | | | | |
| Number | 1,888 | 1,402 | 1,904 | 2,031 | 1,704 |
| Percentage change | 4/ | -25.7 | +35.8 | 4/ | -16.1 |
| Hours worked by production and related workers: | | | | | |
| Number----1,000 hours | 2,931 | 2,230 | 3,226 | 2,602 | 2,272 |
| Percentage change | 4/ | -23.9 | +44.7 | 4/ | -12.7 |
| Wages paid to production and related workers: | | | | | |
| Value----1,000 dollars | *** | 30,630 | 47,231 | 38,184 | 33,613 |
| Percentage change | 4/ | -*** | +54.2 | 4/ | -12.0 |
| Total compensation paid to production and related workers: | | | | | |
| Value----1,000 dollars | *** | *** | 67,452 | 54,341 | 48,771 |
| Percentage change | 4/ | -24.5 | +*** | 4/ | -10.3 |
| Labor productivity: | | | | | |
| Quantity----tons per hour | 0.108 | 0.122 | 0.130 | 0.122 | 0.127 |
| Percentage change | 4/ | +13.0 | +6.6 | 4/ | +4.1 |
| Hourly compensation: 5/ | | | | | |
| Value | $*** | $13.74 | $14.64 | $14.67 | $14.79 |
| Percentage change | 4/ | -*** | +6.6 | 4/ | +0.8 |
| Unit labor costs: 6/ | | | | | |
| Value----per ton | $*** | $*** | $161 | $171 | $169 |
| Percentage change | 4/ | -12.1 | -*** | 4/ | -1.2 |

1/ Includes hours worked plus hours of paid leave time.
2/ Includes wages and contributions to Social Security and other employee benefits.
3/ Data are understated and percentage changes understated or overstated to the extent that not all producers responded to the Commission's questionnaires.
4/ Data for the previous year or comparable period are not available.
5/ Based on wages paid excluding fringe benefits.
6/ Based on total compensation paid.

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission.

operating incomes of $*** in 1982, $*** in 1983, $*** in 1984, $*** in the interim period of 1984, and $*** in the interim period of 1985, as shown in table II-8. The operating income margins for the nonintegrated line pipe and tube producers increased from * * * percent in 1982 to * * * percent in 1983 and * * * percent in 1984; the margin was * * * percent in interim 1985, compared with * * * percent in interim 1984.

Table II-7.--Income-and-loss experience of * * * U.S. producers 1/ on their operations producing line pipes and tubes, accounting years 1982-84 and interim periods ended Sept. 30, 1984, and Sept. 30, 1985

| Item | 1982 | 1983 | 1984 | Interim period ended Sept. 30-- | |
|---|---|---|---|---|---|
| | | | | 1984 | 1985 |
| Net sales--------1,000 dollars-- | 196,927 | 133,427 | 207,656 | 150,193 | 126,888 |
| Cost of goods sold---------do------ | *** | 161,386 | 226,583 | 165,987 | 133,505 |
| Gross (loss)------------------do------ | (***) | (27,959) | (18,927) | (15,794) | (6,617) |
| General, selling, and administrative expenses------------------do------ | *** | 10,537 | 12,062 | 11,955 | 6,756 |
| Operating (loss)-----------do------ | (38,007) | (38,496) | (30,989) | (27,749) | (13,373) |
| Depreciation and amortization expense 2/--------do------ | 5,461 | 4,180 | 7,618 | 5,343 | 3,900 |
| As a share of net sales: | | | | | |
| Cost of goods sold percent--- | *** | 121.0 | 109.1 | 110.5 | 105.2 |
| Gross (loss)-----------------do------ | (***) | (21.0) | (9.1) | (10.5) | (5.2) |
| General, selling, and administrative expenses------------------do------ | *** | 7.9 | 5.8 | 8.0 | 5.3 |
| Operating (loss)---------do------ | (19.3) | (28.9) | (14.9) | (18.5) | (10.5) |
| Number of firms reporting operating losses----------------- | 2 | 3 | 2 | 2 | 3 |

1/ These firms are * * *.

2/ The Commission recieved no data on depreciation and amortization from 1 firm which accounted for * * * percent of reported 1984 net sales.

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission.

Table II-8.--Income-and-loss experience of * * * U.S. producers on their operations producing line pipes and tubes, by nonintegrated producers and specified integrated producers, accounting years 1982-84 and interim periods ended Sept. 30, 1984, and Sept. 30, 1985

| Item | 1982 | 1983 | 1984 | Interim period ended Sept. 30-- | |
|---|---|---|---|---|---|
| | | | | 1984 | 1985 |
| * | * | * | * | * | * |

*

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Capital expenditures and research and development expenses.—No information was furnished regarding capital expenditures or research and development expenses incurred exclusively in the production of line pipes and tubes.

## The Question of the Threat of Material Injury

### Consideration factors

In its examination of the question of the threat of material injury to an industry in the United States, the Commission considers, among other relevant factors, the nature of any subsidies, any increase in production capacity or existing unused capacity in the exporting country likely to result in an increase in imports of the subject merchandise to the United States, any rapid increase in U.S. market penetration and the likelihood that the penetration will increase to an injurious level, the probability that the price of the subject imported product will have a depressing or suppressing effect on the domestic price of the merchandise, any substantial increase in inventories of the merchandise in the United States, any other demonstrable trends that indicate that the importation (or sale for importation) of the merchandise will be the cause of actual injury, and the potential for product shifting.

Information on the market penetration of the subject products is presented in the section of the report entitled "Consideration of the Causal Relationship Between Alleged Material Injury or the Threat Thereof and Subsidized Imports." Available information on the depressing or suppressing effect of the imported product on domestic prices is presented in the pricing section of this report. Available information on subsidies, foreign producers' capacity, production, and exports, and the potential for product shifting was presented in the introductory part of the report.

### U.S. importers' inventories

* * * reported * * * tons of inventory held as of September 30, 1985, of Turkish product imported from * * *. * * * does not maintain inventories; the product which * * * reported importing was shipped by the Turkish firm * * *.

## Consideration of the Causal Relationship Between Alleged Material Injury or the Threat Thereof and Subsidized Imports

### U.S. imports

U.S. imports of line pipes and tubes decreased from 334,362 tons in 1982 to 277,077 tons in 1983, then increased by 87 percent to 519,308 tons in 1984 (table II-9). Imports of these products decreased from 487,325 tons during January-November 1984, to 345,197 tons during January-November 1985, or by 29 percent. There were no imports of line pipes and tubes from Turkey during 1982-84; such imports during January-November 1985 amounted to 7,111 tons. As a share of total imports, those from Turkey accounted for 2.1 percent of total imports during January-November 1985.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Table II-9.—Line pipes and tubes: U.S. imports for consumption, 1/ by sources, 1982-84, January-November 1984, and January-November 1985

| Source | 1982 | 1983 | 1984 | January-November— 1984 | January-November— 1985 |
|---|---|---|---|---|---|
| | Quantity (tons) | | | | |
| Turkey | 0 | 0 | 0 | 0 | 2/ 7,111 |
| Japan | 157,221 | 73,591 | 129,075 | 118,039 | 77,228 |
| Republic of Korea | 85,629 | 98,504 | 137,692 | 133,682 | 92,294 |
| Mexico | 13,191 | 43,503 | 72,997 | 72,261 | 28,456 |
| Venezuela | 2,599 | 11,524 | 79,451 | 76,219 | 43,546 |
| Brazil | 17,492 | 27,006 | 25,645 | 18,506 | 27,125 |
| West Germany | 11,010 | 311 | 20,704 | 20,027 | 6,220 |
| France | 745 | 2,965 | 8,890 | 8,864 | 22,381 |
| All other | 46,475 | 19,673 | 44,856 | 39,727 | 40,836 |
| Total | 334,362 | 277,077 | 519,308 | 487,325 | 2/ 345,197 |
| | Value (1,000 dollars) | | | | |
| Turkey | - | - | - | - | 2,297 |
| Japan | 77,619 | 26,170 | 47,186 | 43,418 | 29,844 |
| Republic of Korea | 39,226 | 30,493 | 44,919 | 43,418 | 31,644 |
| Mexico | 5,687 | 14,108 | 24,315 | 24,076 | 10,143 |
| Venezuela | 1,014 | 3,483 | 22,229 | 21,141 | 15,099 |
| Brazil | 7,897 | 8,474 | 8,666 | 6,280 | 8,700 |
| West Germany | 6,368 | 225 | 7,419 | 7,147 | 2,276 |
| France | 425 | 1,127 | 3,195 | 3,186 | 10,184 |
| All other | 20,979 | 6,613 | 15,676 | 13,807 | 16,085 |
| Total | 159,215 | 90,695 | 173,606 | 162,473 | 126,272 |
| | Unit value | | | | |
| Turkey | - | - | - | - | 2/ $323 |
| Japan | $494 | $356 | $366 | $368 | 386 |
| Republic of Korea | 458 | 310 | 326 | 325 | 343 |
| Mexico | 431 | 324 | 333 | 333 | 356 |
| Venezuela | 390 | 302 | 280 | 277 | 347 |
| Brazil | 451 | 314 | 338 | 339 | 321 |
| West Germany | 578 | 724 | 358 | 357 | 366 |
| France | 571 | 380 | 359 | 359 | 455 |
| All other | 451 | 336 | 349 | 348 | 394 |
| Average | 476 | 327 | 334 | 333 | 2/ 366 |

1/ Includes imports under TSUSA items 610.3208 and 610.3209.
2/ Estimated by the staff of the U.S. International Trade Commission. The import quantity is understated by 1,910 tons in the official statistics because of a keypunch error.

Source: Compiled from official statistics of the U.S. Department of Commerce, except where noted.

Note.—Because of rounding, figures may not add to the totals shown.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Barcode:3883995-04 A-549-502 SCO - Scope Inquiry - Line Pipe

Monthly import data for January-November 1985 on line pipes and tubes both from Turkey and all countries are presented in table II-10. Neither the petitioners nor the respondents have supplied the Commission with any information concerning sales of line pipes and tubes from Turkey destined to arrive in the United States after November 1985.

Table II-10.--Line pipes and tubes: U.S. imports for consumption, 1/ by sources, January-November 1985

(In tons)

| Period | Turkey | All sources |
|---|---|---|
| January 1985 | 109 | 43,845 |
| February 1985 | 0 | 34,559 |
| March 1985 | 0 | 41,427 |
| April 1985 | 0 | 36,441 |
| May 1985 | 0 | 32,845 |
| June 1985 | 22 | 34,217 |
| July 1985 | 2,348 | 30,837 |
| August 1985 | 516 | 17,211 |
| September 1985 | 1,992 | 41,715 |
| October 1985 | 2/ 2,124 | 2/ 12,762 |
| November 1985 | 0 | 19,338 |
| January-November 1985 | 2/ 7,111 | 2/ 345,197 |

1/ Includes imports under TSUSA items 610.3208 and 610.3209.
2/ Estimated by the staff of the U.S. International Trade Commission. The import quantity is understated by 1,910 tons in the official statistics because of a keypunch error.

Source: Compiled from official statistics of the U.S. Department of Commerce, except where noted.

Nearly all imports of line pipes and tubes from Turkey during January-November 1985 entered through the Port of Houston, TX; 151 tons, or 2 percent of such imports, entered through New Orleans, LA.

Market penetration by the subsidized imports

Market penetration data are not available for January-November 1985. The share of the U.S. market for line pipes and tubes supplied by the 4,987 tons imported from Turkey during January-September 1985 was 0.7 percent; there were no imports of such products during 1982-84. 1/

1/ Market penetration by imports from other countries currently or recently subject to investigation by the Commission or the Department of Commerce is shown in table II-1.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Prices

The line pipe included in this investigation is generally priced on a per-hundred-foot basis. While several U.S. producers publish confidential pricelists, list prices are often discounted to meet competitive offers. The U.S.-produced pipes and tubes are predominantly sold on an f.o.b. mill basis. The imported products under investigation are normally sold on an ex-dock, duty-paid, or f.o.b. warehouse basis. Formal bidding is not the usual means of price competition for line pipe up to 16 inches in diameter, unlike the market for line pipe with diameter of over 16 inches.

The Commission requested U.S. producers and importers to provide price data on their largest sale of each of five product specifications to both a service center/distributor and an end-user customer. These prices reported by U.S. producers were to be for articles that they had produced and prices reported by importers were to be for products that they had imported from Turkey. The five line pipe product specifications are as follows:

PRODUCT 1: API 5L line pipe, carbon welded, black, plain end, 4 1/2-inch diameter, 0.188-inch wall thickness.
PRODUCT 2: API 5L line pipe, carbon welded, black, plain end, 6 5/8-inch diameter, 0.280-inch wall thickness.
PRODUCT 3: API 5L line pipe, carbon welded, black, plain end, 8 5/8-inch diameter, 0.188-inch wall thickness.
PRODUCT 4: API 5L line pipe, carbon welded, black, plain end, 8 5/8-inch diameter, 0.250-inch wall thickness.
PRODUCT 5: API 5L line pipe, carbon welded, black, plain end, 10 3/4-inch diameter, 0.365-inch wall thickness.

Prices of domestic products.--* * * U.S. producers reported some selling price data for line pipe (products 1 through 5). U.S. producers' selling prices to service centers/distributors and end users of line pipe are shown in table II-11.

In sales to service centers/distributors, all five products showed a mix of price trends between January-March 1983 and July-September 1985. All products except product 1 registered increased prices in 1984. Over the entire period of investigation, prices for product 1 fell by 11 percent from $*** to $***, and prices for product 3 fell by 24 percent from $*** to $***.

Prices for products 2, 4, and 5 to service centers/distributors, however, rose between January-March 1983 and July-September 1985 by 10 to 21 percent. Product 2 experienced a rise of 21 percent from $*** to $***. Prices for product 4 fluctuated irregularly from $*** to $***, posting a 17-percent gain for the overall period. Product 5 climbed by approximately 10 percent from $*** to $***.

As in the case of sales to service centers/distributors, overall price trends for sales to end users between January-March 1983 and July-September 1985 of the five line pipe products were mixed. Products 1, 3, and 4 experienced overall price rises during the period, whereas products 2 and 5 underwent overall price declines. In 1984, products 1 through 3 showed price

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Table II-11.--Line pipes and tubes: U.S. producers' weighted-average net selling prices to service centers/distributors and end users of specified products, 1/ January 1983-September 1985

(Per 100 feet)

| Period | Product 1 | Product 2 | Product 3 | Product 4 | Product 5 |
|---|---|---|---|---|---|
| | Sold to service centers/distributors | | | | |
| 1983: | | | | | |
| Jan.-Mar | $*** | $*** | $*** | $*** | $*** |
| Apr.-June | *** | *** | 2/ | 2/ | *** |
| July-Sept | *** | *** | *** | *** | *** |
| Oct.-Dec | *** | *** | *** | *** | *** |
| 1984: | | | | | |
| Jan.-Mar | *** | *** | *** | *** | *** |
| Apr.-June | *** | *** | *** | *** | *** |
| July-Sept | *** | *** | *** | *** | *** |
| Oct.-Dec | *** | *** | *** | *** | *** |
| 1985: | | | | | |
| Jan.-Mar | *** | *** | *** | *** | *** |
| Apr.-June | *** | *** | *** | *** | *** |
| July-Sept | *** | *** | *** | *** | *** |
| | Sold to end users | | | | |
| 1983: | | | | | |
| Jan.-Mar | $*** | 2/ | 2/ | $*** | 2/ |
| Apr.-June | *** | $*** | 2/ | *** | $*** |
| July-Sept | 2/ | 2/ | 2/ | *** | 2/ |
| Oct.-Dec | *** | *** | $*** | 2/ | 2/ |
| 1984: | | | | | |
| Jan.-Mar | *** | *** | *** | *** | *** |
| Apr.-June | *** | *** | *** | *** | *** |
| July-Sept | *** | *** | *** | *** | *** |
| Oct.-Dec | *** | *** | *** | *** | 2/ |
| 1985: | | | | | |
| Jan.-Mar | *** | *** | *** | *** | *** |
| Apr.-June | *** | 2/ | *** | 2/ | *** |
| July-Sept | *** | *** | *** | 2/ | 2/ |

1/ See product list for specifications.
2/ No prices were reported.

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission.

increases followed by declines, prices for product 4 remained constant, and product 5 experienced a temporary price dip. In 1985, reported prices for products 1 and 5 remained constant while prices for products 2 and 3 fell modestly.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Weighted-average prices for sales of product 1 to end users increased irregularly by 20 percent from $*** during January-March 1983 to $*** during July-September 1985. The price of product 3 rose by 3 percent from $*** during October-December 1983 to $*** during July-September 1985. The price of product 4 rose by 8 percent from $*** during January-March 1983 to $*** during January-March 1985.

Prices for product 2 declined erratically from $*** during April-June 1983 to $*** during July-September 1985, or by 14 percent. The price of product 5 slid by 19 percent from a high of $*** during April-June 1983 to $*** during April-June 1985.

Prices of imports from Turkey and price comparisons.--

* * * * * * *

* * *, accounting for * * * percent of imports of line pipe from Turkey during January-September 1985, reported selling price information to the Commission for product 2. 1/ Imports of product 2 sold to service centers/distributors for $*** during July-September 1985, underselling the U.S. producers' price of $*** by 12 percent.

## Transportation costs

* * * U.S. producers of line pipe provided data relating to transportation costs faced by their firms. * * * line pipe producers indicated that they serve a nationwide market, * * * others cited the Southwest as their main market area, and * * * listed the Midwest and Eastern United States as their major market areas.

The Commission also requested domestic producers to estimate the percentage of shipments in which their firms absorb transportation costs to effect a sale. * * * firms indicated they do so in * * * percent of their shipments; * * * in * * * percent; * * *; and * * * did not respond.

## Other purchase decision factors

U.S. producers also provided their standard minimum quantity requirements for a sale as well as the average leadtime between a customer's order and shipment date. * * * cited their minimum quantity at * * * tons; * * * at * * * tons; and * * * at * * *. Leadtime between a customer's order and shipment was given as * * * to * * * days by * * * producers; * * * to * * * days by * * * producer; and * * * days by another.

All imports of line pipe from Turkey during January-November 1985 entered through gulf ports. One importer of line pipe from Turkey provided information concerning transportation costs. This importer cited the firm's

---

1/ * * *.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

minimum quantity requirement for orders as * * * tons and reported average leadtime for ex-warehouse sales as * * *, and leadtime for future orders as * * *. The firm, with its main market area in the * * *, stated that it absorbs transportation costs in * * * percent of its line pipe shipments to effect a sale.

Lost sales

One U.S. producer * * * provided one allegation of a sale of line pipe lost to imports from Turkey. The allegation, amounting to * * * tons on * * *, was investigated by the Commission. * * *.

* * *, described price as the main purchase consideration of his firm in recent months. He also cited familiarity with distributors, the necessity of mills to have API certification, and for the product to meet certain test specifications as important purchasing concerns of his firm. He noted that * * * of imported products is a minor, but useful, advantage of imported over domestic products, because * * *. * * * noted that his firm typically buys both foreign and domestic pipe, with * * * being its main foreign sources. He indicated that his firm probably purchases * * * of its pipe from domestic producers and * * * from importers. He stated that * * * pipe account for about * * * percent of the firm's purchases of imported product, while * * * pipe accounts for about * * * percent. * * * pointed out that his firm purchased about * * *.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

PUBLIC DOCUMENT
Barcode:3883995-04 A-549-502 SCO - Scope Inquiry - Line Pipe

II-18

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

PUBLIC DOCUMENT

# APPENDIX A

## COMMERCE'S FINAL SUBSIDY AND LTFV DETERMINATIONS

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

PUBLIC DOCUMENT

Barcode:3883995-04 A-549-502 SCO - Scope Inquiry - Line Pipe

[C-489-502]

**Final Affirmative Countervailing Duty Determinations; Certain Welded Carbon Steel Pipe and Tube Products From Turkey**

**AGENCY:** Import Administration, International Trade Administration, Commerce.

**ACTION:** Notice.

**SUMMARY:** We determine that certain benefits which constitute subsidies within the meaning of the contervailing duty law are being provided to manufacturers, producers, or exporters in Turkey of certain welded carbon steel pipe and tube products (standard pipe and tube and line pipe). The estimated net subsidy is 18.81 percent *ad valorem*. However, we are taking into account several program-wide changes which occurred after our review period, but prior to the preliminary determinations, and we are adjusting the duty deposit rate accordingly. We determine that "critical circumstances" do not exist with regard to the subject merchandise.

We have notified the United States International Trade Commission (ITC) of our determinations. We are directing the U.S. Customs Service to continue to suspend liquidation of all entries of standard pipe and tube and line pipe from Turkey that are entered or withdrawn from warehouse for consumption, on or after October 28, 1985, and to require a cash deposit or bond on entries of these products in an amount equal to 17.80 percent *ad valorem*. Because we have determined that critical circumstances do not exist, we are also directing the U.S. Customs Service to terminate the suspension of liquidation of all entries of standard pipe and tube from Turkey that were entered or withdrawn from warehouse, for consumption, between July 30 and October 28, 1985.

**EFFECTIVE DATE:** January 10, 1986.

**FOR FURTHER INFORMATION CONTACT:** Peter Sultan or Mary Martin, Office of Investigations, Import Administration, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue, NW., Washington, DC 20230; telephone: (202) 377-1439 (Sultan) or 377-2830 (Martin).

**SUPPLEMENTARY INFORMATION:**

## Final Determinations

Based upon our investigations, we determine that certain benefits which constitute subsidies within the meaning of section 701 of the Tariff Act of 1930, as amended (the Act), are being provided to manufacturers, producers, or exporters in Turkey of certain welded carbon steel pipe and tube products. For purposes of these investigations, the following programs are found to confer subsidies:

- Export Tax Rebate and Supplemental Tax Rebate
- Preferential Export Financing
- Deduction from Taxable Income for Export Revenues
- Resource Utilization Support Fund

We determine the estimated net subsidy to be 18.81 percent *ad valorem* for all manufacturers, producers, or exporters in Turkey of certain welded carbon steel pipe and tube products. However, we are adjusting the duty deposit rate to reflect several program-wide changes that occurred after our review period but prior to our preliminary determinations. Thus, the cash deposit or bond on entries of these products will be 17.80 percent *ad valorem*.

*Case History*

On July 16, 1985, we received a petition in proper form from the Standard Pipe Subcommittee and Line Pipe Subcommittee of the Committee on Pipe and Tube Imports (CPTI) and by each of their member companies which produce standard pipe and tube and line pipe. In compliance with the filing requirements of § 355.26 of our regulations (19 CFR 355.26), the petition alleged that manufacturers, producers, or exporters in Turkey of certain welded carbon steel pipe and tube products directly or indirectly receive benefits which constitute subsidies within the meaning of section 701 of the Act, and that these imports materially injure, or threaten material injury to, a U.S. industry.

We found that the petition contained sufficient grounds upon which to initiate countervailing duty investigations on certain welded carbon steel pipe and tube products, and on August 2, 1985, we initiated such investigations (50 FR 32248, August 9, 1985). We stated that we expected to issue preliminary determinations by October 9, 1985.

On September 5, 1985, we received a request from petitioners that the preliminary determinations be postponed to October 21, 1985, and on September 12, 1985, we postponed these determinations in accordance with section 703(c)(1)(A) of the Act (50 FR 37891, Sept. 18, 1985).

On September 24, 1985, petitioners alleged that critical circumstances exist with respect to certain welded carbon steel pipe and tube products from Turkey.

Since Turkey is a "country under the Agreement" within the meaning of section 701(b) of the Act, an injury determination is required for these investigations. Therefore, we notified the ITC of our initiation. On August 30, 1985, the ITC determined that there is a reasonable indication that industries in the United States are materially injured by reason of imports of certain welded carbon steel pipe and tube products from Turkey (50 FR 37068, Sept. 11, 1985).

We presented a questionnaire concerning the allegations to the government of Turkey in Washington, DC on August 15, 1985. Responses to our questionnaire were received from the government of Turkey and from the following producers in Turkey of certain welded carbon steel pipe and tube products: the Borusan group of companies, Mannesmann-Suemerbank Boru Endustris (Mannesmann-Suemerbank), Yucel Boru ve Profil

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Barcode:3883995-04 A-549-502 SCO - Scope Inquiry - Line Pipe

Endustrisi (Yucel Boru), Erkboru Profil Sanayi ve Ticaret, and Umran Spiral Welded Pipe Inc. Because the latter two companies did not export to the United States during 1984 and the first six months of 1985, we have not used their responses for our determinations. On the basis of information contained in the other responses, we made preliminary determinations on October 21, 1985 (50 FR 43597, Oct. 28, 1985). We verified the responses of the government of Turkey, the Borusan group, Mannesmann-Suemerbank, and Yucel Boru in Turkey between November 4 and 16, 1985.

We held a hearing on December 2, 1985, at which the parties addressed the issues raised in these investigations. Before and after the hearing, petitioners and respondents filed briefs discussing these issues.

*Scope of Investigations*

The products covered by these investigations are:

(1) Welded carbon steel pipe and tube, with an outside diameter of .375 inch or more, but not over 16 inches, of any wall thickness, currently classifiable in the *Tariff Schedules of the United States, Annotated* (TSUSA), under items 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258, and 610.4925. These products, commonly referred to in the industry as standard pipe or tube, are produced to various ASTM specifications, most notably A-120, A-53 or A-135; and

(2) Welded carbon steel line pipe with an outside diameter of .375 inch or more, but not over 16 inches, and with a wall thickness of not less than .065 inch, currently classifiable in the TSUSA, under items 610.3208 and 610.3209. These products are produced to various American Petroleum Institute (API) specifications for line pipe, most notably API-L or API-LX.

*Analysis of Programs*

Throughout this notice, we refer to certain general principles applied to the facts of the current investigations. These principles are described in the "Subsidies Appendix" attached to the notice of "Cold-Rolled Carbon Steel Flat-Rolled Products from Argentina; Final Affirmative Countervailing Duty Determination and Countervailing Duty Order," which was published in the April 26, 1984, issue of the Federal Register (49 FR 18006).

For purposes of these final determinations, the period for which we are measuring subsidization ("the review period") is calendar year 1984. The subsidy rates set forth in this notice are country-wide rates.

It is the Department's policy to take into account program-wide changes when these are implemented after the review period, but before a preliminary determination, and when we can verify these changes. Where these conditions are met the rate for cash deposit or bonding purposes is raised or lowered, as appropriate. This policy is desirable because it promotes the expeditious elimination or curtailment of subsidies. The recognition of program-wide changes also permits the Department to adjust the duty deposit rate to correspond as nearly as possible to the eventual duty liability.

In these investigations we discovered that, subsequent to the review period, but prior to the preliminary determinations, a number of programs were either eliminated, newly instituted, or altered in such a way as to result in a fundamental change in the bestowal of benefits. Descriptions of these program-wide changes, and of our treatment of them, follow in the description of the programs.

Although there were no imports of line pipe from Turkey into the United States during the review period, we believe that the circumstances of the production and exportation of standard pipe and tube are so similar to those of line pipe that the incidence of subsidization would be the same for both products. Also, line pipe has begun to be imported into the United States from Turkey since the review period. Therefore, we are attributing the subsidy rates found on the production and exportation of standard pipe and tube to line pipe also.

Based upon our analysis of the petition, the responses to our questionnaire, our verification, and comments filed by petitioners and respondents, we determine the following:

I. Programs Determined to Confer Subsidies

We determine that subsidies are provided to manufacturers, producers, or exporters in Turkey of certain welded carbon steel pipe and tube products under the following programs.

*A. Export Tax Rebate and Supplemental Tax Rebate.* The government of Turkey provides tax rebates to exporters of certain products, pursuant to Law number 261 of July 1963, and Decree number 7/10624 of September 16, 1975, as amended by Decree numbers 8/2625 (April 23, 1981), 8/4397 (April 22, 1982) and 83/7542 (December 29, 1983).

In its questionnaire response, the government of Turkey states that the objectives of this program are to expand the range of exportable products, to increase the competitiveness of those products in world markets, and to increase the variety and volume of industrial products among Turkey's exports.

At verification we learned that, before implementing this program in 1975, Turkey's State Planning Organization conducted a study of the tax incidence on exported products. On a product-by-product basis, information on the costs of production and tax incidence was obtained from producers. The competitive position of a product in international markets, and thus its need for a tax rebate, was also taken into account. Rates of rebate were not to exceed the tax incidence on the product and could be lower where the full amount of the rebate was not necessary to make a product internationally competitive. The taxes that were meant to be rebated, which are set out in List A in Decree number 7/10624, are primarily indirect taxes, although several direct taxes are also included.

Eligible products are classified in ten lists, each list having a separate rebate rate. The amount of rebate is calculated by applying the applicable rebate rate to the amount of the FOB value of the exported goods which is repatriated and converted into Turkish lira. (Where exports are transported on Turkish vessels, the CIF value of the exported goods is used.) To be eligible for a rebate on a particular shipment, at least 80 percent of the sales proceeds must be repatriated and converted into Turkish lira. The rates of rebate during 1984 for certain welded carbon steel pipe and tube products were 20 percent from January 1 to April 1, 16 percent from April 1 to September 1, and 11 percent from September 1.

In order to determine whether export payments, purportedly operating as a rebate of indirect taxes, are in fact a *bona fide* rebate of indirect taxes, the Department examines whether: (1) The program operates for the purpose of rebating indirect taxes; (2) there is a clear link between eligibility for export payments and indirect taxes paid; and (3) the government has reasonably calculated and documented the actual indirect tax incidence borne by the product concerned and has demonstrated a clear link between such tax incidence and the rebate amount paid on export.

Where these conditions are met, the Department considers that a rebate system does not confer a subsidy to the extent that it rebates prior stage indirect taxes on inputs that are physically incorporated in the exported products and indirect taxes levied at the final

A-3

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Barcode:3883995-04 A-549-502 SCO - Scope Inquiry - Line Pipe
A-4

stage. To the extent that the rebates exceed the payment of such indirect taxes we would find that a countervailable benefit is being provided.

The taxes that were meant to be rebated under this program are primarily indirect taxes, although several direct taxes are included. Thus, we find that this program operated for the purpose of rebating indirect taxes.

Our examination of the process whereby the government studied the tax incidence on each product before adding it to the list of products for which rebates are available leads us to conclude that there is a link between eligibility for the rebates and indirect taxes paid, that the government of Turkey reasonably calculated and documented the actual indirect tax incidence by pipe and tube products, and that it demonstrated a clear link between such tax incidence and the rebate amount paid.

However, we were unable to verify the payment by the companies of indirect taxes on physically incorporated inputs. Consequently, we cannot follow our usual practice of not countervailing that portion of the rebate that represents such indirect taxes. Furthermore, with the introduction in Turkey on January 1, 1985, of a value added tax, all indirect taxes on physically incorporated inputs into pipe and tube (except import duties, from which exporters are largely exempt) and indirect taxes at the final stage have been abolished. Yet the export tax rebates remain. Thus, we determine that the full amount of the rebate is countervailable.

In addition to basic export tax rebates described above, the government of Turkey also provides supplemental tax rebates to exporters that have annual exports of more than $2 million. The rates of these supplemental rebates were reduced during 1984. Effective September 1, 1984, the rates applicable to exports of certain welded carbon steel pipe and tube products were 3.3 percent for exports of between $2 million and $10 million, 6.6 percent for exports of between $10 million and $30 million, and 5.5 percent for those above $30 million. For a company with annual exports of less than $30 million, these rates are applied on a graduated basis. If annual exports are more than $30 million, the 5.5 percent rate applies to the entire amount, including the first $2 million.

To calculate the benefit, we divided the amount of basic and supplemental rebate earned by each company on exports to the United States during the review period by the value of such exports. We then weight-averaged the resulting *ad valorem* benefit for each company by the company's proportion of the value of Turkish exports of the subject merchandise to the United States. On this basis, we calculated a subsidy of 14.68 percent *ad valorem*. However, we recognize that the substantial reductions in the rates of rebate during 1984 have resulted in a significant change in the benefit levels under this program. Accordingly, we have adjusted the duty deposit rate to reflect the current rebate rates, in effect since September 1, 1984. To calculate a duty deposit rate, we weight-averaged the current nominal rebate rates applicable to each company by the company's proportion of the value of exports of the subject merchandise to the United States. In this weight-average calculation we took into account that companies may not fully utilize this program if they do not repatriate and convert into Turkish lira all of their export proceeds. Thus, we reduced one company's nominal rate to reflect the fact that it did not apply for rebate payments on the full amount of its proceeds from exports to the United States during 1984. On this basis, we calculated a duty deposit rate of 14.01 percent *ad valorem*.

*B. Preferential Export Financing.* Preferential short-term export financing was available pursuant to Decree number 84/7557 of January 1984. (In our preliminary determinations we stated that medium-term export loans were also available under this program; we learned at verification that they are not.) This preferential export financing is obtained through commercial banks, with the Central Bank of Turkey rediscounting part or all of the loan amount. Such financing was classified as certificated and non-certificated. In the case of certificated credits, the lender could rediscount the entire loan amount with the Central Bank; for uncertificated credits only a part of the loan could be rediscounted. Certificated credits were those for which the exporter needed to have an export incentive certificate from the State Planning Organization. This program is countervailable because it provided financing to exporters, at interest rates below comparable commercial rates.

All three companies had loans with principal outstanding under this program during the review period. To calculate the benefit derived from this program, we compared the cost of the financing to the cost of comparable commercial financing. Because these loans are related to exports, and because the loans reported relate to exports of all products to all markets, we allocated the benefits over the value of each company's total exports of all products during the review period. We then weight-averaged the resulting *ad valorem* benefit for each company by the company's proportion of the value of Turkish exports of the subject merchandise to the Untied States. On this basis, we calculated a subsidy of 3.74 percent *ad valorem*.

However, short-term export financing under Decree number 84/7557 was abolished by Decree number 84/8861, which became effective on January 1 1985. We verified that all such loans were repaid prior to our preliminary determinations. We have taken the elimination of this program into account by excluding it from the duty deposit rate.

*C. Deduction from Taxable Income for Export Revenues.* Article 8 of the Turkish Corporation Tax Law, as amended by Law No. 2362, permits producers that export industrial products valued in excess of $250,000 annually to deduct 20 percent of their export revenues from taxable corporate income. A 5 percent deduction is provided to exporters that are not producers.

However, under Article 94 of the Turkish Income Tax Law, as amended by Law No. 2772, these deductions are reduced. If the income from the deduction is distributed to shareholders, the deduction is reduced by 25 percent; if the income is retained, the reduction is 20 percent.

This program is countervailable because it provides a benefit which is contingent upon export performance.

All three companies used these deductions. The benefit is the amount of tax savings realized by using the deduction. Each company's benefits were allocated over the value of its total exports during the review period. By weight-averaging the resulting *ad valorem* benefit for each company by the company's proportion of the value of Turkish exports of the subject merchandise to the United States, we calculated an estimated net subsidy of 0.39 percent *ad valorem*.

*D. Payments to Exporters from the Resource Utilization Support Fund (RUSF).* The RUSF was created by Decree number 84/8860 which was published in the Official Journal on December 15, 1984, and became effective January 1, 1985. This fund provides payments to exporters and is also the source of funding for payments to investors with investment incentive certificates under the General Incentives Program. Exporters are eligible to receive payments in the amount of 4

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

PUBLIC DOCUMENT

Barcode:3883995-04 A-549-502 SCO - Scope Inquiry - Line Pipe





percent of the FOB value of the exported goods which is repatriated into Turkish lira. (Where exports are transported on Turkish vessels, the CIF value of the exported goods is used.) Because these payments were not available for those exports which had benefited from Preferential Export Financing loans, exporters with such loans outstanding did not make full use of this program immediately after its inception. Because this element of the program provides for payments on the basis of export performance, we determine that it confers a countervailable benefit on exports.

This program did not exist during our review period and the exporters of the subject merchandise did not receive these payments on exports to the United States during the first six months of 1985. However, it is the Department's policy to adjust the duty deposit rate to correspond as nearly as possible to the eventual duty liability in cases where changes have occurred after the period for which we are measuring subsidization and prior to our preliminary determination. We have taken into account the elimination of the Preferential Export Financing program, which, in the sense that eligibility for benefits was mutually exclusive, preceded this program. Also, it appears that these benefits are granted automatically. Thus, we are adjusting the bonding rate to include benefits under this program.

In calculating the benefit, we took into account that this program operates in the same way as the export tax rebate, insofar as payment is made only on the amount of export proceeds that is repatriated into Turkish lira, and thus the program may not be fully utilized by exporters. We took the 1984 utilization experience of these companies under the export tax rebate program on exports to the United States, as best information to assess utilization under this program. We then weight-averaged the companies' rates. On this basis, we are adjusting the duty deposit rate to include an estimated net subsidy of 3.40 percent *ad valorem*.

II. Programs Determined Not To Confer Subsidies

We determine that subsidies are not being provided to manufacturers, producers, or exporters in Turkey of certain welded carbon steel pipe and tube products under the following program:

*A. General Incentives Program.* The General Incentives Program is designed to implement the targets of Turkey's five-year development plan and annual development programs. The government of Turkey in its questionnaire response states that the goals of the General Incentives Program are to remove development disparities among different regions, to assure economically efficient investments by region and by sector, and to direct savings to the most economically suitable investment areas.

Three distinct programs are available under the General Incentives Program. These are: (1) Income and corporation tax allowances; (2) exemptions from customs duties and other duties, fees and taxes; and (3) rebates of interest. (The programs providing exemptions from customs duties and other duties, fees and taxes and interest rebates on export credits are discussed in the section of this notice entitled "Programs Determined Not to be Used.") In order to receive benefits under any of the three programs, a company within an eligible sector or industry was required to obtain an investment incentive certificate from Turkey's State Planning Organization.

1. *Interest Rebates.* Pursuant to Decree number 83/7507, eligible companies with investment incentive certificates were able to receive low-interest medium- and long-term investment loans and short-term export loans. These loans were disbursed by commercial banks, which received interest rebates of up to 8 percent. These rebates were passed along in the form of reduced interest to borrowers. The interest rebates were made from an Interest Spread Return Fund administered by the Central Bank of Turkey.

2. *Income and Corporation Tax Allowances.* This program provides investment deductions to companies with an incentive certificate which are eligible under the General Incentives Program. These are deductions from taxable income based upon investments in new assets. The amount of the deduction varies from 30 percent to 100 percent of the cost of the investment, depending on the region and the economic sector in which the investment is made. A deduction of at least 30 percent is available to all holders of investment incentive certificates.

During our review period, the sectors and industries which are eligible for benefits were listed on a General Incentives Table. Producers of spiral tube were included on the table. Some of the sectors and industries listed on this table qualified for benefits only with respect to export oriented investments; however, for the great majority, including spiral tube producers, there was no export requirement.

Also, under the income and corporation tax allowances program, greater benefits were available to eligible companies which located in priority development regions of Turkey and to certain designated industries. None of the producers of the subject merchandise is located in these priority development regions, and pipe and tube is not among these designated industries.

The list of sectors and industries on the General Incentives Table and those which actually received investment incentive certificates encompass a broad spectrum of the Turkish economy, in agriculture, mining and manufacturing. Thus, since benefits received by producers of the subject merchandise are not contingent on investments being export oriented, we determine that they are not export subsidies. In addition, these benefits are not conditioned on location in a priority development region, and we thus determine that the programs providing income and corporation tax allowances and interest rebates under the General Incentives Program are not domestic subsidies because their benefits are not limited to a specific enterprise or industry, or group of enterprises or industries.

B. *Customs Duty Exemption Under Decree Number 84/8861.* Under Decree number 84/8861, which became effective on January 1, 1985, exporters in Turkey may obtain a customs duty exemption on the importation of raw materials used in the manufacture and packaging of exported goods. To be eligible for this exemption, exporters must obtain an export incentive certificate from Turkey's State Planning Organization.

Because the non-excessive drawback, rebate or remission of customs duties on imported items physically incorporated in the final product is not a subsidy, we determine that this program is not countervailable.

III. Programs Determined Not To Be Used

We determine that manufacturers, producers, or exporters in Turkey of certain welded carbon steel pipe and tube products did not use the following programs:

A. *Exemptions from or Deferrals of Customs Duties and Other Duties, Fees and Taxes.* Under the General Incentives Program, eligible companies with investment incentive certificates are exempt from customs duties and other taxes on imports of capital equipment related to the investment project for which the investment incentive certificate is issued. Deferrals



Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

of duties were discontinued. (In our preliminary determinations, we stated that exemptions under this program were also available for imports of raw materials. At verification we learned that this is not the case; such exemptions are given under Decree Number 84/8861, discussed above.) We verified that this program was not used during the review period.

B. *Interest Rebates on Export Financing.* Companies with investment incentive certificates under the General Incentives Program are eligible to receive export financing with interest rebates. We verified that this program was not used during the review period.

C. *$25 Per Ton Back-up Fund.* Exporters of certain iron and steel products are eligible to receive a $20 per ton payment from Turkey's Support and Price Stability Fund for each ton of domestically produced iron and steel used in the exported product. (It was once $25 per ton; hence the name of the program.) Certain welded carbon steel pipe and tube products are not among the products eligible for these payments.

**Negative Determinations of Critical Circumstances**

Petitioners alleged that "critical circumstances" exist with respect to imports of the subject merchandise. Under section 705(a)(2) of the Act, we must determine whether critical circumstances exist as alleged under section 703(e). Critical circumstances exist when: "(A) the subsidy is inconsistent with the Agreement; and (B) there have been massive imports of the class or kind of merchandise which is the subject of the investigation over a relatively short period."

Because we have determined that there have not been massive imports of standard pipe and tube or line pipe over a relatively short period, we need not address the issue of whether the subsidies in these investigations are inconsistent with the Subsidies Code.

To determine whether there have been massive imports of the products under investigation over a relatively short period of time, we considered: (1) Whether imports have surged recently; (2) whether recent import penetration ratios have increased significantly; and (3) whether recent imports are significantly above the average calculated over the last three years. Based upon our analysis of the information, we determine that imports of standard pipe and tube and imports of line pipe have not been massive over a relatively short period.

Since massive imports of standard pipe and tube and of line pipe do not exist over a relatively short period of time, we determine that critical circumstances do not exist with respect to standard pipe and tube and line pipe from Turkey.

*Petitioners' Comments*

*Comment 1:* Petitioners argue that the Department should find that critical circumstances exist with respect to the subject merchandise.

*DOC Position:* We disagree with petitioners' contention that imports of these products have been massive over a relatively short period—a prerequisite for a finding of critical circumstances.

*Comment 2:* Petitioners argue that benefits provided under the General Incentives Program are countervailable subsidies, despite the fact that they are not limited to a specific enterprise or industry, or group of enterprises or industries.

*DOC Position:* We have verified that the General Incentives Program not only is generally available to Turkish industries, but that the pipe and tube industries receive no benefits providing a *de facto* advantage. The petitioners rely upon the Court of International Trade decision in *Cabot Corp. v. United States,* ___ Cit ___, Slip Op. 85-102 (Oct. 4, 1985) for the proposition that we are to countervail generally available programs. We do not follow that decision.

*Comment 3:* Petitioners argue that, because of the elimination of indirect taxes on physically incorporated inputs into the subject merchandise, the export tax rebate has become a straight export subsidy. They also argue that where, as here, recurring export payments are tied to particular shipments, the subsidy should be calculated on the amount that will be available to be collected on each shipment.

*DOC Position:* We agree. See the section of this notice entitled "Programs Determined to Confer Subsidies."

*Comment 4:* With respect to the Preferential Export Financing program, petitioners argue that the Department should not take its elimination into account by reducing the deposit rate, unless all benefits have ceased before July 30, 1985, the date of suspension of liquidation for standard pipe and tube.

*DOC Position:* Because we have now determined that critical circumstances do not exist with respect to either product, the date on which suspension begins is October 28, 1985, which is after the last loans were repaid. Thus, the argument raised by petitioners is moot.

*Comment 5:* Petitioners argue that the deposit rate should include benefits available under the new Resource Utilization Support Fund.

*DOC Position:* We agree. See the section of this notice entitled "Programs Determined to Confer Subsidies."

*Respondents' Comments*

Comments were submitted by counsel for the government of Turkey, for the Borusan Group and for Mannesmann-Suemerbank.

*Comment 1:* The government of Turkey argues that the Export Tax Rebate program operates as a bona fide non-excessive rebate of indirect taxes and thus is not countervailable.

*DOC Position:* Until 1985 the Export Tax Rebate program did operate primarily to rebate indirect taxes. It would have been countervailable only to the extent that some direct taxes were rebated and hence may have constituted an overrebate. The issue is moot, however, because the government of Turkey instituted a value-added tax in January 1985, replacing most direct and indirect taxes. The incidental indirect taxes remaining, taxes on banking and insurance transactions, are not taxes on physically-incorporated inputs. Therefore, as of 1985 the tax rebate in its entirety is countervailable.

*Comment 2:* The government of Turkey argues that the Department should take into account the changed status of the Export Tax Rebate program, based upon the significant change in Turkish tax law on January 1, 1985, and calculate a weighted-average rate for 1984 and the first six months of 1985.

*DOC Position:* We disagree. One of the reasons why the Department recognizes alterations (after its review period) in programs, which result in a fundamental change in the bestowal of benefits, is to adjust the deposit rate to correspond more accurately to eventual duty liability. Because of the elimination in 1985 of prior stage indirect taxes on physically incorporated inputs into certain welded carbon steel pipe and tube products and indirect taxes levied at the final stage, the entire amount of export tax rebates in 1985 is countervailable. We have adjusted our deposit rate to reflect this fact.

*Comment 3:* All respondents argue that if the Export Tax Rebate program is countervailed, the rate should reflect actual utilization, rather than the levels of rebate nominally available.

The Borusan Group further argues that its rate for this program should reflect the amount of benefit actually received in 1984, not the amount applied for in 1984.

*DOC Position:* We agree that the rate should be calculated on the basis of actual utilization. We have calculated

Barcode:3883995-04 A-549-502 SCO - Scope Inquiry - Line Pipe

A-7

the subsidy rate for this program on the basis of rebates earned during the review period. In calculating the duty deposit rate, we took into account the fact that one of the companies persistently did not repatriate and convert into Turkish lira the entire amount of its export earnings on sales to the United States. *See* section of this notice entitled "Programs Determined to Confer Subsidies."

When a tax program operates to rebate a fixed proportion of the value of each shipment, which is known to the exporter during the review period, we countervail the amount of benefit earned during the period, rather than the amount received "Certain Carbon Steel Products from Brazil: Final Affirmative Countervailing Duty Determinations" (49 F.R. 17988, 17991, April 26, 1984); "Ceramic Tile from Mexico; Final Results of Administrative Review of Countervailing Duty Order" (49 F.R. 9919, March 16, 1984). The rationale for countervailing amounts received applies when the recipient could not anticipate precisely how much would be received and hence could not make business decisions based upon benefits earned.

*Comment 4:* The government of Turkey and Mannesmann-Suemerbank argue that the rate for the Export Tax Rebate program should be reduced to account for: (i) Government-mandated delays in receiving payment as provided in section 771(6)(B) of the Act, and (ii) the payment of a portion of the rebate with low-interest bonds.

*DOC Position:* We disagree with both of the proposed reductions.

The delays in receiving payment, described by counsel for Mannesmann-Suemerbank as being due to "Government procedures and bureaucratic delays," are administrative; they are not mandated by government order.

With regard to payment of a portion of the rebate with low-interest bonds, we do not have verified information to support this claim. Although we learned at verification that one company had received low-interest bonds in part-payment of the rebates on two export sales, and were subsequently informed by another company that it had also been paid with such bonds, we do not have verified information to show that it is common practice to make payment in this manner. Also, there is no evidence that the other company subject to these investigations received the rebates in this manner. Further, we cannot speculate that receipt of these bonds warrants any reduction in the net subsidy at all, much less what that amount should be.

*Comment 5:* All respondents argue that the Department's calculation of the rate for the Export Tax Rebate program was incorrect, in that it was based on an erroneous assumption concerning the operation of the supplemental tax rebate.

*DOC Position:* We agree. The operation of the supplemental rebate was clarified at verification and we have adjusted our calculation.

*Comment 6:* Mannesmann-Suemerbank argues that it is entitled to an offset from the rate for the Export Tax Rebate program for indirect taxes paid in 1985 on physically incorporated imputs.

*DOC Position:* The questionnaire response of the government of Turkey and information obtained at verification show that indirect taxes on physically incorporated inputs were abolished by January 1, 1985. If Mannesmann-Suemerbank continued to pay such taxes during the first six months of 1985, we must regard this as an aberration. Verified information supplied by the government of Turkey is controlling in this situation.

*Comment 7:* All respondents argue that the Preferential Export Financing program should be excluded from the deposit rate because it has been eliminated.

*DOC Position:* We agree. *See* "Programs Determined to Confer Subsidies" section of this notice.

*Comment 8:* All respondents argue that payments to exporters from the RUSF should not be countervailed, because countervailable benefits should be measured on a receipt basis and none of the companies had received payments on exports to the United States under this program during the period covered by the Department's questionnaire. They also contend that the value of benefits is too speculative and uncertain to measure at this point.

*DOC Position:* We disagree. In order to apply our program-wide change methodology consistently, we must take into account not only the elimination of benefits (as we have done with regard to the Preferential Export Financing program), but also the introduction of new ones. Although none of the companies had received RUSF payments on exports to the United States as of June 30, 1985, the record shows that the two companies that exported to the United States in 1985 have applied for such payments, and we know of no legal or administrative impediments to receipt. Because benefits are a fixed proportion of export value, their valuation is not speculative or uncertain. We have taken into account that payment is made only on the amount of export proceeds repatriated and converted into Turkish lira.

*Comment 9:* The government of Turkey argues that if the Department countervails the RUSF payments to exporters, it should take into account delays in receiving benefits and Turkey's high inflation rate in calculating the benefit. Also, Borusan argues that if the Department countervails this program it should take into account the factors which make utilization lower than the nominal rate of benefit.

*DOC Position:* Under section 771(6)(B) of the Act, an offset is allowed for "any loss in the value of the subsidy resulting from its deferred receipt, if the deferral is mandated by Government order." The delays in receiving RUSF payments and the effect of inflation are not such allowable offsets.

We have taken into account the fact that, because RUSF payments are made only on the amount of export proceeds repatriated into Turkish lira, utilization of this program may be lower than the normal rate of benefit.

*Comment 10:* The government of Turkey and Mannesmann-Suemerbank argue that benefits to producers of the subject merchandise under the General Incentives Program are not countervailable because these benefits are not limited to a specific enterprise or industry or group of enterprises or industries. In the alternative, they argue that these benefits should not be countervailable because producers of the subject merchandise have ceased to be eligible under the GIP.

*DOC Position:* We agree with the first argument. *See* the section of this notice entitled "Programs Determined Not to Confer Subsidies."

*Comment 11:* Borusan argues that its subsidy rate is significantly lower than those of the other firms, and that it is entitled to a company specific rate.

*DOC Position:* The difference in the levels of subsidization between Borsuan and the weighted-average rate is not large enough for us to consider it significant.

*Comment 12:* All respondents argue that the Department has no basis for finding that critical circumstances exist in these investigations, because: (i) Imports have not been massive over a relatively short period, and (ii) the subsidies are not inconsistent with the Subsidies Code.

*DOC Position:* Because we have determined that critical circumstances are not present, for lack of massive imports over a relatively short period, the issue raised by respondents with

A-7

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

respect to the second prong of the test are moot.

*Verification*

In accordance with section 776(a) of the Act, we verified all information used in making our final determinations. During verification we followed standard verification procedures, including meeting with government officials, inspection of documents and ledgers, and tracing the information in the responses to source documents, accounting ledgers, and financial statements.

*Suspension of Liquidation*

In accordance with section 703(d) of the Act, on October 28, 1985, we instructed the U.S. Customs Service to suspend liquidation of all entries of standard pipe and tube from Turkey which were entered, or withdrawn from warehouse, for consumption on or after July 30, 1985, and to suspend liquidation of all unliquidated entries of line pipe from Turkey which were entered, or withdrawn from warehouse, for consumption on or after October 28, 1985.

Because we have now determined that critical circumstances do not exist with respect to either product, we are directing the U.S. Customs Service to terminate suspension of liquidation of all entries of standard pipe and tube from Turkey that were entered or withdrawn from warehouse, for consumption, between July 30 and October 28, 1985, and to release any bond, or other security, and refund any cash deposit on these entries. As of the date of publication of this notice in the **Federal Register**, the liquidation of all entries, or withdrawals from warehouse, for consumption, of these products will continue to be suspended and the Customs Service shall require an *ad valorem* cash deposit or bond for all such entries of these products at 17.80 percent *ad valorem*.

This suspension will remain in effect until further notice.

*ITC Notification*

In accordance with section 705(f) of the Act, we will notify the ITC of our determinations. In addition, we are making available to the ITC all non-privileged and non-confidential information relating to these investigations. We will allow the ITC access to all privileged and confidential information in our files, provided the ITC confirms that it will not disclose such information, either publicly or under an administrative protective order, without the written consent of the Deputy Assistant Secretary for Import Administration.

The ITC will determine whether these imports materially injure, or threaten material injury to, a U.S. industry within 45 days of the publication of this notice.

If the ITC determines that material injury or the threat of material injury does not exist, these proceedings will be terminated and all estimated duties deposited or security posted as a result of the suspension of liquidation will be refunded or cancelled. If, however, the ITC determines that such injury does exist, we will issue a countervailing duty order, directing Customs officers to assess a countervailing duty on certain welded carbon steel pipe and tube products from Turkey entered, or withdrawn from warehouse, for consumption, on or after the date of suspension of liquidation, equal to the net subsidy amount indicated in the "Suspension of Liquidation" section of this notice.

This notice is published pursuant to section 705(d) of the Act (19 U.S.C. 1671d(d)).

**Paul Freedenberg,**

*Assistant Secretary for Trade Administration.*

January 6, 1986.

[FR Doc. 86-594 Filed 1-9-86; 8:45 am]

BILLING CODE 3510-DS-M

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Barcode:3883995-04 A-549-502 SCO - Scope Inquiry - Line Pipe

[A-549-502]

## Antidumping: Circular Welded Carbon Steel Pipes and Tubes From Thailand; Final Determination of Sales at Less Than Fair Value

**AGENCY:** International Trade Administration, Import Administration, Commerce.

**ACTION:** Notice.

**SUMMARY:** We have determined that certain circular welded carbon steel pipes and tubes from Thailand are being, or are likely to be, sold in the United States at less than fair value, and have notified the U.S. International Trade Commission (ITC) of our determination. We have also directed the U.S. Customs Service to continue to suspend the liquidation of all entries of certain circular welded carbon steel pipes and tubes from Thailand that are entered, or withdrawn from warehouse, for consumption, on or after October 3, 1985, and to require a cash deposit or bond for each entry in an amount equal to 15.69 percent *ad valorem* for Saha Thai Steel Pipe Company and 15.60 percent for Thai Steel Pipe Industry Company.

**EFFECTIVE DATE:** January 27, 1986.

**FOR FURTHER INFORMATION CONTACT:** John J. Kenkel or Charles Wilson, Office of Investigations, Import Administration, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue, NW., Washington, D.C. 20230; telephone: (202) 377-5404 or (202) 377-5288.

**SUPPLEMENTARY INFORMATION:**

### Final Determination

We have determined that certain circular welded carbon steel pipes and tubes from Thailand are being, or are likely to be, sold in the United States at less than fair value, as provided in section 735 of the Tariff Act of 1930, as amended (19 U.S.C. 1673d) (the Act). The weighted-average margins are listed in the "Suspension of Liquidation" section of this notice.

### Case History

On February 28, 1985, we received a petition filed in proper form from the Standard Pipe Subcommittee of the Committee on Pipe and Tube Imports, and its member companies, on behalf of the U.S. industry producing certain circular welded carbon steel pipes and tubes. In compliance with the filing requirements of § 353.36 of the Commerce Regulations (19 CFR 353.36), the petition alleges that imports of the subject merchandise from Thailand are being, or are likely to be, sold in the United States at less than fair value within the meaning of section 731 of the Act (19 U.S.C. 1673), and that these imports are materially injuring, or threatening material injury to, a U.S. industry.

After reviewing the petition, we determined that it contained sufficient grounds upon which to initiate an antidumping investigation. We initiated the investigation on March 20, 1985 (50 FR 12068), and notified the ITC of our action.

On April 15, 1985, the ITC found that there is a reasonable indication that imports of certain circular welded carbon steel pipes and tubes from Thailand are materially injuring, or threatening material injury to, a U.S. industry (U.S. ITC Pub. No. 1680, April 1985).

On July 11, 1985, the petitioners alleged that the respondents' home market sales prices were below cost of production.

On July 16, 1985, the petitioners requested that we postpone the preliminary determination until September 26, 1985. They also alleged that critical circumstances exist. We postponed the preliminary determination on July 18, 1985 (50 FR 30493).

On July 25, 1985, we initiated a cost of production investigation.

We investigated Saha Thai Steel Pipe Company, Ltd., (Saha Thai) and Thai Steel Pipe Industry Company, Ltd., (Thai Steel) the manufacturers who account for all Thai exports of the merchandise to the United States. We examined 100 percent of the sales made by these companies during the period of investigation.

On September 26, 1985, we made an affirmative preliminary determination (50 FR 40427).

We verified the respondents' questionnaire resposes on October 10-24, 1985.

We conducted a public hearing on December 5, 1985.

On December 6, 1985, we postponed our final determination until not later than January 16, 1986.

### Scope of Investigation

The products under investigation are: certain circular welded carbon steel pipes and tubes, also known as "standard pipe" or "structural tubing," which includes pipe and tube with an outside diameter of 0.375 inch or more but not over 16 inches, or any wall thickness, as currently provided in items 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258 and 610.4925 of the *Tariff Schedules of the United States Annotated.*

### Fair Value Comparisons

To determine whether sales of the subject merchandise in the United States were made at less than fair value we compared the United States price with the foreign market value.

### United States Price

As provided in section 772(b) of the Act, we used the purchase price of the subject merchandise to represent the United States price because the merchandise was sold prior to the date of importation to unrelated purchasers in the United States. We calculated the purchase price based on the FOB or C + I packed price. We made deductions, where appropriate, for foreign inland freight, inland and marine insurance, handling and brokerage charges. We increased the United States price by the amount of import duties imposed by Thailand which had been rebated by reason of the exportation of the merchandise pursuant to section 772(d)(1)(B) of the Act (19 U.S.C. 1677a(d)(1)(B)).

### Foreign Market Value

The petitioners alleged that sales in the home market were at prices below the cost of producing the merchandise. We attempted to examine production costs including all appropriate costs for materials, fabrication and general expenses. However, as explained in the verification section of this notice, below, we were unable to verify portions of the respondents' cost of production information. Therefore, for those portions which could not be verified, we calculated the cost of production by using the best information available, which was estimates derived from the respondents' and petitioners' information.

In accordance with section 773(a)(1)(A) of the Act, when there were sufficient sales of such or similar merchandise at or above the cost of production for a particular product group, we calculated foriegn market value for Thai Steel based on home market sales, packed, to unrelated purchasers. When there were insufficient sales of such or similar merchandise at or above the cost of production for a particular product group, we used constructed value as the basis for comparison.

When foreign market value was based on home market price, we made comparisons of "such or similar" merchandise groups based on grade, dimension, and end finish selected by

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Barcode:3883995-04 A-549-502 SCO - Scope Inquiry - Line Pipe
A-010

Commerce Department industry experts. Where foreign market value was based on constructed value, we used timely information submitted by Thai Steel when we were able to verify it and, otherwise, best information available for materials, fabrication, general expenses, profit, and packing costs. When appropriate for constructed value, adjustments were made under § 353.15 of the Commerce Regulations for differences in circumstances of sale between the two markets. These adjustments were for differences in credit costs. Since the amount for general expenses was greater than 10 percent of the cost of materials and fabrication, we did not need to adjust it to the statutory minimum of 10 percent. Since the amount for profit was less than eight percent of the cost of materials, fabrication and general expenses, in accordance with statutory requirements, we added eight percent of the sum of the cost of materials, fabrication and general expenses for profit.

In the case of Thai Steel, we found sufficient sales in one product group at or above the cost of production to allow us to use its delivered home market prices to determine foreign market value. From these delivered prices we deducted inland freight costs. We made adjustments for differences in credit costs in accordance with § 353.15 of our Regulations (19 CFR 353.15). Since there were no home market packing costs, we added the packing costs incurred on sales to the United States.

In accordance with current Departmental policy, we also deducted from foreign market value for both respondents a business or sales tax which is levied on domestic sales of pipe and tube at a 5.5 percent rate. Although section 772(d)(1)(C) of the Act calls for adding these taxes to the United States price, this would result in distorting the tax absent an *ad valorem* margin. We are unable to establish what the appropriate tax basis would be for the exported merchandise since it is not subject to the tax. In the absence of knowing what the tax addition to U.S. price should be, we cannot calculate the differential. Therefore, as best information, we are making the adjustment by deducting these taxes from the price of the home market merchandise. Deducting from the home market price is the only tax neutral adjustment for both the *ad valorem* and absolute margin.

In the case of Saha Thai, we found sufficient sales at or above the cost of production for some product groupings, but not for others. For those sales at or above the cost of production, we used delivered home market prices to determine the foreign market value. From these delivered prices we deducted inland freight costs and trade discounts. We made adjustments for differences in credit costs. We also subtracted home market packing costs and added U.S. packing charges.

For product groupings for which there were insufficient sales at or above the cost of production, we calculated the constructed value by using information submitted by Saha Thai when it was timely and we were able to verify it, and, otherwise, best information available for cost of materials, fabrication, general expenses, profit, and packing costs. Since the amount for general expenses was less than ten percent of the cost of materials and fabrication, we adjusted it to the statutory minimum of ten percent. Since the amount for profit was less than eight percent of the cost of materials, fabrication and general expenses, in accordance with statutory requirements, we added eight percent of the sum of the costs of materials, fabrication and general expenses for profit. Where appropriate for constructed value, adjustments were made under § 353.15 of the Commerce Regulations for differences in credit costs in the two markets.

**Negative Determination of Critical Circumstances**

The petitioners alleged that imports of pipe and tube from Thailand present "critical circumstances." Under section 735(a)(3) of the Act, critical circumstances exist if we determine that: (1) There is a history of dumping in the United States or elsewhere of the class or kind of merchandise which is the subject of the investigation; or the person by whom, or for whose account, the merchandise was imported knew or should have known that the exporter was selling the merchandise which is the subject of the investigation at less than its fair value; and (2) there have been massive imports of the class or kind of merchandise that is the subject of the investigation over a relatively short period.

In determining whether there is a history of dumping of the products under investigation, we ascertain whether there have been any prior investigations of these products in any other country. When Australia investigated these products, it made a negative final determination in February 1985. Neither the Department nor Treasury has investigated these products before. Therefore, we find that there is no history of dumping.

The second criterion is whether the importers knew, or should have known, that the exporter was dumping the merchandise. We normally consider margins of 25 percent or more to constitute constructive knowledge of dumping. Since the margins in this case do not meet or exceed this level, we find tht knowledge of dumping cannot be imputed to the importers.

Because we do not have either a history of dumping or knowledge on the part of the importers that the merchandise was being dumped, we, therefore, do not have to consider whether there are massive imports over a relatively short period.

Thus, for the reasons described above, we determine that "critical circumstances" do not exist with respect to pipes and tubes from Thailand.

**Verification**

In accordance with section 776(a) of the Act, the Department attempted to verify the cost-of-production data of Thai Steel and Saha Thai. However, respondents submitted numerous revisions to the cost-of-production data shortly before the start of and during the on-site verification. In addition, there was a lack of sufficient supporting documentation for certain portions of the respondents' cost-of-production information. Therefore, we determined that portions of the cost of production data submitted by the respondents could not be verified.

**Petitioners' Comments**

*Comment 1.* The petitioners allege that critical circumtances exist and that the Department should impute knowledge of dumping to the importers based on prices of pipe imports from countries other than Thailand, price of coil imports and margins lower than 25 percent.

*DOC Position.* We have found that critical circumstances do not exist. Petitioners' position ignores the many financial complexities and adjustments that are essential in calculating whether merchandise is sold at less than fair value. Only after thorough investigation and verification can such a determination be made under section 773 of the Act. Short-hand formulas for imputing knowledge of dumping such as those suggested by petitioners run the risk of arbitrarily penalizing importers who believe in good faith that their imports are not being dumped.

*Comment 2.* Petitioners state that the Department should use the best information available since the Department could not examine underlying documentation to test the

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

PUBLIC DOCUMENT

Barcode:3883995-04 A-549-502 SCO - Scope Inquiry - Line Pipe

accuracy of the summary documents at verification for one company, and the information and methodology changes significantly at the other company.

*DOC Position.* We agree. The Department used the best information available for those costs presented in the respondents' submission which could not be verified.

*Comment 3.* Petitioners state that the Department should use coil costs of Thai Steel only for the last three quarters of Thai Steel's 1984–1985 fiscal year instead of the full year.

*DOC Position.* We agree. The Department used best information to adjust the material costs to reflect the costs of the higher priced coils which were used by the company for the nine months ended March 31, 1985.

*Comment 4.* Petitioners contend that certain costs for Thai Steel are incorrect, specifically, the scrap rate, production rates and zinc yield.

*DOC Position.* In determining the steel scrap rate, zinc yield loss and transformation costs to be used for calculating the cost of production, the Department analyzed the respondent's data, which was considered by the Department not to be verified, to determine the reasonableness of the data compared to available U.S. industry data. The Department accepted the company's steel scrap rate but we adjusted the transformation costs and zinc yield loss.

*Comment 5.* Petitioners contend that the Department may not have included in the cost of production and may not have verified certain items, such as flux, acid for pickling and energy costs.

*DOC Position.* These costs were included as part of the fabrication costs, and adjusted accordingly. See Comment 4.

*Comment 6.* The Department should consider the business tax as a cost of manufacturing rather than as a general expense.

*DOC Position.* We disagree. The business tax was considered a part of the general expenses because it is paid on sales.

*Comment 7.* The amount of the business tax paid should be calculated by applying 5.5 percent to the price of pipe after deducting the amount of the tax.

*DOC Position.* We disagree. The business tax is already included in the home market price of the pipe. Therefore, we subtracted the verified amount from the home market price.

*Comment 8.* Since the foreign market value, pursuant to section 773(a)(1), is the price in the home market at the time of sale of the merchandise within the United States, the Department should consider only the home market price in the same month as sales to the U.S. Since the only sale to the U.S. occurred in February, 1985, then the Department need look at only February, 1985, home market sales.

*DOC Position.* We disagree. It is our practice to use foreign market value for the entire period of investigation, unless we are investigating imports from a hyper-inflationary economy or rapidly changing prices. Therefore, we have used all home market sales during the period of investigation.

*Comment 9.* The petitioners contend that the Department should compare U.S. sales of ASTM–120 pipe to both British Standard medium and heavy pipe sold in the home market because the specification of ASTM 1–120, in terms of wall thickness, is between both British specifications for some sizes and is thicker than the heavy specification for other sizes.

*DOC Position.* Our Departmental steel industry experts agree. When ASTM–120 pipe wall thickness is closer to British Standard medium, we used that for comparison purposes. Likewise, where the ASTM–120 is closer to British Standard heavy, we used it.

*Comment 10.* Saha Thai's duty drawback claims cannot be correct, particularly in light of what it pays for coil.

*DOC Position.* We disagree. We verified the amount that Saha Thai collects for duty drawback and have used that amount.

*Comment 11.* Petitioners contend that certain costs of Saha Thai do not seem plausible, specifically scrap loss, factory overhead and finishing galvanizing costs.

*DOC Position.* The Department did not consider the cost of manufacturing presented in the response received by the Department prior to its verification to be verified. Therefore, we adjusted such costs.

*Comment 12.* Petitioners contend that the business tax should not be included in Saha Thai's production costs if it is paid on sales.

*DOC Position.* In comparing cost of production to home market sales, we included the business tax in each. We did not include the business tax in constructed value or in the home market sales price, nor in the U.S. sales price when making our fair value comparisons.

*Comment 13.* Petitioners contend that not all interest expense should be allocated to SG&A expenses. Specifically, interest expenses arising from supplier credits should properly be considered a part of raw material costs.

*DOC Position.* The Department considers the financing expense of assets, long-term or short-term, to be fungible and, therefore, a general expense of operating the company.

**Respondents' Comments**

*Comment 1.* Respondents contend that the Department should not use best information available because they gave the verification team revised data at the outset of the verification and the data were fully verified. Any changes made to the data were insignificant.

*DOC Position.* The purpose of verification is to assess the accuracy of the response to the Department's questionnaire which is required, in most instances, prior to the preliminary determination. When required, respondents have an obligation to provide the Department with an accurate and complete response prior to the preliminary determination so that the Department has accurate and complete information on which to base its preliminary determination. That obligation is not met where a respondent reconstructs its response after the preliminary determination and presents it to our analysts or accountants shortly before the start of the verification or at the verification site. Indeed, this may render meaningless our preliminary determination. In addition, a thorough on-site verification can be conducted only where the Department has the opportunity: (1) To fully analyze information included in the response, (2) to assess comments submitted by other parties to the proceeding, and (3) to develop questions to pursue at the on-site verification. In cases where initial or supplemental responses to questionnaires are due after the preliminary determination date, they must be submitted in a timely manner to allow for analysis, comments and the development of questions prior to arrival at the verification site. Thus, while correction of minor errors is acceptable during verification, as a general matter we will not accept portions of responses (or entire responses) when they are changed in major respects shortly before the start of the verification or at the verification site because there is insufficient time for analysis and verification.

In this case both respondents prior to and in the course of the verification made significant changes in the cost submissions because the respondents were unable to provide support for their responses and because of the discovery of errors and inconsistencies.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Federal Register / Vol. 51, No. 17 / Monday, January 27, 1986 / Notices 

*Comment 2.* Respondents contend that the Department, if it uses constructed value, should adjust for circumstances of sale.

*DOC Position.* We agree. See our section, *supra*, on "Foreign Market Value."

*Comment 3.* Respondents contend that with respect to the outstanding countervailing duty order, the Department should adjust the U.S. price to reflect the amount of the countervailing duty attributable to an export subsidy, instead of adjusting the deposit rate.

*DOC Position.* We disagree. The statutory prohibition of section 772(d)(1)(D) is on double assessment for the same situation of dumping or export subsidization. Nevertheless, the Departmental practice has been to deduct the amount of the export subsidy from the dumping deposit or bonding requirement when there is a final countervailing duty order in effect on the imported merchandise. It is reasonable not to collect a double deposit when there cannot be double assessment. There has not yet been any assessment of countervailing duties on the shipments referred to by respondents. If there is ultimately such an assessment attributable to export subsidies, assessment of dumping duties for that amount will not be made. In the meantime, we will continue to deduct the amount attributable to the export subsidy from the dumping deposit.

*Comment 4.* Respondents contend that the Department erred in not correcting a clerical error in the preliminary determination concerning the use of British Standard heavy pipe, when only medium pipe should have been used.

*DOC Position.* We disagree. The Department's steel industry experts have decided that it is proper to include British Standard heavy pipe for certain product groups in making our comparisons.

*Comment 5.* Respondents contend that the Department should adjust the business tax by adding it to the U.S. purchase price instead of adjusting the foreign market value.

*DOC Position.* We disagree. See "Foreign Market Value," *supra*.

**Suspension of Liquidation**

In accordance with section 733(d) of the Act, we are directing the United States Customs Service to continue to suspend liquidation of all entries of certain circular welded carbon steel pipes and tubes from Thailand that are entered, or withdrawn from warehouse, for consumption, on or after October 3, 1985. The United States Customs Service shall require a cash deposit or the posting of a bond equal to the estimated weighted-average amounts by which the foreign market value of the merchandise subject to this investigation exceeds the United States price as shown in the table below. This suspension of liquidation will remain in effect until further notice.

Article VI.5 of the General Agreement on Tariffs and Trade provides that "[n]o product . . . shall be subject to both antidumping and countervailing duties to compensate for the same situation of dumping or export subsidization." This provision is implemented by section 772(d)(1)(D) of the Act, which prohibits assessing dumping duties on the portion of the margin attributable to export subsidies. In the final countervailing duty determination on certain circular welded carbon steel pipes and tubes from Thailand, we found export subsidies (50 FR 32751). Since dumping duties cannot be assessed on the portion of the margin attributable to export subsidies, there is no reason to require a cash deposit or bond for that amount. Thus, the amont of the export subsidies will be subtracted for deposit or bonding purposes from the dumping margins.

| Manufacturer/Producer/Exporter | Weighted-average margin percentage |
|---|---|
| Saha Thai Steel Pipe Co | 15.69 |
| Thai Steel Pipe Industry Co | 15.60 |
| All others | 15.67 |

**ITC Notification**

In accordance with section 735(c)(1) of the Act, we will notify the ITC of our determination. In addition, we are making available to the ITC all nonprivileged and nonconfidential information relating to this investigation. We will allow the ITC access to all privileged and confidential information in our files, provided the ITC confirms that it will not disclose such information, either publicly or under an administrative protective order, without the written consent of the Deputy Assistant Secretary for Import Administration. The ITC will determine whether these imports materially injure, or threaten material injury to, a U.S. industry within 45 days after we make our final affirmative determination

This determination is published pursuant to section 735(d) of the Act (19 U.S.C. 1673d(d).

**Paul Freedenberg,**

*Assistant Secretary for Trade Administration.*

January 16, 1986.

[FR Doc. 86–1702 Filed 1–24–86; 8:45 am]

BILLING CODE 3510-DS-M

**APPENDIX B**

**NOTICES OF THE INVESTIGATIONS BY THE COMMISSION**

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

43814 Federal Register / Vol. 50, No. 208 / Monday, October 28, 1985 / Notices

[Investigation No. 731-TA-252 (Final)]

**Certain Welded Carbon Steel Pipes and Tubes From Thailand**

**AGENCY:** International Trade Commission.

**ACTION:** Institution of a final antidumping investigation and scheduling of a hearing to be held in connection with the investigation.

**SUMMARY:** The Commission hereby gives notice of the institution of final antidumping investigation No. 731-TA-252 (Final) under section 735(b) of the Tariff Act of 1930 (19 U.S.C. 1673d(b)) to determine whether an industry in the United States is materially injured, or is threatened with material injury, or the establishment of an industry in the United States in materially retarded, by reason of imports from Thailand of certain welded carbon steel pipes and tubes [1] which have been found by the Department of Commerce, in a preliminary determination, to be sold in the United States at less than fair value (LTFV). Unless the investigation is extended, Commerce will make its final

[1] For purposes of this investigation, the term "certain welded carbon steel pipes and tubes" covers welded carbon steel pipes and tubes of circular cross section, 0.375 inch or more but not over 16 inches in outside diameter, provided for in items 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3244, 610.3256, 610.3258, and 610.4925 of the Tariff Schedules of the United States Annotated (1985) (TSUSA).

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Federal Register / Vol. 50, No. 208 / Monday, October 28, 1985 / Notices 43615

LTFV determination on or before December 10, 1985, and the Commission will make its final injury determination by January 28, 1986 (see sections 735(a) and 735(b) of the act (19 U.S.C. 1673d(a) and 1673d(b))).

For further information concerning the conduct of this investigation, hearing procedures, and rules of general application, consult the Commission's Rules of Practice and Procedure, Part 207, Subparts A and C (19 Part 207), and Part 201, Subparts A through E (19 CFR Part 201).

**EFFECTIVE DATE:** October 1, 1985.

**FOR FURTHER INFORMATION CONTACT:** Bonnie Noreen (202-523-1369), Office of Investigations, U.S. International Trade Commission, 701 E Street NW., Washington, DC 20436. Hearing-impaired individuals are advised that information on this matter can be obtained by contacting the Commission's TDD terminal on 202-724-0002.

**SUPPLEMENTARY INFORMATION:**

## Background

This investigation is being instituted as a result of an affirmative preliminary determination by the Department of Commerce that imports of certain welded carbon steel pipes and tubes from Thailand are being sold in the United States at less than fair value within the meaning of section 731 of the act (19 U.S.C. 1673). The investigation was requested in a petition filed on February 28, 1985, and amended on March 12, 1985, by counsel for the standard pipe subcommittee of the Committee of Pipe and Tube Imports, and for each of the individual manufacturers of standard pipe that are members of the subcommittee. In response to that petition the Commission conducted a preliminary antidumping investigation and, on the basis of information developed during the course of that investigation, determined that there was a reasonable indication that an industry in the United States was materially injured by reason of imports of the subject merchandise (50 FR 16167, April 24, 1985).

## Participation in the Investigation

Persons wishing to participate in this investigation as parties must file an entry of appearance with the Secretary to the Commission, as provided in § 201.11 of the Commission's rule (19 CFR 201.11), not later than twenty-one (21) days after the publication of this notice in the **Federal Register**. Any entry of appearance filed after this date will be referred to the Chairwoman, who will determine whether to accept the late-entry for good cause shown by the person desiring to file the entry.

## Service List.

Pursuant to § 201.11(d) of the Commission's rules (19 CFR 201.11(d)), the Secretary will prepare a service list containing the names and addresses of all persons, or their representatives, who are parties to this investigation upon the expiration of the period for filing entries of appearance. In accordance with 201.16(c) and 207.3 of the rules (19 CFR 201.16(c) and 207.3), each document filed by a party to the investigation must be served on all other parties to the investigation (as identified by the service list), and a certificate of service must accompany the document. The Secretary will not accept a document for filing without a certificate of service.

## Staff Report

A public version of the prehearing staff report in this investigation will be placed in the public record on November 27, 1985, pursuant to § 207.21 of the Commission's rules (19 CFR 207.21).

## Hearing

The Commission will hold a hearing in connection with this investigation beginning at 10:00 a.m. on December 12, 1985, at the U.S. International Trade Commission Building, 701 E Street NW., Washington, DC. Requests to appear at the hearing should be filed in writing with the Secretary to the Commission not later than the close of business (5:15 p.m.) on December 2, 1985. All persons desiring to appear at the hearing and make oral presentations should file prehearing briefs and attend a prehearing conference to be held at 10:30 a.m. on December 6, 1985 in room 117 of the U.S. International Trade Commission Building. The deadline for filing prehearing briefs is December 9, 1985.

Testimony at the public hearing is governed by § 207.23 of the Commission's rules (19 CFR 207.23). This rule requires that testimony be limited to a nonconfidential summary and analysis of material contained in prehearing briefs and to information not available at the time the prehearing brief was submitted. Any written materials submitted at the hearing must be filed in accordance with the procedures described below and any confidential materials must be submitted at least three (3) working days prior to the hearing (see § 201.6(b)(2) of the Commission's rules(19 CFR 201.6(b)(2))).

## Written Submissions

All legal arguments, economic analyses, and factual materials relevant to the public hearing should be included in prehearing briefs in accordance with § 207.22 of the Commission's rules (19 CFR 207.22). Posthearing briefs must conform with the provisions of § 207.24 (19 CFR 207.24) and must be submitted not later than the close of business on December 19, 1985. In addition, any person who has not entered an appearance as a party to the investigation may submit a written statement of information pertinent to the subject of the investigation on or before December 19, 1985.

A signed original and fourteen (14) copies of each submission must be filed with the Secretary to the Commission in accordance with section 201.8 of the Commission's rules (19 CFR 201.8). All written submissions except for confidential business data will be available for public inspection during regular business hours (8:45 a.m. to 5:15 p.m.) in the Office of the Secretary to the Commission.

Any business information for which confidential treatment is desired must be submitted separately. The envelope and all pages of such submissions must be clearly labeled "Confidential Business Information." Confidential submissions and requests for confidential treatment must conform with the requirements of section 201.6 of the Commission's rules (19 CFR 201.6)

## Authority

This investigation is being conducted under authority of the Tariff Act of 1930, title VII. This notice is published pursuant to § 207.20 of the Commission's rules (19 CFR 207.20).

Issued: October 23, 1985.

By order of the Commission.

**Kenneth R. Mason,**

*Secretary.*

[FR Doc. 85-25663 Filed 10-25-85; 8:45 am]

BILLING CODE 7020-02-M

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Barcode:3883995-04 A-549-502 SCO - Scope Inquiry - Line Pipe

B-4

[Investigation No. 731-TA-252 (Final)]

**Certain Welded Carbon Steel Pipes and Tubes From Thailand**

**AGENCY:** International Trade Commission.

**ACTION:** Revised schedule for the subject investigation.

**EFFECTIVE DATE:** November 1, 1985.

**FOR FURTHER INFORMATION CONTACT:** Bonnie Noreen (202-523-1369), Office of Investigations, U.S. International Trade Commission, 701 E Street NW., Washington, DC 20436. Hearing-impaired individuals may obtain information on this matter by contacting the Commission's TDD terminal on 202-724-0002.

**SUPPLEMENTARY INFORMATION:** Effective October 1, 1985, the Commission instituted the subject investigation and established a schedule for its conduct (50 FR 43614, October 28, 1985). The Commission hereby revises its schedule in the investigation, in order to conduct its hearing and certain other aspects of the investigation concurrent with investigations concerning pipe and tube imports from India, Taiwan, Turkey, (investigations Nos. 701-TA-251, 252, and 253 (Final), respectively), and Venezuela (investigation No. 731-TA-253 (Final)).

The Commission's new schedule for the investigation is as follows: requests to appear at the hearing must be filed with the Secretary to the Commission not later than December 20, 1985; the prehearing conference will be held in room 117 of the U.S. International Trade Commission Building at 9:30 a.m. on December 27, 1985; the public version of the prehearing staff report will be placed on the public record on December 24, 1985; the deadline for filing prehearing briefs is December 31, 1985; the hearing will be held in room 331 of the U.S. International Trade Commission Building at 10:00 a.m. on January 7, 1986; and the deadline for filing all other written submissions, including posthearing briefs, is January 14, 1986.

For further information concerning this investigation see the Commission's notice of investigation cited above and the Commission's Rules of Practice and Procedure, Part 207, Subparts A and C (19 CFR Part 207), and Part 201, Subparts A through E (19 CFR Part 201).

Authority: This investigation is being conducted under authority of the Tariff Act of 1930, title VII. This notice is published pursuant to § 207.20 of the Commission's rules (19 CFR 207.20).

Issued: November 1, 1985.

By order of the Commission.

Kenneth R. Mason,

*Secretary.*

[FR Doc. 85-27119 Filed 11-13-85; 8:45 am]

BILLING CODE 7020-02-M

[Investigations Nos. 701-TA-251-253 (Final)]

**Certain Welded Carbon Steel Pipes and Tubes From India, Taiwan and Turkey**

**AGENCY:** International Trade Commission.

**ACTION:** Institution of final countervailing duty investigations and scheduling of a hearing to be held in connection with the investigations.

**SUMMARY:** The Commission hereby gives notice of the institution of final countervailing duty investigations Nos. 701-TA-251 through 253 (Final) under section 705(b) of the Tariff Act of 1930 (19 U.S.C. 1671d(b)) to determine whether industries in the United States are materially injured, or are threatened with material injury, or the establishment of an industry in the United States is materially retarded, by reason of imports of the following welded carbon steel pipes and tubes, which have been found by the Department of Commerce, in preliminary determinations, to be subsidized by the Governments of the respective countries.

Standard pipes and tubes [1] from India (investigation No. 701-TA-251 (Final)),

Line pipes and tubes [2] from Taiwan (investigation No. 701-TA-252 (Final)), and

Line and standard pipes and tubes from Turkey (investigation No. 701-TA-253 (Final)).

Unless these cases are extended, Commerce will make its final subsidy determinations in these investigations on or before December 23, 1985, for subject imports from India and Taiwan, and January 6, 1986, for subject imports from Turkey. The Commission will make its final injury determinations by January 28, 1986 (see sections 705(a) and 705(b) of the act (19 U.S.C. 1671d(a) and 1671d(b))).

For further information concerning the conduct of these investigations, hearing procedures, and rules of general application, consult the Commission's Rules of Practice and Procedure, Part 207, Subparts A and C (19 CFR Part 207), and Part 201, Subparts A through E (19 CFR Part 201).

**EFFECTIVE DATE:** October 25, 1985.

**FOR FURTHER INFORMATION CONTACT:** Bonnie Noreen (202-523-1369), Office of Investigations, U.S. International Trade Commission, 701 E Street NW., Washington, DC 20436. Hearing-

[1] For purposes of these investigations, the term "welded carbon steel standard pipes and tubes" covers welded carbon steel pipes and tubes of circular cross section, 0.375 inch or more but not over 16 inches in outside diameter, provided for in items 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258, and 610.4925 of the *Tariff Schedules of the United States (Annotated) (TSUSA)*.

[2] For purposes of these investigations, the term "welded carbon steel line pipes and tubes" covers welded carbon steel pipes and tubes of circular cross section, with walls not thinner than 0.065 inch, 0.375 inch or more but not over 16 inches in outside diameter, conforming to American Petroleum Institute (API) specifications for line pipe, provided for in TSUSA items 610.3208 and 610.3209.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

impaired individuals are advised that information on this matter can be obtained by contacting the Commission's TDD terminal on 202-724-0002.

**SUPPLEMENTARY INFORMATION:**

**Background**

These investigations are being instituted as a result of affirmative preliminary determinations by the Department of Commerce that certain benefits which constitute subsidies within the meaning of section 710 of the act (19 U.S.C. 1671) are being provided to manufacturers, producers, or exporters in India, Taiwan, and Turkey of certain welded carbon steel pipes and tubes. The investigations were requested in petitions filed on July 16, 1985, by counsel for the individual producer members of the subcommittees on standard and line pipe of The Committee on Pipe and Tube Imports. In response to those petitions the Commission conducted preliminary countervailing duty investigations and, on the basis of information developed during the course of those investigations, determined that there was a reasonable indication that industries in the United States were materially injured by reason of imports of the subject merchandise (50 FR 37068, September 11, 1985).

**Participation in the Investigations**

Persons wishing to participate in these investigations as parties must file an entry of appearance with the Secretary to the Commission, as provided in section 201.11 of the Commission's rules (19 CFR 201.11), not later than twenty-one (21) days after the publication of this notice in the **Federal Register**. Any entry of appearance filed after this date will be referred to the Chairwoman, who will determine whether to accept the late entry for good cause shown by the person desiring to file the entry.

**Service List**

Pursuant to § 201.11(d) of the Commission's rules (19 CFR 201.11(d)), the Secretary will prepare a service list containing the names and addresses of all persons, or their representatives, who are parties to these investigations upon the expiration of the period for filing entries of appearance. In accordance with §§ 201.16(c) and 207.3 of the rules (19 CFR 201.16(c) and 207.3), each document field by a party to the investigations must be served on all other parties to the investigations (as identified by the service list), and a certificate of service must accompany the document. The Secretary will not accept a document for filing without a certificate of service.

**Staff Report**

A public version of the prehearing staff report in these investigations will be placed in the public record on December 24, 1985, pursuant to § 207.21 of the Commission's rules (19 CFR 207.21).

**Hearing**

The Commission will hold a hearing in connection with these investigations beginning at 10:00 a.m. on January 7, 1986, at the U.S. International Trade Commission Building, 701 E Street NW., Washington, DC. Requests to appear at the hearing should be filed in writing with the Secretary to the Commission not later than the close of business (5:15 p.m.) on December 20, 1985. All persons desiring to appear at the hearing and make oral presentations should file prehearing briefs and attend a prehearing conference to be held at 9:30 a.m. on December 27, 1985, in room 117 of the U.S. International Trade Commission Building. The deadline for filing prehearing briefs is December 31, 1985. The Commission will be conducting the hearing in these investigations concurrent with investigations concerning pipe and tube imports from Thailand (investigation No. 731-TA-252 (Final)) and Venezuela (investigation No. 731-TA-253 (Final)).

Testimony at the public hearing is governed by section 207.23 of the Commission's rules (19 CFR 207.23). This rule requires that testimony be limited to a nonconfidential summary and analysis of material contained in prehearing briefs and to information not available at the time the prehearing brief was submitted. Any written materials submitted at the hearing must be filed in accordance with the procedures described below and any confidential materials must be submitted at least three (3) working days prior to the hearing (see § 201.6(b)(2) of the Commission's rules (19 CFR 201.6(b)(2))).

**Written Submissions**

All legal arguments, economic analyses, and factual materials relevant to the public hearing should be included in prehearing briefs in accordance with § 207.22 of the Commission's rules (19 CFR 207.22). Posthearing briefs must conform with the provisions of § 207.24 (19 CFR 207.24) and must be submitted not later than the close of business on January 14, 1986. In addition, any person who has not entered an appearance as a party to the investigations may submit a written statement of information pertinent to the subject of the investigations on or before January 14, 1986.

A signed original and fourteen (14) copies of each submission must be filed with the Secretary to the Commission in accordance with § 201.8 of the Commission's rules (19 CFR 201.8). All written submissions except for confidential business data will be available for public inspection during regular business hours (8:45 a.m. to 5:15 p.m.) in the Office of the Secretary to the Commission.

Any business information for which confidential treatment is desired must be submitted separately. The envelope and all pages of such submissions must be clearly labeled "Confidential Business Information." Confidential submissions and requests for confidential treatment must conform with the requirements of § 201.6 of the Commission's rules (19 CFR 201.6).

**Authority:** These investigations are being conducted under authority of the Tariff Act of 1930, title VII. This notice is published pursuant to § 207.20 of the Commission's rules (19 CFR 207.20).

Issued: November 1, 1985.

By order of the Commission.

**Kenneth R. Mason,**

*Secretary.*

[FR Doc. 85-27120 Filed 11-13-85; 8:45 am]

BILLING CODE 7020-02-M

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

PUBLIC DOCUMENT

B-6

PUBLIC DOCUMENT
C-1
Barcode:3883995-04 A-549-502 SCO - Scope Inquiry - Line Pipe

# APPENDIX C

## LIST OF WITNESSES APPEARING AT THE HEARING

C-1

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

CALENDAR OF PUBLIC HEARING

Those listed below appeared as witnesses at the United States International Trade Commission's hearing:

Subjects : Certain Welded Carbon Steel Pipes and Tubes from Turkey

and

Certain Welded Carbon Steel Pipes and Tubes from Thailand

Inv. Nos. : 701-TA-253 (Final)

and

731-TA-252 (Final)

Date and time : January 7, 1986 - 10:00 a.m.

Sessions were held in connection with the investigation in the Hearing Room of the United States International Trade Commission, 701 E Street, N.W., in Washington.

In support of the imposition and countervailing and/or antidumping duties:

Schagrin Associates--Counsel
Washington, D.C.
on behalf of

The Standard Pipe Subcommittee and the Line Pipe Subcommittee of The Committee on Pipes and Tube Imports and the individual producer members of these subcommittees

Mack Hamblem, Vice President of Marketing and Sales, Sawhill Division of Cyclops Corporation

James McCammack, General Manager of the Fence Division, Allied Tube and Conduit

Will Boggs, Sales Manager, American Tube

Roger B. Schagrin)
Paul W. Jameson )--OF COUNSEL

- more -

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

In opposition to the imposition of countervailing and/or antidumping duties:

White & Case--Counsel
Washington, D.C.
on behalf of

The Republic of Turkey

Joseph W. McAnneny, Economists Incorporated

John J. McAvoy )
Anne D. Smith )--OF COUNSEL
Shawn Fitzpatrick)

Coudert Brothers--Counsel
Washington, D.C.
on behalf of

Mannesmann-Suemerbank Boru Enduestrisi T.A.S.

Mark Herlach )
Robert Lipstein)--OF COUNSEL

Willkie, Farr & Gallagher--Counsel
Washington, D.C.
on behalf of

Thai and Turkish Producers of Pipes and Tubes

William H. Barringer)
James P. Durling )--OF COUNSEL

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

PUBLIC DOCUMENT
Barcode:3883995-04 A-549-502 SCO - Scope Inquiry - Line Pipe

C-4

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

PUBLIC DOCUMENT

Barcode:3883995-04 A-549-502 SCO - Scope Inquiry - Line Pipe

# APPENDIX D

## NOTICES OF TERMINATION BY THE COMMISSION

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Federal Register / Vol. 50, No. 208 / Monday, October 28, 1985 / Notices 43615

[Investigation No. 731-TA-212 (Final)]

**Certain Welded Carbon Steel Pipes and Tubes From Venezuela**

**AGENCY:** International Trade Commission.

**ACTION:** Termination of investigation.

**SUMMARY:** On October 17, 1985, the Commission received a letter from counsel for the petitioners in the subject investigation (the standard pipe subcommittee of The Committee on Pipe and Tube Imports and the individual

43616 Federal Register / Vol. 50, No. 208 / Monday, October 28, 1985 / Notices

members of that subcommittee) withdrawing their petition. Accordingly, pursuant to § 207.40(a) of the Commission's Rules of Practice and Procedure (19 CFR 207.40(a)), the antidumping investigation concerning certain welded carbon steel pipes and tubes from Venezuela (investigation No. 731–TA–212 (Final)) is terminated.

**EFFECTIVE DATE:** October 22, 1985.

**FOR FURTHER INFORMATION CONTACT:** Bonnie Noreen (202–523–1369), Office of Investigations, U.S. International Trade Commission, 701 E Street NW., Washington, DC 20436. Hearing-impaired individuals are advised that information on this matter can be obtained by contacting the Commission's TDD terminal on 202–724–0002.

## Authority

This investigation is being terminated under authority of the Tariff Act of 1930, title VII. This notice is published pursuant to § 207.40 of the Commission's rules (19 CFR 207.40).

Issued: October 23, 1985.

By order of the Commission.

Kenneth R. Mason,

*Secretary.*

[FR Doc. 85–25664 Filed 10–25–85; 8:45 am]

BILLING CODE 7020–02–M

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Barcode:3883995-04 A-549-502 SCO - Scope Inquiry - Line Pipe

[Investigations Nos. 701-TA-242 and 731-TA-253 (Final)]

## Certain Welded Carbon Steel Line Pipes and Tubes from Venezuela

**AGENCY:** International Trade Commission.

**ACTION:** Termination of final antidumping investigation; withdrawal of countervailing duty petition.

**SUMMARY:** On November 13, 1985, the Commission received a letter from counsel for the petitioners in the subject investigations withdrawing their countervailing duty and antidumping petitions concerning imports of certain welded carbon steel line pipes and tubes from Venezuela. Accordingly, pursuant to § 207.40(a) of the Commission's Rules of Practice and Procedure (19 CFR 207.40(a)), the antidumping investigation concerning certain welded carbon steel line pipes and tubes from Venezuela (investigation No. 731-TA-253 (Final)) is terminated.

On November 13, 1985, the Department of Commerce published notice in the Federal Register of its affirmative preliminary determination that certain benefits which constitute subsidies within the meaning of section 701 of the Tariff Act of 1930 (19 U.S.C. 1671) are being provided to manufacturers, producers, or exporters in Venezuela of certain circular welded carbon steel line pipes and tubes.' Because the countervailing duty petition concerning imports of welded carbon steel line pipes and tubes from Venezuela has been withdrawn, the Commission will not institute a final countervailing duty investigation on this subject.

**EFFECTIVE DATE:** December 4, 1985.

**FOR FURTHER INFORMATION CONTACT:** Bonnie Noreen (202-523-1369), Office of Investigations, U.S. International Trade Commission, 701 E Street NW., Washington, DC 20436. Hearing-impaired individuals are advised that information on this matter can be obtained by contacting the Commission's TDD terminal on 202-724-0002.

Authority: The subject antidumping investigation is being terminated under authority of the Tariff Act of 1930, title VII. This notice is published pursuant to § 207.40 of the Commission's rules (19 CFR 207.40).

Issued: December 5, 1985.

By order of the Commission.

Kenneth R. Mason,

*Secretary.*

[FR Doc. 85-29412 Filed 12-11-85; 8:45 am]

BILLING CODE 7020-02-M

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

PUBLIC DOCUMENT

Barcode:3883995-04 A-549-502 SCO - Scope Inquiry - Line Pipe

# APPENDIX E

## VOLUNTARY RESTRAINT AGREEMENT EXPORT CEILINGS AND IMPORT DATA

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Barcode:3883995-04 A-549-502-ECO - Scope Inquiry - Line Pipe

Table E-1.--Steel pipes and tubes: Ceilings negotiated under voluntary restraint agreements for exports shipped to the United States from certain countries, by products and sources, initial period and 1986

| Item | Initial period 1/ | | | 1986 2/ | | |
|---|---|---|---|---|---|---|
| | Standard pipes and tubes | Line pipes and tubes | Other products | Standard pipes and tubes | Line pipes and tubes | Other products |
| Australia: | | | | | | |
| Quantity----short tons-- | 3/ | 3/ | 4/ 17,171 | 3/ | 3/ | 4/ 12,333 |
| Imports-to-consumption ratio 5/-----percent-- | 3/ | 3/ | 4/ 0.16 | 3/ | 3/ | 4/ 0.16 |
| Brazil: | | | | | | |
| Quantity----short tons-- | 60,379 | 61,979 | 6/ | 44,402 | 50,945 | 6/ |
| Imports-to-consumption ratio 5/-----percent-- | 2.52 | 2.59 | 6/ | 2.52 | 2.59 | 6/ |
| Czechoslovakia: | | | | | | |
| Quantity----short tons-- | 3/ | 3/ | 7/ 9,000 | 3/ | 3/ | 7/ 6,000 |
| Imports-to-consumption ratio 5/-----percent-- | 3/ | 3/ | 3/ | 3/ | 3/ | 3/ |
| East Germany: | | | | | | |
| Quantity----short tons-- | 3/ | 3/ | 7/ 3,000 | 3/ | 3/ | 7/ 13,000 |
| Imports-to-consumption ratio 5/-----percent-- | 3/ | 3/ | 3/ | 3/ | 3/ | 3/ |
| Finland: | | | | | | |
| Quantity----short tons-- | 3/ | 3/ | 4/ 10,732 | 3/ | 3/ | 4/ 7,708 |
| Imports-to-consumption ratio 5/-----percent-- | 3/ | 3/ | 4/ 0.10 | 3/ | 3/ | 4/ 0.10 |
| Hungary: | | | | | | |
| Quantity----short tons-- | 3/ | 3/ | 7/ 18,750 | 3/ | 3/ | 7/ 15,000 |
| Imports-to-consumption ratio 5/-----percent-- | 3/ | 3/ | 3/ | 3/ | 3/ | 3/ |
| Japan: | | | | | | |
| Quantity----short tons-- | 3/ | 371,394 | 8/ 1,423,063 | 3/ | 305,278 | 8/ 1,022,081 |
| Imports-to-consumption ratio 5/-----percent-- | 3/ | 15.52 | 8/ 13.26 | 3/ | 15.52 | 8/ 13.26 |
| Mexico: | | | | | | |
| Quantity----short tons-- | 57,504 | 47,860 | 6/ | 42,288 | 39,340 | 6/ |
| Imports-to-consumption ratio 5/-----percent-- | 2.40 | 2.00 | 6/ | 2.40 | 2.00 | 6/ |
| Poland: | | | | | | |
| Quantity----short tons-- | 3/ | 3/ | 7/ 13,000 | 3/ | 3/ | 7/ 23,400 |
| Imports-to-consumption ratio 5/-----percent-- | 3/ | 3/ | 3/ | 3/ | 3/ | 3/ |
| Romania: | | | | | | |
| Quantity----short tons-- | 3/ | 3/ | 9/ 26,000 | 3/ | 3/ | 9/ 13,500 |
| Imports-to-consumption ratio 5/-----percent-- | 3/ | 3/ | 3/ | 3/ | 3/ | 3/ |
| South Africa: | | | | | | |
| Quantity----short tons-- | 3/ | 3/ | 4/ 59,026 | 3/ | 3/ | 4/ 42,394 |
| Imports-to-consumption ratio 5/-----percent-- | 3/ | 3/ | 4/ 0.55 | 3/ | 3/ | 4/ 0.55 |

See footnotes at end of table.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Barcode:3883995-04 A-549-502 SCO - Scope Inquiry - Line Pipe

Table E-1.--Steel pipes and tubes: Ceilings negotiated under voluntary restraint agreements for exports shipped to the United States from certain countries, by products and sources, initial period and 1986--Continued

| Item | Initial period 1/ | | | 1986 2/ | | |
|---|---|---|---|---|---|---|
| | Standard pipes and tubes | Line pipes and tubes | Other products | Standard pipes and tubes | Line pipes and tubes | Other products |
| South Korea: | | | | | | |
| Quantity----short tons--: | 3/ | 3/ | 4/ 823,144 | 3/ | 3/ | 4/ 591,204 |
| Imports-to-consumption ratio 5/-----percent--: | 3/ | 3/ | 4/ 7.67 | 3/ | 3/ | 4/ 7.67 |
| Spain: | | | | | | |
| Quantity----short tons--: | 24,200 | 3/ | 10/ 14,137 | 17,796 | 3/ | 10/ 10,811 |
| Imports-to-consumption ratio 5/-----percent--: | 1.01 | 3/ | 10/ 0.36 | 1.01 | 3/ | 10/ 0.36 |
| Venezuela: | | | | | | |
| Quantity----short tons--: | 38,000 | 79,000 | 6/ | 7,000 | 14,000 | 6/ |
| Imports-to-consumption ratio 5/-----percent--: | 3/ | 3/ | 6/ | 3/ | 3/ | 6/ |

1/ The initial period is from Oct. 1, 1984, to Dec. 31, 1985. Forecasts for quantities that are dependent on import-to-consumption ratios are estimated by Commerce as of October 1985.

2/ Forecasts for quantities that are dependent on import-to-consumption ratios are estimated by Commerce as of December 1985 and do not include adjustments for overages shipped in the initial period.

3/ Not specified in VRA.

4/ Includes all pipes and tubes.

5/ Import-to-consumption ratios for exports allowable under VRA arrangements are established by the U.S. Department of Commerce using estimated U.S. consumption for the period.

6/ Not applicable.

7/ This is a "basket" amount that includes pipes and tubes, as well as other steel products.

8/ Includes total pipes and tubes, which may include up to 17.56 percent of oil country tubular goods (OCTG) consumption, up to 15.52 percent of line pipe and tube consumption, and up to 24.18 percent of structural pipe and tube consumption. For the initial period, the estimated ceilings on exports from Japan are 618,639 tons for OCTG; 371,394 tons for line pipes; and 214,235 tons for structural pipes and tubes. For 1986, the estimated export ceilings are 404,758 tons for OCTG; 305,278 tons for line pipes and tubes; and 154,268 tons for structural pipes and tubes.

9/ Includes all pipes and tubes except OCTG.

10/ Includes all pipes and tubes except OCTG, standard, and structural.

Source: U.S. Department of Commerce.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Barcode:3883995-04 A-549-502 SCO - Scope Inquiry - Line Pipe

Table E-2.--Steel pipes and tubes: U.S. imports for consumption, by selected sources that have signed voluntary agreements restraining their exports shipped to the United States, January-November 1984, January-November 1985, and October 1984-November 1985

(In tons)

| Source | Standard pipes and tubes 1/ | | | Line pipes and tubes 2/ | | | All pipes and tubes 3/ | | |
|---|---|---|---|---|---|---|---|---|---|
| | Jan.-Nov. 1984 | Jan.-Nov. 1985 | Oct. 1984-Nov. 1985 | Jan.-Nov. 1984 | Jan.-Nov. 1985 | Oct. 1984-Nov. 1985 | Jan.-Nov. 1984 | Jan.-Nov. 1985 | Oct. 1984-Nov. 1985 |
| Australia | 13,877 | 17,615 | 20,843 | 1,147 | 2,513 | 3,275 | 18,013 | 20,876 | 25,285 |
| Brazil | 177,354 | 46,806 | 95,056 | 18,506 | 27,125 | 40,361 | 297,582 | 197,804 | 283,307 |
| Czechoslovakia | 2,698 | 225 | 1,408 | 0 | 103 | 103 | 3,943 | 1,578 | 3,574 |
| East Germany | 67 | 0 | | 0 | 0 | 0 | 228 | 0 | 0 |
| Finland | 455 | 886 | 2,120 | 7,150 | 4,454 | 5,041 | 10,382 | 8,468 | 11,122 |
| Hungary | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Japan | 113,410 | 164,897 | 196,650 | 118,039 | 77,228 | 114,958 | 1,259,276 | 1,287,718 | 1,594,516 |
| Mexico | 93,988 | 37,539 | 51,875 | 72,261 | 28,456 | 34,969 | 278,504 | 94,934 | 134,066 |
| Poland | 1,120 | 1,483 | 3,365 | 366 | 0 | 142 | 2,327 | 1,547 | 3,571 |
| Romania | 14,297 | 21,735 | 24,241 | 478 | 288 | 524 | 54,253 | 32,974 | 47,470 |
| South Africa | 44,451 | 36,763 | 53,438 | 0 | 316 | 316 | 47,588 | 39,355 | 56,784 |
| Republic of Korea | 472,322 | 527,964 | 614,536 | 133,682 | 92,294 | 110,838 | 859,420 | 750,400 | 922,893 |
| Spain | 76,211 | 14,584 | 29,879 | 1,596 | 969 | 969 | 199,893 | 60,332 | 107,125 |
| Venezuela | 38,406 | 21,581 | 33,433 | 76,219 | 43,546 | 56,886 | 152,842 | 114,404 | 155,457 |

1/ Includes imports under TSUSA items 610.3231, 610.3232, 610.3234, 610.3241, 610.3242, 610.3243, 610.3244, 610.3247, 610.3252, 610.3254, 610.3256, 610.3258, and 610.4925.

2/ Includes imports under TSUSA items 610.3208 and 610.3209.

3/ Includes imports under TSUS items 610.30 through 610.52. This classification may differ from the pipe and tube imports subject to specific VRA export levels; hollow bars (TSUSA items 610.4800, 610.5130, and 610.5160) are included in the data presented and electrical conduit (TSUSA item 652.3300) is not.

PUBLIC DOCUMENT
Barcode:3883995-04 A-549-502 SCO - Scope Inquiry - Line Pipe
F-1

# APPENDIX F

## PREVIOUS COMMISSION INVESTIGATIONS

F-1

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Several other Commission investigations have dealt with some or all of the pipes and tubes currently under investigation. Most recently, in preliminary antidumping investigations (731-TA-292-294 (Preliminary)), the Commission made an affirmative determination on December 30, 1985, with respect to imports of standard pipes and tubes from the People's Republic of China, the Philippines, and Singapore.

The Commission notified the Department of Commerce on August 30, 1985, that there is a reasonable indication that industries in the United States are materially injured 1/ by reason of imports of welded carbon steel pipe and tube products 2/ that are alleged to be subsidized by the Governments of India, Taiwan, and Turkey (investigations Nos. 701-TA-251-253 (Preliminary). On the same date, the Commission determined that there is a reasonable indication that industries in the United States are materially injured 1/ by reason of imports of welded carbon steel pipe and tube products 3/ that are alleged to be sold in the United States at less than fair value (LTFV) from India, Taiwan, and Yugoslavia. Further, the Commission determined that there is no reasonable indication that an industry in the United States is materially injured or threatened with material injury, or that the establishment of an industry in the United States is materially retarded by reason of imports from Yugoslavia of welded carbon steel line pipes and tubes that are alleged to be sold in the United States at LTFV. 4/ Commerce made affirmative preliminary determinations of subsidies in each of the cases and the Commission instituted its final investigations. Subsequently, Commerce made negative final determinations with respect to imports from India and Taiwan and an affirmative final determination with respect to imports from Turkey (one of the instant investigations).

On April 15, 1985, the Commission notified Commerce of its preliminary determinations in investigations Nos. 731-TA-252 and 253 (Preliminary), that there is a reasonable indication that an industry in the United States is threatened with material injury by reason of imports of welded carbon steel standard pipes and tubes from Thailand and materially injured by reason of welded carbon steel line pipes and tubes from Venezuela, that are allegedly sold in the United States at LTFV. The Commission also determined, on that date, in investigation No. 701-TA-242 (Preliminary), that there is a reasonable indication that an industry in the United States is materially injured by reason of imports of standard and line pipes and tubes that are allegedly subsidized by the Government of Venezuela. Commerce made preliminary determinations effective August 13, 1985, and October 3, 1985, that line pipes and tubes from Venezuela and standard pipes and tubes from

1/ Chairwoman Stern determined that the domestic industries are materially injured or threatened with material injury.

2/ These products are standard pipes and tubes from India (investigation No. 701-TA-251 (Preliminary)); line pipes and tubes from Taiwan (investigation No. 701-TA-252 (Preliminary)); and standard and line pipes and tubes from Turkey (investigation No. 701-TA-253 (Preliminary)).

3/ These products are standard pipes and tubes from India (investigation No. 731-TA-271 (Preliminary)); line pipes and tubes from Taiwan (investigation No. 731-TA-272 (Preliminary)); standard pipes and tubes from Turkey (investigation No. 731-TA-273 (Preliminary)); and standard pipes and tubes from Yugoslavia (investigation No. 731-TA-274 (Preliminary)).

4/ Certain Welded Carbon Steel Pipes and Tubes from India, Taiwan, Turkey, and Yugoslavia: Determinations of the Commission in Investigations Nos. 701-TA-251-253 and 731-TA-271-274 . . ., USITC Publication 1742, August 1985.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Thailand, respectively, are being sold in the United States at LTFV. The Commission subsequently instituted final antidumping investigations in these cases but the Venezuela line pipe case (investigation No. 731-TA-253 (Final)) was terminated, effective December 4, 1985, upon withdrawal of the petition. The case on line pipes and tubes from Thailand (investigation No. 731-TA-252 (Final) is one of the instant investigations. Although Commerce made an affirmative preliminary subsidy determination, effective November 13, 1985, with respect to line pipes and tubes from Venezuela, the petitioners withdrew their petition on that same date; accordingly, the Commission did not institute investigation No. 701-TA-242 (Final) (50 F.R. 50852) and Commerce terminated its investigation, effective November 27, 1985.

On February 1, 1985, the Commission notified Commerce of its preliminary determination in investigation No. 731-TA-212 (Preliminary) that there is a reasonable indication that an industry in the United States is materially injured by reason of imports from Venezuela of standard pipes and tubes 1/ and that there is no reasonable indication that an industry is materially injured or threatened with material injury by reason of imports from Venezuela of line pipes and tubes 2/ that are alleged to be sold in the United States at LTFV. 3/ Commerce made a preliminary determination effective June 3, 1985, that the standard pipes and tubes from Venezuela were being sold in the United States at LTFV. The Commission subsequently instituted final investigation No. 731-TA-212 (Final), but this case was terminated, effective October 22, 1985, upon withdrawal of the petition.

On August 22, 1984, the Commission made a preliminary determination in investigation No. 701-TA-220 (Preliminary) that there was a reasonable indication that an industry in the United States was materially injured by reason of allegedly subsidized imports of small circular and light-walled rectangular pipes and tubes from Spain. 4/ In addition, in investigations Nos. 731-TA-197 and 198 (Preliminary), 5/ the Commission found that there was a reasonable indication that an industry in the United States was materially injured by reason of imports from Spain of small circular and light-walled rectangular pipes and tubes allegedly sold at LTFV and by reason of imports from Brazil of small circular pipes and tubes allegedly sold at LTFV. 6/ However, the pipes and tubes in the present investigations cover a wider range of circular pipe and tube than was included in the investigations involving Spain and Brazil.

---

1/ Chairwoman Stern determined that there is a reasonable indication that an industry in the United States is materially injured or threatened with material injury by reason of the subject imports.

2/ Commissioners Eckes and Lodwick dissented.

3/ Certain Welded Carbon Steel Pipes and Tubes from Taiwan and Venezuela: Determinations of the Commission in investigations Nos. 731-TA-211 and 212 (Preliminary). . ., USITC Publication 1639, February 1985.

4/ The final Commission investigation on these products was instituted on Oct. 17, 1984, and terminated on Feb. 4, 1985, subsequent to the withdrawal of the petition.

5/ Certain Welded Carbon Steel Pipes and Tubes from Brazil and Spain: Determinations of the Commission in Investigations Nos. 701-TA-220 and 731-TA-197 and 198 (Preliminary). . ., USITC Publication 1569, August 1984.

6/ The final Commission investigations on these products were instituted on Jan. 29, 1985, and terminated on Feb. 4, 1985 (Spain), and Mar. 20, 1985 (Brazil), subsequent to the withdrawal of the petitions.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

On June 12, 1984, the Commission found in investigation No. TA-201-51 (Carbon and Certain Alloy Steel Products) that, under section 201 of the Trade Act of 1974, the domestic steel pipe and tube industry was experiencing serious injury. However, the Commission determined that imports of certain steel pipes and tubes were not being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or threat thereof, to the domestic industry producing articles like or directly competitive with the imported articles. 1/ The steel pipes and tubes that were the subject of the section 201 investigation included the welded carbon steel pipes and tubes that are the subject of the instant investigations, as well as other pipes and tubes that are not the subject of these investigations.

On April 17, 1984, the Commission determined in investigations Nos. 731-TA-131 and 132 (Final) that an industry in the United States was materially injured by reason of imports from Korea and Taiwan of small circular pipes and tubes that had been found by Commerce to be sold in the United States at LTFV. 2/ The present investigations cover other circular pipes and tubes as well as those covered in these previous investigations.

On February 8, 1983, the Commission determined that an industry in the United States was materially injured by reason of imports of certain welded carbon steel pipes and tubes that were found by Commerce to be subsidized by the Government of Korea. That investigation covered certain circular pipes and tubes (including American Petroleum Institute (API) line pipe) up to 16 inches in outside diameter, which includes most of the circular pipes and tubes in the current investigations. 3/

A complete list of standard and line pipe and tube investigations conducted by the Commission since 1982 is shown in table F-1.

---

1/ Carbon and Certain Alloy Steel Products: Report to the President on Investigation No. TA-201-51. . ., USITC Publication 1553, July 1984.
2/ Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea and Taiwan: Determinations of the Commission in Investigations Nos. 731-TA-131, 132, and 138 (Final). . ., USITC Publication 1519, April 1984.
3/ Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Determination of the Commission in Investigation No. 701-TA-168 (Final) . . ., USITC Publication 1345, February 1983.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Table F-1.--Standard and line pipes and tubes: Title VII investigations by the U.S. International Trade Commission, 1982-85

| Year and type of investigation | Investigation No. | Country | Type of welded carbon steel pipes and tubes | Dates of-- Petition | Commission preliminary determination | Commission final determination |
|---|---|---|---|---|---|---|
| 1982: | | | | | | |
| Countervailing duty. | 701-TA-165 | Brazil | Standard and line (to 16" OD). | 5-7-82 | 6-21-82 (aff) | 12-27-82. 1/ |
| Countervailing duty. | 701-TA-167 | Italy | Standard and line (all sizes). | 5-7-82 | 6-21-82 (neg) | |
| Countervailing-duty. | 701-TA-168 | Korea | Standard and line (to 16" OD). | 5-7-82 | 6-21-82 (aff) | 2-8-83 (aff). |
| 1983: | | | | | | |
| Antidumping---- | 2/ 731-TA-131 | Korea | Standard (to 4.5" OD). | 4-21-83 | 6-6-83 (aff) | 4-30-84 (aff). |
| Antidumping---- | 2/ 731-TA-132 | Taiwan | Standard (to 4.5" OD). | 4-21-83 | 6-6-83 (aff) | 4-30-84 (aff). |
| 1984: | | | | | | |
| Antidumping---- | 731-TA-197 | Brazil | Standard (to 4.5" OD). | 7-17-84 | 8-31-84 (aff) | 3-20-85. 3/ |
| Antidumping---- | 2/ 731-TA-198 | Spain | Standard (to 4.5" OD). | 7-17-84 | 8-31-84 (aff) | 2-4-85. 3/ |
| Countervailing duty. | 2/ 701-TA-220 | Spain | Standard (to 4.5" OD). | 7-17-84 | 8-31-84 (aff) | 2-4-85. 3/ |
| Antidumping----- | 731-TA-212 | Venezuela | Standard (to 16" OD). | 12-18-84 | 2-1-85 (aff) | 10-22-85 3/ |
| | | | Line (to 16" OD). | | 2-1-85 (neg) | |
| 1985: | | | | | | |
| Antidumping----- | 731-TA-252 | Thailand | Standard (to 16" OD). | 2-28-85 | 4-15-85 (aff) | Pending. |
| Antidumping---- | 731-TA-253 | Venezuela | Line (to 16" OD). | 2-28-85 | 4-15-85 (aff) | 12-4-85. 3/ |
| Countervailing duty. | 701-TA-242 | Venezuela | Standard and line (to 16" OD). | 2-28-85 | 4-15-85 (aff) | 11-27-85. 3/ |
| Antidumping---- | 731-TA-271 | India | Standard (to 16" OD). | 7-16-85 | 8-30-85 (aff) | Pending. |
| Countervailing duty. | 701-TA-251 | India | Standard (to 16" OD). | 7-16-85 | 8-30-85 (aff) | 4/ |
| Antidumping---- | 731-TA-272 | Taiwan | Line (to 16" OD). | 7-16-85 | 8-30-85 (aff) | Pending. |
| Countervailing duty. | 701-TA-252 | Taiwan | Line (to 16" OD). | 7-16-85 | 8-30-85 (aff) | 4/ |
| Antidumping---- | 731-TA-273 | Turkey | Standard (to 16" OD). | 7-16-85 | 8-30-85 (aff) | Pending. |
| | | | Line (to 16" OD). | | 8-30-85 (aff) | Pending. |
| Countervailing duty. | 701-TA-253 | Turkey | Standard (to 16" OD). | 7-16-85 | 8-30-85 (aff) | Pending. |
| | | | Line (to 16" OD). | | 8-30-85 (aff) | Pending. |
| Antidumping---- | 731-TA-274 | Yugoslavia | Standard (to 16" OD). | 7-16-85 | 8-30-85 (aff) | Pending. |
| | | | Line (to 16" OD). | | 8-30-85 (neg) | |
| Antidumping---- | 731-TA-292 | China | Standard (to 16" OD). | 11-13-85 | 12-30-85 | Pending. |
| Antidumping---- | 731-TA-293 | Philippines | Standard (to 16" OD). | 11-13-85 | 12-30-85 | Pending. |
| Antidumping---- | 731-TA-294 | Singapore | Standard (to 16" OD). | 11-13-85 | 12-30-85 | Pending. |

1/ Suspended.
2/ Other products were also included within the scope of this investigation.
3/ Terminated.
4/ Negative determination by Commerce.

Source: U.S. International Trade Commission.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

PUBLIC DOCUMENT
Barcode:3883995-04 A-549-502 SCO - Scope Inquiry - Line Pipe

F-6
Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

**Attachment 6**

Tariff Schedules of the United States, Annotated
(TSUSA) (1985 version)

Barcode:3883995-05 A-549-502 SCO - Scope Inquiry - Line Pipe

# TARIFF SCHEDULES OF THE UNITED STATES ANNOTATED (1985)

USITC PUBLICATION 1610

United States International Trade Commission / Washington, D.C. 20436

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

SCHEDULE 6. - METALS AND METAL PRODUCTS
Part 2. - Metals, Their Alloys, and Their Basic Shapes and Forms

6 - 2 - B
610.30 - 610.32

| Item | Stat. Suf-fix | Articles | Units of Quantity | Rates of Duty 1 | Rates of Duty Special | Rates of Duty 2 |
|---|---|---|---|---|---|---|
| | | Pipes and tubes and blanks therefor, all the foregoing of iron (except cast iron) or steel: | | | | |
| | | Welded, jointed, or seamed, with walls not thinner than 0.065 inch, and of circular cross section: | | | | |
| | | Other than alloy iron or steel: | | | | |
| 610.30 | 00 | Under 0.25 inch in outside diameter...... | Lb...... | 5.2% ad val. | 4.5% ad val.(D) Free (E,I) | 13% ad val. |
| 610.31 | 00 | 0.25 inch or more but under 0.375 inch in outside diameter.................. | Lb...... | 2.8% ad val. | 2.6% ad val.(D) Free (E,I) | 6.5% ad val. |
| 610.32 | | 0.375 inch or more in outside diameter... | ........ | 1.9% ad val. | Free (E,I) | 5.5% ad val. |
| | 05 | Suitable for use in boilers, superheaters, heat exchangers, condensers, and feedwater heaters... | Lb. | | | |
| | | Other: | | | | |
| | | Conforming to A.P.I. specifications for line pipe (Std. 5L, 5LS, or 5LX): | | | | |
| | 08 | Not over 4.5 inches in outside diameter....... | Lb. | | | |
| | 09 | Over 4.5 inches but not over 16 inches in outside diameter....... | Lb. | | | |
| | 12 | Over 16 but under 24 inches in outside diameter.................. | Lb. | | | |
| | 13 | Over 24 inches in outside diameter.............. | Lb. | | | |
| | | Conforming to A.P.I. specifications for oil well tubing: | | | | |
| | 16 | Imported with coupling.... | Lb. | | | |
| | 19 | Other..................... | Lb. | | | |
| | 21 | Cold drawn pipes and tubes..... | Lb. | | | |
| | | Other: | | | | |
| | 27 | Cold rolled pipes and tubes with wall thickness not exceeding 0.1 inch........................ | Lb. | | | |
| | | Other: | | | | |
| | | Not over 4.5 inches in outside diameter: | | | | |
| | 31 | Galvanized, imported with coupling......... | Lb. | | | |
| | | Other, imported with coupling: | | | | |
| | 33 | With upset ends....... | Lb. | | | |
| | 34 | Other...... | Lb. | | | |
| | 41 | Other, galvanized............ | Lb. | | | |
| | 42 | Other than galvanized, valued less than 16¢ per pound....... | Lb. | | | |
| | 43 | Other than galvanized, valued 16¢ and over per pound and less than 40,000 P.S.I. minimum yield strength.. | Lb. | | | |

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

SCHEDULE 6. - METALS AND METAL PRODUCTS
Part 2. - Metals, Their Alloys, and Their Basic Shapes and Forms

| Item | Stat. Suf-fix | Articles | Units of Quantity | Rates of Duty 1 | Rates of Duty Special | Rates of Duty 2 |
|---|---|---|---|---|---|---|
| | | Pipes and tubes and blanks therefor, all the foregoing of iron (except cast iron) or steel (con.): | | | | |
| | | Welded, jointed, or seamed, with walls not thinner than 0.065 inch, and of circular cross section (con.): | | | | |
| | | Other than alloy iron or steel (con.): | | | | |
| 610.32 (con.) | | 0.375 inch or more in outside diameter (con.) | | | | |
| | | Other (con.): | | | | |
| | | Other (con.): | | | | |
| | | Other (con.): | | | | |
| | | Not over 4.5 inches in outside diameter (con.): | | | | |
| | | Other than galvanized, valued 16¢ and over per pound and 40,000 P.S.I. and over minimum yield strength: | | | | |
| | 49 | With upset ends....... | Lb. | | | |
| | 52 | Other...... | Lb. | | | |
| | | Over 4.5 but not over 16 inches in outside diameter: | | | | |
| | 54 | Having a minimum yield strength of less than 40,000 P.S.I.... | Lb. | | | |
| | 56 | Having a minimum yield strength of 40,000 P.S.I. and over, imported with coupling......... | Lb. | | | |
| | 58 | Other........... | Lb. | | | |
| | | Over 16 inches in outside diameter: | | | | |
| | 62 | Having a minimum yield strength of less than 40,000 P.S.I.... | Lb. | | | |
| | 64 | Other........... | Lb. | | | |
| | | Alloy iron or steel: | | | | |
| 610.35 | 00 | Under 0.25 inch in outside diameter...... | Lb...... | 4.1% ad val. + additional duties (see headnote 4) | 3.7% ad val. + additional duties (see headnote 4)(D) Free (E,I) | 10% ad val. + additional duties (see headnote 4) |
| 610.36 | 00 | 0.25 inch or more but under 0.375 inch in outside diameter.................. | Lb...... | 3.9% ad val. + additional duties (see headnote 4) | 3.5% ad val. + additional duties (see headnote 4)(D) Free (E,I) | 9.5% ad val. + additional duties (see headnote 4) |

(3rd supp. 9/1/85)

PUBLIC DOCUMENT
Barcode:3883985-05 A-549-502 SCO - Scope Inquiry - Line Pipe
TARIFF SCHEDULES OF THE UNITED STATES ANNOTATED (1985)

Page 6-46

SCHEDULE 6. - METALS AND METAL PRODUCTS
Part 2. - Metals, Their Alloys, and Their Basic Shapes and Forms

6 - 2 - B
610.37 - 610.40

| Item | Stat. Suf-fix | Articles | Units of Quantity | Rates of Duty 1 | Special | 2 |
|---|---|---|---|---|---|---|
| | | Pipes and tubes and blanks therefor, all the foregoing of iron (except cast iron) or steel (con.): | | | | |
| | | Welded, jointed, or seamed, with walls not thinner than 0.065 inch, and of circular cross section (con.): | | | | |
| | | Alloy iron or steel (con.): | | | | |
| 610.37 | | 0.375 inch or more in outside diameter... | ........ | 4.9% ad val. + additional duties (see headnote 4) | Free (E,I) | 10% ad val. + additional duties (see headnote 4) |
| | | Suitable for use in boilers, superheaters, heat exchangers, condensers, and feedwater heaters: | | | | |
| | 01 | Stainless steel.................. | Lb. | | | |
| | 04 | Other............................ | Lb. | | | |
| | | Other: | | | | |
| | | Conforming to A.P.I. specifications for line pipe (Std. 5L, 5LX, 5LS): | | | | |
| | 11 | Not over 4.5 inches in outside diameter.......... | Lb. | | | |
| | 12 | Over 4.5 but not over 16 inches in outside diameter.................. | Lb. | | | |
| | 13 | Over 16 inches in outside diameter............ | Lb. | | | |
| | | Conforming to A.P.I. specifications for oil well tubing: | | | | |
| | 21 | Imported with coupling.... | Lb. | | | |
| | 22 | Other..................... | Lb. | | | |
| | | Cold drawn pipes and tubes: | | | | |
| | 27 | Stainless steel........... | Lb. | | | |
| | 28 | Other..................... | Lb. | | | |
| | | Other: | | | | |
| | | Cold rolled pipes and tubes with wall thickness not exceeding 0.1 inch: | | | | |
| | 31 | Stainless steel...... | Lb. | | | |
| | 32 | Other................ | Lb. | | | |
| | | Other: | | | | |
| | | Stainless steel: | | | | |
| | 41 | Not over 4.5 inches in outside diameter... | Lb. | | | |
| | 42 | Over 4.5 inches in outside diameter........ | Lb. | | | |
| | 51 | Other................ | Lb. | | | |
| | | Other: | | | | |
| | | Steel pipe conforming to A.P.I. specifications for oil well casing and steel pipes and tubes of rectangular cross section, whether welded or seamless, having a wall thickness not less than 0.156 inch: | | | | |
| | | Not threaded and not otherwise advanced: | | | | |
| 610.39 | | Other than alloy steel.............. | ........ | 0.5% ad val. | Free (E,I) | 1% ad val. |
| | | Oil well casing: | | | | |
| | 25 | Seamless................... | Lb. | | | |
| | 35 | Other...................... | Lb. | | | |
| | | Other: | | | | |
| | 45 | Seamless................... | Lb. | | | |
| | 55 | Other...................... | Lb. | | | |
| 610.40 | | Alloy steel.......................... | ........ | 3.6% ad val. + additional duties (see headnote 4) | 3.3% ad val. + additional duties (see headnote 4)(D) Free (E,I) | 8.3% ad val. + additional duties (see headnote 4) |
| | | Oil well casings: | | | | |
| | 25 | Seamless.............. | Lb. | | | |
| | 35 | Other................. | Lb. | | | |
| | | Other: | | | | |
| | 45 | Seamless.............. | Lb. | | | |
| | 55 | Other................. | Lb. | | | |

(3rd supp. 9/1/85)

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

PUBLIC DOCUMENT
TARIFF SCHEDULES OF THE UNITED STATES ANNOTATED (1985)
Barcode:3883055-06 A-549-502 SCO - Scope Inquiry - Line Pipe

SCHEDULE 6. - METALS AND METAL PRODUCTS
Part 2. - Metals, Their Alloys, and Their Basic Shapes and Forms
Page 6-47
6 - 2 - B
610.42 - 610.49

| Item | Stat. Suf-fix | Articles | Units of Quantity | Rates of Duty 1 | Special | 2 |
|---|---|---|---|---|---|---|
| | | Pipes and tubes and blanks therefor, all the foregoing of iron (except cast iron) or steel (con.): | | | | |
| | | Other (con.): | | | | |
| | | Steel pipe conforming to the A.P.I. specifications for oil well casing and steel pipes and tubes of rectangular cross section, whether welded or seamless, having a wall thickness not less than 0.156 inch (con.): | | | | |
| | | Threaded or otherwise advanced: | | | | |
| 610.42 | | Other than alloy steel............... | ......... | 6.5% ad val. | 5% ad val.(D) Free (E,I) | 20% ad val. |
| | | Oil well casing: | | | | |
| | 25 | Seamless..................... | Lb. | | | |
| | 35 | Other........................ | Lb. | | | |
| | | Other: | | | | |
| | 45 | Seamless..................... | Lb. | | | |
| | 55 | Other........................ | Lb. | | | |
| 610.43 | | Alloy steel........................ | ......... | 7.8% ad val. + additional duties (see headnote 4) | 6.2% ad val. + additional duties (see headnote 4)(D) Free (E,I) | 28% ad val. + additional duties (see headnote 4) |
| | | Oil well casing: | | | | |
| | 25 | Seamless..................... | Lb. | | | |
| | 35 | Other........................ | Lb. | | | |
| | | Other: | | | | |
| | 45 | Seamless..................... | Lb. | | | |
| | 55 | Other........................ | Lb. | | | |
| | | Other: | | | | |
| | | Suitable for use in the manufacture of ball or roller bearings: | | | | |
| 610.45 | 00 | Other than alloy iron or steel..... | Lb...... | 7.8% ad val. | 6.2% ad val.(D) Free (E,I) | 25% ad val. |
| 610.46 | 00 | Alloy iron or steel................ | Lb...... | 8.8% ad val. + additional duties (see headnote 4) | 6.7% ad val. + additional duties (see headnote 4)(D) Free (E,I) | 33% ad val. + additional duties (see headnote 4) |
| | | Not suitable for use in the manufacture of ball or roller bearings: | | | | |
| | | Other than alloy iron or steel: | | | | |
| 610.48 | 00 | Hollow bars.................... | Lb...... | 7.8% ad val. | 6.2% ad val.(D) Free (E,I) | 22% ad val. |
| 610.49 | | Other.......................... | ......... | 8.8% ad val. | 8% ad val.(D) Free (E,I) | 25% ad val. |
| | 20 | Seamless, suitable for use in boilers, superheaters, heat exchangers, condensers, refining furnaces, and feedwater heaters.................. | Lb. | | | |
| | | Welded, jointed, or seamed pipes and tubes: | | | | |
| | 25 | Of circular cross section............. | Lb. | | | |
| | 28 | Other................ | Lb. | | | |
| | | Other: | | | | |
| | | Conforming to A.P.I. specifications for line pipe (Std. 5L, 5LX, or 5LS): | | | | |
| | 31 | Not over 4.5 inches in outside diameter.... | Lb. | | | |
| | 33 | Over 4.5 inches but not over 16 inches in outside diameter... | Lb. | | | |
| | 36 | Over 16 inches in outside diameter....... | Lb. | | | |
| | | Conforming to A.P.I. specifications for oil well tubing: | | | | |
| | 42 | Imported with coupling......... | Lb. | | | |
| | 44 | Other........... | Lb. | | | (3rd supp. 9/1/85) |

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

SCHEDULE 6. - METALS AND METAL PRODUCTS
Part 2. - Metals, Their Alloys, and Their Basic Shapes and Forms

| Item | Stat. Suf-fix | Articles | Units of Quantity | Rates of Duty 1 | Special | 2 |
|---|---|---|---|---|---|---|
| | | Pipes and tubes and blanks therefor, all the foregoing of iron (except cast iron) or steel (con.): | | | | |
| | | Other (con.): | | | | |
| | | Other (con.): | | | | |
| | | Not suitable for use in the manufacture of ball or roller bearings (con.): | | | | |
| | | Other than alloy iron or steel (con.): | | | | |
| 610.49 (con.) | | Other (con.) | | | | |
| | | Other (con.): | | | | |
| | 46 | Conforming to A.P.I. specifications for oil well drill pipe.. | Lb. | | | |
| | 48 | Cold drawn pipes and tubes................ | Lb. | | | |
| | | Other: | | | | |
| | | Of circular cross section, not over 4.5 inches in outside diameter: | | | | |
| | 51 | Galvanized, imported with coupling....... | Lb. | | | |
| | 53 | Galvanized, not imported with coupling... | Lb. | | | |
| | 54 | Other, with upset ends. | Lb. | | | |
| | 55 | Other, valued under 22.5¢ per pound.. | Lb. | | | |
| | 56 | Other, valued 22.5¢ per pound and over, with a minimum yield strength of less than 40,000 P.S.I...... | Lb. | | | |
| | 57 | Other...... | Lb. | | | |
| | | Of circular cross section, over 4.5 inches, but not over 16 inches, in outside diameter: | | | | |
| | 66 | Valued under 22.5¢ per pound.. | Lb. | | | |

(3rd supp. 9/1/85)

PUBLIC DOCUMENT
Barcode:3883993-05 A-549-502 SCO - Scope Inquiry - Line Pipe
TARIFF SCHEDULES OF THE UNITED STATES ANNOTATED (1985)

SCHEDULE 6. - METALS AND METAL PRODUCTS
Part 2. - Metals, Their Alloys, and Their Basic Shapes and Forms

Page 6-49

6 - 2 - B
610.49 - 610.51

| Item | Stat. Suf-fix | Articles | Units of Quantity | Rates of Duty 1 | Special | 2 |
|---|---|---|---|---|---|---|
| 610.49 (con.) | | Pipes and tubes and blanks therefor, all the foregoing of iron (except cast iron) or steel (con.): Other (con.): Other (con.): Not suitable for use in the manufacture of ball or roller bearings (con.): Other than alloy iron or steel (con.): Other (con.) Other (con.): Other (con.): Of circular cross section, over 4.5 inches, but not over 16 inches, in outside diameter (con.): | | | | |
| | 67 | Valued 22.5c per pound and over and having a minimum yield strength of less than 40,000 P.S.I...... | Lb. | | | |
| | 68 | Valued 22.5c per pound and over and having a minimum yield strength of 40,000 P.S.I. and over, imported with coupling... | Lb. | | | |
| | 69 | Other...... | Lb. | | | |
| | 70 | Of circular cross section, over 16 inches in outside diameter........ | Lb. | | | |
| | 76 | Other........... | Lb. | | | |
| | | Alloy iron or steel: | | | | |
| 610.51 | | Hollow bars..................... | ........ | 9.3% ad val. + additional duties (see headnote 4) | 7.5% ad val. + additional duties (see headnote 4)(D) Free (E,I) | 30% ad val. + additional duties (see headnote 4) |
| | 30 | Stainless steel and heat resisting steel...... | Lb. | | | |
| | 60 | Other..................... | Lb. | | | |

(3rd supp. 9/1/85)

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

**Attachment 7**

*Certain Welded Non-Alloy Steel Pipes And Tubes From Brazil, India, South Korea, Mexico, Taiwan, Thailand, Turkey And Venezuela (Review)*, Prehearing Brief of Wheatland Tube et al (Feb. 29, 2000)

PUBLIC DOCUMENT

Barcode:3883995-05 A-549-502 SCO - Scope Inquiry - Line Pipe

**SCHAGRIN ASSOCIATES**
1100 FIFTEENTH STREET, N.W.
SUITE 700
WASHINGTON, D.C. 20005
(202) 223-1700

FAX (202) 429-2522

EMAIL: schagrin@erols.com

Case Nos.
731-TA-132 731-TA-273
731-TA-252 731-TA-532
701-TA-253 731-TA-533
731-TA-271 731-TA-534
731-TA-536 731-TA-537
731-TA-276 731-TA-277
731-TA-296 731-TA-409
731-TA-410
Sunset Reviews
Total Pages: 232
**Public Version**

Bei CBI 00-303

1 March 2000

The Honorable Donna R. Koehnke
Secretary
U.S. International Trade Commission
500 E Street, S.W., Room 112
Washington, D.C. 20436

DOCKET

'00 MAR -1 P3:5

RECEIVED
OFC OF THE SECRETARY
US ITC

Re: *Certain Pipes and Tubes from Argentina, Brazil, Canada, India, Korea, Mexico, Singapore, Taiwan, Thailand, Turkey, and Venezuela*

Dear Madame Secretary:

On behalf of Petitioners we hereby submit an original and four copies of the public version of our prehearing brief for filing in the above-referenced investigation. Our submission consists of three sections for the three different like products. Business Proprietary Information has been deleted from this submission. This submission has been served in accordance with the enclosed public certificate of service.

Should you have any questions regarding this submission, please do not hesitate to contact me.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

PUBLIC DOCUMENT
Barcode:3883995-05 A-549-502 SCO - Scope Inquiry - Line Pipe

Respectfully submitted,

Roger B. Schagrin
Counsel to Petitioners

Enclosures

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Barcode:3883995-05 A-549-502 SCO - Scope Inquiry - Line Pipe

CERTIFICATE OF SERVICE

I, Nicholas A. Kessler, do hereby certify that I did, on this 1st day of March 2000, cause a copy of the foregoing public information to be served to the following parties via hand delivery:

Arthur J. Lafave
DICKSTEIN, SHAPIRO & OSHINSKY
2101 L Street, N.W.
Washington D.C. 20037-1526

Walter J. Spak
WHITE & CASE
601 Thirteenth Street, N.W.
Suite 600 South
Washington D.C. 20005-3807

Julie C. Mendoza
KAY, SCHOLER, FIERMAN, HAYS & HANDLER
901 Fifteenth Street, N.W.
Suite 1100
Washington D.C. 20005-2327

Michael J. Chapman
SHEARMAN & STERLING
801 Pennsylvania Avenue, N.W.
Washington D.C. 20004-2604

William Silverman
CLIFFORD, CHANCE, ROGERS & WELLS
607 Fourteenth Street, N.W.
Washington D.C. 20005-2018

John J. Mangan
SKADDEN, ARPS, SLATE, MEAGHER & FLOM
1440 New York Avenue, N.W.
Washington D.C. 20005-2111

Marc S. McConnell
HOGAN & HARTSON, LLP
555 Thirteenth Street, N.W.
Washington D.C. 20004-1109

Charles Owen Verrill, Jr.
WILEY, REIN & FIELDING
1776 K Street, N.W.
Washington, D.C. 20006

Christopher Dunn
WILLKIE, FARR & GALLAGHER
Three Lafayette Center
1155 21st Street, NW
Washington, DC 20036-3384

Nicholas A. Kessler

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

PUBLIC DOCUMENT

Investigation Nos. 701-TA-253, 731-TA-132, 252, 271, 273, 276, 277, 296, 409, 410, 532, 533, 534, 536, and 537

No. of Pages: 140
Sunset Review
Business Proprietary Information Has Been Deleted From Pages 14, 16, 22-23, 26-28, 30-31, 57-58, 61.

BEFORE THE
UNITED STATES INTERNATIONAL TRADE COMMISSION

CERTAIN PIPE AND TUBE FROM ARGENTINA, BRAZIL, CANADA, INDIA, KOREA, MEXICO, SINGAPORE, TAIWAN, THAILAND, TURKEY, AND VENEZUELA
Inv. Nos. 701-TA-253 (Review) and 731-TA-132, 252, 271, 273, 276, 277, 296, 409, 410, 532-534, 536, and 537 (Review)

VOLUME 1 of 3

---

# CERTAIN WELDED NON-ALLOY STEEL PIPES AND TUBES FROM BRAZIL, INDIA, SOUTH KOREA, MEXICO, TAIWAN, THAILAND, TURKEY AND VENEZUELA

---

**ANTIDUMPING DUTY SUNSET REVIEW**
**PUBLIC VERSION**

PREHEARING BRIEF

DOMESTIC PRODUCERS:

Allied Tube & Conduit Corporation
Century Tube Corporation
Ipsco Tubular, Inc.
LTV Steel Tubular Products Company
Maverick Tube Corporation
Sawhill Tubular Division--Armco, Inc.
Sharon Tube Company
Western Tube & Conduit Corporation
Wheatland Tube Company

COUNSEL:

Schagrin Associates
1100 Fifteenth St., NW
Suite 700
Washington, D.C. 20005
(202) 223-1700

ECONOMISTS:

Dr. Robert Feinberg
Dr. Robert Scott

February 29, 2000

Barcode:3883995-05 A-549-502 SCO - Scope Inquiry - Line Pipe

**Public Version**

I. SUMMARY . . . . . 1

II. LEGAL STANDARDS . . . . . 3

III. THE COMMISSION'S FINDINGS IN THE PRIOR INJURY DETERMINATIONS SUPPORT CONTINUATION OF THE ORDERS . . . . . 4

A. The Injured State of the Industry Prior to the Order . . . . . 4

1. Volume of imports. . . . . . 6

2. Price effects. . . . . . 8

3. Impact on the domestic industry. . . . . . 9

a. Companies exiting the industry. . . . . . 9

b. Declining profitability. . . . . . 10

c. Declining employment. . . . . . 11

d. Decreasing capital expenditures. . . . . . 11

4. Dumping in third countries. . . . . . 12

IV. THE ORDERS UNDER REVIEW LED TO SUBSTANTIAL IMPROVEMENTS IN THE CONDITION OF THE DOMESTIC INDUSTRY . . . . . 13

V. THE DOMESTIC INDUSTRY IS HIGHLY SUSCEPTIBLE TO UNFAIR IMPORT COMPETITION DUE TO A COST-PRICE SQUEEZE . . . . . 15

VI. LIKELY VOLUME OF IMPORTS IN THE ABSENCE OF ANTIDUMPING AND COUNTERVAILING DUTY ORDERS . . . . . 16

A. Imports From All Subject Countries Should Be Cumulated . . . . . 19

1. Legal standards . . . . . 19

2. The imports are fungible with each other and with the domestic product. . . . . . 20

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

PUBLIC DOCUMENT
Barcode:3883995-05 A-549-502 SCO - Scope Inquiry - Line Pipe

**Public Version**

3. The imported and domestic products compete in the same geographic markets. . . . . 23

4. The imported and domestic products are sold in identical channels of distribution. . . . . 23

5. The imported and domestic products were simultaneously present. . . . . 24

6. Cumulation summary. . . . . 24

B. Historical Data On Pre-Case, Pre-VRA Era Suggests the Level Of Imports If Orders Are Revoked . . . . . 24

C. Excess Production Capacity in Foreign Countries . . . . . 26

1. India . . . . . 27

2. Korea . . . . . 28

3. Mexico . . . . . 30

4. Turkey . . . . . 31

5. Venezuela . . . . . 31

6. Brazil . . . . . 32

7. Taiwan . . . . . 32

8. Thailand . . . . . 33

C. Barriers To Importation Of This Merchandise Into Other World Markets . . . . . 34

1. Changes in GDP in subject countries and other export markets compared with the United States. . . . . 35

2. Changes in construction demand. . . . . 47

ii

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

3. Reduced construction demand in the rest of the world -- subject countries. . . . . 49

4. Antidumping duties in foreign countries. . . . . 56

D. Shift Of Production Facilities Used For Other Products . . . . . 57

1. Shift from line pipe. . . . . 58

2. Shift from OCTG due to orders. . . . . 59

VII. REVOCATION OF THE ORDERS WOULD LIKELY HAVE ADVERSE PRICE EFFECTS . . . . . 60

VIII. USE OF ADVERSE INFERENCES AGAINST FOREIGN PRODUCERS NOT SUBMITTING INFORMATION . . . . . 62

IX. MAGNITUDE OF MARGIN OF DUMPING AND NET COUNTERVAILABLE SUBSIDY; NATURE OF COUNTERVAILABLE SUBSIDY . . . . . 64

X. CONCLUSION . . . . . 65

Barcode:3883995-05 A-549-502 SCO - Scope Inquiry - Line Pipe

**Public Version**

Allied Tube & Conduit ("Allied"), Century Tube Corporation ("Century Tube"), Ipsco Tubulars, Inc. ("Ipsco"), Wheatland Tube Company ("Wheatland"), Maverick Tube Corporation ("Maverick"), LTV Steel Tubular Products, Inc. ("LTV"), Sharon Tube Company ("Sharon"), Sawhill Tubular ("Sawhill"), and Western Tube & Conduit Corporation ("Western") (collectively referred to as "the domestic interested parties"), through counsel, hereby submit their prehearing brief in connection with the Commission's five-year ("sunset") review of the above-referenced antidumping duty orders on standard and structural pipe and tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, Turkey, and Venezuela and the countervailing duty order on Turkey.

## I. SUMMARY

The domestic industry producing standard pipe owes its very existence to the relief afforded by the antidumping and countervailing duty orders that are now subject to this sunset review. In the late 1970s and early 1980s, the industry lost a dozen mills, capacity had fallen to a level insufficient to supply the U.S. market, and imports were taking 60 percent of the market. The industry that survived was mired in losses. Dumping orders and VRAs begun in 1983 and 1994 saved the industry.

By the end of the VRA program in early 1992, the industry showed signs of recovery. Capacity had increased as new mills were added and some shuttered mills, like the former Van Huffel Tube and Kaiser Steel, were reopened. The industry was profitable, and the U.S. industry had regained more than a quarter of the market. But the standard pipe industry was

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

the first segment of the steel industry to recognize the import surges that would occur after VRAs terminated and filed cases against imports from six countries, which resulted in orders against five.

That relief allowed the industry to continue making investments in new capacity, to serve a market that grew throughout the 1990s because of sustained economic growth. The industry even hit double digit operating profits of 10.5 percent in 1997. Yet even with antidumping orders in effect, the industry has been adversely impacted by foreign producers reducing prices to the United States, increasing their volume of exports, and underselling the U.S. industry because of plummeting demand at home. The effect of these increased subject imports was lower domestic shipments. The domestic industry has responded by asking for administrative reviews in 1998 of Thailand, Taiwan, and Mexico, which demonstrated increased rates of dumping, and has asked for 1999 reviews of Korea, Taiwan, and Mexico.

Obviously, without antidumping orders in effect, producers in Brazil and Venezuela, as well as many other producers in subject countries that have high margins and were unable to ship to the United States during the years 1997 - 1999 despite their slumping home markets, would have exported huge quantities to the United States. The U.S. industry is especially vulnerable because standard pipe is an easily penetrated commodity product sold based on price, and the domestic industry is currently facing a cost-price squeeze caused by rising raw material costs. Because the President has recently imposed restrictions on line pipe pursuant to Section 201, the industry will also face product shifting from line pipe to standard pipe. Also,

as discussed in detail below, a decline in construction demand in the United States contributes to the industry's vulnerability. In sum, the sunset of these orders will roll the clock back to the early 1980s and the industry will be quickly decimated again by surging dumped imports.

## II. LEGAL STANDARDS

Under the Uruguay Round Agreements Act, the Commission has the responsibility of determining in a five-year review whether the revocation of antidumping orders on standard pipe would be likely to lead to continuation or recurrence of material injury. 19 U.S.C. §§ 1675(d)(2), 1675a(a)(1). The Statement of Administrative Action explains how this standard is construed:

> The determination called for ... is inherently predictive and speculative. There may be more than one likely outcome following revocation ... The possibility of other likely outcomes does not mean that a determination that revocation is likely to lead to continuation or recurrence of ... injury is erroneous, as long as the determination of likelihood of continuation or recurrence is reasonable in light of the facts of the case. In such situations, the order or suspended investigation will be continued.

Statement of Administrative Action, H.R. Doc. 103-316, 103d Cong., 2d Sess. ("SAA") at 833. The URAA lists several factors which the Commission must take into account when deciding, under the "likelihood of injury" standard, whether the continuation of the order is warranted. These factors are "the likely volume, price effect and impact of imports of the subject merchandise on the industry if the order is revoked ..." 19 U.S.C. § 1675a(a)(1).

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

PUBLIC DOCUMENT

The Commission shall consider the likely volume, price effect, and impact of imports of the subject merchandise on the industry if the order is revoked or the suspended investigation is terminated. The Commission shall take into account -

(A) its prior injury determinations, including the volume, price effect, and impact of imports of the subject merchandise on the industry before the order was issued or the suspension agreement was accepted,

(B) whether any improvement in the state of the industry is related to the order or the suspension agreement,

(C) whether the industry is vulnerable to material injury if the order is revoked or the suspension agreement is terminated, and

(D) the findings of the Department of Commerce regarding duty absorption under 19 U.S.C. § 1675(a)(4).

## III. THE COMMISSION'S FINDINGS IN THE PRIOR INJURY DETERMINATIONS SUPPORT CONTINUATION OF THE ORDERS

### A. The Injured State of the Industry Prior to the Order

The condition of the U.S. market leaves manufacturers susceptible to economic injury if the antidumping and countervailing duty orders are revoked. This was the case in 1992, when the Commission determined that economic conditions warranted imposing an antidumping order on the subject countries. It was also true at the beginning of the VRA era in 1984, when an extremely open U.S. market saw the foreign share of standard pipe sales rise

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

to 59 percent.[1] The Commission has studied the causes of such market conditions in preparing for prior determinations, and the results are helpful in predicting the likely effect of revoking the antidumping order at issue.

The SAA indicated that the Commission must review the injury determination on which the original antidumping order was based.[2] The Commission is not obligated to determine that the exact pre-order conditions will recur before determining that revocation of the order would be harmful. As the Commission has found in four affirmative determinations in five-year reviews, significant changes in market conditions can indicate that post-order conditions, though very different from the demonstrably harmful pre-order conditions, would still involve injury to domestic industry.[3] In this review, the conditions present during the original determination are analogous to the current situation.

---

[1] "Case Study: Standard Welded Steel Pipes and Tubes," *The Economic Effects of Antidumping and Countervailing Duty Orders and Suspension Agreements*, Inv. No. 332-344, USITC Pub. No. 2900 (June 1995) ("*Standard pipe § 332 study*") at 13-14.

[2] SAA at 884.

[3] *See, e.g.*, *Pressure Sensitive Plastic Tape from Italy*, Inv. No. AA-1921-167 (Review), USITC Pub. No. 3157 (February 1999) at 7 (domestic market had grown, subject import share had diminished, degree of concentration among suppliers had changed); see also *Prestressed Concrete Steel Wire from Japan*, Inv. No. AA-1921-188 (Review), USITC Pub. No. 3156 (February 1999) at 6-7 (supply sources had increased, non-integrated domestic production had taken some of integrated suppliers' market share, subject import share had dropped from 60 percent to 1 percent), *Sorbitol From France*, Inv. No. 731-TA-44 (Review) USITC Pub. No. 3165 (March 1999) at 8-15 (demand had doubled, subject imports had left the market, composition of industry had changed). *Cf. Barium Chloride from China*, Inv. No. 731-TA 149 (Review), USITC Pub. No. 3163 (March 1999) at 5-6 (substitutes had replaced the like product in some applications).

PUBLIC DOCUMENT
Barcode:3883995-05 A-549-502 SCO - Scope Inquiry - Line Pipe

**Public Version**

### 1. Volume of imports.

The Commission determined in 1983 that imports from Korea and Taiwan caused harm to the domestic small-diameter circular pipe and tube industry.[4] Despite a decline in domestic consumption and production during 1980-82, the import penetration levels from Korea remained significant.[5] During 1981-83 Korea was the largest exporter of small circular pipes and tubes to the United States.[6] Taiwanese imports also increased greatly during the same period, their penetration rate doubling from 1980 to 1982.[7] The Commission's final order resulting from that investigation of Korea and Taiwan[8] reported that import volume from these countries continued to rise: The level of imports from Taiwan also increased.

---

[4] *Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea and Taiwan*, Invs. Nos. 731-TA-131 and 132 (Preliminary), USITC Pub No. 1389 (June 1983) ("*Korea and Taiwan 1983*").

[5] *Id.* at 12.

[6] *Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea and Taiwan*, Invs. Nos. 731-TA-131, 132, and 138 (Final), USITC Pub No. 1519 (April 1984) ("*Korea and Taiwan 1984*") at 12-13.

[7] *Korea and Taiwan 1983* at 14.

[8] *Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea and Taiwan*, Invs. Nos. 731-TA-131, 132, and 138 (Final), USITC Pub No. 1519 (April 1984) ("*Korea and Taiwan 1984*").

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

**Public Version**

In its 1986 determination regarding India and Turkey,[9] the Commission found that "{f}rom a negligible percentage of apparent domestic consumption in 1983, the imports rose significantly in 1984 and then increased dramatically in 1985."[10]

These affirmative antidumping and countervailing duty orders were obtained in a period when several of the subject countries had already voluntarily agreed under the VRA program to limit their exports to the U.S.[11] The harmful importation of steel products, including standard pipes and tubes, was already prohibited by these VRAs until they ended in 1992. However, the affirmative antidumping and countervailing duty determinations on standard pipe and tube imports in 1984 and 1986, described above, showed a continued pattern of harmful imports unfairly traded from countries not subject to VRAs.

The Commission found in its 1992 determination regarding Brazil, Korea, Mexico, Taiwan, and Venezuela[12] that despite declining U.S. consumption of standard and structural pipes and tubes between 1990 and 1991, the trend of increasing unfairly traded imports from

---

[9] *Certain Welded Carbon Steel Pipes and Tubes from India, Taiwan, and Turkey*, Invs. Nos. 731-TA-271 through 273 (Final), USITC Pub No. 1383 (April 1986) ("*India and Turkey 1986*").

[10] *Id.* at 13.

[11] *Id.* at a-6-7.

[12] *Certain Circular, Welded, Non-Alloy Steel Pipes and Tubes from Brazil, the Republic of Korea, Mexico, Romania, Taiwan, and Venezuela*, Invs. Nos. 731-TA-532 through 537 (Final), USITC Pub No. 2564 (October 1992) ("*Brazil, Korea, Mexico, Taiwan, and Venezuela 1992*").

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

the subject countries between 1989 and 1991 continued.[13] The market share of the subject country imports rose, while the market share of other countries' imports during the same period decreased.[14] The Commission concluded that the low prices of subject imports contributed significantly to their market share.[15]

**2. Price effects.**

In the 1984 injury determination, the Commission found that both Korean and Taiwanese sprinkler pipe (a subset of standard and structural pipe) undersold the U.S. product. As a result, prices of imports from both Korea and Taiwan decreased and led to high underselling margins.[16] In *India and Turkey 1986*, the Commission found that producers in both countries undersold U.S. producers.[17] For Turkish imports, the margins of underselling were significant.[18] The Commission found that throughout the period from January 1989 to March 1992, subject pipes and tubes from Brazil, Korea, Mexico, Taiwan, and Venezuela were consistently priced lower in the U.S. market than domestic products.[19]

---

[13] *Id. at 35.*

[14] *Id.*

[15] *Id.* at 37.

[16] *Korea and Taiwan 1984* at 13-15.

[17] *India and Turkey 1986* at 13.

[18] *Id.* at 14.

[19] *Brazil, Korea, Mexico, Taiwan, and Venezuela 1992* at I-65.

The effect of this underselling was to drive down the prices of domestic goods: unit prices for the U.S. products fell throughout the period of investigation, and virtually all import prices also declined during this period.[20] Falling prices in the U.S. market contributed to the domestic industry's worsening financial performance but did not prevent domestic producers from decreasing capacity utilization and losing additional market share to imports.[21]

### 3. Impact on the domestic industry.

#### a. Companies exiting the industry.

In 1985, there were 23 U.S. firms producing standard and structural pipe.[22] This was down significantly from the number in existence in previous decades. By 1992, in the presence of the early antidumping and countervailing duty orders, the figure had risen to 27 firms. There were 28 U.S. firms in 1996.[23] Traditional firms such as Bethlehem, LTV, National, USS and Van Huffel have either exited the business or shut down major production facilities, while smaller firms have entered the business. Laclede Steel entered bankruptcy in 1998.

---

[20] *Id.* at 36.

[21] *Id.*

[22] *India and Turkey 1986* at I-5.

[23] *See Circular Welded Nonalloy Steel Pipe from Romania and South Africa*, Invs. Nos. 731-TA-732 and 733 (Final), USITC Pub No. 2973 (July 1996) at I-9.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

**Public Version**

**b. Declining profitability.**

The Commission found in 1983 that sales of standard and structural pipe by domestic manufacturers had decreased in the preceding years.[24] At the same time that sales were decreasing, domestic firms suffered significant operating losses.[25] In its order the next year, 1984, the Commission found continuing drops in sales and concurrent operating losses.[26]

From 1982 to 1984, U.S. operators reported losses in all periods.[27] Operating losses were at an average of 4.3 percent in 1982-83. After the start of the VRA period in 1984 and the first affirmative antidumping and countervailing duty cases in 1983 and 1984, the operating losses decreased to 0.5 percent in 1984, and the industry posted a 1.1 percent income margin in 1985.[28]

In its 1992 order, the Commission noted allegations by domestic producers that they had lost sales of over $14.8 million during this period to these cheaply-priced imports.[29] The industry as a whole experienced revenue losses of 16.3 percent in the same period.[30]

---

[24] *Korea and Taiwan 1983* at A-19.

[25] *Id.* at A-20.

[26] *Korea and Taiwan 1984* at A-25.

[27] *Id.* at I-10.

[28] *Id.*

[29] *Brazil, Korea, Mexico, Taiwan, and Venezuela 1992* at I-73.

[30] *Id.* at I-34.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

**c. Declining employment.**

With the loss in sales came a reduction in the work force necessitated by production cutbacks. The Commission found in 1983 that employment and hours worked by workers producing small round pipes and tubes fell steadily after 1980.[31] Between 1980 and 1981, employment dropped by 6.3 percent. The next year, the Commission found that the downward trend in employment continued.[32]

The number of workers in the industry fell from 3142 in 1982 to 2874 in 1985, a drop of 9 percent.[33] The number of production and related workers in the U.S. industry increased 8.4% between 1989 and 1990, but by 1991 it dropped to a level 1% lower than it had been in 1989.[34] Further, the number of workers employed in January-March 1992 was 15% lower than the comparable period in 1991.[35]

**d. Decreasing capital expenditures.**

Capital expenditures, as noted in the Commission's 1984 order, were steadily decreasing during the pre-order and pre-VRA period as well. Between 1981 and 1983, these expenditures dropped from $6.3 million to $4.5 million, a change of 29 percent. In the same

---

[31] *Korea and Taiwan 1983* at A-16.

[32] *Korea and Taiwan 1984* at A-23.

[33] *Id.* at I-9.

[34] *Brazil, Korea, Mexico, Taiwan, and Venezuela 1992* at I-28.

[35] *Id.*

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

period, spending on research and development fell from $525,000 to $423,000, a 19 percent drop.[36]

Overall, the Commission determined in 1992 that "based on the large and increasing volume and market share of subject imports, a strong pattern of underselling by the subject imports, and the domestic industry's deteriorating performance reflected, inter alia, in its financial and employment data," the domestic industry producing standard and structural pipes and tubes was materially injured by reason of subject cumulated imports from Brazil, Korea, Mexico, Romania, Taiwan, and Venezuela.[37]

**4. Dumping in third countries.**

The Commission in *Brazil, Korea, Mexico, Taiwan, and Venezuela 1992* also noted evidence of dumping by the subject countries in Canada and in the European Community. It cited Canada's antidumping orders on imports of carbon steel welded pipes from Korea[38] and from Taiwan and Venezuela.[39][40] The Commission relied on a January 23, 1992 finding of the Canadian International Trade Tribunal ("CITT") that dumping originating in or exported from

---

[36] *Korea and Taiwan 1984* at A-33.

[37] *Brazil, Korea, Mexico, Taiwan, and Venezuela 1992* at 37.

[38] *See* The Canadian International Trade Tribunal, Review No. RR-94-004 (Ordered in June 1983 and continued twice in June 1990 and June 1995, expires June 5, 2000).

[39] *See* The Canadian International Trade Tribunal, Inquiry No. NQ-90-005 (July 26, 1991); *see also* Section VI.C.4, below.

[40] *Brazil, Korea, Mexico, Taiwan, and Venezuela 1992* at I-46.

Brazil "has caused, is causing and is likely to cause material injury" to Canadian production of like goods.[41] The Commission noted also that the European Community had "imposed antidumping duties of 22.1 percent on imports of certain welded steel pipe and tube products, including standard pipes and tubes, from Venezuela, effective April 13, 1991. In lieu of antidumping duties, the EC accepted price undertakings from Venezuelan producer C.A. Conduven and New York exporter Connectors."[42]

## IV. THE ORDERS UNDER REVIEW LED TO SUBSTANTIAL IMPROVEMENT IN THE CONDITION OF THE DOMESTIC INDUSTRY

At the time of entry of five of the orders under review, domestic market conditions were poor. The U.S. economy was in recession from mid-1990 to mid-1991. Compared to the economy as a whole, the pipe industry follows similar trends, in that it is heavily dependent on construction demand for sales of its product. The market share of imported standard pipe in the United States was 59 percent in 1984, but had dropped to 39 percent in 1990 due in part to the effect of the VRAs which were enacted in late 1984.[43] The penetration rate increased to 43 percent in 1991, the year in which antidumping and countervailing duty petitions were filed on imports from Brazil, Korea, Mexico, Taiwan, and Venezuela. By 1992, after imposition of the antidumping orders, imports had dropped to 33 percent of the

---

[41] *Id.* at I-47.

[42] *Id.*

[43] *Standard pipe § 332 study* at 13-14.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

**Public Version**

U.S. market.[44] In the era of VRAs and of antidumping and countervailing duty orders, since 1984, the penetration rate has declined each year except for 1991.[45]

The orders have had a strong effect on the market and consequently on the behavior of domestic producers and other market participants. [

]. *See* Staff Report at E-6. [

]. *See* Staff Report at E-7. [

]. *See* Staff Report at E-8. [

]. *See* Staff Report at E-8. [

]. *See* Staff Report at E-8. [

]. *See* Staff Report at E-8.

---

[44] *Id.*

[45] *Id.*

The antidumping and countervailing duty orders have allowed domestic manufacturers to remain in business. These firms would not be able to compete with the prices likely to be offered by foreign producers were unfair trading permitted by revocation of these orders. The orders have enabled these manufacturers to stay viable by maintaining their current operations. The antidumping and countervailing duty orders subject to review therefore directly led to the improvements in the standard and structural pipe and tube industry.

## V. THE DOMESTIC INDUSTRY IS HIGHLY SUSCEPTIBLE TO UNFAIR IMPORT COMPETITION DUE TO A COST-PRICE SQUEEZE

In the last few years, the domestic industry has been hurt by increasing imports. After dropping to 263,952 tons in 1993, subject imports have averaged 311,583 tons annually from 1993-1999. Mexico, Taiwan, and Thailand have all increased their standard pipe shipments significantly in the past year. Overall, imports of standard pipe were 24% greater in 1998 than in 1996 and 16% greater in interim 1999 than in interim 1998, even with antidumping and countervailing duty orders in place. As is evident from the impact of surging steel imports on other products such as hot-rolled coil, the situation certainly would have been worse if there had been no orders at all.

The antidumping orders concerning hot-rolled coil have subsequently strengthened the competitive position of U.S. manufacturers in that domestic market. Domestic hot-rolled prices have consequently risen. Since hot-rolled coil is the raw material from which standard pipe is made, costs have increased for U.S. standard pipe manufacturers. Increasing hot-rolled prices, combined with unfairly-priced imports of the finished product, have caught standard

pipe manufacturers in the United States in a "cost-price squeeze." These manufacturers will essentially be forced to buy high and sell low.

The questionnaire responses received by the Commission provide further evidence of a squeeze:

> [ ] domestic producers of {standard pipe} noted that the price of raw materials had recently increased. [ ] reported that magnitude of the change. [ ] reported that steel accounts for up to 40 percent of the cost of subject pipe and tube, and that prices had increased $80 per ton, [ ] reported that steel coils had increased $10 to $30 per ton; [ ] reported that raw material costs were up 20 percent since July 1999.

Staff Report at V-4-5. The Commission noted the effects of this phenomenon in its staff report: "A majority of responding domestic producers of {standard pipe and LWR} report that the costs of production, and selling prices, are directly tied to the price of steel. Several of these producers noted that selling prices for pipe and tube lag behind changes in steel prices." Staff Report at II-1. The standard pipe price increases have lagged behind the price increases of hot-rolled, creating vulnerability to the return of even lower import prices.

## VI. LIKELY VOLUME OF IMPORTS IN THE ABSENCE OF ANTIDUMPING AND COUNTERVAILING DUTY ORDERS

The orders under review have dramatically decreased the amount of standard pipe entering the United States. Even with the significant increases in the past several years, imports are currently less than half what they were in 1985, when imports totaled over one million tons. Exhibit 1 illustrates the levels of imports from each subject country during each year between 1985 and 1999. Exhibit 2 contains the underlying data, and compares individual

subject country imports with the total level of subject imports and the total level of world imports.[46] Foreign manufacturers are likely to capitalize on a newly-opened market free of the need to trade fairly. Because of their large unused capacity, the increase in these countries' production levels would be seen immediately.

In evaluating the likely volume of subject imports if the order is revoked the Commission is directed to consider whether the likely volume of imports of the subject merchandise would be significant if the order is revoked, either in absolute terms or relative to production or consumption in the United States. In so doing, the Commission considers all relevant economic factors, including -

(A) any likely increase in production capacity or existing unused production capacity in the exporting country,

(B) existing inventories of the subject merchandise, or likely increases in inventories,

---

[46] The Commission should revise nonsubject import statistics because of the product mix of Canadian imports. The HTS items for pipe which is imported from Canada includes a high percentage of welded mechanical tubing, which falls under the same HTS classification as standard pipe but which does not represent the like product. We note that the Canadian export statistics of October 1999 show that year-to-date exports of standard pipe were 34,736 metric tons (38,279 net tons) and that exports of mechanical tubing were 88,025 metric tons (97,004 net tons). *See* Exhibit 3. In comparison, the Commerce statistics through October 1999 report that year-to-date imports of Canadian standard pipe were 207,208 net tons. *See* Exhibit 4. We have omitted Canadian imports from our charts of world imports, because their inclusion serves to understate erroneously the percentage of standard pipe imports which come from subject countries. For the post hearing brief Petitioners will submit Statistics Canada information for 1997-1999. *See* Petitioners' June 21, 1999 submission at 51 n.125. *See also Circular Welded Nonalloy Steel Pipe from Romania and South Africa*, Invs. Nos. 731-TA-732 and 733 (Final), USITC Pub No. 2973 (July 1996) at IV-1.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

**Public Version**

(C) the existence of barriers to the importation of such merchandise into countries other than the United States, and

(D) the potential for product-shifting if production facilities in the foreign country, which can be used to produce the subject merchandise, are currently being used to produce other products. 19 U.S.C. § 1675a(a)(2).

If the antidumping order is rescinded, a large increase in imports of standard pipe will occur for the following reasons:

- In the absence of antidumping orders, the U.S. market is likely to revert to the condition it was in before imports of the subject materials were regulated. The comparable era is not 1992, immediately before the order now under review was announced, but 1984, the end of the pre-VRA period. This period saw foreign imports account for 59 percent of the U.S. market, their peak penetration rate. Foreign manufacturers have an incentive to sell aggressively in overseas markets, and they would likely see a U.S. market with reduced trade barriers as a target for increased exports. In the absence of both VRAs and antidumping orders, imports would increase greatly.

- The production capacity of many pipe manufacturing firms in foreign countries is either greater than their current output or is expected to increase, or both. This excess capacity is likely to be used to take advantage of any lifting of U.S. trade restrictions.

- The demand for standard and structural pipe has decreased greatly in Asia and Latin America in recent years, concurrent with the financial downturn in that region. The removal

of antidumping orders here would make the U.S. market an obvious destination for the pipe which foreign manufacturers have been unable to sell in Asia.

•Several countries, such as Japan, which would otherwise be large markets for standard pipe imports, have barriers to foreign trade and have falling demand for the subject products. Manufacturers who have been unable to sell their product in Japan due to these barriers would attempt to compensate for lost sales by taking full advantage of a U.S. market free of such restrictions.

•The restrictions on in line pipe shipments to the United States pursuant to safeguard measures creates an incentive to shift to standard pipe exports.

### A. Imports from All Subject Countries Should Be Cumulated

While cumulation in the context of sunset reviews is discretionary, it is apparent that in this case the nature of standard pipe imports meets the cumulation standard applicable in the Commission's original investigations. Cumulation is necessary to properly evaluate the potential harm which would ensue from the revocation of the antidumping and countervailing duty orders.

#### 1. Legal Standards

The Commission may cumulatively assess the volume and effect of imports of subject merchandise from all countries in this review "if such imports would be likely to compete with each other and with domestic like products in the United States market." In assessing whether cumulation is appropriate, the Commission generally considers the following four factors: (1)

the degree of fungibility; (2) geographic markets; (3) channels of distribution; and (4) simultaneous presence in the market. *See, e.g.*, *Certain Carbon Steel Plate from China, Russia, South Africa, and Ukraine*, Inv. No. 731-TA-753-756 (final) (December 1997) at 16-17 (citing *Wieland Werke, AG v. United States* 718 F. Supp. 50 (Ct. Int'l Trade 1989)).

The information gathered in this investigation, as detailed in the staff report, indicates that each of the factors considered in the cumulation analysis is satisfied. The imports from all subject countries are largely interchangeable with the domestic product and with each other. They compete in the same geographical markets. There is substantial overlap in the channels of distribution. Imports from all subject countries and the domestic like product are simultaneously present in the market. Thus, although not required for cumulation, all four factors are present, making the cumulation of imports in this case especially compelling.

**2. The imports are fungible with each other And with the domestic product.**

In assessing whether imports are "fungible" with each other and with the domestic like product, "{o}nly a 'reasonable overlap' is required." *Id*. *See also Granges Metallverken AB v. U.S.*, 716 F.Supp. 17 (CIT 1989) ("{t}he Commission need not track each sale of individual sub-products and their counterparts to show that all imports compete with all other imports . . ."). The record in this investigation shows that the "reasonable overlap" standard is more than satisfied here.

The Commission found that imported standard pipe "may be considered to be interchangeable with domestic product for most applications. They are commodity products

and must meet common standards as to materials, dimensions, and testing, established by consensus organizations. Manufacturing processes and technology are similar throughout the world." Staff Report at I-39.

According to the Commission, "{a}ll domestic producers and most importers reported that {standard pipe} produced by domestic producers is interchangeable with that produced in subject and nonsubject countries." Staff Report at II-23. Although some importers reported that interchangeability was limited in certain circumstances, only two domestic producers reported differences other than price between domestic and imported standard pipe. *See* Staff Report at II-24. The evidence on the record clearly demonstrates that there is a reasonable overlap in competition.

Price data collected for comparison of imports and the domestic products were gathered for six product types, as detailed on page V-7-8 of the Staff Report. "Sales of the selected {standard pipe} products from subject countries and from domestic sources were reported in all 11 quarters for which data were requested." Staff Report at V-7-8. Further, the Commission recorded sales of these six products from six of the eight countries subject to the standard pipe orders under review. The fact that sales of foreign standard pipe occurred constantly and simultaneously with domestic pipe in itself demonstrates that the imported products are fungible with each other and with the domestic products.

The practice of underselling domestic producers clearly drives sales of the foreign product in the U.S. market. Staff Report at V-8. Imports undersold domestic product 6 in

**Public Version**

every comparison, undersold domestic product 1 in 48 of 49 comparisons, undersold domestic product 2 in 41 of 46 comparisons, and undersold domestic product 5 in half of the comparisons. *See id.* Further, according to the Commission, "{m}argins of underselling for products 1, 2, and 6 (diameters under 4 inches) were generally higher in 1999 than in previous periods."

Additionally, several purchasers have made statements in their questionnaire responses that can only be interpreted as supporting a finding that the imports and domestic products are interchangeable. Specifically, each of the following statements, in response to the Commission's questions on the effects of increased imports, indicates that the imports and domestic products are substitutable:

[ ]. Staff Report at E-26.

[ ]. Staff Report at E-26.

[ ]. Staff Report at E-26.

[ ]. Staff Report at E-26.

[ ]. Staff Report at E-27.

[ ].

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Again, none of the foregoing quotes is consistent with allegations that imports and domestic products are not fungible. Although some purchasers claimed that their products could not be substituted, the foregoing quotes are more than sufficient to establish a "reasonable overlap" of competition between the imported and domestic products.

**3. The Imported and Domestic Products Compete in the Same Geographic Markets**

As noted in the Staff Report, the importers of standard pipe from subject countries are located throughout the country, with representation on both coasts, in Texas and the Great Lakes. *See* Staff Report at IV-3. Further, no purchaser of standard pipe states in a questionnaire response that it does not buy the foreign product due to unavailability in its geographic region. It is beyond dispute that the imported and domestic products compete in the same geographical areas.

**4. The Imported And Domestic Products Are Sold in Identical Channels of Distribution**

Both domestic and imported products are sold to end users and distributors. *See* Staff Report at II-2. All shipments from India, Taiwan, Thailand, Turkey, and Venezuela from 1997 through interim 1999 were sold to distributors, as were 98.3% of imports from Korea and [ ]% of imports from Mexico in interim 1999. *See id.* In comparison, 79.1% of U.S. commercial shipments were sold to distributors. *See id.* Most of the balance of shipments from both domestic and foreign producers were sold to end users. The substantial overlap in the channels of distribution of domestic and imported products supports cumulation.

**5. The imported and domestic products Were simultaneously present.**

Standard pipe produced in the United States is clearly present throughout the domestic market, including all 48 contiguous states, though several producers note that their primary market in on the East or West Coast. *See* Staff Report at II-2. Based on Commerce statistics, imports of standard pipe from six of the eight subject countries entered the United States in each of these years as well.[47] Subject imports from were heavily present in 1998 (16.3% of the domestic market) and interim 1999 (18.8% of the market).

**6. Cumulation summary.**

If the orders were revoked, standard pipe import levels would rise dramatically from all subject countries. For the reasons discussed above, the volume and effect of these imports can best be assessed by the Commission through cumulation. This is a situation in which cumulation is therefore appropriate.

**B. Historical Data On the Pre-Case, Pre-VRA Era Suggests the Level Of Imports If Orders Are Revoked**

The combination of the original antidumping and countervailing duty orders and the onset of VRAs in 1984, in return for which orders were revoked, had the effect of reducing foreign imports, which had reached record high levels. As the VRA period was nearing its end in 1991, imports again rose, but they dropped when additional antidumping orders now

[47] The exceptions are Brazil, which has not shipped subject merchandise since the 1992 antidumping order against it, and Veneuzela, which shipped no standard pipe in 1996, 1997 and interim 1999.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

under review were put in place. This pattern indicates that the rise and fall of the import level is closely linked to the absence or presence of trade relief. If the antidumping orders are revoked, it is likely that import levels will rise to at least their 1984 levels.

Voluntary Restraint Agreements (VRAs) were in effect from 1984 to 1992 between the U.S. and the subject countries Brazil, Korea, Mexico, and Venezuela (Taiwan was not, although it agreed to unilateral restraints during this period).[48] Under the Steel Import Stabilization Act, the VRAs were part of a larger plan designed to modernize the domestic steel industry, retrain its workers, and improve its international competitiveness.[49] The Commission found in its 1995 study that the onset of VRAs ended a period in which foreign imports, especially from the subject countries, had reached all-time high levels.[50] Imported standard pipe accounted for 59 percent of the U.S. market in 1984, the peak foreign penetration rate, immediately before the initial VRAs began in late 1984.[51]

In the absence of antidumping and countervailing duty orders, foreign producers will have an incentive to produce standard pipe at full capacity and maximize their shipments to the United States. The import barriers which other countries maintain make the U.S. market an even more inviting one in comparison. Further, the nature of the production operations in

---

[48] *Brazil, Korea, Mexico, Taiwan, and Venezuela 1992* at I-47.

[49] *Id.* at I-47.

[50] *332 standard pipe case study* at 13-14.

[51] *Id.*

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

PUBLIC DOCUMENT

subject countries, combined with certain U.S. orders and safeguard relief on other products, will invite foreign producers to shift from production of other pipe to standard pipe.

### C. Excess Production Capacity in Foreign Countries

Foreign manufacturers of standard pipe have the significant additional capacity to increase production and export to the United States above current levels. The total standard pipe production capacity in the subject countries is at least [ ] tons. If the orders are revoked, the available production capacity which can be earmarked immediately for the United States is estimated to be at least [ ] tons. This amount is almost [ ] the total subject imports in 1999, and more than [ ] all 1999 imports. In comparison, in 1998 U.S. consumption was 2,729,190 and domestic shipments were 1,893,376 tons. *See* Staff Report at I-7 and I-47. The U.S. market will be dominated by imports if the orders are revoked, with disastrous consequences.

Foreign producers have an incentive to keep their production levels high to minimize unit costs. They have been unable to run at full capacity due to insufficient demand in their home and export markets. Eliminating restrictions on unfair trade would likely spur subject producers to increase production given substantial available capacity. Opening the U.S. market to heightened levels of trade would give them the opportunity to do so.

The level of market penetration is likely to rise in the absence of an antidumping order. The capacity of foreign manufacturers is such that imports could rise at least to the level seen

PUBLIC DOCUMENT

in 1984, before VRAs and antidumping and countervailing duty orders had shown a significant effect, when imports accounted for 59 percent of the domestic market.

The Commission has collected data for several subject countries quantifying the unused production capacity and the possibility of increased production should the orders be rescinded:

**1. India**

As we noted in our June 22, 1999 submission, Indian demand for steel in general, and standard pipes in particular, has been sluggish since 1996.[52] The effects of this decline were aggravated by additional domestic steel capacity and increased competition from South East Asia.[53] The Tata Iron & Steel Company (TISCO), India's largest private steel producer, has an installed capacity for producing welded steel tubes of 185,000 tons[54] and Rajinder Steels, Ltd., has an installed capacity for producing 60,000 tons of steel pipes and tubes.[55] As the Commission noted in its Staff Report, this aggregates to a 245,000 ton production capacity in India. *See* Staff Report at IV-12. Capacity utilization [ ] percent in

[52] *India–TISCO performances–Recession erodes profit margins*, FT Asia Intelligence Wire, May 21, 1999, available in LEXIS, News Library, Allnws File.

[53] Tata Iron & Steel Co., 1997-1998 Annual Report 3 (1998).

[54] *See* Tata Iron & Steel Co., 1997-1998 Annual Report 3 (1998). Tata is currently subject to an antidumping deposit rate of 37.65%. *See Certain Welded Carbon Steel Standard Pipes and Tubes From India, Final Results of Antidumping Duty Administrative Reviews*, 57 Fed. Reg. 54,360 (November 18, 1992).

[55] *See* Rajinder Steels, Ltd., 1996-1997 Annual Report 21, 25 (1997). Rajinder is subject to an 87.39% antidumping duty. *See Certain Welded Carbon Steel Standard Pipes and Tubes From India, Final Results of Antidumping Duty Administrative Reviews*, 64 Fed. Reg. 23,821 (May 4, 1999).

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

PUBLIC DOCUMENT

calendar 1997 to [ ] percent in interim 1999. *See id.* At [ ]% utilization rate, India therefore has an unused capacity of [ ] tons. Tata has, according to the Commission, "the ability to respond to a revocation with increased shipments to the U.S. market." Staff Report at II-8. Imports from India, which were as high as 23,000 tons before duties went into effect, average less than 10,000 tons now.

**2. Korea**

Total steel exports from Korea jumped 56 percent in 1998, while domestic sales of steel dropped 35 percent.[56] The main target of steel exports were the United States. Among the companies who were hoping to increase their exports to the U.S. in 1998 was SeAH Steel, a top supplier of carbon steel pipe to the largest U.S. companies. Prior to the conclusion of its 1998 fiscal year, SeAH had expected an increase of exports to the United States of 20-25 percent.[57] Overall, Korean steel pipe production between 1997 and 1998 fell 15 percent from 2,261,335 metric tons to 1,916,947 metric tons, resulting in lower capacity utilization.[58] In the period 1996 though 1998, domestic shipments of steel pipe fell 40 percent, while export

---

[56] Lee Suk-ki, *Profile–South Korea's Steel Industry (Mar. 1999)*, Asia Pulse Pte, Mar. 31, 1999, available in LEXIS, News Library, Allnws File.

[57] Evelyn Iritani, *A Nation on the Brink: As Korea's Export's Dwindle, so do its Hopes for Recovery*, Los Angeles Times, Sept.13, 1998, at D1, available in LEXIS, News Library, Allnws File.

[58] *See* HYUNDAI PIPE CO., 1998 ANNUAL REPORT 20 (1999).

shipments of steel pipe rose 64 percent.[59] The Staff Report indicates that the reported capacity utilization of Korean producers of standard pipe declined in calendar year 1998, and increased slightly in interim 1999. *See* Staff Report at II-9. Capacity utilization declined from 94.4 percent in 1997 to 80.1 percent in 1998, but was slightly higher in interim 1999 (83.5) than interim 1998 (83.1). *See id.* Total reported production capacity in Korea is 2,490,000 tons. *See* Staff Report at IV-14.

Thus, based on reported available capacity Korean producers could increase exports to the United States by 410,000 tons. According to the Commission, "Korean producers of subject pipe would be able to respond to revocation of duties with increased shipments to the U.S. market." Staff Report at II-9. Even this level of capacity reported to the Commission for standard pipe, however, should be increased by the 170,000 tons of line pipe the Koreans will not be able to continue exporting to the United States. Korea therefore has the true capacity to produce an additional 580,000 tons of standard pipe for export. In 1983-1985, Korean exports averaged over 500,000 tons per year. This figure fell to 300,000 tons per year under the VRAs and to 175,000 tons per year after the orders. Petitioners believe that the Koreans' ability to increase exports is gigantic.

---

[59] Hyundai's domestic steel pipe shipments in 1996 were 651,310 metric tons; in 1997 were 613,743; and in 1998 were 390,659. Its exports in 1996 were 216,959; in 1997 were 289,768; and in 1998 were 354,821. *See* HYUNDAI PIPE CO., 1998 ANNUAL REPORT 29 (1999).

**Public Version**

### 3. Mexico

According to Hylsamex, its steel tubular division focused its efforts on the sale of products with the highest profitability and quality, such as conduit and galvanized pipe, as well as those products offered with the most extensive training and technical support to customers.[60] While domestic sales in 1998 were similar to 1997 levels, exports fell by 32 percent.[61] Significantly, Hylsamex has 1.5 million tons of new hot-rolled capacity, a portion of which can be utilized downstream in its pipe mills.

The Commission notes that the total production capacity in Mexico is [ ] tons. *See* Staff Report at IV-15. Capacity utilization [ ]% in 1997 to [ ]% in 1998, and further [ ]% in interim 1998 to [ ]% in interim 1999. At a [ ]% utilization rate, Mexico has an unused capacity of [ ] tons and thus can [ ] increase exports to the United States. Moreover, this data does not include information from [ ], which have the capacity to produce [ ] tons.[62] Hylsa faces a preliminary increase in its dumping margin to 10.38%,[63] which

---

[60] HYLSAMEX SA, 1998 ANNUAL REPORT 26 (1999).

[61] *Id.* at 49.

[62] *See* THE PRESTON PIPE REPORT, PIPE AND TUBE MILLS OF THE WORLD WITH GLOBAL TECHNICAL DATA (2d ed. 1997) at [ ].

[63] *See Certain Welded Non-Alloy Steel Pipe and Tube From Mexico: Preliminary Results of Antidumping Duty Administrative Review*, 64 Fed. Reg. 68,995, December 9, 1999.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

**Public Version**

should decrease imports from Mexico. Import levels will certainly rise, however, if the order is revoked.

**4. Turkey**

"{Turkish} capacity utilization, which had [ ] during {1997}-98, [ ] percent in interim 1998 to [ ] percent in interim 1999." Staff Report at II-10. According to the Staff Report, the total production capacity in Turkey is [ ] tons. *See* Staff Report at IV-16. At an [ ]% utilization rate, Turkey has an unused capacity of [ ] tons. Further, inventory levels [ ] from 1997 to 1998, but [ ] in interim 1999. Inventory levels in September 1999 were [ ] than in January 1997. The Staff Report is correct that "Turkish producers of subject pipe have the ability to respond to price changes with increased shipments to the U.S. market." Staff Report at II-10. In 1987, Turkish imports were 106,662 tons, but these imports had dropped to an average of 4,544 tons from 1990-1992. After climbing to 46,493 tons in 1994, from 1997-1999 imports have averaged 7,754 tons.

**5. Venezuela**

The total production capacity in Venezuela is [ ] tons. *See* Staff Report at IV-17. Capacity utilization [ ]% in 1997 to [ ]% in 1998, but [ ]% in interim 1998 to [ ]% in interim 1999. At a [ ]% utilization rate, Venezuela has an unused capacity of [ ] tons. "Based on the available information, Venezuelan producers of subject pipe have some ability to respond to a change in prices with increased

shipments to the U.S. market." Staff Report at II-10-11. Although Venezuelan imports have been negligible since 1992, they averaged 15,786 annually from 1985-1987 and 17,307 annually from 1990-1991.

**6. Brazil**

Brazil has not shipped standard pipe to the United Stated since the 1992 order went into effect, but the situation would be changed if the antidumping order were revoked. Mannesmann SA still has the capacity to produce 60,000 metric tons per year using the ERW process,[64] while Persico Pizzamiglio has the capacity to produce 324,000 metric tons per year.[65] The total Brazilian production capacity is therefore at least 384,000 tons. Brazil shipped 185,000 tons in 1984 and 55,650 tons of standard pipe to the United States in 1990, and it has the capacity to ship far more if the antidumping order were revoked.

**7. Taiwan**

Imports from Taiwan have increased dramatically in the past several years from an average of 165 tons annually for 1992-1994, the period immediately after the Commission issued its latest order against Taiwan. Each year since, Taiwanese shipments to the United Stated have risen by at least 13.3% (1996-97) and by as much as 78.3% (1997-98). Far East Machinery Co. Ltd., Kao Hsing Chang Iron & Steel Corp., Yieh Hsing Enterprise Co., Ltd.,

---

[64] THE PRESTON PIPE REPORT, PIPE AND TUBE MILLS OF THE WORLD WITH GLOBAL TECHNICAL DATA (2d ed. 1997) at 68.

[65] *Id.* at 71.

and Yieh Loong Enterprise Co., Ltd. have a combined production capacity of 632,000 tons.[66] Taiwan shipped 141,000 tons of standard pipe to the United States in 1983, and it could ship at least that much if the antidumping order were revoked.

**8. Thailand**

Home market demand for standard pipe in Thailand is nonexistent today.[67] The Thai construction industry is dormant, as 40% of Bangkok's completed office space is empty.[68] Work on new buildings has halted. Obviously, Thai standard pipe producers will turn to the U.S. market, because there are simply no buyers for their product at home.

Thailand's standard pipe shipments to the United States have averaged 51,509 tons annually from 1992-1999. The Commission found in its 1986 order that Thailand had a production capacity of 322,974 tons. *Certain Welded Carbon Steel Pipes and Tubes from Thailand and Venezuela*, Inv. No. 701-TA-242 (Preliminary), USITC Pub No. 1680 (April 1985) at A-25. The Commission noted that this figure represented the following five producers: First Steel Industry Co., Saha Thai Steel Pipe Co., Siam Steel Co., Thai Steel Pipe Industry Co., and Thai Union Steel Co. All of these Thai producers, as well as others, are

---

[66] *See* THE PRESTON PIPE REPORT, PIPE AND TUBE MILLS OF THE WORLD WITH GLOBAL TECHNICAL DATA (2d ed. 1997) at 581-587.

[67] *See* Wayne Arnold, "Monuments to the Thai Debt," THE NEW YORK TIMES, February 25, 2000, at C1.

[68] *See id.*

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

currently subject to U.S. antidumping duties: 9.65% against Saha Thai,[69] 29.89% against Siam Steel Co. and Thai Hong Steel,[70] 37.55% against Thai Union Steel Co.,[71] and 15.67% against all other manufacturers.[72] Thailand shipped 117,042 tons of standard pipe to the United States in 1988 when all imports were subject to 15.69% rates, and its producers, who are believed to have expanded capacity since 1986, can ship at least that much if the antidumping order were revoked.

**C. Barriers To Importation Of This Merchandise Into Other World Markets**

The U.S. market, even with the subject antidumping orders in place, is more open to imports than most foreign markets for pipes and tubes, which are themselves protected by trade barriers. In the absence of the antidumping order, the U.S. market would be even more receptive to imports, and it would likely attract them in greater numbers.

In Japan, there exists "tight control by major integrated producers over steel distribution channels in a manner which strongly discourages imports...."[73] The United States

---

[69] *See Certain Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review*, 64 Fed. Reg. 56,759, October 21, 1999.

[70] *See Circular Welded Carbon Steel Pipes and Tubes From Thailand; Amended Final Results of Antidumping Duty Administrative Review*, 59 Fed. Reg. 65,753, December 21, 1994.

[71] *See Certain Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review*, 62 Fed. Reg. 53,808, October 16, 1997.

[72] *See id.*

[73] *1999 National Trade Estimate Report on Foreign Trade Barriers*, The United States Trade Representative, at 262.

Trade Representative notes that this may be the reason why importers have failed to play a larger role in Japan's steel market.[74] China would be a natural target for sales of pipes and tubes, but it "restricts imports through a variety of means, including high tariffs and taxes, non-tariff measures, limitations on which enterprises can import, and other barriers.[75] Likewise, India, in December 1998, imposed anti-dumping duties and floor prices for imported steel products.[76]

The international climate is such that most markets are already more protected than the U.S. market, and the trend is toward more barriers in other markets, not less. A move by the United States to permit resumption of unfair trading would make the United States a prime target for imports.

**1. Changes in GDP in subject countries and other export markets compared with the United States.**

The standard pipe industry is very sensitive to general business cycle conditions and especially to investment in construction, which is itself highly cyclical. As the Commission staff has previously noted, "The construction industry is the major user of standard welded pipe. Activity in the pipe industry tracks construction fairly well from 1982 to 1992...."[77]

---

[74] *Id.*

[75] *Id.* at 53.

[76] Vivek Raghuvanshi, *India takes second look at pricing*, AMERICAN METAL MARKET, Mar. 25, 1999, at 3, available in LEXIS, News Library, Allnws File.

[77] U.S. International Trade Commission, *The Economic Effects of Antidumping and Countervailing Duty Orders and Suspension Agreements*, Investigation No. 332-344, USITC

Furthermore, the Commission staff's data show that U.S. construction demand follows the general U.S. business cycle, as it was depressed during the recessions of 1982 and 1991 but grew during the years of more rapid growth in the late 1980s.[78] Thus, overall growth in real gross domestic product (hereafter referred to as "GDP growth")—the standard indicator of overall business cycle conditions— is also a good indicator of business cycle conditions in the construction industry, and hence of demand for standard pipe. By comparing actual and projected GDP growth rates in the subject countries with those in the United States and other export markets, it is possible to obtain a general view of the vulnerability of the U.S. standard pipe industry to a surge in unfairly traded imports if the antidumping and countervailing duty orders are revoked in these cases. Where possible, the perspective provided by GDP growth data will be supplemented by more detailed data on the growth of domestic demand and export demand.

Table 1 shows GDP growth data for the eight subject countries covered by the ten orders in these cases. Annual growth rates for 1998 and 1999 and projected growth rates for 2000 are compared with average annual growth rates for the 1990-97 period, in order to give a sense of how each country's present and prospective performance compares with its own historical trends. The projections for 2000 are from the International Monetary Fund (IMF);

---

Publication 2900, June 1995, at 13-5. Note that the years 1982 to 1992 are the entire period covered by the data described by these sentences in this report.

[78] *Id.* at 13-5 to 13-7.

the forecasts for 2000 are based on projections from economic models and are therefore sensitive to the IMF's forecasting methodology. For all of these countries, the growth projections for 1999-2000 show growth rates that can be considered low, either compared to the country's own past growth, or in absolute terms for a developing nation—and in most of these cases, the growth can be expected to come mainly from exports, not from domestic demand.[79]

Four of the subject countries—Brazil, Korea, Thailand, and Venezuela—are among the countries that have been most affected by the global financial crisis since 1997. In each of these four countries, growth fell off sharply in 1998 and 1999 compared with the previous eight years (1990-97), and each country reports negative growth (*i.e.*, a recession) for at least one of these two years (*i.e.*, either 1998 or 1999 or both). Moreover, the IMF projects growth in three of these four countries (Korea, Thailand, and Venezuela) to remain slow relative to their own past performance—*i.e.*, the projected growth rates for these three countries for 2000 are all lower than the actual, average growth rates for 1990-97. Furthermore, since all four of these countries have had significant currency depreciations in

---

[79] An example is Brazil with much lower account deficits due to the devaluation of its currency. *See* Brazil, Countrywise Publishing Limited Country Report, December 13, 1999.

PUBLIC DOCUMENT
Barcode:3883995-05 A-549-502 SCO - Scope Inquiry - Line Pipe

the past few years,[80] we can expect that most of their growth will come from increased export sales rather than increased domestic demand.[81]

[80] Comparing exchange rates on January 18, 2000, with those prevailing on December 31, 1996, before the onset of the Asian financial crisis, we obtain the following comparisons: for Brazil, 1.793 vs. 1.039 reales per dollar; for Korea, 1,126.90 versus 844.20 won per dollar; for Thailand, 37.45 versus 25.61 baht per dollar; and for Venezuela, 652.00 versus 476.50 Bolivares per dollar. Data for January 18, 2000 are from the *New York Times*, January 18, 2000, C22; data for December 31, 1996 are from International Monetary Fund, *International Financial Statistics*, June 1999, at 168, 438, 736, and 798.

[81] Korean exports have increased steadily, even during the financial crisis: 11.2% in 1996, 21.4% in 1997, 13.3% in 1998, and 18.1% in 1999. IMF at http://www.imf.org/external/np/sec/pn/1999/PN99115.HTM.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Public Version

**Table 1**

**GDP Growth Rates in the Subject Countries,**

**Annual for 1998-2000 Compared with Averages for 1990-1997**[82]
(in percent)

| Country | 1990-97 average | 1998 | 1999 | 2000 |
|---|---|---|---|---|
| Brazil | 3.4 | 0.1 | -1 | 4 |
| India | 6 | 5.8 | 5.7 | 5.5 |
| Korea | 7.2 | -5.8 | 6.5 | 5.5 |
| Mexico | 2.2 | 4.6 | 3 | 5 |
| Taiwan | 6.1[a] | 4.9 | 5 | 5.1 |
| Thailand | 7.4 | -9.4 | 4 | 4 |
| Turkey | 4.1 | 2.8 | 1.2 | 2.6 |
| Venezuela | 2.2 | -0.7 | -7.6 | 1.6 |

Note:
[a]This is the annual growth rate for 1991-2000 for Taiwan, as reported in the IMF's *World Economic Outlook*, October 1999, Table 2 at 170; growth data for Taiwan in 1990-1997 are not reported in the World Bank source used here.

Of these four crisis countries, only Brazil is projected by the IMF to recover to about its average growth rate for the 1990-97 period in 2000. But a growth rate at 4% is still low for a developing nation with rapid population growth like Brazil. Another sign that the

---

[82] Sources: Average growth rates for 1990-97 are from World Bank, *World Development Indicators 1999*, Table 4.1 at 188-90, except as noted; annual growth rates for 1998 and 1999 and projections for 2000 are from International Monetary Fund, *World Economic Outlook*, Part I, October 1999, Tables 1.3 and 1.5 at 10 and 20, respectively.

recovery in Brazil is only modest at best is increasing unemployment (7.5% unemployment in October 1999).[83] Moreover, according to Professor Jeffrey Sachs, the IMF's forecasts for Brazil are likely to be overly optimistic if the country continues to maintain high interest rates.[84] With the Brazilian currency (the *real*) depreciated by 47.8% since January 1999,[85] most of Brazil's recovery in 2000, if it occurs, is likely to come through increased exports rather than through domestic expansion.[86]

The other four countries all have unique situations, but are generally projected to have low or reduced growth rates in 1999-2000. Mexico had its financial crisis earlier (in 1994-95) than the Asian countries, Brazil, and Venezuela, and therefore Mexico's average growth for the 1990-97 period (which includes a severe recession in 1995) was relatively low (2.2%). However, after a strong recovery in 1996-97, Mexican GDP growth is again slowing down: from 5.2% in 1996 and 7.0% in 1997[87] to 4.6% in 1998, an estimated 3.0% in 1999, and a

---

[83] Brazil, Countrywise Publishing Limited Country Market Report, December 13, 1999.

[84] Jeffrey Sachs, "Brazil Fever: First Do No Harm," *The Milken Institute Review*, Second Quarter 1999, at 16-25.

[85] The Brazilian exchange rate was 1.793 reales per U.S. dollar on January 18, 2000, as reported in the *New York Times*, January 18, 2000, at C22, compared with a close of 1.209 reales per U.S. dollar on December 31, 1998, as reported in the International Monetary Fund, *International Financial Statistics*, June 1999, at 168.

[86] Brazil, Countrywise Publishing Limited Country Market Report, December 13, 1999.

[87] Calculated from data on Mexico's GDP at constant 1993 prices in International Monetary Fund, *International Financial Statistics*, June 1999, at 518. This same source shows Mexican growth slightly lower for 1998 at 4.6%, compared with the data in the source used in the table.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

projected 5.0% in 2000. Moreover, most of Mexico's growth in 1996-97 was fuelled by export growth, rather than by growth of domestic demand. In real terms (*i.e.*, at constant 1993 *pesos*), Mexico's exports rose by 18.2% while its domestic demand increased by only 4.0% in 1996; in 1997, the corresponding figures are 13.0% and 8.3%, respectively.[88] Mexico's export growth then slowed to 7.6% in 1998, but was still higher than domestic demand growth of 6.5%. However, the *peso* had become overvalued in real terms again by early 1998, and has since depreciated—from 8.0833 new *pesos* per dollar at the end of 1997 to 9.395 new *pesos* per dollar on January 18, 2000[89] indicating that Mexican exports are likely to increase again in 2000. Indeed, U.S. imports from Mexico jumped up by 13.3% from January-November 1998 to January-November 1999, while trade deficit with Mexico increased from $14.6 billion to $22.0 billion (33.6%) over the same period[90]—behavior that is consistent with another depreciation-driven, export-led recovery in Mexico this year and next.

Taiwan did not have a major financial crisis as many other East Asian countries did, but its growth has slowed down nonetheless and is projected to remain relatively sluggish in

---

[88] Calculated from data in Organization of Economic Co-operation and Development (OECD), *Main Economic Indicators*, May 1999, at 10-11.

[89] The exchange rate for 1997 is from International Monetary Fund, *International Financial Statistics*, June 1999, at 514; the rate for January 18, 2000, is from the *New York Times*, January 18, 2000, at C22.

[90] U.S. imports from Mexico rose from $86.9 billion to $100.2 billion, according to U.S. Department of Commerce, Bureau of Economic Analysis and Bureau of the Census, U.S. International Trade in Goods and Services, November 1999, Statistical Release of January 20, 2000 (available at website www.bea.doc.gov/bea/rels.htm).

2000, compared with its excellent growth performance in the past (when Taiwan was one of the "Four Tiger" nations). Taiwan's growth rate is projected to fall from 6.8% in 1997 (close to its long-run, historical average)[91] to 4.9% in 1998, 5.0% in 1999, and 5.1% in 2000. Another indicator of slowing domestic growth in Taiwan is the fact that U.S. trade deficit with Taiwan increased by 6.8% (from $13.8 billion to $14.8 billion) between January-November 1998 and the same period in 1999.[92]

Turkish growth has also slowed down, from an average rate of 4.1% in 1990-97 to 2.8% in 1998, an estimated 1.2% in 1999, and a projected 2.6% in 2000. Moreover, literally *all* of Turkey's growth in 1998 came from exports: in real terms (*i.e.*, in constant 1987 Turkish *lira*), exports grew by 10.4% in 1998, while total domestic expenditures (on private consumption, fixed investment, and government consumption) actually fell slightly (by -0.2%).[93] This is not surprising given the enormous depreciation of the Turkish lira in recent

---

[91] Taiwan's average growth rate for the 1960-85 period is shown as about 6.5% in World Bank, *The East Asian Miracle: Economic Growth and Public Policy*, Oxford: Oxford University Press, 1993, Figure 1.1 at 29. Recent GDP data for Taiwan are not reported in many standard sources, due to the country's anomalous political status vis-à-vis China.

[92] U.S. Department of Commerce, Bureau of Economic Analysis and Bureau of the Census, U.S. International Trade in Goods and Services, November 1999, Statistical Release of January 20, 2000 (available at website www.bea.doc.gov/bea/rels.htm).

[93] Calculated from data in Organization of Economic Co-operation and Development (OECD), *Main Economic Indicators*, May 1999, at 18-19.

years (the *lira* fell by 52.9% in 1998 alone, and has fallen by another 42.5% since January 1999).[94]

Of the eight subject countries, only India has GDP growth rates for 1998-2000 that are projected to be relatively close to its historical average, and even then they are somewhat lower and falling (from an average of 6.0% in 1990-97 to 5.5% in 2000). Most of this growth, however has been due to a jump in agricultural production.[95] Foreign investment has dropped dramatically due to India's nuclear tests from $3 billion in 1996-97 to $61 million in 1998-99.[96]

Venezuela has been hit hard by political and economic uncertainty.[97] The economy was in deep recession in 1999, contracting 7.6%. High interest rates, and high inflation have continued to undermine the economy.[98]

Thus, all eight subject countries are projected to have relatively slow growth for the foreseeable future, either in absolute terms or compared with their own past performance–and

---

[94] The Turkish exchange rate was 107,775 *lira* per dollar at the end of 1996, 205,605 *lira* per dollar at the end of 1997, 314,464 *lira* per dollar at the end of 1998, and 546,700 *lira* per dollar on January 18, 2000. Data for January 18, 2000 is from the *New York Times*, January 18, 2000, at C22; data for earlier years are from International Monetary Fund, *International Financial Statistics*, June 1999, at 758.

[95] India Country Brief, http://wbln1018.worldbank.org/sar/sa.nsf (September 1999).

[96] *Id.*

[97] Venezuela - MacroEconomic Update, August 1999, International Market Insight, September 23, 1999.

[98] *Id.*

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

much of the growth they will have is likely to come from exports rather than from domestic sources. As a result, their construction industries are likely to remain depressed and, consequently, their domestic demand for standard pipe products will also be low. Exports are likely to be the main source of growth for those subject countries that do recover in the next few years. The next question, then, is where these exports are likely to go, to the United States or other major export markets. The subject countries will have tremendous economic incentives to increase their exports of unfairly traded standard pipe products to the United States if the orders in these cases are removed.

Table 2 shows recent trends in (and forecasts of) GDP growth for the United States and other major countries or regions that might provide export markets for the subject countries in this industry. In examining these data, it should be borne in mind that industrialized countries like the United States typically grow more slowly than developing countries, on average, and hence what matters is not the comparison of absolute growth rates across countries, but rather each country's current and projected growth relative to its own past trends.

As shown in Table 2, U.S. growth has been relatively robust, at 3.9% per year in each of 1997 and 1998, and 3.7% in 1999. The IMF projects U.S. growth to fall to 2.6% in 2000. However, the IMF and other forecasters (including the U.S. Congressional Budget Office and Council of Economic Advisers) have been making such forecasts of U.S. growth falling to a supposed long-term trend rate of just over 2% for the last several years, and to date they have

Barcode:3883995-05 A-549-502 SCO - Scope Inquiry - Line Pipe

been persistently wrong. Indeed, the latest U.S. growth rate data shows the United States experiencing a 5.7% growth rate.[99]

**Table 2**[100]

**GDP Growth Rates in the United States and Other Major Markets for Standard Pipe Products, Actual Data for 1997-1998 and IMF Projections for 1999-2000**

(in percent)

| Country or Region: | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|
| **Industrialized Countries** | | | | |
| United States | 3.9 | 3.9 | 3.7 | 2.6 |
| European Union | 2.6 | 2.7 | 2 | 2.7 |
| Japan | 1.4 | -2.8 | 1 | 1.5 |
| **Developing Countries** | | | | |
| East Asian NICs | 4.2 | -8.1 | 6.7 | 6.4 |
| Other Asia[a] | 6.6 | 3.7 | 5.3 | 5.4 |
| Western Hemisphere[a] | 5.3 | 2.2 | 0.1 | 3.9 |
| Middle East and Europe[a] | 4.5 | 3.2 | 1.8 | 3.1 |
| Transition Economies | 2.2 | -0.2 | 0.8 | 2.8 |

Notes:
[a]Developing nations only.

[99] See *GDP revised to 6.9% in Q4*, http://www.usatoday.com/money/economy/econ0002.htm (visited February 28, 2000).

[100] Source: International Monetary Fund, *World Economic Outlook*, Part I, October 1999, Tables 1.3, 1.5, 1.6, and 2, at 10, 20, 28, and 170, respectively.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Growth in most of the other countries and regions shown in Table 2 has been more sluggish or declining, however, by those regions' own standards. The European Union (EU) has grown at anemic rates in recent years (2.6% in 1997, 2.7% in 1998, and 2.0% in 1999), and is projected to have continued slow growth this year (2.7% in 2000— which may be optimistic). Also, with the new euro currency having fallen by 17.4% in value since its inception in January 1999,[101] most European countries are likely to recover mainly through increasing their own exports, while their imports are likely to be reduced—hence, Europe will not provide a robust import market for the foreseeable future, and on the contrary will be putting more pressure on global export markets.

Japan has been mired in a recession with negative growth throughout 1998 and minimal growth in 1999, according to the IMF's data shown in Table 2, and is projected to recover only to 1.5% growth in 2000—i.e., Japan faces continued medium-term stagnation, even if the economy bottoms out and the recession officially ends. The East Asian newly industrializing countries are recovering from a significant drop in GDP in 1998 and the Asian developing countries show lower average growth rates for 1999-2000 than they had in 1997, after extremely slow growth in 1998. The developing nations of the western hemisphere (Latin America and the Caribbean) had almost no growth in 1999 (growth of 0.1%) followed by a

[101] This is based on an exchange rate of 0.9754 dollars per euro on January 28, 2000 (The Wall Street Journal, C19), compared with 1.1812 dollars per euro on January 4, 1999 (U.S. Board of Governors of the Federal Reserve System, Statistical Release H.10, from website www.bog.frb.fed.us/releases/H10/hist/).

slow recovery in the current year (3.9%, well below the 1997 growth rate of 5.3%). The Middle East and the developing nations in Europe have reduced growth in the data for 1998 and in the projections for 1999-2000, compared with 1997. Finally, the transition economies as a group have had (or are projected to have) extremely anemic or negative growth over the entire period shown in Table 2; they are much more likely to export the subject product than to import it.

Thus, none of these regions or countries is likely to have a booming construction industry or to provide a healthy market for standard pipe exports for the foreseeable future. As a result, it can reasonably be projected that the subject countries will increase their exports of standard pipe in the next few years--and that the lion's share of these increased exports will be targeted on the U.S. market, if those countries are no longer bound by the restrictions imposed as a result of the Commission's orders in these cases.

**2. Changes in construction demand.**

Recent industry forecasts suggest that the growth in U.S. construction expenditures, on a constant dollar basis, will slow from 3.8% in 1998 to 3.4% in 1999[102] and then grow slightly to 3.6% in 2000.[103] Housing starts are expected to decline by 3% in 2000, dropping to a

[102] Merrill Lynch Capital Markets, "U.S. Building Industry Monthly Review: March," (c)Thomson Financial Services, 03/03/1999, at 4.

[103] Cammack, K., *et al.*, England Construction/General Contracting: Industry Update, Merrill Lynch Capital Markets, October 19, 1999, Table 7 "US Construction and Economic Forecasts.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

lower number of starts than 1998.[104] Any slowing of the domestic economy 2000 will have a particularly severe impact on the demand for the products in these cases because construction is highly sensitive to changes in the level of output in the economy. Real construction spending in the U.S. fell 2.4% in April, relative to the previous month, although it remained about 4% above spending levels a year earlier.[105]

**Table 3**[106]

CONSTRUCTION EXPENDITURES (Bil. '92 $)

| | Percent Change | | |
|---|---|---|---|
| | '97-'98 | '98-'99 | '99-'00 |
| Residential | 9.7% | 3.7% | 3.5%[107] |
| Private Nonresidential | 1.1% | 2.0% | 2.2% |
| Public | -2.9% | 4.6% | 5.5% |
| Total | 3.8% | 3.4% | 3.8% |

[104] 1.62 million starts in 1998, 1.65 million in 1999, and a forecast 1.60 million in 2000. *Id.*

[105] The Wall Street Journal, Briefing.com, "April Construction Spending", *The Wall Street Journal Interactive Edition*, Updated: 01-Jun-99.

[106] Source: Merrill Lynch Capital Markets, "U.S. Building Industry Monthly Review: March," (c)Thomson Financial Services, 03/03/1999, at 4.

[107] This figure has changed from 4% to only 3.5% while the other forecasts have remained constant for 2000 in this more recent report. Cammack, K., *et al.*, England Construction/General Contracting: Industry Update, Merrill Lynch Capital Markets, October 19, 1999, Table 7 "US Construction and Economic Forecasts.

These forecasts assume that Real GDP in the U.S. will increase by 3.4% in 1999 and 2.6% in 2000.[108] Recent increases in interest rates have caused the housing recovery to lose momentum, which could have a substantial impact on producers of the domestic like product in these cases.[109] Construction is one of the most interest-sensitive sectors of the U.S. economy. Long-term interest rates (for the benchmark 30-year U.S. treasury bonds), which are most important to the construction expenditures, have increased from 5.1% in the week ending January 1, 1999 to over 6.4% on January 28, 2000.[110]

A decline in the level of construction demand in the U.S. would heighten the vulnerability of the domestic standard pipe and tube industry to injury from increased imports. Thus, the potential for a slowdown in U.S. construction increases the threat that the domestic producers of the like product will be injured by subject imports if the orders in these cases are terminated.

**3. Reduced construction demand in the rest of the world – subject countries.**

Construction demand in the subject countries is highly sensitive to domestic macroeconomic conditions, including local interest and GDP growth rates. Output growth is

[108] *Id.* at 4.

[109] Curran, R.P., *et al.*, Building Materials Monthly Review, Merrill Lynch Capital Markets, December 3, 1999.

[110] Federal Reserve, Board of Governors, "Federal Reserve Statistical Release: Selected Interest Rates, G.13(415)" January 5, 1999, at 1, and The Wall Street Journal C1 (January 31, 2000); *see also* The Wall Street Journal, "U.S. Rate Increase Concerns Fuel Downturn in the Americas," *The Wall Street Journal Interactive Edition.*

**Public Version**

slowing in 2000 in many of the subject countries, for reasons discussed above. Although interest rates have begun to fall throughout the region, rates remain well above levels of a year ago in many countries. For example, money market interest rates in Brazil stood at 36.12 percent in April 1999.[111] While this was down from the peak rate of 43.25 percent in the previous month, it was nearly sixteen points higher than the rate which prevailed in July 1998 (19.23 percent), the month before the crisis began.[112] Demand in the construction industry has been punished by the high interest rates.[113] Construction demand in Brazil, the largest economy in Latin America, has declined 6.4% between the second quarter of 1998 and the second quarter of 1999.[114]

Construction elsewhere in Latin America is also quite depressed, as noted in one recent financial market analysis:

> The creation of new projects in the rest of the region remains rather thin. Most new projects likely will come from privatization efforts or Government-sponsored projects, which stems from reduced capital expenditure plans given the current macroeconomic environment (sic). For the most part, the outlook for heavy construction activities,

---

[111] International Monetary Fund, *International Financial Statistics*, ("*IFS*"), June 1999, at 171.

[112] *Id.* at 171.

[113] Brazil Industry Forecast, Cambridge International Forecasts Country Report November 17, 1999.

[114] Brazil Industry Forecast, Cambridge International Forecasts Country Report November 17, 1999.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Barcode:3883995-05 A-549-502 SCO - Scope Inquiry - Line Pipe

while not deteriorating any further, is not showing signs of a recovery in the short run.[115]

Consistent with this trend, construction in Venezuela declined 22% in the first semester of 1999 compared with the year previous.[116] The crisis continued into the second half of 1999, with 40% unemployment in the construction industry.[117]

Mexico is a slight exception to the depressed construction activity in Latin America. Construction grew 2.3% in the third quarter of 1999, but "the construction sector is still relatively weak."[118] Data reported for Mexico indicates falling output in late 1998, as shown below.

---

115 Warburg Dillon Read, "Latin American Construction: A Strategic Review" (c) Thomson Financial Services, 04/08/1999, at 1.

116 Venezuela - Macroeconomic Update, August 1999, National Trade Data Bank Market Reports, International Market Insight, September 23, 1999.

117 Venezuela Country Profile, The Economic Intelligence Unit Ltd., December 3, 1999.

118 Mexico: Economy, Hilfe Country Report, December 22, 1999; Trade Port at http://www.tradeport.org/ts/countries/mexico/sectors.html (visited January 17, 1999).

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

**Public Version**

**Table 4**[119]

Industry Trends

Construction Indicators

| Country/Indicator | Last | Date | Previous Growth | Year-Ago |
|---|---|---|---|---|
| Argentina | | | | |
| Cement Deliveries (000 tons) | 586.28 | Feb -99 | -2.11% | -7.3% |
| Construction Index | 98.9 | Feb -99 | 0% | 2.89% |
| Brazil | | | | |
| Construction Index | 169.29 | Feb-99 | 0.97% | 3.48% |
| Chile | | | | |
| Construction Index | 90.0 | Sep-98 | -8.8% | 16.9% |
| Housing Starts (units) | 4,483.0 | Jan -99 | -64.95% | -52.45% |
| Colombia | | | | |
| Cement Sales (000 tons) | 665.12 | Apr-98 | -6.3% | -4.2% |
| Mexico | | | | |
| Construction GDP | 59.41 | Dec-98 | -3.81 | 0.16% |
| Construction Spending (MXP Mn) | 5,865.65 | Nov-98 | -3.85% | 20.8% |
| Peru | | | | |
| Cement Sales (000 tons) | 273.06 | Feb-99 | -12.15% | -18.28% |
| Construction GDP | 363.80 | Jan-99 | -12.38% | -5.97% |

119 Source: Warburg Dillon Read, "Latin American Construction: A Strategic Review" (c) Thomson Financial Services, 04/08/1999, at 1.

Note in Table 4 that construction activity also declined sharply in Chile and Peru. In addition, the Mexican economy remains highly vulnerable to changes in the economic environment in the U.S. Any increase interest rates or decline in output in the U.S. would be rapidly transmitted to Mexico, as well, because Mexico is highly dependent on the demand for exports to the U.S. as well as U.S. financing of its external debt.

Korea, another major supplier of subject imports in these cases, also remains mired in a deep recession. A recent market research summarized this situation in its subtitle: "The worst is yet to come."[120] This report expects "no improvement in the fundamentals of the construction sector in the medium term."[121]

---

[120] Credit Suisse First Boston Corporation, "Construction Sector: Maintain Underweight, The worst is yet to come," (c) Thomson Financial Services, 09/22/1998, at 1.

[121] *Id.* at 1.

**Public Version**

**Table 5**[122]

Construction building permit trend

('000 sq m)

| | Residential Commercial | Factory | Other | Total | YoY | % chg. |
|---|---|---|---|---|---|---|
| Jan 98 | 4,319 | 1,059 | 226 | 534 | 6,137 | -16.8 |
| Feb 98 | 3,435 | 1,109 | 213 | 1,065 | 5,822 | -7.3 |
| Mar 98 | 3,571 | 1,014 | 312 | 757 | 5,653 | -38.6 |
| Apr 98 | 2,501 | 736 | 296 | 721 | 4,253 | -58.1 |
| May 98 | 2,338 | 1,064 | 172 | 589 | 4,163 | -65.2 |
| Jun 98 | 2,784 | 829 | 206 | 690 | 4,510 | -54.3 |
| Jul 98 | 1,963 | 406 | 212 | 804 | 3,385 | -63.5 |

Evidence in support of this conclusion is provided in Table 5, which shows a steady decline in building permits in the key residential and commercial sectors in Korea through the first half of 1998. The amount of building permits issued in Korea continued to decline in 1999. Building permits had declined 2.4% in August, year to date, compared to the same period in 1998.[123] Construction order growth declined 5.4% year to date as of August, which is only 58.2% of total construction orders during the same period in 1997.[124]

---

[122] Source: Credit Suisse First Boston Corporation, "Construction Sector: Maintain Underweight, The worst is yet to come," (c) Thomson Financial Services, 09/22/1998, at 1.

[123] Kim, M., South Korea Construction Update, HSBC James Capel, October 21, 1999.

[124] *Id.*

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

Public Version

Some recent news reports suggest that Korea has begun to recover from its recession. The industrial production index has recovered to pre-crisis levels.[125] However, the number of officially unemployed persons remains 262% above levels in 1997.[126] Thus, the overall Korean economy remains mired in a deep recession, despite the reported recovery of manufacturing production. Construction activity is unlikely to recover until the recession ends and overall economic activity recovers to pre-crisis levels.[127] Until that time, Korea is likely to retain substantial excess production capacity and to face substantial incentives to export subject products to the U.S. market.

In Thailand, the decline in the economy and the closure of many finance companies have severely impacted construction. The private sector has slowed down its investment in response to the uncertainty in the value of the *baht* and high interest rates.[128] The government has also adopted a leniency policy by allowing contractors to extend the work completion periods on current projects without being subject to fines.[129] India's construction industry

---

[125] *IFS*, June 1999 at 441.

[126] *IMF* at http://www.imf.org/external/np/sec/pn/1999/PN99115.HTM (visited January 24, 2000).

[127] Trade Port at http://www.tradeport.org/ts/countries/skorea/sectors.html (visited January 17, 2000).

[128] Trade Port at http://www.tradeport.org/ts/countries/thailand/sectors.html (visited January 17, 2000).

[129] *Ministry Plans Fund to Help Construction Contractors*, http://bday.net/dec07/1-071.html (visited January 17, 2000).

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

grew only 2.0% in 1999, after growing 4.1% in 1998, 2.8% in 1997, and 7.6% in 1996.[130] Taiwan's construction industry has declined 32.9% between 1994 and 1998.[131] Those employed by the construction industry in Taiwan dropped from over 1 million in 1995 to 834,000 in 1998.[132]

Producers in elsewhere in Latin America and Asia confront similar prospects.[133] Therefore, the U.S. will continue to be threatened with excess production capacity in many of the subject countries in these cases in 1999 and beyond.

**4. Antidumping duties in foreign countries.**

In 1996, the Canadian CITT conducted a review of its findings of material injury made in July 1991 and January 1992, regarding standard pipe from India, Taiwan, Thailand, and Venezuela, and Brazil.[134] The CITT determined that the dumping of standard pipe from these countries was causing and was likely to cause material injury to the production in Canada of like goods.[135] Exhibit 5 shows the dumping margins found by Revenue Canada, including 19.8% against Tata, 23.7% against Kao Hsing Chang, and 33.4% against Conduven. In its

---

[130] Based on fiscal years. India, EIU Country Profiles, November 19, 1999.

[131] Taiwan, EIU Country Profiles, November 29, 1999.

[132] *Id.*

[133] For example, construction in Venezuela declined 22.0% in the first four months of 1999.

[134] *See* Canadian International Trade Tribunal, Review No. RR-95-002, July 25, 1996.

[135] *See id.*

PUBLIC DOCUMENT

injury review the CITT found a likelihood of material injury in "the potential diversionary effects of injury findings against the named countries in the United States...."[136] For the same reason, in 1995 Canada continued its finding of material injury by imports from Korea.[137] The CITT noted that "the same exporters that have been found to be dumping standard pipe in Canada were also found to be injuriously dumping the same goods in the United States..."[138] The Canadian orders against India, Korea, Taiwan, Thailand, and Venezuela, and Brazil are still in effect today,[139] which means that the United States will be the target if the U.S. orders are revoked.

**D. Shift Of Production Facilities Used For Other Products**

The ability of foreign producers to shift production facilities from one product to another allows them to take advantage of changing market conditions and product-specific opportunities. The Commission notes that in Korea, alternate products reportedly produced on the same equipment include line pipe, cylinders, OCTG, and mechanical tubing. *See* Staff Report at II-9. Further, both {[ ]} reported that line pipe and conduit were produced using the same equipment. *See id.* at II-9-10. In Venezuela, alternate products

---

[136] *Id.*

[137] *See* Canadian International Trade Tribunal, Review No. RR-94-004, June 5, 1995.

[138] *Id.* *See* Exhibit 5.

[139] *See* Section III.A.4, above.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

produced on the same equipment as standard pipe include [

]. *See id.* at II-10-11.

**1. Shift from line pipe.**

There is a serious threat of product shifting between line-pipe and standard pipe. In the September 30, 1999 hearing for the line pipe investigation (No. TA-201-70), Donald Cameron and others testified that 70-80% of dual stenciled material imported from Korea as line pipe is sold for standard-pipe applications. *See e.g., Line Pipe Transcript* at 159 line 21, 195 line 9. Mr. Cameron stated that "70 to 80 percent of the dual-stenciled material imported from Korea that enters the United States as line pipe is sold for standard-pipe applications." *Line Pipe Transcript* at 159, lines 21-23. Mr. Cameron also quoted the staff report in that investigation, stating that "Triple-stenciled, welded line pipe and standard pipe were physically the same product," and "under these circumstances the product's end use is the only practical way to distinguish between welded line pipe and standard pipe." *Line Pipe Transcript* at 160 lines 5-11. Mr. Ed Smith, President of Palomar Pipe, a pipe distributor, testified that "{a}s I also stated in my affidavit, my experience is that 70 to 80 percent of the imports of dual stenciled pipe from Korea into the West Coast . . . is sold for standard pipe applications." *Line Pipe Transcript* at 195 lines 8-11. Mr. Cameron further testified that "{t}here is more of an incentive in Korea to be supplying dual-stencil material for standard-pipe use, and that's simply because of the dumping order." *Line Pipe Transcript* at 225 lines 20-23. It is likely that Korea, and other countries if no longer subject to the restraints imposed by the Standard

**Public Version**

Pipe antidumping order, will switch their production from line pipe (whether dual stenciled or not) to standard pipe.

As the following table shows, the impact of that switch will be devastating on the domestic standard pipe industry. With extra tariffs of 19% imposed on line pipe beginning March 1, 2000 as a result of the section 201 relief, product shifting into standard pipe with its lower dumping duties will become even more attractive. As much as 150,000 tons of capacity will become available because of this shift.

Line Pipe from Korea[140]

All figures in tons

| Country | 1997 imports | 1998 imports | 1st half of '98 | 1st half of '99 | Capacity |
|---|---|---|---|---|---|
| Korea | 76,671 | 157,997 | 79,318 | 84,013 | 360,011 |

**2. Shift from OCTG due to orders.**

The recent preliminary affirmative antidumping decision regarding oil country tubular goods ("OCTG") from Korea has raised the dumping margin against SeAH to 15.03%.[141] This gives SeAH and other producers an incentive to shift away from OCTG production, and

[140] Data obtained from *Circular Welded Carbon Quality Line Pipe*, Investigation No. TA-201-70, Publication 3261, December 1999, at II-15, II-32, and II-37.

[141] *See Oil Country Tubular Goods From Korea: Preliminary Results of Antidumping Duty Administrative Review*, 64 Fed. Reg. 48,783, September 8, 1999.

obviously means that the excess capacity in line pipe production will not be turned to OCTG either.

## VII. REVOCATION OF THE ORDERS WOULD LIKELY HAVE ADVERSE PRICE EFFECTS

The statute instructs the Commission to assess whether revoking the orders would result in adverse price effects in the domestic market. In making this evaluation, the Commission is to consider whether:

(A) there is likely to be significant price underselling by imports of the subject merchandise as compared to domestic like products, and

(B) imports of the subject merchandise are likely to enter the United States at prices that otherwise would have a significant depressing or suppressing effect on the price of domestic like products. 19 U.S.C. § 1675a(a)(3).

Even with duties in effect, producers that have had smaller rates of duties can cut prices and significantly increase shipments. Between 1997 and 1999, on small diameter products (Products 1, 2, and 6), both volume of sales and amount of underselling increased significantly for imports, because import prices dropped much more rapidly than those of domestic producers. *See* Tables V-1, V-2, and V-6; Staff Report at V-10, V-11, and V-15. The Commission notes that imports undersold domestic product 1 in 48 of 49 comparisons, undersold domestic product 2 in 41 of 46 comparisons, and undersold domestic product 6 in all comparisons. *See* Staff Report at V-8. Due to this pervasive underselling, the domestic producers asked for administrative reviews of the antidumping orders against subject countries.

Barcode:3883995-05 A-549-502 SCO - Scope Inquiry - Line Pipe

**Public Version**

To date, the new administrative review determinations duties have significantly increased duties on producers [ ]. Commerce has raised the dumping duties against Taiwanese imports by Kao Hsing Chang, Yun Din, and Yieh Loong from less than 1% to 24.8%,[142] while duties against Saha Thai have increased from 1.92% to 9.65%.[143]

The data for other standard pipe products (Products 3, 4, and 5) shows no significant underselling. *See* Tables V-3, V-4, and V-5; Staff Report at V-12-14. We note that for these products, imports are very small compared to domestic shipments and to the import quantities of Products 1, 2, and 6. This demonstrates that foreign products whose prices are set below those of domestic producers are sold in much larger quantities.

Even with orders in place, subject imports increased by more than 10% from 1997 to 1999. This growing level of imports in the face of dumping duties demonstrates the home-market domestic demand problems faced by subject countries. If orders were to be revoked, there will be a huge surge based on underselling from those producers which are already shipping to the U.S. market. Added to this surge will be the resumption of imports from producers which have reduced or halted their shipments because of high duties, such as Brazil,

---

[142] *See Certain Circular Welded Carbon Steel Pipes and Tubes From Taiwan: Amended Final Results of Antidumping Duty Administrative Review*, 65 Fed. Reg. 5310, February 3, 2000.

[143] *See Certain Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review*, 64 Fed. Reg. 56,759, October 21, 1999.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

India, Turkey, Venezuela, and Taiwan (large diameter). In the absence of duties, these countries will significantly increase their shipping.

## VIII. USE OF ADVERSE INFERENCES AGAINST FOREIGN PRODUCERS NOT SUBMITTING INFORMATION

In an investigation where only one party has participated in the review through questionnaire responses, the statute authorizes the Commission to take adverse inferences against any party that has failed to cooperate with the Commission's review.[144] The statute authorizes the Commission to

employ secondary information to make such inferences in order to ensure that no party benefits by not cooperating with the Commission's review.[145] As the Uruguay Round Agreements Act ("URAA") Statement of Administrative Action ("SAA") explains,

> Where a party has not cooperated, Commerce and the Commission may employ adverse inferences about the missing information to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully. In employing adverse inferences, one factor the agencies will consider is the extent to which a party may benefit from its own lack of cooperation.[146]

---

[144] In previous full five-year reviews where only one party has responded to the Commission's questionnaires, the Commission has noted that the statute authorizes the Commission to take adverse inferences while maintaining its obligation to consider the record evidence as a whole in making its determination. *See Polychloroprene Rubber From Japan*, Inv. No. AA1921-129 (Review) USITC Publication 3212 (July 1999), at 8-9 (note 44) and *Anhydrous Sodium Metasilicate From France*, Inv. No. 731-TA-25 (Review), USITC Publication 3235 (September 1999), at 7.

[145] 19 U.S.C. § 1677e.

[146] SAA, H.R. Rep. No. 103-316, Vol. I, at 870 (1994).

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:57 PM, Submission Status: Approved

The Commission is not required to demonstrate that information it uses to make such inferences is the best alternative information.[147] Furthermore, the Act does not require the Commission to show that its inferences are the same as the conclusions it would reach if perfect information were available.[148] It is only necessary that, based on the available information, the Commission draws inferences that are reasonable.[149]

The Commission may also use information from previous determinations to establish facts that are relevant to the present review. Although the statute imposes an obligation that the Commission should, to the extent possible, corroborate secondary information it uses to make adverse inferences in its investigations,[150] that obligation does not apply in instances where the Commission is conducting a five-year review and looks to previous findings established in investigations underlying the original orders.[151] The legislative history in this situation specifically cites the example of sunset reviews, and notes that the corroboration

---

[147] "{N}either Commerce nor the Commission must prove that the facts available are the best alternative information." *Id* at 869.

[148] "It is not possible for the Commission to demonstrate that its inferences are the same as those it would have made if it had perfect information." *Id.*

[149] "{F}acts available are information or inferences which are reasonable to use under the circumstances." *Id.*

[150] 19 U.S.C. § 1677e(b).

[151] SAA at 870.

requirement does not apply when the Commission uses facts established in prior determinations to aid in evaluating the likelihood of future injury in sunset reviews.[152]

## IX. MAGNITUDE OF MARGIN OF DUMPING AND NET COUNTERVAILABLE SUBSIDY; NATURE OF COUNTERVAILABLE SUBSIDY.

In making a determination under section 1675(b) or (c) of this title, the Commission may consider the magnitude of the margin of dumping or the magnitude of the net countervailable subsidy. 19 U.S.C. § 1675a(a)(6). Commerce conducted expedited reviews pursuant to 19 U.S.C. § 1675(c)(1) to determine whether revocation of the orders would be likely to lead to continuation of dumping. The results are summarized in Table I-5 on page I-23 of the Staff Report and show that in the absence of orders, the foreign producers are likely to resume dumping at significant margins. The margins of 103.38% against all Brazilian producers and 52.51% against all Venezuelan producers are dramatic indicators of the potential negative impact of imports from these countries. *See* Staff Report at I-23.

Still, Table I-5 does not fully show the potential impact of revoking the orders. The margin against Tata Iron and Steel Co. is listed as 7.08% because this was the margin from the original investigation, which Commerce believes to be "probative of the behavior of the

---

[152] "The Administration does not intend that the corroboration requirement will apply when information from a prior determination is being used to establish the facts concerning the period that was the subject of that prior determination. In such cases, the information is not being used "rather than" facts obtained in the course of the current investigation or review. The situation may arise, for example, when a prior injury determination is used for evaluating the likelihood of future injury if an order is revoked or an agreement terminated in a changed circumstances review under section 751(b) *or a five-year review under section 751(c).*" SAA at 870 (emphasis added).

producers ... without the discipline of the orders." Staff Report at I-22. However, the most recent margin against Tata is 37.65%,[153] which means that this company's dumping has actually increased despite the current orders. If the orders are revoked, Tata's dumping certainly will not decrease to 7.08%, as Table I-5 indicates.

## X. CONCLUSION

For the foregoing reasons the Commission should continue relief from subject unfair imports.

Respectfully submitted,

Roger B. Schagrin
SCHAGRIN ASSOCATES
Counsel to the Domestic interested parties

---

[153] *See Certain Welded Carbon Steel Standard Pipes and Tubes From India, Final Results of Antidumping Duty Administrative Reviews*, 57 Fed. Reg. 54,360 (November 18, 1992).

Barcode:3883995-06 A-549-502 SCO - Scope Inquiry - Line Pipe

**Attachment 8**

*Certain Welded Carbon Steel Pipes and Tubes from Thailand and Venezuela*, Inv. No. 701-TA-252-53 (Prelim), USITC Pub. 1680 (Apr. 1985)

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

PUBLIC DOCUMENT

Barcode:3883995-06 A-549-502 SCO - Scope Inquiry - Line Pipe

# CERTAIN WELDED CARBON STEEL PIPES AND TUBES FROM THAILAND AND VENEZUELA

**Determination of the Commission in Investigation No. 701-TA-242 (Preliminary) Under the Tariff Act of 1930, Together With the Information Obtained in the Investigation**

**Determinations of the Commission in Investigation Nos. 731-TA-252 and 253 (Preliminary) Under the Tariff Act of 1930, Together With the Information Obtained in the Investigations**

**USITC PUBLICATION 1680**

**APRIL 1985**

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

United States International Trade Commission / Washington, D.C. 20436

Barcode:3883995-06 A-549-502 SCO - Scope Inquiry - Line Pipe

# UNITED STATES INTERNATIONAL TRADE COMMISSION

## COMMISSIONERS

**Paula Stern, Chairwoman**
**Susan W. Liebeler, Vice Chairman**
**Alfred E. Eckes**
**Seeley G. Lodwick**
**David B. Rohr**

Bruce Cates, Office of Investigations
Dennis Rapkins, Office of Industries
John Ryan, Office of Economics
Jack Simmons, Office of the General Counsel
Chand Mehta, Office of Investigations
Robert Carpenter, Supervisory Investigator

**Address all communications to**
**Kenneth R. Mason, Secretary to the Commission**
**United States International Trade Commission**
**Washington, DC 20436**

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

Barcode:3883995-06 A-549-502 SCO - Scope Inquiry - Line Pipe

CONTENTS

Page

Determinations---------- 1
Views of Commission---------- 5
Separate Views of Vice Chairman Liebeler---------- 19
Information obtained in the investigations:
  Introduction---------- A-1
  Previous Commission investigations---------- A-2
  Nature and extent of the alleged subsidies---------- A-4
  Nature and extent of the alleged sales at LTFV---------- A-5
  The products:
    Description and uses---------- A-5
    Manufacturing processes---------- A-6
    U.S. tariff treatment---------- A-8
  U.S. producers---------- A-8
  U.S. importers---------- A-10
  The U.S. market:
    Channels of distribution---------- A-10
    U.S. consumption---------- A-11
  Consideration of alleged material injury to an industry in the United States---------- A-12
    U.S. production, capacity, and capacity utilization---------- A-13
    U.S. producers' shipments---------- A-14
    U.S. exports---------- A-15
    U.S. producers' inventories---------- A-16
    Employment and wages---------- A-17
    Financial experience of U.S. producers---------- A-19
      Standard and line pipes and tubes---------- A-19
      Standard pipes and tubes---------- A-19
      Line pipes and tubes---------- A-22
      Overall establishment operations---------- A-22
      U.S. producers' statements on the impact of imports from Thailand and Venezuela on their growth, investment, and ability to raise capital---------- A-24
  The question of the threat of material injury---------- A-24
    U.S. importers' inventories---------- A-24
    Capacity of foreign producers to generate exports:
      Thailand---------- A-24
      Venezuela---------- A-26
  Consideration of the causal relationship between alleged material injury or the threat thereof and the allegedly subsidized and LTFV imports:
    U.S. imports---------- A-27
      Standard pipes and tubes---------- A-28
      Line pipes and tubes---------- A-28
    Market penetration by the alleged subsidized and LTFV imports---------- A-28
      Standard pipes and tubes---------- A-32
      Line pipes and tubes---------- A-32
    Prices---------- A-32
      Standard pipes and tubes---------- A-35
      Line pipe---------- A-37
    Transportation costs---------- A-37
    Exchange rates---------- A-39
    Lost sales---------- A-40

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

PUBLIC DOCUMENT

Barcode:3883995-06 A-549-502 SCO - Scope Inquiry - Line Pipe

CONTENTS

Page

Appendix A. Commission's Federal Register notice of investigation---------- A-43
Appendix B. Calendar of witnesses who appeared at the Commission's conference---------- A-47
Appendix C. Previous Commission investigations---------- A-49

Tables

1. Certain welded carbon steel pipes and tubes: Selected U.S. producers' shares of domestic shipments, by product lines, 1984---------- A-9
2. Certain welded carbon steel pipes and tubes: U.S. producers' domestic shipments, imports for consumption, and apparent consumption, by types, 1982-84, January 1984, and January 1985---------- A-12
3. Standard and line pipes and tubes: U.S. production, capacity, and and capacity utilization, 1982-84, January-February 1984, and January-February 1985---------- A-13
4. Standard and line pipes and tubes: U.S. producers' domestic shipments, by types, 1982-84, January-February 1984, and January-February 1985---------- A-15
5. Standard and line pipes and tubes: U.S. producers' inventories of domestically produced merchandise, by types, as of Dec. 31 of 1982-84 and Feb. 29 of 1984-85---------- A-17
6. Average number of production and related workers producing standard and line pipes and tubes and hours worked by and wages and total compensation paid to such employees, 1982-84, January-February 1984, and January-February 1985---------- A-18
7. Income-and-loss experience of 6 U.S. producers on their operations producing standard and line circular welded carbon steel pipes and tubes, accounting years 1982-84---------- A-20
8. Income-and-loss experience of 2 U.S. producers on their operations producing standard pipes and tubes, accounting years 1982-84---------- A-21
9. Income-and-loss experience of 3 U.S. producers on their operations producing line pipes and tubes, accounting year 1982-84---------- A-22
10. Income-and-loss experience of 6 U.S. producers on the overall operations of their establishment within which welded carbon steel pipes and tubes are produced, accounting years 1982-84---------- A-23
11. Standard pipes and tubes: Thailand's production, capacity, capacity utilization, domestic shipments, and exports, 1982-85---------- A-25
12. Standard and line pipes and tubes: Conduven's capacity, production, export sales, and home-market sales, 1981-83, January-September 1983, and January-September 1984---------- A-27
13. Standard and line pipes and tubes: U.S. imports for consumption, by principal sources, 1982-84, January 1984, and January 1985---------- A-29
14. Standard pipes and tubes: U.S. imports for consumption, by principal sources, 1982-84, January 1984, and January 1985---------- A-30
15. Line pipes and tubes: U.S. imports for consumption, by principal sources, 1982-84, January 1984, and January 1985---------- A-31
16. Standard and line pipes and tubes: Shares of U.S. consumption supplied by Venezuela, Thailand, all other countries, and U.S producers, 1982-84, January 1984, and January 1985---------- A-33

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

CONTENTS

Tables--Continued

Page

17. Standard and line pipes and tubes: Shares of U.S. consumption, by specified sources, 1982-84, January 1984, and January 1985---------- A-34
18. Standard circular pipes and tubes: U.S. producers' and importer's weighted-average prices to service centers/distributors for schedule 40 standard pipe, by quarters, January 1982-February 1985---------- A-36
19. Line pipe: U.S. producers' and importers' weighted-average prices to service center/distributors, by quarters, January 1982-February 1985---------- A-38
20. Nominal and real exchange rate indexes between the U.S. dollar and the Venezuelan bolivar and the Thai baht, by quarters, January 1982-December 1984---------- A-40

Certain welded carbon steel pipes and tubes: Pending and recently terminated title VII investigations and outstanding dumping/countervailing orders and most recent dumping/subsidy margins, and import/consumption ratios, by countries, 1982-84---------- A-50

Note.--Information that would reveal the confidential operations of individual concerns may not be published and therefore has been deleted from this report. Such deletions are indicated by asterisks.

PUBLIC DOCUMENT
Barcode:3883995-06 A-549-502 SCO - Scope Inquiry - Line Pipe

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

UNITED STATES INTERNATIONAL TRADE COMMISSION
Washington, DC

Investigations Nos. 701-TA-242 (Preliminary) and
731-TA-252 and 253 (Preliminary)

CERTAIN WELDED CARBON STEEL PIPES AND TUBES FROM
THAILAND AND VENEZUELA

## Determinations

On the basis of the record 1/ developed in the subject investigations, the Commission determines, pursuant to section 703(a) of the Tariff Act of 1930 (19 U.S.C. § 1671b(a)), that there is a reasonable indication that industries in the United States are materially injured by reason of imports of welded carbon steel standard 2/ and line pipes and tubes 3/ which are allegedly subsidized by the Government of Venezuela. The Commission also determines, pursuant to section 733(a) of the Tariff Act of 1930 (19 U.S.C. § 1673b(a)), that there is a reasonable indication that an industry in the United States is threatened with material injury by reason of imports of welded carbon steel standard pipes and tubes from Thailand 4/ and materially injured by welded carbon steel line pipes and tubes from Venezuela, which are allegedly being sold in the United States at less than fair value (LTFV).

---

1/ The "record" is defined in section 207.2(i) of the Commission's Rules of Practice and Procedure (19 CFR § 207.2(i)).

2/ Chairwoman Stern and Vice Chairman Liebeler dissenting with respect to standard pipes and tubes.

3/ The term "welded carbon steel standard pipes and tubes" covers welded carbon steel pipes and tubes of circular cross section, 0.375 inch or more but not over 16 inches in outside diameter, provided for in items 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258, and 610.4925 of the Tariff Schedules of the United States Annotated (TSUSA). The term "welded carbon steel line pipes and tubes" covers welded carbon steel pipes and tubes of circular cross section, with walls not thinner than 0.065 inch, 0.375 inch or more but not over 16 inches in outside diameter, conforming to API specifications for line pipe, provided for in TSUSA items 610.3208 and 610.3209.

4/ Chairwoman Stern determines on the basis of a cumulative analysis that there is a reasonable indication that an industry in the United States is materially injured by reason of imports of welded carbon steel standard pipes and tubes from Thailand. Vice Chairman Liebeler dissenting with respect to imports from Thailand.

Background

On February 28, 1985, petitions were filed with the U.S. International Trade Commission and the U.S. Department of Commerce by counsel for the Committee on Pipe and Tube Imports alleging that an industry in the United States is materially injured and threatened with material injury by reason of imports of certain welded carbon steel pipes and tubes which are being subsidized by the Governments of Thailand and Venezuela, and which are also being sold in the United States at LTFV. On March 12, 1985, counsel amended the petitions to state, among other things, that the petitions were filed by the Standard Pipe Subcommittee and the Line Pipe Subcommittee of the Committee on Pipe and Tube Imports, and by each of the individual manufacturers that are members of those subcommittees. Accordingly, effective February 28, 1985, the Commission instituted investigation No. 701-TA-242 (Preliminary), to determine whether there is a reasonable indication that an industry in the United States is materially injured, or is threatened with material injury, or the establishment of an industry in the United States is materially retarded by reason of imports from Venezuela of certain welded carbon steel pipes and tubes which are allegedly subsidized by the Government of Venezuela. 1/ The Commission also instituted, effective February 28, 1985, investigations Nos. 731-TA-252 and 253 (Preliminary), to determine whether there is a reasonable indication that an industry in the United States is materially injured or threatened with material injury, or the establishment of an industry in the United States is materially retarded by reason of imports of certain welded

1/ Thailand is not a "Country under the Agreement" and therefore the Commission is not required to reach a determination with respect to injury from allegedly subsidized imports. Consequently, the Commission did not institute a countervailing duty investigation with respect to the allegedly subsidized imports from Thailand.

carbon steel pipes and tubes from Thailand and Venezuela which are alleged to be sold in the United States at LTFV.

In the process of instituting these investigations, Commerce advised the petitioner that the welded carbon steel pipe and tube products covered by the petitions represented two distinct classes or kinds of products, standard pipe and line pipe. Subsequently, on March 14, 1985, the petitions involving imports from Thailand were withdrawn as they relate to line pipe because there is no known production in Thailand of line pipe to American Petroleum Institute (API) specifications. On the same date, the antidumping petition involving imports from Venezuela was withdrawn as it relates to standard pipe because the Commission, on February 1, 1985, had made an affirmative preliminary determination with respect to imports of that product from Venezuela and Commerce was in the process of conducting its antidumping investigation.

Notice of the institution of the Commission's investigations and of a public conference to be held in connection therewith was given by posting copies of the notice in the Office of the Secretary, U.S. International Trade Commission, Washington, DC, and by publishing the notice in the Federal Register of March 18, 1985 (50 FR 10866). The conference was held in Washington, DC, on March 22, 1985, and all persons who requested the opportunity to appear in person or by counsel were given the opportunity to do so. The Commission's determinations in these investigations were made in an open "Government in the Sunshine" meeting held on April 8, 1985.

PUBLIC DOCUMENT
Barcode:3883995-06 A-549-502 SCO - Scope Inquiry - Line Pipe

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

## VIEWS OF THE COMMISSION

In these three preliminary investigations, we have determined that: (1) there is a reasonable indication that industries in the United States are materially injured by reason of allegedly subsidized imports of welded carbon steel standard and line pipes and tubes from Venezuela (Inv. No. 701-TA-242); 1/ 2/ (2) there is a reasonable indication that an industry in the United States is threatened with material injury by reason of imports of welded carbon steel standard pipes and tubes from Thailand allegedly sold at less than fair value (LTFV) (Inv. No. 731-TA-252); 3/ 4/ and (3) there is a reasonable indication that an industry in the United States is materially

---

1/ Chairwoman Stern determines that there is no reasonable indication that industries in the United States are materially injured or threatened with material injury by reason of allegedly subsidized imports of welded carbon steel standard pipes and tubes from Venezuela.

2/ Vice Chairman Liebeler determines that there is no reasonable indication that industries in the United States are materially injured or threatened with material injury by reason of allegedly subsidized imports of welded carbon steel standard pipes and tubes from Venezuela. See separate views of Vice Chairman Liebeler.

3/ Based on a cumulative analysis, Chairwoman Stern determines that there is a reasonable indication that an industry in the United States is materially injured by reason of allegedly LTFV imports from Thailand and does not reach the question of threat of material injury.

4/ Vice Chairman Liebeler determines that there is no reasonable indication that an industry in the United States is materially injured or threatened with material injury by reason of allegedly LTFV imports from Thailand. See separate views of Vice Chairman Liebeler.

injured by reason of allegedly LTFV imports of welded carbon steel line pipes and tubes from Venezuela (Inv. No. 731-TA-253). 5/

Like Products and the Domestic Industries

The term "industry" is defined in section 771(4)(A) of the Tariff Act of 1930 as being "the domestic producers as a whole of the like product." 6/ The term "like product" is defined in section 771(10) as being "a product which is like, or in the absence of like, most similar in characteristics and uses with the article subject to an investigation." 7/

There are two imported products that are the subjects of the three petitions in these investigations: standard and line circular welded carbon steel pipes and tubes, 0.375 inch or more but not over 16.0 inches in outside diameter, as follows:

(1) No. 701-TA-242, countervailing duty petition regarding Venenzuela, both standard and line pipes and tubes;

(2) No. 731-TA-252, antidumping petition regarding Thailand, standard pipes and tubes only; and

(3) No. 731-TA-253, antidumping petition regarding Venezuela, line pipes and tubes only.

We have addressed the like product question regarding standard pipes and tubes (standard pipe) and line pipes and tubes (line pipe) in prior

---

5/ Material retardation of the establishment of an industry in the United States was not at issue in any of the three investigations and will not be discussed further.

6/ 19 U.S.C. § 1677(4)(A).

7/ 19 U.S.C. § 1677(10).

investigations. 8/ In those investigations, the Commission recognized distinctions between standard pipe and line pipe. 9/ Standard pipe is manufactured to American Society of Testing and Materials (ASTM) specifications and line pipe is manufactured to American Petroleum Institute (API) specifications. 10/ Line pipe is made of higher grade steel and may have a higher carbon and manganese content than is permissible for standard pipe. Line pipe also requires additional testing. Wall thicknesses for standard and line pipes, although similar in the smaller diameters, differ in the larger diameters. 11/ Moreover, standard pipe (whether imported or domestic) is generally used for low-pressure conveyance of water, steam, air, or natural gas in plumbing, air-conditioning, automatic sprinkler and similar systems. Line pipe is generally used for the transportation of gas, oil, or

---

8/ The Commission has conducted a series of investigations regarding imports of welded carbon steel pipes and tubes in the recent past. Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea, Inv. No. 701-TA-168, USITC Pub. 1345 (1983); Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea and Taiwan, Invs. Nos. 731-TA-131 and 132 (Preliminary), USITC Pub. 1389 (1983), aff'd, Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea and Taiwan, Invs. Nos. 731-TA-131, 132, and 138 (Final), USITC Pub. 1519 (1984); Certain Welded Carbon Steel Pipes and Tubes from Brazil and Spain, Inv. Nos. 701-TA-220 (Preliminary), 731-TA-197 and 198 (Preliminary), USITC Pub 1569 (1984); Certain Welded Carbon Steel Pipes and Tubes from Taiwan and Venezuela, Inv. Nos. 731-TA-211 and 212 (Preliminary), USITC Pub. 1639 (1985).

9/ E.g., Certain Welded Carbon Steel Pipes and Tubes from Taiwan and Venezuela, supra, at 7.

10/ According to the petitions in these cases, standard pipe is generally produced to ASTM specifications A-120, A-53, or A-135, and line pipe is produced to API specifications API-5L or API-5X. E.g., petition in No. 731-TA-252 at 11.

11/ Report at A-8.

water in utility pipeline distribution systems. 12/ We conclude that domestic line pipe is like imported line pipe and not like imported standard pipe. We further conclude that domestic standard pipe is like imported standard pipe and is not like imported line pipe.

Turning to the question of pipe diameter, we believe that differentiation of either line or standard pipe by outside diameter is somewhat arbitrary. While it may be true that in some instances a country may export standard or line pipe above or below a certain diameter, this is not sufficient reason to limit the like product to only those sizes in cases such as these. According to American Iron & Steel Institute (AISI) information, there is no domestic production of standard pipe above 16 inches outside diameter. 13/ It appears that line pipe above 16 inches diameter generally has different uses from smaller line pipe and is marketed in a different fashion. Thus, the like products consist of all standard pipe and line pipe up to 16 inches outside diameter.

We conclude, therefore, that there are two like products in this investigation -- welded carbon steel line pipe and welded carbon steel standard pipe of circular cross-section up to 16 inches outside diameter. We further conclude that there are two domestic industries comprised, respectively, of the domestic producers of welded carbon steel line pipe and welded carbon steel standard pipe.

---

12/ Id. at A-6. See also Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea, supra, at A-2-4.

13/ AISI Form 10-P.

The domestic industries are composed of the producers of the like product. The domestic standard pipe and tube industry consists of 41 firms producing only standard pipe and 7 firms that produce both standard and line pipe. The domestic line pipe and tube industry consists of 4 firms that produce only line pipe and tube and the same 7 firms that produce both the standard pipe. 14/

---

14/ Petitioners have argued that if those firms that produce both line and standard pipe are unable to provide separate data for standard and line pipes, the Commission must, under 19 U.S.C. § 1677(4)(D), "view the producers of standard and line pipe a single industry." Petitioners' preconference brief at 1. The argument is misplaced.

Even though we usually evaluate the industry consisting only of the production of the like product, the "product line" provision (19 U.S.C. § 1677(4)(D)) permits us to examine a product line that includes the like product when the like product has no separate identification in terms of such criteria as production process or producer's profits. Under product line, we must evaluate the narrowest range of products, including the like product, for which information is available; we may not use data for a product line that does not include the like product. Accordingly, in the case of the line pipe industry and assuming that the statutory criteria for use of "product line" are met, we may consider information from those firms that produce only line pipe and from those firms that produce both line and standard pipe, but not information from those firms that produce only standard pipe.

In these investigations, we have considered each industry separately. However, we also have considered data for the producers of both line and standard pipe who were unable to separate their data when such consideration provides additional insight into the condition of the domestic industry.

Should any of these cases return for a final investigation, we anticipate that the domestic producers who have been unable to allocate their production and financial data between line pipe and standard pipe within the limited time available for these preliminary investigations will be able to do so, explaining the basis for the allocations, or have persuasive reasons why such allocation is not possible.

Condition of the Domestic Standard Pipe Industry [15]

As noted above, the Commission has investigated the domestic standard pipe and line pipe industries in prior investigations. [16] From the data gathered in those investigations, the domestic line and standard pipe industries demonstrated reasonable performance through 1981, but suffered serious setbacks in 1982 in terms of almost all significant economic indicators. Production, shipments, capacity utilization, employment, and wages all decreased precipitously, and financial performance deteriorated. [17] We keep these facts in mind as we consider the data gathered during the course of this investigation. [18]

Apparent domestic consumption of standard pipe increased 40 percent during the period under investigation. [19] Nevertheless, AISI data show

---

15/ Much of the information in these investigations regarding the condition of the domestic industries and regarding the imports are confidential and, therefore, can only be discussed in general terms.

16/ See footnote 8, supra.

17/ See Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea, supra, at 6-8.

18/ The period covered by these investigations includes calendar years 1982, 1983, and 1984, and January 1985.

19/ Report at Table 2.

Barcode:3883995-06 A-549-502 SCO - Scope Inquiry - Line Pipe

that U.S. producers' shipments declined from 1982 through 1984. [20/] Production of standard pipe increased steadily, [21/] but capacity utilization, although it increased from 1982 to 1984, remained at extremely low levels.

Data on employment, wages, and hours show no significant trends in terms of the number of production and related workers and their hours worked. The number of workers declined by more than 6 percent from 1982 to 1983 and then increased by less than 3 percent from 1983 to 1984. [22/]

The financial performance of the domestic standard pipe and tube industry deteriorated from 1982 to 1983 and then improved in 1984, surpassing the 1982 levels for net sales, gross profits, operating income, and cash flow from operations. [23/] However, operating income as a percentage of net sales did not reach a reasonably profitable level in 1984. Domestic prices, moreover, have shown a steady, if irregular, downward trend. [24/]

The end-of-period data show, notwithstanding the improvements experienced, that the industry's performance remains weak. Moreover, it is

---

20/ Id. According to data supplied in response to our questionnaires, domestic producers' shipments increased throughout the period of investigation. Report at Table 4. The questionnaire data are not inconsistent with the AISI data because Table 4 excludes the shipments of several large producers, whose shipments decreased sharply during the the period under investigation.

21/ Report at Table 3.

22/ Report at Table 6.

23/ Report at Tables 7 and 8.

24/ Report at Table 18.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

clear that there has been very significant growth in demand in the United States market. However, the domestic industry has consistently lost market share. Accordingly, we find that there is a reasonable indication that the domestic industry is suffering from material injury.

Impact of the Allegedly Subsidized Standard Pipe Imports from Venezuela [25/]

Imports of standard pipe from Venezuela rose significantly from 1982 to 1984, increasing approximately twelve-fold during the course of those three years. [26/] Venezuelan standard pipe and tube, as a percentage of domestic consumption has likewise increased rapidly during the period of this investigation. [27/]

Pricing information is available for one standard pipe product. [28/] The data show that the prices of the Venezuelan standard pipe imports have been consistently below the prices for the domestic standard pipe. Margins of underselling, evident in every quarter for which comparisons are possible, are significant. [29/] This underselling occurred while prices for the domestic product were generally declining.

---

25/ Petitioners have urged us to cumulate the imports from Venezuela subject to these investigations with imports from Mexico, Spain, and Brazil. However, as the investigations regarding imports from those countries have been terminated by the withdrawal of the petitions, cumulation with these imports is inappropriate.

26/ Report at Table 14.

27/ Id.

28/ Report at Table 18.

29/ Id.

PUBLIC DOCUMENT

Accordingly, in investigation Nos. 701-TA-242, we find that there is a reasonable indication that the domestic standard pipe industry is materially injured by reason of the alleged subsidized standard pipe imports from Venezuela. 30/ 31/

Impact of the Allegedly LTFV Imports of Standard Pipe from Thailand

In the consideration of the impact of imports from Thailand, petitioners urge us to evaluate threat of material injury on both national and regional industry bases, with the regional industry consisting of States west of the Rocky Mountains (California, Oregon, Washington, Idaho, Nevada, Utah, and

---

30/ Having found that there is a reasonable indication of material injury by reason of the allegedly subsidized imports from Venezuela, we do not need to consider whether there is a threat of material injury.

31/ Chairwoman Stern finds no reasonable indication of material injury or threat of material injury by reason of allegedly subsidized Venezuelan standard pipe. As mandated by the Tariff and Trade Act of 1984 amendments to the Tariff Act of 1930, she has considered the appropriateness of a cumulative analysis of these imports with others under investigation or subject to recent antidumping duty orders. However, the most recent other countervailing duty (CVD) investigation of this product resulted in the placing of a final order against imports from Korea in February 1983. Imports from Korea since that date have not benefitted in the U.S. marketplace from injurious subsidies. Therefore, the requirement that imports be coincident in time if they are to be cumulated has not been met. Cumulation is therefore inappropriate. Chairwoman Stern does not believe that it is appropriate to aggregate subject imports across statutes. The data on standard pipe imports show very low levels of market penetration. There was only one confirmed instance of a sale lost to the imported product and that sale involved a very low quantity. Report at A-42. Moreover, there is no threat of material injury because Venezuelan capacity utilization is at high levels and there is nothing to suggest that production levels will be further elevated to generate exports to the United States.

Arizona). 32/ 33/ The information regarding the ports of entry for the pending Thai shipments does not show the requisite concentration of imports into the proposed region, thus failing to satisfy one of the three statutory criteria for a regional industry. 34/ Therefore, we decline to conduct a regional industry analysis in this case.

Imports of standard pipe and tube from Thailand first entered the United States in 1984 with a total of 50 tons, constituting less than 0.05 percent of the United States' market. 35/ Data obtained by the Commission on future shipments indicate that it is highly likely that the quantity of imports from Thailand for 1985 will increase significantly. 36/ Pricing data obtained from the importer of Thai standard pipe show that prices of the presold product that will enter in the next several months are below the current

---

32/ Amended petition at 34-38.

33/ In this investigation, we have considered both material injury and threat of material injury even though the petition does not claim that material injury is currently present.

34/ In appropriate circumstances, the United States may be divided into two or more markets and the producers within each such market may be treated as if they were a separate industry. 19 U.S.C. § 1677(4)(C). The statute establishes three criteria for a regional industry: (1) whether the producers within the regional market sell all or almost all of their production of the like product in that market; (2) whether the demand in that market is not supplied, to any substantial degree, by producers of the product located elsewhere in the United States; and (3) whether there is a concentration of the allegedly dumped or subsidized imports into the regional market. Id.; Rock Salt from Canada, Inv. No. 731-TA-239 (Preliminary), USITC Pub. No. 1658 at 5 (1985).

35/ Report at Table 14.

36/ Report at A-26.

weighted average price charged by U.S. producers. 37/ Therefore, we find that there is a reasonable indication that an industry in the United States is threatened with material injury by reason of imports of allegedly LTFV standard pipe from Thailand. 38/ 39/

---

37/ Memorandum to the Commission from Acting Director, Office of Investigations, No. Inv-I-071 (April 5, 1985).

38/ Chairwoman Stern finds that there is a reasonable indication of material injury and does not reach the question of threat of material injury. In reaching this determination, she has cumulated the imports from Thailand with the recently investigated allegedly LTFV imports of standard pipe from Venezuela. See Certain Welded Carbon Steel Pipes and Tubes from Taiwan and Venezuela, supra. While the imports from Thailand are miniscule, the 1984 act is clear that they must be considered for cumulation. They are reasonably coincident with and present in the same markets as the Venezuelan standard pipe on which she joined the Commission in a preliminary affirmative determination in February 1985. Thus, when the subject Thai imports -- however tiny their individual significance -- are cumulated with those Venezuelan imports, an affirmative preliminary determination is appropriate.

39/ Commissioner Rohr notes that during the period of investigation there were two shipments of Thai steel into the United States, of 11 and 39 tons, respectively, into two East Coast ports. The information which the Commission has gathered suggests that it is unlikely that these two shipments "competed" with other domestic or imported steel. In this investigation, he has concluded that the information gathered establishes a reasonable indication that imports of allegedly LTFV Thai steel are a threat to a domestic industry, and he has decided to reserve the issue of cumulation.

Commissioner Rohr also notes that this investigation poses several issues of first impression for the Commission relating to imports to the United States from non-traditional suppliers of particular articles. He expects this aspect of the investigation to be fully considered by the Commission if this investigation continues.

Condition of the Domestic Line Pipe Industry 40/

Apparent consumption of line pipe decreased from 1982 to 1983, rebounding in 1984 to a level more than 22 percent above the 1982 level. 41/ U.S. producers' shipments, however, according to AISI data, declined in 1983 and exceeded 1982 levels only slightly in 1984. 42/ Domestic production, for firms that produced only line pipe, increased from 1982 to 1984. 43/ Capacity utilization levels likewise increased but remained unacceptably low even at the close of this period. 44/

The number of production and related workers, hours worked, wages paid, and total compensation decreased sharply from 1982 to 1983 and then increased in 1984 to levels surpassing those of 1982. 45/

The financial performance of firms producing line pipe only is quite similar to the performance of the standard pipe industry, with some

---

40/ As in the case of standard pipe, we conduct our analysis of the condition of the domestic line pipe industry keeping in mind the serious economic downturn suffered by this industry in 1982.

41/ Report at Table 2.

42/ Id. Shipment data from our questionnaires show significant increases from 1982 to 1984. These data, however, overstate the trends in domestic shipments as Table 4 excludes the shipments of several large producers, whose shipments decreased very sharply during the period covered by the investigation, and also excludes data for U.S. firms that may have ceased production in 1982 or 1983.

43/ Report at Table 3.

44/ Id. This is also true when the producers of both standard and line pipe are considered along with the producers of line pipe only.

45/ Report at Table 6.

improvement in 1984 when compared to prior years. 46/ Gross profit and operating income as a percentage of net sales remain at depressed levels. 47/ Moreover, the prices received by domestic producers for line pipe decreased irregularly from 1982 to 1984. 48/

As in the case of standard pipe, there has been improvement in some key indicators from 1982 through 1984. However, those indicators still demonstrate a reasonable indication of material injury. Moreover, when the increase in apparent consumption is considered, it is clear that the domestic industry has not enjoyed much of that growth and has steadily lost market

Impact of Allegedly Subsidized and LTFV Line Pipe Imports from Venezuela 49/ 50/

The volume of imports of line pipe from Venezuela has increased substantially throughout the period of this investigation, in both absolute

---

46/ Report at Tables 7 and 9. Data for line pipe in these preliminary investigations represent less than 40 percent of domestic shipments.

47/ Report at Table 9.

48/ Report at Table 19.

49/ Allegedly LTFV imports from Venezuela are at issue in Inv. No. 731-TA-253 and allegedly subsidized imports are at issue in Inv. No. 701-TA-242. The same imports are at issue in both cases.

50/ In the case of line pipe imports from Venezuela, petitioners have urged the Commission to cumulate the line pipe imports from Venezuela with imports from Brazil, Mexico, and Spain. E.g., countervailing duty petition on Venezuela at 30. As noted above, investigations regarding imports from these countries were terminated when the petitions were withdrawn and, thus, cumulation is not appropriate.

share. Accordingly, we find that there is a reasonable indication that the domestic industry is materially injured.and relative terms. The volume has increased from 2,599 tons in 1982 to 79,451 tons in 1984. 51/ As a percentage of the domestic market, Venezuelan line pipe imports constituted 0.3 percent in 1982 and 7.5 percent in 1984. 52/

The Commission obtained usable net selling price data for one of the two line pipe products specified in the questionnaires. In each of the periods for which comparisons are available, the Venezuelan line pipe product undersold domestic line pipe in each quarter for which data are available. The margins of underselling are significant. 53/ Moreover, the U.S. producers' weighted average prices show their lowest levels during those quarters in which the Venezuela product is first significantly present in the market, showing evidence of price depression. 54/

Accordingly, we determine that there is a reasonable indication that an industry in the United States is materially injured by reason of the allegedly LTFV and subsidized imports from Venezuela. 55/

---

51/ Report at Table 15.

52/ Report at Table 16.

53/ Report at Table 19.

54/ Report at Tables 16 and 19.

55/ Chairwoman Stern notes that her analysis of the effects of the allegedly LTFV imports is made separately from that of the allegedly subsidized imports. While the imports are one and the same, the alleged unfair acts are not. In any final analysis, when final LTFV and subsidy margins are available, a more detailed individual examination will be made.

Separate Views

of Vice Chairman Liebeler

Both with regard to the countervailing duty petition concerning standard pipe from Venezuela and the antidumping duty petition concerning standard pipe from Thailand, I find no reasonable indication that material injury to a domestic industry is caused or threatened by the imports in question.[1]

The majority notes that there has been a sharp increase in imported standard pipe from Venezuela over the last three years. However, by 1984 imports reached a level of only 2.2% of domestic consumption. The record does not reveal any characteristic of the domestic market for standard pipe, such as highly inelastic supply and demand curves, that suggest that a relatively small level of imports could result in any material injury or threat of material injury. In the absence of such factors, I presume that an import penetration ratio of less than 2.5% is too small to support a finding of a reasonable indication of material injury or threat thereof by reason of imports.[2]

There are two reasons for choosing a 2.5% de minimus threshold: first, because it is small and, therefore, highly unlikely to have more

---

[1]As there is an established domestic industry, "material retardation" was not raised as an issue in these investigations and will not be discussed further.

[2]See Certain Carbon Steel Products From Czechoslovakia, East Germany, Finland, Hungary, Norway, Poland, Romania, Sweden, and Venezuela, Invs. Nos. 701-TA-225-234, 731-TA-213-217, 219, 21-26, and 228-235 (P), Views of Vice Chairman Liebeler at 50-52 for a discussion of this presumption.

than an inconsequential or insubstantial adverse impact on the domestic industry; and second, because such market share is very likely to signify a competitive process and to reflect only dumping or subsidization in a "technical" sense. Each of these justifications will be discussed in turn.

Any time a foreign producer exports products to the United States, it harms the domestic industry that competes in that market. An increase in supply, ceteris paribus, must result in a lower price of the product than would otherwise prevail. If a downward effect on price, accompanied by a finding by the Department of Commerce of dumping or subsidy, and a finding on the part of the Commission of material injury were all that were required for an affirmative determination, there would be no need to inquire further into the question of causation.

Congress has recognized that the mere presence of less than fair value imports is not sufficient to establish causation.[3] Thus, the inquiry into causation must proceed. The Senate Finance Committee instructed the Commission to search for a causal link:

> While injury caused by unfair competition, such as less-than-fair-value imports, does not require as strong a causation link to imports as would be required in determining the existence of injury under fair trade import relief laws, the Commission must satisfy itself that, in light of all the information presented, there is a sufficient causal link between the less-than-fair-value imports and the requisite injury. The determination of the ITC with respect to causation is, under

[3] "[T]he ITC will consider information which indicates that harm is caused by factors other than the less-than-fair-value imports." Report on the Trade Agreements Act of 1979, Senate Finance Committee, S. Rep. No. 249, 96th Cong. 1st Sess. 75 (1979).

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

> current law, and will be, under section 735, complex and difficult, and is a matter for the judgment of the ITC. [4]

This "complex and difficult" judgment begins with an examination of the import penetration ratio. There must be some import penetration level which is so insubstantial that it cannot result in material injury.

When the industry demand and supply curves have low elasticities, a given import penetration will have a large impact on the domestic industry. The more inelastic the demand and supply curves, the greater will be the effect on price of a given change in imports. Two examples are provided as illustration.

If the domestic market for standard pipe were like that depicted in Figure I (below) there might be a material effect on the domestic industry. A relatively small increase in supply from S to $S^1$ may result in a precipitous fall in price.

Fig. I

---

[4] Id.

On the other hand, in the more general case, where supply and demand are somewhat more elastic, as in Figure II, a 2.5% import penetration ratio even if all of it were a consequence of unfair trade, cannot have a significant enough effect on price to result in material injury or threat thereof. The shift in the curve from S to $S^1$ results in an inconsequential drop in price.

Fig. II

Therefore, in the absence of a showing that the supply and demand curves in the domestic market are sufficiently inelastic, I presume that a 2.5% import penetration ratio cannot result in material injury.

A second reason for using this <u>de minimus</u> threshold rests on the legislative history on "technical dumping". Import penetration ratios o

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

.5% or less are more likely to represent technical dumping. In enacting he unfair trade laws, Congress was not concerned with imports that were imply priced at the level necessary to enable the producer to sell his roduct.

> (1) Technical dumping. The concept, underlying a number of International Trade (Tariff) Commission determinations, is wholly consistent with the basic philosophy and purpose of the Antidumping Act. <u>This Act is not a 'protectionist' statute designed to bar or restrict U.S. imports; rather, it is a statute designed to free U.S. imports from unfair price discrimination practices</u>. As is explained below, this distinction is of importance in the context of recent suggestions that the Antidumping Act should not be applied to imports of articles in short supply.
>
> Conceptually, the Antidumping Act is not directed toward forcing foreign suppliers to sell in the U.S. market at the same prices that they sell at in their home markets. Rather, the Act is primarily concerned with the situation in which the margin of dumping contributes to underselling the U.S. product in the domestic market, resulting in injury or likelihood of injury to a domestic industry. Such injury may be manifested by such indicators as suppression or depression of prices, loss of customers, and penetration of the U.S. market. When clear indication of injury, or likelihood of injury, exists there would be reason for making an affirmative determination. <u>The Antidumping Act is designed to discourage and prevent foreign suppliers from using unfair price discrimination practices to the detriment of a United States industry</u>.
>
> <u>On the other hand, the Antidumping Act does not proscribe transactions which involve selling an imported product at a price which is not lower than that needed to make the product competitive in the U.S., market, even though the price of the imported product is lower than its home market price. Such so-called 'technical dumping' is not anti-competitive, hence, not unfair; it is procompetitive in effect</u>. The Commission has recognized the concept of technical dumping and in a number of cases has made a negative determination in the circumstances of such dumping. It is to be noted that in the usual short supply situation or inflationary period, imports--regardless of home market price--would normally be sold to the domestic market at a price no lower than the prevailing U.S. market price, thus indicating that when dumping exists in such situations, it is likely to be a case of technical dumping in which there is not likely to be injury to a domestic industry. <u>In other words</u>,

> importers as prudent businessmen dealing fairly would be interested in maximizing profits by selling at prices as high as the U.S. market would bear. But if there is a margin of dumping in a tight supply situation, it may be due to technical reasons, which would not be injurious to domestic industries.[5]

Congress was not concerned with dumping per se. Rather, Congress focused on plans by "foreign suppliers [to use] unfair price discriminative practices to the detriment of a United States industry".[6]

The pricing policy of an importer may be either pro-competitive or anti-competitive. A rational and profit maximizing importer/competitor will price its product as high as the market will bear, unless there is some possibility of gain to be derived by predatory behavior. Two possibilities exist: first, the importer is pricing his product and seeking sales as part of an effort to meet competition, in the sense that he is seeking to sell at the highest price possible in the expectation that if ever he sells at too high a price, there will be a plethora of other suppliers available to take his place. Second, the importer could attempt to price his product below the market price, and thereby drive his competitors out of the market and gain some measure of monopoly power.

---

[5] Report on the Trade Reform Act of 1974, Senate Finance Committee, S. Rep. No. 1298, 93rd Cong. 2d Sess. at 179 (1979) (emphasis added). Because of the virtually identical language and history of Countervailing and Antidumping Duty Provisions of the Tariff Act of 1930, 19 U.S.C. Sections 1671 1673 (1982) respectively, logic compels me to extend the reasoning embodied in this "technical dumping" analysis to subsidy cases.

[6] Id.

Congress recognized that importers are normally interested in maximizing their return. The Commission must use its best judgment to determine whether this profit maximization is part of a pattern of anticompetitive "unfair" price discrimination or subsidization, or alternatively, an imperfect reflection of the normal competitive process. Congress did not intend that the Commission examine the data before it in a spirit of naivete. Rather, the Commission must cull from the mass of data that information necessary to answer the question of whether any dumping or subsidization is merely "technical", or whether it is unfair price discrimination.

In a typical case the Commission is confronted with a factual melange from which it must discern an underlying story that explains the facts. The staff report contains information on: (1) the financial condition of the domestic industry; (2) the prices of the domestic and imported products; and (3) the volume and market share of the imported product.

How much reliability should we attach to the data? Volume and relative market share are the most reliable data. They are generated by third parties and easily verified. Profit data is self-generated by the parties and is frequently provided on a product-specific basis requiring subjective cost allocations. Such data is difficult to verify. Price data is also provided by the parties and is usually not verified beyond telephone confirmations.

Moreover, price data may reflect a variety of phenomena. First, the suppliers may not be selling a homogeneous product. If the products

are not identical, there is no reason to suppose that they should sell at an identical price.[7] Second, because of: (a) a lack of homogeneity of the product; (b) the fact that the contracts for sale are not concluded on a public anonymous market; and (c) possible antitrust concerns, suppliers may be unaware of the exact price at which other suppliers are concluding contracts. Third, there may be inaccuracies in the data that the Commission receives. Finally, there is at least the theoretical possibility that a supplier, although selling a product identical to his competitors, and fully aware of the market price of that product, is attempting to undersell them in order to damage their businesses. Such behavior is something akin to predatory pricing.

Determining the plausibility of each of these explanations is the implicit task of the Commission in deciding the cases before it. At

---

[7] Commission opinions have traditionally found technical dumping only when no underselling has been found or, in cases when underselling has been found, when such underselling has been deemed "commercially insignificant". In the situation where the products under investigation are identical in <u>every</u> characteristic, this analysis would be correct. Seldom, if ever, will the Commission be dealing with such a product market. Even when dealing with products such as wheat, a homogeneous product by most standards, one might find that imports were underselling (overselling) the domestic product if certain characteristics of the product not inherent to the product, i.e., certainty of delivery, risk of loss, were worse (better) than those offered by domestic producers. Thus, the price "needed to make the product competitive in the U.S. market" could be lower or higher than the price charged by domestic producers. Commission decisions that have neglected to consider the impact on prices of characteristics which are often the source of intense negotiation and expensive litigation risked under or overstating price differentials.

(Footnote continued to page 27)

first blush it might seem that the question whether the importer is simply trying to meet the competition or, alternatively is seeking to underprice the competition, could best be resolved by examining price data.[8] However, there is no plausible way to separate and distinguish the possible explanations on the basis of the price data we receive. As explained above, it is of necessity unreliable and incomplete. There is fortunately an alternative way of approaching the question.

An assertion of unfair price competition in the form of dumping or subsidization should be accompanied by a factual record which can support such a conclusion. Foreign firms and governments exporting to the United States should be presumed to be rational. Actions which they take should be presumed to be in their self-interest. Therefore, if the factual setting in which the LTFV or subsidized sales take place do not support any rational self-serving goal to be served by predatory pricing, it is reasonable to conclude that such sales must be credited to one of the three benign explanations, and injury to the industry should not be treated as being "by reason of" such imports.

In most cases, predatory pricing by a competitor would be irrational. An examination of the wheat farming industry illustrates

(Footnote continued from page 26)
Further, when dealing with heterogenous products, the problems with straightforward price comparisons are compounded inordinately for obvious reasons.

[8] In analyzing predation, price data is primarily relevant because of its relationship to marginal cost. Because of the unavailability of marginal cost data, price data alone is not meaningful.

this point. One of the reasons that it would be irrational for a wheat producer to undersell the market and thereby drive out his competition is that he could never hope to grow large enough to ever raise his price above the market price by dint of his now greater market power. Similarly in the various markets which we examine, it is reasonable to conclude that unless a foreign firm has a fairly large market share, it cannot hope that by charging less than the market price it can drive out competitors and thereby gain the requisite market power to charge more than the competitive equilibrium price. I have chosen a conservative market share of less than 2.5 at a preliminary proceeding as inconsistent with even the most optimistic rational expectation of gaining an advantage by selling at less than the market price.

It has been suggested that the Commission does not have the power to adopt a rebuttable de minimus standard. I believe this to be incorrect. Congress chose not to determine cases itself. Instead, it delegated this power to the Commission. Congress' mandate provides very broad discretion to the Commission. Aside from guidance about weighing causes, technical dumping, and cumulation,[9] Congress has not specifically instructed the Commission on how it is to conduct its

---

[9]Congress' attention to the cumulation issue in its recent revision of the statute gives further support to the use of a de minimus standard. Congress' mandating cumulation in certain cases demonstrated a sensitivity to the issue of import penetration. It was precisely because Congress was aware that certain levels of imports were insufficient to satisfy the causation standard that Congress required a summation of imports across nations in certain cases.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

investigations and decide the cases before it. The use of a de minimus standard is common in the law, and although it was not specifically mandated by Congress, neither was it precluded by our enabling statute or legislative history. Congress may be presumed to have left the use of such administrative tools to the discretion of the Commission.

In adopting this de minimus threshold, I am aware that Congress indicated that no absolute volume of imports should be considered dispositive of the issue of whether there has been material injury or threat by reason of imports.[10] The 2.5% threshold is not based on the absolute volume of imports, but rather on relative market share.

The import penetration ratio of line pipe from Venezuela was 2.2% in 1984 and, therefore, fails to satisfy the de minimus standard.[11]

The imports from Thailand were less than 0.05% in 1984. I am compelled to cumulate these imports with those from Venezuela, which is concurrently under investigation in an antidumping case.[12] The cumulated import penetration ratio is still less than 2.3% of domestic consumption. For the same reasons discussed above, this level of imports

---

[10] It is expected in its investigation that the Commission will continue to focus on the conditions of trade, competition, and development regarding the industry concerned. For one industry, an apparently small volume of imports may have a significant impact on the market; for another, the same import volume might not be significant. S. Rep. No. 249, 96th Cong., 1st Sess. 88 (1979).

[11] There is nothing in the record to suggest that the demand and supply for line pipe is highly inelastic. Such factors would rebut the presumption.

[12] See supra note 2.

PUBLIC DOCUMENT
Barcode:3883995-06 A-549-502 SCO - Scope Inquiry - Line Pipe

will not support a finding of a reasonable indication of material injury or threat thereof in the standard pipe antidumping case against Thailand. Had these imports from Thailand and Venezuela not entered the American market at subsidized and less than fair market value prices, the domestic industry would not be materially better off than it is now.

30
Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

INFORMATION OBTAINED IN THE INVESTIGATIONS

Introduction

On February 28, 1985, petitions were filed with the U.S. International Trade Commission and the U.S. Department of Commerce by counsel for the Committee on Pipe & Tube Imports 1/ alleging that an industry in the United States is materially injured and threatened with material injury by reason of imports of certain welded carbon steel pipes and tubes 2/ that are being subsidized by the Governments of Thailand and Venezuela and that are also being sold in the United States at less than fair value (LTFV). On March 12, 1985, counsel amended the petitions to state, among other things, that the petitions were filed by the Standard Pipe Subcommittee 3/ and the Line Pipe Subcommittee 4/ of the Committee on Pipe and Tube Imports, and by each of the individual manufacturers that are members of those subcommittees. Accordingly, effective February 28, 1985, the Commission instituted investigation No. 701-TA-242 (Preliminary), under section 703 of the Tariff Act of 1930 (the Act), to determine whether there is a reasonable indication that an industry in the United States is materially injured, or is threatened with material injury, or the establishment of an industry in the United States is materially retarded by reason of imports from Venezuela of certain welded carbon steel pipes and tubes that are allegedly subsidized by the Government of

---

1/ The 25 member producers of the CPTI are Allied Tube and Conduit Corp., American Tube Co., Inc., Bernard Epps & Co., Bock Industries of Elkhart, IN, Bull Moose Tube Co., Central Steel Tube Co., Century Tube Corp., Copperweld Tubing Group, Hughes Steel & Tube, Kaiser Steel Corp., LaClede Steel Co., Maruichi American Corp., Maverick Tube Corp., Merchant Metals, Inc., Phoenix Steel Corp., Pittsburgh Tube Co., Quanex Corp., Sawhill Division of Cyclops Corp., Sharon Tube Co., Southwestern Pipe, Inc., Tex-Tube division of Cyclops Corp., UNR-Leavitt, Welded Tube Co. of America, Western Tube & Conduit, and Wheatland Tube Corp.

2/ For purposes of these investigations the term certain welded carbon steel pipes and tubes refers to welded carbon steel pipes and tubes of circular cross section, over 0.375 inch but not over 16 inches in outside diameter, provided for in Tariff Schedules of the United States Annotated (TSUSA) items 610.3208, 610.3209, 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258, and 610.4925 (TSUSA items 610.3208, 610.3209, 610.3231, 610.3232, 610.3241, 610.3244, and 610.3247 prior to Apr. 1, 1984).

3/ The 10 members of the Standard Pipe Subcommittee that are in support of these petitions are Allied Tube & Conduit Corp., American Tube Co., Bull Moose Tube Co., LaClede Steel Co., Merchant Metals, Inc., Pittsburgh Tube Co., Sawhill Division of Cyclops Corp., Sharon Tube Co., Southwestern Pipe, Inc., and Wheatland Tube Corp. The two members of the Standard Pipe Subcommittee that are not in support of these petitions are Maruichi American Corp. and Western Tube & Conduit.

4/ The four members of the Line Pipe Subcommittee that are in support of these petitions are LaClede Steel Co., Sawhill Division of Cyclops Corp., Tex-Tube Division of Cyclops Corp., and Wheatland Tube Corp.

Venezuela. 1/ The Commission also instituted, effective February 28, 1985, investigations Nos. 731-TA-252 and 253 (Preliminary), under section 733(a) of the act, to determine whether there is a reasonable indication that an industry in the United States is materially injured or threatened with material injury, or the establishment of an industry in the United States is materially retarded by reason of imports of certain welded carbon steel pipes and tubes from Thailand and Venezuela that are allegedly sold in the United States at LTFV.

In the process of instituting these investigations, Commerce advised the petitioner that the welded carbon steel pipe and tube products covered by the petitions represented two distinct classes or kinds of products, standard pipe and line pipe. Subsequently, on March 14, 1985, the petitions involving imports from Thailand were withdrawn as they relate to line pipe, because there is no known production in Thailand of line pipe to American Petroleum Institute (API) specifications. On the same date, the antidumping petition involving imports from Venezuela was withdrawn as it relates to standard pipe, because the Commission, on February 1, 1985, had made an affirmative preliminary determination with respect to imports of that product from Venezuela, and Commerce was in the process of conducting its antidumping investigation.

The statute directs the Commission to make its determinations within 45 days after receipt of petitions for preliminary countervailing duty and antidumping investigations, or in these cases by April 15, 1985. Notice of the institution of the Commission's investigations and of a conference to be held in connection therewith was given by posting copies of the notice in the Office of the Secretary, U.S. International Trade Commission, Washington, DC, and by publishing the notice in the Federal Register of March 18, 1985 (50 F.R. 10866). 2/ The Commission held a public conference in Washington, DC, on March 22, 1985, at which time all interested parties were allowed to present information and data for consideration by the Commission. 3/ The Commission's determinations in these investigations were made in an open "Government in the Sunshine" meeting held on April 8, 1985.

## Previous Commission Investigations

Several previous Commission investigations have dealt with some or all of the pipes and tubes currently under investigation. 4/ Most recently, on February 1, 1985, the Commission notified the Department of Commerce of its preliminary determination in investigation No. 731-TA-211 that there is a reasonable indication that an industry in the United States is materially injured by reason of imports from Taiwan of light-walled rectangular welded

---

1/ Thailand is not a "Country under the Agreement," and therefore, the Commission is not required to reach a determination with respect to injury from allegedly subsidized imports. Consequently, the Commission did not institute a countervailing duty investigation with respect to the allegedly subsidized imports from Thailand.

2/ A copy of the Commission's Federal Register notice is presented in app. A.

3/ A list of witnesses who appeared at the public conference is presented in app. B.

4/ See table, app. C.

carbon steel pipes and tubes which are alleged to be sold in the United States at LTFV. At the same time, the Commission also determined in investigation No. 731-TA 212 that there is a reasonable indication that an industry in the United States is materially injured by reason of imports from Venezuela of standard welded carbon steel pipes and tubes 1/ and that there is no reasonable indication that an industry is materially injured or threatened with material injury by reason of imports from Venezuela of welded carbon steel line pipes and tubes that are alleged to be sold in the United States at LTFV. 2/

On August 22, 1984, the Commission made a preliminary determination in investigation No. 701-TA 220 (Preliminary) that there was a reasonable indication that an industry in the United States was materially injured by reason of allegedly subsidized imports of small circular and light-walled rectangular pipes and tubes from Spain. 3/ In addition, in investigations Nos. 731-TA-197 and 198 (Preliminary), the Commission found that there was a reasonable indication that an industry in the United States was materially injured by reason of imports from Spain of small circular and light-walled rectangular pipes and tubes allegedly sold at LTFV, and by reason of imports from Brazil of small circular pipes and tubes allegedly sold at LTFV. 4/ However, the pipes and tubes in the present investigation involving Venezuela cover a wider range of circular pipes and tubes than was included in the investigations involving Spain and Brazil.

On June 12, 1984, the Commission found in investigation No. TA-201-51 on carbon and certain alloy steel products that, under section 201 of the Trade Act of 1974, the domestic steel pipe and tube industry was experiencing serious injury. However, the Commission determined that imports of certain steel pipes and tubes were not being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or threat thereof, to the domestic industry producing articles like or directly competitive with the imported articles. 5/ The steel pipes and tubes that were the subject of the section 201 investigation included the welded carbon steel pipes and tubes that are the subject of the instant investigations, as well as other pipes and tubes that are not the subject of these investigations.

---

1/ Chairwoman Stern determined that there is a reasonable indication that an industry in the United States is materially injured or threatened with material injury by reason of the subject imports.

2/ Commissioners Eckes and Lodwick dissented. Certain Welded Carbon Steel Pipes and Tubes From Taiwan and Venezuela: Determination of the Commission in investigations Nos. 731-TA-211 and 212 (Preliminary). . . ., USITC Publication 1639, February 1985.

3/ The final Commission investigation on these products was instituted on October 17, 1984, and terminated on February 4, 1985, subsequent to the withdrawal of the petition.

4/ Certain Welded Carbon Steel Pipes and Tubes from Brazil and Spain: Determinations of the Commission in Investigations Nos. 701-TA-220 and 731-TA-197 and 198 (Preliminary). . . ., USITC Publication 1569, August 1984. The final Commission investigations on these products were instituted on Jan. 29, 1985, and terminated on Feb. 4, 1985 (Spain) and Mar. 20, 1985 (Brazil), subsequent to the withdrawal of the petitions.

5/ Carbon and Certain Alloy Steel Products: Report to the President on Investigation No. TA-201-51. . . ., USITC Publication 1553, July 1984.

On April 17, 1984, the Commission determined in investigations Nos. 731-TA-131 and 132 (Final) that an industry in the United States was materially injured by reason of imports from the Republic of Korea (Korea) and Taiwan of small circular pipes and tubes that had been found by Commerce to be sold in the United States at LTFV. In addition, on the same date, the Commission determined in investigation No. 731-TA-138 (Final) that an industry in the United States was materially injured by reason of LTFV imports of light-walled rectangular pipes and tubes from Korea. 1/ The present investigations cover other circular pipes and tubes, as well as those covered in these previous investigations.

On February 8, 1983, the Commission determined that an industry in the United States was materially injured by reason of imports of certain welded carbon steel pipes and tubes that were found by Commerce to be subsidized by the Government of Korea. That investigation covered certain circular pipes and tubes (including API line pipe) up to 16 inches in outside diameter, which includes most of the circular pipes and tubes in the current investigations. 2/

Nature and Extent of the Alleged Subsidies

The petition alleges that CA Conduven (Conduven), the principal producer and exporter in Venezuela of welded carbon steel pipes and tubes, has benefited directly and indirectly from a number of domestic and export subsidies through a program that provides discounts ranging from 15 to 40 percent of the regular domestic price if the steel they purchase from SIDOR, the State-owned, allegedly heavily subsidized, integrated producer, is processed into products for export. 3/

The petition further alleges that there are at least three sources of below-market-rate loans available to Conduven and that, by special agreement with the Government, Conduven is allowed to convert its dollar export earnings at a free-market exchange rate (currently 14 bolivars per dollar), which provides an incentive to export. 4/ According to the petition, the official exchange rate is 4.3 bolivars per dollar. 5/ Also, according to the petition, preferential export financing is available from the Fondo De Financiamiento de las Exportacinoes (Finexpo) to Conduven through the Banco Industrial de Venezuela. The loans are for a period of up to 1 year at the preferential rate

---

1/ Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea and Taiwan: Determinations of the Commission in Investigations Nos. 731-TA-131, 132, and 138 (Final). . . ., USITC Publication 1519, April 1984.

2/ Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Determination of the Commission in Investigation No. 701-TA-168 (Final) . . ., USITC Publication 1345, February 1983.

3/ A number of domestic subsidies are alleged to have been received by SIDOR, including preferential Government credit, Government equity infusions, import duty reductions, tax incentives, input subsidies, and regional incentives.

4/ Petition for countervailing duties in the matter of certain welded carbon steel pipe and tube products from Venezuela, p. 20.

5/ Ibid, p. 21.

of 5 percent plus bank charges, with a commercial bank required to match the Finexpo financing.

## Nature and Extent of the Alleged Sales at LTFV

For Thailand, petitioners were unable to obtain home-market sales prices for the pipes and tubes covered by the petition. Petitioners believe that the Thai exporters are importing steel sheet and coil from Japan and possibly from Brazil or other countries. Petitioners obtained information on export prices of steel sheet and coil from Japan and, on the basis of U.S. non integrated producers' cost of production adjusted for wage rates in Thailand, estimated the cost of processing raw materials into finished pipe products. Petitioner selected three products as a basis for fair-value comparisons of imports of standard pipes, which, according to the petition, show that the standard pipes from Thailand are offered in the United States at prices 21.1 to 40.7 percent below the cost of production. 1/

In order to determine the U.S. purchase price of the pipe and tube products from Venezuela, petitioners used import statistics as reported by the U.S. Department of Commerce for October 1984. The alleged dumping margins as determined by the petitioners are based on an average home-market price to account for the range of sizes. As a result, the actual home-market prices may vary from product to product. 2/ The petition alleges that comparisons of U.S. prices to Venezuelan home-market prices show dumping margins of 65.5 percent for API line pipe up to 4-1/2 inches in outside diameter and 77.2 percent for line pipe up to 16 inches in diameter. 3/

## The Products

### Description and uses

For the most part, the terms "pipes," "tubes," and "tubular products" can be used interchangeably. In some industry publications, however, a distinction is made between pipes and tubes. According to these publications, pipes are produced in large quantities in a few standard sizes, whereas tubes are made to customers' specifications regarding dimension, finish, chemical composition, and mechanical properties. Pipes are normally used as conduits for liquids or gases, whereas tubes are generally used for load bearing or mechanical purposes. Nevertheless, there is apparently no clear line of demarcation in many cases between pipes and tubes.

Steel pipes and tubes can be divided into two general categories according to the method of manufacture -welded or seamless. Each category can be further subdivided by grades of steel: carbon, heat-resisting, stainless, or other alloy. This method of distinguishing between steel pipe and tube

---

1/ Antidumping petition in the matter of certain welded carbon steel pipe and tube products from Thailand, p. 19.

2/ Antidumping petition in the matter of certain welded carbon steel pipe and tube products from Venezuela, p. 15.

3/ Ibid, p. 16.

product lines is one of several methods used by the industry. Pipes and tubes typically come in circular, square, or rectangular cross section.

The American Iron & Steel Institute (AISI) distinguishes among the various types of pipes and tubes according to six end uses: standard pipe, line pipe, structural pipe and tubing, mechanical tubing, pressure tubing, and oil country tubular goods. 1/

Steel pipes and tubes are generally produced according to standards and specifications published by a number of organizations, including the American Society for Testing & Materials (ASTM), the American Society of Mechanical Engineers, and the API. Comparable organizations in Japan, West Germany, the United Kingdom, the U.S.S.R., and other countries have also developed standard specifications for steel pipes and tubes.

The imported pipe and tube products that are the subject of these investigations are the following circular welded carbon steel pipes and tubes over 0.375 inch but not over 16 inches in outside diameter, which are known in the industry as standard and line pipes and tubes:

(1) Standard pipes and tubes are intended for the low-pressure conveyance of water, steam, natural gas, air, and other liquids and gases in plumbing and heating systems, air-conditioning units, automatic sprinkler systems, and other related uses. They may also be used for light load-bearing or mechanical applications, such as for fence tubing. These steel pipes and tubes may carry fluids at elevated temperatures and pressures but may not be subjected to the application of external heat. They are most commonly produced to ASTM specifications A-120, A-53, and A-135.

(2) Line pipes and tubes are used for the transportation of gas, oil, or water, generally in pipeline or utility distribution systems. They are most commonly produced to API specification 5L.

Manufacturing processes

Welded steel pipes and tubes are made by forming flat-rolled steel into a tubular configuration and welding it along the joint axis. There are various ways to weld pipes and tubes: the most popular are the electric resistance weld (ERW), the continuous weld (butt weld) (CW), the submerged-arc weld, and the spiral weld. Submerged-arc weld and spiral weld are normally used to produce pipes and tubes of relatively large diameter. The circular pipes and tubes now under investigation are generally produced either by the ERW or CW

1/ For a full description of these items, see Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Determination of the Commission in Investigation No. 701-TA-168 (Final) . . ., USITC Publication 1345, February 1983.

processes. 1/ All pipes and tubes are formed and welded in a cylindrical configuration. Immediately after welding, the product may be reduced in diameter by rolling or stretch reducing or may be further formed into squares, rectangles, or other shapes by using forming rolls.

In the ERW process, skelp 2/ is cold-formed by tapered rolls into a cylinder. The weld is formed when the joining edges are heated to approximately 2,600° F. Pressure exerted by rolls squeezes the heated edges together to form the weld. ERW mills produce both pipe in standard sizes and tubular products between 0.375 and 24 inches in outside diameter.

In the CW process, skelp is heated to approximately 2,600° F and hot-formed into a cylinder. The heat, in combination with the pressure of the rolls, forms the weld. Continuous-weld mills generally produce the higher volume, standardized pipe products from 0.375 through 4.5 inches in outside diameter.

The advantage of the CW process lies in its ability to produce pipe at speeds up to 1,200 feet per minute compared with the ERW process maximum of approximately 110 feet per minute. Thus, economies associated with high-volume production may make CW pipe cheaper to produce than ERW pipe of the same grade and specification. 3/ The CW process is especially suited for the manufacture of standardized, high-volume, small-diameter pipe products, such as the ASTM A-120 circular pipe now under investigation.

Standard and line pipe can be produced on the same equipment. The principal differences between the two are that line pipe is made from a higher grade steel and requires additional testing. 4/ Line pipe may have a higher content of carbon and manganese than is permissible for standard pipe, whereas standard pipe may have a higher content of phosphorus and sulfur than is permissible for line pipe. Requirements concerning chemical and mechanical properties for API line pipe and ASTM standard pipe differ for the various specifications and grades of each. There are at least 10 grades of API 5L line pipe compared with 2 grades of ASTM A-53 and A-135 standard pipe and 1 grade of ASTM A-120 standard pipe. Of the circular pipe and tube products covered by the investigation on Venezuela, API 5L line pipe must undergo the greatest amount of testing, followed by ASTM A-53, A-135, and A-120 standard pipe. With respect to pipe sizes, wall thicknesses for standard and line

---

1/ Transcript of the public conference in investigations Nos. 731-TA-131 and 132 (Preliminary), pp. 52 and 53.

2/ Skelp is a flat-rolled, intermediate product used as the raw material in the manufacture of pipes and tubes. It is typically an untrimmed band of hot- or cold-rolled sheet.

3/ On the other hand, the ERW process has gained increased popularity with U.S. producers of small-diameter pipe and tube products in recent years because it requires significantly less energy per pipe produced, as only the joining edges of the product are heated, creating a weld of comparatively high integrity within the product specification. Also, it can be used to produce pipes in sizes up to 24 inches in outside diameter compared with the 4.5-inch maximum outside diameter usually attainable with the CW process.

4/ Transcript of the public conference, investigations Nos. 731-TA-211 and 212 (Preliminary), p. 17.

PUBLIC DOCUMENT

pipe are similar in the smaller diameters but are more divergent in the larger diameters. 1/

U.S. tariff treatment

Imports of the circular pipes and tubes covered by these investigations are classified under TSUSA items 610.3208, 610.3209, 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258, and 610.4925, which cover welded pipes and tubes (and blanks therefor 2/) of iron (except cast iron) or of nonalloy (carbon) steel, of circular cross section, having an outside diameter over 0.375 inch but not more than 16 inches. During the Tokyo round of the Multilateral Trade Negotiations (MTN), the most-favored-nation (MFN) rate of duty for TSUS item 610.32 was changed from 0.3 cent per pound to 1.9 percent ad valorem, effective January 1, 1982. 3/ This MFN rate of duty is the final rate negotiated in the Tokyo round, with no further changes or reductions scheduled.

The duty rates under item 610.49 are currently set at 8.8 percent ad valorem (col. 1), 8 percent ad valorem (least developed developing countries, (LDDC)) and 25 percent ad valorem (col. 2). These articles are eligible for duty-free entry under the Caribbean Basin Initiative (CBI) but not under the Generalized System of Preferences (GSP). The 1986 column 1 duty rate will be 8.4 percent ad valorem.

U.S. Producers

Welded carbon steel pipe and tube producers may be divided into two types: large, fully integrated producers, which make raw steel and produce a variety of steel products, and smaller, nonintegrated or partially integrated producers, which concentrate on fewer product lines. The integrated producers, which include LTV Steel Corp., United States Steel Corp., and Armco, Inc., 4/ concentrate production in the high-volume, standardized pipe products. The nonintegrated producers manufacture the low-volume, more specialized tubular products as well as the high-volume products.

In 1984, according to the petitions, there were 53 producers of the products covered by these investigations. Forty-one of the firms produced

---

1/ Ibid., p. 31.

2/ Blanks are semifinished pipe or tube hollows that are purchased by producers and further processed.

3/ The col. 2 rate of duty is 5.5 percent ad valorem. There is no LDDC rate or duty-free entry under the GSP. These articles are eligible for duty-free entry under the CBI.

4/ Another integrated producer, Bethlehem, permanently closed its pipe and tube operations, which were located at Sparrows Point, MD, effective Apr. 30, 1983. A nonintegrated producer, Merchants Metals, Inc., ceased producing the small circular, and light-walled rectangular pipes and tubes in January-March 1984. LTV Steel recently announced that it was closing indefinitely two pipe mills at Aliquippa, PA, and in early 1985, Central Steel Tube of Iowa went into bankruptcy.

only standard pipes and tubes, seven firms made both standard and line, and four made only line pipe. 1/ Production is concentrated in the East, where the integrated producers are located. U.S producers of the pipes and tubes that are the subject of these investigations are shown in table 1.

Table 1.--Certain welded carbon steel pipes and tubes: Selected U.S. producers' shares of domestic shipments, by product lines, 1984

(In percent)

| Producers | Standard pipes and tubes | Line pipes and tubes | Standard and line |
|---|---|---|---|
| CPTI member firms: | | | |
| Allied Tube and Conduit | *** | *** | *** |
| Wheatland Tube Corp | *** | *** | *** |
| Sawhill Tubular Division | *** | *** | *** |
| Sharon Tube Co | *** | *** | *** |
| Maruichi American Corp 1/ | *** | *** | *** |
| Western Tube | *** | *** | *** |
| Bull Moose Tube Corp | *** | *** | *** |
| Tex-Tube Division | *** | *** | *** |
| LaClede Steel Co | *** | *** | *** |
| Subtotal | *** | *** | *** |
| Non CPTI firms: | | | |
| LTV | *** | *** | *** |
| Lone Star | *** | *** | *** |
| U.S. Steel | *** | *** | *** |
| Subtotal | *** | *** | *** |
| Nonrespondents | 7.6 | 59.5 | 2/ |
| Total 3/ | 100.0 | 100.0 | 100.0 |

1/ * * *.

2/ Total shipments reported in questionnaire responses exceed AISI shipments by 6.2 percent.

3/ Total domestic shipments are based on AISI data which are understated, especially with respect to standard pipes and tubes, because not all producers report to AISI.

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission and from AISI data.

Note.--Because of rounding, figures may not add to the totals shown.

1/ Transcript of the conference, p. 38. The four firms that produce only line pipes are LaClede, Wheatland, Sawhill, and Tex-Tube; transcript of the conference, p. 44.

U.S. Importers

The U.S. Customs Service's net import file showed 11 importers of pipes and tubes from Venezuela between October 1982 and September 1984. Connectors, Inc., of Melville, NY, the U.S. importer for the Venezuelan producer Conduven, 1/ was the major importer during 1984, accounting for * * * percent of imports. The only other sizable importer was * * *, which took a * * * percent share of total imports during January-September 1984. No importers of pipe and tubes from Thailand appeared on the net import file; therefore, questionnaires were sent to the three firms listed as importers in the petition. 2/

The U.S. Market

Channels of distribution

In the U.S. market, sales of the pipes and tubes that are the subject of these investigations are made directly to end users or to steel service centers/distributors, which, in turn, sell to end users. The bulk of shipments are sold typically to service centers/distributors; 3/ however, line pipe over 4 inches in outside diameter is often sold directly to end users. Service centers/distributors are middlemen that buy large quantities of pipes and tubes, usually from both domestic producers and importers, warehouse the product, and sell smaller quantities to end users. The service centers/distributors may also have some simple finishing equipment, such as equipment to cut pipe to lengths or to thread and couple it. According to AISI data for 1984, service centers/distributors accounted for 69 percent of domestic shipments of standard pipe and 28 percent of shipments of line pipe. 4/ Major markets in which shipments were made directly to end users in 1984 were the oil and gas and electrical equipment industries for standard pipe and the oil and gas industry for line pipe.

In the public conference on investigations Nos. 731-TA-211 and 212 (Preliminary), an industry representative testified that during the last 10 years, imported pipe has been sold through a distribution system distinct from that used for the sale of domestic pipe. Foreign pipe is sold by a separate group of distributors that maintain multilocation stocking depots and carry pipe imported from various foreign sources. This imported pipe is then sold to wholesale plumbing and heating jobbers and pipe valves and fittings jobbers, the same customers (end users) to which the domestic product is sold. 5/

---

1/ Post conference brief of CA Conduven in investigations Nos. 731-TA-211 and 212 (Preliminary), p. 1.

2/ Antidumping petition in the matter of Certain Welded Carbon Steel Pipes and Tubes from Thailand, pp. 20-21.

3/ Transcript of the public conference in investigations Nos. 731-TA-131 and 132 (Preliminary), pp. 79 and 86.

4/ Such AISI data are not available on the basis of size.

5/ Transcript of the public conference in investigations Nos. 731-TA-211 and 212 (Preliminary), pp. 17-18.

U.S. consumption

In the aggregate, U.S. consumption of standard and line pipes and tubes increased annually, from 2.4 million tons 1/ in 1982 to 3.2 million tons in 1984, or by a total of 33.3 percent. Consumption continued to rise in January 1985, reaching 259,000 tons, representing an increase of 14.6 percent from consumption of 226,000 tons in January 1984.

U.S. consumption of standard pipes and tubes increased annually, from 1.5 million tons in 1982 to 2.1 million tons in 1984, or by a total of 40.0 percent. Consumption at 180,000 tons in January 1985 was up 19.2 percent from that in January 1984. Consumption of line pipes and tubes fluctuated during the period, dropping from 863,000 tons in 1982 to 772,000 tons in 1983, or by 10.5 percent, and then increasing to 1.1 million tons in 1984, or by 36.4 percent from the level of consumption in 1983, and by 22.0 percent above consumption in 1982. In January 1985, consumption of line pipes and tubes amounted to 78,000 tons, representing an increase of 4.0 percent from consumption in January 1984 (table 2).

---

1/ Unless otherwise noted, the term "ton" refers to a short ton (2,000 pounds).

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

Table 2.--Certain welded carbon steel pipes and tubes: U.S. producers' domestic shipments, imports for consumption, and apparent consumption, by types, 1982-84, January 1984, and January 1985

| Type and period | U.S. producers' shipments 1/ | Imports | Apparent consumption | Ratio to consumption of-- Producers' shipments | Imports |
|---|---|---|---|---|---|
| | Tons | | | Percent | |
| Standard: | | | | | |
| 1982 | 650,780 | 843,919 | 1,494,699 | 43.5 | 56.5 |
| 1983 | 625,749 | 1,181,652 | 1,807,401 | 34.6 | 65.4 |
| 1984 | 565,132 | 1,544,141 | 2,109,273 | 26.8 | 73.2 |
| January-- | | | | | |
| 1984 | 50,226 | 101,030 | 151,256 | 33.5 | 66.8 |
| 1985 | 50,567 | 130,497 | 180,064 | 27.5 | 72.5 |
| Line: | | | | | |
| 1982 | 528,690 | 334,362 | 863,052 | 61.3 | 38.7 |
| 1983 | 494,765 | 277,077 | 771,842 | 64.1 | 35.9 |
| 1984 | 534,177 | 519,308 | 1,053,485 | 50.7 | 49.3 |
| January-- | | | | | |
| 1984 | 37,831 | 36,939 | 74,770 | 50.6 | 49.4 |
| 1985 | 33,708 | 43,845 | 77,553 | 43.5 | 56.5 |
| Total: | | | | | |
| 1982 | 1,179,470 | 1,178,281 | 2,357,751 | 50.0 | 50.0 |
| 1983 | 1,120,509 | 1,458,729 | 2,579,238 | 43.4 | 56.6 |
| 1984 | 1,099,309 | 2,063,449 | 3,162,758 | 34.8 | 65.2 |
| January-- | | | | | |
| 1984 | 88,057 | 137,969 | 226,026 | 39.0 | 61.0 |
| 1985 | 84,276 | 174,342 | 258,618 | 32.6 | 67.4 |

1/ Data on U.S. producers' shipments may be understated, especially with respect to standard pipes and tubes, because not all producers report to AISI.

Source: U.S. producers' shipments, compiled from AISI data; imports, compiled from official statistics of the U.S. Department of Commerce.

## Consideration of Alleged Material Injury to an Industry in the United States

The petition alleges, with respect to standard pipes and tubes from Thailand, that the domestic industry as a whole is materially injured, or threatened with material injury, and that the western region 1/ of the United States, in particular, is materially injured or threatened with material injury as provided in section 771(4)(C) of the Tariff Act of 1930. To the extent that data are available, separate tabulations concerning producers in the western region are provided throughout this section. Producers in the western region do not manufacture line pipe.

1/ The petitioner defines the western region as consisting of the States of California, Oregon, Washington, Idaho, Nevada, Utah, and Arizona.

U.S. production, capacity, and capacity utilization

U.S. production of standard and line pipes and tubes by responding firms increased overall between 1982 and 1984 and continued to increase in January-February 1985. U.S. production increased from 985,000 tons in 1982 to 1.0 million tons in 1983, or by 4.3 percent. In 1984, production totaled 1.2 million tons, representing an increase of 20.0 percent from production in 1983. Production during January-February 1985, at * * * tons, was up * * * percent from the * * * tons produced in January-February 1984 (table 3).

Firms that produced standard pipes and tubes reported an annual increase in production from 371,000 tons in 1982 to 484,000 tons in 1984, or 30.5 percent. Production of standard pipes and tubes during January-February 1985 also increased, by 3.8 percent from production in the corresponding months of 1984.

Table 3.--Standard and line pipes and tubes: U.S. production, capacity, and capacity utilization, 1982-84, January-February 1984, and January-February 1985

| Item | 1982 | 1983 | 1984 | January-February-- | |
|---|---|---|---|---|---|
| | | | | 1984 | 1985 |
| Standard: | | | | | |
| Production----------tons--- | 371,138 | 433,819 | 483,827 | 78,631 | 82,254 |
| Capacity-----------do----- | 1,057,312 | 1,110,302 | 1,157,478 | 173,003 | 191,204 |
| Capacity utilization percent--- | 35.1 | 39.1 | 41.8 | 45.5 | 43.0 |
| Line: | | | | | |
| Production----------tons--- | 92,113 | 102,701 | 186,165 | 28,687 | 27,833 |
| Capacity-----------do----- | 547,200 | 601,462 | 604,974 | 92,792 | 90,794 |
| Capacity utilization percent--- | 16.8 | 17.1 | 30.8 | 30.9 | 30.7 |
| Standard and line: 1/ | | | | | |
| Production----------tons--- | 520,782 | 489,194 | 506,386 | *** | *** |
| Capacity-----------do----- | 1,127,200 | 1,009,200 | 1,009,200 | *** | *** |
| Capacity utilization percent--- | 46.2 | 48.5 | 50.2 | 2/ 57.8 | 2/ 76.4 |
| Total: | | | | | |
| Production----------tons--- | 984,033 | 1,025,714 | 1,176,378 | *** | *** |
| Capacity-----------do----- | 2,731,712 | 2,720,964 | 2,771,652 | *** | *** |
| Capacity utilization percent--- | 36.0 | 37.7 | 42.4 | 42.8 | 2/ 44.2 |

1/ Represents data from 3 firms that could not separate either capacity or production by product.

Source: Compiled from data submitted in response to questionnaies of the U.S. International Trade Commission.

U.S. production of line pipes and tubes increased annually from 92,000 tons in 1982 to 186,000 tons in 1984, more than twice the production in 1982. Production in January-February 1985 was down slightly (3.0 percent) from production in January-February 1984.

The overall capacity of the responding firms for the production of standard and line pipes and tubes increased irregularly from 2.7 million tons in 1982 to 2.8 million tons in 1984, or by 3.7 percent. Capacity utilization increased annually from 36.0 percent in 1982 to 42.4 percent in 1984. For standard pipes and tubes, U.S. capacity increased annually from 1.1 million tons in 1982 to 1.2 million tons in 1984, or overall by 9.1 percent. Utilization of capacity by standard pipe and tube producers increased annually from 35.1 percent in 1982 to 41.8 percent in 1984. U.S. capacity as reported by firms that produce line pipes and tubes increased from 547,000 tons in 1982 to 605,000 tons to 1984, or by 10.6 percent. Capacity utilization by those firms increased annually from 16.8 percent in 1982 to 30.8 percent in 1984.

The following tabulation shows production, capacity, and capacity utilization with respect to standard pipes and tubes by producers in the western region that responded to the Commission questionnaire.

| Period | Production | Capacity | Capacity utilization |
|---|---|---|---|
| | Tons | | Percent |
| 1982 | *** | *** | *** |
| 1983 | *** | *** | *** |
| 1984 | *** | *** | *** |
| Jan.-Feb.-- | | | |
| 1984 | *** | *** | *** |
| 1985 | *** | *** | *** |

U.S. producers' shipments

Domestic shipments of standard and line pipes and tubes by U.S. producers that provided separate data in their questionnaire responses increased annually between 1982 and 1984, and that trend continued in January-February 1985. Shipments increased from 539,000 tons in 1982 to 588,000 tons in 1983, or by 9.1 percent, and then to 727,000 tons in 1984, or by 23.6 percent from shipments in 1983. In January-February, shipments were up 3.5 percent from shipments in January-February 1984 (table 4).

Domestic shipments of standard pipes and tubes rose annually from 415,000 tons in 1982 to 509,000 tons in 1984, or by 22.7 percent. In January-February 1985, producers' shipments of standard pipes were up slightly from shipments in January-February 1984. Shipments of responding firms of line pipes and tubes dropped from 124,000 tons in 1982 to 114,000 tons in 1983, or by 8.1 percent.

Table 4.--Standard and line pipes and tubes: U.S. producers' domestic shipments, by types, 1/ 1982-84, January-February 1984, and January-February 1985

| Item | 1982 | 1983 | 1984 | January-February-- 1984 | January-February-- 1985 |
|---|---|---|---|---|---|
| | Quantity (tons) | | | | |
| Standard | 414,782 | 474,590 | 509,176 | 84,211 | 87,882 |
| Line | 123,842 | 113,684 | 216,492 | 26,962 | 30,316 |
| Total | 538,624 | 588,274 | 725,668 | 114,173 | 118,218 |
| | Value (1,000 dollars) | | | | |
| Standard | 261,626 | 276,664 | 311,462 | 52,598 | 54,391 |
| Line | 65,881 | 54,407 | 109,503 | 13,407 | 14,809 |
| Total | 327,507 | 331,071 | 420,965 | 66,005 | 69,200 |
| | Unit value | | | | |
| Standard | $631 | $583 | $612 | $625 | $619 |
| Line | 532 | 479 | 506 | 497 | 488 |
| Average | 608 | 563 | 580 | 594 | 585 |

1/ Excludes shipments by * * *, which did not provide the value of shipments, and * * *, which did not provide data by type of product. Shipments by those 2 firms declined annually from * * * tons in 1982 to * * * tons in 1983 and to * * * tons in 1984.

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission.

They increased in 1984 to 216,000 tons, 89.5 percent above the level of shipments in 1983 and 15.1 percent above the level of shipments in 1982. Shipments in January-February 1985 were up 11.1 percent from shipments in January-February 1984.

Three U.S. producers, * * *, were the only firms that reported shipments both east and west of the Rocky Mountains during 1982-84. * * *. Those shipments, as a share of each firm's total shipments, are shown in the following tabulation:

* * * * * * *

U.S. exports

Three firms, * * *, * * *, and * * *, were the only U.S. producers that reported exports during the period covered by the Commission questionnaire.

Exports of standard pipes and tubes by those firms increased annually from
* * * tons in 1982 to * * * tons in 1984, or overall by 27.0 percent.  Exports
of line pipes and tubes, which were all shipped by * * *, declined from * * *
tons in 1982 to * * * tons in 1984, or by * * * percent.  Exports represented
less than 5 percent of the firms' total shipments during the period.  Exports
as reported to the Commission are shown in the following tabulation:

        *       *       *       *       *       *       *

U.S. producers' inventories 1/

    U.S. producers' yearend inventories of standard and line pipes and tubes
declined from 103,000 tons in 1982 to 90,000 tons in 1983, or by 12.6 percent
and then increased to 109,000 tons in 1984, or by 21.1 percent from the 1983
inventory level, and by 6.9 percent compared with the level in 1982.  As a
share of shipments, producers' yearend inventories declined annually from 19.0
percent in 1982 to 15.0 percent in 1984 (table 5).

    Yearend inventories of standard pipes and tubes declined irregularly from
82,000 tons in 1982 to 74,000 tons in 1984, or by 10.8 percent.  As a share of
shipments, producers' inventories of standard pipes and tubes declined
annually from 19.7 percent in 1982 to 14.5 percent in 1984.  Inventories of
line pipes and tubes increased irregularly from 21,000 tons in 1982 to 35,000
tons in 1984, which was 66.7 percent above the inventory level in 1982.  As a
share of shipments, producers' yearend inventories of line pipes and tubes
declined irregularly from 17.0 percent in 1982 to 16.4 percent in 1984.

---

    1/ Seven producers provided inventory data for standard pipes and tubes, and
four producers provided inventory data for line pipes.

Table 5.--Standard and line pipes and tubes: U.S. producers' inventories of domestically produced merchandise, by types, as of Dec. 31 of 1982-84, and Feb. 28 of 1984-85

| Type | As of Dec. 31-- | | | As of Feb. 28-- | |
|---|---|---|---|---|---|
| | 1982 | 1983 | 1984 | 1984 | 1985 |
| | Quantity (tons) | | | | |
| Standard | 81,539 | 72,576 | 73,597 | 62,977 | 66,994 |
| Line | 21,051 | 17,392 | 35,403 | 19,103 | 27,873 |
| Total | 102,590 | 89,968 | 109,000 | 82,080 | 94,867 |
| | Ratio of inventories to shipments (percent) | | | | |
| Standard | 19.7 | 15.3 | 14.5 | 74.8 | 76.2 |
| Line | 17.0 | 15.3 | 16.4 | 80.4 | 91.9 |
| Average | 19.0 | 15.3 | 15.0 | 73.8 | 80.3 |

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission.

Employment and wages

Data were obtained from six producers that could provide separate employment data for standard and line pipes and tubes. 1/ The number of production workers employed at the reporting establishments declined from 1,946 in 1982 to 1,683 in 1983, or by 13.5 percent and then increased in 1984 to 2,002, up 2.9 percent from employment in 1982. Employment continued to rise in January-February 1985, by 4.4 percent from employment in January-February 1984 (table 6).

1/ One firm, * * *, reports that its employees are used interchangably in the production of standard and line pipe and separate data are not available. * * * employed * * * production workers in 1982, * * * in 1983, and * * * in 1984.

Barcode:3883995-07 A-549-502 SCO - Scope Inquiry - Line Pipe

Table 6.--Average number of production and related workers employed in establishments producing standard and line pipes and tubes and hours worked by and wages and total compensation paid to such employees, 1982-84, January-February 1984, and January-February 1985

| Item | 1982 | 1983 | 1984 | January-February-- | |
|---|---|---|---|---|---|
| | | | | 1984 | 1985 |
| Production and related workers: | | | | | |
| Standard | 1,377 | 1,288 | 1,324 | 1,380 | 1,404 |
| Line | 569 | 395 | 678 | 582 | 644 |
| Total | 1,946 | 1,683 | 2,002 | 1,962 | 2,048 |
| Hours worked: | | | | | |
| Standard------1,000 hours | 2,630 | 2,638 | 2,663 | 438 | 478 |
| Line----------------do | 1,157 | 837 | 1,466 | 211 | 268 |
| Total---------------do | 3,787 | 3,475 | 4,129 | 649 | 746 |
| Wages paid: | | | | | |
| Standard----1,000 dollars | 29,606 | 30,522 | 35,327 | 5,757 | 6,144 |
| Line----------------do | 12,564 | 9,682 | 20,358 | 2,918 | 3,558 |
| Total---------------do | 42,170 | 40,204 | 55,685 | 8,675 | 9,699 |
| Total compensation paid: | | | | | |
| Standard----1,000 dollars | 43,317 | 45,276 | 47,025 | 7,836 | 8,276 |
| Line----------------do | 20,988 | 16,518 | 27,606 | 4,147 | 4,969 |
| Total---------------do | 64,305 | 61,794 | 74,631 | 11,983 | 13,240 |

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission.

Total hours worked by production and related workers declined from 3.8 million in 1982 to 3.5 million in 1983 and then increased to 4.1 million in 1984. Annual hours worked by production workers increased from 1,946 in 1982 to 2,065 in 1983 and then declined slightly in 1984 to 2,062 hours.

Total wages paid to production workers declined from $42.2 million in 1982 to $40.2 million in 1983 and then increased in 1984 to $55.7 million. Average hourly wages paid to production workers increased during the period--from $11.14 per hour in 1982 to $13.49 per hour in 1984, an increase of 21.1 percent.

Total compensation paid by U.S. producers declined from $64.3 million in 1982 to $61.8 million in 1983 and then increased in 1984 to $74.6 million. Average hourly total compensation paid to production workers increased annually from $16.98 in 1982 to $18.07 in 1984, or by 6.4 percent. Workers at all but two of the firms (* * * and * * *) are represented by unions.

The following tabulation shows employment, hours worked, wages paid, and total compensation with respect to firms located in the western region that responded to the Commission questionnaire.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

| Period | Numbers of workers | Hours worked | Wages paid | Total compensation |
|---|---|---|---|---|
| | | 1,000 hours | ------1,000 dollars----- | |
| 1982 | *** | *** | *** | *** |
| 1983 | *** | *** | *** | *** |
| 1984 | *** | *** | *** | *** |
| Jan.-Feb.-- | | | | |
| 1984 | *** | *** | *** | *** |
| 1985 | *** | *** | *** | *** |

Financial experience of U.S. producers

Usable income-and-loss data on an establishment basis and for standard and/or line welded carbon steel pipes and tubes were received from only 6 of the 35 U.S. firms to which the Commission sent questionnaires.

Standard and line pipes and tubes.--Six producers provided usable income-and-loss data relative to their standard and line welded carbon steel pipes and tube operations. These producers accounted for 55.6 percent of total shipments of these products in 1984, as reported by the AISI. These data are presented in table 7. Net sales declined by 3.8 percent, from $287.2 million in 1982 to $276.4 million in 1983, and then increased by 28.2 percent to $354.3 million in 1984.

Operating income rose to $18.4 million, or 5.2 percent of net sales, in 1984, compared with an operating loss of $646,000, or 0.2 percent of net sales, in 1983 and an operating income of $4.9 million, or 1.7 percent of net sales, in 1982. Only one of the six firms reported operating losses in 1982 and 1984, whereas two sustained such losses in 1983. Cash flow from operations dropped by 72.7 percent, from $7.2 million in 1982 to $2.0 million in 1983. In 1984 such cash flow jumped to $21.3 million.

Standard pipes and tubes.--Two firms, accounting for * * * percent of total shipments of standard welded carbon steel pipes and tubes, as reported by the American Iron & Steel Institute, furnished usable income-and-loss data. These data are presented in table 8. Net sales increased from * * * in 1982 to * * * in 1984, or by * * * percent. However, operating income declined from * * * in 1982 to * * * in 1983, or by * * * percent, and then rose to * * * in 1984. The two firms reported operating income margins of * * *, * * *, and * * * percent, respectively, in 1982, 1983, and 1984. * * *. Cash flow from operations declined from * * * in 1982 to * * * in 1983 and then increased to * * * in 1984. None of the Western region producers were able to provide usable income-and-loss data.

Table 7.--Income-and-loss experience of 6 U.S. producers 1/ on their operations producing standard and line circular welded carbon steel pipes and tubes, accounting years 1982-84

| Item | 1982 | 1983 | 1984 |
|---|---|---|---|
| Net sales---1,000 dollars-- | 287,238 | 276,442 | 354,295 |
| Cost of goods sold---do--- | 257,453 | 250,105 | 305,513 |
| Gross profit---do--- | 29,785 | 26,337 | 48,782 |
| General, selling, and administrative expenses---do--- | 24,868 | 26,983 | 30,336 |
| Operating income or (loss)---do--- | 4,917 | (646) | 18,446 |
| Depreciation and amortization 2/---do--- | 2,242 | 2,602 | 2,899 |
| Cash flow from operations 2/---do--- | 7,159 | 1,956 | 21,345 |
| Ratio to net sales: | | | |
| Gross profit---percent-- | 10.4 | 9.5 | 13.8 |
| Operating income or (loss)---do--- | 1.7 | (.2) | 5.2 |
| Cost of goods sold---do--- | 89.6 | 90.5 | 86.2 |
| General, selling, and administrative expenses---do--- | 8.7 | 9.8 | 8.6 |
| Number of firms reporting operating losses--- | 1 | 2 | 1 |

1/ Accounting for 55.6 percent of total shipments of standard and line circular welded carbon steel pipes and tubes in 1984, as reported by the AISI.

2/ 2 firms that accounted for * * * percent of reported 1984 net sales did not provide the Commission with data on depreciation and amortization. Hence, cash flow from operations is understated, and deficit is overstated.

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission, except as noted.

Table 8.--Income-and-loss experience of 2 U.S. producers 1/ on their operations producing standard pipes and tubes, accounting years 1982-84

| Item | 1982 | 1983 | 1984 |
|---|---|---|---|
| Net sales------1,000 dollars | *** | *** | *** |
| Cost of goods sold------do | *** | *** | *** |
| Gross profit------do | *** | *** | *** |
| General, selling, and administrative expenses------do | *** | *** | *** |
| Operating income------do | *** | *** | *** |
| Depreciation and amortization 2/------do | *** | *** | *** |
| Cash flow from operations 2/------do | *** | *** | *** |
| Ratio to net sales of-- | | | |
| Gross profit------percent | *** | *** | *** |
| Operating income------do | *** | *** | *** |
| Cost of goods sold------do | *** | *** | *** |
| General, selling, and administrative expenses------do | *** | *** | *** |
| Number of firms reporting operating losses------ | *** | *** | *** |

1/ Accounting for * * * percent of total shipments of standard welded carbon steel pipes and tubes in 1984, as reported by the AISI.

2/ 1 firm, * * *, which accounted for * * * percent of reported 1984 net sales, did not provide the Commission with data on depreciation and amortization. Hence, cash flow from operations is understated, and deficit is overstated.

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission.

Line pipes and tubes.--Three producers, which furnished income-and-loss data, accounted for * * * percent of the total shipments of welded carbon steel line pipes and tubes in 1984, as reported by the American Iron & Steel Institute. These data are presented in table 9. Net sales increased by * * * percent, from * * * in 1982 to * * * in 1984, after declining to * * * in 1983. In the aggregate, three firms reported operating losses of * * *, or * * * percent of net sales, in 1982 and * * *, or * * * percent of net sales, in 1983. In 1984, three firms earned an aggregate operating income of * * *, equivalent to * * * percent of net sales. One firm reported operating losses in 1982 and 1984, whereas two firms sustained such losses in 1983. The responding firms reported a positive cash flow of * * * in 1984 compared with a negative cash flow of * * * in 1983 and * * * in 1982.

Overall establishment operations.--Six producers furnished usable income-and-loss data on their overall establishment operations within which welded carbon steel pipes and tubes are produced. Net sales of standard and line pipes and tubes accounted for 8.8 to 11.5 percent of total establishment

Table 9.--Income-and-loss experience of 3 U.S. producers 1/ on their operations producing line pipes and tubes, accounting years 1982-84

| Item | 1982 | 1983 | 1984 |
|---|---|---|---|
| Net sales--------1,000 dollars | *** | *** | *** |
| Cost of goods sold--------do | *** | *** | *** |
| Gross profit or (loss)--------do | *** | *** | *** |
| General, selling, and administrative expenses--------do | *** | *** | *** |
| Operating income or (loss)--------do | *** | *** | *** |
| Depreciation and amortization 2/--------do | *** | *** | *** |
| Cash flow or (deficit) from operations 2/---do | *** | *** | *** |
| Ratio to net sales of-- | | | |
| Gross profit or (loss)--------percent | *** | *** | *** |
| Operating income or (loss)--------do | *** | *** | *** |
| Cost of goods sold--------do | *** | *** | *** |
| General, selling, and administrative expenses--------do | *** | *** | *** |
| Number of firms reporting operating losses-------- | *** | *** | *** |

1/ Accounting for * * * percent of total shipments of line circular welded carbon steel line pipes and tubes in 1984, as reported by the AISI.

2/ 2 firms that accounted for * * * percent of reported 1984 net sales, did not provide the Commission with data on depreciation and amortization. Hence, cash flow from operations is understated, and deficit is overstated.

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission.

sales during 1982-84. Net sales of total establishment operations declined from $3.3 billion in 1982 to $2.7 billion in 1983, or by of 18.4 percent (table 10). Such sales increased to $3.1 billion in 1984. Six firms reported reported an aggregate operating loss of $345.2 million, or 13.0 percent of net sales, in 1983 compared with an operating income of $188.0 million, or 5.8 percent of net sales, in 1982 and $88.7 million, or 2.9 percent of net sales, in 1984.

Table 10.--Income-and-loss experience of 6 U.S. producers on the overall operations of their establishments within which welded carbon steel pipes and tubes are produced, accounting years 1982-84

| Item | 1982 | 1983 | 1984 |
|---|---|---|---|
| Net sales------------------1,000 dollars-- | 3,265,323 | 2,663,414 | 3,080,414 |
| Cost of goods sold--------------------do---- | 2,944,166 | 2,857,671 | 2,871,687 |
| Gross profit or (loss)----------------do---- | 321,157 | (194,257) | 208,727 |
| General, selling, and administrative expenses----------------------------do---- | 133,190 | 150,929 | 120,031 |
| Operating income or (loss)------------do---- | 187,967 | (345,186) | 88,696 |
| Depreciation and amortization 1/------do---- | 29,441 | 31,425 | 32,707 |
| Cash flow from operations 1/----------do---- | 217,408 | 313,761 | 121,403 |
| Ratio to net sales of-- | | | |
| Gross profit or (loss)---------percent---- | 9.8 | (7.3) | 6.8 |
| Operating income or (loss)----------do---- | 5.8 | (13.0) | 2.9 |
| Cost of goods sold------------------do---- | 90.2 | 107.3 | 93.2 |
| General, selling, and administrative expenses------------------------do---- | 4.1 | 5.7 | 3.9 |
| Standard and line pipes and tubes' net sales----------------------------do---- | 8.8 | 10.4 | 11.5 |
| Number of firms reporting operating losses-- | 2 | 3 | 1 |

1/ 1 firm, * * *, which accounted for * * * percent of reported 1984 net sales, did not provide the Commission with data on depreciation and amortization. Hence, cash flow from operations is understated, and deficit is overstated.

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission.

Two producers, * * * and * * *, which accounted for * * * percent of domestic shipments of standard and line pipes and tubes in 1984, provided financial data on their total pipe and tube operations. Hence, their data were not included in any of the income-and-loss data in tables 7 through 10. Their data are presented in the following tabulation:

* * * * * * *

* * * * * * *.

U.S. producers' statements on the impact of imports from Thailand and Venezuela on their growth, investment, and ability to raise capital.--The Commission requested U.S. producers to describe and explain the actual and potential negative effects, if any, of imports from Brazil, Thailand, and Venezuela of the subject welded carbon steel pipes and tubes on their firms' growth, investment, and ability to raise capital. Excerpts and/or summaries of the responses from U.S. producers are presented below.

* * * * * * *

The Question of the Threat of Material Injury

In its examination of the question of a reasonable indication of the threat of material injury to an industry in the United States, the Commission may take into consideration such factors as the rate of increase of the allegedly subsidized and LTFV imports, the rate of increase of U.S. market penetration by such imports, the quantities of such imports held in inventory in the United States, and the capacity of producers in Thailand and Venezuela to generate exports (including the availability of export markets other than the United States).

U.S. importers' inventories

Questionnaires were received from two importers, Connectors, Inc., which accounted for virtually all of the standard and line pipes and tubes imported from Venezuela in 1984, and * * *, which accounted for all of the imports of standard pipes and tubes from Thailand in 1984. Both importers had no inventories during 1982-84.

Capacity of foreign producers to generate exports

Thailand.--Petitioners allege threat of material injury with respect to imports of standard pipes and tubes from Thailand, stating that producers in Thailand have recently begun offering large quantities of pipe and tube for delivery to the U.S. market beginning in January-March 1985. 1/ Petitioners further allege that the capacity of producers in Thailand has increased significantly in the last few years, stating that, in 1982, the capacity of the entire industry was 234,000 tons, but now two companies alone have the capacity to produce 300,000 tons per year. Petitioners also allege that this increased capacity is to allow producers in Thailand to increase exports. 2/

1/ Antidumping petition in the matter of certain welded carbon steel pipe and tube products from Thailand, p. 24.
2/ Ibid, p. 26.

Thailand's 1/ production of standard pipe and tube increased annually from 272,000 tons in 1982 to 323,000 tons in 1984, or by a total of 18.8 percent. Production in 1985 is projected at 20 tons less than production in 1984. Capacity in Thailand increased by 3.9 percent during 1982-84, with no increase in capacity projected for 1985. Producers in Thailand increased their capacity utilization annually from 82.2 percent in 1982 to 93.9 percent in 1984. Capacity utilization is projected to remain at 93.9 percent in 1985. Shipments to the domestic market accounted for more than one-half of Thailand's output during 1982-84, during which exports increased annually from 45.5 percent of production (1982) to 48.4 percent (1984). Exports to the United States accounted for 0.7 percent of the total exports from Thailand in 1984 (table 11).

Table 11.--Standard pipes and tubes: Thailand's 1/ production, capacity, capacity utilization, domestic shipments, and exports, 1982-85

| Item | 1982 | 1983 | 1984 | 1985 2/ |
|---|---|---|---|---|
| Production 3/------------tons--- | 272,196 | 308,291 | 322,994 | 322,974 |
| Capacity----------------do---- | 331,131 | 331,131 | 343,918 | 343,918 |
| Capacity utilization--percent--- | 82.2 | 93.1 | 93.9 | 93.9 |
| Domestic shipments--------tons--- | 148,216 | 162,952 | 167,692 | 4/ |
| Exports to-- | | | | |
| United States-----------do---- | 0 | 0 | 1,023 | 5/ 31,378 |
| All other markets-------do---- | 123,980 | 145,339 | 155,302 | 4/ |
| Subtotal-------------do---- | 123,980 | 145,339 | 156,325 | 4/ |
| Total shipments---------do---- | 272,196 | 308,291 | 324,017 | 4/ |
| Ratio to total shipments: | | | | |
| Domestic shipments--percent--- | 54.5 | 52.9 | 51.6 | 4/ |
| Total exports-----------do---- | 45.5 | 47.1 | 48.4 | 4/ |
| Ratio of exports to the United States to total exports percent--- | 0 | 0 | 0.7 | 4/ |

1/ Data are for the following 5 producers: First Steel Industry Co., Saha Thai Steel Pipe Co., Siam Steel Co., Thai Steel Pipe Industry Co., and Thai Union Steel Co.

2/ Projected except as noted.

3/ Manfacturers report that they produce to meet orders and do not maintain inventories excepts to accumulate quantities for bulk shipment.

4/ Not available.

5/ Data are for current orders where payment has been arranged. No allowances were made for cancellations.

Source: Post-conference brief on behalf of the 5 Thailand producers.

1/ The data in this section are for five producers that according to the post conference brief on behalf of First Steel Industry Co., Saha Thai Steel Pipe Co., Siam Steel Pipe Co., Thai Steel Pipe Industry Co., and Thai Union Steel Co. are the only manufacturers in Thailand with sufficient capacity and adaptability to manufacture products to U.S. specifications in sufficent quantities to make export profitable, pp. 11-12.

According to the petitioners, producers in the west coast region of the United States are threatened with material injury from imports of the standard pipes and tubes from Thailand. 1/ According to the petitioners, because of the high dumping margins issued against imports from Taiwan and the imminent voluntary restraint agreements with Japan and the Republic of Korea (Korea), purchasers on the west coast will be looking for other foreign sources to supply their requirements and Thailand is an obvious source. Producers' shipments, imports, and apparent consumption of standard pipes and tubes in the west coast region are shown in the follow tabulation:

* * * * * * *

Petitioners further allege that a 10,000-ton shipment is due in Los Angeles in March, and petitioners expect that a majority of the pipe and tube imports from Thailand will enter the United States through west coast ports. 2/ The Commission's staff has verified that * * *, an importer on the west coast, placed an order on * * *, with a producer in Thailand for * * * metric tons (* * * short tons) of standard pipe. * * * expects the shipment, which left Thailand on * * *, and is all destined for customers on the west coast, to arrive in * * *. Counsel for the five Thailand producers provided in the post conference brief 3/ commitments for future shipments where payment has been arranged for each of the five firms. The shipments may be overstated, as no allowance was made for cancellations. These exports from Thailand are reportedly all destined for east coast ports, as shown in the following tabulation:

| Firm | Quantity (Tons) | Expected arrival date | Port |
|---|---|---|---|
| Thai Union----------- | *** | * * * | * * * |
| Thai Steel----------- | *** | * * * | * * * |
| | | | * * * |
| Saha----------------- | *** | * * * | * * * |
| First---------------- | *** | * * * | * * * |
| | | | * * * |
| Siam----------------- | *** | * * * | * * * |
| Total----------- | 31,378 | | |

Venezuela.--Counsel for Venezuelan producers was requested to provide updated information on that country's industry, but the data have not yet been received. The data presented below are the same as reported to the Commission in investigations Nos. 731-TA-211 and 212 (Preliminary).

According to counsel for the Venezuelan producer CA Conduven, this company was the sole exporter of the standard and line pipes and tubes under

1/ Petition, p. 29. According to counsel for the petitioners, the firms threatened with material injury are those producers that are located in California, Oregon, Washington, Idaho, Nevada, Utah, and Arizona.
2/ Ibid, p. 31.
3/ Post conference brief on behalf of 5 Thai producers, exhibit G.

investigation. 1/ Conduven's capacity for producing these products rose by * * * percent, from * * * tons in 1981 to * * * tons in 1983, but production declined by * * * percent, from * * * tons in 1982 to * * * tons in 1983, before increasing to * * * tons during January-September 1984 (table 12).

Table 12.--Standard and line pipes and tubes: Conduven's capacity, production, export sales, and home-market sales, 1981-83, January-September 1983, and January-September 1984

| Item | 1981 | 1982 | 1983 | January-September | |
|---|---|---|---|---|---|
| | | | | 1983 | 1984 |
| Capacity--------------short tons--: | *** | *** | *** | *** | *** |
| Production------------------do----: | *** | *** | *** | *** | *** |
| Capacity utilization----percent--: | *** | *** | *** | *** | *** |
| Domestic shipments---short tons--: | *** | *** | *** | *** | *** |
| Exports to-- | | | | | |
| United States-------------do----: | *** | *** | *** | *** | *** |
| South America-------------do----: | *** | *** | *** | *** | *** |
| Total-----------------------: | *** | *** | *** | *** | *** |

Source: Compiled from data provided by counsel for CA Conduven.

Conduven's capacity utilization rate declined from * * * percent in 1982 to * * * percent in 1983 before rising to * * * percent during January-September 1984. Domestic shipments rose from * * * tons in 1981 to * * * tons in 1982 before dropping to * * * tons in 1983 and * * * tons during January-September 1984. Exports to the United States declined by * * * percent, from * * * tons in 1981 to * * * tons in 1983, and then reached * * * tons during January-September 1984. Exports to South America decreased after 1982 from * * * tons to * * * tons in January-September 1984.

## Consideration of the Causal Relationship Between Alleged Material Injury or the Threat Thereof and the Allegedly Subsidized and LTFV Imports

### U.S. imports

Aggregate U.S. imports of standard and line pipes and tubes increased annually from 1982 to 1984 and continued upward in January 1985. U.S. imports increased from 1.2 million tons in 1982 to 2.1 million tons in 1984, or by 75.0 percent. In January 1985, imports, at 174,000 tons, were up 26.1 percent from imports in January 1984. U.S. imports of the allegedly subsidized and

1/ Counsel for Conduven reports that Union Industrial Venezolana SA, named by the petitioners as a Venezuelan producer and exporter of the products under investigation, does not export pipes and tubes to the United States (transcript of conference on investigations Nos. 731-TA-211 and 212 (Preliminary), p. 41).

LTFV imports from Venezuela more than tripled between 1982 and 1983, from 6,389 tons in 1982 to 24,435 tons in 1983. Imports from Venezuela reached 124,821 tons in 1984, more than five times the level of imports from that source in 1983. As a share of total imports, those from Venezuela increased annually from 0.5 percent in 1982 to 5.3 percent in 1983, 6.0 percent in 1984, and 9.1 percent in January 1985. Shipments of the allegedly subsidized and LTFV imports from Thailand, which entered the United States only in 1984 and January 1985, accounted for less than 0.05 percent of total imports in both those periods (table 13).

Standard pipes and tubes.--U.S. imports of standard pipes and tubes increased annually from 844,000 tons in 1982 to 1.5 million tons in 1984, or by 82.9 percent. They continued to increase in January 1985, reaching 130,000 tons, representing an increase of 28.7 percent from imports in January 1984. Imports from Venezuela increased substantially during 1982-84 and continued to surge in January 1985. Imports from that source more than tripled, from 3,790 tons in 1982 to 12,911 tons in 1983, and then more than tripled again, reaching 45,370 tons in 1984. As a share of total imports of standard pipes and tubes, those from Venezuela rose annually from 0.4 percent in 1982 to 1.1 percent in 1983, 2.9 percent in 1984, and to 3.6 percent in January 1985. Imports of standard pipes and tubes from Thailand amounted to 50 tons in 1984 and to 44 tons in January 1985. Imports from that source accounted for less than 0.05 percent of total imports in 1984 and January 1985 (table 14).

Line pipes and tubes.--U.S. imports of line pipes and tubes increased irregularly from 334,000 tons in 1982 to 519,000 tons in 1984, or by 55.4 percent. Imports totaled 44,000 tons in January 1985, up 18.5 percent from imports of 37,000 tons in January 1984. Imports from Venezuela increased substantially from 1982 to 1984 and continued to rise in January 1985. Such imports increased from 2,599 tons in 1982 to 11,524 tons in 1983 and to 79,451 tons in 1984. Imports from Venezuela in January 1985 amounted to 11,134 tons compared with imports of 1,531 tons in January 1984. As a share of total imports, those from Venezuela amounted to 0.8 percent in 1982, 4.2 percent in 1983, 15.3 percent in 1984, and 25.4 percent in January 1985. There were no imports of line pipes and tubes from Thailand during the period (table 15).

Petitioners request that the Commission cumulate the subject imports from Venezuela with imports of those products from Brazil, Mexico, and Spain that have recently been the subject of investigations. 1/ Imports of standard and line pipes and tubes from those sources, and from Korea and Taiwan whose exports of standard pipes and tubes not over 4.5 inches in outside diameter are currently subject to antidumping duties, are shown in tables 13, 14, and 15.

Market penetration by the allegedly subsidized and LTFV imports

The share of the U.S. market for standard and line pipes and tubes supplied by imports from Venezuela increased annually from 0.3 percent in 1982 to 3.9 percent in 1984 and to 6.1 percent in January 1985. Imports from

1/ Antidumping petition in the matter of Certain Welded Carbon Steel Pipes and Tubes from Venezuela, p. 24; transcript of conference, p. 36. These investigations were terminated effective Mar. 30, 1985, Apr. 2, 1985, and Feb. 4, 1985, respectively, following withdrawal of the petitions.

Barcode:3883995-07 A-549-502 SCO - Scope Inquiry - Line Pipe

Table 13.--Standard and line pipes and tubes: U.S. imports for consumption, by principal sources, 1982-84, January 1984, and January 1985

| Source | 1982 | 1983 | 1984 | January 1984 | January 1985 |
|---|---|---|---|---|---|
| | Quantity (tons) | | | | |
| Venezuela | 6,389 | 24,435 | 124,821 | 1,889 | 15,814 |
| Thailand | 0 | 0 | 50 | 0 | 44 |
| Brazil | 37,757 | 79,180 | 212,603 | 14,903 | 21,817 |
| Mexico | 35,371 | 140,598 | 169,773 | 18,415 | 7,807 |
| Spain | 6,819 | 20,405 | 83,712 | 6,283 | 7,293 |
| Republic of Korea | 441,713 | 673,512 | 636,728 | 46,845 | 42,574 |
| Japan | 293,125 | 142,803 | 252,763 | 18,088 | 28,645 |
| All other | 357,107 | 377,796 | 582,999 | 31,546 | 50,348 |
| Total | 1,178,281 | 1,458,729 | 2,063,449 | 137,969 | 174,342 |
| | Value (1,000 dollars) | | | | |
| Venezuela | 2,876 | 6,873 | 34,808 | 489 | 5,398 |
| Thailand | - | - | 15 | - | 14 |
| Brazil | 17,551 | 23,765 | 69,775 | 4,289 | 7,573 |
| Mexico | 14,582 | 45,838 | 58,508 | 6,044 | 2,869 |
| Spain | 2,505 | 5,599 | 25,591 | 1,813 | 2,495 |
| Republic of Korea | 192,450 | 216,067 | 232,758 | 15,877 | 17,202 |
| Japan | 152,595 | 56,577 | 103,841 | 6,625 | 12,326 |
| All other | 168,591 | 135,145 | 223,173 | 12,496 | 19,138 |
| Total | 551,150 | 489,864 | 748,469 | 47,633 | 66,936 |
| | Unit value | | | | |
| Venezuela | $450 | $281 | $279 | $259 | $341 |
| Thailand | - | - | 300 | - | 318 |
| Brazil | 465 | 300 | 328 | 288 | 347 |
| Mexico | 412 | 326 | 345 | 328 | 367 |
| Spain | 367 | 274 | 306 | 289 | 342 |
| Republic of Korea | 436 | 321 | 366 | 339 | 404 |
| Japan | 521 | 396 | 411 | 366 | 430 |
| All other | 472 | 358 | 383 | 396 | 380 |
| Average | 468 | 336 | 363 | 345 | 384 |

Source: Compiled from official statistics of the U.S. Department of Commerce.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

Table 14.--Standard pipes and tubes: U.S. imports for consumption, by principal sources, 1982-84, January 1984, and January 1985

| Source | 1982 | 1983 | 1984 | January 1984 | January 1985 |
|---|---|---|---|---|---|
| | Quantity (tons) | | | | |
| Venezuela | 3,790 | 12,911 | 45,370 | 358 | 4,680 |
| Thailand | 0 | 0 | 1/ 50 | 0 | 2/ 44 |
| Brazil | 20,265 | 52,174 | 186,958 | 13,690 | 12,390 |
| Mexico | 22,180 | 97,095 | 96,776 | 8,843 | 5,276 |
| Spain | 4,039 | 19,495 | 82,116 | 6,283 | 7,293 |
| Republic of Korea | 356,084 | 575,008 | 499,036 | 34,933 | 34,136 |
| Japan | 135,904 | 69,212 | 123,688 | 8,186 | 20,786 |
| All other | 301,657 | 355,757 | 510,147 | 28,737 | 45,892 |
| Total | 843,919 | 1,181,652 | 1,544,141 | 101,030 | 130,497 |
| | Value (1,000 dollars) | | | | |
| Venezuela | 1,862 | 3,390 | 12,579 | 90 | 1,469 |
| Thailand | - | - | 1/ 15 | - | 2/ 14 |
| Brazil | 9,654 | 15,291 | 61,109 | 3,884 | 4,392 |
| Mexico | 8,895 | 31,730 | 34,193 | 2,908 | 2,038 |
| Spain | 1,401 | 5,425 | 25,143 | 1,813 | 2,498 |
| Republic of Korea | 153,224 | 185,574 | 187,839 | 12,041 | 13,914 |
| Japan | 74,976 | 30,407 | 56,655 | 3,375 | 9,357 |
| All other | 141,923 | 127,352 | 197,330 | 11,453 | 17,169 |
| Total | 391,935 | 399,169 | 574,863 | 35,564 | 50,851 |
| | Unit value | | | | |
| Venezuela | $491 | $263 | $277 | $253 | $314 |
| Thailand | - | - | 1/ 291 | - | 2/ 317 |
| Brazil | 476 | 293 | 327 | 284 | 354 |
| Mexico | 401 | 327 | 353 | 329 | 386 |
| Spain | 347 | 278 | 306 | 289 | 343 |
| Republic of Korea | 430 | 323 | 376 | 345 | 408 |
| Japan | 552 | 439 | 458 | 412 | 450 |
| All other | 470 | 358 | 387 | 399 | 374 |
| Average | 464 | 338 | 372 | 352 | 390 |

1/ Includes 39 tons, valued at $11,000, with an average unit value of $280 per ton, which entered the United States through the port of Wilmington, NC, and 11 tons, valued at $4,000, with an average unit value of $328 per ton which entered through the port of Philadelphia, PA.

2/ All imports from Thailand in January 1985 entered the United States through the port of Bridgeport, CT.

Source: Compiled from official statistics of the U.S. Department of Commerce.

Table 15.--Line pipes and tubes: U.S. imports for consumption, by principal sources, 1982-84, January 1984, and January 1985

| Source | 1982 | 1983 | 1984 | January 1984 | January 1985 |
|---|---|---|---|---|---|
| | Quantity (tons) | | | | |
| Venezuela | 2,599 | 11,524 | 79,451 | 1,531 | 11,134 |
| Brazil | 17,492 | 27,006 | 25,645 | 1,213 | 9,427 |
| Mexico | 13,191 | 43,503 | 72,997 | 9,572 | 2,531 |
| Spain | 2,780 | 910 | 1,596 | 0 | 0 |
| Republic of Korea | 85,629 | 98,504 | 137,692 | 11,912 | 8,438 |
| Japan | 157,221 | 73,591 | 129,075 | 9,902 | 7,859 |
| All other | 55,450 | 22,039 | 72,852 | 2,809 | 4,456 |
| Total | 334,362 | 277,077 | 519,308 | 36,939 | 43,845 |
| | Value (1,000 dollars) | | | | |
| Venezuela | 1,014 | 3,483 | 22,229 | 399 | 3,929 |
| Brazil | 7,897 | 8,474 | 8,666 | 405 | 3,181 |
| Mexico | 5,687 | 14,108 | 24,315 | 3,136 | 831 |
| Spain | 1,104 | 174 | 448 | - | - |
| Republic of Korea | 39,226 | 30,493 | 44,919 | 3,836 | 3,106 |
| Japan | 77,619 | 26,170 | 47,186 | 3,250 | 2,969 |
| All other | 26,668 | 7,793 | 25,843 | 1,043 | 2,069 |
| Total | 159,215 | 90,695 | 173,606 | 12,069 | 16,085 |
| | Unit value | | | | |
| Venezuela | $390 | $302 | $280 | $261 | $353 |
| Brazil | 451 | 314 | 338 | 334 | 337 |
| Mexico | 431 | 324 | 333 | 328 | 328 |
| Spain | 397 | 191 | 281 | - | - |
| Republic of Korea | 458 | 310 | 326 | 322 | 368 |
| Japan | 494 | 356 | 366 | 328 | 378 |
| All other | 481 | 354 | 355 | 371 | 464 |
| Average | 476 | 327 | 334 | 327 | 367 |

Source: Compiled from official statistics of the U.S. Department of Commerce.

Thailand, which entered the United States only in 1984 and January 1985, accounted for less than 0.05 percent of U.S. consumption in those period (table 16).

Standard pipes and tubes.--Market penetration by standard pipes and tubes imported from Venezuela increased without interruption during the period covered by these investigations. The share of the market supplied by Venezuela increased from 0.3 percent in 1982 to 2.2 percent in 1984. In January 1985, market penetration by Venezuela reached 2.6 percent compared with an 0.2 percent penetration in January 1984. Penetration by imports from Thailand, which consisted entirely of standard pipes and tubes, was less than 0.05 percent in 1984 and in January 1985.

Lines pipes and tubes.--Line pipes and tubes imported from Venezuela increased their share of the U.S. market much more rapidly than did the imports of standard pipes and tubes. Imported line pipes and tubes from Venezuela increased their U.S. market share from 0.3 percent in 1982 to 1.5 percent in 1983 and to 7.5 percent in 1984. In January 1985, market penetration by the imports from Venezuela amounted to 14.4 percent compared with market penetration of 2.2 percent in January 1984. There were no imports of line pipes or tubes from Thailand during the period covered by these investigations.

Petitioners request that the Commission cumulate the subject imports from Venezuela with imports of those products from Brazil, Mexico, and Spain that have recently been the subject of investigations. Import penetration of standard and line pipes and tubes from those sources, and from Korea and Taiwan, whose exports of standard pipes and tubes not over 4.5 inches are currently subject to antidumping duties, is shown in table 17.

## Prices

The pipes and tubes included in these investigations are generally priced on the basis of per 100 feet. Several U.S. producers publish confidential price lists. List prices are often discounted to meet competitive offers. The U.S.-produced pipes and tubes are predominantly sold on an f.o.b. mill or warehouse basis. The imported product under investigation is normally sold on an ex-dock, duty-paid, or f.o.b. warehouse basis. Formal bidding is not the usual means of price competition for pipes and tubes up to 16 inches in diameter, unlike the market for pipes and tubes with diameter over 16 inches.

The Commission requested U.S. producers and importers to provide price data on their largest sale of each of four product specifications to both a service center/distributor and end-user customer. The four product specifications are as follows:

Product 1.--ASTM A-120 schedule 40 standard pipe, carbon welded, black, plain end, 1.315-inch outside diameter (1-inch nominal), 0.133-inch wall thickness.

Table 16.--Standard and line pipes and tubes: Shares of U.S. consumption supplied by Venezuela, Thailand, all other countries, and U.S. producers, 1/ 1982-84, January 1984, and January 1985

| Item | 1982 | 1983 | 1984 | January 1984 | January 1985 |
|---|---|---|---|---|---|
| Standard pipes and tubes: | | | | | |
| U.S. consumption---tons-- | 1,494,699 | 1,807,401 | 2,109,273 | 151,256 | 180,064 |
| Share of U.S. consumption supplied by-- | | | | | |
| Venezuela-------percent-- | 0.3 | 0.7 | 2.2 | 0.2 | 2.6 |
| Thailand-----------do---- | - | - | 2/ | - | 2/ |
| All other----------do---- | 56.2 | 64.7 | 71.0 | 66.6 | 69.9 |
| Subtotal---------do---- | 56.5 | 65.4 | 73.2 | 66.8 | 72.5 |
| U.S. producers-----do---- | 43.5 | 34.6 | 26.8 | 33.5 | 27.5 |
| Total------------do---- | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Line pipes and tubes: | | | | | |
| U.S. consumption---tons-- | 863,052 | 771,842 | 1,053,485 | 70,770 | 77,553 |
| Share of U.S. consumption supplied by-- | | | | | |
| Venezuela-------percent-- | 0.3 | 1.5 | 7.5 | 2.2 | 14.4 |
| Thailand-----------do---- | - | - | - | - | - |
| All other----------do---- | 38.4 | 34.4 | 41.8 | 47.2 | 42.1 |
| Subtotal---------do---- | 38.7 | 35.9 | 49.3 | 49.4 | 56.5 |
| U.S. producers-----do---- | 61.3 | 64.1 | 50.7 | 50.6 | 43.5 |
| Total------------do---- | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Total, standard and line pipes and tubes: | | | | | |
| U.S. consumption---tons-- | 2,357,751 | 2,579,238 | 3,162,758 | 226,026 | 258,618 |
| Share of U.S. consumption supplied by-- | | | | | |
| Venezuela-------percent-- | 0.3 | 0.9 | 3.9 | 0.8 | 6.1 |
| Thailand-----------do---- | - | - | 2/ | - | 2/ |
| All other----------do---- | 49.7 | 55.7 | 61.3 | 60.2 | 61.3 |
| Subtotal---------do---- | 50.0 | 56.6 | 65.2 | 61.0 | 67.4 |
| U.S. producers-----do---- | 50.0 | 43.4 | 34.8 | 39.0 | 32.6 |
| Total------------do---- | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

1/ Shares supplied by imports may be overstated, and shares supplied by U.S. producers may be understated, especially with respect to standard and tubes, because U.S. producers' shares are based on the AISI's shipments data, and not all producers report to the AISI.
2/ Less than 0.05 percent.

Source: Compiled from AISI data and from official statistics of the U.S. Department of Commerce.

Table 17.--Standard and line pipes and tubes: Shares of U.S. consumption, by specified sources, 1982-84, January 1984, and January 1985

(In percent)

| Item and source | 1982 | 1983 | 1984 | January 1984 | January 1985 |
|---|---|---|---|---|---|
| Standard pipes and tubes: | | | | | |
| Venezuela | 0.3 | 0.7 | 2.2 | 0.2 | 2.6 |
| Thailand | - | - | 1/ | - | 1/ |
| Brazil | 1.4 | 2.9 | 8.9 | 9.1 | 6.9 |
| Mexico | 1.5 | 5.4 | 4.6 | 5.8 | 2.9 |
| Spain | .3 | 1.1 | 3.9 | 4.2 | 4.1 |
| Republic of Korea | 23.8 | 31.8 | 23.7 | 23.1 | 19.0 |
| Taiwan | 6.4 | 7.8 | 1.5 | 0 | 2.0 |
| All other | 22.8 | 15.7 | 28.4 | 23.7 | 35.0 |
| Total imports | 56.5 | 65.4 | 73.2 | 66.8 | 72.5 |
| Line pipes and tubes: | | | | | |
| Venezuela | .3 | 1.5 | 7.5 | 2.2 | 14.4 |
| Thailand | - | - | - | - | - |
| Brazil | 2.0 | 3.5 | 2.4 | 1.7 | 12.2 |
| Mexico | 1.5 | 5.6 | 6.9 | 13.5 | 3.3 |
| Spain | .3 | .1 | .2 | - | - |
| Republic of Korea | 9.9 | 12.7 | 13.1 | 14.0 | 10.1 |
| Taiwan | .6 | .1 | .4 | - | 1.0 |
| All other | 25.3 | 12.4 | 18.8 | 18.0 | 10.0 |
| Total | 38.7 | 35.9 | 49.3 | 49.4 | 56.5 |
| Total, standard and line pipes and tubes: | | | | | |
| Venezuela | .3 | .9 | 3.9 | .8 | 6.0 |
| Thailand | - | - | 1/ | - | 1/ |
| Brazil | 1.6 | 3.1 | 6.7 | 6.7 | 8.3 |
| Mexico | 1.5 | 5.5 | 5.4 | 8.3 | 3.0 |
| Spain | .3 | .8 | 2.6 | 2.8 | 2.8 |
| Republic of Korea | 18.7 | 26.2 | 20.1 | 20.7 | 16.5 |
| Taiwan | 4.3 | 5.5 | .7 | .5 | 1.7 |
| All other | 23.3 | 14.6 | 25.8 | 21.5 | 28.9 |
| Total | 50.0 | 56.6 | 65.2 | 61.0 | 67.4 |

1/ Less than 0.05 percent.

Source: Compiled from AISI data and from official statistics of the U.S. Department of Commerce.

Note.--Because of rounding, figures may not add to the totals shown.

Product 2.--ASTM A-53 standard pipe, carbon welded, black, plain end, 6-5/8-inch outside diameter (6-inch nominal), 0.280-inch wall thickness.

Product 3.--API 5L line pipe, carbon welded, black, plain end, 4-1/2-inch diameter, 0.188-inch wall thickness.

Product 4.--API 5L line pipe, carbon welded, black, plain end, 8-5/8-inch diameter, 0.188-inch wall thickness.

Standard pipes and tubes.--Seven U.S. producers reported some selling price data on product 1, one of the two standard pipe products for which information was requested. 1/ In 1984, the seven U.S. producers accounted for approximately 95 percent of total U.S. shipments of standard pipes and tubes, as reported by the AISI. The major importer of this product from Venezuela provided price data. This importer accounted for approximately * * * percent of the tonnage of imports under investigation from Venezuela in 1984, according to the U.S. Customs Service's net import file. 2/ One major importer of Thai-produced pipe and tube reported requested price data. 3/

The weighted-average net selling prices reported by U.S. producers and the converted Venezuelan import prices for 1-inch nominal diameter standard pipe are shown in table 18. U.S. producers' quarterly selling prices per 100 hundred feet of domestically produced, 1-inch nominal diameter, schedule 40 standard pipe (product 1) decreased irregularly from $44.24 in January-March 1982 to $32.92 in July-September 1983, or by 26 percent. The price then fluctuated from October-December 1983 to January-February 1985, yielding a 19-percent overall decrease from January-March 1982 to January-February 1985.

The selling price of Venezuelan-produced product 1 increased from * * * in July-September 1983 (the first period for which imported prices were reported) to * * * in October-December 1984, or by * * * percent, but then decreased to * * * in January-February 1985, yielding an overall increase of * * * percent over the period July-September 1983 to January-February 1985. The imported standard pipe undersold the competing domestically produced pipe in each quarter in which prices could be compared. Margins of underselling ranged from * * * percent (* * *) in October-December 1984 to * * * percent (* * *) in January-March 1984 and averaged * * * percent.

* * *, the importer contracting for the all of the scheduled shipment of 11,023 tons of Thai-produced standard pipe, reported ex-dock, duty-paid prices for the estimated * * * percent of the imported product it has presold. The reported price per hundred feet of product 1 scheduled for delivery in

---

1/ Only one U.S. producer reported price data for product 2.

2/ No other importers of pipe and tube from Venezuela responded to the questionnaire. The responding importer provided price data on the basis of metric tons in lieu of the requested prices per 100 feet. The Commission's staff converted the metric ton prices to a per-hundred-feet basis using conversion factors reported by U.S. producers (the importer did not report the requested conversion factor).

3/ A second importer of Thai-produced pipe and tube submitted some aggregate average price data which were not comparable to U.S. producers' prices.

late-April 1985 was * * *. Although no U.S. producers' price data are available for April 1985, * * * price is * * * percent (* * *) below the U.S. weighted-average price in January-February 1985. 1/

Line pipe.--Three U.S. producers and the responding importer of Venezuelan-produced pipe reported usable net selling price data for one of the two line pipe product specifications. 2/ The three producers accounted for 33 percent of total U.S. shipments of line pipe in 1984. The metric ton prices provided by the major importer of this product from Venezuela were converted to a per-hundred-feet basis. The average net selling prices reported by the U.S. producer and the converted Venezuelan import prices for 4.5-inch diameter, API 5L line pipe are shown in table 19.

U.S. producers' quarterly selling price per hundred feet of domestically produced, 4.5-inch diameter, API 5L line pipe (product 3) fluctuated in a downward trend from $272.75 in January-March 1982 to $198.83 in October-December 1983, or by 27 percent. Reversing this trend, the price then increased to $219.59 in July-September 1984, or by 10 percent over that in October-December 1983 to July-September 1984. The price then decreased by 4 percent, to $211.08, in January-February 1985, yielding a 23-percent overall decline from January-March 1982 to January-February 1985.

The quarterly selling price per 100 hundred feet of imported Venezuelan-produced line pipe increased irregularly from * * * in April-June 1983 (the first period for which imported prices were reported) to * * * in July-September 1984, or by * * * percent. In comparison, the reported price of domestically produced product 3 increased by approximately * * * percent over that in the same period. The imported line pipe undersold the competing U.S. product in each quarter for which comparable prices were available. Margins of underselling ranged from * * * percent (* * *) in October-December 1983 to approximately * * * percent (* * *) in January-March 1984 and averaged * * * percent.

Transportation costs

Domestic producers of welded carbon steel pipes and tubes are concentrated along the eastern seaboard, the west coast, and in the Midwest. The pipes and tubes under investigation from Venezuela enter the United States mainly through the Ports of Houston, TX, and New Orleans, LA. However, many other major U.S. ports are also utilized to a lesser extent for this purpose. A shipment of * * * tons of ASTM A-120 standard pipe produced in Thailand is scheduled to be delivered to the Port of Los Angeles, CA, in * * *.

The paucity of response from U.S. producers and importers to a section of the questionnaire concerning inland transportation costs precludes drawing any conclusions from information received during the current investigation.

---

1/ Weighted-average f.o.b. prices were from U.S. producers located east of the Rocky Mountains, whereas * * *'s price is ex-dock, duty paid, port of Los Angeles, CA.

2/ No line pipe is imported from Thailand.

Table 18.--Standard circular pipes and tubes: U.S. producers' and importer's weighted-average prices to service centers/distributors for schedule 40 standard pipe, 1/ by quarters, January 1982-February 1985

(Per 100 feet)

| Period | U.S. product price | Venezuelan product: Price | Margin of underselling: Amount | Margin of underselling: Percent |
|---|---|---|---|---|
| | -----------Per 100 feet--------- | | | |
| 1982: | | | | |
| January-March | $44.24 | *** | *** | *** |
| April-June | 45.46 | *** | *** | *** |
| July-September | 44.68 | *** | *** | *** |
| October-December | 38.09 | *** | *** | *** |
| 1983: | | | | |
| January-March | 37.76 | *** | *** | *** |
| April-June | 35.88 | *** | *** | *** |
| July-September | 32.92 | *** | *** | *** |
| October-December | 34.33 | *** | *** | *** |
| 1984: | | | | |
| January-March | 36.33 | *** | *** | *** |
| April-June | 35.34 | *** | *** | *** |
| July-September | 36.41 | *** | *** | *** |
| October-December | 36.72 | *** | *** | *** |
| 1985 (January-February) | 35.80 | *** | *** | *** |

1/ ASTM-A120, schedule 40 standard pipe, carbon welded, black, plain end, 1.315-inch outside diameter, 0.133-inch wall thickness.
2/ Not available.

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission.

Table 19.--Line pipe: U.S. producers' and importer's weighted-average prices to service centers/distributors, 1/ by quarters, January 1982-February 1985

(Per 100 feet)

| Period | U.S. product price | Venezuelan product | | |
|---|---|---|---|---|
| | | Price | Margin of underselling | |
| | | | Amount | Percent |
| 1982: | | | | |
| January-March | $272.75 | *** | *** | *** |
| April-June | 231.23 | *** | *** | *** |
| July-September | 211.04 | *** | *** | *** |
| October-December | 229.84 | *** | *** | *** |
| 1983: | | | | |
| January-March | 222.86 | *** | *** | *** |
| April-June | 202.26 | *** | *** | *** |
| July-September | 206.67 | *** | *** | *** |
| October-December | 198.83 | *** | *** | *** |
| 1984: | | | | |
| January-March | 216.97 | *** | *** | *** |
| April-June | 215.74 | *** | *** | *** |
| July-September | 219.59 | *** | *** | *** |
| October-December | 215.84 | *** | *** | *** |
| 1985: (January-February) | 211.08 | *** | *** | *** |

1/ API 5L line pipe, carbon welded, black, plain end, 4.5-inch diameter, 0.188-inch wall thickness.
2/ Not available.

Source: Compiled from data submitted in response to questionnaires of the U.S. International Trade Commission.

However, some information can be assembled from recent investigations concerning welded carbon steel pipes and tubes. 1/

The Venezuelan imports enjoy a distinct advantage in the Houston/New Orleans market owing to the substantial inland transportation costs required to deliver the competing U.S.-produced pipe and tube from most U.S. mills. * * *, one of the largest U.S. producers of pipe and tube, * * * estimated transportation costs to be 13 percent of the delivered price of its pipe and tube to the Houston/New Orleans market. 2/ * * *, a major producer of the line and standard pipe and tube covered by this investigation, estimated transportation costs to the Houston/New Orleans market area to be 10 percent of the delivered price of pipe and tube produced at its * * *, (13 percent from * * *). On the other hand, * * * stated that the Chicago area (* * *) was significantly insulated from import competition owing to prohibitive inland transportation costs confronting importers.

In the Los Angeles/San Francisco market area, Thai-produced standard pipes and tubes enjoy a certain inland freight advantage over most U.S. mills. * * *, the importer contracting for the scheduled shipment of * * * tons of standard pipe, reported that the Thai product will be sold primarily in southern California. The importer stated that transport costs preclude sales of the Thai product east of the Rocky Mountains. 3/

Purchasers of standard pipe located on the west coast reported that inland transport costs from mills such as * * * or * * * made delivered prices from those producers prohibitive. * * * estimated transportation costs to the Los Angeles/San Francisco market area to be 15 percent of the delivered price of pipes and tubes produced at its mill in * * * (20 percent from its mill in * * *). * * * estimated transportation costs to the Los Angeles/San Francisco market area to be 19 percent of the delivered price of pipes and tubes produced at its mills in * * * and * * *. However, several U.S. producers of standard pipes and tubes are located on the west coast. * * * estimated transportation costs to be 2 percent of the delivered price of their pipe sold in the Los Angeles/San Francisco area.

Exchange rates

Indexes of the nominal and real exchange rates of the Venezuelan bolivar and the Thai baht relative to the U.S. dollar are shown in table 20. Exchange rate indexes in table 20 are based on rates expressed in U.S. dollars per foreign currency unit. The real exchange rate is determined by adjusting the nominal exchange rate for differences in the rate of inflation in Venezuela and Thailand relative to the inflation rate in the United States.

---

1/ Investigations Nos. 731-TA-131, 132, and 138 and 701-TA-220.

2/ Examining the Houston/New Orleans market in 1983, * * * shipped * * * tons by truck, with freight charges estimated to be 14 percent (* * * per ton) of the delivered price, and * * * tons by rail, with freight charges estimated to be 10 percent (* * * per ton) of the delivered price.

3/ Telephone inquiry on Mar. 26, 1985, * * *.

Table 20.--Nominal and real exchange rate indexes between the U.S. dollar and the Venezuelan bolivar and the Thai baht, by quarters, January 1982-December 1984

(January-March 1982=100.0)

| Period | Venezuelan Bolivar | | Thai Baht | |
|---|---|---|---|---|
| | Nominal | Real | Nominal | Real |
| 1982: | | | | |
| January-March | 100.0 | 100.0 | 100.0 | 100.0 |
| April-June | 100.0 | 101.6 | 100.0 | 100.2 |
| July-September | 100.0 | 102.3 | 100.0 | 98.7 |
| October-December | 100.0 | 101.7 | 100.0 | 99.1 |
| 1983: | | | | |
| January-March | 100.0 | 108.3 | 100.0 | 99.6 |
| April-June | 99.9 | 106.8 | 100.0 | 100.3 |
| July-September | 99.8 | 109.0 | 100.0 | 101.1 |
| October-December | 99.8 | 110.4 | 100.0 | 100.8 |
| 1984: | | | | |
| January-March | 77.1 | 87.8 | 100.0 | 96.9 |
| April-June | 57.2 | 68.1 | 100.0 | 95.2 |
| July-September | 57.2 | 1/ | 100.0 | 94.9 |
| October-December | 57.2 | 1/ | 90.0 | 1/ |

1/ Not available.

Source: International Monetary Fund, International Financial Statistics.

In nominal terms, the Venezuelan bolivar held essentially constant from January-March 1982 to October-December 1983. The nominal value of the bolivar vis-a-vis that of the U.S. dollar then depreciated by 43 percent from October-December 1983 to October-December 1984. In real terms the bolivar appreciated by 10 percent from January-March 1982 to October-December 1983. The real U.S. dollar/bolivar exchange rate then depreciated by 38 percent from October-December 1983 to April-June 1984.

The Thai baht maintained a constant nominal exchange rate vis-a-vis that of the U.S. dollar from January-March 1982 to July-September 1984. The baht then depreciated by 10 percent in nominal terms from July-September 1984 to October-December 1984. After adjusting for inflation, the baht depreciated by 5 percent from January-March 1982 to July-September 1984.

## Lost sales

The Commission received lost sales allegations from only one domestic producer. Petitioner indicated at the public conference that lost sales information is very difficult to obtain, because their customers do not inform them when they buy pipe from foreign producers, and, in fact, often do not know the origin of the pipe, except that it may be imported.

One U.S. pipe and tube producer reported seven specific instances, involving two firms, in which it had allegedly lost sales to imports from Venezuela. The allegations amounted to * * * short tons of fence tube during June-September 1984. The same producer reported four specific instances in which it had allegedly lost sales to imports from Thailand to be delivered in January-March 1985. The allegations concerning Thailand amounted to * * * short tons. The Commission investigated all 11 allegations.

In the seven allegations concerning imports from Venezuela, the purchasers stated they have never purchased pipe or tube produced in Venezuela. Of the four firms to which sales were allegedly lost to competition from Thailand, one reported it had purchased approximately * * * tons of Thai-produced pipe to be delivered in April 1985. This buyer cited the Thai pipe's lower price as his primary reason for purchasing the imported product. The remaining three firms reported they had not purchased pipe imported from Thailand. Details of the allegations are discussed below.

* * * was cited in four allegations totaling * * * tons of Venezuelan fence tube during June-September 1984. * * *, purchasing manager for the firm, denied the allegations, stating that his firm has never purchased Venezuelan pipe or tube.

* * * was cited in three allegations totaling * * * tons of Venezuelan fence tube during June-September 1984. * * * denied the allegations, stating that his firm has never purchased Venezuelan pipe or tube.

* * * was cited in an allegation involving * * * tons of Thai standard pipe for January-March 1985 arrival. * * * purchasing agent for the firm, confirmed having purchased approximately * * * tons of Thai standard pipe at the alleged price of * * * per ton, * * * percent below the delivered price offered by the U.S. producer. * * * indicated that the product he requires, * * *. He noted that the U.S.-produced product is not price competitive because of prohibitively high transportation costs.

* * * was cited in an allegation involving * * * tons of Thai standard pipe for arrival in January-March 1985. * * *, denied the allegation, stating that his firm has never purchased or ordered pipe or tube produced in Thailand.

* * * was cited in an allegation involving * * * tons of Thai standard pipe for arrival in January-March 1985. * * *, purchaser for the firm, denied the allegation, stating that her firm has never purchased or ordered pipe or tube produced in Thailand.

* * * was cited in an allegation involving * * * tons of Thai standard pipe for arrival in January-March 1985. * * *, purchaser for the firm, denied the allegation, stating that her firm has never purchased or ordered pipe or tube produced in Thailand.

The following lost sales information concerning the pipes and tubes currently under investigation was collected in a recent investigation 1/ involving Venezuela:

---

1/ Investigation No. 731-TA-212 (Preliminary), Certain Welded Carbon Steel Pipes and Tubes from Venezuela.

One U.S. pipe and tube producer reported 15 specific instances in which it had allegedly lost sales to imports from Venezuela. The allegations amounted to * * * short tons of fence tube and covered the period June-September 1984. In 14 of the 15 allegations concerning imports from Venezuela, which amounted to * * * short tons, the purchasers stated that they had not purchased the Venezuelan product. In one allegation involving * * * short tons of Venezuelan fence tube, the buyer stated that he had purchased approximately * * * tons of the Venezuelan product. This buyer cited the Venezuelan tube's lower price as his primary reason for purchasing the imported product. Details of the allegations are discussed below.

* * * was cited in four allegations totaling * * * tons of Venezuelan fence tube during June-September 1984. * * *, a purchaser for the firm, reported having purchased approximately * * * tons of Venezuelan fence tube during September 1984. He cited the Venezuelan product's lower price as his principal reason for buying the imported product. * * * denied the remaining allegations, stating that the above referenced purchase was "a one-shot deal."

* * * was cited in three allegations totaling * * * short tons of Venezuelan fence tube during July-September 1984. * * *, a purchaser for the firm, denied the allegation. * * * stated that his firm had purchased approximately * * * tons of Venezuelan pipe about 1 year ago, reporting availability as his primary reason for purchasing the imported product.

* * * was cited in three allegations totaling * * * short tons of Venezuelan fence tube during July-September 1984. * * *, purchaser for the firm, denied the allegation. * * * stated that his firm had purchased Venezuelan pipe approximately 5 years ago but has purchased none since then.

* * * was cited in three allegations totaling * * * tons of Venezuelan fence tube during June-September 1984. * * *, a purchaser for the firm, denied the allegation, stating that his firm has never purchased Venezuelan pipe or tube.

* * * was cited in two allegations totaling * * * tons of Venezuelan fence tube during August and September 1984. * * *, a purchaser for the firm, denied the allegation, stating that his firm has never purchased Venezuelan pipe or tube.

PUBLIC DOCUMENT

Barcode:3883995-07 A-549-502 SCO - Scope Inquiry - Line Pipe

A-43

APPENDIX A

COMMISSION'S FEDERAL REGISTER
NOTICE OF INVESTIGATION

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

Barcode:3883995-07 A-549-502 SCO - Scope Inquiry - Line Pipe

## INTERNATIONAL TRADE COMMISSION

[Investigations Nos. 701-TA-242 (Preliminary); 731-TA-252 and 253 (Preliminary)]

### Certain Welded Carbon Steel Pipes and Tubes From Thailand and Venezuela

**AGENCY:** United States International Trade Commission.

**ACTION:** Institution of preliminary countervailing duty and antidumping investigations and scheduling of a conference to be held in connection with the investigations.

**SUMMARY:** The Commission hereby gives notice of the institution of preliminary countervailing duty investigation No. 701-TA-242 (Preliminary) under section 703(a) of the Tariff Act of 1930 (19 U.S.C. 1671b(a)) to determine whether there is a reasonable indication that an industry in the United States is materially injured, or is threatened with material injury, or the establishment of an industry in the United States is materially retarded, by reason of imports from Venezuela of certain welded carbon steel pipes and tubes [1] which are alleged to be subsidized by the Government of Venezuela. As provided in section 703(a), the Commission must complete preliminary countervailing duty investigations in 45 days, or in this case by April 15, 1985.

The Commission also gives notice of the institution of preliminary antidumping investigations Nos. 731-TA-252 and 253 (Preliminary) under section 733(a) of the Tariff Act of 1930 (19 U.S.C. 1673b(a)) to determine whether there is a reasonable indication that an industry in the United States is materially injured, or is threatened with material injury, or the establishment of an industry in the United States is materially retarded, by reason of imports from Thailand and Venezuela of certain welded carbon steel pipes and tubes,[1] which are alleged to be sold in the United States at less than fair value. As provided in section 733(a), the Commission must complete preliminary antidumping investigations in 45 days, or in these cases by April 15, 1985.

For further information concerning the conduct of these investigations and rules of general application, consult the Commission's Rules of Practice and Procedure, part 207, subparts A and B (19 CFR part 207), and part 201, subparts A through E (19 CFR part 201).

**EFFECTIVE DATE:** February 28, 1985.

**FOR FURTHER INFORMATION CONTACT:** Bruce Cates (202-523-0369), Office of Investigations, U.S. International

---

[1] For purposes of these investigations, the term "certain welded carbon steel pipes and tubes" covers welded carbon steel pipes and tubes of circular cross section 0.375 inch or more but not over 16 inches in outside diameter, provided for in items 610.3208, 610.3209, 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258, and 610.4925 of the Tariff Schedules of the United States Annotated (TSUSA). Prior to Apr. 1, 1984, these pipes and tubes were provided for in TSUSA items 610.3208, 610.3209, 610.3231, 610.3232, [illegible]

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

Barcode:3883995-07 A-549-502 SCO - Scope Inquiry - Line Pipe

de Commission, 701 E Street NW., shington, DC 20436.

**PLEMENTARY INFORMATION:**

**kground**

hese investigations are being ituted in response to petitions filed February 28, 1985, and amended on rch 12, 1985, by counsel for the ndard pipe subcommittee and the line e subcommittee of the Committee on e and Tube Imports, and for each of individual manufacturers of ndard pipe and line pipe that are nbers of those subcommittees.

**ticipation in the Investigations**

ersons wishing to participate in these estigations as parties must file an y of appearance with the Secretary he Commission, as provided in 01.11 of the Commission's rules (19 R 201.11), not later than seven (7) s after publication of this notice in Federal Register. Any entry of earance filed after this date will be rred to the Chairwoman, who will ermine whether to accept the late y for good cause shown by the son desiring to file the entry.

**vice List**

ursuant to § 201.11(d) of the nmission's rules (19 CFR 201.11(d)), Secretary will prepare a service list taining the names and addresses of persons, or their representatives, are parties to these investigations n the expiration of the period for g entries of appearance. In ordance with § 201.16(c) of the rules CFR 201.16(c)), each document filed a party to the investigations must be ved on all other parties to the estigations (as identified by the vice list), and a certificate of service st accompany the document. The retary will not accept a document for g without a certificate of service.

**nference**

he Director of Operations of the nmission has scheduled a conference connection with these investigations 9:30 a.m. on March 22, 1985, at the International Trade Commission ding, 701 E Street NW., Washington, Parties wishing to participate in the ference should contact Bruce Cates -523-0369) not later than March 21, 5, to arrange for their appearance. ies in support of the imposition of dumping and/or countervailing es in these investigations and ies in opposition to the imposition of duties will each be collectively cated one hour within which to e an oral presentation at the

**Written Submissions**

Any person may submit to the Commission on or before March 26, 1985, a written statement of information pertinent to the subject of the investigations, as provided in § 207.15 of the Commission's rules (19 CFR 207.15). A signed original and fourteen (14) copies of each submission must be filed with the Secretary to the Commission in accordance with § 201.8 of the rules (19 CFR 201.8). All written submissions except for confidential business data will be available for public inspection during regular business hours (8:45 a.m. to 5:15 p.m.) in the Office of the Secretary to the Commission.

Any business information for which confidential treatment is desired must be submitted separately. The envelope and all pages of such submissions must be clearly labeled "Confidential Business Information." Confidential submissions and requests for confidential treatment must conform with the requirements of § 201.6 of the Commission's rules (19 CFR 201.6, as amended by 49 FR 32569, Aug. 15, 1984).

**Authority:** These investigations are being conducted under authority of the Tariff Act of 1930, title VII. This notice is published pursuant to § 207.12 of the Commission's rules (19 CFR 207.12).

Issued: March 13, 1985

By order of the Commission.

**Kenneth R. Mason,**

*Secretary.*

[FR Doc. 85-6314 Filed 3-15-85; 8:45 am]

BILLING CODE 7020-02-M

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

PUBLIC DOCUMENT
Barcode:3883995-07 A-549-502 SCO - Scope Inquiry - Line Pipe

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

APPENDIX B

CALENDAR OF WITNESSES WHO APPEARED AT THE COMMISSION'S CONFERENCE

CALENDAR OF PUBLIC CONFERENCE

Investigations Nos. 701-TA-242 (Preliminary)
and 731-TA-252 and 253 (Preliminary)

CERTAIN WELDED CARBON STEEL PIPES AND TUBES
FROM THAILAND AND VENEZUELA

Those listed below appeared as witnesses at the United States International Trade Commission conference in connection with the subject investigations which began at 9:30 a.m., March 22, 1985, in the Hearing Room of the USITC Building, 701 E Street, N.W., Washington, DC.

In support of the imposition of countervailing duties and antidumping duties

Roger B. Schagrin, P.C.—Counsel
Washington, DC
on behalf of

The Committee on Pipe and Tube Imports and Individual Members of the Standard and Line Pipe Subcommittees

Roger B. Schagrin)
Paul W. Jameson )—of Counsel

In opposition to the imposition of countervailing duties and antidumping duties

Barnett & Alagia—Counsel
Washington, DC

on behalf of

Thai Steel Pipe Industry Co., Ltd.
Thai Union Steel Co. Ltd.
Saha Thai Steel Pipe Co., Ltd.
Siam Steel Pipe Import Export Co., Ltd.
First Steel Industry Co.

P. Lance Graef—ICF Inc.

Keith L. Baker )
Richard A. Gladstone)—of Counsel

Mudge, Rose, Guthrie, Alexander and Ferdon—Counsel
Washington, DC

on behalf of

Venezuelan Steel Producers and Exporters

David Palmeter—of Counsel

PUBLIC DOCUMENT
Barcode:3883995-07 A-549-502 SCO - Scope Inquiry - Line Pipe
A-49

# APPENDIX C

## PREVIOUS COMMISSION INVESTIGATIONS

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

Certain welded carbon steel pipes and tubes: Pending and recently terminated title VII investigations and outstanding dumping/countervailing orders, most recent dumping/subsidy margins, and import/consumption ratios, by countries, 1982-84

| Item | Weighted-average margin | Date of bond or order 1/ | Ratio of imports to apparent consumption | | |
|---|---|---|---|---|---|
| | | | 1982 | 1983 | 1984 |
| Standard pipes and tubes not over 16 inches in outside diameter: | | | | | |
| Pending anti-dumping investigations: | | | | | |
| Thailand---------- | 2/ | 2/ | – | – | 3/ |
| Venezuela--------- | 2/ | 2/ | 0.3 | .7 | 2.2 |
| Pending countervailing duty investigation: | | | | | |
| Venezuela--------- | 2/ | 2/ | .3 | .7 | 2.2 |
| Outstanding countervailing order: | | | | | |
| Korea------------- | 1.88 | Feb. 15, 1983 | 23.8 | 31.8 | 23.7 |
| Recently terminated countervailing duty investigation: | | | | | |
| Mexico 4/--------- | .67-23.65 | Jan. 31, 1985 | 1.5 | 5.4 | 4.6 |
| Line pipes and tubes not over 16 inches in outside diameter: | | | | | |
| Pending anti-dumping investigation: | | | | | |
| Venezuela--------- | 2/ | 2/ | .3 | 1.5 | 7.5 |
| Pending countervailing duty investigation: | | | | | |
| Venezuela--------- | 2/ | 2/ | .3 | 1.5 | 7.5 |
| Outstanding countervailing order: | | | | | |
| Korea------------- | 1.88 | Feb. 15, 1983 | 9.9 | 12.8 | 13.1 |

Continued. See footnotes at end of table.

Certain welded carbon steel pipes and tubes: Pending and recently terminated title VII investigations and outstanding dumping/countervailing orders, most recent dumping/subsidy margins, and import/consumption ratios, by countries, 1982-84--Continued

| Item | Weighted-average margin | Date of bond or order 1/ | Ratio of imports to apparent consumption | | |
|---|---|---|---|---|---|
| | | | 1982 | 1983 | 1984 |
| Line pipes...cont.: | | | | | |
| Recently terminated: | | | | | |
| counter-vailing duty investigation: | | | | | |
| Mexico 4/---------- | 0.67-23.65 | Jan. 31, 1985 | 1.5 | 5.6 | 6.9 |
| Standard pipes and tubes not over 4.5 inches in outside diameter: | | | | | |
| Recently terminated: | | | | | |
| antidumping investigations: | | | | | |
| Brazil 5/---------- | 3.23 | Dec. 31, 1984 | 1.0 | 2.5 | 9.0 |
| Spain 6/---------- | 40.75 | Dec. 31, 1984 | .3 | .9 | 5.1 |
| Recently terminated: | | | | | |
| counter-vailing duty investigation: | | | | | |
| Spain 6/---------- | 1.14 | Oct. 10, 1984 | .3 | .9 | 5.1 |
| Outstanding antidumping orders: | | | | | |
| Korea------------ | .9 | May 7, 1984 | 7/ 18.5 | 7/ 22.9 | 7/ 24.8 |
| Taiwan----------- | 9.7 | May 7, 1984 | 5.9 | 6.9 | 8/ .3 |

1/ Date posting of bond required or date order issued.
2/ This is one of the instant investigations. To date, there is no determination of sales at less than fair value by Commerce nor requirement for the posting of bond.
3/ Less than 0.05 percent.
4/ Terminated effective Apr. 2, 1985, following withdrawal of petition.
5/ Terminated effective Mar. 20, 1985, following withdrawal of petition.
6/ Terminated effective Feb. 4, 1985, following withdrawal of petition.
7/ Imports at less than fair value from this source constituted approximately * * *, * * *, and * * * percent of consumption of all standard pipes and tubes in 1982, 1983, and 1984, respectively.
8/ Imports at less than fair value from this source constituted approximately 0.1 percent of consumption of all standard pipes and tubes in 1984.

Source: Compiled from data contained in various reports of the U.S. International Trade Commission and from the U.S. Department of Commerce.

PUBLIC DOCUMENT
Barcode:3883995-07 A-549-502 SCO - Scope Inquiry - Line Pipe

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

Barcode:3883995-08 A-549-502 SCO - Scope Inquiry - Line Pipe

# Attachment 9

*Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey (Final)*, Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534, and 536 (Fourth Review), USITC Pub.4754 (Jan. 2018)

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

PUBLIC DOCUMENT
Barcode:3883995-08 A-549-502 SCO - Scope Inquiry - Line Pipe

# Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey

Investigation Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534, and 536 (Fourth Review)

**Publication 4754** **January 2018**

**U.S. International Trade Commission**

**Washington, DC 20436**

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

PUBLIC DOCUMENT

Barcode:3883995-08 A-549-502 SCO - Scope Inquiry - Line Pipe

# U.S. International Trade Commission

**COMMISSIONERS**

**Rhonda K. Schmidtlein, Chairman**
**David S. Johanson, Vice Chairman**
**Irving A. Williamson**
**Meredith M. Broadbent**

---

Catherine DeFilippo
***Director of Operations***

---

*Staff assigned*

Amelia Shister, Investigator
Daniel Matthews, Industry Analyst
Brian Allen, Attorney
Nathanael Comly, Supervisory Investigator

**Address all communications to**
**Secretary to the Commission**
**United States International Trade Commission**
**Washington, DC 20436**

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

Barcode:3883995-08 A-549-502 SCO - Scope Inquiry - Line Pipe

# U.S. International Trade Commission

Washington, DC 20436
*www.usitc.gov*

# Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey

Investigation Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534, and 536 (Fourth Review)

**Publication 4754** **January 2018**

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

PUBLIC DOCUMENT

Barcode:3883995-08 A-549-502 SCO - Scope Inquiry - Line Pipe

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

PUBLIC DOCUMENT

Barcode:3883995-08 A-549-502 SCO - Scope Inquiry - Line Pipe

**CONTENTS**

**Page**

**Determinations** ... 1

**Views of the Commission** ... 3

**Information obtained in these reviews** ... **I-1**

Background ... I-1

Responses to the Commission's Notice of Institution ... I-1

Individual responses ... I-1

Party comments on adequacy ... I-2

Recent developments in the industry ... I-3

The original investigation and subsequent reviews ... I-4

The original investigations ... I-4

Subsequent five-year reviews ... I-5

Prior related investigations ... I-7

Related title VII investigations ... I-7

Related safeguard investigations ... I-9

Pending litigation ... I-11

The product ... I-11

Commerce's scope ... I-11

Description and applications ... I-14

Manufacturing process ... I-17

U.S. tariff treatment ... I-18

The definition of the domestic like product ... I-18

Actions at Commerce ... I-19

Company revocations ... I-19

Changed circumstances reviews ... I-20

Current five-year reviews ... I-20

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

## CONTENTS

Page

The industry in the United States ........ I-20

U.S. producers ........ I-20

Definition of the domestic industry and related party issues ........ I-21

U.S. producers' trade and financial data ........ I-22

U.S. imports and apparent consumption ........ I-22

U.S. importers ........ I-22

U.S. imports ........ I-23

Apparent U.S. consumption and market shares ........ I-25

Cumulation considerations ........ I-28

The industry in Brazil ........ I-29

The industry in India ........ I-31

The industry in Korea ........ I-33

the industry in Mexico ........ I-35

The industry in Taiwan ........ I-37

The industry in Thailand ........ I-39

The industry in Turkey ........ I-41

Antidumping or countervailing duty orders in third-country markets ........ I-43

The global market ........ I-44

**Appendixes**

A. *Federal Register* notices ........ A-1

B. Company-specific data ........ B-1

C. Summary data ........ C-1

D. Purchaser questionnaire responses ........ D-1

Note.—Information that would reveal confidential operations of individual concerns may not be published and therefore has been deleted. Such deletions are indicated by asterisks.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

**UNITED STATES INTERNATIONAL TRADE COMMISSION**

Investigation Nos. 701-TA-253 and 731-TA-132, 252, 271, 273,
532-534, and 536 (Fourth Review)

Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey

## DETERMINATION

On the basis of the record[1] developed in the subject five-year reviews, the United States International Trade Commission ("Commission") determines, pursuant to the Tariff Act of 1930 ("the Act"), that revocation of the countervailing duty order on certain circular welded pipe and tube from Turkey and revocation of the antidumping duty orders on certain circular welded pipe and tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey would be likely to lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time.

## BACKGROUND

The Commission, pursuant to section 751(c) of the Act (19 U.S.C. 1675(c)), instituted these reviews on June 1, 2017 (82 F.R. 25328) and determined on September 5, 2017 that it would conduct expedited reviews (82 F.R. 49423, October 25, 2017).

[1] The record is defined in sec. 207.2(f) of the Commission's Rules of Practice and Procedure (19 CFR 207.2(f)).

PUBLIC DOCUMENT

Barcode:3883995-08 A-549-502 SCO - Scope Inquiry - Line Pipe

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

PUBLIC DOCUMENT

## Views of the Commission

Based on the record in these five-year reviews, we determine under section 751(c) of the Tariff Act of 1930, as amended ("the Tariff Act"), that revocation of the countervailing duty order on imports of certain circular welded pipe ("CWP") from Turkey and the antidumping duty orders on CWP from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey would be likely to lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time.

## I. Background

*Original Investigations:* The orders at issue in these reviews followed from a series of original investigations.[1] On April 17, 1984, the Commission determined that a domestic industry was materially injured by reason of imports of small-diameter circular welded carbon steel pipe and tube from Taiwan sold at less than fair value ("LTFV").[2] On February 12, 1986, two Commissioners determined that a domestic industry was materially injured and two found the industry threatened with material injury by reason of subsidized imports from Turkey and by LTFV imports from Thailand of welded carbon steel standard pipe and tube.[3] On April 21, 1986, two Commissioners determined that a domestic industry was materially injured and one Commissioner found the domestic industry threatened with material injury by reason of LTFV imports of standard pipe and tube from India and Turkey.[4] On October 20, 1992, the Commission determined that a domestic industry was materially injured by reason of LTFV

[1] Confidential Report ("CR")/Public Report ("PR") at Table I-2 (tabulating original investigations).

[2] *Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea and Taiwan*, Inv. Nos. 731-TA-131, 132, and 138 (Final), USITC Pub. 1519 (Apr. 1984) ("Original Determination for Taiwan"). The Department of Commerce ("Commerce") issued an antidumping duty order on this product on May 7, 1984. 49 Fed. Reg. 19369 (May 7, 1984).

[3] *Certain Welded Carbon Steel Pipes and Tubes from Turkey and Thailand*, Inv. Nos. 701-TA-253 and 731-TA-252 (Final), USITC Pub. 1810 (Feb. 1986) ("Original Determinations for Turkey and Thailand"). Commerce issued countervailing and antidumping duty orders on these products on March 7 and March 11, 1986, respectively. 51 Fed. Reg. 7984 (Mar. 7, 1986) (Turkey) (CVD); 51 Fed. Reg. 8341 (Mar. 11, 1986) (Thailand) (AD).

[4] *Certain Welded Carbon Steel Pipes and Tubes from India, Taiwan, and Turkey*, Inv. Nos. 731-TA-271–273 (Final), USITC Pub. 1839 (Apr. 1986) ("Original Determinations for India and Turkey"). Commerce issued antidumping duty orders on May 12 and May 15, 1986. 51 Fed. Reg. 17384 (May 12, 1986) (India); 51 Fed. Reg. 17784 (May 15, 1986) (Turkey).

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

imports of standard and structural pipe and tube from Brazil, Korea, Mexico, Taiwan (those imports not already subject to order), and Venezuela.[5]

*First Reviews:* In May 1999, the first five-year reviews of the preceding CWP orders were grouped for review with certain antidumping duty orders on imports of light-walled rectangular pipe and tube ("LWR pipe") in order to promote administrative efficiency due to similarities in the products and/or market participants.[6] With respect to CWP, the Commission conducted full reviews and made a negative determination concerning imports from Venezuela and affirmative determinations concerning imports from Brazil, India, Korea, Mexico, Taiwan (two orders), Thailand, and Turkey (two orders).[7]

*Second Reviews:* In the second five-year reviews instituted on July 1, 2005, the nine CWP orders again were grouped with certain orders on LWR pipe.[8] With respect to CWP, the Commission conducted full reviews and determined that revocation of the orders on imports from the seven subject countries would be likely to lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time.[9]

*Third Reviews:* In the third five-year reviews instituted on July 1, 2011, the nine CWP orders were grouped with the lone remaining order on LWR pipe from the prior reviews (Taiwan).[10] With respect to CWP, the Commission conducted full reviews and determined that

---

[5] *Certain Circular, Welded, Non-Alloy Steel Pipes and Tubes from Brazil, the Republic of Korea, Mexico, Romania, Taiwan, and Venezuela*, Inv. Nos. 731-TA-532–537 (Final), USITC Pub. 2564 (Oct. 1992) ("Original Determinations for Brazil, Korea, Mexico, and Taiwan") (also making a negative injury determination regarding imports from Romania that the Commission concluded were negligible); Commerce issued antidumping orders on November 2, 1992. 57 Fed. Reg. 49453 (Nov. 2, 1992) (Brazil, Korea, and Mexico); 57 Fed. Reg. 49454 (Nov. 2, 1992) (Taiwan).

There were no appeals of the Commission's final determinations in the original investigations or of any five-year reviews that resulted in a court decision.

[6] *Certain Pipe and Tube from Argentina, Brazil, Canada, India, Korea, Mexico, Singapore, Taiwan, Thailand, Turkey, and Venezuela*, Inv. Nos. 701-TA-253, 731-TA-132, 252, 271, 273, 276, 277, 296, 409, 410, 532–534, 536, and 537 (Review), USITC Pub. 3316 at 6 (July 2000) ("First Five-Year Reviews").

At the time of the first reviews, these orders were also grouped with orders regarding various oil country tubular goods ("OCTG"). The Commission made negative first five-year review determinations concerning all OCTG orders. *Id.* at 3.

[7] First Five-Year Reviews, USITC Pub. 3316 at 3.

[8] *Certain Pipe and Tube from Argentina, Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey*, Inv. Nos. 701-TA-253, 731-TA-132, 252, 271, 273, 409, 410, 532–534, and 536 (Second Review), USITC Pub. 3867 at 4–5 (July 2006) ("Second Five-Year Reviews").

[9] Second Five-Year Reviews, USITC Pub. 3867 at 3, 16 (exercising its discretion to cumulate subject imports from all seven subject countries).

[10] *Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey*, Inv. Nos. 701-TA-253, 731-TA-132, 252, 271, 273, 532–534, and 536 (Third Review), USITC Pub. 4333 at 4, n.12 (June 2012) ("Third Five-Year Reviews").

revocation of the orders on imports from the seven subject countries would be likely to lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time.[11]

*Current Reviews:* On June 1, 2017, the Commission instituted the current five-year reviews to determine whether revoking the nine orders on CWP would be likely to lead to continuation or recurrence of material injury to a domestic industry.[12] The Commission received a joint response to the notice of institution filed on behalf of four domestic producers of CWP: Bull Moose Tube Company, EXLTUBE, TMK IPSCO Tubulars, and Zekelman Industries (collectively the "domestic interested parties").[13] The government of Turkey also responded to the notice of institution.[14] On September 5, 2017, the Commission determined in each review that the domestic interested party group response to its notice of institution was adequate and that the respondent interested party group response was inadequate.[15] The Commission did not find any other circumstances that would warrant conducting full reviews and determined that it would conduct expedited reviews of the orders pursuant to section 751(c)(3) of the Tariff Act.[16] On December 15, 2017, the domestic interested parties filed comments with the Commission pursuant to 19 C.F.R. § 207.62(d).[17]

In these fourth five-year reviews, U.S. industry data are based on information submitted by the four responding domestic producers in their response to the notice of institution.[18] These producers estimate that they accounted for *** percent of domestic production of CWP

---

[11] Third Five-Year Reviews, USITC Pub. 4333 at 27, 45 (exercising its discretion to cumulate subject imports from all seven subject countries).

[12] 82 Fed. Reg. 25328 (June 1, 2017). Commerce initiated its five-year reviews of these nine orders on June 2, 2017. 82 Fed. Reg. 25599 (June 2, 2017); 82 Fed. Reg. 27690 (June 16, 2017) (correction). It issued the results of its expedited reviews thereafter. 82 Fed. Reg. 46485 (Oct. 5, 2017); 82 Fed. Reg. 46761 (Oct. 6, 2017); 82 Fed. Reg. 46768 (Oct. 6, 2017).

[13] Domestic Interested Parties' Response, EDIS Doc. 616044 (July 3, 2017) at 1.

[14] Respondent Interested Party Response to the Notice of Institution, EDIS Doc. 616033 (July 3, 2017) and Respondent Interested Party Response to Staff Questions, EDIS Doc. 618574 (July 21, 2017) (hereinafter collectively "Respondent Interested Party Response").

[15] Explanation of Commission Determination on Adequacy, EDIS Doc. 622908 (Sept. 13, 2017).

[16] Explanation of Commission Determination on Adequacy. In the reviews concerning CWP from Turkey, the Commission unanimously determined that the response from the government of Turkey was individually adequate. Because the government of Turkey did not itself represent a substantial share of production or exports of subject merchandise from Turkey, nor did its response indicate that it would be able to provide the type of information concerning the subject industry in Turkey that the Commission would seek to collect in a full review, the Commission found that the respondent interested party group response was inadequate. *Id.*

Commissioner Broadbent found the respondent interested party group response adequate in the reviews concerning CWP from Turkey and voted to conduct full reviews of all nine orders. *Id.*

[17] Domestic Interested Parties' Final Comments, EDIS Doc. 631693 (Dec. 15, 2017).

[18] Domestic Interested Parties' Response at 1.

in 2016.[19]  U.S. import data and related information are based on official import statistics. Foreign industry data and related information are based on information from the original investigations and prior reviews, as well as available information submitted by domestic interested parties in these expedited reviews and publicly available information, such as Global Trade Atlas ("GTA") data.

## II.    Domestic Like Product and Industry

### A.    Scope of the Orders Under Review and Background on Product and Scope Issues

The Department of Commerce ("Commerce") has used several different formulations in defining the imported products in the scope of the various orders subject to these reviews.[20] The 1984 antidumping duty order encompasses only circular carbon welded steel pipe from Taiwan between 0.375 inches and 4.5 inches in outside diameter, i.e., small-diameter CWP.[21] The 1992 antidumping duty order includes product from Taiwan over 4.5 inches, but not more than 16 inches, in outside diameter, and contains numerous exclusions.[22]  The remaining CWP orders generally cover circular welded non-alloy steel pipes not more than 16 inches in outside diameter, but vary in terms of outside wall thickness specifications and product exclusions.[23]

Producers manufacture CWP in standard diameters and wall thicknesses to American Society for Testing and Material ("ASTM") specifications for use in plumbing and heating systems, air conditioning units, machinery, buildings, sprinkler systems, irrigation systems, and water wells for low-pressure conveyance of air, steam, natural gas, water, oil, or other liquids and gases.[24]  The product, sometimes referenced as standard pipe, is used in light load-bearing, mechanical, and structural applications and may be galvanized (zinc coated by dipping in molten zinc), lacquered (black finish), or painted (black) to provide corrosion resistance for storage in humid conditions or ocean transport.[25]

Producers primarily make CWP to ASTM specifications A53, A135, and A795.[26]  Since these standards often require engineering characteristics that overlap with other specifications, a pipe may be dual stenciled, i.e., stamped to indicate compliance with two different specifications, such as ASTM A53 and API 5L.[27] Dual-stenciled pipe, which enters as line pipe

---

[19] CR/PR at Table I-1; CR at I-2, PR at I-2.
[20] *See* CR/PR at Table I-3 (providing scope definitions for individual orders).
[21] CR/PR at Table I-3.
[22] CR/PR at Table I-3.
[23] CR/PR at Table I-3.
[24] CR at I-19, PR at I-15.
[25] CR at I-20 to I-21; PR at I-16.
[26] CR at I-20, PR at I-16.
[27] CR at I-20, PR at I-16.

under a different subheading of the Harmonized Tariff Schedule of the United States ("HTS") for U.S. customs purposes, is not within the scope of the orders.[28]

CWP is also used for structural or load-bearing purposes aboveground by the construction industry and for structural purposes in ships, trailers, farm equipment, and similar uses.[29] It is produced in nominal wall thicknesses and sizes, primarily to ASTM specifications such as A500 or A252, as well as to American Society of Mechanical Engineers specifications.[30]

Furthermore, CWP also may be used in light load-bearing and mechanical applications, such as for fence tubing, scaffolding components, or conduit shells that protect electrical wiring.[31] Fence tubing can be produced to ASTM specification F 1083, which covers hot-dipped galvanized welded steel pipe used for fence structures, but it also can be produced without reference to an ASTM specification or to a general specification, such as ASTM A513.[32]

### B. Domestic Like Product

In making its determination under section 751(c) of the Tariff Act, the Commission defines the "domestic like product" and the "industry."[33] The Tariff Act defines "domestic like product" as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this subtitle."[34] The Commission's practice in five-year reviews is to examine the domestic like product definition from the original investigation and consider whether the record indicates any reason to revisit the prior findings.[35]

#### 1. The Original Investigations

The domestic like products defined by the Commission in the various underlying CWP original investigations differed from one another in some respects because of differences in wall thicknesses and excluded products among the CWP scope definitions. In each of the

---

[28] CR at I-20, PR at I-16.

[29] CR at I-20 to I-21, PR at I-16.

[30] CR at I-21, PR at I-16.

[31] CR at I-20, PR at I-16.

[32] CR at I-20, PR at I-16.

[33] 19 U.S.C. § 1677(4)(A).

[34] 19 U.S.C. § 1677(10); *see*, *e.g., Cleo Inc. v. United States*, 501 F.3d 1291, 1299 (Fed. Cir. 2007); *NEC Corp. v. Department of Commerce*, 36 F. Supp. 2d 380, 383 (Ct. Int'l Trade 1998); *Nippon Steel Corp. v. United States*, 19 CIT 450, 455 (1995); *Timken Co. v. United States*, 913 F. Supp. 580, 584 (Ct. Int'l Trade 1996); *Torrington Co. v. United States*, 747 F. Supp. 744, 748–49 (Ct. Int'l Trade 1990), *aff'd*, 938 F.2d 1278 (Fed. Cir. 1991); *see also* S. Rep. No. 249, 96th Cong., 1st Sess. 90–91 (1979).

[35] *See*, *e.g.*, *Internal Combustion Industrial Forklift Trucks from Japan*, Inv. No. 731-TA-377 (Second Review), USITC Pub. 3831 at 8–9 (Dec. 2005); *Crawfish Tail Meat from China*, Inv. No. 731-TA-752 (Review), USITC Pub. 3614 at 4 (July 2003); *Steel Concrete Reinforcing Bar from Turkey*, Inv. No. 731-TA-745 (Review), USITC Pub. 3577 at 4 (Feb. 2003).

PUBLIC DOCUMENT
Barcode:3883995-08 A-549-502 SCO - Scope Inquiry - Line Pipe

original investigations, the domestic like product definitions generally conformed to Commerce's scope definition for the corresponding original investigation.[36]

### 2. First Five-Year Reviews

In the first five-year reviews, all parties expressing a position on the issue asked the Commission to reconsider the domestic like product definition and to define a single domestic like product consisting of all circular welded non-alloy steel pipes and tubes not more than 16 inches in outside diameter.[37] After considering the record and party arguments, the Commission agreed and applied the requested domestic like product definition to all orders under review.[38]

### 3. Second and Third Five-Year Reviews

In the second and third five-year reviews, no party argued that the domestic like product definition in the first five-year reviews should be revisited, and the record in each of these prior reviews did not indicate any changes in the relevant facts.[39] Consequently, the Commission again defined the domestic like product as all circular, welded, non-alloy steel pipes and tubes not more than 16 inches in outside diameter.[40]

### 4. The Current Reviews

In these fourth five-year reviews, the domestic interested parties agree with the domestic like product definition adopted by the Commission in the prior reviews.[41] There is no

---

[36] There were two principal exceptions. In the 1992 investigation concerning CWP from Taiwan, the Commission's domestic like product definition included CWP between 0.375 and 4.5 inches in diameter, which Commerce had excluded from the scope of the investigation because it was already covered by the 1984 antidumping duty order. Additionally, in the 1992 investigations concerning imports from Brazil, Korea, Mexico, and Taiwan (large diameter), the Commission defined finished conduit and mechanical tubing, which were not entirely excluded from the scope of those investigations, as separate like products from CWP, and it made negative final determinations regarding imports from Brazil, Korea, Mexico, Romania, Taiwan, and Venezuela of finished conduit and mechanical tubing that was not cold drawn or cold rolled. Original Determinations for Brazil, Korea, Mexico, and Taiwan, USITC Pub. 2564 at 5, 8–17.

[37] First Five-Year Reviews, USITC Pub. 3316 at 12.

[38] First Five-Year Reviews, USITC Pub. 3316 at 12.

[39] Second Five-Year Reviews, USITC Pub. 3867 at 7; Third Five-Year Reviews, USITC Pub. 4333 at 10.

[40] Second Five-Year Reviews, USITC Pub. 3867 at 7; Third Five-Year Reviews, USITC Pub. 4333 at 10.

[41] Domestic Interested Parties' Response at 23; Domestic Interested Parties' Final Comments at 2. The respondent interested party did not provide a responsive comment on the definition of the domestic like product. Respondent Interested Party Response at 12.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

new information in the record indicating that the characteristics and uses of CWP have changed since the prior reviews.[42] We therefore again define a single domestic like product consisting of circular, welded, non-alloy steel pipes and tubes not more than 16 inches in outside diameter (also referred to as "CWP").

### C. Domestic Industry

Section 771(4)(A) of the Tariff Act defines the relevant industry as the domestic "producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product."[43] In defining the domestic industry, the Commission's general practice has been to include in the industry producers of all domestic production of the like product, whether toll-produced, captively consumed, or sold in the domestic merchant market.

In each of the original investigations and the subsequent reviews, the Commission defined the domestic industry to include all domestic producers of CWP.[44] There were no related party issues in the original investigations.[45] In the first and second five-year reviews, the Commission found a domestic producer, ***, to be a related party, but concluded that appropriate circumstances did not exist to exclude it from the domestic industry.[46]

In the third five-year reviews, three firms were potentially subject to exclusion as related parties.[47] The Commission found that, even assuming *arguendo* that the firms were related parties, appropriate circumstances did not exist to exclude them.[48]

In these fourth five-year reviews, there is no information on the record indicating that a different definition of the domestic industry is warranted or any domestic producers are related parties.[49] No party has argued otherwise.[50] Accordingly, we define the domestic industry as all domestic producers of CWP.

---

[42] *See generally* CR at I-18 to I-23, PR at I-14 to I-18.

[43] 19 U.S.C. § 1677(4)(A). The definitions in 19 U.S.C. § 1677 are applicable to the entire subtitle containing the antidumping and countervailing duty laws, including 19 U.S.C. §§ 1675 and 1675a. *See* 19 U.S.C. § 1677.

[44] Original Determination for Taiwan, USITC Pub. 1519 at 4; Original Determinations for Turkey and Thailand, USITC Pub. 1810 at 7; Original Determinations for India and Turkey, USITC Pub. 1839 at 6–7; Original Determinations for Brazil, Korea, Mexico, and Taiwan, USITC Pub. 2564 at 8.

[45] Original Determination for Taiwan, USITC Pub. 1519 at 4; Original Determinations for Turkey and Thailand, USITC Pub. 1810 at 7; Original Determinations for India and Turkey, USITC Pub. 1839 at 6–7; Original Determinations for Brazil, Korea, Mexico, and Taiwan, USITC Pub. 2564 at 8.

[46] First Five-Year Reviews, USITC Pub. 3316 at 18–19; Confidential First Five-Year Review Determinations, EDIS Doc. 458850 at 23–25; Second Five-Year Reviews, USITC Pub. 3867 at 8–9; Confidential Second Five-Year Review Determinations, EDIS Doc. 458587 at 12–13 and n.41.

[47] Third Five-Year Reviews, USITC Pub. 4333 at 11.

[48] Third Five-Year Reviews, USITC Pub. 4333 at 11.

[49] The domestic interested parties stated that none of the four domestic producers that jointly responded to the notice of institution import "any product from subject countries." Domestic Interested Parties' Response at 21.

# III. Cumulation

## A. Legal Standard

> With respect to five-year reviews, section 752(a) of the Tariff Act provides as follows: the Commission may cumulatively assess the volume and effect of imports of the subject merchandise from all countries with respect to which reviews under section 1675(b) or (c) of this title were initiated on the same day, if such imports would be likely to compete with each other and with domestic like products in the United States market. The Commission shall not cumulatively assess the volume and effects of imports of the subject merchandise in a case in which it determines that such imports are likely to have no discernible adverse impact on the domestic industry.[51]

Cumulation therefore is discretionary in five-year reviews, unlike original investigations, which are governed by section 771(7)(G)(i) of the Tariff Act.[52] The Commission may exercise its discretion to cumulate, however, only if the reviews are initiated on the same day, the Commission determines that the subject imports are likely to compete with each other and the domestic like product in the U.S. market, and imports from each such subject country are not likely to have no discernible adverse impact on the domestic industry in the event of revocation. Our focus in five-year reviews is not only on present conditions of competition, but also on likely conditions of competition in the reasonably foreseeable future.

## B. Prior Proceedings

Because the orders in these five-year reviews originated from a series of original investigations initiated and conducted over a span of several years, the Commission observed that the first reviews provided the initial opportunity to consider cumulation with respect to all orders subject to review.[53] In the prior five-year reviews, the Commission rejected arguments that certain imports were likely to have no discernible adverse impact on the domestic industry

(…Continued)

[50] Domestic Interested Parties' Response at 23; Domestic Interested Parties' Final Comments at 2. The respondent interested party did not provide a responsive comment on the definition of the domestic industry. Respondent Interested Party Response at 12.

[51] 19 U.S.C. § 1675a(a)(7).

[52] 19 U.S.C. § 1677(7)(G)(i); *see also*, *e.g.*, *Nucor Corp. v. United States*, 601 F.3d 1291, 1293 (Fed. Cir. 2010) (Commission may reasonably consider likely differing conditions of competition in deciding whether to cumulate subject imports in five-year reviews); *Allegheny Ludlum Corp. v. United States*, 475 F. Supp. 2d 1370, 1378 (Ct. Int'l Trade 2006) (recognizing the wide latitude the Commission has in selecting the types of factors it considers relevant in deciding whether to exercise discretion to cumulate subject imports in five-year reviews); *Nucor Corp. v. United States*, 569 F. Supp. 2d 1328, 1337–38 (Ct. Int'l Trade 2008).

[53] Second Five-Year Reviews, USITC Pub. 3867 at 11.

if each of the corresponding orders were revoked or that subject imports would likely compete under different conditions of competition.[54] The Commission exercised its discretion to cumulate subject imports from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey.[55]

### C. Analysis

In these fourth five-year reviews, the statutory threshold for cumulation is satisfied because all reviews were initiated on the same day: June 1, 2017.[56] In addition, we consider the following issues in deciding whether to exercise our discretion to cumulate the subject imports: (1) whether imports from any of the subject countries are precluded from cumulation because they are likely to have no discernible adverse impact on the domestic industry; (2) whether there is a likelihood of a reasonable overlap of competition among subject imports and the domestic like product; and (3) whether subject imports are likely to compete in the U.S. market under different conditions of competition.[57]

#### 1. Likelihood of No Discernible Adverse Impact

The statute precludes cumulation if the Commission finds that subject imports from a country are likely to have no discernible adverse impact on the domestic industry.[58] Neither the statute nor the Uruguay Round Agreements Act Statement of Administrative Action ("SAA") provides specific guidance on what factors the Commission is to consider in determining that imports "are likely to have no discernible adverse impact" on the domestic industry.[59] With respect to this provision, the Commission generally considers the likely volume of subject imports and the likely impact of those imports on the domestic industry within a reasonably foreseeable time if the orders are revoked. Our analysis for each of the subject countries takes into account, among other things, the nature of the product and the behavior of subject imports in the original investigations.

---

[54] First Five-Year Reviews, USITC Pub. 3316 at 26; Second Five-Year Reviews, USITC Pub. 3867 at 11–14, 16; Third Five-Year Reviews, USITC Pub. 4333 at 13.

[55] First Five-Year Reviews, USITC Pub. 3316 at 26; Second Five-Year Reviews, USITC Pub. 3867 at 11–14, 16; Third Five-Year Reviews, USITC Pub. 4333 at 13. In the first five-year review, the Commission further found that subject imports from Venezuela were likely to have no discernible adverse impact on the domestic industry if the relevant order were revoked and therefore did not cumulate imports from Venezuela with other subject imports. First Five-Year Reviews, USITC Pub. 3316 at 26.

[56] 82 Fed. Reg. 25328 (June 1, 2017).

[57] The domestic interested parties maintain the Commission should cumulate subject imports from all seven countries based on the considerations found in the prior reviews. Domestic Interested Parties' Response at 14; Domestic Interested Parties' Final Comments at 5. The respondent interested party made no statements or arguments related to the statutory criteria for cumulation.

[58] 19 U.S.C. § 1675a(a)(7).

[59] SAA, H.R. Rep. No. 103-316, vol. I at 887 (1994).

Based on the record in these reviews, we do not find that imports from any of the seven subject countries are likely to have no discernible adverse impact on the domestic industry in the event of revocation of the corresponding orders.[60]

*Brazil.* In 1991, during the original investigation, subject imports from Brazil totaled 54,000 short tons and accounted for 2.8 percent of apparent U.S. consumption.[61] The level of these imports fluctuated between 0 and 622 short tons in 1998 and each year from 2005 to 2011.[62] During the current period of review, subject imports from Brazil were present in the U.S. market in each year. Import levels were highest in 2013 at 1,620 short tons and lowest in 2014 at 201 short tons.[63] The share of apparent U.S. consumption represented by these imports was zero or less than 0.1 percent in 1998, 2001, each year from 2005 to 2011, and in 2016.[64]

Although there are minimal data on the record concerning current capacity in Brazil, the domestic interested parties identified seven firms they believe to be producers of CWP in Brazil.[65] In prior reviews, the Commission found that the Brazilian CWP industry was export oriented and had substantial unused capacity.[66] GTA data for HTS subheading 7306.30, a category that includes CWP and may also include out-of-scope merchandise, indicate that the U.S. market was Brazil's seventh-largest export destination in 2016 and that Brazilian exports of CWP globally declined from 18,054 short tons in 2012 to 12,521 short tons in 2016.[67]

In light of the foregoing, we do not find that subject imports from Brazil would likely have no discernible adverse impact on the domestic industry if the antidumping duty order covering these imports were revoked.

*India.* In 1985, during the original investigation, subject imports from India totaled 22,000 short tons and accounted for 0.9 percent of apparent U.S. consumption.[68] The level of these imports fluctuated between *** and *** short tons in 1998 and each year from 2005 to 2011.[69] During the current period of review, subject imports from India increased from *** short tons in 2012 to *** short tons in 2015 before declining to *** short tons in 2016.[70] The

---

[60] The domestic interested parties argue that revocation of any of the orders in these reviews would have a discernible adverse impact on the domestic industry. Domestic Interested Parties' Final Comments at 6.

[61] CR/PR at Appendix C.

[62] CR/PR at Appendix C; Third Five-Year Reviews, USITC Pub. 4333 at Table IV-1.

[63] CR/PR at Table I-5.

[64] CR/PR at Table I-7 and Appendix C.

[65] Domestic Interested Parties' Response at Exhibit 8; CR at I-27, PR at I-___.

[66] First Five-Year Reviews, USITC Pub. 3316 at 36; Second Five-Year Reviews, USITC Pub. 3867 at 11–12; Third Five-Year Reviews, USITC Pub. 4333 at 37–38.

[67] CR/PR at Table I-8.

[68] CR/PR at Appendix C.

[69] CR/PR at Table I-6 and Appendix C.

[70] CR/PR at Table I-5.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

share of apparent U.S. consumption represented by these imports varied between *** and *** percent in 1991, 1998, and 2005–2011 and was *** percent in 2016.[71]

Although there are minimal data on the record concerning current capacity in India, the domestic interested parties identified five firms they believe to be producers of CWP in India.[72] In prior reviews, the Commission found that the Indian CWP industry was export oriented, had substantial unused capacity, and faced trade barriers in third-country markets.[73] GTA data for HTS subheading 7306.30, a category that includes CWP and may also include out-of-scope merchandise, indicate that Indian exports of CWP globally increased from 110,646 short tons in 2012 to 209,268 short tons in 2016.[74] CWP from India is subject to antidumping and countervailing duties in Canada.[75] GTA data indicate that India was the ninth-largest global exporter of CWP in 2016.[76]

In light of the foregoing, we do not find that subject imports from India would likely have no discernible adverse impact on the domestic industry if the antidumping duty order covering these imports were revoked.

*Korea.* In 1991, during the original investigation, subject imports from Korea totaled 325,000 short tons and accounted for 16.9 percent of apparent U.S. consumption.[77] The level of these imports fluctuated between *** and *** short tons in 1998, 2001, and each year from 2005 to 2011.[78] During the current period of review, subject imports from Korea increased from 56,510 short tons in 2012 to 87,668 short tons in in 2016.[79] The share of apparent U.S. consumption represented by these imports varied between *** and *** percent in 1998 and 2005–2011 and was 6.0 percent in 2016.[80]

Although there are minimal data on the record concerning current capacity in Korea, the domestic interested parties identified 10 firms they believe to be producers of CWP in Korea.[81] In prior reviews, the Commission found that the Korean CWP industry was export oriented, had substantial unused capacity, and faced trade barriers in third-country markets.[82] GTA data for HTS subheading 7306.30, a category that includes CWP and may also include out-of-scope merchandise, indicate that the U.S. market became the largest export market for CWP from

---

[71] CR/PR at Table I-7 and Appendix C.

[72] Domestic Interested Parties' Response at Exhibit 8; CR at I-27, PR at I-21.

[73] First Five-Year Reviews, USITC Pub. 3316 at 36; Second Five-Year Reviews, USITC Pub. 3867 at 11–12; Third Five-Year Reviews, USITC Pub. 4333 at 37.

[74] CR/PR at Table I-9.

[75] CR at I-59, PR at I-43 to I-44.

[76] CR at I-61, PR at I-44; CR/PR at Table I-13.

[77] CR/PR at Appendix C.

[78] CR/PR at Table I-6 and Appendix C.

[79] CR/PR at Table I-5.

[80] CR/PR at Table I-7 and Appendix C.

[81] Domestic Interested Parties' Response at Exhibit 8; CR at I-27, PR at I-21.

[82] First Five-Year Reviews, USITC Pub. 3316 at 36; Second Five-Year Reviews, USITC Pub. 3867 at 11–12; Third Five-Year Reviews, USITC Pub. 4333 at 37.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

Korea in 2016, accounting for 31.9 percent of Korean exports; that Korean exports of CWP globally increased from 405,031 short tons in 2012 to 449,754 short tons in 2016; and that Korean exports of CWP to the U.S. market increased from 108,983 short tons in 2012 to 143,341 short tons in 2016.[83] CWP from Korea is subject to antidumping duties in Canada.[84] GTA data indicate that Korea was the fourth-largest global exporter of CWP (behind China, Italy, and Turkey) each year from 2013 to 2016.[85]

In light of the foregoing, we do not find that subject imports from Korea would likely have no discernible adverse impact on the domestic industry if the antidumping duty order covering these imports were revoked.

*Mexico.* In 1991, during the original investigation, subject imports from Mexico totaled 48,000 short tons and accounted for 2.5 percent of apparent U.S. consumption.[86] The level of these imports fluctuated between *** and *** short tons in 1998, 2001, and each year from 2005 to 2011.[87] During the current period of review, subject imports from Mexico declined from 66,490 short tons in 2012 to 57,765 short tons in 2014 and then increased to 61,038 short tons in 2016.[88] The share of apparent U.S. consumption represented by these imports varied between *** and *** percent in 1998, 2001, and 2005–2011 and was 4.2 percent in 2016.[89]

Although there are minimal data on the record concerning current capacity in Mexico, the domestic interested parties identified eight firms they believe to be producers of CWP in Mexico.[90] In prior reviews, the Commission found that the Mexican CWP industry was export oriented and had substantial unused capacity.[91] GTA data for HTS subheading 7306.30, a category that includes CWP and may include out-of-scope merchandise, indicate that the U.S. market was the largest export market for CWP from Mexico during each year in the current period of review, accounting for 91.1 percent of Mexican exports in 2016, and that Mexican exports of CWP to the U.S. market decreased from 101,770 short tons in 2012 to 88,407 short tons in 2016.[92]

In light of the foregoing, we do not find that subject imports from Mexico would likely have no discernible adverse impact on the domestic industry if the antidumping duty order covering these imports were revoked.

---

[83] CR/PR at Table I-9.

[84] CR at I-59, PR at I-43 to I-44. The record in these reviews indicates that Korean exports of CWP to Australia may be subject to antidumping duties currently. CR at I-58, PR at I-43.

[85] CR at I-61, PR at I-44; CR/PR at Table I-13.

[86] CR/PR at Appendix C.

[87] CR/PR at Table I-6 and Appendix C.

[88] CR/PR at Table I-5.

[89] CR/PR at Table I-7 and Appendix C.

[90] Domestic Interested Parties' Response at Exhibit 8; CR at I-27, PR at I-21.

[91] First Five-Year Reviews, USITC Pub. 3316 at 36; Second Five-Year Reviews, USITC Pub. 3867 at 11–12; Third Five-Year Reviews, USITC Pub. 4333 at 37.

[92] CR/PR at Table I-9.

*Taiwan.*[93] In 1983, during one of the original investigations, subject imports from Taiwan totaled 131,000 short tons and accounted for 6.6 percent of apparent U.S. consumption.[94] The level of these imports fluctuated between *** and *** short tons in 1998, 2001, and each year from 2005 to 2011.[95] During the current period of review, subject imports from Taiwan increased from 2,910 short tons in 2012 to 14,487 short tons in 2016.[96] The share of apparent U.S. consumption represented by these imports varied between *** and *** percent in 1998, 2001, and 2005–2011 and was 1.0 percent in 2016.[97]

Although there are minimal data on the record concerning current capacity in Taiwan, the domestic interested parties identified six firms they believe to be producers of CWP in Taiwan.[98] In prior reviews, the Commission found that the CWP industry in Taiwan was export oriented and had substantial unused capacity.[99] GTA data for HTS subheading 7306.30, a category that includes CWP and may also include out-of-scope merchandise, indicate that the U.S. market became the largest export market for CWP from Taiwan in 2016, accounting for 44.4 percent of exports from Taiwan; that exports of CWP from Taiwan globally increased from 43,670 short tons in 2012 to 48,698 short tons in 2016; and that exports of CWP from Taiwan to the U.S. market increased from 3,321 short tons in 2012 to 21,633 short tons in 2016.[100] CWP from Taiwan is subject to antidumping duties in Canada.[101]

In light of the foregoing, we do not find that subject imports from Taiwan would likely have no discernible adverse impact on the domestic industry if the antidumping duty orders covering these imports were revoked.

*Thailand.* In 1984, during the original investigation, subject imports from Thailand totaled less than 500 short tons and accounted for less than 0.05 percent of apparent U.S.

---

[93] The Commission's typical practice in grouped five-year reviews involving multiple orders with different scopes concerning an individual subject country is to evaluate each order separately for purposes of the no discernible adverse impact analysis. *See Carbon and Alloy Seamless Standard, Line, and Pressure Pipe from Japan and Romania*, Inv. Nos. 731-TA-847 and 849 (Third Review), USITC Pub. 4731 at 27 n.118 (Oct. 2017); *Stainless Steel Sheet and Strip from Japan, Korea, and Taiwan*, Inv. Nos. 701-TA-382 and 731-TA-800, 801, and 803, USITC Pub. 4725 at 19 (Sept. 2017). Because of the expedited nature of these reviews, data are not available on the current volume of imports subject to each of the separate orders on subject imports from Taiwan. Hence, data are presented on a country-wide, rather than order-specific, basis.

[94] CR/PR at Appendix C.

[95] CR/PR at Table I-6 and Appendix C.

[96] CR/PR at Table I-5.

[97] CR/PR at Table I-7 and Appendix C.

[98] Domestic Interested Parties' Response at Exhibit 8; CR at I-27, PR at I-21.

[99] First Five-Year Reviews, USITC Pub. 3316 at 36; Second Five-Year Reviews, USITC Pub. 3867 at 11–12; Third Five-Year Reviews, USITC Pub. 4333 at 37.

[100] CR/PR at Table I-9.

[101] CR at I-59, PR at I-43 to I-44. The record in these reviews indicates that exports of CWP from Taiwan to Australia may be subject to antidumping duties currently. *Id.*

consumption; in January–September 1985, subject imports from Thailand were 29,738 short tons and accounted for 0.7 percent of apparent U.S. consumption.[102] The level of these imports fluctuated between 28,000 and 86,000 short tons in 1998, 2001, and each year from 2005 to 2011.[103] During the current period of review, import levels decreased from 115,190 short tons in 2012 to 43,133 short tons in 2014 then increased to 58,348 short tons in 2016.[104] The share of apparent U.S. consumption represented by these imports varied between *** and *** percent in 1998, 2001, and 2005–2011 and was 4.0 percent in 2016.[105]

Although there are minimal data on the record concerning current capacity in Thailand, the domestic interested parties identified five firms they believe to be producers of CWP in Thailand.[106] In prior reviews, the Commission found that the CWP industry in Thailand was export oriented, had substantial unused capacity, and faced trade barriers in third-country markets.[107] GTA data for HTS subheading 7306.30, a category that includes CWP and may also include out-of-scope merchandise, indicate that the U.S. market was the largest export market for CWP from Thailand during each year in the current period of review and accounted for 56.9 percent of exports from Thailand in 2016; that exports of CWP from Thailand globally decreased from 160,583 short tons in 2012 to 114,414 short tons in 2016; and that exports of CWP from Thailand to the U.S. market decreased from 109,632 short tons in 2012 to 39,012 short tons in 2013 then increased steadily to 65,054 short tons in 2016.[108] CWP from Thailand is subject to antidumping duties in Canada and the European Union.[109]

In light of the foregoing, we do not find that subject imports from Thailand would likely have no discernible adverse impact on the domestic industry if the antidumping duty order covering these imports were revoked.

*Turkey.* In 1985, during the original investigations, subject imports from Turkey totaled 36,000 short tons and accounted for 1.5 percent of apparent U.S. consumption.[110] The level of these imports fluctuated between *** and *** short tons in 1998, 2001, and each year from 2005 to 2011.[111] During the current period of review, import levels increased from 67,266 short tons in 2012 to 110,562 short tons in 2015 then decreased to 50,293 short tons in

---

[102] CR/PR at Appendix C; Original Determinations for Thailand and Turkey, USITC Pub. 1810 at Tables I-9, I-11.

[103] CR/PR at Table I-6 and Appendix C.

[104] CR/PR at Table I-5.

[105] CR/PR at Table I-7 and Appendix C.

[106] Domestic Interested Parties' Response at Exhibit 8; CR at I-27, PR at I-21.

[107] First Five-Year Reviews, USITC Pub. 3316 at 36; Second Five-Year Reviews, USITC Pub. 3867 at 11–12; Third Five-Year Reviews, USITC Pub. 4333 at 37.

[108] CR/PR at Table I-9.

[109] CR at I-59, PR at I-44. The record in these reviews indicates that exports of CWP from Thailand to Australia may be subject to antidumping duties currently. *Id.*

[110] CR/PR at Appendix C.

[111] CR/PR at Table I-6 and Appendix C.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

2016.[112] The share of apparent U.S. consumption represented by these imports varied between *** and *** percent in 1998, 2001, and 2005–2011 and was *** percent in 2016.[113]

Although there are minimal data on the record concerning current capacity in Turkey, the domestic interested parties identified six firms they believe to be producers of CWP in Turkey.[114] In prior reviews, the Commission found that the CWP industry in Turkey was export oriented, had substantial unused capacity, and faced trade barriers in third-country markets.[115] GTA data for HTS subheading 7306.30, a category that includes CWP and may also include out-of-scope merchandise, indicate that the U.S. market was the largest export market for CWP from Turkey during each year from 2012 to 2015 and was the fourth-largest market in 2016; that exports of CWP from Turkey globally increased from 547,339 short tons in 2012 to 643,240 short tons in 2014 then declined to 541,876 short tons in 2016; and that exports of CWP from Turkey to the U.S. market decreased from 137,526 short tons in 2012 to 52,037 short tons in 2016.[116] GTA data indicate that Turkey was the third-largest global exporter of CWP (behind China and Italy) in each year of the current period of review.[117]

In light of the foregoing, we do not find that subject imports from Turkey would likely have no discernible adverse impact on the domestic industry if the countervailing or antidumping duty order covering these imports were revoked.

### 2. Likelihood of a Reasonable Overlap of Competition

The Commission generally has considered four factors intended to provide a framework for determining whether subject imports compete with each other and with the domestic like product.[118] Only a "reasonable overlap" of competition is required.[119] In five-year reviews, the

---

[112] CR/PR at Table I-5.

[113] CR/PR at Table I-7 and Appendix C.

[114] Domestic Interested Parties' Response at Exhibit 8; CR at I-27, PR at I-21.

[115] First Five-Year Reviews, USITC Pub. 3316 at 36; Second Five-Year Reviews, USITC Pub. 3867 at 11–12; Third Five-Year Reviews, USITC Pub. 4333 at 37.

[116] CR/PR at Table I-9.

[117] CR/PR at Table I-13.

[118] The four factors generally considered by the Commission in assessing whether imports compete with each other and with the domestic like product are as follows: (1) the degree of fungibility among subject imports from different countries and between subject imports and the domestic like product, including consideration of specific customer requirements and other quality-related questions; (2) the presence of sales or offers to sell in the same geographical markets of imports from different countries and the domestic like product; (3) the existence of common or similar channels of distribution for subject imports from different countries and the domestic like product; and (4) whether subject imports are simultaneously present in the market with one another and the domestic like product. *See, e.g., Wieland Werke, AG v. United States*, 718 F. Supp. 50 (Ct. Int'l Trade 1989).

[119] *See Mukand Ltd. v. United States*, 937 F. Supp. 910, 916 (Ct. Int'l Trade 1996); *Wieland Werke,* 718 F. Supp. at 52 ("Completely overlapping markets are not required."); *United States Steel Group v. United States,* 873 F. Supp. 673, 685 (Ct. Int'l Trade 1994), *aff'd*, 96 F.3d 1352 (Fed. Cir. 1996). We note, however, that there have been investigations where the Commission has found an insufficient (Continued…)

relevant inquiry is whether there likely would be competition even if none currently exists because the subject imports are absent from the U.S. market.[120]  In each of the three prior reviews, the Commission found a likely reasonable overlap of competition among the domestic like product and subject imports from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey.[121] [122]

*Fungibility.*  As in the prior reviews, CWP in these reviews is a standardized product generally made to ASTM A53, A135, A795, or similar common specifications.[123]  A majority of market participants in all prior reviews that compared products from different sources found them to be at least "frequently" if not "always" interchangeable.[124]  During the third five-year reviews, the majority of questionnaire respondents reported products made in each subject country "comparable" to one another and the domestic like product in terms of all but two specified factors, only reporting differences in availability and delivery time between imports from Mexico and product imported from Korea, Taiwan, Thailand, and Turkey.[125]  There is no new information on the record in these reviews to indicate that the fungibility of CWP imports from different subject sources with the domestic like product or each other has changed.[126]

*Geographic Overlap.*  In all prior reviews, the Commission found a likely geographic overlap on the basis that many domestic producers sold their products nationwide and

---

(…Continued)

overlap in competition and has declined to cumulate subject imports.  *See, e.g.*, *Live Cattle from Canada and Mexico*, Inv. Nos. 701-TA-386 and 731-TA-812–813 (Preliminary), USITC Pub. 3155 at 15 (Feb. 1999), *aff'd sub nom, Ranchers-Cattlemen Action Legal Foundation v. United States*, 74 F. Supp. 2d 1353 (Ct. Int'l Trade 1999); *Static Random Access Memory Semiconductors from the Republic of Korea and Taiwan*, Inv. Nos. 731-TA-761–762 (Final), USITC Pub. 3098 at 13–15 (Apr. 1998).

[120] *See generally*, *Chefline Corp. v. United States*, 219 F. Supp. 2d 1313, 1314 (Ct. Int'l Trade 2002).

[121] First Five-Year Reviews, USITC Pub. 3316 at 30; Second Five-Year Reviews, USITC Pub. 3867 at 14; Third Five-Year Reviews, USITC Pub. 4333 at 22.

[122] The domestic interested parties argue that CWP is a fungible product and that subject imports during the period of review entered the U.S. market from common ports of entry nationwide; were sold through overlapping channels of distribution, usually distributors; and were simultaneously present in the U.S. market.  Domestic Interested Parties' Final Comments at 6–7.

[123] First Five-Year Reviews, USITC Pub. 3316 at 30; Second Five-Year Reviews, USITC Pub. 3867 at 14; Third Five-Year Reviews, USITC Pub. 4333 at 21; CR at I-18 to I-20, PR at I-14 to I-16.

[124] First Five-Year Reviews, USITC Pub. 3316 at 30–31; Second Five-Year Reviews, USITC Pub. 3867 at 14 and n.72; Third Five-Year Reviews, USITC Pub. 4333 at 21–22.

[125] Third Five-Year Reviews, USITC Pub. 4333 at 21–22.  During the second and third five-year reviews, fewer market participants offered views concerning the comparability of subject imports from Brazil.  Second Five-Year Reviews, USITC Pub. 3867 at 14 and n.72; Third Five-Year Reviews, USITC Pub. 4333 at 21–22.

[126] CR at I-18 to I-23, PR at I-14 to I-18.

PUBLIC DOCUMENT

importers of subject merchandise were located throughout the United States.[127] In these reviews, subject imports from six of the seven subject countries entered the United States through Texas ports (Houston-Galveston and Laredo) and at least one additional common port, except for subject imports from Brazil, which entered the United States through the Chicago port, as did subject imports from India.[128]

*Channels of Distribution.* In all prior reviews, the Commission found that CWP, regardless of source, was principally sold through distributors.[129] There is no new information on the record in these reviews to indicate that the channels of distribution have changed or are likely to do so upon revocation.

*Simultaneous Presence in Market.* As in all prior reviews, the record in these reviews showed domestic industry shipments and imports of CWP from each of the seven subject countries were in the U.S. market during each year from 2012 to 2016.[130]

*Conclusion*. The record in these expedited reviews contains very limited information concerning subject imports in the U.S. market during the period of review. There is no information suggesting a change in the market factors that led the Commission in the prior three reviews to conclude that there would be a likely reasonable overlap of competition among imports from different subject sources and between imports from each subject source and the domestic like product upon revocation. In light of this and the absence of any contrary argument, we find a likely reasonable overlap of competition among subject imports from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey and between the domestic like product and subject imports from each source.

### 3. Likely Conditions of Competition

In determining whether to exercise our discretion to cumulate the subject imports, we assess whether subject imports from the subject countries would compete under similar or different conditions in the U.S. market if the orders under review were revoked.

---

[127] First Five-Year Reviews, USITC Pub. 3316 at 31; Second Five-Year Reviews, USITC Pub. 3867 at 14–15; Third Five-Year Reviews, USITC Pub. 4333 at 21–22. In the third five-year reviews, questionnaire responses and Commerce data showed that CWP manufactured in the United States, Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey served the U.S. market nationwide, despite the fact that not all subject imports entered the U.S. market in overlapping ports of entry. Third Five-Year Reviews, USITC Pub. 4333 at 21–22.

[128] CR at I-37 to I-38, PR at I-28 to I-29. Subject imports from Brazil also entered the United States through the New York port. CR at I-37, PR at I-28.

[129] CR at I-22, PR at I-17.

[130] First Five-Year Reviews, USITC Pub. 3316 at 31; Second Five-Year Reviews, USITC Pub. 3867 at 15; Third Five-Year Reviews, USITC Pub. 4333 at 22; CR/PR at Table I-5.

In the first five-year reviews, the Commission majority found that any differences in likely dumping margins, economic conditions, or export marketing patterns among the individual subject countries were outweighed by considerations supporting cumulation, particularly the commodity nature of the product and the existence of excess capacity in each subject country. It consequently did not find that any difference in likely conditions of competition was sufficient to warrant it to decline to exercise its discretion to cumulate imports from any individual subject country.[131]

In the second five-year reviews, only the Mexican respondent argued that imports from an individual subject country would likely face different conditions of competition than other subject imports. The Commission rejected this argument.[132] It also did not find any likely differences in conditions of competition among subject imports from any of the other subject countries and thus decided to exercise its discretion to cumulate subject imports from all subject countries.[133]

In the third five-year reviews, only respondents from Turkey argued that their imports would likely face different conditions of competition than other subject imports. The Commission rejected their arguments that subject imports from Turkey had maintained a limited and consistent presence in the U.S. market, that the subject industry in Turkey operated at high capacity utilization rates and that its overall production capacity fluctuated narrowly during the period of review, and that the subject industry supplied different and more attractive non-U.S. markets.[134] It also did not find any likely differences in conditions of competition among subject imports from any of the other subject countries and thus decided to exercise its discretion to cumulate subject imports from all subject countries.[135]

In these reviews, the government of Turkey argues, as it did in the third five-year reviews, that the subject industry in Turkey concentrates its sales on the Turkish domestic and regional markets instead of the U.S. market and that Turkish subject exports face no restrictive measures in any market worldwide except the U.S. market.[136]

Neither the government of Turkey nor any subject producer in Turkey provided data on domestic shipments in Turkey.[137] Although the government of Turkey reported CWP production data obtained from the Turkish Steel Pipe Manufacturers Association showing CWP production was *** tons in 2016, GTA data indicates that global exports of CWP from Turkey

---

[131] First Five-Year Reviews, USITC Pub. 3316 at 31–32.

[132] Second Five-Year Reviews, USITC Pub. 3867 at 16.

[133] Second Five-Year Reviews, USITC Pub. 3867 at 15–16.

[134] Third Five-Year Reviews, USITC Pub. 4333 at 24–27.

[135] Third Five-Year Reviews, USITC Pub. 4333 at 27.

[136] Respondent Interested Party's Response at 3–6. *See* Third Five-Year Reviews, USITC Pub. 4333 at 20. The domestic interested parties argue without elaboration that the Commission, as in the prior reviews, should find that there are no differences in the likely conditions of competition between the domestic like product and any subject imports. Domestic Interested Parties' Final Comments at 7.

[137] Respondent Interested Party's Response at 10–11.

PUBLIC DOCUMENT

Barcode:3883995-08 A-549-502 SCO - Scope Inquiry - Line Pipe

were *** short tons that year.[138] The record also reflects that the U.S. market was the largest export market for subject merchandise from Turkey during four of the five years of the period of review.[139]

The importance of the U.S. market to subject imports from Turkey was unchanged for most of the period of review despite the restraining effect of the orders in the U.S. market and the absence of trade measures in third-country markets.[140] Therefore, we find these arguments are not supported by the record and have not identified distinctions in the likely conditions of competition facing subject imports from Turkey and other subject imports.

The record in these reviews does not indicate that there would likely be any significant difference in the conditions of competition among subject imports upon revocation. Accordingly, we exercise our discretion to cumulate subject imports from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey.

#### 4. Conclusion

Based on the record, we find that subject imports from each of the seven subject countries would not be likely to have no discernible adverse impact on the domestic industry were the corresponding countervailing or antidumping duty orders revoked. We also find a likely reasonable overlap of competition among the subject imports and between the subject imports and the domestic like product and that imports from each of the subject countries are likely to compete in the U.S. market under similar conditions of competition should the orders be revoked. We therefore exercise our discretion to cumulate subject imports from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey for our analysis of whether material injury to the domestic industry is likely to continue or recur if the orders were to be revoked.

---

[138] CR/PR at Table I-1 n.2 and Table I-14. Production data for the Turkish industry was undated, but presumed to be 2016. Global exports data may contain products outside the scope of these reviews and may be overstated.

[139] When comparing shipments of subject merchandise to Turkey's largest and second-largest markets during the period of review, subject exports from Turkey to the U.S. market were 137,526 short tons in 2012 (compared to 84,891 short tons for the United Kingdom), 114,482 short tons in 2013 (compared to 80,261 short tons for Iraq), 124,646 short tons in 2014 (compared to 95,133 short tons for the United Kingdom), and 107,859 short tons in 2015 (compared to 86,440 short tons for the United Kingdom). The U.S. market was the fourth-largest export destination for subject imports from Turkey in 2016 at 52,037 short tons (compared to 79,107 short tons for the United Kingdom, Turkey's top export destination that year). CR/PR at Table I-14.

[140] CR/PR at Table I-14.

21

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

PUBLIC DOCUMENT

## IV. Revocation of the Countervailing and Antidumping Duty Orders Would Likely Lead to Continuation or Recurrence of Material Injury Within a Reasonably Foreseeable Time

### A. Legal Standards

In a five-year review conducted under section 751(c) of the Tariff Act, Commerce will revoke an antidumping or countervailing duty order unless: (1) it makes a determination that dumping or subsidization is likely to continue or recur and (2) the Commission makes a determination that revocation of the antidumping or countervailing duty order "would be likely to lead to continuation or recurrence of material injury within a reasonably foreseeable time."[141] The SAA states that "under the likelihood standard, the Commission will engage in a counterfactual analysis; it must decide the likely impact in the reasonably foreseeable future of an important change in the status quo – the revocation or termination of a proceeding and the elimination of its restraining effects on volumes and prices of imports."[142] Thus, the likelihood standard is prospective in nature.[143] The U.S. Court of International Trade has found that "likely," as used in the five-year review provisions of the Act, means "probable," and the Commission applies that standard in five-year reviews.[144]

The statute states that "the Commission shall consider that the effects of revocation or termination may not be imminent, but may manifest themselves only over a longer period of time."[145] According to the SAA, a "'reasonably foreseeable time' will vary from case-to-case,

---

[141] 19 U.S.C. § 1675a(a).

[142] SAA at 883–84. The SAA states that "{t}he likelihood of injury standard applies regardless of the nature of the Commission's original determination (material injury, threat of material injury, or material retardation of an industry). Likewise, the standard applies to suspended investigations that were never completed." *Id*. at 883.

[143] While the SAA states that "a separate determination regarding current material injury is not necessary," it indicates that "the Commission may consider relevant factors such as current and likely continued depressed shipment levels and current and likely continued {sic} prices for the domestic like product in the U.S. market in making its determination of the likelihood of continuation or recurrence of material injury if the order is revoked." SAA at 884.

[144] *See NMB Singapore Ltd. v. United States*, 288 F. Supp. 2d 1306, 1352 (Ct. Int'l Trade 2003) ("'likely' means probable within the context of 19 U.S.C. § 1675(c) and 19 U.S.C. § 1675a(a)"), *aff'd mem.*, 140 Fed. Appx. 268 (Fed. Cir. 2005); *Nippon Steel Corp. v. United States*, 26 CIT 1416, 1419 (2002) (same); *Usinor Industeel, S.A. v. United States*, 26 CIT 1402, 1404 nn.3, 6 (2002) ("more likely than not" standard is "consistent with the court's opinion;" "the court has not interpreted 'likely' to imply any particular degree of 'certainty'"); *Indorama Chemicals (Thailand) Ltd. v. United States*, 26 CIT 1059, 1070 (2002) ("standard is based on a likelihood of continuation or recurrence of injury, not a certainty"); *Usinor v. United States*, 26 CIT 767, 794 (2002) ("'likely' is tantamount to 'probable,' not merely 'possible'").

[145] 19 U.S.C. § 1675a(a)(5).

PUBLIC DOCUMENT
Barcode:3883995-08 A-549-502 SCO - Scope Inquiry - Line Pipe

but normally will exceed the 'imminent' timeframe applicable in a threat of injury analysis in original investigations."[146]

Although the standard in a five-year review is not the same as the standard applied in an original investigation, it contains some of the same fundamental elements. The statute provides that the Commission is to "consider the likely volume, price effect, and impact of imports of the subject merchandise on the industry if the orders are revoked or the suspended investigation is terminated."[147] It directs the Commission to take into account its prior injury determination, whether any improvement in the state of the industry is related to the order or the suspension agreement under review, whether the industry is vulnerable to material injury if an order is revoked or a suspension agreement is terminated, and any findings by Commerce regarding duty absorption pursuant to 19 U.S.C. § 1675(a)(4).[148] The statute further provides that the presence or absence of any factor that the Commission is required to consider shall not necessarily give decisive guidance with respect to the Commission's determination.[149]

In evaluating the likely volume of imports of subject merchandise if an order under review is revoked and/or a suspended investigation is terminated, the Commission is directed to consider whether the likely volume of imports would be significant either in absolute terms or relative to production or consumption in the United States.[150] In doing so, the Commission must consider "all relevant economic factors," including four enumerated factors: (1) any likely increase in production capacity or existing unused production capacity in the exporting country; (2) existing inventories of the subject merchandise, or likely increases in inventories; (3) the existence of barriers to the importation of the subject merchandise into countries other than the United States; and (4) the potential for product shifting if production facilities in the foreign country, which can be used to produce the subject merchandise, are currently being used to produce other products.[151]

In evaluating the likely price effects of subject imports if an order under review is revoked and/or a suspended investigation is terminated, the Commission is directed to consider whether there is likely to be significant underselling by the subject imports as compared to the domestic like product and whether the subject imports are likely to enter the

---

[146] SAA at 887. Among the factors that the Commission should consider in this regard are "the fungibility or differentiation within the product in question, the level of substitutability between the imported and domestic products, the channels of distribution used, the methods of contracting (such as spot sales or long-term contracts), and lead times for delivery of goods, as well as other factors that may only manifest themselves in the longer term, such as planned investment and the shifting of production facilities." *Id*.

[147] 19 U.S.C. § 1675a(a)(1).

[148] 19 U.S.C. § 1675a(a)(1). Commerce has not made any duty absorption findings with respect to the orders under review. CR at I-25, PR at I-19.

[149] 19 U.S.C. § 1675a(a)(5). Although the Commission must consider all factors, no one factor is necessarily dispositive. SAA at 886.

[150] 19 U.S.C. § 1675a(a)(2).

[151] 19 U.S.C. § 1675a(a)(2)(A–D).

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

United States at prices that otherwise would have a significant depressing or suppressing effect on the price of the domestic like product.[152]

In evaluating the likely impact of imports of subject merchandise if an order under review is revoked and/or a suspended investigation is terminated, the Commission is directed to consider all relevant economic factors that are likely to have a bearing on the state of the industry in the United States, including but not limited to the following: (1) likely declines in output, sales, market share, profits, productivity, return on investments, and utilization of capacity; (2) likely negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment; and (3) likely negative effects on the existing development and production efforts of the industry, including efforts to develop a derivative or more advanced version of the domestic like product.[153]  All relevant economic factors are to be considered within the context of the business cycle and the conditions of competition that are distinctive to the industry.  As instructed by the statute, we have considered the extent to which any improvement in the state of the domestic industry is related to the orders under review and whether the industry is vulnerable to material injury upon revocation.[154]

As discussed above, only the government of Turkey participated in these expedited reviews as a respondent interested party.[155]  The record, therefore, contains limited new information with respect to the industries in Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey that produce CWP.  There also is limited information on the CWP market in the United States during the period of review.  Accordingly, for our determination, we rely as appropriate on the facts available from the original investigations and the prior reviews and the limited new information on the record in these reviews.

### B.    Conditions of Competition and the Business Cycle

In evaluating the likely impact of the subject imports on the domestic industry if an order is revoked, the statute directs the Commission to consider all relevant economic factors

---

[152] *See* 19 U.S.C. § 1675a(a)(3).  The SAA states that "{c}onsistent with its practice in investigations, in considering the likely price effects of imports in the event of revocation and termination, the Commission may rely on circumstantial, as well as direct, evidence of the adverse effects of unfairly traded imports on domestic prices."  SAA at 886.

[153] 19 U.S.C. § 1675a(a)(4).

[154] The SAA states that in assessing whether the domestic industry is vulnerable to injury if the order is revoked, the Commission "considers, in addition to imports, other factors that may be contributing to overall injury.  While these factors, in some cases, may account for the injury to the domestic industry, they may also demonstrate that an industry is facing difficulties from a variety of sources and is vulnerable to dumped or subsidized imports."  SAA at 885.

[155] Although the Commission unanimously determined that this response was individually adequate, the Commission found that the respondent interested party group response was inadequate.  *See* section I, *supra* (explanation of Commission determination on adequacy).

"within the context of the business cycle and conditions of competition that are distinctive to the affected industry."[156] The following conditions of competition inform our determinations.

### 1. Demand Conditions

In all prior reviews, the Commission found that demand for CWP generally depended on construction levels, particularly spending levels for nonresidential construction.[157] Both nonresidential construction spending and apparent U.S. consumption of CWP were increasing during the first reviews, whereas during the second reviews, total U.S. spending on public and private nonresidential construction, when adjusted for inflation, declined slightly and apparent U.S. consumption of CWP declined overall, although it fluctuated on an annual basis.[158] During the third reviews, following sharp declines in overall U.S. economic activity in 2008, spending on U.S. nonresidential construction declined to period lows in 2010 and 2011, and apparent U.S. consumption decreased overall from 2.4 million short tons in 2006 to 1.2 million short tons in 2009 before increasing to 1.5 million short tons in 2011.[159]

In these reviews, apparent U.S. consumption was 1.45 million short tons in 2016, which is slightly lower (1.2 percent) than in 2011 (1.5 million short tons) and notably lower (42.2 percent) than in 2001 (2.52 million short tons).[160] The domestic interested parties contend that demand during the current period of review "has remained relatively flat" and continues to depend on and track demand for downstream products such as plumbing and heating systems, air conditioning units, sprinkler systems, irrigation systems, and the low-pressure conveyance of air, steam, natural gas, water, oil, and other liquids and gases.[161]

### 2. Supply Conditions

As in all prior reviews, the domestic industry, subject imports, and nonsubject imports supplied the U.S. market with CWP during the current reviews.[162] Data collected during the first three reviews indicate that the domestic industry supplied at least half of the U.S. market during these periods, declining from 73.0 percent in 1998 to 56.0 percent in 2005 and to 51.1 percent in 2006, then increasing steadily to 71.3 percent in 2009 before declining to 65.6

---

[156] 19 U.S.C. § 1675a(a)(4).

[157] First Five-Year Reviews, USITC Pub. 3316 at 32–33; Second Five-Year Reviews, USITC Pub. 3867 at 19; Third Five-Year Reviews, USITC Pub. 4333 at 29.

[158] First Five-Year Reviews, USITC Pub. 3316 at 32–33; Second Five-Year Reviews, USITC Pub. 3867 at 19.

[159] Third Five-Year Reviews, USITC Pub. 4333 at 29–30.

[160] CR/PR at Table I-7 and Appendix C. The lone purchaser to respond to the Commission's questionnaire in these reviews, ***, stated that, during the period of review, *** and that ***. CR/PR at D-4. It also states that there has been a *** during the period of review. *Id.* at D-5.

[161] Domestic Interested Parties' Response at 13, 22.

[162] Third Five-Year Reviews, USITC Pub. 4333 at 30; CR/PR at Table I-7.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

percent in 2010 and 2011.[163]  The varied share of the U.S. market held by subject imports and nonsubject imports during these periods was affected by the revocation of the order on subject imports from Venezuela in 2000 and the issuance of antidumping and countervailing duty orders covering CWP imports from China in 2008.[164]  The market share of subject imports was 9.4 percent in 1998 and 7.5 percent in 2005 and increased from *** percent in 2006 to *** percent in 2008 before declining to *** percent in 2011.[165]  The market share of nonsubject imports was 17.7 percent in 1998 and 36.5 percent in 2005 and decreased from *** percent in 2006 to *** percent in 2009 before increasing to *** percent in 2011.[166]

The Commission observed during the third reviews that the composition of the domestic industry had changed since the original investigations due to new entrants, consolidations, and closures that affected the types of production facilities (fully integrated versus non- or partially integrated) manufacturing CWP.[167]  Commission reports in the original investigations and prior reviews identified about two dozen U.S. CWP producers in 1986, 21 producers in 1992, 25 producers in 1998, 20 producers in 2005, and 17 producers in 2011.[168]

The Commission found in prior reviews that some CWP producers in the United States and in the subject countries manufacture other products using the same manufacturing equipment and employees.[169]  Depending on changes in market demand, they had some ability to shift production among products, including small/medium line pipe, large-diameter line pipe, mechanical tubing, oil country tubular goods, and such other products as square and rectangular structural tubing, electrical conduit, slurry pipe, coupling stock, and strut.[170]  In most of the years for which data were collected in the prior reviews, the domestic industry's capacity to produce CWP approached or exceeded apparent U.S. consumption.[171]

Although domestic producers were the largest source of supply to the U.S. market in 2016, their share of apparent U.S. consumption was 46.2 percent, which was lower than in any prior review.[172]  In these reviews, the domestic interested parties contend that there have been no significant developments affecting domestic supply during the period of review.  They state

---

[163] CR at Tables I-5 to I-7 and Appendix C.

[164] CR at Table I-2.

[165] CR at Tables I-5 to I-7 and Appendix C.

[166] CR at Tables I-5 to I-7 and Appendix C.

[167] Third Five-Year Reviews, USITC Pub. 4333 at 31.

[168] First Five-Year Reviews, USITC Pub. 3316 at Table CIRC-I-4; Second Five-Year Reviews, USITC Pub. 3867 at Table CIRCULAR-I-11; Third Five-Year Reviews, USITC Pub. 4333 at Table I-13.

[169] Second Five-Year Reviews, USITC Pub. 3867 at 20; Third Five-Year Reviews, USITC Pub. 4333 at 32.

[170] Third Five-Year Reviews, USITC Pub. 4333 at 32–33.

[171] CR at Tables I-5 to I-7 and Appendix C.

[172] Domestic producers' share of apparent U.S. consumption was *** percent in 2011, *** percent in 2010, *** percent in 2009, *** percent in 2008, *** percent in 2007, *** percent in 2006, *** percent in 2005, *** percent in 2001, and 73.0 percent in 1998.  CR/PR at Table I-7 and Appendix C.

that, in addition to the four domestic producers participating in these reviews, there are four other producers of CWP in the United States.[173]

Subject imports' share of the U.S. market was *** percent in 2016, which was higher than any year during the prior reviews but for one year.[174] Nonsubject imports' share of the U.S. market was *** percent in 2016, which was higher than in most years during the prior reviews.[175]

### 3. Substitutability and Other Conditions

In all prior reviews, the Commission found CWP, regardless of source, to be a standardized product generally made to ASTM standards.[176] Market participants generally reported that CWP, whether imported or produced in the United States, was at least "frequently" if not "always" interchangeable, could be used for the same applications, and was comparable in most nonprice characteristics.[177] Furthermore, the Commission found in all prior reviews that price is an important factor in purchasing decisions for CWP in the U.S. market.[178] In view of the importance of price in purchasing decisions and the high substitutability of the products, the Commission found the U.S. CWP market to be price competitive.[179]

The information in these expedited reviews contains nothing to indicate that the substitutability between domestically produced CWP and subject imports regardless of source

---

[173] The four other producers are California Steel Industries; Maruichi American Corp.; Maruichi Levitt Pipe and Tube, LLC; and U.S. Steel. Domestic Interested Parties' Response at 20. The domestic interested parties state that, during the current period of review, there has been consolidation and closure of domestic producers, including the idling of a Pennsylvania facility in 2015 by Wheatland Tube, the announcement in October 2015 of the end of production by Allied Tube and Conduit of certain CWP at its Pennsylvania and Arizona facilities, and the February 2017 completion by Zekelman Industries of its acquisition of Western Tube and Conduit Corporation. Domestic Interested Parties' Response at 13–14; Domestic Interested Parties' Final Comments at 3–4.

[174] Subject imports' share of the U.S. market was *** percent in 2011, *** percent in 2010, *** percent in 2009, *** percent in 2008, *** percent in 2007, *** percent in 2006, 7.5 percent in 2005, *** percent in 2001, and 9.4 percent in 1998. CR/PR at Table I-6 and Appendix C.

[175] Nonsubject imports' share of the U.S. market was *** percent in 2011, *** percent in 2010, *** percent in 2009, *** percent in 2008, *** percent in 2007, *** percent in 2006, 36.5 percent in 2005, 21.9 percent in 2001, and 17.7 percent in 1998. CR/PR at Table I-6 and Appendix C.

[176] First Five-Year Reviews, USITC Pub. 3316 at 30 and 32–33; Second Five-Year Reviews, USITC Pub. 3867 at 14 and 21; Third Five-Year Reviews, USITC Pub. 4333 at 34.

[177] First Five-Year Reviews, USITC Pub. 3316 at 33; Second Five-Year Reviews, USITC Pub. 3867 at 21; Third Five-Year Reviews, USITC Pub. 4333 at 34.

[178] First Five-Year Reviews, USITC Pub. 3316 at 37; Second Five-Year Reviews, USITC Pub. 3867 at 12, 13, and 23–25; Third Five-Year Reviews, USITC Pub. 4333 at 34.

[179] First Five-Year Reviews, USITC Pub. 3316 at 32, 37; Second Five-Year Reviews, USITC Pub. 3867 at 12, 24; Third Five-Year Reviews, USITC Pub. 4333 at 17, 34.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

or the importance of price has changed since the prior reviews.[180]  Accordingly, we again find that the domestic like product and subject imports are highly substitutable and that price is an important factor in purchasing decisions.  In addition, we observe the presence of various import restraints against exports of CWP from India, Korea, Taiwan, and Thailand worldwide.[181]

### C.    Likely Volume of Subject Imports

#### 1.    The Prior Proceedings

The Commission's analysis of subject import volume differed slightly in each of the original investigations.  In the 1984 investigation, the Commission focused on volume and market share increases by the subject imports.[182]  In the 1986 antidumping and countervailing duty investigations concerning CWP from Turkey and Thailand, the two Commissioners who made affirmative present material injury determinations focused on increases in the volume and market share of subject imports.[183]  The two Commissioners making affirmative threat determinations noted that, although subject producers had a small market share, they had increased their market share substantially, had the ability to shift production between various tubular products, and, in the case of Turkey, had substantial underutilized capacity.[184]  In the 1986 antidumping duty investigations concerning CWP from India, Taiwan, and Turkey, the Commission emphasized subject imports' dramatic increases in market share.[185]  In the 1992 investigations, the Commission based its volume analysis on the absolute and relative increases in cumulated subject imports.[186]

In the first five-year reviews, the Commission majority found that the orders had restrained subject imports.[187]  It concluded that if the orders were revoked, the likely volume of subject imports would be significant both in absolute terms and relative to U.S. consumption.[188]  It based this conclusion on significant unused capacity in the subject countries; the ability of several subject producers to switch production from other tubular products to CWP; the attractiveness of the large, growing U.S. market; and subject producers' demonstrated ability to increase U.S. market share rapidly.[189]

---

[180] Domestic Interested Parties' Response at 14; Domestic Interested Parties' Final Comments at 4; CR at I-18 to I-23, PR at I-14 to I-18.

[181] CR at I-58 to I-60, PR at I-43 to I-44.

[182] Original Determination for Taiwan, USITC Pub. 1519 at 14.

[183] Original Determinations for Turkey and Thailand, USITC Pub. 1810 at 15–16, 21. These two Commissioners' volume analyses shared this common rationale although each examined different combinations of subject imports due to divergent cumulation decisions.

[184] Original Determinations for Turkey and Thailand, USITC Pub. 1810 at 25–28.

[185] Original Determinations for India and Turkey, USITC Pub. 1839 at 12–13.

[186] Original Determinations for Brazil, Korea, Mexico, and Taiwan, USITC Pub. 2564 at 34–35.

[187] First Five-Year Reviews, USITC Pub. 3316 at 34.

[188] First Five-Year Reviews, USITC Pub. 3316 at 36.

[189] First Five-Year Reviews, USITC Pub. 3316 at 34–36.

In the second five-year reviews, the Commission based its finding on the restraining effect of the orders, including responses by several foreign producers in questionnaires that the orders had precluded them from participating in the U.S. market or that they would increase U.S. shipments if the orders were revoked.[190] Although CWP inventories in the subject countries were generally stable, the Commission found that revoking the orders would provide incentives for subject producers to use what it found to be substantial excess capacity to increase their U.S. exports, particularly given that producers in most of the subject countries faced antidumping duty orders in one or more of their major non-U.S. markets.[191] Given the large amount of unused CWP capacity, which the Commission found was likely understated due to the failure of numerous firms to submit data, and the subject producers' ability in the original investigations to increase imports rapidly, it found that the likely volume of cumulated subject imports in the event of revocation would be significant absolutely and relative to U.S. consumption.[192]

In the third five-year reviews, the Commission found that the orders served to restrain subject import volumes and that subject imports would increase upon their revocation.[193] The Commission concluded that revocation of the orders would provide an incentive for the subject producers, many of which already had existing customers or sales networks in the United States, to use their excess production capacity or their existing foreign inventories of subject CWP to increase their exports to the United States.[194] The Commission added that because subject producers in several of the subject countries faced orders or investigations of their CWP exports to one or more of their non-U.S. export markets, revocation of the orders would provide further incentive for them to direct additional shipments to the large U.S. market.[195] Given the large amount of unused capacity and the subject producers' ability to increase imports rapidly during the period of review in the third five-year reviews as imports from China exited the U.S. market due to the issuance of antidumping and countervailing duty orders, the Commission found that if the orders under review were revoked, the likely volume of cumulated subject imports would be significant in absolute terms and relative to consumption in the United States.[196]

---

[190] Second Five-Year Reviews, USITC Pub. 3867 at 23.

[191] Second Five-Year Reviews, USITC Pub. 3867 at 22–23.

[192] Second Five-Year Reviews, USITC Pub. 3867 at 23–24 (noting that some subject producers had the ability to shift production from other products to CWP but explaining that it did not rely on this in making its affirmative determinations).

[193] Third Five-Year Reviews, USITC Pub. 4333 at 38.

[194] Third Five-Year Reviews, USITC Pub. 4333 at 36–38.

[195] Third Five-Year Reviews, USITC Pub. 4333 at 37.

[196] Third Five-Year Reviews, USITC Pub. 4333 at 36 and 38. The Commission stated that it did not rely on product shifting as a basis for finding that significant quantities of subject imports were likely upon revocation of the orders. *Id.* at 37.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

### 2. The Current Reviews

In these reviews, we find that the volume of subject imports would likely be significant in the event of revocation. Despite the countervailing and antidumping duty orders, subject imports continued to enter the U.S. market in substantial quantities during the current period of review. From 2012 to 2016, the quantity of subject imports ranged from a low of *** short tons in 2014 to a high of *** short tons the next year.[197] The share of the U.S. market held by subject imports was *** percent in 2016, an increase from the *** percent market share held at the end of the previous period of review.[198]

The record contains limited data concerning the CWP industries in Brazil, India, Korea, Mexico, Taiwan, and Thailand because no foreign producer or exporter of subject merchandise from these countries participated in these reviews; the government of Turkey provided only partial data concerning the CWP industry in Turkey. The available information indicates that each of the subject countries has substantial capacity and unused capacity, with the most recent reported data indicating that subject producers had *** short tons of CWP production capacity in 2011, equivalent to *** percent of domestic production in that year.[199] These subject producers collectively operated at *** percent capacity utilization in 2011, and their collective unused CWP capacity in 2011 was *** short tons, equivalent to *** percent of domestic production in that year.[200] Each of these figures was seriously understated because, of the subject producers in the seven cumulated subject countries, only five producers in three countries submitted complete questionnaire data.[201] Consequently, subject CWP producers will likely have the ability to increase shipments of subject merchandise significantly to the United States should the orders be revoked.

The information available also indicates that the CWP industries in the subject countries remain export oriented. GTA data show that the subject producers continue to export

---

[197] CR/PR at Table I-5.

[198] CR/PR at Table I-6 and Appendix C (2011 data).

[199] Third Five-Year Reviews, USITC Pub. 4333 at 36; Confidential Third Five-Year Review Determinations, EDIS Doc. 619212 at 49.

[200] Third Five-Year Reviews, USITC Pub. 4333 at 36; Confidential Third Five-Year Review Determinations at 49.

[201] One CWP producer in Mexico, one in Thailand, and three in Turkey submitted complete questionnaire data. A producer in Taiwan submitted incomplete data, and no information was received from subject producers in Brazil, India, and Korea. Third Five-Year Reviews, USITC Pub. 4333 at 36.

The information available indicates that the subject producers possess the ability to shift exports readily among certain forms of pipe, including CWP, although we do not rely on product shifting as a basis for finding that significant quantities of subject imports are likely upon revocation of the orders due to the unavailability of data in these expedited reviews. We note that line pipe and OCTG are among the principal other products produced. *See* Second Five-Year Reviews, USITC Pub. 3867 at 23–24; Third Five-Year Reviews, USITC Pub. 4333 at 37.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

significant volumes of CWP[202] and that India, Korea, and Turkey are among the top 10 exporters of CWP globally.[203]  In addition, the United States was the single-largest export market for CWP from Korea, Mexico, Taiwan, and Thailand in 2016.[204]  The United States remains an attractive market to the CWP industries in the subject countries.  The subject countries have demonstrated an ongoing interest in serving the United States throughout the period of review.  Indeed, subject imports were present in the U.S. market in each year of the period of review despite the restraining effects of the orders.[205]  Moreover, the information available indicates that there are antidumping duty measures on CWP from Thailand currently in place in Australia and the European Union and on CWP from India, Korea, Taiwan, and Thailand currently in place in Canada.[206]  These actions provide additional incentive for subject producers to target the United States should the orders be revoked.[207]

Based on the information available in these expedited reviews, in particular the substantial presence of subject imports in the U.S. market even under the discipline of the orders; the size of the industries in the subject countries, their excess capacity, and their export orientation; the attractiveness of the U.S. market; and restrictions on the subject countries' exports in various third-country markets, we find that subject producers would likely increase their exports to the United States if the countervailing and antidumping duty orders were to be revoked.  Accordingly, we conclude that the volume of subject imports would likely be significant, both in absolute terms and relative to U.S. consumption, should the orders be revoked.

---

[202] CR/PR at Tables I-8 (Brazil), I-9 (India), I-10 (Korea), I-11 (Mexico), I-12 (Taiwan), I-13 (Thailand), and I-14 (Turkey).   GTA data show that Turkey and Korea were the largest exporters of subject merchandise during the period of review.  *Id.* at Tables I-10, I-14.  GTA data on the subject countries' global exports are classifiable in HS 7306.30, a broader commodity category than subject CWP and thus may be overinclusive.  *See* CR/PR at Tables I-8 to I-14 and notes.

[203] Turkey was the third-largest and Korea was the fourth-largest exporter of CWP globally over the period of review.  CR/PR at Table I-15.

[204] CR/PR at Tables I-10 (Korea), I-11 (Mexico), I-12 (Taiwan), and I-13 (Thailand).

[205] CR/PR at Table I-5.

[206] CR at I-58 to I-60, PR at I-43 to I-44.

[207] Because of the expedited nature of these reviews, the record does not contain information about inventories of the subject merchandise.

### D. Likely Price Effects

#### 1. The Prior Proceedings

In each of the original determinations, the Commission centered its price effects analysis on pervasive underselling by the subject imports.[208] In several of the determinations, the Commission also found that the subject imports had significant price-depressing effects.[209]

In the first five-year reviews, the Commission characterized CWP as a price-sensitive product.[210] Because CWP from various sources was generally interchangeable, price was important in purchasing decisions.[211] The Commission observed that should the orders be revoked, there would likely be pervasive underselling by the subject imports, based on pricing patterns observed during both the original investigations and the period of review.[212] Because the market for CWP was price sensitive, it found that the addition of even relatively small amounts of additional subject imports upon revocation would be likely to have significant price-depressing or -suppressing effects.[213]

In the second five-year reviews, the Commission found that price continued to be critical to purchasing decisions and that the presence of likely significant U.S. CWP imports after revocation of the orders that were likely to undersell the domestically produced product would force domestic producers to lower prices or lose sales.[214] It found domestic producers' raw material costs to be volatile.[215] It found the addition of significant quantities of low-priced subject imports would likely impair the domestic industry's ability to recover increased costs should these costs continue to rise as they did during the bulk of the period of review during the second five-year reviews.[216] In light of these considerations and the price-sensitive nature of CWP, the Commission concluded that cumulated subject imports would likely have price-depressing or -suppressing effects were the orders to be revoked.[217]

In the third five-year reviews, the Commission found that price continued to be an important factor in purchasing decisions for CWP in the U.S. market given the general

---

[208] Original Determination for Taiwan, USITC Pub. 1519 at 15–16; Original Determinations for Turkey and Thailand, USITC Pub. 1810 at 16, 22, and 25–26; Original Determinations for India and Turkey, USITC Pub. 1839 at 13–14; Original Determinations for Brazil, Korea, Mexico, and Taiwan, USITC Pub. 2564 at 36–37.

[209] Original Determinations for Turkey and Thailand, USITC Pub. 1810 at 16 and 22; Original Determinations for India and Turkey, USITC Pub. 1839 at 13–14; Original Determinations for Brazil, Korea, Mexico, and Taiwan, USITC Pub. 2564 at 36–37.

[210] First Five-Year Reviews, USITC Pub. 3316 at 37.

[211] First Five-Year Reviews, USITC Pub. 3316 at 37.

[212] First Five-Year Reviews, USITC Pub. 3316 at 37.

[213] First Five-Year Reviews, USITC Pub. 3316 at 37.

[214] Second Five-Year Reviews, USITC Pub. 3867 at 24–25.

[215] Second Five-Year Reviews, USITC Pub. 3867 at 25.

[216] Second Five-Year Reviews, USITC Pub. 3867 at 25.

[217] Second Five-Year Reviews, USITC Pub. 3867 at 25.

interchangeability of subject imports and domestically produced CWP.[218] Because the U.S. CWP market remained price sensitive, the Commission reaffirmed its finding from the prior reviews that sustained underselling by even a relatively small amount of subject imports would be likely to depress or suppress prices of the domestic like product to a significant degree.[219] Given the subject producers' demonstrated interest in the U.S. market during the original investigations and the continued presence of cumulated subject imports in the U.S. market after imposition of the orders at prices below those for the domestic like product, the Commission found that the subject producers were likely to find the large U.S. market attractive and that there would likely be significant price underselling should the orders be revoked.[220] Because the likely significant volume of low-priced subject imports upon revocation would force the domestic industry to lower prices, limit price increases, or lose sales in this price-sensitive market, the Commission concluded that the increased cumulated subject imports likely would have significant price-depressing or -suppressing effects.[221]

### 1. The Current Reviews

For purposes of these reviews, we again find a high degree of substitutability between the domestic like product and subject imports, and price continues to be an important factor in purchasing decisions. The record does not contain new pricing data due to the expedited nature of these reviews.[222] As observed above, subject import volumes would likely increase significantly upon revocation of the orders. Additionally, given the continued attractiveness of the U.S. market, subject producers would be likely to resume the behavior observed in the original investigations, exporting subject merchandise at low prices to gain market share. These subject imports would likely undersell domestically produced CWP, as they did during the original investigations. Consequently, there would likely be significant underselling by subject imports. The likely significant volume of subject imports, which would undersell the domestic like product, would likely force the domestic industry to lower prices or lose sales.

In light of these considerations, we conclude that subject imports would likely have significant depressing or suppressing effects on prices for the domestic like product upon revocation of the orders.

---

[218] Third Five-Year Reviews, USITC Pub. 4333 at 39.

[219] Third Five-Year Reviews, USITC Pub. 4333 at 40.

[220] Third Five-Year Reviews, USITC Pub. 4333 at 40. Cumulated subject imports undersold the domestic like product in 452 of 492 quarterly observations during the third period of review. *Id*.

[221] Third Five-Year Reviews, USITC Pub. 4333 at 40.

[222] We observe that the available average unit value ("AUV") data indicate that the AUV for subject merchandise was $*** per short ton in 2016, *** percent lower than the AUV for domestic producers' domestic shipments for that year ($***). CR/PR at Tables I-4, I-5. We typically view AUV data with caution for price comparisons because differences in AUVs can reflect differences in product mix rather than differences in price.

## E. Likely Impact

### 1. The Prior Proceedings

In each of the original determinations, the Commission's impact analysis focused on the poor operating performance of the domestic CWP industry.[223] Other factors the Commission cited in individual original determinations included declines in production, shipments, and employment (in the 1984 Taiwan investigation), declines in market share and employment (in both 1986 determinations), and declines in employment and capacity utilization (in the 1992 investigations).[224]

In the first five-year reviews, the Commission found that the industry's condition had improved markedly since the original investigations, due to the existence of the orders and the recent increases in demand for construction materials.[225] Although the domestic industry's operating performance had declined during that period of review, it was consistently better than during the original investigations.[226] The Commission did not find the domestic industry to be vulnerable, but it concluded that if the orders were revoked, the adverse price effects associated with increased subject imports would likely have a significant impact on the domestic industry.[227]

In the second five-year reviews, the Commission did not find the domestic industry to be vulnerable to material injury but concluded that subject imports would likely increase to significant levels if the orders were revoked.[228] Because the subject imports were good substitutes for the domestic like product, the domestic industry supplied the majority of the U.S. market, and there appeared to be no significant market segments in which the domestic industry participated exclusively, the Commission found that any increase in subject import volumes would likely be in substantial part at the domestic industry's expense.[229] Additionally, because of the likely aggressive pricing of the subject imports, the Commission found that the domestic industry would need to cut prices for the domestic like product or lose sales.[230] Under either scenario, it found that the domestic industry's revenues would likely decline significantly

---

[223] Original Determination for Taiwan, USITC Pub. 1519 at 7–8; Original Determinations for Turkey and Thailand, USITC Pub. 1810 at 8–9; Original Determinations for India and Turkey, USITC Pub. 1839 at 7–9; Original Determinations for Brazil, Korea, Mexico, and Taiwan, USITC Pub. 2564 at 36–37.

[224] Original Determination for Taiwan, USITC Pub. 1519 at 7–8; Original Determinations for Turkey and Thailand, USITC Pub. 1810 at 8–9; Original Determinations for India and Turkey, USITC Pub. 1839 at 7–9; Original Determinations for Brazil, Korea, Mexico, and Taiwan, USITC Pub. 2564 at 36–37.

[225] First Five-Year Reviews, USITC Pub. 3316 at 38.

[226] First Five-Year Reviews, USITC Pub. 3316 at 38.

[227] First Five-Year Reviews, USITC Pub. 3316 at 38.

[228] Second Five-Year Reviews, USITC Pub. 3867 at 27.

[229] Second Five-Year Reviews, USITC Pub. 3867 at 27.

[230] Second Five-Year Reviews, USITC Pub. 3867 at 27.

in light of the anticipated volume of subject imports and that its operating performance would deteriorate.[231]

In the third five-year reviews, the Commission examined performance indicators for the domestic industry as a whole while acknowledging that the industry consisted of a variety of firms that differed in size, product mix, cost methodologies, and the extent to which they manufactured products other than CWP.[232] The Commission observed that many of the domestic industry's performance indicators, such as capacity, production, and U.S. shipments, declined overall between 2006 and 2011, peaking earlier in the period and not recovering to earlier levels by the end of the period.[233] The domestic industry's net sales, operating income, and ratio of operating income to net sales followed the same trend during the period of review.[234] The Commission found that the likely increase in cumulated subject imports would be substantially at the expense of the domestic industry, which supplied the majority of the U.S. market. It further concluded that if the orders were revoked, the adverse price effects associated with increased subject imports would likely have a significant impact on the domestic industry.[235] The Commission noted that the presence of nonsubject imports in the U.S. market would not sever the likely causal nexus between the likely significant volume of low-priced subject imports and likely adverse impact on the domestic industry were the orders under review to be revoked, citing the decline in market share of nonsubject imports and the lower AUVs for cumulated subject imports than for nonsubject imports.[236]

### 2. The Current Reviews

In these expedited reviews, the information available on the domestic industry's condition is limited. In 2016, the domestic industry's production capacity was *** short tons, its production was *** short tons, and its capacity utilization rate was *** percent.[237] The industry's domestic shipments were *** short tons, accounting for *** percent of apparent

---

[231] Second Five-Year Reviews, USITC Pub. 3867 at 27.

[232] Third Five-Year Reviews, USITC Pub. 4333 at 43.

[233] Third Five-Year Reviews, USITC Pub. 4333 at 43 and n.278. The domestic industry's share of apparent U.S. consumption increased overall, but was lower in 2011 than its peak in 2009. Third Five-Year Reviews, USITC Pub. 4333 at 43.

[234] Third Five-Year Reviews, USITC Pub. 4333 at 44.

[235] Third Five-Year Reviews, USITC Pub. 4333 at 45. Three Commissioners found the domestic industry to be vulnerable, and three Commissioners did not find the industry to be vulnerable. *Id.* at 44–45, nn.288–289.

[236] Third Five-Year Reviews, USITC Pub. 4333 at 38, n.249.

[237] CR/PR at Tables I-4, I-6. The domestic industry's capacity was 3.0 million short tons in 1998 and 2.6 million short tons in 2005 and declined slightly from 2.09 million short tons in 2006 to 2.05 million short tons in 2011. CR at Table I-4 and Appendix C. Similarly, its production in 2016 was lower than in 2011, when it was *** short tons. CR/PR at Table I-4. Its capacity utilization rate was 73.3 percent in 1998 and 50.9 percent in 2005 and declined irregularly from 61.4 percent in 2006 to 49.8 percent in 2011. CR at Table I-4 and Appendix C.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

U.S. consumption by volume and *** percent by value.[238] Its net sales value was $***, and its operating income was $***, equivalent to *** percent of net sales.[239] The limited evidence in these expedited reviews is insufficient for us to make a finding on whether the domestic industry is vulnerable to the continuation or recurrence of material injury in the event of revocation of the orders.

Based on the information available in these reviews, we find that revocation of the orders would likely lead to a significant volume of subject imports and that these imports would likely undersell the domestic like product to a significant degree, resulting in significant price depression or suppression for the domestic like product. We find that the increased subject import competition that would likely occur after revocation of the orders would likely have a significant impact on the domestic industry. The domestic industry would likely lose market share to subject imports and/or experience lower prices due to competition from subject imports, which would adversely impact its production, shipments, sales, and revenue. These reductions would likely have a direct adverse impact on the domestic industry's profitability and employment levels, as well as its ability to raise capital and make and maintain necessary capital investments.

We have also considered the role of factors other than subject imports, including the presence of nonsubject imports, so as not to attribute likely injury from other factors to the subject imports. Although nonsubject imports' market share was higher in 2016 (34.9 percent) than in 2011 (19.4 percent), subject imports' market share also increased from 2011 to 2016.[240] Thus, there is no indication on the record that the presence of nonsubject imports would prevent cumulated subject imports from entering the U.S. market in significant quantities upon revocation of the orders. Given the high degree of substitutability of CWP from different sources, the fact that the domestic industry is currently the largest supplier to the U.S. market, and the increase in cumulated subject imports' market share since the last five-year reviews despite the restraining effects of the orders, any increase in cumulated subject import volume and market penetration is likely to come, at least in substantial proportion, at the expense of the domestic industry. In light of these considerations, we find that the effects we have attributed to the subject imports are distinguishable from any effects likely from nonsubject imports in the event of revocation.

---

[238] CR/PR at Tables I-4, I-7. Domestic producers' U.S. shipments were *** short tons in 1998, *** short tons in 2001, *** short tons in 2005, *** short tons in 2006, *** short tons in 2007, *** short tons in 2008, *** short tons in 2009, *** short tons in 2010, and *** short tons in 2011. CR/PR at Table I-6 and Appendix C. The AUV of the domestic industry's U.S. commercial shipments in 2016 ($*** per short ton) was lower than in 2011 ($*** per short ton). CR/PR at Table I-4.

[239] CR/PR at Table I-4. Although the domestic industry's net sales in 2016 were lower than during the third review ($*** in 2011), operating income was higher ($*** in 2011), and the ratio of operating income to net sales was also higher (*** percent in 2011). *Id*.

[240] CR/PR at Table I-7. Cumulated subject imports' market share was *** percent in 2011 and *** percent in 2016. *Id*.

Accordingly, we conclude that, if the orders were to be revoked, subject imports would likely have a significant impact on domestic producers of CWP within a reasonably foreseeable time.

## V. Conclusion

For the reasons above, we determine that revocation of the countervailing duty order on imports of CWP from Turkey and the antidumping duty orders on CWP from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey would be likely to lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

PUBLIC DOCUMENT
Barcode:3883995-08 A-549-502 SCO - Scope Inquiry - Line Pipe

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

# INFORMATION OBTAINED IN THESE REVIEWS

## BACKGROUND

On June 1, 2017, the U.S. International Trade Commission ("Commission") gave notice, pursuant to section 751(c) of the Tariff Act of 1930, as amended ("the Act"),[1] that it had instituted a review to determine whether revocation of countervailing duty order on circular welded pipe and tube ("CWP") from Turkey and the antidumping duty orders on CWP from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey would likely lead to the continuation or recurrence of material injury to a domestic industry.[2] All interested parties were requested to respond to this notice by submitting certain information requested by the Commission.[3] [4] The following tabulation presents information relating to the background and schedule of this proceeding:

| Effective or statutory date | Action |
| --- | --- |
| June 1, 2017 | Notice of initiation and institution by Commerce and Commission |
| September 5, 2017 | Commission vote on adequacy |
| September 29, 2017 | Commerce results of its expedited review |
| October 30, 2017 | Commission statutory deadline to complete expedited review |
| May 29, 2018 | Commission statutory deadline to complete full review |

## RESPONSES TO THE COMMISSION'S NOTICE OF INSTITUTION

### Individual responses

The Commission received two submissions in response to its notice of institution in the subject review(s). They were filed on behalf of the following entities:

---

[1] 19 U.S.C. 1675(c).

[2] *Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand and Turkey; Institution of a Five-Year Review*, 82 FR 25328, June 1, 2017. In accordance with section 751(c) of the Act, the U.S. Department of Commerce ("Commerce") published a notice of initiation of a five-year review of the subject antidumping duty order concurrently with the Commission's notice of institution. *Initiation of Five-Year ("Sunset") Review*, 82 FR 25599, June 2, 2017. Pertinent *Federal Register* notices are referenced in app. A, and may be found at the Commission's website (www.usitc.gov).

[3] As part of their response to the notice of institution, interested parties were requested to provide company-specific information. That information is presented in app. B. Summary data compiled in prior proceedings is presented in app. C.

[4] Interested parties were also requested to provide a list of three to five leading purchasers in the U.S. market for the subject merchandise. Presented in app. D are the responses received from purchaser surveys transmitted to the purchasers identified in the adequacy phase of this review.

1. Bull Moose Tube Company ("Bull Moose"), EXLTUBE, TMK IPSCO Tubulars ("TMK"), and Zekelman Industries ("Zekelman"), domestic producers of circular welded pipe and tube (collectively referred to herein as "domestic interested parties");

2. Government of Turkey ("GOT").

A complete response to the Commission's notice of institution requires that the responding interested party submit to the Commission all the information listed in the notice. Responding firms are given an opportunity to remedy and explain any deficiencies in their responses. A summary of the number of responses and estimates of coverage for each is shown in table I-1.

**Table I-1**
**CWP: Summary of responses to the Commission's notice of institution**

| Type of interested party | Completed responses | |
|---|---|---|
| | Number | Coverage |
| Domestic: | | |
| U.S. producer | 1 | ***%[1] |
| Respondent: | | |
| Foreign government | 1 | ([2]) |

[1] In their response to the notice of institution, domestic interested parties estimated that they accounted for this share of total U.S. production of CWP during 2016. Domestic interested parties have based their computation on 2015 total domestic production data. Domestic Interested Parties' Response to the Notice of Institution, July 3, 2017, p. 22.

[2] In its response to the notice of institution, the GOT reported capacity of all firms in Turkey to produce welded carbon steel pipe and tube is *** tons, while production of welded carbon steel pipe and tube in Turkey was *** tons, which accounted for *** percent of total production of welded steel pipe in Turkey. The data provided in the GOT's response to the notice of institution was obtained from Turkish Steel Pipe Manufacturers Association. GOT's Cure Response to the Notice of Institution, July 21, 2017.

## Party comments on adequacy

The Commission received one submission from parties commenting on the adequacy of responses to the notice of institution and whether the Commission should conduct expedited or full reviews. This submission was filed on behalf of the following entities: (1) Bull Moose Tube Company, (2) EXLTUBE, (3) TMK IPSCO Tubulars, and (4) Zekelman Industries.[5]

Domestic interested parties argue that the Commission should find the GOT Response is individually inadequate and that it represents an inadequate portion of the respondent interested parties subject to these reviews.[6] Therefore, because of the inadequate response by the respondent interested parties and the fact that there have been no major changes in the conditions of competition in the market since the Commission's last five-year reviews, they request that the Commission conduct expedited reviews of the antidumping and/or countervailing duty orders on CWP.

[5] Domestic Interested Parties' Comments on Adequacy, August 14, 2017, pp. 1-2.

[6] Domestic Interested Parties' Comments on Adequacy pp. 1-2.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

## RECENT DEVELOPMENTS IN THE INDUSTRY

Since the Commission's last five-year reviews, the following developments have occurred in the CWP industry:

| Year | Company | Event |
|---|---|---|
| 2012 | Leavitt Tube Company | **Name change: The** Leavitt Tube Company announced that it would be renamed to Maruichi Leavitt Pipe & Tube, LLC after Maruichi Steel Tube Ltd acquired a 60-percent stake in the company. |
| 2013 | TMK IPSCO | **Acquisition:** TMK IPSCO acquired the pipe services and precision manufacturing assets of ITS Tubular Services Limited. The acquisition included a manufacturing facility located near Houston, Texas. |
| 2014 | TMK IPSCO | **Production reduction:** TMK IPSCO announced that it would reduce the number of operating hours to produce welded pipe at its facilities in Blytheville, Arkansas; Camanche, Iowa; and Wilder, Kentucky by 30 percent.<br>**New labor agreement:** TMK IPSCO announced that it reached an agreement with union members at its Koppel and Ambridge, Pennsylvania facilities. The agreement is expected to remain in effect through November 1, 2018. |
| 2015 | Wheatland Tube Co. | **Furlough/operations idled**: Wheatland Tube Co. announced that it would indefinitely idle its Sharon, Pennsylvania hot mill operations and lay off 100 workers. |
| | Allied Tube & Conduit Corporation | **Closure:** Allied Tube & Conduit Corporation announced that it would cease production of steel fence framework and sprinkler pipe products as of October 5, 2015, and permanently exit these markets. The company planned to close its Philadelphia, Pennsylvania operations after transferring remaining production to other facilities owned by its parent company, Atkore International Group Inc. The company also announced that it would close operations at its facilities in Harvey, Illinois and Phoenix, Arizona. These actions were expected to result in 317 positions being eliminated nationwide. |
| 2016 | Zekelman Industries Inc. | **Name change:** JMC Steel Group changed its name to Zekelman Industries Inc.<br>**Acquisition:** Zekelman entered into a definitive agreement to purchase Western Tube and Conduit Corporation. |
| 2017 | Zekelman Industries Inc./American Tube Manufacturing Inc. | **Acquisition:** Zekelman Industries acquired American Tube Manufacturing, Inc. |

Sources: Steel Market Update, "Leavitt Tube has been Renamed Maruichi Leavitt Pipe & Tube," July 2, 2012, https://www.steelmarketupdate.com/blog/1296-leavitt-tube-has-been-renamed-maruichi-leavitt-pipe--tube, (accessed July 24, 2017); TMK IPSCO, "TMK Acquires Pipe Services Assets in Houston," April 8, 2013, https://tmk-ipsco.tmk-group.com/tmk_ipsco_press_releases/show/847, (accessed July 24, 2017); TMK IPSCO, "TMK IPSCO to Reduce Operating Hours at Three Welded Pipe Facilities," April 7, 2014, https://tmk-ipsco.tmk-group.com/tmk_ipsco_press_releases/show/889, (accessed July 24, 2017); TMK IPSCO, "TMK IPSCO's

Koppel and Ambridge, Pennsylvania Plants Ratify New Labor Agreement," June 23, 2014, https://tmk-ipsco.tmk-group.com/tmk_ipsco_press_releases/show/908, (accessed July 24, 2017); The Herald, "100 Furloughed at Wheatland Tube," June 27, 2015, http://www.sharonherald.com/news/furloughed-at-wheatland-tube/article_402e35f4-d70b-50f3-9053-36fbbaa285c3.html, (accessed July 24, 2017); Bloomberg, "Allied Tube & Conduit Corporation to Cease Manufacturing of Steel Fence Framework and Sprinkler Pipe Products, Effective October 5, 2015," August 6, 2015, https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=237388919, (accessed July 24, 2017); Wheatland Tube, "JMC Steel Group Changes Name to Zekelman Industries Inc." June 6, 2016, http://www.wheatland.com/press-releases/jmc-steel-group-changes-name-to-zekelman-industries-inc, (accessed July 16, 2017); Zekelman Industries, "Zekelman Industries to Acquire Western Tube and Conduit Corporation," December 6, 2016, http://www.zekelman.com/press-release/zekelman-industries/zekelman-industries-to-acquire-western-tube-conduit-corporation, (accessed July 19, 2017); Zekelman Industries, "Zekelman Industries acquires American Tube Manufacturing, Inc.," February 22, 2017, http://www.zekelman.com/press-release/zekelman-industries/zekelman-industries-acquires-american-tube-manufacturing-inc, (accessed July 19, 2017).

## THE ORIGINAL INVESTIGATION AND SUBSEQUENT REVIEWS

### The original investigations

These reviews of the countervailing duty order for CWP from Turkey, and the antidumping duty orders for circular welded pipe from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey follow from a series of countervailing and antidumping duty petitions filed with Commerce and the Commission since 1983. The following tabulation presents information on the dates of the original orders issued by Commerce, the products and countries covered, the investigation numbers at both Commerce and the Commission, and the Federal Register citations relevant to the issuance of the subject orders.

| Order date | Subject merchandise | Country | Investigation number | | *Federal Register* notice |
|---|---|---|---|---|---|
| | | | Commerce | Commission | |
| 5/7/84 | Small diameter carbon steel pipe tube | Taiwan | A-583-008 | 731-TA-132 | 49 FR 19369 |
| 3/7/86 | Welded carbon steel pipe and tube | Turkey | C-489-502 | 701-TA-253 | 51 FR 7984 |
| 3/11/86 | Welded carbon steel pipe and tube | Thailand | A-549-502 | 731-TA-252 | 51 FR 8341 |
| 5/12/86 | Welded carbon steel pipe and tube | India | A-533-502 | 731-TA-271 | 51 FR 17384 |
| 5/15/86 | Welded carbon steel pipe and tube | Turkey | A-489-501 | 731-TA-273 | 51 FR 17784 |
| 11/2/92 | Circular welded nonalloy steel pipe | Brazil | A-351-809 | 731-TA-532 | 57 FR 49453 |
| | Circular welded nonalloy steel pipe | Korea | A-580-809 | 731-TA-533 | 57 FR 49453 |
| | Circular welded nonalloy steel pipe | Mexico | A-201-805 | 731-TA-534 | 57 FR 49453 |
| | Circular welded nonalloy steel pipe | Taiwan | A-583-814 | 731-TA-536 | 57 FR 49454 |
| Source: Cited *Federal Register* notices. | | | | | |

On April 17, 1984, the Commission determined that an industry in the United States was materially injured by reason of imports of certain small-diameter circular welded carbon steel pipes and tubes from Taiwan that were being sold in the United States at less than fair value

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

("LTFV").[7] Commerce issued an antidumping duty order on imports of certain small-diameter circular welded carbon steel pipes and tubes from Taiwan on May 7, 1984.

On February 12, 1986, the Commission determined that an industry in the United States was materially injured or threatened with material injury by reason of subsidized imports from Turkey and LTFV imports from Thailand of certain welded carbon steel pipes and tubes.[8] Commerce issued antidumping and countervailing duty orders on these products from Thailand and from Turkey on March 7 and March 11, 1986, respectively.

On April 21, 1986, the Commission determined that an industry in the United States was materially injured by reason of LTFV imports of certain welded carbon steel pipes and tubes from India and Turkey.[9] Commerce issued antidumping duty orders on these products on May 12 and May 15, 1986, respectively.

On October 20, 1992, the Commission determined that an industry in the United States was materially injured by reason of LTFV imports of standard and structural pipes and tubes from Brazil, Korea, Mexico, Taiwan, and Venezuela.[10] On November 2, 1992, Commerce issued antidumping duty orders on these products.

### Subsequent five-year reviews

In June 2000, the Commission completed full five-year reviews of the subject orders and determined that revocation of the countervailing duty order on circular welded pipe from Turkey and the antidumping duty orders on circular welded pipe from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey would be likely to lead to the continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time.[11] On

---

[7] *Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea and Taiwan, Invs. Nos. 731-TA-131,132, and 138 (Final)*, USITC Publication 1519 (April 1984). The Commission also determined that an industry in the United States was not materially injured or threatened with material injury by reasons of imports from Korea of heavy-walled rectangular (including square) welded pipes and tubes.

[8] *Certain Welded Carbon Steel Pipes and Tubes from Turkey and Thailand, Invs. Nos. 701-TA-253 and 731-TA-252 (Final)*, USITC Publication 1810 (February 1986). Of the four affirmative voting Commissioners, two found material injury by reason of subject imports and two found threat of material injury by reason of subject imports.

[9] *Certain Welded Carbon Steel Pipes and Tubes from India, Taiwan, and Turkey, Invs. Nos. 731-TA-271 to 273 (Final)*, USITC Publication 1839 (April 1986). The Commission also determined that an industry in the United States was not materially injured or threatened with material injury by reasons of imports of line pipes and tubes from Taiwan and Turkey.

[10] *Certain Circular, Welded, Non-Alloy Steel Pipes and Tubes from Brazil, the Republic of Korea, Mexico, Romania, Taiwan, and Venezuela, Invs. Nos. 731-TA-532-537 (Final),* USITC Publication 2564, October 1992. The Commission also determined that an industry in the United States was not materially injured or threatened with material injury by reasons of imports from Romania of subject pipe and tube, and by reason of imports from Brazil, Korea, Mexico, Taiwan, and Venezuela of finished conduit or mechanical tubing.

[11] *Certain Pipe and Tube from Argentina, Brazil, Canada, India, Korea, Mexico, Singapore, Taiwan, Thailand, Turkey, and Venezuela, Invs. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 276-277, 296, 409-410, 532-534, and 536-537 (Review)*, USITC Publication 3316 (July 2000) ("First Reviews"). The Commission also determined that revocation of the antidumping duty orders on circular welded carbon steel pipe from Venezuela, on light-walled rectangular pipe and tube from Singapore, imports of oil country tubular goods (other than drill pipe) from Canada

(*continued*...)

PUBLIC DOCUMENT

August 22, 2000, Commerce published notice of the continuation of the countervailing duty order on circular welded pipe from Turkey and the antidumping duty orders on circular welded pipe from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey.[12]

In June 2006, the Commission completed full five-year reviews of the subject orders and determined that revocation of the countervailing duty order on CWP from Turkey and the antidumping duty orders on CWP from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey would be likely to lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time.[13] Consequently, Commerce issued a continuation of the countervailing duty order on imports of CWP from Turkey, and the antidumping duty orders on imports of CWP from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey, effective August 8, 2006.[14]

On October 4, 2011, the Commission determined that it would conduct full reviews of the countervailing duty order on CWP from Turkey and the antidumping duty orders on CWP from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey. On October 19, 2011, Commerce published its determination that revocation of the countervailing duty order on CWP from Turkey would be likely to lead to material injury within a reasonably foreseeable time and on October 28, 2011, Commerce published its determination that revocation of the antidumping duty orders on CWP from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey would be likely to lead to continuation or recurrence of dumping.[15] On July 5, 2012, the Commission notified Commerce of its determination that material injury would be likely to continue or recur within a reasonably foreseeable time.[16] Following affirmative determinations in the five-year reviews by Commerce and the Commission, effective, July 17, 2012, Commerce issued a continuation of the countervailing duty order on imports of CWP from Turkey and the

(…*continued*)
and Taiwan, and imports of drill pipe from Canada and Taiwan would not be likely to lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time.

[12] *Continuation of Antidumping Duty Orders: Light-Walled Rectangular Welded Carbon Steel Pipe and Tube From Argentina and Taiwan; Circular Welded Non-Alloy Steel Pipe and Tube from Brazil, Korea, Mexico, and Taiwan; Welded Carbon Steel Pipe and Tube From India, Thailand, and Turkey; and Small Diameter Standard and Rectangular Steel Pipe and Tube From Taiwan*, 65 FR 50955, August 22, 2000.

[13] *Certain Circular Welded Pipe and Tube From Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey* 71 FR 42118, July 25, 2006.

[14] *Continuation of Antidumping Duty Orders on Circular Welded Non–Alloy Pipes and Tubes from Brazil, Mexico, Republic of Korea, Antidumping Duty Orders on Welded Carbon Steel Pipe from India, Thailand and Turkey, and Countervailing Duty Order on Welded Carbon Steel Standard Pipe from Turkey*, 71 FR 44996, August 8, 2006.

[15] *Welded Carbon Steel Pipe and Tube From Turkey: Final Results of Expedited Sunset Review of Countervailing Duty Order,* 76 FR 64900, October 19, 2011 *Certain Circular Welded Carbon Steel Pipes and Tubes From India, Thailand, and Turkey; Final Results of Expedited Five-Year ("Sunset") Reviews of Antidumping Duty Orders*, 76 FR 66893, October 28, 2011, and *Circular Welded Carbon Steel Pipes and Tubes From Brazil, Mexico, the Republic of Korea, and Taiwan: Final Results of the Expedited Third Sunset Reviews of the Antidumping Duty Order*, 76 F.R. 66899, October 28, 2011.

[16] *Certain Circular Welded Pipe and Tube From Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey* 77 FR 39736, July 5, 2012.

antidumping duty orders on imports of CWP from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey.[17]

## PRIOR RELATED INVESTIGATIONS

### Related title VII investigations

The Commission has conducted a number of previous import relief investigations on circular welded pipe or substantially similar merchandise. Table I-2 presents data on previous and related title VII investigations.

**Table I-2**
**CWP: Previous and related Commission proceedings**

| Product | Inv. No. | Year | Country | Original determination | Current status of order |
|---|---|---|---|---|---|
| Circular welded pipe | 701-TA-165 | 1982 | Brazil | Terminated | N/A |
| | 701-TA-166 | 1982 | France | Terminated | N/A |
| | 701-TA-167 | 1982 | Italy | Negative (P) | N/A |
| | 701-TA-168 | 1982 | Korea | Affirmative | Order revoked by Commerce-1985 |
| | 701-TA-169 | 1982 | West Germany | Terminated | N/A |
| | 731-TA-132 | 1983 | Taiwan | Affirmative | Order under review |
| | 701-TA-220 | 1984 | Spain | Terminated | N/A |
| | 731-TA-183 | 1984 | Brazil | Terminated | N/A |
| | 731-TA-197 | 1984 | Brazil | Terminated | N/A |
| | 731-TA-198 | 1984 | Spain | Terminated | N/A |
| | 701-TA-242 | 1985 | Venezuela | Terminated | N/A |
| | 701-TA-251 | 1985 | India | Terminated | N/A |

Table continued on next page.

[17] *Certain Circular Welded Carbon Steel Pipes and Tubes From India, Thailand, and Turkey; Certain Circular Welded Non-Alloy Steel Pipe From Brazil, Mexico, the Republic of Korea, and Taiwan; and Certain Circular Welded Carbon Steel Pipes and Tubes From Taiwan: Continuation of Antidumping and Countervailing Duty Orders,* 77 FR 41967, July 17, 2012.

**Table I-2--Continued**
**CWP: Previous and related Commission proceedings**

| Product | Inv. No. | Year | Country | Original determination | Current status of order |
|---|---|---|---|---|---|
| Circular welded pipe | 701-TA-252 | 1985 | Taiwan | Terminated | N/A |
| | 701-TA-253 | 1985 | Turkey | Affirmative | Order under review |
| | 731-TA-211 | 1985 | Taiwan | Negative | N/A |
| | 731-TA-212 | 1985 | Venezuela | Terminated | N/A |
| | 731-TA-252 | 1985 | Thailand | Affirmative | Order under review |
| | 731-TA-253 | 1985 | Venezuela | Terminated | N/A |
| | 731-TA-271 | 1985 | India | Affirmative | Order under review |
| | 731-TA-273 | 1985 | Turkey | Affirmative | Order under review |
| | 731-TA-274 | 1985 | Yugoslavia | Terminated | N/A |
| | 731-TA-292 | 1986 | China | Negative | N/A |
| | 731-TA-293 | 1986 | Philippines | Negative | N/A |
| | 731-TA-294 | 1986 | Singapore | Negative | N/A |
| | 701-TA-311 | 1991 | Brazil | Terminated | N/A |
| | 731-TA-532 | 1991 | Brazil | Affirmative | Order under review |
| | 731-TA-533 | 1991 | Korea | Affirmative | Order under review |
| | 731-TA-534 | 1991 | Mexico | Affirmative | Order under review |
| | 731-TA-535 | 1991 | Romania | Negative | N/A |
| | 731-TA-536 | 1991 | Taiwan | Affirmative | Order under review |
| | 731-TA-537 | 1991 | Venezuela | Affirmative | Revoked, 2000 review |
| | 731-TA-732 | 1995 | Romania | Negative | N/A |
| | 731-TA-733 | 1995 | South Africa | Negative | N/A |
| | 731-TA-943 | 2001 | China | Negative | N/A |
| | 731-TA-944 | 2001 | Indonesia | Negative (P) | N/A |
| | 731-TA-945 | 2001 | Malaysia | Negative (P) | N/A |

Table continued on next page.

**Table I-2--Continued**
**CWP: Previous and related Commission proceedings**

| Product | Inv. No. | Year | Country | Original determination | Current status of order |
|---|---|---|---|---|---|
| Circular welded pipe | 731-TA-946 | 2001 | Romania | Negative (P) | N/A |
| | 731-TA-947 | 2001 | South Africa | Negative (P) | N/A |
| | 701-TA-447 | 2007 | China | Affirmative | Order in place |
| | 731-TA-1116 | 2007 | China | Affirmative | Order in place |
| | 701-TA-482 | 2012 | India | Negative | N/A |
| | 701-TA-483 | 2012 | Oman | Negative | N/A |
| | 701-TA-484 | 2012 | United Arab Emirates | Negative | N/A |
| | 701-TA-485 | 2012 | Vietnam | Terminated | N/A |
| | 731-TA-1191 | 2012 | India | Negative | N/A |
| | 731-TA-1192 | 2012 | Oman | Negative | N/A |
| | 731-TA-1193 | 2012 | United Arab Emirates | Negative | N/A |
| | 731-TA-1194 | 2012 | Vietnam | Negative | N/A |
| | 701-TA-549 | 2016 | Pakistan | Affirmative | Order in place |
| | 731-TA-1299 | 2016 | Oman | Affirmative | Order in place |
| | 731-TA-1300 | 2016 | Pakistan | Affirmative | Order in place |
| | 731-TA-1301 | 2016 | Philippines | Negative (P) | N/A |
| | 731-TA-1302 | 2016 | United Arab Emirates | Affirmative | Order in place |
| | 731-TA-1303 | 2016 | Vietnam | Affirmative | Order in place |

Source: U.S. International Trade Commission publications.

## Related safeguard investigations

During the 1980s, the United States took steps to limit imports of various steel products into the U.S. market. In October 1982, the United States concluded an agreement with what was then known as the European Coal and Steel Community regulating trade in certain still

products.[18] In response to a January 24, 1984 petition filed by Bethlehem Steel Corp. and the United Steelworkers of America, the Commission conducted an investigation under section 201 of the Trade Act of 1974 regarding imports of a wide range of carbon and certain alloy steel products, including carbon and alloy steel ingots, blooms, billets, slabs, and sheet bars; plates; sheets and strip; wire rods; wire and wire products; railway-type products; bars; structural shapes and units; and pipes and tubes and blanks.[19] The Commission made affirmative determinations with respect to 5 of the 9 investigated products, and the Commission majority recommended various relief measures.[20] On September 18, 1984, the President announced that he would not implement the remedies proposed by the Commission as they were not “in the national economic interest,” but instead, as part of a 9-point plan to assist the domestic steel industry to compete with imports, he recommended the negotiation of voluntary restraint agreements (“VRAs”) with trading partners to address unfair surges in imports of steel products.[21] Between October 1, 1984, and March 31, 1992, the United States limited imports into the U.S. market of non-alloy carbon steel products from the European Union and 19 other sources through VRAs.[22] The VRAs covered circular welded pipe (as well as other pipe and tube products) from, among other countries, Brazil, Korea, and Mexico.[23] Although there was no VRA with Taiwan, Taiwan established a voluntary unilateral restraint on its steel exports to the United States through an exchange of letters between the Coordination Council for North American Affairs and the American Institute in Taiwan.[24]

In 2001, the Commission determined that certain carbon and alloy steel welded tubular products other than oil country tubular goods (including circular welded pipe as defined in the current proceeding) were being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or threat thereof, to the domestic industry producing such articles, and recommended a tariff-rate quota decreasing from 20 percent to 11 percent over four years.[25] On March 5, 2002, President George W. Bush announced the implementation of steel safeguard measures. Import relief relating to welded tubular products (other than oil country tubular goods) consisted of an additional tariff for a period of three years and one day (15 percent *ad valorem* on imports in the first year, 12 percent in the second year, and 9 percent in the third year).[26] Following receipt of the Commission’s mid-term monitoring report in September 2003, and after seeking information from the U.S. Secretary of Commerce and

---

[18] 47 Fed. Reg. 49058, October 29, 1982.

[19] *Carbon and Certain Alloy Steel Products, Inv. TA-201-51*, USITC Pub. 1553, July 1984.

[20] *Carbon and Certain Alloy Steel Products, Inv. TA-201-51*, USITC Pub. 1553, July 1984.

[21] 49 Fed. Reg. 36813, September 20, 1984 (President’s Memorandum).

[22] *Certain Circular, Welded, Non-Alloy Steel Pipes and Tubes from Brazil, the Republic of Korea, Mexico, Romania, Taiwan, and Venezuela, Invs. Nos. 731-TA-532-537 (Final),* USITC Publication 2564, October 1992, p. I-48.

[23] Ibid.

[24] Ibid.

[25] *Steel; Import Investigations*, 66 FR 67304, December 28, 2001.

[26] *Presidential Proclamation 7529 of March 5, 2002, To Facilitate Positive Adjustment to Competition From Imports of Certain Steel Products*, 67 FR 10553, March 7, 2002. The President also instructed the Secretaries of Commerce and the Treasury to establish a system of import licensing to facilitate steel import monitoring.

U.S. Secretary of Labor, President Bush determined that the effectiveness of the action taken had been impaired by changed circumstances. Therefore, he terminated the U.S. measure with respect to increased tariffs on December 4, 2003.[27] On March 21, 2005, the Commission instituted an investigation under section 204(d) of the Trade Act of 1974 for the purpose of evaluating the effectiveness of the relief action imposed by President Bush on imports of certain steel products. The Commission's report on the evaluation was transmitted to the President and the Congress on September 19, 2005.

In 2005, the Commission conducted a China-specific safeguard investigation on circular welded nonalloy steel pipe (Inv. No. TA-421-6). Following the Commission's affirmative determination of market disruption and remedy recommendations, President Bush issued a proclamation on December 30, 2005, determining not to impose temporary import relief.[28]

## PENDING LITIGATION

On May 11, 2017, the GOT requested that the Dispute Settlement Body of the World Trade Organization ("WTO") establish a panel to consider its complaint that countervailing duty measures by the United States on various tubular products (including CWP) are inconsistent with several provisions of the WTO Agreement on Subsidies and Countervailing Measures ("SCM Agreement"). With respect to the CWP countervailing duty order, the GOT alleges that the Commission's practice of "cross-cumulating" subsidized and non-subsidized imports, with respect to which five-year reviews are initiated on the same day, is inconsistent with the SCM Agreement, both "as such" and "as applied."

## THE PRODUCT

### Commerce's scope

Table I-3 presents the imported product subject to the antidumping and countervailing duty orders under review, as defined by Commerce.

[27] *Presidential Proclamation 7741 of December 4, 2003, To Provide for the Termination of Action Taken With Regard to Imports of Certain Steel Products*, 68 FR 68483, December 8, 2003. Import licensing, however, remained in place through March 21, 2005, and continues in modified form at this time.

[28] *Presidential Proclamation 2006-7 of December 30, 2005, Presidential Determination on Imports of Circular Welded Non-Alloy Steel Pipe from the People's Republic of China*, 71 FR 871, January 6, 2006.

**Table I-3**
**CWP: Commerce's scope definitions**

| | | |
|---|---|---|
| Brazil, Mexico, and Korea | AD<br>731-TA-532, 533, and 534 | …circular welded non-alloy steel pipes and tubes, of circular cross-section, not more than 406.4 millimeters (16 inches) in outside diameter, regardless of wall thickness, surface finish (black, galvanized, or painted), or end finish (plain end, beveled end, threaded and coupled). These pipes and tubes are generally known as standard pipes and tubes and are intended for the low pressure conveyance of water, steam, natural gas, and other liquids and gasses in plumbing and heating systems, air conditioning units, automatic sprinkler systems, and other related uses, and generally meets American Society for Testing Materials ("ASTM") A–53 specifications. Standard pipe may also be used for light load-bearing applications, such as for fence tubing, and as structural pipe tubing used for farming and support members for reconstruction or load bearing purposes in the construction, shipbuilding, trucking, farm equipment, and related industries. Unfinished conduit pipe is also included in the orders. All carbon steel pipes and tubes within the physical description outlined above are included within the scope of the orders, except line pipe, oil country tubular goods, boiler tubing, mechanical tubing, pipe and tube hollows for redraws, finished scaffolding, and finished conduit. Standard pipe that is dual or triple certified/stenciled that enters the U.S. as line pipe of a kind used for oil or gas pipelines is also not included in the orders. Imports of the products covered by the orders are currently classifiable under the following Harmonized Tariff Schedule of the United States ("HTS") subheadings: 7306.30.1000, 7306.30.5025, 7306.30.5032, 7306.30.5040, 7306.30.5055, 7306.30.5085, and 7306.30.5090. |
| India | AD<br>731-TA-271 | …certain welded carbon steel standard pipes and tubes with an outside diameter of 0.375 inch or more but not over 16 inches. These products are commonly referred to in the industry as standard pipes and tubes produced to various specifications, most notably ASTM A-53, A-120, or A-135. This merchandise is currently classifiable under HTS item numbers 7306.30.1000, 7306.30.5025, 7306.30.5032, 7306.30.5040, 7306.30.5055, 7306.30.5085, 7306.30.5090. |

Table continued on next page.

**Table I-3 --Continued**
**CWP: Commerce's scope definitions**

| | | |
|---|---|---|
| Taiwan (1 of 2) | AD<br>731-TA-132 | …certain circular welded carbon steel pipes and tubes from Taiwan, which are defined as: welded carbon steel pipes and tubes, of circular cross section, with walls not thinner than 0.065 inch, and 0.375 inch or more but not over 4.5 inches in outside diameter, currently classified under HTS item numbers 7306.30.5025, 7306.30.5032, 7306.30.5040, and 7306.30.5055. |
| Taiwan (2 of 2) | AD<br>731-TA-536 | ...(1) circular welded non-alloy steel pipes and tubes, of circular cross section over 114.3 millimeters (4.5 inches), but not over 406.4 millimeters (16 inches) in outside diameter, with a wall thickness of 1.65 millimeters (0.065 inches) or more, regardless of surface finish (black, galvanized, or painted), or end-finish (plain end, beveled end, threaded, or threaded and coupled); and (2) circular welded non-alloy steel pipes and tubes, of circular cross-section less than 406.4 millimeters (16 inches), with a wall thickness of less than 1.65 millimeters (0.065 inches), regardless of surface finish (black, galvanized, or painted) or end-finish (plain end, beveled end, threaded, or threaded and coupled). These pipes and tubes are generally known as standard pipes and tubes and are intended for the low pressure conveyance of water, steam, natural gas, air, and other liquids and gases in plumbing and heating systems, air conditioning units, automatic sprinkling systems, and other related uses, and generally meet ASTM A-53 specifications. Standard pipe may also be used for light loadbearing applications, such as for fence-tubing and as structural pipe tubing used for framing and support members for construction, or load-bearing purposes in the construction, shipbuilding, trucking, farm-equipment, and related industries. Unfinished conduit pipe is also included in the order. All carbon steel pipes and tubes within the physical description outlined above are included within the scope of the order, except line pipe, oil country tubular goods, boiler tubing, mechanical tubing, pipe and tube hollows for redraws, finished scaffolding, and finished conduit. Standard pipe that is dual or triple certified/stenciled that enters the U.S. as line pipe of a kind or used for oil and gas pipelines is also not included in the scope of the order. Imports of the products covered by the order are currently classifiable under the following HTS subheadings, 7306.30.1000, 7306.30.5085, and 7306.30.5090. |
| Thailand | AD<br>731-TA-252 | ...certain welded carbon steel standard pipes and tubes with an outside diameter of 0.375 inch or more but not over 16 inches. These products are commonly referred to in the industry as standard pipes and tubes produced to various ASTM specifications, most notably A-53, A-120, or A-135. This merchandise is currently classifiable under HTS item numbers 7306.30.1000, 7306.30.5025, 7306.30.5032, 7306.30.5040, 7306.30.5055, 7306.30.5085, and 7306.30.5090. |

Table continued on next page.

**Table I-3 --Continued**
**CWP: Commerce's scope definitions**

| | | |
|---|---|---|
| Turkey | CVD<br>701-TA-253 | ...certain welded carbon steel pipe and tube with an outside diameter of 0.375 inch or more, but not over 16 inches, of any wall thickness (pipe and tube) from Turkey. These products are currently provided for under the HTS as item numbers 7306.30.10, 7306.30.50, and 7306.90.10.[1] |
| Turkey | AD<br>731-TA-273 | ...circular welded non-alloy steel pipes and tubes, of circular cross-section, not more than 406.4 millimeters (16 inches) in outside diameter, regardless of wall thickness, surface finish (black, or galvanized, painted), or end finish (plain end, beveled end, threaded and coupled). Those pipes and tubes are generally known as standard pipe, though they may also be called structural or mechanical tubing in certain applications. Standard pipes and tubes are intended for the low-pressure conveyance of water, steam, natural gas, air, and other liquids and gases in plumbing and heating systems, air conditioner units, automatic sprinkler systems, and other related uses. Standard pipe may also be used for light load-bearing and mechanical applications, such as for fence tubing, and for protection of electrical wiring, such as conduit shells. The scope is not limited to standard pipe and fence tubing, or those types of mechanical and structural pipe that are used in standard pipe applications. All carbon steel pipes and tubes within the physical description outlined above are included in the scope of this order, except for line pipe, oil country tubular goods, boiler tubing, cold-drawn or cold rolled mechanical tubing, pipe and tube hollows for redraws, finished scaffolding, and finished rigid conduit. Imports of these products are currently classifiable under the following HTS subheadings: 7306.30.1000, 7306.30.5025, 7306.30.5032, 7306.30.5040, 7306.30.5055, 7306.30.5085, and 7306.30.5090. |

[1] During the third review of this investigation, the Commission did not believe any material within the scope was classifiable in HTS 7306.90.10

Source: Commerce continuation orders (77 FR 41967).

## Description and applications[29]

Steel pipes and tubes are generally produced in various grades of carbon, alloy, or stainless steel. Tubular products frequently are distinguished by the following six end uses as defined by the American Iron and Steel Institute ("AISI").

- *Standard pipe* is ordinarily used for low-pressure conveyance of air, steam, gas, water, oil, or other fluids for mechanical applications. It is used primarily in machinery, buildings, sprinkler systems, irrigation systems, and water wells rather than in pipe lines

[29] Unless otherwise noted, this information is based on *Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey, 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534 and 536*, USITC Publication INV-KK-060, May 2012, pp. I-29 through I-32.

or utility distribution systems. It may carry fluids at elevated temperatures which are not subject to external heat applications. It is usually produced in standard diameters and wall thicknesses to ASTM specifications.

- *Line pipe* is used for transportation of gas, oil, or water generally in a pipeline or utility distribution system. It is produced to API-5L and American Water Works Association ("AWWA") specifications.

- *Structural pipe and tubing* is generally used for structural or loadbearing purposes above ground by the construction industry, as well as for structural purposes in ships, trailers, farm equipment, and other similar uses. It is produced in nominal wall thicknesses and sizes to ASTM specifications in round, square, rectangular, or other cross-sectional shapes.

- *Mechanical tubing* is produced in a large number of shapes of varied chemical composition. It is not normally produced to meet any specification other than that required to meet the end use. It is produced to meet exact O.D. (outer diameter) and decimal wall thicknesses.

- *Pressure tubing* is used to convey fluids at elevated temperatures or pressures, or both, and is suitable to be subjected to heat applications. It is produced to exact O.D. and decimal wall thicknesses in sizes 0.5 inch to 6 inches O.D. inclusive, usually to specifications such as ASTM.

- *Oil country tubular goods* ("OCTG") are pipe produced to API specifications and used in wells in the oil and gas industries:
    - *Casing* is the structural retainer for the walls of oil or gas wells and covers sizes 4.500 to 20 inches O.D. inclusive.
    - *Tubing* is used within casing oil wells to convey oil to ground level and ordinarily includes sizes 1.050 to 4.500 inches O.D. inclusive.
    - *Drill pipe* is used to transmit power to a rotary drilling tool below ground level and covers sizes to 2.375 to 6.750 inches O.D., inclusive.

Standard pipe of non-alloy steel is the primary product within the scope of these reviews (*see* figure I-1). Standard pipe is intended for the low-pressure conveyance of water, steam, natural gas, air, and other liquids and gases in plumbing and heating systems, air conditioning units, automatic sprinkler systems, and other related uses. Standard pipe may carry liquids at elevated temperatures but may not be subject to the application of external heat. It is made primarily to ASTM A53, A135, and A795 specifications, but can also be made to other specifications, such as British Standard ("BS") 1387. Since these standards often specify required engineering characteristics that overlap, a pipe also can be dual stenciled, meaning that the pipe is stamped with monograms signifying compliance with two different

specifications, such as ASTM A53 and API 5L; however, such dual-stenciled pipe is not within the scope of the subject orders.

**Figure I-1**

**Circular welded pipe: Cross section of welded pipe showing inside diameter "A" and wall thickness "B"**



Source: ASA Alloys, Inc., retrieved at http://www.asaalloys.com/diagrams.html.

     Other uses of circular welded pipe include light load-bearing mechanical applications, such as for fence tubing; scaffolding components; and protection of electrical wiring, such as conduit shells. Fence tubing can be produced to ASTM specification F-1083, which covers hot-dipped galvanized welded steel pipe used for fence structures. However, fence tubing can also be produced without reference to an ASTM specification, or to a general specification such as ASTM A513.

     In addition, circular welded pipe is used for structural applications in general construction. Structural pipe is generally used for structural or load-bearing purposes above ground by the construction industry, as well as for structural purposes in ships, trailers, farm equipment, and other similar uses. It is produced in nominal wall thicknesses and sizes. These products also are manufactured primarily to standard ASTM specifications (such as A500 or A252), as well as American Society of Mechanical Engineers ("ASME") specifications. Standard pipe used in light load-bearing, mechanical, and structural applications may be galvanized (zinc-coated by dipping in molten zinc), lacquered (black finish), or painted (black) to provide corrosion resistance, which is important for storage in humid conditions or for ocean transport. End finishes include plain end, which may be either cut, or beveled suitable for welding, or include threaded ends, or threaded or coupled, as well as other special end finishes. Pipe with threaded ends is usually provided "threaded and coupled," meaning that a coupling is attached to one end of each length of pipe.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

## Manufacturing process[30]

Circular welded pipes of the sizes subject to these reviews are manufactured by either the electric resistance-welding ("ERW") process or the continuous-welding ("CW") process. The ERW process is a cold-forming process. The raw material input is steel sheet which has been slit into strips of appropriate width that will be consistent with the diameter of the pipe to be welded. The strips, or "skelp," are formed into a tubular shape by passing them through a series of rollers, which provide the initial shaping into round form, as well as guidance into the welding section (figure I-2).

**Figure I-2**
**Circular welded pipe: Operations to make ERW tubes from steel strip**

Source: AISI, *Steel Products Manual – Steel Specialty Tubular Products*, p. 20.

After the strips have been formed to a tubular shape, the edges are heated by electrical resistance and welded by a combination of heat and pressure. The welding pressure causes some of the metal to be squeezed from the joint, forming a bead of metal on both the inside and outside of the tube. While still in the continuous processing line, the tube is then subjected to post-weld heat treatment, as required. This may involve heat treatment of the welded seam only, or treatment of the entire pipe. After heat treatment, sizing rolls shape the tube to the

---

[30] Unless otherwise noted, this information is based on *Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey, Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534 and 536 (Third Review)*, USITC Publication INV-KK-060 (Staff Report), May 2012, pp. I-32 through I-34.

correct diameter. The product is cooled and then cut at the end of the tube mill by a flying shear or saw, synchronized with the tube's movement so that it is not necessary to stop the process. The ERW process can be used to cover the full range of standard pipe diameters pertinent to these investigations.

In the CW process, the entire strip of steel sheet is heated to approximately 2,450 degrees Fahrenheit in a gas-fired, continuous furnace. As the strip leaves the furnace, a blower is normally furnished to provide a blast of air to raise the temperature of the edges to approximately 2,600 degrees Fahrenheit for welding. The strip is formed into tubular shape by a series of rollers, and the edges are butted together under pressure to form the weld. While still hot, the product may be processed through a stretch reduction mill, which simultaneously reduces the diameter and wall thickness of the pipe. The continuous tube is then cut into predetermined lengths by a flying saw or shear. The CW method can be used to produce pipe up to 4.5 inches in O.D.

Finishing operations on standard pipe and tube may include hydrostatic testing, oiling, and galvanizing. The process of galvanizing involves the application of a zinc coating to steel pipe for protection from atmospheric corrosion. In a hot-dip process of galvanizing, cut lengths of steel pipe are dipped in a bath of molten zinc maintained at a temperature of 820 to 860 degrees Fahrenheit. The combination of the temperature of both the zinc and the steel, as well as the immersion time within the zinc bath, determine the thickness of the coating. The zinc coating may be applied to the outside only, or both the inside and outside of the steel pipe, depending on end-use application and industry specification (*e.g.*, ASTM). In a continuous galvanizing process, the zinc coating may be applied to the outside of the pipe before the steel pipe is cut to length by passing it through a bath of molten zinc.

End finishing may include square cutting, beveling, threading, or grooving. Threaded pipe may be furnished "threaded and coupled," in which case both ends of each length of pipe are threaded and a threaded coupling is applied to one end.

## U.S. tariff treatment

As previously discussed, circular welded pipe is classifiable and imported under the following subheadings of the Harmonized Tariff Schedule of the United States ("HTS"): 7306.30.10 and 7306.30.50. The current general rate of duty for circular pipe and tube is free.

## The definition of the domestic like product

The domestic like product is defined as the domestically produced product or products which are like, or in the absence of like, most similar in characteristics and uses with, the subject merchandise. In its original determinations and its first full five-year review

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

determinations, the Commission defined the domestic like product as all circular welded non-alloy steel pipe and tube not more than 16 inches in outside diameter.[31]

In the second reviews, domestic interested parties urged the Commission to define the domestic like product as it had in the first reviews, no party argued otherwise, and the record did not indicate any changes in the relevant facts. Consequently, the Commission again defined the domestic like product as all circular, welded, non-alloy steel pipe and tube not more than 16 inches in outside diameter.[32]

In the third full five-year reviews, domestic interested parties asked for the same definition as in prior reviews and no party argued for a different definition and the Commission once again defined a single domestic like product consisting of circular, welded, non-alloy steel pipe and tube not more than 16 inches in outside diameter.[33]

In its notice of institution for these reviews, the Commission solicited comments from interested parties regarding what they deemed to be the appropriate definition of the domestic like product. In to their response to the notice of institution, the domestic interested parties agreed with the Commission's definition of the domestic like product as stated in the last five-year reviews. However, domestic interested parties believe the Commission should consider CWP and light walled rectangular pipe and tube in separate reviews.[34] The respondent interested party did not comment on the domestic like product.[35]

## ACTIONS AT COMMERCE

Commerce has not conducted any critical circumstances reviews, or anti-circumvention findings since the completion of the last five-year reviews. In addition, Commerce has not made any duty absorption findings or scope rulings since the imposition of the orders.

### Company revocations

In the original investigation of CWP from India, Commerce excluded two producers of CWP, Zenith Steel Pipes and Industries Ltd. ("Zenith") and Gujarat Steel Tubes Ltd.[36]

[31] *Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey,* USITC Publication 4333, June 2012, pp 9-10.

[32] *Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey,* USITC Publication 4333, June 2012, p 10.

[33] Ibid.

[34] *Domestic Interested Parties' Response to the Notice of Institution,* July 3, 2017, p. 23.

[35] *Respondent Interested Party Response to the Notice of Institution,* July 3, 2017, p. 12.

[36] *Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey,* USITC Publication 4333, June 2012, p I-21.

PUBLIC DOCUMENT

### Changed circumstances reviews

Since the continuation of the last orders, Commerce initiated a changed circumstances review for CWP from Korea. In its preliminary determination, Commerce determined that Hyundai Steel is the successor-in-interest to Hyundai HYSCO.[37]

### Current five-year reviews

Commerce is conducting expedited reviews with respect to all orders subject to these reviews and intends to issue the final results of these reviews based on the facts available not later than October 2, 2017.[38] [39]

## THE INDUSTRY IN THE UNITED STATES

### U.S. producers

Over time, the composition of the domestic circular welded pipe industry has shifted. Allied has consistently accounted for *** of domestic production. However, most of the other large producers from the initial investigations have changed substantially. LTV, formed from the merger of Republic Steel and Jones & McLaughlin Steel, was the *** producer in 1984-85 ***. LTV subsequently entered into bankruptcy, though several of its former mills produce circular welded pipe as Atlas (which acquired LTV's Copperweld division and portions of Maverick's product line after Maverick acquired LTV's Tubular division). U.S. Steel, the *** producer in 1984-85, spun off its Geneva and Fairless Hills facilities to Geneva Steel and Laclede Steel, both sizeable producers that subsequently ceased production. Wheatland, on the other hand, has grown to be the largest producer in the domestic industry, acquiring, consolidating, and ultimately rationalizing the operations of Sawhill Tubular and Sharon Tube.[40]

---

[37] *Circular Welded Non-Alloy Steel Pipe From the Republic of Korea: Initiation and Preliminary Results of Antidumping Duty Changed Circumstances Review,* 81 FR 29842, May 13, 2016.

[38] *Letter from Irene Darzenta Tzafolias, Director, AD/CVD Operations, Enforcement and Compliance, U.S. Department of Commerce to Michael G. Anderson*, August 9, 2017.

[39] In the initial notice of institution, Commerce omitted one of the investigations regarding Taiwan. Commerce issued a correction initiating the review of circular welded non-alloy steel pipe from Taiwan (fourth review) on June 18. *Initiation of Five-Year (Sunset) Review; Correction,* 82 FR 27690, June 16, 2017.

[40] *See* confidential staff reports from the original investigations and subsequent reviews (plant locations and shares of production). See also *Steel: Evaluation of the Effectiveness of Import Relief, Investigation No. TA-204-12*, USITC Publication 3797, September 2005, Chapters CIRCULAR I and II.

During the first reviews, twenty-five firms supplied the Commission with information on their U.S. operations with respect to circular welded pipe,[41] and twenty firms responded during the second reviews.[42] During the third reviews, the Commission obtained data from 17 producers.[43] In all previous reviews, these firms accounted for the vast majority of U.S. production of circular welded pipe during the periods for which data were collected in those reviews. In response to the Commission's notice of institution in this current review, domestic interested parties provided a list of four additional known and currently operating U.S. producers of CWP.[44] [45]

**Definition of the domestic industry and related party issues**

The domestic industry is defined as the U.S. producers as a whole of the domestic like product, or those producers whose collective output of the domestic like product constitutes a major proportion of the total domestic production of the product. Under the related parties provision, the Commission may exclude a related party for purposes of its injury determination if "appropriate circumstances" exist.[46] In its original determination and its prior five-year review determinations, the Commission defined the domestic industry as all U.S. producers of the domestic like product.[47] In the third reviews, three U.S. producers were related to foreign

[41] The responding firms were Allied Tube & Conduit, American Steel Pipe, Bull Moose, California Steel, Century Tube, EXLTUBE, IPSCO Tubulars, Laclede Steel, Leavitt Tube, Lone Star Steel, LTV Tubular, Maruichi American, Maverick Tube, Newport Steel, Northwest Pipe, Parthenon Metal Works, Prudential Steel, Sawhill Tubular, Searing Industries, Sharon Tube, Tex-Tube, USX, Western Tube & Conduit, and Wheatland Tube.

[42] The responding firms were Allied, American, Atlas, Bull Moose, California, Hanna, IPSCO, Laclede, Leavitt, Lone Star, LTV Copperweld, Maruchi, Maverick, Newport, Northwest, Sawhill, Sharon, Stupp, Tex-Tube, U.S. Steel, and Vest.

[43] Since 2006, the U.S. circular welded pipe industry has experienced several mergers and acquisitions, including U.S. Steel's acquisition of Lone Star in 2007 and JMC Steel Group's acquisition of Atlas in 2006 and Sharon Tube in 2007.

[44] *Domestic Interested Parties' Response to the Notice of Institution*, July 3, 2017, p.20.

[45] Zekelman Industries includes the operating divisions of Atlas Tube, Picoma, Energez Tube, Sharon Tube, Wester Tube & Conduit Corporation, Wheatland Tube, and Z Modular.

[46] Section 771(4)(B) of the Tariff Act of 1930, 19 U.S.C. § 1677(4)(B).

[47] *Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea and Taiwan, Inv. Nos. 731-TA-131, 132, and 138 (Final),* USITC Publication 1519, April 1984, pp. 3-4; *Certain Welded Carbon Steel Pipes and Tubes from Turkey and Thailand, Inv. Nos. 701-TA-253 and 731-TA-252 (Final),* USITC Publication 1810, February 1986, pp. 6-7; *Certain Light-Walled Rectangular Pipes and Tubes from Taiwan, Inv. No. 731-TA-410 (Final),* USITC Publication 2169, March 1989, pp. 3-6; *Certain Circular, Welded, Non-Alloy Steel Pipes and Tubes from Brazil, the Republic of Korea, Mexico, Romania, Taiwan, and Venezuela, Inv. Nos. 731-TA-532-537 (Final),* USITC Publication 2564, October 1992, pp. 5-8; *Certain Circular Welded Pipe and Tube from Argentina, Brazil, Canada, India, Korea, Mexico, Singapore, Taiwan, Thailand, Turkey, and Venezuela, Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 276, 277, 409, 410, 532-534, and 536, and 537, (Review)*, USITC Publication 3316, July 2000, pp. 7-16; *Certain Circular*

(*continued*...)

producers of the subject merchandise and one U.S. producer was related to U.S. importers of the subject merchandise. The Commission did not find that appropriate circumstances existed to exclude any firm from the domestic industry pursuant to the related parties provision in any of the previous reviews.[48]

In its notice of institution for these reviews, the Commission solicited comments from interested parties regarding the appropriate definition of the domestic industry and inquired as to whether any related parties issues existed. The domestic interested parties did not cite any potential related parties issues and agreed with the Commission's prior definition of the domestic industry.[49]

### U.S. producers' trade and financial data

The Commission asked domestic interested parties to provide trade and financial data in their response to the notice of institution of the current five-year reviews.[50] Table I-4 presents a compilation of the data submitted from all responding U.S. producers as well as trade and financial data submitted by U.S. producers in the prior five-year reviews.[51]

**Table I-4**
**CWP: Trade and financial data submitted by U.S. producers, 2001, 2006, 2011, and 2016**

* * * * * * *

## U.S. IMPORTS AND APPARENT U. S. CONSUMPTION

### U.S. importers

In the first full five-year reviews, 43 U.S. importing firms supplied the Commission with usable information on their operations involving the importation of CWP, and 34 firms provided usable data in the second full five-year reviews, accounting for over 50 percent of subject imports, based on official Commerce statistics, over the period for which data were collected.

(…*continued*)
*Welded Pipe and Tube from Argentina, Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey, Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 409, 410, 532-534, and 536, (Second Review)*, USITC Publication 3867, July 2006, pp. 6-7; *Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey, Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534, and 536, (Third Review)*, USITC Publication 4333, June 2012, pp. 9-10.

[48] *Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey, Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534, and 536, (Third Review)*, USITC Publication 4333, June 2012, pp. 10-11.

[49] *Domestic Interested Parties' Response to the Notice of Institution,* July 3, 2017, p. 23.

[50] Individual company trade and financial data are presented in app. B.

[51] Final investigation data are not presented due to the aligning of four original investigations with differing final investigation years. These data are available in Appendix C.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

In the third full five-year reviews, usable questionnaire responses were received from 21 companies, representing over one-half of total subject imports over the period for which data were collected, based on official Commerce statistics.[52] The domestic interested parties provided a list of 22 potential U.S. importers of CWP.[53]

## U.S. imports

Table I-5 presents the quantity, value, and unit value for imports from subject countries as well as the other top sources of U.S. imports. Subject imports have remained present in the U.S. market throughout the period under review and have remained relatively consistent with the exception of a spike in subject imports from all countries under review except Brazil in 2015. The majority of imports of CWP are from non-subject countries, mainly due to the imports from Canada.

**Table I-5**
**CWP: U.S. imports, 2012-16**

| Item | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| | Quantity (Short Tons) | | | | |
| Brazil (subject) | 1,225 | 1,620 | 201 | 296 | 310 |
| India (subject) | *** | *** | *** | *** | *** |
| Korea (subject) | 56,510 | 56,787 | 43,944 | 61,428 | 87,668 |
| Mexico (subject) | 66,490 | 65,357 | 57,765 | 61,369 | 61,038 |
| Taiwan (subject) | 2,910 | 617 | 2,814 | 13,765 | 14,487 |
| Thailand (subject) | 115,190 | 43,968 | 43,133 | 60,116 | 58,348 |
| Turkey (subject) | 67,266 | 51,670 | 61,772 | 110,562 | 50,293 |
| Total subject imports | *** | *** | *** | *** | *** |
| Canada | 222,133 | 229,658 | 228,769 | 227,590 | 224,144 |
| China | 3,778 | 5,044 | 6,368 | 24,012 | 86,740 |
| India (nonsubject) | *** | *** | *** | *** | *** |
| United Arab Emirates | 40,235 | 44,726 | 76,365 | 108,401 | 52,872 |
| Vietnam | 42,156 | 65,445 | 60,546 | 83,393 | 59,089 |
| All other imports (nonsubject) | 167,636 | 120,247 | 126,177 | 126,826 | 88,869 |
| Total nonsubject imports | *** | *** | *** | *** | *** |
| Total imports | 788,736 | 694,752 | 714,232 | 890,445 | 799,268 |

Table continued on next page.

[52] *Investigation Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534, and 536, (Third Review): Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey—Staff Report,* INV-KK-060, May 29, 2012, p. I-39

[53] *Domestic Interested Parties' Response to the Notice of Institution,* July, 3, 2017, p. 21.

**Table I-5--Continued**
**CWP: U.S. imports, 2012-16**

| Item | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| | Landed, duty-paid value ($1,000) | | | | |
| Brazil (subject) | 978 | 501 | 392 | 841 | 1,196 |
| India (subject) | *** | *** | *** | *** | *** |
| Korea (subject) | 61,104 | 54,737 | 43,944 | 50,608 | 53,583 |
| Mexico (subject) | 59,874 | 57,770 | 53,053 | 48,698 | 49,114 |
| Taiwan (subject) | 3,754 | 974 | 2,507 | 11,687 | 8,511 |
| Thailand (subject) | 110,495 | 38,552 | 37,189 | 49,398 | 32,953 |
| Turkey (subject) | 62,282 | 43,225 | 52,319 | 81,516 | 31,231 |
| Total subject imports | *** | *** | *** | *** | *** |
| Canada | 254,513 | 267,081 | 273,833 | 250,646 | 240,126 |
| China | 5,805 | 7,020 | 9,825 | 32,467 | 105,714 |
| India (nonsubject) | *** | *** | *** | *** | *** |
| United Arab Emirates | 37,962 | 39,850 | 64,867 | 84,767 | 32,346 |
| Vietnam | 37,565 | 54,033 | 48,261 | 60,894 | 37,445 |
| All other imports (nonsubject) | 190,662 | 132,387 | 129,675 | 125,589 | 84,828 |
| Total nonsubject imports | *** | *** | *** | *** | *** |
| Total imports | 828,320 | 705,196 | 722,300 | 807,843 | 687,593 |
| | Unit value (dollars per short tons) | | | | |
| Brazil (subject) | 797.91 | 309.45 | 1,949.31 | 2,838.91 | 3,854.93 |
| India (subject) | *** | *** | *** | *** | *** |
| Korea (subject) | 1,081.28 | 963.91 | 1,000.00 | 823.85 | 611.20 |
| Mexico (subject) | 900.49 | 883.91 | 918.44 | 793.53 | 804.65 |
| Taiwan (subject) | 1,289.80 | 1,577.10 | 890.97 | 849.05 | 587.49 |
| Thailand (subject) | 959.24 | 876.83 | 862.19 | 821.70 | 564.77 |
| Turkey (subject) | 925.91 | 836.57 | 846.97 | 737.29 | 620.97 |
| Total subject imports | *** | *** | *** | *** | *** |
| Canada | 1,145.77 | 1,162.95 | 1,196.99 | 1,101.31 | 1,071.30 |
| China | 1,536.57 | 1,391.88 | 1,542.92 | 1,352.13 | 1,218.74 |
| India (nonsubject) | *** | *** | *** | *** | *** |
| United Arab Emirates | 943.50 | 890.98 | 849.44 | 781.97 | 611.78 |
| Vietnam | 891.10 | 825.62 | 797.10 | 730.21 | 633.72 |
| All other imports (nonsubject) | 1,137.36 | 1,100.95 | 1,027.72 | 990.25 | 954.53 |
| Total nonsubject imports | *** | *** | *** | *** | *** |
| Total imports | 1,050.19 | 1,015.03 | 1,011.30 | 907.24 | 860.28 |

Note.--Because of rounding, figure may not add to total shown.
Source: Official statistics of Commerce and confidential Customs data for HTS statistical reporting numbers
7306.30.1000, 7306.30.5025, 7306.30.5032, 7306.30.5040, 7306.30.5055, 7306.30.5085, 7306.30.5090.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

## Apparent U.S. consumption and market shares

Table I-6 presents data on U.S. producers' U.S. shipments, U.S. imports, and apparent U.S. consumption, while table I-7 presents data on U.S. market shares of U.S. apparent consumption. Imports from subject countries continued to enter the U.S. market since the imposition of the original orders. Concurrently, U.S. producers' U.S. shipments continued to decline, and in 2016 were over one million short tons lower than during the first full five-year reviews. Subject imports have been declining since the imposition of the orders, however non-subject imports have remained prevalent and growing, accounting for 37.4 percent of apparent U.S. consumption, compared to the U.S. producers' share of 49.4 percent.

**Table I-6**
**CWP: U.S. producers' U.S. shipments, U.S. imports, and apparent U.S. consumption, 2001, 2006, 2011, and 2016**

| Item | 2001 | 2006 | 2011 | 2016 |
|---|---|---|---|---|
| | Quantity (Short Tons) | | | |
| U.S. producers' U.S. shipments | 1,674,000 | 1,230,000 | 966,000 | 671,581 |
| U.S. imports from— | | | | |
| Brazil (subject) | 0 | 1,000 | 401 | 310 |
| India (subject) | *** | *** | *** | *** |
| Korea (subject) | 218,000 | 44,000 | 48,054 | 87,668 |
| Mexico (subject) | 1,000 | 75,000 | 66,017 | 61,038 |
| Taiwan (subject) | 7,000 | 43,000 | 22,966 | 14,487 |
| Thailand (subject) | 62,000 | 78,000 | 47,696 | 58,348 |
| Turkey (subject) | 5,000 | 32,000 | 31,723 | 50,293 |
| Total subject imports | *** | *** | *** | *** |
| All other | *** | *** | *** | *** |
| Total imports | 843,306 | 1,180,000 | 506,620 | 783,303 |
| Apparent U.S. consumption | 2,517,306 | 2,410,000 | 1,472,620 | 1,454,884 |

Table continued on next page.

**Table I-6--Continued**
**CWP: U.S. producers' U.S. shipments, U.S. imports, and apparent U.S. consumption, 2001, 2006, 2011, and 2016**

| Item | 2001 | 2006 | 2011 | 2016 |
|---|---|---|---|---|
| | Value (1,000 dollars) | | | |
| U.S. producers' U.S. shipments | 892,797 | 1,216,918 | 1,043,584 | 561,767 |
| U.S. imports from— | | | | |
| Brazil (subject) | 0 | 841 | 1,041 | 1,196 |
| India (subject) | *** | *** | *** | *** |
| Korea (subject) | 82,564 | 35,399 | 51,190 | 53,583 |
| Mexico (subject) | 783 | 61,461 | 63,670 | 49,114 |
| Taiwan (subject) | 2,468 | 26,302 | 20,989 | 8,511 |
| Thailand (subject) | 26,622 | 52,738 | 46,507 | 32,953 |
| Turkey (subject) | 1,863 | 21,087 | 30,124 | 31,231 |
| Total subject imports | *** | *** | *** | *** |
| All other | *** | *** | *** | *** |
| Total imports | 373,422 | 741,190 | 505,746 | 687,593 |
| Apparent U.S. consumption | 1,266,219 | 1,958,108 | 1,549,330 | 1,249,360 |

Source: For the years 2001, 2006, and 2011, data are compiled using data submitted in the Commission's prior five-year reviews. *See app. C*. For the year 2016, U.S. producers' U.S. shipments are compiled from the domestic interested parties' response to the Commission's notice of institution and U.S. imports are compiled using official Commerce statistics and confidential Customs data under HTS numbers 7306.30.1000, 7306.30.5025, 7306.30.5032, 7306.30.5040, 7306.30.5055, 7306.30.5085, 7306.30.5090.

**Table I-7**
**CWP: Apparent U.S. consumption and U.S. market shares, 2001, 2006, 2011, and 2016**

| Item | 2001 | 2006 | 2011 | 2016 |
|---|---|---|---|---|
| | **Quantity (Short Tons)** | | | |
| Apparent U.S. consumption | 2,517,306 | 2,410,000 | 1,472,620 | 1,454,884 |
| | **Value (*1,000 dollars*)** | | | |
| Apparent U.S. consumption | 1,266,219 | 1,958,108 | 1,549,330 | 1,249,360 |
| | **Share of consumption based on quantity (*percent*)** | | | |
| U.S. producer's share | 66.5 | 51.0 | 65.6 | 46.2 |
| U.S. imports from-- | | | | |
| Brazil (subject) | 0.0 | 0.04 | 0.03 | 0.0 |
| India (subject) | *** | *** | *** | *** |
| Korea (subject) | 8.66 | 1.83 | 3.26 | 6.0 |
| Mexico (subject) | 0.04 | 3.11 | 4.48 | 4.2 |
| Taiwan (subject) | 0.28 | 1.78 | 1.56 | 1.0 |
| Thailand (subject) | 2.46 | 3.24 | 3.24 | 4.0 |
| Turkey (subject) | 0.20 | 1.33 | 2.15 | 3.5 |
| Total subject imports | *** | *** | *** | *** |
| All other | *** | *** | *** | *** |
| Total imports | 33.50 | 48.96 | 34.4 | 53.8 |
| | **Share of consumption based on value (*percent*)** | | | |
| U.S. producer's share | 70.5 | 62.1 | 67.4 | 45.0 |
| U.S. imports from-- | | | | |
| Brazil (subject) | 0.0 | 0.0 | 0.1 | 0.1 |
| India (subject) | *** | *** | *** | *** |
| Korea (subject) | 6.5 | 1.8 | 3.3 | 4.3 |
| Mexico (subject) | 0.1 | 3.1 | 4.1 | 3.9 |
| Taiwan (subject) | 0.2 | 1.3 | 1.4 | 0.7 |
| Thailand (subject) | 2.1 | 2.7 | 3.0 | 2.6 |
| Turkey (subject) | 0.1 | 1.1 | 1.9 | 2.5 |
| Total subject imports | *** | *** | *** | *** |
| All other | *** | *** | *** | *** |
| Total imports | 29.5 | 37.9 | 32.6 | 55.0 |

Source: For the years 2001, 2006, and 2011, data are compiled using data submitted in the Commission's prior five-year reviews. *See app. C*. For the year 2016, U.S. producers' U.S. shipments are compiled from the domestic interested parties' response to the Commission's notice of institution and U.S. imports are compiled using official Commerce statistics and confidential Customs data under HTS numbers 7306.30.1000, 7306.30.5025, 7306.30.5032, 7306.30.5040, 7306.30.5055, 7306.30.5085, 7306.30.5090.

## CUMULATION CONSIDERATIONS

In assessing whether imports should be cumulated, the Commission determines whether U.S. imports from the subject countries compete with each other and with the domestic like product and has generally considered four factors: (1) fungibility, (2) presence of sales or offers to sell in the same geographical markets, (3) common or similar channels of distribution, and (4) simultaneous presence in the market. Additional information concerning geographical markets and simultaneous presence in the market is presented below.[54]

Imports of CWP from Brazil entered the United States in 42 out of the 60 months under review. The two highest months of imports from Brazil in terms of quantity were September 2012 and February of 2013 at 593 and 586 short tons respectively. In 2016, imports from Brazil entered the United States in every month except January, peaking at 48 short tons in April, followed by May at 44 short tons and December at 42 short tons. Imports of CWP from India entered the United States in 59 out of the 60 months under review. Quantity of imports from India exceeded *** short tons in 16 of those months, and reached *** in March of 2015 and *** short tons in September of 2016. Imports of CWP from Korea entered the United States in all 60 of the months under review. All 60 months saw import levels above 1,000 short tons, and three months saw imports above 10,000 short tons, with 11,111 short tons entering the United States in May 2013, 10,235 short tons entering the United States in June 2015, and 10,290 short tons entering the United States from Korea in August 2016. Imports of CWP from Mexico entered the United States in all 60 of the months under review. Import levels remained relatively consistent over the period, with the lowest level of imports in August 2015 at 3,064 short tons and the highest level in April 2016 at 7,418 short tons. Imports of CWP from Taiwan entered the United States in 58 out of the 60 months under review, with 13 months seeing imports above 1,000 short tons, concentrating in the second half of both 2015 and 2016. December 2016 saw the highest levels of imports at 3,679 short tons followed by March 2015 at 2,274 short tons. Imports of CWP from Thailand entered the United States in 56 of the 60 months under review. Import levels varied widely, with 11 months seeing imports over 10,000 short tons and 19 months seeing import levels less than 1,000 short tons, including 4 months with no imports of CWP from Thailand. September 2012 saw the largest amount of imports from Thailand at 18,391 short tons, followed closely by May 2015 at 18,147 short tons and June 2012 at 18,024 short tons. Imports of CWP from Turkey entered the United States in 58 of the 60 months under review. Similarly to Thailand, import volumes varied widely, with 19,899 short tons entering the United States from Turkey in January 2015 while 1 short ton entered the United States in November, 2013 and March and June 2013 saw no imports from Turkey.

Subject imports entered the United States across all four borders of entry, however imports from Brazil did not enter through the West coast. The largest entry districts for imports for CWP from Brazil in 2016 were New York, New York and Chicago, Illinois. The largest entry

---

[54] In addition, available information concerning subject country producers and the global market is presented in the next section of this report.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

districts for imports of CWP from India in 2016 were Houston-Galveston, Texas, followed by Savannah, Georgia; and Chicago, Illinois. The largest entry districts for imports of CWP from Korea in 2016 were Los Angeles, California, followed by Houston-Galveston, Texas; Mobile, Alabama; Columbia-Snake, Oregon; Tampa, Florida; and Seattle, Washington, The largest entry districts for imports of CWP from Mexico in 2016 were Laredo, Texas, followed by San Juan, Puerto Rico. The largest entry districts for imports of CWP from Taiwan in 2016 were Los Angeles, California, followed by Houston-Galveston, Texas; Philadelphia, Pennsylvania; and Savannah, Georgia. The largest entry districts for imports of CWP from Thailand in 2016 were Houston-Galveston, Texas, followed by Los Angeles, California; Tampa, Florida; Seattle, Washington; and San Francisco, California. The largest entry districts for imports of CWP from Turkey in 2016 were Houston-Galveston, Texas; followed by Baltimore, Maryland; Philadelphia, Pennsylvania; and Savannah, Georgia.

## THE INDUSTRY IN BRAZIL

During the final phase of the original investigations, the Commission received foreign producer/exporter questionnaires from three firms, which accounted for approximately *** percent of production of CWP from Brazil during 1989-1991, and 17 and 34 percent of exports from Brazil to the United States of CWP. During the first five-year reviews, the Commission tried to send questionnaires to three possible CWP producers in Brazil. Of the two firms to which it was able to transmit the questionnaire, one did not respond and one reported that it did not produce the product. In the second five-year reviews, the Commission transmitted questionnaires to ten possible producers of CWP, but none provided questionnaire responses. In the third five-year review, the Commission sent questionnaires to ten firms in Brazil identified as possible producers of CWP according to parties' responses to the notice of institution, proprietary Customs data, and Commerce notices. None of the firms provided data on CWP operations and one firm provided a response indicating that it did not produce or export CWP to the United States. [55]

Table I-8 presents data on exports of CWP from Brazil to leading foreign markets during 2012-16. The United States was the seventh largest export destination for CWP from Brazil and accounted for 2.6 percent of Brazil's CWP exports in 2016. Paraguay, Argentina, and Uruguay were the three largest export destinations for CWP from Brazil and accounted for 22.9, 21.5, and 19.8 percent of CWP exports in 2016, respectively. Brazil's exports of CWP increased from 2012 to 2013 before declining 42.0 percent during 2013-16.

---

[55] *Investigation Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534, and 536, (Third Review): Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey—Staff Report,* INV-KK-060, May 29, 2012 p. IV-18

**Table I-8**
**CWP: Exports of CWP from Brazil, by destination, 2012-16**

| Item | Calendar year | | | | |
|---|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 | 2016 |
| | Quantity (short tons) | | | | |
| Paraguay | 3,030 | 5,039 | 2,561 | 3,337 | 2,871 |
| Argentina | 5,049 | 5,960 | 4,872 | 3,201 | 2,689 |
| Uruguay | 2,564 | 2,272 | 1,875 | 1,972 | 2,480 |
| Bolivia | 868 | 1,884 | 4,144 | 3,585 | 1,682 |
| Mexico | 1,243 | 1,077 | 978 | 825 | 1,048 |
| Angola | 643 | 2,236 | 1,791 | 1,190 | 983 |
| United States | 1,534 | 1,210 | 204 | 329 | 328 |
| Ghana | 0 | 1 | 16 | 0 | 110 |
| Colombia | 535 | 342 | 84 | 98 | 102 |
| Canada | 16 | 20 | 0 | 0 | 82 |
| All other | 2,572 | 1,558 | 638 | 1,274 | 146 |
| Total | 18,054 | 21,599 | 17,163 | 15,810 | 12,521 |
| | Value (1,000 dollars) | | | | |
| Argentina | 11,274 | 11,439 | 10,409 | 5,749 | 4,259 |
| Paraguay | 3,651 | 6,095 | 2,692 | 3,431 | 2,762 |
| Angola | 1,673 | 4,675 | 3,810 | 2,192 | 2,546 |
| Mexico | 3,471 | 2,775 | 2,128 | 1,436 | 1,672 |
| Uruguay | 2,641 | 2,215 | 1,683 | 1,467 | 1,439 |
| Bolivia | 1,032 | 1,942 | 3,911 | 3,006 | 1,185 |
| United States | 2,758 | 1,926 | 361 | 944 | 1,153 |
| Ghana | - | 1 | 46 | 0 | 597 |
| Colombia | 1,627 | 1,064 | 490 | 279 | 409 |
| Canada | 44 | 59 | 0 | - | 201 |
| All other | 8,899 | 5,024 | 2,720 | 1,810 | 549 |
| Total | 37,070 | 37,216 | 28,248 | 20,314 | 16,771 |

Note.--Because of rounding, figures may not add to totals shown.

Source: Global Trade Information Services, Inc., Global Trade Atlas, HTS subheading 7306.30.These data may be overstated as HTS 7306.30 may contain products outside the scope of this review.

## THE INDUSTRY IN INDIA

During the final phase of the original investigations, the Commission received foreign producer/exporter questionnaires from two firms, which accounted for the majority of production of subject CWP from India during 1985, and approximately *** percent of exports from India to the United States of CWP during 1985. Two firms (Zenith and Gujarat) were excluded from the order by Commerce. In the first five-year reviews, U.S. producers identified at least three producers of CWP (and industry publication and questionnaire data identified an estimated 40 pipe producers) in India of which one (***) provided responses to the Commission's questionnaire. *** reported *** exports of CWP to the United States between January 1997 and September 1999. In the second reviews, there were an estimated 46 steel tube producers in India, of which one (Tata Group, Steel Tubes division) provided questionnaire data. Tata reported *** exports of CWP to the United States during 1999-2005. In the third full five-year reviews, the Commission sent questionnaires to ten firms in India identified as possible producers of CWP according to parties' responses to the notice of institution, proprietary Customs data, and Commerce notices. None of the firms provided data on CWP operations. [56]

Table I-9 presents data on exports of CWP from India to leading foreign markets during 2012-16. The United Arab Emirates, Belgium, and the United Kingdom were the three largest export destinations by quantity for CWP from India and accounted for 19.9 percent, 10.7 percent, and 10.1 percent of CWP exports in 2016, respectively. India's exports of CWP increased 122.3 percent from 2012 to 2014 before declining in 2015 and 2016 by 6.2 percent and 9.3 percent respectively.

[56] *Investigation Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534, and 536, (Third Review): Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey—Staff Report,* INV-KK-060, May 29, 2012 p. IV-22

**Table I-9**
**CWP: Exports of CWP from India, by destination, 2012-16**

| Item | Calendar year | | | | |
|---|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 | 2016 |
| | Quantity (short tons) | | | | |
| United Arab Emirates | 14,803 | 35,838 | 42,063 | 57,334 | 41,600 |
| Belgium | 10,756 | 28,182 | 25,920 | 24,293 | 22,354 |
| United Kingdom | 6,142 | 39,142 | 49,150 | 19,893 | 21,078 |
| Ethiopia | 12,018 | 6,471 | 6,017 | 7,706 | 17,835 |
| Germany | 4,979 | 8,230 | 9,888 | 9,675 | 17,199 |
| Qatar | 6,119 | 10,495 | 11,550 | 14,719 | 16,165 |
| Australia | 3,657 | 11,940 | 23,235 | 21,322 | 10,577 |
| Netherlands | 5,197 | 2,585 | 13,100 | 8,908 | 10,289 |
| Egypt | - | 74 | 2,965 | 15,168 | 7,596 |
| Sri Lanka | 9,579 | 10,139 | 5,786 | 6,405 | 5,183 |
| All other | 37,396 | 72,451 | 56,239 | 45,186 | 39,391 |
| Total | 110,646 | 225,547 | 245,913 | 230,610 | 209,268 |
| | Value (1,000 dollars) | | | | |
| United Arab Emirates | 11,740 | 27,594 | 31,933 | 39,529 | 25,074 |
| Belgium | 8,469 | 21,114 | 17,661 | 15,437 | 11,702 |
| United Kingdom | 4,609 | 27,709 | 35,546 | 12,756 | 11,261 |
| Ethiopia | 11,165 | 8,260 | 4,465 | 4,969 | 10,795 |
| Qatar | 4,902 | 7,622 | 8,353 | 9,777 | 9,155 |
| Germany | 3,661 | 6,163 | 7,153 | 6,013 | 8,486 |
| Australia | 2,918 | 8,980 | 18,139 | 14,118 | 6,228 |
| Egypt | - | 74 | 3,152 | 4,947 | 5,673 |
| Netherlands | 4,242 | 2,151 | 5,857 | 5,957 | 5,474 |
| Niger | 50 | - | - | 2,354 | 3,603 |
| All other | 40,354 | 55,224 | 51,667 | 36,585 | 32,616 |
| Total | 92,111 | 164,890 | 183,926 | 152,443 | 130,068 |

Note.--Because of rounding, figures may not add to totals shown.

Source: Global Trade Information Services, Inc., Global Trade Atlas, HTS subheading 7306.30. These data may be overstated as HTS 7306.30 may contain products outside the scope of this review.

## THE INDUSTRY IN KOREA

During the final phase of the original investigations, the Commission received foreign producer/exporter questionnaires from five firms, which accounted for *** of production and exports to the United States of CWP from Korea during 1989-91. During the first five-year reviews, industry publications estimated 15 firms produced CWP in Korea, of which nine provided questionnaire responses. These pipe producers exported between *** percent of their total CWP shipments to the United States during 1997-98. In the second five-year reviews, the Commission sent questionnaires to 25 possible producers of CWP in Korea and received one response (Husteel). The firm exported between *** percent of total CWP shipments to the United States during 1999-2005. During the third full five-year reivews, the Commission sent questionnaires to ten firms in Korea identified as possible producers of CWP according to parties' responses to the notice of institution, proprietary Customs data, and Commerce notices. None of the firms provided data on CWP operations. [57]

Table I-10 presents data on exports of CWP from South Korea to leading foreign markets during 2012-16. The United States was the largest export destination by quantity for CWP exports from South Korea and accounted for 31.9 percent of South Korean exports in 2016. Other major export destinations for CWP exports from South Korea included Japan and China, accounting for 26.3 percent and 8.3 percent of South Korean exports in 2016, respectively. South Korea's exports of CWP increased from 2012 to 2013, decreased from 2013 to 2015, and increased 26.7 percent from 2015 to 2016.

[57] *Investigation Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534, and 536, (Third Review): Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey—Staff Report,* INV-KK-060, May 29, 2012 pp. IV-27-28

PUBLIC DOCUMENT
Barcode:3883995-08 A-549-502 SCO - Scope Inquiry - Line Pipe

**Table I-10**
**CWP: Exports of CWP from Korea, by destination, 2012-16**

| Item | Calendar year | | | | |
|---|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 | 2016 |
| | Quantity (short tons) | | | | |
| United States | 108,983 | 104,061 | 121,516 | 76,598 | 143,341 |
| Japan | 119,144 | 125,409 | 157,850 | 127,639 | 118,142 |
| China | 29,439 | 30,818 | 23,095 | 27,320 | 37,303 |
| Hong Kong | 16,924 | 14,561 | 21,236 | 29,741 | 20,810 |
| Mexico | 13,228 | 15,964 | 7,955 | 9,420 | 14,789 |
| United Arab Emirates | 3,708 | 4,997 | 6,562 | 9,933 | 11,537 |
| Malaysia | 1,770 | 2,288 | 2,983 | 1,815 | 9,277 |
| Thailand | 11,199 | 9,486 | 10,259 | 9,150 | 9,168 |
| Canada | 6,480 | 5,801 | 3,804 | 1,998 | 8,933 |
| India | 2,220 | 4,202 | 4,776 | 4,551 | 7,062 |
| All other | 91,938 | 133,260 | 71,306 | 56,707 | 69,392 |
| Total | 405,031 | 450,848 | 431,343 | 354,872 | 449,754 |
| | Value (1,000 dollars) | | | | |
| United States | 107,004 | 90,605 | 113,281 | 57,432 | 92,003 |
| Japan | 115,060 | 98,504 | 122,207 | 82,565 | 73,699 |
| China | 45,385 | 46,957 | 30,202 | 29,157 | 33,422 |
| Venezuela | - | 385 | 14 | 10,145 | 23,145 |
| Mexico | 19,814 | 18,662 | 12,798 | 16,057 | 18,572 |
| United Arab Emirates | 5,601 | 5,272 | 13,650 | 11,848 | 16,930 |
| Hong Kong | 14,781 | 11,325 | 15,860 | 20,120 | 11,595 |
| India | 3,755 | 6,000 | 7,777 | 7,319 | 9,298 |
| Thailand | 13,234 | 10,172 | 9,939 | 8,749 | 7,442 |
| Canada | 8,175 | 6,356 | 4,113 | 1,477 | 4,754 |
| All other | 100,227 | 130,997 | 85,539 | 64,450 | 65,843 |
| Total | 433,036 | 425,236 | 415,379 | 309,321 | 356,702 |

Notes continued on next page.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

**Table I-10--Cointinued**
**CWP: Exports of CWP from Korea, by destination, 2012-16**

Note.--Because of rounding, figures may not add to totals shown.

Source: Global Trade Information Services, Inc., Global Trade Atlas, HTS subheading 7306.30. These data may be overstated as HTS 7306.30 may contain products outside the scope of this review.

## THE INDUSTRY IN MEXICO

During the final phase of the original investigations, the Commission received foreign producer/exporter questionnaires from three firms, which accounted for *** of production and exports of CWP from Mexico during 1989-91. During the first five-year reviews, there were an estimated twenty producers of CWP in Mexico. Two producers of CWP responded to the Commission's questionnaire (Hylsa and Tuberia Nacional). These producers exported between *** percent of their total CWP shipments to the United States during 1997-98. In the second five-year reviews, the Commission sent questionnaires to 54 possible producers of CWP in Mexico, of which three producers provided data (Hylsa, Productos Laminados de Monterrer, and Tuberia Nacional). These producers exported between *** percent of their total CWP shipments to the United States during 1999-2005. In the third full five-year reviews, the Commission sent questionnaires to ten firms in Mexico identified as possible producers of CWP according to parties' responses to the notice of institution, proprietary Customs data, and Commerce notices. Three firms ***, provided questionnaire responses indicating that they did not produce or export CWP to the United States at any time since January 1, 2006. One firm, Conduit, S.A. de C.V. provided data on its CWP operations. Conduit estimated that it accounted for *** percent of total production of CWP in Mexico and *** percent of total exports of CWP to the United States in 2011. Conduit reported that ***.[58]

Table I-11 presents data on exports of CWP from Mexico to leading foreign markets during 2012-16. The United States was the largest export destination for CWP exports from Mexico in terms of quantity, and accounted for 91.1 percent of Mexico's CWP exports in 2016. Mexico's exports of CWP to the United States declined 13.1 percent during 2012-16, while total CWP exports fluctuated year to year during the review period.

---

[58] *Investigation Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534, and 536, (Third Review): Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey—Staff Report,* INV-KK-060, May 29, 2012 pp. IV-31-32

Barcode:3883995-08 A-549-502 SCO - Scope Inquiry - Line Pipe

**Table I-11**
**CWP: Exports of CWP from Mexico, by destination, 2012-16**

| Item | Calendar year | | | | |
|---|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 | 2016 |
| | Quantity (short tons) | | | | |
| United States | 101,770 | 98,543 | 89,633 | 88,786 | 88,407 |
| Costa Rica | 3,677 | 4,938 | 3,972 | 3,920 | 2,729 |
| Guatemala | 788 | 1,113 | 558 | 1,790 | 1,296 |
| Brazil | 48 | 1 | 19 | 1,568 | 1,247 |
| Colombia | 261 | 1,378 | 1,631 | 1,165 | 623 |
| Honduras | 51 | 336 | 625 | 526 | 549 |
| Panama | 125 | 67 | 423 | 473 | 541 |
| Nicaragua | - | 144 | 419 | 523 | 465 |
| Cuba | 79 | 4 | 17 | 960 | 297 |
| Belize | 65 | 115 | 146 | 103 | 190 |
| All other | 1,647 | 2,298 | 2,276 | 501 | 667 |
| Total | 108,510 | 108,935 | 99,719 | 100,315 | 97,012 |
| | Value (1,000 dollars) | | | | |
| United States | 100,200 | 116,672 | 90,839 | 77,667 | 79,042 |
| Guatemala | 1,006 | 1,217 | 894 | 2,879 | 6,997 |
| Costa Rica | 3,567 | 4,433 | 3,890 | 3,662 | 3,009 |
| Brazil | 110 | 20 | 38 | 2,673 | 1,932 |
| Colombia | 348 | 1,617 | 2,058 | 1,330 | 703 |
| Honduras | 83 | 407 | 797 | 638 | 686 |
| Panama | 273 | 96 | 534 | 493 | 626 |
| Nicaragua | - | 177 | 719 | 606 | 532 |
| Cuba | 128 | 6 | 33 | 1,681 | 479 |
| China | 4 | 1,768 | 3,305 | 156 | 287 |
| All other | 2,827 | 2,434 | 1,235 | 766 | 1,093 |
| Total | 108,547 | 128,846 | 104,341 | 92,551 | 95,386 |

Note.--Because of rounding, figures may not add to totals shown.

Source: Global Trade Information Services, Inc., Global Trade Atlas, HTS subheading 7306.30. These data may be overstated as HTS 7306.30 may contain products outside the scope of this review.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

## THE INDUSTRY IN TAIWAN

During the final phase of the original investigations concerning small-diameter pipes, the Commission received foreign producer/exporter questionnaires from three firms, which accounted for approximately 95 percent of exports of CWP from Taiwan during 1981-83. In the original investigations on certain circular welded non-alloy steel pipes and tubes from Taiwan, which applies to large-diameter pipes, the Commission received foreign producer/exporter questionnaires from three firms, which accounted for approximately *** percent of total exports to the United States in 1991. During the first five-year reviews, the Commission sent questionnaires to three possible producers of CWP in Taiwan, none of which provided responses. In the second five-year reviews, the Commission sent questionnaires to 11 possible producers of CWP in Taiwan, none of which provided responses. In the third full five-year reviews, the Commission sent questionnaires to ten firms in Taiwan identified as possible producers of CWP according to parties' responses to the notice of institution, proprietary Customs data, and Commerce notices. One firm, Tension Steel Industries Co., Ltd., provided data on its CWP operations. Tension Steel did not provide an estimate of the share of total production of CWP in Taiwan for which it accounted, but estimated that the firm's exports accounted for *** percent of total exports of CWP to the United States in 2011. Tension Steel reported that its production capacity was limited by the scale of machinery and equipment.[59]

Table I-12 presents data on exports of CWP from Taiwan to leading foreign markets during 2012-16. The United States is the largest export destination of CWP from Taiwan. In 2012, exports to the United States accounted for 7.6 percent of Taiwan's total CWP exports, and increased to 44.4 percent in 2016. Other major export destinations for CWP from Taiwan included Japan and Vietnam, which accounted for 13.8 percent and 8.5 percent of CWP exports in 2016, respectively. Total CWP exports fluctuated year to year during the review period.

[59] *Investigation Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534, and 536, (Third Review): Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey—Staff Report,* INV-KK-060, May 29, 2012 pp.IV-37-38

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

PUBLIC DOCUMENT
Barcode:3883995-08 A-549-502 SCO - Scope Inquiry - Line Pipe

**Table I-12**
**CWP: Exports of CWP from Taiwan, by destination, 2012-16**

| Item | Calendar year | | | | |
|---|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 | 2016 |
| | Quantity (short tons) | | | | |
| United States | 3,321 | 2,264 | 1,972 | 10,875 | 21,633 |
| Japan | 6,246 | 5,416 | 9,577 | 5,570 | 6,711 |
| Vietnam | 5,386 | 4,168 | 6,417 | 5,207 | 4,130 |
| Thailand | 5,408 | 4,045 | 3,289 | 3,246 | 3,610 |
| China | 3,147 | 3,641 | 3,579 | 3,355 | 3,277 |
| Indonesia | 1,354 | 1,603 | 1,366 | 1,222 | 1,239 |
| New Zealand | - | 67 | 519 | 753 | 1,049 |
| Korea South | 20 | - | 304 | 966 | 875 |
| Mexico | - | - | - | 326 | 750 |
| Belgium | - | 98 | 301 | 345 | 677 |
| All other | 18,789 | 15,160 | 19,074 | 7,036 | 4,747 |
| Total | 43,670 | 36,462 | 46,398 | 38,903 | 48,698 |
| | Value (1,000 dollars) | | | | |
| United States | 3,503 | 2,066 | 1,768 | 7,844 | 11,402 |
| Japan | 5,468 | 4,238 | 7,684 | 4,417 | 4,410 |
| China | 4,448 | 4,365 | 4,506 | 4,532 | 4,303 |
| Vietnam | 5,386 | 4,194 | 6,644 | 4,688 | 3,724 |
| Thailand | 5,529 | 4,283 | 3,534 | 3,101 | 3,249 |
| Indonesia | 1,904 | 2,284 | 1,994 | 1,709 | 1,555 |
| Korea South | 34 | - | 482 | 1,442 | 1,293 |
| Mexico | - | - | - | 497 | 1,110 |
| Pakistan | 624 | 620 | 877 | 880 | 974 |
| Belgium | - | 189 | 589 | 570 | 934 |
| All other | 17,385 | 13,310 | 16,148 | 7,303 | 6,031 |
| Total | 44,281 | 35,546 | 44,227 | 36,983 | 38,987 |

Note.--Because of rounding, figures may not add to totals shown.

Source: Global Trade Information Services, Inc., Global Trade Atlas, HTS subheading 7306.30. These data may be overstated as HTS 7306.30 may contain products outside the scope of this review.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

Barcode:3883995-08 A-549-502 SCO - Scope Inquiry - Line Pipe

## THE INDUSTRY IN THAILAND

During the final phase of the original investigations, the Commission received foreign producer/exporter questionnaires from five firms, which accounted for between 0.0 and 0.7 percent of exports of CWP from Thailand during 1983-84. In the first five-year reviews, the Commission sent questionnaires to two possible producers of CWP in Thailand, of which neither provided responses to the Commission's questionnaire. In the second five-year reviews, there were an estimated four steel tube producers in Thailand, of which one (Saha Thai) provided responses to the Commission's questionnaire. Saha Thai exported between *** percent of its total CWP shipments to the United States during 1999-2005. In the third full five-year reviews, the Commission sent questionnaires to ten firms in Thailand identified as possible producers of CWP from parties' responses to the notice of institution, proprietary Customs data, and Commerce notices. One firm, Saha Thai, provided data on its CWP operations. Saha Thai estimated that it accounted for *** percent of total production of CWP in Thailand and *** percent of total exports of CWP in the United States in 2011.[60]

Table I-13 presents data on exports of CWP from Thailand to leading foreign markets during 2012-16. The United States was the largest export destination for CWP exports from Thailand and accounted for 56.9 percent of Thailand's exports in 2016. Other major export destinations for CWP from Thailand included Australia and Laos, which accounted for 23.5 percent and 3.7 percent of Thailand's exports in 2016, respectively. Thailand's total exports of CWP declined 49.2 percent from 2012 to 2014, and then increased 40.3 percent from 2014 to 2016.

[60] *Investigation Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534, and 536, (Third Review): Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey—Staff Report,* INV-KK-060, May 29, 2012 p. IV-42

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

**Table I-13**
**CWP: Exports of CWP from Thailand, by destination, 2012-16**

| Item | Calendar year | | | | |
|---|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 | 2016 |
| | Quantity (short tons) | | | | |
| United States | 109,632 | 39,012 | 48,630 | 51,622 | 65,054 |
| Australia | 16,054 | 13,243 | 16,169 | 15,630 | 26,844 |
| Laos | 4,459 | 2,195 | 2,040 | 5,014 | 4,284 |
| Indonesia | 4,554 | 5,277 | 5,596 | 3,058 | 3,329 |
| Myanmar | 1,896 | 1,580 | 1,293 | 1,523 | 3,009 |
| Mexico | 440 | 568 | 456 | 970 | 1,586 |
| Egypt | 664 | 593 | 678 | 1,085 | 1,506 |
| Cambodia | 64 | 71 | 76 | 31 | 1,313 |
| Canada | 11,259 | 30 | 786 | 253 | 1,232 |
| Qatar | 1,099 | 719 | 874 | 1,415 | 1,152 |
| All other | 10,463 | 20,574 | 4,963 | 5,303 | 5,105 |
| Total | 160,583 | 83,862 | 81,562 | 85,905 | 114,414 |
| | Value (1,000 dollars) | | | | |
| United States | 95,930 | 31,284 | 37,161 | 36,586 | 31,340 |
| Australia | 13,515 | 10,219 | 12,194 | 9,657 | 14,122 |
| Indonesia | 9,210 | 12,251 | 13,464 | 7,686 | 7,919 |
| Mexico | 773 | 945 | 771 | 2,369 | 4,420 |
| Laos | 6,958 | 3,333 | 3,845 | 4,517 | 3,207 |
| Egypt | 764 | 688 | 939 | 1,876 | 2,794 |
| Myanmar | 2,834 | 2,127 | 1,612 | 1,590 | 2,292 |
| Malaysia | 962 | 1,043 | 1,112 | 988 | 1,863 |
| Qatar | 1,118 | 842 | 1,045 | 1,713 | 1,452 |
| Cambodia | 58 | 71 | 85 | 36 | 1,377 |
| All other | 22,081 | 24,523 | 7,242 | 8,384 | 8,719 |
| Total | 154,145 | 87,254 | 79,468 | 75,404 | 78,129 |

Note.--Because of rounding, figures may not add to totals shown.

Source: Global Trade Information Services, Inc., Global Trade Atlas, HTS subheading 7306.30. These data may be overstated as HTS 7306.30 may contain products outside the scope of this review.

## THE INDUSTRY IN TURKEY

During the final phase of the original investigations, the Commission received foreign producer/exporter questionnaires from five firms, which accounted for all production of CWP from Turkey during 1985 and 1986. The firms' exports to the United States were minimal until January-September 1985 when they increased to *** short tons. In the first five-year reviews, there were an estimated 13 producers of CWP, of which one producer (Borusan Birlesik Boru Fabrikalari, A.S.) provided a response to the Commission's questionnaire. The producer exported between *** percent of its total CWP shipments to the United States during 1997-98. In the second five-year reviews, the Commission sent questionnaires to 11 possible producers of CWP in Turkey, of which four (Borusan, Erbosan Erciyas Boru Sanayii ve Ticaret, Güven Boru Profil Sanayi ve Ticaret, and Noksel) provided data. These firms exported between *** percent of their total CWP shipments to the United States during 1999-2005. In the third full five-year reviews, the Commission sent questionnaires to ten firms in Turkey identified as possible producers of CWP according to parties' responses to the notice of institution, proprietary Customs data, and Commerce notices. Three firms, Borusan, Noksel, and Toscelik Profil ve Sac Endustrisi A.S. provided data on their CWP operations. Borusan estimated that it accounted for *** percent of total production of CWPin Turkey and *** percent of total exports of CWP from Turkey to the United States in 2011. Noksel estimated that it accounted for *** percent of total production of CWP in Turkey and *** percent of total exports of CWP from Turkey to the United States in 2011. Toscelik estimated that it accounted for *** percent of total production of CWP in Turkey and *** percent of total exports of CWP from Turkey to the United States in 2011. All three responding producers reported constraints in the manufacturing process. *** reported production was constrained by stop times needed for maintenance and switching equipment during changes for size and by limited storage area. ***.[61]

In its response to the notice of institution, the Government of Turkey indicated that Turkey's subject merchandise exports to the United States declined 23 percent in terms of quantity, while Turkey's total exports increased 21 percent during 2011-16.[62]

Table I-14 presents export data for CWP from Turkey to leading foreign markets during 2012-16. The United Kingdom, Romania, and Germany were the three largest export destinations for CWP from Turkey and accounted for 14.6 percent, 10.3 percent, and 9.8 percent of Turkey's exports in 2016, respectively.

---

[61] *Investigation Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534, and 536, (Third Review): Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey—Staff Report,* INV-KK-060, May 29, 2012 pp. IV-49-IV-50.

[62] Government of Turkey's Response to the Notice of Institution, July 3, 2017, pp. 3-4.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

**Table I-14**
**CWP: Exports of CWP from Turkey, by destination, 2012-16**

| Item | Calendar year | | | | |
|---|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 | 2016 |
| | Quantity (short tons) | | | | |
| United Kingdom | 84,891 | 61,316 | 95,133 | 86,440 | 79,107 |
| Romania | 31,437 | 29,240 | 38,958 | 46,760 | 55,869 |
| Germany | 26,606 | 28,226 | 45,403 | 44,517 | 53,309 |
| United States | 137,526 | 114,482 | 124,646 | 107,859 | 52,037 |
| Iraq | 74,918 | 80,261 | 52,364 | 46,377 | 45,080 |
| Italy | 22,189 | 25,416 | 38,147 | 41,673 | 41,191 |
| Canada | 11,118 | 19,925 | 29,938 | 23,761 | 21,780 |
| Greece | 10,476 | 17,817 | 24,397 | 19,563 | 21,425 |
| Israel | 5,546 | 12,850 | 22,953 | 18,203 | 17,750 |
| Egypt | 6,621 | 11,309 | 24,739 | 13,623 | 15,120 |
| All other | 136,011 | 139,822 | 146,562 | 152,076 | 139,208 |
| Total | 547,339 | 540,665 | 643,240 | 600,850 | 541,876 |
| | Value (1,000 dollars) | | | | |
| United Kingdom | 64,100 | 43,841 | 66,002 | 50,128 | 39,651 |
| Germany | 35,872 | 35,874 | 47,071 | 36,365 | 34,643 |
| United States | 109,001 | 82,033 | 89,088 | 69,284 | 29,611 |
| Romania | 23,087 | 20,949 | 26,958 | 25,560 | 28,431 |
| Iraq | 54,950 | 57,824 | 34,877 | 24,117 | 21,882 |
| Italy | 16,458 | 18,965 | 26,708 | 23,918 | 21,551 |
| Poland | 7,360 | 8,734 | 9,506 | 9,878 | 12,899 |
| Canada | 8,854 | 15,201 | 22,372 | 16,552 | 12,284 |
| Greece | 8,629 | 13,841 | 18,069 | 11,934 | 11,918 |
| Egypt | 5,486 | 9,964 | 22,648 | 9,533 | 9,687 |
| All other | 121,597 | 125,176 | 132,981 | 107,992 | 93,489 |
| Total | 455,394 | 432,401 | 496,280 | 385,261 | 316,046 |

Note.--Because of rounding, figures may not add to totals shown.

Source: Global Trade Information Services, Inc., Global Trade Atlas, HTS subheading 7306.30. These data may be overstated as HTS 7306.30 may contain products outside the scope of this review.

## ANTIDUMPING OR COUNTERVAILING DUTY ORDERS IN THIRD-COUNTRY MARKETS

CWP is currently subject to antidumping duties in the Australia, Canada, and the European Union.

### Australia

As of September 8, 2016, the Australian Antidumping Commission applied antidumping measures on hollow structural sections from 5 countries, including China, South Korea, Malaysia, Taiwan, and Thailand, as well as countervailing measures on hollow structural sections from China. The scope of these orders covers the following HS 6-digit subheadings: 7306.30, 7306.50, 7306.61, and 7306.69. The duties on China, South Korea, Malaysia, and Taiwan ranged from 2.4 percent to 100.8 percent and were set to expire on July 2, 2017[63], while the duties on Thailand range from 5.7 percent to 29.7 percent and are set to expire on August 18, 2020.[64]

### Canada

CWP is subject to two antidumping duty orders and one countervailing duty order in Canada. In 2013, the Canadian International Trade Tribunal ("CITT") issued antidumping duty orders equal to 179 percent of the export price and countervailing duty orders equal to 5,280 renminbi per metric ton on imports of CWP from China. The scope of this order includes:

> "carbon steel welded pipe, commonly identified as standard pipe, in the nominal size range from ½ inch up to and including 6 inches (12.7 mm to 168.3 mm in outside diameter) inclusive, in various forms and finishes, usually supplied to meet ASTM A53, ASTM A135, ASTM A252, ASTM A589, ASTM A795, ASTM FI083 or Commercial Quality, or AWWA C200-97 or equivalent specifications, including water well casing, piling pipe, sprinkler pipe and fencing pipe, but excluding oil and gas line pipe made to API specifications."[65]

---

[63] As of July 26, 2017, no information is available on the status of the antidumping orders on China, South Korea, Malaysia, Taiwan, and Thailand, and the countervailing orders on China.

[64] Australian Antidumping Commission, "Goods subject to measures," http://www.adcommission.gov.au/measures/Documents/Summary%20Table%20-%20Steel%20and%20Aluminium%20Products%20-%20Measures%20Applied%20-%20By%20Tariff%20Line%20-%207%20September%202016.pdf, p. 7, (accessed July 26, 2017).

[65] Canada Border Services Agency, "Measures in Force: Carbon and Steel Welded Pipe (CSWP 1)," http://www.cbsa-asfc.gc.ca/sima-lmsi/mif-mev-eng.html, (accessed July 26, 2017).

On May 7, 2013, the Canada Border Services Agency ("CBSA") conducted a re-investigation on certain carbon steel welded pipe originating in or exported from Taiwan, India, Oman, South Korea, Thailand, and the United Arab Emirates. This re-investigation was in response to a threat of injury finding issued by the CITT on December 11, 2012.  Canada applies an antidumping duty rate of 54.2 percent of the export price for all subject goods imported from these countries, unless the exporter has been issued a specific normal value.  CWP from India is also subject to countervailing duties in the range of 3,577 to 23,872 Indian rupees per metric ton, unless the exporter has been issued its own subsidy rate. The scope of all of these orders is the same as the orders on CWP from China. [66]

**European Union**

In 2015, the European Commission ("EC") imposed antidumping duties on certain welded tubes and pipes of iron or non-alloy steel originating in Belarus, the People's Republic of China, Russia, Thailand, and Ukraine. Duty rates on EU imports of CWP from these subject countries range from 10.1 percent to 90.6 percent. The scope of this order includes:

> "welded tubes and pipes, of iron or non-alloy steel, of circular cross-section and of an external diameter not exceeding 168,3 mm, excluding line pipe of a kind used for oil or gas pipelines, casing and tubing of a kind used in drilling for oil and gas, precision tubes and tubes and pipes with attached fittings suitable for conducting gases or liquids for use in civil aircraft, currently falling within CN codes ex 7306 30 41, ex 7306 30 49, ex 7306 30 72 and ex 7306 30 77."[67]

On March 31, 2012, the EC initiated antidumping proceedings concerning imports of welded tubes, pipes and hollow profiles of square or rectangular cross-section, of iron other than cast iron or steel other than stainless, originating in the former Yugoslav Republic of Macedonia, Turkey and Ukraine.[68] However, the EC terminated this investigation on February 13, 2013 after the EU producers withdrew their complaint.[69]

---

[66] Canada Border Services Agency, "Measures in Force: Carbon and Steel Welded Pipe 2 (CSWP 2)," http://www.cbsa-asfc.gc.ca/sima-lmsi/mif-mev-eng.html, (accessed July 20, 2017).

[67] Official Journal of the European Union, "Commission Implementing Regulation (EU) 2015/110," January 26, 2015, http://trade.ec.europa.eu/doclib/docs/2015/january/tradoc_153068.def.en.L20-2015.pdf, p. L 20/6 through L 20/8.

[68] Official Journal of the European Union, "2012/C 96/07," March 31, 2012, http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:C:2012:096:0013:0021:EN:PDF, p. C 96/13.

[69] Official Journal of the European Union, "Commission Decision of 13 February 2013," 2013/80/EU, http://trade.ec.europa.eu/doclib/docs/2013/february/tradoc_150525.term.en.L43-2013.pdf, (accessed July 31, 2017).

## THE GLOBAL MARKET

Table I-13 presents the largest global export sources of CWP during 2012-16. China, Italy, and Turkey were the largest exporters of CWP in terms of quantity and accounted for 20.6 percent, 16.1 percent, and 7.8 percent of global exports during the period, respectively. China's exports increased 74.5 percent during 2012-16, while global exports increased 10.0 percent. Italy's exports of CWP increased 14.8 percent during 2012-16, while Turkey's exports fell after peaking in 2014.

**Table I-15**
**CWP: Global exports, by major sources, 2012-16**

| Item | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| | Quantity (short tons) | | | | |
| China | 819,853 | 934,017 | 1,146,964 | 1,407,541 | 1,430,952 |
| Italy | 970,387 | 1,006,301 | 1,100,892 | 1,099,915 | 1,113,910 |
| Turkey | 547,339 | 540,665 | 643,240 | 600,850 | 541,876 |
| South Korea | 405,031 | 450,848 | 431,343 | 354,872 | 449,754 |
| Germany | 418,046 | 381,464 | 361,451 | 342,567 | 354,481 |
| USA | 476,743 | 403,893 | 381,935 | 334,877 | 298,461 |
| Canada | 231,189 | 235,026 | 247,571 | 259,826 | 260,196 |
| Spain | 235,833 | 234,133 | 247,913 | 191,462 | 230,426 |
| India | 110,646 | 225,547 | 245,913 | 230,610 | 209,268 |
| Russia | 138,645 | 247,636 | 248,950 | 309,844 | 194,883 |
| All other | 1,951,613 | 1,876,027 | 1,816,217 | 1,921,917 | 1,850,612 |
| Total | 6,305,326 | 6,535,558 | 6,872,390 | 7,054,282 | 6,934,818 |

Table continued on next page.

**Table I-15--Continued**
**CWP: Global exports, by major sources, 2012-16**

| Item | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| | | | Value (1,000 dollars) | | |
| China | 682,514 | 734,967 | 872,421 | 945,876 | 879,827 |
| Italy | 1,045,657 | 1,061,882 | 1,122,144 | 915,124 | 859,692 |
| USA | 681,822 | 621,181 | 611,165 | 532,420 | 457,410 |
| Germany | 617,610 | 617,368 | 570,297 | 450,701 | 445,298 |
| South Korea | 433,036 | 425,236 | 415,379 | 309,321 | 356,702 |
| Turkey | 455,394 | 432,401 | 496,280 | 385,261 | 316,046 |
| Canada | 268,777 | 284,178 | 298,914 | 288,128 | 282,182 |
| Japan | 309,127 | 281,555 | 260,495 | 237,876 | 236,707 |
| Spain | 278,548 | 280,087 | 256,779 | 188,601 | 216,609 |
| Switzerland | 295,132 | 265,952 | 256,035 | 226,574 | 196,031 |
| All other | 2,072,917 | 2,139,876 | 2,053,873 | 1,788,748 | 1,581,083 |
| Total | 7,140,534 | 7,144,683 | 7,213,782 | 6,268,630 | 5,827,586 |

Note.--Because of rounding, figures may not add to total shown.

Source: Global Trade Information Services, Inc., Global Trade Atlas, HTS subheading 7306.30. These data may be overstated as HTS 7306.30 may contain products outside the scope of this review.

PUBLIC DOCUMENT
Barcode:3883995-08 A-549-502 SCO - Scope Inquiry - Line Pipe

# APPENDIX A

## *FEDERAL REGISTER* NOTICES

A-1
Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

PUBLIC DOCUMENT
Barcode:3883995-08 A-549-502 SCO - Scope Inquiry - Line Pipe

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

PUBLIC DOCUMENT
Barcode:3883995-08 A-549-502 SCO - Scope Inquiry - Line Pipe

The Commission makes available notices relevant to its investigations and reviews on its website, www.usitc.gov. In addition, the following tabulation presents, in chronological order, *Federal Register* notices issued by the Commission and Commerce during the current proceeding.

| Citation | Title | Link |
|---|---|---|
| 82 FR 25328<br>June 1, 2017 | *Certain Circular Welded Pipe and Tube From Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey; Institution of Five-Year Reviews* | https://www.gpo.gov/fdsys/pkg/FR-2017-06-01/pdf/2017-11049.pdf |
| 82 FR 25599<br>June 2, 2017 | *Initiation of Five-Year (Sunset) Reviews* | https://www.gpo.gov/fdsys/pkg/FR-2017-06-02/pdf/2017-11419.pdf |
| 82 FR 27690<br>June 16, 2017 | *Initiation of Five-Year (Sunset) Review; Correction* | https://www.gpo.gov/fdsys/pkg/FR-2017-06-16/pdf/2017-12523.pdf |

A-3

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

PUBLIC DOCUMENT
Barcode:3883995-08 A-549-502 SCO - Scope Inquiry - Line Pipe

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

# APPENDIX B

# COMPANY-SPECIFIC DATA

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

PUBLIC DOCUMENT
Barcode:3883995-08 A-549-502 SCO - Scope Inquiry - Line Pipe

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

## RESPONSE CHECKLIST FOR U.S. PRODUCERS

| Item | Bull Moose Tube | EXLTUBE | TMK IPSCO | Zekelman Industries | Total |
|---|---|---|---|---|---|
| | Quantity=Short Tons; value=1,000 dollars; | | | | |
| | Unit values, unit labor costs, and unit financial data are per pound | | | | |
| Nature of operation | ✓ | ✓ | ✓ | ✓ | ✓ |
| Statement of intent to participate | ✓ | ✓ | ✓ | ✓ | ✓ |
| Statement of likely effects of revoking the order | ✓ | ✓ | ✓ | ✓ | ✓ |
| U.S. producer list | ✓ | ✓ | ✓ | ✓ | ✓ |
| U.S. importer/foreign producer list | ✓ | ✓ | ✓ | ✓ | ✓ |
| List of 3-5 leading purchasers | ✓ | ✓ | ✓ | ✓ | ✓ |
| List of sources for national/regional prices | ✓ | ✓ | ✓ | ✓ | ✓ |
| Production: | | | | | |
| Quantity | *** | *** | *** | *** | *** |
| Percent of total reported | *** | *** | *** | *** | *** |
| Capacity | *** | *** | *** | *** | *** |
| Commercial shipments: | | | | | |
| Quantity | *** | *** | *** | *** | *** |
| Value | *** | *** | *** | *** | *** |
| Internal consumption: | | | | | |
| Quantity | *** | *** | *** | *** | *** |
| Value | *** | *** | *** | *** | *** |
| Net sales | *** | *** | *** | *** | *** |
| COGS | *** | *** | *** | *** | *** |
| Gross profit or (loss) | *** | *** | -*** | *** | *** |
| SG&A expenses (loss) | *** | *** | *** | *** | *** |
| Operating income/(loss) | *** | *** | -*** | *** | *** |
| Changes in supply/demand | ✓ | ✓ | ✓ | ✓ | ✓ |

Note.—The production, capacity, and shipment data presented are for calendar year 2016. The financial data are for fiscal year ended December 31, 2016.

✓ = response provided; ✖ = response not provided; **NA** = not applicable; ? = indicated that the information was not known.

## RESPONSE CHECKLIST FOR FOREIGN GOVERNMENT

| Item | Government of Turkey | Total |
|---|---|---|
| | Quantity= Short tons; value=1,000 dollars; | |
| | Unit values, unit labor costs, and unit financial data are per pound | |
| Nature of operation | ✓ | ✓ |
| Statement of intent to participate | ✓ | ✓ |
| Statement of likely effects of revoking the order | ✓ | ✓ |
| U.S. producer list | ? | ? |
| U.S. importer/foreign producer list | ✓ | ✓ |
| List of 3-5 leading purchasers | ? | ? |
| List of sources for national/regional prices | ✓ | ✓ |
| Production: | | |
| Quantity | *** | *** |
| Percent of total reported | *** | *** |
| Capacity | *** | *** |
| Exports to the United States: | | |
| Quantity | *** | *** |
| Value | *** | *** |
| Percent of total reported | *** | *** |
| Changes in supply/demand | ✓ | ✓ |

**Note.—The production, capacity, and shipment data presented are for calendar year 2016.**

✓ = response provided; × = response not provided; **NA** = not applicable; ? = indicated that the information was not known.

PUBLIC DOCUMENT
Barcode:3883995-08 A-549-502 SCO - Scope Inquiry - Line Pipe

# APPENDIX C

# SUMMARY DATA COMPILED IN PRIOR INVESTIGATIONS

C-1
Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

PUBLIC DOCUMENT
Barcode:3883995-08 A-549-502 SCO - Scope Inquiry - Line Pipe

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

Table C-1
Circular welded pipe and tube: Summary data concerning the U.S. market, 2006-11

(Quantity=short tons, value=1,000 dollars, unit values, unit labor costs, and unit expenses are per short ton; period changes=percent, except where noted)

| Item | Reported data | | | | | | Period changes | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2006-11 | 2006-07 | 2007-08 | 2008-09 | 2009-10 | 2010-11 |
| U.S. consumption quantity: | | | | | | | | | | | | |
| Amount | 2,409,602 | 2,266,826 | 1,928,401 | 1,237,066 | 1,405,519 | 1,472,635 | -38.9 | -5.9 | -14.9 | -35.8 | 13.6 | 4.8 |
| Producers' share (1) | 51.1 | 56.2 | 64.3 | 71.3 | 65.6 | 65.6 | 14.5 | 5.2 | 8.0 | 7.0 | -5.7 | 0.0 |
| Importers' share (1): | | | | | | | | | | | | |
| Brazil | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| India (Subject) | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Korea | 1.8 | 1.4 | 6.4 | 3.1 | 5.4 | 3.3 | 1.4 | -0.5 | 5.0 | -3.3 | 2.3 | -2.1 |
| Mexico | 3.1 | 2.9 | 2.7 | 5.4 | 4.5 | 4.5 | 1.4 | -0.2 | -0.2 | 2.7 | -0.9 | 0.0 |
| Taiwan | 1.8 | 1.5 | 3.9 | 0.6 | 2.0 | 1.6 | -0.2 | -0.3 | 2.4 | -3.3 | 1.4 | -0.4 |
| Thailand | 3.2 | 2.1 | 4.4 | 2.5 | 2.0 | 3.2 | 0.0 | -1.1 | 2.3 | -1.9 | -0.5 | 1.2 |
| Turkey | 1.3 | 0.1 | 2.8 | 2.1 | 2.6 | 2.2 | 0.8 | -1.2 | 2.8 | -0.7 | 0.5 | -0.5 |
| Subtotal, Subject | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Subtotal, Nonsubject | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Total imports | 48.9 | 43.8 | 35.7 | 28.7 | 34.4 | 34.4 | -14.5 | -5.2 | -8.0 | -7.0 | 5.7 | 0.0 |
| U.S. consumption value: | | | | | | | | | | | | |
| Amount | 1,958,107 | 1,876,439 | 2,230,487 | 1,099,589 | 1,332,584 | 1,549,330 | -20.9 | -4.2 | 18.8 | -50.7 | 21.2 | 16.3 |
| Producers' share (1) | 62.1 | 64.2 | 68.2 | 71.6 | 67.4 | 67.4 | 5.2 | 2.0 | 4.0 | 3.4 | -4.2 | 0.0 |
| Importers' share (1): | | | | | | | | | | | | |
| Brazil | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| India (Subject) | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Korea | 1.8 | 1.5 | 5.7 | 3.1 | 5.1 | 3.3 | 1.5 | -0.3 | 4.1 | -2.6 | 2.1 | -1.8 |
| Mexico | 3.1 | 2.8 | 2.6 | 4.5 | 3.9 | 4.1 | 1.0 | -0.3 | -0.2 | 1.8 | -0.5 | 0.2 |
| Taiwan | 1.3 | 1.2 | 3.2 | 0.7 | 1.7 | 1.4 | 0.0 | -0.2 | 2.0 | -2.5 | 1.0 | -0.3 |
| Thailand | 2.7 | 2.0 | 4.0 | 2.8 | 2.0 | 3.0 | 0.3 | -0.7 | 2.1 | -1.2 | -0.8 | 1.0 |
| Turkey | 1.1 | 0.2 | 2.6 | 2.2 | 2.3 | 1.9 | 0.8 | -0.9 | 2.4 | -0.5 | 0.1 | -0.3 |
| Subtotal, Subject | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Subtotal, Nonsubject | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Total imports | 37.9 | 35.8 | 31.8 | 28.4 | 32.6 | 32.6 | -5.2 | -2.0 | -4.0 | -3.4 | 4.2 | 0.0 |
| U.S. imports from: | | | | | | | | | | | | |
| Brazil: | | | | | | | | | | | | |
| Quantity | 570 | 386 | 555 | 490 | 622 | 401 | -29.6 | -32.3 | 43.8 | -11.7 | 26.9 | -35.6 |
| Value | 841 | 696 | 1,289 | 1,059 | 1,394 | 1,041 | 23.8 | -17.2 | 85.1 | -17.8 | 31.6 | -25.3 |
| Unit value | $1,475 | $1,803 | $2,321 | $2,161 | $2,241 | $2,596 | 75.9 | 22.2 | 28.7 | -6.9 | 3.7 | 15.8 |
| Ending inventory quantity | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| India (Subject): | | | | | | | | | | | | |
| Quantity | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Value | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Unit value | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Ending inventory quantity | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Korea: | | | | | | | | | | | | |
| Quantity | 44,348 | 31,437 | 123,952 | 38,833 | 75,857 | 48,054 | 8.4 | -29.1 | 294.3 | -68.7 | 95.3 | -36.7 |
| Value | 35,389 | 29,031 | 126,895 | 33,714 | 68,178 | 51,180 | 44.6 | -18.0 | 337.1 | -73.4 | 102.2 | -24.9 |
| Unit value | $798 | $923 | $1,024 | $868 | $899 | $1,065 | 33.5 | 15.7 | 10.9 | -15.2 | 3.5 | 18.5 |
| Ending inventory quantity | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Mexico: | | | | | | | | | | | | |
| Quantity | 74,808 | 64,938 | 52,245 | 66,813 | 63,151 | 66,017 | -11.8 | -13.2 | -19.5 | 27.9 | -5.5 | 4.5 |
| Value | 61,481 | 52,858 | 58,380 | 49,111 | 52,473 | 63,670 | 3.6 | -14.0 | 10.4 | -15.9 | 6.8 | 21.3 |
| Unit value | $822 | $814 | $1,117 | $735 | $831 | $964 | 17.4 | -0.9 | 37.3 | -34.2 | 13.0 | 16.1 |
| Ending inventory quantity | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Taiwan: | | | | | | | | | | | | |
| Quantity | 43,036 | 33,306 | 75,017 | 7,600 | 27,621 | 22,986 | -46.6 | -22.6 | 125.2 | -89.9 | 263.4 | -16.8 |
| Value | 26,302 | 22,296 | 70,947 | 7,871 | 22,370 | 20,989 | -20.2 | -15.2 | 218.2 | -88.9 | 184.2 | -6.2 |
| Unit value | $611 | $669 | $946 | $1,036 | $810 | $914 | 49.5 | 9.5 | 41.3 | 9.5 | -21.8 | 12.8 |
| Ending inventory quantity | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Thailand: | | | | | | | | | | | | |
| Quantity | 77,632 | 47,736 | 85,780 | 31,389 | 28,751 | 47,896 | -38.7 | -38.7 | 79.7 | -63.4 | -8.4 | 66.6 |
| Value | 52,738 | 36,738 | 89,600 | 30,584 | 26,785 | 46,507 | -11.8 | -30.3 | 143.9 | -65.9 | -12.5 | 73.6 |
| Unit value | $678 | $770 | $1,045 | $974 | $932 | $973 | 43.8 | 13.6 | 35.8 | -6.7 | -4.4 | 4.7 |
| Ending inventory quantity | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Turkey: | | | | | | | | | | | | |
| Quantity | 31,797 | 3,146 | 53,583 | 26,032 | 37,228 | 31,723 | -0.2 | -90.1 | 1603.2 | -51.4 | 43.0 | -14.8 |
| Value | 21,087 | 3,295 | 58,346 | 23,731 | 30,389 | 30,124 | 42.9 | -84.4 | 1670.7 | -59.3 | 28.1 | -0.9 |
| Unit value | $663 | $1,047 | $1,089 | $912 | $817 | $950 | 43.2 | 57.9 | 4.0 | -16.3 | -10.4 | 16.3 |
| Ending inventory quantity | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Subtotal (Subject): | | | | | | | | | | | | |
| Quantity | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Value | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Unit value | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Ending inventory quantity | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Subtotal (Nonsubject): | | | | | | | | | | | | |
| Quantity | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Value | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Unit value | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Ending inventory quantity | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| All sources: | | | | | | | | | | | | |
| Quantity | 1,179,398 | 991,842 | 688,846 | 355,658 | 483,675 | 506,620 | -57.0 | -15.9 | -30.5 | -48.4 | 36.0 | 4.7 |
| Value | 741,109 | 672,368 | 709,014 | 312,059 | 434,328 | 505,746 | -31.8 | -9.3 | 5.5 | -56.0 | 39.2 | 16.4 |
| Unit value | $628 | $678 | $1,029 | $877 | $898 | $998 | 58.8 | 7.9 | 51.8 | -14.8 | 2.3 | 11.2 |
| Ending inventory quantity | 15,161 | 2,767 | 21,554 | 11,457 | 9,511 | 13,426 | -11.4 | -81.7 | 693.4 | -47.7 | -17.2 | 41.2 |

Table continued on next page.

Table C-1--Continued
Circular welded pipe and tube: Summary data concerning the U.S. market, 2006-11

(Quantity=short tons, value=1,000 dollars, unit values, unit labor costs, and unit expenses are per short ton; period changes=percent, except where noted)

| | Reported data | | | | | | Period changes | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Item | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2006-11 | 2006-07 | 2007-08 | 2008-09 | 2009-10 | 2010-11 |
| U.S. producers: | | | | | | | | | | | | |
| Average capacity quantity | 2,088,327 | 2,009,829 | 1,944,986 | 1,938,832 | 2,009,753 | 2,054,223 | -1.6 | -3.8 | -3.2 | -0.3 | 3.7 | 2.2 |
| Production quantity | 1,282,325 | 1,282,391 | 1,212,165 | 899,463 | 968,312 | 1,023,576 | -20.2 | 0.0 | -5.5 | -25.8 | 7.7 | 5.7 |
| Capacity utilization (1) | 61.4 | 63.8 | 62.3 | 46.4 | 48.2 | 49.8 | -11.6 | 2.4 | -1.5 | -15.9 | 1.8 | 1.6 |
| U.S. shipments: | | | | | | | | | | | | |
| Quantity | 1,230,404 | 1,274,984 | 1,239,555 | 881,430 | 921,844 | 966,015 | -21.5 | 3.6 | -2.8 | -28.9 | 4.6 | 4.8 |
| Value | 1,216,918 | 1,204,071 | 1,521,473 | 787,540 | 898,256 | 1,043,584 | -14.2 | -1.1 | 26.4 | -48.2 | 14.1 | 16.2 |
| Unit value | $989 | $944 | $1,227 | $893 | $974 | $1,080 | 9.2 | -4.5 | 30.0 | -27.2 | 9.1 | 10.9 |
| Export shipments: | | | | | | | | | | | | |
| Quantity | 33,387 | 47,103 | 38,192 | 39,331 | 45,650 | 54,556 | 63.4 | 41.1 | -18.9 | 3.0 | 16.1 | 19.5 |
| Value | 30,728 | 43,305 | 49,907 | 33,390 | 42,215 | 58,615 | 90.8 | 40.9 | 15.2 | -33.1 | 26.4 | 38.8 |
| Unit value | $920 | $919 | $1,307 | $849 | $925 | $1,074 | 16.7 | -0.1 | 42.1 | -35.0 | 8.9 | 16.2 |
| Ending inventory quantity | 193,218 | 168,394 | 151,707 | 139,243 | 142,504 | 151,164 | -21.8 | -12.8 | -9.9 | -8.2 | 2.3 | 6.1 |
| Inventories/total shipments (1) | 15.3 | 12.7 | 11.9 | 15.1 | 14.7 | 14.8 | -0.5 | -2.6 | -0.9 | 3.2 | -0.4 | 0.1 |
| Production workers | 2,192 | 2,032 | 1,906 | 1,589 | 1,451 | 1,549 | -29.3 | -7.3 | -6.2 | -16.6 | -8.7 | 6.8 |
| Hours worked (1,000s) | 4,555 | 4,191 | 4,343 | 2,893 | 3,074 | 3,397 | -25.4 | -8.0 | 3.6 | -33.4 | 6.3 | 10.5 |
| Wages paid ($1,000s) | 99,169 | 96,098 | 101,721 | 72,328 | 80,361 | 96,222 | -3.0 | -3.1 | 5.9 | -27.9 | 9.6 | 19.7 |
| Hourly wages | $21.77 | $22.93 | $23.42 | $25.35 | $26.14 | $28.33 | 30.1 | 5.3 | 2.2 | 8.2 | 3.1 | 8.4 |
| Productivity (tons/1,000 hours) | 281.5 | 306.0 | 279.1 | 310.3 | 315.0 | 301.3 | 7.0 | 8.7 | -8.8 | 11.2 | 1.5 | -4.3 |
| Unit labor costs | $77.34 | $74.94 | $83.92 | $81.52 | $82.99 | $94.01 | 21.6 | -3.1 | 12.0 | -2.9 | 1.8 | 13.3 |
| Net sales: | | | | | | | | | | | | |
| Quantity | 1,361,747 | 1,321,492 | 1,425,103 | 900,288 | 949,647 | 1,016,377 | -25.4 | -3.0 | 7.8 | -36.8 | 5.5 | 7.0 |
| Value | 1,281,582 | 1,218,151 | 1,719,099 | 858,849 | 914,734 | 1,075,973 | -16.0 | -4.9 | 41.1 | -50.0 | 6.5 | 17.6 |
| Unit value | $941 | $922 | $1,206 | $954 | $963 | $1,059 | 12.5 | -2.1 | 30.9 | -20.9 | 1.0 | 9.9 |
| Cost of goods sold (COGS) | 1,076,829 | 1,103,506 | 1,351,533 | 900,451 | 806,893 | 950,989 | -11.7 | 2.5 | 22.5 | -33.4 | -10.4 | 17.9 |
| Gross profit or (loss) | 204,753 | 114,645 | 367,566 | -41,602 | 107,841 | 124,984 | -39.0 | -44.0 | 220.6 | (2) | (3) | 15.9 |
| SG&A expenses | 61,301 | 74,710 | 96,564 | 84,972 | 73,543 | 93,915 | 53.2 | 21.9 | 29.3 | -12.0 | -13.5 | 27.7 |
| Operating income or (loss) | 143,452 | 39,935 | 271,002 | -126,574 | 34,298 | 31,069 | -78.3 | -72.2 | 578.6 | (3) | (3) | -9.4 |
| Capital expenditures | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Unit COGS | $791 | $835 | $948 | $1,000 | $850 | $936 | 18.3 | 5.6 | 13.6 | 5.5 | -15.0 | 10.1 |
| Unit SG&A expenses | $45 | $57 | $68 | $94 | $77 | $92 | 105.3 | 25.6 | 19.9 | 39.3 | -17.9 | 19.3 |
| Unit operating income or (loss) | $105 | $30 | $190 | -$141 | $36 | $31 | -71.0 | -71.3 | 529.3 | (3) | (3) | -15.4 |
| COGS/sales (1) | 84.0 | 90.6 | 78.6 | 104.8 | 88.2 | 88.4 | 4.4 | 6.6 | -12.0 | 26.2 | -16.6 | 0.2 |
| Operating income or (loss)/ sales (1) | 11.2 | 3.3 | 15.8 | -14.7 | 3.7 | 2.9 | -8.3 | -7.9 | 12.5 | -30.5 | 18.5 | -0.9 |

(1) "Reported data" are in percent and "period changes" are in percentage points.
(2) Not applicable.
(3) When there are negative values, going through the zero point, from a positive number to a negative one or from a negative one to a positive one, can distort the percentage calculations.

Note.--Financial data are reported on a fiscal year basis and may not necessarily be comparable to data reported on a calendar year basis. Because of rounding, figures may not add to the totals shown. Unit values and shares are calculated from the unrounded figures.

Source: Compiled from data submitted in response to Commission questionnaires, official Commerce statistics, Customs data, and Cansim (Canada) data.

Barcode:3883995-08 A-549-502 SCO - Scope Inquiry - Line Pipe

**Table C-1**
**Circular welded pipe and tube: Summary data concerning the U.S. market, 1999-2005**

(Quantity=1,000 short tons, value=1,000 dollars, unit values, unit labor costs, and unit expenses are per short ton; period changes=percent, except where noted)

| | Reported data | | | | | | | Period changes | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Item | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 1999-2005 | 1999-2000 | 2000-2001 | 2001-2002 | 2002-2003 | 2003-2004 | 2004-2005 |
| U.S. consumption quantity: | | | | | | | | | | | | | | |
| Amount | 2,348 | 2,777 | 2,519 | 2,236 | 2,064 | 2,422 | 2,339 | -0.4 | 18.2 | -9.3 | -11.2 | -7.7 | 17.4 | -3.4 |
| Producers' share (1) | 72.2 | 63.2 | 66.5 | 66.4 | 66.2 | 60.2 | 56.0 | -16.2 | -9.0 | 3.3 | -0.0 | -0.2 | -6.0 | -4.2 |
| Importers' share (1): | | | | | | | | | | | | | | |
| Brazil | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| India | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Korea | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Mexico | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Taiwan | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Thailand | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Turkey | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Subtotal | 10.1 | 13.6 | 11.7 | 13.8 | 8.9 | 9.2 | 7.5 | -2.6 | 3.5 | -1.9 | 2.1 | -4.9 | 0.3 | -1.7 |
| All other sources | 17.7 | 23.3 | 21.8 | 19.8 | 24.9 | 30.5 | 36.5 | 18.7 | 5.5 | -1.4 | -2.1 | 5.1 | 5.7 | 5.9 |
| Total imports | 27.8 | 36.8 | 33.5 | 33.6 | 33.8 | 39.8 | 44.0 | 16.2 | 9.0 | -3.3 | 0.0 | 0.2 | 6.0 | 4.2 |
| U.S. consumption value: | | | | | | | | | | | | | | |
| Amount | 1,257,304 | 1,474,994 | 1,266,218 | 1,154,799 | 1,167,870 | 1,854,804 | 1,994,144 | 58.6 | 17.3 | -14.2 | -8.8 | 1.1 | 58.8 | 7.5 |
| Producers' share (1) | 74.7 | 66.5 | 70.5 | 69.2 | 69.4 | 65.3 | 60.8 | -13.9 | -8.3 | 4.0 | -1.3 | 0.2 | -4.1 | -4.5 |
| Importers' share (1): | | | | | | | | | | | | | | |
| Brazil | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| India | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Korea | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Mexico | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Taiwan | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Thailand | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Turkey | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Subtotal | 7.8 | 11.0 | 9.0 | 10.7 | 8.0 | 7.0 | 6.5 | -1.3 | 3.2 | -2.0 | 1.7 | -2.7 | -0.9 | -0.5 |
| All other sources | 17.5 | 22.5 | 20.5 | 20.1 | 22.6 | 27.7 | 32.7 | 15.2 | 5.1 | -2.1 | -0.4 | 2.6 | 5.1 | 5.0 |
| Total imports | 25.3 | 33.5 | 29.5 | 30.8 | 30.6 | 34.7 | 39.2 | 13.9 | 8.3 | -4.0 | 1.3 | -0.2 | 4.1 | 4.5 |
| U.S. imports from: | | | | | | | | | | | | | | |
| Brazil: | | | | | | | | | | | | | | |
| Quantity | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Value | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Unit value | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Ending inventory quantity | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| India: | | | | | | | | | | | | | | |
| Quantity | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Value | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Unit value | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Ending inventory quantity | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Korea: | | | | | | | | | | | | | | |
| Quantity | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Value | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Unit value | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Ending inventory quantity | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Mexico: | | | | | | | | | | | | | | |
| Quantity | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Value | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Unit value | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Ending inventory quantity | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Taiwan: | | | | | | | | | | | | | | |
| Quantity | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Value | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Unit value | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Ending inventory quantity | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Thailand: | | | | | | | | | | | | | | |
| Quantity | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Value | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Unit value | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Ending inventory quantity | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Turkey: | | | | | | | | | | | | | | |
| Quantity | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Value | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Unit value | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Ending inventory quantity | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Subtotal (subject): | | | | | | | | | | | | | | |
| Quantity | 237 | 376 | 294 | 308 | 184 | 223 | 176 | -25.8 | 59.1 | -21.8 | 4.6 | -40.3 | 21.4 | -21.3 |
| Value | 98,089 | 162,147 | 114,419 | 123,627 | 92,989 | 130,572 | 129,786 | 32.3 | 65.3 | -29.4 | 8.0 | -24.8 | 40.4 | -0.6 |
| Unit value | $414 | $431 | $389 | $401 | $506 | $585 | $739 | 78.4 | 3.9 | -9.7 | 3.3 | 26.0 | 15.6 | 26.4 |
| Ending inventory quantity | 2 | 2 | 3 | 2 | 2 | 3 | 3 | 91.0 | 9.3 | 57.4 | -31.6 | 20.8 | 5.0 | 28.0 |
| All other sources: | | | | | | | | | | | | | | |
| Quantity | 416 | 646 | 550 | 442 | 513 | 740 | 853 | 104.8 | 55.1 | -14.8 | -19.6 | 16.0 | 44.1 | 15.3 |
| Value | 219,634 | 332,426 | 259,002 | 231,602 | 264,078 | 513,122 | 651,863 | 196.8 | 51.4 | -22.1 | -10.6 | 14.0 | 94.3 | 27.0 |
| Unit value | $527 | $515 | $471 | $523 | $514 | $694 | $764 | 44.9 | -2.4 | -8.6 | 11.2 | -1.7 | 34.8 | 10.2 |
| Ending inventory quantity | 1 | 1 | 0 | 0 | 0 | 2 | 7 | 737.5 | -37.5 | -80.0 | -100.0 | (2) | (2) | 219.0 |
| All sources: | | | | | | | | | | | | | | |
| Quantity | 653 | 1,022 | 845 | 750 | 697 | 963 | 1,028 | 57.4 | 56.6 | -17.4 | -11.2 | -7.1 | 38.1 | 6.8 |
| Value | 317,723 | 494,573 | 373,421 | 355,229 | 357,067 | 643,693 | 781,648 | 146.0 | 55.7 | -24.5 | -4.9 | 0.5 | 80.3 | 21.4 |
| Unit value | $487 | $484 | $442 | $473 | $512 | $668 | $760 | 56.3 | -0.6 | -8.6 | 7.1 | 8.2 | 30.5 | 13.7 |
| Ending inventory quantity | 2 | 2 | 3 | 2 | 2 | 5 | 10 | 300.0 | -5.9 | 27.9 | -33.9 | 20.8 | 93.3 | 115.2 |

Table continued on next page.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

PUBLIC DOCUMENT

**Table C-1--Continued**
**Circular welded pipe and tube: Summary data concerning the U.S. market, 1999-2005**

(Quantity=1,000 short tons, value=1,000 dollars, unit values, unit labor costs, and unit expenses are per short ton; period changes=percent, except where noted)

| | Reported data | | | | | | | Period changes | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Item | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 1999-2005 | 1999-2000 | 2000-2001 | 2001-2002 | 2002-2003 | 2003-2004 | 2004-2005 |
| U.S. producers': | | | | | | | | | | | | | | |
| Average capacity quantity | 2,926 | 2,883 | 2,640 | 2,510 | 2,601 | 2,661 | 2,629 | -10.1 | -1.5 | -8.4 | -4.9 | 3.6 | 2.3 | -1.2 |
| Production quantity | 1,739 | 1,814 | 1,686 | 1,541 | 1,355 | 1,513 | 1,325 | -23.8 | 4.3 | -7.1 | -8.6 | -12.1 | 11.7 | -12.4 |
| Capacity utilization (1) | 59.4 | 62.9 | 63.8 | 61.4 | 52.1 | 56.9 | 50.4 | -9.0 | 3.5 | 0.9 | -2.4 | -9.3 | 4.8 | -6.4 |
| U.S. shipments: | | | | | | | | | | | | | | |
| Quantity | 1,695 | 1,754 | 1,674 | 1,485 | 1,367 | 1,459 | 1,310 | -22.7 | 3.5 | -4.6 | -11.3 | -8.0 | 6.8 | -10.2 |
| Value | 939,581 | 980,421 | 892,797 | 799,570 | 810,803 | 1,211,111 | 1,212,496 | 29.0 | 4.3 | -8.9 | -10.4 | 1.4 | 49.4 | 0.1 |
| Unit value | $554 | $559 | $533 | $538 | $593 | $830 | $925 | 66.9 | 0.8 | -4.6 | 1.0 | 10.2 | 39.9 | 11.5 |
| Export shipments: | | | | | | | | | | | | | | |
| Quantity | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Value | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Unit value | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Ending inventory quantity | 212 | 240 | 217 | 217 | 183 | 196 | 152 | -28.2 | 13.4 | -9.8 | -0.0 | -15.5 | 7.2 | -22.5 |
| Inventories/total shipments (1) | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Production workers | 2,580 | 2,610 | 2,745 | 2,747 | 2,125 | 2,331 | 2,046 | -20.7 | 1.2 | 5.2 | 0.1 | -22.6 | 9.7 | -12.2 |
| Hours worked (1,000s) | 5,427 | 5,664 | 5,864 | 5,318 | 4,611 | 4,675 | 4,097 | -24.5 | 4.4 | 3.5 | -9.3 | -13.3 | 1.4 | -12.4 |
| Wages paid ($1,000s) | 89,972 | 96,381 | 98,432 | 96,944 | 85,182 | 90,494 | 79,992 | -11.1 | 7.1 | 2.1 | -1.5 | -12.1 | 6.2 | -11.6 |
| Hourly wages | $16.58 | $17.02 | $16.79 | $18.23 | $18.47 | $19.36 | $19.53 | 17.8 | 2.6 | -1.3 | 8.6 | 1.3 | 4.8 | 0.9 |
| Productivity (tons per hour) | 0.320 | 0.320 | 0.287 | 0.290 | 0.294 | 0.324 | 0.323 | 1.1 | 0.0 | -10.1 | 0.8 | 1.4 | 10.1 | -0.1 |
| Unit labor costs | $52 | $53 | $58 | $63 | $63 | $60 | $60 | 16.5 | 2.6 | 9.8 | 7.7 | -0.1 | -4.9 | 0.9 |
| Net sales: | | | | | | | | | | | | | | |
| Quantity | 1,729 | 1,801 | 1,712 | 1,470 | 1,401 | 1,499 | 1,348 | -22.0 | 4.1 | -4.9 | -14.1 | -4.7 | 7.0 | -10.1 |
| Value | 959,174 | 1,007,248 | 915,465 | 795,982 | 834,561 | 1,243,926 | 1,245,783 | 29.9 | 5.0 | -9.1 | -13.1 | 4.8 | 49.1 | 0.1 |
| Unit value | $555 | $559 | $535 | $541 | $596 | $830 | $924 | 66.6 | 0.8 | -4.4 | 1.2 | 10.0 | 39.3 | 11.3 |
| Cost of goods sold (COGS) | 788,301 | 865,003 | 790,334 | 670,514 | 739,311 | 1,013,441 | 1,063,038 | 34.9 | 9.7 | -8.6 | -15.2 | 10.3 | 37.1 | 4.9 |
| Gross profit or (loss) | 170,873 | 142,245 | 125,131 | 125,468 | 95,250 | 230,485 | 182,745 | 6.9 | -16.8 | -12.0 | 0.3 | -24.1 | 142.0 | -20.7 |
| SG&A expenses | 72,171 | 73,221 | 80,677 | 61,147 | 57,818 | 84,110 | 73,528 | 1.9 | 1.5 | 10.2 | -24.2 | -5.4 | 45.5 | -12.6 |
| Operating income or (loss) | 98,702 | 69,024 | 44,454 | 64,321 | 37,432 | 146,375 | 109,217 | 10.7 | -30.1 | -35.6 | 44.7 | -41.8 | 291.0 | -25.4 |
| Capital expenditures | 33,644 | 23,253 | 18,374 | 37,606 | 29,085 | 23,314 | 31,166 | -7.4 | -30.9 | -21.0 | 104.7 | -22.7 | -19.8 | 33.7 |
| Unit COGS | $456 | $480 | $462 | $456 | $528 | $676 | $788 | 72.9 | 5.4 | -3.9 | -1.2 | 15.7 | 28.1 | 16.6 |
| Unit SG&A expenses | $42 | $41 | $47 | $42 | $41 | $56 | $55 | 30.6 | -2.6 | 15.9 | -11.8 | -0.8 | 36.0 | -2.8 |
| Unit operating income or (loss) | $57 | $38 | $26 | $44 | $27 | $98 | $81 | 41.9 | -32.8 | -32.2 | 68.5 | -38.9 | 265.4 | -17.0 |
| COGS/sales (1) | 82.2 | 85.9 | 86.3 | 84.2 | 88.6 | 81.5 | 85.3 | 3.1 | 3.7 | 0.5 | -2.1 | 4.3 | -7.1 | 3.9 |
| Operating income or (loss)/ sales (1) | 10.3 | 6.9 | 4.9 | 8.1 | 4.5 | 11.8 | 8.8 | -1.5 | -3.4 | -2.0 | 3.2 | -3.6 | 7.3 | -3.0 |

(1) "Reported data" are in percent and "period changes" are in percentage points.
(2) Not applicable.

Note.--Financial data are reported on a fiscal year basis and may not necessarily be comparable to data reported on a calendar year basis. Because of rounding, figures may not add to the totals shown. Unit values and shares are calculated from the unrounded figures.

Source: Compiled from data submitted in response to Commission questionnaires, official Commerce statistics, Customs data, and Cansim (Canada) data.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

**Table C-2**
**LWR pipe and tube: Summary data concerning the U.S. market, 1999-2005**

(Quantity=1,000 short tons, value=1,000 dollars, unit values, unit labor costs, and unit expenses are per short ton; period changes=percent, except where noted)

| | Reported data | | | | | | | Period changes | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Item | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 1999-2005 | 1999-2000 | 2000-2001 | 2001-2002 | 2002-2003 | 2003-2004 | 2004-2005 |
| U.S. consumption quantity: | | | | | | | | | | | | | | |
| Amount | 749 | 746 | 668 | 787 | 793 | 763 | 792 | 5.8 | -0.5 | -10.4 | 17.9 | 0.7 | -3.7 | 3.8 |
| Producers' share (1) | 69.8 | 67.3 | 66.5 | 62.6 | 63.4 | 63.7 | 57.4 | -12.4 | -2.5 | -0.8 | -3.9 | 0.7 | 0.3 | -6.3 |
| Importers' share (1): | | | | | | | | | | | | | | |
| Argentina | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | -0.0 | 0.0 | -0.0 | 0.0 | 0.0 |
| Taiwan | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | -0.0 | -0.0 | -0.0 | 0.0 | 0.0 | 0.0 |
| Subtotal | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | -0.0 | -0.0 | -0.0 | -0.0 | 0.0 | 0.0 |
| All other sources | 30.2 | 32.7 | 33.5 | 37.4 | 36.6 | 36.3 | 42.6 | 12.3 | 2.5 | 0.8 | 3.9 | -0.7 | -0.3 | 6.3 |
| Total imports | 30.2 | 32.7 | 33.5 | 37.4 | 36.6 | 36.3 | 42.6 | 12.4 | 2.5 | 0.8 | 3.9 | -0.7 | -0.3 | 6.3 |
| U.S. consumption value: | | | | | | | | | | | | | | |
| Amount | 403,990 | 423,193 | 352,957 | 422,226 | 437,124 | 649,020 | 691,926 | 71.3 | 4.8 | -16.6 | 19.6 | 3.5 | 48.5 | 6.6 |
| Producers' share (1) | 74.5 | 71.1 | 70.4 | 66.6 | 67.6 | 67.5 | 61.4 | -13.1 | -3.4 | -0.7 | -3.8 | 1.0 | -0.1 | -6.1 |
| Importers' share (1): | | | | | | | | | | | | | | |
| Argentina | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | -0.0 | 0.0 | -0.0 | 0.0 | 0.0 |
| Taiwan | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | -0.0 | -0.0 | -0.0 | 0.0 | 0.0 | 0.0 |
| Subtotal | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | -0.0 | -0.0 | -0.0 | -0.0 | 0.0 | 0.0 |
| All other sources | 25.5 | 28.9 | 29.6 | 33.4 | 32.4 | 32.5 | 38.5 | 13.0 | 3.4 | 0.7 | 3.8 | -1.0 | 0.0 | 6.1 |
| Total imports | 25.5 | 28.9 | 29.6 | 33.4 | 32.4 | 32.5 | 38.6 | 13.1 | 3.4 | 0.7 | 3.8 | -1.0 | 0.1 | 6.1 |
| U.S. imports from: | | | | | | | | | | | | | | |
| Argentina: | | | | | | | | | | | | | | |
| Quantity | 0 | 0.003 | 0 | 0.014 | 0 | 0 | 0 | (2) | (2) | -100.0 | (2) | -100.0 | (2) | (2) |
| Value | 0 | 6 | 0 | 7 | 0 | 0 | 0 | (2) | (2) | -100.0 | (2) | -100.0 | (2) | (2) |
| Unit value | (2) | $2,068 | (2) | $483 | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) |
| Ending inventory quantity | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (2) | (2) | (2) | (2) | (2) | (2) | (2) |
| Taiwan: | | | | | | | | | | | | | | |
| Quantity | 0.077 | 0.023 | 0.013 | 0 | 0 | 0.059 | 0.277 | 258.4 | -69.9 | -43.1 | -100.0 | (2) | (2) | 372.0 |
| Value | 132 | 48 | 6 | 0 | 0 | 98 | 441 | 233.0 | -63.8 | -86.6 | -100.0 | (2) | (2) | 352.2 |
| Unit value | $1,713 | $2,062 | $484 | (2) | (2) | $1,661 | $1,592 | -7.1 | 20.3 | -76.5 | (2) | (2) | (2) | -4.2 |
| Ending inventory quantity | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (2) | (2) | (2) | (2) | (2) | (2) | (2) |
| Subtotal (subject): | | | | | | | | | | | | | | |
| Quantity | 0.077 | 0.026 | 0.013 | 0.014 | 0 | 0.059 | 0.277 | 258.4 | -66.1 | -49.5 | 7.8 | -100.0 | (2) | 372.0 |
| Value | 132 | 54 | 6 | 7 | 0 | 98 | 441 | 233.0 | -59.2 | -88.1 | 7.5 | -100.0 | (2) | 352.2 |
| Unit value | $1,713 | $2,063 | $484 | $483 | (2) | $1,661 | $1,592 | -7.1 | 20.4 | -76.5 | -0.3 | (2) | (2) | -4.2 |
| Ending inventory quantity | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (2) | (2) | (2) | (2) | (2) | (2) | (2) |
| All other sources: | | | | | | | | | | | | | | |
| Quantity | 227 | 244 | 224 | 294 | 290 | 277 | 337 | 48.9 | 7.6 | -8.2 | 31.4 | -1.3 | -4.6 | 21.8 |
| Value | 103,032 | 122,291 | 104,642 | 141,019 | 141,739 | 210,700 | 266,654 | 158.8 | 18.7 | -14.4 | 34.8 | 0.5 | 48.7 | 26.6 |
| Unit value | $455 | $502 | $468 | $479 | $488 | $761 | $790 | 73.8 | 10.3 | -6.8 | 2.5 | 1.8 | 55.8 | 3.9 |
| Ending inventory quantity | 1 | 1 | 1 | 1 | 0 | 1 | 1 | -13.8 | 4.3 | -22.3 | 38.3 | -97.7 | 3,566.7 | -9.1 |
| All sources: | | | | | | | | | | | | | | |
| Quantity | 227 | 244 | 224 | 294 | 290 | 277 | 338 | 49.0 | 7.6 | -8.2 | 31.4 | -1.3 | -4.6 | 21.8 |
| Value | 103,165 | 122,345 | 104,648 | 141,026 | 141,739 | 210,798 | 267,095 | 158.9 | 18.6 | -14.5 | 34.8 | 0.5 | 48.7 | 26.7 |
| Unit value | $455 | $502 | $468 | $479 | $488 | $761 | $791 | 73.8 | 10.2 | -6.8 | 2.5 | 1.8 | 55.8 | 4.0 |
| Ending inventory quantity | 1 | 1 | 1 | 1 | 0 | 1 | 1 | -13.8 | 4.3 | -22.3 | 38.3 | -97.7 | 3,566.7 | -9.1 |
| U.S. producers': | | | | | | | | | | | | | | |
| Average capacity quantity | 901 | 893 | 894 | 924 | 883 | 891 | 886 | -1.6 | -0.9 | 0.1 | 3.4 | -4.5 | 0.9 | -0.5 |
| Production quantity | 544 | 518 | 450 | 507 | 503 | 488 | 451 | -17.1 | -4.7 | -13.2 | 12.7 | -0.7 | -3.0 | -7.6 |
| Capacity utilization (1) | 60.3 | 58.0 | 50.3 | 54.8 | 57.0 | 54.8 | 50.9 | -9.5 | -2.3 | -7.7 | 4.5 | 2.2 | -2.2 | -3.9 |
| U.S. shipments: | | | | | | | | | | | | | | |
| Quantity | 523 | 502 | 444 | 493 | 502 | 486 | 455 | -13.0 | -4.0 | -11.5 | 11.0 | 1.9 | -3.2 | -6.4 |
| Value | 300,825 | 300,848 | 248,309 | 281,200 | 295,385 | 438,222 | 424,830 | 41.2 | 0.0 | -17.5 | 13.2 | 5.0 | 48.4 | -3.1 |
| Unit value | $576 | $600 | $559 | $570 | $588 | $902 | $934 | 62.3 | 4.2 | -6.7 | 2.0 | 3.1 | 53.3 | 3.6 |
| Export shipments: | | | | | | | | | | | | | | |
| Quantity | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Value | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Unit value | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Ending inventory quantity | 66 | 73 | 66 | 73 | 69 | 66 | 60 | -8.6 | 10.1 | -8.7 | 10.9 | -5.8 | -4.7 | -8.5 |
| Inventories/total shipments (1) | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Production workers | 1,093 | 1,050 | 978 | 1,058 | 1,099 | 1,068 | 1,059 | -3.1 | -3.9 | -6.9 | 8.2 | 3.9 | -2.8 | -0.8 |
| Hours worked (1,000s) | 1,807 | 1,766 | 1,559 | 1,680 | 1,998 | 1,867 | 1,770 | -2.0 | -2.3 | -11.7 | 7.7 | 18.9 | -6.6 | -5.2 |
| Wages paid ($1,000s) | 28,178 | 27,048 | 25,256 | 29,610 | 34,092 | 34,009 | 32,999 | 17.1 | -4.0 | -6.6 | 17.2 | 15.1 | -0.2 | -3.0 |
| Hourly wages | $15.59 | $15.32 | $16.20 | $17.63 | $17.07 | $18.22 | $18.64 | 19.6 | -1.8 | 5.8 | 8.8 | -3.2 | 6.8 | 2.3 |
| Productivity (tons per hour) | 0.301 | 0.293 | 0.288 | 0.302 | 0.252 | 0.261 | 0.255 | -15.4 | -2.5 | -1.7 | 4.6 | -16.5 | 3.8 | -2.6 |
| Unit labor costs | $52 | $52 | $56 | $58 | $68 | $70 | $73 | 41.2 | 0.7 | 7.6 | 4.1 | 16.0 | 2.8 | 5.0 |
| Net sales: | | | | | | | | | | | | | | |
| Quantity | 499 | 477 | 421 | 467 | 509 | 490 | 457 | -8.4 | -4.5 | -11.7 | 11.0 | 9.0 | -3.8 | -6.6 |
| Value | 288,564 | 288,059 | 234,075 | 265,797 | 297,840 | 441,580 | 428,401 | 48.5 | -0.2 | -18.7 | 13.6 | 12.1 | 48.3 | -3.0 |
| Unit value | $578 | $604 | $556 | $569 | $585 | $901 | $936 | 62.0 | 4.6 | -7.9 | 2.3 | 2.8 | 54.0 | 3.9 |
| Cost of goods sold (COGS) | 226,206 | 233,531 | 188,135 | 210,432 | 252,677 | 337,733 | 356,747 | 57.7 | 3.2 | -19.4 | 11.9 | 20.1 | 33.7 | 5.6 |
| Gross profit or (loss) | 62,358 | 54,528 | 45,940 | 55,365 | 45,163 | 103,847 | 71,654 | 14.9 | -12.6 | -15.8 | 20.5 | -18.4 | 129.9 | -31.0 |
| SG&A expenses | 22,165 | 22,804 | 22,089 | 24,374 | 23,682 | 30,408 | 26,978 | 21.7 | 2.9 | -3.1 | 10.3 | -2.8 | 28.4 | -11.3 |
| Operating income or (loss) | 40,193 | 31,724 | 23,851 | 30,991 | 21,481 | 73,438 | 44,676 | 11.2 | -21.1 | -24.8 | 29.9 | -30.7 | 241.9 | -39.2 |
| Capital expenditures | 7,698 | 8,578 | 7,727 | 5,768 | 10,842 | 9,973 | 7,434 | -3.4 | 11.4 | -9.9 | -25.4 | 88.0 | -8.0 | -25.5 |
| Unit COGS | $453 | $490 | $447 | $451 | $496 | $689 | $780 | 72.1 | 8.1 | -8.7 | 0.8 | 10.1 | 38.9 | 13.1 |
| Unit SG&A expenses | $44 | $48 | $53 | $52 | $47 | $62 | $59 | 32.8 | 7.8 | 9.7 | -0.6 | -10.9 | 33.4 | -5.0 |
| Unit operating income or (loss) | $81 | $67 | $57 | $66 | $42 | $150 | $98 | 21.3 | -17.3 | -14.8 | 17.1 | -36.4 | 255.2 | -34.8 |
| COGS/sales (1) | 78.4 | 81.1 | 80.4 | 79.2 | 84.8 | 76.5 | 83.3 | 4.9 | 2.7 | -0.7 | -1.2 | 5.7 | -8.4 | 6.8 |
| Operating income or (loss)/ sales (1) | 13.9 | 11.0 | 10.2 | 11.7 | 7.2 | 16.6 | 10.4 | -3.5 | -2.9 | -0.8 | 1.5 | -4.4 | 9.4 | -6.2 |

(1) "Reported data" are in percent and "period changes" are in percentage points.
(2) Not applicable.

Note.--Financial data are reported on a fiscal year basis and may not necessarily be comparable to data reported on a calendar year basis. Because of rounding, figures may not add to the totals shown. Unit values and shares are calculated from the unrounded figures.

Source: Compiled from data submitted in response to Commission questionnaires and from official statistics of the U.S. Department of Commerce.

Table C-1
**Circular welded carbon steel pipes and tubes: Summary data concerning the U.S. market, 1997-98, January-September 1998, and January-September 1999**

(Quantity=short tons, value=1,000 dollars, unit values, unit labor costs, and unit expenses are per short ton; period changes=percent, except where noted)

| Item | Reported data | | | | Period changes | |
|---|---|---|---|---|---|---|
| | | | January-September | | | Jan.-Sept. |
| | 1997 | 1998 | 1998 | 1999 | 1997-98 | 1998-99 |
| U.S. consumption quantity: | | | | | | |
| Amount | 2,812,359 | 2,996,472 | 2,304,619 | 2,191,218 | 6.5 | -4.9 |
| Producers' share (1) | 76.2 | 73.0 | 73.2 | 73.8 | -3.3 | 0.7 |
| Importers' share (1): | | | | | | |
| Brazil | (2) | (2) | (2) | (2) | 0.0 | 0.0 |
| India | 0.4 | 0.4 | 0.5 | 0.3 | 0.0 | -0.1 |
| Korea | 6.2 | 5.8 | 5.2 | 5.9 | -0.3 | 0.7 |
| Mexico | 0.1 | 0.5 | 0.5 | 0.9 | 0.4 | 0.4 |
| Taiwan | 0.8 | 1.4 | 1.5 | 1.4 | 0.5 | -0.1 |
| Thailand | 2.2 | 0.9 | 1.2 | 1.6 | -1.3 | 0.4 |
| Turkey | 0.1 | 0.2 | 0.1 | 0.6 | 0.2 | 0.5 |
| Venezuela | (2) | 0.1 | 0.1 | 0.0 | 0.1 | -0.1 |
| Subtotal | 9.8 | 9.5 | 9.2 | 10.8 | -0.3 | 1.6 |
| Other sources (3) | 14.0 | 17.6 | 17.6 | 15.4 | 3.6 | -2.2 |
| Total imports | 23.8 | 27.0 | 26.8 | 26.2 | 3.3 | -0.7 |
| U.S. consumption value: | | | | | | |
| Amount | 1,678,432 | 1,727,424 | 1,344,256 | 1,193,290 | 2.9 | -11.2 |
| Producers' share (1) | 77.9 | 75.0 | 75.2 | 76.2 | -2.9 | 1.0 |
| Importers' share (1): | | | | | | |
| Brazil | (2) | (2) | (2) | (2) | 0.0 | 0.0 |
| India | 0.3 | 0.4 | 0.4 | 0.3 | 0.0 | -0.2 |
| Korea | 4.8 | 4.6 | 4.2 | 4.4 | -0.2 | 0.2 |
| Mexico | 0.1 | 0.5 | 0.5 | 0.8 | 0.4 | 0.3 |
| Taiwan | 0.6 | 1.1 | 1.1 | 1.0 | 0.4 | -0.2 |
| Thailand | 1.8 | 0.8 | 1.0 | 1.2 | -1.0 | 0.2 |
| Turkey | 0.1 | 0.2 | 0.1 | 0.4 | 0.1 | 0.3 |
| Venezuela | (2) | 0.1 | 0.1 | 0.0 | 0.1 | -0.1 |
| Subtotal | 7.8 | 7.6 | 7.5 | 8.1 | -0.2 | 0.6 |
| Other sources (3) | 14.3 | 17.3 | 17.3 | 15.7 | 3.1 | -1.6 |
| Total imports | 22.1 | 25.0 | 24.8 | 23.8 | 2.9 | -1.0 |
| U.S. imports from: | | | | | | |
| Brazil: | | | | | | |
| Quantity | 69 | 45 | 38 | 45 | -33.8 | 19.1 |
| Value | 139 | 82 | 70 | 72 | -41.1 | 3.0 |
| Unit value | $2,031.95 | $1,808.18 | $1,844.43 | $1,595.27 | -11.0 | -13.5 |
| Ending inventory quantity | 0 | 0 | 0 | 0 | 0.0 | 0.0 |
| India: | | | | | | |
| Quantity | 10,095 | 12,137 | 11,190 | 7,429 | 20.2 | -33.6 |
| Value | 5,367 | 6,211 | 5,686 | 3,097 | 15.7 | -45.5 |
| Unit value | $531.63 | $511.71 | $508.09 | $416.87 | -3.7 | -18.0 |
| Ending inventory quantity | 0 | 0 | 0 | 0 | 0.0 | 0.0 |
| Korea: | | | | | | |
| Quantity | 173,579 | 174,929 | 120,983 | 129,806 | 0.8 | 7.3 |
| Value | 80,284 | 79,702 | 56,583 | 52,656 | -0.7 | -6.9 |
| Unit value | $462.52 | $455.62 | $467.69 | $405.65 | -1.5 | -13.3 |
| Ending inventory quantity | 0 | 0 | 0 | 1,011 | 0.0 | (4) |
| Mexico: | | | | | | |
| Quantity | 3,407 | 16,282 | 12,501 | 19,875 | 377.9 | 59.0 |
| Value | 1,957 | 8,262 | 6,360 | 9,712 | 322.1 | 52.7 |
| Unit value | $574.44 | $507.41 | $508.73 | $488.64 | -11.7 | -4.0 |
| Ending inventory quantity | 0 | 422 | 394 | 96 | (4) | -75.6 |
| Taiwan: | | | | | | |
| Quantity | 23,027 | 41,007 | 33,980 | 30,792 | 78.1 | -9.4 |
| Value | 10,861 | 18,144 | 15,306 | 11,353 | 67.0 | -25.8 |
| Unit value | $471.69 | $442.45 | $450.44 | $368.68 | -6.2 | -18.2 |
| Ending inventory quantity | 1,620 | 583 | 632 | 393 | -64.0 | -37.8 |
| Thailand: | | | | | | |
| Quantity | 62,328 | 28,049 | 28,049 | 35,251 | -55.0 | 25.7 |
| Value | 30,740 | 13,996 | 13,996 | 14,898 | -54.5 | 6.4 |
| Unit value | $493.20 | $499.00 | $499.00 | $422.63 | 1.2 | -15.3 |
| Ending inventory quantity | 3,189 | 1,996 | 477 | 1,924 | -37.4 | 303.4 |
| Turkey: | | | | | | |
| Quantity | 2,674 | 7,396 | 2,469 | 12,970 | 176.6 | 425.3 |
| Value | 1,225 | 3,334 | 1,163 | 4,920 | 172.0 | 323.2 |
| Unit value | $458.32 | $450.70 | $470.81 | $379.28 | -1.7 | -19.4 |
| Ending inventory quantity | 0 | 0 | 0 | 0 | 0.0 | 0.0 |

Table continued on next page.

**Table C-1--Continued**
**Circular welded carbon steel pipes and tubes: Summary data concerning the U.S. market, 1997-98, January-September 1998, and January-September 1999**

(Quantity=short tons, value=1,000 dollars, unit values, unit labor costs, and unit expenses are per short ton; period changes=percent, except where noted)

| Item | Reported data | | | | Period changes | |
|---|---|---|---|---|---|---|
| | | | January-September | | | Jan.-Sept. |
| | 1997 | 1998 | 1998 | 1999 | 1997-98 | 1998-99 |
| U.S. imports from: | | | | | | |
| Venezuela: | | | | | | |
| Quantity | 110 | 3,327 | 3,327 | 0 | 2,924.2 | -100.0 |
| Value | 66 | 1,660 | 1,660 | 0 | 2,407.0 | -100.0 |
| Unit value | $601.98 | $499.03 | $499.03 | (4) | -17.1 | (4) |
| Ending inventory quantity | 0 | 0 | 0 | 0 | 0.0 | 0.0 |
| Subtotal: | | | | | | |
| Quantity | 275,288 | 283,174 | 212,537 | 236,170 | 2.9 | 11.1 |
| Value | 130,641 | 131,391 | 100,824 | 96,707 | 0.6 | -4.1 |
| Unit value | $474.56 | $463.99 | $474.38 | $409.48 | -2.2 | -13.7 |
| Ending inventory quantity | 4,809 | 3,001 | 1,503 | 3,424 | -37.6 | 127.8 |
| Other sources (3): | | | | | | |
| Quantity | 393,202 | 526,937 | 405,855 | 337,316 | 34.0 | -16.9 |
| Value | 239,456 | 299,612 | 232,489 | 187,489 | 25.1 | -19.4 |
| Unit value | $608.99 | $568.59 | $572.84 | $555.83 | -6.6 | -3.0 |
| Ending inventory quantity | 490 | 1,052 | 6,371 | 1,850 | 114.7 | -71.0 |
| All sources: | | | | | | |
| Quantity | 668,490 | 810,111 | 618,392 | 573,486 | 21.2 | -7.3 |
| Value | 370,097 | 431,002 | 333,313 | 284,196 | 16.5 | -14.7 |
| Unit value | $553.63 | $532.03 | $539.00 | $495.56 | -3.9 | -8.1 |
| Ending inventory quantity | 5,299 | 4,053 | 7,874 | 5,274 | -23.5 | -33.0 |
| U.S. producers': | | | | | | |
| Average capacity quantity | 2,960,690 | 3,039,075 | 2,286,578 | 2,297,082 | 2.6 | 0.5 |
| Production quantity | 2,256,226 | 2,226,684 | 1,705,991 | 1,604,410 | -1.3 | -6.0 |
| Capacity utilization (1) | 76.2 | 73.3 | 74.6 | 69.8 | -2.9 | -4.8 |
| U.S. shipments: | | | | | | |
| Quantity | 2,143,869 | 2,188,361 | 1,686,227 | 1,617,732 | 2.0 | -4.1 |
| Value | 1,308,335 | 1,296,421 | 1,010,943 | 909,094 | -0.9 | -10.1 |
| Unit value | $610.27 | $592.96 | $599.53 | $561.96 | -2.8 | -6.3 |
| Export shipments: | | | | | | |
| Quantity | 102,827 | 48,401 | 37,960 | 36,819 | -52.9 | -3.0 |
| Value | 57,243 | 28,862 | 22,173 | 19,802 | -49.6 | -10.7 |
| Unit value | $556.69 | $596.32 | $584.12 | $537.83 | 7.1 | -7.9 |
| Ending inventory quantity | 272,395 | 270,689 | 259,005 | 245,331 | -0.6 | -5.3 |
| Inventories/total shipments (1) | 12.1 | 12.1 | 11.3 | 11.1 | -0.0 | -0.1 |
| Production workers | 2,869 | 2,996 | 2,962 | 2,650 | 4.4 | -0.4 |
| Hours worked (1,000s) | 6,132 | 6,160 | 4,648 | 4,651 | 0.5 | 0.1 |
| Wages paid ($1,000s) | 100,442 | 102,421 | 76,564 | 75,637 | 2.0 | 2.6 |
| Hourly wages | $15.44 | $15.79 | $15.64 | $15.97 | 2.3 | 2.1 |
| Productivity (tons/1,000 hours) | 321.3 | 324.0 | 325.6 | 317.8 | 0.8 | -2.4 |
| Unit labor costs | $49.17 | $49.57 | $48.89 | $51.14 | 0.8 | 4.6 |
| Net sales: | | | | | | |
| Quantity | 2,125,717 | 2,139,655 | 1,668,872 | 1,583,653 | 0.7 | -5.1 |
| Value | 1,309,986 | 1,301,467 | 1,017,477 | 907,007 | -0.7 | -10.9 |
| Unit value | $616.26 | $608.26 | $609.68 | $572.73 | -1.3 | -6.1 |
| Cost of goods sold (COGS) | 1,112,093 | 1,106,748 | 864,290 | 768,242 | -0.5 | -11.1 |
| Gross profit or (loss) | 197,894 | 194,719 | 153,187 | 138,765 | -1.6 | -9.4 |
| SG&A expenses | 69,963 | 77,188 | 59,140 | 61,612 | 10.3 | 4.2 |
| Operating income or (loss) | 127,910 | 117,531 | 94,048 | 77,152 | -8.1 | -18.0 |
| Capital expenditures | 25,039 | 32,814 | 23,511 | 26,066 | 31.1 | 10.9 |
| Unit COGS | $523.16 | $517.26 | $517.89 | $485.11 | -1.1 | -6.3 |
| Unit SG&A expenses | $32.92 | $36.08 | $35.44 | $38.91 | 9.6 | 9.8 |
| Unit operating income or (loss) | $60.17 | $54.93 | $56.35 | $48.72 | -8.7 | -13.6 |
| COGS/sales (1) | 84.9 | 85.0 | 84.9 | 84.7 | 0.1 | -0.2 |
| Operating income or (loss)/ sales (1) | 9.8 | 9.0 | 9.2 | 8.5 | -0.7 | -0.7 |

(1) "Reported data" are in percent and "period changes" are in percentage points.
(2) Less than 0.05 percent.
(3) Estimated by the staff to remove mechanical pipe and tubing included in official Commerce statistics.
(4) Not applicable.

Note.--Financial data are reported on a fiscal year basis and may not necessarily be comparable to data reported on a calendar year basis. Because of rounding, figures may not add to the totals shown. Unit values and shares are calculated from the unrounded figures. January-September inventory ratios are annualized.

Source: Compiled from data submitted in response to Commission questionnaires and from official Commerce statistics.

Table C-2
**Certain small diameter circular welded carbon steel pipes and tubes: Summary data concerning the U.S. market, 1997-98, January-September 1998, and January-September 1999**

(Quantity=short tons, value=1,000 dollars, unit values, unit labor costs, and unit expenses are per short ton; period changes=percent, except where noted)

| Item | Reported data | | | | Period changes | |
|---|---|---|---|---|---|---|
| | | | January-September | | | Jan.-Sept. |
| | 1997 | 1998 | 1998 | 1999 | 1997-98 | 1998-99 |
| U.S. consumption quantity: | | | | | | |
| Amount | 1,625,326 | 1,749,775 | 1,343,716 | 1,303,382 | 7.7 | -3.0 |
| Producers' share (1) | 70.4 | 64.7 | 65.4 | 64.8 | -5.7 | -0.6 |
| Importers' share (1): | | | | | | |
| Taiwan | 1.4 | 2.3 | 2.5 | 2.2 | 0.9 | -0.3 |
| Other sources | 28.2 | 33.0 | 32.1 | 33.1 | 4.7 | 0.9 |
| Total imports | 29.6 | 35.3 | 34.6 | 35.2 | 5.7 | 0.6 |
| U.S. consumption value: | | | | | | |
| Amount | 975,467 | 999,160 | 773,683 | 698,415 | 2.4 | -9.7 |
| Producers' share (1) | 74.3 | 68.4 | 68.9 | 69.3 | -5.9 | 0.4 |
| Importers' share (1): | | | | | | |
| Taiwan | 1.1 | 1.8 | 2.0 | 1.5 | 0.7 | -0.4 |
| Other sources | 24.6 | 29.8 | 29.2 | 29.2 | 5.2 | 0.0 |
| Total imports | 25.7 | 31.6 | 31.1 | 30.7 | 5.9 | -0.4 |
| U.S. imports from: | | | | | | |
| Taiwan: | | | | | | |
| Quantity | 23,015 | 40,946 | 33,980 | 28,648 | 77.9 | -15.7 |
| Value | 10,855 | 18,120 | 15,308 | 10,678 | 66.9 | -30.2 |
| Unit value | $471.66 | $442.54 | $450.44 | $372.73 | -6.2 | -17.3 |
| Ending inventory quantity | 0 | 0 | 0 | 0 | 0.0 | 0.0 |
| Other sources: | | | | | | |
| Quantity | 458,728 | 576,778 | 431,487 | 430,774 | 25.7 | -0.2 |
| Value | 240,203 | 297,618 | 225,556 | 203,904 | 23.9 | -9.6 |
| Unit value | $523.63 | $516.00 | $522.74 | $473.34 | -1.5 | -9.4 |
| Ending inventory quantity | 2,780 | 1,889 | 542 | 2,779 | -32.1 | 412.7 |
| All sources: | | | | | | |
| Quantity | 481,743 | 617,723 | 465,467 | 459,422 | 28.2 | -1.3 |
| Value | 251,058 | 315,738 | 240,861 | 214,582 | 25.8 | -10.9 |
| Unit value | $521.16 | $511.13 | $517.46 | $467.07 | -1.0 | -9.7 |
| Ending inventory quantity | 2,780 | 1,889 | 542 | 2,779 | -32.1 | 412.7 |
| U.S. producers': | | | | | | |
| Average capacity quantity | 1,666,197 | 1,677,390 | 1,244,668 | 1,241,968 | 0.7 | -0.2 |
| Production quantity | 1,170,933 | 1,148,789 | 884,901 | 843,091 | -1.9 | -4.6 |
| Capacity utilization (1) | 70.3 | 68.5 | 71.1 | 67.9 | -1.8 | -3.1 |
| U.S. shipments: | | | | | | |
| Quantity | 1,143,583 | 1,132,052 | 878,240 | 843,960 | -1.0 | -3.9 |
| Value | 724,409 | 683,422 | 532,821 | 483,834 | -5.7 | -9.2 |
| Unit value | $633.46 | $603.70 | $606.68 | $573.29 | -4.7 | -5.5 |
| Export shipments: | | | | | | |
| Quantity | 40,702 | 32,511 | 25,743 | 27,988 | -20.1 | 8.7 |
| Value | 25,232 | 20,346 | 15,445 | 15,566 | -19.4 | 0.8 |
| Unit value | $619.91 | $625.83 | $599.98 | $556.16 | 1.0 | -7.3 |
| Ending inventory quantity | 148,895 | 140,828 | 139,781 | 143,078 | -5.4 | 2.4 |
| Inventories/total shipments (1) | 12.7 | 12.1 | 11.6 | 12.3 | -0.6 | 0.7 |
| Production workers | 1,985 | 1,983 | 1,880 | 1,859 | -0.1 | -1.1 |
| Hours worked (1,000s) | 3,985 | 3,739 | 2,827 | 2,768 | -6.2 | -2.1 |
| Wages paid ($1,000s) | 61,389 | 60,609 | 45,131 | 45,634 | -2.3 | 1.0 |
| Hourly wages | $15.46 | $16.22 | $16.01 | $16.39 | 4.9 | 2.4 |
| Productivity (tons/1,000 hours) | 275.7 | 288.4 | 296.0 | 285.8 | 4.6 | -3.4 |
| Unit labor costs | $57.55 | $57.29 | $56.27 | $58.46 | -0.5 | 5.8 |
| Net sales: | | | | | | |
| Quantity | 1,073,628 | 1,069,558 | 824,834 | 813,310 | -0.4 | -1.4 |
| Value | 692,683 | 662,546 | 515,210 | 481,178 | -4.4 | -6.6 |
| Unit value | $645.18 | $619.46 | $624.62 | $591.63 | -4.0 | -5.3 |
| Cost of goods sold (COGS) | 613,227 | 586,837 | 456,314 | 417,690 | -4.3 | -8.5 |
| Gross profit or (loss) | 79,456 | 75,709 | 58,896 | 63,488 | -4.7 | 7.8 |
| SG&A expenses | 41,958 | 43,175 | 33,893 | 34,533 | 2.9 | 1.9 |
| Operating income or (loss) | 37,498 | 32,534 | 25,003 | 28,955 | -13.2 | 15.8 |
| Capital expenditures | 7,797 | 7,745 | 5,230 | 6,816 | -0.7 | 30.3 |
| Unit COGS | $571.17 | $548.67 | $553.22 | $513.57 | -3.9 | -7.2 |
| Unit SG&A expenses | $39.08 | $40.37 | $41.09 | $42.46 | 3.3 | 3.3 |
| Unit operating income or (loss) | $34.93 | $30.42 | $30.31 | $35.60 | -12.9 | 17.4 |
| COGS/sales (1) | 88.5 | 88.6 | 88.6 | 86.8 | 0.0 | -1.8 |
| Operating income or (loss)/sales (1) | 5.4 | 4.9 | 4.9 | 6.0 | -0.5 | 1.2 |

(1) "Reported data" are in percent and "period changes" are in percentage points.

Note.--Financial data are reported on a fiscal year basis and may not necessarily be comparable to data reported on a calendar year basis. Because of rounding, figures may not add to the totals shown. Unit values and shares are calculated from the unrounded figures. January-September inventory ratios are annualized.

Source: Compiled from data submitted in response to Commission questionnaires and from official Commerce statistics.

Table C-3

**Light-walled rectangular carbon steel pipes and tubes: Summary data concerning the U.S. market, 1997-98, January-September 1998, and January-September 1999**

(Quantity=short tons, value=1,000 dollars, unit values, unit labor costs, and unit expenses are per short ton; period changes=percent, except where noted)

| | Reported data | | | | Period changes | |
|---|---|---|---|---|---|---|
| | | | January-September | | | Jan.-Sept. |
| Item | 1997 | 1998 | 1998 | 1999 | 1997-98 | 1998-99 |
| U.S. consumption quantity: | | | | | | |
| Amount | 525,598 | 564,898 | 427,891 | 492,192 | 7.5 | 15.0 |
| Producers' share (1) | 72.2 | 71.7 | 72.4 | 66.9 | -0.5 | -5.5 |
| Importers' share (1): | | | | | | |
| Argentina | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Singapore | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Taiwan | 0.0 | (2) | (2) | (2) | 0.0 | 0.0 |
| Subtotal | 0.0 | (2) | (2) | (2) | 0.0 | 0.0 |
| Other sources | 27.8 | 28.3 | 27.6 | 33.1 | 0.5 | 5.5 |
| Total imports | 27.8 | 28.3 | 27.6 | 33.1 | 0.5 | 5.5 |
| U.S. consumption value: | | | | | | |
| Amount | 294,463 | 304,292 | 233,228 | 245,151 | 3.3 | 5.1 |
| Producers' share (1) | 75.1 | 74.3 | 74.8 | 70.0 | -0.8 | -4.7 |
| Importers' share (1): | | | | | | |
| Argentina | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Singapore | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Taiwan | 0.0 | (2) | (2) | (2) | 0.0 | 0.0 |
| Subtotal | 0.0 | (2) | (2) | (2) | 0.0 | 0.0 |
| Other sources | 24.9 | 25.7 | 25.2 | 29.9 | 0.8 | 4.7 |
| Total imports | 24.9 | 25.7 | 25.2 | 30.0 | 0.8 | 4.7 |
| U.S. imports from: | | | | | | |
| Argentina: | | | | | | |
| Quantity | 0 | 0 | 0 | 0 | 0.0 | 0.0 |
| Value | 0 | 0 | 0 | 0 | 0.0 | 0.0 |
| Unit value | (3) | (3) | (3) | (3) | (3) | (3) |
| Ending inventory quantity | 0 | 0 | 0 | 0 | 0.0 | 0.0 |
| Singapore: | | | | | | |
| Quantity | 0 | 0 | 0 | 0 | 0.0 | 0.0 |
| Value | 0 | 0 | 0 | 0 | 0.0 | 0.0 |
| Unit value | (3) | (3) | (3) | (3) | (3) | (3) |
| Ending inventory quantity | 0 | 0 | 0 | 0 | 0.0 | 0.0 |
| Taiwan: | | | | | | |
| Quantity | 0 | 47 | 31 | 38 | (3) | 22.1 |
| Value | 0 | 86 | 57 | 63 | (3) | 11.8 |
| Unit value | (3) | $1,819.40 | $1,842.88 | $1,686.80 | (3) | -8.5 |
| Ending inventory quantity | 0 | 0 | 0 | 0 | 0.0 | 0.0 |
| Subtotal: | | | | | | |
| Quantity | 0 | 47 | 31 | 38 | (3) | 22.1 |
| Value | 0 | 86 | 57 | 63 | (3) | 11.8 |
| Unit value | (3) | $1,819.40 | $1,842.88 | $1,686.80 | (3) | -8.5 |
| Ending inventory quantity | 0 | 0 | 0 | 0 | 0.0 | 0.0 |
| Other sources: | | | | | | |
| Quantity | 146,220 | 159,881 | 118,237 | 162,859 | 9.3 | 37.7 |
| Value | 73,459 | 78,263 | 58,815 | 73,409 | 6.5 | 24.8 |
| Unit value | $502.38 | $489.51 | $497.43 | $450.75 | -2.6 | -9.4 |
| Ending inventory quantity | 300 | 444 | 1,641 | 1,109 | 48.0 | -32.4 |
| All sources: | | | | | | |
| Quantity | 146,220 | 159,928 | 118,268 | 162,897 | 9.4 | 37.7 |
| Value | 73,459 | 78,349 | 58,872 | 73,473 | 6.7 | 24.8 |
| Unit value | $502.38 | $489.90 | $497.78 | $451.04 | -2.5 | -9.4 |
| Ending inventory quantity | 300 | 444 | 1,641 | 1,109 | 48.0 | -32.4 |

Table continued on next page.

Table C-3--Continued
Light-walled rectangular carbon steel pipes and tubes: Summary data concerning the U.S. market, 1997-98, January-September 1998, and January-September 1999

(Quantity=short tons, value=1,000 dollars, unit values, unit labor costs, and unit expenses are per short ton; period changes=percent, except where noted)

| Item | Reported data | | | | Period changes | |
|---|---|---|---|---|---|---|
| | | | January-September | | | Jan.-Sept. |
| | 1997 | 1998 | 1998 | 1999 | 1997-98 | 1998-99 |
| U.S. producers': | | | | | | |
| Average capacity quantity | 567,640 | 599,170 | 447,564 | 494,793 | 5.6 | 10.5 |
| Production quantity | 382,215 | 403,669 | 310,626 | 335,015 | 5.6 | 7.9 |
| Capacity utilization (1) | 67.3 | 67.4 | 69.4 | 67.7 | 0.0 | -1.7 |
| U.S. shipments: | | | | | | |
| Quantity | 379,378 | 404,970 | 309,623 | 329,295 | 6.7 | 6.4 |
| Value | 221,025 | 225,943 | 174,356 | 171,678 | 2.2 | -1.5 |
| Unit value | $582.60 | $557.93 | $563.12 | $521.35 | -4.2 | -7.4 |
| Export shipments: | | | | | | |
| Quantity | *** | *** | *** | *** | *** | *** |
| Value | *** | *** | *** | *** | *** | *** |
| Unit value | *** | *** | *** | *** | *** | *** |
| Ending inventory quantity | 42,960 | 42,295 | 44,653 | 47,908 | -1.5 | 7.3 |
| Inventories/total shipments (1) | *** | *** | *** | *** | *** | *** |
| Production workers | 528 | 549 | 553 | 590 | 4.0 | 6.7 |
| Hours worked (1,000s) | 1,166 | 1,197 | 1,015 | 1,091 | 2.6 | 7.5 |
| Wages paid ($1,000s) | 14,729 | 15,530 | 12,854 | 14,275 | 5.4 | 11.1 |
| Hourly wages | $12.63 | $12.98 | $12.66 | $13.08 | 2.7 | 3.3 |
| Productivity (tons/1,000 hours) | 327.8 | 337.3 | 306.0 | 306.9 | 2.9 | 0.3 |
| Unit labor costs | $38.54 | $38.47 | $41.38 | $42.61 | -0.2 | 3.0 |
| Net sales: | | | | | | |
| Quantity | 187,993 | 183,392 | 143,617 | 145,252 | -2.4 | 1.1 |
| Value | 116,251 | 112,005 | 88,643 | 82,849 | -3.7 | -6.5 |
| Unit value | $618.38 | $610.74 | $617.22 | $570.38 | -1.2 | -7.6 |
| Cost of goods sold (COGS) | 97,201 | 93,860 | 73,905 | 67,768 | -3.4 | -8.3 |
| Gross profit or (loss) | 19,050 | 18,146 | 14,738 | 15,081 | -4.7 | 2.3 |
| SG&A expenses | 8,151 | 7,660 | 6,118 | 6,282 | -6.0 | 2.7 |
| Operating income or (loss) | 10,899 | 10,485 | 8,620 | 8,800 | -3.8 | 2.1 |
| Capital expenditures | 3,897 | 3,088 | 2,166 | *** | -20.8 | *** |
| Unit COGS | $517.05 | $511.80 | $514.60 | $466.56 | -1.0 | -9.3 |
| Unit SG&A expenses | $43.36 | $41.77 | $42.60 | $43.25 | -3.7 | 1.5 |
| Unit operating income or (loss) | $57.98 | $57.17 | $60.02 | $60.58 | -1.4 | 0.9 |
| COGS/sales (1) | 83.6 | 83.8 | 83.4 | 81.8 | 0.2 | -1.6 |
| Operating income or (loss)/ sales (1) | 9.4 | 9.4 | 9.7 | 10.6 | -0.0 | 0.9 |

(1) "Reported data" are in percent and "period changes" are in percentage points.
(2) Less than 0.05 percent.
(3) Not applicable.

Note.--Financial data are reported on a fiscal year basis and may not necessarily be comparable to data reported on a calendar year basis. Because of rounding, figures may not add to the totals shown. Unit values and shares are calculated from the unrounded figures. January-September inventory ratios are annualized.

Source: Compiled from data submitted in response to Commission questionnaires and from official Commerce statistics.

**Table C-4**
**OCTG other than drill pipe: Summary data concerning the U.S. market, 1997-98, January-September 1998, and January-September 1999**

(Quantity=short tons, value=1,000 dollars, unit values, unit labor costs, and unit expenses are per short ton; period changes=percent, except where noted)

| | Reported data | | | | Period changes | |
|---|---|---|---|---|---|---|
| | | | January-September | | | Jan.-Sept. |
| Item | 1997 | 1998 | 1998 | 1999 | 1997-98 | 1998-99 |
| U.S. consumption quantity: | | | | | | |
| Amount | 2,464,896 | 1,649,796 | 1,378,309 | 759,717 | -33.1 | -44.9 |
| Producers' share (1) | 83.8 | 79.4 | 79.0 | 87.5 | -4.4 | 8.5 |
| Importers' share (1): | | | | | | |
| Canada | *** | *** | *** | *** | *** | *** |
| Taiwan | (2) | (2) | (2) | (2) | 0.0 | 0.0 |
| Subtotal | *** | *** | *** | *** | *** | *** |
| Other sources | *** | *** | *** | *** | *** | *** |
| Total imports | 16.2 | 20.6 | 21.0 | 12.5 | 4.4 | -8.5 |
| U.S. consumption value: | | | | | | |
| Amount | 1,766,882 | 1,197,408 | 992,761 | 447,801 | -32.2 | -54.9 |
| Producers' share (1) | 82.9 | 78.2 | 78.0 | 82.9 | -4.7 | 5.0 |
| Importers' share (1): | | | | | | |
| Canada | *** | *** | *** | *** | *** | *** |
| Taiwan | (2) | (2) | (2) | (2) | 0.0 | 0.0 |
| Subtotal | *** | *** | *** | *** | *** | *** |
| Other sources | *** | *** | *** | *** | *** | *** |
| Total imports | 17.1 | 21.8 | 22.0 | 17.1 | 4.7 | -5.0 |
| U.S. imports from: | | | | | | |
| Canada: | | | | | | |
| Quantity | *** | *** | *** | *** | *** | *** |
| Value | *** | *** | *** | *** | *** | *** |
| Unit value | *** | *** | *** | *** | *** | *** |
| Ending inventory quantity | 0 | 0 | 0 | 0 | 0.0 | 0.0 |
| Taiwan: | | | | | | |
| Quantity | 3 | 5 | 2 | 43 | 68.0 | 1,633.4 |
| Value | 19 | 12 | 6 | 66 | -39.1 | 978.3 |
| Unit value | $6,608.22 | $2,396.18 | $2,442.94 | $1,519.66 | -63.7 | -37.8 |
| Ending inventory quantity | 0 | 0 | 0 | 0 | 0.0 | 0.0 |
| Subtotal: | | | | | | |
| Quantity | *** | *** | *** | *** | *** | *** |
| Value | *** | *** | *** | *** | *** | *** |
| Unit value | *** | *** | *** | *** | *** | *** |
| Ending inventory quantity | 0 | 0 | 0 | 0 | 0.0 | 0.0 |
| Other sources: | | | | | | |
| Quantity | *** | *** | *** | *** | *** | *** |
| Value | *** | *** | *** | *** | *** | *** |
| Unit value | *** | *** | *** | *** | *** | *** |
| Ending inventory quantity | 660 | 2,171 | 1,446 | 1,638 | 228.7 | 13.3 |
| All sources: | | | | | | |
| Quantity | 398,258 | 339,463 | 288,987 | 95,021 | -14.8 | -67.1 |
| Value | 302,033 | 261,486 | 218,809 | 76,396 | -13.4 | -65.1 |
| Unit value | $758.38 | $770.29 | $757.16 | $803.99 | 1.6 | 6.2 |
| Ending inventory quantity | 660 | 2,171 | 1,446 | 1,638 | 228.7 | 13.3 |

Table continued on next page.

Table C-4--Continued
OCTG other than drill pipe: Summary data concerning the U.S. market, 1997-98, January-September 1998, and January-September 1999

(Quantity=short tons, value=1,000 dollars, unit values, unit labor costs, and unit expenses are per short ton; period changes=percent, except where noted)

| Item | Reported data | | | | Period changes | |
|---|---|---|---|---|---|---|
| | | | January-September | | | Jan.-Sept. |
| | 1997 | 1998 | 1998 | 1999 | 1997-98 | 1998-99 |
| U.S. producers': | | | | | | |
| Average capacity quantity | 2,597,546 | 2,594,863 | 1,937,483 | 1,888,940 | -0.1 | -2.5 |
| Production quantity | 2,320,660 | 1,435,248 | 1,210,240 | 690,882 | -38.2 | -42.9 |
| Capacity utilization (1) | 89.3 | 55.3 | 62.5 | 36.6 | -34.0 | -25.9 |
| U.S. shipments: | | | | | | |
| Quantity | 2,066,638 | 1,310,333 | 1,089,322 | 664,696 | -36.6 | -39.0 |
| Value | 1,464,849 | 935,922 | 773,952 | 371,405 | -36.1 | -52.0 |
| Unit value | $708.81 | $714.26 | $710.49 | $558.76 | 0.8 | -21.4 |
| Export shipments: | | | | | | |
| Quantity | 192,259 | 148,594 | 113,312 | 47,419 | -22.7 | -58.2 |
| Value | 136,204 | 106,212 | 81,295 | 28,057 | -22.0 | -65.5 |
| Unit value | $708.44 | $714.78 | $717.44 | $591.68 | 0.9 | -17.5 |
| Ending inventory quantity | 188,443 | 164,764 | 202,052 | 133,570 | -12.6 | -33.9 |
| Inventories/total shipments (1) | 8.3 | 11.3 | 12.6 | 14.1 | 3.0 | 1.5 |
| Production workers | 3,835 | 3,182 | 3,190 | 2,204 | -17.0 | -30.9 |
| Hours worked (1,000s) | 8,319 | 5,907 | 4,818 | 3,028 | -29.0 | -37.2 |
| Wages paid ($1,000s) | 150,896 | 100,965 | 84,808 | 52,884 | -33.1 | -37.6 |
| Hourly wages | $18.14 | $17.09 | $17.60 | $17.47 | -5.8 | -0.8 |
| Productivity (tons/1,000 hours) | 279.0 | 243.0 | 251.2 | 228.2 | -12.9 | -9.1 |
| Unit labor costs | $65.02 | $70.35 | $70.08 | $76.55 | 8.2 | 9.2 |
| Net sales: | | | | | | |
| Quantity | 2,263,366 | 1,466,529 | *** | *** | -35.2 | *** |
| Value | 1,609,876 | 1,054,600 | *** | *** | -34.5 | *** |
| Unit value | $711.28 | $719.11 | *** | *** | 1.1 | *** |
| Cost of goods sold (COGS) | 1,413,196 | 983,251 | *** | *** | -30.4 | *** |
| Gross profit or (loss) | 196,680 | 71,349 | 75,175 | (53,537) | -63.7 | (3) |
| SG&A expenses | 69,715 | 60,339 | 47,344 | 32,854 | -13.4 | -30.6 |
| Operating income or (loss) | 126,965 | 11,010 | 27,831 | (86,391) | -91.3 | (3) |
| Capital expenditures | 37,433 | 73,090 | 52,814 | 42,966 | 95.3 | -18.6 |
| Unit COGS | $624.38 | $670.46 | *** | *** | 7.4 | *** |
| Unit SG&A expenses | $30.80 | $41.14 | *** | *** | 33.6 | *** |
| Unit operating income or (loss) | $56.10 | $7.51 | *** | *** | -86.6 | *** |
| COGS/sales (1) | 87.8 | 93.2 | *** | *** | 5.5 | *** |
| Operating income or (loss)/ sales (1) | 7.9 | 1.0 | *** | *** | -6.8 | *** |

(1) "Reported data" are in percent and "period changes" are in percentage points.
(2) Less than 0.05 percent.
(3) Undefined.

Note.--Financial data are reported on a fiscal year basis and may not necessarily be comparable to data reported on a calendar year basis. Because of rounding, figures may not add to the totals shown. Unit values and shares are calculated from the unrounded figures. January-September inventory ratios are annualized.

Source: Compiled from data submitted in response to Commission questionnaires and from official Commerce statistics.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

Table C-5
**Drill pipe: Summary data concerning the U.S. market, 1997-98, January-September 1998, and January-September 1999**

(Quantity=short tons, value=1,000 dollars, unit values, unit labor costs, and unit expenses are per short ton; period changes=percent, except where noted)

| | Reported data | | | | Period changes | |
|---|---|---|---|---|---|---|
| | | | January-September | | | Jan.-Sept. |
| Item | 1997 | 1998 | 1998 | 1999 | 1997-98 | 1998-99 |
| U.S. consumption quantity: | | | | | | |
| Amount | *** | *** | *** | *** | *** | *** |
| Producers' share (1) | *** | *** | *** | *** | *** | *** |
| Importers' share (1): | | | | | | |
| Canada | *** | *** | *** | *** | *** | *** |
| Taiwan | *** | *** | *** | *** | *** | *** |
| Subtotal | *** | *** | *** | *** | *** | *** |
| Other sources | *** | *** | *** | *** | *** | *** |
| Total imports | *** | *** | *** | *** | *** | *** |
| U.S. consumption value: | | | | | | |
| Amount | *** | *** | *** | *** | *** | *** |
| Producers' share (1) | *** | *** | *** | *** | *** | *** |
| Importers' share (1): | | | | | | |
| Canada | *** | *** | *** | *** | *** | *** |
| Taiwan | *** | *** | *** | *** | *** | *** |
| Subtotal | *** | *** | *** | *** | *** | *** |
| Other sources | *** | *** | *** | *** | *** | *** |
| Total imports | *** | *** | *** | *** | *** | *** |
| U.S. imports from: | | | | | | |
| Canada: | | | | | | |
| Quantity | 1,786 | 323 | 277 | 96 | -81.9 | -65.4 |
| Value | 4,821 | 840 | 569 | 394 | -82.6 | -30.6 |
| Unit value | $2,699.99 | $2,601.83 | $2,055.03 | $4,120.61 | -3.6 | 100.5 |
| Ending inventory quantity | 0 | 0 | 0 | 0 | 0.0 | 0.0 |
| Taiwan: | | | | | | |
| Quantity | 0 | 1 | 1 | 21 | (3) | 2,911.8 |
| Value | 0 | 2 | 2 | 25 | (3) | 1,360.4 |
| Unit value | (3) | $2,513.13 | $2,513.13 | $1,218.59 | (3) | -51.5 |
| Ending inventory quantity | 0 | 0 | 0 | 0 | 0.0 | 0.0 |
| Subtotal: | | | | | | |
| Quantity | 1,786 | 324 | 277 | 116 | -81.9 | -58.1 |
| Value | 4,821 | 842 | 570 | 419 | -82.5 | -26.4 |
| Unit value | $2,699.99 | $2,601.64 | $2,056.15 | $3,608.41 | -3.6 | 75.5 |
| Ending inventory quantity | 0 | 0 | 0 | 0 | 0.0 | 0.0 |
| Other sources: | | | | | | |
| Quantity | 11,777 | 7,836 | 7,274 | 2,499 | -33.5 | -65.6 |
| Value | 9,410 | 13,952 | 12,483 | 2,845 | 48.3 | -77.2 |
| Unit value | $798.97 | $1,780.43 | $1,716.22 | $1,138.60 | 122.8 | -33.7 |
| Ending inventory quantity | 4,033 | 3,041 | 3,930 | 2,397 | -24.6 | -39.0 |
| All sources: | | | | | | |
| Quantity | 13,563 | 8,160 | 7,551 | 2,615 | -39.8 | -65.4 |
| Value | 14,231 | 14,794 | 13,054 | 3,265 | 4.0 | -75.0 |
| Unit value | $1,049.24 | $1,812.99 | $1,728.70 | $1,248.39 | 72.8 | -27.8 |
| Ending inventory quantity | 4,033 | 3,041 | 3,930 | 2,397 | -24.6 | -39.0 |

Table continued on next page.

**Table C-5--Continued**
**Drill pipe: Summary data concerning the U.S. market, 1997-98, January-September 1998, and January-September 1999**

(Quantity=short tons, value=1,000 dollars, unit values, unit labor costs, and unit expenses are per short ton; period changes=percent, except where noted)

| Item | Reported data | | | | Period changes | |
|---|---|---|---|---|---|---|
| | | | January-September | | | Jan.-Sept. |
| | 1997 | 1998 | 1998 | 1999 | 1997-98 | 1998-99 |
| U.S. producers': | | | | | | |
| Average capacity quantity | *** | *** | *** | *** | *** | *** |
| Production quantity | *** | *** | *** | *** | *** | *** |
| Capacity utilization (1) | *** | *** | *** | *** | *** | *** |
| U.S. shipments: | | | | | | |
| Quantity | *** | *** | *** | *** | *** | *** |
| Value | *** | *** | *** | *** | *** | *** |
| Unit value | *** | *** | *** | *** | *** | *** |
| Export shipments: | | | | | | |
| Quantity | *** | *** | *** | *** | *** | *** |
| Value | *** | *** | *** | *** | *** | *** |
| Unit value | *** | *** | *** | *** | *** | *** |
| Ending inventory quantity | *** | *** | *** | *** | *** | *** |
| Inventories/total shipments (1) | *** | *** | *** | *** | *** | *** |
| Production workers | *** | *** | *** | *** | *** | *** |
| Hours worked (1,000s) | *** | *** | *** | *** | *** | *** |
| Wages paid ($1,000s) | *** | *** | *** | *** | *** | *** |
| Hourly wages | *** | *** | *** | *** | *** | *** |
| Productivity (tons/1,000 hours) | *** | *** | *** | *** | *** | *** |
| Unit labor costs | *** | *** | *** | *** | *** | *** |
| Net sales: | | | | | | |
| Quantity | *** | *** | *** | *** | *** | *** |
| Value | *** | *** | *** | *** | *** | *** |
| Unit value | *** | *** | *** | *** | *** | *** |
| Cost of goods sold (COGS) | *** | *** | *** | *** | *** | *** |
| Gross profit or (loss) | *** | *** | *** | *** | *** | *** |
| SG&A expenses | *** | *** | *** | *** | *** | *** |
| Operating income or (loss) | *** | *** | *** | *** | *** | *** |
| Capital expenditures | *** | *** | *** | *** | *** | *** |
| Unit COGS | *** | *** | *** | *** | *** | *** |
| Unit SG&A expenses | *** | *** | *** | *** | *** | *** |
| Unit operating income or (loss) | *** | *** | *** | *** | *** | *** |
| COGS/sales (1) | *** | *** | *** | *** | *** | *** |
| Operating income or (loss)/ sales (1) | *** | *** | *** | *** | *** | *** |

(1) "Reported data" are in percent and "period changes" are in percentage points.
(2) Less than 0.05 percent.
(3) Not applicable.
(4) Undefined.

Note.--Financial data are reported on a fiscal year basis and may not necessarily be comparable to data reported on a calendar year basis. Because of rounding, figures may not add to the totals shown. Unit values and shares are calculated from the unrounded figures. January-September inventory ratios are annualized.

Source: Compiled from data submitted in response to Commission questionnaires and from official Commerce statistics.

PUBLIC DOCUMENT

**Table C-6**
**OCTG (including drill pipe): Summary data concerning the U.S. market, 1997-98, January-September 1998, and January-September 1999**

(Quantity=short tons, value=1,000 dollars, unit values, unit labor costs, and unit expenses are per short ton; period changes=percent, except where noted)

| Item | Reported data | | | | Period changes | |
|---|---|---|---|---|---|---|
| | | | January-September | | | Jan.-Sept. |
| | 1997 | 1998 | 1998 | 1999 | 1997-98 | 1998-99 |
| U.S. consumption quantity: | | | | | | |
| Amount | *** | *** | *** | *** | *** | *** |
| Producers' share (1) | *** | *** | *** | *** | *** | *** |
| Importers' share (1): | | | | | | |
| Canada | *** | *** | *** | *** | *** | *** |
| Taiwan | *** | *** | *** | *** | *** | *** |
| Subtotal | *** | *** | *** | *** | *** | *** |
| Other sources | *** | *** | *** | *** | *** | *** |
| Total imports | *** | *** | *** | *** | *** | *** |
| U.S. consumption value: | | | | | | |
| Amount | *** | *** | *** | *** | *** | *** |
| Producers' share (1) | *** | *** | *** | *** | *** | *** |
| Importers' share (1): | | | | | | |
| Canada | *** | *** | *** | *** | *** | *** |
| Taiwan | *** | *** | *** | *** | *** | *** |
| Subtotal | *** | *** | *** | *** | *** | *** |
| Other sources | *** | *** | *** | *** | *** | *** |
| Total imports | *** | *** | *** | *** | *** | *** |
| U.S. imports from: | | | | | | |
| Canada: | | | | | | |
| Quantity | *** | *** | *** | *** | *** | *** |
| Value | *** | *** | *** | *** | *** | *** |
| Unit value | *** | *** | *** | *** | *** | *** |
| Ending inventory quantity | 0 | 0 | 0 | 0 | 0.0 | 0.0 |
| Taiwan: | | | | | | |
| Quantity | 3 | 6 | 3 | 64 | 91.6 | 1,907.4 |
| Value | 19 | 13 | 8 | 91 | -30.1 | 1,062.0 |
| Unit value | $6,608.22 | $2,410.61 | $2,457.98 | $1,422.86 | -63.5 | -42.1 |
| Ending inventory quantity | 0 | 0 | 0 | 0 | 0.0 | 0.0 |
| Subtotal: | | | | | | |
| Quantity | *** | *** | *** | *** | *** | *** |
| Value | *** | *** | *** | *** | *** | *** |
| Unit value | *** | *** | *** | *** | *** | *** |
| Ending inventory quantity | 0 | 0 | 0 | 0 | 0.0 | 0.0 |
| Other sources: | | | | | | |
| Quantity | *** | *** | *** | *** | *** | *** |
| Value | *** | *** | *** | *** | *** | *** |
| Unit value | *** | *** | *** | *** | *** | *** |
| Ending inventory quantity | 4,693 | 5,212 | 5,376 | 4,035 | 11.0 | -24.9 |
| All sources: | | | | | | |
| Quantity | 411,821 | 347,623 | 296,538 | 97,636 | -15.6 | -67.1 |
| Value | 316,264 | 276,280 | 231,862 | 79,661 | -12.6 | -65.6 |
| Unit value | $767.96 | $794.77 | $781.90 | $815.89 | 3.5 | 4.3 |
| Ending inventory quantity | 4,693 | 5,212 | 5,376 | 4,035 | 11.0 | -24.9 |

Table continued on next page.

Table C-6--Continued
**OCTG (including drill pipe): Summary data concerning the U.S. market, 1997-98, January-September 1998, and January-September 1999**

(Quantity=short tons, value=1,000 dollars, unit values, unit labor costs, and unit expenses are per short ton; period changes=percent, except where noted)

| Item | Reported data | | | | Period changes | |
|---|---|---|---|---|---|---|
| | | | January-September | | | Jan.-Sept. |
| | 1997 | 1998 | 1998 | 1999 | 1997-98 | 1998-99 |
| U.S. producers': | | | | | | |
| Average capacity quantity | *** | *** | *** | *** | *** | *** |
| Production quantity | *** | *** | *** | *** | *** | *** |
| Capacity utilization (1) | *** | *** | *** | *** | *** | *** |
| U.S. shipments: | | | | | | |
| Quantity | *** | *** | *** | *** | *** | *** |
| Value | *** | *** | *** | *** | *** | *** |
| Unit value | *** | *** | *** | *** | *** | *** |
| Export shipments: | | | | | | |
| Quantity | *** | *** | *** | *** | *** | *** |
| Value | *** | *** | *** | *** | *** | *** |
| Unit value | *** | *** | *** | *** | *** | *** |
| Ending inventory quantity | *** | *** | *** | *** | *** | *** |
| Inventories/total shipments (1) | *** | *** | *** | *** | *** | *** |
| Production workers | *** | *** | *** | *** | *** | *** |
| Hours worked (1,000s) | *** | *** | *** | *** | *** | *** |
| Wages paid ($1,000s) | *** | *** | *** | *** | *** | *** |
| Hourly wages | *** | *** | *** | *** | *** | *** |
| Productivity (tons/1,000 hours) | *** | *** | *** | *** | *** | *** |
| Unit labor costs | *** | *** | *** | *** | *** | *** |
| Net sales: | | | | | | |
| Quantity | *** | *** | *** | *** | *** | *** |
| Value | *** | *** | *** | *** | *** | *** |
| Unit value | *** | *** | *** | *** | *** | *** |
| Cost of goods sold (COGS) | *** | *** | *** | *** | *** | *** |
| Gross profit or (loss) | *** | *** | *** | *** | *** | *** |
| SG&A expenses | *** | *** | *** | *** | *** | *** |
| Operating income or (loss) | *** | *** | *** | *** | *** | *** |
| Capital expenditures | *** | *** | *** | *** | *** | *** |
| Unit COGS | *** | *** | *** | *** | *** | *** |
| Unit SG&A expenses | *** | *** | *** | *** | *** | *** |
| Unit operating income or (loss) | *** | *** | *** | *** | *** | *** |
| COGS/sales (1) | *** | *** | *** | *** | *** | *** |
| Operating income or (loss)/ sales (1) | *** | *** | *** | *** | *** | *** |

(1) "Reported data" are in percent and "period changes" are in percentage points.
(2) Less than 0.05 percent.
(3) Undefined.

Note.--Financial data are reported on a fiscal year basis and may not necessarily be comparable to data reported on a calendar year basis. Because of rounding, figures may not add to the totals shown. Unit values and shares are calculated from the unrounded figures. January-September inventory ratios are annualized.

Source: Compiled from data submitted in response to Commission questionnaires and from official Commerce statistics.

PUBLIC DOCUMENT
Barcode:3883995-08 A-549-502 SCO - Scope Inquiry - Line Pipe

# APPENDIX D

# PURCHASER QUESTIONNAIRE RESPONSES

D-1
Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

PUBLIC DOCUMENT
Barcode:3883995-08 A-549-502 SCO - Scope Inquiry - Line Pipe

D-2
Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

As part of their response to the notice of institution, interested parties were asked to provide a list of three to five leading purchasers in the U.S. market for the domestic like product. A response was received from domestic interested parties and it named the following six firms as the top purchasers of circular welded pipe: ***. Purchaser questionnaires were sent to these six firms and one firm (***) provided responses which are presented below.

1. a.) Have any changes occurred in technology; production methods; or development efforts to produce circular welded pipe that affected the availability of circular welded pipe in the U.S. market or in the market for circular welded pipe in Brazil, India, Korea, Mexico, Taiwan, Thailand, and/or Turkey since 2011?

   b.) Do you anticipate any changes in technology; production methods; or development efforts to produce circular welded pipe that will affect the availability of circular welded pipe in the U.S. market or in the market for circular welded pipe in Brazil, India, Korea, Mexico, Taiwan, Thailand, and/or Turkey within a reasonably foreseeable time?

| Purchaser | Changes that have occurred | Anticipated changes |
|---|---|---|
| *** | No | No |

2. a.) Have any changes occurred in the ability to increase production of circular welded pipe (including the shift of production facilities used for other products and the use, cost, or availability of major inputs into production) that affected the availability of circular welded pipe in the U.S. market or in the market for circular welded pipe in Brazil, India, Korea, Mexico, Taiwan, Thailand, and/or Turkey since 2011?

   b.) Do you anticipate any changes in the ability to increase production (including the shift of production facilities used for other products and the use, cost, or availability of major inputs into production) that will affect the availability of circular welded pipe in the U.S. market or in the market for circular welded pipe in Brazil, India, Korea, Mexico, Taiwan, Thailand, and/or Turkey within a reasonably foreseeable time?

| Purchaser | Changes that have occurred | Anticipated changes |
|---|---|---|
| *** | No | No |

3. a.) Have any changes occurred in factors related to the ability to shift supply of circular welded pipe among different national markets (including barriers to importation in foreign markets or changes in market demand abroad) that affected the availability of circular welded pipe in the U.S. market or in the market for circular welded pipe in Brazil, India, Korea, Mexico, Taiwan, Thailand, and/or Turkey since 2011?

   b.) Do you anticipate any changes in factors related to the ability to shift supply among different national markets (including barriers to importation in foreign markets or changes in market

demand abroad) that will affect the availability of circular welded pipe in the U.S. market or in the market for circular welded pipe in Brazil, India, Korea, Mexico, Taiwan, Thailand, and/or Turkey within a reasonably foreseeable time?

| Purchaser | Changes that have occurred | Anticipated changes |
|---|---|---|
| *** | No | No |

4. a.) Have there been any changes in the end uses and applications of circular welded pipe in the U.S. market or in the market for circular welded pipe in Brazil, India, Korea, Mexico, Taiwan, Thailand, and/or Turkey since 2011?

   b.) Do you anticipate any changes in the end uses and applications of circular welded pipe in the U.S. market or in the market for circular welded pipe in Brazil, India, Korea, Mexico, Taiwan, Thailand, and/or Turkey within a reasonably foreseeable time?

| Purchaser | Changes that have occurred | Anticipated changes |
|---|---|---|
| *** | More products such as plastic, pex (sic) and corrugated flex hose. | More acceptability of above referenced products. |

5. a.) Have there been any changes in the existence and availability of substitute products for circular welded pipe in the U.S. market or in the market for circular welded pipe in Brazil, India, Korea, Mexico, Taiwan, Thailand, and/or Turkey since 2011?

   b.) Do you anticipate any changes in the existence and availability of substitute products for circular welded pipe in the U.S. market or in the market for circular welded pipe in Brazil, India, Korea, Mexico, Taiwan, Thailand, and/or Turkey within a reasonably foreseeable time?

| Purchaser | Changes that have occurred | Anticipated changes |
|---|---|---|
| *** | The above reference products continually are upgraded and used in new applications. | No. |

6. a.) Have there been any changes in the level of competition between circular welded pipe produced in the United States, circular welded pipe produced in Brazil, India, Korea, Mexico, Taiwan, Thailand, and/or Turkey, and such merchandise from other countries in the U.S. market or in the market for circular welded pipe in Brazil, India, Korea, Mexico, Taiwan, Thailand, and/or Turkey since 2011?

   b.) Do you anticipate any changes in the level of competition between circular welded pipe produced in the United States, circular welded pipe produced in Brazil, India, Korea, Mexico, Taiwan, Thailand, and/or Turkey, and such merchandise from other countries in the U.S. market or in the market for circular welded pipe in Brazil, India, Korea, Mexico, Taiwan, Thailand, and/or Turkey within a reasonably foreseeable time?

| Purchaser | Changes that have occurred | Anticipated changes |
|---|---|---|
| *** | No. | No. |

7. a.) Have there been any changes in the business cycle for circular welded pipe in the U.S. market or in the market for circular welded pipe in Brazil, India, Korea, Mexico, Taiwan, Thailand, and/or Turkey since 2011?

   b.) Do you anticipate any changes in the business cycle for circular welded pipe in the U.S. market or in the market for circular welded pipe in Brazil, India, Korea, Mexico, Taiwan, Thailand, and/or Turkey within a reasonably foreseeable time?

| Purchaser | Changes that have occurred | Anticipated changes |
|---|---|---|
| *** | Substantial downturn in the energy sector has reduced the need for line pipe. | No. |

# Attachment 10

*TMB 440AE, Inc. v. United States*, Slip Op. 19-109

**Slip Op. 19-109**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **TMB 440AE, INC. (FORMERLY KNOWN AS ADVANCE ENGINEERING CORPORATION),** Plaintiff, v. **UNITED STATES,** Defendant. | **Before: Jane A. Restani, Judge** **Court No. 18-00095** **PUBLIC VERSION** |

**OPINION**

[Commerce's final scope ruling is remanded to consider (k)(1) sources in assessing whether certain pipe is within the scope of antidumping duty and countervailing duty orders.]

Dated: August 13, 2019

Ned H. Marshak, David M. Murphy, and Jordan C. Kahn, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of New York, NY and Washington D.C., and Dale E. Stackhouse and Meghann C. T. Supino, Ice Miller LLP, of Indianapolis, IN for Plaintiff TMB 440AE, Inc.

Elizabeth A. Speck, Senior Trial Counsel, and Patricia M. McCarthy, Civil Division, U.S. Department of Justice, of Washington D.C., for the defendant. With them on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Franklin E. White, Assistant Director. Of counsel on the brief was Jessica R. Di Pietro, Attorney, U.S. Department of Commerce, of Washington, D.C.

Restani, Judge: This action challenges a final scope ruling issued by the United States Department of Commerce, International Trade Administration ("Commerce") regarding seamless pipe imported by TMB 440AE, Inc. (formerly known as Advance Engineering Corporation), ("AEC").[1] AEC moves for judgment on the administrative record and asks the court to hold that Commerce's final scope ruling, finding that AEC's seamless pipe ("AEC

[1] Because the parties refer to plaintiff under its former name, the court follows suit.

pipe") is within the scope of the antidumping and countervailing duty orders on certain seamless

carbon and alloy steel pipe from the People's Republic of China ("PRC"), is unsupported by

substantial evidence or otherwise not in accordance with law. See Mem. L. Supp. Pl. Mot. J.

Agency Record, ECF No. 21 at 19–22 (Oct. 22, 2018) ("AEC Br.").

      AEC contests Commerce's finding that the language of the relevant antidumping and

countervailing duty orders was unambiguous and claims Commerce erred in failing to consider

certain criteria required by its regulations governing scope rulings. If the court sustains the Final

Scope Ruling, AEC alternatively claims that Commerce acted unlawfully in instructing the U.S.

Customs and Border Protection ("Customs") to assess antidumping and countervailing duties on

AEC pipe entries made prior to the publishing of the final scope ruling. Defendant United States

opposes Plaintiff's motion.

      For the following reasons, the court remands Commerce's final scope determination for

reconsideration. Pending the resolution of the remand, the court defers consideration of AEC's

alternative claims regarding Commerce's liquidation instructions.

## BACKGROUND

      In 2010, Commerce published antidumping duty and countervailing duty orders on

certain seamless pipe from the PRC. See Amended Antidumping Duty Order: Certain Seamless

Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the People's Republic of China,

75 Fed. Reg. 69,052-01 (Dep't Commerce Nov. 10, 2010) ("ADD Order"); Amended

Countervailing Duty Order: Certain Seamless Carbon and Alloy Steel Standard, Line, and

Pressure Pipe from the People's Republic of China, 75 Fed. Reg. 69,050-01 (Dep't Commerce

Nov. 10, 2010) ("CVD Order") (collectively, the "Orders"). The Orders cover merchandise

under several headings of the Harmonized Tariff Schedule of the United States ("HTSUS"),

including subheadings 7304.39.0020 and 7304.39.0024,[2] under which the AEC pipe at issue fall. See ADD Order, 75 Fed. Reg. at 69,053; CVD Order, 75 Fed. Reg. at 69,051; AEC Br. at 9. The Orders, however, exclude the following:

> (1) All pipes meeting aerospace, hydraulic, and bearing tubing specifications; (2) all pipes meeting the chemical requirements of ASTM A-335, whether finished or unfinished; and (3) unattached couplings. Also excluded from the scope of the order are all mechanical, boiler, condenser and heat exchange tubing, except when such products conform to the dimensional requirements, i.e., outside diameter and wall thickness of ASTM A-53, ASTM A-106 or API 5L specifications.

ADD Order, 75 Fed. Reg. at 69,052–53; CVD Order, 75 Fed. Reg. at 69,051.

AEC requested that Commerce issue a scope ruling finding that its pipe was excluded from the scope of the Orders as pipes meeting aerospace specifications. See Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the People's Republic of China: Advance Engineering Scope Request: Specialized Seamless Pipe, ECF No. 29 (Oct. 20, 2017)

---

[2] Although the HTSUS subheadings are "provided for convenience and customs purposes, [the] written description of the merchandise subject to this scope is dispositive." ADD Order, 75 Fed. Reg. at 69,053; CVD Order, 75 Fed. Reg. at 69,051. The description in the Orders are:

> The merchandise covered by this order is certain seamless carbon and alloy steel (other than stainless steel) pipes and redraw hollows, less than or equal to 16 inches (406.4 mm) in outside diameter, regardless of wall-thickness, manufacturing process (e.g., hot-finished or cold-drawn), end finish (e.g., plain end, beveled end, upset end, threaded, or threaded and coupled), or surface finish (e.g., bare, lacquered or coated). Redraw hollows are any unfinished carbon or alloy steel (other than stainless steel) pipe or "hollow profiles" suitable for cold finishing operations, such as cold drawing, to meet the American Society for Testing and Materials ("ASTM") or American Petroleum Institutes ("API") specifications referenced below, or seamless carbon and alloy steel (other than stainless steel) standard, line, and pressure pipes produced to the ASTM A-53, ASTM A-106, ASTM A-334, ASTM A-589, ASTM A-795, ASTM A-1024, and the API 5L specifications, or comparable specifications, and meeting the physical parameters described above, regardless of application[.]

("Scope Ruling Request"). Commerce subsequently issued a determination finding that AEC

pipe was within the scope of the Orders and that it did not fall within any exclusion.

Antidumping and Countervailing Duty Orders on Certain Seamless Carbon and Alloy Steel

Standard, Line, and Pressure Pipe from the People's Republic of China: Final Scope Ruling for

Advance Engineering; Specialized Seamless Pipe, ECF No. 18-1 at 7–8 (Mar. 29, 2018) ("Final

Scope Ruling"). Commerce found "the plain language [of the Orders] to be dispositive" and

accordingly did not conduct an analysis under 19 C.F.R. § 351.225(k). Id. at 7. AEC appeals that

determination to the court.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2012). The court has authority

to review Commerce's decision that merchandise falls within an antidumping or countervailing

duty order. 19 U.S.C. § 1516a(a)(2)(B)(vi). Commerce's final scope determination will be

upheld unless "unsupported by substantial evidence on the record, or otherwise not in accordance

with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.   Legal Framework

After an antidumping or countervailing duty order is published, importers can request

that Commerce clarify the scope of the order. See 19 C.F.R. § 351.225(a), (c) (2016). There is no

statutory provision setting forth procedures for interpreting the scope of an order. Shenyang

Yuanda Aluminum Indus. Eng'g Co. v. United States, 776 F.3d 1351, 1353 (Fed. Cir. 2015).

Accordingly, Commerce has published regulations that outline the necessary steps for assessing

whether a product is included within the scope of an order. See 19 C.F.R. § 351.225.

Commerce must consider "[t]he descriptions of the merchandise contained in the petition,

the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission." 19 C.F.R. § 351.225(k)(1). If these "(k)(1) sources" are dispositive, Commerce can end its inquiry and issue a final ruling. Tak Fat Trading Co. v. United States, 396 F.3d 1378, 1382 (Fed. Cir. 2005). If not, Commerce must conduct a formal scope inquiry and consider "(k)(2) factors," which are "(i) [t]he physical characteristics of the product; (ii) [t]he expectations of the ultimate purchasers; (iii) [t]he ultimate use of the product; (iv) [t]he channels of trade in which the product is sold; and (v) [t]he manner in which the product is advertised and displayed." 19 C.F.R. § 352.225(k)(2); 19 C.F.R. § 352.225(e). Although Commerce is owed "significant deference" with regard to its interpretation of its orders, Commerce cannot issue an interpretation that changes the scope of the order nor "interpret an order in a manner contrary to its terms." See Duferco Steel Inc. v. United States, 296 F.3d 1087, 1094–95 (Fed. Cir. 2002).

**II. The AEC Pipe at Issue in the Scope Ruling Request**

In the Scope Ruling Request, AEC describes its pipe as servicing a "niche market" that requires more exacting specifications than "[p]ipes meeting the general industry standard, ASTM A-53." Scope Ruling Request at 3. For instance, the Scope Ruling Request describes AEC pipe as having [[

]] to satisfy the more exacting requirements for residential gas utility use. Id. at 4–7. The "tight specifications that AEC has designed for the imported AEC pipe ensure that the pipe can be easily threaded" so as to conform with the SAE Aerospace Standard which AEC states is "critical" to its business as AEC would otherwise "not be able to

meet its customers' unique needs." Id. at 6.[3] AEC states that this specialization renders its pipes

more akin to [[                        ]], which is explicitly excluded from the Orders, than standard

"commodity" pipe. Id. at 7–8. AEC claims that no domestic source exists that satisfies its

specialized requirements. Id. at 8–10.

Further, in the Scope Ruling Request, AEC notes that despite having imported the pipe at

issue since 2006, neither it nor its Chinese vendor were named in the petition as importers or

producers of seamless pipe. Id. at 10–11. AEC argues that "[d]ue to the highly specialized base

product" AEC pipe does not [[

                        ]] Id. at 13. Finally, as noted below, AEC cites evidence from the

investigation, petition, and ITC Final Report that it claims support a finding that AEC pipe

should be excluded from the Orders. Id. at 21–29.

### III.   Commerce Did Not Act in Accordance with its Regulation in Assessing Whether AEC Pipe is Subject Merchandise Under the Orders.

Commerce found that the language of the Orders was unambiguous and decided not to

consider the criteria of 19 C.F.R. § 351.225(k)(1). Final Scope Ruling at 7–8. It found that the

AEC pipe at importation "meets the written description of the merchandise subject to the

Orders," and additionally falls within the HTSUS subheadings specified. Id. at 7.

Commerce then considered whether AEC pipe fell within the specific exclusion for "[a]ll

pipes meeting aerospace, hydraulic, and bearing tubing specifications." ADD Order, 75 Fed.

---

[3] Although AEC concedes that "commodity pipe" could be threaded so as to meet the SAE Aerospace Standard, it claims that this "would not be accomplished without creating significant waste" and inspection costs. Scope Ruling Request at 6; see also Scope Ruling Request at 17. (noting that without the "tight dimensional requirements for AEC pipe it would be extremely difficult, wasteful, and expensive . . . for AEC pipe to meet the Aerospace Threading Standard"). In addition, AEC asserts that pipes failing to meet its specifications would not be tolerated by its customers given the propensity of less-specialized pipe to crack, leak, or break. Id. at 8–10.

Reg. at 69,052–53; CVD Order, 75 Fed Reg. at 69,051. Commerce found that, in its condition as imported, AEC pipe was not covered by this exclusion. Final Scope Ruling at 7–8.

    AEC contends that its pipe falls within the aerospace exclusion and should not be subject to the Orders. See AEC Br. at 19–22. Specifically, AEC argues that its pipe meets various specifications that allow it to be easily threaded to meet the SAE Aerospace Standard AS71051B ("SAE Aerospace Standard") once in the United States. Id. at 20. Because the Orders do not define what "aerospace specifications" means, AEC argues that Commerce must read the exclusion expansively to cover AEC pipe even though the pipes do not meet the SAE Aerospace Standard until the pipes are threaded following importation. Id. at 31.

    AEC further argues that the scope language is ambiguous and Commerce was obligated to conduct an analysis under 19 C.F.R. § 351.225(k)(1); id. at 22–27, and that the (k)(1) criteria supports a finding that AEC pipe is not subject merchandise. Id. at 27–33. AEC highlights that the petition lists neither AEC nor its supplier as involved in the export, import, or production of subject merchandise and that "none of the injury data provided by the Petitioners would be affected by the import of AEC pipe" as there is no comparable product available on the domestic market. Id. at 28. Regarding Commerce's investigation, AEC argues that Commerce indicated that the Orders were meant to cover "commodity pipe" and not specialized pipe meeting more exacting standards and thus the aerospace exclusion should be read to "capture all manner of custom pipes that contain any specifications suitable for aerospace." Id. at 28–31. AEC asserts that considerations expressed during the U.S. International Trade Commission ("ITC") investigation about specialized A-335 pipe indicate that the Orders were not intended to cover highly-specialized pipes such as AEC pipe. Id. at 31–33.

In the alternative, AEC argues that Commerce should have initiated a formal scope inquiry and considered the (k)(2) factors, which support the exclusion of AEC pipe from the Orders. Id. at 33–36. Finally, AEC contends that even if its pipe is within the scope of the Orders, Commerce cannot assess antidumping and countervailing duties on "shipments entered prior to the initiation of a formal scope ruling." Id. at 36–42.

The government responds that AEC pipe was clearly within the scope of the Orders such that consideration of (k)(1) criteria was not required. Def.'s Resp. to Pl.'s 56.2 Mot. for Summ. J. upon the Agency Record at 7, 10, 13–15, ECF No. 27 (Mar. 19, 2019) ("Def. Br."). The government argues that the Orders are unambiguous, and that Commerce need only consider the (k)(1) criteria if an order is ambiguous. Id. at 10–15. The government further claims that as AEC pipe does not meet any aerospace specification at importation, any potential ambiguity regarding the aerospace exclusion is irrelevant. Id. at 13–15. Finally, the government objects to AEC's claims that Commerce's liquidation instructions to Customs were impermissibly retroactive. Id. at 15–27.

Commerce is incorrect in finding that it need not consider the (k)(1) criteria in this case. The government relies heavily on the Court of Appeals for the Federal Circuit's ("CAFC") decision in Meridian to support its argument that Commerce did not need to consider the (k)(1) criteria. See Def. Br. at 9–12; Meridian Prods., LLC v. United States, 851 F.3d 1375, 1381 (Fed. Cir. 2017). As the court has stated previously, Meridian is considerably narrower than the government asserts. See Atkore Steel Components, Inc. v. United States, 313 F. Supp. 3d. 1374, 1380–1382 (CIT 2018) (stating that Meridian must be read in the light of what "the court

actually did based on particular facts").[4]

Although Meridian broadly states that Commerce must first "determine whether [an order's scope] contains an ambiguity and, thus, is susceptible to interpretation," even in that case the court considered (k)(1) sources, namely prior scope rulings, in concluding that the order at issue was unambiguous. See Meridian, 851 F.3d at 1381, 1384; see also Quiedan Co. v. United States, 927 F.3d 1328, 1333 (Fed. Cir. 2019) (finding the language of the order clear "considering the factors specified in § 351.225(k)(1)"); ArcelorMittal Stainless Belg. N.V. v. United States, 694 F.3d 82, 88–90 (Fed. Cir. 2012) (considering a prior scope ruling in determining whether an order was ambiguous). The language in Meridian should not be read out of context. As noted in Meridian, when a respondent cites (k)(1) sources as supporting a product's exclusion from the scope of an order, the court cannot consider the language of a scope order in isolation, but must consider those sources. See Meridian, 851 F.3d at 1383 (noting that the court "must first assess whether the plain language of the Orders' scope, in light of the disputed 19 C.F.R. § 351.225(k)(1) sources, is unambiguous"). Here, AEC sufficiently challenged the inclusion of its pipe in the Orders based on (k)(1) sources and so Commerce was not free to ignore these sources. Whether the order is ambiguous or not, Commerce's regulations are unambiguous– it "will take into account" the (k)(1) criteria in conducting a scope determination. 19 C.F.R. 351.225(k) (emphasis added). No case has invalidated this regulatory requirement.

The government defends Commerce's analysis by arguing that "AEC's pipe meets the

[4] Meridian dealt with a scope provision with an exception to a "clear" exclusion. Meridian, 851 F.3d at 1384–85. The court sincerely hopes Commerce will not write another scope provision that has general inclusion language, what the CAFC calls a "clear" exclusion to such inclusion, and then an exception to the exclusion. See id. This has resulted in considerable litigation, not to mention confusion. See, e.g., infra note 5.

written description of the scope" and that ambiguity in the exclusion language is irrelevant

because AEC pipe does not meet all purported aerospace specifications until it is threaded after

importation. Def. Br. at 13–14. But this reasoning is circular and confuses the analysis required

by the regulations. Commerce should have first determined the meaning of the term "aerospace

specifications" before concluding that the scope included AEC's pipe. Here, however,

Commerce functionally decided that AEC's unfinished pipe did not meet aerospace

specifications without first considering what "aerospace specification" means. As AEC notes,

"aerospace specifications" could pertain to a number of different standards and the Orders do not

specify any in particular. AEC Br. at 20–22. Because "aerospace specifications" is undefined,

Commerce was obligated to consider the (k)(1) sources before rendering its decision. See

Meridian, 851 F.3d at 1381 n.7, 1381–1382.[5]

Whether these sources are dispositive on the issue is unclear on the record before the

court. Because Commerce did not consider the (k)(1) sources, the record only contains

documents AEC submitted in conjunction with its Scope Ruling Request. AEC cites to some

investigation documents and parts of the ITC report, which appear to indicate that the

investigation was concerned with standard, non-specialized pipe and that petitioners may not

have been injured by specialized pipe. In particular, AEC highlights materials submitted by

---

[5] The government's reliance on Whirlpool Corp. is unavailing. See Def. Br. at 9–13 citing
Whirlpool Corp. v. United States, 890 F.3d 1302 (Fed. Cir. 2018). Unlike here, the exclusion at
issue in that case was said to be unambiguous. Id. at 1309. If scope language clearly excludes a
product, it cannot be within the scope as there would be a complete lack of notice to importers.
Exclusion does not raise the issue of the coverage of the ITC investigation. Whirlpool, however,
involved the same problematic scope provision addressed in Meridian so that the "clear"
exclusion was limited by an exception, that may or may not be clear. See Id. at 1305–06;
Meridian, 851 F.3d at 1379. Many of the broad statements in Meridian are repeated in Whirlpool
including noting that by regulation Commerce must consider the (k)(1) sources. Whirlpool, 890
F.3d at 1308. The sources are not discussed further. Presumably, if someone had argued that
there was not an ITC determination covering the product the court would have addressed that.

Salem Steel North America LLC ("Salem Steel") to Commerce in response to its invitation to provide comments on the scope language. According to AEC, these letters—which AEC claims ultimately resulted in the aerospace exclusion—support the exclusion of AEC pipe from the scope of the Orders. See, e.g., Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the People's Republic of China; Response to Commerce Department's June 23 Proposal to Change Scope Language to Exclude Mechanical Tubing, A-570-956, ECF No. 29, Exhibit H at 2–7 (June 30, 2010) ("Salem Steel Letter") (describing how aviation tubing is a type of mechanical tubing that must conform to certain aerospace specifications); Case Brief of Salem Steel North America LLC, A-570-956, ECF No. 29, Exhibit I at 9–16 (July 14, 2010) ("Salem Steel Case Brief") (describing how mechanical tubing does not compete with standard pipe as it is neither cost-effective nor practical); Salem Steel Letter, Appendix A-2 at 5–6 (May 24, 2010) (noting the differences between mechanical tubing and standard pipe and citing conversations with petitioners who indicated that mechanical tubing was not intended to be included in the investigation).

In addition, AEC notes that the reasons given in the ITC Report for excluding A-335 pipe from the scope of the order support the exclusion of AEC pipe, which is, as AEC contends, similarly specialized. Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from China, Inv. Nos. 701-TA-469 & 731-TA-1168 (Final), USITC Pub. 4190 at I-20–I-22 (Nov. 2010) ("ITC Report") (noting that A-335 pipe, which was excluded by the Orders, was in part excluded because it had specifications that made interchangeability with standard pipe unusual and costly). If these cited materials actually support plaintiff's assertions and reflect the (k)(1) sources generally, subjecting AEC pipe to the Orders may run afoul of the requirement that there be a material injury or threat of material injury to domestic industry prior to the

imposition of such duties. 19 U.S.C. § 1671(a)(2); 19 U.S.C. § 1673(2). It appears from these documents that in general specialized pipe was not meant to be included within the scope of the Orders. If that is the case, and AEC pipe is also rightly described as such specialized pipe, then this merchandise may not properly within the scope of the Orders. By not considering the (k)(1) sources, as required by regulation, Commerce created a situation in which duties might be assessed against products without an injury determination. Indeed, preventing such a result is likely why the applicable regulations state that Commerce "will take into account" the (k)(1) criteria, including the ITC determination. 19 C.F.R. § 351.225(k); see also, Atkore, 313 F. Supp. at 1381–82 (discussing the importance of considering the (k)(1) sources).[6]

Commerce's failure to consider the "descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary . . . and the Commission," as required by 19 C.F.R. § 351.225(k)(1), in its Final Scope Ruling was not in accordance with law. Accordingly, the court will remand the matter for Commerce to consider the (k)(1) sources and, if those criteria are not dispositive of the issue, then Commerce must consider the additional (k)(2) factors in determining whether AEC pipe is properly included within the scope of the Orders. Because the court is ordering Commerce to reconsider its Final Scope Ruling, it does not address AEC's claim regarding Commerce's liquidation instructions.

## CONCLUSION

For the foregoing reasons, the matter is remanded for Commerce to conduct an analysis that considers the sources listed in 19 C.F.R. § 351.225(k)(1) in assessing whether AEC pipe

[6] Looking at (k)(1) sources does not make an order clear or unclear. The (k)(1) sources are what provide the answer as to whether an order is clear enough that no resort to (k)(2) factors is necessary. See 19 C.F.R. § 351.225(k). Further, "no formal inquiry is required where a (k)(1) analysis is dispositive." Quiedan, 927 F.3d at 1333.

falls within the scope of the Orders. If this analysis is not dispositive, Commerce should proceed with a formal scope inquiry and consider the factors specified in 19 C.F.R. § 351.225(k)(2).

Thus, upon consideration of the plaintiff's motion for judgment on the agency record and all papers and proceedings had in relation to this matter, and upon due deliberation, it is hereby

**ORDERED** that plaintiff's motion for judgment on the agency record is **GRANTED** in part;

**ORDERED** that Commerce, within 90 days from the date of issuance of this Opinion and Order, shall submit a Remand Redetermination in compliance with this Opinion and Order;

**ORDERED** that defendant shall supplement the administrative record with all documents considered by Commerce in reaching its decision in the Remand Redetermination;

**ORDERED** that plaintiff shall have 30 days from the filing of the Remand Redetermination to submit comments to the court; and

**ORDERED** that defendant shall have 15 days from the date of the plaintiff's filing of comments to submit a response.

/s/Jane A. Restani
Jane A. Restani, Judge

Dated: August 13, 2019
New York, New York

# Attachment 11

Original Petition for an AD Investigation of CWP from Thailand

ROGER B. SCHAGRIN, P.C.
FOURTH FLOOR
923 FIFTEENTH STREET, N.W.
WASHINGTON, D.C. 20005
(202) 628-3810

February 28, 1985

Secretary of Commerce
Attn: Import Administration
Central Records Unit
Room B-099
Department of Commerce
Pennsylvania Ave. at 14th St., N.W.
Washington, D.C. 20230

Dear Mr. Secretary:

In accordance with 19 C.F.R. 353.36 and 355.26, please find attached ten copies of each of the following petitions, filed on behalf of members of The Committee on Pipe and Tube Imports:

1. Antidumping Petition, Certain Welded Carbon Steel Circular Pipes and Tubes from Venezuela.

2. Countervailing Petition, Certain Welded Carbon Steel Circular Pipes and Tubes from Venezuela.

3. Antidumping Petition, Certain Welded Carbon Steel Circular Pipes and Tubes from Thailand.

4. Countervailing Petition, Certain Welded Carbon Steel Circular Pipes and Tubes from Thailand.

In accordance with 19 C.F.R. 353.28 and 353.29, petitioners request that the price lists of Conduven and Univensa contained in Exhibits 3, 4, and 5 of the antidumping petition regarding products from Venezuela be accorded confidential treatment. While this information is certainly available to Conduven and Univensa because the price lists were issued by those companies, the disclosure of these particular price lists might have a substantial adverse effect upon the source in Venezuela from whom this information was obtained.

Petitioners cannot summarize this information without jeopardizing the confidentiality of the source of the information. The information for which confidential information has been requested is not available to the public. Ten nonconfidential versions of the Venezuelan antidumping

Barcode:3883995-10 A-549-502 SCO - Scope Inquiry - Line Pipe

A-549-5C

63 pages
Nonconfidential

BEFORE THE
UNITED STATES DEPARTMENT OF COMMERCE
AND THE
INTERNATIONAL TRADE COMMISSION

In the Matter of Certain Welded Carbon Steel Pipe and Tube Products from Thailand

PETITION FOR IMPOSITION OF ANTIDUMPING DUTIES

PETITIONERS: MEMBERS OF COMMITTEE ON PIPE AND TUBE IMPORTS

Roger B. Schagrin, Esq.
Paul W. Jameson, Esq.
923 15th Street, N.W.
Fourth Floor
Washington, D.C. 20005
(202) 628-3310

Counsel to Petitioners

ATTENTION:

Assistant Secretary for Trade Administration
U.S. Department of Commerce
Washington, D.C. 20230

Secretary, United States International Trade Commission
701 E Street, N.W.
Washington, D.C. 20436

Dated: February 28, 1984

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

Barcode:3883995-10 A-549-502 SCO - Scope Inquiry - Line Pipe

TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | SUMMARY OF PETITION | 1 |
| II. | INFORMATION REQUIRED BY §353.36 OF THE ANTIDUMPING REGULATIONS | 6 |
| A. | The Name and Address Of The Petitioners And Any Other Person, Firm, Or Association The Petitioners Represent, 19 C.F.R. §353.36(a)(1). | 6 |
| B. | The Industry On Whose Behalf The Petition Is Filed, Including The Names Of Other Enterprises In Such Industry, 19 C.F.R. §353.36(a)(2). | 8 |
| C. | A Statement Indicating Whether The Petitioners Have Filed, Or Are Filing, For Import Relief Pursuant to Section 201 Of The Trade Act Of 1974, Or Have Initiated Proceedings Pursuant To Section 337 or 702 Of The Act, Section 232 Of The Trade Expansion Act Of 1962, Or Section 301 Of The Trade Act Of 1974 With Respect To The Merchandise Which Is The Subject Of The Proceeding, 19 C.F.R. §353.36(a)(3). | 8 |
| D. | A Detailed Description Of The Imported Merchandise, Including Its Technical Characteristics And Uses, And, Where Appropriate, Its Tariff Classification Under The Tariff Schedules Of The United States, 19 C.F.R. §353.36(a)(4). | 12 |
| E. | The Name Of The Country Or Countries From Which The Merchandise Is Being, Or Is Likely To Be Exported To The United States And, If The Merchandise Is Produced In A Country Other Than That From Which It Is Exported, The Name Of The Country In Which It Is Produced, 19 C.F.R. §353.36(a)(5). | 15 |

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

| | | Page |
|---|---|---|
| F. | The Names And Addresses Of All Known Foreign Enterprises Believed To Be Manufacturing, Producing or Exporting The Merchandise In Question, 19 C.F.R. §353.36(a)(6). | 15 |
| G. | All Pertinent Facts As To The Price At Which The Foreign Merchandise Is Sold Or Offered For Sale In The United States And In The Home Market In Which Produced Or From Which Exported, Including Information Concerning Transportation And Insurance Charges, And If Appropriate, Information Regarding Sales In Third Countries Or The Cost Of Producing The Merchandise, 19 C.F.R. §353.36(a)(7). | 16 |
| H. | The Volume And Value Of Imports Of The Merchandise From The Country In Question In The Most Recent Two-Year Period, And Also Other Periods If The Petitioner Believes Such Other Periods To Be More Representative, 19 C.F.R. §353.36(a)(10). | 19 |
| I. | The Names And Addresses Of Enterprises Believed To Be Importing The Merchandise, 19 C.F.R. §353.36(a)(11). | 20 |
| J. | The Names And Addresses Of Other Enterprises In The United States Engaged In The Production, Manufacture, Or Sale Of Like Merchandise, 19 C.F.R. §353.36(a)(12). | 21 |
| K. | Information As To The Material Injury Or Threat Thereof To, Or The Material Retardation Of The Establishment Of, A United States Industry By Reason Of The Imported Merchandise Alleged To Be Sold At Less Than Fair Value, As Described In 19 C.F.R. 5207.11 And §207.26, 19 C.F.R. §353.36(a)(13). | 21 |
| | 1. The Relevant Industry Consists of Those Domestic Producers of Standard and Line Pipe, Considered Together | 21 |

PUBLIC DOCUMENT

Page

2. The Domestic Industry Producing Small Diameter Standard and Line Pipe Threatened With Material Injury By Reason Of Less-Than-Fair-Value Imports From Thailand. 24

3. The Regional Industry on the West Coast Producing Small Diameter Standard and Line Pipe Is Threatened With Material Injury By Reason Of Less-Than-Fair-Value Imports From Thailand. 29

III. CONCLUSION 31

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

EXHIBITS

1 Members of The Committee on Pipe and Tube Imports

2 Other Domestic Producers of Small Diameter Welded Circular Pipe

3 Other Producers of Thai Small Diameter Welded Circular Pipe

4 Formula for Determining Zinc Costs

5 Calculation of Constructed Value and Dumping Margins

6 Offers for Sale of Thai Pipe and Tube Products

7 Article on Thai Pipe Industry

PETITION FOR THE IMPOSITION OF ANTIDUMPING DUTIES
CERTAIN WELDED CARBON STEEL CIRCULAR PIPES AND TUBES
FROM THAILAND

This petition is filed on behalf of The Committee on Pipe
and Tube Imports, a trade association composed of domestic
producers of welded carbon steel pipes and tubes, its product
line subcommittees and its member companies. Petitioners
hereby allege that small diameter circular welded carbon steel
pipes and tubes are likely to be imported at less than fair
value from Thailand within the meaning of section 731 of the
Tariff Act of 1930 as amended, 19 U.S.C. §1673. These
less-than-fair-value imports threaten to cause material injury
to the domestic industries producing the products covered by
the industry, and particularly to those domestic producers
located on the West Coast. This petition contains information
reasonably available to petitioners in support of these
allegations.

I.  SUMMARY OF PETITION

This petition will demonstrate that imports of the pipe
and tube products covered by this petition are being offered
for sale at less than fair value (LTFV) by Thai producers and
United States distributors and that these LTFV imports are
threatening to cause material injury to the domestic industries
producing these products. Petitioner is filing simultaneously
with this petition a petition under 19 U.S.C. §1671, alleging

that the products covered by this petition are being subsidized by the government of Thailand and their offer for sale in the United States threatens to cause material injury to the domestic industries producing these products.

The domestic pipe and tube industry is continuing to be injured by reason of dumped and subsidized imports. In the past two years, the International Trade Commission (ITC) found that the domestic industry producing small diameter circular pipe suffered material injury by reason of imports of subsidized pipe from Brazil, Korea and Spain and by less-than-fair-value imports from Spain, Brazil, Korea and Taiwan.

The indicia of injury upon which the Commission based their recent final determinations of injury are still very much in evidence today. The relevant domestic industries are operating at dangerously low profit margins with some producers battling increasing net losses. Capacity utilization remains low and employment continues to decline.

The main reason for the continued poor operating conditions of the domestic industry, in spite of the successful trade cases filed against producers from a number of major exporting countries, is the lost volume and price depression caused by increased imports of unfairly traded pipe and tube products from a variety of countries. With Voluntary Restraint Agreements (VRAs) being negotiated with the major exporting

PUBLIC DOCUMENT

countries such as the EC countries, Spain, Brazil, Australia, Japan, and Korea, the threat of unfairly traded imports has shifted to non-traditional suppliers. Import statistics reflect an increase in imports from countries such as Saudi Arabia, Turkey and India.

Petitioners have received information that a serious threat of material injury is posed by less-than-fair-value imports from Thailand. While only small amounts of imports of the products covered by this petition have shown up in the import statistics as of December 1984, petitioners have information that 10,000 tons are already available for shipment for the first quarter of 1985.

Petitioners also have information that two Thai pipe and tube producers alone have expanded their capacity such that they could be able to export as much as 300,000 tons of pipe and tube per year into the U.S. market. At least one of these major Thai pipe and tube manufacturers is a subsidiary of a Japanese steel company. Petitioners have knowledge of at least 11 producers of pipe and tube products in Thailand. This information indicates that Thailand has the capacity to export large amounts of pipe and tube to the United States.

At least four importers are already offering Thai pipe and tube products for sale in the domestic market: Globe Traders Group, Inc. of New York, Triangle Winter Wolff (TWW) of Torrance, California, Phillips Brothers of Chicago, and Borneo

PUBLIC DOCUMENT
Barcode:3883995-10 A-549-502 SCO - Scope Inquiry - Line Pipe

Sumatra Trading Co., Inc. of New York. Price sheets for TWW indicate that Thai pipe and tubes are being sold for less than Korean or Japanese prices for the same products. Because there are no integrated steel producers in Thailand, it is believed that the Thai pipe producers are importing their steel coil and sheet from Japan. They also have been importing the necessary zinc for galvanized products. TWW is offering black pipe for just over $400 a ton ex docks duty paid for large purchases and is offering galvanized pipe for just under $500 per ton. This represents sales at prices below that of the Koreans during the fourth quarter of 1984. Such prices indicate less-than-fair-value sales with which domestic producers cannot compete.

Petitioner will demonstrate that a regional threat of injury exists with regard to the producers of the pipe and tube products covered in this petition located on the West Coast as well as to the entire domestic industry. LTFV imports will be particularly devastating to West Coast domestic producers who, despite efficient operations, have been continuing to lose sales to imports, primarily Japanese, Korean and Taiwanese. With at least one of Thailand's major producers of pipe and tube being a subsidiary of a Japanese company, these imports become a way for major Japanese exporters to avoid carefully negotiated VRAs. The result is that West Coast pipe and tube producers fail to get the relief which this Commission has previously determined that the domestic industry requires.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

PUBLIC DOCUMENT

Petitioner was unable to obtain home market sales prices from Thailand for the products covered by this petition; foreign market value was based instead on cost of production for Thai producers. These costs of production were based on prices for Japanese hot-roll coil exported to Thailand, and on estimates of zinc costs based on conversations with international zinc brokers. Conversion costs and selling, general and administrative expenses were based upon the United States industry average for non-integrated producers as determined by the International Trade Commission and adjusted for differences in labor rates. These cost of production figures clearly show that the Thais are offering to sell the pipe and tube products covered by this petition in the United States at less than fair value.

This petition provides specific information demonstrating that imports from Thailand are being offered for sale at less than fair value and threaten to cause material injury to the domestic industries producing these products. Petitioners respectfully request that the Commerce Department and the Commission, based on this information, immediately commence a full scale investigation under 19 U.S.C. §1673 and 19 C.F.R. 207.12 and 353.37 of imports of these products from Thailand.

## II. INFORMATION REQUIRED BY §353.36 OF THE ANTIDUMPING DUTY REGULATIONS

### A. The Name And Address Of The Petitioners And Any Other Person, Firm, Or Association The Petitioners Represent, 19 C.F.R. §353.36(a)(1).

This petition is filed on behalf of the members of the product line subcommittees of The Committee on Pipe and Tube Imports, a not-for-profit trade association of pipe and tube producers organized under the laws of the District of Columbia. The Committee, its subcommittees, and member companies file unfair trade cases to prevent the importation of pipe and tube products in violation of unfair trade laws. Each member of the Committee or a product line subcommittee can choose not to lend its company's name or support to any particular trade case. The Committee's members produce a wide spectrum of carbon steel pipe and tube products. For this reason, the Committee's member companies are organized in subcommittees according to the product lines which they produce. The members producing a particular product line can decide whether or not to support an unfair trade petition involving a product which they produce imported from a certain country.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

The members of the subcommittee producing standard and line pipe less than 16 inches in outside diameter in support of this petition are:

Allied Tube & Conduit Corp.*
16100 S. Lathrop
Harvey, IL 60426

American Tube Co., Inc.*
P.O. Box 6633
Phoenix, AZ 85005

Bernard Epps & Co.*
3691 Bandini Blvd.
Los Angeles, CA 90023

Bull Moose Tube Co.*
12837 Flushing Meadow Dr.
St. Louis, MO 63131

Wheatland Tube Corp.
900 Haddon Avenue
Collingswood, NJ 08108

Tex-Tube Division**
Cyclops Corporation
P.O. Box 7705
Houston, TX 77007

Hughes Steel & Tube*
5333 E. Slauson St.
City of Commerce, CA 90040

LaClede Steel Co.
10 Broadway
St. Louis, MO 63102

Merchants Metals, Inc.*
P.O. Box 11646
Houston, TX 77293

Pittsburgh-International*
P.O. Box 9 - Route 24
West Fairbury, IL 61739

Sawhill Tubular Division
Cyclops Corporation
Box 11
Sharon, PA 16146

Sharon Tube Co.*
134 Mill St.
Sharon, PA 16146

Southwestern Pipe, Inc.*
P.O. Box 2002
Houston, TX 77252

* Standard pipe only

** Line pipe only

The companies listed above represent approximately 45% of domestic production of the product covered by this petition.

PUBLIC DOCUMENT
Barcode:3883995-10 A-549-502 SCO - Scope Inquiry - Line Pipe

The products produced by each of the member companies listed above are like or similar to the respective imported articles covered by this petition. Attached as Exhibit 1 to this petition is a full membership list of The Committee on Pipe and Tube Imports.

B. The Industry On Whose Behalf The Petition Is Filed, Including The Names Of Other Enterprises In Such Industry, 19 C.F.R. §353.36(a)(2).

There are approximately 53 producers of the pipe and tube products covered by this petition. A list of those domestic producers other than petitioners is attached as Exhibit 2.

C. A Statement Indicating Whether The Petitioners Have Filed, Or Are Filing, For Import Relief Pursuant To Section 201 Of The Trade Act of 1974, Or Have Initiated Proceedings Pursuant To Section 337 Or 702 Of The Act, Section 232 Of The Trade Expansion Act Of 1962, Or Section 301 Of The Trade Act Of 1974 With Respect To The Merchandise Which Is The Subject Of The Proceeding, 19 C.F.R. §353.36(a)(3).

CPTI has filed or intervened in the following cases:

1. Countervailing Duty Petition Against South Africa:

Covered standard, structural and mechanical tubing. Filed October, 1982. Suspension agreement entered into on May 30, 1983 renouncing all subsidies. Final countervailing duty determinations of 21.6% plus 9.99 Rand per ton and 26.7% plus 9.99 Rand per ton on September 12, 1983.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

PUBLIC DOCUMENT
Barcode:3883995-10 A-549-502 SCO - Scope Inquiry - Line Pipe

2. Countervailing Duty Petition Against Korea:

Covered small diameter circular pipe. Filed May 7, 1982. Final affirmative subsidy determination of 0 to 1.88% on December 27, 1982. The ITC determined on February 2, 1983 that the domestic industry was being materially injured by reason of subsidized imports from Korea.

3. Antidumping Petition Against Taiwan:

Covered small diameter circular pipe. Filed April 18, 1983. Final dumping margins issued on March 12, 1984, ranging from 9.7% to 42.7%. The ITC determined on April 26, 1984 that the domestic industry was being materially injured by reason of less-than-fair-value imports of circular pipes and tubes from Taiwan.

4. Antidumping Petition Against Korea:

Covered small diameter circular pipe and light- and heavy-walled rectangular tubing. Filed April 18, 1983. Final dumping margins issued on March 12, 1984 ranging from de minimus to 1.51%. Final ITC determination that the domestic industries producing small diameter circular pipe and light-walled rectangular tubing were being injured by reason of LTFV imports from Korea, and a negative determination of injury on heavy-walled rectangular tubing products issued April 25, 1984.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

5. Countervailing Duty Petition Against Mexico

Covered small diameter circular pipe. Filed November, 1983 by United States Steel Corporation. Petition withdrawn on April 24, 1984, after the Mexican government proposed a Voluntary Restraint Agreement. The CPTI filed a countervailing duty petition covering standard and line pipe and mechanical tubing on October 25, 1984. The Department has initiated an investigation and the preliminary determination is due on January 18, 1985.

6. Countervailing Duty Petition Against Spain:

Covered small diameter circular pipe and light-walled rectangular tubing. Filed July 17, 1984. Preliminary affirmative subsidy determination of 1.14% on October 10, 1984.

7. Antidumping Petition Against Spain:

Covered small diameter circular pipe and light-walled rectangular tubing. Filed July 17, 1984.

8. Antidumping Petition Against Brazil:

Covered small diameter circular pipe. Filed July 17, 1984.

9. Antidumping Petition Against Taiwan:

Covered small diameter light-walled rectangular tubing. Filed December 18, 1984. On January 28, 1985, the Commission

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

preliminarily determined that there was a reasonable indication that the domestic industry producing this product was suffering material injury by reason of imports of this product.

10. Antidumping Petition Against Venezuela:

Covered small diameter circular standard and line pipe. Filed December 18, 1984. On January 28, 1985, the Commission preliminarily determined that there was a reasonable indication that the domestic industry producing standard pipe was suffering material injury by reason of imports of this product, but that the domestic industry producing line pipe, because of the difficulty the industry had in providing information solely on line pipe, was not suffering material injury.

11. Section 201 Petition on Carbon and Certain Alloy Steel Products:

Filed January 24, 1984 by Bethlehem Steel Corporation and the United Steelworkers of America. The CPTI intervened as an interested party. On June 12, 1984, the ITC found that imports were not a substantial cause of serious injury to the domestic pipe and tube industry. On September 18, 1984, the President rejected the ITC's recommendations and authorized the United States Trade Representative to enter into negotiations for Voluntary Restraint Agreements with major steel producing countries in order to reduce import penetration to 18.5%,

excluding semifinished products. Pipe and tube products are covered under the President's plan.

Petitioners are filing concurrently with this petition a countervailing duty petition regarding the same products from Thailand, and antidumping and countervailing duty petitions regarding the same products from Venezuela.

D. A Detailed Description Of The Imported Merchandise, Including Its Technical Characteristics And Uses, And, Where Appropriate, Its Tariff Classification Under The Tariff Schedules Of The United States, 19 C.F.R. §353.36(a)(4).

The product covered by this petition is certain circular welded carbon steel circular pipes and tubes, .375 inch or more but not over 16 inches in outside diameter. The product includes "standard pipe," which is a general-purpose commodity used in such applications as plumbing pipe, sprinkler systems and fence posts and is commonly referred to in the industry as a standard pipe. It may be supplied with an oil coating (black pipe) or may be galvanized, and is sold in plain ends, threaded, threaded and coupled, or beveled for welding form. (These products are generally produced to ASTM specifications A-120, A-53, or A-135.) The product also includes "line pipe," which is produced to API specifications for line pipe, API-5L or API5X.

Prior to April 1, 1984 the small diameter circular pipes subject to this investigation were classified in TSUSA

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

categories 610.3208, 610.3209, 610.3231, 610.3232, 610.3241, 610.3244, and 610.3247. As of April 1, 1984, changes were made in the TSUSA. Small diameter pipes with a wall thickness greater than .065 inch are now classified in 610.3208, 610.3209, 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, and 610.3258. Circular pipe with a wall thickness less than .065 inch is now classified in 610.4925.

Petitioners believe that the description of the manufacturing processes for the products covered by this investigation which was formulated by the Commission's staff is a succinct, accurate description and includes it herein in its entirety.

> Welded steel pipes and tubes are made by forming flat-rolled steel into a tubular configuration and welding along the joint axis. There are various ways to weld pipes and tubes; the most popular are the ERW, the continuous weld (butt weld)(CW), the submerged-arc weld, and the spiral weld. Submerged-arc weld and spiral weld are normally used to produce pipes and tubes of relatively large diameter. The small circular pipes and tubes which are the subject of these investigations are produced either by the ERW or CW processes, whereas the rectangular pipes and tubes are produced only by the ERW process.[1] All pipes and tubes are formed and welded in a cylindrical configuration. Immediately after welding, the product may be reduced by rolling or stretch reducing or may be further formed into squares, rectangles, or other shapes by using forming rolls.

---

1 Transcript of the public conference on Investigation Nos. 731-TA-131 and 132 (Preliminary), pp. 52 and 53.

In the ERW process, skelp[2] is cold-formed by tapered rolls into a cylinder. The weld is formed when the joining edges are heated to approximately 2,600°F. Pressure exerted by rolls squeezes the heated edges together to form the weld. ERW mills produce both pipe in standard sizes and tubular products between 0.375 and 24 inches in outside diameter.

In recent years, the ERW process has gained increased popularity with U.S. producers of small-diameter pipe and tube products. This process requires significantly less energy per pipe produced, as only the joining edges of the product are heated, creating a weld of comparatively high integrity within the product specification; it can be used to produce such products in sizes up to 24 inches in outside diameter, compared with the 4.5-inch maximum outside diameter usually attainable in the CW process.

In the CW process, skelp is heated to approximately 2600°F and hot-formed into a cylinder. The heat in combination with the pressure of the rolls forms the weld. Continuous-weld mills generally produce the higher volume, standardized pipe products from 0.375 through 4.5 inches in outside diameter. The advantage of the CW process lies in its ability to be used to produce pipe at speeds up to 1,200 feet per minute compared with the ERW process maximum of approximately 110 feet per minute. Thus, economics associated with high-volume production may make CW pipe cheaper to produce than ERW pipe of the same grade and specification. The CW process is especially suited for the manufacture of standardized, high-volume small-diameter pipe products, such as the ASTM A-120 circular pipe included in this investigation.[3]

The pipe and tube products covered by this petition are produced by the same processes worldwide. The finished

---

[2] Skelp is a flat-rolled, intermediate product used as the raw material in the manufacture of pipe and tube. It is typically an untrimmed band of hot- or cold-rolled sheet.

[3]USITC Publication 1519, at A-5, A-6.

products are identical. Therefore, imported and domestically produced products are completely fungible. For either service centers or end-users, the source of the product is of no consequence. Price is the only important factor.

E. The Name Of The Country Or Countries From Which The Merchandise Is Being, Or Is Likely To Be Exported To The United States And, If The Merchandise Is Produced In A Country Other Than That From Which It Is Exported, The Name Of The Country In Which It Is Produced, 19 C.F.R. §353.36(a)(5).

The pipe and tube products covered by this petition are likely to be imported from Thailand. Petitioner has no evidence indicating that the merchandise in question is being produced in a country other than that from which it is being exported.

F. The Names And Addresses Of All Known Foreign Manufacturers and Exporters Exporting The Merchandise In Question, 19 C.F.R. §353.36(a)(6).

Two Thai pipe and tube producers are believed to be capable of producing pipe for export to the United States and are believed to be responsible for the shipments that have arrived at in the 4th quarter of 1984 and are expected to arrive during the first quarter of 1985.

(1) Thai Union Steel Co., Ltd.
56 Group 2, Poochaosamingprai Rd.
Phrapradaeng, Samutprakarn 10130
Tel: 394-0457, 394-1220-3
394-2941
Cable: TUSCO PRAPRADAENG
Telex: 84500 TUS TH
Attn: Mr. Anan Pojtviboonsiri
Mr. Thongchai Leerungruang

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

PUBLIC DOCUMENT
Barcode:3883995-10 A-549-502 SCO - Scope Inquiry - Line Pipe

(2) Thai Steel Pipe Industry Co., Ltd.
36 Bangyapraek Rd.
Poochaosamingprai Rd.
Phrapradaeng, Samutprakarn 10130
Tel: 394-0811-4
Cable: STELLPIPE BANGKOK
Telex: 87619 TSP TH
Attn: Mr. Paisan Choonchongchot

Nine other Thai producers of the pipe and tube products covered by this petition are listed at Exhibit 3. Petitioners request that the Department determine if these or other Thai producers are likely to sell the products covered by this petition at less than fair value.

G. All Pertinent Facts As To The Price At Which The Foreign Merchandise Is Sold Or Offered For Sale In The United States And In The Home Market In Which Produced Or From Which Exported, Including Information Concerning Transportation And Insurance Charges, And If Appropriate, Information Regarding Sales In Third Countries Or The Cost Of Producing The Merchandise, 19 C.F.R. 353.36(a)(7).

Petitioners have been unable to obtain home market sales prices for the Thai pipe and tube products covered by this petition. Petitioners have also been unable to obtain raw material (sheet) prices for Thai pipe and tube producers. One of the two Thai producers which petitioners believe to be the source of the less-than-fair-value shipments, Thai Steel Pipe Industry Co., is a subsidiary of Sumitomo Metal Industries, Ltd. and Nomura Trading Co. Petitioners believe that these Thai exporters are importing their steel sheet and coil from Japan and possibly from Brazil or other countries.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

PUBLIC DOCUMENT

Petitioners, therefore, obtained information on the export prices of steel sheet and coil from Japan to Thailand from the most recent Japanese export statistics available (September 1984). Using these prices and an estimation of the cost of processing raw materials into finished pipe products, based on United States non-integrated producers' cost of production adjusted for Thai wage rates, petitioner constructed the cost of production for Thai producers of the pipe and tube products covered by this petition. Petitioner assumes that until actual home market prices are received from the Thais that those producers are not selling in their home market for below cost of production. Constructed cost of production was compared to offer prices by Triangle Winter Wolff and Global Traders for selected products and for imports from Thailand reported in import statistics for November 1984.

Petitioner selected three sample products as a basis for fair value comparisons of imports of standard pipe. Each product is representative of the various products in its category. To construct the cost of production for Thai producers of these three products, petitioner utilized the export value of sheet and coil from Japan to Thailand as a base price. Having no actual information regarding freight and insurance rates on the coils shipped from Japan to Thailand, on the basis of conversations with several international shippers petitioner estimated $40.00 per ton for the freight, insurance,

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

PUBLIC DOCUMENT

and delivery charges involved with transporting the steel sheet and coil from Japan to the factories in Thailand.

Added to these costs was a yield factor of 8%, to account for scrap costs associated with slitting, welding, cut-offs and rejected pipe. This is based on a domestic industry average.[4] Industry estimates are that scrap from slitting, welding, cut-offs and rejected pipe averages 5.5% for sheet and an additional 2-3% for trimming the edges of coil.

For galvanized products, petitioner added the cost of zinc necessary to galvanize a ton of that particular pipe product. The cost of zinc in Thailand, according to zinc traders, is the European producers' cost plus an add-on of $45 to $60 per ton. The formula used to calculate the amount of zinc necessary per ton is an industry formula and is attached as Exhibit 4.

After determining raw material costs petitioner added 17.1% for the cost of conversion into pipe and tube products. This is based on the industry average for labor and factory costs for non-integrated United States producers of the products covered in this petition. This estimate may actually be low. While petitioner was unable to obtain energy prices for Thailand, it believes that energy prices are as expensive or more expensive than comparable U.S. prices. Petitioner also believes that the exporting companies named in this petition

---

4 See USITC Publication 1519 at A-43 to A-49.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

have undergone heavy capital infusions over the last few years in order to obtain a dramatic increase in capacity. This would make depreciation costs higher for Thai producers.

Petitioner then added 10% for selling, general and administrative expenses and 8% for profit as per the statutory criteria listed in 19 C.F.R. 353(6)(a)(2).

After constructing the cost of production as demonstrated in confidential Exhibit 5, petitioner compared these costs of production to offers for sale of pipe and tube by Triangle Winter Wolff and Global Traders and to figures representing a shipment received in Wilmington, North Carolina in November.

These comparisons show that the Thai producers of standard pipe are offering to sell large quantities of their products at 21.1% to 40.7% below cost of production. A price list from Triangle Winter Wolff and prices given by Globe Traders Group, Inc. are provided as Exhibit 6.

H. The Volume And Value Of Imports Of The Merchandise From The Country In Question In The Most Recent Two-Year Period, And Also Other Periods If The Petitioner Believes Such Other Periods To Be More Representative, Or, If The Merchandise Is Not Presently Imported Into The United States Or Is Not Imported In Significant Quantities, Information As To The Likelihood Of Its Importation, 19 C.F.R. §353.36(a)(10).

Petitioner is unaware of any imports from Thailand of the pipe and tube products covered by this petition prior to the last quarter of 1984. As of publication of November IM 145X

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

(Department of Commerce, Bureau of the Census) the first evidence of imports from Thailand began to show up. 38.9 tons of small circular pipe, TSUS 610.3242 came into Wilmington, Delaware at a total value of $10,909. 11.0 tons of TSUS 610.3243 entered Philadelphia in December at a total value of $3,612.

Petitioner believes that another 100 tons of the pipe and tube products covered by this petition have already arrived, but have yet to be reported in the import statistics. Petitioner also believes that Globe Traders Group, Inc. and Borneo Sumatra Trading Co., Inc. have each already imported 500 tons of the pipe and tube products covered by this petition. Due to a lag time in Customs reporting, they have not yet shown up in the monthly import statistics published by the Commerce Department.

Petitioner is aware that 10,000 tons of standard pipe are scheduled for February shipment from Thailand to Los Angeles for March delivery. Information available to the petitioner indicates that the two Thai producers named in this petition have the capacity to ship at least 300,000 tons of the pipe and tube products covered by this petition.

I. <u>The Names And Addresses Of Enterprises Believed To Be Importing The Merchandise, 19 §353.36(a)(11).</u>

Triangle Winter Wolff Co.
1000 W. Francisco St.
Torrance, CA 90502
(213) 538-9900

Globe Traders Group, Inc.
350 Fifth Avenue
Suite 5105
Empire State Bldg.
New York, NY 10118
(212) 947-4590

Borneo Sumatra Trading Co., Inc.
14603 Mercado Ave.
La Mirada, CA 90638
(714) 521-4451

Phillips Brothers
Petitioners are presently unable to find an address but will forward it to the ITC as soon as they obtain it.

J. The Names And Addresses Of Other Enterprises In The United States Engaged In The Production, Manufacture Or Sale Of Like Merchandise, 19 C.F.R. §353.36(a)(12).

This information is contained in Exhibit 2.

K. Information As To The Material Injury Or Threat To, Or The Material Retardation Of The Establishment Of A United States Industry By Reason Of The Imported Merchandise Alleged To Be Sold At Less Than Fair Value, As Described In 19 C.F.R. §207.11 And §207.26(d), 19 C.F.R. §353.36(a)(13).

1. The Relevant Industry Consists of Those Domestic Producers of Standard and Line Pipe, Considered Together

Section 771(4)(A) of the Act defines "industry" as:

the domestic producers as a whole of a like product, or those producers whose collective output of the like product constitutes a major proportion of the total domestic production of the product.

Section 771(4)(D) elaborates that:

The effect of subsidized or dumped imports shall be assessed in relation to the United States production of a like product if available data permit the separate

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

> identification of production in terms of such criteria as the production process or the producer's profits. If the domestic production of the like product has no separate identity in terms of such criteria, then the effect of the subsidized or dumped imports shall be assessed by the examination of the production of the narrowest group of range of products, which includes a like product, for which the necessary information can be provided.

The Senate Finance Committee Report (S. Rep. No. 249, 96th Cong., 1st Sess. 83-84 (1979)) explains this provision:

> In examining the impact of imports on the domestic producers comprising the domestic industry, the ITC should examine the relevant economic factors (such as profits, productivity, employment, cash flow, capacity utilization, etc.), as they relate to the production of only the like product, if available data permits a reasonably separate consideration of the factors with respect to production of only the like product. If this is not possible because, for example, of the accounting procedures in use or practical problems in distinguishing or separating the operations of product lines, then the impact of the imports should be examined by considering the relevant economic factors as they relate to the production of the narrowest group or range of products which includes the like product and for which available data permits separate consideration.

As the Commission discovered during the recent preliminary antidumping investigation of circular welded pipe and tube from Venezuela, although there are a number of standard pipe producers who do not also produce line pipe, most of the line pipe producers also produce standard pipe. In particular, the large integrated producers produce both types of pipe and tube products. Those producers were generally able to generate information on sales and shipments for each product, but found it difficult to provide separate information on profits,

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

PUBLIC DOCUMENT

productivity, employment, cash flow, or capacity utilization. Because standard and line pipe are produced in the same mill, such an inability should not be surprising.

Given this difficulty, the statute requires the ITC to consider the producers of standard and line pipe as one industry for injury-determination purposes. It would be inconsistent with the remedial purpose of the statute to deny relief to industries that are unable to provide information on specific problems.

There is Commission precedent for combining standard and line pipe into one industry. In the investigations of Welded Carbon Steel Pipes and Tubes from Brazil, France, Italy, the Republic of Korea, and West Germany,[5] the Commissioners divided the pipe and tube industry into two industries: small diameter (less than 16" OD) standard, structural, and line welded carbon steel pipes and tubes, and large diameter (at least 16" OD) structural and line welded carbon steel pipes and tubes. Petitioners believe that the reasons for making this division hold true today.

---

5 Inv. Nos. 701-TA-165-169 (Preliminary), USITC Pub. 1262 (June 1982), at 3-5.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

2. The Domestic Industry Producing Small Diameter Standard and Line Pipe Is Threatened With Material Injury By Reason Of Less-Than-Fair-Value Imports From Thailand.

The U.S. International Trade Commission has concluded a number of times that the industry producing the products covered by this petition are suffering material injury. In early 1983, the Commission determined that the same industry on whose behalf this petition is being brought--the domestic producers of small diameter welded carbon steel pipes and tubes--is materially injured by reason of imports of those products.[6] More recently, the Commission has preliminarily determined that the domestic industry producing some of the products covered by this petition, i.e., standard pipe, is suffering material injury by reason of imports of standard pipe.[7]

Now a new threat to the industry has appeared. Thai steel pipe and tube producers, previously unknown in the U.S. market, have begun offering large quantities of pipe and tube for delivery beginning in the first quarter of 1985. Section 612 of the Trade and Tariff Act of 1984 added subparagraph (F) to section 771(7) of the Tariff Act of 1930:

---

6 See Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea, Inv. No. 701-TA-168 (Final), USITC Pub. 1345 (February 1983).

7 See Certain Welded Carbon Steel Pipes and Tubes from Brazil and Spain, Inv. Nos. 701-TA-220 and 731-TA-197 and 198 (Preliminary), USITC Pub. 1569 (August 1984); Certain Welded Carbon Steel Pipes and Tubes from Taiwan and Venezuela, Inv. Nos. 731-TA-211 and 212 (Preliminary), 50 Fed. Reg. 5326 (February 7, 1985).

(F) Threat of Material Injury.--

(i) In General.--In determining whether an industry in the United States is threatened with material injury by reason of imports (or sales for importation) of any merchandise, the Commission shall consider, among other relevant factors--

(I) If a subsidy is involved, such information as may be presented to it by the administering authority as to the nature of the subsidy (particularly as to whether the subsidy is an export subsidy inconsistent with the Agreement),

(II) any increase in production capacity or existing unused capacity in the exporting country likely to result in a significant increase in imports of the merchandise to the United States,

(III) any rapid increase in United States market penetration and the likelihood that the penetration will increase to an injurious level,

(IV) the probability that imports of the merchandise will enter the United States at prices that will have a depressing or suppressing effect on domestic prices of the merchandise,

(V) any substantial increase in inventories of the merchandise in the United States,

(VI) the presence of underutilized capacity for producing the merchandise in the exporting country, and

(VII) any other demonstrable adverse trends that indicate the probability that the importation (or sale for importation) of the merchandise (whether or not it is actually being imported at the time) will be the cause of actual injury.

> (VIII) the potential for product-shifting if production facilties owned or controlled by the foreign manufacturers, which can be used to produce products subject to investigation(s) under section 701 or 731 or to find orders under section 706 or 736, are also used to produce the merchandise under investigation.
>
> (ii) Basis for determination.--Any determination made by the Commission under this title that an industry in the United States is threatened with material injury shall be made on the basis of evidence that the threat of material injury is real and that actual injury is imminent. Such a determination may not be made on the basis of mere conjecture or supposition.

A number of these considerations apply here. The evidence is that the threat of injury is real and that actual injury is imminent. First, the capacity of the Thai pipe and tube manufacturers has increased significantly in the last few years. In early 1980, the capacity of the entire Thai pipe and tube industry was 19,500 tons per month, or 234,000 tons per year. See Exhibit 7. Petitioners' information is that two companies, Thai Steel Pipe Industries Co. and the Thai Union Steel Co., alone now have the capacity to produce 300,000 tons per year of steel pipe and tube products. Petitioners believe that the Thais have increased their capacity for pipe and tube production since 1981 in order to participate in export markets. The capacity of the other nine Thai producers supplementally listed is unknown. However, it is clear that Thai pipe and tube producers have the capacity to cause material injury to United States producers of standard pipe.

Sales overtures by United States importers of Thai products and the new flow of Thai imports in these product areas show their willingness to do so.

Second, a substantial increase in market penetration will certainly result from the imports flowing from the present offers for sale. Thailand exported no small diameter circular pipe to the United States prior to 1984. In November 1984 the first shipment, 38.9 tons, was ecorded in the import statistics for TSUS 610.3242 as having entered the port of Wilmington, North Carolina. In December 1984, 11 tons classified under TSUS 610.3243 entered the port of Philadelphia. Petitioners believe that another 100 tons brought in by Triangle Winter Wolff and two shipments of 500 tons each brought in by Borneo Sumatra Trading Co., Inc. and Globe Traders Group, Inc. have already arrived in the United States via Los Angeles but have not yet been recorded in the import statistics. From sales overtures made by Triangle Winter Wolff and conversations with knowledgeable persons in the industry, petitioners are aware of at least 10,000 tons of the pipe and tube products covered by this petition scheduled for February shipment from Thailand for March delivery in Los Angeles. These figures point to a dramatic increase in the rate of dumped exports from Thailand into the United States market.

Third, the offered prices will have a substantially depressive effect on prices in the U.S. market. The staff report accompanying the preliminary determination in the

PUBLIC DOCUMENT

investigation of Certain Welded Carbon Steel Pipes and Tubes from Brazil and Spain,[8] chronicles the increasingly depressed domestic producers' price for ASTM A120, schedule 40, sprinkler pipe, carbon welded, black, 2.375-inch OD, 0.154-inch wall thickness, plain end pipe. In January 1982, the average price was $100.09 per hundred feet, which translates to $548 per ton. By June 1984, the price had declined to $84.90 per hundred feet, or $465 per ton. Triangle Winter Wolff is offering for January 1985 shipment that same pipe specification for $75.88 ex-dock Los Angeles, or only $415 per ton. See Exhibit 6. The Thais are obviously using extremely low prices as the means to gain market share, which will have a severe effect on market prices for pipe and tube products.

The United States market has suddenly become a very attractive market for Thai pipe and tube products. With voluntary restraint agreements (VRAs) signed by Spain and the EC countries and VRAs imminent with Japan, Korea, Mexico and Brazil and other major exporters of pipe and tube products, Thai producers see the opportunity to put excess capacity to good use by exporting to the United States. At least one major source of Thai pipe and tube exports, Thai Steel Pipe Industry Co., is a subsidiary of a major Japanese steel producer and exporter, Sumitomo Metal Industries, Ltd. With a VRA limiting

---

8 Inv. Nos. 701-TA-220 and 731-TA-197 and 198, USITC Pub. 1569, at A-28.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

Japanese exports of pipe and tube to the United States, a great incentive exists to shift production to subsidiaries in countries such as Thailand which are not covered by a VRA. VRAs were meant to provide relief to the American steel industry, but they are also providing an opportunity for non-covered countries like Thailand to sell less-than-fair-value goods to the United States. Thus the American pipe and tube industry could get little or no relief from extraordinarily high import penetration levels.

3. The Regional Industry on the West Coast Producing Small Diameter Standard and Line Pipe Is Threatened With Material Injury By Reason Of Less-Than-Fair-Value Imports From Thailand.

Thai small-diameter pipe will affect the entire domestic industry. As noted, two small shipments have already entered eastern ports. As was done by the Koreans and the Taiwanese, the Thais will be able to ship pipe to any region of the United States and displace domestic sales due to their extremely low less-than-fair-value offer prices.

Alternatively, petitioners allege that the regional industry consisting of those producers in the West Coast region are threatened with material injury by reason of imports of small-diameter welded pipe and tube products from Thailand. 19 U.S.C. §1677(4)(C) reads as follows:

> Regional industries. In appropriate circumstances, the United States, for a particular product market, may be divided into two or more markets and the producers within each market may be treated as if they were a separate industry if--

    Barcode:3883995-10 A-549-502 SCO - Scope Inquiry - Line Pipe

(i) the producers within such market sell all or almost all of their production of the like product in question in that market, and

(ii) the demand in that market is not supplied, to any substantial degree, by producers of the product in question located elsewhere in the United States.

The Commission can therefore also find material injury based on a regional industry analysis of the western domestic producers of these products.

Information on part of the West Coast small diameter circular welded pipe industry was developed during the investigation of Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea and Taiwan.[9] In 1983, producers West of the Rockies accounted for 162,946 tons annual capacity of total U.S. capacity of 3,605,877 tons, or 4.5%. Production in the West accounted for 78,469 tons out of total U.S. production of 1,032,280 tons, or 7.6% (the difference was largely because of the extremely low capacity utilization--15.0%--of the Eastern integrated producers). The ITC staff found that producers located east of the Rocky Mountains shipped between 2.5% and 3.3% of their aggregate U.S. shipments to customers on the West Coast and that none of the West Coast producers shipped east of the Rockies. The West Coast producers can therefore be considered a regional industry.

---

9 Inv. Nos. 731-TA-131, 132, and 138 (Final), USITC Pub. 1519 (April 1984), at A-18 to A-22 and passim (covering only standard pipe under 4.5").

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

PUBLIC DOCUMENT

Until recently West Coast producers of pipe and tube products have been in competition primarily with Korean, Taiwanese and Japanese producers. With the high dumping margins issued against the Taiwanese and with VRAs imminent with Japan and Korea, West Coast importers will be looking for other cheap foreign sources to fill the gap. The Thais are an obvious source, as the 10,000 ton shipment due in Los Angeles in March indicates. It is expected that a majority of the pipe and tube imports will enter the U.S. through West Coast ports. Therefore, the ITC could make a determination of threat of material injury based upon a threat of material injury to a regional industry.

III. CONCLUSION

This petition for the imposition of antidumping duties presents all information reasonably available to petitioners in support of the allegations that imports of certain small diameter circular pipes and tubes from Thailand are likely to be sold at less than fair value and that the domestic industries producing these products are threatened with material injury by reason of imports of the merchandise within the meaning of Section 731 of the Act. Accordingly, in compliance with Section 732 of the Act, and 19 C.F.R. §353.37, the Department and the Commission are requested to commence an antidumping investigation to determine whether the statutory elements necessary for the imposition of antidumping duties on

PUBLIC DOCUMENT

imports from Thailand of small diameter circular welded pipe exists.

Roger B. Schagrin, Esq.
Paul W. Jameson, Esq.
Counsel to The Committee
On Pipe and Tube Imports

PUBLIC DOCUMENT

Barcode:3883995-10 A-549-502 SCO - Scope Inquiry - Line Pipe

EXHIBIT 1

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

EXHIBIT 1

MEMBERS OF THE COMMITTEE ON PIPE AND TUBE IMPORTS

Allied Tube and Conduit Corp.
16100 S. Lathrop
Harvey, IL 60426

American Tube Co., Inc.
P.O. Box 6633
Phoenix, AZ 85005

Bernard Epps & Co.
3691 Bandini Blvd.
P.O. Box 23984
Los Angeles, CA 90023

Bock Industries of
    Elkhart, Indiana
P.O. Box B-1027
Elkhart, IN 46515

Bull Moose Tube Co.
12837 Flushing Meadow Drive
St. Louis, MO 63131

Central Steel Tube Co.
Central Steel Road-Box 551
Clinton, IA 53732

Century Tube Corp.
P.O. Box 7612
Pinebluff, AR 71611

Copperweld Tubing Group
Two Robinson Plaza
Route 60, Box 60
Pittsburgh, PA 15230

Hughes Steel & Tube
5401 E. Slauson St.
City of Commerce, CA 90040

Kaiser Steel Corp.
3851 Santa Fe Avenue
Los Angeles, CA 90058

LaClede Steel Company
10 Broadway
St. Louis, MO 63102

Maruichi American Corp.
11529 S. Greenstone Avenue
Santa Fe Springs, CA 90670

Maverick Tube Corp.
311 N. Lindbergh, Suite 130
St. Louis, MO 63141

Phoenix Steel Corp.
121 Budge Street
Phoenixville, PA 19460

Pittsburgh Tube Co.
2060 Pennsylvania Avenue
Monaca, PA 15061

Quanex Corp.
1900 W. Loop South
Suite 1500
Houston, Texas  77027

Sawhill Tubular Division
Cyclops Corp.
P.O. Box 11
Sharon, PA 16161

Sharon Tube Co.
134 Mill Street
Sharon, PA 16146

Southwestern Pipe, Inc.
P.O. Box 2002
Houston, TX 77252

Tex-Tube Division
Cyclops Corp.
P.O. Box 7705
Houston, TX 77007

UNR-Leavitt
1717 W. 115th Street
Chicago, IL 60643

Welded Tube Company of
    America
1855 E. 122nd Street
Chicago, IL 60633

Western Tube & Conduit
1001 East Dominguez
Long Beach, CA 90810

Wheatland Tube Corp.
Wheatland, PA 16161

PUBLIC DOCUMENT
Barcode:3883995-10 A-549-502 SCO - Scope Inquiry - Line Pipe

EXHIBIT 2

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

EXHIBIT 2

OTHER DOMESTIC PRODUCERS OF SMALL DIAMETER
CIRCULAR STANDARD AND LINE PIPE

Armco Inc.*
703 Curtis Street
Middletown, OH 45042

Atlantic Steel Co.*
P.O. Box 82000
Tallapoosa, GA 30176

Berger Industries, Inc.*
Steel Tube Division
7416 Grand Avenue
Maspeth, NY 11378

Daily Corp.*
Box 414
Montgomeryville, PA 18936

Donovan Steel Tube Co.*
P.O. Box 5147
Point Place Station
Toledo, OH 43611

Hanna Steel Corp.*
3812 Commerce Avenue
Fairfield, AL 35064

Hoffmann Industries, Inc.*
Shillington Road
Singing Spring, PA 19608

James Steel & Tube Co.*
P.O. Box 945
Madison Heights, MI 48071

Lone Star**
2200 W. Mockingbird Lane
Dallas, TX 75235

Metal-Matic, Inc.*
620 Second Street, S.E.
Minneapolis, MN 55414

American Roll Formed Products*
Box 668
Painesville, OH 4077

Babcock & Wilcox**
Tubular Products Group
P.O. Box 401
Beaver Falls, PA 15010

California Steel & Tube Corp.*
16049 Stephens Street
City of Industry, CA 91745

Delta Tube & Fabrication*
4149 Granges Hall Road
Holly, MI 48442

Geneva**
Box 30 A
Geneva, NE 68361

Harris Tube Division*
Automation Industries, Inc.
8720 South San Pedro Street
Los Angeles, CA 90003

Jackson Tube Service, Inc.*
P.O. Box 818
Piqua, OH 45356

Lock Joint Tube Co., Inc.*
P.O. Box 239
South Bend, IN 46624

LTV Steel
P.O. Box 6778
Cleveland, OH 44101

Miami Industries, Div. of*
MSL Ind.
P.O. Box 912
Piqua, OH 45356

Mid-States Tube Corp.*
6600 52nd Street
Kenosha, WI

Pacific Tube Co.*
5710 Smithway Street
Los Angeles, CA 90040

Pixley Tube Corp.*
Highway 81 South
Marlow, OK 73533

Roth Steel Tube Co.*
1335 E. 171st Street
Cleveland, OH 44110

Stupp**
P.O. Box 3558
Baton Rouge, LA 70821

Torrance Tubing & Conduit Co.*
1739 W. 213th Street
Torrance, CA 90509

Tubular Products Co.*
P.O. Box 6418
Birmingham, AL 35217

U.S. Tube, Inc.*
P.O. Box 5487
Birmingham, AL 35207

Valmont Industries, Inc.
West Highway 275
Valley, NB 68064

Maruichi American Corp.*
11529 S. Greenstone Ave.
Santa Fe Springs, CA 90670

Western Tube & Conduit*
1001 East Dominguez
Long Beach, CA 90810

Motor City Tube Corp.*
777 Advance Street
Brighton, MI 48116

Parthenon Metal Works, Inc.*
P.O. Box 307
Laverne, TN 37086

J.M. Tull Industries*
P.O. Box 725
Norcross, GA 30071

Royal Tube Corp.*
P.O. Box 726
Seymour, IN 47274

Tectron Tube Division,*
Menco Corp.
P.O. Box 360
Depere, WI 54115

U.S. Steel
600 Grant Street
Pittsburgh, PA 15230

United Tube Corp.*
10 South Ware Blvd.
Tampa, FL 33619

Wheeling-Pittsburgh Steel Corp.
Four Gateway Center
Pittsburgh, PA 15230

Century Tube Corp.*
P.O. Box 7612
Pinebluff, AR 71611

* Produces Standard Pipe Only

** Produces Line Pipe Only

PUBLIC DOCUMENT

Barcode:3883995-10 A-549-502 SCO - Scope Inquiry - Line Pipe

EXHIBIT 3

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

Barcode:3883995-10 A-549-502 SCO - Scope Inquiry - Line Pipe

Exhibit 3

OTHER PRODUCERS OF THAI STANDARD PIPE

1. Saha Thai Steel Pipe Co., Ltd.
78 Group 3, Poochaosamingprai Rd.
Phrapradaeng, Samutprakarn 10180
Tel: 394-0891, 394-1973
394-1650-1
Cable: SAHASTEEL PARAPRADEANG
Telex: 72095 SCS TH
Attn: Mr. Somchai Karuchit
Product: Galvanized Steel Pipe

2. Thai-Asia Steel Pipe Co., Ltd.
35 Suksawad Rd., Phrapradaeng
Samutprakarn 10180
Tel: 462-6875
Cable: TASTEEL BANGKOK
Telex: UDOMTHAI TH 82011
Attn: Mr. Udom Pichitpongchai
Product: Galvanized Steel Pipe

3. Siam Syndicate Co., Ltd.
260, 4th Floor, Suriyothai Bldg.
Phaholyothin Road,
Bangkok
Tel: 279-4630-1, 279-3377,
279-3096, 278-3730-1
Cable: SYNDICO
Telex: 82702 ASCO TH
Attn: Mr. Somkiet Amorn-Trakul
Mr. Yutthaphong Krityakianrana
Product: Galvanized Steel Pipe
& Fittings
Cast Iron Valves

4. Bangkok Industry Service Co., Ltd.
149 St. Louis 3, Chan Rd.,
Bangkok
Tel: 211-4601-4
Cable: BISCO
Telex: 87996 BISEXPO TH
Attn: Mr. Nimitr Tiewxharoean
Product: Galvanized Steel Pipe

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

5. Sathask-driam Co., Ltd.
   76 Soi Paisanee, Charoenkrung Rd.
   Bangkok
   Tel: 234-0126
   Cable: SATHASKCO
   Telex: 87980 TH
   Attn: Ms. Orawan Saengrangkaran
   Product: Black Steel Pipe

6. TCP Thai Cast Manufacturing Ltd. Part.
   31/37 Vorachak Rd., Pomprab
   Bangkok 10100
   Tel: 223-0922-3
   Cable: SAIRON BANGKOK
   Telex: 81099 SACKIWA TH
   Attn: Mr. Mana Karoonyanont
   Product: Cast Iron Pipe

7. Siam Steel Pipe Import Export Co., Ltd.
   316 Soi Miktr-Maitri
   Pracha-Uthit Rd., Bangmod
   Rajburana, Bangkok 10140
   Tel: 234-0840, 462-5573
        462-6922, 462-5705
   Cable: SIAM STEEL BANGKOK 14
   Telex: 87655 JHC TH
          Attn: Vichien
   Attn: Mr. Vichien A Wong
   Product: Galvanized Steel Pipes

8. P.H. and P. Co., Ltd.
   715/5 Soi Wat-Dognai, Sathupradith
   Bangkok
   Tel: 284-0887, 284-1639
   Cable: PHPSIAM
   Telex: 82164 BVT TH
          Attn: PHPSIAM
   Attn: Mr. Hoon wongjitwuthikrai
   Product: Black Steel Pipe

9. Waltzen Enterprise Co., Ltd.
   2083, 5th Floor Wenco Bldg.,
   New Petchburi Rd., Bangkapi
   Huaykwang, Bangkok 10810
   Tel: 314-2721-2, 314-5157
   Cable: WALTZEN BANGKOK
   Telex: 82443 TRANTEX TH
          Attn: Watzen
   Attn: Mr. Tavich Suksupprachai
   Product: Cast Iron Pipe and Fittings

PUBLIC DOCUMENT
Barcode:3883995-10 A-549-502 SCO - Scope Inquiry - Line Pipe

EXHIBIT 4

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

Barcode:3883995-10 A-549-502 SCO - Scope Inquiry - Line Pipe

FORMULA FOR 1 1/2" SK40 (ASTM-A-120)

A. Industry formula for wt/ft

10.68 (D-t)t, where
D = O.D.
t = wall thickness
10.68 = 3.1417 (pi) x 12"/ft. x .2833#/cu. in. (steel density)

B. Square ft/lineal ft

(1.900" O.D. x 3.1417 (pi) x 12"/ft x 2 sides) divided by
144 sq. in./sq. ft. =
.9949 sq. ft. surface area/lineal ft.

C. Square ft/ton

$\frac{2000\#/\text{ton}}{2.718\#/\text{ft}}$ (.9949) = 732 sq. ft.ton

D. ASTM-A-120 requires 1.8 oz./sq. ft.

1. Price of zinc to Thailand is European producer's price plus $45-65 per ton charge.

| | |
|---|---|
| Dec. 1984 zinc prices | $900 |
| Surcharge | 45 |
| Zinc$/MT | $945 |

2.

| | |
|---|---|
| Zinc price | .4288$/# |
| Zinc price | .0268$/oz. |
| Dross price | .0134$/oz. |
| Zinc | .0402$/1.5 oz. |
| Dross | .0067$/.5 oz. |
| | $.0335 to put 1 oz. zinc on pipe |

3. $.0603 to put 1.8 oz. of zinc on pipe

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

ZINC COST/SHORT TON FINISHED PIPE

550g/sq. meter

| Trade | O.D. | Wall | Wt/Ft. | Sq. ft./Ton | $ Ton |
|---|---|---|---|---|---|
| 1 1/2"SK40 | 1.900 | 1.45 | 2.718 | 732 | 44.14 |
| 1 3/8 Tube | 1.315 | .069 | .918 | 1500 | 90.45 |

EXHIBIT 5

PUBLIC DOCUMENT

TABLE 1

COST OF PRODUCTION

| | | Product 1[1] | Product 2[2] | Product 3[3] |
|---|---|---|---|---|
| A | Coil Price[4] | 299.47 | 299.47 | 278.41 |
| B | Shipping[5] | 40.00 | 40.00 | 40.00 |
| C | Base Price[6] | 339.47 | 339.47 | 318.41 |
| D | Yield Factor 8%[7] | 27.16 | 27.16 | 25.47 |
| E | Zinc[8] | -- | 44.14 | 90.45 |
| F | Conversion Cost 17.1%[9] | 62.69 | 70.24 | 74.27 |
| G | Total Cost of Goods | 429.32 | 481.01 | 508.60 |
| H | SGA 10%[10] | 42.93 | 48.10 | 50.86 |
| I | COP | 472.25 | 529.11 | 559.46 |
| J | Profit 8%[11] | 37.78 | 42.33 | 44.76 |
| K | Constructed Value | 510.03 | 571.44 | 604.22 |
| L | Offer Price[12] | 423.62 | 517.73 | 587.02 |
| M | Freight, Insur.[13] | 40.00 | 40.00 | 40.00 |
| N | Duty 1.9% | 7.29 | 9.08 | 10.39 |
| O | Ex-Factory U.S. Purchase Price | 376.33 | 468.65 | 536.63 |
| P | Difference Between K & O | 133.70 | 102.79 | 67.59 |
| Q | Margin | 35.5% | 21.9% | 12.6% |

FOOTNOTES FOR TABLE 1

1 Product 1 is an ASTM-A-120 Schedule 40 pipe, welded, carbon, black, 1.9 inch O.D., 0.145 inch (3.68 mm) wall thickness. It is usually purchased in widths of 44 to 48 inches or between 1.1 to 1.3 meters.

2 Product 2 is an ASTM-A-120 Schedule 40 pipe, welded, carbon, galvanized, 1.9 inch O.D., 0.145 inch (3.68 mm) wall thickness. It is usually purchased in widths of 44 to 48 inches or between 1.1 to 1.3 meters.

3 Product 3 is light-walled fence tubing, welded, carbon, galvanized 1.315 in. O.D., .069 in. (1.75 mm) wall thickness. It is usually purchased in widths of 44 to 48 inches or between 1.1 to 1.3 meters.

4 All coil prices are based on hot-rolled coil prices calculated from Japanese export statistics on coil shipments to Thailand for period September 1984. See Exhibit 5, Table III.

5 Petitioner was unable to obtain exact shipping, insurance, port and handling charges from Japan to Thailand. Conversations with international shipping agents indicate that $40.00 per ton is not an unreasonable rate. This does not take into account inland freight charges for delivery to the pipe mill, but since all pipe mills are at or near the coast, such charges would be minimal.

6 This base price does not include any extras which the Thais may actually be paying in their sheet costs, making this a conservative figure.

7 Industry estimates are that scrap from slitting, welding, cut-offs and rejected pipe average 5.5% for sheet and an additional 2-3% for trimming the edges of coil.

8 Based on a price of 42.88 cents per pound and the specified application under ASTM-A-120. See Exhibit 4.

9 Conversion cost was based on average manufacturing cost for U.S. non-integrated producers as established by the International Trade Commission. (See Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea and Taiwan, Inv. Nos. 731-TA-131, 132, and 138 (Final), USITC Pub. 1519, at A-29.) No current wage information was available to petitioner. Petitioner therefore used an average industrial wage taken from the United Nations' Statistical Yearbook 1970, adjusted for consumer price increases since 1970 and further adjusted to reflect higher wages in the Bangkok area and higher wages in the steel industry. Petitioner estimates the average Thai steelworker engaged in the production of pipe and tube earns approximately $1 per hour. Petitioner believes that this conversion factor may even be too low considering the interest and depreciation expenses involved with expanding production capacity which are believed to have been incurred over the last few years.

10 Petitioner has no information concerning selling, general and administrative expenses of Thai pipe and tube producers. Petitioner has therefore chosen to use the statutory minimum of 10% used when constructed value is compared with U.S. purchase price. (See, 19 C.F.R. §353.6(a)(2).)

11 Petitioner has chosen the statutory minimum 8% profit level that would be used in a constructed value analysis.

12 Based on Triangle Winter Wolff price sheets for October 1984.

13 Petitioner was unable to obtain shipping and insurance rates between Thailand and Los Angeles. Petitioner does know from IM 145X statistics published by Commerce Department, Bureau of the Census, that 38.9 tons of the pipe and tube products covered by this petition cost $43.04 per ton in ocean freight and insurance to ship from Thailand to Wilmington, South Carolina. Adding port fees, handling cost and inland freight to this would produce an even higher figure. Petitioner has chosen the conservative estimate of $40.00 per ton to represent these costs.

PUBLIC DOCUMENT

TABLE II

FAIR VALUE COMPARISON FOR GLOBE TRADERS AND NOVEMBER SHIPMENT

| | Globe Traders Product #3 | | Nov. Shipment (Product #1) |
|---|---|---|---|
| Constructed Value | 604.22[1] | Constructed Value | 510.03[2] |
| Offer Price[3] | 553.47 | Landed Value[4] | 328.33 |
| Freight[5] | 40.00 | Shipping[6] | 43.04 |
| Duty 1.9% | 9.76 | Duty | 5.32 |
| Ex-Factory Purchase | 503.71 | Ex-Factory Purchase | 279.97 |
| Difference | 100.51 | Difference | 230.06 |
| Margin | 20.0 | Margin | 82.1 |

# FOOTNOTES TO TABLE II

1 Taken from product 3 constructed value analysis in Table I.

2 Taken from product 1 constructed value analysis in Table I.

3 Taken from phone quotes offered by Globe Traders in July, 1984. See Exhibit 6.

4 Taken from IM145X statistics, Commerce Department, Bureau of the Census.

5 See footnote 13, Table I.

6 Based on IM145X statistics, Commerce Department, Bureau of the Census. This figure does not include inland freight and handling charges.

TABLE III

EXPORTS OF JAPANESE SHEET TO THAILAND
FOR JAN.-SEPT. 1984

Jan.-Sept. Average Prices

| Product | MT | ST | Yen (1000) | Yen/Ton[1] | $/Ton |
|---|---|---|---|---|---|
| Hot-rolled sheet, less than 3 mm | 5,229 | 5,762 | 372,265 | 64,603 | 275.6 |
| Cold-rolled sheet, over 3 mm, n.e.s. | 8,001 | 8,817 | 666,245 | 75,564 | 322.4 |
| Cold-rolled sheet, in coils over 3 mm | 27,482 | 30,285 | 2,217,204 | 73,211 | 312.4 |
| Sheet plates 3 mm - 4.75 mm | 3,917 | 4,317 | 302,616 | 70,107 | 299.1 |
| Sheet plates 4.75 mm - 6 mm | 1,020 | 1,124 | 74,745 | 66,499 | 283.7 |

Sept. Prices

| Product | MT | ST | (1000) | Yen/Ton[1] | $/Ton |
|---|---|---|---|---|---|
| Hot-rolled sheet, less than 3 mm | 1,023 | 1,127 | 75,735 | 67,180 | 278.4 |
| Cold-rolled sheet, over 3 mm, n.e.s. | 869 | 958 | 75,180 | 78,476 | 325.2 |
| Cold-rolled sheet, in coils over 3 mm | 2,887 | 3,182 | 243,749 | 76,615 | 317.5 |
| Sheet plates 3 mm - 4.75 mm | 633 | 709 | 51,234 | 72,262 | 299.4 |
| Sheet plates 4.75 mm - 6 mm | 13 | 14 | 1,094 | 76,343 | 316.3 |

SOURCE: Japanese Import and Export Statistics, Commodity by Country

NOTE: Average value of yen from January to August 1984 was 234.3375 y/$. The average value of the yen in August 1984 was 241.3 y/$. Taken from market/par rate, International Financial Statistics, IMF, Sept. 1984.

PUBLIC DOCUMENT

EXHIBIT 6

PUBLIC DOCUMENT

TRIANGLE WINTER WOLFF

1000 W. Francisco St., Torrance, California 90502
(213) 538-9900

ML #1832
10/5/84
Cancels ML 1780

## A120 PIPE/FENCE TUBING

January Shipment from the Orient

**A120 Schedule 40** — **Black P.E.**

| | Galv. T&C | Galv. P.E. (Per ton) | | Black T & C | Sch. 40 (Per ton) | Sch. 10 (Per ton) |
|---|---|---|---|---|---|---|
| 1/2 | 24.17 | 527 22.42 | | 19.91 | 439 18.69 | |
| 3/4 | 31.61 | 513 29.02 | | 26.18 | 430 24.29 | |
| 1 | 46.74 | 516 43.36 | | 38.26 | 434 35.62 | |
| 1-1/4 | 62.75 | 519 58.93 | (16'/21') | 50.21 | 422 47.98 | 439 39.62 |
| 1-1/2 | 74.27 | 518 70.36 | (16'/18'/21') | 61.66 | 424 57.57 | 437 45.57 |
| 2 | 99.93 | 518 94.61 | (16'/18'/21') | 81.05 | 415 75.88 | 438 57.75 |
| 2-1/2 | 158.08 | 517 149.56 | (16'/18'/21') | 128.35 | 424 122.79 | 435 76.74 |
| 3 | 207.01 | 516 195.73 | | 167.83 | 418 158.29 | 434 93.95 |
| 4 | 298.94 | 522 281.49 | | 243.10 | 426 230.09 | 434 121.78 |

**H.D. Galv. Fence Tubes, P.E.**

| | (Per ton) | | | (Per ton) | |
|---|---|---|---|---|---|
| .059 x 1-3/8 O.D. | 631 24.95 | | .104 x 1-5/8 | 551 47.60 | (16'/21 |
| x 1-5/8 O.D. | 612 30.90 | (16'/21') | x 1-7/8 | 551 54.95 | |
| x 1-7/8 O.D. | 614 35.60 | (16'/21') | x 2-3/8 | 554 69.90 | (16'/21 |
| x 2-3/8 O.D. | 685 44.85 | (16'/21') | 116 x 1-7/8 | 553 61.10 | (16'/18 & 21') |
| .069 x 1-3/8 OD | 587 26.95 | (16'/21') | x 2-3/8 | 556 77.85 | (16'/18 & 21') |
| x 1-5/8 O.D. | 589 34.50 | (17'/21') | 128 x 2-7/8 | 546 102.50 | (16'/18 & 21') |
| x 1-7/8 O.D. | 591 39.85 | (16'/21') | | | |
| x 2-3/8 O.D. | 584 49.60 | (16'/21') | | | |

Prices per 100', ex-dock L. A. Harbor, Oakland, add 1/2%; Portland, add 1%

Terms: Net 30 Days

Lengths: Where not shown all are x 21 ft

Black P.E. Sch. 40 21 ft. all; 24' 1" and larger
Black P.E. Sch. 10 21 ft. all and 24 ft. all

ML:gb

PUBLIC DOCUMENT
Barcode:3883995-10 A-549-502 SCO - Scope Inquiry - Line Pipe

Price Quote from Globe Traders
July 1984

Schedule 40 Fence Pipe

Available September 1984,
Hold prices until November 1984

Prices for 100 tons:

| OD | Wall Thickness | Price per 100' | Per Ton |
|---|---|---|---|
| 1.315 | .069 | $25.41 | $533 |
| 1.660 | .069 | $32.30 | |
| 1.900 | .069 | $37.35 | |
| 2.375 | .069 | $47.06 | |

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

MEMORANDUM

TO:    The File

FROM:  Roger Schagrin

DATE:  February 13, 1985

RE:    Telephone conversation with Mr. Mahoney of
       Cambridge-Lee Industries


      On February 7 I received a phone call from a Mr.
Mahoney, representing Cambridge-Lee Industries out of
Memphis. Mr. Mahoney requested a copy of a December 29
memo sent to all CPTI members by this office concerning
1) pipe marking regulations, 2) CPTI filing of antidumping
petitions against Venezuela and Taiwan, 3) the ITC hearing
on Canada free trade, and 4) agreements reached under the
president's program.

      I told Mr. Mahoney that this information was
prepared specifically for CPTI members and could not be
shared with non-member companies by me. Mr. Mahoney
mentioned that his experience as an importer led him to
believe that importers would find new sources of supply to
replace the tonnages reduced from countries covered by the
agreements. He mentioned as an example that he had been
offered 12,000 tons of standard pipe from Thailand by a
broker, Phillips Brothers. I received another phone call
and our conversation ended.

EXHIBIT 7

# Pipe dreams become reality

## Thriving local industry

*Local demand for steel pipes is 9,000 tons a month, only 45 per cent of total capacity*

Although there are doubtless a few exceptions, virtually everyone in Thailand's pipe industry must be fairly happy. All sectors report either steady or rapid growth in demand and there seems no end in sight to such growth. The country is even gaining a name for itself as a manufacturer of pipes for export.

Think of pipes, and most people picture a household water pipe. But this is only one example of a large range of pipes, which can vary from large concrete units of 1.5 metres diameter and more, to small PVC or steel pipes of only ¼ inch diameter. In between are spirally welded steel pipes and pressure and non-pressure asbestos cement pipes. Rather surprisingly, except in domestic applications, there is very little market overlap among the different types.

The most common type of pipe is made of steel. Nomura Trading Thailand Co Ltd, who are the sole distributors in Thailand for Thai Steel Pipe Industry Co Ltd, estimate total production capacity to be close to 19,500 tons per month. They say there are 12 major manufacturers in Thailand, seven of whom can produce galvanised and all other types of steel pipe. The remaining five are capable of producing black ungalvanised pipe only. Pipe diameter can range between ½ and 8 inches.

### Imported steel

The pipe is made from imported steel sheet. This is trimmed, formed and welded in Thailand and after sizing, the pipe may either leave the factory as black pipe or may continue through a series of finishing processes which include straightening, pipe end facing, galvanising and threading. Whichever way, the leading companies now produce to international specifications. In fact Thai Steel Pipe Industry, using high frequency induction electric resistance welding, produces pipes to Japanese, British and American standards. This is just as well because the market for steel pipes in Thailand is estimated at 9,000 tons a month or only about 45 per cent of total production capacity. Yet all factories are now thought to be working flat out, the balance of 10,500 tons being exported.

Main markets are mainland China, which is buying between 3 to 4,000 tons of Thai made steel pipe a month and could well increase its orders, the Middle East, and the more traditional markets of Hong Kong and Singapore. Indeed, so strong is demand in both the export and domestic markets, that two to three manufacturers are expanding. This will probably give the industry a further 20 per cent additional capacity by year end.

### Seven major firms

Predictably, the seven major manufacturers divide the lion's share of the market between them. They are able to produce 17,500 tons of the present total of 19,500 and it is they who are expanding. They make a very wide range of pipes. In addition to hundreds of different specifications covering such essentials as internal and external diameter, metal thickness, weight per foot or metre and the number of threads per inch, there are several distinct applications.

These can conveniently be divided into water, gas, construction and furniture, there being major developments in each area. The demand for water pipes, for instance, has never been higher because the MWWA are in the middle of a two-decades long expansion project

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved



*Reinforced concrete pipes (above) of Siam Cement Co., Ltd. are used mostly for drainage, culverts and sewers*

which will eventually require thousands of kilometres of steel water pipe. Gas pipe demand while small, is growing fast, and should soon boom, while construction applications are also booming. This is due partly to a very healthy construction sector that has as much work as it can handle, and partly to the gradual enforcement of recent laws specifying steel, or at least wooden, scaffolding in place of flimsy bamboo. Since wood is becoming increasingly scarce and expensive and can only be used once or twice anyway, steel tubing made into prefabricated scaffolding which can be used over and over again is rapidly gaining popularity.

## Water pipes

Of the four types, water pipes account for about half the volume on the domestic market and they have an approximate market value of 49.5 million baht. All the other applications require pipe of less high quality. Thus these pipes sell for around 38.25 million baht a month. Even so, total domestic market value comes to 87.75 million baht a month which is equivalent to a very healthy 1,056 million baht a year. If the exported pipes are bringing in as much, then Thailand has discovered a new important industrial export.

In addition to the longitudinal welded pipes, for which eight inches is the maximum diameter, at least one company in Thailand makes spirally welded steel pipes. With these, the metal sheet, instead of being allowed to lie in the direction of he pipe, is set at an angle to it and then wound round it. The spiral joint is then welded, the advantage of this method being that it allows larger diameters. Sathask-Driam, the Thai manufacturer, can produce spirally welded pipes of up to 60 inches diameter.

## Spun concrete pipes

Sathask-Driam also makes centrifugally spun concrete pipes which may or may not have steel wire reinforcement. These are used for road culverts, drains and sewers and this brings the company into more or less direct competition with the Siam Cement group. For the latter produce cast reinforced concrete pipe, this particular market being the largest in terms of tonnage and number of manufacturers, and the second largest in terms of value.

Siam Cement's reinforced concrete pipes vary in diameter from 40-150 cms. They are used almost exclusively for drainage, culverts and sewers and they offer the cheapest form of piping for these applications. Even so, there is very stiff competition within the market. Siam Cement estimates that there are at least 30 to 40 recognised manufacturers plus many more small backyard enterprises. These smaller companies serve to keep

*Pipe threading at Thai Steel Pipe Industry Co., Ltd., which manufactures steel pipes to British, American and Japanese standards*

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:58 PM, Submission Status: Approved

prices way down so that, although total market demand for 1980 is estimated by Siam Cement to be about 371,000 tons, its value will be only around 223 million baht. Quite a drop from the 1,000 million baht value for steel pipes!

Siam Cement reckons that they have an 18 per cent share of the market, the other 30 to 40 makers having between 12 to 1 per cent each. The large band of unknowns manage to capture a surprisingly large 18 per cent of the trade. The reason for this is, first, low prices offered by the small firms, and the bulky nature of the pipes themselves. They are costly to transport, relatively easy to make almost anywhere, and thus the market is fragmented in terms of location. While demand is increasing at an estimated 10 per cent per year, 30 per cent of all sales are made in Bangkok. Again, the government has been the main spur to this sector because accelerated road construction has called for more culverts and drainpipes. The Highways Department is far and away the single largest purchaser of reinforced concrete pipes.

## Asbestos cement pipes

Asbestos cement pipes, also made by the Siam Cement group of companies, come in two distinct types. These are pressure and non-pressure, the former being used as drain pipes, the latter as water supply pipes. The non-pressure drain pipes vary in diameter between 80 and 150 mm and can be between one and four metres long. Total demand is around 15,000 tons a year, giving a market value of 50 million baht. Again, there is tough competition. This is in spite of the fact that Siam Cement is the only manufacturer in Thailand of asbestos cement pipes. Wily businessmen have found substitute materials which allow them to produce similar pipe for less money. Is the quality as good? Well, no, but then the Thai market is traditionally governed by price considerations.

Asbestos cement pressure pipes tend to sell more easily because they are a comparatively high technology product. Their diameter can vary from 80 to 600 mm and they come in three classes. These are class 15, 20 and 25, the numbers specifying the pressure in kgs/square centimetre that the pipe is able to withstand. Demand is about 40,000 tons a year, and total market value about 200 million baht growing at roughly 10 per cent per year.

## PVC pipes

The final type of pipe is PVC, and although this is tending to replace steel pipes in domestic applications, the process is slow. PVC pipes, while cheap and easy to deal with, do not have such a long life as steel pipes and are not as rigid. The main manufacturer in Thailand, however, is Thai Pipe Industry Co Ltd and they make rigid PVC pipes and pipe fittings and flexible garden hose. Pipe diameter can vary from ½ to 16 inches and the factory has TISI certification ●

THAI STEEL PIPE INDUSTRY CO.,LTD.
LEADING MANUFACTURER OF GALVANIZED AND BLACK STEEL PIPE IN THAILAND
TSP
THAI STEEL PIPE INDUSTRY CO.,LTD.
บริษัท อุตสาหกรรมท่อเหล็ก จำกัด

**Attachment 12**

Commerce Department Memorandum dated March 7, 1985



Barcode:3883995-11 A-549-502 SCO - Scope Inquiry - Line Pipe

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Office of Investigations

Date: 3-7-85

File #: A549-502 ~~C-549-501~~ ~~A307-502~~ ~~C-307-501~~

CLASSIFICATION: Public ✓
Proprietary ____
Internal ____
Gov. Class. ____

TO: FILE

FROM: John Brinkmann

THROUGH: Mary Clapp

SUBJECT: AD & CVD investigations of pipes and tubes from Thailand & Venezuela

DATE OF ACTIVITY: ____

| PARTICIPANTS | REPRESENTING |
|---|---|
| John Brinkmann | DOC/ITA/IA/OI |
| Roger Shagrin | Counsel for petitioners |

DESCRIPTION OF ACTIVITY

Based on our initial review of the AD and CVD petitions, counsel for petitioners was asked to provide the following data by COB March 11:

1. Articles of incorporation ~~are~~ or other official organizational documents which establish the subcommittee on Line Pipe and the Subcommittee on Standard Pipe.

2. Letters from the members of the subcommittees stating what subcommittees they belong to, date they joined the committee, and that they support the petition as filed.

3. Documentation which demonstrates that line pipe is manufactured in Thailand.

4. Documentation which supports the allegation that line pipe from Thailand is being sold at less than fair value.

5. Advise the Department what he intends to do regarding the Department current AD investigation of standard pipe and tube from Venezuela.

ATTACHMENTS ____

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:59 PM, Submission Status: Approved

Barcode:3883995-11 A-549-502 SCO - Scope Inquiry - Line Pipe

**Attachment 13**

Amended Petition Filed by Petitioner on March 12, 1985

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:59 PM, Submission Status: Approved

PUBLIC DOCUMENT
Barcode:3883995-11 A-549-502 SCO - Scope Inquiry - Line Pipe

Amended

24 pages
Nonconfidential Version

BEFORE THE
UNITED STATES DEPARTMENT OF COMMERCE
AND THE
INTERNATIONAL TRADE COMMISSION

In the Matter of Certain Welded Carbon Steel Pipe and Tube Products from Thailand

AMENDED
PETITION FOR
IMPOSITION OF
ANTIDUMPING DUTIES

PETITIONERS:
INDIVIDUAL PRODUCER MEMBERS OF THE SUBCOMMITTEES
ON STANDARD AND LINE PIPE OF THE
COMMITTEE ON PIPE AND TUBE IMPORTS

Roger B. Schagrin, Esq.
Paul W. Jameson, Esq.
923 15th Street, N.W.
Fourth Floor
Washington, D.C. 20005
(202) 628-3810

Counsel to Petitioners

ATTENTION:

Assistant Secretary for Trade Administration
U.S. Department of Commerce
Washington, D.C. 20230

Secretary, United States International Trade Commission
701 E Street, N.W.
Washington, D.C. 20436

Dated: February 28, 1985

Amendment filed on March 12, 1985

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:59 PM, Submission Status: Approved

PUBLIC DOCUMENT

Amended

# PETITION FOR THE IMPOSITION OF ANTIDUMPING DUTIES CERTAIN WELDED CARBON STEEL CIRCULAR PIPES AND TUBES FROM THAILAND

This petition is filed by the standard pipe subcommittee and the line pipe subcommittee of the The Committee on Pipe and Tube Imports, and by each of the individual manufacturers of standard pipe and line pipe that are members of these subcommittees. Petitioners hereby allege that small diameter circular welded carbon steel pipes and tubes are likely to be imported at less than fair value from Thailand within the meaning of section 731 of the Tariff Act of 1930 as amended, 19 U.S.C. §1673. These less-than-fair-value imports threaten to cause material injury to the domestic industries producing the products covered by the industry, and particularly to those domestic producers located on the West Coast. This petition contains information reasonably available to petitioners in support of these allegations.

## I. SUMMARY OF PETITION

This petition will demonstrate that imports of the pipe and tube products covered by this petition are being offered for sale at less than fair value (LTFV) by Thai producers and United States distributors and that these LTFV imports are threatening to cause material injury to the domestic industries producing these products. Petitioners are filing simultaneously with this petition a petition under 19 U.S.C. §1671, alleging

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:59 PM, Submission Status: Approved

Amended

that the products covered by this petition are being subsidized by the government of Thailand and their offer for sale in the United States threatens to cause material injury to the domestic industries producing these products.

The domestic pipe and tube industry is continuing to be injured by reason of dumped and subsidized imports. In the past two years, the International Trade Commission (ITC) found that the domestic industry producing small diameter circular pipe suffered material injury by reason of imports of subsidized pipe from Brazil, Korea and Spain and by less-than-fair-value imports from Spain, Brazil, Korea and Taiwan.

The indicia of injury upon which the Commission based their recent final determinations of injury are still very much in evidence today. The relevant domestic industries are operating at dangerously low profit margins with some producers battling increasing net losses. Capacity utilization remains low and employment continues to decline.

The main reason for the continued poor operating conditions of the domestic industry, in spite of the successful trade cases filed against producers from a number of major exporting countries, is the lost volume and price depression caused by increased imports of unfairly traded pipe and tube products from a variety of countries. With Voluntary Restraint Agreements (VRAs) being negotiated with the major exporting

Barcode:3883995-11 A-549-502 SCO - Scope Inquiry - Line Pipe

Amended

countries such as the EC countries, Spain, Brazil, Australia, Japan, and Korea, the threat of unfairly traded imports has shifted to non-traditional suppliers. Import statistics reflect an increase in imports from countries such as Saudi Arabia, Turkey and India.

Petitioners have received information that a serious threat of material injury is posed by less-than-fair-value imports from Thailand. While only small amounts of imports of the products covered by this petition have shown up in the import statistics as of December 1984, petitioners have information that 10,000 tons are already available for shipment for the first quarter of 1985.

Petitioners also have information that two Thai pipe and tube producers alone have expanded their capacity such that they could be able to export as much as 300,000 tons of pipe and tube per year into the U.S. market. At least one of these major Thai pipe and tube manufacturers is a subsidiary of a Japanese steel company. Petitioners have knowledge of at least 11 producers of pipe and tube products in Thailand. This information indicates that Thailand has the capacity to export large amounts of pipe and tube to the United States.

At least four importers are already offering Thai pipe and tube products for sale in the domestic market: Globe Traders Group, Inc. of New York, Triangle Winter Wolff (TWW) of Torrance, California, Phillips Brothers of Chicago, and Borneo

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:59 PM, Submission Status: Approved

Sumatra Trading Co., Inc. of New York. Price sheets for TWW indicate that Thai pipe and tubes are being sold for less than Korean or Japanese prices for the same products. Because there are no integrated steel producers in Thailand, it is believed that the Thai pipe producers are importing their steel coil and sheet from Japan. They also have been importing the necessary zinc for galvanized products. TWW is offering black pipe for just over $400 a ton ex docks duty paid for large purchases and is offering galvanized pipe for just under $500 per ton. This represents sales at prices below that of the Koreans during the fourth quarter of 1984. Such prices indicate less-than-fair-value sales with which domestic producers cannot compete.

Petitioners will demonstrate that a regional threat of injury exists with regard to the producers of the pipe and tube products covered in this petition located on the West Coast as well as to the entire domestic industry. LTFV imports will be particularly devastating to West Coast domestic producers who, despite efficient operations, have been continuing to lose sales to imports, primarily Japanese, Korean and Taiwanese. With at least one of Thailand's major producers of pipe and tube being a subsidiary of a Japanese company, these imports become a way for major Japanese exporters to avoid VRAs.

Petitioners were unable to obtain home market sales prices from Thailand for the products covered by this petition; foreign market value was based instead on cost of production for Thai

Amended

producers. These costs of production were based on prices for Japanese hot-roll coil exported to Thailand, and on estimates of zinc costs based on conversations with international zinc brokers. Conversion costs and selling, general and administrative expenses were based upon the United States industry average for non-integrated producers as determined by the International Trade Commission and adjusted for differences in labor rates. These cost of production figures clearly show that the Thais are offering to sell the pipe and tube products covered by this petition in the United States at less than fair value.

This petition provides specific information demonstrating that imports from Thailand are being offered for sale at less than fair value and threaten to cause material injury to the domestic industries producing these products. Petitioners respectfully request that the Commerce Department and the Commission, based on this information, immediately commence a full scale investigation under 19 U.S.C. §1673 and 19 C.F.R. 207.12 and 353.37 of imports of these products from Thailand.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:59 PM, Submission Status: Approved

Amended

## II. INFORMATION REQUIRED BY §353.36 OF THE ANTIDUMPING DUTY REGULATIONS

### A. The Name And Address Of The Petitioners And Any Other Person, Firm, Or Association The Petitioners Represent, 19 C.F.R. §353.36(a)(1).

This petition is filed by the standard pipe and line pipe subcommittees of The Committee on Pipe and Tube Imports (CPTI) and by each of the individual manufacturers of standard pipe and line pipe that are members of these subcommittees. The CPTI is a not-for-profit trade association of pipe and tube producers organized under the laws of the District of Columbia. The Committee's members produce a wide spectrum of carbon steel pipe and tube products. For this reason, the Committee's member companies are organized in subcommittees according to the product lines which they produce. The members producing a particular product line decide whether to file an unfair trade petition involving a product which they produce imported from a certain country.

The members of the subcommittees producing standard and line pipe less than 16 inches in outside diameter in support of this petition are:

Allied Tube & Conduit Corp.*
16100 S. Lathrop
Harvey, IL 60426

American Tube Co., Inc.*
P.O. Box 6633
Phoenix, AZ 85005

LaClede Steel Co.
10 Broadway
St. Louis, MO 63102

Merchants Metals, Inc.*
P.O. Box 11646
Houston, TX 77293

Amended

Southwestern Pipe, Inc.*
P.O. Box 2002
Houston, TX 77252

Bull Moose Tube Co.*
12837 Flushing Meadow Dr.
St. Louis, MO 63131

Wheatland Tube Corp.
900 Haddon Avenue
Collingswood, NJ 08108

Tex-Tube Division**
Cyclops Corporation
P.O. Box 7705
Houston, TX 77007

Pittsburgh-International*
P.O. Box 9 - Route 24
West Fairbury, IL 61739

Sawhill Tubular Division
Cyclops Corporation
Box 11
Sharon, PA 16146

Sharon Tube Co.*
134 Mill St.
Sharon, PA 16146

* Standard pipe only

** Line pipe only

The companies listed above represent approximately 56% of the domestic production of standard pipe and approximately 25% of the domestic production of line pipe.

The products produced by each of the member companies listed above are like or similar to the respective imported articles covered by this petition. Attached as Exhibit 1 to this petition is a full membership list of The Committee on Pipe and Tube Imports.

B. The Industry On Whose Behalf The Petition Is Filed, Including The Names Of Other Enterprises In Such Industry, 19 C.F.R. §353.36(a)(2).

There are approximately 51 producers of the pipe and tube products covered by this petition. A list of those domestic producers other than petitioners is attached as Exhibit 2.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:59 PM, Submission Status: Approved

Amended

There is Commission precedent for combining standard and line pipe into one industry. In the investigations of Welded Carbon Steel Pipes and Tubes from Brazil, France, Italy, the Republic of Korea, and West Germany,[5] the Commissioners divided the pipe and tube industry into two industries: small diameter (less than 16" OD) standard, structural, and line welded carbon steel pipes and tubes, and large diameter (at least 16" OD) structural and line welded carbon steel pipes and tubes. Petitioners believe that the reasons for making this division hold true today.

2. The Domestic Industry Producing Small Diameter Standard and Line Pipe Is Threatened With Material Injury By Reason Of Less-Than-Fair-Value Imports From Thailand.

The U.S. International Trade Commission has concluded a number of times that the industry producing the products covered by this petition are suffering material injury. In early 1983, the Commission determined that the same industry on whose behalf this petition is being brought--the domestic producers of small diameter welded carbon steel pipes and tubes--is materially injured by reason of imports of those products.[6] More recently, the Commission has preliminarily determined that the domestic industry producing some of the

---

5 Inv. Nos. 701-TA-165-169 (Preliminary), USITC Pub. 1262 (June 1982), at 3-5.

6 See Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea, Inv. No. 701-TA-168 (Final), USITC Pub. 1345 (February 1983).

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:59 PM, Submission Status: Approved

Amended

products covered by this petition, i.e., standard pipe, is suffering material injury by reason of imports of standard pipe.[7]

Now a new threat to the industry has appeared. Thai steel pipe and tube producers, previously unknown in the U.S. market, have begun offering large quantities of pipe and tube for delivery beginning in the first quarter of 1985. Section 612 of the Trade and Tariff Act of 1984 added subparagraph (F) to section 771(7) of the Tariff Act of 1930:

> (F) Threat of Material Injury.--
>
> (i) In General.--In determining whether an industry in the United States is threatened with material injury by reason of imports (or sales for importation) of any merchandise, the Commission shall consider, among other relevant factors--
>
> (I) If a subsidy is involved, such information as may be presented to it by the administering authority as to the nature of the subsidy (particularly as to whether the subsidy is an export subsidy inconsistent with the Agreement),
>
> (II) any increase in production capacity or existing unused capacity in the exporting country likely to result in a significant increase in imports of the merchandise to the United States,
>
> (III) any rapid increase in United States market penetration and the likelihood that the penetration will increase to an injurious level,

---

[7] See Certain Welded Carbon Steel Pipes and Tubes from Brazil and Spain, Inv. Nos. 701-TA-220 and 731-TA-197 and 198 (Preliminary), USITC Pub. 1569 (August 1984); Certain Welded Carbon Steel Pipes and Tubes from Taiwan and Venezuela, Inv. Nos. 731-TA-211 and 212 (Preliminary), 50 Fed. Reg. 5326 (February 7, 1985).

Amended

(IV) the probability that imports of the merchandise will enter the United States at prices that will have a depressing or suppressing effect on domestic prices of the merchandise,

(V) any substantial increase in inventories of the merchandise in the United States,

(VI) the presence of underutilized capacity for producing the merchandise in the exporting country, and

(VII) any other demonstrable adverse trends that indicate the probability that the importation (or sale for importation) of the merchandise (whether or not it is actually being imported at the time) will be the cause of actual injury.

(VIII) the potential for product-shifting if production facilties owned or controlled by the foreign manufacturers, which can be used to produce products subject to investigation(s) under section 701 or 731 or to find orders under section 706 or 736, are also used to produce the merchandise under investigation.

(ii) Basis for determination.--Any determination made by the Commission under this title that an industry in the United States is threatened with material injury shall be made on the basis of evidence that the threat of material injury is real and that actual injury is imminent. Such a determination may not be made on the basis of mere conjecture or supposition.

A number of these considerations apply here. The evidence is that the threat of injury is real and that actual injury is imminent. First, the capacity of the Thai pipe and tube manufacturers has increased significantly in the last few years. In early 1980, the capacity of the entire Thai pipe and

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:59 PM, Submission Status: Approved

Amended

tube industry was 19,500 tons per month, or 234,000 tons per year. See Exhibit 7. Petitioners' information is that two companies, Thai Steel Pipe Industries Co. and the Thai Union Steel Co., alone now have the capacity to produce 300,000 tons per year of steel pipe and tube products. Petitioners believe that the Thais have increased their capacity for pipe and tube production since 1981 in order to participate in export markets. The capacity of the other nine Thai producers supplementally listed is unknown. However, it is clear that Thai pipe and tube producers have the capacity to cause material injury to United States producers of standard pipe. Sales overtures by United States importers of Thai products and the new flow of Thai imports in these product areas show their willingness to do so.

Second, a substantial increase in market penetration will certainly result from the imports flowing from the present offers for sale. Thailand exported no small diameter circular pipe to the United States prior to 1984. In November 1984 the first shipment, 38.9 tons, was recorded in the import statistics for TSUS 610.3242 as having entered the port of Wilmington, North Carolina. In December 1984, 11 tons classified under TSUS 610.3243 entered the port of Philadelphia. Petitioners believe that another 100 tons brought in by Triangle Winter Wolff and two shipments of 500 tons each brought in by Borneo Sumatra Trading Co., Inc. and Globe Traders Group, Inc. have

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:59 PM, Submission Status: Approved

PUBLIC DOCUMENT

Amended

already arrived in the United States via Los Angeles but have not yet been recorded in the import statistics. From sales overtures made by Triangle Winter Wolff and conversations with knowledgeable persons in the industry, petitioners are aware of at least 10,000 tons of the pipe and tube products covered by this petition scheduled for February shipment from Thailand for March delivery in Los Angeles. These figures point to a dramatic increase in the rate of dumped exports from Thailand into the United States market.

Third, the offered prices will have a substantially depressive effect on prices in the U.S. market. The staff report accompanying the preliminary determination in the investigation of Certain Welded Carbon Steel Pipes and Tubes from Brazil and Spain,[8] chronicles the increasingly depressed domestic producers' price for ASTM A120, schedule 40, sprinkler pipe, carbon welded, black, 2.375-inch OD, 0.154-inch wall thickness, plain end pipe. In January 1982, the average price was $100.09 per hundred feet, which translates to $548 per ton. By June 1984, the price had declined to $84.90 per hundred feet, or $465 per ton. Triangle Winter Wolff is offering for January 1985 shipment that same pipe specification for $75.88 ex-dock Los Angeles, or only $415 per ton. See Exhibit 6. The Thais are obviously using extremely low prices

8 Inv. Nos. 701-TA-220 and 731-TA-197 and 198, USITC Pub. 1569, at A-28.

Amended

as the means to gain market share, which will have a severe effect on market prices for pipe and tube products.

The United States market has suddenly become a very attractive market for Thai pipe and tube products. With voluntary restraint agreements (VRAs) signed by Spain and the EC countries and VRAs imminent with Japan, Korea, Mexico and Brazil and other major exporters of pipe and tube products, Thai producers see the opportunity to put excess capacity to good use by exporting to the United States. At least one major source of Thai pipe and tube exports, Thai Steel Pipe Industry Co., is a subsidiary of a major Japanese steel producer and exporter, Sumitomo Metal Industries, Ltd. With a VRA limiting Japanese exports of pipe and tube to the United States, a great incentive exists to shift production to subsidiaries in countries such as Thailand which are not covered by a VRA. VRAs were meant to provide relief to the American steel industry, but they are also providing an opportunity for non-covered countries like Thailand to sell less-than-fair-value goods to the United States. Thus the American pipe and tube industry could get little or no relief from extraordinarily high import penetration levels.

These imports threaten a fragile domestic industry. Domestic shipments have declined from 1981 levels, as Table 1 shows. The best information available to the petitioners is that inventories have remained relatively steady over the last

Amended

Table 1

Small Diameter (Not Over 16" OD)
Welded Carbon Steel Pipes and Tubes
Decline in Domestic Shipments and Market Share

| | 1981 | 1982 | 1983 | 1st Hf 1984 |
|---|---|---|---|---|
| Domestic Shipments[1] | 2,703,678 | 1,768,020 | 1,785,250 | 860,887 |
| Total Imports[2] | 1,967,000 | 1,049,529 | 1,464,645 | 866,860 |
| Apparent Consumption | 4,670,678 | 2,817,549 | 3,249,895 | 1,727,747 |
| Import Penetration | 42.1% | 37.2% | 45.1% | 50.2% |

1 Domestic shipments derived from USITC Pub. 1569, at A-13 and A-14 for standard pipe, plus 25% for standard pipe greater than 4.5 but less than 16 inches (as estimated by the domestic industry), plus domestic shipment figures for welded line pipe up to 16" OD from the AISI AIS 10P.

2 Imports for 1981 from USITC Pub. 1262, at A-24, other years from Department of Commerce, Bureau of the Census.

four years,[9] so that it may be deduced that production has likewise declined. As Table 1 also shows, domestic shipments have declined at a more precipitous rate than have imports, so that the domestic industry has lost market share to imports. A flood of imports from Thailand would further erode the domestic industry's market share.

Capacity utilization remains well below acceptable levels. The latest information available for certain small diameter

---

9 See Certain Welded Carbon Steel Pipes and Tubes from Taiwan and Venezuela, Inv. Nos. 731-TA-211 and 212 (Preliminary), USITC Pub. 1639 (February 1985), at A-16.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:59 PM, Submission Status: Approved

Amended

circular pipes (not including line pipe and standard pipe over 4.5") is that utilization declined from 34.4% in 1981 to 23.7% in 1982 and 28.4% in 1983, rising only slightly to 36% in the first six months of 1984.[10] Since domestic shipments have decreased in the second half of 1984 compared to the first half (according to AISI figures, domestic shipments of welded standard and line pipe under 16" declined from 589,709 tons in the first half of 1984 to only 509,870 tons in the second half of 1984),[11] it may be assumed that capacity utilization rates remain low. Because domestic shipments of welded line pipe under 16" have declined from 994,318 tons in 1981 to only 494,765 tons in 1983 and have remained at a low 534,447 tons in 1984,[12] it may be assumed that capacity utilization figures for standard and line pipe combined are at least as dismal as

---

10 See Certain Welded Carbon Steel Pipes and Tubes from Brazil and Spain, Inv. Nos. 701-TA-220, 731-TA-197 and 198 (Preliminary), USITC Pub. 1569 (August 1984), at A-11 and A-12.

11 AISI 10-P. Net Shipments for Use in U.S.A. for Continuous Weld and ERW standard pipe, plus line pipe 16" and under minus seamless line pipe.

12 AISI 10-P. Line pipe 16" and under minus seamless line pipe (all of which is under 16"). In Certain Welded Carbon Steel Pipes and Tubes from Taiwan and Venezuela, Inv. Nos. 731-TA-211 and 212 (Preliminary), USITC Pub. 1639 (February 1985), at A-8, the ITC staff failed to subtract the seamless line pipe from their shipment figures. As a result, their figure on the percentage of domestic shipments responding to the questionnaire on page A-10 was significantly understated, seriously prejudicing petitioners in the eyes of those Commissioners who voted in the negative on the basis of the response rate.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:59 PM, Submission Status: Approved

those previously reported for standard pipe. If anything, line pipe capacity utilization is even less, as industry estimates that the remaining capacity for line pipe is still in the neighborhood of 4.5 million tons per year, meaning that line pipe capacity utilization is less than 15%.

Capacity utilization remains low in spite of the fact that a number of producers have completely closed down their operations. In the past two years, Bethlehem has closed down its Sparrows Point plant (in April 1983), Babcock & Wilcox has stopped producing welded line pipe (although Exhibit 2 still lists it as a producer of line pipe, because petitioners believe that the company would begin production again if the market improves), LTV announced that it was closing down its Aliquippa plant just last January and has had shutdowns at its Youngstown plant, Wheeling-Pittsburgh has closed down its Benwood facility, Kaiser closed down its line pipe mills in Fontana, Merchants Metals ceased producing standard pipe in January-March 1984, and Torrance Tubing & Conduit Co. declared bankruptcy in January 1985. In addition, Geneva Tube of Geneva, Nebraska, which was one of a number of API line pipe licensees which had not been producing line pipe because of market conditions and import penetration levels, closed down its mill in November 1984.

Some domestic producers who have the capacity to produce either standard pipe or API line pipe on their ERW or

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:59 PM, Submission Status: Approved

continuous weld mills have been forced to pass up what was traditionally the more profitable line pipe production because of increasing import penetration levels and decreased prices. The list of companies going out of the pipe and tube business lengthens with each petition filed by the remaining producers. It is obvious that the domestic industry producing small diameter pipe has been decimated over the past two years and that its problems continue despite strong demand for the products.

The most recent information available indicates that the producers of small diameter welded pipe continue to suffer from insufficient profits or outright losses. Profits had declined from .6% in 1981 to -7.3% in 1982 and -3.1% in 1983.[13] As Table 3 supra shows, domestic prices have not increased as of the first half of 1984. It is possible that profitability has increased slightly in 1984, but only because those domestic manufacturers who remain in business have increased worker productivity dramatically and cut their white collar work forces and SG&A expenses to the bone. Those producers who make both standard and line pipe do so on the same mills and cannot easily separately determine profits for standard and line pipe. Given the decline in shipments of line pipe, it may be

---

13 See Certain Welded Carbon Steel Pipes and Tubes from Brazil and Spain, Inv. Nos. 701-TA-220, 731-TA-197 and 198 (Preliminary), USITC Pub. 1569 (August 1984), at A-17.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:59 PM, Submission Status: Approved

assumed that overall profitability remains as low as that for standard pipe alone.

Conditions are no better for employment in this industry. The number of workers employed in this industry has declined significantly from 1981 levels while wages have remained stagnant relative to inflation.[14] Because with few exceptions the same workers who work on line pipe also work on standard pipe, the information collected to date on standard pipe is applicable to the line pipe workers.

These conditions have adversely affected the ability of the industry to raise capital. Profitability remains very low, making other investments far more attractive in the present generally expanding economy. The large number of companies going out of business makes it unusually risky for lenders or investors, further drying up sources of capital for the companies. The addition of another foreign supplier of dumped welded pipe and tube products would certainly cause material injury to this industry.

---

14 See Certain Welded Carbon Steel Pipes and Tubes from Brazil and Spain, Inv. Nos. 701-TA-220, 731-TA-197 and 198 (Preliminary), USITC Pub. 1569 (August 1984), at A-15 and A-16. The number of standard pipe workers declined from 5,478 in 1981 to 4,080 in 1983. Employment rose only slightly between January-June 1983 and January-June 1984.

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:59 PM, Submission Status: Approved

Amended

3. The Regional Industry on the West Coast Producing Small Diameter Standard and Line Pipe Is Threatened With Material Injury By Reason Of Less-Than-Fair-Value Imports From Thailand.

Thai small-diameter pipe will affect the entire domestic industry. As noted, two small shipments have already entered eastern ports. As was done by the Koreans and the Taiwanese, the Thais will be able to ship pipe to any region of the United States and displace domestic sales due to their extremely low less-than-fair-value offer prices.

Alternatively, petitioners allege that the regional industry consisting of those producers in the West Coast region are threatened with material injury by reason of imports of small-diameter welded pipe and tube products from Thailand. 19 U.S.C. §1677(4)(C) reads as follows:

> Regional industries. In appropriate circumstances, the United States, for a particular product market, may be divided into two or more markets and the producers within each market may be treated as if they were a separate industry if--
>
> (i) the producers within such market sell all or almost all of their production of the like product in question in that market, and
>
> (ii) the demand in that market is not supplied, to any substantial degree, by producers of the product in question located elsewhere in the United States.
>
> In such appropriate circumstances, material injury, the threat of material injury, or material retardation of the establishment of an industry may be found to exist with respect to an industry even if the domestic industry as a whole, or those producers whose collective output of a like product constitutes a major proportion of the total domestic production

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:59 PM, Submission Status: Approved

Amended

> of that product, is not injured, if there is a concentration of subsidized or dumped imports into such an isolated market and if the producers of all, or almost all, of the production within that market are being materially injured or threatened with material injury, of if the establishment of an industry is being materially retarded, by reason of the subsidized or dumped imports.

The Commission can therefore also find material injury based on a regional industry analysis of the western domestic producers of these products. The information available to the petitioners indicates that the statutory criteria for the finding of threat of material injury to a regional industry are met.

The West Coast constitutes that area West of the Rocky Mountains, and basically covers the states of California, Oregon, Washington, Idaho, Nevada, Utah, and Arizona. Petitioners include one company in Arizona (see II.A. supra). Non-petitioning producers of the products covered by this petition include six producers in California (see Exhibit 2 infra), although one of these producers, Torrance Tubing & Conduit, declared bankruptcy in January 1985.

Information on part of the West Coast small diameter circular welded pipe industry was developed during the investigation of Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea and Taiwan.[9] In 1983, producers West of the Rockies accounted for 162,946 tons annual capacity

9 Inv. Nos. 731-TA-131, 132, and 138 (Final), USITC Pub. 1519 (April 1984), at A-18 to A-22 and passim (covering only standard pipe under 4.5").

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:59 PM, Submission Status: Approved

Amended

of total U.S. capacity of 3,605,877 tons, or 4.5%. Production in the West accounted for 78,469 tons out of total U.S. production of 1,032,280 tons, or 7.6% (the difference was largely because of the extremely low capacity utilization--15.0%--of the Eastern integrated producers). The ITC staff found that producers located east of the Rocky Mountains shipped between 2.5% and 3.3% of their aggregate U.S. shipments to customers on the West Coast and that none of the West Coast producers shipped east of the Rockies. Shipments to the West Coast from non-Western producers amounts to 24,458 tons and 31,639 tons in 1982 and 1983 respectively, amounting to only 8.6% and 7.6% of Western apparent consumption in those years.[10] Petitioners are unable to furnish information on West Coast demand until the Census Bureau releases its IA245 statistics and information on non-CPTI producers East of the Rockies can be collected by the ITC. Petitioners will furnish this information at that time. In a survey of West Coast producers, Counsel for Petitioners was told that their shipments are almost all located within the West Coast region.

The West Coast producers can therefore be considered a regional industry, in that the statutory criteria that "the producers within such market sell all or almost all of their production of the like product in question in that market" and

---

10 Id. at A-9.

"the demand in that market is not supplied, to any substantial degree, by producers of the product in question located elsewhere in the United States."

Information obtained from three West Coast producers of small diameter pipe is contained in confidential Exhibit 8. These three producers represent approximately two-thirds of the reported West Coast capacity for these products. They represent approximately 53% of production. All three producers reported reduced capacity utilization for 1984 compared to 1983. Two of the three also reported reduced sales volume in 1984 compared to 1983. In addition, the aggregate capacity utilization for the three was below 33% in 1984. Further, each of the three producers thought that the non-responding West Coast producers also suffered poor operating performances in 1984.

Petitioners' information is that imports of the pipe and tube products that are the subject of this petition will be concentrated in the West Coast region. Until recently West Coast producers of pipe and tube products have been in competition primarily with Korean, Taiwanese and Japanese producers. With the high dumping margins issued against the Taiwanese and with VRAs imminent with Japan and Korea, West Coast importers will be looking for other cheap foreign sources to fill the gap. The Thais are an obvious source, as the 10,000 ton shipment due in Los Angeles in March indicates. It

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:59 PM, Submission Status: Approved

Amended

is expected that a majority of the pipe and tube imports will enter the U.S. through West Coast ports. Therefore, the ITC could make a determination of threat of material injury based upon a threat of material injury to a regional industry.

III. CONCLUSION

This petition for the imposition of antidumping duties presents all information reasonably available to petitioners in support of the allegations that imports of certain small diameter circular pipes and tubes from Thailand are likely to be sold at less than fair value and that the domestic industries producing these products are threatened with material injury by reason of imports of the merchandise within the meaning of Section 731 of the Act. Accordingly, in compliance with Section 732 of the Act, and 19 C.F.R. §353.37, the Department and the Commission are requested to commence an antidumping investigation to determine whether the statutory elements necessary for the imposition of antidumping duties on imports from Thailand of small diameter circular welded pipe exists.

Roger B. Schagrin, Esq.
Paul W. Jameson, Esq.
Counsel to The Committee
On Pipe and Tube Imports

PUBLIC DOCUMENT
Barcode:3883995-11 A-549-502 SCO - Scope Inquiry - Line Pipe

Amended

Exhibit 8

CONFIDENTIAL TREATMENT REQUESTED FOR ALL INFORMATION IN BRACKETS

Capacity, Shipments, and Sales
Three West Coast Producers of the Products
Subject to this Investigation

| Year | Capacity (net tons) | Shipments (net tons) | Capacity[1] Utilization | Sales |
|---|---|---|---|---|
| [ | | ] | | |
| 1982 | [ | | | ] |
| 1983 | [ | | | ] |
| 1984 | [ | | | ] |
| [ | | ] | | |
| 1982 | [ | | | ] |
| 1983 | [ | | | ] |
| 1984 | [ | | | ] |
| [ | | ] | | |
| 1982 | [ | | | ] |
| 1983 | [ | | | ] |
| 1984[2] | [ | | | ] |
| Total | | | | |
| 1982 | [ | | | ] |
| 1983 | [ | | | ] |
| 1984 | [ | | | ] |

1 Shipments used as a proxy for production.

2 [

]

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:59 PM, Submission Status: Approved

**Attachment 14**
Letter Dated March 14, 1985 from Petitioner Regarding
Partial Withdrawal of Petition

ROGER B. SCHAGRIN, P.C.
FOURTH FLOOR
923 FIFTEENTH STREET, N.W.
WASHINGTON, D.C. 20005
(202) 628-3810

March 14, 1985

Secretary of Commerce
Attn: Import Administration
Central Records Unit
Room B-099
Department of Commerce
Pennsylvania Ave. at 14th St., N.W.
Washington, D.C. 20230

A-307-502
A-549-502
C-549-501
2 pages
Nonconfidential

Attention: John Brinkmann, Room 3608

Re: Certain Welded Carbon Steel Circular Pipe and Tube Products from Thailand and Venezuela: Partial Withdrawal of Petition

Dear Mr. Secretary:

Petitioners in the above designated investigations, the standard pipe subcommittee and the line pipe subcommittee of The Committee on Pipe and Tube Imports and the individual members of these subcommittees, hereby withdraw the following portions of the followings petitions:

1. A-307-502, Certain Pipe and Tube Products from Venezuela: Petitioners withdraw the petition insofar as it concerns standard pipe, TSUS numbers 610.3231, 3234, 3241, 3242, 3243, 3252, 3254, 3256, 3258, and 4925. The ITA is presently conducting an antidumping investigation of this product from Venezuela, and initiating another investigation would be duplicative.

2. A-549-502 and C-549-501. Certain Pipe and Tube Products from Thailand: Petitioners withdraw these petitions insofar as they concern line pipe, TSUS numbers 610.3208 and 3209. Petitioners have ascertained that no Thai company is presently licensed to produce pipe to API specifications, and imports of API line pipe from Thailand are therefore not likely.

PUBLIC DOCUMENT

ROGER B. SCHAGRIN, P.C.

Petitioners wish to stress that the withdrawal of these portions of their petitions in no way alters their position that the appropriate domestic industry for injury determination purposes is the industry producing standard and line pipe.

Respectfully submitted,

Roger B. Schagrin
Paul W. Jameson

Filed By: dporter@curtis.com, Filed Date: 8/26/19 4:59 PM, Submission Status: Approved

**Tab 4**

LETTER FROM CURTIS, MALLET-PREVOST, COLT & MOSLE LLP TO SEC OF
COMMERCE PERTAINING TO SAHA THAI REBUTTAL COMMENTS ON SCOPE
INQUIRY (Sept. 3, 2019) (P.R. 34)

Barcode:3886289-01 A-549-502 SCO - Scope Inquiry - Line Pipe

CURTIS

**Curtis, Mallet-Prevost, Colt & Mosle LLP**

Almaty
Beijing
Buenos Aires
Dubai
Frankfurt
Geneva
Houston
London
Mexico City
Milan
Muscat
New York
Nur-Sultan
Paris
Rome

1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

**Telephone +1 202 452 7373**
**Facsimile +1 202 452 7333**
www.curtis.com

**Daniel L. Porter**
Tel: +1 202 452 7340
Fax: +1 202 452 7333
E-Mail: dporter@curtis.com

September 3, 2019

**PUBLIC DOCUMENT**

Case No.: A-549-502

No. Pages: 17

Status: Anti-Circumvention Inquiry
Scope Inquiry

This proceeding is conducted by Enforcement & Compliance, AD/CVD Operations/ VII

This submission contains no business proprietary information.

The Honorable Wilbur Ross
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/Dockets Unit, Room 18022
14th Street & Constitution Avenue, N.W.
Washington, D.C. 20230

Attn: Toni Page & Alexander Cipolla

Re: *Saha Thai's Rebuttal Comments on "Line Pipe" Scope Inquiry*
Circular Welded Carbon Steel Pipe and Tubes from Thailand

Dear Secretary Ross:

On behalf of Saha Thai Steel Pipe Public Co., Ltd. ("Saha Thai"), we hereby submit Saha Thai's rebuttal comments in response to Wheatland Tube Company's ("Petitioner") comments on the scope language "matter" dated August 26, 2019.[1] This submission is timely made

[1] Wheatland Tube Company's Response to July 29, 2019 Request for Comments, dated Aug. 26, 2019 ("Petitioner's Comments").

Filed By: dporter@curtis.com, Filed Date: 9/3/19 12:18 PM, Submission Status: Approved

Barcode:3886289-01 A-549-502 SCO - Scope Inquiry - Line Pipe

CURTIS
Curtis, Mallet-Prevost, Colt & Mosle LLP

September 3, 2019
Page 2

pursuant to the Department's memorandum to the file dated August 28, 2019. This submission contains no business proprietary information.

If you have any questions, please contact the undersigned.

Respectfully submitted,

/s/ Daniel L. Porter

Daniel L. Porter
Tung Nguyen
Gina Colarusso

**Curtis, Mallet-Prevost, Colt & Mosle LLP**

*Counsel for Saha Thai*

Filed By: dporter@curtis.com, Filed Date: 9/3/19 12:18 PM, Submission Status: Approved

**Circular Welded Carbon Steel Pipes and Tubes from Thailand**

**A-549-502**
**Scope Inquiry**
**SCO – Line Pipe**

## CERTIFICATE OF ACCURACY AND COMPLETENESS

I, Daniel L. Porter, of Curtis, Mallet-Prevost, Colt & Mosle LLP, counsel to Saha Thai Steel Pipe Public Co., Ltd. ("Saha Thai"), certify that I have read the attached : ***Saha Thai's Rebuttal Comments on "Line Pipe" Scope Inquiry***, ***dated September 3, 2019***, pursuant to the Scope Inquiry of Circular Welded Carbon Steel Pipes and Tubes from Thailand, A-549-502. In my capacity as an adviser, counsel, preparer or reviewer of this submission, I hereby certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that I am filing a copy of this signed certification with this submission to the U.S. Department of Commerce and that I will retain the original for a five-year period commencing with the filing of this document. The original will be available for inspection by U.S. Department of Commerce officials.

Daniel L. Porter
Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, NW
Washington, DC 20006

Dated: September 3, 2019

**Circular Welded Carbon Steel Pipes and Tubes from Thailand**

**A-549-502**
**Scope Inquiry**
**SCO – Line Pipe**

**PUBLIC**
**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing submission has been served this day, by hand delivery, upon the following persons:

| | |
|---|---|
| Roger B. Schagrin, Esq.<br>On behalf of Wheatland Tube<br>**SCHAGRIN ASSOCIATES**<br>900 7th Street, NW<br>Suite 500<br>Washington, DC 20001 | Robert George Gosselink, Esq.<br>On behalf of Thai Premium Pipe Company Ltd.<br>**TRADE PACIFIC PLLC**<br>660 Pennsylvania Avenue, SE<br>Suite 401<br>Washington, DC 20002 |
| Alan H. Price, Esq.<br>On behalf of Independence Tube Corporation, et al.<br>**WILEY REIN LLP**<br>1776 K Street, N.W.<br>Washington, DC 20006 | |

Daniel L. Porter
Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, NW
Washington, DC 20006

Dated: September 3, 2019

Barcode:3886289-01 A-549-502 SCO - Scope Inquiry - Line Pipe

**PUBLIC DOCUMENT**

Case No.: A-549-502

No. Pages: 17

Status: Anti-Circumvention Inquiry
Scope Inquiry

This proceeding is conducted by Enforcement & Compliance, AD/CVD Operations/ VII

This submission does not contain any business proprietary information.

# SAHA THAI STEEL'S
# REBUTTAL COMMENTS ON SCOPE INQUIRY

*Circular Welded Steel Pipes and Tubes from Thailand*

Daniel L. Porter
Tung Nguyen
Gina Colarusso

**Curtis, Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, N.W.
Washington, D.C., 20006
(202) 452-7327

September 3, 2019

Filed By: dporter@curtis.com, Filed Date: 9/3/19 12:18 PM, Submission Status: Approved

Barcode:3886289-01 A-549-502 SCO - Scope Inquiry - Line Pipe

**TABLE OF CONTENTS**

**Page #**

INTRODUCTION AND SUMMARY OF COMMENTS .......... 1

REBUTTAL COMMENTS .......... 3

A. The Plain Language Of The Scope Makes Crystal Clear That Line Pipe Products Are Not Covered .......... 3

B. The Department Is Required To Consider Relevant Materials Under 19 CFR § 351.225(k)(1) .......... 9

CONCLUSION .......... 11

Filed By: dporter@curtis.com, Filed Date: 9/3/19 12:18 PM, Submission Status: Approved

## INTRODUCTION AND SUMMARY OF COMMENTS

On behalf of Saha Thai Steel Pipe Public Co., Ltd. ("Saha Thai"), we respectfully submit rebuttal comments in response to Wheatland Tube Company ("Petitioner")'s comments on the scope language "matter" dated August 26, 2019.[1] These comments are timely filed in accordance with the Department's memorandum dated August 28, 2019.[2]

As detailed further below, the Department should summarily reject Petitioner's argument that the plain language of the antidumping duty ("AD") order unambiguously covers "line pipes," including "dual-stenciled" pipes because they meet the physical description of the order, i.e., "circular in shape, welded, made of carbon steel, and have an outside diameter of 0.375 inches or more but not exceeding 16 inches."[3] Petitioner's arguments can be summarily rejected.[4]

First, contrary to Petitioner's contention, the plain language of the order *definitively* covers only "standard pipe" while *intentionally and specifically* excluding

---

[1] Wheatland Tube Company's Response to July 29, 2019 Request for Comments, dated Aug. 26, 2019 ("Petitioner's Comments").

[2] Memorandum to the File from Alex Cipolla, *Extension of Time Limit for Rebuttal New Factual Information*, dated Aug. 28, 2019.

[3] Petitioner's Comments at 1-2.

[4] Although these rebuttal comments address the substance of Petitioners' comments, we reiterate our concerns about the apparent initiation of a "scope inquiry." As set forth in Saha Thai's comments of August 26, 2019, this "scope proceeding" is void *ab initio* because the Department did not follow its own regulations that govern the initiations of scope inquiries. Among the requirements for self-initiating a scope inquiry is an explanation as to why the inquiry is needed, and a review and approval of that reasoning by a senior government official. These procedural requirements are meant to prevent meaningless scope inquiries. For the reasons set forth by Saha Thai in its August 26, 2019 comments and in this submission, there is absolutely no *prima facie* case for a change in the scope of this proceeding to cover line pipe or pipe with multiple stenciling. Had the Department reviewed the investigation record (as the law requires), it would have become immediately evident that there were no grounds for initiating a scope inquiry on line pipe. Parties should not be required to spend time drafting comments and rebuttals on baseless scope inquiries.

"line pipe," including "dual-stenciled pipe" products. Accordingly, it is simply not true that the scope language of the AD Order is unambiguous in including line pipe products.

Second, contrary to Petitioner's contention, in analyzing the appropriate scope of the CWP from Thailand AD order, the Department must take into account relevant original investigation documents. The Court of International Trade has made clear that the Department may not ignore original investigation documents when determining the scope of an AD order.

## REBUTTAL COMMENTS

### A.    The Plain Language of The Scope Makes Crystal Clear that Line Pipe Products Are Not Covered

The essence of Petitioner's argument is that the plain language of the scope is clear and unambiguous with regard to whether it covers line pipe and dual-stenciled pipe products that meet the physical characteristics of subject pipes and tubes enumerated in the scope of the AD order, and therefore, the Department is not required to consider various enumerated factors under 19 CFR § 351.225(k)(1).[5]

Contrary to Petitioner's contention, the scope language actually makes clear that the AD order on circular welded carbon steel pipes and tubes ("CWP") from Thailand does not cover "line pipe" or "dual-stenciled pipe".

The scope language, as cited by Petitioner itself, states:[6]

> The products covered by this order are certain circular welded carbon steel pipes and tubes from Thailand. The subject merchandise has an outside diameter of 0.375 inches or more, but not exceeding 16 inches. *These products, which are commonly referred to in the industry as "standard pipe" or "structural tubing" are hereinafter designated as "pipes and tubes."* The merchandise is classifiable under the Harmonized Tariff Schedule of the United States (HTSUS) item numbers 7306.30.1000, 7306.30.5025, 7306.30.5032, 7306.30.5040, 7306.30.5055, 7306.30.5085 and 7306.30.5090. Although the HTSUS subheadings are provided for convenience and purposes of U.S. Customs and Border Protection (CBP), the written description of the merchandise subject to the order is dispositive.

The scope language identifies 5 physical characteristics of subject merchandise as noted by Petitioner: (1) pipe and/or tube; (2) circular; (3) welded; (4) made of carbon steel; and

---

[5] Petitioner's Comments at 3.

[6] *See Circular Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 83 FR 51927 (October 15, 2018) and accompanying I&D Memo at 2-3 (emphasis added).

(5) having an outside diameter of 0.375 inches or more, but not exceeding 16 inches. These are the common physical characteristics of both standard pipe and line pipe. However, these physical characteristics *per se* do not establish that line pipe is covered by the AD order at hand.

First, Petitioner ignores that the scope language above only refers to the subject merchandise being "standard pipe" or "structural tubing" as commonly known to the industry. Petitioner's complete neglect to mention the "industry reference" in the scope language is telling. It demonstrates Petitioner's gamesmanship in trying to downplay the distinction between "standard pipe" that is subject to the AD order and "line pipe" (including dual-stenciled pipe) that is not subject to the order.

Indeed, it is well-known that standard pipe and line pipe are distinct products notwithstanding common physical characteristics. The ITC has in many cases confirmed such a distinction:

> "Standard pipe is manufactured to American Society of Testing and Materials (ASTM) specifications and line pipe is manufactured to American Petroleum Institute (API) specifications. Line pipe is made of higher grade steel and may have a higher carbon and manganese content than is permissible for standard pipe. Line pipe also requires additional testing. . . .
>
> We conclude, therefore, that there are two like products in this investigation -- welded carbon steel line pipe and welded carbon steel standard pipe of circular cross-section up to 16 inches outside diameter",[7] and
>
> "Producers primarily make CWP to ASTM specifications A53, A135, and A795. Since these standards often require engineering characteristics that overlap with other specifications, a pipe may be dual stenciled, i.e., stamped to indicate compliance with two different specifications, such as ASTM A53 and API 5L. Dual-stenciled pipe, which enters as line pipe under a different subheading of the

[7] *Certain Welded Carbon Steel Pipes and Tubes from Thailand and Venezuela (Preliminary),* USITC Publication 1680 (April 1985) at 7-8

> Harmonized Tariff Schedule of the United States ("HTS") for U.S. customs purposes, is not within the scope of the orders."[8]

The industry understanding of the distinction between "standard pipe" and "line pipe" was in place at the time of the petition and the original investigation, and has not changed since that date.

Clearly the five physical characteristics noted by petitioner (and enumerated by the scope language) are not sufficient to distinguish line pipe from standard pipe. As correctly noted by the ITC, the characteristic that distinguishes line pipe (including dual-stenciled pipe) from standard pipe is the applicable standard, i.e., ASTM or API.

In *ArcelorMittal Stainless Belgium NV v. United States*, a case cited by Petitioner itself, the Federal Circuit ruled that the Department must consider industry custom and trade usage in determining the scope of an order:[9]

> {W}e agree with the Government and Allegheny that antidumping orders should not be interpreted in a vacuum devoid of any consideration of the way the language of the order is used in the relevant industry. As the Court of International Trade also observed, "{c}ourts have long recognized the importance of considering context, including industry custom, in interpreting written language." *ArcelorMittal*, 2011 WL 2713872, at *9 n. 8. Because the primary purpose of an antidumping order is to place foreign exporters on notice of what merchandise is subject to duties, the terms of an order should be consistent, to the extent possible, with trade usage.

As discussed above, it is well-known in the industry that "standard pipe" means pipe that meets ASTM specifications; and "line pipe" means pipe that meets API specifications. Even though the scope language does not include a specific sentence excluding line pipe

[8] *Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey (Fourth Review)*, USITC Publication 4754 (Jan. 2018) at 6-7.

[9] *ArcelorMittal Stainless Belgium NV v. United States*, 694 F. 3d 82, 88 (Fed. Cir. 2012).

products that meet API standards, the fact that the scope only references "standard pipe" as subject merchandise while making no reference to either "line pipe" or "dual-stenciled" pipe indicates that the scope intends to cover products that meet only ASTM specifications, and not API. Indeed, such an intentional exclusion of the scope is confirmed by the <u>original</u> language of the AD order, which states:[10]

> The products under investigation are: certain circular welded carbon steel pipes and tubes, also known as <u>"standard pipe" or "structural tubing"</u> which includes pipe and tube with an outside diameter of 0.375 inch or more but not over 16 inches, of any wall thickness, as currently provided in items <u>610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258 and 610.4925</u> of the Tariff Schedules of the United States Annotated.

The scope above includes HTS codes that cover only products that are <u>not</u> "conforming to API specifications for line pipe (Std. 5L, 5LS, or 5LX)."[11] And so the only plausible conclusion based on a reading of the scope language is that the scope requires subject merchandise to meet only ASTM specifications for standard pipe but not API specifications for line pipe.

<u>Second</u>, Petitioner points to the scope language in <u>other</u> CWP cases, which contains an explicit exclusion, "{s}tandard pipe that is dual or triple certified/stenciled that enters the U.S. as line pipe of a kind used for oil or gas pipelines is also not included in this investigation," to argue that "in stark contrast" the plain language of the scope of the AD order on CWP from Thailand does not prohibit the Department from finding that

---

[10] *Antidumping Duty Order: Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 51 FR 8341 (Mar. 11, 1986) (emphasis added).

[11] *See* Tariff Schedules of the United States Annotated (1985) (excerpt), provided at Attachment 6 to Saha Thai's Comments dated August 26, 2019.

"line pipe" shipped by Saha Thai is covered by this order.[12] Petitioner's reliance on the different scope language is misplaced. The case cited by Petitioner, *Wheatland Tube Co. v. United States*, concerns the AD orders on CWP from Brazil, Mexico and Venezuela – which are later in time than the AD order against Thailand at hand.[13] Even though the final scope language of those orders contain an explicit exclusion of "multiple-stenciled pipe" as cited by Petitioner, that language was only added by Commerce after conducting a scope clarification during the course of the original AD investigations. In fact, the original scope language of the petitions in those cases is strikingly similar to the scope language of the CWP from Thailand order, i.e:

> Original Scope Language of 1991 Cases:[14]
>
> The merchandise subject to these investigations is circular welded non-alloy steel pipes and tubes, of circular cross-section, not more than 406.4 mm (16 inches) in outside diameter, regardless of wall thickness, surface finish (black, galvanized, or painted), or end finish (plain end, bevelled end, threaded, or threaded and coupled). These pipes and tubes are generally known as standard pipe, though they may also be called structural or mechanical tubing in certain applications. Standard pipes and tubes are intended for the low pressure conveyance of water, steam, natural gas, air, and other liquids and gases in plumbing and heating systems, air conditioning units, automatic sprinkler systems, and other related uses. Standard pipe may also be used for light load-bearing and mechanical applications, such as for fence tubing.
>
> Imports of these products are currently classifiable under the following Harmonized Tariff Schedule (HTS) subheadings: 7306.30.10 and 7306.30.50. Although the HTS subheadings are provided for convenience and customs purposes, our written description of the scope of these investigations is dispositive.

---

[12] Petitioner's Comments at 5 (citing *Wheatland Tube Co. v. United States*, 161 F. 3d 1365 (Fed. Cir. 1998).

[13] *Wheatland Tube Co.*, 161 F. 3d at 1366.

[14] *See Certain Circular Welded Non-Alloy Steel Pipe from Brazil, the Republic of Korea, Mexico and Venezuela*, 56 FR 52528 (Oct. 21, 1991).

The original scope language above lists only physical characteristics of CWP with reference to standard pipe (and its usages) as subject merchandise without excluding line pipe or multiple-stenciled pipe. When faced with respondents' request for scope clarification during the original AD investigations, the Department concluded that this language is not sufficiently clear with regard to whether it covers "multiple-stenciled" pipe that meet both ASTM A-53 standard (standard pipe specification) and API 5L (line pipe specification) or not.[15] After consulting with the petitioners in those cases, the Department added the following sentence to the scope of the orders:[16]

> The scope is not limited to standard pipe and fence tubing, or those types of mechanical and structural pipe that are used in standard pipe applications. *All carbon steel pipes and tubes within the physical description outlined above are included within the scope of this investigation, except line pipe, oil country tubular goods, boiler tubing, cold-drawn or cold-rolled mechanical tubing, pipe and tube hollows for redraws, finished scaffolding, and finished rigid conduit. Standard pipe that is dual or triple certified/stenciled that enters the U.S. as line pipe of a kind used for oil or gas pipelines is also not included in this investigation*.

There are two important points to take away from this sequence of events: *First*, the exclusion language cited by Petitioner was never included in the original proposed scope of the 1991 petition – which is similar to the language of the scope language in this case. *Second*, reviewing the original proposed scope of the 1991 petition, the Department already concluded that such language did not include line pipe or multi-stenciled pipe, that is why the Department added the explicit exclusion language to the final scope language. Because the scope language of the CWP from Thailand order is similar to that

[15] *Wheatland Tube Co.*, 161 F. 3d at 1367.

[16] *See Certain Circular Welded Non-Alloy Steel Pipe from Brazil, the Republic of Korea (Korea), Mexico, and Venezuela*, 57 FR 49453, 49453 (Nov. 2, 1992).

of the original 1991 CWP petitions, the only conclusion warranted is that the AD order on CWP from Thailand does not over line pipe (including dual-stenciled pipe) products.

In sum, the scope language of the AD order in this case is clear that line pipe (including dual-stenciled pipe) products are excluded.

### B. The Department Is Required To Consider Relevant Materials Under 19 CFR § 351.225(k)(1)

As Saha Thai explained in detailed in our affirmative comments, in an August 2019 decision, *TMB 440AE, Inc. v. United States*, Slip Op. 19-109 (Ct. Int'l Trade, August 13, 2019), the Court remanded a scope determination to the Department when it found that the Department had failed to comply with its own regulations and consider "(k)(1)" sources when assessing whether certain pipe was within the scope of antidumping duty and countervailing duty orders. Specifically, the Court ruled: [17]

> *when a respondent cites (k)(1) sources as supporting a product's exclusion from the scope of an order, the court cannot consider the language of a scope order in isolation, but must consider those sources. See Meridian*, 851 F.3d at 1383 (noting that the court "must first assess whether the plain language of the Orders' scope, in light of the disputed 19 C.F.R. § 351.225(k)(1) sources, is unambiguous"). Here, AEC sufficiently challenged the inclusion of its pipe in the Orders based on (k)(1) sources and so Commerce was not free to ignore these sources. *Whether the order is ambiguous or not, Commerce's regulations are unambiguous– it "will take into account" the (k)(1) criteria in conducting a scope determination.* 19 C.F.R. 351.225(k) (emphasis added). No case has invalidated this regulatory requirement.

Therefore, Saha Thai submits that contrary to Petitioner's contention that the Department can ignore (k)(1) materials in this case, the Department <u>is required</u> to follow its 19 CFR § 351.225(k)(1) requirement to consider "{t}he descriptions of the merchandise contained

[17] *TMB 440AE, Inc. v. United States*, Slip Op. 19-109 (Ct. Int'l Trade, August 13, 2019) at 9 (emphasis added), provided at Attachment 10 to Saha Thai's Comments dated August 26, 2019.

in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission."

In our August 26, 2019 affirmative comments, Saha Thai has explained extensively why (k)(1) materials in this case further establish unequivocally that line pipe, including dual-stenciled pipe is intentionally and specifically excluded from the AD order. In the interest of brevity, we refer the Department to those arguments.

Barcode:3886289-01 A-549-502 SCO - Scope Inquiry - Line Pipe

## CONCLUSION

This is not the first time that Petitioner Wheatland Tube seeks an impermissible expansion of an AD order on standard pipe. Wheatland Tube sought to expand the scope of the AD orders on standard pipes from Brazil, Korea, Mexico and Venezuela to cover line pipes in the past, but its baseless attempt was correctly denied by the Department and the courts.[18] This time, Petitioner has raised no new arguments that would warrant a different outcome.

For all of the foregoing reasons and for reasons addressed in our affirmative comments, Saha Thai asks the Department to terminate this scope inquiry, as it has not been lawfully initiated. Alternatively, the Department should find that "line pipe" and "products that are dual-stenciled" are not included in the scope of the CWP from Thailand AD Order. Finally, the Department should also terminate its anti-circumvention inquiry, as there is no question that any claims of circumvention fall well short of the legal standard for an affirmative finding.

Respectfully submitted,

/s/ Daniel L. Porter

Daniel L. Porter
Tung Nguyen
Gina Colarusso

*Counsel for Saha Thai*

[18] *See Certain Circular Welded Non-Alloy Steel Pipe and Tube from Brazil, the Republic of Korea, Mexico and Venezuela*, 61 FR 11608 (Mar. 21, 1996), affirmed by *Wheatland Tube Co.*, 161 F. 3d 1365.

Filed By: dporter@curtis.com, Filed Date: 9/3/19 12:18 PM, Submission Status: Approved

**Tab 5**

MEMO FROM USDOC TO DAS FOR OPERATIONS PERTAINING TO INTERESTED
PARTIES SCOPE INQUIRY SELF INITIATION (Nov. 22, 2019) (P.R. 36)

Barcode:3914022-01 A-549-502 SCO - Scope Inquiry - Line Pipe

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-549-502
Scope Inquiry
Line Pipe
**Public Document**
E&C/OVII: LA

**DATE:** November 22, 2019

**MEMORANDUM TO:** James Maeder
Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

**THROUGH:** Steven Presing
Acting Senior Director, Office VII
Antidumping and Countervailing Duty Operations

**FROM:** Leo Ayala
International Trade Compliance Analyst, Office VII
Antidumping and Countervailing Duty Operations

**RE:** Antidumping Duty Order on Circular Welded Carbon Steel Pipes and Tubes from Thailand: Self Initiation of Scope Inquiry on Line Pipe and Dual-Stenciled Standard Line Pipe

---

**SUMMARY**

The Department of Commerce (Commerce) is self-initiating a scope inquiry to determine whether line pipe, and whether dual-stenciled standard and line pipe, is subject to the antidumping duty (AD) order on circular welded carbon steel pipes and tubes (standard pipe) from Thailand.[1]

**BACKGROUND**

On January 31, 2019, domestic interested parties filed a request for a circumvention ruling, pursuant to 781(c) of the Tariff Act of 1930, as amended (the Act), to determine whether Saha Thai Steel Pipe (Public) Company, Ltd. (Saha Thai) is circumventing the *Order* on standard pipe from Thailand by performing minor alterations on standard pipe to convert it to allegedly non-subject "line pipe."[2] The domestic interested parties (DIPs, also referred to as "petitioners") are

[1] *See Antidumping Duty Order; Circular Welded Carbon Steel Pipes and Tubes from Thailand,* 51 FR 8341 (March 11, 1986) (*Order*).
[2] *See* DIPs' Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Request for Circumvention Ruling Pursuant to Section 781(c) of the Tariff Act of 1930," (January 31, 2019) (Circumvention Request).

Filed By: Leo Ayala, Filed Date: 11/22/19 5:03 PM, Submission Status: Approved



Wheatland Tube Company (Wheatland), Independence Tube Corporation and Southland Tube, Incorporated.

On February 19, 2019, Saha Thai rebutted the information in the DIPs' anti-circumvention ruling request claiming that Saha Thai paid cash deposits for AD duties on all U.S. imports of pipe identified by the DIPs.[3]

On May 3, 2019, Commerce issued a supplemental questionnaire to the DIPs requesting them to clarify and supplement their claim that the standard pipe exported by Saha Thai is being subject to minor alterations in form or appearance and exported to the United States.[4] On May 30, 2019, the DIPs responded to our request for information.[5]

On June 6, 2019, Saha Thai responded to the DIPs' May 30, 2019 submission, arguing that the DIPs have only shown that Saha Thai has produced and exported steel pipe that meets the specifications of line pipe.[6] Specifically, Saha Thai argued that "Saha Thai has not circumvented the current antidumping duty order, but rather, in fact, has simply produced and exported to the United States line pipe – non-subject merchandise that is expressly excluded from the circular welded line pipe antidumping duty order…{which} cannot be subject to {a} minor alteration anti-circumvention investigation."[7] Finally, on June 14, 2019, the DIPs argued that the scope language does not exclude "line pipe" or products that are dual-stenciled, and, therefore, any minor alterations to standard pipe to classify it as line pipe does not remove it from the scope of the *Order*.[8]

Based on the comments and information provided by interested parties, on July 29, 2019, Commerce issued a letter stating our intent to consider whether Saha Thai's line pipe is covered by the *Order* on standard pipe from Thailand.[9] As such, we provided interested parties with an opportunity to submit comments and factual information regarding whether the scope of the *O*rder on standard pipe from Thailand covers line pipe and products that are dual-stenciled as both standard pipe and line pipe. On August 26, 2019 Wheatland[10] and Saha Thai[11] submitted

---

[3] *See* Saha Thai's Letter, "Saha Thai's Response to Petitioners' Circumvention Allegation: Circular Welded Carbon Steel Pipe and Tubes from Thailand (AR 16-17)," (February 19, 2019).
[4] *See* Commerce's Letter, "Request for Circumvention – Circular Welded Carbon Steel Pipes and Tubes from Thailand: Request for Further Information," (May 3, 2019).
[5] *See* DIPs' Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Response to Request for Information for Allegation of Circumvention," (May 30, 2019).
[6] *See* Saha Thai's Letter, "Saha Thai's Comments to Petitioners' May 30, 2019 Response to Department Request: Circular Welded Carbon Steel Pipe and Tubes from Thailand," (June 6, 2019).
[7] *Id.* at 2.
[8] *See* DIPs' Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Response to Saha Thai's June 6, 2019 Comments," (June 14, 2019) at 5; *see* also *Order*, 51 FR at 8341.
[9] *See* Commerce letter to interested parties, "*Circular Welded Carbon Steel Pipes and Tubes from Thailand*: Scope Inquiry on Line Pipe" (July 29, 2019) (Commerce July 29 Letter).
[10] *See* Wheatland's letter "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Response to July 29, 2019 Request for Comments," (August 26, 2019) (Wheatland Aug 26 Response).
[11] *See* Saha Thai's letter "Saha Thai's Comments on "Line Pipe" Scope Inquiry Circular Welded Carbon Steel Pipe and Tubes from Thailand," (August 26, 2019) (Saha Thai Aug 26 Response).

timely responses. On September 3, 2019, Wheatland[12] and Saha Thai[13] provided timely rebuttal submissions.

## SCOPE OF THE *ORDER*

The products covered by the *Order* are certain circular welded carbon steel pipes and tubes from Thailand. The subject merchandise has an outside diameter of 0.375 inches or more, but not exceeding 16 inches, of any wall thickness. These products, which are commonly referred to in the industry as "standard pipe" or "structural tubing" are hereinafter designated as "pipes and tubes." The merchandise is classifiable under the Harmonized Tariff Schedule of the United States (HTSUS) item numbers 7306.30.1000, 7306.30.5025, 7306.30.5032, 7306.30.5040, 7306.30.5055, 7306.30.5085 and 7306.30.5090. Although the HTSUS subheadings are provided for convenience and purposes of U.S. Customs and Border Protection (CBP), the written description of the merchandise subject to the order is dispositive.

## SELF-INITIATION OF SCOPE INQUIRY

In accordance with 19 CFR 351.225(b), if Commerce "determines from the available evidence that an inquiry is warranted to determine whether a product is included within the scope of an antidumping or countervailing duty order or a suspended investigation, {Commerce} will initiate an inquiry, and will notify all parties on {Commerce}'s scope service list of its initiation of a scope inquiry."

Additionally, pursuant to 19 CFR 351.225(f), the notice of initiation of the scope inquiry will include the following information: (i) a description of the product that is the subject of the scope inquiry; (ii) an explanation of the reasons for the Secretary's decision to initiate a scope inquiry; and (iii) a schedule for submission of comments that normally will allow interested parties 20 days in which to provide comments on, and supporting factual information relating to, the inquiry, and 10 days in which to provide any rebuttal to such comments.

A description of the products covered by this scope inquiry is provided below.

Commerce has reviewed the submissions filed in connection with the DIPs' request for a circumvention inquiry, and has also reviewed the description of the merchandise in the petition, the initial investigation, and the determinations of Commerce and the International Trade Commission. Based on this review, Commerce finds that it would be prudent to initiate a formal scope inquiry to allow parties the opportunity to provide additional factual information and arguments. Issuing a scope ruling in this situation is necessary because, if the line pipe or dual-stenciled standard and line pipe, produced and exported by Saha Thai, is subject to the *Order*, then initiating a circumvention inquiry with respect to the merchandise at issue will be unnecessary. Further, as noted above, Commerce finds that initiating a formal scope inquiry and then issuing of a preliminary scope ruling will provide all interested parties with an opportunity to comment on this question which has had a long history of scope challenges and litigation

---

[12] *See* Saha Thai's letter "Saha Thai's Rebuttal Comments on "Line Pipe" Scope Inquiry Circular Welded Carbon Steel Pipe and Tubes from Thailand," (September 3, 2019).

[13] *See* Wheatland's letter "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Rebuttal to Saha Thai's August 26, 2019 Comments," (September 3, 2019).

across various antidumping and countervailing duty proceedings covering standard and line pipe products.

Pursuant to 19 CFR 351.225(f)(1)(iii), interested parties will have until December 12, 2019, to submit additional comments and supporting factual information concerning this issue, and until December 22, 2019, to submit rebuttal comments and supporting factual information.

Consistent with 19 CFR 351.225(b), Commerce will notify all interested parties on the scope service list of the initiation of this formal scope inquiry.

**DESCRIPTION OF MERCHANDISE SUBJECT TO THIS SCOPE INQUIRY**

As described above, the scope of the *Order* covers circular welded carbon steel pipe which is commonly referred to as "standard pipe." As described in the Petition,[14] "standard pipe"

> …. is a general-purpose commodity used in such applications as plumbing pipe, sprinkler systems and fence posts and is commonly referred to in the industry as a standard pipe. It may be supplied with an oil coating (black pipe) or may be galvanized, and is sold in plain ends, threaded, threaded and coupled, or beveled for welding form. (These products are generally produced to ASTM specifications A-120, A-53, or A-135.)[15]

The International Trade Commission (ITC) described "standard pipes and tubes" in its ITC Final Report[16] as follows:

> Standard pipes and tubes are intended for the low--pressure conveyance of water, steam, natural gas, air, and other liquids and gases in plumbing and heating systems, air-conditioning units, automatic sprinkler systems, and other related uses. They may also be used for light load-bearing or mechanical applications, such as for fence tubing. These steel pipes and tubes may carry fluids at elevated temperatures and pressures but may not be subjected to the application of external heat. They are most commonly produced to ASTM specifications A·-120, A-53, and A-135.[17]

This scope inquiry covers "line pipe" with outside diameters of 0.375 inch or more, but not exceeding 16 inches, produced in Thailand. "Line pipe," as described in the Petition, "is produced to API specifications for line pipe, API-51 or APISX."[18] The ITC states that "{l}ine pipes and tubes are used for the transportation of gas, oil, or water, generally in pipeline or utility distribution systems. They are most commonly produced to API specification 5L."[19] The ITC continues:

---

[14] *See* "Petition for Imposition of Antidumping Duties: Members of Committee on Pipe and Tube Imports" (February 28, 1984) (Petition); included in Wheatland Aug 26 Response at Exhibit 3.
[15] *See* Petition at 12.
[16] *See* "Certain Welded Carbon Steel Pipes and Tubes from Turkey and Thailand (Final), Inv. Nos. 701-TA-253 and 731-TA-252," USITC Pub. 1810 (Feb. 1986) (ITC Final Report), included in Saha Thai Aug 26 Response at Attachment 5.
[17] *See* ITC Final Report at I-1 to I-2.
[18] *See* Petition at 12.
[19] *See* ITC Final Report at II-1.

> …. the principal differences between {standard pipe and line pipe} are that line pipe is made from a higher-grade steel and requires additional testing to ensure that it meets API specifications. Line pipe may have a higher content of carbon and manganese than is permissible for standard pipe, whereas standard pipe may have a higher content of phosphorus and sulfur than is permissible for line pipe. Requirements concerning chemical and mechanical properties for API line pipe differ for the various specifications and grades. There are at least 10 grades of API 5L line pipe. API 5L line pipe is inspected and tested at various stages in the production process to ensure strict conformity to API specifications.[20]

Further, standard pipe may be dual-stenciled, *i.e.*, identified to indicate compliance with two different specifications, as conforming to industry standards for both standard pipe and line pipe, such as ASTM A53 and API 5L. The DIPs have provided information which warrants the inclusion of dual-stenciled standard and line pipe as part of this scope inquiry.

**RECOMMENDATION**

For the reasons discussed above, we recommend self-initiating a scope inquiry to determine whether line pipe, and whether dual-stenciled standard and line pipe, are covered by the scope of the antidumping duty order for circular welded carbon steel pipe and tube from Thailand. We will notify all parties on the scope service list of this initiation and opportunity to make submissions to the record consistent with 19 CFR 351.225(b). Further, interested parties will have until December 12, 2019 to submit comments and supporting factual information, and until December 22, 2019 to submit rebuttal comments and supporting factual information.

☒ Agree ☐ Disagree

11/22/2019

X James Maeder

Signed by: JAMES MAEDER

James Maeder
Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

[20] *Id.*

**Tab 6**

MEMO FROM USDOC TO FILE PERTAINING TO INTERESTED PARTIES DOCS
PLACED ON RECORD (Dec. 6, 2019) (P.R. 38, 39)

Barcode:3918328-01 A-549-502 SCO - Scope Inquiry - Line Pipe

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-549-502
Scope Inquiry: Line Pipe
**Public Version**
E&C/OVII: TP

**DATE:** December 6, 2019

**MEMORANDUM TO:** The File

**THROUGH:** Thomas Gilgunn
Program Manager
AD/CVD Operations, Office VII
Enforcement and Compliance

**FROM:** Toni Page
International Trade Specialist
AD/CVD Operations, Office VII
Enforcement and Compliance

**RE:** Circular Welded Carbon Steel Pipes and Tubes from Thailand: Scope Inquiry on Line Pipe and Dual-Stenciled Standard Line Pipe

**SUBJECT:** Placing Documents on the Record of the Line Pipe Scope Inquiry

---

On November 22, 2019, Commerce initiated a scope inquiry to determine whether line pipe and dual-stenciled standard and line pipe are covered by the scope of the antidumping duty order on circular welded carbon steel pipe and tube from Thailand (line pipe scope inquiry).[1] Prior to the initiation of the line pipe scope inquiry, domestic interested parties, Wheatland Tube Company, Independence Tube Corporation and Southland Tube, Incorporated (Wheatland) filed an anti-circumvention ruling request regarding the merchandise at issue in this scope inquiry.[2] As part of this scope inquiry, Commerce is placing certain documents filed on the record of the anti-circumvention inquiry on the record of this proceeding. These following documents placed on the record of the anti-circumvention inquiry by Wheatland and Saha Thai Steel Pipe (Public) Company, Ltd. (Saha Thai) will be placed on the record of this scope inquiry:

- Attachment 1 Wheatland's January 31, 2019 Circumvention Request

---

[1] *See* Commerce Memorandum, "Antidumping Duty Order on Circular Welded Carbon Steel Pipes and Tubes from Thailand: Self Initiation of Scope Inquiry on Line Pipe and Dual-Stenciled Standard Line Pipe," (November 22, 2019); *see also Antidumping Duty Order; Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 51 FR 8341 (March 11, 1986).

[2] *See* Domestic Interested Parties' Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Request for Circumvention Ruling Pursuant to Section 781(c) of the Tariff Act of 1930," (January 31, 2019) (Circumvention Request).

Filed By: Toni Page, Filed Date: 12/6/19 2:34 PM, Submission Status: Approved



- Attachment 2 Saha Thai's February 19, 2019 Rebuttal to Wheatland's Circumvention Request
- Attachment 3 Wheatland's May 30, 2019 Response to Commerce's Supplemental Information Request
- Attachment 4 Saha Thai's June 6, 2019 Comments re: Wheatland's May 30, 2019 Response
- Attachment 5 Wheatland's June 14, 2019 Response to Saha Thai's June 6, 2019 Comments

We note that, due to certain confidential business proprietary information, we are releasing this document in two document designations: 1) Business Proprietary – May be Released under APO, and 2) Public Version.

In the initiation of our line pipe scope inquiry, we gave interested parties, until December 12, 2019 to submit comments and supporting factual information, and until December 22, 2019 to submit rebuttal comments and supporting factual information. We are extending the deadline for initial comments and supporting factual information until December 20, 2019, and rebuttal comments and factual information until December 30, 2019.[3]

[3] *See* Saha Thai letter, "Saha Thai's Request for Extension of Scope Comments Deadlines Circular Welded Carbon Steel Pipe and Tubes from Thailand," dated December 4, 2019; *see also* 19 CFR 351.301(c)(4).

January 31, 2019

DOC Case No.: A-549-502
Total Pages: 91
Anti-Circumvention Inquiry (Minor Alteration)

**PUBLIC VERSION**

Petitioners' Business Proprietary Information Deleted from Exhibit 2.

The Honorable Wilbur Ross, Jr.
Secretary of Commerce
Attention: Enforcement & Compliance
Central Records Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

Re: Circular Welded Carbon Steel Pipes and Tubes from Thailand: Request for Circumvention Ruling Pursuant to Section 781(c) of the Tariff Act of 1930

Dear Secretary Ross:

On behalf of Wheatland Tube Company, Independence Tube Corporation, a Nucor Company, and Southland Tube, Incorporated, a Nucor Company (collectively "Petitioners"), we respectfully request that the Department of Commerce ("Commerce") determine pursuant to Section 731(c) of the Tariff Act of 1930, as amended ("the Act") (19 U.S.C. § 1677j(c)), that certain imports of merchandise from Thailand that are entering the United States as "line pipe" are circumventing the antidumping duty order on *Circular Welded Carbon Steel Pipes and Tubes from Thailand* (the "Order"). Specifically, as discussed in greater detail below, Saha Thai Steel Pipe (Public) Company Ltd ("Saha Thai") started exporting merchandise identified as "line pipe" shortly before an anticipated increase in the dumping margin applicable to Saha Thai's exports of standard pipe that are subject to the Order. As discussed below, the evidence shows that Saha Thai is circumventing the Order by exporting subject standard pipe with minor alterations in

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

form or appearance.[1] Petitioners therefore request that Commerce determine that imports of "line pipe" manufactured by Saha Thai are circumventing the Order and that such imports should be treated as subject to the Order with duties imposed accordingly.

## I. BACKGROUND

### A. The Product at Issue

On March 11, 1986, Commerce published an antidumping duty order on circular welded carbon steel pipes and tubes from Thailand.[2] The current scope of the order describes the subject merchandise as:

> certain circular welded carbon steel pipes and tubes from Thailand. The subject merchandise has an outside diameter of 0.375 inches or more, but not exceeding 16 inches. These products, which are commonly referred to in the industry as "standard pipe" or "structural tubing" are hereinafter designated as "pipes and tubes." The merchandise is classifiable under the Harmonized Tariff Schedule of the United States (HTSUS) item numbers 7306.30.1000, 7306.30.5025, 7306.30.5032, 7306.30.5040, 7306.30.5055, 7306.30.5085 and 7306.30.5090. Although the HTSUS subheadings are provided for convenience and purposes of U.S. Customs and Border Protection (CBP), the written description of the merchandise subject to the order is dispositive.[3]

In the most recent sunset review of the Order, the U.S. International Trade Commission (the "Commission") stated that subject standard pipe is "ordinarily used for low-pressure conveyance of air, steam, gas, water, oil, or other fluids for mechanical applications" and "used

---

[1] To the extent that Saha Thai has not performed any alterations to subject standard pipe and the imports of merchandise identified as "line pipe" are simply being misclassified as line pipe to avoid the payment of antidumping duties, then it is clear that the importer of record, Master Pipe Distribution Company, LLC ("Master Pipe"), is evading the Order.

[2] *Antidumping Duty Order; Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 51 Fed. Reg. 8341 (March 11, 1986).

[3] Issues and Decision Memorandum accompanying *Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 83 Fed. Reg. 51,927 (Dep't Commerce Oct. 15, 2018) (final results of antidumping duty admin. review; 2016-2017) at 2-3.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

primarily in machinery, buildings, sprinkler systems, irrigation systems, and water wells rather than in pipe lines or utility distribution systems."[4] The Commission noted that standard pipe "may carry fluids at elevated temperatures which are not subject to external heat applications."[5] In addition, the Commission explained that standard pipe is "usually produced in standard diameters and wall thicknesses to ASTM specifications."[6] The Commission stated that line pipe, on the other hand, "is used for transportation of gas, oil, or water generally in a pipeline or utility distribution system" and "is produced to API-5L and American Water Works Association specifications."[7] That said, because the specifications for standard pipe and line pipe often require engineering characteristics that overlap, a pipe may be dual stenciled – *i.e.*, stamped to indicate compliance with two different specifications such as ASTM A53 and API 5L.[8]

**B. Saha Thai's Minor Alteration of Subject Pipe to Circumvent the Order**

Saha Thai is a Thai producer and exporter of subject merchandise that has been subject to the Order since its imposition and has been individually examined in numerous administrative reviews of the Order.[9] Data gathered from bills of lading for shipments of steel pipe from

---

4 *Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey*, Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534, and 536, USITC Pub. 4754, I-14-15 (Jan. 2018) (Fourth Review), excerpts attached at **Exhibit 1** ("USITC Pub. 4754").

5 *See id.*

6 *Id.*

7 *Id.*

8 *Id.*

9 *See* AD Order at 8,341; *Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 71 Fed. Reg. 54,266 (Dep't Commerce Oct. 10, 2017) (final results of antidumping duty admin. review and final deter. of no shipments; 2015-2016); *Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 80 Fed. Reg. 59,732 (Dep't Commerce Oct. 2, 2015) (final results of antidumping duty admin. review; 2013-2014); Circula*r Welded Carbon Steel Pipes and Tubes From Thailand*, 79 Fed. Reg. 64,170 (Dep't Commerce Oct. 28, 2014) (final results of antidumping duty admin.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

Thailand to the United States show that Saha Thai has historically shipped large volumes of steel pipe to the United States that fit within the scope of the Order.[10] According to the same bill of lading data, the U.S. importer Master Pipe started importing significant volumes of steel pipe from Saha Thai in March 2017.[11] During the first year that Master Pipe imported steel pipe from Saha Thai, the bill of lading data show that the Master Pipe imported only subject standard pipe from Saha Thai.[12]

While Saha Thai has been subject to the Order since the original investigation, the company has had relatively low dumping margins. For instance, in the five administrative reviews that were conducted prior to the most recently completed review, Saha Thai received individual dumping margins ranging from 0.00 percent to 1.36 percent.[13] This was due in large part to Commerce's inability during those reviews to adjust Saha Thai's reported costs to reflect

---

review; 2012-2013); *Circular Welded Carbon Steel Pipes and Tubes From Thailand*, 78 Fed. Reg. 65,272 (Dep't Commerce Oct. 31, 2013) (final results of antidumping duty admin. review; 2011-2012); *Circular Welded Carbon Steel Pipes and Tubes From Thailand*, 77 Fed. Reg. 61,738 (Dep't Commerce Oct. 11, 2012) (final results of antidumping duty admin. review).

10 *See* Bill of Lading Data, attached at **Exhibit 2**.

11 *See id.*

12 *Id.*

13 *See Circular Welded Carbon Steel Pipes and Tubes From Thailand*, 82 Fed. Reg. 46,961 (Dep't Commerce Oct. 10, 2017) (final results of antidumping duty admin. review and final deter. of no shipments; 2015-2016); *Circular Welded Carbon Steel Pipes and Tubes From Thailand*, 80 Fed. Reg. 59,732 (Dep't Commerce Oct. 2, 2015) (final results of antidumping duty admin. review; 2013-2014); *Circular Welded Carbon Steel Pipes and Tubes From Thailand*, 79 Fed. Reg. 64,170 (Dep't Commerce Oct. 28, 2014) (final results of antidumping duty admin. review; 2012-2013); *Circular Welded Carbon Steel Pipes and Tubes From Thailand*, 78 Fed. Reg. 65,272 (Dep't Commerce Oct. 31, 2013) (final results of antidumping duty admin. review; 2011-2012); *Circular Welded Carbon Steel Pipes and Tubes From Thailand*, 77 Fed. Reg. 61,738 (Dep't Commerce Oct. 11, 2012) (final results of antidumping duty admin. review); *see also Circular Welded Carbon Steel Pipes and Tubes From Thailand*, 80 Fed. Reg. 57,153 (rescission of antidumping duty admin. review; 2015).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

the existence of any particular market situation ("PMS") in Thailand that had an impact on Saha Thai's costs. In the most recently completed 2016-2017 review, however, Wheatland Tube LLC filed a PMS allegation on February 5, 2018, pursuant to section 504 of the Trade Preferences Extension Act of 2015 (codified at 19 U.S.C. § 1677b(e)), alleging that a PMS existed in Thailand with respect to hot-rolled coil, the primary input used to produce pipes and tubes, such that the cost of production of subject pipe was distorted, and thus that an alternative calculation methodology should be used in place of reported production costs, specifically, by making an upward adjustment to the acquisition costs of hot-rolled coil.[14] On March 20, 2018, Commerce accepted the PMS allegation, strongly indicating that Saha Thai's dumping margin may increase.[15]

As previously mentioned, prior to March 2018, when Commerce accepted the PMS allegation in the 2016-2017 review, U.S. importer Master Pipe had been importing significant volumes of subject standard pipe from Saha Thai.[16] In April 2018, the month following Commerce's acceptance of the PMS allegation, Master Pipe began to import "line pipe" from Saha Thai.[17] Prior to this point in time, the bill of lading data do not indicate that Master Pipe had ever imported steel pipe from Saha Thai that was identified as "line pipe."[18]

---

[14] *See* Memorandum re: *Antidumping Duty Administrative Review of Circular Welded Steel Pipes and Tubes from Thailand: Post-Preliminary Decision Memorandum on Particular Market Situation Allegation* (Dep't Commerce Aug. 31, 2018) ("PMS Memo"), attached at **Exhibit 3** at 1-3.

[15] *See id.* at 3-4.

[16] *See* Bill of Lading Data, attached at **Exhibit 2**.

[17] *Id.*

[18] *Id.*

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

Shortly before the final results in the 2016-2017 review, Commerce found that a PMS existed in Thailand with respect to the cost of hot-rolled coil and made an upward adjustment to the reported costs for the input.[19] Subsequently, Commerce issued its final results for the review, assigning Saha Thai a significantly higher dumping margin of 28 percent.[20] The fact that Saha Thai began shipping merchandise identified as "line pipe" shortly after the PMS allegation was filed and accepted shows that this "line pipe" is actually subject standard pipe that has undergone a minor alteration so that it can be imported as "line pipe" in the United States in an apparent scheme to avoid the payment of increased dumping duties.

## II. IMPORTS OF STANDARD PIPE THAT HAVE UNDERGONE A MINOR ALTERATION IN FORM OR APPEARANCE IN THAILAND ARE CIRCUMVENTING THE ORDER

### A. Legal Standard

Congress provided Commerce with the tools necessary to combat the circumvention of antidumping and countervailing duties in Section 731 of the Act (19 U.S.C. §1677j).[21] These circumvention provisions allow Commerce to treat merchandise as subject to the scope of an antidumping or countervailing duty order even where the merchandise does not fall within the literal scope language of the order.[22] Pursuant to Section 731(c) of the Act, Commerce may include within the scope of an antidumping or countervailing duty order imported merchandise

---

19 PMS Memo at 6, attached at **Exhibit 3**.

20 *Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 83 Fed. Reg. at 51,928.

21 *See Deacero S.A. de C.V. v. United States*, 817 F.3d 1332,1337 (Fed. Cir. 2016).

22 *See id.* ("In order to effectively combat circumvention of antidumping duty orders, Commerce may determine that certain types of articles are within the scope of a duty order, even when the articles do not fall within the order's literal scope.") (citing *Target Corp. v. United States*, 609 F.3d 1352, 1355 (Fed. Cir. 2010) (quoting *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1370 (Fed. Cir. 1998)).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

that has been "altered in form or appearance in minor respects . . . whether or not included in the same tariff classification."[23] Indeed, the Federal Circuit has recognized that Section 731(c) "reflects Congress' concern that foreign producers were circumventing antidumping duty orders by making minor alterations to products falling within the scope of an order in an effort to take these products outside of the literal scope."[24]

While the statute is silent regarding the specific factors to consider in determining whether alterations are properly considered "minor," the legislative history of this Section indicates that there are certain factors that should be considered before reaching an anti-circumvention determination based on minor alterations. Specifically, the Senate Finance Committee report on the Omnibus Trade and Competitiveness Act of 1988 (which amended the Tariff Act of 1930 to include the anti-circumvention provisions contained in section 781), states:

> In applying this provision, the Commerce Department should apply practical measurements regarding minor alterations, so that circumvention can be dealt with effectively, even where such alterations to an article technically transform it into a differently designated article. The Commerce Department should consider such criteria as the overall physical characteristics of the merchandise, the expectations of the ultimate users, the use of the merchandise, the channels of marketing and the cost of any modification relative to the total value of the imported products.[25]

---

23 *See* 19 U.S.C. § 1677j(c); 19 C.F.R. § 351.225(i).

24 *Wheatland Tube Co. v. United States*, 161 F.3d at 1370 (citing S. Rep. No. 100-71, at 101 (1987) ("An important purpose of this provision is to avoid results such as the one reached ... where a minor alteration resulted in portable typewriters with calculator or memory features being excluded from the scope of an existing antidumping order on portable typewriters. The Committee intends this provision to prevent foreign producers from circumventing existing findings or orders through the sale of later-developed products or of products with minor alterations that contain features or technologies not in use in the class or kind of merchandise imported into the United States at the time of the original investigation."); H.R. 10040, at 135 (1987) (The minor alterations provision "might apply when steel sheet is temper rolled prior to importation ... or when a fire resistance coating is applied to cookware prior to importation.")).

25 Omnibus Trade Act of 1987, Report of the Senate Finance Committee, S. Rep. No. 71, 100th Cong., 1st Sess., at 100 (1987).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Consistent with this legislative history, it is Commerce's practice to look at the five factors listed in the Senate Finance Committee report to determine if circumvention through minor alterations exists in a particular case.[26] In certain circumvention inquiries, Commerce has also analyzed additional factors, as appropriate on a case-by-case basis, to determine if circumvention of the order is taking place.[27] Such additional factors have included the circumstances under which the products enter the United States, the timing of the entries during the circumvention review period, and the quantity of the merchandise entered during the circumvention review period.[28]

**B. Commerce's Five-Factor Test Demonstrates that Saha Thai's "Line Pipe" Involves a Minor Alteration of Its Subject Standard Pipe**

As discussed below, each of the five factors that Commerce traditionally examines in circumvention inquiries shows that the "line pipe" being shipped by Saha Thai to the United States involves a minor alteration in form or appearance of subject standard pipe.

1. Physical Characteristics

In terms of physical characteristics, there are no differences between the standard pipe being produced and sold by Saha Thai and the "line pipe" that is being shipped to the United States. Indeed, the available evidence shows that Saha Thai is not capable of actually producing line pipe with physical characteristics that are different from its subject standard pipe. According to its company website, Saha Thai produces standard pipe, specializing in black steel

---

26 *Ceramark Tech., Inc. v. United States*, 11 F. Supp. 3d 1317, 1325 (Ct. Int'l Trade 2014); *see also Preliminary Determination of Circumvention of Antidumping Order; Cut-to-Length Carbon Steel Plate from Canada*, 65 Fed. Reg. 64926, 64929 (Dep't Commerce Oct. 31, 2000), *unchanged in final results*, 66 Fed. Reg. 7617, 7618 (Jan. 24, 2001) ("*Canadian Plate*"); *Final Results of Anti-Circumvention Review of Antidumping Order: Corrosion-Resistant Carbon Steel Flat Products From Japan*, 68 Fed. Reg. 33676, 33679 (Dep't Commerce June 5, 2003).

27 *See, e.g., Canadian Plate, 65 Fed. Reg. at 64929.*

28 *Id.*

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

pipe, galvanized steel pipe, furniture steel pipe, and blue-painted steel pipe. [29] Nowhere on its website does Saha Thai indicate that it produces line pipe.[30]

Saha Thai's recent submissions in the administrative reviews of the Order at Commerce also show a lack of separate line pipe capabilities. For instance, in its Section A Response submitted in the 2017-2018 review for the Order, Saha Thai stated that it has "two pipe production facilities in Thailand."[31] The first location is in Samutprakarn, approximately 20 kilometers outside of Bangkok.[32] Saha Thai stated that this facility produces "carbon steel pipe and tube (black, painted and galvanized), furniture tube, square and rectangular tube, and flat bar."[33] Saha Thai's second facility is located in Ayutthaya and, according to Saha Thai's Section A Response, it produces "black and painted carbon steel pipe and tube, rectangular tube, flat bar, metal sheet and corrugated roofing material."[34] None of these products appear to be line pipe with physical characteristics that is distinct from Saha Thai's subject standard pipe.

Saha Thai's Section D Response in the 2017-2018 review provides additional information regarding Saha Thai's two pipe facilities, noting their production of both subject merchandise and non-subject merchandise.[35] The response states that the Samutprakarn facility

---

29 Saha Thai Website Excerpts, attached at **Exhibit 4**.

30 *Id.*

31 *See* Saha Thai's Section A Questionnaire Response in *Circular Welded Carbon Steel Pipe and Tubes from Thailand (AR 17-18)* (July 27, 2018) (Public Verso ion), excerpts attached as **Exhibit 5** ("Sec. A Questionnaire AR 17-18") at 6.

32 Sec. A Questionnaire AR 17-18 at 6.

33 Sec. A Questionnaire AR 17-18 at 6.

34 Sec. A Questionnaire AR 17-18 at 7.

35 Merchandise under consideration refers generally to all products within the scope of the review sold in any market. *See* Saha Thai's Section D Questionnaire Response in *Circular Welded*

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

produces subject merchandise including "circular welded carbon steel pipe in various surface finishes (black, varnished, painted, and galvanized) and end finishes (plain end, threaded, and threaded and coupled)."[36] Saha Thai also highlights that the non-subject merchandise produced at the Samutprakarn plant includes "non-circular tubes (rectangular, square, and C shape) and flat bar."[37] Regarding the Ayutthaya plant, Saha Thai states in its Section D Response that in terms of subject merchandise, the plant "produces black carbon steel pipe, ranging in sizes from 3/8 inches to 8 inches in diameter" and that non-subject "production at the Ayutthaya plant consists of a limited volume of corrugated roofing sheet."[38] This information provides a complete picture of Saha Thai's pipe production capabilities, which do not include line pipe. It is quite clear then, from its own admission, that Saha Thai's production capabilities do not include the production of line pipe with physical characteristics that are different from subject standard pipe.[39]

The bottom line is that Saha Thai's inability to produce line pipe means that the physical characteristics of the merchandise being shipped to the United States as "line pipe" are not significantly different from the physical characteristics of the subject standard pipe that is produced and sold by Saha Thai.  To the contrary, the merchandise being shipped as "line pipe"

*Carbon Steel Pipe and Tubes from Thailand* (AR 17-18) (Aug. 28, 2018) ("Sec. D Questionnaire AR 17-18") at 3, attached as **Exhibit 6**.

36 *Id.* at 4-5.

37 *Id.* at 5.

38 *Id.*

39 *See also* API Certifications Thailand, attached at **Exhibit 9** (showing that Saha Thai's application for an API certificate is still currently pending).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

can only involve a minor alteration in form or appearance that allows it to be entered into the United States as "line pipe."

The bill of lading data regarding Saha Thai's shipments of "line pipe" also show that there are no significant differences in the physical characteristics between subject standard pipe and the merchandise being entered into the United States as "line pipe." Specifically, for line entries 1576, 1585, and 1670 in the bill of lading data, the full commodity descriptions on the bills of lading indicate that the shipments include "prime quality ERW steel line pipe manufactured in accordance with ASTM A53."[40] However, as discussed above, line pipe is produced to API 5L standards, while standard pipe is produced to ASTM standards. The fact that Saha Thai's shipments of "line pipe" are being produced and marketed based on the ASTM standards that govern the physical characteristics of subject standard pipe, shows that the physical characteristics of this "line pipe" are identical to subject standard pipe, except for extremely minor alterations that allow the merchandise to be imported into the United States as "line pipe."

2. Expectations of Ultimate Users

The expectations of the ultimate users of the merchandise being shipped as "line pipe" by Saha Thai also show that this merchandise involves a minor alteration of subject standard pipe. As mentioned above, nowhere on Saha Thai's company website does the company indicate that it produces line pipe, creating no expectation from ultimate users that Saha Thai produces line pipe.[41] Instead, the company showcases its production and specializations in standard pipe.[42]

---

40 Bill of Lading Data, attached at **Exhibit 2**.

41 Saha Thai Website Excerpts, attached at **Exhibit 4**.

42 *Id.*

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

Likewise, because Saha Thai has no API license to produce line pipe, the ultimate users of the merchandise would expect to be able to use the merchandise only in standard pipe applications – not any line pipe applications.

As discussed above, line pipe is produced to API 5L specifications. API 5L certificates are issued by the American Petroleum Institute to provide uniform standards for pipe used in the oil and gas industries.[43] To verify that pipe is line pipe that can be used in the oil and gas industries, specific and technical inspections must take place. These inspections indicate the "strength of the steel, process of manufacture, product specification levels, heat treatment, and test pressure of the pipe."[44] The rigorous certification process serves as a proxy for individualized testing and ensures fairness in the steel pipe industry for both business and consumers.[45]

Saha Thai is not certified to produce API 5L line pipe. A search of API 5L certifications held by Thai companies on a database maintained by the American Petroleum Institute shows no API 5L certifications for Saha Thai.[46] Furthermore, as discussed above, the bill of lading data show that the merchandise being entered as "line pipe" is produced to the ASTM standards that govern subject standard pipe. As a result, the ultimate users of this merchandise would not expect to be able to use the merchandise in actual line pipe applications – *i.e.*, for transportation of gas, oil, or water in a pipeline or utility distribution system. The ultimate users would instead

43 API Website Excerpts, attached as **Exhibit 7**.

44 *Large Diameter Welded Pipe from Canada, China, Greece, India, Korea, and Turkey*, Inv. Nos. 701-TA-593-596 and 731-TA-1401-1406, USITC Pub. 4768 (Mar. 2018) (Preliminary Determination) at 8, attached as **Exhibit 8**.

45 API Website Excerpts, attached as **Exhibit 7**.

46 API Certifications Thailand, attached at **Exhibit 9**.

Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918528-02 A-549-502 SCO - Scope Inquiry - Line Pipe

expect that the merchandise can only be used in typical standard pipe applications – *i.e.*, for low-pressure conveyance of air, steam, gas, water, oil, or other fluids for mechanical applications in machinery, buildings, sprinkler systems, irrigation systems, and water wells rather than in pipe lines or utility distribution systems.

3. Use of the Merchandise

Consistent with the expectations of the ultimate users, the actual use of the merchandise being entered as "line pipe" is identical or similar to the use of subject standard pipe. Again, because Saha Thai is not certified to produce pipe to API 5L specifications, and because the merchandise being entered as "line pipe" is produced to ASTM certifications, the only proper use for this merchandise is standard pipe applications.

In addition, Saha Thai's own website confirms that its pipe is used only for standard pipe applications and not for line pipe applications. For example, Saha Thai states its "{b}lack steel pipes are widely used in construction and in other industrial projects."[47] Similarly, Saha Thai states that its "galvanized steel pipes are most often used for water pipelines, air conditioning systems, and many other applications."[48] Saha Thai's description of its furniture steel pipe indicates that it is used for making steel furniture.[49] Saha Thai states that its blue-painted steel pipes "are suitable for common constructions, such as roofs, scaffolds, columns, beams, doors, fences, and general decorative installations."[50] Finally, Saha Thai identifies three main usages for its black steel pipe and galvanized steel pipe: (1) steel pipe for water and other liquid supply

---

47 Saha Thai Website excerpts, attached at **Exhibit 4** at Product Capability.

48 *Id.*

49 *Id.*

50 *Id.*

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

"in high buildings such as water supply pipe, fire extinguisher pipe, and pipe for air conditioner system"; (2) steel pipe for "structure works such as pylons, beams, work platform, and roof structures"; and (3) steel pipe for general use "such as electricity line pine, fencing and door work of buildings, and other decoration works."[51] Nowhere does Saha Thai indicate that any of its pipe can be used for line pipe applications such as the conveyance of oil and gas in distribution systems.

4. The Channels of Marketing

The channels of marketing through which Saha Thai has shipped its "line pipe" are identical to the channels of marketing through which Saha Thai has shipped subject standard pipe. First of all, Saha Thai does not advertise line pipe separately from standard pipe on its website or in its product brochure. In addition, Saha Thai does not sell "line pipe" to any customer to whom it did not previously sell standard pipe. According to the bill of lading data, the only U.S. importer of Saha Thai's "line pipe" is Master Pipe, and Master Pipe had only been importing standard pipe from Saha Thai prior to April 2018, when it began importing "line pipe" from Saha Thai after the filing of a PMS allegation in the 2016-2017 review.[52] Finally, Master Pipe also markets all of the pipe that it imports from Saha Thai in a common manner.[53] Thus, this factor also supports a finding of circumvention through minor alterations of subject standard pipe.

---

[51] *Id.* at Specification.

[52] Bill of Lading Data, attached at **Exhibit 2**.

[53] Master Pipe Distribution Company Website Excerpts, attached at **Exhibit 10**.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

5. The Cost of Any Minor Alteration

As discussed above, the merchandise produced by Saha Thai and being entered as "line pipe" cannot be produced to API 5L specifications with an API monogram. Indeed, the bill of lading data indicate it is being produced to ASTM specifications. Thus, the minor alterations in form or appearance that Saha Thai is making to allow the pipe to be entered as "line pipe" are clearly inconsequential and do not result in Saha Thai incurring any significant additional costs. Furthermore, even if Saha Thai's "line pipe" did conform to API 5L specifications, the difference in cost between standard pipe and API 5L with the same outside diameter is approximately 10% - a cost difference which reflects a requirement for thicker steel substrate in line pipe compared to standard pipe because of the narrower tolerances and additional testing associated with line pipe.

**C. Other Relevant Factors Also Support a Finding of Circumvention**

In addition to the five factors discussed above, Commerce has also analyzed factors such as the circumstances under which the products enter the United States, the timing of the entries during the circumvention review period, and the quantity of the merchandise entered during the circumvention review period.[54] These factors also show that Saha Thai is circumventing the Order through its shipments of "line pipe." Saha Thai, a Thai producer that has historically exported standard pipe to the United States and has been subject to the Order since the original investigation, only began to ship merchandise identified as "line pipe" to the United States shortly after it became apparent that the dumping margin applicable to Saha Thai could increase due to the filing of a PMS allegation in the 2016-2017 review of the Order. Saha Thai does not

[54] *See, e.g.*, *Canadian Plate*, 65 Fed. Reg. at 64929.

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918528-02 A-549-502 SCO - Scope Inquiry - Line Pipe

appear to produce line pipe, however, and does not have an API 5L certification, which is the standard that governs line pipe. These factors show that Saha Thai's shipments of "line pipe" are actually comprised of standard pipe that has undergone minor alterations in form or appearance in an attempt to circumvent the Order and avoid duties.

**D. There Is No Reason to Exclude "Line Pipe" from the Scope of the Orders**

The circumvention allegation in this case is not barred by the Federal Circuit's holding in *Wheatland Tube Co. v. United States*.[55] In *Wheatland*, the Federal Circuit upheld Commerce's determination not to conduct a minor alterations inquiry in response to an allegation that exports of API 5L line pipe and dual-certified pipe from Brazil, Korea, and Mexico were circumventing antidumping duty orders on standard pipe from these countries because the exports in question were being sold for use in standard pipe applications.[56] However, the scope of the antidumping orders in that proceeding specifically stated that "{s}tandard pipe that is dual or triple certified/stenciled that enters the U.S. as line pipe of a kind used for oil or gas pipelines is also not included in this investigation."[57] Commerce declined to conduct a minor alterations inquiry, and the Federal Circuit upheld this decision. The Federal Circuit explained that to conduct a minor alterations inquiry, "Commerce would have had to conclude that section 1677j(c) and section 353.29 of the regulations authorize it to interpret the scope of an antidumping order to cover an article that the order expressly and unambiguously excludes from the kind or class of article covered by it."[58]

---

55 *Wheatland Tube Co. v. United States*, 161 F.3d 1365 (Fed. Cir. 1998).

56 *Id.*

57 *Id.*

58 *Id.*

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Here, in contrast to the scope language at issue in *Wheatland*, the scope language of the Order does not expressly and unambiguously exclude line pipe.[59] Thus, there is nothing in the holding of *Wheatland* or the scope of the Order that would prohibit Commerce from determining that the "line pipe" being shipped by Saha Thai should be covered by the Order.

## III. CONCLUSION

For the foregoing reasons, Petitioners respectfully request that Commerce determine that imports of "line pipe" manufactured by Saha Thai are circumventing the Order and that such imports should be treated as subject to the Order with duties imposed accordingly.

---

59 *Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 83 Fed. Reg. 51,927 (Dep't Commerce Oct. 15, 2018).

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

**REQUEST FOR BUSINESS PROPRIETARY TREATMENT**

Petitioners request proprietary treatment for information designated as proprietary in this submission pursuant to Commerce's regulations codified at 19 C.F.R. §§ 351.202(d) and 351.304. Business proprietary information is enclosed in single brackets ("[ ]"). The information for which the Petitioner requests proprietary treatment is located at Exhibit 2 and consists of the names of individuals or organizations that provided price, cost, and other production, freight, sales or market information, information which would tend to identify those individuals or organizations, and other information that would cause harm to the submitters' competitive position. *See* 19 C.F.R. § 351.105(c)(9)).

Respectfully submitted,

/s/ Roger B. Schagrin
Roger B. Schagrin, Esq.
Christopher T. Cloutier, Esq.
Luke A. Meisner, Esq.
**SCHAGRIN ASSOCIATES**
900 Seventh Street, N.W.
Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel to Wheatland Tube Company*

/s/ Alan H. Price
Alan H. Price, Esq.
Robert E. DeFrancesco, III, Esq.
Cynthia C. Galvez, Esq.
Elizabeth S. Lee, Esq.
**WILEY REIN LLP**
1776 K Street, N.W.
Washington, DC 20006
(202) 719-7000

*Counsel to Independence Tube Corp. and Southland Tube, Inc.*

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

## REPRESENTATIVE CERTIFICATION

I, Robert E. DeFrancesco, III, with Wiley Rein LLP, counsel to Independence Tube Corporation, a Nucor company, and Southland Tube, Incorporated, a Nucor company, certify that I have read the attached submission of Request for Circumvention Ruling Pursuant to Section 781(c) of the Tariff Act of 1930, filed on February 1, 2019, pursuant to the Anti-Circumvention Inquiry (Minor Alteration) under the antidumping duty order on *Circular Welded Carbon Steel Pipes and Tubes from Thailand*, Case No. A-549-502. In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. § 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: ______________________
Robert E. DeFrancesco, III

Date: February 1, 2019

14235889.2

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

## COMPANY CERTIFICATION

I, Douglas R. Gunson, Legal Counsel, currently employed by Nucor Corporation, parent company of Independence Tube Corporation and Southland Tube, Incorporated, certify that I prepared or otherwise supervised the preparation of the attached submission of Request for Circumvention Ruling Pursuant to Section 781(c) of the Tariff Act of 1930, filed on February 1, 2019, pursuant to the Anti-Circumvention Inquiry (Minor Alteration) under the antidumping duty order on *Circular Welded Carbon Steel Pipes and Tubes from Thailand*, Case No. A-549-502. I certify that the public information and any business proprietary information of Nucor Corporation and its subsidiaries contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. § 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: ______________________
Douglas R. Gunson

Date: February 1, 2019

13932220.6

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

## Certification

I, Kevin Kelly, currently employed by the Wheatland Tube Company, certify that I have prepared or otherwise supervised the preparation of the *Request for Circumvention Ruling* pursuant to the antidumping duty order on Circular Welded Carbon Steel Pipes and Tubes from Thailand (A-549-502).

I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that I am filing a copy of this signed certification with this submission to the U.S. Department of Commerce and that I will retain the original for a five-year period commencing with the filing of this document. The original will be available for inspection by U.S. Department of Commerce officials.

Signature: [signature]

Date: 1/30/19

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918528-02 A-549-502 SCO - Scope Inquiry - Line Pipe

**Counsel Certification**

I, Luke A. Meisner, counsel to Wheatland Tube Company, certify that I have prepared or otherwise supervised the preparation of the attached *Request for Circumvention Ruling* pursuant to the antidumping duty order on Circular Welded Carbon Steel Pipe and Tubes from Thailand (A-549-502).

In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. § 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: Luke A. Meisner

Date: 1/31/19

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

# CERTIFICATE OF SERVICE

**Circular Welded Carbon Steel Pipes and Tubes from Thailand**
**A-549-502**
**Scope Inquiry**

I, Ariana Mercado, hereby certify that copies of the attached public document were served today, January 31, 2019, via first class mail upon the following parties:

Lizbeth R. Levinson, Esq.
**Kutak Rock LLP**
1101 Connecticut Ave., NW
Suite 1000
Washington, DC 20036-4374

Daniel L. Schneiderman, Esq.
**King & Spalding, LLP**
1700 Pennsylvania Avenue, NW
Washington, DC 20006-4706

McAllister Jimbo, Esq.
**O'Melveny & Myers LLP**
1625 Eye Street, NW
Washington, DC 20006-4001

Frederick P. Waite, Esq.
**Vorys, Sater, Seymour and Pease LLP**
1909 K Street, NW
Ninth Floor
Washington, DC 20006-1152

Ariana Mercado, *Paralegal*
SCHAGRIN ASSOCIATES

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

## LIST OF EXHIBITS

| Exhibit | Description | BPI/Public |
|---|---|---|
| 1 | *Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey*, Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534, and 536, USITC Pub. 4754, I-14-15 (Jan. 2018) (Fourth Review) | Public |
| 2 | Bill of Lading Data | BPI |
| 3 | Memorandum re: Antidumping Duty Administrative Review of Circular Welded Steel Pipes and Tubes from Thailand: Post-Preliminary Decision Memorandum on Particular Market Situation Allegation (Dep't Commerce Aug. 31, 2018) | Public |
| 4 | Saha Thai Website Excerpts | Public |
| 5 | Saha Thai's Section A Questionnaire Response in *Circular Welded Carbon Steel Pipe and Tubes from Thailand (AR 17-18)* (July 27, 2018) (Public Version) | Public |
| 6 | Saha Thai's Section D Questionnaire Response in *Circular Welded Carbon Steel Pipe and Tubes from Thailand* (AR 17-18) (Aug. 28, 2018) (Public Version) | Public |
| 7 | API Website Excerpts | Public |
| 8 | *Large Diameter Welded Pipe from Canada, China, Greece, India, Korea, and Turkey*, Inv. Nos. 701-TA-593-596 and 731-TA-1401-1406, USITC Pub. 4768 (Mar. 2018) (Preliminary Determination) | Public |
| 9 | API Certifications Thailand | Public |
| 10 | Master Pipe Distribution Company Website Excerpts | Public |

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

# EXHIBIT 1

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

# Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey

Investigation Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534, and 536 (Fourth Review)

**Publication 4754** **January 2018**

**U.S. International Trade Commission**

Washington, DC 20436

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

# U.S. International Trade Commission

**COMMISSIONERS**

**Rhonda K. Schmidtlein, Chairman**
**David S. Johanson, Vice Chairman**
**Irving A. Williamson**
**Meredith M. Broadbent**

---

Catherine DeFilippo
***Director of Operations***

---

*Staff assigned*

Amelia Shister, Investigator
Daniel Matthews, Industry Analyst
Brian Allen, Attorney
Nathanael Comly, Supervisory Investigator

**Address all communications to**
**Secretary to the Commission**
**United States International Trade Commission**
**Washington, DC 20436**

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

# U.S. International Trade Commission

Washington, DC 20436
*www.usitc.gov*

# Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey

Investigation Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534, and 536 (Fourth Review)

**Publication 4754** **January 2018**

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

**CONTENTS**

Page

**Determinations** .......... 1

**Views of the Commission** .......... 3

**Information obtained in these reviews** .......... **I-1**

Background .......... I-1

Responses to the Commission's Notice of Institution .......... I-1

Individual responses .......... I-1

Party comments on adequacy .......... I-2

Recent developments in the industry .......... I-3

The original investigation and subsequent reviews .......... I-4

The original investigations .......... I-4

Subsequent five-year reviews .......... I-5

Prior related investigations .......... I-7

Related title VII investigations .......... I-7

Related safeguard investigations .......... I-9

Pending litigation .......... I-11

The product .......... I-11

Commerce's scope .......... I-11

Description and applications .......... I-14

Manufacturing process .......... I-17

U.S. tariff treatment .......... I-18

The definition of the domestic like product .......... I-18

Actions at Commerce .......... I-19

Company revocations .......... I-19

Changed circumstances reviews .......... I-20

Current five-year reviews .......... I-20

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

## CONTENTS


Page

The industry in the United States ........ I-20

U.S. producers ........ I-20

Definition of the domestic industry and related party issues ........ I-21

U.S. producers' trade and financial data ........ I-22

U.S. imports and apparent consumption ........ I-22

U.S. importers ........ I-22

U.S. imports ........ I-23

Apparent U.S. consumption and market shares ........ I-25

Cumulation considerations ........ I-28

The industry in Brazil ........ I-29

The industry in India ........ I-31

The industry in Korea ........ I-33

the industry in Mexico ........ I-35

The industry in Taiwan ........ I-37

The industry in Thailand ........ I-39

The industry in Turkey ........ I-41

Antidumping or countervailing duty orders in third-country markets ........ I-43

The global market ........ I-44

**Appendixes**

A. *Federal Register* notices ........ A-1

B. Company-specific data ........ B-1

C. Summary data ........ C-1

D. Purchaser questionnaire responses ........ D-1


Note.—Information that would reveal confidential operations of individual concerns may not be published and therefore has been deleted. Such deletions are indicated by asterisks.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918528-02 A-549-502 SCO - Scope Inquiry - Line Pipe

**Table I-3 --Continued**
**CWP: Commerce's scope definitions**

| | | |
|---|---|---|
| Turkey | CVD 701-TA-253 | ...certain welded carbon steel pipe and tube with an outside diameter of 0.375 inch or more, but not over 16 inches, of any wall thickness (pipe and tube) from Turkey. These products are currently provided for under the HTS as item numbers 7306.30.10, 7306.30.50, and 7306.90.10.[1] |
| Turkey | AD 731-TA-273 | ...circular welded non-alloy steel pipes and tubes, of circular cross-section, not more than 406.4 millimeters (16 inches) in outside diameter, regardless of wall thickness, surface finish (black, or galvanized, painted), or end finish (plain end, beveled end, threaded and coupled). Those pipes and tubes are generally known as standard pipe, though they may also be called structural or mechanical tubing in certain applications. Standard pipes and tubes are intended for the low-pressure conveyance of water, steam, natural gas, air, and other liquids and gases in plumbing and heating systems, air conditioner units, automatic sprinkler systems, and other related uses. Standard pipe may also be used for light load-bearing and mechanical applications, such as for fence tubing, and for protection of electrical wiring, such as conduit shells. The scope is not limited to standard pipe and fence tubing, or those types of mechanical and structural pipe that are used in standard pipe applications. All carbon steel pipes and tubes within the physical description outlined above are included in the scope of this order, except for line pipe, oil country tubular goods, boiler tubing, cold-drawn or cold rolled mechanical tubing, pipe and tube hollows for redraws, finished scaffolding, and finished rigid conduit. Imports of these products are currently classifiable under the following HTS subheadings: 7306.30.1000, 7306.30.5025, 7306.30.5032, 7306.30.5040, 7306.30.5055, 7306.30.5085, and 7306.30.5090. |

[1] During the third review of this investigation, the Commission did not believe any material within the scope was classifiable in HTS 7306.90.10

Source: Commerce continuation orders (77 FR 41967).

## Description and applications[29]

Steel pipes and tubes are generally produced in various grades of carbon, alloy, or stainless steel. Tubular products frequently are distinguished by the following six end uses as defined by the American Iron and Steel Institute ("AISI").

- *Standard pipe* is ordinarily used for low-pressure conveyance of air, steam, gas, water, oil, or other fluids for mechanical applications. It is used primarily in machinery, buildings, sprinkler systems, irrigation systems, and water wells rather than in pipe lines

[29] Unless otherwise noted, this information is based on *Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey, 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534 and 536*, USITC Publication INV-KK-060, May 2012, pp. I-29 through I-32.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

or utility distribution systems. It may carry fluids at elevated temperatures which are not subject to external heat applications. It is usually produced in standard diameters and wall thicknesses to ASTM specifications.

- *Line pipe* is used for transportation of gas, oil, or water generally in a pipeline or utility distribution system. It is produced to API-5L and American Water Works Association ("AWWA") specifications.

- *Structural pipe and tubing* is generally used for structural or loadbearing purposes above ground by the construction industry, as well as for structural purposes in ships, trailers, farm equipment, and other similar uses. It is produced in nominal wall thicknesses and sizes to ASTM specifications in round, square, rectangular, or other cross-sectional shapes.

- *Mechanical tubing* is produced in a large number of shapes of varied chemical composition. It is not normally produced to meet any specification other than that required to meet the end use. It is produced to meet exact O.D. (outer diameter) and decimal wall thicknesses.

- *Pressure tubing* is used to convey fluids at elevated temperatures or pressures, or both, and is suitable to be subjected to heat applications. It is produced to exact O.D. and decimal wall thicknesses in sizes 0.5 inch to 6 inches O.D. inclusive, usually to specifications such as ASTM.

- *Oil country tubular goods* ("OCTG") are pipe produced to API specifications and used in wells in the oil and gas industries:
  - *Casing* is the structural retainer for the walls of oil or gas wells and covers sizes 4.500 to 20 inches O.D. inclusive.
  - *Tubing* is used within casing oil wells to convey oil to ground level and ordinarily includes sizes 1.050 to 4.500 inches O.D. inclusive.
  - *Drill pipe* is used to transmit power to a rotary drilling tool below ground level and covers sizes to 2.375 to 6.750 inches O.D., inclusive.

Standard pipe of non-alloy steel is the primary product within the scope of these reviews (*see* figure I-1). Standard pipe is intended for the low-pressure conveyance of water, steam, natural gas, air, and other liquids and gases in plumbing and heating systems, air conditioning units, automatic sprinkler systems, and other related uses. Standard pipe may carry liquids at elevated temperatures but may not be subject to the application of external heat. It is made primarily to ASTM A53, A135, and A795 specifications, but can also be made to other specifications, such as British Standard ("BS") 1387. Since these standards often specify required engineering characteristics that overlap, a pipe also can be dual stenciled, meaning that the pipe is stamped with monograms signifying compliance with two different

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

# EXHIBIT 2

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe

Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

# EXHIBIT NOT SUSCEPTIBLE TO PUBLIC SUMMARIZATION

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved

Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

# EXHIBIT 3

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789127-01 A-549-502 REV - Admin Review 3/1/16 - 2/28/17
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-549-502
AR 03/01/2016-02/28/2017
**Public Document**
AD/CVD Operations OVII: TP

August 31, 2018

MEMORANDUM TO: James Maeder
Associate Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations
performing the duties of Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

FROM: Edward Yang
Senior Director, Office VII
Antidumping and Countervailing Duty Operations

SUBJECT: Antidumping Duty Administrative Review of Circular Welded Steel Pipes and Tubes from Thailand: Post-Preliminary Decision Memorandum on Particular Market Situation Allegation

---

## I. Summary

The Department of Commerce (Commerce) is conducting an administrative review of the antidumping duty (AD) order on circular welded steel pipes and tubes (pipes and tubes) from Thailand covering the period of review (POR) March 1, 2016, through February 28, 2017. During the course of this administrative review, Wheatland Tube LLC (the petitioner) alleged that a particular market situation (PMS) existed in Thailand during the POR. We have considered the information contained in the petitioner's allegation, along with comments submitted by interested parties after the *Preliminary Results*,[1] and have determined that there is sufficient evidence to show that the PMS alleged by the petitioner existed in the instant POR.

## II. Background

On February 5, 2018, the petitioner alleged that a PMS existed during the POR in Thailand with respect to hot-rolled coil (HRC), the largest input used to produce pipes and tubes, and that Commerce must use an alternative calculation methodology in place of the reported production costs.[2]

[1] *See Circular Welded Carbon Steel Pipes and Tubes From Thailand: Preliminary Results of Antidumping Duty Administrative Review; 2016–2017*, 83 FR 15127 and accompanying Preliminary Decision Memorandum (PDM) (April 9, 2018) (*Preliminary Results*).
[2] *See* Petitioner's Letter, "Circular Welded Steel Pipes and Tubes from Thailand: Particular Market Situation Allegation" dated February 5, 2018 (Petitioner's February 5, 2018 PMS Allegation).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/31/18 2:14 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved



Barcode:3789437-01 A-549-502 REV - Admin Review 3/1/17 - 2/28/18
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry Line Pipe

On March 21, 2018, we accepted the petitioner's PMS allegation and gave interested parties an opportunity to comment.[3] Pacific Pipe Public Co., Ltd. (Pacific Pipe) and Saha Thai Steel Pipe Public Co., Ltd. (Saha Thai), both mandatory respondents in the instant administrative review, timely filed comments in response to the petitioner's PMS allegation.[4] Additionally, we issued all three mandatory respondents (Pacific Pipe, Saha Thai, and Thai Premium Pipe Co., Ltd. (Thai Premium)) supplemental questionnaires regarding PMS issues.[5] All three respondents filed timely responses to Commerce's supplemental questionnaires.[6] The petitioner, Pacific Pipe, and Saha Thai subsequently filed additional comments regarding the PMS allegation.[7] On April 9, 2018, Commerce published the *Preliminary Results* of the instant administrative review.[8] In the *Preliminary Results*, we stated that, due to the timing of the allegation, we intended to consider the PMS allegations prior to the final results.[9]

## III. Interested Parties' Arguments

### *Petitioner's Arguments*

The petitioner argues that the PMS in Thailand resulted from two sources of distortion to the cost of production (COP) of pipes and tubes during the POR.[10] Both sources pertain to the price of HRC, which is the primary input in the production of CWP in Thailand.[11]

First, the petitioner alleges that domestic subsidies, as evidenced by the U.S. CVD order[12] against Thai HRC producers, distort the domestic prices of HRC. On this basis, the petitioner contends that Commerce should make an upwards adjustment to respondents' acquisition costs for Thai-produced HRC by 2.38 percent.[13] Second, the petitioner argues that dumping, subsidization, and global overcapacity distorted the price of imported HRC in Thailand.

---

[3] *See* Memorandum, "Antidumping Duty Administrative Review: Circular Welded Carbon Steel Pipes and Tubes from Thailand- Deadline for Submission of Factual Information Relating to Particular Market Situation Allegation," dated March 21, 2018.
[4] *See* Pacific Pipe's Letter, "Welded Circular Carbon Steel Pipe and Tube from Thailand: Amended Comments on Particular Market Situation Allegations," dated March 21, 2018 (Pacific Pipe's March 21, 2018 PMS Rebuttal Comments); and Saha Thai's Letter, "Rebuttal Factual Information and Comments on Wheatland's PMS Allegation Circular Welded Steel Pipes and Tubes from Thailand," dated March 28, 2018 (Saha Thai's March 28, 2018 PMS Rebuttal Comments).
[5] *See* Commerce's April 25, 2018 letters to Pacific Pipe, Saha Thai, and Thai Premium, "First Supplemental Questionnaire in the Antidumping Duty Administrative Review of Circular Welded Steel Pipes and Tubes from Thailand."
[6] *See* Pacific Pipe's May 8, 2018 First Supplemental Response (Pacific Pipe's May 8, 2018 1st SQR); Saha Thai's May 14, 2018 First Supplemental Response (Saha Thai's May 14, 2018 1st SQR); and Thai Premium's May 14, 2018 First Supplemental Response (Thai Premium's May 14, 2018 1st SQR).
[7] *See* Petitioner's Letter, "Comments on and Clarifying Factual Information regarding Pacific Pipe and Saha Thai Supplemental Questionnaire Responses" dated May 17, 2018 (Petitioner's May 17, 2018 Comments re: Pacific Pipe's and Saha Thai's 1st SQRs); Saha Thai's Letter, "Request for Rejection of Petitioner's May 17, 2018 Factual Submission" dated May 21, 2018; and Pacific Pipe's Letter, "Request to Reject Petitioner's Unsolicited New Factual Information" Dated June 1, 2018.
[8] *See Preliminary Results,* 83 FR at 15129, and accompanying PDM.
[9] *Id.*, and accompanying PDM at 4.
[10] *See* Petitioner's February 5, 2018 PMS Allegation.
[11] *See* Petitioner's February 5, 2018 PMS Allegation.
[12] *See Final Affirmative Countervailing Duty Determination: Certain Hot-Rolled Carbon Steel Flat Products from Thailand*, 66 FR 50410 (October 3, 2001) (*HRC from Thailand Order*).
[13] *See* Petitioner's February 5, 2018 PMS Allegation at 11.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 12/31/18 12:14:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3918328-02 A-549-502 SCO - Scope Inquiry T/4 Line Pipe

Specifically, the petitioner maintains that global overcapacity drove a large surge of injuriously priced imports of HRC into Thailand, and the GOT reacted by imposing antidumping and safeguard duties on imports of HRC from numerous countries. The petitioner alleges that the GOT cited the increase in imports due to overcapacity when it reported the imposition of safeguard duties to the WTO.[14] The GOT determined that imports of HRC had increased at the expense of the domestic industry, driving down production, capacity utilization, profits, and employment.[15] The petitioner claims that the second alleged source of the PMS results in the reported cost of producing exported pipes and tubes not accurately reflecting the COP of pipes and tubes in the ordinary course of trade. On this basis, the petitioner contends that Commerce should make an upward adjustment to respondents' acquisition costs for imported HRC by the sum of all antidumping and safeguard duties imposed on imported HRC by the GOT during the POR.[16]

Lastly, the petitioner claims that domestic Thai prices for HRC are distorted as a result of the GOT's monitoring of domestic steel prices, which is "designed" to prevent Thai HRC producers from raising prices. The petitioner claims that the GOT's monitoring activities benefit Thai producers of pipes and tubes and other downstream products because the monitoring activity is designed to prevent Thai HRC producers from raising their prices.[17]

***Saha Thai's and Pacific Pipe's Arguments***

Saha Thai and Pacific Pipe each note that the CVD order on Thai hot-rolled carbon steel flat products[18] covered the POI of 1999, and argue that the PMS allegation has not shown how these "ancient" subsidies are evidence that either company's HRC costs were distorted in the current POR.[19] Saha Thai also contends that because Commerce determined that the average useful life (AUL) in the steel industry was 15 years in the underlying investigation, any benefit from the nonrecurring subsidy (IPA Duty exemption on Machinery) was extinguished prior to the POR and that benefits from the IPA Tax Deduction program expired prior to the POR.[20] Finally, Pacific Pipe argues that it does not purchase HRC from Thai producers that were found to benefit from Thai government subsidies.[21]

Saha Thai also argues that global steel overcapacity, and in particular HRC, does not meet the statutory criteria of a PMS because it is not unique to the Thai market, and, thus, it is not a

---

[14] The GOT stated that this "significant increase of imports was attributed to the adverse effect of global economic slowdown resulting from the Euro-Zone crisis and the recession in the United States causing the oversupply of steel products in the countries of major steel producers. Hence, the major steel producers needed to export their products to other possible markets, including Thailand, to absorb the oversupply products available in their home countries and to utilize their excessive capacities." *See* Thailand, Notification under Articles 12.1(B), 12.1(C), and 9, Footnote 2, of the Agreement on Safeguards, G/SG/N/8/THA/3, G/SG/N/10/THA/3, G/SG/N/11/THA/4 (Jan. 15, 2015) (Thailand Safeguard Notification) at 4 of Exhibit 17 of Petitioner's February 5, 2018 PMS Allegation.

[15] *Id.*, at 2-4.

[16] *See* Petitioner's February 5, 2018 PMS Allegation at 19.

[17] *See* Petitioner's February 5, 2018 PMS Allegation at 9.

[18] *See HRC from Thailand Order*.

[19] *See* Pacific Pipe's March 21, 2018 PMS Rebuttal Comments at 2-3 and Saha Thai's March 28, 2018 PMS Rebuttal Comments at 3-4.

[20] *See* Pacific Pipe's March 21, 2018 PMS Rebuttal Comments at 2 and Saha Thai's March 28, 2018 PMS Rebuttal Comments at 3-6.

[21] *See* Pacific Pipe's March 21, 2018 PMS Rebuttal Comments at 2-3.

Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789127-05 A-549-502 REV - Admin Review 3/1/16 - 2/28/17
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry/Anti Circumvention Inquiry - Line Pipe

condition that is outside of the ordinary course of trade.[22] Additionally, Saha Thai argues that Commerce has repeatedly found it impossible to quantify the effects of global steel overcapacity on an individual producer's COP.[23] Saha Thai also argues that Commerce should not rely on the GOT's antidumping and safeguard duties to quantify the magnitude of PMS distortions because Commerce has consistently ruled that it is inappropriate to rely on determinations made by other administering authorities.[24]

## IV. Legal Framework

Section 504 of the Trade Preferences Extension Act of 2015 (TPEA)[25] added the concept of "particular market situation" in the definition of the term "ordinary course of trade" for purposes of constructed value (CV) under section 773(e) of the Tariff Act of 1930, as amended (the Act), and through these provisions for purposes of the COP under section 773(b)(3) of the Act. Section 773(e) of the Act states that "if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the COP in the ordinary course of trade, the administering authority may use another calculation methodology under this subtitle or any other calculation methodology." The statute does not define "particular market situation," but the SAA explains that such a situation may exist for sales "where there is government control over pricing to such an extent that home market prices cannot be considered competitively set."[26] Prior to the TPEA, in a limited number of cases, Commerce found that particular market situations existed and, as a result, declined to use an entire market for purposes of calculating NV, as provided for in section 773(a)(1) of the Act and section 351.404(c)(2) of Commerce's regulations.[27] More recently, Commerce determined that particular market situations existed which distorted the domestic costs of major inputs used in the production of subject merchandise.[28]

## V. Analysis

Commerce finds that a PMS existed in Thailand during the POR with regard to the cost of HRC as a component of the COP. Commerce notes that the acquisition costs of HRC constitute 80-90

---

[22] *See* Saha Thai's March 28, 2018 PMS Rebuttal Comments at 6-7.
[23] *Id.* at 7.
[24] *Id.* at 8.
[25] *See Trade Preferences Extension Act of 2015*, Pub. L. No. 114-27, 129 Stat. 362 (2015) (TPEA).
[26] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, vol. 1 (1994) (SAA) at 822.
[27] Examples of investigations or reviews where we have found a sales-based particular market situation include *Notice of Final Determination of Sales at Less Than Fair Value: Fresh Atlantic Salmon from Chile*, 63 FR 31411 (June 9, 1998); *Mechanical Transfer Presses from Japan; Final Results of Antidumping Duty Administrative Review and Revocation of Antidumping Duty Administrative Order in Part*, 63 FR 37331 (July 10, 1998); and *Notice of Final Results of the Ninth Administrative Review of the Antidumping Duty Order on Certain Pasta from Italy*, 72 FR 7011 (February 14, 2007).
[28] *See, e.g.*, *Certain Oil Country Tubular Goods from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 FR 18105 (April 17, 2017) (*OCTG Korea 14-15*), and accompanying Issues and Decision Memorandum at 40-41; *Biodiesel from Indonesia: Preliminary Affirmative Determination of Sales at Less Than Fair Value*, 82 FR 50379 (October 31, 2017) and accompanying Preliminary Decision Memorandum at 18-24, unchanged in *Biodiesel From Argentina: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 83 FR 8837 (March 1, 2018).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 3/1/19 12:14 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3918328-02 A-549-502 SCO - Scope Inquiry 1/4 Line Pipe

percent of the production of the subject merchandise and the foreign like product.[29] Therefore, any price distortion in the Thai HRC market may have a significant impact on normal value.

### A. The Government of Thailand's Subsidization of Hot-Rolled Coil

The record shows that Commerce has found that the GOT subsidizes all Thai HRC producers.[30] Consequently, Pacific Pipe's argument that it did not purchase HRC from a Thai producer that Commerce found to benefit from GOT subsidies is without merit. In addition, we find that the respondents' arguments regarding the "extinguishment" of GOT subsidies prior to the instant POR are not supported by the information on the record because all imports of HRC from Thailand into the United States remain subject to a CVD rate of 2.38 percent.[31]

### B. Distorted Import Prices of Hot-Rolled Coil Because of Dumping, Subsidization, and Global Overcapacity

As a result of the significant global overcapacity in steel production, which stems, in part, from the distortions and interventions prevalent in the Chinese economy, the Thai steel market has been flooded with imports of cheap steel products, including HRC, from multiple countries, including China.[32] To level the playing field in Thailand and stop the injury to Thai domestic HRC producers, the GOT imposed antidumping and safeguard measures.[33] The GOT imposed antidumping and safeguard duties on imported HRC during the POR, and the record evidence shows that these measures were intended to impact the acquisition cost of HRC imported into the Thai market.[34]

Additionally, the respondents reported that they did not ultimately pay antidumping or safeguard duties on the imported HRC used to produce exported subject merchandise and, therefore, the payment of such duties was not reflected in the COP of the pipes and tubes producers in this POR. Saha Thai reported that it paid the duties and was reimbursed through the use of duty drawback.[35] However, neither Pacific Pipe nor Thai Premium provided an explanation, such as duty drawback or use of an Foreign Trade Zone (FTZ), for the reimbursement or nonpayment of the antidumping and safeguard duties.[36] Thus, none of the respondents reported payment (or non-reimbursed payment) of these antidumping or safeguard duties on imported HRC.[37] Moreover, none of the respondents included payment of these antidumping or safeguard duties in

---

[29] *See*, *e.g.*, Saha Thai Section A Response (Public Version) (July 31, 2017) at 27.
[30] *See HRC from Thailand Order*.
[31] The CVD order was continued in the most recent sunset review with a CVD rate likely to prevail of 2.38%. *See Certain Hot-Rolled Carbon Steel Flat Products From India, Indonesia, and Thailand: Final Results of Expedited Sunset Reviews*, 78 FR 16252 (March 14, 2014).
[32] *See* Thailand Safeguard Notification at 4 of Exhibit 17 of Petitioner's February 5, 2018 PMS Allegation.
[33] *See* Thailand Safeguard Notification at 4 of Exhibit 17 of Petitioner's February 5, 2018 PMS Allegation.
[34] *Id.* at 2-4.
[35] *See* Saha Thai Section C Response (Public Version) (August 17, 2017) at 14-15 and 43.
[36] "Pacific Pipe did not receive duty drawback on sales of subject merchandise." *See* Pacific Pipe's initial Section C Questionnaire Response (August 18, 2017) at 28. "Not applicable." *see* Thai Premium's Initial Section C Questionnaire Response (August 17, 2017) at 35 (in response to the question re: duty drawback).
[37] *See* Thai Premium's Initial Section D Questionnaire Response (August 17, 2017) at 19; Saha Thai's Initial Section D Questionnaire Response (August 17, 2017) at 15; and Pacific Pipe's Initial Section D Questionnaire Response (August 18, 2017) at 33.

Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789427-05 A-549-502 REV - Admin Review 3/1/16 - 2/28/17
Barcode:3918328-02 A-549-502 SC0 - Scope Inquiry Thai Line Pipe

their COPs.[38] Given that these antidumping and safeguard duties are not being paid or, if paid, are being reimbursed, the measures implemented by the GOT to address the price distortions and injury caused by global steel overcapacity are not being remedied.[39]

### C. Quantifying the Impact of the Particular Market Situations

In addition to finding that a PMS existed in Thailand during the POR with respect to the costs for the HRC input, Commerce has determined that there is sufficient evidence to quantify the impact of the PMS. In quantifying the impact, Commerce has determined to make an upward adjustment to the respondents' reported costs for HRC. Specifically, the acquisition cost for all HRC (domestic and imported) will be increased by the CVD rate on HRC and by the GOT's safeguard duty rate. In addition, the acquisition cost for HRC imported from countries that are subject to GOT AD orders will be increased by the amount of the applicable AD duty rate.[40]

We preliminarily find that these rates appropriately quantify the impact of the PMS for HRC in Thailand. Further, Commerce notes that excess steel-production capacity has created market distortions across the globe.[41] Excess steel-production capacity causes significant market distortions and contributes to the downturn in global steel markets, including significant price suppression, displaced markets, unsustainable capacity utilization, negative financial performance, shutdowns, and lay-offs.[42] The deterioration in steel demand, along with continued production capacity expansion, are likely to place further pressure on country-specific steel markets and create incentives for government interventions which will further distort the production costs and prices for a wide range of steel products.[43]

---

[38] *See* Thai Premium's Initial Section D Questionnaire Response (August 17, 2017) at 19; Saha Thai's Initial Section D Questionnaire Response (August 17, 2017) at 15; and Pacific Pipe's Initial Section D Questionnaire Response (August 18, 2017) at 33.

[39] *See* Saha Thai Section C Response (Public Version) (August 17, 2017) at 14-15 and 43; Pacific Pipe's Initial Section C Questionnaire Response (August 18, 2017) at 28; and Thai Premium's Initial Section C Questionnaire Response (August 17, 2017) at 35.

[40] *See* Analysis Memorandum for the Post-Preliminary Results of the Antidumping Duty Administrative Review of Circular Welded Steel Pipes and Tubes from Thailand: Thai Premium Pipe Company Ltd. (Thai Premium), Analysis Memorandum for the Post-Preliminary Results of the Antidumping Duty Administrative Review of Circular Welded Steel Pipes and Tubes from Thailand: Saha Thai Steel Pipe Public Co., Ltd. (Saha Thai); and Analysis Memorandum for the Post-Preliminary Results of the Antidumping Duty Administrative Review of Circular Welded Steel Pipes and Tubes from Thailand: Pacific Pipe Public Co., Ltd. (Pacific Pipe), dated concurrently with this memorandum.

[41] *See, e.g.*, *Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: Preliminary Results of Antidumping Duty Administrative Review; 2015- 2016*, 82 FR 57583 (December 6, 2017) (*OCTG from Korea Prelim*) and accompanying Preliminary Decision Memorandum at 14.

[42] *Id.*

[43] *Id.*

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/18 12:14:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 ARP - Admin Review 8/1/16 - 7/31/17 - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry 1/4 - Line Pipe

## VI. CONCLUSION

We recommend finding a particular market situation with respect to HRC in Thailand during the POR, and to adjust each respondent's reported acquisition cost for HRC in Commerce's dumping calculations.

| ☒ | ☐ |
|---|---|
| Agree | Disagree |

8/31/2018

X James Maeder

Signed by: JAMES MAEDER

James Maeder
Associate Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations
performing the duties of Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

7

Filed By: rschagrin@schagrinassociates.com, Filed Date: 8/31/18 2:41:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

# EXHIBIT 4

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918528-02 A-549-502 SCO - Scope Inquiry - Line Pipe

HOME

## NEW UPDATE!

Saha Thai Steel Pipe Piblic Co., Ltd. was incorporated in April 1, 1968 with a registered capital of Baht 3,000,000 to a group of more than 30 furniture manufacturers. Readmore..

The company's products can be divided into 3 major groups, which are black steel pipe, galvanized steel pipe, and steel pipe material, proportionately accounted for 49.2%, 31.2%, and 0.2% of total sales in 2004 respectively. Readmore..

Securities of the Company Registered capital Issued and paid-up capital As at March 31, 2009, the registered capital of 1,000,000,000 Baht consists of 1,000,000,000 ordinary shares with a par value of Baht 1.00 Readmore..

Include pictures of the launch. United Thai Steel Pipe Branch, Wang Noi, Phra Nakhon Si Ayutthaya Province, 21 September 2009 Readmore..

## INVESTOR

Copyright © 2010, **Saha Thai Steel Pipe Public Co., Ltd.**

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved





Barcode:3789121-01 A-549-502 CIRC Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line-Pipe

TH | EN

SAHA THAI STEEL PIPE PUBLIC COMPANY LIMITED

HOME | CORPORATE | PRODUCTS | INVESTOR | KNOWLAGE | DEALER | JOB | CONTACT US

Title_01.swf

Products - Productions Process

## PRODUCTS

- Productions Process
- Product Capability
- Steel Grades
- Specifications

### Productions Process

Zoom View

HOME | CORPORATE | PRODUCTS | INVESTOR | KNOWLAGE | DEALER | JOB | CONTACT US

Copyright © 2010, **Saha Thai Steel Pipe Public Co., Ltd**

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Total Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved







Barcode:3789121-01 A-549-502 CIRC Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

Products - Productions Process

HOME | CORPORATE | PRODUCTS | INVESTOR | KNOWLAGE | DEALER | JOB | CONTACT US

Copyright © 2010, **Saha Thai Steel Pipe Public Co., Ltd**

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Tona Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved









Barcode:3789121-01 A-549-502 CIRC Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

Products - Productions Process

HOME | CORPORATE | PRODUCTS | INVESTOR | KNOWLAGE | DEALER | JOB | CONTACT US

Copyright © 2010, **Saha Thai Steel Pipe Public Co., Ltd**

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Tonu Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved





Barcode:3789121-01 A-549-502 CIRC Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line-Pipe

Products - Productions Process

HOME | CORPORATE | PRODUCTS | INVESTOR | KNOWLAGE | DEALER | JOB | CONTACT US

Copyright © 2010, **Saha Thai Steel Pipe Public Co., Ltd**

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved



12/12/2018 Case 1:20-cv-00133-SAV Document 40 Filed 05/07/21 Page 866 of 1077
:SAHA THAI STEEL PIPE PCL:
Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

TH
EN
SAHA THAI STEEL PIPE PUBLIC COMPANY LIMITED
HOME
CORPORATE
PRODUCTS
INVESTOR
KNOWLAGE
DEALER
JOB
CONTACT US
OVER 42 YEARS
EXPERIENCES
HIGH
QUALITY
PRODUCTS
Title_01.swf

Products - Product Capability

PRODUCTS
Productions Process
Product Capability
Steel Grades
Specifications

## Product Capability

The Company's products can be divided into 3 major groups, which are black steel pipe, galvanized steel pipe, and furniture steel pipe, proportionately accounted for 49.2%, 31.2% and 0.2% of total sales in 2004 respectively.

### Black Steel Pipe

Hot rolled coil is treated to a high-frequency electric resistance welding process which produces either round, square or rectangular steel pipes of a standard 6-meter length. Black steel pipes are widely used in construction and in other industrial projects.

HOME | CORPORATE | PRODUCTS | INVESTOR | KNOWLAGE | DEALER | JOB | CONTACT US

Copyright © 2010, **Saha Thai Steel Pipe Public Co., Ltd**

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Tona Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved
http://sahathai.com/en/capability.htm 1/1



Barcode:3789121-01 A-549-502 CIRC Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line-Pipe

SAHA THAI STEEL PIPE PUBLIC COMPANY LIMITED
HOME
CORPORATE
PRODUCTS
INVESTOR
KNOWLAGE
DEALER
JOB
CONTACT US
OVER 42 YEARS
EXPERIENCES
HIGH
QUALITY
PRODUCTS
Title_01.swf

Products - Product Capability

PRODUCTS
Productions Process
Product Capability
Steel Grades
Specifications

## Product Capability

### Galvanized steel pipe

Galvanized steel pipe is produced by passing black steel pipe through a hot dip galvanizing process to ensure rust-free protection. Because of their durability, galvanized steel pipes are most often used for water pipelines, air conditioning systems and many other applications. STS galvanized steel pipe is produced in 3 varieties - round, square and rectangular. All in a standard 6-meter length.

### Furniture steel pipe

Cold rolled coil is process through a high-frequency electric resistance welding process to produce smooth-

HOME | CORPORATE | PRODUCTS | INVESTOR | KNOWLAGE | DEALER | JOB | CONTACT US

Copyright © 2010, **Saha Thai Steel Pipe Public Co., Ltd**

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Tona Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved





Barcode:3789121-01 A-549-502 CIRC Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

Products - Product Capability

## Furniture steel pipe

Cold rolled coil is process through a high-frequency electric resistance welding process to produce smooth-surfaced, white furniture steel pipes of different shapes such as circular, oval, semi-oval, square and rectangular.

## Blue-painted steel pipe

Steel pipes pre-coated for anti-rust protection by fully automated machines. The finished blue painted steel pipes are resistant to rust, are durable and eye-pleasing. They are suitable for common constructions

HOME | CORPORATE | PRODUCTS | INVESTOR | KNOWLAGE | DEALER | JOB | CONTACT US

Copyright © 2010, **Saha Thai Steel Pipe Public Co., Ltd**

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Tona Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved



12/12/2018 Case 1:20-cv-00133-SAV Document 40 Filed 05/07/21 Page 869 of 1077
:SAHA THAI STEEL PIPE PCL:
Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

SAHA THAI STEEL PIPE PUBLIC COMPANY LIMITED
HOME
CORPORATE
PRODUCTS
INVESTOR
KNOWLAGE
DEALER
JOB
CONTACT US
OVER 42 YEARS
EXPERIENCES
HIGH
QUALITY
PRODUCTS
Title_01.swf

Products - Product Capability

PRODUCTS
Productions Process
Product Capability
Steel Grades
Specifications
Product Capability
semi oval, square and rectangular.

## Blue-painted steel pipe

Steel pipes pre-coated for anti-rust protection by fully automated machines. The finished blue painted steel pipes are resistant to rust, are durable and eye-pleasing. They are suitable for common constructions such as roofs, scaffolds, columns, beams, doors, fences and general decorative installations. We produce round, square and rectangular blue painted steel pipes of standard 6-meter length.

HOME | CORPORATE | PRODUCTS | INVESTOR | KNOWLAGE | DEALER | JOB | CONTACT US

Copyright © 2010, **Saha Thai Steel Pipe Public Co., Ltd**

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Tona Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

http://sahathai.com/en/capability.htm 1/1





Barcode:3789121-01 A-549-502 CIRC Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

TH EN

SAHA THAI STEEL PIPE PUBLIC COMPANY LIMITED

HOME | CORPORATE | PRODUCTS | INVESTOR | KNOWLAGE | DEALER | JOB | CONTACT US

OVER 42 YEARS
EXPERIENCES
HIGH
QUALITY
PRODUCTS

Title_01.swf

Products - Steel Grades

## PRODUCTS

- Productions Process
- Product Capability
- Steel Grades
- Specifications

## Steel Grades

Product quality is what all of us at STS strictly believe in and adhere to. We are always active in implementing the latest, most advanced technologies in our production in order to achieve ever-improving quality. This is simply the reason why STS has become a trusted name highly regarded for quality be satisfied customers throughout Thailand and beyond.

Domestic standard certifications
The Thai Industrial Standards Institute (TISI), Ministry of Industry, has certified STS with the following accreditations:
TIS 276 - 2532 Steel pipes
TIS 277 - 2532 Galvanized steel pipes
TIS 107 - 2533 Hollow structural steel sections
TIS 1228 - 2549 Cold formed structural steel sections lip channel steel

International standard certifications
ASTM (American Society for Testing and Materials)
JIS (Japanese Industrial Standards)
DIN (Deutsches Institut fur Normung)
BS (British Standard)
UL (Underwriters Laboratories Inc R)
AS/NZS (Australian Standard / New Zealand Standard)
API (American Petroleum Institute)

Saha Thai Steel Pipe Public Co., Ltd. is ISO 9001 : 2008 certified by Bureau Veritas Quality International (BVQI) for quality management under the "Quality Products, On-time Delivery, Satisfied Customers" policy.

HOME | CORPORATE | PRODUCTS | INVESTOR | KNOWLAGE | DEALER | JOB | CONTACT US

Copyright © 2010, Saha Thai Steel Pipe Public Co., Ltd
Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

Products - Specifications

## Specification

Black steel pipe and galvanized steel pipe of the Company can be separated in 3 usages which are

### Steel pipe for water and other liquid supply

Black steel pipe and galvanized steel pipe are used as pipe for water supply in high buildings such as water supply pipe, fire extinguisher pipe, and pipe for air conditioner system because of its advantages in taking high pressure and strength which is 5 times than PVC products.

### Steel pipe for structure works

Black steel pipe and galvanized steel pipe in various shapes are getting more attention in structure works such as pylons, beams, work platform, and roof structures, to substitute woods, concrete, and various structural steel because of its advantages in strength, duration, light weight, easy to weld, and architectural beauty. So it can save time and cost for construction work. Structural steel pipe can bear push and

HOME | CORPORATE | PRODUCTS | INVESTOR | KNOWLAGE | DEALER | JOB | CONTACT US

Copyright © 2010, **Saha Thai Steel Pipe Public Co., Ltd**

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Tona Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved





Barcode:3789121-01 A-549-502 CIRC Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

Products - Specifications

Specification

platform, and roof structures, to substitute woods, concrete, and various structural steel because of its advantages in strength, duration, light weight, easy to weld, and architectural beauty. So it can save time and cost for construction work. Structural steel pipe can bear push and pull presure better than PVC pipes since the hot-roll steel sheet used as raw material for structural steel pipe contain very high carbon and the production process is under stricter control.

Steel pipe for general use

In addition to its use as water pipe and structural steel pipe, the steel pipes can be used in other works such as electricity line pine, fencing and door work of buildings, and other decoration works. Our black steel pipe and galvanized steel pipe are used in the following sample construction projects underground trains, BTS sky train, Suvarnabhum Airport, and the Siam Paragon.

HOME | CORPORATE | PRODUCTS | INVESTOR | KNOWLAGE | DEALER | JOB | CONTACT US

Copyright © 2010, **Saha Thai Steel Pipe Public Co., Ltd**

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved





TH EN

SAHA THAI STEEL PIPE PUBLIC COMPANY LIMITED

HOME | CORPORATE | PRODUCTS | INVESTOR | KNOWLAGE | DEALER | JOB | CONTACT US

Title_01.swf

Products - Specifications

## PRODUCTS

- Productions Process
- Product Capability
- Steel Grades
- Specifications

### Specification

Steel pipe for general use

In addition to its use as water pipe and structural steel pipe, the steel pipes can be used in other works such as electricity line pine, fencing and door work of buildings, and other decoration works. Our black steel pipe and galvanized steel pipe are used in the following sample construction projects underground trains, BTS sky train, Suvarnabhum Airport, and the Siam Paragon.

HOME | CORPORATE | PRODUCTS | INVESTOR | KNOWLAGE | DEALER | JOB | CONTACT US

Copyright © 2010, **Saha Thai Steel Pipe Public Co., Ltd**



Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

# EXHIBIT 5

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved



Barcode:3789123-02 A-549-502 CIRC - Anti-Circumvention Inquiry 2/28/18 Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry 1/4 Line Pipe

**Curtis, Mallet-Prevost, Colt & Mosle LLP**

Almaty
Ashgabat
Astana
Beijing
Buenos Aires
Dubai
Frankfurt
Geneva
Houston
London
Mexico City
Milan
Muscat
New York
Paris
Rome

1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

**Telephone +1 202 452 7373**
**Facsimile +1 202 452 7333**
www.curtis.com

**Daniel L. Porter**
Tel: +1 202 452 7340
Fax: +1 202 452 7333
E-Mail: dporter@curtis.com

July 27, 2018

**Public Version**

Case No.: A-549-502

No. Pages: 394

Status: Administrative Review
(POR: 3/1/17 – 2/28/18)

This proceeding is conducted by Enforcement & Compliance, AD/CVD Operations/ VII

This submission contains Saha Thai's business proprietary information on pages 3, 8, 10-12, 19-24, 27, 29, 31 and 35 of the narrative, and in Exhibits A-1 through A-6, and A-8 through A-13. This information has been ranged or redacted from the public version.

This submission may be released under APO.

The Honorable Wilbur Ross
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/Dockets Unit, Room 18022
14th Street & Constitution Avenue, N.W.
Washington, D.C. 20230

Re: *Saha Thai's Section A Questionnaire Response*
Circular Welded Carbon Steel Pipe and Tubes from Thailand (AR 17-18)

Dear Secretary Ross:

On behalf of Saha Thai Steel Pipe Public Co., Ltd. ("**Saha Thai**"), we hereby submit a response to the Department's *Section A questionnaire* issued on June 25, 2018 in the above

Filed By: rschagrin@schagrinassociates.com, Filed Date: 7/27/18 ... PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

development, production, sale and/or distribution of the merchandise under review be sufficiently detailed to provide the Department with a good working understanding of how these units function within the company.

**ANSWER**: A copy of Saha Thai's organizational chart is provided in **Exhibit A-2**. Saha Thai's organizational structure is not broken down by product or families of products.

b. Provide a list of all the production facilities, sales office locations, research and development facilities and administrative offices involved in the development, production, sale and/or distribution of the merchandise under review operated by your company and its affiliates. Please briefly describe the purpose of each. Provide a complete address and telephone number for each of these plants, offices, and other facilities.

**ANSWER**: Saha Thai has two pipe production facilities in Thailand. The first facility is located in Samutprakarn, Thailand (approximately 20 kilometers outside of Bangkok) at the following address:

78 Moo, 3 Poochao Road
Bangyapraek, Prapradaeng
Sumutprakarn, Thailand 10130

At this facility, Saha Thai produces and markets carbon steel pipe and tube (black, painted and galvanized), furniture tube, square and rectangular tube, and flat bar. The main production equipment include: coil slitting machines, tubular forming/welding lines, a galvanizing tank and auxiliary equipment, painting machines, testing equipment, packing and warehousing facility. Senior management and administrative operations, including accounting, purchases, and sales, are also located at this facility.

A second pipe production facility started producing during 2010 and is located in Wagnoi (near Ayutthaya, Thailand) at the following address:

224 Moo 5 Lamsai
Wangnoi, PhraNakhon
Si Ayutthaya, Thailand 13170

Filed By: Tom Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789127-35772-540-56245 TRC - Anti-Circumvention Inquiry 2/28/18 Line Pipe
Barcode:3918328-02 A-549-502 ADM - Scope Inquiry 7/4 Line Pipe

PUBLIC VERSION

In Wagnoi facility, Saha Thai produces black and painted carbon steel pipe and tube, rectangular tube, flat bar, metal sheet and corrugated roofing material. The main production equipment in Wagnoi consists of coil slitting machines and tubular forming/welding lines, painting machines, testing equipment, packing and warehousing facilities. Although Saha Thai produces the merchandise under review at two separate sites, the two plants are treated as one production unit for accounting purposes. That is, Saha Thai does not prepare separate profit and loss statements or production costs summaries by plant.

During the POR, C-shapes sold in the home market and the painting of certain pipe sold in the home market and certain third-country markets was done at an off-site location in the Samutprakarn area; however, for accounting purposes, Saha Thai incorporates expenses for this facility into its consolidated financials.

In addition to producing pipe and tube, Saha Thai on occasion engages in related business activities, including the purchase and resale of hot-rolled carbon steel sheets in coils, seamless pipe & tube, rebar etc. and the occasional provision of steel slitting and galvanizing services to outside companies.

Sahathai Terminal Co., Ltd. ("Sahathai Terminal") provides Saha Thai and other companies with port handling and warehousing services, primarily for import and export operations. Sahathai Terminal is located across the road from the Sumatprakarn plant. Prior to February 2015, Sahathai Terminal was wholly-owned by Saha Thai; however, in February 2015, Sahathai Terminal was sold to the owners of Saha Thai. Thus, it remains an affiliated party, even though it is no longer owned directly by Saha Thai. Saha Thai Terminal has sold its shares to the public in 2017 and is now listed in the Stock Exchange of Thailand.

Filed By: ecbegr@schagrinassociates.com, Filed Date: 7/31/18 1:31 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

# EXHIBIT 6

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved



Barcode:3918328-02 A-549-502 SCO - Scope Inquiry 1/4 Line Pipe

**Curtis, Mallet-Prevost, Colt & Mosle LLP**

Almaty
Ashgabat
Astana
Beijing
Buenos Aires
Dubai
Frankfurt
Geneva
Houston
London
Mexico City
Milan
Muscat
New York
Paris
Rome

1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

**Telephone +1 202 452 7373**
**Facsimile +1 202 452 7333**
www.curtis.com

**Daniel L. Porter**
Tel: +1 202 452 7340
Fax: +1 202 452 7333
E-Mail: dporter@curtis.com

August 28, 2018

**<u>Public Version</u>**

Case No.: A-549-502

No. Pages: 134

Status: Administrative Review
(POR: 3/1/17 – 2/28/18)

This proceeding is conducted by Enforcement & Compliance, AD/CVD Operations/ VII

This submission contains Saha Thai's business proprietary information on pages 10, 11, 12, 14, 22, 23, 28, 29, 32, 34, 37, 42, 43 and 48-51 of the narrative; and in Exhibits D-1a through D-5 and D-7 through D-14. This information has been ranged or redacted from the public version.

This submission may be released under APO.

The Honorable Wilbur Ross
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/Dockets Unit, Room 18022
14th Street & Constitution Avenue, N.W.
Washington, D.C. 20230

Attn: Toni Page

Re: *Saha Thai's Section D Questionnaire Response*
<u>Circular Welded Carbon Steel Pipe and Tubes from Thailand (AR 17-18)</u>

Dear Secretary Ross:

On behalf of Saha Thai Steel Pipe Public Co., Ltd. ("**Saha Thai**"), we hereby submit a response to the Department's *Section D questionnaire* issued on June 25, 2018 in the above

Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789127-01 A-549-502 REV - Admin Review 3/1/17 - 2/28/18 / Anti-Circumvention Inquiry / Line Pipe
PUBLIC VERSION

B. Constructed Value

Constructed value is the weighted-average CONNUM specific cost of the product sold by your company in the U.S. market, plus an amount for profit. Because CV is a type of normal value, selling, general and administrative (SG&A) expenses and profit are computed as if the merchandise had been sold in your comparison market.[2] Unless otherwise instructed by the Department, you should report per-unit CV information for each CONNUM included in your U.S. market sales listing submitted in response to section C of this questionnaire.

C. Reporting Period for Cost of Production and Constructed Value

Calculate reported COP and CV figures based on the actual costs incurred by your company during the period of review (POR), as recorded under your company's normal accounting system.[3] If you have any questions regarding the appropriate cost calculation period for the merchandise under consideration, notify the Department in writing before preparing your response to this section of the questionnaire.

**ANSWER**: The reported COP and CV figures, set forth in **Exhibit D-1a** and the accompanying electronic files, are based on actual costs incurred by Saha Thai during the POR, as recorded under Saha Thai's normal accounting system.

D. Weighted-Average COP and CV

Please report per-unit cost information (i.e., a per-unit cost per CONNUM) for all merchandise under consideration produced by your company corresponding to those CONNUMs reported in your responses to Sections B and C of this questionnaire.[4] Ensure that each CONNUM included in your comparison market or U.S. sales listing has a corresponding CONNUM-specific cost reported in response to this section of the questionnaire. Calculate reported COP and CV figures on a weighted-average basis using the CONNUM specific production quantity, regardless of market sold, as the weighting factor. Thus, each CONNUM should be assigned only one cost, regardless of the market or markets in which the product(s) were sold. If more than one unique product produced at a domestic facility falls within the definition of a specific CONNUM, determine first the weighted-average CONNUM specific costs at that facility; then calculate the company-wide weighted-average CONNUM specific costs. If you have any questions regarding how to compute the

[2] If you did not sell the foreign like product in the comparison market and thus are relying on CV as the basis for normal value, please notify the Department in writing.
[3] If your company's fiscal year ends within three months of the POR and you want to report COP and CV based on your company's fiscal year, you must contact the official in charge within 14 days after receipt of the initial questionnaire. See 19 CFR 351.301(c)(2)(iv).
[4] Throughout the questionnaire, whenever we refer to the merchandise under consideration we are referring generally to all products within the scope of the review that your company sold in any market. When we use the term subject merchandise, we are referring to products sold to the United States. When we use the term foreign like product, we are referring to products sold in your home market or exported to a country other than the United States. Note we consider merchandise under consideration, products under review, and merchandise under review to be synonymous. We have provided a description of the merchandise included in the review in Appendix III.

Filed By: tom.page@schagrinassociates.com, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3918328-02 A-549-502 SCO - Anti-Circumvention Inquiry - Line Pipe
PUBLIC VERSION

weighted-average cost of the merchandise under consideration, notify the Department in writing before preparing your response to this section of the questionnaire.

**ANSWER**: Saha Thai has calculated the reported COP and CV figures by CONNUM, in accordance with the Department's instructions. During the POR, Saha Thai produced the merchandise under review at two principal facilities: the old plant in Samutprakarn (near Bangkok) and a newer plant in Wangnoi, near Ayutthaya. Saha Thai also has an off-site location for painting and occasional forming of non-subject merchandise (rectangular and C-channel); however, the production costs of all three locations are aggregated into one unified cost accounting system, which is the basis for this Response. Therefore Saha Thai's reported costs represent weighted average costs for all three facilities.

## II. General Information

The production process, financial accounting, and cost accounting information requested below is necessary for the Department to better understand your company's operations, its products and production processes, and its financial and cost accounting practices. Therefore, you should provide complete narrative responses to each of the items listed below.

A. Products and Production Processes

Provide a description of your company's production process for the merchandise under consideration.[5] Your description should address each of the items 1 through 8 listed below.

1. Provide a description of your company's production facilities. If production of the merchandise under consideration takes place at more than one facility, identify each facility and describe the production activities that take place at each facility. Identify all products manufactured at each facility, including products not under consideration.

**ANSWER**: As noted above, Saha Thai has a facility in Samutprakarn, Thailand that produces merchandise under consideration ("MUC"). This includes circular welded carbon steel pipe in various surface finishes (black, varnished, painted, and galvanized) and end finishes (plain end,

[5] If you have already provided a description of your company's production process in response to section A of this questionnaire, you may repeat that description or refer to the page numbers in that part of your response where the information is presented. However, your response must address each of the items noted in parts II.A.1 through 8 of this section of the questionnaire. If it does not, provide the description of your company's production process in this section of your response and supplement it accordingly with the requested information.

Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789127-01 A-549-502 INQ - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

threaded, and threaded and coupled). The plant also produces the following non-MUC products: non-circular tubes (rectangular, square, and C shape) and flat bar. Merchandise under review is produced in sizes ranging from under 3/8 inch to 6 inches in diameter. The second plant in Ayutthaya produces black carbon steel pipe, ranging in sizes from 3/8 inches to 8 inches in diameter. Non-MUC production at the Ayutthaya plant consists of a limited volume of corrugated roofing sheet. Some of the pipe sold in home and third country markets is painted at an offsite facility operated by Saha Thai; however, all costs of this separate location are included in Saha Thai's books and records. Finally, Saha Thai also purchases and resells hot-rolled and cold-rolled carbon steel sheet in coils, non-subject merchandise e.g., rebar, and sells a limited amount of its own slit coils, and provides limited slitting and galvanizing services to outside companies.

2. Provide a flowchart of the production process for the merchandise under consideration. Please supplement your flowchart with descriptions of each stage in the process.

**ANSWER**: A flowchart of Saha Thai's production process is provided in the company brochure (see Exhibit A-14 of *Saha Thai's Section A Response*). The steps to produce the subject merchandise are described in the same product brochure and summarized below.

Slitting

> Hot-rolled carbon steel coil purchased from outside suppliers is placed on the slitting line, where it is uncoiled, slit into standard widths, and then recoiled for storage and handling convenience.

Forming

> The slit coil hoops enter the forming line, where they are uncoiled and sent through a series of rollers which gradually bend and reform the flat steel strip into a continuous cylinder. The seam where the two edges of the coil meet is heated and then welded using the ERW process. Next, the bead of excess welding

Filed By: echeng@crowell.com, Filed Date: 8/18/21 3:19 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

# EXHIBIT 7

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918528-02 A-549-502 SCO - Scope Inquiry - Line Pipe

# STANDARDS

Since 1924, the American Petroleum Institute has been a cornerstone in establishing and maintaining standards for the worldwide oil and natural gas industry. Our work helps the industry invent and manufacture superior products consistently, provide critical services, ensure fairness in the marketplace for businesses and consumers alike, and promotes the acceptance of products and practices globally.

Standards enhance the safety of industry operations, assure quality, help keep costs down, reduce waste, and minimize confusion. They help speed acceptance, bring products to market quicker, and avoid having to reinvent the wheel every time a product is manufactured.

To see our recently published documents, addenda and erratas please click **here**.

# IMPORTANT STANDARDS ANNOUNCEMENTS

## API Specification 6A

API SPECIFICATION 6A, 21st EDITION

We are pleased to announce the publication of the 21st edition of Specification 6A, Wellhead and Tree Equipment. This new edition provides technical updates that have reached consensus within API's Subcommittee on Valves & Wellhead Equipment and will now give industry consistent practices in these respective areas of the standard. These updates are reflective of API's standards program mission to provide a forum for development of consensus-based industry standards, and technical cooperation to improve the industry's safety performance and competitiveness.

## API Specification 5L, 46th Ed.

We are pleased to announce the publication of the 46th edition of Specification 5L, *Line Pipe*. This new edition provides technical updates that have reached consensus within API's Subcommittee on Tubular Goods and will now give industry consistent practices in these

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:43 PM, Submission Status: Approved

Barcode:3818328-02 A-549-502 SCO - Scope Inquiry - Line Pipe
respective areas of the standard. These updates are reflective of API's standards program mission to provide a forum for development of consensus-based industry standards, and technical cooperation to improve the industry's safety performance and competitiveness.

## API Specification 5CT, 10th Ed.

We are pleased to announce the publications of the 10th edition of Specification 5CT, *Casing and Tubing*, and the 7th edition of Technical Report 5C3, *Calculating Performance Properties of Pipe Used as Casing or Tubing*. These new editions provide technical updates that have reached consensus within API's Subcommittee on Tubular Goods and will now give industry consistent practices in the respective areas of the standards. As part of API's standards develop program, these updates are reflective of API's standards program mission to provide a forum for development of consensus-based industry standards, and technical cooperation to improve the industry's safety performance and competitiveness.

# PURCHASE API STANDARDS & SOFTWARE

Visit the API Publications Store to purchase copies of our standards. Our standards are designed to assist industry professionals improve the efficiency and cost-effectiveness of their operations, comply with legislative and regulatory requirements, safeguard health, and protect the environment.

## API Compass Subscriptions

# CONTACT FOR API SUBSCRIPTIONS

API now offers a direct subscription service to the API standards your organization needs.

Access standards, mitigate risk with the latest change management tools (including new standard alerts), analyze available standards and make gap analysis notes to reduce reliance on internal standards (increasing efficiencies), and support other API initiatives through this direct licensing platform.

Subscribers can sign up by industry area or for the complete API collection. The most used standards are also available in two convenient formats (PDF and HTML/online).

You can also call toll-free **1-800-730-0250** or email us at **compass@api.org**.

# STANDARDS INQUIRIES

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789721-02 A-549-502 SCO - Scope Inquiry - Line Pipe
Barcode:3918528-02 A-549-502 SCO - Scope Inquiry - Line Pipe
API receives numerous inquiries related to its standards, specifications, recommended practices, technical reports and codes (i.e. documents).

# STANDARDS COMMITTEES

API's Standards Committees are made up of subcommittees and task groups comprised of industry experts who develop API standards. See a **list of all open ballots** .

## Downstream Committees

## Midstream Committees

## Upstream Committees

# PROGRAM INFORMATION

Information on the API Standards Program

## Annual Standards Plan

Each year, API updates current standards, creates new standards and adopts existing standards.

## Addenda & Errata

Addenda (amendments) and errata for published API standards are available via the API Publications Store.

## Educational Outreach

API Global Webcasts and Engineering Partnership Program

## Policies & Procedures

API Standards Policy and Procedure Documents

## FAQs

# RIGHTS AND USAGE POLICY

The Intellectual Property (IP) Rights and Usage Policy provides information on API's copyrights and trademarks, and outlines the process of requesting to reproduce API-copyrighted material.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

© Copyright 2018 – API. All Rights Reserved.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

# EXHIBIT 8

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

# Large Diameter Welded Pipe from Canada, China, Greece, India, Korea, and Turkey

Investigation Nos. 701-TA-593-596 and 731-TA-1401-1406 (Preliminary)

**Publication 4768** **March 2018**

U.S. International Trade Commission

**Washington, DC 20436**

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

# U.S. International Trade Commission

## COMMISSIONERS

**Rhonda K. Schmidtlein, Chairman**
**David S. Johanson, Vice Chairman**
**Irving A. Williamson**
**Meredith M. Broadbent**

---

Catherine DeFilippo
***Director of Operations***

---

*Staff assigned*

Abu B. Kanu, Investigator
Gregory LaRocca, Industry Analyst
Aimee Larsen, Economist
Joanna Lo, Accountant
Lita David-Harris, Statistician
Carolyn Holmes, Statistical Assistant
Michael Haldenstein, Attorney
Henry Smith, Attorney
Douglas Corkran, Supervisory Investigator

*Special assistance from*

Julie Duffy
Bronwen Schriml

**Address all communications to**
**Secretary to the Commission**
**United States International Trade Commission**
**Washington, DC 20436**

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

# U.S. International Trade Commission

Washington, DC 20436
*www.usitc.gov*

# Large Diameter Welded Pipe from Canada, China, Greece, India, Korea, and Turkey

Investigation Nos. 701-TA-593-596 and 731-TA-1401-1406 (Preliminary)

**Publication 4768** **March 2018**

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

**CONTENTS**

Page

**Determinations** ... 1

**Views of the Commission** ... 3

**Part I: Introduction ... I-1**

Background ... I-1

Statutory criteria and organization of the report ... I-2

Statutory criteria ... I-2

Organization of report ... I-3

Market summary ... I-3

Summary data and data sources ... I-4

Previous and related investigations ... I-4

Nature and extent of alleged subsidies and sales at LTFV ... I-6

Alleged subsidies ... I-6

Alleged sales at LTFV ... I-11

The subject merchandise ... I-12

Commerce's scope ... I-12

Tariff treatment ... I-13

The product ... I-13

Description and applications ... I-13

Manufacturing processes ... I-18

Domestic like product issues ... I-24

**Part II: Conditions of competition in the U.S. market ... II-1**

U.S. market characteristics ... II-1

Channels of distribution ... II-1

Geographic distribution ... II-2

Supply and demand considerations ... II-3

U.S. supply ... II-3

U.S. demand ... II-7

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

**CONTENTS**

**Page**

**Part II: Conditions of competition in the U.S. market....Continued**

Substitutability issues .... II-12

Lead times .... II-12

Factors affecting purchasing decisions .... II-12

Comparison of U.S.-produced and imported LDWP .... II-14

**Part III: U.S. producers' production, shipments, and employment .... III-1**

U.S. producers .... III-1

U.S. production, capacity, and capacity utilization .... III-3

Alternative products .... III-4

U.S. producers' U.S. shipments and exports .... III-5

U.S. producers' inventories .... III-6

U.S. producers' imports and purchases .... III-6

U.S. employment, wages, and productivity .... III-6

**Part IV: U.S. imports, apparent U.S. consumption, and market shares .... IV-1**

U.S. importers .... IV-1

U.S. imports .... IV-1

Negligibility .... IV-5

Cumulation considerations .... IV-6

Fungibility .... IV-7

Geographical markets .... IV-7

Presence in the market .... IV-7

U.S. market shares .... IV-13

**Part V: Pricing data .... V-1**

Factors affecting prices .... V-1

Raw material costs .... V-1

U.S. inland transportation costs .... V-1

Pricing practices .... V-2

Pricing methods .... V-2

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

CONTENTS

Page

**Part V: Pricing data....................................................................................Continued**

Sales terms and discounts ....................................................................................V-3

Price data....................................................................................V-3

Price trends....................................................................................V-8

Price comparisons ....................................................................................V-10

Lost sales and lost revenue ....................................................................................V-11

**Part VI: Financial experience of U.S. producers ....................................................................................VI-1**

Background....................................................................................VI-1

Operations on LDWP ....................................................................................VI-2

Net sales quantity and revenue ....................................................................................VI-8

COGS and expenses ....................................................................................VI-9

Profitability ....................................................................................VI-10

Capital expenditures and research and development expenses ....................................................................................VI-11

Assets and return on Assets ....................................................................................VI-12

Capital and investment ....................................................................................VI-13

**Part VII: Threat considerations and information on nonsubject countries ....................................................................................VII-1**

The industry in Canada....................................................................................VII-3

Changes in operations ....................................................................................VII-3

Operations on LDWP ....................................................................................VII-3

Alternative products....................................................................................VII-4

Exports ....................................................................................VII-4

The industry in China....................................................................................VII-6

Exports....................................................................................VII-6

The industry in Greece ....................................................................................VII-8

Changes in operations ....................................................................................VII-8

Operations on LDWP ....................................................................................VII-9

Alternative products....................................................................................VII-9

Exports ....................................................................................VII-9

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

CONTENTS

Page

**Part VII: Threat considerations and information on nonsubject countries..................Continued**

The industry in India ........................................ VII-12

Changes in operations ........................................ VII-12

Operations on LDWP ........................................ VII-12

Alternative products ........................................ VII-12

Exports ........................................ VII-13

The industry in Korea ........................................ VII-15

Changes in operations ........................................ VII-15

Operations on LDWP ........................................ VII-15

Alternative products ........................................ VII-15

Exports ........................................ VII-16

The industry in Turkey ........................................ VII-18

Changes in operations ........................................ VII-18

Operations on LDWP ........................................ VII-18

Alternative products ........................................ VII-19

Exports ........................................ VII-19

U.S. inventories of imported merchandise ........................................ VII-21

Subject countries combined ........................................ VII-21

U.S. importers' outstanding orders ........................................ VII-22

Information on nonsubject countries ........................................ VII-22

**Appendixes**

A. *Federal Register* notices ........................................ A-1

B. List of staff conference witnesses ........................................ B-1

C. Summary data ........................................ C-1

D. Shipments of LDWP by grade, size, and method of manufacturing ........................................ D-1

E. Line pipe and structural pipe ........................................ E-1

Note— Information that would reveal confidential operations of individual concerns may not be published and therefore has been deleted. Such deletions are indicated by asterisks. ***.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

and line pipe over 24 inches in diameter are separate domestic like products. Finally, nonparty SeAH maintains that stainless LDWP should be defined to be a separate domestic like product.[22]

### C. Analysis

Based on the current record, we define a single domestic like product consisting of all LDWP coextensive with the scope of the investigations for purposes of the preliminary phase of these investigations.

#### 1. Line Pipe vs. Structural Pipe

*Physical Characteristics and Uses.* All line pipe and structural pipe within the scope of investigation are tubular products produced from carbon and alloy steel. However, line pipe and structural pipe are produced from different grades of steel to different specifications.[23] Line pipe is produced to API 5L specifications, which are standards for pipe designed for conveying gas, water, and oil. API specifications indicate the strength of the steel, process of manufacture, product specification levels, heat treatment, and test pressure.[24] Line pipe above 30 inches in diameter is often produced to additional more stringent specifications provided by the customer.[25] Structural pipe, in contrast, is produced to ASTM specifications, such as A53, A252, or A500.[26] Line pipe can bear multiple stencils that indicate conformance with API as well as less restrictive ASTM standards.[27] Corinth indicates that line pipe and structural pipe also have different finishes. Line pipe receives an epoxy coating designed to last longer than the paint or varnish on structural pipe.[28]

With respect to uses of line pipe and structural pipe, the record indicates that line pipe is used to convey liquids such as oil and gas while structural pipe is used for support in construction projects and as piling.[29] Petitioners assert that, in addition to some line pipe being downgraded and sold for structural uses, line pipe may be deliberately produced to API standards for structural uses. For instance, they claim that line pipe produced to API standards is required for certain bridge pilings.[30]

*Manufacturing Facilities, Production Processes, and Employees*. The record on this factor is mixed. Both line and structural pipe are produced by the same manufacturing processes: electric resistance welding ("ERW"), helical (or spiral) submerged arc welding ("HSAW"), and longitudinal welding ("LSAW").[31] Although each domestic producer tends to

---

[22] See SeAH's Statement at 6.
[23] Evraz's Postconference Brief at 41-42.
[24] CR at I-19, PR at I-17.
[25] Conf. Tr. at 144 (Harapiak).
[26] CR at I-21, PR at I-18.
[27] CR at I-20 n.40, PR at I-17 n.40.
[28] Corinth's Postconference Brief at 7-8.
[29] CR at I-19 to I-20, PR at I-16 to I-18.
[30] Petitioners' Postconference Brief, Exhibit 1 at 15.
[31] CR at I-22, PR at I-18.

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

Subject line pipe is normally produced in conformance with the American Petroleum Institute's ("API") 5L specifications, which provides standards for "pipe suitable for use in conveying gas, water, and oil in both the oil and gas industries."[36] The subject product generally bears an API line pipe stencil.[37] The API 5L specification for line pipe indicates the marking and class (e.g. A-25, A, B, and X-42 through X-80), process of manufacture (electric resistance welded pipe[38] or submerged arc welded pipe[39]), product specification levels (PSL 1 and PSL 2), heat treatment, and test pressure. The API 5L grades define the yield (tensile) strength level of the pipe and of the steel used to make the pipe.

The API 5L specification also suggests that "products in compliance with multiple compatible standards may be marked with the name of each standard." Thus, line pipe can bear multiple stencils, signifying compliance with one or more certifications (such as grade B/ X-42), as well as standard pipe,[40] piling,[41] or structural[42] pipe certifications.

---

(...*continued*)
http://corridoreis.anl.gov/documents/docs/technical/apt_61034_evs_tm_08_5.pdf, retrieved on February 2, 2018 ; U.S. Department of Energy, Argonne National Laboratory, *Overview of the Design, Construction and Operation of Interstate Liquid Petroleum Pipelines,* http://corridoreis.anl.gov/documents/docs/technical/apt_60928_evs_tm_08_1.pdf, retrieved on February 2, 2018.

[36] The API 5L specification covers both seamless and welded steel line pipe. Although seamless pipe is covered by the API 5L specification, it is outside the scope of these investigations. American Petroleum Institute, *API Specification 5L*, 45th Edition, December 2012.

[37] A "stencil" is information marked by the manufacturer with paint stenciled on the outside of the pipe indicating the specification in conformance with which it has been manufactured. However, the purchaser and manufacturer can agree to put all or part of the markings on the inside of the pipe. Pipe O.D. 1-1/2 inches and smaller has identification markings die-stamped on a metal tag fixed to the bundle or printed on the straps or binding clips used to tie the bundle.

[38] An electric resistance weld is a process where the strip edges are mechanically pressed together and welded. The heat for welding is generated by resistance of the steel to the flow of an electric current. In one process, a low-frequency (typically 60 to 360 hertz) current is conducted to the strip edges by a pair of copper alloy discs which rotate as the pipe is propelled under them. A second variation uses high-frequency (in the range of 400 to 500 kilohertz) which enters the tubing through shoes which act as sliding contacts. An induction coil can also be used with the high frequency current to induce current in the edges of the steel. No direct contact between the induction coil and tubing is required. American Petroleum Institute, *API Specification 5L*, 44th Edition, October 2008.

[39] The submerged arc weld process is a welding process that produces coalescence of metals by heating them with an arc or arcs between a bare metal consumable electrode or electrodes and the work. The arc and molten metal are shielded by a blanket of granular, fusible material on the work. Pressure is not used and part or all of the filler metal is obtained from the electrodes, *API Specification 5L*, 43rd Edition, October 2004.

[40] Because welded line pipe for use in oil and gas pipelines requires higher hydrostatic test pressures and more restrictive weight tolerances than standard pipe, pipe that is in conformance with API Specification 5L Grade B is automatically in conformance with the less restrictive standard pipe specification of the American Society for Testing Materials, ASTM A-53, Grade B. ASTM A-53, Grade B covers both welded and seamless pipe with a minimum tensile strength of 60,000 psi and minimum yield strength of 35,000 psi. The weld seam for ERW line pipe meeting ASTM A-53, Grade B

(*continued*...)

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

# EXHIBIT 9

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

12/17/2018 Case 1:20-cv-00133-SAV Document 40 Composite List Filed 05/07/21 Page 901 of 1077
Barcode:3789121-01 A-549-502 CIRC - Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

CONTACT US | HELP

# Composite List

## Search

Company Name

Certification #

Specification/ Standard

Choose a specification...

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved
https://mycerts.api.org/Search/CompositeSearch 1/3

Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

Advanced Search Options

Product

- Manufacturer of Line Pipe Plain End at PSL 1
- Manufacturer of Line Pipe Plain End at PSL 2
- Manufacturer of Line Pipe Threaded and Coupled
- Manufacturer of Line Pipe Couplings
- Processor of Line Pipe Plain End at PSL 1
- Processor of Line Pipe Plain End at PSL 2
- Threader
- Manufacturer of Line Pipe Plain End at PSL 2 - Service Annex H
- Manufacturer of Line Pipe Plain End at PSL 2 - Service Annex J

Registration Scope included

Status

Choose a status...

Country

Thailand

Search Reset

Back

| Company | City | State | Country | Certification(s) | Status | Product(s) |
|---|---|---|---|---|---|---|
| BOLY PIPE CO., LTD. | A. Pluakdaeng | Rayong | Thailand | 5L-0956 | Active | Manufacturer of Line Pipe Plain End at PSL 1 |
| | | | | | Active | Manufacturer of Line Pipe Plain End at PSL 2 |
| OST Tube (Thailand) Co., Ltd. | Chonburi | | Thailand | 5L-1102 | Active | Threader |
| Thai Oil Pipe Co., Ltd. | Rayong | | Thailand | 5L-1100 | Active | Threader |
| | | | | | Active | Manufacturer of Line Pipe Plain End at PSL 2 |
| | | | | | Active | Manufacturer of Line Pipe Plain End at PSL 1 |
| TSG (Thailand) Co., Ltd. | Rayong | | Thailand | 5L-0862 | Active | Manufacturer of Line Pipe Plain End at PSL 1 |
| | | | | | Active | Manufacturer of Line Pipe Plain End at PSL 2 |
| Company | City | State | Country | Certification(s) | Status | Product(s) |

Filed By: Total Page Date: 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC Anti-Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

| | | | | | | |
|---|---|---|---|---|---|---|
| TSP PRECISION STEEL TUBE MANUFACTURING (THAILAND) CO., LTD | Pluakdaeng | Rayong | Thailand | 5L-1158 | Active | Processor of Line Pipe Plain End at PSL 2 |
| | | | | | Active | Processor of Line Pipe Plain End at PSL 1 |
| | | | | | Active | Manufacturer of Line Pipe Plain End at PSL 2 |
| | | | | | Active | Manufacturer of Line Pipe Plain End at PSL 1 |

1

1 - 12 of 12 items

Back

Copyright 2018 - American Petroleum Institute, all rights reserved.
API Home | Terms And Conditions | Privacy

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Barcode:3789121-01 A-549-502 CIRC - Anti Circumvention Inquiry - Line Pipe
Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

# EXHIBIT 10

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved



Barcode:3789921-03 A-549-502 SCO - Scope Inquiry - Line Pipe
Barcode:3918321-04 A-549-502 SCO - Scope Inquiry - Line Pipe

Excellence in trade
Specializing in the finest steel tubular products for energy and commercial / construction applications.
Learn more

# Who we are

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved
Filed By: Toni Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

Master Pipe is a customer driven, [illegible] the inventory and project needs of major distributors in the United States. Our products range from ASTM A53 standard pipe, to API 5L and API 5CT energy focused products. We enjoy the privilege of representing proven, quality, and market accepted manufacturers throughout the world. We strive to create long term partnerships with both our customers and vendors that provide value for all parties, and bridge commercial and cultural divides.

Joseph B. Konis
**President**

Ted Bates
**Vice President**

Creighton Uyechi
**Chief Financial Officer**

Joyce Konis
**Logistics Coordinator**

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/31/19 4:12 PM, Submission Status: Approved

Barcode:3918328-02 A-549-502 SCO - Scope Inquiry - Line Pipe

Chad Jones
**Accounting Manager**

Ham
**Order Coordinator / Expeditor**

Kevin Lee
**A/R Supervisor**

**Master Pipe Distribution Company**

11110 Ohio Ave., Suite #201

Los Angeles, CA 90025

Phone: 310-320-6400

Copyright © 2018 Master Pipe Distribution Company, LLC. All rights reserved.
Designed by Keebs. Developed by Andres Cruz.

Filed By: Tona Page, Filed Date: 12/6/19 2:44 PM, Submission Status: Approved

**Tab 7**

LETTER FROM CURTIS, MALLET-PREVOST, COLT & MOSLE LLP TO SEC OF
COMMERCE PERTAINING TO SAHA THAI COMMENTS ON SCOPE INQUIRY (Dec. 20,
2019) (P.R. 52)

CURTIS

**Curtis, Mallet-Prevost, Colt & Mosle LLP**

Almaty
Beijing
Buenos Aires
Dubai
Frankfurt
Geneva
Houston
London
Mexico City
Milan
Muscat
New York
Nur-Sultan
Paris
Rome

1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

**Telephone +1 202 452 7373**
**Facsimile +1 202 452 7333**
www.curtis.com

**Daniel L. Porter**
Tel: +1 202 452 7340
Fax: +1 202 452 7333
E-Mail: dporter@curtis.com

December 20, 2019

**<u>PUBLIC DOCUMENT</u>**

Case No.: A-549-502

No. Pages: 42

Status: Scope Inquiry (Line Pipe)

This proceeding is conducted by Enforcement & Compliance, AD/CVD Operations/ VII

This submission contains no business proprietary information.

The Honorable Wilbur Ross
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/Dockets Unit, Room 18022
14th Street & Constitution Avenue, N.W.
Washington, D.C. 20230

Attn: Toni Page & Alexander Cipolla

Re: *Saha Thai's Comments on "Line Pipe" Scope Inquiry*
<u>Circular Welded Carbon Steel Pipe and Tubes from Thailand</u>

Dear Secretary Ross:

On behalf of Saha Thai Steel Pipe Public Co., Ltd. ("Saha Thai"), we hereby submit Saha Thai's comments on the Department's "Line Pipe" Scope Inquiry pursuant to the Department's "Self-Initiation" Memorandum dated November 22, 2019. This submission is timely made pursuant to the Department's memorandum to the file dated December 6, 2019. This submission contains no business proprietary information.

Barcode:3922534-01 A-549-502 SCO - Scope Inquiry - Line Pipe

CURTIS

Curtis, Mallet-Prevost, Colt & Mosle LLP

December 20, 2019
Page 2

If you have any questions, please contact the undersigned.

Respectfully submitted,

/s/ Daniel L. Porter

Daniel L. Porter
Tung Nguyen
Gina Colarusso

**Curtis, Mallet-Prevost, Colt & Mosle LLP**

*Counsel for Saha Thai*

Filed By: dporter@curtis.com, Filed Date: 12/20/19 3:16 PM, Submission Status: Approved
36427907

**Circular Welded Carbon Steel Pipes and Tubes from Thailand**

**A-549-502**
**Scope Inquiry**
**SCO – Line Pipe**

**PUBLIC**
**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing submission has been served this day, by hand delivery, upon the following persons:

| | |
|---|---|
| Roger B. Schagrin, Esq.<br>On behalf of Wheatland Tube<br>**SCHAGRIN ASSOCIATES**<br>900 7th Street, NW<br>Suite 500<br>Washington, DC 20001 | Robert George Gosselink, Esq.<br>On behalf of Thai Premium Pipe Company Ltd.<br>**TRADE PACIFIC PLLC**<br>660 Pennsylvania Avenue, SE<br>Suite 401<br>Washington, DC 20002 |
| Alan H. Price, Esq.<br>On behalf of Independence Tube Corporation, et al.<br>**WILEY REIN LLP**<br>1776 K Street, N.W.<br>Washington, DC 20006 | |

Daniel L. Porter
Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, NW
Washington, DC 20006

Dated: December 20, 2019

Barcode:3922534-01 A-549-502 SCO - Scope Inquiry - Line Pipe

**PUBLIC DOCUMENT**

Case No.: A-549-502

No. Pages: 42

Status: Anti-Circumvention Inquiry
Scope Inquiry

This proceeding is conducted by Enforcement & Compliance, AD/CVD Operations/ VII

This submission does not contain any business proprietary information.

# SAHA THAI STEEL'S COMMENTS ON SCOPE INQUIRY

*Circular Welded Steel Pipes and Tubes from Thailand*

Daniel L. Porter
Tung Nguyen
Gina Colarusso

**Curtis, Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, N.W.
Washington, D.C., 20006
(202) 452-7327

December 20, 2019

Filed By: dporter@curtis.com, Filed Date: 12/20/19 3:16 PM, Submission Status: Approved

Barcode:3922534-01 A-549-502 SCO - Scope Inquiry - Line Pipe

**TABLE OF CONTENTS**

**Page #**

INTRODUCTION AND SUMMARY OF COMMENTS .......... 2

COMMENTS .......... 4

I. INITIAL INVESTIGATION DOCUMENTS AND PRIOR SCOPE RULINGS ARE DISPOSITIVE THAT LINE PIPE IS NOT COVERED BY THE CWP AD ORDER .. 4

A. Initial Investigation Documents Demonstrate Unequivocally That Line Pipe (Including Dual-Stenciled Pipe) Was Excluded From the Scope of The AD Order on Circular Welded Steel Pipes And Tubes From Thailand .......... 4

B. The Department's Past Scope Definitions in Standard Pipe AD Cases Further Support A Finding That Line Pipe Is Excluded from the CWP AD Order .......... 16

C. Petitioner's Contrary Arguments Can Be Easily Rejected .......... 18

II. BECAUSE THERE IS NO QUESTION THAT THE ITC'S ORIGINAL INJURY DETERMINATION DID NOT INLCUDE IMPORTS OF LINE PIPE, A SCOPE DECISION TO INCLUDE LINE PIPE WITHIN THE AD ORDER WOULD VIOLATE U.S. LAW .......... 24

III. BECAUSE LINE PIPE (INCLUDING DUAL-STENCILED PIPE) IS EXCLUDED FROM THE SCOPE OF THE UNDERLYING AD ORDER, THE DEPARTMENT ALSO NEEDS TO PUT PETITIONER'S ALLEGATION OF CIRCUMVENTION TO REST .......... 31

IV. IF THE DEPARTMENT ERRONEOUSLY CONCLUDES THAT THE AD ORDER COVERS LINE PIPE, THE EARLIEST DATE THE DEPARTMENT CAN SUSPEND LIQUIDATION OF LINE PIPE IMPORTS IS NOVEMBER 22, 2019, THE DATE OF SELF-INITIATION .......... 34

CONCLUSION .......... 35

Filed By: dporter@curtis.com, Filed Date: 12/20/19 3:16 PM, Submission Status: Approved

Barcode:3922534-01 A-549-502 SCO - Scope Inquiry - Line Pipe

## TABLE OF AUTHORITIES

**Statutes**

19 U.S.C. § 1673 ........ 13, 28

19 U.S.C. § 1677j(c) ........ 32

19 U.S.C. § 1677j(e) ........ 27

**Regulations**

19 C.F.R. § 351.225(k)(1) ........ 1, 4, 16, 20

19 C.F.R. § 351.225(l)(2) ........ 34

**Cases**

*Allegheny Bradford Corp. v. United States*,
342 F. Supp. 2d 1172 (2004) ........ 29

*ArcelorMittal Stainless Belg. N.V. v. United States*,
Slip Op. 11-82, 2011 WL 2713872, at *1 (Ct. Int'l Trade July 12, 2011) ........ 21

*Duferco Steel, Inc. v. United States*,
296 F. 3d 1087 (Fed. Cir. 2002) ........ 13

*Fedmet Resources Corp. v. United States*,
755 F.3d 912, 919 (Fed. Cir. 2014) ........ 19

*Mitsubishi Polyester Film, Inc. v. United States*,
321 F. Supp. 3d 1298 (Ct. Int'l Trade 2018) ........ 22

*Shake & Shingle All. v. United States*,
No. 18-00228, 2019 WL 5963415, at *1 (Ct. Int'l Trade Nov. 13, 2019) ........ 21

*TMB 440AE, Inc. v. United States*,
399 F. Supp. 3d 1314 (Ct. Int'l Trade 2019) ........ 1, 4, 29

*Wheatland Tube Co. v. United States*,
161 F.3d 1365 (Fed. Cir. 1998) ........ 31

*Wheatland Tube Co. v. United States*,
973 F. Supp. 149 (Ct. Int'l Trade 1997) ........ 13, 29, 32, 33

Filed By: dporter@curtis.com, Filed Date: 12/20/19 3:16 PM, Submission Status: Approved

Barcode:3922534-01 A-549-502 SCO - Scope Inquiry - Line Pipe

**Administrative Determinations**

*Antidumping: Circular Welded Carbon Steel Pipes and Tubes From Thailand; Final Determination of Sales at Less Than Fair Value*, 51 Fed. Reg. 8384 (Jan. 27, 1986).... 8, 18, 19

*Certain Circular Welded Carbon Steel Pipes and Tubes From Thailand; Initiation of Antidumping Duty Investigation*, 59 Fed. Reg. 12,068 (Mar. 27, 1985)............................... 6, 19

*Certain Circular Welded Carbon Steel Pipes and Tubes From Thailand; Preliminary Determination of Sales at Less Than Fair Value*, 50 Fed. Reg. 40,427 (Oct. 3, 1985) .............. 8

*Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey (Final)*, Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534, and 536 (Fourth Review), USITC Pub.4754 (Jan. 2018)........................................................... 14, 26, 28

*Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey*, Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534 and 536 (Third Review), USITC Pub. 4333 (June 2012)...................................................................... 15, 26, 28

*Certain Welded Carbon Steel Pipes and Tubes from Thailand and Venezuela*, Inv. No. 701-TA-242, 731-TA-252-53 (Preliminary), USITC Pub. 1680 (Apr. 1985) ...................... 10, 12, 23, 25

*Certain Welded Carbon Steel Pipes And Tubes From Turkey And Thailand*, Inv. Nos. 701-TA-253 and 731-TA-252 (Final), USITC Pub. 1810 (Feb. 1986)........... 9, 12, 23

*Later-Developed Merchandise Anticircumvention Inquiry of the Antidumping Duty Order on Petroleum Wax Candles from the People's Republic of China: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order*, 71 Fed. Reg. 32,033 (June 2, 2006) ............................................................................. 32

*Polyethylene Terephthalate Film, Sheet, & Strip From Brazil, China, Thailand, & the United Arab Emirates*, Inv. No. 731–TA–1131–1134 (Final), USITC Pub. 4040 (Oct. 2008)............ 23

*Polyethylene Terephthalate Film, Sheet, and Strip From Japan and the Republic of Korea*, Inv. No. 731–TA–458 and 459 (Final), USITC Pub. 2383 (May 1991).................................. 22

Filed By: dporter@curtis.com, Filed Date: 12/20/19 3:16 PM, Submission Status: Approved

## INTRODUCTION AND SUMMARY OF COMMENTS

On behalf of Saha Thai Steel Pipe Public Co., Ltd. ("Saha Thai"), we respectfully submit comments on the scope language "matter" as requested by the Department in the Memorandum dated November 22, 2019.[1] As detailed below, Saha Thai makes five primary comments.

**Saha Thai Comment #1**: The Department's regulations governing the conduct of scope inquiries, Section 351.225 of the Department's AD-CVD regulations make clear that the Department will first examine original investigation documents to determine whether the inquiry merchandise is included or excluded from the scope of the AD order.[2] On this legal requirement – the need to examine original investigation documents – there can be little doubt. Indeed, in a recent decision involving imported pipe products, the Court of International Trade reiterated this important legal requirement for Commerce Department scope inquiries.[3]

In the instant case, the original investigation documents demonstrate unequivocally that line pipe and dual-stenciled pipe were never intended to be included in the scope of the AD order covering CWP from Thailand. The Commerce Department's own *Initiation Notice* could not be more clear that the petition was specifically amended to exclude line pipe from the scope of the CWP from Thailand AD case. The Commerce Department's own *Final Determination* could not be more clear in excluding line pipe

[1] Commerce Memorandum re "Self Initiation of Scope Inquiry on Line Pipe and Dual-Stenciled Standard Line Pipe" (November 22, 2019) (hereinafter "Commerce Self Initiation Memo").

[2] 19 C.F.R. § 351.225(k)(1).

[3] *TMB 440AE, Inc. v. United States*, 399 F. Supp. 3d 1314 (Ct. Int'l Trade 2019).

HTS codes in the final scope language adopted for the CWP from Thailand AD case. And the International Trade Commission's preliminary and final determinations specifically address the distinct differences between standard pipe and line pipe and explicitly state that the underlying investigation of CWP from Thailand *does not include* line pipe. Finally, during the sunset case of the CWP from Thailand AD Order, the petitioner admitted that both dual-stenciled pipe and line pipe were excluded from the CWP AD Order.

Additional context provided by the Department's past scope definitions in standard pipe AD cases further support a finding that line pipe is excluded from CWP AD cases. Indeed, in every single past AD case involving circular welded steel pipe (i.e., standard pipe), line pipe has been excluded from the scope.

**Saha Thai Comment #2:** The International Trade Commission did not make an injury determination with respect to line pipe or dual stenciled pipe in its investigation determination. As such, in the current proceeding, the Department cannot expand the scope to include line pipe and dual stenciled pipe for which there was no investigation and for which there was no determination of sales at LTFV or of injury.

**Saha Thai Comment #3**: Given that the original AD investigation documents make clear that "line pipe" and "products that are dual-stenciled" are outside the scope of the CWP AD order, the Department must terminate its minor-alterations anti-circumvention investigation. The applicable governing law leaves no doubt that the Commerce Department may not proceed with a minor-alternations anti-circumvention

investigation when it is clear that the inquiry merchandise was excluded from the original AD order.

**Saha Thai Comment #4**: If the Department erroneously concludes that the AD Order covers line pipe and imposes duties on line pipe as a results, the earliest date the Department can suspend liquidation of line pipe imports is November 22, 2019, the date of self-initiation.

## COMMENTS

### I. INITIAL INVESTIGATION DOCUMENTS AND PRIOR SCOPE RULINGS ARE DISPOSITIVE THAT LINE PIPE IS NOT COVERED BY THE CWP AD ORDER

#### A. Initial Investigation Documents Demonstrate Unequivocally That Line Pipe (Including Dual-Stenciled Pipe) Was Excluded From the Scope of The AD Order on Circular Welded Steel Pipes And Tubes From Thailand

The Department's regulations governing the conduct of scope inquiries, Section 351.225 of the Department's AD-CVD regulations make clear that the Department will first examine original investigation documents to determine whether the inquiry merchandise is included or excluded from the scope of the AD order.[4] On this legal requirement – the need to examine original investigation documents – there can be little doubt. Indeed, in a recent decision involving imported pipe products, the Court of International Trade reiterated this important legal requirement for Commerce Department scope inquiries.[5]

In the instant case, the original investigation documents demonstrate unequivocally that line pipe and dual-stenciled pipe were never intended to be included in the scope of the AD order covering CWP from Thailand. Indeed, although the original petition for an AD investigation of circular welded steel pipes and tubes from Thailand

---

[4] 19 C.F.R. § 351.225(k)(1).

[5] *TMB 440AE, Inc. v. United States*, 399 F. Supp. 3d 1314 (Ct. Int'l Trade 2019). This court case concerned a Commerce Department scope ruling in which Commerce did not analyze original investigation documents to decide whether the actual scope language of the AD order was or was not ambiguous. The Court ruled that Commerce's refusal to examine original investigation documents was unlawful because it was contrary to the Commerce Department's own regulations. *See id*. at 12 ("Commerce's failure to consider the "descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary . . . and the Commission," as required by 19 C.F.R. § 351.225(k)(1), in its Final Scope Ruling was not in accordance with law.")

(filed over 34 years ago, in 1985) included both circular welded pipe ("standard pipe") and line pipe, pursuant to the Department's request for clarification, the petitioners filed an amended petition ***removing*** **line pipe from the scope of the petition**.[6] The original investigation documents, as well as the subsequent determinations from the Commerce Department and the International Trade Commission, demonstrate that "line pipe" was explicitly excluded during the original investigation phase by the petitioners. Below we walk through the various original investigation documents.

**<u>The Original Petition and Amended Petition Filed by Petitioner</u>**:

The petition, as originally filed in February of 1985, originally requested an investigation on both standard pipe and line pipe imports from Thailand.[7] Prior to its initiation, however, the Department requested petitioners' counsel to provide certain additional information, documentation, and clarification to support its allegations. Included in the Department's request was "documentation which demonstrates that line pipe is manufactured in Thailand" and "documentation which supports the allegation that line pipe from Thailand is being sold at less than fair value."[8] By amendment dated March 12, 1985, counsel for petitioners clarified that the petition was being filed on

---

[6] Copies of the original petition, the amended petition, as well as a letter from the petitioners regarding its partial withdrawal of the petition are provided in Attachments 11, 13, and 14 to Saha Thai's August 26, 2019 Scope Inquiry Comments.

[7] *See* Petition for the Imposition of Antidumping Duties on Certain Welded Carbon Steel Pipes and Tube Products from Thailand, filed by Roger B. Schagrin on behalf of Members of Committee on Pipe and Tube Imports (Feb. 28, 1985) (provided in Saha Thai's August 26, 2019 Scope Inquiry Comments, Attachment 11); *see id.* at 12 ("The product covered by this petition is certain circular welded carbons teel circular pipes and tubes . . . includes "standard pipe" . . . the product also includes "line pipe").

[8] Commerce Department Memorandum to the file, *AD & CVD investigations of pipes and tubes from Thailand & Venezuela* (March 7, 1985) (provided in Saha Thai's August 26, 2019 Scope Inquiry Comments, Attachment 12).

behalf of two separate entities: the Standard Pipe Subcommittee and the Line Pipe Subcommittee of the CPTI, and by individual manufacturers of standard pipe and line pipe.[9] On March 14, 1985, petitioners filed a letter in which petitioners **amended the scope of the petition against Thailand by taking out line pipe**, stating:

> Petitioners in the above designated investigations . . . hereby withdraw the following portions of the followings petitions . . . A-549-502 and C-549-501. Certain Pipe and Tube Products from Thailand: Petitioners withdraw these petitions insofar as they concern line pipe, TSUS numbers 610.3208 and 3209. Petitioners have ascertained that no Thai company is presently licensed to produce pipe to API specifications, and imports of API line pipe from Thailand are therefore not likely.[10]

**The Department's Initiation Notice**:

In the Department's Notice of Initiation of the original AD Investigation it explains that the petition was originally filed against both standard pipe and line pipe from Thailand and that it was later modified to cover only standard pipe and to exclude "line pipe:"[11]

> The petition, as originally filed, covered both standard pipe, which is defined in the "Scope of Investigation" section of this notice, and line pipe. By amendment dated March 12, 1985, counsel for petitioners clarified that the petition was being filed on behalf of the standard pipe subcommittee and the line pipe subcommittee of the {Committee on Pipe and Tube

[9] *See* Amended Petition for the Imposition of Antidumping Duties on Certain Welded Carbon Steel Pipes and Tube Products from Thailand, filed by Roger B. Schagrin and Paul W. Jameson on behalf of Individual Producer Members of the Subcommittees on Standard and Line Pipe of the Committee on Pipes and Tube Imports (March 12, 1985) (provided in Saha Thai's August 26, 2019 Scope Inquiry Comments, Attachment 13).

[10] *See* Letter to the Secretary of Commerce from Roger Schagrin and Paul Jameson on behalf of Petitioners, *Certain Welded Carbon Steel Circular Pipe and Tube Products from Thailand and Venezuela: Partial Withdrawal of Petition* (March 14, 1985) (provided in Saha Thai's August 26, 2019 Scope Inquiry Comments, Attachment 14).

[11] *Certain Circular Welded Carbon Steel Pipes and Tubes From Thailand; Initiation of Antidumping Duty Investigation*, 59 Fed. Reg. 12,068 (Mar. 27, 1985) (provided in Saha Thai's August 26, 2019 Scope Inquiry Comments, Attachment 2**)**.

> Imports (CPTI)} and by individual manufacturers of standard pipe and line pipe. By amendment dated March 14, 1985, **petitioners withdrew the portion of the petition dealing with line pipe**.[12]

Indeed, the Department's Initiation Notice goes on to explain that although the petition was initially filed on behalf of the (full) Committee on Pipe and Tube Imports (CPTI), which included both its Subcommittee on Standard Pipe and Subcommittee on Line Pipe, after the March amendment to the petition, the Department concluded that only the Subcommittee on Standard Pipe (as well as certain individual manufacturers of standard pipe) had standing to file the petition:

> Based on the petition, as amended, we determine that the Subcommittee on Standard Pipe and the following individual manufacturers of standard pipe, who have indicated that they are filing the petition, Bull Moose Tube Company, Western Tube and Conduit Corporation, Maruichi American Corporation, Southwestern Pipe, Inc., Laclede Steel Company, Pittsburgh Tube Company, Allied Tube and Conduit, Century Tube Corporation and Sharon Tube Company, have standing to file with respect to standard pipe. We have determined from the amended petition filed March 12 that the Subcommittee on Line Pipe does not have standing with respect to standard pipe because a majority of its membership does not produce standard pipe.[13]

In short, the Commerce Department's own *Initiation Notice* makes it crystal clear that the original petition was explicitly amended to exclude line pipe from the scope of the CWP from Thailand AD investigation. Saha Thai believes that there can be no clearer evidence that the petition as initiated specifically excluded line pipe. This fact alone should be sufficient to put this scope "inquiry" to rest.

---

[12] *Id.* (emphasis added).

[13] *Id.*

**The Department's Final Determination**

Further support for the conclusion that line pipe was excluded from the scope of the CWP from Thailand AD investigation can be found in the Department's Final Determination, and specifically the final scope definition included in the Final Determination. The final scope language that the Department adopted in its Final Determination provided as follows:

> Circular welded carbon steel pipes and tubes, with an outside diameter of .375 inch or more but not over 16 inches, of any wall thickness, currently classifiable in the Tariff Schedules of the United States, Annotated (TSUSA), under items 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258 and 610.4925. These products, commonly referred to in the industry as standard pipe or structural tubing, are produced to various ASTM specifications, most notably A-152, A- 53 or A-135.[14]

The applicable tariff schedule items for "standard pipe" are important here because they demonstrate unequivocally that "line pipe" (including "dual stenciled" pipe) was specifically excluded from the Thailand investigation and subsequent AD order. Indeed, "line pipe" items and "standard pipe" items were mutually exclusive under the applicable tariff schedule. At the time of the petition/original AD investigation, "line pipe" would enter under specific Tariff Schedules of the United States, Annotated (TSUSA) items

[14] *Id.* at 12068-69; *see also Certain Circular Welded Carbon Steel Pipes and Tubes From Thailand; Preliminary Determination of Sales at Less Than Fair Value*, 50 Fed. Reg. 40,427 (Oct. 3, 1985) (provided in Saha Thai's August 26, 2019 Scope Inquiry Comments, Attachment 3); and *Antidumping: Circular Welded Carbon Steel Pipes and Tubes From Thailand; Final Determination of Sales at Less Than Fair Value*, 51 Fed. Reg. 8384 (Jan. 27, 1986) (provided in Saha Thai's August 26, 2019 Scope Inquiry Comments, Attachment 4).

610.3208 and 610.3209[15] while "standard pipe" would enter under items 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258 and 610.4925. TSUSA (1985 version) provides:[16]

| TSUSA Item | Description |
|---|---|
| 61032 | Pipes and tubes and blanks therefor, all the fore-going of iron (except cast iron) or steel: Welded, jointed, or seamed, with walls not thinner than 0.065 inch, and of circular cross section, 0.375 inch or more in outside diameter |
| **61032.08-013** | **Conforming to A.P.I. specifications for line pipe** (Std. 5L, 5LS, or 5LX) |
| 61032.16-19 | Conforming to A.P. I. specifications for oil well tubing |
| 61032.21 | Cold drawn pipes and tubes |
| **61032.31-64** | **Other** |
| **610.4925** | **Pipes and tubes and blanks therefor, all the foregoing of iron (except cast iron) or steel, Other, Other, Not suitable for use in the manufacture of ball or roller bearings, Other than alloy iron or steel, Other, Welded, jointed, or seamed pipes and tubes, Of circular cross section** |

Applying TSUSA (1985 version), a circular welded steel pipe or tube that conformed to API specifications for line pipe (5L, 5 LS or 5 LX) of no more than 16 inches in outside diameter must enter the U.S. under either items 610.3208 or 610.3209. Therefore, it is crystal clear that dual-stenciled products (i.e., pipes that would meet both ASTM specifications for standard pipe and API specifications for line pipe) and other products that only conformed to API specifications for line pipe (single-stenciled) could only be categorized as "line pipe" under TSUSA 610.3208 and 610.3209. [17]

---

[15] *Certain Welded Carbon Steel Pipes And Tubes From Turkey And Thailand*, Inv. Nos. 701-TA-253 and 731-TA-252 (Final), USITC Pub. 1810 at a-1 (Feb. 1986) (provided in Saha Thai's August 26, 2019 Scope Inquiry Comments, **Attachment 5**).

[16] Provided in Saha Thai's August 26, 2019 Scope Inquiry Comments, **Attachment 6**.

[17] Petitioner Wheatland Tube itself in a subsequent sunset review of the AD order on circular welded steel pipes and tubes from Thailand acknowledged that "dual stenciled" pipe is considered as "line pipe" instead of "standard pipe:" "It is likely that Korea, and other countries if no longer subject to the restraints imposed by the Standard Pipe antidumping order, will switch their production from line pipe

In sum, a proper understanding of the Department's own Initiation Notice and Final determination demonstrate unequivocally that: (1) "line pipe" was intentionally excluded from the AD order on circular welded steel pipes and tubes from Thailand; and (2) "dual-stenciled" pipe was considered as "line pipe" and therefore also excluded from the AD order on circular welded steel pipes and tubes from Thailand.

**The ITC Injury Determinations**:

The International Trade Commission's preliminary and final determinations made during the original investigation specifically address the distinct differences between standard pipe and line pipe and explicitly state that the underlying investigation of steel pipe from Thailand *does not include* line pipe. For instance, during the original investigation, the ITC explained in its preliminary determination that after the original petition was filed, and during the process of instituting the investigation, "Commerce advised the petitioner that the welded carbon steel pipe and tube products covered by the petitions represented two distinct classes or kinds of products, standard pipe and line pipe."[18] The Commission explained that the petition was subsequently amended to remove from the scope imports of line pipe from Thailand:[19]

> In the process of instituting these investigations, Commerce advised the petitioner that the welded carbon steel pipe and tube products covered by

(whether dual stenciled or not) to standard pipe." *Certain Welded Non-Alloy Steel Pipes And Tubes From Brazil, India, South Korea, Mexico, Taiwan, Thailand, Turkey And Venezuela (Review)*, Prehearing Brief of Wheatland Tube et al (Feb. 29, 2000) at 58-59 (emphasis added), narrative provided in Saha Thai's August 26, 2019 Scope Inquiry Comments, Attachment 7.

[18] *Certain Welded Carbon Steel Pipes and Tubes from Thailand and Venezuela*, Inv. No. 701-TA-242, 731-TA-252-53 (Preliminary), USITC Pub. 1680 at 3 (Apr. 1985) (provided in Saha Thai's August 26, 2019 Scope Inquiry Comments, Attachment 8).

[19] *Id*.

> the petitions represented two distinct classes or kinds of products, standard pipe and line pipe. Subsequently, on March 14, 1985, the petitions involving imports from Thailand were withdrawn as they relate to line pipe because there is no known production in Thailand of line pipe to American Petroleum Institute (API) specifications.[20]

We note that in its preliminary determination, the Commission was also simultaneously considering whether there was a reasonable indication that the domestic industry was materially injured by reason of allegedly less than fair value imports of welded carbon steel line pipes and tubes from Venezuela.[21] For clarity, the Commission explicitly stated that the only imported product at issue in the AD petition regarding imports from Thailand was standard pipes and tubes; whereas the CVD petition regarding imports from Venezuela included both standard pipe and line pipe and the AD petition regarding imports from Venezuela dealt only with line pipe.[22]

Moreover, in its preliminary determination, the Commission explained at length that it has repeatedly addressed the distinctions between standard pipe and line pipe.[23]

> We have addressed the like product question regarding standard pipes and tubes (standard pipe) and line pipes and tubes (line pipe) in prior investigations. In those investigations, the Commission recognized distinctions between standard pipe and line pipe. Standard pipe is manufactured to American Society of Testing and Materials (ASTM) specifications and line pipe is manufactured to American Petroleum Institute (API) specifications. Line pipe is made of higher grade steel and may have a higher carbon and manganese content than is permissible for standard pipe. Line pipe also requires additional testing. Wall thicknesses for standard and line pipes, although similar in the smaller diameters, differ

[20] *Id*. at 3.

[21] *Id*. at 6.

[22] *Id*. at 5-6 (emphasis included in the original).

[23] *Id*. at 6-8.

> in the larger diameters. Moreover, standard pipe (whether imported or domestic) is generally used for low-pressure conveyance of water, steam, air, or natural gas in plumbing, air-conditioning, automatic sprinkler and similar systems. Line pipe is generally used for the transportation of gas, oil, or water in utility pipeline distribution systems.[24]

The Commission thus concluded, that "domestic line pipe is like imported line pipe and not like imported standard pipe. We further conclude that domestic standard pipe is like imported standard pipe and is not like imported line pipe."[25]

In the final determination of injury concerning imports from Thailand, the ITC repeated its determination regarding the two distinct products: standard pipe and line pipe:[26]

> Line pipes and tubes were included within the scope of the original petition. In the process of instituting its investigation, Commerce advised the petitioner that the welded carbon steel pipes and tubes covered by the petition represented two distinct classes or kinds of products---standard pipe and line pipe. Subsequently, on Mar. 14, 1985, the petition involving imports from Thailand was withdrawn as it relates to line pipe, because there is no known production in Thailand of line pipe to API specifications.

---

[24] *Certain Welded Carbon Steel Pipes and Tubes from Thailand and Venezuela*, USITC Pub. 1680 at 7-8 (Apr. 1985) (internal references omitted). *See id*. at 8, n. 8 ("The Commission has conducted a series of investigations regarding imports of welded carbon steel pipes and tubes in the recent past. *Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea*, Inv. No. 701-TA-168, USITC Pub. 1345 (1983); *Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea and Taiwan*, Invs. Nos. 731-TA-131 and 132 (Preliminary), USITC Pub. 1389 (1983), *aff'd*, *Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea and Taiwan*, Invs. Nos. 731-TA-131, 132, and 138 (Final), USITC Pub. 1519 (1984); *Certain Welded Carbon Steel Pipes and Tubes from Brazil and Spain*, Inv. Nos. 701-TA-220 (Preliminary), 731-TA-197 and 198 (Preliminary), USITC Pub. 1569 (1984); *Certain Welded Carbon Steel Pipes and Tubes from Taiwan and Venezuela*, Inv. Nos. 731-TA-211 and 212 (Preliminary), USITC Pub. 1639 (1985)).

[25] *Id*. at 8 (emphasis added).

[26] *Certain Welded Carbon Steel Pipes and Tubes from Turkey and Thailand*, Inv. Nos. 701-TA-253, 731-TA-252 (Final), USITC Pub. 1810 at a-2, n. 6 (Feb. 1986) (provided in Saha Thai's August 26, 2019 Scope Inquiry Comments at Attachment 5).

As a result, for purposes of defining the U.S. industry for its injury analysis, the ITC determined that "domestically produced standard pipe is like imported standard pipe" and that "there are two domestic industries comprised, respectively, of the domestic producers of standard pipe and line pipe."[27] In turn, the ITC determined imported standard pipe to be imports under TSUSA 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258 and 610.4925;[28] while imported line pipe was determined to be imported under TSUSA 610.3208 and 610.3209.[29] Clearly, imports of "line pipe" (including dual-stenciled pipe) under TSUSA 610.3208 and 610.3209 were not considered for purposes of injury by Thai imports of standard pipe. Therefore, there could be no doubt that in the original AD investigation, the ITC determined injury by subject imports from Thailand solely based on the ITC defined domestic "standard pipe" industry and "standard pipe" imports.[30]

**ITC Sunset Review 2018**

[27] *Id.* at 6-7.

[28] *Id.* at Tables I-10 and I-11 (pages I-17, I-18).

[29] *Id.* at Tables II-9, II-10 (pages II-12, II-13).

[30] Because line pipe (including dual-stenciled pipe) was not included in the ITC's injury analysis in the original AD investigation, the Department is barred from including line pipe in the scope of the AD order through a scope proceeding. *See Wheatland Tube Co. v. United States*, 973 F. Supp. 149, 158 (Ct. Int'l Trade 1997) ("A fundamental requirement of both U.S. and international law is that an antidumping duty order must be supported by an ITC determination of material injury covering the merchandise in question. *See* 19 U.S.C. § 1673 (1994). The ITC, in defining like product for purposes of its injury investigations, followed the scope language adopted by Commerce . . . The injury determination of the ITC, thus, covered only products within the original scope of the Commerce investigation . . . It would follow that any expansion of the scope by Commerce would extend the antidumping duty order beyond the limits of the ITC injury determination and would therefore violate both U.S. and international law"); *see also Duferco Steel, Inc. v. United States*, 296 F. 3d 1087, 1089 (Fed. Cir. 2002) ("scope orders may be interpreted as including subject merchandise only if they contain language that specifically includes the subject merchandise or may be reasonably interpreted to include it.").

In the most recent sunset review of this AD order on circular welded steel pipes and tubes from Thailand, the ITC again made clear that line pipe and "dual-stenciled pipe, which enters as line pipe under a different subheading of the Harmonized Tariff Schedule of the United States ("HTS") for U.S. customs purposes, is not within the scope of the orders."[31] When discussing the product under review and providing the exact Commerce scope language for each of the CWP Orders under review, the Commission explained:

> Steel pipes and tubes are generally produced in various grades of carbon, alloy, or stainless steel. Tubular products frequently are distinguished by the following six end uses as defined by the American Iron and Steel Institute ("AISI").
>
> *Standard pipe* is ordinarily used for low-pressure conveyance of air, steam, gas, water, oil, or other fluids for mechanical applications. It is used primarily in machinery, buildings, sprinkler systems, irrigation systems, and water wells rather than in pipe lines or utility distribution systems. It may carry fluids at elevated temperatures which are not subject to external heat applications. It is usually produced in standard diameters and wall thicknesses to ASTM specifications.
>
> *Line pipe* is used for transportation of gas, oil, or water generally in a pipeline or utility distribution system. It is produced to API-5L and American Water Works Association ("AWWA") specifications.
>
> { . . . }
>
> Standard pipe of non-alloy steel is the primary product within the scope of these reviews (see figure I-1). Standard pipe is intended for the low-pressure conveyance of water, steam, natural gas, air, and other liquids and gases in plumbing and heating systems, air conditioning units, automatic sprinkler systems, and other related uses. Standard pipe may carry liquids at

[31] *Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey (Final)*, Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534, and 536 (Fourth Review), USITC Pub.4754 (Jan. 2018) at 6-7 (emphasis added) (provided in Saha Thai's August 26, 2019 Scope Inquiry Comments, Attachment 9).

Filed By: dporter@curtis.com, Filed Date: 12/20/19 3:16 PM, Submission Status: Approved

> elevated temperatures but may not be subject to the application of external heat. It is made primarily to ASTM A53, A135, and A795 specifications, but can also be made to other specifications, such as British Standard ("BS") 1387. Since these standards often specify required engineering characteristics that overlap, a pipe also can be dual stenciled, meaning that the pipe is stamped with monograms signifying compliance with two different specifications, such as ASTM A53 and API 5L; **however, such dual-stenciled pipe is not within the scope of the subject orders.**[32]

The Commissions explanation in the most recent sunset review (i.e., the fourth review) is unsurprising as it is consistent with the previous sunset review regarding the AD Order on CWP from Thailand. For instance, in the third review, when providing a description of the scope of the Orders under review, the Commission stated "dual-stenciled pipe, which for U.S. customs purposes enters as line pipe under a different tariff subheading, is not within the scope of the orders."[33] As provided in the fourth review, the Commission explained:

> Standard pipe of non-alloy steel is the primary product within the scope of these investigations (see figure I-1). Standard pipe is intended for the low-pressure conveyance of water, steam, natural gas, air, and other liquids and gases in plumbing and heating systems, air conditioning units, automatic sprinkler systems, and other related uses . . . Since these standards often specify required engineering characteristics that overlap, a pipe also can be dual stenciled, meaning that the pipe is stamped with monograms signifying compliance with two different specifications, such as ASTM A53 and API 5L; however, **such dual-stenciled pipe is not within the scope of the subject orders**.[34]

Indeed, Petitioner Wheatland Tube itself in a sunset review of the AD order on circular welded steel pipes and tubes from Thailand and other countries acknowledged

[32] *Id*. at I-14-16 (emphasis added).

[33] *Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey*, Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534 and 536 (Third Review), USITC Pub. 4333 at 8 (June 2012).

[34] *Id*. at I-25.

Filed By: dporter@curtis.com, Filed Date: 12/20/19 3:16 PM, Submission Status: Approved

that "dual stenciled" pipe is considered as "line pipe" instead of "standard pipe":[35] The Commission explicitly quoted Petitioner as follows:

> It is likely that Korea, and other countries {e,g. Thailand} if no longer subject to the restraints imposed by the Standard Pipe antidumping order, will switch their production from {non-subject} line pipe (whether dual stenciled or not) to standard pipe.

This Petitioner admission cannot be ignored. In a legal proceeding the explicitly addressed CWP from Thailand, Petitioner testified under oath that line pipe and dual-stenciled pipe were not covered by the CWP from Thailand AD Order.

### B. The Department's Past Scope Definitions in Standard Pipe AD Cases Further Support A Finding That Line Pipe Is Excluded from the CWP AD Order

The Department's own regulations provide that, in making scope determinations, the Department "will take into account … prior scope determinations."[36] Such requirement is particularly important for the Department's instant scope inquiry because there have been so many past AD cases covering circular welded pipe in which the Department rendered a decision that confirmed that line pipe was not covered by an AD case targeting circular welded pipe.

In every single past AD case involving circular welded steel pipe (i.e., standard pipe), line pipe has been excluded from the scope. Following the CWP from Thailand AD order, there have been 9 separate Department AD investigations covering "circular welded pipe." These AD cases include the following:

[35] *Certain Welded Non-Alloy Steel Pipes And Tubes From Brazil, India, South Korea, Mexico, Taiwan, Thailand, Turkey And Venezuela (Review)*, Prehearing Brief of Wheatland Tube et al (Feb. 29, 2000) at 58-59 (emphasis added), provided in Saha Thai's August 26, 2019 Scope Inquiry Comments, Attachment 7.

[36] 19 C.F.R. § 351.225(k)(1).

PUBLIC DOCUMENT

| *Country and Case Number* | *Year of AD Order* | *Relevant Scope Language* |
|---|---|---|
| United Arab Emirates (A-520-807) | 2016 | "The merchandise covered by these orders is welded carbon-quality steel pipes and tube, of circular cross-section. . . generally known as standard pipe . . . **the scope of these orders does not include . . . line pipe**" |
| Pakistan (A-535-903) | 2016 | |
| Oman (A-523-812) | 2016 | |
| China (A-570-910) | 2008 | "The merchandise subject to this proceeding is certain welded carbon quality steel pipes and tubes, of circular cross-section. . . generally known as standard pipe **the scope of this investigation does not include . . . line pipe**" |
| Brazil (A-351-809) | 1992 | "The products covered by these orders are circular welded non-alloy steel pipes and tubes, of circular cross-section generally known as standard pipes and tubes . . . All carbon steel pipes and tubes within the physical description outlined above are included within the scope of these orders, **except line pipe** . . . Standard pipe that is **dual or triple certified/stenciled** that enters the U.S. as line pipe of a kind used for oil or gas pipelines is **also not included** in these orders . . . " |
| Mexico (A-201-805) | 1992 | |
| Korea (A-580-809) | 1992 | |
| Venezuela (A-307-805) | 1992 | |
| Taiwan (A-583-814) | 1992 | "The products covered by these orders are (1) circular welded non-alloy steel pipes and tubes, of circular cross-section generally known as standard pipes and tubes . . . All carbon steel pipes and tubes within the physical description outlined above are included within the scope of these orders, **except line pipe** . . . standard pipe that is **dual or triple certified/stenciled** that enters the U.S. as line pipe of a kind used for oil or gas pipelines **is also not included** in this investigation." |

All of these AD cases confirm that the Department has always considered "line pipe" (which by definition includes dual-stenciled pipe) to be excluded from the scope of any AD case covering circular welded pipe. In sum, the use of a scope inquiry to add line pipe into an antidumping order that specifically was limited to standard pipe would

violate years of precedent and AD/CVD proceedings regarding different categories of tubular products.

**C. Petitioner's Contrary Arguments Can Be Easily Rejected**

In its September 3, 2019 submission, Petitioner made a number of arguments in response to Saha Thai's arguments above.[37] None of Petitioner's arguments have merit and can easily be dismissed.

First, Petitioner argues that the plain language of the scope shows that line pipe is covered by the AD Order. To support this argument, Petitioner relies on the scope language in the Department's recent review, *Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 83 Fed. Reg. 51,927 (Oct. 15, 2018). The scope language noted in the Department's final administrative review, however, is not identical to the scope language of the original AD order. As the Department's stated, the purpose of this scope inquiry is to determine "whether line pipe, and whether dual-stenciled standard and line pipe, is subject to the antidumping duty (AD) order on circular welded carbon steel pipes and tubes (standard pipe) from Thailand"[38] the language of the original order must be the primary focus. And as Saha Thai explains above, the scope language of the AD order[39] does not support Petitioner's contention and instead clearly shows that line pipe was intentionally and specifically excluded from the order at the time of the original AD investigation.

[37] *See* Petitioner's Rebuttal to Saha Thai's August 26, 2019 Comments (Sept. 3, 2019).

[38] Commerce Self Initiation Memo, at 1 (emphasis added).

[39] *Antidumping: Circular Welded Carbon Steel Pipes and Tubes From Thailand; Final Determination of Sales at Less Than Fair Value*, 51 Fed. Reg. 8384 (Jan. 27, 1986).

Petitioner also argues that there are no scope exclusions in the Order for line pipe.[40] That contention is meritless. A scope exclusion needs not be explicit but could be implied.[41] As explained above, the facts that (1) Petitioner specifically distinguished standard pipe and line pipe in the original petition and subsequently withdrew the "line pipe" petition and (2) the Department specifically omitted "line pipe" TSUSA codes from the scope language in the final determination of the AD investigation[42] despite their inclusion in the petition,[43] unequivocally demonstrate that there is a specific and intentional exclusion of line pipe from the scope of the AD order even though there is no explicit sentence in the scope to exclude line pipe.

Second, Petitioner argues that Saha Thai is wrong by asserting that "petitioners amended the scope of the petition against Thailand by taking out line pipe" and that "there is absolutely no evidence that petitioners ever amended the scope".[44] Petitioner blatantly ignores the Department's own description of the amendment of the scope in the original AD investigation. The Department's Notice of Initiation of the original AD Investigation states: [45]

---

[40] Petitioner's Rebuttal to Saha Thai's August 26, 2019 Comments (Sept. 3, 2019) at 5.

[41] *See, e.g., Fedmet Resources Corp. v. United States*, 755 F.3d 912, 919 (Fed. Cir. 2014) (noting that the scope language was sufficient to implicitly exclude MAC bricks).

[42] *See Antidumping: Circular Welded Carbon Steel Pipes and Tubes From Thailand; Final Determination of Sales at Less Than Fair Value*, 51 Fed. Reg. 8384 (Jan. 27, 1986) (provided in Saha Thai's August 26, 2019 Scope Comments, Attachment 4).

[43] *See* Saha Thai's August 26, 2019 Scope Comments, at Attachment 11 - Original Petition at pages 12-13 ("the small diameter circular pipes subject to this investigation were classified in TSUSA categories 610.3208, 610.3209…")

[44] Petitioner's Rebuttal to Saha Thai's August 26, 2019 Comments (Sept. 3, 2019) at 7.

[45] *Certain Circular Welded Carbon Steel Pipes and Tubes From Thailand; Initiation of Antidumping Duty Investigation*, 59 Fed. Reg. 12,068 (Mar. 27, 1985) (provided in Saha Thai's August 26, 2019 Scope Comments, Attachment 2**)**.

> The petition, as originally filed, covered both standard pipe, which is defined in the "Scope of Investigation" section of this notice, and line pipe. **By amendment** dated March 12, 1985, counsel for petitioners clarified that the petition was being filed on behalf of the standard pipe subcommittee and the line pipe subcommittee of the {Committee on Pipe and Tube Imports (CPTI)} and by individual manufacturers of standard pipe and line pipe. By amendment dated March 14, 1985, petitioners withdrew the portion of the petition dealing with line pipe.

Petitioner further contends that "Petitioners withdrew the petition with respect to line pipe from Thailand …{but} Petitioners did not amend the language in the scope to exclude line pipe." This argument makes no sense. By accepting that there was no line pipe production in Thailand at the time and withdrawing the line pipe petition, Petitioners were fully aware that the investigation (and subsequent order) did not cover line pipe. In fact, the Department (who has the authority to define scope, not Petitioners) specifically modified the scope language based on Petitioners' amendment to omit "line pipe" TSUSA codes as explained above. Therefore, contrary to Petitioner's contention, it is crystal clear that both Petitioner and the Department knew fully well that line pipe was excluded from the original investigation and the resulting AD order.

Finally, Petitioner argues that the ITC's findings in the original injury investigation and subsequent proceedings as well as the Department's subsequent investigations of pipe products have "no relevance whatsoever to the instant scope inquiry."[46] Petitioner's argument is flat wrong. At the outset, the Department is specifically required to consider these determinations for purposes of scope determination pursuant to 19 C.F.R. § 351.225(k)(1). The scope of the original investigation against Thailand contains the following language: "the products under investigation are certain

[46] Petitioner's Rebuttal to Saha Thai's August 26, 2019 Comments (Sept. 3, 2019) at 9-12.

circular welded carbon steel pipes and tubes, also known as "standard pipe" or "structural tubing." The scope has no mention of line pipe – contrary to Petitioner's contention that the scope unequivocally includes line pipe.

And this is where the past ITC and Commerce determinations become relevant. Both the ITC and the Department in multiple cases consistently concluded that line pipe is different to standard pipe and belongs to a different class of product (as explained above). The case against Thailand does not exist in a vacuum, and must be viewed within the context of the industry.[47] Because both the ITC and the Department have consistently recognized that line pipe is a different class of product than standard pipe, it must conclude that the AD order against Thailand, which references only "standard pipe," does not cover line pipe.

Recently, the U.S. Court of International Trade rejected the Department's expansion of the scope of the *Softwood Lumber* Order, in part, because the Department did not consider the original investigation documents from the Commission.[48] In that case, the Department's scope ruling determined that cedar shakes and shingles were within the scope of the antidumping and countervailing duty orders on *Certain Softwood Lumber from Canada* when the Commission previously had determined that cedar shakes and shingles and lumber were different products.[49] The Court remanded the

[47] *See ArcelorMittal Stainless Belg. N.V. v. United States*, Slip Op. 11-82, 2011 WL 2713872, at *1 (CIT July 12, 2011) ("{A}ntidumping and countervailing duty orders are specific to a particular kind or class of merchandise and, therefore, unless otherwise specified, they must necessarily be interpreted in the context of the industry in which the merchandise at issue is manufactured, bought and sold.").
[48] *See Shake & Shingle All. v. United States*, No. 18-00228, 2019 WL 5963415, at *1 (Ct. Int'l Trade Nov. 13, 2019)
[49] *Id*.

Department's determination because the Department did not sufficiently address the prior proceedings in its determination.[50] Thus, despite Petitioner's claims, the Commission's determinations must be factored into the Department's decision making. As stated above, the Commission clearly did not view line pipe or dual stenciled pipe as products within of scope of the standard pipe Order, and the Department's scope determination in this case must take into account the Commission's findings. Based on the extensive history in this case, the Department must conclude that line pipe and dual stenciled pipe are not within the scope of this Order.

Petitioner also has claimed that the Commission's pronouncements regarding line pipe being excluded from the scope of the orders were general statements regarding the orders on CWP from seven countries and not statements specific to the Order on CWP from Thailand.[51] This interpretation is misleading and wrong. First, the relevance of other similar antidumping duty proceedings always has been given weight by the Department in making its scope determinations. For example, in a scope determination for PET Film, Sheet, and Strip from Brazil,[52] the Department considered the Commission determination regarding PET film from numerous determinations, including PET Film from Japan and Korea;[53] PET Film from India and Taiwan;[54] and PET Film from Brazil, Thailand, and the UAE.[55]

---

[50] *Id*. at 8.

[51] *See* Petitioner's Rebuttal to Saha Thai's August 26, 2019 Comments (Sept. 3, 2019) at 9-10.

[52] *See Mitsubishi Polyester Film, Inc. v. United States*, 321 F. Supp. 3d 1298 (Ct. Int'l Trade 2018).

[53] *See Polyethylene Terephthalate Film, Sheet, and Strip From Japan and the Republic of Korea*, Inv. No. 731–TA–458 and 459 (Final), USITC Pub. 2383 (May 1991).

Second, and more importantly, in the standard pipe from Thailand investigation in 1985, the Commission did not simply make general statements regarding the CWP Orders; rather, the Commission made specific and unequivocal determinations that line pipe and standard pipe were different products.  At three separate phases of the investigation, the Commission was aware that the case before them was only for standard pipes and that line pipe was not included.  First, the petition before the Commission was only for standard pipe.[56]  Second, in its preliminary injury determination, the Commission stated that line pipe and standard pipe were different products, and made a preliminary injury determination only for standard pipe.[57]  Finally, in the final determination, the Commission made its injury determination only for standard pipe.[58]  These specific statements regarding the standard pipe case for the Order subject to this scope ruling show that the Commission intentionally and specifically considered only standard pipe from Thailand in its injury analysis.  Thus, based on the Department's k(1) factors, line pipe and dual stenciled pipes may not be subject to the scope of the standard pipe from Thailand AD Order.

---

[54] *PET Film from India and Taiwan*, Staff Report to the Commission Inv. Nos. 701–TA–415 and 731–TA–933–934 (Final), (May 28, 2002).

[55] *See Polyethylene Terephthalate Film, Sheet, & Strip From Brazil, China, Thailand, & the United Arab Emirates*, Inv. No. 731–TA–1131–1134 (Final), USITC Pub. 4040 (Oct. 2008).

[56] *See Certain Welded Carbon Steel Pipes and Tubes from Thailand and Venezuela*, USITC Pub. 1680 at 6 (Apr. 1985).

[57] *See Certain Welded Carbon Steel Pipes and Tubes from Thailand and Venezuela*, USITC Pub. 1680 at 6-7 (Apr. 1985).

[58] *See Certain Welded Carbon Steel Pipes And Tubes From Turkey And Thailand*, Inv. Nos. 701-TA-253 and 731-TA-252 (Final), USITC Pub. 1810 at a-1 (Feb. 1986).

## II. BECAUSE THERE IS NO QUESTION THAT THE ITC'S ORIGINAL INJURY DETERMINATION DID NOT INLCUDE IMPORTS OF LINE PIPE, A SCOPE DECISION TO INCLUDE LINE PIPE WITHIN THE AD ORDER WOULD VIOLATE U.S. LAW

As discussed below, a review of the International Trade Commission's determinations demonstrate that line pipe and dual stenciled pipe are outside the scope of the Order on Thai standard pipe because Petitioner modified the scope of the petition expressly to exclude line pipe and the Commission did not consider line pipe or dual stenciled pipe in its injury determination. Thus, any expansion of the scope of this Order to include line pipe or dual stenciled pipe would violate U.S. law.

**Background Of The ITC's Original Injury Investigation**

The Commission's injury investigation commenced in this case over 34 years ago when the Committee on Pipe and Tube Imports filed its petition on February 28, 1985.[59] As discussed above in Section I, the Commission's preliminary and final determinations during this original investigation establish that line pipe was not included in the scope of the case. Specifically, the Commission explained that the petition was amended to remove imports of line pipe from Thailand. [60] Then in the preliminary determination, the Commission specifically stated that it was investigating only standard pipe for Thailand:

> There are two imported products that are subject of the three petitions in these investigations: standard and line circular welded carbon steel pipes and tubes, 0.375 inch or more but not over 16 inches in outside diameter as follows:

---

[59] *See Certain Welded Carbon Steel Pipes and Tubes from Turkey and Thailand*, Inv. Nos. 701-TA-253, 731- TA-252 (Final), USITC Pub. 1810 at 2 (Feb. 1986) (emphasis added).

[60] *Id.* at 3 ("on March 14, 1985, **the petitions involving imports from Thailand were withdrawn as they relate to line pipe because** there is no known production in Thailand of line pipe to American Petroleum Institute (API) specifications.") (emphasis added).

Barcode:3922534-01 A-549-502 SCO - Scope Inquiry - Line Pipe

(1) No. 701-TA-242, countervailing duty petition regarding Venezuela, both standard and line pipes and tubes;

(2) No. 731-TA-252, antidumping petition regarding Thailand, **standard pipe and tubes only**; and

(3) No. 731-TA-253, antidumping petition regarding Venezuela, line pipes and tubes only.[61]

The Commission explained in detailed that line pipe and standard pipe are two distinct products with different uses and physical characteristics.[62] According to the Commission's preliminary determination staff report, standard pipes and tubes are used for low-pressure conveyance of water, steam, natural gas, air and other liquids and gases in plumbing and heating systems, air-conditioning units, automatic sprinkler systems, and other related uses. In contrast, for line pipe, the Commission explained that "line pipes and tubes are used for the transportation of gas, oil, or water, generally in pipeline or utility distribution systems."[63] As a result of the differences between the two products, the Commission concluded that its injury determinations must be based on two separate industries.[64] As a matter of law, the Commission's like product finding meant that, for

[61] *See Certain Welded Carbon Steel Pipes and Tubes from Thailand and Venezuela*, USITC Pub. 1680 at 6 (Apr. 1985).

[62] *See Certain Welded Carbon Steel Pipes and Tubes from Thailand and Venezuela*, USITC Pub. 1680 at 7, fn. 8 (Apr. 1985) ("The Commission has conducted a series of investigations regarding imports of welded carbon steel pipes and tubes in the recent past. Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea, Inv. No. 701-TA-168, USITC Pub. 1345 (1983); Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea and Taiwan, Invs. Nos. 731-TA-131 and 132 (Preliminary), USITC Pub. 1389 (1983), *aff'd*, Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea and Taiwan, Invs. Nos. 731-TA-131, 132, and 138 (Final), USITC Pub. 1519 (1984); Certain Welded Carbon Steel Pipes and Tubes from Brazil and Spain, Inv. Nos. 701-TA-220 (Preliminary), 731-TA-197 and 198 (Preliminary), USITC Pub. 1569 (1984); Certain Welded Carbon Steel Pipes and Tubes from Taiwan and Venezuela, Inv. Nos. 731-TA-211 and 212 (Preliminary), USITC Pub. 1639 (1985).").

[63] *See id*. at A-6.

[64] *Id*. at 6-7.

Filed By: dporter@curtis.com, Filed Date: 12/20/19 3:16 PM, Submission Status: Approved

purposes of the Commission's injury analysis, there were two domestic industries producing two distinct products: the line industry and the standard pipe industry.

In its final determination, the Commission reiterated that, "{i}n the preliminary investigations, we determined that domestically produced line pipe is like imported line pipe and that domestically produced standard pipe is like imported standard pipe. None of the parties to these investigations has argued that those determinations should be changed and no facts have been presented that persuade us to change them."[65]

The Thai AD order has been in place for more than 34 years, and the Commission has been consistent in its repeated determinations that line pipe and dual-stenciled pipe are not part of the scope of this case. In the most recent (fourth) sunset review of the AD order of circular welded steel pipes and tubes from Thailand, the Commission again reiterated that line pipe and dual stenciled pipe are not within the scope of the order.[66] Additionally, in the third sunset review of this investigation, the Commission made clear that dual stenciled pipe is not within the scope of these investigations.[67] Based on the Commission's determinations in the original investigation in 1985 and in all subsequent sunset reviews, it is clear that the Commission's position is that line pipe and dual stenciled pipe are not included within the scope of the Order.

---

[65] *See Certain Welded Carbon Steel Pipes And Tubes From Turkey And Thailand*, Inv. Nos. 701-TA-253 and 731-TA-252 (Final), USITC Pub. 1810 at 6-7 (Feb. 1986).

[66] *See Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey (Final)*, Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534, and 536 (Fourth Review), USITC Pub.4754 at 6-7 (Jan. 2018).

[67] *See Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey*, Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534 and 536 (Third Review), USITC Pub. 4333 at 8 (June 2012).

PUBLIC DOCUMENT

**Adopting the Petitioner's Suggestion Would Conflict Directly with the ITC's Final Determination**

The Department's self-initiated scope inquiry focuses exclusively on the criteria under Section 781(a) of the Tariff Act, 19 U.S.C. § 1677j(a). Conspicuously absent from the initiation memorandum is any mention of the provisions found under Section 781(e), 19 U.S.C. § 1677j(e), concerning the requirement of the Department to seek advice from the Commission regarding any proposed action under Section 781(a). Under this provision, before making any determination under Section 781(a), the Department "shall notify the Commission of the proposed inclusion of such merchandise in" the AD order, and the Commission thereafter can seek consultations with the Department. See 19 U.S.C. §§ 1677j(e)(1) & (2) (emphasis added). The statute specifies that:

> If the Commission believes . . . that a significant injury issue is presented by the proposed inclusion, the Commission may provide written advice to the {Department} as to whether the inclusion would be inconsistent with the affirmative determination of the Commission on which the order or finding is based. . . . For purposes of formulating its advice with respect to merchandise completed or assembled in the United States from parts or components produced in a foreign country, the Commission shall consider whether the inclusion of such parts or components taken as a whole would be inconsistent with its prior affirmative determination.

*Id.* § 1677j(e)(3).

Section 781(a) mandates that the Department seek consultations with the Commission prior to making a scope determination on whether line pipe or dual stenciled pipe should be included within the scope of the standard pipe Order from Thailand. Thus, any determination without consultations with the Commission would be unlawful.

In light of the procedural history at the Commission in this case, the inclusion of line pipe and dual-stenciled pipe within the scope of the Thai AD order "would be inconsistent with {the ITC's} prior affirmative determination." In asking the Department to include line pipe and dual-stenciled pipe within the scope of the AD Order, the petitioner is asking the Department to take actions that directly contradict the Commission's determinations, in effect exploiting Section 781(a) of the Tariff Act to include line pipe and dual-stenciled pipe within the scope notwithstanding the **absence** of any Commission determination that such products caused (or threatened to cause) injury to the relevant domestic industry or that such products would continue to injure the U.S. industry within a reasonably foreseeable future if the Thai AD order was revoked.[68] But, as described in detail below, the Department cannot apply an antidumping duty absent an injury determination. In this case, any expansion of the scope to cover line pipe and dual-stenciled pipe would be unlawful because it would impose AD duties on distinct products for which the Commission never specifically determined that the domestic industry was injured.

AD/CVD orders must be supported by an ITC determination of material injury covering the merchandise in question,[69] and in this respect the courts have ruled that

[68] *See Certain Welded Carbon Steel Pipes and Tubes from Turkey and Thailand*, Inv. Nos. 701-TA-253, 731- TA-252 (Final), USITC Pub. 1810 at a-2 (Feb. 1986); *Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey (Final)*, Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534, and 536 (Fourth Review), USITC Pub.4754 at 6-7 (Jan. 2018); *Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey*, Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534 and 536 (Third Review), USITC Pub. 4333 at 8 (June 2012).

[69] 19 U.S.C. § 1673 (requiring an injury determination by the ITC before the imposition of antidumping duties).

expanding the scope of an AD order beyond the Commission's injury analysis is contrary to the law. Specifically, the Federal Circuit has stated, "the injury determination of the ITC . . . cover{s}only products within the original scope of the Commerce investigation. It would follow that any expansion of the scope by Commerce would extend the antidumping duty order beyond the limits of the Commission's injury determination and would therefore violate both U.S. and international law."[70] The Court of International Trade similarly has stated that the Department cannot include in the final order merchandise for which there was no investigation and for which there was no determination of sales at less than fair value ("LTFV") or of injury.[71] In *TMB440 AE, Inc v. United States*, the Court remanded the Department's determination because the Department did not properly take into account the Commission's determinations in that case.[72] The Court explained the problem for cases where the Department makes scope determinations without taking into account the injury determination, stating, "{b}y not considering the (k)(1) sources, as required by regulation, Commerce created a situation in which duties might be assessed against products without an injury determination. Indeed, preventing such a result is likely why the applicable regulations state that Commerce 'will take into account' the (k)(1) criteria, including the ITC determination."[73] Similarly, in *Trendium Pool Products, Inc. v. United States*, the Court found that a scope

[70] *See Wheatland Tube Co. v. United States*, 973 F. Supp. 149, 158 (Ct. Int'l Trade 1997) (citing *United States Steel Group v. United States*, 873 F. Supp. 673, 683 n.6 (1994)), *aff'd*, 161 F.3d 1365 (Fed. Cir. 1998).

[71] *See Allegheny Bradford Corp. v. United States*, 342 F. Supp. 2d 1172 (2004).

[72] *See TMB 440AE, Inc. v. United States*, 399 F. Supp. 3d 1314, 1322 (Ct. Int'l Trade 2019).

[73] *See id*.

determination by the Department was not in accordance with law because the products under examination "were never considered as part of the ITC's injury analysis despite the requirement of an injury determination prior to the imposition of duties."[74] The Court concluded that allowing the Department to include those products within the scope of the order would "frustrate the purpose of the antidumping laws because it would allow Commerce to assess antidumping duties on products intentionally omitted from the ITC's injury investigation."[75]

During the original investigation of pipe from Thailand, the Commission was well aware that certain U.S. companies manufactured line pipe and dual-stenciled pipe and that other companies had the potential to do so.[76] The Commission considered and understood fully that line pipe and dual-stenciled pipe were not within the scope its determination. As such, the Commission did not make an affirmative injury determination with respect to Thai imports of line pipe and dual-stenciled pipe.[77] As explained above, the Commission went to great length to elaborate the differences between line pipe and standard pipe in the original investigation. Specifically, in its like product analysis the Commission stated, "{w}e conclude that domestic line pipe is like imported line pipe and not like imported standard pipe. We further conclude that domestic standard pipe is like imported standard pipe and not like imported line pipe." Thus, the Commission's analysis clearly shows that the Commission did not make an

[74] *See id*. at 1345.

[75] *See id*. (citing *Wheatland Tube Co. v. United States,* 161 F.3d 1365, 1371 (Fed. Cir. 1998)).

[76] *See Certain Welded Carbon Steel Pipes and Tubes from Turkey and Thailand*, Inv. Nos. 701-TA-253, 731- TA-252 (Final), USITC Pub. 1810 at 2-3 (Feb. 1986).

[77] *See id*. .

injury determination with respect to line pipe or dual stenciled pipe in its investigation determination. As such, in the current proceeding, the Department cannot expand the scope to include line pipe and dual stenciled pipe for which there was no investigation and for which there was no determination of sales at LTFV or of injury.

Petitioner claims that the fact that the Commission found "two distinct classes or kinds or products, standard pipe and line pipe," has no relevance whatsoever to the instant scope inquiry regarding whether line pipe is included within the scope of the Order is false.[78]

## III. BECAUSE LINE PIPE (INCLUDING DUAL-STENCILED PIPE) IS EXCLUDED FROM THE SCOPE OF THE UNDERLYING AD ORDER, THE DEPARTMENT ALSO NEEDS TO PUT PETITIONER'S ALLEGATION OF CIRCUMVENTION TO REST

In its letter of July 29, 2019, the Department states that, if it determines that "line pipe" does not fall within the scope of the existing order, it will continue its anti-circumvention inquiry. The analysis herein should also lay to rest any resumption of such an inquiry. Moreover, as Saha Thai has submitted in its June 6, 2019 letter in the anti-circumvention segment, the Department does not have the legal authority to initiate a minor alteration anti-circumvention investigation with respect to a product that was unambiguously excluded from the scope of an AD order.

The Department has long recognized the Federal Circuit's decision in *Wheatland Tube Co. v. United States*,[79] as the guiding authority on the general issue of initiating

[78] *See* Petitioner's Rebuttal to Saha Thai's August 26, 2019 Comments (Sept. 3, 2019) at 9.

[79] *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1371 (Fed. Cir. 1998).

anti-circumvention inquiries.[80] Importantly, *Wheatland* involved the AD orders that covered imports of circular welded non-alloy steel pipe, known as *standard pipe*, and is used for low pressure applications, such as plumbing.[81] The scope of the orders at issue in *Wheatland Tube* were very similar to the scope of the underlying order at issue here and also excluded *line pipe* – a high quality type of standard pipe that is often used of oil or gas pipelines.[82] After the orders were issued, Wheatland and other domestic producers filed petitions with the Department claiming that line pipe from certain subject countries were imported for standard pipe applications, thereby circumventing the orders.[83] The Department of Commerce declined to initiate an anti-circumvention inquiry. Rather, the Department ultimately concluded that the orders expressly excluded line and dual-certified pipe that enters the United States as line pipe regardless of actual use; and such conclusion was appealed by Petitioner Wheatland.[84] Holding that the Department was correct in not initiating a "minor alteration" inquiry under 19 U.S.C. § 1677j(c), the Federal Circuit ruled that "section 1677j(c) {the minor alteration circumvention

[80] *See e.g.* Memorandum to James Maeder from Amanda Brings, *Re: Certain Hardwood Plywood Products from the People's Republic of China: Minor Alterations Anti-Circumvention Inquiry Request*, dated Apr. 2, 2018 at 13-14; *Later-Developed Merchandise Anticircumvention Inquiry of the Antidumping Duty Order on Petroleum Wax Candles from the People's Republic of China: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order*, 71 Fed. Reg. 32,033, 32,036 at fn. 7 (June 2, 2006).

[81] *Wheatland*, 161 F. 3d at 1367-68; *see Wheatland Tube Co. v. United States*, 973 F. Supp. 149, 151-153 (Ct. Int'l Trade 1997) (quoting the relevant scope from *Circular Welded Non-Alloy Steel Pipe from Brazil, the Republic of Korea, Mexico, Romania, Taiwan, and Venezuela*, 56 Fed. Reg. 52,528 (Dep't Comm. 1991) (initiation of antidumping duty investigations)).

[82] *Id*. 161 F. 3d at 1367-68.

[83] *Id*.

[84] *Id*.

provision} does not apply to products unequivocally excluded from the order in the first place."[85]

Moreover, a minor alterations inquiry under section 1677j(c) is applicable only if the articles in question have been altered in form or appearances in some minor respects. As explained by the Court of International Trade (and confirmed by the Federal Circuit):

> It is undisputed that API 5L and dual-certified API 5L/ASTM A53 pipe are not created by altering the subject merchandise in form or appearance. Standard pipe, such as ASTM A53 pipe, is made to lower specifications than API line pipe and cannot be transformed into line pipe through a minor alteration. Line pipe is a distinct product, produced using different raw materials, manufacture to different chemical, dimensional, and weight specifications, and designed for different uses from standard pipe.[86]

Accordingly, the Federal Circuit ruled that the Department was correct in refusing to initiate the minor alteration circumvention investigation.

The present factual situation is exactly the same as the facts in *Wheatland*. All Petitioner has shown – and Saha Thai does not dispute – is that Saha Thai has made a product that meets line pipe specifications. As evidenced by the plain language of the scope (which refers only to standard pipe and does not mention line pipe or dual-stenciled pipe) and by the original investigation documents, line pipe is explicitly excluded from the scope of the investigations. Thus, Saha Thai submits that the Department should adopt the same conclusion is it did in the CWP proceeding underlying *Wheatland* and reject Petitioner's request for initiation of a "minor alterations" anti-circumvention inquiry. The Department has previously found unlawful Petitioner's attempt to expand

---

[85] *Wheatland*, 161 F. 3d at 1371.

[86] *Id.* (emphasis added)

the scope of a CWP AD Order to include line pipe and it should reach this same conclusion once again.

## IV. IF THE DEPARTMENT ERRONEOUSLY CONCLUDES THAT THE AD ORDER COVERS LINE PIPE, THE EARLIEST DATE THE DEPARTMENT CAN SUSPEND LIQUIDATION OF LINE PIPE IMPORTS IS NOVEMBER 22, 2019, THE DATE OF SELF-INITIATION

As Saha Thai extensively argued earlier in this proceeding, the Department did not properly initiate the scope inquiry by way of its July 29, 2019 letter.[87] Therefore, July 29, 2019 cannot be considered as the date of initiation for purposes of imposition of suspension of liquidation under 19 C.F.R. § 351.225(l)(2). The proper initiation date must be November 22, 2019, the date of the Department's memorandum re "Self Initiation of Scope Inquiry on Line Pipe and Dual-Stenciled Standard Line Pipe."

[87] *See* Saha Thai's Comments on Scope Inquiry (Aug. 26, 2019) at 4-9 (hereby incorporated by reference).

Barcode:3922534-01 A-549-502 SCO - Scope Inquiry - Line Pipe

## CONCLUSION

For all of the foregoing reasons, the Department should find that "line pipe" and "products that are dual-stenciled" are not included in the scope of the CWP from Thailand AD Order. The Department should also terminate its anti-circumvention inquiry, as there is no question that any claims of circumvention fall well short of the legal standard for an affirmative finding.

Respectfully submitted,

/s/ Daniel L. Porter

Daniel L. Porter
Tung Nguyen
Gina Colarusso

*Counsel for Saha Thai*

Filed By: dporter@curtis.com, Filed Date: 12/20/19 3:16 PM, Submission Status: Approved

**Tab 8**

LETTER FROM CURTIS, MALLET-PREVOST, COLT & MOSLE LLP TO SEC OF
COMMERCE PERTAINING TO SAHA THAI CMTS ON SCOPE INQUIRY (Dec. 30, 2019)
(P.R. 53)



Barcode:3925153-01 A-549-502 SCO - Scope Inquiry - Line Pipe

**Curtis, Mallet-Prevost, Colt & Mosle LLP**

Almaty
Beijing
Buenos Aires
Dubai
Frankfurt
Geneva
Houston
London
Mexico City
Milan
Muscat
New York
Nur-Sultan
Paris
Rome

1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

**Telephone +1 202 452 7373**
**Facsimile +1 202 452 7333**
www.curtis.com

**Daniel L. Porter**
Tel: +1 202 452 7340
Fax: +1 202 452 7333
E-Mail: dporter@curtis.com

December 30, 2019

**PUBLIC DOCUMENT**

Case No.: A-549-502

No. Pages: 14

Status: Scope Inquiry (Line Pipe)

This proceeding is conducted by Enforcement & Compliance, AD/CVD Operations/ VII

This submission contains no business proprietary information.

The Honorable Wilbur Ross
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/Dockets Unit, Room 18022
14th Street & Constitution Avenue, N.W.
Washington, D.C. 20230

Attn: Toni Page & Alexander Cipolla

Re: *Saha Thai's Rebuttal Comments on "Line Pipe" Scope Inquiry*
Circular Welded Carbon Steel Pipe and Tubes from Thailand

Dear Secretary Ross:

On behalf of Saha Thai Steel Pipe Public Co., Ltd. ("Saha Thai"), we hereby submit Saha Thai's rebuttal comments on the Department's "Line Pipe" Scope Inquiry pursuant to the Department's "Self-Initiation" Memorandum dated November 22, 2019. This submission is timely made pursuant to the Department's memorandum to the file dated December 6, 2019. This submission contains no business proprietary information.

Filed By: dporter@curtis.com, Filed Date: 12/30/19 12:41 PM, Submission Status: Approved

Barcode:3925153-01 A-549-502 SCO - Scope Inquiry - Line Pipe

CURTIS

Curtis, Mallet-Prevost, Colt & Mosle LLP

December 30, 2019
Page 2

If you have any questions, please contact the undersigned.

Respectfully submitted,

/s/ Daniel L. Porter

Daniel L. Porter
Tung Nguyen
Gina Colarusso

**Curtis, Mallet-Prevost, Colt & Mosle LLP**

*Counsel for Saha Thai*

Filed By: dporter@curtis.com, Filed Date: 12/30/19 12:41 PM, Submission Status: Approved

Barcode:3925153-01 A-549-502 SCO - Scope Inquiry - Line Pipe

**Circular Welded Carbon Steel Pipes and Tubes from Thailand**

**A-549-502**
**Scope Inquiry**
**SCO – Line Pipe**

## CERTIFICATE OF ACCURACY AND COMPLETENESS

I, Daniel L. Porter, of Curtis, Mallet-Prevost, Colt & Mosle LLP, counsel to Saha Thai Steel Pipe Public Co., Ltd. ("Saha Thai"), certify that I have read the attached : ***Saha Thai's Rebuttal Comments on "Line Pipe" Scope Inquiry***, ***dated December 30, 2019***, pursuant to the Scope Inquiry of Circular Welded Carbon Steel Pipes and Tubes from Thailand, A-549-502. In my capacity as an adviser, counsel, preparer or reviewer of this submission, I hereby certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that I am filing a copy of this signed certification with this submission to the U.S. Department of Commerce and that I will retain the original for a five-year period commencing with the filing of this document. The original will be available for inspection by U.S. Department of Commerce officials.

Daniel L. Porter
Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, NW
Washington, DC 20006

Dated: December 30, 2019

Filed By: dporter@curtis.com, Filed Date: 12/30/19 12:41 PM, Submission Status: Approved

**Circular Welded Carbon Steel Pipes and Tubes from Thailand**

**A-549-502**
**Scope Inquiry**
**SCO – Line Pipe**

**PUBLIC**
**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing submission has been served this day by first-class mail, upon the following persons:

| | |
|---|---|
| Roger B. Schagrin, Esq.<br>On behalf of Wheatland Tube<br>**SCHAGRIN ASSOCIATES**<br>900 7th Street, NW<br>Suite 500<br>Washington, DC 20001 | Robert George Gosselink, Esq.<br>On behalf of Thai Premium Pipe Company Ltd.<br>**TRADE PACIFIC PLLC**<br>660 Pennsylvania Avenue, SE<br>Suite 401<br>Washington, DC 20002 |
| Alan H. Price, Esq.<br>On behalf of Independence Tube Corporation, et al.<br>**WILEY REIN LLP**<br>1776 K Street, N.W.<br>Washington, DC 20006 | |

Daniel L. Porter
Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, NW
Washington, DC 20006

Dated: December 30, 2019

Barcode:3925153-01 A-549-502 SCO - Scope Inquiry - Line Pipe

**PUBLIC DOCUMENT**

Case No.: A-549-502

No. Pages: 14

Status: Scope Inquiry (Line Pipe)

This proceeding is conducted by Enforcement & Compliance, AD/CVD Operations/ VII

This submission does not contain any business proprietary information.

# SAHA THAI'S
# REBUTTAL COMMENTS ON SCOPE INQUIRY

*Circular Welded Steel Pipes and Tubes from Thailand*

Daniel L. Porter
Tung Nguyen

**Curtis, Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, N.W.
Washington, D.C., 20006
(202) 452-7327

December 30, 2019

Filed By: dporter@curtis.com, Filed Date: 12/30/19 12:41 PM, Submission Status: Approved

Barcode:3925153-01 A-549-502 SCO - Scope Inquiry - Line Pipe

**TABLE OF CONTENTS**

**Page #**

INTRODUCTION AND SUMMARY OF COMMENTS ........ 1

COMMENTS ........ 2

I. FACTORS UNDER 19 C.F.R. § 351.225(K)(1) ARE RELEVANT TO THE DEPARTMENT'S ANALYSIS ........ 2

II. INITIAL INVESTIGATION DOCUMENTS AND PRIOR SCOPE RULINGS ARE DISPOSITIVE THAT LINE PIPE IS NOT COVERED BY THE CWP AD ORDER ........ 6

CONCLUSION ........ 8

Filed By: dporter@curtis.com, Filed Date: 12/30/19 12:41 PM, Submission Status: Approved

## INTRODUCTION AND SUMMARY OF COMMENTS

On behalf of Saha Thai Steel Pipe Public Co., Ltd. ("Saha Thai"), we respectfully submit rebuttal comments in response to Wheatland Tube ("Petitioner")'s December 12, 2019 comments[1] on the scope language "matter" as requested by the Department in the Memorandum dated November 22, 2019.[2] As detailed below, Saha Thai makes two rebuttal comments.

First, contrary to Petitioner's contention, the Department is required to consider the factors under 19 C.F.R. § 351.225(k)(1) to determine whether the plain language of the scope of the AD order is ambiguous or not. And in any event, the scope language does not unambiguously establish that line pipe is covered. Therefore, the (k)(1) factors are relevant to the Department's analysis.

Second, contrary to Petitioner's contention, documents in (a) the Department's original investigation, (b) the U.S International Trade Commission ("ITC")'s original investigation and reviews, and (c) the Department's scope determinations in other CWP cases all establish that line pipe was excluded from the AD order at issue.

[1] Wheatland Tube's Response to November 22, 2019 Request for Comments (December 12, 2019) ("Petitioner's Comments").

[2] Commerce Memorandum re "Self Initiation of Scope Inquiry on Line Pipe and Dual-Stenciled Standard Line Pipe" (November 22, 2019) ("Self Initiation Memo").

## COMMENTS

### I. FACTORS UNDER 19 C.F.R. § 351.225(K)(1) ARE RELEVANT TO THE DEPARTMENT'S ANALYSIS

Petitioner argues that the legal framework of a scope inquiry requires that the Department look to the plain language of the underlying order and "if the terms of the order are dispositive – i.e., not subject to interpretation – then those terms govern."[3] Petitioner then contends that the terms of the order in this case unambiguously covers line pipe, thus the Department need not examine the factors under 19 C.F.R. § 351.225(k)(1), i.e., "the descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission."[4]

First, Petitioner's understanding of legal framework is wrong. To assess whether the plain language of the Orders' scope is ambiguous or not, the Department must consider the (k)(1) factors. As the Court of International Trade stated in a recent case, *TMB 440AE, Inc. v. United States*, "when a respondent cites (k)(1) sources as supporting a product's exclusion from the scope of an order, the court cannot consider the language of a scope order in isolation, but must consider those sources."[5] Indeed, 19 C.F.R. 351.225(k) makes clear that the Department "will take into account" the (k)(1) criteria in conducting a scope determination (emphasis added).

---

[3] Petitioner's Comments at 2-3.

[4] *Id.* at 3-5.

[5] *TMB 440AE, Inc. v. United States*, Ct. No. 18-00095, Slip Op. 19-109, 399 F. Supp. 3d 1314 (Ct. Int'l Trade 2019) (citing Meridian Prods., LLC v. United States, 851 F.3d 1375, 1383 (Fed. Cir. 2017) (noting that the court "must first assess whether the plain language of the Orders' scope, in light of the disputed 19 C.F.R. § 351.225(k)(1) sources, is unambiguous")).

Second, even if Petitioner were correct that the Department must first determine that the plain language of the scope does not unambiguously cover the product at issue before considering the (k)(1) factors, such a requirement is met in this case. Indeed, if the scope clearly covers line pipe then we would not have this discussion at all. The current scope language states:

> The products covered by the Order are certain circular welded carbon steel pipes and tubes from Thailand. The subject merchandise has an outside diameter of 0.375 inches or more, but not exceeding 16 inches, of any wall thickness. These products, which are commonly referred to in the industry as "standard pipe" or "structural tubing" are hereinafter designated as "pipes and tubes." The merchandise is classifiable under the Harmonized Tariff Schedule of the United States (HTSUS) item numbers 7306.30.1000, 7306.30.5025, 7306.30.5032, 7306.30.5040, 7306.30.5055, 7306.30.5085 and 7306.30.5090. Although the HTSUS subheadings are provided for convenience and purposes of U.S. Customs and Border Protection (CBP), the written description of the merchandise subject to the order is dispositive. (Emphasis added).

The plain language above refers to the subject merchandise as "Standard Pipe," not "Standard Pipe or Line Pipe or Dual-Stenciled Standard Line Pipe." Even staying within the four corners of the paragraph above, one cannot reasonably conclude that "line pipe or dual-stenciled standard line pipe" is covered. Petitioner itself does not deny that generally speaking "line pipe" and "standard pipe" are two different types of product. In fact, this is exactly why on January 31, 2019, Petitioner requested that the Department conduct a "minor alteration" circumvention of Saha Thai's "line pipe" imports under 19 U.S.C. § 1677j(c),[6] which is the type of proceeding to determine whether an "out-of-

[6] Wheatland Tube's Request for Circumvention Ruling Pursuant to Section 781(c) of the Tariff Act of 1930 (January 31, 2019).

scope" product should otherwise be covered to prevent circumvention.[7] In other words, Petitioner knows well that line pipe (including dual-stenciled pipe) is not covered by the scope of the order at issue. Thus, Petitioner is not genuine in now contending that "line pipe" is unambiguously covered by the scope language.

Moreover, to determine whether the scope of the Order covers line pipe, the Department must examine the original scope language itself, not just the current language in recent reviews. The final scope language as adopted in its Final Determination of the original investigation states:

> Circular welded carbon steel pipes and tubes, with an outside diameter of .375 inch or more but not over 16 inches, of any wall thickness, currently classifiable in the Tariff Schedules of the United States, Annotated (TSUSA), under items 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258 and 610.4925. These products, commonly referred to in the industry as standard pipe or structural tubing, are produced to various ASTM specifications, most notably A-152, A- 53 or A-135.[8]

The original scope language also refers to the subject merchandise as "standard pipe" and makes no reference to "line pipe." In addition, the applicable tariff schedule items included in the scope are important here because they demonstrate unequivocally that "line pipe" (including "dual stenciled" pipe) was intentionally and specifically excluded Indeed, "line pipe" items and "standard pipe" items were mutually exclusive under the

[7] AMS Associates, Inc. v. United States, 737 F. 3d 1338, 1343 (Fed. Cir. 2013) ("In order to prevent circumvention, 19 U.S.C. §§ 1677j(a)-(d) authorize Commerce to expand the scope of existing antidumping and countervailing duty orders to reach products that are not covered by the existing scope and to suspend liquidation through formal anti-circumvention inquiries.") (emphasis added).

[8] *See Antidumping: Circular Welded Carbon Steel Pipes and Tubes From Thailand; Final Determination of Sales at Less Than Fair Value*, 51 Fed. Reg. 8384 (Jan. 27, 1986) (provided in Saha Thai's August 26, 2019 Scope Inquiry Comments, Attachment 4).

applicable tariff schedule. At the time of the petition/original AD investigation, "line pipe" would enter under specific Tariff Schedules of the United States, Annotated (TSUSA) items 610.3208 and 610.3209[9] while "standard pipe" would enter under items 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258 and 610.4925.[10] The original petition included both TSUSA 610.3208 and 610.3209 as two of the relevant HTS of subject merchandise[11] but they were omitted from the final scope language. This intentional omission confirms that the scope of the AD order does not unambiguously cover line pipe, contrary to Petitioner's contention, and instead the scope was specifically drafted to exclude line pipe.

Petitioner's argument that "the HTS items listed in the scope are 'provided for convenience and purposes of U.S. Customs and Border Protection (CBP)' and that the HTSUS subheadings under which the pipe is being imported has no bearing on whether it is covered by the scope of the Order"[12] is unavailing. The HTS items are part of the scope language. If the Department must first only consider the four corners of the scope language as Petitioner argues, it must not ignore the HTS listing. The HTS listing in the original scope language is very important here because of not what are included but what are omitted. When the scope refers to subject merchandise only as "standard pipe" and

[9] *Certain Welded Carbon Steel Pipes And Tubes From Turkey And Thailand*, Inv. Nos. 701-TA-253 and 731-TA-252 (Final), USITC Pub. 1810 at a-1 (Feb. 1986) (provided in Saha Thai's August 26, 2019 Scope Inquiry Comments, Attachment 5).

[10] *See* Saha Thai's Comments on "Line Pipe" Scope Inquiry (December 20, 2019) at 8-9.

[11] See Original Petition (February 28, 1985) at 13, provided at Attachment 11 to Saha Thai's Comments on "Line Pipe" Scope Inquiry (August 26, 2019).

[12] Petitioner's Comments at 4.

specifically omits "line pipe-exclusive" HTS numbers, one cannot reasonably conclude that the scope unambiguously covers line pipe.

In sum, the Department's regulations explicitly require that it consider the (k)(1) factors in this case. And even if Petitioner's alleged legal framework were correct, both the current and the original scope languages confirm that the AD order does not unambiguously cover line pipe, thus, the Department must consider the (k)(1) factors.

## II. INITIAL INVESTIGATION DOCUMENTS AND PRIOR SCOPE RULINGS ARE DISPOSITIVE THAT LINE PIPE IS NOT COVERED BY THE CWP AD ORDER

Petitioner argues that the original investigation and other proceedings confirm that the scope language covers line pipe and dual-stenciled pipe.[13] However, Petitioner sprinkles this argument with self-serving assertions without providing any factual or legal support.

First, Petitioner admits that in the original investigation, the petition with respect to line pipe was later *withdrawn* but it argues that as part of this withdrawal process, Petitioner "did not actually amend the scope of the petition in any way to exclude any line pipe that may later be produced in Thailand."[14] This self-contradictory argument makes no sense and should be rejected. Petitioner withdrew the "line pipe" petition, in which case line pipe was not covered by the investigation; or it did not, in which case line pipe was covered by the investigation. Here Petitioner essentially argues that "it withdrew the line pipe petition just to overcome standing issue, but did not really." To

[13] Petitioner's Comments at 5-6.
[14] *Id.*

accept Petitioner's contradictory argument would make a mockery of the Department's (and the ITC's) investigation.

Second, Petitioner admits that because there was no production of line pipe in Thailand during the course of the ITC's original investigation, there are no issues as to whether the ITC included line pipe or dual-stenciled pipe in its injury analysis; but argues that "nothing in the ITC's analysis would preclude the inclusion of such pipe from the scope of the AD order." Petitioner is flat wrong. Because Petitioner provides no factual or legal support for this claim Saha Thai refers the Department to Section I.A. and Section II of its December 20, 2019 Comments where we discuss in detail the ITC's injury determination and why it confirms that line pipe was not included in the investigation then, and cannot be included in the AD order now.

Finally, Petitioner argues that the Department's scope determinations with respect to the orders on CWP from other countries supports including line pipe in the scope of the Order on Thailand because those other orders contain explicit exclusion language in the scope while the Thai order does not. This argument is also unavailing. Just because the Order on Thailand does not contain an explicit sentence excluding line pipe and dual-stenciled pipe does not mean that the scope does not otherwise exclude these products. As explained in Saha Thai's December 20, 2019 comments (which we do not need to repeat ourselves here), all of the other CWP AD cases confirm that the Department has always considered "line pipe" (which by definition includes dual-stenciled pipe) to be excluded from the scope of any AD case covering "standard pipe." The AD order at issue is also a "standard pipe" order. While the exclusion is not explicit, for the reasons

discussed above and in Saha Thai's December 20, 2019 Comments, the AD order still specifically and intentionally excludes "line pipe" consistent with other standard CWP cases.

## CONCLUSION

For all of the foregoing reasons, the Department should reject Petitioner's arguments and conclude that "line pipe" and "products that are dual-stenciled" are not included in the scope of the CWP from Thailand AD Order.

Respectfully submitted,

/s/ Daniel L. Porter

Daniel L. Porter
Tung Nguyen

*Counsel for Saha Thai*

Filed By: dporter@curtis.com, Filed Date: 12/30/19 12:41 PM, Submission Status: Approved

**Tab 9**

MEMO FROM USDOC TO DAS FOR OPERATIONS PERTAINING TO INTERESTED
PARTIES PRELIMINARY SCOPE INQUIRY DECISION (Feb. 25, 2020) (P.R. 62)

Barcode:3946949-01 A-549-502 SCO - Scope Inquiry - Line Pipe

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-549-502
Scope Inquiry – Line Pipe
**Public Document**
E&C/OVII: LA

February 24, 2020

**MEMORANDUM TO:** James Maeder
Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

**THROUGH:** Steven Presing
Acting Senior Director, Office VII
Antidumping and Countervailing Duty Operations

**FROM:** Leo Ayala
International Trade Compliance Analyst, Office VII
Antidumping and Countervailing Duty Operations

**RE:** Antidumping Duty Order on Circular Welded Carbon Steel Pipes and Tubes from Thailand: Preliminary Scope Ruling on Line Pipe and Dual-Stenciled Standard and Line Pipe

---

**SUMMARY**

The Department of Commerce (Commerce) is conducting a scope inquiry to determine whether line pipe, including that reportedly produced or exported by Saha Thai Steel Pipe (Public) Company, Ltd. (Saha Thai), is subject to the antidumping duty (AD) order on circular welded carbon steel pipes and tubes (CWP) from Thailand.[1] Based on our analysis, we preliminarily find, pursuant to 19 CFR 351.225(k)(1), that line pipe is not covered by the scope of the *Order*, while products which are dual-stenciled[2] as standard pipe and line pipe are within the scope of the *Order*.

[1] *See Antidumping Duty Order; Circular Welded Carbon Steel Pipes and Tubes from Thailand,* 51 FR 8341 (March 11, 1986) (*Order*).
[2] Standard pipe and line pipe often require physical and mechanical characteristics that overlap. Specifically, a pipe may be dual-stenciled, *i.e.*, stamped to indicate compliance with two different specifications, such as ASTM A53 and API 5L.

INTERNATIONAL TRADE ADMINISTRATION

Filed By: Toni Page, Filed Date: 2/25/20 9:44 AM, Submission Status: Approved



## BACKGROUND

On November 22, 2019, Commerce self-initiated a scope inquiry to determine whether line pipe, as well as dual-stenciled standard and line pipe, is subject to the *Order*.[3] On December 12, 2019, Wheatland Tube Company (Wheatland), a domestic producer of subject merchandise who was a member of the original petitioners[4] in this proceeding, timely submitted comments.[5] On December 20, 2019, Saha Thai timely filed comments.[6] On December 30, 2019, Saha Thai filed rebuttal comments.[7]

## SCOPE OF THE *ORDER*

The products covered by the *Order* are certain circular welded carbon steel pipes and tubes from Thailand. The subject merchandise has an outside diameter of 0.375 inches or more, but not exceeding 16 inches, of any wall thickness. These products, which are commonly referred to in the industry as "standard pipe" or "structural tubing" are hereinafter designated as "pipes and tubes." The merchandise is classifiable under the Harmonized Tariff Schedule of the United States (HTSUS) item numbers 7306.30.1000, 7306.30.5025, 7306.30.5032, 7306.30.5040, 7306.30.5055, 7306.30.5085 and 7306.30.5090. Although the HTSUS subheadings are provided for convenience and purposes of U.S. Customs and Border Protection (CBP), the written description of the merchandise subject to the order is dispositive.

## DESCRIPTION OF MERCHANDISE SUBJECT TO THIS SCOPE INQUIRY

As described above, the scope of the *Order* covers circular welded carbon steel pipe which is commonly referred to as "standard pipe." As described in the Petition,[8] "standard pipe"

> …. is a general-purpose commodity used in such applications as plumbing pipe, sprinkler systems and fence posts and is commonly referred to in the industry as a standard pipe. It may be supplied with an oil coating (black pipe) or may be galvanized, and is sold in

---

[3] *See* Memorandum, "Antidumping Duty Order on Circular Welded Carbon Steel Pipes and Tubes from Thailand: Self Initiation of Scope Inquiry on Line Pipe and Dual-Stenciled Standard Line Pipe," dated November 22, 2019.
[4] The original petitioners in this proceeding were the Committee on Pipe and Tube Imports (CPTI), its subcommittees on standard and line pipe, and the companies which are members of those subcommittees with respect to certain welded carbon steel pipes and tubes. Wheatland was a member of the CPTI and of the standard pipe subcommittee. *See Certain Circular Welded Carbon Steel Pipes and Tubes From Thailand; Initiation of Antidumping Duty Investigation*, FR 50 12068 (March 27, 1985); Petitioner's Letter, "Petition for Imposition of Antidumping Duties: Members of Committee on Pipe and Tube Imports," dated February 28, 1984 (Petition) at Exhibit 1; and *Certain Welded Carbon Steel Pipes and Tubes from Thailand and Venezuela* (Inv. Nos. 701-TA-242 (Preliminary) and 731-TA-252 and 253 (Preliminary), USITC Pub 1680 (April 1985) at 15.
[5] *See* Wheatland's Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Response to November 22, 2019 Request for Comments," dated December 12, 2019 (Wheatland's December 12 Comments).
[6] *See* Saha Thai's Letter, "Saha Thai's Comments on "Line Pipe" Scope Inquiry Circular Welded Carbon Steel Pipe and Tubes from Thailand," dated December 20, 2019 (Saha Thai's December 20 Comments).
[7] *See* Saha Thai's Letter, "Saha Thai's Rebuttal Comments on "Line Pipe" Scope Inquiry Circular Welded Carbon Steel Pipe and Tubes from Thailand," dated December 30, 2019 (Saha Thai's December 30 Rebuttal Comments).
[8] *See* Wheatland's Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Response to July 29, 2019 Request for Comments," dated August 26, 2019 (Wheatland's August 26 Comments) at Exhibit 3.

> plain ends, threaded, threaded and coupled, or beveled for welding form. (These products are generally produced to ASTM specifications A-120, A-53, or A-135.)[9]

The U.S. International Trade Commission (ITC) described "standard pipes and tubes" in its *ITC Injury Final Report*[10] as follows:

> Standard pipes and tubes are intended for the low--pressure conveyance of water, steam, natural gas, air, and other liquids and gases in plumbing and heating systems, air-conditioning units, automatic sprinkler systems, and other related uses. They may also be used for light load-bearing or mechanical applications, such as for fence tubing. These steel pipes and tubes may carry fluids at elevated temperatures and pressures but may not be subjected to the application of external heat. They are most commonly produced to ASTM specifications A-120, A-53, and A-135.[11]

This scope inquiry covers "line pipe" with outside diameters of 0.375 inch or more, but not exceeding 16 inches, produced in Thailand. "Line pipe," as described in the Petition, "is produced to API specifications for line pipe, API-51 or APISX."[12] The ITC states that "{l}ine pipes and tubes are used for the transportation of gas, oil, or water, generally in pipeline or utility distribution systems. They are most commonly produced to API specification 5L."[13] The ITC continues:

> …. the principal differences between {standard pipe and line pipe} are that line pipe is made from a higher grade steel and requires additional testing to ensure that it meets API specifications. Line pipe may have a higher content of carbon and manganese than is permissible for standard pipe, whereas standard pipe may have a higher content of phosphorus and sulfur than is permissible for line pipe. Requirements concerning chemical and mechanical properties for API line pipe differ for the various specifications and grades. There are at least 10 grades of API 5L line pipe. API 5L line pipe is inspected and tested at various stages in the production process to ensure strict conformity to API specifications.[14]

Further, standard pipe may be dual-stenciled, *i.e.*, identified to indicate compliance with two different specifications, as conforming to industry standards for both standard pipe and line pipe, such as ASTM A53 and API 5L.

---

[9] *See* Petition at 12.
[10] *See* Saha Thai's Letter, "Saha Thai's Comments on 'Line Pipe' Scope Inquiry – Circular Welded Carbon Steel Pipe and Tubes from Thailand," dated August 26, 2019 (Saha Thai's August 26 Comments) at Attachment 5 (*Certain Welded Carbon Steel Pipes And Tubes From Turkey And Thailand (Final)*, Inv. Nos. 701-TA-253 and 731-TA-252, USITC Pub. 1810 (Feb. 1986) (*ITC Injury Final Report*)).
[11] *See ITC Injury Final Report* at I-1 to I-2.
[12] *See* Petition at 12.
[13] *See ITC Injury Final Report* at II-1.
[14] *Id.*

**PRELIMINARY SCOPE RULING**

Legal Framework

In determining if merchandise is covered by the scope of an AD and/or countervailing duty order, Commerce will first examine the plain language of the underlying order to determine if it is dispositive of the matter.[15] Pursuant to its regulations, Commerce may also examine other information, including the description of the merchandise contained in the petition, the descriptions of the merchandise in the initial investigation, and prior scope determinations made for the same product.[16] If Commerce determines that these sources are sufficient to decide the matter, it will issue a final scope ruling as to whether the merchandise is covered by the order.[17]

Conversely, where the descriptions of the merchandise in the sources described in 19 CFR 351.225(k)(1) are not dispositive, Commerce will consider the five additional factors set forth at 19 CFR 351.225(k)(2).[18] These factors are: (i) the physical characteristics of the merchandise; (ii) the expectations of the ultimate purchasers; (iii) the ultimate use of the product; (iv) the channels of trade in which the product is sold; and (v) the manner in which the product is advertised and displayed.[19] The determination as to which analytical framework is most appropriate in any given scope proceeding is made on a case-by-case basis after consideration of all evidence before Commerce.

Arguments from Interested Parties

Issue 1: Whether Line Pipe is Covered by the Scope of the *Order*.

*Wheatland's Arguments:*

- The fact that the plain language of the scope covers line pipe is supported by the original investigation and other proceedings conducted by Commerce and the ITC.[20] The U.S. Court of Appeals for the Federal Circuit (CAFC) has recognized that where there is no ambiguity in the language of the scope, there is no need to examine the other sources set forth in 19 CFR 351.225(k)(1).[21]
- There is no evidence that the petitioners ever amended the scope of the original investigation. The original scope language from the Petition, which was intended to cover both standard pipe and line pipe, remained unchanged.[22]

---

[15] *See Tak Fat Trading Co. v. United States*, 396 F. 3d 1378, 1383 (Fed. Cir. 2005) ("a predicate for the interpretive process is language in the order that is subject to interpretation,") (quoting *Duferco Steel, Inc. v. United States*, 296 F. 3d 1087, 1097 (Fed. Cir. 2002)).
[16] *See* 19 CFR 351.225(k)(1).
[17] *See* 19 CFR 351.225(d).
[18] *See Diversified Products Corp. v. United States*, 572 F. Supp. 883 (CIT 1983) (*Diversified Products*).
[19] *See* 19 CFR 351.225(k)(2).
[20] *See* Wheatland's December 12 Comments at 2; and Wheatland's August 26 Comments at 3-4.
[21] *See* Wheatland's December 12 Comments at 2-5 (citing *Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1381 (Fed. Cir. 2017); and *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1302 (Fed. Cir. 2013)).
[22] *Id*. at 5-6; and Wheatland's Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Rebuttal to Saha Thai's August 26, 2019 Comments," dated September 3, 2019 (Wheatland's September 3 Rebuttal) at 8.

*Saha Thai's Arguments:*

- The petitioners in the original investigation filed an amended petition removing line pipe from the scope of the Petition.[23] The omission of "line pipe" from the scope of the investigation was memorialized in Commerce's initiation of the less-than-fair-value investigation for Thailand.[24]
- The ITC's preliminary and final injury determinations explicitly state that the underlying investigation of steel pipe from Thailand *does not include* line pipe.[25]
- The Court of International Trade (CIT) has made clear that Commerce may not ignore original investigation documents when interpreting the scope of an order.[26]

**Commerce Position**: Wheatland's argument that Commerce need not consider the (k)(1) sources if the text of the scope is determinative is not persuasive in this situation. The CIT has stated that "when a respondent cites (k)(1) sources as supporting a product's exclusion from the scope of an order, the court cannot consider the language of a scope order in isolation, but must consider those sources."[27] Based on our analysis of the (k)(1) sources, "line pipe" was not included in the scope of the *Order*. Specifically, during the underlying investigation, the petitioners withdrew line pipe from the scope of the Petition with respect to Thailand.[28] Moreover, the ITC's determinations during its original injury investigation explicitly state that the underlying investigation of steel pipe from Thailand did not include line pipe.[29]

Issue 2: Whether Dual-Stenciled Standard and Line Pipe Is Covered By the Scope of the *Order*.

*Wheatland's Arguments:*

- There are no scope exclusions that apply to line pipe and dual-stenciled pipe imported from Thailand, in contrast to the scope language of orders on similar merchandise from other countries that specifically exclude standard pipe that is dual- or triple-stenciled.[30]
- The line pipe and dual-stenciled pipe imported from Thailand meet all of the criteria stated in the text of the scope (*i.e*. circular in shape; welded (as opposed to seamless); composed of carbon steel (as opposed to alloy steel or stainless steel); and has an outside diameter of 0.375 inches or more but not exceeding 16 inches).[31]
- The mill test certificate and photographs of the dual-stenciled line pipe that was manufactured by Saha Thai and exported to the United States meets all of the aforementioned criteria.[32]

---

[23] *See* Saha Thai's August 26 Comments at 10-12 and Attachment 14 (citing the Petition).
[24] *See* Saha Thai's December 20 Comments at 5; and Saha Thai's August 26 Comments at 11 and Attachment 11.
[25] *See* Saha Thai's December 12 Comments at 10-11; and Saha Thai's August 26 Comments at 16-17 and Attachment 8.
[26] *See* Saha Thai's December 12 Comments at 29; and Saha Thai's August 26 Comments at 8-10 (citing *TMB 440AE, Inc. v. United States,* 399 F. Supp. 3d 1314 (CIT 2019) (*TMB 440AE, Inc.*)).
[27] *See TMB 440AE, Inc.*, 399 F. Supp. at 1320.
[28] There were no known producers of line pipe in Thailand in 1985. *See* Saha Thai's August 26 Comments at Attachments 13 & 14.
[29] *Id*. at Attachment 8.
[30] *See* Wheatland's December 12 Comments 4-5; and Wheatland's August 26 Comments at 4-5 (citing *Wheatland Tube Co. v. United States*, 161 F.3d 1365 (Fed. Cir. 1998) (*Wheatland Tube Co., II*)).
[31] See Wheatland's December 12 Comments at 7; and Wheatland's August 26 Comments at 3-4.
[32] See Wheatland's December 12 Comments at 4; and Wheatland's August 26 Comments at Exhibits 1 and 2.

- The HTSUS subheadings under which the pipe is being imported has no bearing on whether it is covered by the scope of the *Order* because the written description of the merchandise subject to the order is dispositive.[33]
- To the extent that Commerce finds that the scope does not include line pipe, it should proceed with the anti-circumvention inquiry and determine that Saha Thai's shipments of line pipe are circumventing the *Order*.[34]

*Saha Thai's Arguments:*

- The plain language of the *Order* definitively covers only "standard pipe" while intentionally and specifically excluding "line pipe," including "dual-stenciled pipe" products. Accordingly, it is not correct that the scope language of the *Order* is unambiguous in including line pipe products.[35]
- The language of the scope further demonstrates that not only was line pipe excluded from Commerce investigation, but that dual-stenciled pipe was never included in the scope of the investigation. The scope states that subject merchandise is classifiable under TSUSA 610.3231-610.3264 or 610.4925 (each of which are "other" classifications for circular-welded pipe of given dimensions). Dual-stenciled line and standard pipe would be classified under TSUSA 610.3208-610.3213 (the tariff classification for API line pipe), rather than the scope's designated TSUSA numbers for standard pipe, and, therefore, dual-stenciled line and standard pipe would never be classified under the TSUSA numbers for standard pipe.[36]
- In the 2018 sunset review of the *Order*, the ITC made clear that line pipe and dual-stenciled pipe, which enter as line pipe under a different subheading of the HTSUS for U.S. customs purposes, is not within the scope of the order.[37]
- Commerce should adopt the same conclusion it did in the standard pipe proceeding, underlying the *Wheatland Tube Co.* litigation, and reject Wheatland's request for initiation of a "minor alterations" anti-circumvention inquiry. In the *Wheatland Tube Co.* opinion, the CIT upheld Commerce's decision not to initiate a minor alteration inquiry regarding line pipe because such an inquiry should not apply to products unequivocally excluded from the order.[38]

**Commerce's Position**: Commerce finds that dual-stenciled standard and line pipe is covered by the scope of the *Order*. Unlike the orders covering similar merchandise (*e.g.*, from Mexico or Venezuela),[39] the instant *Order* does not explicitly exclude pipe that has been dual-stenciled as

---

[33] *See* Wheatland's December 12 Comments at 4; and Wheatland's August 26 Comments at 4.
[34] *See* Wheatland's September 3 Rebuttal at 2.
[35] *See* Saha Thai's September 3 Rebuttal at 1.
[36] *See* Saha Thai's December 12 Comments at 8-10; and Saha Thai's August 26 Comments at 22-23 and Attachment 9.
[37] *See* Saha Thai's December 12 Comments at 13-16; and Saha Thai's August 26 Comments at 19-20.
[38] *See* Saha Thai's December 12 Comments at 32-33; and Saha Thai's August 26 Comments at 25 (citing *Wheatland Tube Co., II*, 161 F.3d at 1367-68*;* and *Wheatland Tube Co. v. United States*, 973 F. Supp. 149, 151-153 (CIT 1997) (*Wheatland Tube Co., I*) (quoting the relevant scope from *Circular Welded Non-Alloy Steel Pipe from Brazil, the Republic of Korea, Mexico, Romania, Taiwan, and Venezuela*, 56 FR 52528 (October 21, 1991))).
[39] *See Notice of Antidumping Duty Orders: Certain Circular Welded Non-Alloy Steel Pipe from Brazil, the Republic of Korea (Korea), Mexico, and Venezuela and Amendment to Final Determination of Sales at Less Than Fair Value: Certain Welded Non-Alloy Steel Pipe from Korea*, 57 FR 49453 (November 2, 1992) (*Standard Pipe Orders*).

standard pipe and line pipe.[40] Saha Thai maintains that, following CBP's classification rules, all line pipe, including dual-stenciled standard and line pipe, are classified by importers as line pipe at the time of entry.[41] However, CBP's classification rules are not binding with respect to Commerce's analysis of whether dual-stenciled pipe is covered by the *Order*.[42] Moreover, the classification rules followed by CBP, which direct importers to enter dual-stenciled products using the more specific TSUSA line pipe categories, rather than the less-specific TSUSA standard pipe categories, has no bearing on the fact that the dual-stenciled pipe meets the definition of the TSUSA standard pipe categories, and that product is certified to be used as standard pipe.

Moreover, there is no information from the investigation indicating that pipe which has been dual-stenciled as both standard pipe and line pipe was intended to be excluded from the *Order*. The *ITC 2018 Final Report*[43] for the 2018 sunset review covers seven orders on similar standard pipe products, but the individual orders were established based on different petitions with different scope language. Although some of the CWP orders explicitly include exclusions for line pipe and dual-stenciled line pipe, some of the CWP orders do not include such exclusions. As such, we find that the ITC's statement, quoted by Saha Thai, that these orders, including the *Order* at issue here, exclude dual-stenciled products is not definitive, given the variations in the scope language of the CWP orders covered by the *ITC 2018 Final Report*.

Furthermore, Saha Thai's reliance on the exclusions in other proceedings involving standard pipe, as well as the CIT's opinion in *Wheatland Tube Co.*, which is specific to the AD order on CWP from Mexico, is inapposite.[44] These proceedings are separate from the order on CWP from Thailand, which has different scope language and its own record that differs from the records covered by the proceedings referenced by Saha Thai. Specifically, the scope of the Mexican CWP order includes the explicit exclusions for line pipe and dual- or triple-stenciled products, which was the crux of the *Wheatland Tube Co.* litigation.[45] However, unlike the Mexican CWP order, there is no basis to find that pipe which has been dual-stenciled as standard pipe and line pipe is outside the scope of the *Order*.

## RECOMMENDATION

For the reasons discussed above, we recommend preliminarily finding that line pipe is not covered by the scope of the *Order*. We further recommend preliminarily finding that products which are dual-stenciled as standard pipe and line pipe are within the scope of this *Order*. If the

---

[40] *See Standard Pipe Orders* ("Standard pipe that is dual or triple certified/stenciled that enters the U.S. as line pipe of a kind used for oil or gas pipelines is also not included in these orders.").
[41] *See* Saha Thai's August 26 Comments at 21.
[42] *See, e.g.*, *Notice of Final Determination of Sales at Not Less Than Fair Value: Wax and Wax/Resin Thermal Transfer Ribbon from the Republic of Korea*, 69 FR 17645, 17648 (April 5, 2004); and Memorandum, "Oil Country Tubular Goods from the People's Republic of China - Final Scope Ruling on Green Tubes Manufactured in the People's Republic of China and Finished in Countries Other than the United States and the People's Republic of China," dated February 7, 2014 at 4.
[43] *See Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey (Final)*, Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534, and 536 (Fourth Review), USITC Pub. 4754 (Jan. 2018) (*ITC 2018 Final Report*).
[44] *See Standard Pipe Orders*, 57 FR at 49453.
[45] *Id.*

recommendations in this memorandum are accepted, we will serve a copy of this memorandum on all interested parties on the scope service list via first class mail as directed by 19 CFR 351.225(f)(3).

Commerce invites all interested parties to submit case briefs concerning this preliminary ruling no later than March 23, 2020; and to submit rebuttal briefs, limited to issues raised in the case briefs, no later than April 2, 2020.

☒ ☐

Agree Disagree

2/24/2020

X James Maeder

Signed by: JAMES MAEDER

James Maeder
Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

**Tab 10**

BRIEF FROM SCHAGRIN ASSOCIATES TO SEC OF COMMERCE PERTAINING TO
WHEATLAND TUBE CASE BRIEF (Mar. 23, 2020) (P.R. 68)

Barcode:3956944-01 A-549-502 SCO - Scope Inquiry - Line Pipe

SCHAGRIN ASSOCIATES

900 SEVENTH STREET, N.W. - SUITE 500 - WASHINGTON, D.C. 20001
P: (202) 223-1700 E: LMEISNER@SCHAGRINASSOCIATES.COM F: (202) 429-2522

March 23, 2020

Case No. A-549-502
Total Pages: 13
Scope Inquiry – Line Pipe
AD/CVD Operations, Office VII

**PUBLIC DOCUMENT**

**VIA ACCESS**

The Honorable Wilbur L. Ross, Jr.
Secretary of Commerce
Attention: Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

**Re: Circular Welded Carbon Steel Pipes and Tubes from Thailand: Case Brief**

Dear Secretary Ross:

On behalf of Wheatland Tube, a domestic producer and interested party under 19 U.S.C. § 1677(9)(C), we hereby submit our case brief in the above-referenced scope inquiry. This case brief is timely filed pursuant to the schedule established by the U.S. Department of Commerce in a Memorandum dated February 24, 2020. Please contact the undersigned with any questions regarding this submission.

Respectfully submitted,

Roger B Schagrin
Luke A. Meisner
Michael Panfeld, *Consultant*
SCHAGRIN ASSOCIATES
*Counsel to Wheatland Tube*

Filed By: rschagrin@schagrinassociates.com, Filed Date: 3/23/20 2:12 PM, Submission Status: Approved

Barcode:3956944-01 A-549-502 SCO - Scope Inquiry - Line Pipe

**BEFORE THE UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**

Case No. A-549-502
Total Pages:
Scope Inquiry – Line Pipe
AD/CVD Operations, Office VII

**PUBLIC DOCUMENT**

---

**Circular Welded Carbon Steel Pipes and Tubes from Thailand**

---

# WHEATLAND TUBE'S CASE BRIEF

Roger B. Schagrin
Luke A. Meisner
Michael Panfeld, *Consultant*
SCHAGRIN ASSOCIATES
900 Seventh Street, N.W.
Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel to Wheatland Tube*

March 23, 2020

Filed By: rschagrin@schagrinassociates.com, Filed Date: 3/23/20 2:12 PM, Submission Status: Approved

Barcode:3956944-01 A-549-502 SCO - Scope Inquiry - Line Pipe

TABLE OF CONTENTS

I. SUMMARY OF ARGUMENT .......... 1

II. COMMERCE SHOULD FIND IN THE FINAL DETERMINATION THAT BOTH REGULAR LINE PIPE AND DUAL-STENCILED LINE PIPE ARE SUBJECT TO THE ORDER .......... 1

A. LEGAL STANDARD .......... 2

B. THE PLAIN LANGUAGE OF THE SCOPE SHOWS THAT LINE PIPE IS COVERED BY THE ORDER 3

C. THE FEDERAL CIRCUIT HAS HELD THAT COMMERCE NEED NOT EXAMINE (K)(1) SOURCES WHERE THE LANGUAGE OF THE SCOPE IS UNAMBIGUOUS .......... 4

D. THE ORIGINAL INVESTIGATION AND OTHER PROCEEDINGS CONFIRM THAT THE SCOPE LANGUAGE COVERS LINE PIPE AND DUAL-STENCILED PIPE .......... 6

III. CONCLUSION .......... 8

Filed By: rschagrin@schagrinassociates.com, Filed Date: 3/23/20 2:12 PM, Submission Status: Approved

Barcode:3956944-01 A-549-502 SCO - Scope Inquiry - Line Pipe

## TABLE OF AUTHORITIES

### Cases

*ArcelorMittal Stainless Belgium N.V. v. United States*, 694 F. 3d 82 (Fed. Cir . 2012)................. 2

*Diversified Products Corp. v. United States*, 6 C.I.T. 155, 162, 572 F. Supp. 883 (1983) ............ 3

*Meridian Prods., LLC v. United States*, 851 F.3d 1375 (Fed. Cir. 2017).................................. 2, 4

*Mid Continent Nail Corp. v. United States*, 725 F.3d 1295 (Fed. Cir. 2013)................................ 2

*Tak Fat Trading Co. v. United States*, 396 F. 3d 1378 (Fed. Cir. 2005) ....................................... 2

*TMB 440AE, Inc. v. United States*, Slip Op. 19-109 (Ct. Int'l Trade Aug. 13, 2019)................ 1, 4

### Other Authorities

*Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 83 Fed. Reg. 51,927 (Dep't Commerce Oct. 15, 2018)........................................................................................................ 8

### Regulations

19 C.F.R. § 351.225.................................................................................................................. 1, 2

Filed By: rschagrin@schagrinassociates.com, Filed Date: 3/23/20 2:12 PM, Submission Status: Approved

PUBLIC DOCUMENT

## I. SUMMARY OF ARGUMENT

As demonstrated in greater detail below, the U.S. Department of Commerce ("Commerce") properly found in the preliminary determination of the instant scope inquiry that dual-stenciled pipe (*i.e.*, line pipe that is produced dual-stenciled to conform to both standard pipe and line pipe specifications) is covered by the scope of the antidumping duty order on circular welded pipe from Thailand (the "Order"). However, Commerce erroneously found in the preliminary determination that regular line pipe is outside the scope of the Order. In the final determination, Commerce should find that the plain language of the Order covers both regular line pipe and dual-stenciled pipe. Furthermore, although there is no requirement that Commerce look beyond the plain language of the scope, as there is no ambiguity in the scope language that needs clarification, this conclusion is also supported by the original investigation and other proceedings conducted by Commerce and the U.S. International Trade Commission (the "Commission").

## II. COMMERCE SHOULD FIND IN THE FINAL DETERMINATION THAT BOTH REGULAR LINE PIPE AND DUAL-STENCILED LINE PIPE ARE SUBJECT TO THE ORDER

There is no dispute that the plain language of the scope unambiguously covers not only dual-stenciled pipe but also regular line pipe. As discussed below, Commerce erroneously found in the preliminary determination that it was required to look beyond the unambiguous language of the scope to other criteria under subparagraph (k)(1) of 19 C.F.R. § 351.225 to conduct this scope inquiry. This finding ignores applicable Federal Circuit precedent and misapplies the holding of the Court of International Trade in *TMB 440AE, Inc. v. United States*, Slip Op. 19-109 (Ct. Int'l Trade Aug. 13, 2019). But even if it is necessary for Commerce to examine the (k)(1) criteria, those criteria also demonstrate that the scope covers regular line pipe. Accordingly, in

the final determination, Commerce should find that the scope covers both regular line pipe and dual-stenciled pipe.

**A. Legal Standard**

To determine whether a product is subject to an antidumping or countervailing duty order, Commerce follows an interpretive framework provided in the regulations.[1] First, relying on the description of the product contained in the scope ruling request, Commerce looks to the plain language of the underlying order.[2] If the terms of the order are dispositive — *i.e.*, not subject to interpretation – then those terms govern.[3] If those terms do not govern, Commerce applies the factors set forth in 19 C.F.R. § 351.225(k)(1).[4] Finally, if the factors set forth in paragraph (k)(1) do not resolve the question, Commerce applies the "*Diversified Products*"

---

1 19 C.F.R. § 351.225(a).

2 *See* 19 C.F.R. § 351.225(d) (ruling based upon the application).

3 *See Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1381 (Fed. Cir. 2017) ("If the scope is unambiguous, it governs.") (citations omitted); *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1302 (Fed. Cir. 2013) (explaining that the inquiry begins with "the language of the final order" and turns to other sources only if the scope itself "is ambiguous"); *Tak Fat Trading Co. v. United States*, 396 F. 3d 1378, 1383 (Fed. Cir. 2005) ("{A} predicate for the interpretive process is language in the order that is subject to interpretation."). *See also ArcelorMittal Stainless Belgium N.V. v. United States*, 694 F. 3d 82, 84 (Fed. Cir . 2012) ("If Commerce determines that the language at issue is not ambiguous, it states what it understands to be the plain meaning of the language, and the proceedings terminate. On the other hand, if Commerce finds that the scope language is ambiguous, it then looks to two sets of factors spelled out in {19 C. F.R. § 351.225(k)} to determine the intended scope of the order.").

4 The (k)(1) criteria include: "The descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission."

criteria[5] found in 19 C.F.R. § 351.225(k)(2).[6] Here, the terms of the order are unambiguous and dispositive of whether line pipe and dual-stenciled pipe are covered by the scope.

**B. The Plain Language of the Scope Shows that Line Pipe is Covered by the Order**

As Petitioner has previously established, the plain language of the scope demonstrates that line pipe and dual-stenciled pipe are covered by the Order.[7] The scope covers all circular welded carbon steel pipes and tubes from Thailand with an outside diameter of 0.375 inches or more, but not exceeding 16 inches.[8] The line pipe and dual-stenciled pipe manufactured by Saha Thai in Thailand are circular in shape, welded, made of carbon steel, and have an outside diameter of 0.375 inches or more, but not exceeding 16 inches.[9] Furthermore, there are no scope exclusions in the Order for line pipe.[10] Finally, because the terms of the order are unambiguous and dispositive of whether Saha Thai's line pipe and dual-stenciled pipe are covered by the scope, there is no need to examine the other criteria in 19 C.F.R. § 351.225(k)(1) such as the descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of Commerce and the Commission.[11]

---

5 The "Diversified Products" criteria are so named as they arise out of *Diversified Products Corp. v. United States*, 6 C.I.T. 155, 162, 572 F. Supp. 883, 889 (1983).

6 The (k)(2) criteria include: "(i) The physical characteristics of the product; (ii) The expectations of the ultimate purchasers; (iii) The ultimate use of the product; (iv) The channels of trade in which the product is sold; and (v) The manner in which the product is advertised and displayed."

7 *See* Petitioner's Response to Commerce's July 29, 2019 Request for Comments (Aug. 26, 2019) at 3-4.

8 *Id.*

9 *Id.*

10 *Id.*

11 *Id.*

Filed By: rschagrin@schagrinassociates.com, Filed Date: 3/23/20 2:12 PM, Submission Status: Approved

### C. The Federal Circuit Has Held that Commerce Need Not Examine (k)(1) Sources Where the Language of the Scope Is Unambiguous

In the preliminary determination, Commerce found that it was bound to examine other (k)(1) sources to determine whether line pipe is covered by the scope of the order.[12] Quoting the decision in *TMB 440AE, Inc. v. United States*, Commerce noted that the Court of International Trade has stated that "when a respondent cites (k)(1) sources as supporting a product's exclusion from the scope of an order, the court cannot consider the language of a scope order in isolation, but must consider those sources."[13] However, this ignore the fact that the Federal Circuit Commerce has repeatedly found that Commerce is not required to examine the other (k)(1) criteria when the plain language of the scope is unambiguous and not in need of any further clarification. The Federal Circuit has found that, where there is no ambiguity in the language of the scope, there is no need to examine the other factors set forth in 19 C.F.R. § 351.225(k)(1).[14]

The recent decision in *TMB 440AE, Inc. v. United States* is not to the contrary.[15] There, Commerce had found that certain unfinished pipe was covered by the scope of the orders on certain seamless carbon and alloy steel pipe from China because the pipe at issue met the general description of the subject merchandise but did not fall under the exclusion for aerospace pipe because it did not meet "aerospace specifications."[16] The court noted that the term "aerospace

---

12 Commerce Preliminary Scope Determination (Feb. 24, 2020) at 5.

13 *Id.* (quoting *TMB 440AE, Inc. v. United States*, Slip Op. 19-109 (Ct. Int'l Trade Aug. 13, 2019)).

14 *See Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1381 (Fed. Cir. 2017) ("If the scope is unambiguous, it governs.") (citations omitted); *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1302 (Fed. Cir. 2013) (explaining that the inquiry begins with "the language of the final order" and turns to other sources only if the scope itself "is ambiguous").

15 *TMB 440AE, Inc. v. United States*, Slip Op. 19-109 (Ct. Int'l Trade Aug. 13, 2019).

16 *Id.* at 10.

PUBLIC DOCUMENT

specifications" could pertain to a number of different standards and the orders did not specify any in particular.[17] The court held that "because 'aerospace specifications' is undefined, Commerce was obligated to consider the (k)(1) sources before rendering its decision."[18] It was under these circumstances that the court held that "Commerce's failure to consider the 'descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary . . . and the Commission,' as required by 19 C.F.R. § 351.225(k)(1), in its Final Scope Ruling was not in accordance with law."[19]

For the Order at issue here, there is no exclusion referencing "line pipe specifications" that is undefined and ambiguous. Nor is there any ambiguity in the other terms used to describe the subject merchandise, such as "circular," "welded," or "diameter." Thus, in contrast to *TMB 440AE*, there is no language in the scope that is in need of further clarification by examination of the petition, the initial investigation, and other determinations by Commerce and the Commission.

In sum, Commerce need not examine the (k)(1) criteria in its final determination in this scope inquiry. Commerce should only examine the plain language of the scope. Furthermore, as discussed above, the plain language of the scope covers not only dual-stenciled line pipe but also regular line pipe. Thus, Commerce should determine in the final determination that both regular line pipe and dual-stenciled line pipe are covered by the scope.

---

17 *Id.*

18 *Id.*

19 *Id.* at 12. To the extent that the court used any language suggesting that Commerce is *always* required to analyze the (k)(1) criteria—even when there is no ambiguity in the scope language—such language would be *dicta* that holds not precedential value.

Barcode:3956944-01 A-549-502 SCO - Scope Inquiry - Line Pipe

PUBLIC DOCUMENT

**D. The Original Investigation and Other Proceedings Confirm that the Scope Language Covers Line Pipe and Dual-Stenciled Pipe**

As discussed above, the plain language of the scope unambiguously covers the line pipe and dual-stenciled pipe manufactured by Saha Thai and, as a result, there is no need to examine the (k)(1) criteria to resolve this scope inquiry. But even if it is necessary to examine the (k)(1) criteria, they all provide further support for including line pipe and dual-stenciled pipe in the scope of the Order.

As Petitioner has shown, the record of the initial investigation conducted by Commerce supports inclusion of line pipe in the scope of the Order.[20] In particular, the initial petition filed in the original investigation included all "small diameter circular welded carbon steel pipes and tubes" from Thailand and specifically included any imports of line pipe.[21] In its preliminary determination in this scope inquiry, Commerce found that the (k)(1) sources indicate that the scope does not cover regular line pipe because "during the underlying investigation, the petitioners withdrew line pipe from the scope of the Petition with respect to Thailand."[22]

Commerce's preliminary determination was erroneous in this respect because it ignores the fact that the original language of the scope – which was drafted to include both standard pipe and line pipe – was never amended through the withdrawal process. The petitioner was withdrawn with respect to line pipe only because there was no Thai production of line pipe at that time. After the petitions were filed, Commerce issued a questionnaire requesting that petitioners provide "{d}ocumentation which demonstrates that line pipe is manufactured in

---

[20] *See* Petitioner's Response to Commerce's July 29, 2019 Request for Comments (Aug. 26, 2019) at5 n.13.

[21] *Id.*

[22] Preliminary Scope Determination (Feb. 24, 2020) at 5.

6

Filed By: rschagrin@schagrinassociates.com, Filed Date: 3/23/20 2:12 PM, Submission Status: Approved

Thailand" and "{d}ocumentation which supports the allegation that line pipe from Thailand is being sold at less than fair value."[23] In addition, the Commission was indicating that standard pipe and line pipe would be treated as separate like products for its injury analysis.[24] In light of these developments, Petitioners withdrew the petition with respect to line pipe from Thailand. It would not be possible to show dumping by Thai producers that was specific to line pipe as opposed to dumping of "circular welded carbon steel pipes and tubes." Nor was there any point in attempting to show material injury to the domestic line pipe industry by reason of imports of line pipe from Thailand given that there was no production of line pipe in Thailand. However, *Petitioners did not amend the language in the scope to exclude line pipe*. The original language describing the covered pipe – which was intended to cover both standard pipe and line pipe – remained unchanged. Thus, this same language continues to cover both standard pipe and line pipe.[25]

The record of the initial investigation conducted by the Commission also supports inclusion of line pipe in the scope of the Order. In particular, because there was no production of line pipe in Thailand during the course of the Commission's original investigation, there are no concerns with respect to issues such as whether the Commission included any line pipe or dual-stenciled pipe in its injury analysis. Thus, nothing in the Commission's analysis of imports of

---

23 *Id.* at Attachment 12.

24 *See, e.g.*, Saha Thai Comments at Attachment 8.

25 The only language in the scope that appears to have changed, which was not through any amendment proposed by petitioners, is the reference to the HTS codes for line pipe. The Order clearly states that the HTSUS items listed in the scope are "provided for convenience and purposes of U.S. Customs and Border Protection (CBP)" and that the written description of the merchandise subject to the order is dispositive. Thus, the HTSUS subheadings under which the pipe is being imported has no bearing on whether it is covered by the scope of the Order. Issues and Decision Memorandum accompanying *Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 83 Fed. Reg. 51,927 (Dep't Commerce Oct. 15, 2018) (final results of antidumping duty admin. review; 2016-2017) at 2-3.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 3/23/20 2:12 PM, Submission Status: Approved

CWP from Thailand in the original investigation would preclude the inclusion of such pipe within the scope of the Order.

The bottom line is that the (k)(1) sources unequivocally demonstrate that the plain language of the scope was always intended to cover both standard pipe and line pipe. [26]

## III. CONCLUSION

In sum, the plain language of the scope covers regular line pipe and dual-stenciled line pipe because these pipe and tube products are circular in shape, welded, made of carbon steel, and have an outside diameter of 0.375 inches or more, but not exceeding 16 inches. Although there is no need to examine the (k)(1) criteria as there is no ambiguity within the scope that needs clarification, these criteria lead to the same conclusion. Accordingly, Petitioner requests that Commerce determine that imports of line pipe and dual-stenciled pipe and tube are subject to the Order.

Respectfully Submitted,

Roger B. Schagrin
Luke A. Meisner
Michael Panfeld, *Consultant*
SCHAGRIN ASSOCIATES
*Counsel to Wheatland Tube*

---

[26] If Commerce ultimately concludes that the scope does not cover regular line pipe, the agency should nonetheless continue with an anti-circumvention inquiry to determine whether Saha Thai's "line pipe" is circumventing the Order.

# CERTIFICATE OF SERVICE

**Circular Welded Carbon Steel Pipes and Tubes from Thailand**
**A-549-502**
**Scope Inquiry – Line Pipe**

I, Brittney Allen, hereby certify that copies of the attached PUBLIC DOCUMENT were served today, March 23, 2020, via electronic delivery upon the following parties:

Daniel L. Porter, Esq.
**Curtis, Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, NW
Washington, DC 20006
dporter@curtis.com

Alan H Price, Esq.
**Wiley Rein LLP**
1776 K Street, NW
Washington, DC 20006
aprice@wiley.law

Robert George Gosselink, Esq.
**Trade Pacific PLLC**
660 Pennsylvania Avenue, SE
Suite 401
Washington, DC 20002
rgosselink@tradepacificlaw.com

Brittney Allen, *Senior Paralegal*
SCHAGRIN ASSOCIATES

**Tab 11**

BRIEF FROM CURTIS, MALLET-PREVOST, COLT & MOSLE LLP TO SEC OF
COMMERCE PERTAINING TO SAHA THAI CASE BRIEF - SCOPE (Mar. 30, 2020)
(P.R. 71)

Barcode:3959214-01 A-549-502 SCO - Scope Inquiry - Line Pipe

CURTIS

**Curtis, Mallet-Prevost, Colt & Mosle LLP**

Almaty
Beijing
Buenos Aires
Dubai
Frankfurt
Geneva
Houston
London
Mexico City
Milan
Muscat
New York
Nur-Sultan
Paris
Rome

1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

**Telephone +1 202 452 7373**
**Facsimile +1 202 452 7333**
www.curtis.com

**Daniel L. Porter**
Tel: +1 202 452 7340
Fax: +1 202 452 7333
E-Mail: dporter@curtis.com

March 30, 2020

**PUBLIC DOCUMENT**

Case No.: A-549-502

No. Pages: 30

Status: Scope inquiry

This proceeding is conducted by Enforcement & Compliance, AD/CVD Operations/ VII

This document does not contain any business proprietary information.

The Honorable Wilbur Ross
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/Dockets Unit, Room 18022
14th Street & Constitution Avenue, N.W.
Washington, D.C. 20230

Re: *Saha Thai's Scope Inquiry Case Brief*
Circular Welded Carbon Steel Pipe and Tubes from Thailand

Dear Secretary Ross:

On behalf of Saha Thai Steel Pipe Public Co., Ltd. ("Saha Thai"), we hereby submit the case brief in the above referenced proceeding. This submission is timely made pursuant to the Department's letter of March 23, 2020.

Filed By: dporter@curtis.com, Filed Date: 3/30/20 1:39 PM, Submission Status: Approved

Barcode:3959214-01 A-549-502 SCO - Scope Inquiry - Line Pipe

CURTIS

**Curtis, Mallet-Prevost, Colt & Mosle LLP**

March 30, 2020
Page 2

If the Department has any questions regarding this submission, please contact the undersigned.

Respectfully submitted,

/s/ Daniel L. Porter

Daniel L. Porter
Tung Nguyen

**Curtis, Mallet-Prevost, Colt & Mosle LLP**

*Counsel for Saha Thai*

Filed By: dporter@curtis.com, Filed Date: 3/30/20 1:39 PM, Submission Status: Approved
37154733

**Circular Welded Carbon Steel Pipes and Tubes from Thailand**

**A-549-502**
**Scope Inquiry**
**SCO – Line Pipe**

**PUBLIC**
**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing submission has been served this day by federal express, and/or secured electronic service upon the following persons:

| | |
|---|---|
| Roger B. Schagrin, Esq.<br>On behalf of Wheatland Tube<br>**SCHAGRIN ASSOCIATES**<br>900 7th Street, NW<br>Suite 500<br>Washington, DC 20001 | Robert George Gosselink, Esq.<br>On behalf of Thai Premium Pipe Company Ltd.<br>**TRADE PACIFIC PLLC**<br>660 Pennsylvania Avenue, SE<br>Suite 401<br>Washington, DC 20002 |
| Alan H. Price, Esq.<br>On behalf of Independence Tube Corporation, et al.<br>**WILEY REIN LLP**<br>1776 K Street, N.W.<br>Washington, DC 20006 | |

Daniel L. Porter
Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, NW
Washington, DC 20006

Dated: March 30, 2020

Barcode:3959214-01 A-549-502 SCO - Scope Inquiry - Line Pipe

**PUBLIC DOCUMENT**

Case No.: A-549-502

No. Pages: 30

Status: Scope Inquiry

This proceeding is conducted by Enforcement & Compliance, AD/CVD Operations/ VII

This submission does not contain any business proprietary information.

# SAHA THAI STEEL'S
# SCOPE INQUIRY CASE BRIEF

*Circular Welded Steel Pipes and Tubes ("CWP") from Thailand*

Daniel L. Porter
Tung Nguyen

**Curtis, Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, N.W.
Washington, D.C., 20006
(202) 452-7327

March 30, 2020

Filed By: dporter@curtis.com, Filed Date: 3/30/20 1:39 PM, Submission Status: Approved

Barcode:3959214-01 A-549-502 SCO - Scope Inquiry - Line Pipe

PUBLIC DOCUMENT

**TABLE OF CONTENTS**

**Page #**

INTRODUCTION AND SUMMARY OF ARGUMENT ........ 1

ARGUMENT ........ 3

I. THE CWP FROM THAILAND ORIGINAL INVESTIGATION DOCUMENTS DEMONSTRATE UNEQUIVOCALLY THAT THE SCOPE EXCLUDES ALL LINE PIPE INCLUDING DUAL-STENCILED PIPE ........ 3

A. The Original Petition and Amended Petition Confirm That All Line Pipe -- Including Dual-Stencil Pipe -- Is Excluded Without Qualification ........ 6

B. The International Trade Commission's Original Investigation Documents Confirm That All Line Pipe -- Including Dual-Stencil Pipe -- Is Excluded Without Qualification ........ 10

II. SUBSEQUENT CWP AD PROCEEDINGS SUPPORT A FINDING THAT DUAL-STENCILED PIPE IS EXCLUDED FROM THE CWP AD ORDER ........ 11

A. ITC Sunset Reviews of The Very CWP from Thailand AD Order Confirm That All Line Pipe -- Including Dual-Stencil Pipe -- Is Excluded From The Scope Without Qualification ........ 11

B. The Department's Past Scope Definitions In Standard Pipe AD Cases Further Confirm That Dual-Stenciled Pipe Is Excluded From The CWP AD Order ........ 14

III. BECAUSE THE ITC DID NOT INLCUDE DUAL-STENCIL PIPE IN ITS INJURY ANALYSIS, THE DEPARTMENT MAY NOT EXPAND THE SCOPE TO INCLUDE DUAL-STENCIL PIPE ........ 20

IV. IF THE DEPARTMENT ERRONEOUSLY CONCLUDES THAT THE AD ORDER COVERS LINE PIPE, THE EARLIEST DATE THE DEPARTMENT CAN SUSPEND LIQUIDATION OF IMPORTS IS NOVEMBER 22, 2019, THE DATE OF SELF-INITIATION ........ 22

CONCLUSION ........ 23

- i -

Filed By: dporter@curtis.com, Filed Date: 3/30/20 1:39 PM, Submission Status: Approved

**TABLE OF AUTHORITIES**

**Page #**

**Regulatory Provisions**

19 C.F.R. § 351.225 .......... 11

19 C.F.R. § 351.225(k)(1) .......... 3, 14

19 C.F.R. § 351.225(l)(2) .......... 22

**Court Decisions**

*Fedmet Resources Corp. v. United States*, 755 F.3d 912 (Fed. Cir. 2014) .......... 14

*TMB 440AE, Inc. v. United States*, 399 F. Supp. 3d 1314 (Ct. Int'l Trade 2019) .......... 3

*Trendium Pool Products, Inc. v. United States*, 399 F. Supp. 3d 1335, 1345 (Ct. Int'l Trade 2019) .......... 21

*Wheatland Tube Co. v. United States*, 161 F. 3d 1365 (Fed. Cir. 1998) .......... 19, 22, 24

*Wheatland Tube Co. v. United States*, 973 F. Supp. 149 (Ct. Int'l Trade 1997) .......... passim

**Administrative Decisions**

*Certain Welded Carbon Steel Pipes and Tubes From India, Thailand, and Turkey; Certain Circular Welded Non-Alloy Steel Pipe From Brazil, Mexico, the Republic of Korea, and Taiwan, and Certain Circular Welded Carbon Steel Pipes and Tubes From Taiwan: Continuation of Antidumping Duty Orders and Countervailing Duty Order*, 83 FR 5402 (February 7, 2018) .......... 15

*Circular Welded Carbon-Quality Steel Pipe From the Sultanate of Oman, Pakistan, and the United Arab Emirates: Amended Final Affirmative Antidumping Duty Determination and Antidumping Duty Orders*, 81 FR 91906 (December 19, 2016) .......... 17

*Circular Welded Carbon-Quality Steel Pipe From the Sultanate of Oman, Pakistan, the Philippines, the United Arab Emirates, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*, 80 FR 73708 (November 25, 2015) .......... 17

*Initiation of Antidumping Duty Investigation: Circular Welded Carbon Quality Steel Pipe from the People's Republic of China*, 72 FR 36663 (July 5, 2007) .......... 16

Barcode:3959214-01 A-549-502 SCO - Scope Inquiry - Line Pipe

*Initiation of Antidumping Duty Investigation: Circular Welded Carbon Quality Steel Pipe from the People's Republic of China*, 72 FR 36663 (July 5, 2007); *Circular Welded Carbon-Quality Steel Pipe From the Sultanate of Oman, Pakistan, the Philippines, the United Arab Emirates, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*, 80 FR 73708 (November 25, 2015) ..................................... 15

*Initiation of Antidumping Duty Investigations: Circular Welded Non-Alloy Steel Pipe From Brazil, the Republic of Korea, Mexico, Romania, Taiwan, and Venezuela*, 56 FR 52528 (October 21, 1991)..................................................................... 15, 16

*Notice of Antidumping Duty Order: Circular Welded Carbon Quality Steel Pipe from the People's Republic of China*, 73 FR 42547 (July 22, 2008) ............................................. 16

*Notice of Antidumping Orders: Certain Circular Welded Non-Alloy Steel Pipe from Brazil, the Republic of Korea (Korea), Mexico, and Venezuela, and Amendment to Final Determination of Sales at Less Than Fair Value: Certain Circular Welded Non-Alloy Steel Pipe from Korea*, 57 FR 49453 (November 2, 1992) ............................................. 16

**ITC Decisions**

*Certain Circular Welded Carbon Quality Line Pipe From China, Korea, and Mexico*, Inv. 731-TA-1073-1075 (Preliminary), USITC Pub. 3687 (April 2004)............................ 5

*Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey (Final)*, Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534, and 536 (Fourth Review), USITC Pub.4754 (January 2018) ............................ 11

*Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey*, Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534 and 536 (Third Review), USITC Pub. 4333 (June 2012)................................................ 13

*Certain Welded Carbon Steel Pipes and Tubes from Thailand and Venezuela*, Inv. No. 701-TA-242, 731-TA-252-53 (Preliminary), USITC Pub. 1680 (April 1985) ................. 10

*Certain Welded Carbon Steel Pipes And Tubes From Turkey And Thailand*, Inv. Nos. 701-TA-253 and 731-TA-252 (Final), USITC Pub. 1810 (February 1986) .............4, 7, 10

Filed By: dporter@curtis.com, Filed Date: 3/30/20 1:39 PM, Submission Status: Approved

# INTRODUCTION AND SUMMARY OF ARGUMENT

On behalf of Saha Thai Steel Pipe Public Co., Ltd. ("Saha Thai"), we respectfully submit this case brief addressing the Department's preliminary determination in the above referenced scope inquiry proceeding.[1] The Department preliminarily determines that (1) line pipe is excluded from the AD order, while (2) dual-stenciled standard and line pipe is not. Saha Thai completely agrees with the Department's first conclusion that the scope of the AD order explicitly excludes line pipe. However, as detailed below, there are multiple reasons why the Department's preliminary conclusion with regard to dual-stenciled standard and line pipe (herein referred to as "dual-stenciled pipe") is legally and factually wrong.

First and foremost, until more recently, for purposes of defining the scope of circular welded pipe AD cases, the Department never treated line pipe and dual-stenciled standard and line pipe as separate products. Rather, for purposes of determining the scope of AD cases, for a very long time -- indeed for decades after the original CWP from Thailand AD determination -- the Department consistently considered dual-stenciled pipe to be the same as line pipe. Specifically, if line pipe was excluded from the scope so was dual-stenciled pipe. And if line pipe was included in the scope, so was dual-stenciled. For decades, the Department never treated dual-stenciled pipe separately from line pipe.

[1] Commerce Memorandum Re "Preliminary Scope Proceeding on Line Pipe and Dual-Stenciled Standard and Line Pipe" (February 24, 2020) (hereinafter "*Preliminary Determination*").

But long-standing Department practice is not the only reason why the Department must change its preliminary determination to conclude that dual-stenciled pipe is not covered by the scope of the CWP from Thailand AD Order. In **Section I** we document how the CWP from Thailand original investigation documents demonstrate unequivocally that the scope excludes all line pipe, including dual-stenciled pipe.

In **Section II** we explain how subsequent CWP AD proceedings support a finding that dual-stenciled pipe is excluded from the CWP from Thailand AD order. Specifically, ITC sunset reviews of the very CWP from Thailand AD Order confirm that all line pipe -- including dual-stencil pipe -- is excluded from the scope without qualification. And the Department's past scope definitions in standard pipe AD cases further confirm that dual-stenciled pipe is excluded from the CWP from Thailand Order.

In **Section III** we explain how and why, as a matter of law, the Department may not expand the scope to include dual-stencil pipe because the ITC did not include dual stencil pipe in its injury analysis. This legal prohibition has been affirmed by both the Court of International Trade and the Court of Appeals for the Federal Circuit in cases addressing CWP AD orders.

And in **Section IV** we argue that, if the Department erroneously concludes that the CWP from Thailand AD Order covers line pipe, the earliest date the department can suspend liquidation of imports is November 22, 2019, the date of the Department's actual self-initiation.

## ARGUMENT

### I. THE CWP FROM THAILAND ORIGINAL INVESTIGATION DOCUMENTS DEMONSTRATE UNEQUIVOCALLY THAT THE SCOPE EXCLUDES ALL LINE PIPE INCLUDING DUAL-STENCILED PIPE

The Department's specific regulation governing scope inquiries, 19 C.F.R. § 351.225(k)(1), makes clear that the Department's very first step in a scope inquiry is to examine <u>original investigation documents</u> to determine whether the inquiry merchandise is included or excluded from the scope of the AD order. On this legal requirement – the need to examine original investigation documents – there can be little doubt. Indeed, in a recent decision involving imported pipe products, the Court of International Trade reiterated this important legal requirement for Commerce Department scope inquiries.[2] The Department's preliminary determination correctly acknowledges this requirement.[3] However, notwithstanding the correct legal framework, the Department reaches a wrong preliminary conclusion about what the original investigation documents demonstrate concerning the exclusion of dual-stenciled pipe from the scope of the CWP AD Order.

In its preliminary determination, the Department states that "there is no information from the investigation indicating that pipe which as been dual-stenciled as

---

[2] *TMB 440AE, Inc. v. United States*, 399 F. Supp. 3d 1314 (Ct. Int'l Trade 2019). This court case concerned a Commerce Department scope ruling in which Commerce did not analyze original investigation documents to decide whether the actual scope language of the AD order was or was not ambiguous. The Court ruled that Commerce's refusal to examine original investigation documents was unlawful because it was contrary to the Commerce Department's own regulations. *See id*. at 12 ("Commerce's failure to consider the "descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary . . . and the Commission," as required by 19 C.F.R. § 351.225(k)(1), in its Final Scope Ruling was not in accordance with law.")

[3] *See Preliminary Determination* at 4-5 (Issue 1).

PUBLIC DOCUMENT

both standard pipe and line pipe was intended to be excluded from the *Order*."[4] That preliminary determination is demonstrably wrong. On the contrary, the original investigation documents affirmatively and unequivocally demonstrate that the AD order on CWP from Thailand excludes all line pipe without qualification. That means dual-stenciled standard and line pipe is also excluded.

At the outset we note that there is no dispute with regard to the definition of line pipe and standard pipe in this case. "Standard and line pipe can be produced on the same equipment. The manufacturing processes for the two products are nearly identical; *the principal differences between the two are that line pipe is made from a higher grade steel and requires additional testing to ensure that it meets API specifications*."[5] Line pipe is recognizable by its conformity to API 5L or 5X specifications while standard pipe is recognizable by its conformity to ASTM A-120, A-53 and A-135 specifications.[6]

The product at issue is dual-stenciled pipe. As the ITC has noted generally, "because line pipe that complies with the API specifications is necessarily in conformance with the less demanding specifications of the American Society for Testing and Materials ("ASTM") and American Society of Manufacturing Engineers ("ASME")

4 *Preliminary Determination* at 7.

5 *Certain Welded Carbon Steel Pipes And Tubes From Turkey And Thailand*, Inv. Nos. 701-TA-253 and 731-TA-252 (Final), USITC Pub. 1810 (February 1986) at page II-1 (provided in Saha Thai's August 26, 2019 Scope Inquiry Comments, **Attachment 5**).

6 *Preliminary Determination* at 3.

for standard pipe, it is often dual (or multiple) stenciled so it can be used in both line pipe and standard pipe applications."[7]

For ease of understanding, consider the following graph:

From a technical standpoint, dual-stenciled pipe is line pipe that is capable of standard pipe usages because of its dual qualification. However, notwithstanding its ASTM-qualification, as explained below dual-stenciled pipe is imported specifically and exclusively as line pipe. The original petition reveals that the petitioners did not intend for the AD order to cover any API-conformed pipe. And the ITC has consistently considered dual-stenciled pipe as line pipe for injury purposes, especially at the time of the original investigation. Thus for the Department's scope purposes, dual-stenciled pipe is unequivocally excluded from the AD order.

7 *Certain Circular Welded Carbon Quality Line Pipe From China, Korea, and Mexico*, Inv. 731-TA-1073-1075 (Preliminary), USITC Pub. 3687 (April 2004) at page 5.

We review below the various original investigation evidence that dual stenciled pipe was intended to be excluded.

**A. The Original Petition and Amended Petition Confirm That All Line Pipe -- Including Dual-Stencil Pipe -- Is Excluded Without Qualification**

The petition, as originally filed in February of 1985, requested an investigation on both standard pipe and line pipe imports from Thailand.[8] Prior to its initiation, however, the Department requested petitioners' counsel to provide certain additional information, documentation, and clarification to support its allegations. By amendment dated March 12, 1985, counsel for petitioners clarified that the petition was being filed on behalf of two separate entities: the Standard Pipe Subcommittee and the Line Pipe Subcommittee of the CPTI, and by individual manufacturers of standard pipe and line pipe.[9] On March 14, 1985, petitioners filed a letter in which petitioners **amended the scope of the petition against Thailand by taking out line pipe**, stating:

> Petitioners in the above designated investigations . . . hereby withdraw the following portions of the followings petitions . . . A-549-502 and C-549-501. Certain Pipe and Tube Products from Thailand: *Petitioners withdraw*

[8] *See* Petition for the Imposition of Antidumping Duties on Certain Welded Carbon Steel Pipes and Tube Products from Thailand, filed by Roger B. Schagrin on behalf of Members of Committee on Pipe and Tube Imports (Feb. 28, 1985) (provided in Saha Thai's August 26, 2019 Scope Inquiry Comments, **Attachment 11**); *see id*. at 12 ("The product covered by this petition is certain circular welded carbons steel circular pipes and tubes . . . includes "standard pipe" . . . the product also includes "line pipe").

[9] *See* Amended Petition for the Imposition of Antidumping Duties on Certain Welded Carbon Steel Pipes and Tube Products from Thailand, filed by Roger B. Schagrin and Paul W. Jameson on behalf of Individual Producer Members of the Subcommittees on Standard and Line Pipe of the Committee on Pipes and Tube Imports (March 12, 1985) (provided in Saha Thai's August 26, 2019 Scope Inquiry Comments, **Attachment 13**).

PUBLIC DOCUMENT

> *these petitions insofar as they concern line pipe, TSUS numbers 610.3208 and 3209.*[10]

Petitioner's scope amendment could not be clearer: all pipes from Thailand that meet API specification and classified under TSUS numbers 640.3208 and 610.3209 are excluded.

There are two important takeaways from this Petitioner action from the original investigation. First, Petitioner did not place any qualification whatsoever on the exclusion of line pipe, thereby confirming that line pipe that also meets ASTM specifications for standard pipes (that is, "dual-stencil" pipe) is also excluded.

Second, the fact that Petitioner specifically excludes "line pipe" tariff items while keeping only "standard pipe" tariff items also confirms that the exclusion covers all products that would meet "line pipe" API specifications, without qualification. At the time of the petition/original AD investigation, "line pipe" of the relevant sizes would enter under specific Tariff Schedules of the United States Annotated (TSUSA) items 610.3208 and 610.3209[11] while "standard pipe" would enter under different items, specifically 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258 and 610.4925.

The TSUSA 1985 version provides:[12]

---

[10] *See* Letter to the Secretary of Commerce from Roger Schagrin and Paul Jameson on behalf of Petitioners, *Certain Welded Carbon Steel Circular Pipe and Tube Products from Thailand and Venezuela: Partial Withdrawal of Petition* (March 14, 1985) (provided in Saha Thai's August 26, 2019 Scope Inquiry Comments, **Attachment 14**) (emphasis added).

[11] *Certain Welded Carbon Steel Pipes And Tubes From Turkey And Thailand*, Inv. Nos. 701-TA-253 and 731-TA-252 (Final), USITC Pub. 1810 (February 1986)at a-1 (provided in Saha Thai's August 26, 2019 Scope Inquiry Comments, **Attachment 5**).

[12] Provided in Saha Thai's August 26, 2019 Scope Inquiry Comments, **Attachment 6**.

| TSUSA Item | Included or Excluded by Amended Petition | Description |
|---|---|---|
| 61032 | | Pipes and tubes and blanks therefor, all the fore-going of iron (except cast iron) or steel: Welded, jointed, or seamed, with walls not thinner than 0.065 inch, and of circular cross section, 0.375 inch or more in outside diameter |
| **610.3208-09** | Included in the original petition BUT **excluded from the amended petition** | **Conforming to A.P.I. specifications for line pipe** (Std. 5L, 5LS, or 5LX), of no more than 16 inches in outside diameter |
| 610.3216-19 | Excluded | Conforming to A.P. I. specifications for oil well tubing |
| 610.3221 | Excluded | Cold drawn pipes and tubes |
| **610.3231-64** | **Included** | **Other** |
| **610.4925** | **Included** | **Pipes and tubes and blanks therefor, all the foregoing of iron (except cast iron) or steel, Other, Other, Not suitable for use in the manufacture of ball or roller bearings, Other than alloy iron or steel, Other, Welded, jointed, or seamed pipes and tubes, Of circular cross section** |

The tariff schedule requires that any pipe that conforms to API specifications for line pipe (5L, 5 LS or 5 LX), and of no more than 16 inches in outside diameter must enter the U.S. under either items 610.3208 or 610.3209. Therefore, under the 1985 TSUSA, both "dual-stenciled" products (i.e., pipes that would meet both ASTM specifications for standard pipe and API specifications for line pipe) and "mono-stenciled" line pipe (i.e., pipes that only conformed to API specifications for line pipe) could only be categorized as "line pipe" under TSUSA 610.3208 and 610.3209.[13]

[13] Petitioner Wheatland Tube itself in a subsequent sunset review of the AD order on circular welded steel pipes and tubes from Thailand acknowledged that "dual stenciled" pipe is considered as "line pipe" instead of "standard pipe:" "It is likely that Korea, and other countries if no longer subject to the restraints imposed by the Standard Pipe antidumping order, will switch their production from line pipe (whether dual stenciled or not) to standard pipe." *Certain Welded Non-Alloy Steel Pipes And Tubes From Brazil, India, South Korea, Mexico, Taiwan, Thailand, Turkey And Venezuela (Review)*, Prehearing Brief of Wheatland Tube et al (Feb. 29, 2000) at 58-59 (emphasis added), narrative provided in Saha Thai's August 26, 2019 Scope Inquiry Comments, **Attachment 7**.

The Department's preliminary determination contends that CBP's classification rule is irrelevant for purposes of determining whether dual-stenciled pipe is covered by the AD order.[14] Such Department comment, however, misunderstands Saha Thai's argument. We do not argue that the Department must apply CBP's classification rule in its scope analysis. Instead, Saha Thai's point is that the Department cannot ignore the following two facts: (1) "dual-stenciled" pipe was classified under TSUSA 610.3208 and 610.3209 at the time of the petition and (2) during the original investigation Petitioner explicitly excluded from the case all pipe that entered under TSUSA 610.3208 and 610.3209. These two facts are not disputed by either the Department or Petitioner, and the discussion of classification rule is simply to explain these facts.

In short, original investigation documents demonstrate that (1) dual-stenciled pipe is a type of line pipe because it meets API 5L specifications; (2) all API 5L pipes were classified under TSUSA 610.3208 and 610.3209 at the time of the petition; and (3) Petitioner excluded, without qualification, all API 5L pipes that were classified under TSUSA 610.3208 and 610.3209. Accordingly, the only correct and supported conclusion is that the original investigation documents demonstrate that the AD Order for CWP excludes all line pipe, including dual-stenciled pipes, without any qualification.[15]

---

[14] *Preliminary Determination* at 7.

[15] We note that both the Court of International Trade and the Court of Appeals for the Federal Circuit have affirmed that the original investigation documents referenced above are determinative for analyzing the scope of the CWP AD orders.

### B. The International Trade Commission's Original Investigation Documents Confirm That All Line Pipe -- Including Dual-Stencil Pipe -- Is Excluded Without Qualification

In its injury determination, the ITC explicitly noted that, after the original petition was filed, and during the process of instituting the investigation, "Commerce advised the petitioner that the welded carbon steel pipe and tube products covered by the petitions represented two distinct classes or kinds of products, standard pipe and line pipe."[16] The ITC further noted that the petition was subsequently amended to remove from the scope imports of *API-conformed* pipe from Thailand:[17]

> In the process of instituting these investigations, Commerce advised the petitioner that the welded carbon steel pipe and tube products covered by the petitions represented two distinct classes or kinds of products, standard pipe and line pipe. Subsequently, on March 14, 1985, the petitions involving imports from Thailand were withdrawn as they relate to line pipe ...[18]

Furthermore, the ITC determined that subject standard pipe were imported entirely under TSUSA 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258 and 610.4925;[19] while imports under TSUSA 610.3208 and 610.3209 were of entirely of line pipe, [20] which was <u>not</u> subject to the Thailand investigation. Because imports of dual-stenciled pipe would enter under TSUSA 610.3208 and 610.3209, dual-stenciled pipe was <u>not</u> considered for purposes of injury by

---

16 *Certain Welded Carbon Steel Pipes and Tubes from Thailand and Venezuela*, Inv. No. 701-TA-242, 731-TA-252-53 (Preliminary), USITC Pub. 1680 (April 1985) at 3 (provided in Saha Thai's August 26, 2019 Scope Inquiry Comments, **Attachment 8**).

17 *Id*.

18 *Id*. at 3 (emphasis added); *see also Certain Welded Carbon Steel Pipes and Tubes from Turkey and Thailand*, Inv. Nos. 701-TA-253, 731-TA-252 (Final), USITC Pub. 1810 (February 1986) at a-2, n. 6 (provided in Saha Thai's August 26, 2019 Scope Inquiry Comments at **Attachment 5**) (emphasis added).

19 *Id.* at Tables I-10 and I-11 (pages I-17, I-18).

20 *Id.* at Tables II-9, II-10 (pages II-12, II-13).

Thai imports of standard pipe. Therefore, there could be no doubt that in the original AD investigation, the ITC determined injury by subject imports from Thailand solely based on non-API "standard pipe" subject imports.

## II. SUBSEQUENT CWP AD PROCEEDINGS SUPPORT A FINDING THAT DUAL-STENCILED PIPE IS EXCLUDED FROM THE CWP AD ORDER

The Department's regulations do not limit the Department's analysis to original investigation documents. The Department's regulations also make clear that the Department must also take into account how the Department and the ITC have addressed similar scope issues.[21]

### A. ITC Sunset Reviews of The Very CWP from Thailand AD Order Confirm That All Line Pipe -- Including Dual-Stencil Pipe -- Is Excluded From The Scope Without Qualification

In the most recent sunset review of this AD order on circular welded steel pipes and tubes from Thailand, the ITC again made clear that line pipe and "dual-stenciled pipe, which enters as line pipe under a different subheading of the Harmonized Tariff Schedule of the United States ("HTS") for U.S. customs purposes, is not within the scope of the orders."[22] When discussing the product under review and providing the exact Commerce scope language for each of the CWP Orders under review, the ITC explained:

> Steel pipes and tubes are generally produced in various grades of carbon, alloy, or stainless steel. Tubular products frequently are distinguished by

21 19 C.F.R. § 351.225.

22 *Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey (Final)*, Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534, and 536 (Fourth Review), USITC Pub.4754 (January 2018) at 6-7 (emphasis added) (provided in Saha Thai's August 26, 2019 Scope Inquiry Comments, **Attachment 9**).

the following six end uses as defined by the American Iron and Steel Institute ("AISI").

*Standard pipe* is ordinarily used for low-pressure conveyance of air, steam, gas, water, oil, or other fluids for mechanical applications. It is used primarily in machinery, buildings, sprinkler systems, irrigation systems, and water wells rather than in pipe lines or utility distribution systems. It may carry fluids at elevated temperatures which are not subject to external heat applications. It is usually produced in standard diameters and wall thicknesses to ASTM specifications.

*Line pipe* is used for transportation of gas, oil, or water generally in a pipeline or utility distribution system. It is produced to API-5L and American Water Works Association ("AWWA") specifications.

{ . . . }

Standard pipe of non-alloy steel is the primary product within the scope of these reviews (see figure I-1). Standard pipe is intended for the low-pressure conveyance of water, steam, natural gas, air, and other liquids and gases in plumbing and heating systems, air conditioning units, automatic sprinkler systems, and other related uses. Standard pipe may carry liquids at elevated temperatures but may not be subject to the application of external heat. It is made primarily to ASTM A53, A135, and A795 specifications, but can also be made to other specifications, such as British Standard ("BS") 1387. Since these standards often specify required engineering characteristics that overlap, a pipe also can be dual stenciled, meaning that the pipe is stamped with monograms signifying compliance with two different specifications, such as ASTM A53 and API 5L; **however, such dual-stenciled pipe is not within the scope of the subject orders.**[23]

The ITC's explanation in the most recent sunset review (i.e., the fourth review) is unsurprising as it is consistent with the previous sunset reviews regarding the AD Order on CWP from Thailand. For instance, in the third review, when providing a description of the scope of the Orders under review, the ITC stated "dual-stenciled pipe, which for

[23] *Id*. at I-14-16 (emphasis added).

U.S. customs purposes enters as line pipe under a different tariff subheading, is not within the scope of the orders."[24]

Indeed, Wheatland Tube itself acknowledged that "dual stenciled" pipe is considered as "line pipe" instead of "standard pipe":[25] The ITC explicitly quoted Petitioner as follows:

> It is likely that Korea, and other countries {e,g. Thailand} if no longer subject to the restraints imposed by the Standard Pipe antidumping order, will switch their production from {non-subject} line pipe (whether dual stenciled or not) to standard pipe.

This Petitioner admission cannot be ignored. In a legal proceeding that explicitly addressed *CWP from Thailand*, Petitioner testified under oath that line pipe and dual-stenciled pipe were not covered by the CWP from Thailand AD Order.

In its preliminary determination, the Department dismisses the ITC's findings with regard to dual-stenciled pipe because "the ITC's statement, quoted by Saha Thai, that these orders, including the *Order* at issue here, exclude dual-stenciled products is not definitive, given the variations in the scope language of the CWP orders covered by the ITC 2018 Final Report."[26] The Department's discount of the ITC's explicit findings is unfounded. Even though the ITC's 2018 Final Report covers a number of different countries, the ITC report generally noted, without limitation to any particular country, that dual-stenciled pipes are not within the scope of the "standard pipe" orders. The fact

---

24 *Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey*, Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534 and 536 (Third Review), USITC Pub. 4333 (June 2012) at 8.

25 *Certain Welded Non-Alloy Steel Pipes And Tubes From Brazil, India, South Korea, Mexico, Taiwan, Thailand, Turkey And Venezuela (Review)*, Prehearing Brief of Wheatland Tube (Feb. 29, 2000) at 58-59 (emphasis added), provided in Saha Thai's August 26, 2019 Scope Inquiry Comments, **Attachment 7**.

26 *Preliminary Determination* at 7.

that some other AD orders contain explicit scope language excluding dual-stenciled product is irrelevant as to whether the AD order against Thailand excludes dual-stenciled pipe. An AD order can specifically exclude a product without containing an enumerated exclusion language in the scope.[27] Indeed, the Department itself correctly finds in the preliminary determination that the Thai AD order excludes line pipe notwithstanding that there is no enumerated exclusion language of line pipe in the scope language.

In sum, the ITC has consistently and explicitly stated in its sunset reviews that the subject AD Order for Thailand excludes dual-stenciled pipe, which is consistent with its injury determination in the original investigation of imports from Thailand as discussed above. The Department must consider this important fact for its final determination and reverse its preliminary determination with regard to dual-stenciled pipe.

### B. The Department's Past Scope Definitions In Standard Pipe AD Cases Further Confirm That Dual-Stenciled Pipe Is Excluded From The CWP AD Order

The Department's own regulations provide that, in making scope determinations, the Department "will take into account … scope determinations."[28] Following such requirement is particularly important in this case because there is a well-developed history of Department investigations of CWP standard pipes from different countries.

In older cases filed on or before 1985, such as Taiwan (A-583-008, petition filed in 1983), India (A-533-502, petition filed in 1985), Turkey (A-489-501, petition filed in

---

27 *See, e.g., Fedmet Resources Corp. v. United States*, 755 F.3d 912, 919 (Fed. Cir. 2014) (noting that the scope language was sufficient to implicitly exclude MAC bricks).

28 19 C.F.R. § 351.225(k)(1).

1985), Thailand (A-549-502), the petitions never include any enumerated exclusion of either line pipe or dual-stenciled pipe from the scope language.[29] In 1991, when CWP cases were filed against Brazil, Korea, Mexico and Venezuela, the original petition also did not include any exclusion language concerning either line pipe or dual-stenciled pipe.[30] Only in later cases such as China (A-570-910, petition filed in 2007) and Oman, Pakistan, UAE (petition filed in 2015) that the scope of the petitions explicitly include dual-stenciled pipe.[31] Clearly the domestic industry's intention has changed over time. When they intended to include dual-stenciled pipe to be included they explicitly stated so. The lack of explicit inclusion language in earlier petitions means that there was no intention at all. This change in petitioner intention over time is demonstrated below:

[29] *See Certain Welded Carbon Steel Pipes and Tubes From India, Thailand, and Turkey; Certain Circular Welded Non-Alloy Steel Pipe From Brazil, Mexico, the Republic of Korea, and Taiwan, and Certain Circular Welded Carbon Steel Pipes and Tubes From Taiwan: Continuation of Antidumping Duty Orders and Countervailing Duty Order*, 83 FR 5402 (February 7, 2018).

[30] *See Initiation of Antidumping Duty Investigations: Circular Welded Non-Alloy Steel Pipe From Brazil, the Republic of Korea, Mexico, Romania, Taiwan, and Venezuela*, 56 FR 52528 (October 21, 1991).

[31] *See, e.g., Initiation of Antidumping Duty Investigation: Circular Welded Carbon Quality Steel Pipe from the People's Republic of China*, 72 FR 36663 (July 5, 2007); *Circular Welded Carbon-Quality Steel Pipe From the Sultanate of Oman, Pakistan, the Philippines, the United Arab Emirates, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*, 80 FR 73708 (November 25, 2015).

Barcode:3959214-01 A-549-502 SCO - Scope Inquiry - Line Pipe

| Country[32] | Year of Petition | Petition contains enumerated dual-stenciled pipe language? | AD Order Scope contains enumerated exclusion of dual-stenciled pipe? |
|---|---|---|---|
| Taiwan | 1983 | No. There is no mentioning of line pipe or dual-stenciled pipe in the petition language. | No. |
| Turkey, Thailand, India | 1985 | No. There is no mentioning of line pipe or dual-stenciled pipe in the petition language. | No. |
| Brazil, Korea, Mexico, Venezuela | 1991 | No. There is no mentioning of line pipe or dual-stenciled pipe in the petition language.[33] | Yes. The AD order states "Standard pipe that is dual or triple certified/stenciled that enters the U.S. as line pipe of a kind used for oil and gas pipelines is also not included in this investigation."[34] |
| China | 2007 | Yes. The petition explicitly states that multi-stenciled pipe is covered:[35] | No. The AD order follows the scope of the petition and explicitly states that multi-stenciled pipe is covered.[36] |
| Oman, Pakistan, UAE | 2015 | Yes. The petition explicitly states that multi-stenciled pipe is covered by the scope.[37] | No. Same as the petition.[38] |

32 Countries with currently active AD orders.

33 *See Initiation of Antidumping Duty Investigations: Circular Welded Non-Alloy Steel Pipe From Brazil, the Republic of Korea, Mexico, Romania, Taiwan, and Venezuela*, 56 FR 52528 (October 21, 1991).

34 *See Notice of Antidumping Orders: Certain Circular Welded Non-Alloy Steel Pipe from Brazil, the Republic of Korea (Korea), Mexico, and Venezuela, and Amendment to Final Determination of Sales at Less Than Fair Value: Certain Circular Welded Non-Alloy Steel Pipe from Korea*, 57 FR 49453 (November 2, 1992).

35 *See Initiation of Antidumping Duty Investigation: Circular Welded Carbon Quality Steel Pipe from the People's Republic of China*, 72 FR 36663 (July 5, 2007).

36 *See Notice of Antidumping Duty Order: Circular Welded Carbon Quality Steel Pipe from the People's Republic of China*, 73 FR 42547 (July 22, 2008).

37 *See Circular Welded Carbon-Quality Steel Pipe From the Sultanate of Oman, Pakistan, the Philippines, the United Arab Emirates, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*, 80 FR 73708 (November 25, 2015).

38 *See Circular Welded Carbon-Quality Steel Pipe From the Sultanate of Oman, Pakistan, and the United Arab Emirates: Amended Final Affirmative Antidumping Duty Determination and Antidumping Duty Orders*, 81 FR 91906 (December 19, 2016).

Filed By: dporter@curtis.com, Filed Date: 3/30/20 1:39 PM, Submission Status: Approved

In the case of the 1991 Brazil, Korea, Mexico and Venezuela investigation, both the Department and the Court specifically concluded that, notwithstanding an omission of dual-stenciled pipe in the scope of the petition, the petitioner did not intend for the AD orders to cover dual-stenciled pipe.

The procedural history of the 1991 case is perfectly summarized in *Wheatland Tube Co. v. United States*, 973 F. Supp. 149 (Ct. Int'l Trade 1997), which we summarize here. On September 24, 1991, Wheatland Tube and the domestic pipe producers filed the AD petitions against standard pipe from Brazil, Korea, Mexico, Romania, Taiwan and Venezuela. *Id.* at 151. The scope of these petitions, similar to the Thailand petition, made no reference to line pipe or duals-stenciled pipe, instead referring to subject merchandise simply as "standard pipe." During the course of the investigation, respondents requested a clarification of the scope with regard to "triple-certified" standard pipe. *Id.* Petitioners responded that "{d}ual or triple certified standard pipe should be covered by these investigations only if they enter the United States under one of the tariff numbers listed in section I.D.3 of the petitions," "The scope, *as defined by the petition*, the Department and the Commission, *clearly excludes* both imports of *line pipe* entering the United States in Harmonized Tariff System of the United States (HS) category 7306.10 and oil country tubular goods entering the United States in HS category 7306.20." *Id.* at 152. Based on Petitioners' clarification, the Department modified the scope of the ultimate AD order as follows:

> All carbon steel pipes and tubes within the physical description outlined above are included within the scope of this investigation, except line pipe, oil country tubular goods, boiler tubing, cold-drawn or cold-rolled mechanical tubing, pipe and tube

hollows for redraws, finished scaffolding, and finished rigid conduit. **Standard pipe that is dual or triple certified/stenciled that enters the U.S. as line pipe of a kind used for oil or gas pipelines is also not included in this investigation**.[39]

On April 23, 1993, petitioners requested an anti-circumvention determination of API 5L line pipe and dual-stenciled pipe from Korea, Mexico and Brazil. *Id.* at 153. The Department decided to conduct a scope inquiry instead of an anti-circumvention inquiry (just was it did in this case). *Id.* Petitioners made the same argument as it is making in this case: "{t}he written scope description published in the antidumping duty order supports" the conclusion that line pipe and dual-certified pipe, "when intended for use as standard pipe or when actually used as standard pipe, is included within the scope of the antidumping duty order" covering standard pipe. *Id.*

Applying the "diversified product" analysis, the Department issued a preliminary affirmative scope determination. *Id.* at 154. However, in March 1996, the Department reversed its decision, issuing a final negative determination. The Department concluded that the scope language of the order "excludes line pipe and dual-stenciled pipe." Both the Court of International Trade and the Court of Appeals for the Federal Circuit affirmed the Department's final negative determination. [40]

In its preliminary determination in this case the Department contends that Saha Thai's reliance on *Wheatland Tube* litigation is misplaced because of the factual distinction, especially the fact that the CWP orders against Korea, Mexico and Brazil contain an explicit enumerated exclusion of dual-stenciled pipe that the order against

---

39 *Wheatland Tube*, 973 F. Supp. at 153.

40 *Wheatland Tube*, 973 F. Supp. 149 (Ct. Int'l Trade 1997), affirmed by *Wheatland Tube Co. v. United States*, 161 F. 3d 1365 (Fed. Cir. 1998).

Thailand does not have.[41] However, the enumerated exclusion language is not determinative because it simply reflects an early attempt by respondents and the Department to clarify the scope of the petition. Both the 1991 cases and the Thailand case began with a petition that made no reference to line pipe and dual-stenciled pipe. And as the *Wheatland Tube* court noted, it was clear the petitioners intended to use tariff classification as a means of defining the scope of the investigations.[42] As discussed above, petitioners removed the specific customs classification exclusively covering line pipe and dual-stenciled pipe in an attempt to amend the Thailand petition. In the 1991 cases, the same petitioners made clear that omission of line pipe customs classification meant that line pipe and dual-stenciled pipe were excluded.[43]

Moreover, another reason that both the Court of International Trade and the Court of Appeals for the Federal Circuit upheld Commerce's decision that dual-stencil pipe was excluded from the CWP AD order was because the ITC did not consider line and dual-stenciled pipe in its injury analysis.[44] As explained above, in the Thailand investigation,

---

41 *Preliminary Determination* at 7.

42 *Wheatland Tube*, 973 F. Supp. at 157.

43 *Id.* at 152 (quoting Petitioners, "The scope, *as defined by the petition*, the Department and the Commission, *clearly excludes* both imports of *line pipe* entering the United States in Harmonized Tariff System of the United States (HS) category 7306.10").

44 *Id.* at 158 (upholding the Department's determination that because the ITC did not include producers of line pipe in its definition of the U.S. industry for injury purposes and did not examine the impact of imports of line pipe on the domestic industry, the Department is barred from line pipe and dual-stenciled pipe within the scope of the order); *Wheatland Tube*, 161 F. 3d at 1369 (noting that Wheatland Tube stated before Commerce that the AD investigations should cover pipe entering the United States under one of the tariff numbers pertaining to standard pipe and that pipe entering as line pipe would be outside the scope of the petitions, the Federal Circuit held that the ITC's "reliance on these statements in conducting its injury analysis makes Wheatland's new position especially untenable.").

the ITC similarly did not consider any producer or imports of API-conformed pipe from Thailand, leaving all pipe entered under 610.3208 and 610.3209 out of its injury analysis.

Saha Thai respectfully submits that the both Department's own regulation and past court precedent make clear that the Department's' scope analysis cannot be done in a vacuum. Both original investigation documents and subsequent Department and ITC actions must be taken into account. And when the Department does so in this case, there is only conclusion that can be sustained: For the purposes of the scope of the CWP from Thailand AD case, all line pipe -- including dual stencil pipe -- is excluded from the scope of the CWP from Thailand AD order without any qualification.

## III. BECAUSE THE ITC DID NOT INLCUDE DUAL-STENCIL PIPE IN ITS INJURY ANALYSIS, THE DEPARTMENT MAY NOT EXPAND THE SCOPE TO INCLUDE DUAL-STENCIL PIPE

As detailed above, it is uncontroverted fact that, for purposes of its injury analysis for the CWP from Thailand case, the ITC did not include imports of dual-stencil pipe in its analysis. Such fact is made clear from both the ITC's original investigation documents and from the ITC's subsequent discussion of its approach during sunset reviews.

Such fact has legal consequences for the Department. Under U.S. law, the Department may not expand the scope of an AD order to include a product that was not part of the ITC's injury analysis. Both the Court of International Trade and the Federal Circuit have reiterated this legal obligation, and have done so in cases involving CWP. Specifically, in *Wheatland Tube*, the Court of International Trade ruled as follows:

> A fundamental requirement of both U.S. and international law is that an antidumping duty order must be supported by an ITC determination of material injury covering the merchandise in question. *See* 19 U.S.C. § 1673 (1994). . . . It would follow that any expansion of the scope by Commerce would extend the antidumping duty order beyond the limits of the ITC injury determination and would therefore violate both U.S. and international law.[45]

The Federal Circuit affirmed this legal conclusion in its own *Wheatland Tube* decision:

> The International Trade Commission's (ITC) reliance on these statements in conducting its injury analysis makes Wheatland's new position {that dual-stencil pipe is covered by the scope} especially untenable. As a result of Wheatland's representations, the ITC did not "examine the impact of imports of line pipe upon the domestic industry." *{citation omitted}* . It is possible that the ITC would not have found domestic injury if it had examined line pipe imports. Having argued that the orders should exclude line and dual-certified pipe regardless of actual use in order to obtain the antidumping duty orders, Wheatland cannot now urge a broader interpretation during enforcement of the orders.
>
> . . .
>
> Wheatland argues that this result allows importers to finesse their way through loopholes in antidumping orders, contrary to public policy. We do not consider the unequivocal exclusion of line and dual-certified pipe from the *Standard Pipe Orders* to be a loophole. Rather, Wheatland repeatedly argued for this exclusion with full knowledge that these pipes were capable of standard applications. Allowing Wheatland to retreat from this error **would itself frustrate the purpose of the antidumping laws because it would allow Commerce to assess antidumping duties on products intentionally omitted from the ITC's injury investigation**. *See* 19 U.S.C. § 1673 (1994) (requiring an injury determination by the ITC before the imposition of antidumping duties).[46]

Saha Thai respectfully submit that the legal conclusions adopted by the Court of International Trade and the Federal Circuit noted above prohibit the Department from

---

[45] *Wheatland Tube*, 973 F. Supp. at 158; *see also Trendium Pool Products, Inc. v. United States*, 399 F. Supp. 3d 1335, 1345 (Ct. Int'l Trade 2019) (holding that a scope determination by the Department was not in accordance with law because "the products under examination were never considered as part of the ITC's injury analysis despite the requirement of an injury determination prior to the imposition of duties" and that allowing the Department to include those products within the scope of the order would "frustrate the purpose of the antidumping laws because it would allow Commerce to assess antidumping duties on products intentionally omitted from the ITC's injury investigation.").

[46] *Wheatland Tube*, 161 F. 3d at 1371.

concluding that dual-stencil pipe is covered by the CWP from Thailand AD order. Because there is no doubt that such dual-stencil was not included in the ITC's injury analysis, it would follow that any expansion of the scope by Commerce would extend the antidumping duty order beyond the limits of the ITC injury determination and would therefore violate both U.S. and international law.

## IV. IF THE DEPARTMENT ERRONEOUSLY CONCLUDES THAT THE AD ORDER COVERS LINE PIPE, THE EARLIEST DATE THE DEPARTMENT CAN SUSPEND LIQUIDATION OF IMPORTS IS NOVEMBER 22, 2019, THE DATE OF SELF-INITIATION

As Saha Thai extensively argued earlier in this proceeding, the Department did not properly initiate the scope inquiry by way of its July 29, 2019 letter.[47] Therefore, July 29, 2019 cannot be considered as the date of initiation for purposes of imposition of suspension of liquidation under 19 C.F.R. § 351.225(l)(2).

The proper initiation date must be November 22, 2019, the date of the Department's memorandum re "Self Initiation of Scope Inquiry on Line Pipe and Dual-Stenciled Standard Line Pipe."

[47] *See* Saha Thai's Comments on Scope Inquiry (Aug. 26, 2019) at 4-9 (hereby incorporated by reference).

Barcode:3959214-01 A-549-502 SCO - Scope Inquiry - Line Pipe

PUBLIC DOCUMENT

## CONCLUSION

For all of the foregoing reasons, the Department should find that both "line pipe" and "dual-stenciled standard and line pipe" are not included in the scope of the CWP from Thailand AD Order and terminate its pending anti-circumvention inquiry[48] as a result.

Respectfully submitted,

/s/ Daniel L. Porter

Daniel L. Porter
Tung Nguyen

*Counsel for Saha Thai*

March 30, 2020

---

[48] *See Wheatland*, 161 F. 3d at 1371 ("section 1677j(c) {the minor alteration circumvention provision} does not apply to products unequivocally excluded from the order in the first place."); *see also* Saha Thai's Comments on Scope Inquiry (December 20, 2019) at 32-33 (hereby incorporated by reference).

23

Filed By: dporter@curtis.com, Filed Date: 3/30/20 1:39 PM, Submission Status: Approved

**Tab 12**

BRIEF FROM CURTIS, MALLET-PREVOST, COLT & MOSLE LLP TO SEC OF
COMMERCE PERTAINING TO SAHA THAI REBUTTAL BRIEF (Apr. 9, 2020) (P.R. 72)

Barcode:3962959-01 A-549-502 SCO - Scope Inquiry - Line Pipe

SCHAGRIN ASSOCIATES

900 SEVENTH STREET, N.W. - SUITE 500 - WASHINGTON, D.C. 20001
P: (202) 223-1700 E: LMEISNER@SCHAGRINASSOCIATES.COM F: (202) 429-2522

April 9, 2020

Case No. A-549-502
Total Pages: 18
Scope Inquiry – Line Pipe
AD/CVD Operations, Office VII

**PUBLIC DOCUMENT**

**VIA ACCESS**

The Honorable Wilbur L. Ross, Jr.
Secretary of Commerce
Attention: Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

**Re: Circular Welded Carbon Steel Pipes and Tubes from Thailand: Rebuttal Brief**

Dear Secretary Ross:

On behalf of Wheatland Tube, a domestic producer and interested party under 19 U.S.C. § 1677(9)(C), we hereby submit our rebuttal brief in the above-referenced scope inquiry. Please contact the undersigned with any questions regarding this submission.

Respectfully submitted,

Luke A. Meisner

Roger B Schagrin
Luke A. Meisner
Michael Panfeld, *Consultant*
SCHAGRIN ASSOCIATES
*Counsel to Wheatland Tube*

Filed By: rschagrin@schagrinassociates.com, Filed Date: 4/9/20 11:46 AM, Submission Status: Approved

Barcode:3962959-01 A-549-502 SCO - Scope Inquiry - Line Pipe

**BEFORE THE UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**

Case No. A-549-502
Total Pages: 17
Scope Inquiry – Line Pipe
AD/CVD Operations, Office VII

**PUBLIC DOCUMENT**

---

**Circular Welded Carbon Steel Pipes and Tubes from Thailand**

---

# WHEATLAND TUBE'S REBUTTAL BRIEF

Roger B. Schagrin
Luke A. Meisner
Michael Panfeld, *Consultant*
SCHAGRIN ASSOCIATES
900 Seventh Street, N.W.
Suite 500
Washington, DC 20001
(202) 223-1700
*Counsel to Wheatland Tube*

April 9, 2020

Filed By: rschagrin@schagrinassociates.com, Filed Date: 4/9/20 11:46 AM, Submission Status: Approved

Barcode:3962959-01 A-549-502 SCO - Scope Inquiry - Line Pipe

PUBLIC DOCUMENT

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........ ii

SUMMARY OF ARGUMENT ........ 1

I. COMMERCE PROPERLY FOUND THAT DUAL-STENCILED LINE PIPE IS SUBJECT TO THE ORDER ........ 1

A. The Original Investigation Conducted by Commerce Shows that Dual-Stenciled Pipe Is Covered by the Scope ........ 2

B. The Proceedings Conducted by the Commission Likewise Confirm that Dual-Stenciled Pipe Is Covered by the Scope ........ 6

C. Proceedings Involving CWP from Other Countries Show that the Scope Covers Dual-Stenciled Pipe ........ 8

II. THE FEDERAL CIRCUIT'S DECISION IN WHEATLAND TUBE CO. V. UNITED STATES DOES NOT MANDATE A CONTRARY OUTCOME ........ 9

III. THE COMMISSION'S INJURY ANALYSIS FROM THE ORIGINAL INVESTIGATION COULD NOT HAVE POSSIBLY COVERED DUAL-STENCILED PIPE ........ 10

IV. COMMERCE SHOULD TREAT JULY 29, 2019 AS THE DATE OF INITIATION ... 11

i

Filed By: rschagrin@schagrinassociates.com, Filed Date: 4/9/20 11:46 AM, Submission Status: Approved

Barcode:3962959-01 A-549-502 SCO - Scope Inquiry - Line Pipe

## TABLE OF AUTHORITIES

### Cases

*Algoma Steel Corp. v. United States,* 688 F. Supp. 639 (1988) ..................... 6

*Allegheny Ludlum Corp. v. United States*, 24 CIT 858, 116 F. Supp.2d 1276 (2000) ..................... 6

*Hosiden Corp. v. United States,* 85 F.3d 1561 (Fed. Cir. 1996) ..................... 6

*Torrington Co. v. U.S.*, 747 F. Supp. 744 (Ct. Int'l Trade 1990) ..................... 6

*Wheatland Tube Co. v. United States,* 161 F.3d 1365 (Fed. Cir. 1998) ..................... 9

### Other Authorities

*Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 83 Fed. Reg. 51,927 (Dep't Commerce Oct. 15, 2018) (final results of antidumping duty admin. review; 2016-2017) ....... 4

Merriam-Webster Dictionary ..................... 4

### Regulations

19 C.F.R. § 351.225(b) ..................... 11

Filed By: rschagrin@schagrinassociates.com, Filed Date: 4/9/20 11:46 AM, Submission Status: Approved

## SUMMARY OF ARGUMENT

As demonstrated in Section I of this rebuttal brief, the U.S. Department of Commerce ("Commerce") properly found in the preliminary determination of the instant scope inquiry that dual-stenciled pipe is covered by the scope of the antidumping duty order on circular welded pipe from Thailand (the "Order"). Contrary to the arguments presented by Saha Thai Steel Pipe (Public) Company Ltd. ("Saha Thai") in its case brief, Commerce's preliminary determination is supported by the original investigation and other proceedings conducted by Commerce and the U.S. International Trade Commission (the "Commission"). As established in Section II, the Federal Circuit's decision in *Wheatland Tube Co. v. United States* does not preclude Commerce from finding that dual-stenciled pipe is covered by the scope of the Order. Unlike the scope at issue in that case, the scope of the Order in this case does not contain an explicit exclusion for dual-stenciled pipe. Section III demonstrates that it is irrelevant that the Commission did not find that the domestic line pipe injury was injured by Thai line pipe imports in its original investigation, because there were no Thai producers of line pipe or U.S. imports of Thai line pipe at that time. Finally, as shown in Section IV, Commerce should treat July 29, 2019 as the date of initiation for this scope inquiry, because Commerce properly initiated this scope inquiry on that date in a perfectly adequate notice of initiation.

## I. COMMERCE PROPERLY FOUND THAT DUAL-STENCILED LINE PIPE IS SUBJECT TO THE ORDER

Commerce correctly found in its preliminary determination in this scope inquiry that dual-stenciled pipe is covered by the scope of the Order.[1] The scope covers all circular welded carbon steel pipes and tubes from Thailand with an outside diameter of 0.375 inches or more, but

---

[1] *See* Petitioner's Response to Commerce's July 29, 2019 Request for Comments (Aug. 26, 2019) at 3-4.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 4/9/20 11:46 AM, Submission Status: Approved

not exceeding 16 inches.[2] The dual-stenciled pipe manufactured by Saha Thai in Thailand is circular in shape, welded, made of carbon steel, and has an outside diameter of 0.375 inches or more, but not exceeding 16 inches.[3] Furthermore, there are no scope exclusions in the Order for dual-stenciled pipe.[4] Thus, the plain language of the Order covers dual-stenciled pipe.

There is no merit to Saha Thai's argument that "the original investigation documents affirmatively and unequivocally demonstrate that the AD order on CWP from Thailand excludes all line pipe without qualification."[5] First, as discussed in Petitioner's case brief, the plain language of the scope unambiguously covers the dual-stenciled pipe manufactured by Saha Thai and, as a result, there is no need to examine the 19 C.F.R. § 351.225(k)(1) criteria to resolve this scope inquiry. But even if it is necessary to examine these criteria, they all provide further support for including line pipe and dual-stenciled pipe in the scope of the Order.

### A. The Original Investigation Conducted by Commerce Shows that Dual-Stenciled Pipe Is Covered by the Scope

First, the record of the initial investigation supports inclusion of dual-stenciled pipe in the scope of the Order. In particular, the initial petition filed in the original investigation included all "small diameter circular welded carbon steel pipes and tubes" from Thailand and specifically included any imports of line pipe.[6] The petition with respect to line pipe was later *withdrawn* only because there was no known production in Thailand of line pipe at that time.[7] However, as part of this withdrawal process, Petitioner did not actually amend the scope of the petition in any

---

2 *Id.*

3 *Id.*

4 *Id.*

5 Saha Thai Case Brief at 4.

6 *See* Petitioner's Response to Commerce's July 29, 2019 Request for Comments (Aug. 26, 2019) at5 n.13.

7 *Id.*

way to exclude any line pipe that may later be produced in Thailand.[8] Thus, it is clear that the plain language of the scope – as originally drafted and never amended – was always intended to cover both standard pipe and line pipe.

Saha Thai is wrong when it asserts that "petitioners **amended the scope of the petition against Thailand by taking out line pipe**" (emphasis in original).[9] There is absolutely no evidence that petitioners ever amended the scope. After the petitions were filed, Commerce issued a questionnaire requesting that petitioners provide "{d}ocumentation which demonstrates that line pipe is manufactured in Thailand" and "{d}ocumentation which supports the allegation that line pipe from Thailand is being sold at less than fair value."[10] In addition, the Commission indicated that standard pipe and line pipe would be treated as separate like products for its injury analysis.[11] In light of these developments, Petitioners withdrew the petition with respect to line pipe from Thailand. It would not be possible to show dumping by Thai producers that was specific to line pipe as opposed to dumping of "circular welded carbon steel pipes and tubes." Nor was there any point in attempting to show material injury to the domestic line pipe industry by reason of imports of line pipe from Thailand given that there was no production of line pipe in Thailand. However, **Petitioners did not amend the language in the scope to exclude line pipe**. The original language describing the covered pipe – which was intended to cover both standard pipe and line pipe – remained unchanged. Thus, this same language continues to cover both standard pipe and line pipe.

---

8 *See id.*

9 Saha Thai Case Brief at 6 (emphasis in original).

10 *Id.* at Attachment 12.

11 *See, e.g.*, Saha Thai Comments (Aug. 26, 2019) at Attachment 8.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 4/9/20 11:46 AM, Submission Status: Approved

The only language in the scope that appears to have changed through Petitioner's withdrawal process is the removal to the Tariff Schedules of the United States ("TSUS") codes for line pipe – *i.e.*, 640.3208 and 610.3209. Saha Thai is wrong to suggest, however, that the removal of the reference to these TSUS codes somehow means that "Petitioner ***explicitly*** excluded from the case all pipe that entered under TSUSA 610.3208 and 610.3209."[12] First of all, Saha Thai fails to understand what "explicit" means. According to Merriam-Webster's dictionary, language is explicit when it is "fully revealed or expressed without vagueness, implication, or ambiguity: leaving no question as to meaning or intent."[13] Below is the scope of the Order, which describes the subject merchandise as:

> certain circular welded carbon steel pipes and tubes from Thailand. The subject merchandise has an outside diameter of 0.375 inches or more, but not exceeding 16 inches. These products, which are commonly referred to in the industry as "standard pipe" or "structural tubing" are hereinafter designated as "pipes and tubes." The merchandise is classifiable under the Harmonized Tariff Schedule of the United States (HTSUS) item numbers 7306.30.1000, 7306.30.5025, 7306.30.5032, 7306.30.5040, 7306.30.5055, 7306.30.5085 and 7306.30.5090. Although the HTSUS subheadings are provided for convenience and purposes of U.S. Customs and Border Protection (CBP), the written description of the merchandise subject to the order is dispositive.[14]

Nowhere does the scope state "without vagueness, implication, or ambiguity" that imports entering under TSUSA 610.3208 and 610.3209 are excluded from the Order. The scope simply does not reference these TSUS codes. And the removal of these TSUS codes from scope was not made through any "amendment" proposed by petitioners to explicitly exclude line pipe. The

12 *See* Saha Thai Case Brief at 9 (emphasis added).

13 Merriam-Webster Dictionary, definition of "explicit."

14 Issues and Decision Memorandum accompanying *Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 83 Fed. Reg. 51,927 (Dep't Commerce Oct. 15, 2018) (final results of antidumping duty admin. review; 2016-2017) at 2-3.

removal of the reference to these TSUS codes was apparently made by Commerce on its own to prevent confusion.

Furthermore, the scope clearly states that the TSUS or HTSUS items listed in the scope are "provided for convenience and purposes of U.S. Customs and Border Protection (CBP)" and that the written description of the merchandise subject to the order is dispositive.[15] Thus, the HTSUS subheadings under which the pipe is being imported have no bearing on whether it is covered by the scope of the Order.

Finally, as Commerce explained in its preliminary determination:

> The classification rules followed by CBP, which direct importers to enter dual-stenciled products using the more specific TSUSA line pipe categories, rather than the less-specific TSUSA standard pipe categories, has no bearing on the fact that the dual-stenciled pipe meets the definition of the TSUSA standard pipe categories, and that product is certified to be used as standard pipe.[16]

Saha Thai's Venn diagram in its case brief is helpful in illustrating this point:

The scope of the Order covers all standard pipe – without any exclusions whatsoever – meaning that the scope covers all merchandise shaded in blue. Dual-stenciled pipe meets the definition of standard pipe and is thus covered by the scope of the Order—regardless of the fact that it may

---

15 *Id.*

16 Preliminary Decision Memorandum at 7.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 4/9/20 11:46 AM, Submission Status: Approved

also be certified to line pipe standards and regardless of the TSUSA or HTS code under which it is entered. There is no exclusion for imports that are shaded yellow in the diagram.

**B. The Proceedings Conducted by the Commission Likewise Confirm that Dual-Stenciled Pipe Is Covered by the Scope**

The proceedings conducted by the Commission do not help Saha Thai's cause. First of all, contrary to Saha Thai's claims, the fact that Commerce found "two distinct classes or kinds or products, standard pipe and line pipe," has no relevance whatsoever to the instant scope inquiry regarding whether line pipe is included within the scope of the Order.[17] It is well-established that Commerce's scope determinations and the Commission's like-product determinations are separate inquiries that can arrive at completely separate conclusions regarding which merchandise is in-scope and which merchandise is part of the same domestic like product.[18] Indeed, the courts have specifically held that "{i}nconsistencies in the agencies' determinations are not, *per se*, contrary to law. Indeed, the possibility that they will reach inconsistent conclusions is 'built into the law.'"[19] Thus, the fact that the Commission has found that standard pipe and line pipe are separate like products does not preclude Commerce from finding that line pipe is including in the scope of the Order.

---

17 Saha Thai Case Brief at 10.

18 *Torrington Co. v. U.S.*, 747 F. Supp. 744 (Ct. Int'l Trade 1990) ("It is settled law that the ITC's like product determination is separate and distinct from the ITA's determination of the class or kind of merchandise. "); *Allegheny Ludlum Corp. v. United States*, 24 CIT 858, 879, 116 F. Supp.2d 1276, 1297 (2000) ("Although the ITC must accept Commerce's determination as to the scope of the imported merchandise found to be subsidized or sold at less than fair value, the Commission determines what domestic product or products is like the imported articles Commerce identified."); *Hosiden Corp. v. United States*, 85 F.3d 1561, 1567 (Fed. Cir. 1996) ("Both the Court of International Trade and this court have long recognized that for injury determinations the 'class or kind' and 'like product' determinations required by the statute need not be consistent.").

19 *Torrington Co. v. U.S.*, 747 F. Supp. 744 (Ct. Int'l Trade 1990) (citing *Algoma Steel Corp. v. United States*, 688 F. Supp. 639, 642 (1988), *aff'd*, 865 F.2d 240 (Fed. Cir. 1989), *cert. denied*, 109 S.Ct. 3244, 106 L.Ed.2d 590 (1989)).

The same is true with respect to the Commission's pronouncements regarding the scope during the sunset reviews of the orders on CWP from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey.[20] As an initial matter, Commerce and not the Commission has sole authority for determining whether merchandise is in or out of the scope. More importantly, the Commission's pronouncements regarding line pipe being excluded from the scope of the orders were general statements regarding the orders on CWP from seven countries and not statements specific to the Order on CWP from Thailand. These statements are generally true because the orders on CWP for the countries other than Thailand all have specific scope exclusions for line pipe. But the statements are not true for Thailand—which has no exclusion for line pipe.

Despite Saha Thai's assertions, it is absolutely false that "Petitioner testified under oath that line pipe and dual-stenciled pipe were not covered by the CWP from Thailand AD Order."[21] The supposed testimony quoted by Saha Thai is as follows:

> It is likely that Korea, and other countries if no longer subject to the restraints imposed by the Standard Pipe antidumping order, will switch their production from line pipe (whether dual stenciled or not) to standard pipe.[22]

First, the language quoted by Saha Thai is not testimony but is a section of Petitioner's Pre-Hearing brief in the 2000 sunset review of CWP from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey. Moreover, that section of the brief focused exclusively on how Korean producers of line pipe would shift from the production of line pipe to standard pipe if the order on CWP from Korea were to be revoked.[23] This is relevant because the order on CWP from

---

[20] *See* Saha Thai Case Brief at 11-14.

[21] Saha Thai Case Brief at 13.

[22] *Id.*

[23] Saha Thai Comments (Aug. 26, 2019) at Attachment 7, pp. 58-59.

Korea has a specific exclusion for line pipe.[24] If anything, the section of Petitioner's Prehearing Brief that Saha Thai quotes only underscores why dual-stenciled pipe in particular should be covered by the order on CWP from Thailand given that the overwhelming majority of dual-stenciled pipe is used as standard pipe:

> Donald Cameron and others testified that 70-80 % of dual stenciled material imported from Korea as line pipe is sold for standard pipe-applications. . . . Mr. Cameron also quoted the staff report in that investigation stating that "Triple-stenciled, welded line pipe and standard pipe were physically the same product" and "under these circumstances the product's end use is the only practical way to distinguish between welded line pipe and standard pipe." . . . Mr. Cameron further testified that "{t}here is more of an incentive in Korea to be supplying dual-stencil material for standard-pipe use, and that's simply because of the dumping order."[25]

In sum, the proceedings conducted by the Commission provide further support for including line pipe and dual-stenciled pipe.

**C. Proceedings Involving CWP from Other Countries Show that the Scope Covers Dual-Stenciled Pipe**

Commerce's scope determinations with respect to the orders on CWP from other countries supports including line pipe in the scope of the Order. Saha Thai points out that the orders on CWP from certain other countries all had specific exclusions for line pipe and/or dual-stenciled pipe and that Commerce has interpreted the scopes of those orders as excluding line pipe.[26] According to Saha Thai, this means that the Order on CWP from Thailand must also exclude line pipe. Here is the syllogism of Saha Thai's argument:

---

24 *See id* at 22.

25 *Id.* at Attachment 7, pp. 58-59

26 Saha Thai Case Brief at 14-17.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 4/9/20 11:46 AM, Submission Status: Approved

1. Some orders on circular welded pipe contain exclusions for line pipe.

2. Commerce interprets these orders not to include line pipe based on the exclusions.

3. The Order on CWP from Thailand does not contain any exclusion for line pipe.

4. Therefore, the Order on CWP from Thailand must exclude line pipe.

This makes no sense. A comparison of the various orders on CWP does not point to the conclusion that the order for CWP from Thailand excludes line pipe. To the contrary, this comparison shows that this Order is distinct from the orders for those nine other counties—with the relevant distinction being that there is no basis in the plain language of the scope to exclude line pipe from the Order on CWP from Thailand.

## II. THE FEDERAL CIRCUIT'S DECISION IN WHEATLAND TUBE CO. V. UNITED STATES DOES NOT MANDATE A CONTRARY OUTCOME

Commerce should reject Saha Thai's argument that the Federal Circuit decision in *Wheatland Tube Co. v. United States* precludes Commerce from finding that dual-stenciled pipe is covered by the scope of this Order.[27] In *Wheatland*, the Federal Circuit upheld Commerce's determination not to conduct a minor alterations inquiry in response to an allegation that exports of API 5L line pipe and dual-certified pipe from Brazil, Korea, and Mexico were circumventing antidumping duty orders on standard pipe from these countries because the exports in question were being sold for use in standard pipe applications.[28] However, the scope of the antidumping orders in that proceeding specifically stated that "{***s}tandard pipe that is dual or triple certified/stenciled that enters the U.S. as line pipe of a kind used for oil or gas pipelines is also not included in this investigation***."[29] It was in that context that Commerce declined to conduct a

---

27 *Id.* at 17-20 (citing *Wheatland Tube Co. v. United States*, 161 F.3d 1365 (Fed. Cir. 1998)).

28 *Id.*

29 *Id.* (emphasis added).

minor alterations inquiry, and that the Federal Circuit upheld the agency's decision. The Federal Circuit explained that to conduct a minor alterations inquiry, "Commerce would have had to conclude that section 1677j(c) and section 353.29 of the regulations authorize it to interpret the scope of an antidumping order to cover an article that the order expressly and unambiguously excludes from the kind or class of article covered by it."[30]

Here, in contrast to the scope language at issue in *Wheatland*, the scope language of the Order does not expressly and unambiguously exclude line pipe. Unlike the orders governing circular welded pipe from Brazil, Korea, and Mexico, the scope of the Order for circular welded pipe from Thailand does not even mention "line pipe," "dual-stenciled pipe," "triple-stenciled pipe," or pipe of "a kind used for oil or gas pipelines." Thus, there is nothing in *Wheatland* or the scope of the Order that would prohibit Commerce from determining that the dual-stenciled pipe being shipped by Saha Thai should be covered by the Order.

## III. THE COMMISSION'S INJURY ANALYSIS FROM THE ORIGINAL INVESTIGATION COULD NOT HAVE POSSIBLY COVERED DUAL-STENCILED PIPE

Commerce should also reject Saha Thai's contention that the Order cannot be interpreted to cover dual-stenciled pipe because the Commission never included imports of line pipe from Thailand in its original injury investigation.[31] As discussed above, at the time of the original investigation, there was no production of line pipe in Thailand. There would be no point in attempting to show material injury to the domestic line pipe industry by reason of imports of line pipe from Thailand. Thus, the concerns expressed in *Wheatland* that the Commission may not

---

30 *Id.*

31 Saha Thai Case Brief at 20-21.

have found domestic injury if it had examined line pipe imports in its original investigation are not at issue in this case.

## IV. COMMERCE SHOULD TREAT JULY 29, 2019 AS THE DATE OF INITIATION

In its final determination, Commerce should treat July 29, 2019 as the date of initiation for this scope inquiry. There is no merit to Saha Thai's argument that Commerce did not properly initiate this scope inquiry in its July 29, 2019 notice. This argument is just a blatant attempt to escape payment of antidumping duties on merchandise that Saha Thai was on notice would be treated as covered by the scope of the Order.

Commerce's regulations state that if the agency determines from available information that an inquiry is warranted to determine whether a product is included within the scope of an antidumping duty order, it will initiate an inquiry, and will notify all parties on its scope service list of its initiation of a scope inquiry.[32] The regulations further provide that a notice of a self-initiated scope inquiry must provide (i) a description of the product that is the subject of the scope inquiry; (ii) an explanation of the reasons for the decision to initiate a scope inquiry; and (iii) a schedule for submission of comments that normally will allow interested parties 20 days in which to provide comments on, and supporting factual information relating to, the inquiry, and 10 days in which to provide any rebuttal to such comments.[33]

On July 29, 2019, Commerce issued a notification to all interested parties on its scope service list that it was initiating an inquiry and requesting comments on whether the Order covers line pipe and products that are dual-stenciled as both standard pipe and line pipe.[34] This notification complied with all of the relevant requirements set form in the agency's regulations.

---

32 19 C.F.R. § 351.225(b).

33 *Id.* § 351.225(f).

34 Commerce Letter re: Scope Inquiry on Line Pipe (July 29, 2019).

First, it described the merchandise at issue as being "line pipe" or "products that are dual-stenciled" as both standard pipe and line pipe. Second, the notification explained that the reason for initiating the scope inquiry involved Petitioner's allegation that Saha Thai is circumventing the Order by shipping line pipe to the United States and the need to clarify whether such merchandise is already covered by the plain language of the Order before determining whether circumvention through minor alterations is taking place. Third, Commerce set a schedule for the submission of comments.

Commerce should reject Saha Thai's claim that the notice of initiation is defective because it is "hard to see how a Department document that does not contain any form of the word 'initiate' or 'initiation' can meet the requirements of "notice of initiation of a scope inquiry.'"[35] Rather, it is hard to see how Saha Thai could not comprehend that Commerce was initiating a scope inquiry simply because the notification did not use the magic words "initiate" or "initiation." But in any event, the magic words "Initiation of Scope Inquiry" were used in the title of the notification itself—as Saha Thai is undoubtedly aware as it submitted a screen capture of the document's title as it appears on ACCESS.[36]

There is likewise no merit to Saha Thai's claim that the description of the merchandise at issue is legally insufficient. The term "line pipe" is commonly understood in the pipe and tube industry. As a reflection of this fact, all of the other antidumping orders on circular welded pipe ("CWP") reference "line pipe" as an excluded production without providing any additional description.[37] Furthermore, as Saha Thai itself points out, there have been numerous Commerce

---

35 Saha Thai Comments (Aug. 26, 2019) at 6.

36 *Id.* at Attachment 1.

37 *Id.* at 23.

and Commission proceedings that describe in great detail the physical characteristics and specifications of line pipe and dual-stenciled pipe. Indeed, Saha Thai quotes extensively from these proceedings.[38] When viewed in the context of Commerce's prior proceedings as well as the anti-circumvention proceeding involving line pipe, Commerce's description of the merchandise at issue is more than sufficient.

Saha Thai's contention that "the July 29th letter provides no reasons why the Secretary is initiating a scope inquiry" simply ignores the reasons that were provided in the letter.[39] This contention is baseless and should be rejected.

In sum, Commerce's notice that it was initiating a scope inquiry complied with all of the regulatory requirements and is not deficient in any way that would prevent Commerce from treating July 29, 2019 as the date of initiation.

Respectfully Submitted,

Roger B. Schagrin
Luke A. Meisner
Michael Panfeld, *Consultant*
SCHAGRIN ASSOCIATES
*Counsel to Wheatland Tube*

---

38 *Id.* at 17-20.

39 *Id.* at 7.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 4/9/20 11:46 AM, Submission Status: Approved

# CERTIFICATE OF SERVICE

**Welded Carbon Steel Pipe & Tube from Thailand**
**A-549-502**
**Anti-Circumvention Inquiry**
**Scope Inquiry – Line Pipe**

I, Brittney Allen, hereby certify that copies of the attached PUBLIC DOCUMENT were served today, April 9, 2020, via electronic delivery upon the following parties:

Robert George Gosselink, Esq.
**Trade Pacific PLLC**
660 Pennsylvania Avenue, SE
Suite 401
Washington, DC 20002

Daniel L. Porter, Esq.
**Curtis, Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, NW
Washington, DC 20006

Alan H. Price, Esq.
**Wiley Rein LLP**
1776 K Street, NW
Washington, DC 20006

/s/ Brittney Allen
Brittney Allen, *Paralegal*
SCHAGRIN ASSOCIATES

**Tab 13**

BRIEF FROM SCHAGRIN ASSOCIATES TO SEC OF COMMERCE PERTAINING TO
WHEATLAND TUBE REBUTTAL BRIEF (Apr. 9, 2020) (P.R. 73)

Barcode:3962959-01 A-549-502 SCO - Scope Inquiry - Line Pipe

SCHAGRIN ASSOCIATES

900 SEVENTH STREET, N.W. - SUITE 500 - WASHINGTON, D.C. 20001
P: (202) 223-1700 E: LMEISNER@SCHAGRINASSOCIATES.COM F: (202) 429-2522

April 9, 2020

Case No. A-549-502
Total Pages: 18
Scope Inquiry – Line Pipe
AD/CVD Operations, Office VII

**PUBLIC DOCUMENT**

**VIA ACCESS**

The Honorable Wilbur L. Ross, Jr.
Secretary of Commerce
Attention: Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

**Re: Circular Welded Carbon Steel Pipes and Tubes from Thailand: Rebuttal Brief**

Dear Secretary Ross:

On behalf of Wheatland Tube, a domestic producer and interested party under 19 U.S.C. § 1677(9)(C), we hereby submit our rebuttal brief in the above-referenced scope inquiry. Please contact the undersigned with any questions regarding this submission.

Respectfully submitted,

*Luke A. Meisner*

Roger B Schagrin
Luke A. Meisner
Michael Panfeld, *Consultant*
SCHAGRIN ASSOCIATES
*Counsel to Wheatland Tube*

Filed By: rschagrin@schagrinassociates.com, Filed Date: 4/9/20 11:46 AM, Submission Status: Approved

Barcode:3962959-01 A-549-502 SCO - Scope Inquiry - Line Pipe

**BEFORE THE UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**

Case No. A-549-502
Total Pages: 17
Scope Inquiry – Line Pipe
AD/CVD Operations, Office VII

**PUBLIC DOCUMENT**

---

**Circular Welded Carbon Steel Pipes and Tubes from Thailand**

---

# WHEATLAND TUBE'S REBUTTAL BRIEF

Roger B. Schagrin
Luke A. Meisner
Michael Panfeld, *Consultant*
SCHAGRIN ASSOCIATES
900 Seventh Street, N.W.
Suite 500
Washington, DC 20001
(202) 223-1700
*Counsel to Wheatland Tube*

April 9, 2020

Filed By: rschagrin@schagrinassociates.com, Filed Date: 4/9/20 11:46 AM, Submission Status: Approved

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........ ii

SUMMARY OF ARGUMENT ........ 1

I. COMMERCE PROPERLY FOUND THAT DUAL-STENCILED LINE PIPE IS SUBJECT TO THE ORDER ........ 1

A. The Original Investigation Conducted by Commerce Shows that Dual-Stenciled Pipe Is Covered by the Scope ........ 2

B. The Proceedings Conducted by the Commission Likewise Confirm that Dual-Stenciled Pipe Is Covered by the Scope ........ 6

C. Proceedings Involving CWP from Other Countries Show that the Scope Covers Dual-Stenciled Pipe ........ 8

II. THE FEDERAL CIRCUIT'S DECISION IN WHEATLAND TUBE CO. V. UNITED STATES DOES NOT MANDATE A CONTRARY OUTCOME ........ 9

III. THE COMMISSION'S INJURY ANALYSIS FROM THE ORIGINAL INVESTIGATION COULD NOT HAVE POSSIBLY COVERED DUAL-STENCILED PIPE ........ 10

IV. COMMERCE SHOULD TREAT JULY 29, 2019 AS THE DATE OF INITIATION ... 11

Filed By: rschagrin@schagrinassociates.com, Filed Date: 4/9/20 11:46 AM, Submission Status: Approved

Barcode:3962959-01 A-549-502 SCO - Scope Inquiry - Line Pipe PUBLIC DOCUMENT

## TABLE OF AUTHORITIES

### Cases

*Algoma Steel Corp. v. United States,* 688 F. Supp. 639 (1988) ..................................................... 6

*Allegheny Ludlum Corp. v. United States*, 24 CIT 858, 116 F. Supp.2d 1276 (2000) ................... 6

*Hosiden Corp. v. United States,* 85 F.3d 1561 (Fed. Cir. 1996) .................................................... 6

*Torrington Co. v. U.S.*, 747 F. Supp. 744 (Ct. Int'l Trade 1990) ................................................... 6

*Wheatland Tube Co. v. United States,* 161 F.3d 1365 (Fed. Cir. 1998) ........................................ 9

### Other Authorities

*Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 83 Fed. Reg. 51,927 (Dep't Commerce Oct. 15, 2018) (final results of antidumping duty admin. review; 2016-2017) ....... 4

Merriam-Webster Dictionary .......................................................................................... 4

### Regulations

19 C.F.R. § 351.225(b) ............................................................................................. 11

ii

Filed By: rschagrin@schagrinassociates.com, Filed Date: 4/9/20 11:46 AM, Submission Status: Approved

Barcode:3962959-01 A-549-502 SCO - Scope Inquiry - Line Pipe 

**SUMMARY OF ARGUMENT**

As demonstrated in Section I of this rebuttal brief, the U.S. Department of Commerce ("Commerce") properly found in the preliminary determination of the instant scope inquiry that dual-stenciled pipe is covered by the scope of the antidumping duty order on circular welded pipe from Thailand (the "Order"). Contrary to the arguments presented by Saha Thai Steel Pipe (Public) Company Ltd. ("Saha Thai") in its case brief, Commerce's preliminary determination is supported by the original investigation and other proceedings conducted by Commerce and the U.S. International Trade Commission (the "Commission"). As established in Section II, the Federal Circuit's decision in *Wheatland Tube Co. v. United States* does not preclude Commerce from finding that dual-stenciled pipe is covered by the scope of the Order. Unlike the scope at issue in that case, the scope of the Order in this case does not contain an explicit exclusion for dual-stenciled pipe. Section III demonstrates that it is irrelevant that the Commission did not find that the domestic line pipe injury was injured by Thai line pipe imports in its original investigation, because there were no Thai producers of line pipe or U.S. imports of Thai line pipe at that time. Finally, as shown in Section IV, Commerce should treat July 29, 2019 as the date of initiation for this scope inquiry, because Commerce properly initiated this scope inquiry on that date in a perfectly adequate notice of initiation.

## I. COMMERCE PROPERLY FOUND THAT DUAL-STENCILED LINE PIPE IS SUBJECT TO THE ORDER

Commerce correctly found in its preliminary determination in this scope inquiry that dual-stenciled pipe is covered by the scope of the Order.[1] The scope covers all circular welded carbon steel pipes and tubes from Thailand with an outside diameter of 0.375 inches or more, but

---

[1] *See* Petitioner's Response to Commerce's July 29, 2019 Request for Comments (Aug. 26, 2019) at 3-4.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 4/9/20 11:46 AM, Submission Status: Approved

not exceeding 16 inches.[2] The dual-stenciled pipe manufactured by Saha Thai in Thailand is circular in shape, welded, made of carbon steel, and has an outside diameter of 0.375 inches or more, but not exceeding 16 inches.[3] Furthermore, there are no scope exclusions in the Order for dual-stenciled pipe.[4] Thus, the plain language of the Order covers dual-stenciled pipe.

There is no merit to Saha Thai's argument that "the original investigation documents affirmatively and unequivocally demonstrate that the AD order on CWP from Thailand excludes all line pipe without qualification."[5] First, as discussed in Petitioner's case brief, the plain language of the scope unambiguously covers the dual-stenciled pipe manufactured by Saha Thai and, as a result, there is no need to examine the 19 C.F.R. § 351.225(k)(1) criteria to resolve this scope inquiry. But even if it is necessary to examine these criteria, they all provide further support for including line pipe and dual-stenciled pipe in the scope of the Order.

### A. The Original Investigation Conducted by Commerce Shows that Dual-Stenciled Pipe Is Covered by the Scope

First, the record of the initial investigation supports inclusion of dual-stenciled pipe in the scope of the Order. In particular, the initial petition filed in the original investigation included all "small diameter circular welded carbon steel pipes and tubes" from Thailand and specifically included any imports of line pipe.[6] The petition with respect to line pipe was later *withdrawn* only because there was no known production in Thailand of line pipe at that time.[7] However, as part of this withdrawal process, Petitioner did not actually amend the scope of the petition in any

---

[2] *Id.*

[3] *Id.*

[4] *Id.*

[5] Saha Thai Case Brief at 4.

[6] *See* Petitioner's Response to Commerce's July 29, 2019 Request for Comments (Aug. 26, 2019) at5 n.13.

[7] *Id.*

way to exclude any line pipe that may later be produced in Thailand.[8] Thus, it is clear that the plain language of the scope – as originally drafted and never amended – was always intended to cover both standard pipe and line pipe.

Saha Thai is wrong when it asserts that "petitioners **amended the scope of the petition against Thailand by taking out line pipe**" (emphasis in original).[9] There is absolutely no evidence that petitioners ever amended the scope. After the petitions were filed, Commerce issued a questionnaire requesting that petitioners provide "{d}ocumentation which demonstrates that line pipe is manufactured in Thailand" and "{d}ocumentation which supports the allegation that line pipe from Thailand is being sold at less than fair value."[10] In addition, the Commission indicated that standard pipe and line pipe would be treated as separate like products for its injury analysis.[11] In light of these developments, Petitioners withdrew the petition with respect to line pipe from Thailand. It would not be possible to show dumping by Thai producers that was specific to line pipe as opposed to dumping of "circular welded carbon steel pipes and tubes." Nor was there any point in attempting to show material injury to the domestic line pipe industry by reason of imports of line pipe from Thailand given that there was no production of line pipe in Thailand. However, **Petitioners did not amend the language in the scope to exclude line pipe**. The original language describing the covered pipe – which was intended to cover both standard pipe and line pipe – remained unchanged. Thus, this same language continues to cover both standard pipe and line pipe.

---

8 *See id.*

9 Saha Thai Case Brief at 6 (emphasis in original).

10 *Id.* at Attachment 12.

11 *See, e.g.*, Saha Thai Comments (Aug. 26, 2019) at Attachment 8.

The only language in the scope that appears to have changed through Petitioner's withdrawal process is the removal to the Tariff Schedules of the United States ("TSUS") codes for line pipe – *i.e.*, 640.3208 and 610.3209. Saha Thai is wrong to suggest, however, that the removal of the reference to these TSUS codes somehow means that "Petitioner ***explicitly*** excluded from the case all pipe that entered under TSUSA 610.3208 and 610.3209."[12] First of all, Saha Thai fails to understand what "explicit" means. According to Merriam-Webster's dictionary, language is explicit when it is "fully revealed or expressed without vagueness, implication, or ambiguity: leaving no question as to meaning or intent."[13] Below is the scope of the Order, which describes the subject merchandise as:

> certain circular welded carbon steel pipes and tubes from Thailand. The subject merchandise has an outside diameter of 0.375 inches or more, but not exceeding 16 inches. These products, which are commonly referred to in the industry as "standard pipe" or "structural tubing" are hereinafter designated as "pipes and tubes." The merchandise is classifiable under the Harmonized Tariff Schedule of the United States (HTSUS) item numbers 7306.30.1000, 7306.30.5025, 7306.30.5032, 7306.30.5040, 7306.30.5055, 7306.30.5085 and 7306.30.5090. Although the HTSUS subheadings are provided for convenience and purposes of U.S. Customs and Border Protection (CBP), the written description of the merchandise subject to the order is dispositive.[14]

Nowhere does the scope state "without vagueness, implication, or ambiguity" that imports entering under TSUSA 610.3208 and 610.3209 are excluded from the Order. The scope simply does not reference these TSUS codes. And the removal of these TSUS codes from scope was not made through any "amendment" proposed by petitioners to explicitly exclude line pipe. The

---

12 *See* Saha Thai Case Brief at 9 (emphasis added).

13 Merriam-Webster Dictionary, definition of "explicit."

14 Issues and Decision Memorandum accompanying *Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 83 Fed. Reg. 51,927 (Dep't Commerce Oct. 15, 2018) (final results of antidumping duty admin. review; 2016-2017) at 2-3.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 4/9/20 11:46 AM, Submission Status: Approved

removal of the reference to these TSUS codes was apparently made by Commerce on its own to prevent confusion.

Furthermore, the scope clearly states that the TSUS or HTSUS items listed in the scope are "provided for convenience and purposes of U.S. Customs and Border Protection (CBP)" and that the written description of the merchandise subject to the order is dispositive.[15] Thus, the HTSUS subheadings under which the pipe is being imported have no bearing on whether it is covered by the scope of the Order.

Finally, as Commerce explained in its preliminary determination:

> The classification rules followed by CBP, which direct importers to enter dual-stenciled products using the more specific TSUSA line pipe categories, rather than the less-specific TSUSA standard pipe categories, has no bearing on the fact that the dual-stenciled pipe meets the definition of the TSUSA standard pipe categories, and that product is certified to be used as standard pipe.[16]

Saha Thai's Venn diagram in its case brief is helpful in illustrating this point:

The scope of the Order covers all standard pipe – without any exclusions whatsoever – meaning that the scope covers all merchandise shaded in blue. Dual-stenciled pipe meets the definition of standard pipe and is thus covered by the scope of the Order—regardless of the fact that it may

---

15 *Id.*

16 Preliminary Decision Memorandum at 7.

also be certified to line pipe standards and regardless of the TSUSA or HTS code under which it is entered. There is no exclusion for imports that are shaded yellow in the diagram.

**B. The Proceedings Conducted by the Commission Likewise Confirm that Dual-Stenciled Pipe Is Covered by the Scope**

The proceedings conducted by the Commission do not help Saha Thai's cause. First of all, contrary to Saha Thai's claims, the fact that Commerce found "two distinct classes or kinds or products, standard pipe and line pipe," has no relevance whatsoever to the instant scope inquiry regarding whether line pipe is included within the scope of the Order.[17] It is well-established that Commerce's scope determinations and the Commission's like-product determinations are separate inquiries that can arrive at completely separate conclusions regarding which merchandise is in-scope and which merchandise is part of the same domestic like product.[18] Indeed, the courts have specifically held that "{i}nconsistencies in the agencies' determinations are not, *per se*, contrary to law. Indeed, the possibility that they will reach inconsistent conclusions is 'built into the law.'"[19] Thus, the fact that the Commission has found that standard pipe and line pipe are separate like products does not preclude Commerce from finding that line pipe is including in the scope of the Order.

---

17 Saha Thai Case Brief at 10.

18 *Torrington Co. v. U.S.*, 747 F. Supp. 744 (Ct. Int'l Trade 1990) ("It is settled law that the ITC's like product determination is separate and distinct from the ITA's determination of the class or kind of merchandise. "); *Allegheny Ludlum Corp. v. United States*, 24 CIT 858, 879, 116 F. Supp.2d 1276, 1297 (2000) ("Although the ITC must accept Commerce's determination as to the scope of the imported merchandise found to be subsidized or sold at less than fair value, the Commission determines what domestic product or products is like the imported articles Commerce identified."); *Hosiden Corp. v. United States*, 85 F.3d 1561, 1567 (Fed. Cir. 1996) ("Both the Court of International Trade and this court have long recognized that for injury determinations the 'class or kind' and 'like product' determinations required by the statute need not be consistent.").

19 *Torrington Co. v. U.S.*, 747 F. Supp. 744 (Ct. Int'l Trade 1990) (citing *Algoma Steel Corp. v. United States*, 688 F. Supp. 639, 642 (1988), *aff'd,* 865 F.2d 240 (Fed. Cir. 1989), *cert. denied,* 109 S.Ct. 3244, 106 L.Ed.2d 590 (1989)).

The same is true with respect to the Commission's pronouncements regarding the scope during the sunset reviews of the orders on CWP from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey.[20] As an initial matter, Commerce and not the Commission has sole authority for determining whether merchandise is in or out of the scope. More importantly, the Commission's pronouncements regarding line pipe being excluded from the scope of the orders were general statements regarding the orders on CWP from seven countries and not statements specific to the Order on CWP from Thailand. These statements are generally true because the orders on CWP for the countries other than Thailand all have specific scope exclusions for line pipe. But the statements are not true for Thailand—which has no exclusion for line pipe.

Despite Saha Thai's assertions, it is absolutely false that "Petitioner testified under oath that line pipe and dual-stenciled pipe were not covered by the CWP from Thailand AD Order."[21] The supposed testimony quoted by Saha Thai is as follows:

> It is likely that Korea, and other countries if no longer subject to the restraints imposed by the Standard Pipe antidumping order, will switch their production from line pipe (whether dual stenciled or not) to standard pipe.[22]

First, the language quoted by Saha Thai is not testimony but is a section of Petitioner's Pre-Hearing brief in the 2000 sunset review of CWP from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey. Moreover, that section of the brief focused exclusively on how Korean producers of line pipe would shift from the production of line pipe to standard pipe if the order on CWP from Korea were to be revoked.[23] This is relevant because the order on CWP from

---

20 *See* Saha Thai Case Brief at 11-14.

21 Saha Thai Case Brief at 13.

22 *Id.*

23 Saha Thai Comments (Aug. 26, 2019) at Attachment 7, pp. 58-59.

Korea has a specific exclusion for line pipe.[24] If anything, the section of Petitioner's Prehearing Brief that Saha Thai quotes only underscores why dual-stenciled pipe in particular should be covered by the order on CWP from Thailand given that the overwhelming majority of dual-stenciled pipe is used as standard pipe:

> Donald Cameron and others testified that 70-80 % of dual stenciled material imported from Korea as line pipe is sold for standard pipe-applications. . . . Mr. Cameron also quoted the staff report in that investigation stating that "Triple-stenciled, welded line pipe and standard pipe were physically the same product" and "under these circumstances the product's end use is the only practical way to distinguish between welded line pipe and standard pipe." . . . Mr. Cameron further testified that "{t}here is more of an incentive in Korea to be supplying dual-stencil material for standard-pipe use, and that's simply because of the dumping order."[25]

In sum, the proceedings conducted by the Commission provide further support for including line pipe and dual-stenciled pipe.

### C. Proceedings Involving CWP from Other Countries Show that the Scope Covers Dual-Stenciled Pipe

Commerce's scope determinations with respect to the orders on CWP from other countries supports including line pipe in the scope of the Order. Saha Thai points out that the orders on CWP from certain other countries all had specific exclusions for line pipe and/or dual-stenciled pipe and that Commerce has interpreted the scopes of those orders as excluding line pipe.[26] According to Saha Thai, this means that the Order on CWP from Thailand must also exclude line pipe. Here is the syllogism of Saha Thai's argument:

---

24 *See id* at 22.

25 *Id.* at Attachment 7, pp. 58-59

26 Saha Thai Case Brief at 14-17.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 4/9/20 11:46 AM, Submission Status: Approved

1. Some orders on circular welded pipe contain exclusions for line pipe.
2. Commerce interprets these orders not to include line pipe based on the exclusions.
3. The Order on CWP from Thailand does not contain any exclusion for line pipe.
4. Therefore, the Order on CWP from Thailand must exclude line pipe.

This makes no sense. A comparison of the various orders on CWP does not point to the conclusion that the order for CWP from Thailand excludes line pipe. To the contrary, this comparison shows that this Order is distinct from the orders for those nine other counties—with the relevant distinction being that there is no basis in the plain language of the scope to exclude line pipe from the Order on CWP from Thailand.

## II. THE FEDERAL CIRCUIT'S DECISION IN WHEATLAND TUBE CO. V. UNITED STATES DOES NOT MANDATE A CONTRARY OUTCOME

Commerce should reject Saha Thai's argument that the Federal Circuit decision in *Wheatland Tube Co. v. United States* precludes Commerce from finding that dual-stenciled pipe is covered by the scope of this Order.[27] In *Wheatland*, the Federal Circuit upheld Commerce's determination not to conduct a minor alterations inquiry in response to an allegation that exports of API 5L line pipe and dual-certified pipe from Brazil, Korea, and Mexico were circumventing antidumping duty orders on standard pipe from these countries because the exports in question were being sold for use in standard pipe applications.[28] However, the scope of the antidumping orders in that proceeding specifically stated that "{***s}tandard pipe that is dual or triple certified/stenciled that enters the U.S. as line pipe of a kind used for oil or gas pipelines is also not included in this investigation***."[29] It was in that context that Commerce declined to conduct a

---

[27] *Id.* at 17-20 (citing *Wheatland Tube Co. v. United States*, 161 F.3d 1365 (Fed. Cir. 1998)).

[28] *Id.*

[29] *Id.* (emphasis added).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 4/9/20 11:46 AM, Submission Status: Approved

minor alterations inquiry, and that the Federal Circuit upheld the agency's decision. The Federal Circuit explained that to conduct a minor alterations inquiry, "Commerce would have had to conclude that section 1677j(c) and section 353.29 of the regulations authorize it to interpret the scope of an antidumping order to cover an article that the order expressly and unambiguously excludes from the kind or class of article covered by it."[30]

Here, in contrast to the scope language at issue in *Wheatland*, the scope language of the Order does not expressly and unambiguously exclude line pipe. Unlike the orders governing circular welded pipe from Brazil, Korea, and Mexico, the scope of the Order for circular welded pipe from Thailand does not even mention "line pipe," "dual-stenciled pipe," "triple-stenciled pipe," or pipe of "a kind used for oil or gas pipelines." Thus, there is nothing in *Wheatland* or the scope of the Order that would prohibit Commerce from determining that the dual-stenciled pipe being shipped by Saha Thai should be covered by the Order.

## III. THE COMMISSION'S INJURY ANALYSIS FROM THE ORIGINAL INVESTIGATION COULD NOT HAVE POSSIBLY COVERED DUAL-STENCILED PIPE

Commerce should also reject Saha Thai's contention that the Order cannot be interpreted to cover dual-stenciled pipe because the Commission never included imports of line pipe from Thailand in its original injury investigation.[31] As discussed above, at the time of the original investigation, there was no production of line pipe in Thailand. There would be no point in attempting to show material injury to the domestic line pipe industry by reason of imports of line pipe from Thailand. Thus, the concerns expressed in *Wheatland* that the Commission may not

30 *Id.*

31 Saha Thai Case Brief at 20-21.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 4/9/20 11:46 AM, Submission Status: Approved

have found domestic injury if it had examined line pipe imports in its original investigation are not at issue in this case.

## IV. COMMERCE SHOULD TREAT JULY 29, 2019 AS THE DATE OF INITIATION

In its final determination, Commerce should treat July 29, 2019 as the date of initiation for this scope inquiry. There is no merit to Saha Thai's argument that Commerce did not properly initiate this scope inquiry in its July 29, 2019 notice. This argument is just a blatant attempt to escape payment of antidumping duties on merchandise that Saha Thai was on notice would be treated as covered by the scope of the Order.

Commerce's regulations state that if the agency determines from available information that an inquiry is warranted to determine whether a product is included within the scope of an antidumping duty order, it will initiate an inquiry, and will notify all parties on its scope service list of its initiation of a scope inquiry.[32] The regulations further provide that a notice of a self-initiated scope inquiry must provide (i) a description of the product that is the subject of the scope inquiry; (ii) an explanation of the reasons for the decision to initiate a scope inquiry; and (iii) a schedule for submission of comments that normally will allow interested parties 20 days in which to provide comments on, and supporting factual information relating to, the inquiry, and 10 days in which to provide any rebuttal to such comments.[33]

On July 29, 2019, Commerce issued a notification to all interested parties on its scope service list that it was initiating an inquiry and requesting comments on whether the Order covers line pipe and products that are dual-stenciled as both standard pipe and line pipe.[34] This notification complied with all of the relevant requirements set form in the agency's regulations.

---

32 19 C.F.R. § 351.225(b).

33 *Id.* § 351.225(f).

34 Commerce Letter re: Scope Inquiry on Line Pipe (July 29, 2019).

First, it described the merchandise at issue as being "line pipe" or "products that are dual-stenciled" as both standard pipe and line pipe. Second, the notification explained that the reason for initiating the scope inquiry involved Petitioner's allegation that Saha Thai is circumventing the Order by shipping line pipe to the United States and the need to clarify whether such merchandise is already covered by the plain language of the Order before determining whether circumvention through minor alterations is taking place. Third, Commerce set a schedule for the submission of comments.

Commerce should reject Saha Thai's claim that the notice of initiation is defective because it is "hard to see how a Department document that does not contain any form of the word 'initiate' or 'initiation' can meet the requirements of "notice of initiation of a scope inquiry.'"[35] Rather, it is hard to see how Saha Thai could not comprehend that Commerce was initiating a scope inquiry simply because the notification did not use the magic words "initiate" or "initiation." But in any event, the magic words "Initiation of Scope Inquiry" were used in the title of the notification itself—as Saha Thai is undoubtedly aware as it submitted a screen capture of the document's title as it appears on ACCESS.[36]

There is likewise no merit to Saha Thai's claim that the description of the merchandise at issue is legally insufficient. The term "line pipe" is commonly understood in the pipe and tube industry. As a reflection of this fact, all of the other antidumping orders on circular welded pipe ("CWP") reference "line pipe" as an excluded production without providing any additional description.[37] Furthermore, as Saha Thai itself points out, there have been numerous Commerce

---

[35] Saha Thai Comments (Aug. 26, 2019) at 6.

[36] *Id.* at Attachment 1.

[37] *Id.* at 23.

and Commission proceedings that describe in great detail the physical characteristics and specifications of line pipe and dual-stenciled pipe. Indeed, Saha Thai quotes extensively from these proceedings.[38] When viewed in the context of Commerce's prior proceedings as well as the anti-circumvention proceeding involving line pipe, Commerce's description of the merchandise at issue is more than sufficient.

Saha Thai's contention that "the July 29th letter provides no reasons why the Secretary is initiating a scope inquiry" simply ignores the reasons that were provided in the letter.[39] This contention is baseless and should be rejected.

In sum, Commerce's notice that it was initiating a scope inquiry complied with all of the regulatory requirements and is not deficient in any way that would prevent Commerce from treating July 29, 2019 as the date of initiation.

Respectfully Submitted,

Luke A. Meisner

Roger B. Schagrin
Luke A. Meisner
Michael Panfeld, *Consultant*
SCHAGRIN ASSOCIATES
*Counsel to Wheatland Tube*

---

38 *Id.* at 17-20.

39 *Id.* at 7.

# CERTIFICATE OF SERVICE

**Welded Carbon Steel Pipe & Tube from Thailand**
**A-549-502**
**Anti-Circumvention Inquiry**
**Scope Inquiry – Line Pipe**

I, Brittney Allen, hereby certify that copies of the attached PUBLIC DOCUMENT were served today, April 9, 2020, via electronic delivery upon the following parties:

Robert George Gosselink, Esq.
**Trade Pacific PLLC**
660 Pennsylvania Avenue, SE
Suite 401
Washington, DC 20002

Daniel L. Porter, Esq.
**Curtis, Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, NW
Washington, DC 20006

Alan H. Price, Esq.
**Wiley Rein LLP**
1776 K Street, NW
Washington, DC 20006

/s/ Brittney Allen
Brittney Allen, *Paralegal*
SCHAGRIN ASSOCIATES

**Tab 14**

MEMO FROM USDOC TO DAS FOR OPERATIONS PERTAINING TO INTERESTED
PARTIES FINAL SCOPE RULING (June 30, 2020) (P.R. 76)

Barcode:3993265-01 A-549-502 SCO - Scope Inquiry - Line Pipe

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-549-502
Scope Inquiry
**Public Document**
E&C/OVII: LA

June 30, 2020

**MEMORANDUM TO:** James Maeder
Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

**THROUGH:** Melissa G. Skinner
Senior Director, Office VII
Antidumping and Countervailing Duty Operations

**FROM:** Leo Ayala
International Trade Compliance Analyst, Office VII
Antidumping and Countervailing Duty Operations

**RE:** Antidumping Duty Order on Circular Welded Carbon Steel Pipes and Tubes from Thailand: Final Scope Ruling on Line Pipe and Dual-Stenciled Standard and Line Pipe

---

**SUMMARY**

Based on the analysis below, we recommend that the Department of Commerce (Commerce) find that line pipe is not within the scope of the antidumping (AD) duty order (*Order*) on circular welded pipes and tubes (CWP) from Thailand.[1] We also recommend that products which are dual-stenciled[2] as standard pipe and line pipe are within the scope of the *Order*. We recommend that you approve the positions described in the "Final Scope Ruling" section of this memorandum. Below is a list of the issues in this scope ruling for which we received comments from interested parties:

Comment 1: Consideration of the (k)(1) sources
Comment 2: Line pipe and dual-stenciled standard and line pipe
Comment 3: Date of initiation

---

[1] *See Antidumping Duty Order; Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 51 FR 8341 (March 11, 1986) (*Order*).
[2] Standard pipe and line pipe often require physical and mechanical characteristics that overlap. Specifically, a pipe may be dual-stenciled, *i.e.*, certified that the product complies with two different industry specifications, such as ASTM A53 and API 5L, which are applicable for standard pipe and line pipe, respectively.

Filed By: Leo Ayala, Filed Date: 6/30/20 11:46 AM, Submission Status: Approved

INTERNATIONAL TRADE ADMINISTRATION

## BACKGROUND

On February 24, 2020, Commerce issued a Preliminary Scope Ruling.[3] In the Preliminary Scope Ruling, Commerce found, pursuant to 19 CFR 351.225(k)(1), that line pipe is not covered by the scope of the *Order*, but that products which are dual-stenciled as standard pipe and line pipe are within the scope of the *Order*.[4] On March 23, 2020 and March 30, 2020, Commerce received case briefs from Wheatland Tube Company (Wheatland) and Saha Thai Steel Pipe (Public) Company, Ltd. (Saha Thai), respectively.[5] On April 9, 2020, Commerce received scope rebuttal briefs from Wheatland and Saha Thai.[6]

## SCOPE OF THE *ORDER*

The products covered by the order are certain circular welded carbon steel pipes and tubes from Thailand. The subject merchandise has an outside diameter of 0.375 inches or more, but not exceeding 16 inches, of any wall thickness. These products, which are commonly referred to in the industry as "standard pipe" or "structural tubing" are hereinafter designated as "pipes and tubes." The merchandise is classifiable under the Harmonized Tariff Schedule of the United States (HTSUS) item numbers 7306.30.1000, 7306.30.5025, 7306.30.5032, 7306.30.5040, 7306.30.5055, 7306.30.5085 and 7306.30.5090. Although the HTSUS subheadings are provided for convenience and purposes of U.S. Customs and Border Protection (CBP), the written description of the merchandise subject to the order is dispositive.

## DESCRIPTION OF MERCHANDISE SUBJECT TO THIS SCOPE INQUIRY

The scope of this *Order* covers "pipes and tubes," commonly referred to as "standard pipe" and "structural tubing," limited by the dimensional requirements stated in the scope of the *Order*. The Petition describes "standard pipe" as:[7]

> {A} general-purpose commodity used in such applications as plumbing pipe, sprinkler systems and fence posts and is commonly referred to in the industry as a standard pipe. It may be supplied with an oil coating (black pipe) or may be galvanized, and is sold in

---

[3] *See* Memorandum, "Antidumping Duty Order on Circular Welded Carbon Steel Pipes and Tubes from Thailand: Preliminary Scope Ruling on Line Pipe and Dual-Stenciled Standard and Line Pipe," dated February 24, 2020 (Preliminary Scope Ruling).
[4] *Id.*
[5] *See* Wheatland's Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Case Brief," dated March 23, 2020 (Wheatland's Case Brief); *see also* Saha Thai's Letter, "Saha Thai's Scope Inquiry Case Brief Circular Welded Carbon Steel Pipe and Tubes from Thailand," dated March, 30, 2020 (Saha Thai's Case Brief).
[6] *See* Wheatland's Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Rebuttal Brief," dated April 9, 2020 (Wheatland's Rebuttal); *see also* Saha Thai's Letter, "Saha Thai's Scope Inquiry Rebuttal Brief Circular Welded Carbon Steel Pipe and Tubes from Thailand," dated April 9, 2020 (Saha Thai's Rebuttal).
[7] *See* Wheatland's Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Response to July 29, 2019 Request for Comments," dated August 26, 2019 (Wheatland's August 26 Comments) at Exhibit 3: Petitioners' Letter, "Petition for the Imposition of Antidumping Duties: Certain Welded Carbon Steel Pipe and Tube Products from Thailand," dated February 28, 1984 (Petition), at 6-7, filed on behalf of the Committee on Pipe and Tube Imports, its sub-committees and constituent members (petitioners).

> plain ends, threaded, threaded and coupled, or beveled for welding form. (These products are generally produced to ASTM specifications A-120, A-53, or A-135.)[8]

Further, the International Trade Commission (ITC), in its final injury determination,[9] defined the merchandise subject to its injury investigation for pipes and tubes from Thailand:

> The imported pipe and tube products that are the subject of these investigations are circular welded carbon steel pipes and tubes over 0.375 inch but not over 16 inches in outside diameter, which are known in the industry as standard pipes and tubes. Standard pipes and tubes are intended for the low-pressure conveyance of water, steam, natural gas, air, and other liquids and gases in plumbing and heating systems, air-conditioning units, automatic sprinkler systems, and other related uses. They may also be used for light load-bearing or mechanical applications, such as for fence tubing. These steel pipes and tubes may carry fluids at elevated temperatures and pressures but may not be subjected to the application of external heat. They are most commonly produced to ASTM specifications A-120, A-53, and A-135.[10]

This scope inquiry covers "line pipe" with outside diameters of 0.375 inch or more, but not exceeding 16 inches, produced in Thailand.[11] "Line pipe," as described in the Petition, "is produced to API specifications for line pipe, API-5L or API{-}5X."[12] The ITC stated that "{l}ine pipes and tubes are used for the transportation of gas, oil, or water, generally in pipeline or utility distribution systems. They are most commonly produced to API specification 5L."[13]

Further, pipe may be dual-stenciled as both "standard pipe" and "line pipe," *i.e.*, identified to indicate compliance with two different industry specifications, as conforming to industry standards for both standard pipe and line pipe, such as ASTM A53 and API 5L.

---

[8] *See* Wheatland's August 26 Comments at Exhibit 3: Petition at 12.

[9] *See* Saha Thai's Letter, "Saha Thai's Comments on 'Line Pipe' Scope Inquiry Circular Welded Carbon Steel Pipe and Tubes from Thailand," dated August 26, 2019 (Saha Thai's August 26 Comments) at Attachment 5: "*Certain Welded Carbon Steel Pipes and Tubes from Turkey and Thailand: Determinations of the Commission In Investigation No. 701-TA-253 (Final) Under the Tariff Act of 1930, Together With the Information Obtained in the Investigation; and Determination of the Commission In Investigation No. 731-TA-252 (Final) Under the Tariff Act of 1930, Together With the Information Obtained In the Investigation*, USITC Publication 1810 (February 1986) (*ITC Final Injury Determination*).

[10] *See ITC Final Injury Determination* at I-1 to I-2.

[11] *See* Memorandum, "Antidumping Duty Order on Circular Welded Carbon Steel Pipes and Tubes from Thailand: Self Initiation of Scope Inquiry on Line Pipe and Dual-Stenciled Standard Line Pipe," dated November 22, 2019 at 4 (Scope Inquiry Initiation).

[12] *See* Petition at 12. Line pipe was included in the Petition, however, because record information demonstrated that no line pipe was produced in Thailand at that time, the petitioners withdrew their request for the imposition of antidumping duties on line pipe from Thailand. *See* Saha Thai's August 26 Comments at Attachment 14: Petitioners' Letter, "Certain Welded Carbon Steel Circular Pipe and Tube Products from Thailand and Venezuela: Partial Withdrawal of Petition," dated March 14, 1985.

[13] *See ITC Final Injury Determination* at II-1.

The following diagram from Saha Thai is helpful to conceptually illustrate the overlap between the industrial standards which result in a dual-stenciled product.[14]



**FINAL SCOPE RULING**

<u>Legal Framework</u>

In determining if merchandise is covered by the scope of an AD and/or countervailing duty order, Commerce will first examine the plain language of the underlying order to determine if it is dispositive of the matter.[15]  Pursuant to its regulations, Commerce may also examine other information, including the description of the merchandise contained in the petition, the descriptions of the merchandise in the initial investigation, and prior scope determinations made for the same product.[16]  If Commerce determines that these sources are sufficient to decide the matter, it will issue a final scope ruling as to whether the merchandise is covered by the *Order*.[17]

Conversely, where the descriptions of the merchandise in the sources described in 19 CFR 351.225(k)(1) are not dispositive, Commerce will consider the five additional factors set forth at 19 CFR 351.225(k)(2).[18]  These factors are:  (i) the physical characteristics of the merchandise; (ii) the expectations of the ultimate purchasers; (iii) the ultimate use of the product; (iv) the channels of trade in which the product is sold; and (v) the manner in which the product is advertised and displayed.[19]  The determination as to which analytical framework is most appropriate in any given scope proceeding is made on a case-by-case basis after consideration of all evidence before Commerce.

---

[14] *See* Saha Thai's Case Brief at 5.
[15] *See Tak Fat Trading Co. v. United States*, 396 F. 3d 1378, 1383 (Fed. Cir. 2005) ("a predicate for the interpretive process is language in the order that is subject to interpretation,") (quoting *Duferco Steel, Inc. v. United States*, 296 F. 3d 1087, 1097 (Fed. Cir. 2002)).
[16] *See* 19 CFR 351.225(k)(1).
[17] *See* 19 CFR 351.225(d).
[18] Four of the regulatory factors originate from a Court of International Trade holding - *Diversified Products Corp. v. United States*, 572 F. Supp. 883 (CIT 1983) (*Diversified Products*).
[19] *See* 19 CFR 351.225(k)(2).

Analysis of Comments

**Comment 1: Consideration of the 19 CFR 351.225 (k)(1) sources.**

*Wheatland's Case Brief:*

- Commerce's preliminary determination erroneously found that regular line pipe is outside the scope of the *Order*. Commerce should find that the plain language of the *Order* covers both regular line pipe and dual-stenciled pipe.[20]
- There is no requirement that Commerce look beyond the plain language of the scope, to the sources listed under 19 CFR 351.225(k)(1), such as the description of merchandise contained in the Petition, the investigation, and other proceedings conducted by Commerce and the ITC because there is no ambiguity in the scope language that needs clarification.[21]
- Additionally, the Court of Appeals for the Federal Circuit (CAFC) found that, where there is no ambiguity in the language of the scope, there is no need to examine the other factors set forth in 19 CFR 351.225(k)(1).[22]

*Saha Thai's Rebuttal:*

- Commerce is required to consider the sources under 19 CFR 351.225(k)(1) to determine whether the plain language of the scope of the *Order* is ambiguous.
- The scope language does not unambiguously establish that line pipe and dual-stenciled standard and line pipe is covered by the scope of the *Order*. Therefore, the (k)(1) sources are relevant to Commerce's analysis.[23]
- In accordance with 19 CFR 351.225(k), Commerce "will take into account" the (k)(1) sources in conducting a scope determination.[24]
- Even if Wheatland were correct that Commerce "must first determine that the plain language of the scope does not ambiguously cover the product at issue before analyzing the (k)(1) {sources}, such a requirement is met in this case."[25]
- Further, Wheatland's request that Commerce conduct a "minor alteration" circumvention inquiry clearly indicates that the scope of the *Order* is ambiguous.

---

[20] *See* Wheatland's Case Brief at 1.
[21] *Id*.
[22] *Id.* at 4 (citing *Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1381 (Fed. Cir. 2017) ("If the scope is unambiguous, it governs.") (citations omitted); *see also Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1302 (Fed. Cir. 2013) (explaining that the inquiry begins with "the language of the final order" and turns to other sources only if the scope itself "is ambiguous").
[23] *See* Saha Thai's Rebuttal at 2-6.
[24] *Id*. at 2-3 (citing *TMB 440AE, Inc. v. United States*, Ct. No. 18-00095, Slip Op. 19-109, 399 F. Supp. 3d 1314 (CIT 2019) (citing *Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1383 (Fed. Cir. 2017) noting that the court "must first assess whether the plain language of the Orders' scope, in light of the disputed {(k)(1) sources}, is unambiguous").
[25] *Id*. at 3.

**Commerce Position:** We continue to reject Wheatland's argument that Commerce need not consider the (k)(1) sources in making our scope determination because the plain language of the scope is definitive in finding that line pipe and dual-stenciled pipe are covered by the scope of the *Order*. Importantly, the Court of International Trade (CIT) has stated that "when a respondent cites (k)(1) sources as supporting a product's exclusion from the scope of an order, the court cannot consider the language of a scope order in isolation, but must consider those sources."[26] The CIT has also stated that regardless of "{w}hether the order is ambiguous or not, Commerce's regulations are unambiguous– it 'will take into account' the (k)(1) criteria in conducting a scope determination. No case has invalidated this regulatory requirement."[27]

In this scope inquiry, Saha Thai has challenged the inclusion of line pipe and dual-stenciled standard and line pipe in the scope of the *Order*, based on the information in the (k)(1) sources, which Saha Thai has placed on the record of this inquiry, such that it would be inconsistent with Commerce's statutory obligations to ignore these sources. In particular, Saha Thai placed information on the record showing that, in the original investigation, the petitioners filed an amended petition removing line pipe from the scope of the Petition.[28] The omission of "line pipe" from the scope of the investigation was memorialized in Commerce's initiation of the less-than-fair-value investigation for Thailand.[29] Additionally, Saha Thai submitted information documenting the ITC's preliminary and final injury determinations, which explicitly state that its injury investigation of steel pipe from Thailand did not include line pipe.[30] Significantly, in accordance with section 731 of the Act (Supp. V 1981), the ITC must find that an industry in the United States is "materially injured, or threatened with material injury" prior to the imposition of antidumping duties. This requirement has been affirmed by the CAFC in *Wheatland Tube*, where it stated that "{a}llowing Commerce to include downstream products {in the scope} would "frustrate the purpose of the antidumping laws because it would allow Commerce to assess antidumping duties on products intentionally omitted from the ITC's injury investigation."[31] Based on this statutory requirement, among others,[32] Commerce would be acting inconsistently with our statutory and regulatory obligations[33] if we ignored the (k)(1) sources placed on the record by Saha Thai in rendering our scope determination.

We also disagree with Wheatland that Commerce has been directed by the CAFC to ignore record evidence that speaks directly to an issue in a scope inquiry. In *Fedmet*, the CAFC held that because the plain language of the scope is "paramount," in "reviewing the plain language of a duty order, "Commerce *must* consider the descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior

---

[26] *See TMB 440AE, Inc. v. United States*, 399 F. Supp. 3d 1314, 1320 (CIT 2019).
[27] *Id.* (emphasis in original).
[28] *See* Saha Thai's August 26 Comments at 10-12; *see also* Attachment 14 (citing the Petition).
[29] *See* Saha Thai's December 20 Comments at 5; *see also* Saha Thai's August 26 Comments at 11 and Attachment 11.
[30] *See* Saha Thai's December 12 Comments at 10-11; *see also* Saha Thai's August 26 Comments at 16-17 and Attachment 8.
[31] *See Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1371 (Fed. Cir. 1998).
[32] *See, e.g.*, section 516A(b)(1)(B)(i) of the Act ("The court shall hold unlawful any determination, finding, or conclusion . . . unsupported by substantial evidence on the record.")
[33] *Id.*

determinations) and the Commission."[34]  In other words, under the CAFC's holding in *Fedmet*, Commerce cannot elect not to review the (k)(1) sources of information, but must always consider those sources in analyzing the plain language of the scope of an order to determine if the language is unambiguous.  Likewise, in its 2015 *Shenyang Yuanda* holding, after affirming Commerce's determination that Yuanda's merchandise was "within the plain language of the Orders," the CAFC stated:

> The regulations require Commerce, when determining the scope of an order, to engage in a two-step process.  First, Commerce must consider the scope language contained in the order itself {and then} the descriptions contained in the petition, and how the scope was defined in the investigation and in the determinations issued by Commerce and the ITC.[35]  The petition and preliminary determinations of Commerce and the ITC involved in the underlying duty investigations "may provide valuable guidance as to the interpretation of the final order."[36]

We recognize that the CAFC has, at times, suggested that the (k)(1) sources might be of less importance if the scope language does not appear to be ambiguous, and we agree with that interpretation of the statute and regulations when there is little to no (k)(1) sources on the record of a proceeding or the sources on the record do not actually address the language at issue.  But, when (k)(1) sources have been placed on the record, such as in this inquiry, which directly address the language at issue, the CAFC has never directed Commerce to ignore such evidence in making its determination.  In fact, such direction would contradict the statutory requirement that we consider the substantial evidence on the record.  Instead, in *Shenyang Yuanda*, the CAFC has affirmed Commerce's two-step process of considering such arguments – first to review the plain language of the scope, and then to examine the (k)(1) sources that were placed on the record and address the language, as a matter of course, to see if those sources add any additional context.[37]  The key, for purposes of our analysis in this scope inquiry, is that Commerce's interpretation of the scope was considered *in conjunction with* the additional regulatory sources, such as the initial investigation record, and not *instead* of those sources.[38]

Therefore, in accordance with our regulations and judicial precedent, we have considered the (k)(1) sources in making our final scope determination.

**Comment 2:  Line pipe and dual-stenciled standard and line pipe.**

*Wheatland's Case Brief:*
- There is neither an exclusion referencing "line pipe specifications" in the *Order* nor an ambiguity in the other terms used to describe the subject merchandise, such as "circular," "welded," or "diameter."[39]

---

[34] *See Fedmet Resources Corp. v. United States*, 755 F.3d 912, 918 (Fed Cir 2014).
[35] *See Duferco Steel*, 296 F.3d at 1097; *see also* 19 CFR 351.225(k)(1).
[36] *See Shenyang Yuanda Aluminum Industry Engineering Co., Ltd. v. United States*, 776 F.3d 1351, 1354 (Fed. Cir. 2015).
[37] *Id.*
[38] *Id.*
[39] *See* Wheatland's Case Brief at 5

- Commerce's preliminary scope ruling ignores the fact that the original language of the scope was never amended through the petition withdrawal process. The petitioners withdrew the Petition with respect to line pipe from Thailand because it would not be possible to show dumping by Thai producers that was specific to line pipe as opposed to dumping of circular welded carbon steel pipes and tubes.[40] "Because there was no production of line pipe in Thailand during the course of the ITC's original investigation, there are no concerns as to whether the ITC included line pipe or dual-stenciled standard and line pipe in its injury analysis."[41]

*Saha Thai's Case Brief:*

- The investigation documents demonstrate that all line pipe products are excluded from the scope of the *Order*. Since the investigation, Saha Thai asserts that Commerce has consistently considered dual-stenciled pipe to be the same as line pipe. Therefore, if all line pipe was excluded from the scope, then dual-stenciled standard and line pipe is also excluded from the *Order*.[42]
- On March 14, 1985, the petitioners modified the Petition and withdrew their request for AD duties on line pipe from Thailand.[43] In its withdrawal of line pipe from the Petition, the petitioners place no qualifications on the line pipe to be excluded from its request for AD duties, such that all line pipe is was excluded from the Petition.[44]
- Further, the petitioners identified the excluded line pipe products with numbers 610.3208 and 610.3209 of the Tariff Schedules of the United States, Annotated (TSUSA).[45] Saha Thai asserts that both dual-stenciled standard and line pipe as well as "mono-stenciled" line pipe "could only be categorized as "line pipe" under TSUSA 610.3208 and 610.3209."[46] Thus, as a result of the petitioners' exclusion of products classified under TSUSA 610.3208 and 610.3209 from the scope of the Petition, all line pipe products, including dual-stenciled standard and line products are excluded from the scope of the *Order*.
- Saha Thai asserts that the ITC has consistently considered dual-stenciled standard and line pipe as line pipe for injury purposes, especially at the time of the investigation.[47]
- The ITC noted in its preliminary ruling that the Petition regarding imports of line pipe from Thailand had been withdrawn.[48]
- Saha Thai further asserts that "the ITC determined that subject standard pipe were imported entirely under TSUSA 610.3231, 610.3234, 610.3241, 610.3242, 610.3243,

[40] *Id.* at 6.
[41] *See* Wheatland's Case Brief at 7.
[42] *See* Saha Thai's Case Brief at 1.
[43] *See* Saha Thai's Case Brief at 6-7.
[44] *Id.* at 7.
[45] *Id.*
[46] *Id.* at 8.
[47] *Id*. at 5.
[48] *Id.* at 10 (citing *Certain Welded Carbon Steel Pipes and Tubes from Thailand and Venezuela: Determination of the Commission In Investigation No. 701-TA-242 (Preliminary) Under the Tariff Act of 1930, Together With the Information Obtained In the Investigation; and Determinations of the Commission In Investigation Nos. 731-TA-252 and 253 (Preliminary) Under the Tariff Act of 1930, Together With the Information Obtained In the Investigations*, USITC Publication 1680 (April 1985) (*ITC Preliminary Injury Determination*) at 3; and the *ITC Final Injury Determination*).

610.3252, 610.3254, 610.3256, 610.3258 and 610.4925; while imports under TSUSA 610.3208 and 610.3209 were of entirely of line pipe, which was not subject to the Thailand investigation."[49]

- In its fourth sunset review of the *Order*,[50] the ITC stated that "since these standards often require engineering characteristics that overlap with other specifications, a pipe may be dual stenciled, *i.e.*, stamped to indicate compliance with two different specifications, such as ASTM A53 and API 5L. Dual-stenciled pipe, which enters as line pipe under a different subheading of the Harmonized Tariff Schedule of the United States ("HTS") for U.S. customs purposes, is not within the scope of the orders."[51]

- Furthermore, in the fourth sunset review of the *Order*, the ITC says that "standard pipe of non-alloy steel is the primary product within the scope of these reviews. Standard pipe is intended for the low pressure conveyance of water, steam, natural gas, air, and other liquids and gases in plumbing and heating systems, air conditioning units, automatic sprinkler systems, and other related uses. Standard pipe may carry liquids at elevated temperatures but may not be subject to the application of external heat. It is made primarily to ASTM A53, A135, and A795 specifications, but can also be made to other specifications, such as British Standard (BS) 1387. Since these standards often specify required engineering characteristics that overlap, a pipe also can be dual stenciled, meaning that the pipe is stamped with monograms signifying compliance with two different specifications, such as ASTM A53 and API 5L; however, such dual-stenciled pipe is not within the scope of the subject orders."[52]

- Further, in its third sunset review of the *Order*,[53] the ITC stated that "dual-stenciled pipe, which for U.S. customs purposes enters as line pipe under a different tariff subheading, is not within the scope of the orders."[54]

- Saha Thai rejects Commerce's determination in the Preliminary Scope Ruling that these statements in the *ITC Fourth Sunset Final* and the *ITC Third Sunset Final* "{are} not definitive, given the variations in the scope language of the CWP orders covered by the {*ITC Fourth Sunset Final*}." Saha Thai asserts that the ITC's explicit exclusion of dual-stenciled products is "without limitation to any particular country."[55] Saha Thai rationalizes that whether the scope of a given order explicitly excludes a product is immaterial, that an order "can specifically exclude a product without containing an enumerated exclusion language in the scope."[56] "Indeed, {Commerce} itself correctly finds in the preliminary determination that the {*Order*} excludes line pipe

---

[49] *Id.* at 10 (citations omitted, emphasis in the original).
[50] *See Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey Investigation Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534, and 536 (Fourth Review)*, USITC Publication 4754 (January 2018) (*ITC Fourth Sunset Final*).
[51] Saha Thai's Case Brief at 11 (quoting *ITC Fourth Sunset Final* at 6-7).
[52] *Id.* at 12 (quoting *ITC Fourth Sunset Final* at I-16).
[53] *See Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey Investigation Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534 and 536 (Third Review)*, USITC Publication 4333 (June 2012) (*ITC Third Sunset Final*).
[54] *See* Saha Thai's Case Brief at 12-13 (quoting *ITC Third Sunset Final* at 8).
[55] *Id.* at 13 (emphasis in the original).
[56] *Id.* at 14 (referencing *Fedmet Resources Corp. v. United States*, 755 F.3d 912, 919 (Fed. Cir. 2014) (*Fedmet*)).

notwithstanding that there is no enumerated exclusion language of line pipe in the scope language."[57]

- Saha Thai asserts that the "{petitioners} testified under oath that line pipe and dual-stenciled pipe were not covered by the CWP from Thailand AD Order."[58] In citing 19 CFR 351.225(k)(1), Saha Thai asserts that "there is a well-developed history of {Commerce} investigations of CWP standard pipes from different countries."
- Commerce's past scope definitions in other standard pipe AD proceedings confirm that dual-stenciled pipe is excluded from the *Order*. Moreover, the petitioners' intentions with respect to multi-stenciled pipe have changed over time.[59]
- In the earliest Petitions concerning CWP, including India, Taiwan, Thailand and Turkey, there was no explicit mention of line pipe or dual-stenciled standard and line pipe in the Petition or the resulting AD duty orders.[60]
- The scopes of the petitions for the 1991 Brazil, Korea, Mexico and Venezuela CWP investigations did not contain enumerated line pipe or dual-stenciled pipe language. In the case of the Brazil, Korea, Mexico and Venezuela CWP investigations, the petitioners stated that "{t}he scope, as defined by the petition, {Commerce} and the Commission, clearly excludes both imports of line pipe entering the United States in Harmonized Tariff System of the United States (HS) category 7306.10 and oil country tubular goods entering the United States in HS category 7306.20." Thus, at the time of the 1985 and 1991 pipe investigations, the petitioners did not seek to include multi-stenciled pipe as subject merchandise. [61]
- The petitioners did not file a petition with scope language that enumerated multi-stenciled pipe was included until the 2007 China pipe investigation and the 2015 Oman, Pakistan and United Arab Emirates investigations.[62]
- Commerce may not expand the scope to include dual-stencil standard and line pipe because the ITC did not include dual-stenciled standard and line pipe in its injury analysis. This legal prohibition has been affirmed by both the CIT and the CAFC in litigation addressing CWP AD orders.[63]

*Wheatland's Rebuttal:*

- Commerce correctly found in its Preliminary Scope Ruling that dual-stenciled is covered by the scope of the *Order*. The plain language of the *Order* covers dual-stenciled standard and line pipe.[64]
- The CAFC's decision in *Wheatland Tube* does not preclude Commerce from finding that dual-stenciled pipe is covered by the scope of the *Order*. Unlike the scope at issue in

---

[57] *Id.*
[58] *Id*. at 13 (emphasis in the original) (citing Saha Thai's August 26, 2019 Comments at Attachment 7: Saha Thai's Letter, "Saha Thai's Comments on 'Line Pipe' Scope Inquiry Circular Welded Carbon Steel Pipe and Tubes from Thailand," dated August 26, 2019 at 58-59).
[59] *See* Saha Thai's Case Brief at 14.
[60] *Id.* at 16.
[61] *See* Saha Thai's Case Brief at 16-20.
[62] *Id.*
[63] *Id.* at 19, 20, 22, 24 (citing *Wheatland Tube Co. v. United States*, 161 F. 3d 1365 (Fed. Cir. 1998); *Wheatland Tube Co. v. United States*, 973 F. Supp. 149 (CIT 1997)).
[64] *See* Wheatland's Rebuttal at 2.

*Wheatland Tube*, the scope of the *Order* on CWP from Thailand does not contain an explicit exclusion for dual-stenciled pipe.[65]

- More importantly, the ITC's pronouncements regarding dual-stenciled line pipe being excluded from the scope of the orders were general statements regarding the orders on CWP from seven countries and not statements specific to the order on CWP from Thailand.
- These statements are generally true because the orders on CWP for countries other than Thailand have specific scope exclusions for line pipe.[66]
- Saha Thai's claim that "Wheatland testified under oath that line pipe and dual-stenciled pipe were not covered by the CWP from Thailand AD Order" is not accurate. The language quoted by Saha Thai is not testimony but a section of Wheatland's Pre- Hearing brief in the 2000 sunset review of CWP from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey. That section of the brief focused exclusively on Korean producers of line pipe. This is relevant because the order on CWP from Korea has a specific exclusion for line pipe.[67]
- The scope language of the *Order* does not expressly and unambiguously exclude line pipe. Unlike the orders governing CWP from Brazil, Korea, and Mexico, the scope of the *Order* at issue does not mention "line pipe," "dual-stenciled pipe," "triple-stenciled pipe," or pipe of "a kind used for oil or gas pipelines."[68]
- The record of the investigation of CWP from Thailand shows that dual-stenciled pipe is covered by the scope of the *Order*. The petition with respect to line pipe was later withdrawn only because there was no known production in Thailand of line pipe at that time.[69]
- In the investigation, Wheatland did not amend the scope language in the petition in any way to exclude any line pipe that might later be produced in Thailand.[70]
- The only language in the scope that appears to have changed through Wheatland's withdrawal process is the removal of the Tariff Schedules of the United States (TSUS) codes for line pipe – *i.e.*, 640.3208 and 610.3209, which appears to have been done by Commerce.[71]
- Commerce should reject Saha Thai's contention that the scope of the *Order* cannot be interpreted to cover dual-stenciled pipe because the ITC never included imports of line pipe from Thailand in its original injury investigation.[72]
- Because at the time of the investigation there was no production of line pipe in Thailand, there would be no point in attempting to show material injury to the domestic line pipe industry by reason of imports of line pipe from Thailand.[73]

---

[65] *Id*. at 10-11.
[66] *Id*. at 7 (citing Saha Thai's August 26 Comments at 20-22).
[67] *See* Wheatland's Rebuttal at 7.
[68] *Id*. at 10.
[69] *Id*. at 2.
[70] *Id*. at 3.
[71] *Id*. at 4.
[72] *Id*. at 10.
[73] *Id*.

*Saha Thai's Rebuttal*

- Wheatland itself does not deny that generally speaking "line pipe" and "standard pipe" are two different types of product. In fact, this is exactly why on January 31, 2019, Wheatland requested that Commerce conduct a "minor alteration" circumvention of Saha Thai's "line pipe" imports under section 781(c) of the Tariff Act of 1930, as amended (the Act), which is the type of proceeding to determine whether an "out-of-scope" product should otherwise be covered to prevent circumvention.[74]
- The original petition included both TSUSA 610.3208 and 610.3209 as two of the relevant HTS of subject merchandise (line pipe), but they were omitted from the final scope language. This intentional omission confirms that the scope of the *Order* does not unambiguously cover line pipe, contrary to Wheatland's contention, and instead the scope was specifically drafted to exclude line pipe.[75]
- As explained in Saha Thai's case brief, all of the other CWP AD cases confirm that Commerce has always considered "line pipe" (which by definition includes dual-stenciled pipe) to be excluded from the scope of any AD case covering "standard pipe."[76]

**Commerce's Position:** Commerce continues to find that the scope of the *Order* does not include line pipe but does include dual-stenciled standard and line pipe.

As partially documented in the *ITC Fourth Sunset Final*, there has been a decades-long history of trade remedy proceedings involving steel "pipes and tubes."[77] Moreover, as discussed in the *ITC Final Injury Determination*, "pipes and tubes" consists of a number of distinct product groups which are broadly defined by the American Iron and Steel Institute (AISI) based on end-use.[78] In addition to "standard pipe," "structural pipe and tubing" and "line pipe," these product groups include "mechanical tubing," "pressure tubing" and "oil country tubular goods" (OCTG).[79] Although there "may be few or no inherent differences among a number of steel tubular products," "{s}teel pipes and tubes are generally produced according to standards and specifications published by a number of organizations, including the American Society for Testing & Materials (ASTM); the American Society of Mechanical Engineers; and the American Petroleum Institute (API)."[80] These distinct product groups are distinguishable based on these industry standards, which are also reflected in the TSUSA which is contemporaneous with the filing of the Petition, spanning numbers 610.3205 through 610.3299.[81] Although the ITC found that these distinct product groups share many common features, the ITC injury investigation was

---

[74] *See* Saha Thai's Rebuttal at 4.
[75] *Id*. 5-6.
[76] *Id*. at 7.
[77] *See ITC Fourth Sunset Final* at I-4 to I-9.
[78] *See ITC Final Injury Determination* at I-1.
[79] *Id.* (citing *Certain Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Determination of the Commission in Investigation No. 701-TA-168 (Final) Under the Tariff Act of 1930, Together With the Information Obtained in the Investigation*, USITC Publication 1345 (February 1983) (*ITC CWP Korea Final Injury Determination*) at A-3 to A-4);*see also ITC Fourth Sunset Final* at I-14 to I-15.
[80] *See ITC CWP Korea Final Injury Determination* at A-4.
[81] *See Tariff Schedules of the United States Annotated (1985)*, USITC Publication 1610 (1984, 3rd supp. September 1, 1985).

limited to "standard pipes and tubes."[82] Similarly, Commerce's less-than-fair-value investigation was limited to standard pipe.[83]

As discussed above, the original Petition requested the imposition of AD duties on both standard pipe and line pipe from Thailand; however, after inquiry by Commerce, the petitioners withdrew their requests for AD duties on line pipe from Thailand. If not for the qualification that both the ITC's investigation and Commerce's investigation were limited to standard pipe, the scope's description of the physical characteristics of the merchandise (*i.e.*, the product is "welded," made from "carbon steel," with an outside diameter of 0.375 inches through 16 inches, and with any wall thickness) could apply to all of the product groups defined by AISI.

In its investigations, the majority of the commissioners found that the ITC investigations covered two separate-like products:

> We conclude, therefore, that there are two like products in these investigations--standard pipe up to and including 16 inches outside diameter and line pipe up to and including 16 inches outside diameter. We further conclude that there are two domestic industries comprised, respectively, of the domestic producers of standard pipe and line pipe.[84]

In the *ITC Final Injury Determination*, the ITC found that, as a result of imports of standard pipe from Thailand (and only standard pipe), "an industry in the United States is materially injured, or threatened with material injury, by reason of imports from Thailand of welded carbon steel standard pipes and tubes."[85]

Commerce rejects Wheatland's argument that line pipe must be included within the scope of *Order* because the description of the merchandise was not modified as a result of the petitioners withdraw of their inclusion of line pipe in the Petition. The historical documents establish that the investigations of both Commerce and the ITC were limited to standard pipe.[86] The relevant

[82] *See ITC Final Injury Determination* at I-1.
[83] *See Certain Circular Welded Carbon Steel Pipes and Tubes From Thailand: Initiation of Antidumping Duty Investigation*, 50 FR 12068 (March 27, 1985) ("These products {under investigation}, commonly referred to in the industry as standard pipe or structural tubing, are produced to various ASTM specifications, most notably A-152, A-53 or A-135"); *see also Antidumping: Circular Welded Carbon Steel Pipes and Tubes From Thailand; Final Determination of Sales at Less Than Fair Value*, 51 FR 3384 (January 27, 1986) (*Final LTFV Determination*) ("The products under investigation are certain circular welded carbon steel pipes and tubes, also known as 'standard pipe' or 'structural tubing'…").
[84] Commerce and the ITC have also found other product groups which satisfy these general physical descriptions to constitute other like products, such as OCTG. *See ITC Final Injury Determination* at 7.
[85] *See ITC Final Injury Determination*.
[86] *See*, *e.g.*, *Final LTFV Determination*, *see also ITC Final Injury Determination*.

statutory provision[87] states that to impose AD duties, Commerce must determine that the class or kind of merchandise has been found to be sold at less than fair value, and the ITC must conclude that a domestic industry has been materially injured or threatened with material injury. Consequently, the scope of an AD order imposed as a result of the *Final LTFV Determination* and the *ITC Final Injury Determination* does not include line pipe.

Commerce further rejects Saha Thai's assertion that "all" line pipe, including dual-stenciled standard and line pipe, is not covered by the scope of the *Order*. Unlike the AD orders covering similar merchandise (*e.g.*, from Mexico or Venezuela),[88] the CWP from Thailand *Order* does not explicitly exclude dual-stenciled standard and line pipe.[89] Moreover, in contrast to the investigations which resulted in the *1992 Standard Pipe Orders*, and contrary to Saha Thai's claims, neither the *Final LTFV Determination* nor the *ITC Final Injury Determination* address dual-stenciled standard and line pipe.

Commerce finds that Saha Thai's construct that dual-stenciled standard and line pipe are not covered by the scope of the *Order* because line pipe is not covered by the scope of *Order* lacks merit. Simply because a certain product *is* certified as line pipe does not result in it being *not* certified as standard pipe.[90] Stated differently, if a certain product is certified as standard pipe, then it is standard pipe regardless of whether it is also certified as line pipe.

Commerce disagrees with Saha Thai assertion that the sources enumerated under 19 CFR 351.225(k)(1) include determinations in proceedings on similar CWP products "from different countries." The "petition, the initial investigation, and the determinations of the Secretary … and the Commission"[91] reference the instant proceeding and not other proceedings, no matter how similar. The "petition" and "initial investigation," of "the Secretary" and "the

---

[87] *See* section 731 of the Act (Supp. V 1981):

> Imposition of antidumping duties
> If—
> (1) the administering authority determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value, and
> (2) the Commission determines that—
> (A) an industry in the United States—
> (i) is materially injured, or
> (ii) is threatened with material injury, or
> (B) the establishment of an industry in the United States is materially retarded, by reason of imports of that merchandise,
>
> then there shall be imposed upon such merchandise an antidumping duty, in addition to any other duty imposed, in an amount equal to the amount by which the foreign market value exceeds the United States price for the merchandise.

[88] *See Notice of Antidumping Duty Orders: Certain Circular Welded Non-Alloy Steel Pipe from Brazil, the Republic of Korea (Korea), Mexico, and Venezuela and Amendment to Final Determination of Sales at Less Than Fair Value: Certain Welded Non-Alloy Steel Pipe from Korea*, 57 FR 49453 (November 2, 1992) (*1992 Standard Pipe Orders*).

[89] *See 1992 Standard Pipe Orders*, 57 FR at 4945 ("Standard pipe that is dual or triple certified/stenciled that enters the U.S. as line pipe of a kind used for oil or gas pipelines is also not included in these orders.")

[90] In reference to Saha Thai's diagram copied above, the standard pipe encompasses both the blue area as well as green area representing the dual-stenciled products.

[91] *See* 19 CFR 351.225(k)(1).

Commission," are singular, and do not reference multiple petitions or investigations of multiple proceedings. Depending upon the similarity of the circumstances in other proceedings, the petitions, investigations or determinations in such other proceedings may be informative, but are not dispositive in a separate, distinct proceeding.[92]

In any case, Saha Thai has failed to demonstrate how this assertion is directly applicable to the Thailand *Order*. The fact that some CWP orders include specific exclusion language and other CWP orders do not include similar exclusion language is a relevant fact, but the reason behind that differing language may depend on the circumstances during the investigation stage of the proceeding. Put simply, just because certain language is included in one order does not dispositively provide meaning to an order which does not include the same language. At most, such differences merely suggest that some products may have been intended to be treated differently under the different orders.

As Saha Thai has pointed out, in the *ITC Fourth Sunset Final*[93] covering seven CWP orders, including the instant *Order* on standard pipe products from Thailand, the ITC stated that "dual-stenciled pipe, which enters as line pipe under a different subheading of the Harmonized Tariff Schedule of the United States ("HTS") for U.S. customs purposes, is not within the scope of the orders"[94] and that "such dual-stenciled pipe is not within the scope of the subject orders."[95] However, in reviewing those sentences in context, it is clear that the ITC was not addressing the language of each individual order, including the scope text which differed between those orders, but instead was providing a generalized statement applicable to the majority of the orders, which contained explicit exclusions for dual-stenciled pipe. Notably, the ITC in making such statements cited to a table in the confidential and public reports from the original investigations, neither which is on this record, but were summarized in the footnote as pertaining to all of the underlying investigations.[96]

---

[92] *See* Memorandum "Antidumping Duty Order on Certain Circular Welded Non-Alloy Steel Pipe from Mexico: Final Scope Ruling on Finished Electrical Conduit Imported by LOA Incorporado," dated November 15, 2012 at 7-8; *see also* Memorandum, "Antidumping Duty Order on Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Scope Ruling on Precision Components Inc.'s Green Machined but not Heat-Treated Components," dated June 12, 2020 at 7 ("Regarding the Green Rings Memorandum and the Rough Forgings Memorandum {two scope rulings from *TRBs Over Four Inches from Japan*}, we note that although "scope rulings" are a source under 19 CFR 351.225(k)(1), these particular scope rulings are not part of the record of the TRBs from China proceeding, and instead are part of the record of *TRBs Over Four Inches from Japan*, on which these two rulings are based. Nonetheless, because *TRBs Over Four Inches from Japan* and the {Chinese} *Order* are based on the same antidumping duty petition, the scope for *TRBs Over Four Inches from Japan* is unquestionably similar and, in the portions relevant to the scope issue at hand, virtually identical, to the scope of the {Chinese} *Order*. Accordingly, we find that the Green Rings Memorandum and the Rough Forgings Memorandum are informative to the issue at hand, but we have not treated these scope rulings from a separate proceeding as dispositive on their own as to whether Precision Components' merchandise is subject to the scope of the {Chinese} *Order* under 19 CFR 351.225(k)(1)." (citations omitted)).
[93] *See Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey (Final)*, Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534, and 536 (Fourth Review), USITC Pub. 4754 (Jan. 2018) (*ITC Fourth Sunset Final* at 6).
[94] *See* Saha Thai's Case Brief at 11 (quoting *ITC Fourth Sunset Final* at 6-7).
[95] *Id.* at 12 (quoting *ITC Fourth Sunset Final* at I-16).
[96] *See ITC Fourth Sunset Final* at I-6 (citing CR at I-20, PR at I-16 which are described in footnote 1 on page 3 as Confidential Report (CR)/Public Report (PR) (tabulating original investigations)). This language appears to be

Further, as Saha Thai also notes, the ITC in its third sunset review of the *Order* and the six other CWP orders,[97] the ITC stated that "dual-stenciled pipe, which for U.S. customs purposes enters as line pipe under a different tariff subheading, is not within the scope of the orders."[98] Again, that reference was to the "orders" in the plural, yet the scope language of those seven orders was not the same with respect to the inclusion or exclusion of dual-stenciled pipe.

Saha Thai provided a chart on this record which shows that only some of the orders contained an enumerated exclusion of dual stenciled pipe in the scope.[99] Specifically, the orders on CWP from Brazil, Mexico, Korea, and Venezuela have exclusionary language for dual-stenciled pipe and line pipe, while the others do not.[100]

It would be illogical for the ITC to "find" that dual-stenciled pipe is not within the scope of all the orders at issue, when the scopes of some orders explicitly excluded dual-stenciled pipe and others did not. As noted above, the *1992 Standard Pipe Orders* include the dual-stenciled exclusions because of issues raised in the specific LTFV investigations which culminated in those orders. Despite Saha Thai's argument, therefore, the only reasonable conclusion we can derive from the various references to the ITC language is that that language was meant to summarize the status of dual-stenciled pipe under the majority of orders, but <u>not</u> <u>all</u> of the orders.

Furthermore, Saha Thai's reliance on the exclusions in other proceedings involving standard pipe, as well as the CIT's opinion in *Wheatland Tube Co.*, which is specific to the AD order on CWP from Mexico, is misplaced.[101] These proceedings are separate from the order on CWP from Thailand, which has different scope language and its own record that differs from the records covered by the proceedings referenced by Saha Thai. Specifically, the scope of the Mexican CWP order includes the explicit exclusions for line pipe and dual- or triple-stenciled products, which was the crux of the *Wheatland Tube Co.* litigation.[102] However, unlike the Mexican CWP order, there is no basis to find that pipe which has been dual-stenciled as standard pipe and line pipe is outside the scope of the *Order*.

Saha Thai's claim that "Wheatland testified under oath that line pipe and dual-stenciled pipe were not covered by the CWP from Thailand AD Order" is not accurate. The language quoted by Saha Thai is not testimony but a section of Wheatland's Pre- Hearing brief in the 2000 sunset review of CWP from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey. That section of the brief focused on how Korean producers of line pipe would shift from production of line

---

taken from *Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey Investigation Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534 and 536 (Third Review)*, USITC Publication 4333 (June 2012) (*ITC Third Sunset Final*) without further analysis or consideration. Furthermore, the cited clause references only the status of the majority of orders and was not intended to apply to all the orders, regardless of exclusion language.

[97] *See ITC Third Sunset Final*.

[98] *See* Saha Thai's Case Brief at 12-13 (quoting *ITC Third Sunset Final* at 8).

[99] *See* Saha Thai's Case Brief at 23.

[100] *See 1992 Standard Pipe Orders*.

[101] *See 1992 Standard Pipe Orders*, 57 FR at 49453.

[102] *Id.*

pipe to standard pipe if the order on standard pipe from Korea were revoked. This is relevant because the order on CWP from Korea has a specific exclusion for line pipe.[103]

Saha Thai is correct that the petitioners' interest in the imposition of antidumping duties with respect to dual-stenciled pipe changed between the 1991 investigations on Brazil, Korea, Mexico and Venezuela where the petitioners clarified that the scope excluded dual-stenciled pipe and the 2007 China investigation and the 2015 Oman, Pakistan and United Arab Emirates investigations where the four petitions specifically enumerated that multi-stenciled standard pipe was included in the petitioners' request for antidumping duties.

However, Commerce rejects Saha Thai's claim to extrapolate the petitioners' interest in the imposition of antidumping duties for dual-stenciled pipe to the earlier, pre-1991 investigations.[104] Any such conclusions by Saha Thai are mere speculation. There is no information on the record to substantiate Saha Thai's claim that the petitioners' intentions with respect to dual-stenciled pipe in the CWP from Thailand *Order* were the same as in the 1991 investigations on Brazil, Korea, Mexico and Venezuela. Indeed, the petitioners' original interest was to include all line pipe in its request for antidumping duties.[105] The exclusion language in the *1992 Standard Pipe Orders* was based, in part, on the petitioners' clarification in the four 1991 investigations, that Commerce specifically concluded that, notwithstanding an omission of any mention of dual-stenciled standard and line pipe in the scope of the petitions, the petitioners did not intend for the AD orders to cover dual-stenciled standard and line pipe *in those four orders*.

While the scope in the Petition similarly did not include language specific regarding dual-stenciled standard and line pipe, the petitioners made no similar statement or clarification with respect to dual-stenciled pipe in the investigation underlying the instant *Order*. As such, we find that Saha Thai's claim that that the petitioners did not intend to include dual-stenciled pipe in the scope of the instant *Order* is not supported by the record of this proceeding.

**Comment 3: Date of Initiation**

*Saha Thai's Case Briefs*

- If Commerce concludes that the *Order* covers line pipe, the earliest date that Commerce can suspend liquidation of imports is November 22, 2019, the date of the self-initiation, because it did not properly initiate the scope inquiry by way of its July 29, 2019 letter.[106]

---

[103] Elsewhere in Wheatland's Prehearing Brief, multiple parties acknowledge that 70 to 80 percent of dual stenciled pipe imported from Korea is sold for "standard pipe applications." *See* Saha Thai's August 26 Comments at Attachment 7 (pages 58-59).

[104] *See* Saha Thai's Case Brief at 15 ("When they intended to include dual-stenciled pipe to be included they explicitly stated so. The lack of explicit inclusion language in earlier petitions means that there was no intention at all.").

[105] *See* Petition.

[106] *See* Saha Thai's Case Brief at 15 22.

*Wheatland's Case Brief*

- There is no merit to Saha Thai's argument that Commerce did not properly initiate this scope inquiry in its July 29, 2019 notice.[107]
- On July 29, 2019, Commerce issued a notification to all interested parties on its scope service list that it was initiating an inquiry and requesting comments on whether the *Order* covers line pipe and products that are dual-stenciled as both standard pipe and line pipe. This notification complied with all of the relevant requirements set form in the agency's regulations.[108]
- Saha Thai's contention that "the July 29th letter provides no reasons why the Secretary is initiating a scope inquiry" simply ignores the reasons that were provided in the letter.[109]

**Commerce's Position:** On November 22, 2019, Commerce self-initiated a scope inquiry to determine whether line pipe, as well as dual-stenciled standard and line pipe, is subject to the *Order*.[110] The Initiation Memorandum was the first document on this record which provided the following: (1) a description of the products covered by this scope inquiry;[111] (2) an explanation of our decision to initiate the scope inquiry;[112] and (3) 20 days for interested parties to submit additional comments and supporting factual information concerning this issue and 10 days for interested parties to submit rebuttal comments and supporting factual information.[113] Commerce did not initiate a formal scope inquiry in its July 29, 2019 Memorandum.[114] Instead, Commerce intended to provide parties with an opportunity to comment[115] on whether line pipe was covered by the scope of the *Order*, and "to issue a final scope ruling within 45 days of the {July 29th letter}."[116] Normally, when initiating a formally scope inquiry, Commerce issues a final scope ruling within 120 days after initiation, rather than 45 days.[117] In this case, we set a deadline of issuing a final scope ruling within 45 days, and found that the phrase "pipe and tube with an outside diameter of 0.375 inches or more but not over 16 inches" is covered by the *Orde*r was critical to our analysis.[118] However, after receiving scope comments from interested parties, containing (k)(1) sources, we determined that initiation of a formal scope inquiry was warranted.[119] We disagree with Wheatland that the phrase "line pipe" in the July 29th Memorandum satisfies the requirement to provide a "*description* of the product that is the subject of the scope inquiry" under 19 CFR 351.225(f)(1)(i). Accordingly, Commerce's November 22,

[107] *See* Wheatland's Rebuttal at 11-13.
[108] *Id.* at 11.
[109] *Id.* at 13.
[110] *See* Memorandum, "Antidumping Duty Order on Circular Welded Carbon Steel Pipes and Tubes from Thailand: Self Initiation of Scope Inquiry on Line Pipe and Dual-Stenciled Standard Line Pipe," dated November 22, 2019 (Initiation Memorandum).
[111] *See* 19 CFR 351.225(f)(1)(i).
[112] *See* 19 CFR 351.225(f)(1)(ii).
[113] *See* 19 CFR 351.225(f)(1)(iii).
[114] *See* Memorandum, "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Scope Inquiry on Line Pipe," dated July 29, 2019 (July 29th Memorandum).
[115] We set a deadline of 10 days for initial comments and factual information and 7 days for rebuttal comments and factual information. *Id.* Typically, when initiating a formal scope inquiry, Commerce provides interested parties with 20 days to provide comments and factual information and 10 days to provide rebuttal to such comments. *See* 19 CFR 351.225(f)(1(iii).
[116] *See* July 29th Memorandum at 2.
[117] *See* 19 CFR 351.225(f)(5).
[118] *See* July 29th Memorandum at 2.
[119] *See* Initiation Memorandum at 3-4.

2019 Initiation Memorandum complied with all of the regulatory requirements and is the date on which Commerce self-initiated a scope inquiry to determine whether line pipe, as well as dual-stenciled standard and line pipe, is subject to the *Order*.

**Recommendation**

For the reasons discussed above, we recommend continuing to find that line pipe is not covered by the scope of the *Order*. We further recommend continuing to find that products which are dual-stenciled as standard pipe and line pipe are within the scope of this *Order*. If the recommendations in this memorandum are accepted, we will serve a copy of this memorandum on all interested parties on the scope service list via FEDEX in lieu of first-class mail as directed by 19 CFR 351.225(f)(3). In addition, we will issue the appropriate instructions to U.S. Customs and Border Protection (CBP) stating that we found line pipe not within the scope of the *Order*. We will also issue instructions to CBP that we found products which are dual-stenciled as standard pipe and line pipe are within the scope of this *Order* and to suspend liquidation and to require a cash deposit of estimated antidumping duties, at the applicable rate, for each unliquidated entry of the product entered, or withdrawn from warehouse, for consumption on or after the date of initiation of the scope inquiry.

This scope ruling does not preclude an interested party to the proceeding from requesting a circumvention inquiry in the future concerning line pipe. If interested parties become aware of circumvention involving merchandise not considered part of the scope as a result of this scope ruling through one of the four scenarios set forth in Section 781 of the Act, please bring the alleged circumvention to our attention, and we will consider such a request for a circumvention ruling at that time.

☒ ☐

Agree Disagree

6/30/2020

X

Signed by: JAMES MAEDER