Slip Op. No. 21-135

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SAHA THAI STEEL PIPE PUBLIC COMPANY, LTD, | |
| *Plaintiff,* | |
| v. | Before: Stephen Alexander Vaden, Judge |
| UNITED STATES, | |
| *Defendant,* | Court No. 1:20-cv-133 |
| and | |
| WHEATLAND TUBE COMPANY | |
| *Defendant-Intervenor* | |

## OPINION

[Granting Plaintiff's Motion for Judgment on the Agency Record and remanding to Commerce with instructions.]

Dated: October 6, 2021

<u>Daniel L. Porter</u>, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington D.C., for Plaintiff. With him on the brief was <u>James C. Beaty</u>.

<u>In K. Cho</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C. for Defendant United States. With him on the brief were <u>Brian M. Boynton</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, Commercial Litigation Branch, <u>Franklin E. White, Jr.</u>, Assistant Director, Commercial Litigation Branch, and <u>Jonzachary Forbes</u>, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

<u>Luke A. Meisner</u>, Schagrin Associates, of Washington D.C., for Defendant-Intervenor. With him on the brief were <u>Roger B. Schagrin</u> and <u>Kelsey M. Rule</u>.

**Vaden, Judge:** Saha Thai Steel Pipe Public Company, Ltd. (Saha), filed this case under Section 516A of the Tariff Act of 1930, as amended. Saha challenges the final scope ruling issued by the U.S. Department of Commerce (Commerce) after Commerce conducted a scope inquiry into its 1986 antidumping duty order ("Thailand Order") on circular welded carbon steel pipes and tubes (CWP) imported from Thailand (Case No. A-549-502). Saha challenges Commerce's decision to assess antidumping duties on the importation of dual-stenciled pipe imported as line pipe from Thailand. *See* Compl. ¶ 1, ECF No. 6. Before the Court is the Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record. Pl.'s Mot. for J. on the Agency R. (Pl.'s Mot.), ECF No. 26. For the reasons set forth below, the Court finds that Commerce's determination that dual-stenciled pipe is covered by the Thailand Order is not supported by substantial evidence, holds that Commerce's Final Scope Ruling constitutes an unlawful expansion of the scope of the underlying order, **GRANTS** the Plaintiff's Motion, and remands the Final Scope Ruling back to Commerce to render a redetermination consistent with this Court's opinion.

## BACKGROUND

The products at issue in this case are Saha manufactured standard pipes, dual-stenciled pipes imported as line pipe, and line pipe, all produced in Thailand for importation into the United States. The International Trade Commission (ITC) has provided a concise and useful explanation of the differences between line pipe and standard pipe. The ITC's description, from its preliminary injury determination

published before Commerce's antidumping order imposing duties on standard pipe

imported from Thailand, is as follows:

> We have addressed the like product question regarding
> standard pipes and tubes (standard pipe) and line pipes
> and tubes (line pipe) in prior investigations. In those
> investigations, the Commission recognized distinctions
> between standard pipe and line pipe. Standard pipe is
> manufactured to American Society of Testing and
> Materials (ASTM) specifications and line pipe is
> manufactured to American Petroleum Institute (API)
> specifications. Line pipe is made of higher grade steel and
> may have a higher carbon and manganese content than is
> permissible for standard pipe. Line pipe also requires
> additional testing. Wall thicknesses for standard and line
> pipes, although similar in the smaller diameters, differ in
> the larger diameters. Moreover, standard pipe (whether
> imported or domestic) is generally used for low-pressure
> conveyance of water, steam, air, or natural gas in
> plumbing, air-conditioning, automatic sprinkler and
> similar systems. Line pipe is generally used for the
> transportation of gas, oil, or water in utility pipeline
> distribution systems.

*Certain Welded Carbon Steel Pipes and Tubes from Thailand and Venezuela,* Inv.

Nos. 701-TA-242 and 731-TA-252 and 253 (Preliminary), USITC Pub. 1680 (Apr.

1985), Joint Appendix (J.A.) at 1094-96, ECF No. 42. So-called dual-stenciled pipe

has received both an American Society of Testing and Materials (ASTM) stencil and

an American Petroleum Institute (API) stencil, indicating that it meets the minimum

requirements for both standards. *See* J.A. at 1563 (providing a definition for dual-

stenciled pipe).

## I.      The Original Antidumping Investigation

Early in 1985, a subcommittee of the self-named Committee on Pipe and Tube Imports, with its constituent domestic manufacturers, asked Commerce to impose antidumping duties on circular welded carbon steel pipe imports from Thailand. *See id*. at 1090. Their original request sought the imposition of antidumping duties on standard, line, and dual-stenciled pipes. *Id*. Commerce responded to the petition with a memo on March 7, 1985, asking the petitioners to provide "[d]ocumentation which demonstrates that line pipe is manufactured in Thailand" and "[d]ocumentation which supports the allegation that line pipe from Thailand [was] being sold at less than fair value." J.A. at 1753.

After receiving Commerce's March 7th letter, the initial petitioners, among which was Defendant-Intervenor Wheatland Tube Company (Wheatland), filed an amended petition on March 12, 1985. *Amended Petition Filed by Petitioner on March 12, 1985*, J.A. at 1755-79. In that amended petition, the initial petitioners rejected a meaningful distinction between standard and line pipe. *Id.* The initial petitioners instead argued that a precedent existed that collapsed line pipe and standard pipe into a single reviewable industry and that the better distinction was between small diameter and large diameter pipes. *Id.* at 1763. Despite these arguments in their amended petition, in a subsequent letter dated March 14, 1985, the initial petitioners expressly withdrew from their "petitions insofar as they concern line pipe, TSUS numbers 610.3208 and 3209." *Letter Dated March 14, 1985, from Petitioner*

*Regarding Partial Withdrawal of Petition*, J.A. at 1781-82. The Tariff Schedule of the United States (TSUS) numbers 610.3208 and 3209 are the numbers under which line pipe, dual-stenciled or otherwise, would have been imported in 1985. *See* TSUS 1985 Version; *see also* Tr. of Oral Arg. 7:8-12, ECF No. 51, July 26, 2021 (Government and Wheatland's admission that line pipe and dual-stenciled pipe would have been imported under these numbers in 1985). At no point before or after submitting the March 14th letter did the initial petitioners provide any "[d]ocumentation" supporting "the allegation that line pipe from Thailand [was] being sold at less than fair value" or even "manufactured in Thailand." J.A. at 1753.  Indeed, the initial petitioners acknowledged that "no Thai company is presently licensed to produce pipe to API specifications, and imports of API line pipe from Thailand are therefore not likely."  J.A. at 1781.[1]

About a month after the back-and-forth between Commerce and the initial petitioners, the ITC released a preliminary report titled *Certain Welded Carbon Steel Pipes and Tubes from Thailand and Venezuela; Determination of the Commission in Investigation No. 701-TA-242: (Preliminary) Under the Tariff Act of 1930, Together with the Information Obtained in the Investigation*. The ITC determined "pursuant to section 733(a) of the Tariff Act of 1930 (19 U.S.C. § 1673b(a)), that there is a reasonable indication that an industry in the United States is threatened with

---

[1] Meaning, Thailand produced neither line pipe, nor dual-stenciled line pipe, at the time of the initial petition, injury determination, and antidumping order.

material injury by reason of imports of welded carbon steel standard pipes and tubes from Thailand," *i.e.*, the standard pipe industry. J.A. at 1089. In its analysis, the ITC directly addressed the initial petitioners' argument — that distinguishing between line and standard pipe was wrong and that the better distinction was between large and small diameter pipes — describing it as "somewhat arbitrary." *See id.* at 1096. The ITC further stated that "domestic line pipe is like imported line pipe and not like imported standard pipe," and "domestic standard pipe is like imported standard pipe and is not like imported line pipe." *Id.* The ITC also described at length the differences between standard pipe and line pipe. *See id.* at 1095.

Almost a year later in January 1986, Commerce issued its final determination that standard pipe from Thailand was being, or was likely to be, sold in the United States at less than fair value. *Circular Welded Carbon Steel Pipes and Tubes from Thailand; Final Determination of Sales at Less Than Fair Value*, 51 Fed. Reg. 3384 (Jan. 27, 1986), J.A. at 1216. This Final Determination described its scope as encompassing "certain circular welded carbon steel pipes and tubes, also known as '*standard pipe*' or 'structural tubing,' which includes pipe and tube with an outside diameter of 0.375 inch or more but not over 16 inches, or any wall thickness, as currently provided in items 610.3231, 610.3234, 610.3241, 610.3242, 610.3243, 610.3252, 610.3254, 610.3256, 610.3258 and 610.4925 of the Tariff Schedules of the United States Annotated." *Id.* (emphasis added). The TSUS numbers under which dual-stenciled and single-stenciled line pipes would have been imported in 1986 were

not listed in this scope.  This determination relied on the preliminary ITC report released in April 1985 that addressed the material injury caused to the U.S. standard pipe industry by the importation of standard pipe from Thailand, not by line or dual-stenciled pipe. *Id.*

After Commerce issued its Final Determination on standard pipe imported from Thailand, the ITC issued its own final report in February 1986. This report addressed the material injury to domestic industry, actual and threatened, resulting from the importation of standard pipe from Thailand and the importation of line and standard pipe from Turkey. *See Certain Welded Carbon Steel Pipes and Tubes from Turkey and Thailand*, Inv. Nos. 701-TA-253 and 731-TA-252, USITC Pub. 1810 (Feb. 1986) (ITC Final Determination), J.A. at 1221. The ITC evaluated the effects of both imported line pipe *and* standard pipe from Turkey but only evaluated the effects of standard pipe from Thailand. *See id.* As a result of its analysis, the ITC made independent material injury determinations regarding line pipe imported from Turkey, standard pipe imported from Turkey, and standard pipe imported from Thailand. *Id.* At no point did the ITC conflate line and standard pipe of identical sizes. *See id.* at 1233-34. At no point did the ITC make a material injury determination regarding line pipe or dual-stenciled pipe imported from Thailand.  *Id.*  And the ITC consistently treated standard pipe and line pipe as different products throughout its injury analyses but did not mention dual or multi-stenciled pipe imported as line pipe. *See id.* at 1221-1376.

In March 1986, Commerce published its antidumping duty order (the Thailand

Order) and the scope of that order included:

> The products under investigation are certain circular
> welded carbon steel pipes and tubes (referred to in this
> notice as "pipes and tubes"), also known as "standard pipe"
> or "structural tubing," which includes pipe and tube with
> an outside diameter of 0.375 inch or more but not over 16
> inches, of any wall thickness, as currently provided in
> items 610.3231, 610.3234, 610.3241, 610.3242, 610.3243,
> 610.3252, 610.3254, 610.3256, 610.3258, and 610.4925 of
> the Tariff Schedules of the United States Annotated
> (TSUSA).

*Antidumping Duty Order: Circular Welded Carbon Steel Pipes and Tubes from*

*Thailand*, 51 Fed. Reg. 8341, 8341 (Dep't of Commerce Mar. 11, 1986).

Following the 1989 shift from the Tariff Schedule of the United States (TSUS)

to the Harmonized Tariff Schedule of the United States (HTSUS), the language

governing the scope of the Thailand Order was updated to align with the HTSUS and

now states:

> The products covered by the order are certain circular
> welded carbon steel pipes and tubes from Thailand. The
> subject merchandise has an outside diameter of 0.375 inch
> or more, but not exceeding 16 inches, of any wall thickness.
> These products, which are commonly referred to in the
> industry as "standard pipe" or "structural tubing" are
> hereinafter designated as "pipes and tubes." The
> merchandise is classifiable under the Harmonized Tariff
> Schedule of the United States (HTSUS) item numbers
> 7306.30.1000, 7306.30.5025, 7306.30.5032, 7306.30.5040,
> 7306.30.5055, 7306.30.5085 and 7306.30.5090. Although
> the HTSUS subheadings are provided for convenience and
> purposes of U.S. Customs and Border Protection (CBP), the
> written description of the merchandise subject to the order
> is dispositive.

*Antidumping Duty Order on Circular Welded Carbon Steel Pipes and Tubes from Thailand: Final Scope Ruling on Line Pipe and Dual-Stenciled Standard and Line Pipe from Thailand*, dated June 30, 2020 ("Final Scope Ruling"), J.A. at 2042; *Circular Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments*, 86 Fed. Reg. 7260 (Dep't of Commerce Jan. 27, 2021); *see also Certain Circular Welded Carbon Steel Pipes and Tubes From Thailand; Preliminary Results of Antidumping Duty Administrative Review*, 55 Fed. Reg. 42596, 42596 (Dep't Commerce Oct. 22, 1990) (noting transition from TSUS to HTSUS).

## II.   Subsequent Reviews of the Thailand Order

Not quite a decade after Commerce published the Thailand Order, President William Jefferson Clinton signed the Uruguay Round Agreements Act (URAA). Pub. L. No. 103-465, 108 Stat. 4809 (1994). Along with resurrecting dead copyrights on largely forgotten movies, the Uruguay Round Agreements Act established a five-year sunset review process for antidumping and countervailing duty orders. Uruguay Round Agreements Act § 220. Under this process, every five years, the administering agency and the ITC conduct a review of all active antidumping and countervailing orders to determine whether they remain necessary. 19 U.S.C. § 1675.

Since the signing of the Uruguay Round Agreements Act, the ITC has initiated, conducted, and concluded four sunset reviews of the Thailand Order. The ITC conducted its first review in 1999 and published the results in 2000; it published the

results of the second review in 2006, the third review in 2012, and the fourth in 2018.

*See Certain Pipe and Tube from Argentina, Brazil, Canada, India, Korea, Mexico, Singapore, Taiwan, Thailand, Turkey, and Venezuela*, Inv. Nos. 701-TA-253, 731-TA-132, 252, 271, 273, 276, 277, 296, 409, 410, 532–534, 536, and 537 (*First Sunset Review*), USITC Pub. 3316 at 6 (July 2000); *Certain Pipe and Tube from Argentina, Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey*, Inv. Nos. 701-TA-253, 731-TA-132, 252, 271, 273, 409, 410, 532–534, and 536 (*Second Sunset Review*), USITC Pub. 3867 at 4–5 (July 2006); *Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey*, Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532-534 and 536 (*Third Sunset Review*), USITC Pub. 4333 (June 2012); *Certain Circular Welded Pipe and Tube from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey (Final)*, Inv. Nos. 701-TA-253 and 731-TA-132, 252, 271, 273, 532–534, and 536 (*Fourth Sunset Review*), USITC Pub. 4754 (Jan. 2018).

In the ITC's *First Sunset Review*, the express exclusion of line and dual-stenciled pipe from relevant antidumping orders of line pipe was discussed. *See First Sunset Review* at 11-12, n.53. This discussion was within the context of streamlining the ITC's different and like product analyses. *See id.* at 11-12. The ITC noted that "the orders on CWP from Thailand and Turkey (CVD) have no express exclusions for products excluded from the scopes in all later cases, including line pipe, OCTG, boiler tubing, cold-drawn or cold-rolled mechanical tubing, pipe and tube hollows for

redraws, finished scaffolding, and finished rigid conduit." *Id.* n.53.  Notably, none of

these products have ever been treated as within the scope of the Thailand Order,

despite the lack of an express exclusion.  *Cf.* J.A. *passim.*

Elsewhere in the same sunset review, the ITC discussed line pipe and dual-

stenciled line pipe in the context of "safeguard duties" imposed by President Clinton

on every country reviewed that produced line pipe and dual-stenciled pipe at the time,

except Canada and Mexico. *First Sunset Review* at 28; *see also To Facilitate Positive

Adjustment to Competition from Imports of Certain Circular Welded Carbon Quality

Line Pipe*, Proclamation No. 7274, 65 Fed. Reg. 9191 (Feb. 23, 2000).[2]  In that

discussion, the ITC notes that dual-stenciled pipe imported as line pipe, and line pipe

*simpliciter*, were excluded from antidumping orders but were nonetheless subject to

President Clinton's "safeguard duties" covering line pipe.  *First Sunset Review* at 28.

When the ITC conducted its second review of the Thailand Order and other

similar antidumping orders, the safeguard duties against line pipe had expired or

otherwise ended. *See Second Sunset Review* at 11, n.55.  Nonetheless, in the *Second

Sunset Review* the ITC noted that dual-stenciled pipe imported as line pipe had only

been subject to duties under President Clinton's safeguard duties covering line pipes,

not standard pipes: "Following an affirmative determination by the Commission, in

March 2000, President Clinton issued Proclamation 7274, imposing additional duties

---

[2] The Proclamation's safeguard duties expired in March 2003. Proclamation No. 7274, 65 Fed.
Reg. at 9194.

of 19 percent on line pipe imports of more than 9,000 short tons annually (including

"dual-stenciled" pipe but excluding "arctic grade" line pipe)." *Id.* at Overview-5 n.16.

The *Second Sunset Review* also noted that "multiple-stenciled line pipe requires

additional steel than CWP [*sic*] to meet American Petroleum Institute (API)

specifications applicable to line pipe. At [then] current steel prices, this would require

that a multiple-stenciled product be sold at a considerable price premium over a

product that satisfies ASTM specifications but not API specifications." *See id.* at 13

n.66.

In its third review of the Thailand Order, the ITC described the scope of all

Orders under its review and in that description included this caveat: "[D]ual-stenciled

pipe, which for U.S. customs purposes enters as line pipe under a different tariff

subheading, is not within the scope of the orders.*" Third Sunset Review* at 8. The

Thailand Order did not receive a special carve out from the general language of the

*Third Sunset Review's* scope.[3] *See id.*

In the *Fourth Sunset Review* of the Thailand Order in January 2018, the ITC

reiterated the position that it took in the *Third Sunset Review*, that it implied or

stated in the first and second reviews, and that Commerce expressed in 1985, 1986,

---

[3] The argument that the lack of an express exclusion in the Thailand Order means the *Third Sunset Review's* scope cannot possibly include the Thailand Order within its general exclusion of line pipe, single or dual-stenciled, is unavailing. That Thailand's order does not expressly exclude line pipe or dual-stenciled pipe is a function of Thailand's production capacity.  It is not an expression of intent to include line pipe, single and dual-stenciled, within the scope of the Thailand Order. As mentioned above, Thailand's order does not include an express exclusion because Thailand did not produce line pipe or dual-stenciled line pipe at the time the Thailand Order was issued.

and 2012. *See Fourth Sunset Review* at 6-7. The *Fourth Sunset Review* stated that line pipe, which includes dual-stenciled pipe, was not within the scope of the antidumping orders concerning standard pipes:

> Producers primarily make CWP to ASTM specifications A53, A135, and A795.26 Since these standards often require engineering characteristics that overlap with other specifications, a pipe may be dual stenciled, i.e., stamped to indicate compliance with two different specifications, such as ASTM A53 and API 5L. Dual-stenciled pipe, which enters as line pipe under a different subheading of the Harmonized Tariff Schedule of the United States ("HTS") for U.S. customs purposes, is not within the scope of the orders.

*Id.*

## III.    The Scope Determination in Question

In January 2019, Wheatland told Commerce "that certain imports of merchandise from Thailand that are entering the United States as 'line pipe' are circumventing" the Thailand Order and requested that Commerce make a circumvention ruling against Saha. *Circumvention Ruling Request*, J.A. at 1807. According to Wheatland and Southland Tube Company, the domestic interested parties who filed the request, Saha was circumventing the Thailand Order through minor alterations to Saha's merchandise. *See id.* They alleged that Saha began exporting what Wheatland considered "minorly-altered standard pipe" after Saha's dumping margin jumped from 1.36 percent to about 28 percent. *See id.* at 1811.

On November 22, 2019, Commerce self-initiated a scope inquiry into the Thailand Order. *Memorandum from Leo Ayala, International Trade Compliance*

*Analyst, Office VII, Antidumping and Countervailing Duty Operations, to James Maeder, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, regarding Antidumping Duty Order on Circular Welded Carbon Steel Pipes and Tubes from Thailand: Self Initiation of Scope Inquiry on Line Pipe and Dual-Stenciled Standard Line Pipe* (Nov. 22, 2019), J.A. at 1800.  Before the scope inquiry, during the inquiry, and since, Saha has consistently asserted that its dual-stenciled line pipes are not standard pipes with minor alterations and that these dual-stenciled line pipes are outside the antidumping duty order's scope.  J.A. at 1171-1203, 1898-1953, and 1975-2022.

Commerce issued a preliminary scope ruling in February 2020, finding for the first time in thirty-four years that dual-stenciled line pipe is within the scope of the Thailand Order while single-stenciled line pipe is not. *See Antidumping Duty Order on Circular Welded Carbon Steel Pipes and Tubes from Thailand: Preliminary Scope Ruling on Line Pipe and Dual-Stenciled Standard and Line Pipe* (Feb. 24, 2020), J.A. at 1954. All the parties submitted comments and arguments on the preliminary ruling.  J.A. at 1962-2040. Commerce remained unmoved; and in its Final Scope Ruling, Commerce again found that dual-stenciled pipe is within the scope of the Thailand Order. *See* Final Scope Ruling, J.A. at 2042.

## IV.   The Present Case

On July 17, 2020, Saha sued the Department of Commerce seeking to overturn its scope decision.  ECF No. 6.  Wheatland intervened in the case on August 12, 2020.

ECF No. 15.  In December 2020, Saha filed its Motion for Judgment on the Agency

Record, for which the Court held an extensive hearing on July 15, 2021.  ECF Nos.

26 and 47.  Counsel for all parties attended.  During the hearing, the Court asked

several questions.

The first question was:

> [Y]ou can just tell me with a simple yes or no if the
> statement as I have presented it is factually correct or
> not…. [I]n 1985 to 1986, the country of Thailand did not
> produce line pipe, including dual stenciled-line pipe.

Tr. of Oral Arg. 5:24-25, 6:1-4, ECF No. 51, July 26, 2021.  The Government responded

"Your Honor, our understanding is that the – the stated reason for the withdrawal –

affirmative withdrawal of the original petition was that – was the notion that there

was no manufacture of line pipe in Thailand at the time."  *Id.* at 6:12-16.  Wheatland

stated it understood "that there was neither production of regular single stenciled

line pipe nor dual stenciled standard inline [*sic*] pipe in Thailand at the time the

petitions were filed."  *Id.* at 7:1-3.

The second question the Court asked was:

> Was all line pipe, including dual stenciled line pipe, in
> 1985/86 imported under TSUS Codes 610.3208 and/or
> 610.3209?

*Id.* at 7:8-10.  Both the Government and Wheatland admitted that dual-stenciled pipe

would have been imported under the TSUS codes for line pipe in 1985 and 1986.  *Id.*

at 7:11-22.

At the end of the hearing, the Court ordered the Government and Wheatland to review this case's record thoroughly.    After reviewing the record, the Court required them to write a letter identifying for the Court "in the record of this matter" where "there was an instance or more than one instance of…the Government" referring "explicitly to dual stenciled pipe as standard pipe." *Id.* at 71:3-7.  The Court also gave Saha's counsel the right to respond.  *Id.* at 72:1-7.

The Government and Wheatland timely submitted their letters.    The Government identified for the Court quotes in the *Fourth Sunset Review* that came from Commerce's antidumping order on standard pipe imported from Taiwan and from its antidumping order on standard pipe from Brazil, Mexico, and Korea. Government's Letter Re: *Saha Thai Steel Pipe Public Company Limited v. United States*, No. 20-133 (Ct. Int'l Trade), at 1, ECF No. 49 (citing to *Fourth Sunset Review* at I-12 to I-13).  The language that Commerce identifies is as follows:

> **Brazil, Mexico, and Korea**: Standard pipe that is dual or triple certified/stenciled that enters the U.S. as line pipe of a kind used for oil or gas pipelines is also not included in the orders.
>
> **Taiwan**: Standard pipe that is dual or triple certified/stenciled that enters the U.S. as line pipe of a kind or used for oil and gas pipelines is also not included in the scope of the order.

Wheatland, like the Government, also identifies the same language from other antidumping orders that is quoted in the *Fourth Sunset Review*.  Wheatland's Letter Re: *Saha Thai Steel Pipe Public Company Limited v. United States* (Ct. No. 20-00133):

Response to Court's July 15, 2021 Order, at 1-2, ECF No. 50. But Wheatland goes even further and cites additional quotes from the preliminary and final investigations into CWP imported from China. *Id.* at 3-4; *Circular Welded Carbon- Quality Steel Pipe from China*, Inv. Nos. 701-TA-447 and 731-TA-1116 (Preliminary), USITC Pub. 3938 (July 2007); *Circular Welded Carbon-Quality Steel Pipe from China*, Inv. Nos. 701-TA-447 and 731-TA-1116 (Final), USITC Pub. 4019 (July 2008).

Interestingly, the language that the Government and Wheatland have referenced in response to the Court's order is all language from antidumping orders that the Government and Wheatland have consistently argued "are not probative of the [Thailand] order's scope." Def.'s Resp. to Pl.'s Mot. for J. on the Agency R. (Def.'s Resp.) at 18, ECF No. 37. The Government in its response brief had argued that antidumping orders for other countries are not "enumerated under 19 CFR 351.225(k)(1)" and that the (k)(1) materials do not "include determinations [from] proceedings on similar products from different countries." *Id.* at 19. Wheatland likewise argued that the antidumping orders and investigations dealing with other countries "are not included within the 'scope determinations' that Commerce must consider under section (k)(1)." *See* Defendant-Intervenor's Resp. to Pl.'s Mot. for J. on the Agency R. (Def.-Int.'s Resp.) at 21, ECF No. 34. As Wheatland put it, "Saha Thai fails to appreciate that agency determinations arising from different orders with different scope language—even if similarly captioned" are not relevant. *Id.* And "[i]ndeed, there is no basis in law for Saha Thai's assertion that scope determinations

arising from different proceedings involving different records and different scope language should have any bearing on Commerce's analysis of the (k)(1) sources." *Id*

Saha timely responded to the Government and Wheatland's letters. ECF No. 52. In its response letter, Saha pointed out that the Government and Wheatland do not cite to any document or statement in the record underlying the Thailand Order. *Id.* at 1. Saha highlighted how the Government and Wheatland's letters quote language from other antidumping orders that do not involve pipe imports from Thailand. *Id.* at 1-2.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction over Plaintiff's challenge to the Scope Ruling under 19 U.S.C. § 1516a(a)(2)(B)(vi) and 28 U.S.C. § 1581(c), which grant the Court authority to review actions contesting scope determinations described in an antidumping order. The Court must sustain Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). If they are supported by neither substantial evidence nor the law, the Court must "hold unlawful any determination, finding, or conclusion found." *Id.* "[T]he question is not whether the Court would have reached the same decision on the same record[;] rather, it is whether the administrative record as a whole permits Commerce's conclusion." *See New American Keg v. United States*, No. 20-00008, 2021 WL 1206153, at *6 (Ct. Int'l Trade Mar. 23, 2021).

Reviewing agency determinations, findings, or conclusions for substantial evidence, the Court assesses whether the agency action is reasonable given the record as a whole. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). The Federal Circuit has described "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Teijin Films USA v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

## DISCUSSION

### I.     Legal Framework

The Federal Circuit has arguably provided the United States Court of International Trade with two distinct methods that the Court may use to begin its analysis of the lawfulness of Commerce's scope inquiries into antidumping orders. The first method evaluates the content of the plain language of an antidumping order without reference to any other document, except typical references used when analyzing any law or regulation, such as a dictionary. *See OMG, Inc. v. United States*, 972 F.3d 1358, 1363 (Fed. Cir. 2020). The second method is the *Meridian* method, which requires an analysis of a scope's language within the context of the (k)(1) materials, *i.e.*, the administrative documents produced during the agency process that led to the antidumping order. *Meridian Prod. v. United States*, 890 F.3d 1272,

1277 (Fed. Cir. 2018).  Both methods seek to determine whether a scope's language is sufficiently ambiguous that Commerce must resort to additional documents or considerations to interpret an order's scope.

Under *OMG*, "the first step in a scope ruling proceeding is to determine whether the governing language is in fact ambiguous." *ArcelorMittal Stainless Belgium N.V. v. United States*, 694 F.3d 82, 87 (Fed. Cir. 2012).  "If it is not ambiguous, the plain meaning of the language governs." *Id.* But "[i]f the language is ambiguous, Commerce must next consider the . . . '(k)(1) materials.'" *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1302 (Fed. Cir. 2013) (citations omitted).

Under *Meridian*, "the plain language of an antidumping order is paramount." *Meridian Prod. v. United States*, 890 F.3d 1272, 1277 (Fed. Cir. 2018).  But when "reviewing the plain language of a duty order, Commerce must consider" the (k)(1) materials.  *Id.* at 1277; *see also Midwest Fastener Corp. v. United States*, 494 F.Supp.3d 1335, 1340 (Ct. Int'l Trade 2021) ("When considering the scope language, Commerce will take into account descriptions of the merchandise contained in . . . [the (k)(1) sources]").  If the above method does "not dispositively answer the question, Commerce may consider the…so-called (k)(2) factors." *Meridian Prod.*, 890 F.3d at 1278.

Regardless of the method, the question of whether a scope's language is ambiguous is reviewed by the Court *de novo*. *OMG*, 972 F.3d at 1363; *Meridian Prod.*, 851 F.3d at 1382.  After its *de novo* review of Commerce's ambiguity determination

in this case, the Court has determined that the distinction between the Federal Circuit's two methods is of no moment given that the plain language of the Thailand Order's scope is ambiguous without the context of the (k)(1) materials. Whether the Court uses the (k)(1) materials from the beginning or uses them only after reading the original scope does not matter. In this case, the (k)(1) materials must be read.

The (k)(1) materials consist of "[t]he descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission." 19 C.F.R. § 351.225(k)(1). So-called "Sunset Reviews" conducted pursuant to the Uruguay Round Agreements Act are (k)(1) materials. *See Quiedan Co. v. United States*, 294 F.Supp.3d 1345 (Ct. Int'l Trade 2018) (including sunset reviews among the (k)(1) materials), *aff'd*, 927 F.3d 1328 (Fed. Cir. 2019). Also included among the (k)(1) materials are "determinations of…the [ITC]," such as injury determinations. 19 C.F.R. § 351.225(k)(1).

"A fundamental requirement of both U.S. and international law is that an antidumping duty order must be supported by an ITC determination of material injury covering the merchandise in question." *Wheatland Tube Co. v. United States*, 973 F.Supp. 149, 158 (Ct. Int'l Trade 1997), *aff'd*, 161 F.3d 1365 (Fed. Cir. 1998). The law permitting Commerce to issue antidumping orders, 19 U.S.C. § 1673, "is remedial, [and] . . . was designed to protect domestic industry from sales of imported merchandise at less than fair value which either caused or threatened to cause

injury." *Badger-Powhatan, Div. of Figgie Int'l, Inc. v. United States*, 608 F.Supp. 653, 656 (Ct. Int'l Trade 1985). Therefore, "[w]here the domestic industry is not injured, it cannot avail itself of the relief accorded under the antidumping statute." *Id.* at 657. And Commerce cannot "assess antidumping duties on products intentionally omitted from the ITC's injury investigation." *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1371 (Fed. Cir. 1998). Allowing the ITC to assess such duties without an injury determination "would itself frustrate the purpose of the antidumping laws." *Id.*

If these (k)(1) materials are dispositive, whether they are evaluated while initially interpreting a scope or evaluated only after a scope is found ambiguous, Commerce may issue a final ruling based on those materials. *See Tak Fat Trading Co. v. United States*, 396 F.3d 1378, 1382 (Fed. Cir. 2005). If the (k)(1) materials are not dispositive, Commerce must consider "(k)(2) factors," which include "(i) [t]he physical characteristics of the product; (ii) [t]he expectations of the ultimate purchasers; (iii) [t]he ultimate use of the product; (iv) [t]he channels of trade in which the product is sold; and (v) [t]he manner in which the product is advertised and displayed." 19 C.F.R. § 351.225(k)(2); *see also* 19 C.F.R. § 351.225(e); *Meridian Prod.*, 890 F.3d at 1278.

Although this Court owes "significant deference" to Commerce's interpretation of its orders, Commerce cannot issue an interpretation that changes the scope of the order nor "interpret an order in a manner contrary to its terms." *See Duferco Steel*

*Inc. v. United States*, 296 F.3d 1087, 1094–95 (Fed. Cir. 2002) (*quoting Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1072 (Fed. Cir. 2001)).

## II.    Analysis

### A.    Summary

Saha's Motion for Judgment on the Agency Record presents three principal issues:  First, whether Commerce's decision to include dual-stenciled pipe within the scope of the Thailand Order is supported by substantial evidence; second, whether Commerce's final scope decision unlawfully expands the scope to include merchandise that was not part of the final injury determination of the ITC; and third, whether Commerce's final scope decision is otherwise not in accordance with law because it is contrary to the Federal Circuit's decision in *Wheatland Tube Co. v. United States*, 161 F. 3d 1365 (Fed. Cir. 1998). Pl.'s Mot., ECF No. 26.

Saha's argument is straightforward:  Commerce unlawfully expanded the scope of the Thailand Order by ignoring overwhelming evidence that dual-stenciled line pipe was not treated as standard pipe by the ITC or by Commerce and was intentionally excluded from the ITC's injury determination and Commerce's Thailand Order. Therefore, dual-stenciled line pipe is outside the Thailand Order's scope. *See* Pl.'s Mot. at 16-24, ECF No. 26. Saha supports its contention with documents that fall within the (k)(1) materials and with documents, orders, and determinations concerning the same products from other countries. *See* J.A., ECF No. 42; *see also* Pl.'s Mot. at 20, ECF No. 26.

Commerce responds that its determination that dual-stenciled pipe is within the scope of the Thailand Order is supported by substantial evidence because the order's plain language unambiguously encompasses dual-stenciled pipe. *See* Def.'s Resp. at 16-20, ECF No. 37. Commerce rejects Saha's contention that there is probative value in antidumping orders, ITC determinations, and Commerce's determinations that cover the same products but are from different countries. *See id.* at 18-20. Finally, Commerce asserts that its determination is consistent with the (k)(1) materials, but that those materials do not need to be consulted given the unambiguous language of the Thailand Order's scope. *See id.* at 15-18, ECF No. 37.[4]

The Court disagrees with Commerce's interpretation of the plain language of the scope and the short shrift it gives to the (k)(1) materials. Reviewing the Thailand Order's scope language *de novo*, the Court holds that the language is ambiguous without the context provided by the (k)(1) materials. *See OMG*, 972 F.3d at 1363 (scope ambiguity determinations by Commerce receive *de novo* review). Therefore, the Court, like Commerce, must rely on the (k)(1) materials to interpret the Thailand Order's scope language. *See Mid Continent Nail Corp.*, 725 F.3d at 1302.

After reviewing the (k)(1) materials in the administrative record with the appropriate deference, the Court finds that Commerce lacks substantial evidence for its position that dual-stenciled pipe imported as line pipe is included within the Scope

---

[4] Wheatland's arguments are essentially aligned with the Government's.

of the Thailand Order; Commerce has instead unlawfully sought to expand the scope

of its original order.  First, Thailand did not produce dual-stenciled pipe at the time

of the original investigation and order, and the request was effectively withdrawn

from consideration by the petitioners themselves.  Second, the (k)(1) materials show

that the ITC made no injury determination as to dual-stenciled or mono-stenciled line

pipe from Thailand; therefore, antidumping duties cannot be imposed on those types

of pipes when imported from Thailand.  Third, Commerce and the ITC throughout

the (k)(1) materials consistently treat dual-stenciled pipe as line pipe when imported

into the United States.

The Court first will address Commerce's plain language arguments; then it will

turn to an analysis of the (k)(1) materials.[5]

### B.        The Plain Language of the Thailand Order's Scope

The original Thailand Order's scope in its entirety reads:

> The products under investigation are certain circular
> welded carbon steel pipes and tubes (referred to in this
> notice as "pipes and tubes"), also known as "standard pipe"
> or "structural tubing," which includes pipe and tube with
> an outside diameter of 0.375 inch or more but not over 16

---

[5] The Court will not discuss *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1371 (Fed. Cir. 1998) at length.  *Wheatland Tube Co.* involved an analysis of the following question:  If the language in an antidumping order's scope expressly excludes a product, but that product is then imported and used for the same purpose as the products otherwise covered by that same order, does the excluded product then fall under the scope of that antidumping order? *See Wheatland Tube Co.*, 161 F.3d at 1368-69. The answer *Wheatland Tube Co.* gave is no, it does not fall under the scope unless the scope is ambiguous and the (k)(1) materials are not dispositive. *Id.* at 1369-70.

The present case deals with an entirely different legal issue – the applicability of an antidumping order's scope to products neither expressly included in nor expressly excluded from that scope, and whether the (k)(1) materials underlying that antidumping order support by substantial evidence the reading of that scope to nevertheless include those otherwise unmentioned products.

> inches, of any wall thickness, as currently provided in
> items 610.3231, 610.3234, 610.3241, 610.3242, 610.3243,
> 610.3252, 610.3254, 610.3256, 610.3258, and 610.4925 of
> the Tariff Schedules of the United States Annotated
> (TSUSA).

*Antidumping Duty Order: Circular Welded Carbon Steel Pipes and Tubes from*

*Thailand*, 51 Fed. Reg. 8341, 8341 (Dep't of Commerce Mar. 11, 1986).

Commerce later rearranged the scope language, amended the TSUS numbers

to reflect the change to the HTSUS, and added language asserting that the HTSUS

numbers are simply examples and are not exhaustive of what might be covered by

the Thailand Order:

> The products covered by the order are certain circular
> welded carbon steel pipes and tubes from Thailand. The
> subject merchandise has an outside diameter of 0.375 inch
> or more, but not exceeding 16 inches, of any wall thickness.
> These products, which are commonly referred to in the
> industry as "standard pipe" or "structural tubing" are
> hereinafter designated as "pipes and tubes." The
> merchandise is classifiable under the Harmonized Tariff
> Schedule of the United States (HTSUS) item numbers
> 7306.30.1000, 7306.30.5025, 7306.30.5032, 7306.30.5040,
> 7306.30.5055, 7306.30.5085 and 7306.30.5090. Although
> the HTSUS subheadings are provided for convenience and
> purposes of U.S. Customs and Border Protection (CBP), the
> written description of the merchandise subject to the order
> is dispositive.

Final Scope Ruling, J.A. at 2042.

Commerce argues that the plain language of the amended Thailand Order's

scope is "not ambiguous and supports Commerce's determination that dual stenciled

pipe is within the scope of the order," and therefore the inquiry should stop there.

Def.'s Resp. at 13, ECF No. 37. Because, according to Commerce, the Thailand Order

is unambiguous, "the 'plain language of the order governs.'" *Id.* (quoting *OMG*, 972

F.3d at 1364). It is unclear, however, what language in the order Commerce believes

governs given that Commerce fails to direct the Court to specific language in the scope

that plainly subjects dual-stenciled pipe imported as line pipe to the Thailand Order.

*Id.* at 13-16.

Wheatland attempts to bolster Commerce's textual argument by asserting that

"[t]he scope covers all circular welded carbon steel pipes and tubes from Thailand

with an outside diameter of 0.375 inch or more, but not exceeding 16 inches." *See*

Def.-Int.'s Resp. at 12, ECF No. 34. Wheatland argues that, because dual-stenciled

pipe imported as line pipe possesses the same shape characteristics of the

merchandise described in the scope language, dual-stenciled pipe falls under the

scope's plain language; and no further analysis is necessary. *See id.* at 14-15.

The problem with the Defendants' analysis of the text of the scope is that the

Defendants look at the language of only one-third of the scope, isolating the language

about size and diameter from the rest of the text. The scope includes more. The

original scope also lists a set of TSUS item numbers that do not include, as all the

parties agreed, the item numbers under which dual-stenciled pipe would have been

imported in 1986.  *See* Tr. of Oral Arg. 6:12-7:3; 7:11-22, ECF No. 51, July 26, 2021

(all parties agreeing that dual-stenciled pipe would have been imported in 1986 under

TSUS item numbers that were expressly excluded from the scope of the original

antidumping order).  These item numbers, as the amended Thailand Order scope says, are not dispositive.  *See also Novosteel SA v. U.S., Bethlehem Steel Corp.*, 284 F.3d 1261, 1270 (Fed. Cir. 2002) (reasoning that absence of particular HTSUS classification number does not show exclusion of any merchandise); *Smith Corona Corp. v. United States*, 915 F.2d 683, 687 (Fed. Cir. 1990) (reasoning that reference to TSUS classification number is not dispositive); *Wirth Ltd. v. United States*, 5 F.Supp. 968, 977-78 (Ct. Int'l Trade 1998), *aff'd*, 185 F.3d 882 (Fed. Cir. 1999) ("The inclusion of various HTSUS headings in a petition ordinarily should not be interpreted to exclude merchandise determined to be within the scope of the antidumping or countervailing duty orders but classified under an HTSUS heading not listed in the petition").  Though not dispositive, their absence certainly does not provide evidence that dual-stenciled line pipe's inclusion is supported by the scope's plain language.[6]

    Reading further past the language convenient for Wheatland's argument, the scope also states that the pipes subject to the Thailand Order are "commonly referred

---

[6] Wheatland's argument that size and shape are the only relevant characteristics for classifying different kinds of pipes has also been consistently rejected by Commerce and the ITC.  For example, the ITC in 1985 called this approach "somewhat arbitrary" and did not apply it in its injury determinations, instead taking great care to distinguish between standard and line pipe.  J.A. at 1096.  During the scope inquiry that led to this case, Wheatland used this same argument again while attempting to convince Commerce to apply the Thailand Order not only to dual-stenciled line pipe but also to mono-stenciled line pipe.  J.A. at 1004-06.  Commerce rejected Wheatland's argument in its Final Scope Ruling insofar as mono-stenciled line pipe is concerned, noting as the Court does that "[t]he historical documents establish that the investigations of both Commerce and the ITC were limited to standard pipe."  J.A. at 2053.  And that "to impose AD duties, Commerce must determine that the class or kind of merchandise has been found to be sold at less than fair value, and the ITC must conclude that a domestic industry has been materially injured or threatened with material injury."  J.A. at 2053-54.

to in the industry as 'standard pipe.'" J.A. at 2042. Meaning, the scope applies not simply to circular welded pipes with a given size or shape, but rather circular welded pipes that meet the industry standards and specifications required for those pipes to qualify as "standard pipes" *and* are referred to by the industry as "standard pipes" in common usage. *Id.* But what exactly is "standard pipe," and does it include dual-stenciled pipe? The language of the scope itself is silent. Given this, the Court, like Commerce, must turn to the (k)(1) materials to resolve the ambiguity. *Id.* at 2047 (expressly determining that it must examine the (k)(1) materials to resolve the question). The Court, therefore, considers next whether, viewed with the appropriate deference, the record as a whole supports Commerce's decision with substantial evidence.

## C.     The (k)(1) Materials

The (k)(1) materials consist of "[t]he descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission." 19 C.F.R. § 351.225(k)(1). Saha argues that these materials do not support Commerce's decision to include dual-stenciled pipe imported as line pipe within the scope of the Thailand Order but rather lead to the opposite conclusion. *See* Pl.'s Mot. at 16-26, ECF No. 26. Saha supports its argument by noting that Thailand did not produce dual-stenciled pipe at the time of the order, that the original petitioners withdrew from consideration products imported under TSUS item numbers 610.3208 and 3209, and

that the ITC never made a legally required injury determination for imported Thai produced dual-stenciled pipe. *See id.* at 26. Saha also directs the Court's attention to the various sunset reviews and argues that these reviews consistently treat dual-stenciled pipe as line pipe. *See id.* at 32-34.

Commerce and Wheatland respond that the amended petition itself does not exclude dual-stenciled pipe in its language; therefore, dual-stenciled pipe is not excluded from the scope. *See* Def.'s Resp. at 20, ECF No. 37; Def.-Int.'s Resp. at 12, ECF No. 34. They also argue that the original ITC investigation only excluded line pipe and did not expressly exclude dual-stenciled pipe that receives both an ASTM standard pipe stencil and an API line pipe stencil so that any pipe with an ASTM stencil would fall within the ITC's injury determination. *See* Def.'s Resp. at 16, ECF No. 37. Finally, they assert that, when the sunset reviews emphasized that the antidumping orders under review excluded dual-stenciled pipe, "the Commission's statement was not addressing the language of each individual order but rather providing a generalized statement 'applicable to the majority of the orders, which contained explicit exclusions for dual-stenciled pipe.'" *See* Def.-Int.'s Resp. at 18, ECF No. 34 (quoting Final Scope Ruling at 15).

Without going deeply into the (k)(1) materials, one finds the following definition: "Standard pipe is [pipe that is] manufactured to American Society of Testing and Materials (ASTM) specifications." *Certain Welded Carbon Steel Pipes and Tubes from Thailand and Venezuela*, USITC Pub. 1680 at 7-8 (internal

references omitted).  With this aid, the meaning of the scope becomes clearer:  The products subject to the Thailand Order as described by its scope consist of circular welded pipes with a specific range of diameters, any wall thickness, the production and metal quality of what are commonly called "standard pipes," and that obtain an American Society of Testing and Materials stencil. *See id.*

Even this explanation of the Thailand Order's scope raises one final question: Does "standard pipe" refer only to mono-stenciled standard pipe, or does it also include dual-stenciled pipe – pipe that meets both the minimum specifications demanded by the American Society of Testing and Materials for standard pipe and has the higher quality steel and has passed the more stringent tests required to receive an American Petroleum Institute line pipe stencil?  That the scope raises this question and does not answer it means that there is an ambiguity that must be resolved, and thus a much deeper evaluation of the (k)(1) materials is necessary to understand the boundaries of the scope. After reviewing the (k)(1) materials, the Court finds that the original petition, the injury determination, and the sunset reviews do not support Commerce's final scope ruling on the Thailand Order with substantial evidence.  They instead reflect that Commerce has unlawfully expanded the scope of its original order.

i.   **Initial Investigation and Injury Determination**

In their first petition in 1985, the initial petitioners requested an investigation of pipe imported from Thailand under a variety of item numbers found in the Tariff

Schedules of the United States at the time, including item numbers 610.3208 and 3209. *See* J.A. at 1706. Dual-stenciled pipe imported as line pipe would have been imported under these numbers at the time of the original Thailand Order. *See* TSUSA 1985 Version; *see also* Tr. of Oral Arg. 7:11-22, ECF No. 51, July 26, 2021. But after Commerce sent an inquiry asking for evidence that Thailand produced such pipes, the initial petitioners decided to expressly withdraw their "petitions insofar as they concern line pipe, TSUS numbers 610.3208 and 3209." *Letter Dated March 14, 1985, from Petitioner Regarding Partial Withdrawal of Petition*, J.A. at 1781-82.

Once the initial petitioners withdrew all pipes that were importable under 610.3208 and 3209 from consideration by the ITC and Commerce, those pipes were not included in either the resulting injury investigation conducted by the ITC or the antidumping order issued by Commerce. *See Letter Dated March 14, 1985, from Petitioner Regarding Partial Withdrawal of Petition*, J.A. at 1781-82 (letter from petitioners withdrawing from their "petitions insofar as they concern line pipe, TSUS numbers 610.3208 and 3209"). Consequently, the ITC has never conducted an injury investigation, nor made an injury determination, on pipes imported from Thailand that are dual-stenciled, or obtain an API stencil, regardless of whether those pipes also have an ASTM stencil.

Commerce cannot impose a duty on a fiction. API stenciled pipes, *i.e.* line and dual-stenciled pipes, were omitted by the decision of the petitioners themselves from the ITC's original injury investigation. The parties have also admitted that Thailand

*did not produce* line pipes, dual-stenciled or otherwise, at the time the ITC conducted its injury investigation. Tr. of Oral Arg. 6:12-16, 7:1-3, ECF No. 51, July 26, 2021.  It is well settled that Commerce cannot "assess antidumping duties on products intentionally omitted from the ITC's injury investigation." *Wheatland Tube Co.*, 161 F.3d at 1371.  Allowing Commerce to assess such duties without an injury determination "would itself frustrate the purpose of the antidumping laws." *Id.* And finding that the ITC determined a product that did not yet exist somehow injured domestic industry would frustrate common sense.

Since their initial omission from the original injury investigation, the ITC has conducted no subsequent injury investigation to determine whether API stenciled pipe from Thailand injures a domestic industry.  Given that it is "a fundamental requirement" in our law "that an antidumping duty order must be supported by an ITC determination of material injury covering the merchandise in question," the lack of such an injury determination for API stenciled pipes is fatal to Commerce's case. *See Wheatland Tube Co.*, 973 F. Supp. at 158, *aff'd*, 161 F.3d 1365 (Fed. Cir. 1998).

It is worthwhile to note that, when the ITC conducted its injury investigation of domestic industries affected by pipes imported from Thailand, the ITC's preliminary report on the subject addressed the injury caused to domestic industries by not only standard pipes imported from Thailand but also the injury caused by imported standard and line pipes from Venezuela. *See Certain Welded Carbon Steel Pipes and Tubes from Thailand and Venezuela,* Inv. Nos. 701-TA-242 and 731-TA-

252 and 253 (Preliminary), USITC Pub. 1680 (April 1985). In that report, the ITC emphasized that imported standard pipe and line pipe affect separate industries and are different products. At every point, it was careful to not conflate line pipe and standard pipe when discussing imports from Thailand. *See id.* at 7-8.

The same holds true for the ITC Final Determination. J.A. at 1221.  The ITC did not include line pipe or dual-stenciled pipe imported as line pipe within the description of the investigation's scope into Thailand circular welded pipes. *See Circular Welded Carbon Steel Pipes and Tubes from Thailand; Final Determination of Sales at Less Than Fair Value*, 51 Fed. Reg. 8384 (Jan. 27, 1986).  The only discussion of line pipe appears in the sections of the report addressing Turkish imports, and the Commissioners were cautious even in their section headings to use "line pipe" only in conjunction with Turkey. *See, e.g.*, ITC Final Determination, J.A. at 1244-45 (differentiating among "standard pipe imports from Thailand," "standard pipe imports from Turkey," and "line pipe imports from Turkey").

Most notably, the only conflation of standard pipe and line pipe came from the two Commissioners in *dissent*. *Id.* at 1263-83 (dissenting views of Vice Chairman Liebeler and Commissioner Brunsdale).  Commissioner Brunsdale thought that the Commission should not separate its analysis of standard pipes and line pipes but should instead consider them as one product to be analyzed together.[7]  *Id.* at 1281.

---

[7] Interestingly, the dissent found that, if viewed as one product instead of two, there would be no harm to domestic producers.  Thus, the dissent wished to conflate line pipe and standard pipe to block the

That this view was in dissent further points to the lack of evidence of *any* harm finding from the ITC regarding the importation of line pipe, including dual-stenciled line pipe, from Thailand.  With no harm determination from the ITC, Commerce lacks legal authority to impose duties on dual-stenciled pipe.  *See Wheatland Tube Co.*, 161 F.3d at 1371.

### ii.   Sunset Reviews

Although a finding that the ITC's injury determination did not cover dual-stenciled pipe is sufficient to overturn Commerce's scope determination, the ITC's sunset reviews reinforce the Court's finding that dual-stenciled, or API stenciled pipe of any kind, was not included in the Thailand Order's scope. *See Quiedan Co.*, 294 F.Supp.3d 1345, 1351-53 (including sunset reviews among the (k)(1) materials), *aff'd*, 927 F.3d 1328 (Fed. Cir. 2019).  Every sunset review of the Thailand Order treats dual-stenciled pipe as line pipe.  For example, the first two sunset reviews did not find that dual-stenciled pipe imported from any country affected the domestic standard pipe industry. *See First Sunset Review* (makes no findings as to whether dual-stenciled pipe imported as line pipe affects the domestic standard pipe industry); *see also Second Sunset Review* at 13 n.66. Additionally, when the first two sunset reviews discussed duties on dual-stenciled pipe from countries that produced it at the time, it was solely in the context of President Clinton's safeguard duties on line pipe.

---

imposition of tariffs on either type of pipe.  ITC Final Determination, J.A. 1281. Nearly forty years later, Commerce wants to conflate the two types of pipe to achieve the exact opposite result.

The ITC consistently understood those duties to apply to dual-stenciled pipe, not just mono-stenciled line pipe, and *not to apply* to standard pipe. *First Sunset Review* at 28 ("In the case of Korea…until safeguard duties on line pipe went into effect on March 1, 2000, they enjoyed unlimited access to the U.S. CWP market by exporting dual-stenciled line pipe"); *Second Sunset Review* at Overview-5 n.1 ("Following an affirmative determination by the Commission, in March 2000, President Clinton issued Proclamation 7274, imposing additional duties of 19 percent on line pipe imports of more than 9,000 short tons annually (including "dual-stenciled" pipe but excluding "arctic grade" line pipe).").  If dual-stenciled pipe is standard pipe and is only excluded from antidumping orders on standard pipe when it is expressly excluded in the language of those orders' scopes, then dual-stenciled pipe would have fallen under neither the antidumping orders that excluded it nor the safeguard duties imposed by President Clinton that covered line pipe. But dual-stenciled pipe *was* treated as falling under the safeguard duties imposed by President Clinton, even though the proclamation only mentions "line pipe."  *Id.*

The *Second Sunset Review* also expressly rejected the argument that dual or multiple-stenciled pipe affected the same industry as standard pipe.  The review found that "multiple-stenciled line pipe requires additional steel than CWP to meet American Petroleum Institute (API) specifications applicable to line pipe. At [then] current steel prices, this would require that a multiple-stenciled product be sold at a

considerable price premium over a product that satisfies ASTM specifications but not API specifications." *Second Sunset Review* at 13 n.66.

Consistent with the first two sunset reviews, the *Third* and *Fourth Sunset Reviews* also treat dual-stenciled pipe as line pipe.  The *Fourth Sunset Review* states in its scope that "[d]ual-stenciled pipe, which enters as line pipe under a different subheading of the Harmonized Tariff Schedule of the United States ("HTS") for U.S. customs purposes, is not within the scope of the orders."  *Fourth Sunset Review* at 6-7.  The *Third Sunset Review's* language is largely identical. *See Third Sunset Review* at 8.  Both statements are unqualified and give no indication that the scope language does not apply to the Thailand Order. Commerce's argument that the language in these sunset reviews only applied to dual-stenciled pipe imported from every country other than Thailand is not persuasive. The language of the third and fourth reviews is unqualified and consistent with the treatment of dual-stenciled pipe, or API stenciled pipe, at each stage of the administrative process. *Cf., e.g.*, ITC Final Determination at J.A. 1233-34 (differentiating among "standard pipe imports from Thailand," "standard pipe imports from Turkey," and "line pipe imports from Turkey").

No review, original or sunset, has determined that dual-stenciled or API stenciled pipe from Thailand injures a domestic industry. Given that when a "domestic industry is not injured, it cannot avail itself of the relief accorded under

the antidumping statute," Commerce's expansion of the Thailand Order's scope is

unlawful. *Badger-Powhatan*, 608 F. Supp. at 657.

### iii.    The Defendants' Letters to the Court

In response to an invitation extended at oral argument, the Government and

Wheatland did provide isolated examples of dual-stenciled pipe being referred to as

standard pipe within the record. But these quotes came from documents that the

Government and Wheatland themselves argue are irrelevant and not (k)(1)

materials. *See* Def.'s Resp. at 18-20, ECF No. 37; and Def.-Int.'s Resp. at 21, ECF No.

34. The Court agrees with the Defendants.

The (k)(1) materials consist of "[t]he descriptions of the merchandise contained

in the petition, the initial investigation, and the determinations of the Secretary

(including prior scope determinations) and the Commission."). 19 C.F.R. §

351.225(k)(1). The interpretive canon *noscitur a sociis* is relevant here. This canon

holds that "words grouped in a list should be given related meanings." *Third Nat'l*

*Bank in Nashville v. Impac Ltd.*, 432 U.S. 312, 322 (1977). The regulation 19 C.F.R.

§ 351.225(k)(1) first lists among the (k)(1) materials "*the* petition," and "*the* initial

investigation." (emphasis added). This indicates that the relevant petition and initial

investigation are the ones related to the antidumping order at hand, in this case the

Thailand Order. The identical use of the definitive article for "*the* determinations by

the Secretary . . . and the Commission" in 19 C.F.R. § 351.225(k)(1) indicates that the

references to the determinations by the Secretary and Commission are references to

determinations that resulted from "*the* petition" and "*the* initial investigation."  In this case, that is the Thailand Order.  Thus, the Government and Wheatland's appeal to language in other countries' orders is unavailing.

Even were one to consider the language proffered by the Government and Wheatland, it remains true that, after an exhaustive search and a further opportunity provided by the Court, neither has found a single instance of dual-stenciled pipe being referenced as "standard pipe" throughout the entire history of the Thailand Order and the sunset reviews of *that* order.  That fact damns the strongest.  From 1985 until 2020, there is no record evidence of dual-stenciled pipe being considered as standard pipe for purposes of the Thailand Order.  Evidence from other proceedings should not overrule the consistent import of the record of the order actually at issue.  Here, the absence of evidence is indeed evidence of absence.  Substantial evidence does not support the Commerce Department's scope determination.  *See* 19 U.S.C. § 1516a(b)(1)(B)(i) (requiring the Court to "hold unlawful any determination" that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law"); *see also Universal Camera Corp.*, 340 U.S. at 488 ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").

## CONCLUSION

The Court finds that Commerce's determination is both unsupported by substantial evidence and not issued in accordance with the law.  No Thai

manufacturer produced dual-stenciled pipe imported as line pipe at the time of the order; therefore, dual-stenciled pipe could not have been included within the scope. Tr. of Oral Arg. 5:24-25, 6:12-16, 7:1-3, ECF No. 51, July 26, 2021. The initial petitioners expressly withdrew from Commerce and the ITC's consideration the item numbers under which dual-stenciled pipe would have been imported. *Letter Dated March 14, 1985, from Petitioner Regarding Partial Withdrawal of Petition*, J.A. at 1781-82. There has been no injury determination as required by 19 U.S.C. § 1673 and case law. *See Badger-Powhatan*, 608 F. Supp. at 657 ("Where the domestic industry is not injured, it cannot avail itself of the relief accorded under the antidumping statute"). The ITC has not included dual-stenciled pipe imported as line pipe in any injury determination concerning pipe imported from Thailand. And for nearly four decades, the ITC has treated dual-stenciled pipe as line pipe and has noted in the relevant sunset reviews the exclusion of dual-stenciled pipe imported as line pipe from the scope of the orders imposing duties on standard pipes.

For the foregoing reasons, this matter is remanded for Commerce to conduct an analysis that considers the sources listed in 19 C.F.R. § 351.225(k)(1) in assessing whether dual-stenciled pipe falls within the scope of the Thailand Order, and it shall do so in compliance with the reasoning in this Opinion and Order. Commerce may not assess tariffs on any item absent an injury determination from the ITC. This Opinion and Order in no way disturbs Commerce's finding that mono-stenciled line pipe is outside the scope of the Thailand Order.

Thus, on consideration of the Plaintiff's Motion for Judgment on the Agency Record and all papers and proceedings had in relation to this matter, and on due deliberation, it is hereby:

**ORDERED** that Plaintiff's motion for judgment on the agency record is **GRANTED**;

**ORDERED** that Commerce, within 90 days from the date of issuance of this Opinion and Order, shall submit a Remand Redetermination in compliance with this Opinion and Order;

**ORDERED** that Defendant shall supplement the administrative record with all documents considered by Commerce in reaching its decision in the Remand Redetermination;

**ORDERED** that Plaintiff shall have 30 days from the filing of the Remand Redetermination to submit comments to the Court; and

**ORDERED** that Defendant and Defendant-Intervenor shall have 15 days from the date of Plaintiff's filing of comments to submit a reply.

/s/      Stephen Alexander Vaden
Stephen Alexander Vaden, Judge

Dated: October 6, 2021
         New York, New York